# EXHIBIT D

Case 1:19-cv-00001-GTS-ATB    Document 37-4    Filed 03/26/19    Page 2 of 79
Case 1:16-cv-11963-MLW    Document 89    Filed 10/13/17    Page 1 of 78

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


MICHAEL GARBOWSKI and STEPHEN          )
BUSHANSKY, On Behalf of Themselves     )
and All Others Similarly Situated,     )
                                       ) Civil Action
                    Plaintiffs,        ) 16-CV-11963-MLW
                                       )
v.                                     )
TOKAI PHARMACEUTICALS, INC.,           )
JODIE POPE MORRISON, LEE H.            )
KALOWSKI, SETH L. HARRISON,            )
TIMOTHY J. BARBERICH, DAVID A.         )
KESSLER, JOSEPH A. YANCHIK, III,       )
BMO CAPITAL MARKETS CORP.,             )
STIFEL, NICOLAUS & COMPANY,            )
INCORPORATED, WILLIAM BLAIR &          )
COMPANY, L.L.C., and, JANNEY           )
MONTGOMERY SCOTT LLC,                  )
                                       )
                    Defendants.        )


BEFORE THE HONORABLE MARK L. WOLF
UNITED STATES DISTRICT JUDGE

MOTION HEARING

October 10, 2017
1:15 p.m.


John J. Moakley United States Courthouse
Courtroom No. 10
One Courthouse Way
Boston, Massachusetts  02210


Kelly Mortellite, RMR, CRR
Official Court Reporter
John J. Moakley United States Courthouse
One Courthouse Way, Room 5200
Boston, Massachusetts  02210
mortellite@gmail.com

APPEARANCES:

ALL COUNSEL PARTICIPATED VIA TELECONFERENCE

Counsel on behalf of Plaintiff Hao Wu:
Mary K. Blasy
Robbins Geller Rudman & Dowd LLP
58 South Service Road, Suite 200
Melville, New York 11747
(631) 367-7100
mblasy@rgrdlaw.com

Counsel on behalf of Plaintiff Steven Maxon:
J. Alexander Hood
Pomerantz LLP
600 Third Avenue
20th Floor
New York, NY 10016
(212) 661-1100
ahood@pomlaw.com

Counsel on behalf of Plaintiff Peter Angelos:
Charles R. Jacob, III
Miller & Wrubel, P.C.
570 Lexington Avenue
New York, NY 10022
(212) 336-3500
cjacob@mw-law.com

(continued on next page)

Case 1:19-cv-00001-GTS-ATB   Document 37-4   Filed 03/26/19   Page 4 of 79
Case 1:16-cv-11963-MLW   Document 89   Filed 10/13/17   Page 3 of 78

3

APPEARANCES:  (Continued.)

On Behalf of Defendant Tokai Pharmaceuticals:
Boris Feldman
Wilson Sonsini Goodrich & Rosati
650 Page Mill Road
Palo Alto, CA 94304-1050
650-858-4444
boris.feldman@wsgr.com

Gideon A. Schor
Wilson Sonsini Goodrich & Rosati
1301 Avenue of the Americas
40th Floor
New York, NY 10019-6022
212-999-5800
gschor@wsgr.com

Michael J. Pineault
Clements & Pineault, LLP
24 Federal Street
Boston, MA 02110
857-445-0135
mpineault@clementspineault.com

Counsel on behalf of Defendants BMO Capital Markets Corp.,
Stifel Nicolaus & Company, Incorporated, William Blaine
Company, LLC and Janney Montgomery Scott LLC:
Charlene Sachi Shimada
Morgan Lewis & Bockius LLP
One Market
Spear Tower
San Francisco, CA 94105
415-442-1475
charlene.shimada@morganlewis.com

P R O C E E D I N G S

(The following proceedings were held in the lobby of Hon. Mark L. Wolf.)

THE COURT:  Good morning.  This is Judge Wolf with the deputy clerk, Ms. Bono, my law clerk and the stenographer.  Could you tell me, please, starting with the lawyers for the plaintiff, who we have on the phone?

MR. MAXON:  This is Steve Maxon Djibouti.

THE COURT:  All right.  And the lawyer --

MR. HOOD:  Your Honor, good morning.  This is Alexander Hood from the Pomerantz firm on behalf of Mr. Maxon.

MS. BLASY:  Your Honor, this is Mary Blasy from the Robbins Geller firm on behalf of Ms. Wu.

MR. JACOB:  Good morning, Your Honor.  This is Charles Jacob, Miller & Wrubel, representing plaintiff Peter Angelos in the related case.

THE COURT:  Sorry.  Could you hold on.  Hold on. Stop.  This is not working too well.  Who spoke after Ms. Blasy?

MR. JACOB:  Good morning, Your Honor.  Charles Jacob for plaintiff Peter Angelos in the related case.

THE COURT:  Okay.  Go ahead.  Who else is there?

Are there other -- there must be other counsel on the phone.

MR. FELDMAN:  Your Honor, good morning.  It's Boris

Feldman for Tokai.

MR. SCHOR: Your Honor, Gideon Schor for Tokai as well.

MR. PINEAULT: Michael Pineault for Tokai.

THE COURT: All right.

MS. SCHIMADA: Good morning, Your Honor. This is Charlene Shimada from Morgan Lewis Bockius on behalf of the underwriter.

THE COURT: Oh, yes. All right. Mr. Lieberman is not on the phone?

MR. HOOD: Your Honor, Mr. Lieberman may have been detained, but he will join us shortly. This is Alexander Hood.

THE COURT: Mr. Lieberman is seeking to be appointed lead counsel in the case. Isn't he?

MR. HOOD: Yes, Your Honor, that's correct.

THE COURT: And I just realized I probably have lawyers in Silicon Valley who are doing this at 7:30 in the morning. But where are you located? Where is Mr. Lieberman located, New York?

MR. HOOD: I believe Mr. Lieberman is currently in New York, Your Honor.

THE COURT: It's 10:30 in the morning.

All right. We're here pursuant to my September 28, 2017 order which is docket number 80. This is a continuation of the hearing on September 28 regarding Mr. Maxon's motion to

be appointed lead plaintiff and to have Pomerantz appointed as class counsel.  In response to my order, I have received a declaration of Mr. Hood, docket 84, which transmitted a declaration from Mr. Maxon and a declaration from Mr. Schall.

Is Mr. Schall on the phone?

MR. SCHALL:  Yes, Your Honor.

THE COURT:  Okay.  And a memo in further support of the motion of Steven Maxon for appointment as lead plaintiff and approval of counsel.

So as I indicated at the September 28 hearing and in the order, there are questions I'd like to ask Mr. Maxon and Mr. Schall and Mr. Lieberman relating to the pending motion. Mr. Maxon and Mr. Schall, I'm going to put you each under oath.

Okay.  Mr. Maxon, do you solemnly swear that the answers that you're about to give, the statements you're going to make today shall be the truth, the whole truth and nothing but the truth, so help you God?

MR. MAXON:  Yes, Your Honor.

THE COURT:  And Mr. Schall, do you also solemnly swear that the answers and statements you make today shall be the truth, the whole truth and nothing but the truth, so help you God?

MR. SCHALL:  Yes, yes, Your Honor.

THE COURT:  And do you each understand that making an intentional false statement would be a prosecutable criminal

offense?  Mr. Maxon?

MR. MAXON:  Yes.  I understand, Your Honor.

THE COURT:  And Mr. Schall, do you understand?

MR. SCHALL:  Yes, Your Honor.

THE COURT:  Okay.  Mr. Maxon, let me -- do you have a copy of -- did somebody just join the telephone call?  It sounded like it.

Mr. Maxon, do you have a copy of the document called Plaintiff's Certification?  It was Exhibit B in connection with the motion to appoint you as lead plaintiff that was filed in December 2016.  Do you have a copy of that?

MR. MAXON:  Yes, I do.  Yes, I have a copy, Your Honor.

THE COURT:  Thank you.  And do you also have a copy of the recent affidavit -- the affidavit that you submitted?  It's called Declaration in Support of Motion For Consolidation, and it was filed October 5 of this year.  Do you have that one?

MR. MAXON:  Yes, I do have a copy in front of me, yes, Your Honor.

THE COURT:  Thank you.  Where are you now?

MR. MAXON:  I'm located in Djibouti, Republic of Djibouti, United States military base.

THE COURT:  Okay.  And what time is it there?

MR. MAXON:  The time is 5:40.

THE COURT:  In the afternoon?

Case 1:19-cv-00001-GTS-ATB   Document 37-4   Filed 03/26/19   Page 9 of 79
Case 1:10-cv-11963-MLW   Document 89   Filed 10/13/17   Page 8 of 78

8

MR. MAXON:  In the evening.

THE COURT:  Okay.  And on September 28, you listened to part and answered some questions at the outset of the hearing I was conducting in this case.  Do you recall that?

MR. MAXON:  That is correct, yes, Your Honor.

THE COURT:  And after I took a break, deciding certain motions, I turned to issues that related to you, and you were no longer on the phone.  Why was that?

MR. MAXON:  The connection dropped.  I could hardly hear anything.  It was a bad audio connection.

THE COURT:  Have you done something to get a better audio connection today?

MR. MAXON:  Yes.  I'm using a military phone, DNS line.

THE COURT:  Is that something to which you have regular access or will have access --

MR. MAXON:  Yes.  I have access 24/7.

THE COURT:  Okay.  Because I can hear you pretty well today.  Can you hear me well?

MR. MAXON:  Yes, excellent.  Very good.

THE COURT:  Thank you.

MR. MAXON:  Very well.

THE COURT:  All right.  I have an obligation to determine certain things that I've discussed with the lawyers but with regard to whether you're an appropriate representative

of the possible class in this case.  So how did you learn about this dispute, potential class action against Tokai, please?

MR. MAXON:  Well, originally I was following the Stage III study that was going global by the drug company.  And then shortly after that, I read the press release that they could not meet their endpoints on the Yahoo financial page and other financial websites.  And shortly after that, the different notices from different law firms started to appear after the stock dropped to under one dollar because of the failure of the Stage III.  And then I started researching different law firms that were offering their services on the websites.

THE COURT:  I should have asked you something else first.  Can you tell me what your background is, please?

MR. MAXON:  I work in a classified position for the -- I'm a contractor for the United States Department of Defense and I'm in charge of all IT services for the military base, and I've done that for the past 20 years.  I've been stationed out here for the past eight years, and I'm a United States Navy veteran.

THE COURT:  And what background do you have, if any, with regard to investing?

MR. MAXON:  I retained a Merrill Lynch wealth management account for over six years with my own personal investment counselor who guided me through my 401(k) investments and other investments through the Bank of America.

