**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CHRISTINA LEWIS, Individually and on Behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>YRC WORLDWIDE INC., JAMES L. WELCH, JAMIE G. PIERSON, STEPHANIE D. FISHER, and DARREN D. HAWKINS,<br><br>Defendants. | Civ. A. No. 1:19-cv-00001-GTS-ATB<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |


Donald R. Hall
Jeffrey P. Campisi
Jason A. Uris
**KAPLAN FOX & KILSHEIMER LLP**
850 Third Avenue, 14th Floor
New York, NY 10022
Telephone: (212) 687-1980
Facsimile: (212) 687-7714
Email: dhall@kaplanfox.com
jcampisi@kaplanfox.com
juris@kaplanfox.com

Jeremy A. Lieberman
Emma Gilmore
Villi Shteyn
**POMERANTZ LLP**
600 Third Avenue, 20th Floor
New York, NY 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Email: jalieberman@pomlaw.com
egilmore@pomlaw.com
vshteyn@pomlaw.com

*Co-Lead Counsel for Co-Lead Plaintiffs City of Warwick Retirement Board and Peter Szabo and the Proposed Class*

Jonathan B. Fellows
George H. Lowe
**BOND SCHOENECK & KING, PLLC**
One Lincoln Center
Syracuse, NY 13202
Telephone: (315) 218-8000
Facsimile: (315) 218-8100
Email: jfellows@bsk.com
glowe@bsk.com

*Local Counsel for Lead Plaintiffs and the Proposed Class*


Dated: June 14, 2019

# TABLE OF CONTENTS

**Page**


I. NATURE OF THE ACTION ........ 1

II. PRELIMINARY STATEMENT ........ 2

III. JURISDICTION AND VENUE ........ 7

IV. PARTIES ........ 8

A. Lead Plaintiffs ........ 8

B. Defendants ........ 8

1. YRC ........ 8

2. Defendant Welch ........ 9

3. Defendant Fisher ........ 10

4. Defendant Pierson ........ 11

5. Defendant Hawkins ........ 12

V. OVERVIEW OF THE OVERCHARGE SCHEME ........ 13

A. Background on YRC's Corporate History ........ 13

B. Freight Carriers Often Reweighed Shipments to Verify That the Weight Was Correct ........ 15

C. Historically, YRC Freight, Roadway and Yellow Made Positive and Negative Reweigh Corrections ........ 16

D. In 2005 and 2006, YRC Freight, Yellow and Roadway Decided to Boost its Revenue at the Expense of Its Customers by Eliminating Negative Reweigh Corrections ........ 18

E. YRC's Fraudulent Billing Scheme Cheated the DOD and U.S. Taxpayers and Caused YRC to Submit False Claims in Violation of the FCA ........ 26

a. Current YRC Employee James Hannum Files the Whistleblower Action ........ 26

b. The DOJ Investigation Finds Rampant Fraud at YRC and DOJ Files a Complaint in Intervention in the Whistleblower Action ........ 29

F. Former YRC Employees Confirm the Overcharge Scheme Continued Before and During the Class Period ........ 34

G. YRC Was Required to Disclose the DOJ Investigation and the Overcharge Scheme ........ 44

H. Defendants' Fraudulent Financial Reporting ........ 45

VI. DEFENDANTS' MADE MATERIALLY FALSE AND MISLEADING STATEMENTS AND MATERIAL OMISSIONS THROUGHOUT THE CLASS PERIOD ........ 53

A. YRC's Annual Report on Form 10-K ........ 54

B. YRC's First Quarter 2014 Financial Results and Q1 2014 10-Q ........ 63

C. YRC's Second Quarter 2014 Financial Results and Q2 2014 10-Q ........ 66

D. YRC's Third Quarter 2014 Financial Results and Q3 2014 10-Q ........ 68

E. YRC's 2014 Fourth Quarter and Full Year Financial Results and 2014 Annual Report on Form 10-K ........ 70

F. YRC's First Quarter 2015 Financial Results and Q1 2015 10-Q ........ 74

G. YRC's Second Quarter 2015 Financial Results and Q2 2015 10-Q ........ 76

H. YRC's Third Quarter 2015 Financial Results and Q3 10-Q ........ 78

I. YRC's 2015 Fourth Quarter and Full Year Financial Results and 2015 Annual Report on Form 10-K ........ 80

J. Defendant Welch's Message to Shareholders in YRC's 2015 Annual Report ........ 84

K. February 11, 2016 BB&T Transportation Services Conference ........ 85

L. YRC's First Quarter 2016 Financial Results and Q1 2016 10-Q ........ 85

M. YRC's Second Quarter 2016 Financial Results and Q2 10-Q 2016 ........ 88

N. YRC's Third Quarter 2016 Financial Results and Q3 2016 10-Q ........ 90

O. YRC's 2016 Fourth Quarter and Full Year Financial Results and 2016 Annual Report on Form 10-K ........ 92

P. YRC's First Quarter 2017 Financial Results and Q1 2017 10-Q ........ 96

Q. YRC's Second Quarter 2017 Financial Results and Q2 2017 10-Q ........ 98

R. YRC's Third Quarter 2017 Financial Results and Q3 2017 10-Q ...................... 101

S. November 7, 2017 Stephens Fall Investment Conference ................................. 102

T. YRC's 2017 Fourth Quarter and Full Year Financial Results and 2017 Annual Report on Form 10-K ............................................................................. 103

U. YRC's First Quarter 2018 Financial Results and Q1 2018 10-Q ....................... 107

V. YRC's Second Quarter 2018 Financial Results and Q2 2018 10-Q ................... 109

W. YRC's Third Quarter 2018 Financial Results and Q3 2018 10-Q ...................... 112

VII. THE TRUTH EMERGES ............................................................................ 114

VIII. ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER ............................ 116

IX. CLASS ACTION ALLEGATIONS .................................................................. 123

X. LOSS CAUSATION ...................................................................................... 126

XI. PRESUMPTION OF RELIANCE ................................................................... 128

XII. NO SAFE HARBOR ................................................................................... 130

XIII. CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT ........................................ 131

COUNT I Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants (15 U.S.C. §78j(b) and 17 C.F.R. § 240.10b-5) .................. 131

COUNT II Violation of Section 20(a) of the Exchange Act Against the Individual Defendants (15 U.S.C. §78t(a)) ............................................................ 133

XIV. PRAYER FOR RELIEF ............................................................................... 134

XV. JURY DEMAND .......................................................................................... 135

## I. NATURE OF THE ACTION

1. This is a proposed class action for violation of the federal securities laws. Court-appointed lead plaintiffs the City of Warwick Retirement Board ("Warwick") and Peter Szabo ("Szabo") (collectively, "Plaintiffs"), by and through their undersigned counsel, bring this action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. §§ 78j(b) and § 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5) (the "Action").

2. Plaintiffs' claims are brought on behalf of themselves and all other persons and entities who purchased or otherwise acquired the publicly-traded securities of YRC Worldwide Inc. ("YRC" or the "Company") between March 10, 2014 and December 14, 2018, both dates inclusive (the "Class Period").

3. Defendants are (i) YRC; (ii) James L. Welch ("Welch"), the Company's former Chief Executive Officer ("CEO"); (ii) Stephanie D. Fisher ("Fisher"), the Company's Chief Financial Officer ("CFO"); (iii) Jamie G. Pierson ("Pierson"), the Company's former Executive Vice President and CFO; and (iv) Darren D. Hawkins ("Hawkins"), the Company's CEO. Defendants Welch, Fisher, Pierson and Hawkins are identified collectively as the "Individual Defendants." The Company and the Individual Defendants are referred to as the "Defendants."

4. Plaintiffs' allegations are based upon Plaintiffs' counsel's investigation, except as to the allegations pertaining to Plaintiffs, which are based upon their personal knowledge. Plaintiffs' counsel's investigation included, among other things, review and analysis of: (i) YRC's public filings with the U.S. Securities and Exchange Commission (the "SEC"); (ii) research reports disseminated by securities and financial analysts that covered YRC during the Class Period; (iii) transcripts of YRC's conference calls with analysts and investors; (iv) presentations, press releases, and reports regarding the Company; (v) news and media reports concerning the Company

and other facts related to the Action; (vi) data reflecting the pricing of YRC securities; (vii) interviews with former employees of YRC and other knowledgeable persons; (viii) consultations with relevant experts; and (ix) litigations involving YRC, including *United States ex rel. Hannum v. YRC Freight, Inc.; Roadway Express, Inc.; and Yellow Transportation, Inc.*, Civil Action No. 08-0811(A) (W.D.N.Y.) (the "Whistleblower Action").[1] Plaintiffs believe that substantial additional evidentiary support for its allegations will be developed after a reasonable opportunity for discovery.

## II. PRELIMINARY STATEMENT

5. YRC is a transportation company that does business through various subsidiaries, including YRC Freight Inc., which does business as YRC Freight ("YRC Freight"). YRC Freight was created through the 2003 acquisition of Yellow Transportation, Inc. ("Yellow"), based in Overland Park, Kansas, by Roadway Express, Inc. ("Roadway"), based in Akron, Ohio. Yellow and Roadway integrated in 2009.

6. YRC concentrates on less-than-truckload ("LTL") freight shipping in which goods are transported from multiple shippers in a single trailer. YRC Freight serves manufacturing, wholesale, retail and government customers throughout North America. YRC's U.S. government customers have included the DOD, the General Services Administration, the U.S. Department of Energy, the U.S. Department of Veterans Affairs, Unicor (Federal Prison Industries), and the U.S. Census.

---

[1] Facts alleged in this amended complaint regarding YRC's scheme to overcharge its customers, including the U.S. Department of Defense ("DOD"), are based on both Plaintiffs' independent investigation, and, in part, on the allegations of the pleadings and other filings in the Whistleblower Action. To the extent that these sources are considered the basis for information and belief, Plaintiffs allege facts with particularity and identify within the sections of this complaint the sources for the factual allegations. The information alleged is otherwise within Defendants' possession and knowledge.

7. YRC Freight is the largest subsidiary of YRC. YRC Freight has over 100 locations across the U.S. where shipments are collected, consolidated, weighed, transferred, and processed for delivery.

8. Key components of the price YRC charges its customers for the shipment of freight are the weight and classification of the freight. Throughout the Company's terminals across North America, the Company employs dozens of individuals whose responsibilities include inspecting the weight and classification of customer freight, called Weight and Inspection ("W&I") coordinators, managers and directors. YRC's W&I employees, Pricing, Collections and Government Practicing groups and practices are overseen by senior executives and managers located at YRC's headquarters in Overland Park, Kansas.

9. On information and belief, from at least September 2005 through at least the end of the Class Period, Company executives, including Defendant Welch, created, implemented or authorized a fraudulent scheme whereby the Company's customers were materially overcharged for shipments based on weights that were higher than actual weights, and thereby—according to YRC's internal emails—generated at least $2 million per month in illicit revenue.

10. YRC's reweigh scheme worked as follows: YRC would reweigh loads of cargo that passed through its freight terminals. Upon reweighing, if the weight of a customer's freight was heavier than the weight on the associated invoice or bill of lading, the customer was charged more, which internally at YRC was called a "positive" reweigh. However, if the reweigh was "negative," because it indicated that the shipment was actually lighter, YRC did not correct the weight. Because shipment revenue depended on weight, Defendants' reweigh practices meant that they corrected weights if the error was in their favor, but deliberately ignored reweigh results if it

meant their customer was owed a discount or credit, resulting in millions of dollars in overcharges to YRC customers.

11. According to internal YRC documents obtained by the DOJ pursuant its investigation that began in or around 2009 and a Civil Investigative Demand ("CID") that led to the DOJ filing a Complaint in Intervention in the Whistleblower Action in 2018, YRC senior executives understood that their one-sided reweigh practices were cheating customers and were wrong, they took steps to conceal their existence, and the negative reweigh scheme generated at least $2 million of dollars in illicit revenue and profit per month. Through its investigation and pursuant to its CID, DOJ interviewed or took oral testimony from at least 32 witnesses, including current or former YRC employees, including Defendant Welch, and YRC produced hundreds of thousands of pages of documents to the DOJ. During the course of the DOJ's investigation, DOJ and the Company interacted through multiple meetings, negotiations and presentations, including several settlement negotiations (the "DOJ Investigation").

12. Moreover, what the DOJ alleges is just the tip of the iceberg. Numerous former YRC employees confirmed not only that the Company's wrongful negative reweigh practices continued throughout the Class Period, but also that Defendants' scheme to overcharge its customers was multifaceted and employed various other methods to wrongfully overcharge YRC customers.

13. For example, according former YRC employees, overcharging YRC customers was "standard operating procedure," a "constant money grab" and part of a "culture" of wrongdoing. According to YRC former employees, YRC: i) routinely overcharged customers, like Wal-Mart, for a shipment of a full truckload, even if the truck was half empty; ii) incentivized employees to accumulate as many reweighs as possible per day by offering $25 gift cards to Home Depot for

every 30 reweighs achieved, whereby reweighs were frequently forged in order to hit the reweigh target; iii) misclassified freight by manipulating shipping codes to increase charges; iv) manipulated freight in transit by adding unwarranted fees, such as fuel surcharges; and v) maintained a "hit list" of larger customers to target for overcharges, such as Wal-Mart, Sears, and General Mills.

14. On information and belief, the overcharge scheme alleged by both the DOJ and former YRC employees (the "Overcharge Scheme") continued to generate millions of dollars in illicit revenue throughout the Class Period for YRC, thereby artificially inflating the Company's reported operating revenue, operating income and net income (or understating losses).

15. During the Class Period, Defendants repeatedly made representations to investors about the Company's business, operations and financial results, and that the Company's financial results were reported in conformity with accounting principles generally accepted in the United States of America ("GAAP"). At the same time, Defendants i) failed to disclose the Overcharge Scheme, that it was materially inflating YRC's reported revenue, earnings and the value of its publicly-traded securities; ii) failed to disclose that the Company's reported financials were not prepared in conformity with GAAP; and iii) concealed the very existence of the DOJ Investigation.

16. While knowing, or at least recklessly disregarding, that the Overcharge Scheme was artificially inflating YRC's financial results and concealing the DOJ Investigation, the Individual Defendants took advantage of YRC's artificially inflated stock price by selling over $9.8 million dollars-worth of YRC shares during the Class Period at prices between $15 and $24 per share.

17. On December 14, 2018, after the market opened, YRC investors were shocked when the DOJ issued a press release stating that it had filed a Complaint in Intervention in the

Whistleblower Action against YRC Freight, Roadway and Yellow for "systematically overcharg[ing] the government for freight carrier services and ma[king] false statements to the government that hid their misconduct," and disclosed to investors for the first time the Overcharge Scheme:

> United States Sues Freight Companies for Systematic Overcharging of Shipments . . .
>
> BUFFALO, N.Y. -- The United States has filed a complaint in the Western District of New York against YRC Freight Inc., (YRC); Roadway Express Inc. (Roadway); and Yellow Transportation Inc. (Yellow), alleging that these companies systematically overcharged the government for freight carrier services and made false statements to the government that hid their misconduct, the Justice Department announced today.
>
> The United States filed this lawsuit in U.S. District Court in Buffalo, New York. The United States alleges that, for more than seven years, the defendants defrauded the Department of Defense by millions of dollars for shipments that were actually lighter, and thus cheaper, than the weights for which the defendants charged the government. The United States further alleges that the defendants knowingly made or used false statements concealing their overcharging practices to the Department of Defense.
>
> "Those who do business with the government must do so fairly and honestly," said Assistant Attorney General Jody Hunt of the Department of Justice's Civil Division. "Knowingly overcharging the government is an affront to American taxpayers, and the Department of Justice will seek to ensure that those who engage in such misconduct are held accountable."
>
> Specifically, the United States' lawsuit alleges that the defendants reweighed thousands of shipments and suppressed the results whenever they indicated that a shipment was actually lighter than its original estimated weight. Thus, instead of charging the Department of Defense for shipments based on the correct weight, the defendants knowingly billed the government (and their other customers) based on weights that they knew to be inflated. The defendants also allegedly made false statements to induce the Department of Defense to use them as freight carriers and further knowingly made or used false statements to improperly avoid their obligations to correct inflated invoices and return overpayments.
>
> "When a federal agency, such as the Department of Defense, enters into a service contract with a private corporation or company, the expectation is that the agreement will be administered in good faith," stated U.S. Attorney James P. Kennedy Jr. for the Western District of New York. "In this case, YRC did not

> legally fulfill it's agreed upon obligations to the Defense Department, choosing instead to line its pockets with taxpayer's dollars. Such actions are fraudulent and illegal. This case should serve as a warning to any organization that enters into a contract with the federal government-if you try to rip us off, be prepared to pay a heavy price."
>
> "This complaint is the result of a successful investigation to identify those who seek to profit by defrauding the Defense Department," stated Leigh-Alistair Barzey, Special Agent-in-Charge, Defense Criminal Investigative Service (DCIS), Northeast Field Office. "DCIS will continue to investigate procurement fraud allegations, along with its law enforcement partners, in order to protect U.S. military members and the American tax payer."
>
> The original lawsuit in this case was filed by James Hannum under the qui tam, or whistleblower, provisions of the False Claims Act. Under the act, private citizens can bring suit on behalf of the United States for false claims and share in any recovery. The act permits the government to intervene in such lawsuits, as it has done here. Those who violate the act are subject to treble damages and civil penalties.
>
> This matter was investigated by the Civil Division's Commercial Litigation Branch, the U.S. Attorney's Office for the Western District of New York, the Defense Criminal Investigative Service, and the United States Army Criminal Investigation Division Command.
>
> The case is captioned United States ex rel. Hannum v. YRC Freight, Inc.; Roadway Express, Inc.; and Yellow Transportation, Inc., Civil Action No. 08-0811(A) (W.D.N.Y.).
>
> The claims asserted in the United States' complaint are allegations only and there has been no determination of liability.

18. On this news, shares of YRC Worldwide fell from an opening price on December 14, 2018 of $4.41 per share, to close at $3.17 per share on December 14, 2018, a decline of $1.24 per share, or over 28%, on heavier than average volume of over 6.4 million shares traded.

## III. JURISDICTION AND VENUE

19. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and § 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

20. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

21. Venue is proper in this judicial district pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. §1391(b) as the Company conducts business within this judicial district, and the alleged misstatements were disseminated within this judicial district and subsequent damages took place within this judicial district.

22. In connection with the acts, conduct and other wrongs alleged in the Action, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## IV. PARTIES

### A. Lead Plaintiffs

23. Lead Plaintiff Warwick is a Rhode Island pension fund. As set forth in its previously-submitted certification, Warwick purchased YRC's securities at artificially inflated prices during the Class Period and suffered damages thereon. *See* ECF No. 8-2.

24. Lead Plaintiff Peter Szabo purchased YRC's securities at artificially inflated prices during the Class Period, as described in his previously-submitted certification, and suffered damages thereon. *See* ECF No. 11-2.

### B. Defendants

#### 1. YRC

25. Defendant YRC was incorporated in Delaware in 1983 and has facilities throughout the United States, including in this District. The Company is headquartered in Overland Park, Kansas, at 10990 Roe Avenue, Overland Park, Kansas 66211. YRC's Overland Park headquarters is the Company's nerve center where direction, control and coordination of the Company takes

place, and where policy decisions, including the Company's reweigh policies, were made. The Company's securities are traded on the NASDAQ under the ticker symbol "YRCW." YRC maintains 384 terminals throughout North America, employs approximately 32,000 employees, and has more than 250,000 customers. According to Company presentations to investors during the Class Period, YRC represented approximately 23% of the market share among publicly-traded LTL carriers as measured by tonnage. YRC's customers include Wal-Mart Inc., The Home Depot, Inc., Amazon.com, Inc., Toyota Motor Corporation, General Electric Company, Philips Healthcare, and multiple agencies of the U.S. government.

**2. Defendant Welch**

26. Defendant Welch was the Company's CEO between July 22, 2011 through April 30, 2018, and a member of YRC's board of directors between July 22, 2011 and July 31, 2018. Defendant Welch served as President of YRC Freight from September 2013 through February 27, 2014, and CEO and President of Yellow from 2000 to 2007, during the time period when the Overcharge Scheme was created and implemented. Defendant Welch also held various positions in operations, sales and general management at Yellow between 1978 and 2000.

27. During the Class Period, Defendant Welch reviewed, approved, signed and caused to be filed YRC's annual and quarterly reports filed with the SEC on Forms 10-K and 10-Q, he made representations to investors during investor conference calls and presentations, and he signed certifications under the Sarbanes-Oxley Act of 2002 ("SOX Certifications"). As alleged *infra* in Section VI, Defendant Welch's representations contained materially false and misleading statements or material omissions.

28. During the Class Period, Defendant Welch acquired 882,416 YRC shares through the exercise or conversion of stock options at no cost, and he sold approximately 43% of the shares

that he acquired during the Class Period (383,565 shares) at artificially inflated prices and at an average price of $15.32 per share, for gross proceeds of $5,877,367.14. During the Class Period Defendant Welch did not purchase any YRC shares on the open market and he sold approximately 33% of his total holdings. During the Class Period, Defendant Welch received cash bonuses totaling $4,012,188.

29. On December 13, 2017, YRC disclosed that Defendant Welch informed the Company's board of directors of his intention to retire from the Company on July 31, 2018, and effective January 1, 2018, Defendant Hawkins would assume the transitional role of President and Chief Operating Officer of YRC, reporting to Defendant Welch during the transition. On April 30, 2018, YRC disclosed Defendant Hawkins was appointed CEO, and Defendant Welch would continue to serve on the Company's board of directors and as a senior advisor to the Company until July 31, 2018.

**3. Defendant Fisher**

30. Defendant Fisher has served as the Company's CFO since May 2017, and served as the Company's Vice President and Controller from May 2012 until May 2017. Defendant Fisher held various positions in the Company's Corporate Accounting department from 2004 to 2013, including Director – Financial Reporting.

31. During the Class Period, Defendant Fisher reviewed, approved, signed and caused to be filed YRC's annual and quarterly reports filed with the SEC on Forms 10-K and 10-Q, she made representations to investors during investor conference calls and presentations, and she signed SOX Certifications. As alleged *infra* in Section VI, Defendant Fisher's representations contained materially false and misleading statements or material omissions.

32. During the Class Period, Defendant Fisher acquired 52,615 YRC shares through the exercise or conversion of stock options at no cost, and she sold approximately 9.5% of the shares that she acquired during the Class Period (5,000 shares) at artificially inflated prices and at an average price of $23.50 per share, for gross proceeds of $117,500. During the Class Period, Defendant Fisher did not purchase any YRC shares on the open market and she sold approximately 5.58% of her total holdings. During the Class Period, Defendant Fisher received cash bonuses totaling $930,000.

**4. Defendant Pierson**

33. Defendant Pierson was the Company's Executive Vice President and CFO from November 2011 until December 2016.

34. During the Class Period, Defendant Pierson reviewed, approved, signed and caused to be filed YRC's annual and quarterly reports filed with the SEC on Forms 10-K and 10-Q, he made representations to investors during investor conference calls and presentations, and he signed SOX Certifications. As alleged *infra* in Section VI, Defendant Pierson's representations contained materially false and misleading statements or material omissions.

35. During the Class Period, Defendant Pierson acquired 308,171 YRC shares through the exercise or conversion of stock options at no cost, and he sold approximately 53% of the shares that he acquired during the Class Period (163,451 shares) at artificially inflated prices and at an average price of $18.28 per share, for gross proceeds of $2,987,269.12. During the Class Period, Defendant Pierson sold approximately 40% of his total holdings. During the Class Period, Defendant Pierson received cash bonuses totaling $1,022,040.

36. On November 16, 2016, YRC disclosed that Defendant Pierson "resigned" from the Company, effective December 31, 2016.

**5. Defendant Hawkins**

37. Defendant Hawkins has served as the Company's CEO since April 30, 2018. Defendant Hawkins was the Company's President and Chief Operating Officer between January 2018 and April 2018, YRC Freight's President between February 2014 and December 2017, and Senior Vice President—Sales and Marketing of YRC Freight between January 2013 and February 2014. Defendant Hawkins held various positions in operations and sales with Yellow between 1991 to 2009, including Director of Field Sales for the greater Memphis, Tennessee area. As of February 28, 2014, Defendant Hawkins was appointed as President of YRC Freight and reported directly to Defendant Welch.

38. During the Class Period, Defendant Hawkins reviewed, approved, signed and caused to be filed YRC's quarterly reports filed with the SEC on Form 10-Q, he made representations to investors during investor conference calls and presentations, and he signed SOX Certifications. As alleged *infra* in Section VI, Defendant Hawkins' representations contained materially false and misleading statements or material omissions.

39. During the Class Period, Defendant Hawkins acquired 231,803 YRC shares through the exercise or conversion of stock options at no cost, and he sold approximately 23% of the shares that he acquired during the Class period (54,413 shares) at artificially inflated prices and at an average price of $15.42 per share, for gross proceeds of $839,229.72. During the Class Period Defendant Hawkins did not purchase any YRC shares on the open market and he sold approximately 20% of his total holdings. During the Class Period, Defendant Hawkins received cash bonuses totaling $2,782,342.

40. The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of YRC's quarterly and annual reports, press

releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. Each of the Individual Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and their access to material non-public information, each of the Individual Defendants knew, or at least recklessly disregarded, that the adverse material facts alleged herein had not been disclosed to and were being concealed from the public and that the positive representations which were being made were materially false and misleading at the time they were made.