Case 1:19-cv-00001-GTS-ATB   Document 37-4   Filed 03/26/19   Page 11 of 79
Case 1:10-cv-11963-MLW   Document 89   Filed 10/13/17   Page 10 of 78

10

So I was a wealth management client.  And I also had my own Merrill Lynch trading account which I still retain, and I still trade on that account.

THE COURT:  And --

MR. MAXON:  So what -- go ahead.

THE COURT:  No. You go ahead.  Keep going.

MR. MAXON:  So basically I look for stocks that I think are going to be good products for new classes of drugs.  In this case this was a fast track drug that I researched that had FDA for approval for fast track, and it looked like it was a good fit in the market compared to the two drugs that were already out there.  So I did my homework on that.  And then I entered into the trade once the IPO was launched, and I continued to follow it for the next two years closely.

THE COURT:  When you say you entered into the trade after the IPO was launched --

MR. MAXON:  Yes.  I bought -- I first bought -- they had the IPO, which I believe was in September/October of 2014.

THE COURT:  Okay.  And so you're telling me that you were following developments with regard to the Tokai stock on Yahoo and other sites.  And what did you see there that's relevant to this case?

MR. MAXON:  Well, there was different law firms asking for people who had invested over a certain amount of money, I believe it was 100,000 at that time, to contact the law firm in

regards to a class action lawsuit.

THE COURT:  And what if anything did you do after reading those notices?

MR. MAXON:  I contacted Brian Schall at Goldberg Law, and we started exchanging e-mails.  Overall I think we've exchanged between 14 and 20 e-mails.  And they responded very quickly.  And the first part was just to get the basic information on my trades from my Merrill Lynch account, which I sent him a copy of that, and then we continued from there.

THE COURT:  Do you know what date you sent him that information?

MR. MAXON:  I don't have the exact date.  I would say it was within a couple of weeks of the press release that came out from Tokai saying they weren't going to meet the endpoints, around that time period.

THE COURT:  I see.  Let me ask you this.  Did Mr. Hood or somebody else send you all the submissions that were made in response to my September 28 order, one of which was your declaration and another was Brian Schall's declaration or affidavit?

MR. MAXON:  No.  The only two documents I have were the Exhibit A and Exhibit B, which just has my stock purchases listed on it.

THE COURT:  And in Mr. Schall's affidavit he says, "On September 26, 2016 I contacted Mr. Maxon via e-mail requesting

that he provide documents reflecting his transaction history in Tokai securities.  Mr. Maxon promptly responded and provided the documents requested."

MR. MAXON:  Right, right, that is correct.  I might have said 2014, but I was mistaken.  That's when the IPO came out.  So the stock collapsed right around those dates, September of 2016, that is correct.

THE COURT:  Was it by e-mail that Mr. Maxon asked you to provide documents reflecting your transaction history in Tokai, as he said in his affidavit?

MR. MAXON:  Yes.  When they originally contacted me, there was just a form I filled out on the website, and then they e-mailed me and asked me to send a copy of my Merrill Lynch trades on Tokai, which I did.

THE COURT:  Okay.  And did you in some way sign that form that was on the website?

MR. MAXON:  Yes, yes.  They would represent me and that I wasn't dealing with any other firms, except them.

THE COURT:  That was the form?

MR. MAXON:  I believe so, yes, to the best of my knowledge.

THE COURT:  Do you have a copy of that?  Do you have a copy of that?

MR. MAXON:  I don't have a copy in front of me.  The law firm, Goldberg Law, would probably have that copy.

THE COURT:  Let's go to Exhibit -- it should say Exhibit B on the first page.  It's docket number 30-2.  It says Plaintiff's Certification.  Do you have that in front of you?

MR. MAXON:  Yes, I do, Your Honor.

THE COURT:  And it says, "I, Steven Maxon, certify" at the top.  Do you see that?

MR. MAXON:  Correct, yes.  Yes, it does.

THE COURT:  And at the bottom it says, "I declare, under penalty of perjury, that the foregoing is true and correct"?

MR. MAXON:  Yes, that is correct.

THE COURT:  And then is that your signature on the bottom of the page?

MR. MAXON:  I believe that's an electronic signature.

THE COURT:  What do you mean by "an electronic signature"?

MR. MAXON:  Sometimes on these documents you can sign it digitally and it just creates a signature for you.  It's something similar that we do in the military.

THE COURT:  Well, this is somewhat problematic because I can't put the document up on a screen to make sure that we're talking about the same document.  Is the signature you're looking at typed, or does it appear to be written in some fashion?

MR. MAXON:  It appears to be written.

Case 1:19-cv-00001-GTS-ATB   Document 37-4   Filed 03/26/19   Page 15 of 79
Case 1:10-cv-11963-MLW   Document 89   Filed 10/13/17   Page 14 of 78

14

THE COURT:  And does it have -- do you remember how you signed it?

MR. MAXON:  I believe I signed it and then I e-mailed it in to the law firm.  I scanned it and e-mailed it.

THE COURT:  Does the signature you have have a bunch of lines going out from the letters up to the left?

MR. MAXON:  Yes, it does.

THE COURT:  It does?

MR. MAXON:  Yes, correct.

THE COURT:  Was it like that when you signed it?

MR. MAXON:  I don't believe so, no.  Not with the lines.  It was a straight signature.

THE COURT:  And does this look like -- I mean, the only experience I have with this technology is sometimes I give my credit card and I have to sign something with my finger or stylus.

MR. MAXON:  Exactly.

THE COURT:  Is that how you signed?

MR. MAXON:  I don't know exactly how it was generated, but that's what it appeared to be like, like when you sign a credit card.

THE COURT:  Right.

MR. MAXON:  When you check out with a credit card, it kind of does a simulation of your signature.

THE COURT:  Yeah.  And you see that this is dated

Case 1:19-cv-00001-GTS-ATB   Document 37-4   Filed 03/26/19   Page 16 of 79
Case 1:10-cv-11963-MLW   Document 89   Filed 10/13/17   Page 16 of 78

15

8-3-2016, August 3, 2016?

MR. MAXON:  Yes.

THE COURT:  Is that the date on which you signed it?

MR. MAXON:  I believe so.  I don't have all the exact dates.

THE COURT:  Well --

MR. MAXON:  To the best of my knowledge I believe it's correct.

THE COURT:  And you signed this document under the pains and penalties of perjury, right?

MR. MAXON:  That is correct.

THE COURT:  And you read it -- did you read it before you signed it?

MR. MAXON:  Yeah, I've read both of these documents.

THE COURT:  Did you read it before you signed it?

MR. MAXON:  Yes.

THE COURT:  And was it dated 8-3-2016 when you signed it?

MR. MAXON:  I don't have the original copy in front of me.  I just have the one from it the law office.

THE COURT:  Is there a typed date that says, "Dated 8-3-2016?"

MR. MAXON:  Yes, that's correct.

THE COURT:  Was that on there when you signed it?

MR. MAXON:  I don't recall if that date was on there.

16

THE COURT: Do you know what date you signed this?

MR. MAXON: I believe the one declaration I signed last week -- yeah, October 4. That's the one I signed. This other one looks like it's a generated signature.

THE COURT: But I want to know whether you signed it.

MR. MAXON: Not physically, no. It looks like it's generated, like you see on a credit card.

THE COURT: But was it generated by you?

MR. MAXON: Not to my knowledge, no.

THE COURT: Not -- okay. So you're not --

MR. MAXON: I have to see if I can -- go ahead.

THE COURT: Well, look, this says "Plaintiff's Certification. I, Steven Maxon, certify" to six things, and at the bottom it says, "I declare under penalty of perjury that the foregoing is true and correct." And then there's what appears to be -- well, then it says, "Steve Maxon" or maybe "Steven Maxon" on the bottom. Do you see that? And I want to know whether you're the one who affixed that signature.

MR. MAXON: Yeah. I've just got to check my file here and see if this is the correct document. I don't have the second document with me, so.

THE COURT: What do you mean, "the second document"?

MR. MAXON: Plaintiff's Certification.

THE COURT: You don't have that?

MR. MAXON: No. I have that one in front of me, but

that's not my signature.  It's just a generated signature.

THE COURT:  But did you put it on there?

MR. MAXON:  Not to my knowledge, no.  I think it was generated somehow.

THE COURT:  When is the first time you saw this document?

MR. MAXON:  It could have been last week.  I don't have the copy of the other document that I signed.  I think that was a different document.

THE COURT:  Well, hold on a second.  You don't have a copy of the document that was filed with me 10/5/2017?  It's our docket number 84-1.  It's your affidavit dated October 4, 2017.  You don't have that in front of you?

MR. MAXON:  I have the Declaration in Support For Motion of a Consolidation, which I signed on --

THE COURT:  October 4?

MR. MAXON:  -- October 4, 2017.  Well, this one was probably the one on the website when I signed it.

THE COURT:  Well, did you sign it?

MR. MAXON:  Yeah, right.  This is the one that creates -- I'm sorry.  I remember now.  This is the one that, when you go to the website it creates that signature, kind of like you said when you do your credit card.  That is correct. I was reading the wrong date here.  So that's how that was generated.

THE COURT:  All right.

MR. MAXON:  By my saying this will be an electronic signature, and then I submitted it to the law firm on their website, to the best of my knowledge.

THE COURT:  Did you have any discussions with anybody before you signed it?

MR. MAXON:  No.  It was a straightforward form that you have to sign in order for them to go forward with your case.

THE COURT:  Did you speak with Mr. Schall or anybody else at the Goldberg Law Firm before you signed this document?

MR. MAXON:  No, I don't believe so.

THE COURT:  Did you read anything before you signed it?

MR. MAXON:  The only thing I read was that I had to sign this document in order to go forward with the class action suit.

THE COURT:  Did you read the proposed complaint before you signed it?

MR. MAXON:  Proposed complaint?

THE COURT:  Right.  Let me ask you this.  Do you know what a complaint is in this context?

MR. MAXON:  No.

THE COURT:  Do you know the name of a document that initiates a lawsuit, what it's called?

MR. MAXON:  You mean for the class action?

THE COURT:  Any lawsuit.

MR. MAXON:  I'm not sure, no.

THE COURT:  All right.  So you've got that document in front of you.  We had marked this as Exhibit A at the last hearing.  I'll make it Exhibit A of this one.

MR. MAXON:  Yes.

THE COURT:  You see it says at the top "Plaintiff'S Certification," correct?

MR. MAXON:  Yes.

THE COURT:  It says, "I, Steven Maxon, do certify that, 1, plaintiff has" -- do you know who the plaintiff is in this context?

MR. MAXON:  That's me.

THE COURT:  Okay.  It says, "1, plaintiff has reviewed the complaint and authorized its filing."

MR. MAXON:  Right.  Everything on this certification is correct, that I authorized this filing.

THE COURT:  Excuse me.  This is dated August 3, 2016.  Do you see that on the bottom?

MR. MAXON:  Yes.