41. Each of the Individual Defendants: i) directly participated in the management of the Company; ii) was directly involved in the day-to-day operations of the Company at the highest levels; iii) was privy to confidential proprietary information concerning the Company and its business and operations; iv) was directly or indirectly involved in drafting, producing, reviewing or disseminating the false and misleading statements and information alleged herein; v) was directly or indirectly involved in the oversight or implementation of the Company's internal controls; vi) was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; or vii) approved or ratified these statements in violation of the federal securities laws.

42. The Individual Defendants are liable for their respective materially false and misleading representations or material omissions alleged *infra* in Section VI.

## V. OVERVIEW OF THE OVERCHARGE SCHEME

### A. Background on YRC's Corporate History

43. YRC is a holding company that, through its operating subsidiaries, provides various transportation services. The Company purports to have one of the largest, most comprehensive

LTL networks in North America. The Company operates through two reporting segments: i) YRC Freight, and ii) Regional Transportation.

44. YRC Freight is the reporting segment that focuses on longer haul business opportunities with national, regional and international services. YRC Freight was created through the merger of two companies, Roadway and Yellow. Roadway was based in Akron, Ohio, and Yellow was based in Overland Park, Kansas. In 2003, Yellow purchased Roadway for $966 million in cash and stock.

45. From 2003 through 2009, Yellow and Roadway operated separately and had separate corporate structures, but Roadway and Yellow started to share some corporate functions and what they considered to be "best practices." In March 2009, Roadway and Yellow merged to become YRC, Inc. In February 2012, the merged company changed its name to YRC Freight Inc.

46. The Company's YRC Freight segment represented 63% of the Company's consolidated operating revenue in 2015-18, and 64% of the Company's consolidated operating revenue in 2014.

47. Regional Transportation is the reporting segment for the Company's transportation service providers focused on business opportunities in the regional and next-day delivery markets. Regional Transportation is comprised of USF Holland LLC, New Penn Motor Express LLC, and USF Reddaway Inc.

48. YRC's reported operating revenue has two primary components: volume (commonly evaluated using tonnage, tonnage per day, number of shipments, shipments per day or **weight per shipment**), and yield (common evaluated using pickup up revenue, revenue per hundredweight or revenue per shipment).

49. YRC's relationship with the U.S. government was material to YRC's business, operations, and financial results, and YRC solicits U.S. government agencies' business on its website.

50. YRC's website states that it serves "the United States government and provides dedicated personnel who work exclusively to create and manage transportation and logistics solutions that meet the needs of departments and agencies in the U.S. government."

51. Indeed, in order to attract business from U.S. government agencies, the Company dedicates significant resources to its U.S. government business. According to YRC, its Government Solutions team is comprised "of experienced transportation professionals [who] work[] exclusively with the U.S. government to deliver confidence with transportation and logistics services which meet your missions' needs." YRC's Government Solutions Enterprise Client Executive is Brian Carter, and YRC maintains Government Solutions Customer Service, and Price and Analytics teams.

**B. Freight Carriers Often Reweighed Shipments to Verify That the Weight Was Correct[2]**

52. YRC Freight, Roadway and Yellow and other freight carriers picked up a shipment at its origination, transported it to the carrier's terminal, and then loaded it onto a different vehicle for delivery to the final destination. Throughout this process, each shipment was accompanied by a bill of lading, which was an agreement between the customer and the carrier that documented key information about the shipment, including its weight, destination, and the distance it needed to travel. The bill of lading also listed and acknowledged the carrier's receipt of goods for

[2] The allegations in Sections V(B)-(E) are based on the pleadings and other filings in the Whistleblower Action, except for information alleged in footnotes, which are based upon Plaintiffs' counsel's information and belief.

transport, specified the terms of delivery, and served as either the basis for the carrier's ultimate invoice or the actual invoice submitted to the customer.

53. A shipment's weight and the distance traveled generally determined the applicable rate and final fee for the freight service. As one YRC Freight executive stated in an internal email, "the weight drives the price we charge and invoice the customer."

54. While shipments were at a freight carrier's terminal or warehouse, the carrier could check to make sure that the information on the bill of lading was correct. This verification often included reweighing the shipment.

**C. Historically, YRC Freight, Roadway and Yellow Made Positive and Negative Reweigh Corrections**

55. Before September 2005, YRC Freight, Roadway and Yellow's reweighs caused them to correct bills of lading for both "positive" reweighs where the revised shipment weight was heavier than the original weight, and "negative" reweighs where the revised weight was lighter than the original weight. Positive reweigh corrections typically increased the cost of the shipment, and thus YRC Freight, Roadway and Yellow's revenue, while negative reweigh corrections typically benefitted YRC Freight, Roadway and Yellow's customers by reducing the cost of the shipment.

56. YRC Freight, Roadway and Yellow believed that it was important for reweighs to be accurate. For example, in October 2004, reflecting Yellow's concern that one of its terminals was falsely increasing weights during the reweigh process, an internal Yellow email noted that such overcharging "creates an integrity problem for Yellow with every affected customer."

57. Yellow further recognized that making negative reweigh corrections was vital to its credibility. As set forth in an internal email from May 2005, Yellow deliberately excluded negative reweigh corrections when it issued internal tracking reports of all reweigh correction

revenue, lest the reduced revenue "discourage anyone from doing the 'right thing' by [making] a negative revenue correction."

58. Similarly, according to an internal email from June 2005, Roadway was "opposed to using net numbers" when assessing the impact of reweigh corrections "as it sends the wrong message to those responsible for [making] corrections – IE don't [make] corrections in favor of the customer."

59. On August 22, 2005, Roadway streamlined its reweigh procedures so that Roadway could automatically update its records with any new weights and correct Roadway's charges accordingly. As set forth in an internal email to Roadway managers, new scales and wireless tracking devices enabled Roadway to "capture all positive and negative weight corrections regardless of the weight difference." The managers were further instructed to emphasize that the "integrity of correction information is critical in providing the customer with an accurate invoice and supporting documentation."

60. Roadway immediately enjoyed the benefits of the streamlined reweigh procedures. According to an internal email from September 1, 2005, Roadway's new procedures had already caused a surge in reweigh corrections "that turned into a 50% increase in revenue."

61. But Keith Rawson ("Rawson"),[3] then the Senior Director for Revenue Management for Yellow Roadway Enterprise Services (the entity overseeing the merger between Yellow and Roadway), observed in the same internal email that the increase in reweighs also caused "a problem with negative corrections (i.e. weight went down and now giving back money.)" As a result of this "problem," Rawson reported that Roadway had begun "analyzing limits on negative

[3] Rawson was YRC's Director—Procurement and Accounts Payable from April 2013 through December 2016 in in Kansas City, Missouri.

reweighs." Rawson further noted that eliminating negative reweigh corrections was an "opportunity" that could allow Roadway and Yellow to keep a combined $2 million per month.

### D. In 2005 and 2006, YRC Freight, Yellow and Roadway Decided to Boost its Revenue at the Expense of Its Customers by Eliminating Negative Reweigh Corrections

62. On September 13, 2005, Roadway essentially eliminated negative reweigh corrections.

63. Dean Frye ("Frye"),[4] then a senior manager at Roadway, sent a widely distributed internal email on October 3, 2005, that informed his colleagues that Roadway had implemented a programmatic change that "eliminate[d] the automated issuance of negative weight corrections." According to Frye, this meant that, with a few exceptions, "***[n]egative weight corrections will no longer be [made].***" (Emphasis in original.)

64. After implementing its new reweigh practices, Roadway instructed all its freight handlers, weight coordinators, and inspectors that generally "[n]o negative weight corrections will be [made]." A negative reweigh correction could still be made manually in certain circumstances, but the elimination of automated negative reweigh corrections was estimated to save Roadway $1 to $1.5 million in revenue per month by avoiding reduced charges to customers.

65. Rawson noted in an internal email on September 19, 2005, that "Roadway had basically done this on [its] own," but that he and other executives in charge of having Yellow and Roadway adopt each other's "best practices" could take credit if "we consider it a best practice and implement [it] at Yellow." Such cross-company adoption was commonly referred to as "synergy."

---

[4] Frye was YRC Inc.'s Director of Safety from January 2007 through October 2009, and Roadway's Director of Quality Administration and Safety between April 2006 and January 2007.

66. On September 26, 2005, Joe Whitsel ("Whitsel"),[5] a Vice President for Revenue Management at Yellow Roadway Enterprise Services, responded to Rawson that "[w]e need to make this [elimination of negative reweigh corrections] happen – I need the numbers to make [our] synergy goal for the year."

67. Rawson sent another email to Whitsel on September 29, 2005. Rawson stated that eliminating negative reweigh corrections would allow Yellow to "retain approximately $6 million per year ($500k per month)." Rawson also expected these earnings to grow as Yellow joined Roadway in streamlining its reweigh process so that revised weights were automatically recorded. These findings were forwarded to Todd Hacker ("Hacker"),[6] Yellow's Senior Vice President for Finance & Administration, who replied that it would be discussed with Yellow's then-President, Defendant Welch.[7]

68. On October 3, 2005, Whitsel told Mike Smid ("Smid"),[8] Roadway's President and CEO, that "we are recommending that Yellow follow Roadway's lead and implement the

[5] Whitsel was YRC's Vice President Cash Management/Finance Shared Services between January 2010 and January 2017 at the Company's headquarters in Overland Park, Kansas, and Vice President Revenue Management/Vice President Business Integration between September 1999 and January 2010 at the Company's headquarters in Overland Park, Kansas.

[6] Hacker was YRC's VP Investor Relations and Treasurer between February 2007 and December 2007 in the Company's Overland Park, Kansas headquarters; Senior Vice President of Finance and Administration of Yellow between September 2005 and January 2007; and Vice President, Treasurer of YRC between February 2004 and August 2005.

[7] At this time, Defendant Welch was CEO and President of Yellow.

[8] Smid was President and CEO of YRC National Transportation (all carriers) (n/k/a/ YRC Freight) and Chief Operations Officer between 2009 and July 2011 in the Company's Overland Park, Kansas headquarters; President and CEO of YRC National Transportation between 2007 and 2009 in the Company's Overland Park, Kansas headquarters; President and CEO of Roadway between 2005 and 2007 in the Company's Akron, Ohio office; President and CIO of YRCW Enterprise Services between 2004 and 2005 in the Company's Overland Park, Kansas headquarters; and

elimination of the negative revenue adjustments." Smid responded that he was not sure he agreed with a complete elimination and that there was "a right number in order to give our [reweigh] program some credibility."

69. In response, Rawson analyzed various negative weight tolerance scenarios under which weight or revenue variances above a certain level would still be disclosed and credited to customers. On October 13, 2005, Rawson reported his findings in an email to Whitsel. According to Rawson, to reduce negative reweigh corrections by half, YRC Freight could "only process a weight correction if the weight changes by more than 70%." Alternatively, Rawson noted that YRC Freight could set a dollar tolerance, rather than a weight tolerance. But to cut negative reweigh corrections in half, the tolerance would have to be set at negative $800, meaning that a weight drop that reduced revenue by $799 or less for a shipment would not be disclosed and credited to a customer. As Rawson stated, this "would also be hard to explain" because YRC Freight was not contemplating imposing a similar tolerance for positive reweigh corrections.

70. Ultimately, Rawson recommended that "if we are going to do it, let's go all the way." He reasoned that it "would be just as difficult to explain the difference in the positive and negative tolerance vs. saying we don't have one." Rawson further noted that if YRC Freight had to have "the 'tolerance conversation' with the customer, then we're probably going to end up waiving it anyway." In other words, Rawson believed that once a customer learned of YRC Freight's reweigh practices, YRC Freight, Yellow and Roadway would likely have to start making negative reweigh corrections for that customer in order to keep the business.

---

Executive Vice President Operations, Chief Accounting Officer and Chief Financial Officer of Yellow between 2000 and 2004, and held various other positions at Yellow between 1985 and 2000. As President and CIO of YRCW Enterprise Services, Smid purportedly identified over $350 million per year in potential "synergies" through the merger of Roadway and Yellow.

71. On October 27, 2005, Rawson provided Whitsel with a summary of his findings and recommendations regarding the Roadway and Yellow reweigh programs. Rawson stated that YRC Freight "could see $10-20 million in annualized revenue from a best practice weight correction program." He also found that Yellow was considering eliminating negative reweigh corrections and that this would represent about $500,000 in "revenue retained per month," while Roadway had already eliminated negative reweigh corrections and was retaining about $1.5 million per month in revenue.

72. On or about October 24, 2005, Hugh Gaynor ("Gaynor"),[9] a Revenue Management executive at Yellow, attended an industry meeting in which reweigh practices were discussed. At Gaynor's request, the other freight companies stated their policy on negative reweigh corrections. According to Gaynor, almost all of these companies "believed that not [making negative reweigh corrections] was a breach of faith with their consumers and undermined the integrity of the program."

73. On November 2, 2005, Whitsel reported to another Yellow Roadway Enterprise Services executive that, aside from Roadway, only two other freight companies were not "entering negative weight corrections."

74. Yellow's executive leadership, including its President, Defendant Welch, ultimately decided to copy Roadway and stop making negative reweigh corrections.

75. On January 5, 2006, Rawson and Whitsel placed a formal request for Yellow to eliminate all negative reweigh corrections. In the work request, Rawson and Whitsel ordered that

[9] Gaynor has served as YRC North American Transportations Manager, W&I, since 1982, and on information and belief, he "retired" recently.

Yellow "eliminate the negative adjustments" so it could "add [about] $500,000 per month to top and bottom line (revenue and profit)."

76. Yellow stopped making negative reweigh corrections on or around February 27, 2006.

77. In a March 1, 2006, email that was in response to questions from Yellow employees, Gaynor stated that Roadway had not been making negative reweigh corrections for six months and that "Yellow Senior Management has decided to follow suit and not process negative adjustments."[10] Gaynor further emphasized that "**[t]his information is for your use only and should not be communicated outside of our team.**" (Emphasis in original.)

78. As with Roadway, Yellow's new reweigh policy generated rapid results. An internal presentation from June 15, 2006, demonstrated that, in just a few months, Yellow had largely succeeded in reducing or eliminating "the number of [reweigh corrections] that result in a negative revenue change."

79. Meanwhile, YRC Freight continued to focus on positive reweigh revenue. In an internal email from January 4, 2007, Gaynor reiterated what he "had said on our conference calls," which was that "we need to <u>actively promote</u> the reweigh program." (Emphasis in original.) Two weeks later, on January 16, 2007, Gaynor sent another internal email that described Yellow's recent revenue figures as "horrible" and exhorted his colleagues "to push the weight revenue and number of reweighs as well … do not forget to push the reweighs."

80. Yellow spent approximately $2 million on new scales in 2007. As a result, according to an internal email from November 20, 2007, some Yellow terminals showed "a significant improvement in reweigh revenue [when] compared to November 2006." However,

[10] As alleged above, Yellow senior management included Defendant Welch.

other terminals were "flat or even show decreases in reweigh revenue." Yellow found this to be "completely unacceptable" because it "must realize the expected revenue increase" from its investment in new scales. Accordingly, Yellow instructed its managers "to actively monitor the reweigh activity at their terminals" and "hold their teams responsible for weighing freight and using the equipment provided to ensure we are properly compensated for every shipment we haul."

81. The next day, Gaynor and other Yellow executives forwarded this email to Yellow employees throughout Yellow. Gaynor stated that the email "speaks for itself" and instructed Yellow personnel to "not discuss it with anyone outside our team." Gaynor also suggested that managers "[d]o whatever you can to shine a spotlight on the reweigh results in your terminal."

82. But notwithstanding YRC Freight, Yellow and Roadway's desire to be paid according to the correct weight when it benefited them, they continued to monitor their reweigh activity to make sure that they were not correcting weights if it would benefit their customers.

83. In January 2007, Whitsel asked a colleague whether Yellow was still making negative reweigh corrections. On January 23, 2007, the colleague confirmed by email that Yellow was making "very few negative [weight] adjustments." Specifically, out of more than 1.5 million invoices between November 13, 2006, and January 20, 2007, Yellow made 42 negative reweigh corrections. In contrast, Yellow made 75,324 positive reweigh corrections during the same period.

84. Gaynor conducted another informal industry survey on negative reweigh practices in September 2007. Unlike YRC Freight, all twelve companies that responded confirmed that they made negative reweigh corrections.

85. Yet YRC Freight, Yellow and Roadway maintained its secret prohibition on correcting weights when it benefited their customers. On March 17, 2009, Don Geisler

("Geisler"),[11] a business development executive at YRC Freight, emailed Whitsel because he had "noticed that we are passing along changes in favor of the customer … when the weight is corrected to a lesser [number] and the corrected revenue results in a lower charge, the savings is passed along to the customer." Geisler "thought we had blocked that as part of the 'best practice' synergy work" and listed six offending shipments where he believed YRC Freight had made negative reweigh corrections.

86. In turn, Whitsel forwarded the email to his colleagues, noting that he "thought we had stopped negative corrections as part of synergies." Whitsel was assured that "negative reweighs were stopped" and that the shipments with negative revenue adjustments were the result of situations where YRC Freight had not been able to "determine the revenue impact" of non-weight corrections. James Faas, YRC's Director of Weights and Inspections ("Faas"),[12] also noted that for two of the six shipments at issue, YRC Freight "had an agreement on [sic] to cut back if the weight was found to be lower" because former YRC Freight employees told these customers that "YRC was cheating them, so the deal was made to retain to the business."

[11] Geisler was a Manager of Product and Sales Support at Roadway from 2005 to 2006; Director of Service Marketing at Roadway from April 2006 through February 2007; Vice President of Business Development & Services Marketing between 2007 and 2009 at YRC; and Vice President of Marketing at YRC between 2009 and 2011.

[12] Faas has served as Director of W&I at YRC Freight in Tampa, Florida since 2012, reporting to Kelly Kendall, current Vice President of Revenue Management for YRC, who has worked for YRC entities for over 20 years, in Overland Park, Kansas. Faas served as a quality manager at YRC Freight in Tampa, Florida between 2010 and 2012 and reported to Rick Sheafer ("Sheafer"), Director of Quality, in Akron, Ohio. Faas served as Director W&I between 2007 and 2010 in Tampa, Florida and reported to John Colburn, Vice President of Quality and W&I, in Overland Park, Kansas. Faas served as a manager of W&I between 2005 and 2007, reporting to Doug Neiger ("Neiger"), Director, Risk Management in Overland Park, Kansas, and was Director of W&I on interim basis in or around 2005-2007. Faas served as a W&I Coordinator between 2000 and 2005 in New York and reported to Gaynor, Director of W&I, in Maybrook, New York.

87. But as one YRC Freight employee explained in an internal email from May 21, 2009, YRC Freight would not ordinarily make a "negative weight change."

88. In February 2010, one YRC Freight senior analyst had a daily calendar reminder to check for negative reweigh corrections to ensure they were not "the fault of anyone at YRC."

89. An internal YRC Freight email from February 18, 2011, also confirmed that YRC Freight was still not correcting weights when its reweigh indicated there was a "negative weight change."

90. On April 7, 2011, following a "talk about integrity this morning," one YRC Freight manager commented in an internal email that "perhaps we need to revisit the negative weight correction logic" because it was putting YRC Freight's relationships with its customers at risk. In response, a colleague noted that making negative reweigh corrections "has been previously discussed and the decision was made to leave it [the] way that it is currently."

91. Another YRC Freight employee asked a colleague on October 4, 2011, whether negative reweigh corrections were counted against a terminal's revenue. His YRC freight colleague replied that he had been told "that the customer does not receive a lowered invoice" and that the "negative scans never change the mainframe data," but asked a manager for confirmation. The manager responded that "for now we do not systemically [make] negative [reweigh] corrections," but added that "at some point we may to add further credibility to our process."

92. According to the Whistleblower Complaint, notwithstanding their concerns about integrity and credibility, YRC Freight, Yellow and Roadway continued to suppress negative

reweigh corrections for their customers' shipments, including the DOD, until at least October 2013.[13]

### E. YRC's Fraudulent Billing Scheme Cheated the DOD and U.S. Taxpayers and Caused YRC to Submit False Claims in Violation of the FCA

#### a. Current YRC Employee James Hannum Files the Whistleblower Action

93. The Whistleblower Action was filed under seal in November 2008 by James Hannum ("Hannum"). Hannum has been employed by Roadway for over 30 years at its Buffalo (Tonawanda), New York facility. At the time of the filing of the Whistleblower Action, he was a service planner or supervisor. For many years before he was a service planner or supervisor, he was employed as a W&I supervisor at YRC. Hannum worked for Roadway and subsequently YRC Freight. Hannum continues to be employed by YRC. Hannum works for YRC at a "break-bulk terminal," which means that freight is shipped to and from points outside the Buffalo, New York region. When freight is handled in Buffalo, it is scaled, and the weight is verified.

94. The Whistleblower Action brought allegations for violations of the Federal Civil False Claims Act, 31 U.S.C. § 3729 ("FCA"), *et seq*., under the FCA's *qui tam* provisions that allow any person having information regarding a false or fraudulent claim against the U.S. to bring an action for himself (as the "relator") and for the U.S.

---

[13] Defendants' brief filed in the Whistleblower Action essentially admits that the Company's policy of blocking negative reweighs continued after 2013. *See* Defs.' Memo. in Supp. of Mot. to Dismiss, *U.S.*, *ex rel. James Hannum v. YRC Freight, Inc.*, *et al.*, No. 08-cv-811 (W.D.N.Y.), ECF 83-1, at 9; *see also id.*, at 1, 8, 10. In arguing that the DOD became aware of the Company's negative reweigh policy in 2008, but continued to make payments through at least 2013, the Company further argued that: "[t]he same is true for subsequent tender awards and contract extensions, or new contracts/subcontracts, that were issued with simultaneous knowledge that the Defendants were not processing negative reweighs."

95. The FCA establishes liability for knowingly making, submitting, or causing false or fraudulent claims for federal funds. 31 U.S.C. § 3729(a)(1) (through May 19, 2009) and 31 U.S.C. § 3729(a)(1)(A). The FCA also establishes liability for knowingly making, using, or causing false records or statements material to false or fraudulent claims for federal funds. 31 U.S.C. § 3729(a)(1)(B). For conduct occurring through May 19, 2009, any person who knowingly makes, uses, or causes a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money to the federal government is also subject to liability under the FCA. 31 U.S.C. § 3729(a)(7) (through May 19, 2009). For conduct occurring after May 19, 2009, a person who knowingly makes, uses, or causes a false record or statement material to an obligation to pay or transmit money to the government, or any person who knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money to the government, is also liable under the FCA. 31 U.S.C. § 3729(a)(1)(G).

96. Hannum alleged that he has personal knowledge of the Overcharge Scheme and is acquainted with YRC Freight, Yellow and Roadway and their business practices, and alleged firsthand information concerning YRC's policies and procedures employed to implement the Overcharge Scheme.

97. According to Hannum, when shippers like the U.S. government send shipments via Roadway or Yellow, they submit the shipments along with bills of lading, which set forth the shipment's weight — as initially determined by the shipper.

98. Each shipment's weight, along with the distance that it must travel, are the two factors that defendants use to determine the fee that they charge to the U.S.

99. Roadway's internal policies require it to conduct weight verifications, whereby its employees, typically forklift operators (also known as "freight handling professionals"), are to

weigh each shipment to determine whether the shipper's stated weight, typed on the bill of lading, is accurate. Upon information and belief, Yellow has the same internal policies.

100. After it is weighed, each shipment's actual weight — whether it is higher or lower than that stated in the bill of lading — is then entered into Roadway and Yellow's computer system as a weight correction.

101. From about 2004 to 2008, Roadway has been processing its weight corrections solely to *increase* the amount invoiced when the actual scale weight exceeds the stated weight on the bill of lading. Roadway *deliberately prohibits* its computer system from *decreasing* the amount invoiced when the actual scale weight is less than that stated on the bill of lading.

102. In other words, Roadway adjusts invoices upward for heavier-than-stated shipments, but set its automated computer system so that invoices are not adjusted downward for lighter-than-stated shipments, which are essentially ignored by the computer system. Instead, Roadway keeps the resulting overcharges.

103. Upon information and belief, before about 2006, Yellow processed its weight corrections both to (a) *increase* the amount invoiced, when the actual weight exceeded the stated weight on the bill of lading, and (b) *decrease* the amount invoiced, when the actual weight was less than the stated weight on the bill of lading.

104. Upon information and belief, sometime in about 2006, once Roadway's practice became known to its sister company Yellow, Yellow then deliberately chose to change its practice to mirror Roadway's, namely, to make upward weight corrections, yet ignore would-be downward corrections, thereby pocketing the resulting overcharges.

105. Upon information and belief, Yellow's decision to adopt Roadway's fraudulent practice, and Yellow and Roadway's decisions to maintain this practice, were executive-level

decisions. Upon information and belief, some of these executive-level decisions may have been made at Yellow and Roadway's parent company, YRC Worldwide Inc.

106. Upon information and belief, Yellow's fraudulent practice, in place since about 2006, continued through November 2008. Upon information and belief, Yellow and Roadway have and continue to apply this fraudulent practice systematically to thousands of U.S. Government shipments. Yellow and Roadway, upon information and belief, automatically disregard minor weight corrections — both upward and downward — if they are less than about 30-40 pounds.