THE COURT:  And you told me you signed this on August 3, 2016.  Actually, did you sign this on August -- I've asked you this several times, but I'll ask you again.  Did you sign this on August 3, 2016?

Case 1:18-cv-00001-GTS-ATB   Document 37-4   Filed 03/26/19   Page 21 of 79
Case 1:16-cv-11963-MLW   Document 89   Filed 10/13/17   Page 20 of 78

20

MR. MAXON:  I believe so, if this was the document that was on their website.  If it wasn't the document on their website, then I didn't sign it.  So I'm confused on that piece.

THE COURT:  Well, you just told me that you hadn't read anything before you signed this document and you didn't know what a complaint was.  Do you recall saying those two things a few moments ago?

MR. MAXON:  That is correct.

THE COURT:  All right.  In paragraph one you say, "Plaintiff," who you understand is you, "has reviewed the complaint."  If you didn't read anything before you signed this and don't know what a complaint is, why is that statement correct; or is it incorrect?

MR. MAXON:  I don't have an answer for that.  This is -- my signature is -- I can't guarantee that this was generated by me.  This was done on their web page.

THE COURT:  Well, I'll ask Mr. Schall some questions eventually.  Have you ever participated in any way in a lawsuit before?

MR. MAXON:  Yeah, yes, I have.

THE COURT:  Once or more than once?

MR. MAXON:  Once.

THE COURT:  What case was that?

MR. MAXON:  It was a case for some commissions that was due to me quite a while ago in New York City.

THE COURT:  So that was an individual case, not a class action; is that correct?

MR. MAXON:  That is correct, yes.  Yes, Your Honor.

THE COURT:  I asked you this before, but did you read this Plaintiff's Certification before you signed it on the bottom?

MR. MAXON:  I'm not 100 percent familiar with this document, and I can't guarantee that that's my signature, that I signed this document --

THE COURT:  You've never --

MR. MAXON:  -- or when I did.

THE COURT:  And when is the first time you saw this document to your memory?

MR. MAXON:  If this was the one on their website, it would have been right around this date when I first signed up to have them represent me, but they would have to let me know if this was the one from their website, the law firm.

THE COURT:  Well, not right this minute, yet.

Did the lawyers send you a copy of this document at some point?

MR. MAXON:  The Plaintiff's Certification, no.  The other one they did, the declaration, yes.

THE COURT:  Well, how do you happen to have it in front of you if the lawyers didn't send it to you?

MR. MAXON:  No.  They sent me the Plaintiff's

Certification.

THE COURT:  That's what I'm asking you.  When did they send it to you?

MR. MAXON:  Today.

THE COURT:  Today?

MR. MAXON:  Yes.

THE COURT:  Was it with an e-mail from my deputy clerk, Ms. Bono?

MR. MAXON:  Mr. Hood had sent it to me.

THE COURT:  Yeah.  Mr. Hood, did you forward this document to Mr. Maxon today after the deputy clerk sent it to your office at my direction?

MR. HOOD:  Yes, Your Honor.  I don't know offhand whether anyone in my office would have sent him those documents earlier than today.  But yes, I did forward those this morning, yes.

THE COURT:  Yes, I did direct at the September 28 hearing that he have it, and I thought it was out of an abundance of caution that I was reminding you of that.  This would have been an impossible discussion to have if Mr. Maxon didn't have the documents.

All right.  Mr. Maxon?

MR. MAXON:  Yes.

THE COURT:  It says in paragraph 4, "Plaintiff's transactions in the security that is the subject of the

complaint during the class period specified in the complaint are as follows."  And then there's a black box.  Written in the black box in white lettering "See attached."  Do you see that.

MR. MAXON:  Correct.

THE COURT:  Was that black box on the document when you read and signed this on August 3, 2016?

MR. MAXON:  I don't recall it.

THE COURT:  You don't recall it being there; is that correct?

MR. MAXON:  That is correct, but this is the information that I had.  If they're referring to the Merrill Lynch printout, which is the attachment, I believe, that's what I sent them.

THE COURT:  That's what you sent them in response to the e-mail from Mr. Schall requesting it?

MR. MAXON:  Yes, it was a copy of my Merrill Lynch trades.

THE COURT:  But did you send that -- here.  You don't have -- I think you told me that you don't have Mr. Schall's declaration.

MR. MAXON:  Pardon me?

THE COURT:  You told me you don't have the affidavit of Brian Schall filed on October 5, 2017, correct?

MR. MAXON:  That is correct.

THE COURT:  The lawyers didn't send that to you?  Did

the lawyers send --

MR. MAXON:  I don't believe so, no.

THE COURT:  I'm reading you paragraph 3 of Mr. Schall's affidavit on September 26, 2016.  "I contacted Mr. Maxon via e-mail requesting that he provide documents reflecting his transaction history in Tokai securities.  Mr. Maxon promptly responded and provided the documentation requested."  Did you provide that printout from the Merrill Lynch account in response to an e-mail from Mr. Schall which he says he sent you September 26, 2016?

MR. MAXON:  Yes, I did.  I provided a screen shot of the Merrill Lynch letterhead of the entire trades.

THE COURT:  All right.  And is that the second page of the Plaintiff's Certification, which is our docket number 30-2?

MR. MAXON:  Yes, that is correct.  This is not the exact same Merrill Lynch letterhead, but the information is correct.

THE COURT:  All right.  And the Plaintiff's Certification, as we've discussed a number of times, is dated October 3, 2016.  You sent -- you just testified that you sent Mr. Schall the information concerning your transactions in Tokai securities after his September 26, 2016 e-mail.  Is this therefore correct that the list of purchases and sales you made was not attached to this certification when you signed it?

MR. MAXON:  Yes, that could be correct.  I signed -- I

25

sent the information after I filled out the form on the website. I typed them in there, I believe, but they needed the official --

THE COURT: Well, let me explain something to you, Mr. Maxon, since this could have enormous repercussions.

MR. MAXON: Sure.

THE COURT: You're giving testimony in federal court.

MR. MAXON: Yes.

THE COURT: You have a legal obligation to testify to the best of your memory accurately.

MR. MAXON: Yes.

THE COURT: You should not speculate or guess.

MR. MAXON: Okay.

THE COURT: You didn't tell me previously you typed that, so what's your testimony? Was the list of transactions attached when you signed this because you typed them in, or was the list not attached?

MR. MAXON: The list was not attached.

THE COURT: And you said this earlier -- well, I'll ask you again, but you said this before. I mean, you addressed this before. Was this black box under question 4 on the form when you signed it?

MR. MAXON: I don't recall that it was.

THE COURT: Okay.

MR. MAXON: I don't believe it was there.

THE COURT:  All right.  And paragraph 6 says, "Plaintiff will not accept any payment for serving as a representative party on behalf of a class beyond plaintiff's pro rata share of any recovery except as ordered or approved by the court."  Before you signed this did you discuss that statement with anybody?

MR. MAXON:  No, I did not.

THE COURT:  Did you have an understanding of what that meant?

MR. MAXON:  Yes, I did understand it.

THE COURT:  What was your understanding at that time as to what that meant?

MR. MAXON:  That I did not serve as a representative party on behalf of a class under this title during the three years --

THE COURT:  No.  Now I'm on paragraph 6.

MR. MAXON:  Sorry.

THE COURT:  Do you see at the bottom?  I just read it to you.

MR. MAXON:  Right, right.

THE COURT:  It says, "Plaintiff will not accept any payment for serving as a representative party on behalf of a class beyond the plaintiff's pro rata share of any recovery, except as ordered or approved by the court."

MR. MAXON:  Right.  That you would have to approve

whatever the judgment was before I could accept anything.

THE COURT:  Before you signed this Plaintiff's Certification did you speak to any lawyer?

MR. MAXON:  No.

THE COURT:  You just saw this on the website and signed it; is that correct?

MR. MAXON:  Yeah.  I don't recall if this was an exact form that was on the website.  That's where I'm having an issue, that I don't think it was the Plaintiff's Certification form on that website that I signed.  It was just an agreement stating that they would contact me and that I wouldn't work with any other firm.

THE COURT:  Do you remember if they did contact you -- well, who is "they"?

MR. MAXON:  They e-mailed me --

THE COURT:  Is it the Goldberg Firm?

MR. MAXON:  Yes.  After I signed the form on the website, then they sent me an e-mail requesting or they would contact me when they needed the information from the trades that I made.  But I don't recall this being the Plaintiff's Certification on their website.

THE COURT:  So how did you get the Plaintiff's Certification?

MR. MAXON:  It was sent to me by Mr. Hood.

THE COURT:  By Mr. Hood?

MR. MAXON:  I could be wrong.  That's the best of my knowledge.  I don't recall seeing the Plaintiff's Certification.

THE COURT:  I'm sorry.  What did you say, you don't recall?

MR. MAXON:  I don't recall signing the Plaintiff's Certification on the website.

THE COURT:  Do you recall signing it in any other way?

MR. MAXON:  Plaintiff's Certification, no, I do not. I know I had to -- I believe I recall that I had to sign kind of a digital piece on their website saying that I wouldn't talk to any other law firms.

THE COURT:  All right.  So you signed something on the website that said you wouldn't talk to any other law firm. What happened next regarding this matter?

MR. MAXON:  They had contacted me requesting the trade information on the Merrill Lynch letterhead.

THE COURT:  Had you had any discussions with anybody before that?

MR. MAXON:  No.  Just e-mail.

THE COURT:  Who sent you the e-mail?

MR. MAXON:  Brian Schall of Goldberg, I believe.

THE COURT:  Do you have that e-mail with you?

MR. MAXON:  No, I do not.

THE COURT:  Did you save it?

MR. MAXON:  I have to check when I get off work tonight.  I can only access certain things here.

THE COURT:  So is it your testimony that you signed a form on the website saying you wanted to work with Goldberg and wouldn't work with any other firm, and then you heard from Mr. Schall?

MR. MAXON:  Yes, I believe that is correct, requesting the trading information.

THE COURT:  Then what happened?

MR. MAXON:  But I also --

THE COURT:  Go ahead.

MR. MAXON:  I mean, this could have been the Plaintiff's Certification.  I don't know 100 percent because it did have a black box, and I typed in all the transactions, and then they contacted me and said, We need this on the company letterhead, to the best of my knowledge.

THE COURT:  Are you testifying now that you remember when do you -- excuse me.  Because I've heard several different things about this Plaintiff's Certification.  You signed something on the website saying you wanted to work with Goldberg and nobody else; is that right?

MR. MAXON:  That is correct.

THE COURT:  You remember that?

MR. MAXON:  Yes, I do.

THE COURT:  What do you remember happening next?

MR. MAXON:  I had sent them -- after they contacted me they requested the trades, and I just sent them the trades on a regular e-mail.  Then they e-mailed me back saying they needed it from the company letterhead, and I made a copy of that, and I sent it in to them.