107. By way of example, a shipment from Dover Air Force Base in Delaware to a munitions storage site in Oklahoma had 4,310 pounds as its stated weight on the government's bill of lading. Roadway's scale then weighed the shipment at 3,345 pounds, but Roadway charged the government the full amount for a 4,310-pound shipment, resulting in an overcharge of approximately $222.84.

108. Similarly, an exemplar shipment from Travis Air Force Base in California to an Army depot in Pennsylvania had 620 pounds as it stated weight on the government's bill of lading. Roadway's scale then weighed the shipment at 220 pounds, but Roadway charged the government the full amount for a 620-pound shipment, resulting in an overcharge of approximately $133.23.

**b. The DOJ Investigation Finds Rampant Fraud at YRC and DOJ Files a Complaint in Intervention in the Whistleblower Action**

109. In or around 2009, the DOJ Investigation began. The DOJ presented YRC with questions and inquiries concerning the DOD's shipments tendered for transport through YRC. The DOJ issued a CID, and pursuant to its investigation, and YRC produced "hundreds of thousands of pages" of documents, including emails and data. The DOJ interviewed or examined at least 32 witnesses, including 11 current or former YRC employees from the Company's headquarters in

Overland Park, Kansas, including Defendant Welch, as well as nine witnesses in Ohio, and 12 witnesses in Florida, Illinois, Michigan, Indiana, New York and Washington, D.C.

110. On information and belief, DOJ interviews or depositions occurred during the Class Period, witnesses deposed or examined by the DOJ acknowledged YRC's negative reweigh policies, and the Company retained outside counsel, Dentons US LLP.

111. The DOJ engaged in extensive pre-filing discovery. The DOJ sought and obtained documents from YRC relating to its shipping activities relating to negative reweigh shipments billed to the DOD, and obtained documents from YRC via email and scanning. The DOJ focused on where YRC Freight, Yellow and Roadway maintained information to precisely quantify where they conducted their reweigh operations.

112. In particular, the DOJ took deposition testimony or interviewed the following current or former YRC officers or employees: Defendant Welch, Neiger, Rawson, Former YRC CEO Smid, Frye, Sheafer, Faas, Hacker, and Gaynor.

113. Starting in 2009, YRC and the DOJ interacted through multiple meetings, negotiations and presentations, including several settlement negotiations.

114. After a lengthy investigation by the DOJ, which was complicated by YRC Freight's, Yellow's and Roadway's failure to maintain pertinent and relevant records, on December 14, 2018, the DOJ disclosed the filing of its Complaint in Intervention in the Whistleblower Action.

115. The DOJ alleges that YRC Freight, Roadway, and Yellow knowingly submitted thousands of false claims to the DOD that used inflated weights to overcharge the U.S. government, knowingly made false statements to induce DOD to give them business, and further

knowingly made or used false statements to avoid their contractual obligations to correct inflated invoices and return overpayments.

116. YRC Freight, Yellow and Roadway knowingly submitted false claims for payment to DOD for shipments that actually weighed less than the weights the Defendants used when charging the government. The invoices, or bills of lading that served as invoices, that the Defendants submitted to DOD falsely represented shipment weights to be higher than the actual weights measured by the Defendants' own scales, resulting in inflated charges to DOD.

117. Between September 2005 and June 2010, YRC Freight, Yellow and Roadway did not keep records of the negative reweigh corrections that they systematically cancelled during this period.

118. From at least June 2009 to June 2010, YRC Freight, Yellow and Roadway also hid evidence of their misconduct by programming their computer system so that negative reweigh results would not register.

119. For example, as stated in an internal email sent on June 26, 2009, YRC Freight programmed its computer system so that negative reweigh results would "never show up in the mainframe . . . to be recorded." Negative reweigh results were instead automatically rejected and then "*hidden*" by recording the reason for the rejection as "CAN NOT [sic] FIND EMPLOYEE NUMBER," even though YRC also had an error code for "NEGATIVE WEIGHT CORRECTION PROHIBITED." (Emphasis in original.)

120. As stated in an internal email from March 3, 2010, YRC Freight continued to program its computer system to "check to see if the reweigh information is negative" and "if so the system will delete all negative reweigh information."

121. YRC Freight, Yellow and Roadway retained records of their negative reweigh shipments billed to DOD between June 2010 and October 2012. Exhibit A to the DOJ's Complaint in Intervention provides 200 examples of the more than 13,000 false claims YRC Freight, Yellow and Roadway billed to DOD during this period.

122. According to the records YRC Freight, Yellow and Roadway kept for their billings to DOD between June 2010 and October 2012, YRC Freight, Yellow and Roadway submitted to DOD approximately 725 false claims per month. Based on an extrapolation of those false claims per month to the September 2005 to October 2013 period at issue, YRC Freight, Yellow and Roadway submitted to DOD approximately 70,000 false claims predicated on weights that they knew were too heavy. YRC Freight, Yellow and Roadway submitted these false claims pursuant to numerous tender agreements with DOD, as well as certain contracts with the DOD.

123. YRC Freight, Yellow and Roadway deliberately overcharged DOD on thousands of invoices by suppressing negative reweigh corrections. Because the amount DOD paid depended upon the weight of the shipments, YRC Freight, Yellow and Roadway failure to correct weights when it would result in a lower price was capable of influencing DOD's payment decisions. In addition, had DOD known the truth, it would have paid YRC Freight, Yellow and Roadway based on the actual weight of the shipments – as revealed by YRC Freight, Yellow and Roadway's own negative reweigh results – rather than the inflated weight YRC Freight, Yellow and Roadway billed. As one YRC Freight employee asked rhetorically in an internal email from January 29, 2008, "what customer would not want to reduce their charges?"

124. Indeed, YRC Freight, Yellow and Roadway repeatedly emphasized in internal communications that it was important for them to reweigh shipments in order to receive the payments they were owed. For example, in January 2011, YRC Freight wanted to make posters

to encourage its dock workers to reweigh shipments. One employee suggested using old materials from "a few years ago." These materials analogized YRC Freight's reweigh program to when "you walk into a Post Office with a package to mail" and the clerk weighed "the shipment to apply the proper postage." "Accurate weights," according to these materials, "lead to fair rates for consumers, and most importantly, a fair profit for us. We only want to get credit for what we are hauling."

125. YRC Freight, Yellow and Roadway also recognized that their customers would consider their one-sided reweigh practices to be a significant breach of trust that was capable of putting their business at risk. For instance, YRC Freight, Yellow and Roadway assumed that once a customer discovered that YRC Freight, Yellow and Roadway were not generally making negative reweigh corrections, they would have to make an exception for that customer in order to keep their business. As alleged above, these assumptions were proved correct, as YRC Freight, Yellow and Roadway ultimately granted exceptions for various customers who discovered YRC Freight, Yellow and Roadway's scheme. In addition, the above allegations are replete with examples of YRC Freight, Yellow and Roadway acknowledging that fraudulent reweigh practices created an actual or potential integrity problem with customers.

126. YRC Freight, Yellow and Roadway's false representations relating to specific shipments were material to YRC Freight's, Yellow's and Roadway's obligation to return overpayments to DOD.

127. DOD officials were unaware that YRC Freight, Yellow and Roadway had overcharged the government for shipments that warranted, as shown by YRC Freight, Yellow and Roadway's own scales, a negative reweigh correction. To the contrary, these shipments would have appeared to be normal, with no characteristics distinguishing them from those shipments

where YRC Freight, Yellow and Roadway used an accurate weight to charge DOD. Had the government known, it would have sought to recover overpayments to ensure that it was only paying for the actual shipment weights.

128. The FCA provides for a recovery of three times the damages sustained by the U.S. government (treble damages), plus a civil penalty for each violation of the Act. 31 U.S.C. § 3729(a)(1). The civil penalty for an FCA violation is to be not less than $5,500 and not more than $11,000. *See* 31 U.S.C. § 3729(a) (through May 19, 2009); 31 U.S.C. § 3729(a)(1); and 28 C.F.R. § 85.3(a)(9).

129. As a result of the approximately 70,000 false claims alleged to have been submitted to the DOD, YRC Freight, Yellow and Roadway are subject to a civil penalty of approximately $385-$770 million, as well as three times the damages sustained by the U.S. government.

## F. Former YRC Employees Confirm the Overcharge Scheme Continued Before and During the Class Period

### *i. CW 1—Former W&I Manager, Tracy, California*

130. According to Confidential Witness ("CW") 1, a former W&I Manager from March 2011 through March 2014 at YRC's Tracy, California terminal, as a W&I Manager CW 1 was responsible for generating revenue from reweighs through positive reweighs. However, according to CW 1, negative reweighs (whereby customers received credit back from the original quote provided on the bill of lading) were "extremely frowned upon" by YRC management, including CW 1's immediate supervisor Steve Post ("Post").[14] According to CW 1, CW 1 and other W&I employees were routinely chastised for adjusting weights to the benefit of the customer and routinely "got in trouble for doing the right thing."

[14] Post was a W&I manager for YRC's West Coast Region and reported to Faas.

131. According to CW 1, CW 1 frequently objected to the Company's reweigh policies both verbally and via email. In a November 2013 meeting in YRC's conference room at the Tracy, California terminal with Post and Defendant Welch, CW 1, reiterated CW 1's objections to Company policies regarding negative reweighs and "cheating customers." According to CW 1, Welch did not respond to CW 1's concerns about the Company's reweigh policies.

132. CW 1 learned through conversations with other YRC employees that the non-recording of negative reweighs continued "well after" 2014.

***ii. CW 2—Former W&I Coordinator, Chicago, Illinois***

133. According to CW 2, a former W&I Coordinator from August 2015 through March 2018 at the Company's Sauk Village, Illinois terminal, CW 2 was responsible for working with terminal managers and inspecting shipments, and reported to Paul Stegall ("Stegall"), a current W&I Manager for YRC in Akron, Ohio. CW 2 further worked with YRC sales employees to determine freight classifications.

134. According to CW 2, YRC frequently failed to issue negative reweigh corrections, misclassified freight, and manipulated freight in transit in order to overcharge customers. CW 2 described a culture at YRC where employees were trained to target larger customers such as Wal-Mart, Sears, and General Mills, who were unlikely to identify these wrongful overcharge practices. In cases where a customer disputed a weight or classification charge that resulted in a credit to a customer, YRC maintained "cheat codes" which provided guidance to "make-up the [revenue] loss another way." CW 2 stated that YRC employees were trained to routinely overcharge customers, like Wal-Mart, for a full truck (27 cubic feet) even if there was only 12-14 cubic feet of product, and that this occurred "multiple times a day."

135. According to CW 2, YRC only looked at certain customers' freight who YRC "knew" they could "get away with" overcharging. According to CW 2, if a customer objected and eventually received new pricing, YRC found a new way to manipulate it.

136. CW 2 stated that upon arrival of freight at the Sauk Village facility and prior to shipping, photographs were taken of the freight via a wireless tablet and the photos were automatically uploaded into a computer system maintained by the corporate office in Overland Park, Kansas. CW 2 further observed that YRC employees were trained to take photos in such a way as to not reveal their overcharging practices to the respective customer. For example, if YRC was shipping 2 x 4 wood pallets which were only several feet high, the photo would hide the "leftover space" which could be used by YRC to ship additional merchandise from another customer and double bill the shipment.

137. CW 2 left YRC in 2018 due to CW 2's objections to Company billing policies.

***iii. CW 3—Former W&I Coordinator, Laredo, Texas***

138. CW 3, a former W&I Coordinator from May 2012 through April 2015 at the Company's Laredo, Texas terminal, was responsible for working closely with terminal managers on investigations, safety, and short, and long-term projects. CW 3 was also responsible for working with customers on issues surrounding freight measurements, weights and loading.

139. According to CW 3, throughout CW 3's tenure, product coming through the Laredo, Texas terminal was weighed by scales on the loading dock, transported by forklift operators. CW 3 routinely witnessed improper freight charges to customers, specifically failure to issue negative reweigh corrections. According to CW 3, YRC frequently blocked negative reweigh corrections for auto manufacturers, like Toyota and Ford.

140. CW 3 also observed frequent occurrences whereby customers were charged for "entire containers" where "only 2 or 3 boxes" were present, resulting in "thousands of dollars" more in charges. According to CW 3, YRC overcharged a leading "medical parts manufacturer" for entire containers "all the time."

### *iv. CW 4—Former W&I Coordinator and Operations Supervisor, Chicago, Illinois*

141. CW 4 is a former W&I Coordinator and Operations Supervisor from May 2008 through December 2017 at the Company's terminals in Illinois, including terminals at Bolingbrook and Chicago Heights, South Plainfield, New Jersey and Aurora, Colorado. CW 4, as a W&I Coordinator, was responsible for producing revenue on products being shipped. As an Operations Supervisor in South Plainfield, CW 4 was responsible for providing logistical support to sales and operations personnel. CW 4 was also responsible for auditing and validating shipment classifications while working with YRC terminal managers.

142. CW 4 reported directly to Stegall. During CW 4's tenure, Phil Lynch and Gaynor were W&I Managers for the eastern region. Mark Hayes and Post were W&I Managers for the western region. All W&I Managers reported to Faas, Director of W&I. Faas reported to YRC's corporate office in Overland Park, Kansas.

143. CW 4 stated that the wrongful reweigh practices alleged in the DOJ's Complaint in Intervention occurred during CW 4's tenure at YRC, that CW 4 observed them, and objected to them.

144. CW 4 observed YRC's wrongful reweigh practices and verbally objected to at least his immediate superior, Stegall. In particular, CW 4 witnessed various improper billing practices to overcharge customers, including failure to issue negative reweigh corrections, misclassification of freight (*i.e.*, customer shipping bricks while showing pillows on the bill of lading), and

manipulation of freight in transit (*i.e.*, adding unwarranted fuel surcharges and other fees). CW 4 described these practices as "SOP" or "standard operating procedure" at YRC. Throughout CW 4's tenure, "it was SOP not to cut weight back…it was a money grab."

145. According to CW 4, until approximately 2011, YRC terminals were equipped with central scales which terminal workers were required to use to weigh freight. On numerous occasions, terminal workers failed to weigh product using the terminal scale, instead opting to "eyeball" it and complete a paper "weight slip" which was passed along to the W&I coordinators for processing into the main terminal system (RS6000). After 2011, "most" of the larger YRC processing facilities such as Chicago Heights began to use forklifts equipped with digital scales and connected (wirelessly) to the YRC mainframe computer to allow all staffers the ability to track and weigh every shipment.

146. According to CW 4, YRC targeted certain customers who YRC knew would not identify or dispute wrongful overcharge, either through reweighs or classification adjustments. This "hit list" of customers was well-known throughout the Company and included major retailers such as, Home Depot and Wal-Mart.

147. According to CW 4, YRC's Chicago Heights, Illinois terminal operated as a busy distribution center for the Company. No customer was off limits when it came to negative reweighs. Repeat customers were frequently "tested" by YRC to see whether the customer would complain about the overcharge practices to their respective YRC account manager. Additionally, YRC used software programs called "Techpro," which provided W&I employees the ability to track product coming in and out of their terminal. Techpro provided YRC staffers a "roadmap" on what customer product to expect and prepare to manipulate.

148. According to CW 4, while at YRC's Chicago Heights terminal, YRC customers "protested" about their freight invoice "at least 10 times a day" to their respective account manager. Frequent complaints included YRC misrepresenting the true weight of the customer's freight. Complaints were sent via an internal "Protest Board" and were received by CW 4 and W&I personnel who were responsible for reviewing documentation and investigating the claims. When it came to protests stemming from overcharges due to weight, CW 4's directive was "stay your ground, [and] unless the evidence is overwhelming," do not credit to a customer. Ultimately, the account manager was responsible for relaying the W&I inspection findings back to the customer, which CW 4 stated caused discomfort to YRC account managers who also knew the Company was overcharging them due to weight. CW 4 added that on a few occasions during his tenure, customers requested a "reweigh block" on their account, which meant all invoicing was postponed during the YRC investigation. In the end, customer complaints about shipment weight went "into the air," in other words, they were ignored.

149. According to CW 4, YRC forklift operators were incentivized to accumulate as many reweighs as possible per day by receiving $25 gift cards to Home Depot for every 30 reweighs achieved. While working out of the Chicago Height facility, CW 4 witnessed numerous operators "forging reweighs" to hit the goal. Upon CW 4's raising the infractions to the terminal manager, the operator was not punished. As CW 4 described, reweighs were "a constant money grab" for YRC.

150. According to CW 4, YRC employees were trained to routinely upcharge customers like Wal-Mart for a full truck even if the truck was half empty. Prior to shipping, photographs were taken of the freight via a wireless tablet and were automatically uploaded into a computer program called "Share Point" which could be accessed by sales leaders and the corporate office in

Overland Park, Kansas. YRC employees were trained to take "manipulated photos" in such a way as to not reveal a pallet "turned" or a partially empty to the customer.

151. CW 4 described how under normal circumstances, freight classifications are based on four characteristics: (1) density, (2) ability to stow, (4) ease of handling, and (4) liability. Shippers use the National Motor Freight Classification ("NMFC") freight classifications as industry standard when setting rates. By arbitrarily adjusting the weight of the freight or NMFC classification of the freight, YRC artificially increased profits, or as employees within YRC called it, "funny money."

152. CW 4 described these wrongful practices as "SOP"—standard operating procedure. Directives to manipulate customer pricing by rejecting negative reweighs came from Faas and the corporate office in Overland Park, Kansas. CW 4 stated the topic of negative reweighs was discussed on conference calls led by Gaynor (a/k/a "Bulldog"), which typically occurred weekly.[15]

153. CW 4, following the end of CW 4's employment at YRC, continued to communicate with several YRC employees who informed CW 4 that the negative reweigh practices continued after CW 4 left the Company.

***v. CW 5—Former Operations Manager, Columbus, Ohio***

154. CW 5 is a former Operations Manager for YRC in Columbus, Ohio, from 2005 through 2012 who worked for Roadway as a Logistics Coordinator from 1991 through 2005.

155. As an Operations Manager, CW 5 managed a staff including 24 dock workers who were responsible for transporting more than 2 million pounds of freight daily. In addition, CW 5

[15] As alleged in Paragraph 72, 79, and 84, "Bulldog" Gaynor, "actively promoted" YRC's reweigh program, and knew that negative reweighs were wrong and cheated customers from his industry surveys.

worked with W&I employees responsible for generating additional revenue for the Company through reweighing and reclassifying freight.

156. During CW 5's tenure at YRC, CW 5 reported to Terminal Managers, Michael Calvin, Moe Clemmons, and Jeffrey Carroll, who reported to Frye.[16] Frye reported to Howard Moshier, former SVP of Operations at YRC and current President of New Penn, a YRC regional company.

157. Following Yellow's acquisition of Roadway in 2005, as well as YRC's acquisition of Holland Transportation in 2006, CW 5 attended Company meetings whereby CW 5 learned that financial institutions were pressuring YRC to "cut costs and produce more revenue," which CW 5 believes was the catalyst behind the policy to block negative reweigh corrections.

158. CW 5 observed that starting in or around 2007, YRC leadership began to pressure regional W&I staffers to generate additional revenue by, among other things, failing to issue negative reweigh corrections to customers. For example, CW 5 worked with Shanon Wright ("Wright"), a former Senior Supervisor at YRC's Columbus, Ohio terminal, who was responsible for W&I Coordinators. On multiple occasions, Wright informed CW 5 that she was instructed by her superior (on information and belief, believed to be Stegall, W&I Manager), to generate additional revenue via eliminating negative reweigh corrections.

159. CW 5 witnessed improper billing practices to overcharge customers, including failure to issue negative reweigh corrections and misclassification of freight. For example, a customer's bill of lading that states a pallet of product weighs 1,000 pounds, however, which upon reweighing, it is determined to be 800 pounds. Instead of issuing the negative "correction", forklift

[16] As alleged in Paragraph 63, in 2005, Frye disseminated an internal email declaring that "negative weight corrections will no longer be made."

operators were trained and encouraged to "add another pallet" of product weighing 200 pounds to misclassify the correct weight, or in some cases, creating a positive "correction" and generating even more revenue.

160. During CW 5's tenure, every Tuesday, CW 5 received via email weekly "W&I Activity" reports prepared and disseminated by Frye or terminal managers. These reports provided a detailed summary of the terminal's revenue and weight corrections issued by operator each week. On many occasions, CW 5 was instructed by CW 5's terminal managers to speak with specific forklift operators who were "falling behind on reweigh corrections" or questioning CW 5 "why does this guy (forklift operator) always have negative reweighs?"

161. CW 5 further observed that operators were incentivized to accumulate as many reweighs as possible per day by receiving shirts, hats and preferred parking spots for achieving reweigh correction goals. CW 5 learned that other YRC terminals were issuing operators $25 gift cards to Home Depot for achieving reweigh correction goals.

162. CW 5 further witnessed on many occasions YRC customers who "protested" their freight invoice to their respective Account Manager. Frequent complaints included YRC misrepresenting the true weight of the customer's freight. YRC customer complaints were sent via an internal "Protest Board" and were received by W&I personnel who were responsible for reviewing documentation and investigating the claims.

163. Following CW 5's departure from the Company in 2012, CW 5 has maintained contact with several former YRC employees, who have informed CW 5 that the improper billing practices, including failure to record negative reweigh corrections, have continued for many years.

***vi. CW 6—Former W&I Inspection Coordinator***

164. CW 6 is a former W&I Inspection Coordinator for YRC at terminals located in

Fontana and Compton, California from May 2008 through August 2010. As a W&I Coordinator, CW 6 was responsible for oversight of dockworkers assigned to load and unload freight, while seeking ways to increase revenues through weight and classification adjustments.

165. CW 6 observed throughout CW 6's tenure with the Company, YRC leadership pressured W&I employees to generate additional revenue by, among other things, blocking negative reweigh corrections. CW 6 participated in weekly telephone conferences led by Rawson, former Senior Director Revenue Management, who chastised W&I Coordinators, asking them, "What is going on at your terminals (with all of the reweigh corrections)?" Rawson and other YRC leadership from the Southern California area also chastised W&I employees for failing to miss their revenue quota, due in part, by recording negative reweigh corrections.

166. CW 6 observed that, starting in late 2008, YRC forklifts became equipped with scales which were operated by union dock workers. YRC management had access to W&I revenue details which were sent by operators through an internal database.

167. CW 6 observed that YRC targeted certain customers which YRC knew would not identify or dispute invoices manipulated through reweighs or classification adjustments. This "hit list" of customers was well-known throughout the Company and included major retailers including, Home Depot and Wal-Mart. Home Depot products were "easier" to manipulate the weights/classifications because the sizes and locations of the freight Home Depot shipped varied greatly.

168. CW 6 frequently objected verbally to his superiors about Company practices surrounding improper revenues obtained via reweighs and classification adjustments.

### G. YRC Was Required to Disclose the DOJ Investigation and the Overcharge Scheme

169. During the Class Period, YRC filed Forms 10-Q and 10-K with the SEC. As detailed *infra* Section VI, these filings failed to disclose material information required to be disclosed pursuant to controlling SEC rules and regulations.

170. The SEC created specific rules governing the content of disclosures made by public companies in their filings with the SEC. SEC Regulation S-K requires that every Form 10-Q and Form 10-K filing contain "Management's Discussion and Analysis of Financial Condition and Results of Operations" ("MD&A"), drafted in compliance with Item 303 of Regulation S-K, 17 C.F.R. §§ 229.303. The MD&A requirements are intended to provide material historical and prospective textual disclosures that enable investors and others to assess the financial condition and results of operations of a company, with emphasis on that company's prospects for the future.

171. Specifically, Item 303(a)(3) of Regulation S-K requires that the MD&A section of a company's filings with the SEC (i.e., Forms 10-Q and 10-K), among other things:

> (i) Describe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected. In addition, describe any other significant components of revenues or expenses that, in the registrant's judgment, should be described in order to understand the registrant's results of operations.
>
> (ii) Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed.

172. Regulation S-K also states that "[t]he discussion and analysis [section] shall focus specifically on material events and uncertainties known to management that would cause reported

financial information not to be necessarily indicative of future operating results or of future financial condition."

173. Defendants violated the affirmative disclosure duties imposed by Regulation S-K, and thus Section 10(b) of the Exchange Act, by failing to disclose, among other things, the following material information in the Company's Forms 10-Q and 10-K filed during the Class Period: (i) that YRC was engaged in the Overcharge Scheme; (ii) the DOJ Investigation, which was a serious, ongoing investigation that exposed the Company to millions of dollars in liability for FCA violations; and iii) that YRC's Overcharge Scheme subjected it to numerous undisclosed risks, including monetary risks and reputational risks, particularly because U.S. government agencies, like DOD, the General Services Administration, U.S. Department of Energy, and U.S. Department of Veterans Affairs, are YRC customers and any harm to its reputation or relationships with such U.S. government agencies would adversely affect its current business, as well as its future revenues and growth prospects.

174. The foregoing concealed material facts were required to be disclosed by Defendants because they were, among other things: (i) material events and uncertainties known to YRC management that would cause YRC's reported financial information not to be necessarily indicative of the Company's future operating results or of future financial condition; (ii) known trends or uncertainties that have had or that Defendants reasonably expected will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations; and (iii) unusual transactions or significant economic changes that were materially affecting the amount of reported operating and net income from YRC's continuing operations.