THE COURT:  And up to that point have you spoken to anybody at the Goldberg Firm or only e-mail?

MR. MAXON:  Best of my recollection it was only done by e-mail, Your Honor.

THE COURT:  Then what happened next?

MR. MAXON:  Well, we exchanged e-mails over a course of period of time from right around August 2016.  I would check in every two months or so to see what the status of the class action suit was, and they would give me whatever information they had and then repeated that throughout the end of 2016.  And then we continued the e-mails through the beginning of 2017, and they tried to get a date on the docket to see if this thing would move forward, and we discussed becoming the lead plaintiff for the class action suit.  And then there were some more e-mail exchanges up to the phone call that you were on, the one before with you today.

THE COURT:  Who was the first person you spoke to at the Goldberg Firm?

MR. MAXON:  I believe it was Mr. Schall, Brian?

THE COURT:  Excuse me.  He can't answer your

questions.  You have to answer the questions.  Then I'll ask him the pertinent questions.  Do you understand?

MR. MAXON:  Can you repeat that?

THE COURT:  Yeah.  You're not permitted to ask Mr. Schall any questions.  In fact, I probably should have sequestered him.

MR. MAXON:  Okay.

THE COURT:  You answer my questions to the best of your memory, and if the answer is I don't know or I don't remember and that's truthfully the answer, that's what you need to tell me, okay?  Do you understand?

MR. MAXON:  Yes, sir.

THE COURT:  Who was the first person you spoke to at the Goldberg Firm?

MR. MAXON:  Via e-mail, that's my recollection, Brian Schall.

THE COURT:  Did you ever have in person or by telephone, by Skype or anything else, an oral conversation with anybody at the Goldberg Firm?

MR. MAXON:  No, not from my recollection, I never did. The only person I talked to on the phone was Alex Hood in the last month.

THE COURT:  So you had no conversations with any lawyers about this case until the past month; is that right?

MR. MAXON:  Only via e-mail, e-mail updates.

Case 1:19-cv-60001-GTS-ATB   Document 37-4   Filed 03/26/19   Page 33 of 79
Case 1:10-cv-11963-MLW   Document 89   Filed 10/13/17   Page 32 of 78

32

THE COURT:  I'm talking about oral discussions, oral communications.  You had none until the past month?

MR. MAXON:  No.  It was all done via e-mail.

THE COURT:  Okay.  And so the first oral communication you had was with Mr. Hood.  And do you know when that was?

MR. MAXON:  That was two or three weeks ago.

THE COURT:  Was it before or after the hearing in which you participated by telephone with me?

MR. MAXON:  That was before the phone conversation we had together.

THE COURT:  How much before?  Was it the day before or earlier than that?

MR. MAXON:  It might have been a couple of days before.

THE COURT:  And in that conversation did Mr. Hood tell you I wanted you either in court or possibly on the telephone?

MR. MAXON:  He said there would be a phone conversation.

THE COURT:  Okay.  So the first time you had any oral communications with a lawyer in this case was relating to my desire to have you participate in the September 28, 2017 hearing, correct?

MR. MAXON:  As far as I recall, that is correct, Your Honor.

THE COURT:  Hold on just a second, please.

All right.  Mr. Maxon, do you understand I've been asked to appoint you as lead counsel in a class action?

I misspoke.  Let me say that again because I don't want to confuse you.  Do you understand that I've been asked to appoint you as lead plaintiff in a class action?

MR. MAXON:  Yes, I understand that.

THE COURT:  And have you had discussions with anybody about what your responsibilities would be as lead plaintiff if I appoint you?

MR. MAXON:  No, Your Honor; to do the best that I can to represent --

THE COURT:  I'm sorry.  Here, just --

MR. MAXON:  -- class action.

THE COURT:  You haven't discussed that with any lawyer; is that correct?

MR. MAXON:  About?

THE COURT:  I asked you -- let me ask you again.

Have you had any discussions with any lawyer about what your responsibilities would be if you're appointed lead plaintiff?

MR. MAXON:  Yes.  Mr. Hood explained to me what my responsibilities would be to represent --

THE COURT:  Stop.  When did he do that?

MR. MAXON:  That was a few days before the phone conversation with you, the first one.

THE COURT: Had anybody told you what your responsibilities as lead plaintiff would be before that?

MR. MAXON: Not to my recollection, Your Honor.

THE COURT: All right. What do you understand your responsibilities would be if you're appointed lead plaintiff?

MR. MAXON: To represent the people involved in this litigation to the best that I can do as far as a judgment is concerned. And it's not just for me. It's for the entire people involved in this class action suit. So I have to look at everyone's interests.

THE COURT: What else do you have to do?

MR. MAXON: Make sure that everything I state is true and provide any testimony offered -- asked of me by the court and also to possibly attend any hearings in the United States if requested.

THE COURT: Are you reading -- are you looking at something right now?

MR. MAXON: No. I'm just sitting here in my office. It's just common sense.

THE COURT: So you spoke to Mr. Hood for the first time shortly before the September 28, 2017 hearing, correct?

MR. MAXON: Yes.

THE COURT: That's the first time you spoke to any lawyer about this case, correct?

MR. MAXON: That is correct, on the telephone.

THE COURT:  And have you talked with any lawyer, had oral communications with any lawyer about this case other than Mr. Hood?

MR. MAXON:  No, I have not.

THE COURT:  And have you talked to Mr. Hood since that first conversation?

MR. MAXON:  Yes.

THE COURT:  Once or more than once?  I'm sorry.  Here, let me do this again.  Listen to the question.

MR. MAXON:  Okay.

THE COURT:  Have you had any additional oral communication with Mr. Hood since the first one shortly before the September 28 hearing?

MR. MAXON:  We talked briefly in regards to this phone conversation for today.

THE COURT:  When did you have that discussion?

MR. MAXON:  That was probably last week when I just got back to Djibouti.

THE COURT:  Do you remember whether it was last week?

MR. MAXON:  Yes, it was, because I just got back and I had the conversation.  I brought my international phone in and I spoke to him just briefly about the timing and the date of the conversation that we're having now, who would be involved.

THE COURT:  And did you have one conversation with Mr. Hood or more than one?

Case 1:19-cv-00001-GTS-ATB   Document 37-4   Filed 03/26/19   Page 37 of 79
Case 1:16-cv-11963-MLW   Document 89   Filed 10/13/17   Page 36 of 78

36

MR. MAXON:  No.  We just had that one.  It was on my regular phone.  The connection was difficult so we just had a brief conversation, the date and time and who would be involved.

THE COURT:  All right.  Did Mr. Hood ask you to do anything in that conversation?

MR. MAXON:  Just -- well, to review the two documents that I signed.

THE COURT:  What two documents did you sign?  I'm sorry.  Keep going.  I'm sorry to interrupt you.  Go ahead.

MR. MAXON:  No, no.  That's okay.  I don't have the other one in front of me.  The one that I have here is like you say, the declaration --

THE COURT:  No.

MR. MAXON:  -- for the motion.  And I don't have a copy of the other one in front of me.

THE COURT:  Now, here, we're going to go step by step.  Tell me again.  What did Mr. Hood say to you and -- about how long did you speak last week?

MR. MAXON:  Ten, fifteen minutes at the most.

THE COURT:  And ten or fifteen minutes at the most?

MR. MAXON:  Yes.

THE COURT:  What did he say to you and what did you say to him in that conversation?  And Mr. Hood, Mr. Lieberman talked about discussions between lawyers and Mr. Maxon and the

affidavits I have talk about discussions.  I haven't perceived that there was an attorney-client privilege that was or perhaps could be asserted.  But do you have a concern about that?

MR. HOOD:  No, Your Honor, given the issue --

THE COURT:  Okay.  All right.  So you're not advising -- okay.  We'll just keep going.

So you spoke to Mr. Hood last week.  And tell me to the best of your memory what he said to you and what you said to him in that conversation.

MR. MAXON:  He told me that he was going to be sending me two documents and I needed to sign them and then scan and e-mail them back to him, which I did the following day.  He told me --

THE COURT:  Go ahead.

MR. MAXON:  -- who was going to be in the conversation, and the main subject would be about me discussing if I would be the lead plaintiff in this class action suit.  And it was just a basic conversation about those subjects.  He also asked me, similar to what you asked me, how I got involved in selecting the firm.  And I told him similar to what I told you.  I saw the different law firms on the websites.  I researched two or three of them, looked at the client lists, and then I decided to contact his firm.  And that was basically what the conversation was about, and just to call in a few minutes earlier.

THE COURT: All right. And did Mr. Hood send you two documents to sign, or did he send you anything?

MR. MAXON: Yes, Your Honor. I'm sorry, I don't have the other one in front of me. I don't have access to it.

THE COURT: Hold on just a second. Did he send you something to sign?

MR. MAXON: Yes, he did.

THE COURT: Did he send you one document or more than one document?

MR. MAXON: He sent me two documents.

THE COURT: What were the two documents?

MR. MAXON: The first one was Exhibit A, which we discussed, the Declaration in Support of Motion For Consolidation.

I can paraphrase the other one because I just recalled it. The other one stated the terms, if there was a settlement in the case, the percentage that the law firm would get and what costs would be covered, things of that nature. It was an agreement between me and the law firm. I don't have all the details, but basically it was an agreement that I would use their firm and agree to the terms.

THE COURT: Did you read that document?

MR. MAXON: Yes, I did.

THE COURT: Did you sign it?

MR. MAXON: Yes, I did.

THE COURT:  Then what did you do with it?

MR. MAXON:  I scanned both documents, Exhibit A, which I have in front of me, and I scanned and e-mailed the other one, and I sent them to Alex.

THE COURT:  Mr. Hood?

MR. HOOD:  Yes, Your Honor.

THE COURT:  I'm sorry.  You sent it to Alex Hood; is that right?

MR. MAXON:  That is correct.

THE COURT:  And do you understand that to be your fee agreement with the Pomerantz firm if you're lead plaintiff and they're counsel for the class?

What is your understanding of what that document is?

MR. MAXON:  My understanding was that it was just what you stated, the fee agreement and the conditions working with their firm.

THE COURT:  Is that the one and only fee agreement you signed in connection with this case?

MR. MAXON:  That is correct, Your Honor.

THE COURT:  Had anybody discussed with you what the fees would be before that?

MR. MAXON:  No, they did not.  But based on being involved and reading about other cases, I was familiar with percentages usually the firms charge.

THE COURT:  Did anybody from the Goldberg Firm by

e-mail or otherwise communicate with you about what the fee arrangement would be?

MR. MAXON:  No.  We only communicated back and forth since September of 2016 about updates and status and what was going on.  They never discussed any fees.  I was transferred over -- they were in California, I believe, and then when we got closer to the phone conversations, they had transferred me over to Mr. Hood because he was on the East Coast and the time difference was a little bit better.  And he was getting ready to set up the phone conversations with you.  That was the first time I discussed -- saw any agreement for the fees.