**H. Defendants' Fraudulent Financial Reporting**

175. Defendants were required to file with the SEC financial statements that complied with GAAP. The Financial Accounting Standards Board ("FASB") of the American Institute of

Certified Public Accountants ("AICPA") established the Accounting Standards Codification ("ASC") as the sole source of GAAP during the Class Period.

176. The SEC requires that registrants, like YRC, prepare and file financial statements that comply with GAAP. Financial statements filed with the SEC that are not prepared in accordance with GAAP are presumed to be misleading.

177. Specifically, in YRC's annual reports filed with the SEC on Form 10-K, Defendants represented that that Company's "Critical Accounting Policies" "refer to specific accounting principles and the methods of applying those principles to fairly present our financial position and results of operations in accordance with generally accepted accounting principles." The SEC requires that registrants, like YRC, prepare and file financial statements that comply with GAAP.

178. During the Class Period, Defendants' caused YRC's financial statements to be materially false and misleading, while falsely representing that YRC's financial statements presented fairly YRC's financial position and results of operations in conformity with GAAP.

### ***1. Defendants' Caused YRC to Improperly Recognize Revenue in Violation of GAAP***

179. As alleged above in Paragraphs 9-11, and 61, YRC overstated its revenue through the Overcharge Scheme, which generated at least $2 million per month, or at least $6 million per quarter in improper revenue recognized in YRC's financial statements. By inflating YRC's reported revenue by at least $6 million every quarter and by at least $24 million per year through the Overcharge Scheme, Defendants materially overstated YRC's reported operating income and net income, or materially understated YRCW's reported operating loss or net loss, for each quarter and year end during the Class Period. The specific dollar amounts and the magnitude of the accounting errors for each quarter and year-end financial results are alleged *infra* Section VI.

180. During the Class Period, YRC disclosed its Revenue Recognition policy in its financial statements as follows. For example, YRC's 2017 10-K represented the following:

> For shipments in transit, we record revenue based on the percentage of service completed as of the period end and accrue delivery costs as incurred. The percentage of service completed for each shipment is based on how far along in the shipment cycle each shipment is in relation to standard transit days. Standard transit days are defined as our published service days between origin zip code and destination zip code. Based on historical cost and engineering studies, **certain percentages of revenue are determined to be earned** during each stage of the shipment cycle, such as initial pick up, long distance transportation, intermediate transfer and customer delivery. Using standard transit times, we analyze each shipment in transit at a particular period end to determine what stage the shipment is in. **We apply that stage's percentage of revenue earned** factor to the rated revenue for that shipment to **determine the revenue dollars earned** by that shipment in the current period. **The total revenue earned** is accumulated for all shipments in transit at a particular period end and recorded as operating revenue.
>
> In addition, we recognize revenue on a gross basis because we are the primary obligors even when we use other transportation service providers who act on our behalf. We remain responsible to our customers for complete and proper shipment, including the risk of physical loss or damage of the goods and cargo claims issues. We assign pricing to bills of lading at the time of shipment based primarily on the weight, general classification of the product, the shipping destination and individual customer discounts. This process is referred to as rating. At various points throughout our process, incorrect ratings could be identified based on many factors, including weight verifications or update customer discounts. Although the majority of rerating occurs in the same month as the original rating, a portion occurs during the following periods. We accrue a reserve for rerating based primarily on historical trends. At December 31, 2017 and 2016, our financial statements included a rerate reserve as a reduction to "Accounts Receivable" of $8.8 million and $10.4 million, respectively.

181. Under FASB Concepts Statement No. 5, *Recognition and Measurement in Financial Statements of Business Enterprises*, in order for revenue to be recognized in accordance with GAAP, YRC needed to **earn** the revenue and the amount of revenue **earned** must be realizable. Revenue is considered to be **earned** when YRC performs the services it was contracted to perform, and revenue is realizable when YRC is **entitled to collect** and collection is reasonably assured of that revenue.

182. However, the revenue Defendants' caused YRC to generate throughout the Class Period through the Overcharge Scheme was not "**earned**" and YRC was not entitled to collect revenue generated from the Overcharge Scheme. In stark contrast, the revenue generated by the Overcharge Scheme was the result of fraud and cheating YRC customers. Instead of recording revenue generated from the Overcharge Scheme, YRC should have recorded a liability or reserve for the amount of improper revenue recognized to reflect the amount Defendants' overcharged YRC customers directly caused by Defendants' Overcharge Scheme.

### *2. Defendants' Failed to Disclose the DOJ Investigation in Violation of GAAP*

183. Under ASC 450, *Contingencies*, Defendants were required to disclose the DOJ Investigation, and their failure to do so violated GAAP.

184. ASC 450 provides accounting guidance for the accrual and disclosure of a loss contingency, which is defined as "an existing condition, situation or set of circumstances involving uncertainty as to a possible loss that will be resolved when one or more future events occurs or fails to occur." Under GAAP, loss contingencies can include actual or possible claims, as well as pending or threatened litigation.

185. Defendants had a duty to disclose the DOJ Investigation under ASC 450 because it was a loss contingency that needed to be disclosed because there was a reasonable possibility that YRC would suffer a loss.

186. Under ASC 450-20-50, for a claim that has been asserted, an issuer must disclose a loss contingency if there is at least a reasonable possibility that a loss may be incurred, even if the amount cannot be reasonably estimated. A loss contingency is reasonably possible if the likelihood that it will occur "is more than remote but less than likely." ASC at 450-20-20.

187. The DOJ had asserted a claim against YRC's subsidiaries. Under ASC 450, a claim is considered asserted where a claimant at least manifested an awareness of a possible claim. The DOJ had at least manifested an awareness of a possible claim for the following reasons:

i) since at least 2009, the DOJ made inquiries and asked questions about Defendants' reweigh policies and procedures, and issued a CID for documents and testimony concerning Defendants' reweigh policies and procedures;

ii) the DOJ took testimony from, or interviewed at least 32 witnesses, including Defendant Welch and several other senior YRC officers and directors;

iii) YRC produced hundreds of thousands of pages of documents, including documents concerning Defendants' reweigh policies as applied to the DOD;

iv) the DOJ and YRC engaged in multiple meetings, presentations and negotiations over ten years, including several settlement negotiations;

v) the DOJ was actively engaged in an investigation of YRC to determine whether to intervene in the Whistleblower Action; and

vi) YRC and DOJ were engaged in quantifying the scope of the alleged overcharge to the DOD.

188. Defendants knew, or at least recklessly ignored, that there was a reasonable possibility that a loss could occur as a result of the DOJ's claim because: i) the DOJ discovery from YRC focused on Defendants' reweigh policies and procedures; ii) DOJ sought and obtained documents and testimony concerning the DOD freight that was subject to YRC's reweigh policies and procedures; iii) the DOJ was investigating claims with potentially massive damages, given the FCA's statutory damage provision of $5,000 to $11,000 per violation and treble damages, and that the DOD estimated tens of thousands of transactions with YRC; and iv) YRC and DOJ engaged in several settlement negotiations concerning the DOJ's claims.

189. Under ASC 450, even if the DOJ had not manifested an awareness of a potential claim (which it did), Defendants had a duty to disclose the DOJ Investigation because Defendants

knew, or at least recklessly ignored, that it was probable that the DOJ would assert FCA claims (for the same reasons set forth in Paragraphs 187-88), and it was reasonably possible that the outcome would be unfavorable.

190. To determine the probability of an unfavorable outcome in any litigation, claim, or assessment, ASC 450 lists a number of factors Defendants were required to consider, including: i) the nature of the litigation, claim, or assessment; ii) the progress of the case; iii) the opinions of legal counsel or other advisors; iv) the experience of the entity in similar cases; v) the experience of other entities; and iv) "any decision of the entity's management as to how the entity intends to respond to the lawsuit, claim, or assessment (for example, a decision to contest the case vigorously or a decision to seek an out-of-court settlement)." ASC at 450- 20-55-12.

191. Defendants knew, or at least recklessly disregarded, that an unfavorable outcome was probable because: i) the DOJ was involved in an extensive investigation of YRC for violating the FCA, which provide for treble damages and statutory damages per claim, involving an important U.S. government customer; ii) the DOJ Investigation occurred over 10 years, there were at least 32 depositions or interviews of witnesses, including Defendant Welch and other senior YRC officers, YRC produced hundreds of thousands of pages of documents, and there were meetings, negotiations and presentations between YRC and DOJ, including settlement negotiations; and iii) as alleged in Paragraphs 72, 79, and 84, Defendants knew that, unlike YRC, other trucking companies did not block negative reweighs because it was cheating customers.

### *3. Defendants' GAAP Violations Were Material*

192. The SEC in Staff Accounting Bulletin No. 99 – Materiality ("SAB No. 99") expressed the SEC's views that materiality in financial statements involved both quantitative and qualitative factors. Through the Overcharge Scheme, Defendants caused YRC to overstate net

income by 23.2% to 4,200% and overstate operating income by 11.7% to 545%, or understate operating loss by 15.6% to over 100% and understate net loss by 7.5% to over 100%. The specific dollar amounts and the magnitude of the accounting errors for each quarter and year-end financial results are alleged *infra* Section VI.

193. Moreover, the fact that Defendants were engaging in unlawful transactions which affected YRC's compliance with its contractual commitments, legal and regulatory requirements, and that the DOJ was investigating the Company's reweigh policies and procedures, are material facts that should have been disclosed to the users of YRC's financial statements.

#### ***4. Defendants' Internal Control over Financial Reporting Was Materially Defective***

194. The Individual Defendants, even though they had responsibility for establishing and maintaining adequate internal control over financial reporting, failed to establish sound internal controls over YRC's financial reporting. Defendants knew, or at least recklessly disregarded, that YRC's controls were materially deficient and that the material defects caused YRC's financial statements to be materially false and misleading during the Class Period.[17]

195. A material weakness is a control deficiency, or combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of the financial statements will not be prevented or detected on a timely basis.

---

[17] The Committee of Sponsoring Organizations of the Treadway Commission ("COSO") have defined internal control, as a process, effected by an entity's board of directors, management, and other personnel, designed to provide reasonable assurance regarding the achievement of objectives relating to operations, reporting and compliance. The Framework provided by COSO sets forth three categories of objectives which allow organizations to focus on separate aspects of internal control: (i) operations objectives which relate to the effectiveness and efficiency of an entity's operations and safeguarding of assts against loss; (ii) reporting objectives which relate to internal and external financial and nonfinancial reporting that encompass reliability, timeliness, transparency, or other terms as set by regulators, standard setters or the entity's policies; and (iii) compliance objectives which relate to an entity's adherence to laws and regulations.

196. Defendants acknowledged throughout the Class Period their responsibility for financial reporting and for presenting financial statements that conformed to GAAP:

> The Company's management is responsible for establishing and maintaining effective internal control over our financial reporting, which is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of the financial statements for external purposes in accordance with generally accepted accounting principles.
>
> Our management assessed the effectiveness of our system of internal control over financial reporting as of December 31, 2017, based on the framework established in *Internal Control – Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission.
>
> Based on its assessment using those criteria, our management concluded that, as of December 31, 2017, our system of internal control over financial reporting was effective.

197. In contrast to Defendants' assertion that YRC's system of internal control over financial reporting was effective, as set forth above in ¶¶ 57-92, 85, 117-25, 127, 130, 132, 134, 139, 144, 147, 148, 152-53, 157-59, 163 and 165, YRC had instituted a system of routinely and systematically overcharging its customers, including the DOD, by blocking negative reweighs and not adjusting the price of shipments where the actual weight of the shipment was less than the weight shown on the bill of lading. The Overcharge Scheme was instituted, maintained or continued by Defendants to inflate the reported revenue and related earnings of YRC in violation of GAAP that generated at least $2 million per month in revenue or at least $6 million per quarter. Further, even though Defendants knew of, or at least recklessly disregarded, the DOJ Investigation, Defendants' system for internal control was not effective because YRC's financial statements did not disclose the contingency of the DOJ Investigation as required by GAAP.

## VI. DEFENDANTS' MADE MATERIALLY FALSE AND MISLEADING STATEMENTS AND MATERIAL OMISSIONS THROUGHOUT THE CLASS PERIOD

198. Plaintiffs repeat and reallege each allegation set forth above in ¶¶ 5-197, as if fully set forth herein. The false and misleading statements further detailed below were made by Defendants with scienter during the Class Period and were materially false and misleading at the time Defendants made them. Defendants made these statements in, among other things, YRC's SEC filings, public conference calls, and press releases.

199. During the Class Period, Defendants knowingly, or with at least reckless disregard, misled Plaintiffs and the other members of the Class because Defendants made untrue statements of material facts, or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, for the following reasons:

a. Since at least February 2006, YRC, through Roadway and Yellow, engaged in the Overcharge Scheme (¶¶ 62-197) that cheated YRC customers, including the DOD, Wal-Mart, Sears and Home Depot.

b. Through the Overcharge Scheme, as set forth in YRC internal emails among YRC executives, YRC generated at least $2 million per month in illicit revenue for the Company, or at least $6 million per quarter or $24 million per year (¶¶ 9-11, 61, 67, 71, 75).

c. That the Overcharge Scheme continued during the Class Period and caused Defendants' to recognize and report revenue, operating income and net income for YRC that was not earned and that YRC was not entitled to collect, causing YRC's reported financial results to be materially misstated and artificially inflated in violation of GAAP (¶¶ 15, 175-97).

d. YRC executives, including Defendant Welch, assented to or implemented systems to block negative reweighs and overcharged YRC customers (¶¶ 85, 139, 148, 157, 165).

e. YRC executives, including Defendant Welch, intentionally structured the Company's customer invoicing and revenue

management systems to block negative reweighs "systematically" (¶¶ 117-20).

f. As a result of the undisclosed conduct alleged in subsections (a)-(e) of this Paragraph, the Company's internal controls over financial reporting were materially defective.

g. Starting in 2009, YRC faced a serious, extensive, and ongoing investigation by the DOJ that exposed YRC to millions of dollars in liability for FCA violations. In or around 2009, the DOJ began making inquiries and directed questions to YRC concerning the DOD's shipments tendered for transport through YRC, and the DOJ issued a CID to the Company. Between 2009-2018, the DOJ conducted an extensive investigation of the Company's Overcharge Scheme, which included the production of hundreds of thousands of pages of documents by YRC to the DOJ concerning YRC's reweigh practices and policies, interviews or testimony taken from at least 32 witnesses, including Defendant Welch and the Company's former CEO (Smid), and YRC interacting with DOJ through multiple meetings, negotiations and presentations, including several settlement negotiations to settle FCA claims (¶¶ 109-24).[18]

### A. YRC's Annual Report on Form 10-K

200. On March 10, 2014, Defendants caused the Company to file its annual report for the year ended December 31, 2013 with the SEC on Form 10-K ("2013 10-K"). The 2013 10-K was signed by Defendants Welch, Pierson and Fisher.

#### *i. Defendants' Representations Concerning YRC's Reported Financial Results*

201. The 2013 10-K disclosed that for the year ended December 31, 2013, the Company reported operating revenue of $4.865 billion, operating income of $28.4 million, and a net loss of $83.6 million. For the quarter ended December 31, 2013, the Company reported operating revenue of $1.2 billion, an operating loss of $1.6 million, and net income of $400,000.

[18] On information and belief, the latest settlement negotiations broke down and did not resolve the DOJ's claims that YRC violated the FCA and led to the DOJ's filings its Complaint in Intervention.

202. The representations in Paragraph 201 were materially false and misleading because, in violation of GAAP, for the year ended December 31, 2013, the Company's operating revenue was overstated by $24 million, operating income was overstated by $24 million or 545.5%, and net loss was understated by 15.6%. For the quarter ended December 31, 2013, the Company's operating revenue was overstated by $6 million, operating loss was understated by $6 million or 78.9%, and net income was understated by 20%.

***ii. Defendants' Representations Concerning YRC's Revenue Recognition Procedures and Internal Controls***

203. The 2013 10-K represented the following concerning the Company's system for assigning prices to its customers' invoices and revenue recognition:

> *Shipments in Transit*
>
> We assign pricing to bills of lading at the time of shipment based primarily on the weight, general classification of the product, the shipping destination and individual customer discounts. This process is referred to as rating. . . .
>
> *Revenue Recognition* . . . .
>
> The total revenue earned is accumulated for all shipments in transit at a particular period end and recorded as operating revenue. . . .
>
> We assign pricing to bills of lading at the time of shipment based primarily on the weight, general classification of the product, the shipping destination and individual customer discounts. This process is referred to as rating.

204. Defendants' representation that the Company assigns pricing to the bills of lading "based primarily on the weight" and "general classification" of the product was materially false and misleading because Defendants failed to disclose that YRC's system blocked negative reweighs to the detriment of YRC customers, and YRC engaged in various schemes to overcharge YRC customers, such as misclassifying customers' freight. Moreover, Defendants' representation that the Company's "total revenue earned" is recorded as operating income was materially false

and misleading because Defendants' failed to disclose that YRC recorded at least $6 million per quarter in operating revenue that was not "earned," but instead, was obtained through fraud and deceit through the Overcharge Scheme, in violation of GAAP.

205. The 2013 10-K represented the following concerning the components of the Company's operating revenue: "**Operating Revenue:** Operating revenue has two primary components: volume (commonly evaluated using tonnage, tonnage per day, number of shipments, shipments per day or weight per shipment) and yield or price (commonly evaluated using picked up revenue, revenue per hundredweight or revenue per shipment)."

206. The representations in Paragraph 205 that the "primary components" of YRC's operating revenue evaluated "weight per shipment" and "revenue per shipment" were materially false and misleading because Defendants failed to disclose that a material component of YRC's operating revenue was generated through the Overcharge Scheme whereby YRC manipulated its customers' weight per shipment by blocking negative reweighs and used other fraudulent means to artificially inflate the price for its customers' shipments, and thereby generate artificially inflated revenue per shipment for YRC.

207. The 2013 10-K represented the following concerning the Company's policy and procedures for correcting incorrect customer prices based on weight verification:

> *Rerate Reserves*
>
> At various points throughout our customer invoicing process, incorrect ratings (*i.e.* prices) could be identified based on many factors, including weight verifications or updated customer discounts. Although the majority of rerating occurs in the same month as the original rating, a portion occurs during the following periods. We accrue a reserve for rerating based on historical trends. At December 31, 2013 and 2012 , our financial statements included a rerate reserve as a reduction to "Accounts Receivable" of $9.6 million and $11.9 million, respectively. . . .

> *Revenue Recognition* . . . .
>
> At various points throughout our process, incorrect ratings could be identified based on many factors, including weight verifications or updated customer discounts. Although the majority of rerating occurs in the same month as the original rating, a portion occurs during the following periods. At December 31, 2013 and 2012, our financial statements included a rerate reserve as a reduction to "Accounts Receivable" of $9.6 million and $11.9 million, respectively.

208. Defendants' representation that YRC could rerate, or reprice, its customers' freight through "weight verifications" was materially false and misleading because Defendants failed to disclose that by no later than 2006, the Company was engaged in the Overcharge Scheme whereby upon reweighing, if a customer's product weighed less than stated on the bill of lading and the customer was entitled to a refund or a credit, the Company's system blocked negative reweighs to the detriment of YRC customers. Moreover, Defendants' failure to price YRC's customers' products based on actual weights caused the Company's "rerate reserve" to be materially understated in violation of GAAP.

209. The 2013 10-K represented the following concerning the Company's systems for capturing, recording and controlling information relevant to Defendants' management of revenue reserves:

> ***Revenue Reserves*** . . . We have an extensive system that allows us to accurately capture, record and control all relevant information necessary to effectively manage our revenue reserves. . . .

210. Defendants' representation that the Company has "an extensive system" "to accurately record and control all relevant information necessary to effectively manage our revenue reserves" was materially false and misleading because Defendants failed to disclose that YRC's system for recording information necessary to manage YRC's revenue reserves did not "accurately record and control all relevant information necessary." In truth, as alleged in Paragraphs 57-92, 85, 117-25, 127, 130, 132, 134, 139, 144, 147, 148, 152-53, 157-59, 163, 165

and 197, YRC's system was programmed to block negative reweighs, YRC's system did not collect information concerning negative reweighs, and YRC's system did not refund or credit YRC customers who were entitled to a refund or credit because of a negative reweigh. Indeed, YRC executives, including Defendant Welch, assented to or implemented a system whereby: i) negative reweighs were blocked; ii) YRC did not keep records of the negative reweigh corrections that they systematically cancelled; iii) YRC executives hid evidence of misconduct by programming their computer system so that negative reweigh results would not register; iv) as stated in an internal email sent on June 26, 2009, YRC Freight programmed its computer system so that negative reweigh results would "never show up in the mainframe . . . to be recorded" and negative reweigh results were instead automatically rejected and then "*hidden*"; and v) the Company "systematically" did not make negative reweigh corrections.

211. The 2013 10-K contained SOX Certifications pursuant to Exchange Act Rule 13A-14 and 15D-14, as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 that were signed by Defendants Welch and Pierson and that made the following representations:

(1) I have reviewed this report on Form 10-K of YRC Worldwide Inc.;

(2) Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

(3) Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

(4) The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and

15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and we have:

a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

(5) The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

> b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

212. Defendants' representation that the Company "[d]esigned such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles" was materially false and misleading because Defendants failed to disclose that Company executives, including Defendant Welch, designed a system that blocked negative reweighs, thereby cheating its customers, and that the Overcharge Scheme generated at least $2 million per month or at least $6 million per quarter in illicit revenue for the Company in violation of GAAP, as alleged in Paragraphs 194-97.

#### *iii. Defendants' Representations Concerning YRC's Commitment, Contingencies and Uncertainties and Other Legal Matters*

213. The 2013 10-K purported to warn investors about "legal proceedings, claims and other litigation that arise in the ordinary course of business" and represented the following concerning "Commitment, Contingencies and Uncertainties" and "Other Legal Matters":

> Litigation may be related to labor and employment, competitive matters, property damage and liability claims, safety and contract compliance, environmental liability, our past financial restructurings and other matters. . . Litigation can be expensive, lengthy and disruptive to normal business operations, including to our management due to the increased time and resources required to respond to and address the litigation. The results of complex legal proceedings are often uncertain and difficult to predict. An unfavorable outcome of any particular matter or any future legal proceedings could have a material adverse effect on our business, financial condition, liquidity or results of operations. In the future, we could incur judgments or enter into settlements of claims that could harm our financial position, liquidity and results of operations. . .
>
> We are involved in other litigation or proceedings that arise in ordinary business activities. We insure against these risks to the extent we deem prudent, but no

> assurance can be given that the nature or amount of such insurance will be sufficient to fully indemnify us against liabilities arising out of pending and future legal proceedings. Many of these insurance policies contain self-insured retentions in amounts we deem prudent. Based on our current assessment of information available as of the date of these financial statements, we believe that our financial statements include adequate provisions for estimated costs and losses that may be incurred within the litigation and proceedings to which we are a party.

214. In particular, the Company disclosed a proposed class action filed by Bryant Holdings LLC in the U.S. District Court for the District of Kansas on behalf of purchasers of YRC common stock between April 24, 2008 and November 2, 2009 that had settled in 2013, subject to court approval[19] (the "*Bryant* Action"), and an action filed by ABF Freight System, Inc. in the U.S. District Court for the Western District of Arkansas against several parties, including certain Company subsidiaries, alleging violations of the National Master Freight Agreement that was dismissed ("*ABF Freight* Action").

215. The representations in Paragraphs 213-14 were materially false and misleading because, while the Company disclosed the *Bryant* Action and the *ABF Freight* Action, and purported to warn YRC investors that the Company was involved in "other litigation or proceedings that arise in ordinary business activities," Defendants failed to disclose the DOJ Investigation, a serious, ongoing investigation since 2009. Defendants' representation gave investors the false impression that the Company did not face any other material contingencies or uncertainties outside the ordinary course of business and run-of-the-mill litigation and legal proceedings, when, in fact, the Company faced a serious, ongoing civil investigation that exposed it to substantial liability for violations of the FCA. In addition, Defendants' representation was

[19] Court approval of the settlement was denied and the case was voluntarily dismissed under Rule 41 of the Federal Rules of Civil Procedure in May 2016.

materially false and misleading because Defendants failed to disclose the DOJ Investigation, a loss contingency required to be disclosed by Defendants under GAAP (¶¶ 183-91.)

#### *iv. Defendants' Representation That YRC's Financial Statements Were Prepared in Conformity with GAAP*

216. The 2013 10-K represented that Defendants prepared YRC's financial statements in conformity with U.S. GAAP:

> Accounting policies refer to specific accounting principles and the methods of applying those principles to fairly present our financial position and results of operations in accordance with generally accepted accounting principles. The policies discussed below include those that management has determined to be the most appropriate in preparing our financial statements.

217. The representations in Paragraph 216 were materially false and misleading because YRC's financial statements were not prepared in conformity with GAAP. As set forth in Paragraphs 9-11, 61, 64, 67, 71, and 75, as a result of the Overcharge Scheme, the Company's financial results were materially inflated by at least $2 million in illicit revenue per month, and Defendants' failed to disclose the DOJ Investigation, in violation of GAAP, as set forth in Paragraphs 175-93.