THE COURT:  Did you have any negotiations with Mr. Hood about what the fee would be?

MR. MAXON:  No, none whatsoever.  Based on my history and knowledge, the fees he presented seemed to be in line with the legal --

THE COURT:  What's your history with regard to legal fees and class actions?

MR. MAXON:  Well, usually they take one-third.

THE COURT:  How do you know that?

MR. MAXON:  Any type of -- well, I read a lot about the Exxon case, I reviewed other cases, and based on my experience from the legal action that I was involved in in New York.  It hasn't changed in quite a few years because that was 30 percent, too, back then.

THE COURT: So it's your understanding that -- I'm sorry. Is it your understanding that, say if there were a verdict or a settlement with the defendant that generated say $60 million, the lawyers would be entitled under your fee agreement to one-third of that, $20 million, you would be entitled to $20 million --

MR. MAXON: Well, basically. It depends. In the Exxon case, the lawyers got quite a bit more, and whatever the stock price was, decide -- the balance went to the plaintiff. So I would say that's in the ballpark. It just depends on what happens with the legal fees. They could get it all.

THE COURT: It's your understanding of the fee agreement that they could get all the money?

MR. MAXON: Well, it's possible.

THE COURT: How?

MR. MAXON: Depending on --

THE COURT: Depending on what?

MR. MAXON: On if the settlement for the share price was low and their hourly rates ate up the rest of the money. I mean, my expectations are that the law firm usually gets 30 percent of the settlement, and whatever is left over, depending on the agreement for the stock price, would be distributed to the plaintiffs in the class action suit, which could be less than that.

THE COURT: Did you have any discussion with Mr. Hood

about that?

MR. MAXON:  No, none whatsoever.  It seemed like a standard agreement from a law firm.

THE COURT:  Okay.  Do you have your Declaration in Support of Motion For Consolidation, docket number 84-1 -- you may not have "84-1" on the top.

MR. MAXON:  Yes, I have 84-1.

THE COURT:  Okay.  That's what we sent your lawyer this morning.

MR. MAXON:  Right, correct.

THE COURT:  You said you had a brief conversation with Mr. Hood last week.  Was that before or after you signed this document?

MR. MAXON:  The first conversation I had was prior to when we talked to you, when I was traveling, and then there was a date set up for you to discuss my role as lead plaintiff. And that's when I received the two documents, which was last week.

THE COURT:  And did you speak to --

MR. MAXON:  Last week.

THE COURT:  Did you speak to Mr. Hood before or after you received the two documents?

MR. MAXON:  I spoke to him after we had the conversation, the first conversation in regards to signing the documents, when the date and time would be, what the subject

matter would be.

THE COURT:  Well, how many conversations have you had with Mr. Hood since the September 28 hearing in which you participated for a while by telephone?

MR. MAXON:  Just one conversation last week.

THE COURT:  And was that before or after he sent you the documents?

MR. MAXON:  That was after he sent me the documents.

THE COURT:  And have you had any conversations with Mr. Hood after that conversation last week?

MR. MAXON:  No oral conversations.  Just a couple of e-mails.

THE COURT:  And what was said in the e-mails?

MR. MAXON:  It was talking about what time I would get on the -- I sent him back some documents, so he thanked me for signing those and sending them.  And then I told him I might have a time constriction.  But I changed all of that so I didn't.  And he told me to print out the two documents for today's meeting, which I did.  That was it.

THE COURT:  Did he tell you today to print out the two documents for today's meeting?

MR. MAXON:  Yes, he did.

THE COURT:  And I'll state for the record that at about 9:30 today I asked the deputy clerk to tell, I thought Mr. Lieberman, that it would be essential that Mr. Maxon have

the documents he signed, and she e-mailed them to that firm. But that was also discussed at the September 28 meeting with regard to the Plaintiff's Certification.

Your communications, you told me that you saw the notice from the Goldberg Law Firm someplace on the Internet; is that correct?

MR. MAXON:  Yes, it was on the Yahoo financial web page.

THE COURT:  Then you told me you exchanged e-mails with the Goldberg Firm, correct?

MR. MAXON:  Yes, I believe that is correct.

THE COURT:  And do you remember filling out the Plaintiff's Certification as a result of your e-mail communications with the Goldberg Firm?

MR. MAXON:  I believe that is correct, but I can't say 100 percent.  If that was the form on their website, then that's the one I filled out.

THE COURT:  Okay.  But, here --

MR. MAXON:  I can't say 100 percent.

THE COURT:  Okay.  I understand.  But let me ask you this.  When did you first hear of the Pomerantz firm?

MR. MAXON:  Well, it was just recently because there was -- it shifted from California, you know, just before -- a few days before our first phone conversation I was contacted by Mr. Hood, and he said that he would be the lawyer that would be

running the meetings with yourself and that I was to talk to him, to e-mail and talk to him directly since he was in New York.

THE COURT: All right.

MR. MAXON: So they kind of handed me off to them from the firm.

THE COURT: Were you asked by anyone whether you wanted to be represented by the Pomerantz Firm rather than the Goldberg Firm?

MR. MAXON: No, but I thought they were under some type of partnership agreement, since I was on this time zone and Mr. Hood was in New York, it would be beneficial for them to work with me when we had our phone conversations. That was my understanding.

THE COURT: Did anybody at Goldberg tell you anything about Pomerantz, the Pomerantz Firm, Mr. Hood or -- did anybody tell you about the Pomerantz Firm before you heard from Mr. Hood?

MR. MAXON: No.

THE COURT: Had you done any research on the Pomerantz Firm before you heard from Mr. Hood?

MR. MAXON: Yeah. I looked up their firm also, and it seemed reputable to me.

THE COURT: Looked it up when? When did you look it up, before or after you heard --

Case 1:19-cv-00001-GTS-ATB    Document 37-4    Filed 03/26/19    Page 47 of 79
Case 1:16-cv-11963-MLW    Document 89    Filed 10/13/17    Page 46 of 78

46

MR. MAXON:  After he contacted me the first time, I just looked at it briefly, but I assumed that they were associated with the Goldberg Firm.  That was my understanding, my assumption, and they were in this class action working together.  And it was more convenient for Mr. Hood to talk to me being in New York and me being over here.  I could be wrong on that, but that was my assumption, that they were partnering up.

THE COURT:  Do you know Jeremy Lieberman?

MR. MAXON:  Do I know who?

THE COURT:  Do you know or know of a man named Jeremy Lieberman?

MR. MAXON:  I'm not familiar with that name.  From California?

THE COURT:  I don't think so.  But anyway, I have to ask the questions.  All right.  You don't know Mr. Lieberman.

Do you know or recall whether Mr. Lieberman participated in the hearing I conducted on September 28 in the portion for which you were on the telephone?

MR. MAXON:  To tell you the truth, Your Honor, the audio was very weak.  It sounded like static to me.  I apologize, but I couldn't really hear it.

THE COURT:  Okay.  Some of this was covered, but I'm trying to get this clear in my mind.  How many oral communications, telephone calls or Skype calls did you have

with Brian Schall?

MR. MAXON:  To the best of my knowledge, I didn't have any.

THE COURT:  All right.

MR. MAXON:  Never talked to him.

THE COURT:  And you've had two conversations with Mr. Hood; is that right?

MR. MAXON:  That is correct, Your Honor.

THE COURT:  Do I understand correctly that you're in charge of the IT for a Naval installation base in Djibouti?

MR. MAXON:  That is correct.

THE COURT:  And not everybody knows where Djibouti is. Where is Djibouti?

MR. MAXON:  Well, the easiest way to find Djibouti is, if you know where Somalia and -- it's the northeastern coast of Africa directly north of Yemen.  It's to the left of Somalia. It's a strategic base for the United States that protects the interests in those areas and also other areas in Africa.

THE COURT:  Is there sophisticated information technology, IT, at this installation?

MR. MAXON:  I have to be careful.

THE COURT:  I'm not asking you for classified information.

MR. MAXON:  No, no.  Yes, there is.  It's a military base.

THE COURT: Sure. Keep it very general. And do you have a large staff under you?

MR. MAXON: What? Yes, I do. I have -- yes, I do, for IT.

THE COURT: And I'm not asking you to say anything immodest, but are you important to the operation of the IT at this installation?

MR. MAXON: Well, I carry a clearance from the United States government, which is important. And this is a strategic base --

THE COURT: And you --

MR. MAXON: -- of the United States Navy, if you look at its location.

THE COURT: And you perform an important role there?

MR. MAXON: I would say yes, I do.

THE COURT: And how much vacation do you get each year?

MR. MAXON: You get six weeks at my level, which you can --

THE COURT: Do you -- go ahead. Sorry. What were you going to say? You can take it or accrue it? Do you take six weeks' vacation every year?

MR. MAXON: Yes, I do. Djibouti is one of the most terrific environments there are in Africa. It gets up to 140 degrees. It's a Third World desert environment.

THE COURT:  Let me cut to the chase.  Do you understand that if there were a trial of this -- do you understand that if you're the lead plaintiff in this case, you may have to appear a number of times in Boston for hearings?

MR. MAXON:  Yes, I do.

THE COURT:  And for depositions?

MR. MAXON:  Yes.

THE COURT:  Do you know what a deposition is?

MR. MAXON:  Yes, I do.  That's when I'm sworn under oath and I'm cross-examined by both lawyers on both sides.

THE COURT:  And are you prepared and do you understand that if there's a trial in this case, I expect that I would require your presence at that trial; and in any event, you would have to be a witness at it?

MR. MAXON:  I understand that.

THE COURT:  Do you feel comfortable it would be consistent -- do you understand a trial could take two, three -- I'm sorry.  Do you understand that a trial could take two, three or four weeks?

MR. MAXON:  Yes, I do.

THE COURT:  And do you feel comfortable that you could be present for that period of time, if necessary, consistent with your duties to the United States military?

MR. MAXON:  Well, we can work that out when it comes to that point.  It's a matter of asking for the time off.

There's always somebody else to back me up.  That's the way it works here.

THE COURT:  Okay.  Have you ever had any discussions with anybody about what you would get if the claims in this case were settled or if there was a trial and the plaintiff won, the class won?

MR. MAXON:  You mean what my expectations are?

THE COURT:  Have you had any discussions with anybody about what you would get?

MR. MAXON:  Oh, no, no.  I assume it could be anywhere from zero to whatever.

THE COURT:  What do you mean "to whatever"?  How do you think your compensation would be determined or what you get would be determined?

MR. MAXON:  I believe it would be determined by the price of the stock that's awarded times the number of shares that you own, possibly.  That could be a high range.  Probably would be a low range, based on the history of other cases.

THE COURT:  All right.  Hold on just a second.  I may be almost done.

MR. MAXON:  Sure.