#### *v. Defendants' Representation That YRC Was in Compliance with "All Laws"*

218. The 2013 10-K appended "material contracts" as exhibits, including i) the "Credit Agreement dated as of February 13, 2014, by and among [YRC], as borrower, the subsidiaries of the borrower party thereto from time to time, the lenders from time to time party thereto, and Credit Suisse AG, Cayman Islands Branch, as administrative agent and collateral agent for the lenders" (the "Feb. 13, 2014 Credit Agreement"), and ii) the "Loan and Security Agreement, dated as of February 13, 2014, among [YRC], as administrative borrower, the other borrowers named therein, the guarantors named therein, certain financial institutions, as lenders, and RBS Citizens Business

Capital a division of RBS Asset Finance, Inc., a subsidiary of RBS Citizens, N.A., as agent, and RBS Citizens, N.A., Merrill Lynch, Pierce, Fenner & Smith and CIT Finance LLC, as joint lead arrangers and joint bookrunners" (the "Feb. 13, 2014 Loan and Security Agreement").

219. The Feb. 13, 2014 Credit Agreement's and the Feb. 13, 2014 Loan and Security Agreement's respective "Representations and Warranties" sections represented that YRC was in compliance with all laws:

> Existence, Qualification and Power; Compliance with Laws. Each Loan Party and each Restricted Subsidiary . . . (d) is in compliance with all Laws, orders, writs and injunctions . . . .

220. The representations in Paragraph 219 were materially false and misleading because the Company at that time was not in compliance with all laws. To the contrary, the Company had been engaged in the Overcharge Scheme since at least 2006, and the Overcharge Scheme resulted in tens of thousands of false claims by the Company to the DOD in violation of the FCA.

### B. YRC's First Quarter 2014 Financial Results and Q1 2014 10-Q

#### *i. Defendants' Representations Concerning YRC's Reported Financial Results*

221. On May 1, 2014, Defendants caused the Company to file a report with the SEC on Form 8-K that contained the Company's news release of its financial results for the quarter ended March 31, 2014.

222. The Company reported operating revenue for the first quarter of 2014 of $1.211 billion, a consolidated operating loss reported of $32.4 million, and a net loss of 70.2 million.

223. Also on May 1, 2014, Defendants caused the Company to file a report with the SEC on Form 10-Q that contained the Company's financial results for the quarter ended March 31, 2014 (the "Q1 2014 10-Q"). The Q1 2014 10-Q was signed by Defendants Welch and Pierson.

224. The Q1 2014 10-Q repeated the representations set forth in the Company's May 1, 2014 press release concerning the Company's reported operating revenue, operating loss and net loss.

225. The representations in Paragraphs 222 and 224 were materially false and misleading because, in violation of GAAP, the Company's operating revenue was overstated by $6 million, operating loss was understated by $6 million or 15.6%, and net loss was understated by 7.5%.

***ii. Defendants' Representations Concerning YRC's Operating Revenue and Internal Controls***

226. The Q1 2014 10-Q represented the following concerning the components of the Company's operating revenue: "**Operating Revenue:** Our operating revenue has two primary components: volume (commonly evaluated using number of shipments and weight per shipment) and yield or price (commonly evaluated on a dollar per hundredweight basis and a dollar per shipment basis)."

227. The representations in Paragraph 226 were materially false and misleading for the reasons set forth in Paragraph 206.

228. The Q1 2014 10-Q included SOX Certifications signed by Defendants Welch and Pierson that contained representations substantially similar to the representations by Defendants Welch and Pierson in Paragraph 211.

229. The representations in Paragraph 228 were materially false and misleading for the reasons set forth in Paragraph 212.

#### *iii. Defendants' Representations Concerning YRC's Commitment, Contingencies and Uncertainties and Other Legal Matters*

230. The Q1 2014 10-Q purported to warn investors about "legal proceedings, claims and other litigation that arise in the ordinary course of business" and represented the following concerning "Commitment, Contingencies and Uncertainties" and "Other Legal Matters":

> We are involved in other litigation or proceedings that arise in ordinary business activities. We insure against these risks to the extent we deem prudent, but no assurance can be given that the nature or amount of such insurance will be sufficient to fully indemnify us against liabilities arising out of pending and future legal proceedings. Many of these insurance policies contain self-insured retentions in amounts we deem prudent. Based on our current assessment of information available as of the date of these financial statements, we believe that our financial statements include adequate provisions for estimated costs and losses that may be incurred within the litigation and proceedings to which we are a party.

231. The representations in Paragraph 230 were materially false and misleading because, while the Company disclosed the *Bryant* Action and purported to warn YRC investors that the Company was involved in "other litigation or proceedings that arise in ordinary business activities," Defendants failed to disclose the DOJ Investigation, a serious, ongoing investigation since 2009. Defendants' representation gave investors the false impression that the Company did not face any other material contingencies or uncertainties outside the ordinary course of business and run-of-the-mill litigation and legal proceedings, when, in fact, the Company faced a serious, ongoing civil investigation that exposed it to substantial liability for violations of the FCA. In addition, Defendants' representation was materially false and misleading because Defendants failed to disclose the DOJ Investigation, a loss contingency required to be disclosed by Defendants under GAAP (¶¶ 183-91.)

### C. YRC's Second Quarter 2014 Financial Results and Q2 2014 10-Q

#### *i. Defendants' Representations Concerning YRC's Reported Financial Results*

232. On July 31, 2014, Defendants caused the Company to file a report with the SEC on Form 8-K that contained the Company's news release of its financial results for the quarter ended June 30, 2014.

233. The Company reported consolidated operating revenue for the second quarter of 2014 of $1.318 billion, consolidated operating income of $20.0 million, and a net loss of $4.9 million.

234. Also on July 31, 2014, Defendants caused the Company to file a report with the SEC on Form 10-Q that contained the Company's financial results for the quarter ended June 30, 2014 (the "Q2 2014 10-Q"). The Q2 2014 10-Q was signed by Defendants Welch and Pierson.

235. The Q2 2014 10-Q repeated the representations set forth in the Company's July 31, 2014 press release concerning the Company's reported operating revenue, operating income and net loss.

236. The representations in Paragraphs 233 and 235 were materially false and misleading because, in violation of GAAP, the Company's operating revenue was overstated by $6 million, operating income was overstated by 6 million or 42.9%, and net loss was understated by $6 million or 31.9%.

#### *ii. Defendants' Representations Concerning YRC's Operating Revenue and Internal Controls*

237. The Q2 2014 10-Q represented the following concerning the components of the Company's operating revenue: "**Operating Revenue:** Our operating revenue has two primary components: volume (commonly evaluated using number of shipments and weight per shipment)

and yield or price (commonly evaluated on a dollar per hundredweight basis and a dollar per shipment basis)."

238. The representations in Paragraph 237 were materially false and misleading for the reasons set forth in Paragraph 206.

239. The Q2 2014 10-Q included SOX Certifications signed by Defendants Welch and Pierson that contained representations substantially similar to the representations by Defendants Welch and Pierson alleged in Paragraph 211.

240. The representations in Paragraph 239 were materially false and misleading for the reasons set forth in Paragraph 212.

***iii. Defendants' Representations Concerning YRC's Commitment, Contingencies and Uncertainties and Other Legal Matters***

241. The Q2 2014 10-Q purported to warn investors about "legal proceedings, claims and other litigation that arise in the ordinary course of business" and represented the following concerning "Commitment, Contingencies and Uncertainties" and "Other Legal Matters":

> We are involved in other litigation or proceedings that arise in ordinary business activities. When possible, we insure against these risks to the extent we deem prudent, but no assurance can be given that the nature or amount of such insurance will be sufficient to fully indemnify us against liabilities arising out of pending and future legal proceedings. Many of these insurance policies contain self-insured retentions in amounts we deem prudent. Based on our current assessment of information available as of the date of these financial statements, we believe that our financial statements include adequate provisions for estimated costs and losses that may be incurred within the litigation and proceedings to which we are a party.

242. The representations in Paragraph 241 were materially false and misleading for the reasons set forth in Paragraph 231.

### D. YRC's Third Quarter 2014 Financial Results and Q3 2014 10-Q

#### *i. Defendants' Representations Concerning YRC's Reported Financial Results*

243. On October 30, 2014, Defendants caused the Company to file a report with the SEC on Form 8-K that contained the Company's news release of its financial results for the quarter ended September 30, 2014.

244. The Company reported consolidated operating revenue for the third quarter of 2014 of $1.323 billion, consolidated operating income increased of $26.7 million, and net income of $1.2 million.

245. Also on October 30, 2014, Defendants caused the Company to file a report with the SEC on Form 10-Q that contained the Company's financial results for the quarter ended September 30, 2014 (the "Q3 2014 10-Q"). The Q3 2014 10-Q was signed by Defendants Welch and Pierson.

246. The Q3 2014 10-Q repeated the representations set forth in the Company's October 30, 2014 press release concerning the Company's reported operating revenue, operating income and net income.

247. The representations in Paragraphs 244 and 246 were materially false and misleading because, in violation of GAAP, the Company's operating revenue was overstated by $6 million, operating income was overstated by $6 million or 29%, and net income was understated by 65.7%.

#### *ii. Defendant Welch's Representation Concerning YRC's Pricing "Strategy"*

248. The October 30, 2014 press release included the following representation by Defendant Welch concerning YRC's pricing strategy:

> Executing on our strategy of improving price and managing our freight mix to ensure that we have the right freight at the right price will continue to be a priority . . . .

249. Defendant Welch's representation concerning the Company's pricing "strategy" was materially false and misleading because he failed to disclose that the Company's pricing strategy included cheating its customers out of millions of dollars in credits and discounts through the Overcharge Scheme.

### *iii. Defendants' Representations Concerning YRC's Revenue Recognition Procedures and Internal Controls*

250. The Q3 2014 10-Q represented the following concerning the components of the Company's operating revenue: "**Operating Revenue:** Our operating revenue has two primary components: volume (commonly evaluated using number of shipments and weight per shipment) and yield or price (commonly evaluated on a dollar per hundredweight basis and a dollar per shipment basis)."

251. The representations in Paragraph 250 were materially false and misleading for the reasons set forth in Paragraph 206.

252. The Q3 2014 10-Q included SOX Certifications signed by Defendants Welch and Pierson that contained representations substantially similar to the representations by Defendants Welch and Pierson alleged in Paragraph 211.

253. The representations in Paragraph 252 were materially false and misleading for the reasons set forth in Paragraph 212.

### *iv. Defendants' Representations Concerning YRC's Commitment, Contingencies and Uncertainties and Other Legal Matters*

254. The Q3 2014 10-Q purported to warn investors about "legal proceedings, claims and other litigation that arise in the ordinary course of business" and represented the following concerning "Commitment, Contingencies and Uncertainties" and "Other Legal Matters":

> We are involved in other litigation or proceedings that arise in ordinary business activities. When possible, we insure against these risks to the extent we deem prudent, but no assurance can be given that the nature or amount of such insurance will be sufficient to fully indemnify us against liabilities arising out of pending and future legal proceedings. Many of these insurance policies contain self-insured retentions in amounts we deem prudent. Based on our current assessment of information available as of the date of these financial statements, we believe that our financial statements include adequate provisions for estimated costs and losses that may be incurred within the litigation and proceedings to which we are a party.

255. The representations in Paragraph 254 were materially false and misleading for the reasons set forth in Paragraph 231.

### E. YRC's 2014 Fourth Quarter and Full Year Financial Results and 2014 Annual Report on Form 10-K

#### *i. Defendants' Representations Concerning YRC's Reported Financial Results*

256. On February 5, 2015, Defendants caused the Company to file a report with the SEC on Form 8-K that contained the Company's news release of its financial results for the quarter and year ended December 31, 2014.

257. The Company reported consolidated operating revenue for the fourth quarter of 2014 of $1.218 billion, consolidated operating income of $31.2 million, and net income of $6.2 million. Further, the Company reported consolidated operating revenue for the year ended December 31, 2014 of $5.069 billion, consolidated operating income $45.5 million, and a net loss of $67.7 million.

258. On February 20, 2015, Defendants caused the Company to file its annual report for the year ended December 31, 2014 with the SEC on Form 10-K ("2014 10-K"). The 2014 10-K was signed by Defendants Welch, Pierson and Fisher.

259. The 2014 10-K repeated the representations set forth in the February 5, 2015 press release concerning the Company's operating revenue, operating income and net income or loss for the quarter and year ended December 31, 2014.

260. The representations in Paragraphs 257 and 259 were materially false and misleading because, in violation of GAAP, for the year ended December 31, 2014 the Company's operating revenue was overstated by $24 million, operating income was overstated by $24 million or 111.6%, and net loss was understated by 22.3%. For the quarter ended December 31, 2014, the Company's operating revenue was overstated by $6 million, operating income was overstated by $6 million or 23.8%, and net income was overstated by 1,140%.

***ii. Defendants' Representations Concerning YRC's Revenue Recognition Procedures and Internal Controls***

261. The 2014 10-K repeated representations concerning the Company's systems for assigning prices to its customers' invoices and revenue recognition:

> *Shipments in Transit*
>
> We assign pricing to bills of lading at the time of shipment based primarily on the weight, general classification of the product, the shipping destination and individual customer discounts. This process is referred to as rating. . .
>
> *Revenue Recognition*
>
> The total revenue earned is accumulated for all shipments in transit at a particular period end and recorded as operating revenue. . . .
>
> We assign pricing to bills of lading at the time of shipment based primarily on the weight, general classification of the product, the shipping destination and individual customer discounts. This process is referred to as rating.

262. Defendants' representations in Paragraph 261 were materially false and misleading for the reasons set forth in Paragraph 204.

263. The 2014 10-K repeated representations concerning the components of the Company's operating revenue: "**Operating Revenue:** Our operating revenue has two primary components: volume (commonly evaluated using number of shipments and weight per shipment)

and yield or price (commonly evaluated on a dollar per hundredweight basis and a dollar per shipment basis)."

264. The representations in Paragraph 263 were materially false and misleading for the reasons set forth in Paragraph 206.

265. The 2014 10-K repeated representations concerning the Company's policy and procedures for correcting customer prices based on weight verifications:

> *Rerate Reserves*
>
> At various points throughout our customer invoicing process, incorrect ratings (*i.e.* prices) could be identified based on many factors, including weight verifications or updated customer discounts. Although the majority of rerating occurs in the same month as the original rating, a portion occurs during the following periods. We accrue a reserve for rerating primarily based on historical trends. At December 31, 2014 and 2013, our financial statements included a rerate reserve as a reduction to "Accounts Receivable" of $12.2 million and $9.6 million, respectively.
>
> * * *
>
> *Revenue Recognition*
>
> We assign pricing to bills of lading at the time of shipment based primarily on the weight, general classification of the product, the shipping destination and individual customer discounts. This process is referred to as rating. At various points throughout our process, incorrect ratings could be identified based on many factors, including weight verifications or updated customer discounts. Although the majority of rerating occurs in the same month as the original rating, a portion occurs during the following periods. We accrue a reserve for rerating based primarily on historical trends. At December 31, 2014 and 2013, our financial statements included a rerate reserve as a reduction to "Accounts Receivable" of $12.2 million and $9.6 million, respectively.

266. The representations in Paragraph 265 were materially false and misleading for the reasons set forth in Paragraph 208.

267. The 2014 10-K repeated representations concerning the Company's systems for capturing, recording and controlling information relevant to Defendants' management of revenue reserves:

> ***Revenue Reserves*** . . . We have an extensive system that allows us to accurately capture, record and control all relevant information necessary to effectively manage our revenue reserves. . . .

268. Defendants' representations in Paragraph 267 were materially false and misleading for the reasons set forth above in Paragraph 210.

269. The 2014 10-K included SOX Certifications signed by Defendants Welch and Pierson that contained representations substantially similar to the representations by Defendants Welch and Pierson in Paragraph 211.

270. The representations in Paragraph 269 were materially false and misleading for the reasons set forth in Paragraph 212.

***iii. Defendants' Representations Concerning YRC's Commitment, Contingencies and Uncertainties and Other Legal Matters***

271. The 2014 10-K purported to warn investors about "legal proceedings, claims and other litigation that arise in the ordinary course of business" and represented the following concerning "Commitment, Contingencies and Uncertainties" and "Other Legal Matters":

> We are involved in other litigation or proceedings that arise in ordinary business activities. When possible, we insure against these risks to the extent we deem prudent, but no assurance can be given that the nature or amount of such insurance will be sufficient to fully indemnify us against liabilities arising out of pending and future legal proceedings. Many of these insurance policies contain self-insured retentions in amounts we deem prudent. Based on our current assessment of information available as of the date of these financial statements, we believe that our financial statements include adequate provisions for estimated costs and losses that may be incurred within the litigation and proceedings to which we are a party.

272. The representations in Paragraph 271 were materially false and misleading for the reasons set forth in Paragraph 231.

#### iv. *Defendants' Representation That YRC's Financial Statements Were Prepared in Conformity with GAAP*

273. The 2014 10-K represented that Defendants prepared YRC's financial statements in conformity with U.S. GAAP:

> Accounting policies refer to specific accounting principles and the methods of applying those principles to fairly present our financial position and results of operations in accordance with generally accepted accounting principles. The policies discussed below include those that management has determined to be the most appropriate in preparing our financial statements.

274. The representations in Paragraphs 273 were materially false and misleading for the reasons set forth in Paragraph 217.

### F. YRC's First Quarter 2015 Financial Results and Q1 2015 10-Q

#### i. *Defendants' Representations Concerning YRC's Reported Financial Results*

275. On April 30, 2015, Defendants caused the Company to file a report with the SEC on Form 8-K that contained the Company's news release of its financial results for the quarter ended March 31, 2015.

276. The Company reported consolidated operating revenue for the first quarter of 2015 of $1.186 billion, consolidated operating income reported of $3.7 million, and a net loss of $21.6 million.

277. Also on April 30, 2015, Defendants caused the Company to file a report with the SEC on Form 10-Q that contained the Company's financial results for the quarter ended March 31, 2015 (the "Q1 2015 10-Q"). The Q1 2015 10-Q was signed by Defendants Welch and Pierson.

278. The Q1 2015 10-Q repeated the representations set forth in the Company's April 30, 2015 press release concerning the Company's reported operating revenue, operating income and net loss.

279. The representations in Paragraphs 276 and 278 were materially false and misleading because, in violation of GAAP, the Company's operating revenue was overstated by $6 million, operating income was overstated by $6 million and the Company's reported operating income was, in fact, an operating loss, and net loss was understated by 22.9%.

***ii. Defendants' Representations Concerning YRC's Operating Revenue and Internal Controls***

280. The Q1 2015 10-Q represented the following concerning the components of the Company's operating revenue: "**Operating Revenue:** Our operating revenue has two primary components: volume (commonly evaluated using number of shipments and weight per shipment) and yield or price (commonly evaluated on a dollar per hundredweight basis and a dollar per shipment basis)."

281. The representations in Paragraph 280 were materially false and misleading for the reasons set forth in Paragraph 206.

282. The Q1 2015 10-Q included SOX Certifications signed by Defendants Welch and Pierson that contained representations substantially similar to the representations by Defendants Welch and Pierson alleged in Paragraph 211.

283. The representations in Paragraph 282 were materially false and misleading for the reasons set forth in Paragraph 212.

***iii. Defendants' Representations Concerning YRC's Commitment, Contingencies and Uncertainties and Other Legal Matters***

284. The Q1 2015 10-Q purported to warn investors about "legal proceedings, claims and other litigation that arise in the ordinary course of business" and represented the following concerning "Commitment, Contingencies and Uncertainties" and "Other Legal Matters":

> We are involved in other litigation or proceedings that arise in ordinary business activities. When possible, we insure against these risks to the extent we deem

> prudent, but no assurance can be given that the nature or amount of such insurance will be sufficient to fully indemnify us against liabilities arising out of pending and future legal proceedings. Many of these insurance policies contain self-insured retentions in amounts we deem prudent. Based on our current assessment of information available as of the date of these financial statements, we believe that our financial statements include adequate provisions for estimated costs and losses that may be incurred within the litigation and proceedings to which we are a party.

285. The representations in Paragraph 284 were materially false and misleading for the reasons set forth in Paragraph 231.

**G. YRC's Second Quarter 2015 Financial Results and Q2 2015 10-Q**

***i. Defendants' Representations Concerning YRC's Reported Financial Results***

286. On July 30, 2015, Defendants caused the Company to file a report with the SEC on Form 8-K that contained the Company's news release of its financial results for the quarter ended June 30, 2015.

287. The Company reported consolidated operating revenue for the second quarter of 2015 of $1.258 billion, operating income of $56.9 million, and net income of $26 million.

288. Also on July 30, 2015, Defendants caused the Company to file a report with the SEC on Form 10-Q that contained the Company's financial results for the quarter ended June 30, 2015 (the "Q2 2015 10-Q"). The Q2 2015 10-Q was signed by Defendants Welch and Pierson.

289. The Q2 2015 10-Q repeated the representations set forth in the Company's July 30, 2015 press release concerning the Company's reported operating revenue, operating income and net income.

290. The representations in Paragraphs 287 and 289 were materially false and misleading because, in violation of GAAP, the Company's operating revenue was overstated by $6 million, operating income was overstated by $6 million or 11.8%, and net income was overstated by 26.8%.

### *ii. Defendants' Representations Concerning YRC's Operating Revenue and Internal Controls*

291. The Q2 2015 10-Q represented the following concerning the Company's revenue: "**Operating Revenue:** Our operating revenue has two primary components: volume (commonly evaluated using number of shipments and weight per shipment) and yield or price (commonly evaluated on a dollar per hundredweight basis and a dollar per shipment basis)."

292. The representations in Paragraph 291 were materially false and misleading for the reasons set forth in Paragraph 206.

293. The Q2 2015 10-Q included SOX Certifications signed by Defendants Welch and Pierson that contained representations substantially similar to the representations by Defendants Welch and Pierson alleged in Paragraph 211.

294. The representations in Paragraph 293 were materially false and misleading for the reasons set forth in Paragraph 212.

### *iii. Defendants' Representations Concerning YRC's Commitment, Contingencies and Uncertainties and Other Legal Matters*

295. The Q2 2015 10-Q purported to warn investors about "legal proceedings, claims and other litigation that arise in the ordinary course of business" and represented the following concerning "Commitment, Contingencies and Uncertainties" and "Other Legal Matters":

> We are involved in other litigation or proceedings that arise in ordinary business activities. When possible, we insure against these risks to the extent we deem prudent, but no assurance can be given that the nature or amount of such insurance will be sufficient to fully indemnify us against liabilities arising out of pending and future legal proceedings. Many of these insurance policies contain self-insured retentions in amounts we deem prudent. Based on our current assessment of information available as of the date of these financial statements, we believe that our financial statements include adequate provisions for estimated costs and losses that may be incurred within the litigation and proceedings to which we are a party.

296. The representations in Paragraph 295 were materially false and misleading for the reasons set forth in Paragraph 231.

### H. YRC's Third Quarter 2015 Financial Results and Q3 10-Q

#### *i. Defendants' Representations Concerning YRC's Reported Financial Results*

297. On October 29, 2015, Defendants caused the Company to file a report with the SEC on Form 8-K that contained the Company's news release of its financial results for the quarter ended September 30, 2015.

298. The Company reported consolidated operating revenue for the third quarter of 2015 of $1.245 billion, consolidated operating income of $47.7 million, and net income of $19.8 million.

299. Also on October 29, 2015, Defendants caused the Company to file a report with the SEC on Form 10-Q that contained the Company's financial results for the quarter ended September 30, 2015 (the "Q3 2015 10-Q"). The Q3 2015 10-Q was signed by Defendants Welch and Pierson.

300. The Q3 2015 10-Q repeated the representations set forth in the Company's October 30, 2015 press release concerning the Company's reported operating revenue, operating income and net income.

301. The representations in Paragraphs 298 and 300 were materially false and misleading because, in violation of GAAP, the Company's operating revenue was overstated by $6 million, operating income was overstated by $6 million or 14.4%, and net income was overstated by $6 million or 29.4%.

#### *ii. Defendants' Representations Concerning YRC's Operating Revenue and Internal Controls*

302. The Q3 2015 10-Q represented the following concerning the Company's revenue: "**Operating Revenue:** Our operating revenue has two primary components: volume (commonly

evaluated using number of shipments and weight per shipment) and yield or price (commonly evaluated on a dollar per hundredweight basis and a dollar per shipment basis)."

303. The representations in Paragraph 302 were materially false and misleading for the reasons set forth in Paragraph 206.

304. The Q3 2015 10-Q included SOX Certifications signed by Defendants Welch and Pierson that contained representations substantially similar to the representations by Defendants Welch and Pierson alleged in Paragraph 211.

305. The representations in Paragraph 304 were materially false and misleading for the reasons set forth in Paragraph 212.

#### ***iii. Defendants' Representations Concerning YRC's Commitment, Contingencies and Uncertainties and Other Legal Matters***

306. The Q3 2015 10-Q purported to warn investors about "legal proceedings, claims and other litigation that arise in the ordinary course of business" and represented the following concerning "Commitment, Contingencies and Uncertainties" and "Other Legal Matters":

> We are involved in other litigation or proceedings that arise in ordinary business activities. When possible, we insure against these risks to the extent we deem prudent, but no assurance can be given that the nature or amount of such insurance will be sufficient to fully indemnify us against liabilities arising out of pending and future legal proceedings. Many of these insurance policies contain self-insured retentions in amounts we deem prudent. Based on our current assessment of information available as of the date of these financial statements, we believe that our financial statements include adequate provisions for estimated costs and losses that may be incurred within the litigation and proceedings to which we are a party.