THE COURT:  Let me ask you this.  You testified you have no memory of having ever talked with Mr. Schall on the telephone; is that right?

MR. MAXON:  To the best of my knowledge.

Case 1:19-cv-00001-GTS-ATB   Document 37-4   Filed 03/26/19   Page 52 of 79
Case 1:10-cv-11963-MLW   Document 89   Filed 10/13/17   Page 51 of 78

51

THE COURT: Well, based on your memory, do you remember having a telephone conversation with Mr. Schall?

MR. MAXON: No, I do not recall ever talking to him in California.

THE COURT: Did you talk to him anywhere else?

MR. MAXON: No. Only by e-mail. Only twice every two months or so I would send him an e-mail or he would send an e-mail and tell me what the status was. That was it. One-liner.

THE COURT: Did Mr. Schall ever tell you orally or in an e-mail what your duties would be as the lead plaintiff in a class action like this?

MR. MAXON: No. We didn't go into details because it hadn't really gone anywhere until the last three or four months things started to change because they were waiting to get a signature to move forward. So there wasn't really anything to talk about. But I did research on some other class action cases, especially the Enron case, to familiarize myself with what happens and what a lead plaintiff is responsible for so I would have some knowledge.

THE COURT: All right. I may have some more questions for you.

Mr. Maxon [sic], are you still there?

MR. MAXON: Yes, I am, Your Honor.

THE COURT: Do you understand you're still under oath?

MR. MAXON:  Yes, sir.

THE COURT:  Did you ever have any conversations with Mr. Maxon?

Mr. Schall?  Are you there?

MR. SCHALL:  I'm sorry, Your Honor.

THE COURT:  I asked you, did you ever have any conversations, oral conversations --

MR. SCHALL:  I did, Your Honor.

THE COURT:  You did.  Do you have any records of them?

MR. SCHALL:  I'm sorry, Your Honor?

THE COURT:  Do you have any records of those conversations?

MR. SCHALL:  Just probably phone records, but I do remember the calls because they were quite detailed.  It was over a year and three months ago.  But I do recall, you know, getting into certain parts of Mr. Maxon's personal life.  I believe he calls -- he had a home in Spain and we talked about his travels and that sort of thing.  And this was a very long time ago, though.

THE COURT:  Did you make any memoranda of those conversations?

MR. SCHALL:  I did not, Your Honor.  I believe I would only have phone records.

THE COURT:  "Phone records" meaning what?

MR. SCHALL:  From our firm showing that -- you know,

Case 1:19-cv-00001-GTS-ATB   Document 37-4   Filed 03/26/19   Page 54 of 79
Case 1:10-cv-11963-MLW   Document 89   Filed 10/13/17   Page 53 of 78

53

from our Verizon phones showing that I called Mr. Maxon.

THE COURT:  Have you checked those records in the past month?

MR SCHALL:  I have not, Your Honor, because I do recall the conversations.

THE COURT:  How many conversations?

MR. SCHALL:  At least two, maybe three.

THE COURT:  All right.  You filed an affidavit in this case on October 4, 2017?

MR. SCHALL:  Yes, Your Honor.

THE COURT:  Sorry.  October 5, 2017.  Who drafted --

MR. SCHALL:  I'm sorry.  Yes.

THE COURT:  Who drafted that affidavit?

MR. SCHALL:  Alex Hood --

THE COURT:  Did you speak to him before --

MR. SCHALL:  -- and then I edited it.

THE COURT:  Did you speak to him before he drafted it?

MR. SCHALL:  Yes.

THE COURT:  All right.  Are you the person at Goldberg most knowledgeable about this case and Mr. Maxon's involvement in it?

MR. SCHALL:  I am, Your Honor.

THE COURT:  Do you know what the first contact and communication between your firm and Mr. Maxon was?

MR. SCHALL:  I do.  And I think that's -- pardon me --

Case 1:19-cv-00001-GTS-ATB   Document 37-4   Filed 03/26/19   Page 55 of 79
Case 1:16-cv-11963-MLW   Document 89   Filed 10/13/17   Page 54 of 78

54

one of the points of confusion. He submitted what's called a new submission from quick contact, which is basically something on our website that is not a certification form, but it's for people who are interested in participating in a lawsuit. So on that document he would have submitted his contact information, and he submitted a message about his holdings and his loss.

THE COURT: Okay. And have you seen that communication?

MR. SCHALL: I'm sorry, have I seen it?

THE COURT: Yes.

MR. SCHALL: Yes, I'm looking at it right now.

THE COURT: What's the date of it?

MR. SCHALL: July 27, 2016 at 6:43 a.m.

THE COURT: And what happened next?

MR. SCHALL: I believe I called Mr. Maxon right away because he had a loss that was almost half a million dollars, and I got in touch with him -- I don't recall what time it was. I think it might have been in the late evening. But we proceeded to talk for a good while. We covered a lot, everything from what was going on in the case to the law firms that might be involved. And it was the first of what was either two or three conversations.

THE COURT: And what happened next?

MR. SCHALL: So after that there was just kind of a lull because we were focusing on other cases. And ultimately

we realized that we did not have the trade confirmations from Mr. Maxon.  So on September 26, I believe -- sorry, I just wanted to check my affidavits.  That's correct -- I e-mailed him requesting his transaction history so that we could make sure that, you know, we had all the documents in advance of the filing and that all the numbers were correct and that, you know, everything was fine.

THE COURT:  Let me ask you this.  Do you have a copy of the Plaintiff's Certification that was filed in this case, docket number 30-2?

MR. SCHALL:  I do, Your Honor.

THE COURT:  Is that a form --

MR. SCHALL:  It is, Your Honor.

THE COURT:  Is it a form of your firm's?

MR. SCHALL:  No, Your Honor.  It's a form from Lundin Law P.C., which is a firm that we work with.

THE COURT:  It's a form from where?

MR. SCHALL:  It's called Lundin Law P.C.

THE COURT:  And you work with them?

MR. SCHALL:  That's correct.  And that's something that I mentioned to Mr. Maxon on our first call.

THE COURT:  And when you -- so what's your understanding of how this Plaintiff's Certification came to be prepared?

MR. SCHALL:  My understanding is that after we spoke,

apparently Mr. Maxon had contacted Lundin Law P.C. and my firm as well, and then he mistakenly filed a certification on Lundin Law P.C.  And I think that was another source of the confusion.

THE COURT:  Well, when did you first see this form?

MR. SCHALL:  I saw this form on 8/3/2016.

THE COURT:  How did you come to see it?

MR. SCHALL:  Brian Lundin is involved in the class action with us.  So I forget exactly how I saw it, but I'm just trying to recall.  Your Honor, it may have been the first day I heard of it.  I apologize.

THE COURT:  I'm sorry.  You may have first heard of it on 8/3/2016?

MR. SCHALL:  Right, yes.  I don't recall the first day I saw it.

THE COURT:  From who did you hear about it?

MR. SCHALL:  Lundin Law.

THE COURT:  From who at Lundin Law?

MR. SCHALL:  Brian Lundin.

THE COURT:  How did you happen to be communicating with him relating to this?

MR. SCHALL:  We speak by phone and we work together regularly on our cases.  So Lundin Law P.C. prints out press releases.  We print out press releases.  And the idea is to, at the time we were trying to move collectively as co-lead, and then we ultimately ended up working with Pomerantz because it's

Case 1:19-cv-60001-GTS-ATB   Document 37-4   Filed 03/26/19   Page 58 of 79
Case 1:10-cv-11963-MLW   Document 89   Filed 10/13/17   Page 57 of 78

57

a superior firm.

THE COURT:  And we'll come to that.  But with regard to this form, what did -- you say you first learned about it on 8/3/2016 from Brian Lundin.  Did he call you, or did you call him; or did he write you, or did you write him?

MR. SCHALL:  You know what?  I don't recall, Your Honor.  I just don't remember.

THE COURT:  Well, what, to the best of your memory, was the discussion or communication?

MR. SCHALL:  I believe that Brian Lundin just mentioned that Mr. Maxon, who we had been in touch with, had signed up on his site.

THE COURT:  Was Mr. Lundin excited about that?

MR. SCHALL:  I don't recall him being, you know, particularly excited or expressing any strong emotions.

THE COURT:  Well, were you and Mr. Lundin seriously interested in becoming counsel for the lead plaintiff in the class in this case?

MR. SCHALL:  Yes, Your Honor.

THE COURT:  And did you recognize that Mr. Maxon had a substantial financial interest, and if you got him as a client, it might enhance your prospects of getting this case?

MR. SCHALL:  We did, Your Honor, but we were also sober-minded about it.  We thought that this case might likely go to a large institution.

Case 1:19-cv-00001-GTS-ATB   Document 37-4   Filed 03/26/19   Page 59 of 79
Case 1:10-cv-11965-MLW   Document 89   Filed 10/13/17   Page 58 of 78

58

THE COURT:  You mean a bigger law firm?

MR. SCHALL:  I'm sorry?

THE COURT:  Do you mean a bigger law firm?

MR. SCHALL:  So, yeah, a bigger law firm that has, you know, pension funds as their regular clients, that sort of thing.

THE COURT:  You thought a pension fund would be a likely plaintiff in this case?

MR. SCHALL:  I do not have any pension fund clients, only hedge funds and regular wealth advisers.

THE COURT:  But I'm trying to understand the answer you gave me.  Was it your thinking that Mr. Maxon wouldn't turn out to be the lead plaintiff because a pension fund or some other institution would?

MR. SCHALL:  That's correct, Your Honor, because I've followed hundreds of lead plaintiff hearings, and I've noticed that a good percentage of them, you know, go to institutional clients.  And in this case, based on these damages and some other factors that again I don't remember, I was under the impression that an institution would prevail in the case.  I think I looked at the market cap of the company and various other factors.

THE COURT:  All right.  So do you know when you first saw this Plaintiff's Certification by Mr. Maxon?

MR. SCHALL:  I do not, Your Honor.

Case 1:19-cv-00001-GTS-ATB   Document 37-4   Filed 03/26/19   Page 60 of 79
Case 1:16-cv-11963-MLW   Document 89   Filed 10/13/17   Page 59 of 78

59

THE COURT:  Do you have a way of finding out?

MR. SCHALL:  Yeah.  I can -- I would have to go back and go through all of my information.

THE COURT:  Do you recall whether you received it by e-mail?

MR. SCHALL:  I do not, Your Honor.

THE COURT:  Did you receive it by mail?

MR. SCHALL:  No.

THE COURT:  Did you receive it by fax?

MR. SCHALL:  No.  It must have been by e-mail.

THE COURT:  Where is the Lundin -- where is Lundin Law P.C. located physically?

MR. SCHALL:  It's located in Beverly Hills, California.

THE COURT:  And where are you located?

MR. SCHALL:  Century City, California.