307. The representations in Paragraph 306 were materially false and misleading for the reasons set forth in Paragraph 231.

## I. YRC's 2015 Fourth Quarter and Full Year Financial Results and 2015 Annual Report on Form 10-K

### *i. Defendants' Representations Concerning YRC's Reported Financial Results*

308. On February 2, 2016, Defendants caused the Company to file a report with the SEC on Form 8-K that contained the Company's news release of its financial results for the quarter and year ended December 31, 2015.

309. The Company reported consolidated operating revenue for the fourth quarter 2015 of $1.143 billion, a consolidated operating loss of $15.3 million and a net loss of $23.5 million. For the year ended December 31, 2015, the Company report consolidated operating revenue of $4.832 billion, consolidated operating income of $93 million, and net income of $700,000.

310. On February 18, 2016, Defendants caused the Company to file its annual report for the year ended December 31, 2015 with the SEC on Form 10-K ("2015 10-K"). The 2015 10-K was signed by Defendants Welch, Pierson and Fisher.

311. The 2015 10-K repeated the representations set forth in the February 4, 2016 press release concerning the Company's operating revenue, operating income or loss, and net income or loss for the quarter and year ended December 31, 2015.

312. The representations in Paragraphs 309 and 311 were materially false and misleading because, in violation of GAAP, for the year ended December 31, 2015 the Company's operating revenue was overstated by $24 million, operating income was overstated by $24 million or 34.8%, and net income was understated by 84.4%. For the quarter ended December 31, 2015, the Company overstated operating revenue by $6 million, operating loss was understated by $6 million or 28.2%, and net loss was understated by 13.3%.

### *ii. Defendants' Representations Concerning YRC's Revenue Recognition Procedures and Internal Controls*

313. The 2015 10-K repeated representations concerning the Company's systems for assigning prices to its customers' invoices and revenue recognition:

> *Shipments in Transit*
>
> We assign pricing to bills of lading at the time of shipment based primarily on the weight, general classification of the product, the shipping destination and individual customer discounts. This process is referred to as rating. . . .
>
> *Revenue Recognition and Revenue-related Reserves* . . . .
>
> The total revenue earned is accumulated for all shipments in transit at a particular period end and recorded as operating revenue. . . .
>
> We assign pricing to bills of lading at the time of shipment based primarily on the weight, general classification of the product, the shipping destination and individual customer discounts. This process is referred to as rating . . . .

314. The representations in Paragraph 313 were materially false and misleading for the reasons set forth in Paragraph 204.

315. The 2015 10-K repeated representations concerning the Company's revenue: "**Operating Revenue:** Operating revenue has two primary components: volume (commonly evaluated using tonnage, tonnage per day, number of shipments, shipments per day or weight per shipment) and yield or price (commonly evaluated using picked up revenue, revenue per hundredweight or revenue per shipment)."

316. The representations in Paragraph 315 were materially false and misleading for the reasons set forth in Paragraph 206.

317. The 2015 10-K repeated representations concerning the Company's policy and procedures for correcting incorrect customer prices based on weight verification:

> *Rerate Reserves*
>
> At various points throughout our customer invoicing process, incorrect ratings (*i.e.* prices) could be identified based on many factors, including weight verifications or updated customer discounts. Although the majority of rerating occurs in the same month as the original rating, a portion occurs during the following periods. We accrue a reserve for rerating primarily based on historical trends. At December 31, 2015 and 2014, our financial statements included a rerate reserve as a reduction to "Accounts Receivable" of $8.1 million and $12.2 million, respectively.
>
> * * *
>
> *Revenue Recognition and Revenue-related Reserves* . . . .
>
> We assign pricing to bills of lading at the time of shipment based primarily on the weight, general classification of the product, the shipping destination and individual customer discounts. This process is referred to as rating. At various points throughout our process, incorrect ratings could be identified based on many factors, including weight verifications or updated customer discounts. Although the majority of rerating occurs in the same month as the original rating, a portion occurs during the following periods. We accrue a reserve for rerating based primarily on historical trends. At December 31, 2015 and 2014, our financial statements included a rerate reserve as a reduction to "Accounts Receivable" of $8.1 million and $12.2 million, respectively.

318. The representations in Paragraph 317 were materially false and misleading for the reasons set forth in Paragraph 208.

319. The 2015 10-K repeated representations concerning the Company's systems for capturing, recording and controlling information relevant to Defendants' management of revenue reserves:

> ***Revenue Recognition and Revenue-related Reserves***
>
> We have an extensive system that allows us to accurately capture, record and control all relevant information necessary to effectively manage our revenue reserves. . . .

320. The representations in Paragraph 319 were materially false and misleading for the reasons set forth in Paragraph 210.

321. The 2015 10-K included SOX Certifications that contained representations substantially similar to the representations by Defendants Welch and Pierson in Paragraph 211.

322. The representations in Paragraph 321 were materially false and misleading for the reasons set forth in Paragraph 212.

### *iii. Defendants' Representations Concerning YRC's Commitment, Contingencies and Uncertainties and Other Legal Matters*

323. The 2015 10-K purported to warn investors about "legal proceedings, claims and other litigation that arise in the ordinary course of business" and represented the following concerning "Commitment, Contingencies and Uncertainties" and "Other Legal Matters":

> We are involved in other litigation or proceedings that arise in ordinary business activities. When possible, we insure against these risks to the extent we deem prudent, but no assurance can be given that the nature or amount of such insurance will be sufficient to fully indemnify us against liabilities arising out of pending and future legal proceedings. Many of these insurance policies contain self-insured retentions in amounts we deem prudent. Based on our current assessment of information available as of the date of these financial statements, we believe that our financial statements include adequate provisions for estimated costs and losses that may be incurred within the litigation and proceedings to which we are a party.

324. The representations in Paragraph 323 were materially false and misleading because, while the Company disclosed the *Bryant* Action, certain changes to California labor law in October 2015, and the Company's risks relating to compliance with applicable laws relating to the discharge of materials into the environment, and purported to warn YRC investors that the Company was involved in "other litigation or proceedings that arise in ordinary business activities," Defendants failed to disclose the DOJ Investigation, a serious, ongoing investigation since 2009. Defendants' representation gave investors the false impression that the Company did not face any other material contingencies or uncertainties outside the ordinary course of business and run-of-the-mill litigation and legal proceedings, when, in fact, the Company faced a serious, ongoing civil investigation that exposed it to substantial liability for violations of the FCA. In

addition, Defendants' representation was materially false and misleading because Defendants failed to disclose the DOJ Investigation, a loss contingency required to be disclosed by Defendants under GAAP (¶¶ 183-91.)

#### *iv. Defendants' Representation That YRC's Financial Statements Were Prepared in Conformity with GAAP*

325. The 2015 10-K represented that Defendants prepared YRC's financial statements in conformity with U.S. GAAP:

> Accounting policies refer to specific accounting principles and the methods of applying those principles to fairly present our financial position and results of operations in accordance with generally accepted accounting principles. The policies discussed below include those that management has determined to be the most appropriate in preparing our financial statements.

326. The representations in Paragraphs 325 were materially false and misleading for the reasons set forth in Paragraph 217.

### J. Defendant Welch's Message to Shareholders in YRC's 2015 Annual Report

327. On or around February 18, 2016, the date on which Defendants caused the Company to file its 2015 10-K with the SEC, YRC posted a version of the 2015 10-K on its website that included "A MESSAGE TO SHAREHOLDERS" signed by Welch. The letter to shareholders included the following representation by Defendant Welch:

> Staying committed to our strategy was a key driver in improving Adjusted EBITDA by almost $90 million to $333 million. . . .

328. Defendant Welch's representation in Paragraph 327 that YRC was "[s]taying committed to our strategy was a key driver" in improving profitability was materially false and misleading because he failed to disclose that a material part of YRC's strategy was cheating its customers through the Overcharge Scheme, leading to artificially inflated prices for shipments through YRC.

### K. February 11, 2016 BB&T Transportation Services Conference

329. On February 11, 2016, Defendants Welch and Pierson participated in the BB&T Transportation Services Conference. In response to an analyst's question concerning YRC's use of dimensioners, Defendant Pierson made the following representation concerning YRC's collection of customer data for its pricing model:

> We are capturing not only the cube of that shipment, the weight of that shipment, the class of that shipment, the distance of that shipment, how many times we touch that shipment—so we're scraping as much data as possible off every single shipment that we can scan . . . it allows us to improve the intelligence of our pricing model.

330. Defendant Pierson's representation that YRC was "scraping as much data as possible off every single shipment that we can scan" to allow YRC "to improve the intelligence of" its "pricing model" was materially false and misleading because Pierson failed to disclose that YRC's pricing model blocked negative reweighs and, as a result, its pricing model did not credit or refund YRC customers for negative reweighs.

### L. YRC's First Quarter 2016 Financial Results and Q1 2016 10-Q

#### *i. Defendants' Representations Concerning YRC's Reported Financial Results*

331. On April 28, 2016, Defendants caused the Company to file a report with the SEC on Form 8-K that contained the Company's news release of its financial results for the quarter ended March 31, 2016.

332. The Company reported consolidated operating revenue for first quarter 2016 of $1.120 billion, consolidated operating income of $13.4 million, and a net loss of $12 million.

333. Also on April 28, 2016, Defendants caused the Company to file a report with the SEC on Form 10-Q that contained the Company's financial results for the quarter ended March 31, 2016 (the "Q1 2016 10-Q"). The Q1 2016 10-Q was signed by Defendants Welch and Pierson.

334. The Q1 2016 10-Q repeated the representations set forth in the Company's April 28, 2016 press release concerning the Company's reported operating revenue, operating income and net loss.

335. The representations in Paragraphs 332 and 334 were materially false and misleading because, in violation of GAAP, the Company's operating revenue was overstated by $6 million, operating income was overstated by $6 million or 81.1%, and net loss was understated by 30.2%.

#### *ii. Defendant Welch's Representation Concerning YRC's Pricing "Strategy"*

336. The April 28, 2016 press release included the following representation by Defendant Welch concerning YRC's pricing strategy:

> While we have made significant strides, we must balance the volume equation with our strategy to get the right freight at the right price running through our networks . . . Our intent is to remain disciplined and true to this strategy.

337. The representations in Paragraph 336 concerning YRC's "strategy" were materially false and misleading for the reasons set forth in Paragraph 249.

#### *iii. Defendants' Representations Concerning YRC's Operating Revenue and Internal Controls*

338. The Q1 2016 10-Q represented the following concerning the Company's revenue: "**Operating Revenue:** Our operating revenue has two primary components: volume (commonly evaluated using number of shipments and weight per shipment) and yield or price (commonly evaluated on a dollar per hundredweight basis and a dollar per shipment basis)."

339. The representations in Paragraphs 338 were materially false and misleading for the reasons set forth in Paragraph 206.

340. The Q1 2016 10-Q included SOX Certifications signed by Defendants Welch and Pierson that contained representations substantially similar to the representations by Defendants Welch and Pierson alleged in Paragraph 211.

341. The representations in Paragraph 340 were materially false and misleading for the reasons set forth in Paragraph 212.

#### *iv. Defendants' Representations Concerning YRC's Commitment, Contingencies and Uncertainties and Other Legal Matters*

342. The Q1 2016 10-Q purported to warn investors about "legal proceedings, claims and other litigation that arise in the ordinary course of business" and represented the following concerning "Commitment, Contingencies and Uncertainties" and "Other Legal Matters":

> We are involved in other litigation or proceedings that arise in ordinary business activities. When possible, we insure against these risks to the extent we deem prudent, but no assurance can be given that the nature or amount of such insurance will be sufficient to fully indemnify us against liabilities arising out of pending and future legal proceedings. Many of these insurance policies contain self-insured retentions in amounts we deem prudent. Based on our current assessment of information available as of the date of these financial statements, we believe that our financial statements include adequate provisions for estimated costs and losses that may be incurred within the litigation and proceedings to which we are a party.

343. The representations in Paragraph 342 were materially false and misleading because, while the Company disclosed certain changes to California labor law in October 2015, and purported to warn YRC investors that the Company was involved in "other litigation or proceedings that arise in ordinary business activities," Defendants failed to disclose the DOJ Investigation, a serious, ongoing investigation since 2009. Defendants' representation gave investors the false impression that the Company did not face any other material contingencies or uncertainties outside the ordinary course of business and run-of-the-mill litigation and legal proceedings, when, in fact, the Company faced a serious, ongoing civil investigation that exposed it to substantial liability for violations of the FCA. In addition, Defendants' representation was

materially false and misleading because Defendants failed to disclose the DOJ Investigation, a loss contingency required to be disclosed by Defendants under GAAP (¶¶ 183-91.)

### M. YRC's Second Quarter 2016 Financial Results and Q2 10-Q 2016

#### *i. Defendants' Representations Concerning YRC's Reported Financial Results*

344. On July 28, 2016, Defendants caused the Company to file a report with the SEC on Form 8-K that contained the Company's news release of its financial results for the quarter ended June 30, 2016.

345. The Company reported consolidated operating revenue for second quarter 2016 of $1.208 billion, consolidated operating income of $57.2 million, and net income of $27.1 million.

346. Also on July 28, 2016, Defendants caused the Company to file a report with the SEC on Form 10-Q that contained the Company's financial results for the quarter ended June 30, 2016 (the "Q2 2016 10-Q"). The Q2 2016 10-Q was signed by Defendants Welch and Pierson.

347. The Q2 2016 10-Q repeated the representations set forth in the Company's July 28, 2016 press release concerning the Company's reported operating revenue, operating income and net income.

348. The representations in Paragraphs 345 and 347 were materially false and misleading because, in violation of GAAP, the Company's operating revenue was overstated by $6 million, operating income was overstated by $6 million or 11.7%, and net income was overstated by 23.2%.

#### *ii. Defendants' Representations Concerning YRC's Operating Revenue and Internal Controls*

349. The Q2 2016 10-Q represented the following concerning the Company's revenue: "**Operating Revenue:** Our operating revenue has two primary components: volume (commonly

evaluated using number of shipments and weight per shipment) and yield or price (commonly evaluated on a dollar per hundredweight basis and a dollar per shipment basis)."

350. The representations in Paragraphs 349 were materially false and misleading for the reasons set forth in Paragraph 206.

351. The Q2 2016 10-Q included SOX Certifications signed by Defendants Welch and Pierson that contained representations substantially similar to the representations by Defendants Welch and Pierson alleged in Paragraph 211.

352. The representations in Paragraph 351 were materially false and misleading for the reasons set forth in Paragraph 212.

***iii. Defendants' Representations Concerning YRC's Commitment, Contingencies and Uncertainties and Other Legal Matters***

353. The Q2 2016 10-Q purported to warn investors about "legal proceedings, claims and other litigation that arise in the ordinary course of business" and represented the following concerning "Commitment, Contingencies and Uncertainties" and "Other Legal Matters":

> We are involved in other litigation or proceedings that arise in ordinary business activities. When possible, we insure against these risks to the extent we deem prudent, but no assurance can be given that the nature or amount of such insurance will be sufficient to fully indemnify us against liabilities arising out of pending and future legal proceedings. Many of these insurance policies contain self-insured retentions in amounts we deem prudent. Based on our current assessment of information available as of the date of these financial statements, we believe that our financial statements include adequate provisions for estimated costs and losses that may be incurred within the litigation and proceedings to which we are a party.

354. The representations in Paragraph 353 were materially false and misleading for the reasons set forth in Paragraph 343.

## N. YRC's Third Quarter 2016 Financial Results and Q3 2016 10-Q

### *i. Defendants' Representations Concerning YRC's Reported Financial Results*

355. On October 27, 2016, Defendants caused the Company to file a report with the SEC on Form 8-K that contained the Company's news release of its financial results for the quarter ended September 30, 2016.

356. The Company reported consolidated operating revenue for third quarter 2016 of $1.221 billion, consolidated operating income of $38.8 million, and net income of $13.9 million.

357. Also on October 27, 2016, Defendants caused the Company to file a report with the SEC on Form 10-Q that contained the Company's financial results for the quarter ended September 30, 2016 (the "Q3 2016 10-Q"). The Q3 2016 10-Q was signed by Defendants Welch and Pierson.

358. The Q3 2016 10-Q repeated the representations set forth in the Company's October 27, 2016 press release concerning the Company's reported operating revenue, operating income and net income.

359. The representations in Paragraphs 356 and 358 were materially false and misleading because, in violation of GAAP, the Company's operating revenue was overstated by $6 million, operating income was overstated by $6 million or 18.3%, and net income was overstated by 71.6%.

### *ii. Defendants' Representations Concerning YRC's Operating Revenue and Internal Controls*

360. The Q3 2016 10-Q represented the following concerning the Company's revenue: "**Operating Revenue:** Our operating revenue has two primary components: volume (commonly evaluated using number of shipments and weight per shipment) and yield or price (commonly evaluated on a dollar per hundredweight basis and a dollar per shipment basis)."

361. The representations in Paragraph 360 were materially false and misleading for the reasons set forth in Paragraph 206.

362. The Q3 2016 10-Q included SOX Certifications signed by Defendants Welch and Pierson that contained representations substantially similar to the representations by Defendants Welch and Pierson alleged in Paragraph 211.

363. The representations in Paragraph 362 were materially false and misleading for the reasons set forth in Paragraph 212.

***iii. Defendants' Representations Concerning YRC's Commitment, Contingencies and Uncertainties and Other Legal Matters***

364. The Q3 2016 10-Q purported to warn investors about "legal proceedings, claims and other litigation that arise in the ordinary course of business" and represented the following concerning "Commitment, Contingencies and Uncertainties" and "Other Legal Matters":

> We are involved in other litigation or proceedings that arise in ordinary business activities. When possible, we insure against these risks to the extent we deem prudent, but no assurance can be given that the nature or amount of such insurance will be sufficient to fully indemnify us against liabilities arising out of pending and future legal proceedings. Many of these insurance policies contain self-insured retentions in amounts we deem prudent. Based on our current assessment of information available as of the date of these financial statements, we believe that our financial statements include adequate provisions for estimated costs and losses that may be incurred within the litigation and proceedings to which we are a party.

365. The representations in Paragraph 364 were materially false and misleading for the reasons set forth in Paragraph 343.

## O. YRC's 2016 Fourth Quarter and Full Year Financial Results and 2016 Annual Report on Form 10-K

### *i. Defendants' Representations Concerning YRC's Reported Financial Results*

366. On February 6, 2017, Defendants caused the Company to file a report with the SEC on Form 8-K that contained the Company's news release of its financial results for the quarter and year ended December 31, 2016.

367. The Company reported consolidated operating revenue for fourth quarter 2016 of $1.148 billion, consolidated operating income of $14.9 million, and a net loss of $7.5 million. For the year ended December 31, 2016, the Company reported operating revenue of $4.698 billion, consolidated operating income of $124.3 million, and net income of $21.5 million.

368. On February 17, 2017, Defendants caused the Company to file its annual report for the year ended December 31, 2016 with the SEC on Form 10-K ("2016 10-K"). The 2016 10-K was signed by Defendants Welch and Fisher.

369. The 2016 10-K repeated the representations set forth in the February 6, 2017 press release concerning operating revenue, operating income, and net income or loss for the quarter and year ended December 31, 2016.

370. The representations in Paragraphs 367 and 369 were materially false and misleading because, in violation of GAAP, for the year ended December 31, 2016 the Company's operating revenue was overstated by $24 million, operating income was overstated by $24 million or 23.9%, and net income was overstated by 4,200%. For the quarter ended December 31, 2016, the Company overstated operating income by $6 million, overstated operating income by $6 million or 67.4%, and understated net loss by 43.6%.

#### *ii. Defendant Welch's Representation Concerning YRC's Pricing "Strategy"*

371. The February 6, 2017 press release included the following representations by Defendant Welch: "Our pricing strategy remains focused on profitability while delivering award-winning customer service."

372. Defendant Welch's representations in Paragraph 371 concerning the Company's pricing "strategy" were materially false and misleading for the reasons set forth in Paragraph 249.

#### *iii. Defendants' Representations Concerning YRC's Operating Revenue Procedures and Internal Controls*

373. The 2016 10-K represented the following concerning the Company's systems for assigning prices to its customers' invoices and revenue recognition:

> *Shipments in Transit*
>
> We assign pricing to bills of lading at the time of shipment based primarily on the weight, general classification of the product, the shipping destination and individual customer discounts. This process is referred to as rating. . .
>
> ***Revenue Recognition and Revenue-related Reserves*** . . . .
>
> The total revenue earned is accumulated for all shipments in transit at a particular period end and recorded as operating revenue. . . .
>
> We assign pricing to bills of lading at the time of shipment based primarily on the weight, general classification of the product, the shipping destination and individual customer discounts. This process is referred to as rating.

374. The representations in Paragraph 373 were materially false and misleading for the reasons set forth in Paragraph 204.

375. The 2016 10-K repeated representations concerning the Company's revenue: "**Operating Revenue:** Operating revenue has two primary components: volume (commonly evaluated using tonnage, tonnage per day, number of shipments, shipments per day or weight per

shipment) and yield or price (commonly evaluated using picked up revenue, revenue per hundredweight or revenue per shipment)."

376. The representations in Paragraph 375 were false and misleading for the reasons set forth in Paragraph 206.

377. The 2016 10-K repeated representation concerning the Company's systems for capturing, recording and controlling information relevant to Defendants' management of revenue reserves:

> ***Revenue Recognition and Revenue-related Reserves*** . . .
>
> We have an extensive system that allows us to accurately capture, record and control all relevant information necessary to effectively manage our revenue reserves. . . .

378. The representations in Paragraph 377 were materially false and misleading for the reasons set forth in Paragraph 210.

379. The 2016 10-K represented the following concerning the Company's policy and procedures for correcting incorrect customer prices based on weight verification:

> *Rerate Reserves*
>
> At various points throughout our customer invoicing process, incorrect ratings (*i.e.* prices) could be identified based on many factors, including weight verifications or updated customer discounts. Although the majority of rerating occurs in the same month as the original rating, a portion occurs during the following periods. We accrue a reserve for rerating primarily based on historical trends. At December 31, 2016 and 2015, our financial statements included a rerate reserve as a reduction to "Accounts Receivable" of $10.4 million and $8.1 million, respectively. . .
>
> ***Revenue Recognition and Revenue-related Reserves*** . . .
>
> At various points throughout our process, incorrect ratings could be identified based on many factors, including weight verifications or updated customer discounts. Although the majority of rerating occurs in the same month as the original rating, a portion occurs during the following periods. We accrue a reserve for rerating based primarily on historical trends. At December 31, 2016 and 2015, our financial

> statements included a rerate reserve as a reduction to "Accounts Receivable" of $10.4 million and $8.1 million, respectively.

380. The representations in Paragraph 379 were materially false and misleading for the reasons set forth in Paragraph 208.

381. The 2016 10-K included SOX Certifications signed by Defendants Welch and Fisher that contained representations substantially similar to the representation by Defendants Welch and Pierson in Paragraph 211.

382. The representations in Paragraph 381 were materially false and misleading for the reasons set forth in Paragraph 212.

#### *iv. Defendants' Representations Concerning YRC's Commitment, Contingencies and Uncertainties and Other Legal Matters*

383. The 2016 10-K purported to warn investors about "legal proceedings, claims and other litigation that arise in the ordinary course of business" and represented the following concerning "Commitment, Contingencies and Uncertainties" and "Other Legal Matters":

> We are involved in other litigation or proceedings that arise in ordinary business activities. When possible, we insure against these risks to the extent we deem prudent, but no assurance can be given that the nature or amount of such insurance will be sufficient to fully indemnify us against liabilities arising out of pending and future legal proceedings. Many of these insurance policies contain self-insured retentions in amounts we deem prudent. Based on our current assessment of information available as of the date of these financial statements, we believe that our financial statements include adequate provisions for estimated costs and losses that may be incurred within the litigation and proceedings to which we are a party.

384. The representations in Paragraph 384 were materially false and misleading for the reasons set forth in Paragraph 343.

#### *v. Defendants' Representation That YRC's Financial Statements Were Prepared in Conformity with GAAP*

385. The 2016 10-K represented that Defendants prepared YRC's financial statements in conformity with U.S. GAAP:

> Accounting policies refer to specific accounting principles and the methods of applying those principles to fairly present our financial position and results of operations in accordance with generally accepted accounting principles. The policies discussed below include those that management has determined to be the most appropriate in preparing our financial statements.

386. The representations in Paragraph 385 were materially false and misleading for the reasons set forth in Paragraph 217.

**P. YRC's First Quarter 2017 Financial Results and Q1 2017 10-Q**

***i. Defendants' Representations Concerning YRC's Reported Financial Results***

387. On May 4, 2017, Defendants caused the Company to file a report with the SEC on Form 8-K that contained the Company's news release of its financial results for the quarter ended March 31, 2017.

388. The Company reported consolidated operating revenue for first quarter 2017 of $1.171 billion, a consolidated operating loss of $3.0 million, and a net loss of $25.3 million.

389. Also on May 4, 2017, Defendants caused the Company to file a report with the SEC on Form 10-Q that contained the Company's financial results for the quarter ended March 31, 2017 (the "Q1 2017 10-Q"). The Q1 2017 10-Q was signed by Defendants Welch and Fisher.

390. The Q1 2017 10-Q repeated the representations set forth in the Company's May 4, 2017 press release concerning the Company's reported operating revenue, operating loss and net loss.