THE COURT:  Was it given to you by hand by Mr. Lundin?

MR. SCHALL:  No, it was not.  It must have been sent. I'm just not at the office yet.  I'm the one calling from the West Coast, so I don't have access to all of my information.

THE COURT:  All right.  But did you say this is a standard form used by Lundin Law P.C.?

MR. SCHALL:  That's correct.  It's the exact same form in terms of language that most firms use.

THE COURT:  By September 26, you realized that you

didn't have transaction information from Mr. Maxon, correct?

MR. SCHALL:  That's correct, Your Honor.

THE COURT:  Did you have this form before then?

MR. SCHALL:  I believe I saw it before then, yes.

THE COURT:  And did you see that -- when you first saw this form, paragraph 4, "Plaintiff's transactions in the security that is the subject of the complaint during the class period specified in the complaint are as follows:"  Then in the version filed with the court there's a black box, and in white letters it says, "See attached."  Was that black box on the form when you first saw it?

MR. SCHALL:  I believe it was.  I've looked at the Lundin website many, many, many times and I believe that box is on the website as well.

THE COURT:  There's not just a blank space?

MR. SCHALL:  It's not just a blank space.

THE COURT:  When you saw this form was the second page listing Mr. Maxon's transactions in Tokai securities attached to it?

MR. SCHALL:  Yes.

THE COURT:  It was?  I thought you said --

MR. SCHALL:  Yes.

THE COURT:  Then why did you on September 26 ask Mr. Maxon for documents reflecting his transaction history?

MR. SCHALL:  I'm sorry, Your Honor.  I thought you

were talking about more recently.

THE COURT:  No.  Look.  You told me you saw this before September 26, 2016, I believe.  Did you see this form before September 26, 2016?

MR. SCHALL:  I cannot say with certitude.  I believe I did.

THE COURT:  Do you have a record that would tell you -- did you save the form when you first got it?

MR. SCHALL:  I must have.

THE COURT:  Fine.  I'm ordering that you file a supplementary affidavit later today with a copy of the form that you received stating when you received it.

MR. SCHALL:  Okay.

THE COURT:  Then do you recall whether the list of the transactions that's attached to the certification was on the form when you first received -- when you first saw it?

MR. SCHALL:  I believe -- I just I can't recall, Your Honor.

THE COURT:  All right.  It says, and you wrote in your affidavit on September 26, 2016, "I contacted Mr. Maxon via e-mail requesting that he provide documents reflecting his transaction history in Tokai securities.  Mr. Maxon promptly responded and provided the documents requested."  Is that true?

MR. SCHALL:  That's correct.

THE COURT:  Why did you contact Mr. Maxon to request

documents reflecting his transaction history in Tokai securities?

MR. SCHALL:  Just to get the trade confirmations to make sure that they were completely accurate.

THE COURT:  Did you have the attachment -- was the attachment to this certification prepared based on the information you received from Mr. Maxon?

MR. SCHALL:  I believe it was put together at the last moment, so the attachment was probably put together with the certification form when Pomerantz filed the lead plaintiff motion, or in the days leading up to it.

THE COURT:  When you say "the last moment," do you mean the last moment after -- what do you mean?  Was the last moment after September 26, 2016?

MR. SCHALL:  Yes.  So by "the last moment," I generally mean the last week prior to the lead plaintiff deadline.

THE COURT:  Which, according to your affidavit, was September 30, 2016?

MR. SCHALL:  Correct.

THE COURT:  So was the attachment to the Plaintiff's Certification prepared after September 26, 2016?

MR. SCHALL:  I believe so, Your Honor.

THE COURT:  Did you prepare it?

MR. SCHALL:  I did not.

THE COURT: Who prepared it, the attachment?

MR. SCHALL: I believe Alex Hood and someone else at Pomerantz.

THE COURT: Did you give him the information that you had received from Mr. Maxon?

MR. SCHALL: I did.

THE COURT: And how did -- so you were in contact with Mr. Maxon. How did Pomerantz become involved with regard to Mr. Maxon?

MR. SCHALL: So originally, again, you know, we were trying to at the time build I suppose a resume up. And in order to do so, we need co-lead credit. And so we basically figured that Pomerantz would probably be the best chance to move as co-lead and get that credit. So we reached out to Pomerantz, as we have on many occasions, and we have been appointed co-lead with them several times since, and basically told Mr. Maxon that, you know, we have the chance to work with the world's oldest class action firm, certainly a formidable class action firm in its own right, and I believe that was appealing to him.

THE COURT: All right. Who told that to Mr. Maxon?

MR. SCHALL: I did.

THE COURT: In a telephone -- in what form of communications?

MR. SCHALL: In a telephone call.

THE COURT:  When did that telephone call occur?

MR. SCHALL:  It must have been somewhere between the 26th of September 2016 and it would have been before the deadline.  So I believe I can't say the exact date.

THE COURT:  But your telephone records would reflect that?

MR. SCHALL:  I believe so, yes, absolutely.

THE COURT:  Well, I'm ordering -- how long will it take you to check your telephone records and let me know the dates of your calls with Mr. Maxon?

MR. SCHALL:  Probably -- that's a good question.  Our office manager just left, so it could take a week maybe to secure those records.

THE COURT:  All right.  I'm ordering that you do that by October 17.  So you spoke to Mr. Maxon about the Pomerantz Firm, correct?

MR. SCHALL:  Correct.

THE COURT:  Where was he when you spoke to him?

MR. SCHALL:  I believe -- I don't remember.  He might have been traveling to the States briefly.  I don't recall, I truly don't.

THE COURT:  All right.  So your testimony is, it's in your affidavit that you spoke with Mr. Maxon on the telephone on at least two occasions.  And I've just ordered you to give me the records of and dates of all of the telephone calls you

Case 1:19-cv-00001-GTS-ATB   Document 37-4   Filed 03/26/19   Page 66 of 79
Case 1:16-cv-11963-MLW   Document 89   Filed 10/13/17   Page 65 of 78

65

had with him.  But do you remember approximately when the first phone call was?

MR. SCHALL:  Again, I believe it was on the 26th of September 2016, but I would have to see the phone record to be absolutely sure.

THE COURT:  But actually --

MR. SCHALL:  I'm sorry, Your Honor.

THE COURT:  I'm just looking at something.

MR. SCHALL:  Okay.

THE COURT:  Did you speak to Mr. Maxon on July 27, 2016?

MR. SCHALL:  I don't know if it was the next day, but I know that the calls were in rapid succession.

THE COURT:  I'm sorry.  When your affidavit said, "Initially Mr. Maxon contacted me through the Goldberg website on July 27, 2016" --

MR. SCHALL:  Correct.

THE COURT:  How do you know that was the date?

MR. SCHALL:  Because I'm looking at the document on my phone.  So I have access to certain documents on my phone, and I can see it says, "Re:  Submission from quick contact, Steven Maxon," with his e-mail and "Subject, stock loss," and his message about losing $400,000 within 28,000 shares.

THE COURT:  And did you call Mr. Maxon the same day?

MR. SCHALL:  That's my practice is to call the client

as soon as possible, so that's why I believe I did.

THE COURT:  Did you speak to him?

MR. SCHALL:  To the best of my memory that was -- I know with absolutely certainty I spoke to Mr. Maxon on multiple occasions.  I do not recall 100 percent if it was the 26th or the 27th.  But I do hundreds of phone calls a day sometimes, so my memory is foggy, but it was one of those days.

THE COURT:  Are many of those phone calls to potential plaintiffs in class actions?

MR. SCHALL:  I'm sorry, Your Honor.

THE COURT:  Are many of those phone calls to potential plaintiffs in class actions?

MR. SCHALL:  Yes, Your Honor.

THE COURT:  Do you have a memory of what you said to Mr. Maxon in your first conversation with him?

MR. SCHALL:  I do because he stood out in my mind for a variety of reasons.  When he had mentioned that he was stationed in Djibouti, I studied East Africa in depth, and so I found that to be interesting.  And basically we talked and had a very pleasant conversation.  As I mentioned earlier, he told me about his residence in Spain and, you know, how much he likes traveling.  And from what I can recall, we had a very nice conversation.

THE COURT:  And --

MR. SCHALL:  And -- I'm sorry.

THE COURT:  What was the substance of the conversation as it relates to this case to the best of your memory?

MR. SCHALL:  Sure.  So I believe the first thing I asked him was just if he had a general overview of how the class action system works, because that's how I start most of my calls.  So I asked him if he understood the contingency fee agreement, the nature of it, how it works.  And so I sort of explained that to him and how the fees work in this case.  I believe I told Mr. Maxon that ultimately at the end the judge will decide what the appropriate fees are.  But I wouldn't expect him to remember that.

THE COURT:  Why?

MR. SCHALL:  From the -- just because the call was a year and three months ago.

THE COURT:  So you don't think potential lead plaintiffs can be expected to recall material matters 15 months after they're explained by their lawyers?

MR. SCHALL:  I would expect that, Your Honor.

THE COURT:  You would expect what, that they would or would not remember?

MR. SCHALL:  That they would, that they would be -- yes, that's correct.

THE COURT:  And when did you first contact the Pomerantz Firm?

MR. SCHALL:  I do not know, Your Honor.  I don't have

that information in front of me.  I think I might have told Alex Hood about the loss shortly after he contacted us on July 27.

THE COURT:  I'm sorry.  He contacted you on July -- who contacted -- who initiated the contact concerning Tokai?

MR. SCHALL:  I did.  So I contacted Alexander Hood.

THE COURT:  Did you call him or write him or communicate in some other way?

MR. SCHALL:  I believe I forwarded the loss message to him, and I believe I called him as well and discussed the client, where he was, logistics of it and his loss.

THE COURT:  And you told Mr. Hood [sic] about the losses; is that right?  Mr. Maxon.

MR. SCHALL:  Correct.

THE COURT:  So that was sometime after September 26?

MR. SCHALL:  No.  This would have been sometime after July 27, within the week, if not the next few days.

THE COURT:  All right.  How did you know the dimension of the losses?

MR. SCHALL:  I'm sorry, Your Honor.  How did I --

THE COURT:  How did you know the dimension of the losses then?

MR. SCHALL:  "Dimension," meaning?

THE COURT:  How much Mr. Maxon lost.

MR. SCHALL:  Oh, because in his message he wrote that

he had a loss of 400K plus.

THE COURT:  So you spoke to Mr. Hood.  And what did you say to Mr. Hood, and what did he say to you?

MR. SCHALL:  I call Alex so many times a day.  With that said, I must have mentioned that we might have a competitive loss at least in terms of what retail investors versus institutions would have.  So I think I told Alex that we had a competitive retail loss.

THE COURT:  And what did he say to you?

MR. SCHALL:  He said that they were very interested in the Tokai case.  And we planned to work together on it.  I believe they were still doing their investigation.  But with that said, I think they liked the merits from the beginning, as we did.