391. The representations in Paragraphs 388 and 390 were materially false and misleading because, in violation of GAAP, the Company's operating revenue was overstated by $6 million, operating loss was understated by $6 million or 66.7%, and net loss was understated by 17%.

***ii. Defendant Welch's Representation Concerning YRC's Pricing "Strategy"***

392. The May 4, 2017 press release included the following representation by Defendant Welch:

> We expect the improvement in year-over-year tonnage per day to help us execute our strategy of pricing for profitability and moving shipments through YRC Freight, Holland, Reddaway and New Penn's networks that have favorable freight characteristics.

393. The representations in Paragraph 392 concerning the Company's pricing "strategy" were materially false and misleading for the reasons set forth in Paragraph 249.

***iii. Defendants' Representations Concerning YRC's Operating Revenue Procedures and Internal Controls***

394. The Q1 2017 10-Q represented the following concerning the Company's revenue: "**Operating Revenue:** Our operating revenue has two primary components: volume (commonly evaluated using number of shipments and weight per shipment) and yield or price (commonly evaluated on a dollar per hundredweight basis and a dollar per shipment basis)."

395. The representations in Paragraphs 394 were materially false and misleading for the reasons set forth in Paragraph 206.

396. The Q1 2017 10-Q included SOX Certifications signed by Defendants Welch and Fisher that contained representations substantially similar to the representations by Defendants Welch and Pierson alleged in Paragraph 211.

397. The representations in Paragraph 396 were materially false and misleading for the reasons set forth in Paragraph 212.

#### *iv. Defendants' Representations Concerning YRC's Commitment, Contingencies and Uncertainties and Other Legal Matters*

398. The Q1 2017 10-Q purported to warn investors about "legal proceedings, claims and other litigation that arise in the ordinary course of business" and represented the following concerning "Commitment, Contingencies and Uncertainties" and "Other Legal Matters":

> We are involved in other litigation or proceedings that arise in ordinary business activities. When possible, we insure against these risks to the extent we deem prudent, but no assurance can be given that the nature or amount of such insurance will be sufficient to fully indemnify us against liabilities arising out of pending and future legal proceedings. Many of these insurance policies contain self-insured retentions in amounts we deem prudent. Based on our current assessment of information available as of the date of these financial statements, we believe that our financial statements include adequate provisions for estimated costs and losses that may be incurred within the litigation and proceedings to which we are a party.

399. The representations in Paragraph 398 were materially false and misleading for the reasons set forth in Paragraph 343.

### Q. YRC's Second Quarter 2017 Financial Results and Q2 2017 10-Q

#### *i. Defendants' Representations Concerning YRC's Reported Financial Results*

400. On August 3, 2017 Defendants caused the Company to file a report with the SEC on Form 8-K that contained the Company's news release of its financial results for the quarter ended June 30, 2017.

401. The Company reported consolidated operating revenue for second quarter 2017 of $1.261 billion, consolidated operating income of $50 million, and net income of $19 million.

402. Also on August 3, 2017, Defendants caused the Company to file a report with the SEC on Form 10-Q that contained the Company's financial results for the quarter ended June 30, 2017 (the "Q2 2017 10-Q"). The Q2 2017 10-Q was signed by Defendants Welch and Fisher.

403. The Q2 2017 10-Q repeated the representations set forth in the Company's August 3, 2017 press release concerning the Company's reported operating revenue, operating income and net income.

404. The representations in Paragraphs 401 and 403 were materially false and misleading because, in violation of GAAP, the Company's operating revenue was overstated by $6 million, operating income was overstated by $6 million or 13.6%, and net income was overstated by 35.7%.

***ii. Defendant Welch's Representation Concerning YRC's Customers' Needs***

405. The August 3, 2017 press release included the following representation by Defendant Welch: "As we look to the second half of 2017, we expect that meeting our customers' needs, pricing for profitability and diligently managing costs should contribute to improved year-over-year financial performance."

406. Defendant Welch's representation that meeting YRC's "customers' needs" contributed to the Company's financial performance was materially false and misleading because he failed to disclose that YRC was not meeting the needs of customers who were entitled to a negative reweigh credit or discount. Further, YRC was cheating its customers and materially inflating the Company's financial results by at least $2 million per month through the Overcharge Scheme.

***iii. Defendants' Representations Concerning YRC's Operating Revenue Procedures and Internal Controls***

407. The Q2 2017 10-Q represented the following concerning the Company's revenue: "**Operating Revenue:** Our operating revenue has two primary components: volume (commonly

evaluated using number of shipments and weight per shipment) and yield or price (commonly evaluated on a dollar per hundredweight basis and a dollar per shipment basis)."

408. The representations in Paragraphs 407 were materially false and misleading for the reasons set forth in Paragraph 206.

409. The Q2 2017 10-Q included SOX Certifications signed by Defendants Welch and Fisher that contained representations substantially similar to the representations by Defendants Welch and Pierson alleged in Paragraph 211.

410. The representations in Paragraph 409 were materially false and misleading for the reasons set forth in Paragraph 212.

***iv. Defendants' Representations Concerning YRC's Commitment, Contingencies and Uncertainties and Other Legal Matters***

411. The Q2 2017 10-Q purported to warn investors about "legal proceedings, claims and other litigation that arise in the ordinary course of business" and represented the following concerning "Commitment, Contingencies and Uncertainties" and "Other Legal Matters":

> We are involved in other litigation or proceedings that arise in ordinary business activities. When possible, we insure against these risks to the extent we deem prudent, but no assurance can be given that the nature or amount of such insurance will be sufficient to fully indemnify us against liabilities arising out of pending and future legal proceedings. Many of these insurance policies contain self-insured retentions in amounts we deem prudent. Based on our current assessment of information available as of the date of these financial statements, we believe that our financial statements include adequate provisions for estimated costs and losses that may be incurred within the litigation and proceedings to which we are a party.

412. The representations in Paragraph 411 were materially false and misleading for the reasons set forth in Paragraph 343.

## R. YRC's Third Quarter 2017 Financial Results and Q3 2017 10-Q

### *i. Defendants' Representations Concerning YRC's Reported Financial Results*

413. On November 2, 2017, Defendants caused the Company to file a report with the SEC on Form 8-K that contained the Company's news release of its financial results for the quarter ended September 30, 2017.

414. The Company reported consolidated operating revenue for third quarter 2017 of $1.251 billion, consolidated operating income of $40.1 million, and net income of $3 million.

415. Also on November 2, 2017, Defendants caused the Company to file a report with the SEC on Form 10-Q that contained the Company's financial results for the quarter ended September 20, 2017 (the "Q3 2017 10-Q"). The Q3 2017 10-Q was signed by Defendants Welch and Fisher.

416. The Q3 2017 10-Q repeated the representations set forth in the Company's November 2, 2017 press release concerning the Company's reported operating revenue, operating income and net income.

417. The representations in Paragraphs 414 and 416 were materially false and misleading because, in violation of GAAP, the Company's operating revenue was overstated by $6 million, operating income was overstated by $6 million or 17.6%, and the Company's reported net income was, in fact, a net loss of at least $1.6 million.

### *ii. Defendants' Representations Concerning YRC's Operating Revenue Procedures and Internal Controls*

418. The Q3 2017 10-Q represented the following concerning the Company's revenue: "**Operating Revenue:** Our operating revenue has two primary components: volume (commonly evaluated using number of shipments and weight per shipment) and yield or price (commonly evaluated on a dollar per hundredweight basis and a dollar per shipment basis)."

419. The representations in Paragraphs 418 were materially false and misleading for the reasons set forth in Paragraph 206.

420. The Q3 2017 10-Q included SOX Certifications signed by Defendants Welch and Fisher that contained representations substantially similar to the representations by Defendants Welch and Pierson alleged in Paragraph 211.

421. The representations in Paragraph 420 were materially false and misleading for the reasons set forth in Paragraph 212.

#### ***iii. Defendants' Representations Concerning YRC's Commitment, Contingencies and Uncertainties and Other Legal Matters***

422. The Q3 2017 10-Q purported to warn investors about "legal proceedings, claims and other litigation that arise in the ordinary course of business" and represented the following concerning "Commitment, Contingencies and Uncertainties" and "Other Legal Matters":

> We are involved in other litigation or proceedings that arise in ordinary business activities. When possible, we insure against these risks to the extent we deem prudent, but no assurance can be given that the nature or amount of such insurance will be sufficient to fully indemnify us against liabilities arising out of pending and future legal proceedings. Many of these insurance policies contain self-insured retentions in amounts we deem prudent. Based on our current assessment of information available as of the date of these financial statements, we believe that our financial statements include adequate provisions for estimated costs and losses that may be incurred within the litigation and proceedings to which we are a party.

423. The representations in Paragraph 422 were materially false and misleading for the reasons set forth in Paragraph 343.

### **S. November 7, 2017 Stephens Fall Investment Conference**

424. On November 17, 2017, Defendant Welch participated in the Stephens Fall Investment Conference. In response to an analyst's question concerning how YRC's pricing or yield compared to industry peers, Defendant Welch represented the following:

> I don't know that we'd necessarily compare ourselves to our competition just on yield. We want to look at a lot of things: length of haul, revenue per shipment,

> weight per shipment. So we do what we think is best for our Company and I'm sure other companies do what's best for their company.

425. Defendant Welch's representation was materially false and misleading because Welch failed to disclose that YRC, unlike its competitors, blocked negative reweighs to the detriment of YRC's customers. As alleged in Paragraphs 72 and 84, at or around the time the Company determined to block negative reweighs, Gaynor surveyed the trucking industry and determined that YRC's competitors were not blocking negative reweighs because it was a breach of good faith with their consumers and undermined the integrity of the program.

### T. YRC's 2017 Fourth Quarter and Full Year Financial Results and 2017 Annual Report on Form 10-K

#### *i. Defendants' Representations Concerning YRC's Reported Financial Results*

426. On February 1, 2018, Defendants caused the Company to file a report with the SEC on Form 8-K that contained the Company's news release of its financial results for the quarter and year ended December 31, 2017.

427. The Company reported consolidated operating revenue for fourth quarter 2017 of $1.209 billion, consolidated operating income of $11.3 million, and a net loss of $7.5 million. For the year ended December 31, 2017, the Company reported $4.9 billion in operating revenue, $98.4 in operating income, and a net loss of $10.8 million.

428. On February 15, 2018, Defendants caused the Company to file its annual report for the year ended December 31, 2017 with the SEC on Form 10-K ("2017 10-K"). The 2017 10-K was signed by Defendants Welch and Fisher.

429. The 2017 10-K repeated the representations set forth in the February 1, 2018 press release concerning operating revenue, operating income, and net income or loss for the quarter and year ended December 31, 2017.

430. The representations in Paragraphs 427 and 429 were materially false and misleading because, in violation of GAAP, for the year ended December 31, 2017 the Company's operating revenue was overstated by $24 million, operating income was overstated by $24 million or 32.3%, and net loss was understated by 57%. For the quarter ended December 31, 2017, the Company overstated operating income by $6 million, operating income was overstated by $6 million or 113.2%, and net loss was understated by 28.6%.

***ii. Defendants' Representations Concerning YRC's Operating Revenue Procedures and Internal Controls***

431. The 2017 10-K repeated representations concerning the Company's systems for assigning prices to its customers and revenue recognition:

> *Shipments in Transit*
>
> We assign pricing to bills of lading at the time of shipment based primarily on the weight, general classification of the product, the shipping destination and individual customer discounts. This process is referred to as rating. . . .
>
> ***Revenue Recognition and Revenue-related Reserves . . . .***
>
> The total revenue earned is accumulated for all shipments in transit at a particular period end and recorded as operating revenue. . . .
>
> We assign pricing to bills of lading at the time of shipment based primarily on the weight, general classification of the product, the shipping destination and individual customer discounts. This process is referred to as rating.

432. The representations in Paragraph 431 were materially false and misleading for the reasons set forth in Paragraph 204.

433. The 2017 10-K repeated representations concerning the Company's revenue: "**Operating Revenue:** Operating revenue has two primary components: volume (commonly evaluated using tonnage, tonnage per day, number of shipments, shipments per day or weight per

shipment) and yield or price (commonly evaluated using picked up revenue, revenue per hundredweight or revenue per shipment)."

434. The representations in Paragraph 433 were materially false and misleading for the reasons set forth in Paragraph 206.

435. The 2017 10-K repeated representations concerning the Company's policy and procedures for correcting incorrect customer prices based on weight verification:

> *Rerate Reserves*
>
> At various points throughout our customer invoicing process, incorrect ratings (*i.e.* prices) could be identified based on many factors, including weight verifications or updated customer discounts. Although the majority of rerating occurs in the same month as the original rating, a portion occurs during the following periods. We accrue a reserve for rerating primarily based on historical trends. At December 31, 2017 and 2016, our financial statements included a rerate reserve as a reduction to "Accounts Receivable" of $8.8 million and $10.4 million, respectively.
>
> * * *
>
> ***Revenue Recognition and Revenue-related Reserves . . .***
>
> At various points throughout our process, incorrect ratings could be identified based on many factors, including weight verifications or updated customer discounts. Although the majority of rerating occurs in the same month as the original rating, a portion occurs during the following periods. We accrue a reserve for rerating based primarily on historical trends. At December 31, 2017 and 2016, our financial statements included a rerate reserve as a reduction to "Accounts Receivable" of $8.8 million and $10.4 million, respectively.

436. The representations in Paragraph 435 were materially false and misleading for the reasons set forth in Paragraph 208.

437. The 2017 10-K repeated representations concerning the Company's systems for capturing, recording and controlling information relevant to Defendants' management of revenue reserved:

> ***Revenue Recognition and Revenue-related Reserves***
>
> We have an extensive system that allows us to accurately capture, record and control all relevant information necessary to effectively manage our revenue reserves. . . .

438. The representations in Paragraph 437 were materially false and misleading for the reasons set forth in Paragraph 210.

439. The 2017 10-K included SOX Certifications signed by Defendants Welch and Fisher that contained representations substantially similar to the representation by Defendants Welch and Pierson in Paragraph 211.

440. The representations in Paragraph 439 were materially false and misleading for the reasons set forth in Paragraph 212.

#### *iii. Defendants' Representations Concerning YRC's Commitment, Contingencies and Uncertainties and Other Legal Matters*

441. The 2017 10-K purported to warn investors about "legal proceedings, claims and other litigation that arise in the ordinary course of business" and represented the following concerning "Commitment, Contingencies and Uncertainties" and "Other Legal Matters":

> We are involved in other litigation or proceedings that arise in ordinary business activities. When possible, we insure against these risks to the extent we deem prudent, but no assurance can be given that the nature or amount of such insurance will be sufficient to fully indemnify us against liabilities arising out of pending and future legal proceedings. Many of these insurance policies contain self-insured retentions in amounts we deem prudent. Based on our current assessment of information available as of the date of these financial statements, we believe that our financial statements include adequate provisions for estimated costs and losses that may be incurred within the litigation and proceedings to which we are a party.

442. Defendants' representation was materially false and misleading because, while Defendants purported to warn YRC investors that the Company was involved in "other litigation or proceedings that arise in ordinary business activities," Defendants failed to disclose the DOJ Investigation, a serious, ongoing investigation since 2009. Defendants' representation gave

investors the false impression that the Company did not face any other material contingencies or uncertainties outside the ordinary course of business and run-of-the-mill litigation and legal proceedings, when, in fact, the Company faced a serious, ongoing civil investigation that exposed it to substantial liability for violations of the FCA. In addition, Defendants' representation was materially false and misleading because Defendants failed to disclose the DOJ Investigation, a loss contingency required to be disclosed by Defendants under GAAP (¶¶ 183-91.)

#### *iv. Defendants' Representation That YRC's Financial Statements Were Prepared in Conformity with GAAP*

443. The 2017 10-K represented that Defendants prepared YRC's financial statements in conformity with U.S. GAAP:

> Accounting policies refer to specific accounting principles and the methods of applying those principles to fairly present our financial position and results of operations in accordance with generally accepted accounting principles. The policies discussed below include those that management has determined to be the most appropriate in preparing our financial statements.

444. The representations in Paragraph 443 were materially false and misleading for the reasons set forth in Paragraph 217.

### U. YRC's First Quarter 2018 Financial Results and Q1 2018 10-Q

#### *i. Defendants' Representations Concerning YRC's Reported Financial Results*

445. On May 3, 2018, Defendants caused the Company to file a report with the SEC on Form 8-K that contained the Company's news release of its financial results for the quarter ended March 31, 2018.

446. The Company reported consolidated operating revenue for first quarter 2017 of $1.2 billion, a consolidated operating loss of $4.3 million, and a net loss of $14.6 million.

447. Also on May 3, 2018, Defendants caused the Company to file a report with the SEC on Form 10-Q that contained the Company's financial results for the quarter ended March 31, 2018 (the "Q1 2018 10-Q"). The Q1 2018 10-Q was signed by Defendants Hawkins and Fisher.

448. The Q1 2018 10-Q repeated the representations set forth in the Company's May 3, 2018 press release concerning the Company's reported operating revenue, operating loss and net loss.

449. The representations in Paragraphs 446 and 448 were materially false and misleading because, in violation of GAAP, the Company's operating revenue was overstated by $6 million, operating loss was understated by $6 million or 58.3%, and net loss was understated by 18%.

***ii. Defendants' Representations Concerning YRC's Operating Revenue Procedures and Internal Controls***

450. The Q1 2018 10-Q represented the following concerning the Company's revenue: "**Operating Revenue:** Our operating revenue has two primary components: volume (commonly evaluated using tonnage, tonnage per day, number of shipments, shipments per day or weight per shipment) and yield or price (commonly evaluated using picked up revenue, revenue per hundredweight or revenue per shipment)."

451. The representations in Paragraphs 450 were materially false and misleading for the reasons set forth in Paragraph 206.

452. The Q1 2018 10-Q included SOX Certifications signed by Defendants Hawkins and Fisher that contained representations substantially similar to the representations by Defendants Welch and Pierson alleged in Paragraph 211.

453. The representations in Paragraph 452 were materially false and misleading for the reasons set forth in Paragraph 212.

### *iii. Defendants' Representations Concerning YRC's Commitment, Contingencies and Uncertainties and Other Legal Matters*

454. The Q1 2018 10-Q purported to warn investors about "legal proceedings, claims and other litigation that arise in the ordinary course of business" and represented the following concerning "Commitment, Contingencies and Uncertainties" and "Other Legal Matters":

> We are involved in other litigation or proceedings that arise in ordinary business activities. When possible, we insure against these risks to the extent we deem prudent, but no assurance can be given that the nature or amount of such insurance will be sufficient to fully indemnify us against liabilities arising out of pending and future legal proceedings. Many of these insurance policies contain self-insured retentions in amounts we deem prudent. Based on our current assessment of information available as of the date of these financial statements, we believe that our financial statements include adequate provisions for estimated costs and losses that may be incurred within the litigation and proceedings to which we are a party.

455. The representations in Paragraph 454 were materially false and misleading for the reasons set forth in Paragraph 442.

## V. YRC's Second Quarter 2018 Financial Results and Q2 2018 10-Q

### *i. Defendants' Representations Concerning YRC's Reported Financial Results*

456. On August 2, 2018, Defendants caused the Company to file a report with the SEC on Form 8-K that contained the Company's news release of its financial results for the quarter ended June 30, 2018.

457. The Company reported consolidated operating revenue for second quarter 2018 of $1.326 billion, consolidated operating income of $50.9 million, and net income of $14.4 million.

458. Also on August 2, 2018, Defendants caused the Company to file a report with the SEC on Form 10-Q that contained the Company's financial results for the quarter ended June 30, 2018 (the "Q2 2018 10-Q"). The Q2 2018 10-Q was signed by Defendants Hawkins and Fisher.

459. The Q2 2018 10-Q repeated the representations set forth in the Company's August 2, 2018 press release concerning the Company's reported operating revenue, operating income and net income.

460. The representations in Paragraphs 457 and 459 were materially false and misleading because, in violation of GAAP, the Company's operating revenue was overstated by $6 million, operating income was overstated by $6 million or 13.4%, and net income was overstated by 32.1%.

***ii. Defendant Hawkins' Representation Concerning YRC's Pricing "Strategy"***

461. The August 2, 2018 press release included the following representation by Defendant Hawkins:

> During the second quarter we maintained our focus on improving yield and securing the right freight from our customers who value the service and capacity that Holland, New Penn, Reddaway and YRC Freight provide. This strategy contributed to solid year-over-year increases in revenue per hundredweight and revenue per shipment that outpaced contractual cost increases.

462. Defendant Hawkins' representations concerning the Company's "strategy" for improving yield and securing the right freight from YRC's customers were materially false and misleading for the reasons set forth in Paragraph 249.

***iii. Defendants' Representations Concerning YRC's Revenue Recognition Procedures and Internal Controls***

463. The Q2 2018 10-Q represented the following concerning the Company's revenue:

**Operating Revenue:** Our operating revenue has two primary components: volume (commonly evaluated using tonnage, tonnage per day, number of shipments, shipments per day or weight per shipment) and yield or price (commonly evaluated using picked up revenue, revenue per hundredweight or revenue per shipment)."

464. The representations in Paragraphs 463 were materially false and misleading for the reasons set forth in Paragraph 206.

465. The Q2 2018 10-Q included SOX Certifications signed by Defendants Hawkins and Fisher that contained representations substantially similar to the representations by Defendants Welch and Pierson alleged in Paragraph 211.

466. The representations in Paragraph 465 were materially false and misleading for the reasons set forth in Paragraph 212.

***iv. Defendants' Representations Concerning YRC's Commitment, Contingencies and Uncertainties and Other Legal Matters***

467. The Q2 2018 10-Q purported to warn investors about "legal proceedings, claims and other litigation that arise in the ordinary course of business" and "represented the following concerning "Commitment, Contingencies and Uncertainties" and "Other Legal Matters":

> We are involved in other litigation or proceedings that arise in ordinary business activities. When possible, we insure against these risks to the extent we deem prudent, but no assurance can be given that the nature or amount of such insurance will be sufficient to fully indemnify us against liabilities arising out of pending and future legal proceedings. Many of these insurance policies contain self-insured retentions in amounts we deem prudent. Based on our current assessment of information available as of the date of these financial statements, we believe that our financial statements include adequate provisions for estimated costs and losses that may be incurred within the litigation and proceedings to which we are a party.

468. The representations in Paragraph 467 were materially false and misleading for the reasons set forth in Paragraph 442.

## W. YRC's Third Quarter 2018 Financial Results and Q3 2018 10-Q

### *i. Defendants' Representations Concerning YRC's Reported Financial Results*

469. On November 1, 2018, Defendants caused the Company to file a report with the SEC on Form 8-K that contained the Company's news release of its financial results for the quarter ended September 30, 2018.

470. The Company reported consolidated operating revenue for third quarter 2018 of $1.304 billion, consolidated operating income of $41.2 million, and net income of $2.9 million.

471. Also on November 1, 2018, Defendants caused the Company to file a report with the SEC on Form 10-Q that contained the Company's financial results for the quarter ended September 30, 2018 (the "Q3 2018 10-Q"). The Q3 2018 10-Q was signed by Defendants Hawkins and Fisher.

472. The Q3 2018 10-Q repeated the representations set forth in the Company's November 1, 2018 press release concerning the Company's reported operating revenue, operating income and net income.

473. The representations in Paragraphs 470 and 472 were materially false and misleading because, in violation of GAAP, the Company's operating revenue was overstated by $6 million, operating income was overstated by $6 million or 17%, and net income was overstated by 383.3%.

### *ii. Defendant Hawkins' Representation Concerning YRC's Pricing*

474. The November 1, 2018 press release included the following representation by Defendant Hawkins:

> "Pricing discipline and demand trends remained strong in third quarter with year-over-year growth in operating revenue, revenue per hundredweight and revenue per shipment statistics, both including and excluding fuel surcharge," stated Darren Hawkins, chief executive officer of YRC Worldwide. "I am pleased with our

> focused discipline on growing yield and securing the right freight mix for our networks, while balancing our capacity constraints, minimizing third-party costs for local purchased transportation and reducing short-term rentals."

475. Defendant Hawkins' representation that "pricing discipline and demand trends" remained "strong" were materially false and misleading for the reasons set forth in Paragraph 249.

***iii. Defendants' Representations Concerning YRC's Operating Revenue Procedures and Internal Controls***

476. The Q3 2018 10-Q represented the following concerning the Company's revenue:

**Operating Revenue:** Our operating revenue has two primary components: volume (commonly evaluated using tonnage, tonnage per day, number of shipments, shipments per day or weight per shipment) and yield or price (commonly evaluated using picked up revenue, revenue per hundredweight or revenue per shipment)."

477. The representations in Paragraphs 476 were materially false and misleading for the reasons set forth in Paragraph 206.

478. The Q3 2018 10-Q included SOX Certifications signed by Defendants Hawkins and Fisher that contained representations substantially similar to the representations by Defendants Welch and Pierson alleged in Paragraph 211.

479. The representations in Paragraph 478 were materially false and misleading for the reasons set forth in Paragraph 212.