THE COURT:  Well, I'm sure I have more questions, but I'm not thinking of them right at the moment.  I'm going to put you on mute for just a second or just a short time.

(Discussion off the record.)

THE COURT:  All right.  Mr. Schall?

MR. SCHALL:  Yes, Your Honor.

THE COURT:  I think you told me about your first conversation with Mr. Maxon as you recall it.  And you had at least one more with him; is that correct?

MR. SCHALL:  Yes, Your Honor.

THE COURT:  Do you recall when that was?

Case 1:19-cv-00001-GTS-ATB Document 37-4 Filed 03/26/19 Page 71 of 79
Case 1:16-cv-11963-MLW Document 89 Filed 10/13/17 Page 70 of 78

70

MR. SCHALL: So it would have been shortly after our initial call.

THE COURT: So your first call, was it around August 3?

MR. SCHALL: So the first call was -- it was either September 26 or 27.

THE COURT: I see, September 26 or 27.

MR. SCHALL: Right.

THE COURT: Then when was your second call?

MR. SCHALL: It must have been within two or three days. I always do followup calls with my clients.

THE COURT: Do you know whether it was before September 30?

MR. SCHALL: I believe so, but I can't remember or say with any certainty.

THE COURT: About how long was that conversation?

MR. SCHALL: I recall speaking to Mr. Maxon for a good deal of time. When I put together my affidavit I estimated it between an hour and an hour and a half just between talking about, you know, what he does and his vacationing. And he had a lot of questions about the case. He had a lot of questions about the merits. He had a lot of questions about the process, how the fees worked, that sort of thing. But again, I don't know how much he retained from that conversation. That was, you know, quite a while ago.

Case 1:19-cv-60001-GTS-ATB   Document 37-4   Filed 03/26/19   Page 72 of 79
Case 1:16-cv-11963-MLW   Document 89   Filed 10/13/17   Page 71 of 78

71

THE COURT: But what did you tell him in that second conversation?

MR. SCHALL: Whatever I might have not covered or anything that he needed me to lend clarity to. So I gave quite a bit of information in the first conversation but it's mainly just a general overview. The subsequent conversation I usually introduce the idea of being a lead plaintiff if I think that person was going to be a good candidate, and I certainly thought Mr. Maxon was. Not just based on his intelligence and how articulate he was but also based on his position, the status of trust that the military had in him and the fact that he had lost a significant amount of money in this case. In other words, I thought he would be very motivated.

THE COURT: You haven't just told me that in the second conversation you -- well, in the second conversation did you discuss the Pomerantz Firm with him?

MR. SCHALL: I might have in both conversations. I just don't remember.

THE COURT: You don't remember.

MR. SCHALL: I believe -- if I had to -- if I have to say it, I believe that I did because it's -- the process is confusing at first. It's common practice in our industry for firms to kind of scramble to figure out who they're working with on a case. This is true across the entire plaintiff's bar. And so, you know, I wanted to make it clear that we were

working with, you know, a firm that can really handle this case, and Pomerantz --

THE COURT:  Do you have an actual memory of discussing the Pomerantz Firm with Mr. Maxon?

MR. SCHALL:  I have -- I can say that yes, absolutely. And the reason is we were working with them so regularly at the time that that was the only firm that we were really working with on a regular basis.

THE COURT:  All right.

Mr. Hood, are you there?

MR. HOOD:  Yes, Your Honor.

THE COURT:  Yes.  I haven't put you under oath, but you heard what Mr. Maxon said about first speaking with you shortly before the September 28 hearing; is that correct?  Was that the first time?

MR. HOOD:  Pardon me.  Yes, that is correct.

THE COURT:  And how many times have you talked to him since?

MR. HOOD:  We spoke -- well, as Your Honor stated, we spoke directly before that hearing.  After -- pardon me. Shortly before that hearing, I think literally just minutes before we called into Your Honor's court, I spoke with Mr. Maxon again just to make sure he was on the line.  Following that hearing, after corresponding with Mr. Maxon by e-mail, I had another phone call with Mr. Maxon late last week.  I

Case 1:19-cv-00001-GTS-ATB    Document 37-4    Filed 03/26/19    Page 74 of 79
Case 1:16-cv-11963-MLW    Document 89    Filed 10/13/17    Page 73 of 78

73

believe it would have been Friday morning my time; potentially late afternoon, Friday evening Mr. Maxon's time.

THE COURT:  So you've had two telephone conversations with him; is that correct?

MR. HOOD:  Yes, Your Honor, that is correct.

THE COURT:  And last Friday was October 6, correct?

MR. HOOD:  Yes, Your Honor.

THE COURT:  So that conversation occurred after Mr. Maxon signed his affidavit, that's docket number 84-1, and it was filed on October 5?

MR. HOOD:  I believe if Your Honor would allow me to check my e-mail briefly I can confirm one way or the other, it would have been either shortly before or shortly after.

THE COURT:  Go ahead.

MR. HOOD:  Thank you, Your Honor.

Your Honor, my call with Mr. Maxon took place shortly after Mr. Maxon executed the documents we discussed and forwarded them back to me by e-mail.

THE COURT:  All right.  And what communications if any did you have with Mr. Maxon between -- let me ask you this. Your first conversation with Mr. Maxon we can place at September 27, I believe, because I think that's the day the clerk communicated to you that I hoped you would be at the hearing and decided that he could participate by telephone. Had you had any e-mail communications with Mr. Maxon before

that?

MR. HOOD:  Prior to that point, no, Your Honor.

THE COURT:  Okay.  And did you have any e-mail communications with Mr. Maxon after September 28, before sending him the affidavit and the fee agreement?

MR. HOOD:  Yes, Your Honor.  I'm looking at my e-mail right now.  I see I communicated or sent several e-mails to Mr. Maxon on September 28, shortly after the conference.  It looks like on Friday, September 29 I sent him an additional e-mail, to which he responded shortly afterwards, also on September 29.  Then I had several communications with Mr. Maxon by e-mail.  I count three e-mails on October 3, which would have been last Tuesday.

Then, let's see.  I see an e-mail last Thursday to schedule the call that we had last Friday, and then I sent Mr. Maxon another e-mail the last Friday following our call just to memorialize what we had discussed and to transmit the dial-in information for this conference.

THE COURT:  And did you draft Mr. Maxon's declaration in response to my September 28 order?

MR. HOOD:  I did, Your Honor, based on the substance of the communication I had with Mr. Maxon at that point.  I drafted it, sent it along to Mr. Maxon inviting his review to comment on anything that was inaccurate.

THE COURT:  And did he make any comment?

Case 1:19-cv-60001-GTS-ATB   Document 37-4   Filed 03/26/19   Page 76 of 79
Case 1:16-cv-11963-MLW   Document 89   Filed 10/13/17   Page 75 of 78

75

MR. HOOD:  He did not, Your Honor.

THE COURT:  Did he make any corrections?

MR. HOOD:  No, Your Honor.  I believe that the document he executed was identical to the document that I sent to him.

THE COURT:  And you heard Mr. Schall talk about how he contacted you about this case and communicated with you about this case.  Is what he told me accurate?

MR. HOOD:  Yes, Your Honor.  To the best of my recollection, that is accurate.  I would have to -- as Mr. Schall stated, we are in contact up to as many as several times a day about a variety of cases, and that would have been true last fall as well.  I of course am reluctant to speculate.

THE COURT:  And you weren't at the September 28 hearing, correct?

MR. HOOD:  I was telephonically.  I was on the line telephonically for that hearing, Your Honor.

THE COURT:  Mr. Lieberman was at the hearing.

MR. HOOD:  Correct, Your Honor.

THE COURT:  And Mr. Lieberman made several representations to me at the hearing that are reflected in the transcript.  Were you able to hear what Mr. Lieberman was saying?

MR. HOOD:  I was able to hear most of what Mr. Lieberman said, Your Honor.  I think perhaps due to the

microphone placement, it may have been closer to him than the other parties', but I can't say I was always able to hear the context in which those were made.

THE COURT: Have you read the transcript of that hearing?

MR. HOOD: I have reviewed it once, Your Honor.

THE COURT: Have you discussed it with Mr. Lieberman?

MR. HOOD: We discussed the hearing. We had a brief telephone call after the hearing itself. We had not reviewed the transcript together, Your Honor, but we did discuss the substance of the hearing shortly thereafter.

THE COURT: I'm just looking at the transcript.

Have you talked with Mr. Lieberman about the representations he made to me concerning communications with Mr. Maxon about a fee agreement?

MR. HOOD: Yes, Your Honor.

THE COURT: Hold on a second.

All right. Before last week, Mr. Hood, did you or anybody in the Pomerantz Firm have any communications with Mr. Maxon about a fee agreement?

MR. HOOD: No one at the Pomerantz Firm to my knowledge had direct communications with Mr. Maxon about the agreement prior to last week, Your Honor.

THE COURT: Has Mr. Lieberman ever talked to Mr. Maxon?

MR. HOOD:  Your Honor, to my knowledge, Mr. Lieberman has not spoken to Mr. Maxon.

THE COURT:  And why is he not on this call?

MR. HOOD:  Your Honor, I believe that Mr. Lieberman may have been detained at a mediation that ran overtime, but I can't speak to that with absolute certainty.

THE COURT:  Did you expect that he would be on this call?

MR. HOOD:  Yes, Your Honor, I did.

THE COURT:  I did, too.  I am having trouble reading the clock here.  I think this is as far as we can go for today. I'm going to take this matter under advisement.  I'm ordering, Mr. Hood, that you order the transcript of this hearing on an expedited basis, and I'll let you know if I want any briefing.

MR. HOOD:  Certainly, Your Honor.  Thank you, your Honor.

THE COURT:  And today is Tuesday.  I'm ordering that by Thursday, that is the 12th, you file an affidavit either confirming that you wish to have Mr. Maxon appointed as lead plaintiff and Pomerantz as the lead law firm, plaintiff's counsel, or -- well, actually, I'm withdrawing that.  I'll just take this matter under advisement.

MR. HOOD:  Understood, Your Honor.  Thank you.

THE COURT:  Thank you.  We'll be in recess.

(Adjourned, 12:56 p.m.)

CERTIFICATE OF OFFICIAL REPORTER


                I, Kelly Mortellite, Registered Merit Reporter

and Certified Realtime Reporter, in and for the United States

District Court for the District of Massachusetts, do hereby

certify that pursuant to Section 753, Title 28, United States

Code that the foregoing is a true and correct transcript of the

stenographically reported proceedings held in the

above-entitled matter and that the transcript page format is in

conformance with the regulations of the Judicial Conference of

the United States.

                    Dated this 14th day of October, 2017.


                    /s/ Kelly Mortellite

                    _____

                    Kelly Mortellite, RMR, CRR

                    Official Court Reporter