***iv. Defendants' Representations Concerning YRC's Commitment, Contingencies and Uncertainties and Other Legal Matters***

480. The Q3 2018 10-Q purported to warn investors about "legal proceedings, claims and other litigation that arise in the ordinary course of business" and "represented the following concerning "Commitment, Contingencies and Uncertainties" and "Other Legal Matters":

> We are involved in other litigation or proceedings that arise in ordinary business activities. When possible, we insure against these risks to the extent we deem

> prudent, but no assurance can be given that the nature or amount of such insurance will be sufficient to fully indemnify us against liabilities arising out of pending and future legal proceedings. Many of these insurance policies contain self-insured retentions in amounts we deem prudent. Based on our current assessment of information available as of the date of these financial statements, we believe that our financial statements include adequate provisions for estimated costs and losses that may be incurred within the litigation and proceedings to which we are a party.

481. The representations in Paragraph 480 were materially false and misleading for the reasons set forth in Paragraph 442.

## VII. THE TRUTH EMERGES

482. On December 14, 2018, after the market opened, the DOJ issued a press release stating that it had filed a Complaint in Intervention against YRC Worldwide entities for "systematically overcharg[ing] the government for freight carrier services and ma[king] false statements to the government that hid their misconduct[.]" The release was titled "United States Sues Freight Companies for Systematic Overcharging of Shipments" and the contents of the DOJ press release are alleged above in Paragraph 17.

483. On this news, shares of YRC Worldwide fell from an opening price on December 14, 2018 of $4.41 per share, to close at $3.17 per share on December 14, 2018, a decline of $1.24 per share or over 28% on heavier than average volume of over 6.4 million shares traded.

484. Also on December 14, 2018, YRC issued a press release titled "YRC Freight Statement on U.S. Government Litigation" in which the Company's general counsel, Jim Fry ("Fry"), acknowledged that the DOJ had been investigating YRC for over nine years:

> OVERLAND PARK, Kan., Dec. 14, 2018 (GLOBE NEWSWIRE) -- (NASDAQ: YRCW) -- After more than 9 years of diligently cooperating with the federal government's inquiries, YRC Freight was informed that the government filed a Complaint in Intervention related to the company's charges for shipments tendered to it for transport during a period prior to 2013. Business with the U.S. Department of Defense currently represents less than one percent of YRC Freight's annual revenue.

> "These claims are totally without merit," said Jim Fry, YRCW General Counsel. "We have made every effort over nearly a decade to address the government's questions. We are confident that the evidence will demonstrate YRC Freight acted consistently with our contract and all applicable guidelines. We look forward to continuing to provide essential and valuable logistics services to the U.S. government and all our customers."

485. Also on December 14, 2018, the *Wall Street Journal* reported on the United States' lawsuit against YRC's units over military shipments from 2005 to at least 2013, stating in relevant part:

> The Justice Department is suing a major U.S. freight carrier, alleging that trucking units of YRC Worldwide Inc. overcharged the Pentagon millions of dollars for shipping over several years.
>
> The department said in the lawsuit filed earlier this week that YRC Freight Inc., Roadway Express Inc. and Yellow Transportation Inc. made false statements to the government and defrauded the Department of Defense by inflating weight measurements on bills.
>
> For more than seven years, from 2005 to at least 2013, workers for the companies reweighed thousands of shipments and didn't disclose the results when those weights came in under the original estimate, the lawsuit alleges.
>
> * * *
>
> YRC Worldwide's shares tumbled more than 28.4% in trading Friday, to $3.17 a share.

486. On February 19, 2019, the Company filed its annual report with the SEC on Form 10-K for the year ended December 31, 2018. For the first time in its SEC filings, the Company disclosed the loss contingency concerning the DOJ Investigation:

> **Commitments, Contingencies, and Uncertainties . . .**
>
> ***Department of Defense Complaint***
>
> In December 2018, the United States on behalf of the United States Department of Defense filed a complaint against the Company in the U.S. District in the Western District of New York captioned *United States ex rel. James Hannum v. YRC Freight, Inc.; Roadway Express, Inc.; and Yellow Transportation, Inc.*, Civil Action No. 08-0811(A). The complaint alleges that the Company violated the False Claims Act by overcharging the Department of Defense for freight carrier services

> by failing to comply with the contractual terms of freight contracts between the Department of Defense and the Company and related government procurement rules. The complaint also alleges claims for unjust enrichment and breach of contract and seeks damages, treble damages, civil penalties, attorneys' fees and costs of suit, all in unspecified amounts, under the False Claims Act. Management believes it has meritorious defenses and will vigorously defend this action.
>
> * * *
>
> Although the Company believes it has meritorious defenses and intends to vigorously defend [the Whistleblower Action] . . . , if resolved against us, could give rise to substantial damages, and an unfavorable outcome or settlement may result in a significant monetary judgment or award against us or a significant monetary payment by us, and could have a material adverse effect on our business, financial conditions and results of operations.

## VIII. ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER

487. As alleged herein, the Individual Defendants acted with scienter in that they knew, or at least recklessly disregarded, that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew, or at least recklessly disregarded, that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the Section 10(b) of the Exchange Act and Rule 10b-5.

488. As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding YRC, their control over, or receipt or modification of YRC's allegedly materially misleading misstatements or their associations with the Company which made them privy to confidential proprietary information concerning YRC, participated in the fraudulent scheme alleged herein.

489. The Individual Defendants knew, or at least recklessly disregarded, the falsity and misleading nature of the information which they caused to be disseminated to the investing public or omitted to disclose to investors. The ongoing fraudulent scheme described in the Action could

not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including the Individual Defendants.

490. ***Motive and Opportunity***. The Individual Defendants had the motive and opportunity to perpetrate the fraudulent scheme and course of business described herein because the Individual Defendants were the most senior officers of YRC, issued statements and press releases on behalf of YRC and had the opportunity to commit the fraud alleged herein.

491. As alleged above in Paragraphs 28, 32, 35, and 39, during the Class Period, the Individual Defendants collectively sold 606,429 YRC shares at artificially inflated prices for gross proceeds of approximately over $9.8 million.

492. The Individual Defendants' respective sales of YRC common stock were in unusual amounts and at suspicious times. During the Class Period, Welch, Hawkins, Pierson and Fisher, respectively, sold approximately 43%, 23%, 53% and 9.5% of the YRC shares that they acquired during the Class Period.

493. Defendants Welch and Pierson's Class Period sales were highly unusual compared to their pre-Class Period sales.[20] In the nearly three-year period (thirty-one months) prior to the start of the Class Period, Defendant Welch sold 58,000 shares for proceeds of $1,454,380, and Defendant Pierson sold 40,000 shares for proceeds of $974,083. In stark contrast, during the Class Period, Defendant Welch sold 383,565 shares for gross proceeds of $5,877,367.14, and Defendant Pierson sold 163,451 shares for gross proceeds of $2,987,269.12.

[20] Under Section 16(a) of the Exchange Act, as an Officer or Director of the Company, Defendant Welch was required to report his transactions to the SEC as of July 22, 2011 and Defendant Pierson was required to report his transactions to the SEC as of August 8, 2011. Comparative data for Defendants Hawkins and Fisher is not available because they were not required to report their transactions to the SEC prior to the start of the Class Period.

494. Defendants were motivated to continue the Overcharge Scheme and conceal its effect on the Company's business, operations and financial condition in order to raise capital for the Company through the various financing transactions (the "2014 Financing Transactions"), which included the issuance of $250 million in YRC common and preferred stock at artificially inflated prices.

495. On February 3, 2014, Deutsche Bank Markets Research report stated the following concerning YRC's 2014 Financing Transactions:

> YRCW Closes $300 Million Debt Reduction & Amends Credit Agreement
>
> Last week, YRCW (Hold, $21.48) announced that it successfully completed a series of transactions that reduced the company's debt by roughly $300 million through the issuance of $250 million of common and preferred stock as well as approximately $50 million in principal of its 6% Convertible Notes were exchanged or converted to common stock. We note that YRCW had reached an agreement with its lenders to extend the deadline to repay the 6% Convertible Notes to February 13, 2014 (from February 1, 2014 previously) and to permit the repayment of the Series A and B Notes with the cash equity proceeds from its equity offerings. In addition, the company extended its pension fund obligations to December 2019. Management is now focused on refinancing its senior debt facilities in mid-to-late February, which is expected to reduce its cash interest expense and extend its various debt maturities.

496. Had the Overcharge Scheme been disclosed, the 2014 Financing Transactions either would not have occurred, or if they had, it would have been on less favorable terms to YRC.

497. ***Corporate Scienter***. YRC is liable for the acts of the Individual Defendants and its employees for the Overcharge Scheme under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts alleged in the Action were carried out within the scope of their employment.

498. Similarly, the scienter of the Individual Defendants and other YRC employees and agents of the Company is imputed to the Company under *respondeat superior* and agency principles. For example, the scienter of YRC employees who organized, implemented, monitored

and enforced the Overcharge Scheme, as alleged *supra* Section V, are imputed to YRC, and the scienter of the Company's general counsel is imputed to YRC.

499. YRC's general counsel has authority and responsibility for investigating and disclosing any violations of law or regulation by YRC employees, including the DOJ Investigation and allegations concerning the Overcharge Scheme.

500. Between 2008 and December 2010, Daniel Churay was YRC's general counsel; between November 2010 and February 2012, Jeff Bennett was YRC's general counsel; between February 2012 and November 2014, Michelle Friel (née Russell) was the Company's general counsel; and Fry, the Company's current Vice President, General Counsel and Secretary, has been general counsel since 2014.

501. On information and belief, the Company's general counsel knew of the DOJ Investigation and would have known of, or participated, in the discussions, presentations and negotiations between DOJ and YRC concerning allegations that YRC violated the FCA.

502. ***The DOJ Investigation Was Discussed Periodically at YRC's Board of Directors Meetings.*** YRC's Guidelines on Corporate Governance require YRC's board to review the Company's systems and practices designed to bring about compliance with applicable laws and regulations, including its accounting and financial reporting obligations, and meet at least once each calendar quarter.

503. During the Class Period, YRC's board met at least 42 times: 12 times in 2014; six times in 2015; nine times in 2016; eight times in 2017; and seven times in 2018.

504. Defendant Welch was a member of the Company's board at the beginning of the Class Period through July 2018, and Defendant Hawkins has served as a member of the Company's board since April 2018.

505. As members of YRC's board, Defendants Welch and Hawkins regularly reviewed the most significant risks facing the Company, including the DOJ Investigation.

506. YRC's board has delegated oversight responsibility to the Audit & Ethics Committee to risks related to the Company's accounting and financial reporting matters and ethics and general compliance matters. YRC's Charter of the Audit & Ethics Committee of the Board of Directors provides that its responsibility and authority include: i) overseeing the Company's compliance with legal and regulatory requirements; ii) advising the Company's board whether the annual audited financial statements should be included in the Company's Annual Reports on Form 10-K filed with the SEC; and iii) approving the Company's Quarterly Reports on Form 10-Q filed with the SEC.

507. During the Class Period, the following YRC directors were members of the Company's Audit & Ethics Committee: Raymond J. Bromark (Chair); Douglas A. Carty; Robert L. Friedman.

508. YRC's Audit Committee was required to meet with the Company's General Counsel to review legal and regulatory matters, including (i) any matters that may have a material impact on the financial statements of the Company; and (ii) any matters involving potential or ongoing material violations of law by the Company or any of its directors, officers, employees, or agents or breaches of fiduciary duty to the Company by any directors, officers, employees, or agents.

509. YRC's Audit & Ethics Committee would periodically provide reports to the full board of directors, which, during the Class Period, included Defendant Welch and Hawkins. In fulfilling its oversight responsibilities, the Audit & Ethics Committee reviewed and discussed the

Company's audited financial statements with YRC management, including the Individual Defendants.

510. During the Class Period, YRC Audit & Ethics Committee met at least 28 times: in 2014, six times; in 2015, five times; in 2016, six times; in 2017, six times; and in 2018, five times.

511. On information and belief, during the Class Period, the Company's Board and Audit & Ethics Committee reviewed YRC's legal and regulatory matters, including the DOJ Investigation.

512. ***The Overcharge Scheme Violated YRC's Code of Business Conduct.*** YRC's Code of Business Conduct applies to all YRC subsidiaries and affiliates and was approved by Fry. YRC's Code of Business Conduct states the Company's policy on financial records:

> **OUR COMMITMENTS TO OUR STAKEHOLDERS**
>
> *Financial Records*
>
> **21. Keeping Accurate Records**
>
> We rely on our financial records to produce reports to the Board, management, stakeholders, lenders, government agencies and the public. These records must accurately reflect our assets, liabilities, financial condition and performance.
>
> We must provide accurate and truthful information in all reports and records, including . . . business records, financial statements . . . If you are part of our Finance or Accounting organization, you have a special duty to ensure that our financial disclosures are full, fair, accurate, timely and understandable. . .
>
> Any claims we make as employees . . . must be accurate and complete and free of any false or misleading statements.
>
> All transactions must be recorded with care and honesty, and be supported by adequate documentation to permit review and audit. . .
>
> We must never be involved in:
> - Submitting false invoices or expense reports
> - Forging or altering checks or misdirecting payments
> - Unauthorized handling, or false or misleading reporting, of transactions

- Creating or manipulating financial information so as to artificially inflate, depress, distort or conceal financial results
- Intentionally misclassifying transactions between accounts, departments or accounting periods
- Failing to record transactions in the proper account or accounting period
- Keeping secret or special books, records or accounts
- Improperly overriding or working around our system of internal controls
- Improper or fraudulent interference with, coercion, manipulation or misleading of, internal or external auditors or the Audit & Ethics Committee[.]

513. YRC's Code of Business Conduct provides the following concerning the Company's policy on disclosure:

**22. Transparency and Full Disclosure**

Transparency and full disclosure of our financial condition, operating results and significant risks and events are critical to our integrity and required by law. They depend upon the validity, accuracy and completeness of the information upon which our accounts, records and financial statements are based and the effectiveness of our internal accounting and disclosure controls. If you are involved in preparing, processing or recording such information, you must take responsibility for its accuracy and integrity.

Our public communications, including filings with the SEC and communications with stakeholders, lenders and analysts, must be fair, accurate, timely, complete and understandable. If you are involved in our SEC reporting process, and especially if you are a senior officer in Finance or Accounting or a person with supervisory responsibilities for our public disclosure documents, you must act in furtherance of this requirement. In particular, you are required to be familiar and comply with all SEC disclosure rules and guidance and are prohibited from knowingly misrepresenting, omitting, or causing others to misrepresent or omit, material facts about us, or knowingly making any misleading statements, in our public disclosures or otherwise.

If you have any of these responsibilities, you must strictly comply with all internal controls and procedures for preparing public disclosures.

Finance and Accounting employees must record, classify and summarize all transactions in accordance with our internal control procedures, GAAP, and applicable securities laws and regulations. We must never create, or encourage others to create, records that are intended to mislead others or conceal improper activity or adverse results.

514. YRC's Code of Business Conduct provides the following concerning YRC insider trading:

> **23. Insider Trading**
>
> Trading in our securities (common stock or public notes), or the securities of our publicly-traded Customers, suppliers, Business Partners or Transaction Parties, while in possession of material, nonpublic information about them or us, or disclosing that information to others for trading purposes, is against the law and a violation of this Code. . . .

## IX. CLASS ACTION ALLEGATIONS

515. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the publicly traded securities of YRC during the Class Period (the "Class") and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are Defendants, current and former officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, affiliates, successors or assigns and any entity in which Defendants have or had a controlling interest.

516. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's publicly traded securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. According to the Company's SEC filings, during the Class Period, the Company reported between 31.3 million and 33.8 million shares outstanding.

517. As of March 4, 2014, YRC reported 175 shareholders of record held YRC common stock. As of February 12, 2019, YRC reported 364 stockholders of record held YRC common stock. Record owners and other members of the Class may be identified from records maintained

by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

518. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of the Exchange Act.

519. Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

520. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a. whether Defendants' acts as alleged violated the Exchange Act;

b. whether Defendants' statements to the investing public during the Class Period misrepresented material facts about the financial condition, business, and operations;

c. whether Defendants' statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

d. whether the Individual Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;

e. whether Defendants acted knowingly, or at least recklessly, in issuing false and misleading SEC filings and public statements during the Class Period;

f. whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of in the Action; and

g. whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

521. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

522. Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

a. Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

b. the omissions and misrepresentations were material;

c. the Company's securities are traded in efficient markets;

d. the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;

e. the Company traded on the NASDAQ, and was covered by multiple analysts who issued research reports, including Deutsche Bank, Loop Capital, Seaport Capital, Stephens, Stifel, Nicolaus & Company and Wolfe Research;

f. the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities;

Plaintiffs and members of the Class purchased the Company's securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts; and

g. Unexpected material news about the Company was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

## X. LOSS CAUSATION

523. Throughout the Class Period, the price of YRC publicly traded securities were artificially inflated as a result of Defendants' materially false and misleading statements identified above. Defendants engaged in a scheme to deceive the market, and a course of conduct that operated as a fraud or deceit on Class Period purchasers of YRC securities, by failing to disclose and misrepresenting the adverse facts alleged in the Action. When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of YRC common stock fell precipitously as the prior artificial inflation dissipated. As a result of their purchases of YRC common stock during the Class Period, Plaintiffs and the other Class members suffered economic loss, *i.e*., damages, under the federal securities laws.

524. By issuing materially false and misleading financial statements, among other adverse facts alleged in the Action, Defendants presented a misleading picture of YRC's business, financial condition and results of operations. Defendants' false and misleading statements had the intended effect, and caused YRC securities to trade at artificially inflated levels throughout the Class Period.

525. The disclosure on December 14, 2018, after the market opened, revealed to the market the false and misleading nature of Defendants' statements and omissions. On December

14, 2018, after the market opened, it was revealed that YRC had been systematically overcharging the DOD and other customers.

526. In response to the December 14, 2018 disclosure, the price of YRC common stock precipitously declined. On December 14, 2018, shares of YRC Worldwide fell from an opening price on December 14, 2018 of $4.41 per share, to close at $3.17 per share on December 14, 2018, a decline of $1.24 per share or over 28% on heavier than average volume of over 6.4 million shares traded, wiping out millions of dollars in market capitalization in one day.

527. On December 14, 2018, in addition to the article published in the *Wall Street Journal* alleged in Paragraph 484, *Reuters* published a story titled "U.S. sues YRC Worldwide subsidiaries, alleges overcharging gov't." The article stated that "U.S. officials have filed a complaint against several units of YRC Worldwide Inc. alleging that the freight companies systematically overcharged the federal government for its services and lied to hide their misconduct. . . ."

528. Also on December 14, 2018, Stephens issued a Research Brief that stated the following:

> This morning, the Department of Justice posted a release on their website notifying that the U.S. government has filed a lawsuit against YRCW's various subsidiaries. In short, the U.S. government's lawsuit accuses YRCW of overcharging the government for services rendered over many years to the tune of "several million dollars." We outline the specifics of the lawsuit below and remain on the sidelines with Equal-Weight rating given this risk as well as other concerns as we outlined in our downgrade note last month.

529. On December 15, 2018, *Business Insider* published an article titled "America's fifth largest trucking company 'defrauded' the Department of Justice, DOJ suit alleges." The article reported that the DOJ is suing subsidiaries of YRC "for allegedly overcharging the Department of

Defense. This follows a nine-year-long investigation on YRC's charging practices . . . Following the announcement, YRC's shares sank to a 52-week low, dropping 20%" on December 14, 2018.

530. On December 17, 2018, Deutsche Bank research issued a report that stated the following concerning the DOJ's lawsuit against YRC:

> YRCW sued by DOJ – Shares of YRCW sold off nearly 30% on Friday (vs. the S&P down ~2%) as the Department of Justice (DOJ) filed charges against the company stating that YRC Freight "systematically charged the government" for LTL services provided from the years of 2006-2013. YRCW refuted the claims stating that they are "totally without merit" and stressed its confidence that it acted within the appropriate confines of its contract. Additionally, YRCW noted that its business with the government represents under 1% of total company revenue today, though admittedly we believe this could have been higher five years ago. While details are sparse in regards to an ongoing litigation, we will continue to monitor the situation moving forward. . . .

531. As shown, the drastic decline in YRC's stock price was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of the decline in the Company's stock price negates any inference that the loss suffered by Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

## XI. PRESUMPTION OF RELIANCE

532. At all relevant times, the market for YRC common stock was efficient for the following reasons, among others:

a. YRC's stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

b. As a regulated issuer, YRC filed periodic public reports with the SEC and the NASDAQ;

c. YRC regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services, and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d. YRC was followed by numerous securities analysts employed by major brokerage firms who issued reports which were distributed to those brokerage firms' sales force and certain customers. Each of these reports was publicly available and entered the marketplace.

533. As a result of the foregoing, the market for YRC's common stock reasonably and promptly digested current information regarding the Company from all publicly-available sources and reflected such information in the Company's common stock price. All purchasers of YRC's common stock during the Class Period suffered similar injury through their purchase of the Company's common stock at artificially inflated prices and a presumption of reliance applies.

534. A Class-wide presumption of reliance is also appropriate in this action under the U.S. Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants' material omissions.

535. Because this action involves Defendants' failure to disclose material adverse information regarding YRC's business, financial conditions and operations, including the DOJ Investigation—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment

decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## XII. NO SAFE HARBOR

536. The statutory safe harbor or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the false and misleading statements pleaded in the Action. The statements alleged to be false or misleading herein all relate to then-existing facts and conditions.

537. To the extent certain of the statements alleged to be false or misleading may be characterized as forward-looking, they were not adequately identified as forward-looking statements when made, and there were no meaningful cautionary statements identifying important facts that could cause actual results to differ materially from those in the purportedly forward-looking statements.

538. To the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, each of these Defendants had actual knowledge that the particular forward-looking statement was materially false or misleading. Defendants are liable for the statements pleaded because, at the time each of those statements was made, Defendants knew the statement was false and the statement was authorized or approved by an executive officer or director of YRC who knew that such statement was false when made.

## XIII. CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

### COUNT I

### Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants (15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5)

539. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

540. This Count is asserted against the Company and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

541. During the Class Period, the Company and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew, or at least recklessly disregarded, were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

542. The Company and the Individual Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

a. employed devices, schemes and artifices to defraud;

b. made untrue statements of material facts, or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

c. engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

543. The Company and the Individual Defendants acted with scienter in that they knew, or at least recklessly disregarded, that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew, or at least recklessly disregarded, that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. Defendants, by virtue of their receipt of information reflecting the true facts of the Company, their control over, or receipt or modification of the Company's allegedly materially misleading statements, or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

544. The Individual Defendants, who are current or former senior officers or directors of the Company, had knowledge of the material omissions or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiffs and the Class.

545. As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of the Company's and the Individual Defendants' statements, Plaintiffs and the other members of the Class relied on the statements described above or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of the Company's and the Individual Defendants' false and misleading statements.

546. Had Plaintiffs and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by the Company's and the Individual Defendants' misleading statements and by the material adverse information which the Company's and the Individual Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

547. As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

548. By reason of the foregoing, the Company and the Individual Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchases of the Company's securities during the Class Period.

## COUNT II

### Violation of Section 20(a) of the Exchange Act Against the Individual Defendants (15 U.S.C. § 78t(a))

549. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

550. During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's business practices.

551. As officers or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

552. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

553. Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

554. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## XIV. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as Class representatives;

B. Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and omissions alleged herein;

C. Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## XV. JURY DEMAND

Plaintiffs hereby demand a trial by jury.

Dated: June 14, 2019

Respectfully submitted,

*/s/ Donald R. Hall*
Donald R. Hall
(Bar Roll Number: 700973)
Jeffrey P. Campisi
(Bar Roll Number: 700753)
Jason A. Uris
(Bar Roll Number: 701059)
**KAPLAN FOX & KILSHEIMER LLP**
850 Third Avenue, 14th Floor
New York, NY 10022
Telephone: (212) 687-1980
Facsimile: (212) 687-7714
Email: dhall@kaplanfox.com
jcampisi@kaplanfox.com
juris@kaplanfox.com

*Counsel for Lead Plaintiff City of Warwick Retirement Board and Co-Lead Counsel for the Proposed Class*

/s/ *Jeremy A. Lieberman*
Jeremy A. Lieberman
(Bar Roll Number: 700864)
Emma Gilmore
(Bar Roll Number: 700980)
Villi Shteyn
(*pro hac vice* to be submitted)
**POMERANTZ LLP**
600 Third Avenue, 20th Floor
New York, NY 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Email: jalieberman@pomlaw.com
egilmore@pomlaw.com
vshteyn@pomlaw.com

*Counsel for Peter Szabo and*
*Co-Lead Counsel for the Proposed Class*

Jonathan B. Fellows
George H. Lowe
**BOND SCHOENECK & KING, PLLC**
One Lincoln Center
Syracuse, NY 13202
Telephone: (315) 218-8000
Facsimile: (315) 218-8100
Email: jfellows@bsk.com
glowe@bsk.com

*Local Counsel for Lead Plaintiffs and the Proposed Class*

**CERTIFICATE OF SERVICE**

I, Donald R. Hall, hereby certify that, on June 14, 2019, I caused the foregoing to be served on all counsel of record by filing the same with the Court using the CM\ECF system which will send electronic notices of the filing to all counsel of record.

*/s/ Donald R. Hall*

**KAPLAN FOX & KILSHEIMER LLP**
850 Third Avenue, 14th Floor
New York, NY 10022
Telephone: (212) 687-1980
Facsimile: (212) 687-7714
Email: dhall@kaplanfox.com