# Exhibit A

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**WASHINGTON, D.C. 20549**

## FORM 10-K

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2013**

**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____

**Commission file number: 0-12255**

# YRC Worldwide Inc.

**(Exact name of registrant as specified in its charter)**

| | |
|---|---|
| **Delaware** | **48-0948788** |
| **(State or other jurisdiction of** | **(I.R.S. Employer** |
| **incorporation or organization)** | **Identification No.)** |
| **10990 Roe Avenue, Overland Park, Kansas** | **66211** |
| **(Address of principal executive offices)** | **(Zip Code)** |

**(913) 696-6100**
**(Registrant's telephone number, including area code)**

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Name of each exchange on which registered |
|---|---|
| Common Stock, $0.01 par value per share | The NASDAQ Stock Market LLC |

**Securities registered pursuant to Section 12(g) of the Act: NONE**

Indicate by check mark if the registrant is a well-known seasoned issuer as defined in Rule 405 of the Securities Act.
Yes ☐   No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Exchange Act. Yes ☐   No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.
Yes ☒   No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).
Yes ☒   No ☐

Table of Contents

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by referenced in Part III of this Form 10-K or any amendment to this Form 10-K. ☒

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

| Large accelerated filer | ☐ | | Accelerated filer | ☒ |
| Non-accelerated filer | ☐ (Do not check if a smaller reporting company) | | Smaller reporting company | ☐ |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).
Yes ☐   No ☒

As of June 30, 2013, the aggregate market value of the registrant's common stock held by non-affiliates of the registrant was $264.6 million based on the closing price as reported on the NASDAQ Global Select Market.

Indicate the number of shares outstanding of each of the issuer's classes of common stock, as of the latest practicable date.

| Class | Outstanding at March 4, 2014 |
|---|---|
| Common Stock, $0.01 par value per share | 28,901,590 shares |

DOCUMENTS INCORPORATED BY REFERENCE

Pursuant to General Instruction G to Form 10-K, information required by Part III of this Form 10-K, either is incorporated herein by reference to a definitive proxy statement filed with the SEC no later than 120 days after the end of the fiscal year covered by this Form 10-K or will be included in an amendment to this Form 10-K filed with the SEC no later than 120 days after the end of the fiscal year covered by this Form 10-K.

Table of Contents

INDEX

| Item | | Page |
|---|---|---|
| | **PART I** | |
| 1 | Business | 4 |
| 1A | Risk Factors | 11 |
| 1B | Unresolved Staff Comments | 19 |
| 2 | Properties | 19 |
| 3 | Legal Proceedings | 19 |
| 4 | Mine Safety Disclosures | 19 |
| | | |
| | **PART II** | |
| 5 | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 21 |
| 6 | Selected Financial Data | 24 |
| 7 | Management's Discussion and Analysis of Financial Condition and Results of Operations | 25 |
| 7A | Quantitative and Qualitative Disclosures About Market Risk | 45 |
| 8 | Financial Statements | 46 |
| 9 | Changes in and Disagreements With Accountants on Accounting and Financial Disclosure | 92 |
| 9A | Controls and Procedures | 92 |
| 9B | Other Information | 92 |
| | | |
| | **PART III** | |
| 10 | Directors and Executive Officers of the Registrant | 93 |
| 11 | Executive Compensation | 93 |
| 12 | Security Ownership of Certain Beneficial Owners and Management | 93 |
| 13 | Certain Relationships and Related Transactions, and Director Independence | 93 |
| 14 | Principal Accounting Fees and Services | 93 |
| | | |
| | **PART IV** | |
| 15 | Exhibits, Financial Statement Schedules | 94 |
| | | |
| | Exhibits Index | 94 |
| | Signatures | 99 |

Table of Contents

## Note on Forward-Looking Statements

*This entire report, including (among other items) Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations" includes forward-looking statements (each a "forward-looking statement") within the meaning of Section 27A of the Securities Act of 1933, as amended (the "Securities Act"), and Section 21E of the Securities Exchange Act of 1934, as amended ("Exchange Act"). Forward-looking statements include those preceded by, followed by or including the words "will," "expect," "intend," "anticipate," "believe," "project," "forecast," "propose," "plan," "designed," "estimate," "enable" and similar expressions. Those forward-looking statements speak only as of the date of this report. We disclaim any obligation to update those statements, except as applicable law may require us to do so, and we caution you not to rely unduly on them. We have based those forward-looking statements on our current expectations and assumptions about future events, which may prove to be inaccurate. While our management considers those expectations and assumptions to be reasonable, they are inherently subject to significant business, economic, competitive, regulatory and other risks, contingencies and uncertainties, most of which are difficult to predict and many of which are beyond our control. Therefore, actual results may differ materially and adversely from those expressed in any forward-looking statements. Factors that might cause or contribute to such differences include, but are not limited to, those we discuss in this report under the section entitled "Risk Factors" in Item 1A and the section entitled "Financial Condition/Liquidity and Capital Resources" in Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations," and in other reports we file with the Securities and Exchange Commission (the "SEC"). The factors we discuss in this report are not necessarily all the important factors that could affect us. Unpredictable or unknown factors we have not discussed in this report also could have material adverse effects on actual results of matters that are the subject of our forward-looking statements. We do not intend to update our description of important factors each time a potential important factor arises. We advise our existing and potential security holders that they should (1) be aware that important factors to which we do not refer in this report could affect the accuracy of our forward-looking statements and (2) use caution and common sense when considering our forward-looking statements.*

## PART I

<u>Item 1. Business</u>

## General Description of the Business

YRC Worldwide Inc. (also referred to as "YRC Worldwide," the "Company," "we," "us" or "our") is a holding company that, through wholly owned operating subsidiaries and its interest in a Chinese joint venture, offers its customers a wide range of transportation services. We have one of the largest, most comprehensive less-than-truckload ("LTL") networks in North America with local, regional, national and international capabilities. Through our team of experienced service professionals, we offer industry-leading expertise in heavyweight shipments and flexible supply chain solutions, ensuring customers can ship industrial, commercial and retail goods with confidence. Our reporting segments include the following:

- YRC Freight is the reporting segment focused on business opportunities in national, regional and international services. YRC Freight provides for the movement of industrial, commercial and retail goods, primarily through centralized management and customer facing organizations. This segment includes our LTL subsidiary YRC Inc. ("YRC Freight") and Reimer Express ("YRC Reimer"), a subsidiary located in Canada that specializes in shipments into, across and out of Canada. In addition to the United States and Canada, YRC Freight also serves parts of Mexico, Puerto Rico and Guam.

- Regional Transportation is the reporting segment for our transportation service providers focused on business opportunities in the regional and next-day delivery markets. Regional Transportation is comprised of USF Holland ("Holland"), New Penn Motor Express ("New Penn") and USF Reddaway ("Reddaway"). These companies each provide regional, next-day ground services in their respective regions through a network of facilities located across the United States, Canada, Mexico and Puerto Rico.

In 2011, we reported Truckload as a separate segment, which consisted of Glen Moore, a former domestic truckload carrier. On December 15, 2011, we sold the majority of Glen Moore's assets to a third party and concluded its operations.

For revenue and other information regarding our reporting segments, see the "Business Segments" footnote of our consolidated financial statements.

Incorporated in Delaware in 1983 and headquartered in Overland Park, Kansas, we employed approximately 32,000 people as of December 31, 2013. The mailing address of our headquarters is 10990 Roe Avenue, Overland Park, Kansas 66211, and our telephone number is (913) 696-6100. Our website is www.yrcw.com. Through the "SEC Filings" link on our website, we make available

4

Table of Contents

the following filings as soon as reasonably practicable after they are electronically filed with or furnished to the SEC: our Annual Report on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K, and any amendments to those reports filed or furnished pursuant to Section 13(a) or 15(d) of the Exchange Act. All of these filings may be viewed or printed from our website free of charge.

## Narrative Description of the Business

### YRC Freight

YRC Freight offers a full range of services for the transportation of industrial, commercial and retail goods in national, regional and international markets, primarily through the operation of owned or leased equipment in its respective North American ground distribution networks. Transportation services are provided for various categories of goods, which may include (among others) apparel, appliances, automotive parts, chemicals, food, furniture, glass, machinery, metal, metal products, non-bulk petroleum products, rubber, textiles, wood and other manufactured products or components. YRC Freight provides both LTL services, which combine shipments from multiple customers on a single trailer, and truckload services. Most deliveries are LTL shipments with truckload services offered to maximize equipment utilization and reduce empty miles (the distance empty or partially full trailers travel to balance the network). YRC Freight also provides higher-margin specialized services, including guaranteed expedited services, time-specific deliveries, cross-border services, coast-to-coast air delivery, product returns, temperature-sensitive shipment protection and government material shipments.

YRC Freight serves manufacturing, wholesale, retail and government customers throughout North America. YRC Freight's 20,000 employees are dedicated to operating its extensive network which supports approximately 11 million shipments annually. YRC Freight shipments have an average shipment size of approximately 1,000 lbs. and travel an average distance of roughly 1,300 miles. Operations research and engineering teams centrally coordinate the equipment, routing, sequencing and timing necessary to efficiently transport shipments through its network. On December 31, 2013, YRC Freight's revenue fleet was comprised of approximately 8,500 tractors, including approximately 7,500 owned tractors and 1,000 leased tractors, and approximately 33,000 trailers, including approximately 29,000 owned trailers and 4,000 leased trailers. The YRC Freight network includes 267 strategically located service facilities including 124 owned facilities with 8,374 doors and 143 leased facilities with 6,380 doors.

YRC Freight provides services throughout North America, has one of the largest networks of LTL service centers, equipment and transportation professionals and provides flexible and efficient supply chain solutions including:

- **Standard LTL:** One-stop shopping for all big-shipment national LTL freight needs with centralized customer service for LTL shipping among the countries of North America. Flexibility, convenience and reliability that comes with one national freight shipping provider.

- **Guaranteed Standard:** a guaranteed on-time service with more direct points than any other guaranteed standard delivery service in North America. Our guaranteed multiple-day window service is designed to meet retail industry needs to reduce chargeback fees.

- **Time-Critical:** for expedited and specialized shipments including emergency and window deliveries via ground or air anywhere in North America with shipment arrival timed to the hour or day, proactive notification and a 100% on-time guarantee.

- **Specialized Solutions:** includes a variety of services to meet industry and customer-specific needs with offerings such as *Custom Projects, Consolidation and Distribution, Reverse Logistics, Residential White Glove, Exhibit Services* and *Shipment Protection* through *Insulated Covers* and our patented *Sealed Divider* and *Sealed Trailer* services that are designed for products that are difficult or expensive to package for shipping, are of high value, or need verifiable security throughout the transit.

- **my.yrcfreight.com:** a secure e-commerce website offering online resources for supply chain visibility and shipment management in real time.

YRC Freight includes the operations of its wholly owned Canadian subsidiary, YRC Reimer. Founded in 1952, YRC Reimer offers Canadian shippers a selection of direct connections within Canada, throughout North America and around the world. YRC Reimer is also a part of YRC Freight and its operating network and information systems are completely integrated with those of YRC Freight, enabling YRC Reimer to provide seamless cross-border services between Canada, Mexico and the United States and markets overseas.

Table of Contents

YRC Freight represented 64%, 66% and 66% of our consolidated revenue in 2013, 2012 and 2011, respectively.

*Regional Transportation*

Regional Transportation is comprised of Holland, New Penn and Reddaway:

- **Holland:** headquartered in Holland, Michigan, provides local next-day, regional and expedited services through a network located in 21 states in the Midwestern and Southeastern portions of the United States. Holland also provides service to the provinces of Ontario and Quebec, Canada.

- **New Penn:** headquartered in Lebanon, Pennsylvania, provides local next-day, day-definite, and time-definite services through a network located in the Northeastern United States; Quebec, Canada; and Puerto Rico.

- **Reddaway:** headquartered in Tualatin, Oregon, provides local next-day, regional and expedited services through a network located in California, the Pacific Northwest, the Rocky Mountain States and the Southwest. Additionally, Reddaway provides services to Alaska, Hawaii and to the provinces of Alberta and British Columbia, Canada.

Together, the Regional Transportation companies deliver services in the next-day, second-day and time-sensitive markets, which are among the fastest-growing transportation segments. The Regional Transportation service portfolio includes:

- **Regional delivery:** including next-day local area delivery and second-day services; consolidation/distribution services; protect-from-freezing and hazardous materials handling; and a variety of other specialized offerings.

- **Expedited delivery:** including day-definite, hour-definite and time-definite capabilities.

- **Interregional delivery:** combining our best-in-class regional networks with reliable sleeper teams, Regional Transportation provides reliable, high-value services between our regional operations.

- **Cross-border delivery:** through strategic partnerships, the Regional Transportation companies provide full-service capabilities between the U.S. and Canada, Mexico and Puerto Rico.

- **my.yrcregional.com and NewPenn.com:** are e-commerce websites offering secure and customized online resources to manage transportation activity.

The Regional Transportation companies serve manufacturing, wholesale, retail and government customers throughout North America. At December 31, 2013, the Regional Transportation network includes 126 service facilities including 64 owned facilities with 3,950 doors and 62 leased facilities with 2,832 doors. The Regional Transportation revenue fleet includes approximately 6,000 tractors including approximately 5,500 owned and 500 leased and approximately 13,500 trailers including approximately 12,500 owned and 1,000 leased. Regional Transportation's 12,000 employees are dedicated to supporting the delivery of almost 11 million shipments annually.

The Regional Transportation companies accounted for 36%, 34% and 32% of our consolidated operating revenue in 2013, 2012 and 2011, respectively.

*Parent Company*

YRC Worldwide Inc., headquartered in Overland Park, Kansas, has approximately 300 employees. The parent company provides centrally managed support to our operating companies and these services span a variety of functions, including components of finance, legal, risk management and security.

Each of our shared services organizations charges the operating companies for their services, either based upon usage or on an overhead allocation basis.

## Recent Developments

In January 2014, we modified our primary labor agreement with our union workforce to, among other things, extend the expiration date of our previous agreement from March 31, 2015 to March 31, 2019. This extension also extended the contribution rates under

Table of Contents

our multi-employer pension plan. The modification provided for a lump sum payment in lieu of wage increases in 2014 and 2015, but provided for wage increases in 2016 through 2019. Finally, the modification provided for certain changes to work rules and our use of purchased transportation in certain situations.

On January 31, 2014, we consummated a series of private placements pursuant to which: (i) we sold (the "Sales"), in the aggregate, a combination of shares of Common Stock, par value $0.01 per share (the "Common Stock"), and shares of the Company's new Class A Convertible Preferred Stock, par value $1.00 per share (the "Convertible Preferred Stock"), for an aggregate purchase price of $250.0 million in cash and (ii) certain existing holders of the Company's 10% Series B Convertible Senior Secured Notes due 2015 (the "Series B Notes") exchanged or converted their Series B Notes in an aggregate principal amount of approximately $50.6 million, plus, in the case of exchanged Series B Notes, accrued and unpaid interest thereon up to and including January 15, 2014, for an aggregate of 3,394,501 shares of Common Stock (the "Series B Note Exchanges"). We used the proceeds therefrom to, among other things, (i) repay our 6% convertible senior notes, which matured in February of 2014 and (ii) discharge our 10% Series A Convertible Senior Secured Notes due 2015 (the "Series A Notes").

In connection with the Series B Note Exchanges, on January 31, 2014, we amended the indenture governing the Series B Notes to eliminate substantially all of the restrictive covenants, certain events of default and other related provisions contained in the indenture and to release and discharge the liens on the collateral securing the Series B Notes.

Effective January 31, 2014, certain of our subsidiaries, various pension funds party thereto, and Wilmington Trust Company, as agent for such pension funds, entered into the Second Amended and Restated Contribution Deferral Agreement, which, among other things (i) amended and restated the previously effective Amended and Restated Contribution Deferral Agreement, effective as of July 22, 2011 (the "Prior A&R CDA"), (ii) released the agent's security interest in third priority collateral on the Collateral Release Date (as defined therein), (iii) limited the value of obligations secured by the collateral to the Secured Obligations (as defined therein) and (iv) extended the maturity of deferred pension payments and deferred interest from March 31, 2015 to December 31, 2019.

On February 13, 2014, we repaid our existing asset-based loan ("ABL") facility and our term loan with proceeds from a new $450 million ABL facility and a new $700 million term loan facility. These transactions extended the maturity of our credit facilities and will reduce our annual cash interest expense.

We refers to transactions described above collectively as the "2014 Financing Transactions." For additional information, please see the "2014 Financing Transactions" footnote to our consolidated financial statements.

## Competition

Transportation and logistics professionals use a broad range of providers to meet their supply chain needs in an efficient and cost-effective manner. As one of the leading providers of LTL services in North America, we utilize our portfolio of branded companies to provide freight transportation services that are focused on exceeding client expectations.

Few North American based transportation carriers offer comparable freight management capabilities. By integrating traditional LTL ground, expedited, air and ocean transportation capabilities, we provide a critical freight management link that helps business organizations solve supply chain challenges. Our market studies show that customers prefer using LTL providers based on "service value," which is the relationship between overall quality and price. We believe that we can compete well against LTL and other transportation services competitors from an overall value perspective.

Our companies operate in a highly competitive environment. Given the growth of U.S. import/export trade, our competitors include global, integrated freight transportation services providers; global forwarders; national freight services providers including intermodal providers; regional or interregional carriers; third party logistics providers; and small, intraregional transportation companies. Our companies also have competitors within several different modes of transportation including: LTL, truckload, air and ocean cargo, intermodal rail, transportation consolidators and privately owned fleets.

Ground-based transportation includes private fleets and "for-hire" provider groups. The private provider segment consists of fleets owned by companies who move their own goods and materials. The "for-hire" groups are classified based on the typical shipment sizes that they handle. Truckload refers to providers transporting shipments that generally fill an entire 48-foot or 53-foot trailer and LTL refers to providers transporting goods from multiple shippers in a single trailer.

LTL transportation providers consolidate numerous shipments generally ranging from 100 to 10,000 pounds from varying businesses at individual service centers in close proximity to where those shipments originated. Utilizing expansive networks of pickup and delivery operations around local service centers, shipments are moved between origin and destination using distribution

7

Table of Contents

centers when necessary, where consolidation and deconsolidation of shipments occur. Depending on the distance shipped, shared load providers are often classified into one of four sub-groups:

- Regional - Average distance is typically less than 500 miles with a focus on one- and two-day delivery times. Regional transportation companies can move shipments directly to their respective destination centers, which increases service reliability and avoids costs associated with intermediate handling.

- Interregional - Average distance is usually between 500 and 1,000 miles with a focus on two- and three-day delivery times. There is a competitive overlap between regional and national providers in this category, as each group sees the interregional segment as a growth opportunity, and few providers focus exclusively on this sector.

- National - Average distance is typically in excess of 1,000 miles with focus on two- to five-day delivery times. National providers rely on intermediate shipment handling through a network of facilities, which require numerous satellite service centers, multiple distribution centers and a relay network. To gain service and cost advantages, they often ship directly between service centers, minimizing intermediate handling.

- Global - Providing freight forwarding and final-mile delivery services to companies shipping to and from multiple regions around the world. This service can be offered through a combination of owned assets or through a purchased transportation model.

YRC Freight provides services in all four sub-groups in North America. Holland, New Penn and Reddaway compete in the regional, interregional and national transportation marketplace. Each brand competes against a number of providers in these markets from small firms with one or two vehicles to global competitors with thousands of physical assets. While we have competitors with a similar multi-dimensional approach, there are few in the traditional LTL segment with as comprehensive an offering in those categories as our carriers provide.

Competitive cost of entry into the asset-based LTL sector on a small scale, within a limited service area, is relatively small (although more than in other sectors of the transportation industry). The larger the service area, the greater the barriers to entry, due primarily to the need for additional equipment and facilities associated with broader geographic service coverage. Broader market coverage in the competitive transportation landscape also requires increased technology investment and the ability to capture cost efficiencies from shipment density (scale), making entry on a national basis more difficult.

## Regulation

Our operating companies and other interstate carriers were substantially deregulated following the enactment of the Motor Carrier Act of 1980, the Trucking Industry Regulatory Reform Act of 1994, the Federal Aviation Administration Authorization of 1994 and the ICC Termination Act of 1995. Prices and services are now largely free of regulatory controls, although the states retained the right to require compliance with safety and insurance requirements, and interstate motor carriers remain subject to regulatory controls that agencies within the U.S. Department of Transportation impose.

Our operating companies are subject to regulatory and legislative changes, which can affect our economics and those of our competitors. Among potential regulatory changes are potential revisions to rules governing hours of service for commercial truck drivers and safety programs that could impact the pool of available drivers. Various federal and state agencies regulate us, and our operations are also subject to various federal, foreign, state, provincial and local environmental laws and regulations dealing with transportation, storage, presence, use, disposal and handling of hazardous materials, emissions related to the use of petroleum based fuels, discharge of storm-water and underground fuel storage tanks. Our drivers and facility employees are protected by occupational safety and health regulations and our drivers by hours of service regulations. We are also subject to regulations to combat terrorism that the U.S. Department of Homeland Security and other agencies impose. See the Risk Factors section related to our compliance with laws and regulations in Item 1A of this report.

## Environmental Matters

Our operations are subject to U.S. federal, foreign, state, provincial and local regulations with regard to air and water quality and other environmental matters. We believe that we are in substantial compliance with these regulations. Regulations in this area continue to evolve and changes in standards of enforcement of existing regulations, as well as the enactment and enforcement of new legislation or regulation, may require us and our customers to modify, supplement or replace equipment or facilities or to change or discontinue present methods of operation.

Our operating companies store fuel for use in our revenue equipment in approximately 288 underground storage tanks ("USTs") located throughout the U.S. Maintenance of such USTs is regulated at the federal and, in some cases, state level. The USTs are

Table of Contents

required to have leak detection systems and must be extracted if we exit the property. Traditionally upon sale of properties containing USTs, the UST is considered an asset in the transaction and, as such, we contractually transfer this removal obligation to the buyer, or remove the UST at closing at the Buyer's expense.

During 2013, we spent approximately $7.9 million to comply with U.S. federal, state and local provisions regulating the discharge of materials into the environment or otherwise relating to the protection of the environment (collectively, "Environmental Regulations"). In 2014, we expect to spend approximately $8.1 million to comply with the Environmental Regulations. Based upon current information, we believe that our compliance with Environmental Regulations will not have a material adverse effect upon our capital expenditures, results of operations or competitive position because we have either made adequate reserves for such compliance expenditures or the cost for such compliance is expected to be small in comparison with our overall expenses.

The Comprehensive Environmental Response, Compensation and Liability Act (known as the "Superfund Act") imposes liability for the release of a "hazardous substance" into the environment. Superfund liability is imposed without regard to fault and even if the waste disposal was in compliance with then current laws and regulations. With the joint and several liabilities imposed under the Superfund Act, a potentially responsible party ("PRP") may be required to pay more than its proportional share of such environmental remediation. Several of our subsidiaries have been identified as PRPs at various sites discussed below. The U.S. Environmental Protection Agency (the "EPA") and appropriate state agencies are supervising investigative and cleanup activities at these sites. The EPA has identified the former Yellow Transportation (now a part of YRC Freight) as a PRP for three locations: Angeles Chemical Co., Santa Fe Springs, CA; Alburn Incinerator, Inc., Chicago, IL and Omega Chemical, Whittier, CA. We estimate that the combined potential costs at these sites will not exceed $0.2 million. With respect to these sites, it appears that YRC Freight delivered minimal amounts of waste to these sites, which is de minimis in relation to other respondents. The EPA has identified the former Roadway Express (now a part of YRC Freight) as a PRP for three locations: Ward Transformer, Raleigh, NC; Roosevelt Irrigation District, Phoenix, AZ and Berry's Creek, Carlstadt, NJ. We estimate that the potential cost for the Ward Transformer site to be $0.4 million. The EPA has notified YRC Inc. and 140 other potential parties of their potential responsibility status at the Berry's Creek site where YRC Freight owns and operates a service center in the watershed area that discharges into Berry's Creek. We estimate the Berry's Creek potential cost to be $0.6 million. Roosevelt Irrigation District has notified YRC Freight and other potential parties of their responsibility for remediation of contaminated groundwater wells. We estimate YRC Freight's potential cost for Roosevelt Irrigation District to be $0.6 million. The EPA has identified USF Red Star, a non-operating subsidiary, as a PRP at three locations: Booth Oil, N. Tonawanda, NY and two separate landfills in Byron, NY, and Moira, NY. We believe the potential combined costs at these sites to be $0.3 million. The EPA has identified Holland as a PRP for one location, Horton Sales Piedmont Site, Greenville County, SC. We believe the potential cost at this site will be insignificant.

While PRPs in Superfund actions have joint and several liabilities for all costs of remediation, it is not possible at this time to quantify our ultimate exposure because the projects are either in the investigative or early remediation stage. Based upon current information, we do not believe that probable or reasonably possible expenditures in connection with the sites described above are likely to have a material adverse effect on our financial condition or results of operations because:

- To the extent necessary, we have established adequate reserves to cover the estimate we presently believe will be our liability with respect to the matter;

- We and our subsidiaries have only limited or de minimis involvement in the sites based upon volumetric calculations;

- Other PRPs involved in the sites have substantial assets and may reasonably be expected to pay their share of the cost of remediation; and

- We believe that our ultimate liability is relatively small compared with our overall expenses.

We are subject to various other governmental proceedings and regulations, including foreign regulations, relating to environmental matters and are investigating potential violations of environmental regulations with respect to certain sites, but we do not believe that any of these matters or investigations are likely to have a material adverse effect on our business, financial condition, liquidity or results of operations.

This section, "Environmental Matters," contains forward-looking statements within the meaning of Section 27A of the Securities Act and Section 21E Exchange Act. See the introduction section immediately prior to "Part I" and Risk Factors in "Item 1A" of this report regarding these statements. Our expectations regarding our compliance with Environmental Regulations and our expenditures to comply with Environmental Regulations, including (without limitation) our capital expenditures on environmental control equipment, and the effect that liability from Environmental Regulation or Superfund sites may have on our competitive position, financial condition or results of operations, are only our expectations regarding these matters. These expectations may be substantially different from actual results, which may be affected by the following factors: changes in Environmental Regulations; unexpected, adverse outcomes with respect to sites where we have been named as a PRP, including (without limitation) the sites

Table of Contents

described above, and to sites in which we are investigating potential violations of Environmental Regulations; the discovery of new sites of which we are not aware and where additional expenditures may be required to comply with Environmental Regulations; an unexpected discharge of hazardous materials in the course of our business or operations; an acquisition of one or more new businesses; a catastrophic event causing discharges into the environment of hydrocarbons; the inability of other PRPs to pay their share of liability for a Superfund site; and a material change in our allocation of the volume of discharge and a resulting change in our liability as a PRP with respect to a site.

## Economic Factors and Seasonality

Our business is subject to a number of general economic factors that may have a material adverse effect on the results of our operations, many of which are largely out of our control. These include the impact of the recent severe recession and resulting slow-growth economy and recessionary economic cycles and downturns in individual customer's business cycles, particularly in market segments and industries, such as retail and manufacturing, where we have a significant concentration of customers. Economic conditions may adversely affect our customers' business levels, the amount of transportation services they need and their ability to pay for our services. We operate in a highly price-sensitive and competitive industry, making industry pricing actions, quality of customer service, effective asset utilization and cost control major competitive factors. All of our revenues are subject to seasonal variations. Customers tend to reduce shipments just prior to and then after the winter holiday season, and operating expenses as a percent of revenue tend to be higher, and operating cash flows as a percent of revenue tend to be lower, in the winter months primarily due to colder weather and seasonally lower levels of shipments and the seasonal timing of expenditures. Generally, most of the first quarter and the latter part of the fourth quarter are the seasonally weakest while the second and third quarters are the seasonally strongest. The availability and cost of labor and other operating cost inputs, such as fuel and equipment maintenance and equipment replacements, can significantly impact our overall cost structure, competitive position within our industry and our resulting earnings and cash flows.

## Financial Information About Geographic Areas

Our revenue from foreign sources is largely derived from Canada and Mexico. We have certain long-lived assets located in these areas as well. We discuss this information in the "Business Segments" footnote to our consolidated financial statements.

Table of Contents

Item 1A. Risk Factors

In addition to the risks and uncertainties described elsewhere in this report or in our other SEC filings, the following risk factors should be considered carefully in evaluating us. These risks could have a material adverse effect on our business, financial condition and results of operations.

## Liquidity Risks

**Our substantial indebtedness and cash interest payment obligations, lease obligations and pension funding obligations could adversely affect our financial flexibility and our competitive position.**

As of December 31, 2013, we had $1,363.4 million in aggregate principal of outstanding indebtedness. Although our 2014 Financing Transactions reduced our outstanding indebtedness and extended the maturities for a substantial portion of our debt to 2019, we remain substantially levered. Refer to the "2014 Financing Transactions" footnote to our consolidated financial statements for more details.

We also have, and will continue to have, significant lease obligations. As of December 31, 2013, our expected minimum cash payments under our operating leases for 2014 are $56.1 million and our operating lease obligations totaled $166.6 million, which are primarily payable through 2019. We currently plan to procure a portion of our new revenue equipment using operating leases in 2014 and beyond in the same manner. We expect our funding obligations in 2014 under our single-employer pension plans and the multi-employer pension funds will be approximately $168.6 million. Despite the extended maturities and substantial interest savings resulting from the new facility, our substantial indebtedness, lease obligations and pension funding obligations could continue to have a significant impact on our business.

For example, it could:

- increase our vulnerability to adverse changes or sustained slow growth in general economic, industry and competitive conditions;
- require us to dedicate a substantial portion of our cash flow from operations to make payments on our indebtedness, leases and pension funding obligations, thereby reducing the availability of our cash flow to fund working capital, capital expenditures and other general corporate purposes;
- limit our flexibility in planning for, or reacting to, changes in our business and the industry in which we operate;
- restrict us from taking advantage of business opportunities;
- make it more difficult to satisfy our financial obligations and covenants in our credit facilities;
- place us at a competitive disadvantage compared to our competitors that have less debt, lease obligations, and pension funding obligations; and
- limit our ability to borrow additional funds for working capital, capital expenditures, acquisitions, debt service requirements, execution of our business strategy or other general corporate purposes on satisfactory terms or at all.

In addition, the failure to comply with our financial covenants could result in an event of default which, if not cured or waived, could result in the acceleration of all of our indebtedness.

**Our ability to fund working capital needs and capital expenditures will depend on our ability to generate cash in the future.**

Our ability to generate cash in the future, to a certain extent, is subject to general economic, financial, competitive, business, legislative, regulatory and other factors that are beyond our control. We believe that our results of operations will provide sufficient liquidity to fund our operations and meet our covenants for the foreseeable future, including the next twelve months.

Our ability to satisfy our liquidity needs beyond 2014 is dependent on a number of factors, some of which are outside of our control. These factors include:

- we must achieve improvements in our operating results in our YRC Freight operating segment, which rely upon pricing and shipping volumes and network efficiencies;
- we must continue to comply with covenants and other terms of our credit facilities;
- we must continue to implement and realize cost saving measures to match our costs with business levels in a manner that does not harm operations and our productivity and efficiency initiatives must be successful; and

11

Table of Contents

- we must be able to generate operating cash flows that are sufficient to meet cash requirements for pension contributions to our single and multi employer pension funds, cash interest and principal payments on our funded debt, payments on our equipment leases, and for capital expenditures or additional lease payments for new revenue equipment.

A failure to meet our liquidity needs could materially and adversely affect on our business, financial condition, liquidity and results of operations.

**We incurred net losses in each of fiscal 2013, 2012 and 2011. We may not obtain the projected benefits and cost savings from productivity and efficiency initiatives. If we incur future net losses we may need additional capital to meet our future cash requirements and execute our business strategy.**

Our business experienced net losses in each of fiscal 2013, 2012 and 2011. Contributing factors to our net losses in fiscal 2013, 2012 and 2011 were the challenges facing transportation services generally as a result of the prolonged slow economic recovery, competitive pressures in the LTL industry stemming from excess capacity that resulted in lower profit margins, interest expense and financing costs, and our operating cost structure. In each of 2009, 2011 and 2014, we implemented financial restructurings to improve our balance sheet and to provide additional operating liquidity. Since our restructuring in 2011, our senior management team and board of directors have put strategies in place that are focused on driving productivity and efficiency improvements. These efforts have been concentrated on improving pricing and shipping volumes as well as customer mix, redeploying shared services and, in turn, driving more autonomy, responsibility and accountability to our operating companies, streamlining operations and our transportation network, and divesting non-core assets. There is no assurance that these changes and improvements will be successful, that their implementation will have a positive impact on our operating results or that we will not have to initiate additional changes and improvements in order to achieve the projected benefits and cost savings. For example, our operating results for the second and quarters of 2013 were adversely affected by driver shortages and challenges in implementing our network optimization. If we incur future net losses, we may experience liquidity challenges and we may need to raise additional capital to meet our future cash requirements and to execute our business strategy.

**Restrictive covenants in the documents governing our existing and future indebtedness may limit our current and future operations, particularly our ability to respond to changes in our business or to pursue our business strategies.**

The documents governing our existing indebtedness contain, and the documents governing any future indebtedness will likely contain, a number of restrictive covenants that impose significant operating and financial restrictions, including restrictions on our ability to take actions that we believe may be in our interest. The documents governing our existing indebtedness, among other things, limit our ability to:

- incur additional indebtedness and guarantee indebtedness;
- make certain restricted payments or investments;
- enter into agreements that restrict distributions from restricted subsidiaries;
- sell or otherwise dispose of assets, including capital stock of restricted subsidiaries;
- enter into transactions with affiliates;
- create or incur liens;
- enter into sale/leaseback transactions;
- merge, consolidate or sell substantially all of our assets; and
- make investments and acquire assets.

The restrictions could adversely affect our ability to:

- finance our operations;
- make strategic acquisitions or investments or enter into alliances;
- withstand a future downturn in our business or the economy in general;
- engage in business activities, including future opportunities, that may be in our interest; and
- plan for or react to market conditions or otherwise execute our business strategies.

Our ability to obtain future financing or to sell assets could be adversely affected because substantially all of our assets have been secured as collateral for the benefit of the holders of our indebtedness.

**Our failure to comply with the covenants in the documents governing our existing and future indebtedness could materially adversely affect our financial condition and liquidity.**

12

Table of Contents

The documents governing our indebtedness contain financial covenants, affirmative covenants requiring us to take certain actions and negative covenants restricting our ability to take certain actions. During the next twelve months, the thresholds required under the financial covenants in our credit facilities are subject to significant step-ups, specifically our maximum total leverage ratio. In the event our operating results indicate we will not meet our maximum total leverage ratio, we will take action to improve our maximum total leverage ratio which will include paying down our outstanding indebtedness with either cash on hand or from cash proceeds from equity issuances. The issuance of equity is outside of our control and there can be no assurance that management will be able to issue additional equity at terms that are agreeable to us. If we are unsuccessful in meeting our financial covenants, we will need to seek an amendment or waiver from our lenders or otherwise we will be in default under our credit facilities, which would enable lenders thereunder to accelerate the repayment of amounts outstanding and exercise remedies with respect to collateral. If our lenders under our credit facilities demand payment, we will not have sufficient cash and cash flows from operations to repay such indebtedness. In addition, a default under our credit facilities or the lenders exercising their remedies thereunder would trigger cross-default provisions in our other indebtedness and certain other operating agreements. Our ability to amend our credit facilities or otherwise obtain waivers from our lenders depends on matters that are outside of our control and there can be no assurance that we will be successful in that regard. In addition, any covenant breach or event of default could harm our credit rating and our ability to obtain additional financing on acceptable terms. The occurrence of any of these events could have a material adverse effect on our financial condition and liquidity.

## Risks Related to Our Common Stock

**The price of our Common Stock may fluctuate significantly, and this may make it difficult to resell our Common Stock when holders want or at prices they find attractive.**

The market price for our Common Stock has been highly volatile and subject to wide fluctuations. During the period from July 22, 2011 following the completion of our 2011 restructuring until February 25, 2014, the market price of our Common Stock ranged from $303.00 (as adjusted to give retroactive effect to our December 1, 2011 1:300 reverse stock split) to $4.56 per share. We expect the market price of our Common Stock to continue to be volatile and subject to wide fluctuations in response to a wide variety of factors, including the following:

- fluctuations in stock market prices and trading volumes of securities of similar companies;
- general market conditions and overall fluctuations in U.S. equity markets;
- variations in our operating results, or the operating results of our competitors;
- changes in our financial guidance, if any, or securities analysts' estimates of our financial performance;
- sales of large blocks of our Common Stock, including sales by our executive officers, directors and significant stockholders;
- additions or departures of any of our key personnel;
- announcements related to litigation;
- changing legal or regulatory developments in the U.S. and other countries; and
- discussion of us or our stock price by the financial press and in online investor communities.

In addition, the stock markets from time to time experience price and volume fluctuations that may be unrelated or disproportionate to the operating performance of companies and that may be extreme. These fluctuations may adversely affect the trading price of our Common Stock, regardless of our actual operating performance.

**We issued a substantial number of shares of Common Stock and shares of Convertible Preferred Stock convertible into shares of our Common Stock in connection with our 2014 Financing Transactions and have agreed to register such shares of Common Stock under the Securities Act, which could lead to significant sales of our Common Stock and may adversely affect the market price of our Common Stock.**

Pursuant to the 2014 Financing Transactions, we issued an aggregate of 17,727,835 shares of our Common Stock and 583,334 shares of our Convertible Preferred Stock, which may become convertible into 2,333,336 shares of our Common Stock upon stockholder approval of an amendment to our certificate of incorporation, subject to certain limitations. We are unable to predict the potential effects of such issuance of Common Stock, including the shares of Common Stock to be issued upon conversion of the Convertible Preferred Stock, on the trading activity and market price of our Common Stock. Pursuant to a registration rights agreement we entered into in connection with the sale of equity and the exchange of our Series B Notes, we have granted certain registration rights for the resale of shares of our Common Stock issued in the Sales and Series B Notes Exchanges, including the shares of our Common Stock issuable upon conversion of the Convertible Preferred Stock. These registration rights would facilitate the resale of such shares of Common Stock into the public market, and would increase the number of shares of our Common Stock available for public trading. Sales of a substantial number of shares of our Common Stock in the public market, or the perception that such sales may occur, could have a material adverse effect on the market price of our Common Stock.

Table of Contents

**Future issuances of our Common Stock or equity-related securities in the public market could adversely affect the trading price of our Common Stock and our ability to raise funds in new stock offerings.**

In the future, we may issue significant numbers of additional shares of our Common Stock to raise capital or in connection with a restructuring or refinancing of our maturing indebtedness. Shares of our Common Stock are reserved for issuance on conversion of our remaining convertible notes, exercise of outstanding stock options and vesting of outstanding share units. As of December 31, 2013, we had outstanding options to purchase an aggregate of approximately 33,000 shares of Common Stock, outstanding nonvested restricted stock and share units representing the right to receive a total of approximately 658,000 shares of Common Stock upon vesting and an aggregate of approximately 854,000 shares of our Common Stock was reserved for future issuance under our 2011 Incentive and Equity Award Plan (the "2011 Plan"). We have registered under the Securities Act all of the shares of Common Stock that we may issue upon the exercise of our outstanding options and the vesting of outstanding share units and on account of future awards made under the 2011 Plan. All of these registered shares can be freely sold in the public market upon issuance, except for shares issued to our directors and executive officers, which sales are subject to certain volume restrictions. If a large number of these shares are sold in the public market, the sales could reduce the trading price of our Common Stock.

We cannot predict the size of future issuances or the effect, if any, that such issuances may have on the market price for our Common Stock. Sales of significant amounts of our Common Stock or equity-related securities in the public market, or the perception that such sales may occur, could adversely affect prevailing trading prices of our Common Stock and the value of our remaining convertible notes and could impair our ability to raise capital through future offerings of equity or equity-related securities. Further sales of shares of our Common Stock or the availability of shares of our Common Stock for future sale, including sales of our Common Stock by investors who view our remaining convertible notes as a more attractive means of equity participation in our Company or in connection with hedging and arbitrage activity that may develop with respect to our Common Stock, could adversely affect the trading price of our Common Stock.

**We do not intend to pay dividends on our Common Stock in the foreseeable future.**

We do not anticipate that we will be able to pay any dividends on shares of our Common Stock in the foreseeable future. We intend to retain any future earnings to fund operations, to service debt and to use for other corporate needs.

**We can issue shares of preferred stock that may adversely affect the rights of holders of our Common Stock.**

Our certificate of incorporation currently authorizes the issuance of five million shares of preferred stock. Our board of directors is authorized to approve the issuance of one or more series of preferred stock without further authorization of our shareholders and to fix the number of shares, the designations, the relative rights and the limitations of any series of preferred stock. As a result, our board, without shareholder approval, could authorize the issuance of preferred stock with voting, conversion and other rights that could proportionately reduce, minimize or otherwise adversely affect the voting power and other rights of holders of our Common Stock or other series of preferred stock or that could have the effect of delaying, deferring or preventing a change in our control.

## Business Risks

**We are a holding company and we are dependent on the ability of our subsidiaries to distribute funds to us.**

We are a holding company and our subsidiaries conduct substantially all of our consolidated operations and own substantially all of our consolidated assets. Consequently, our cash flow and our ability to make payments on our indebtedness substantially depends upon our subsidiaries' cash flow and payments of funds to us by our subsidiaries. Our subsidiaries' ability to make any advances, distributions or other payments to us may be restricted by, among other things, debt instruments, tax considerations and legal restrictions. If we are unable to obtain funds from our subsidiaries as a result of these restrictions, we may not be able to pay principal of, or cash interest on, our indebtedness when due, and we cannot assure you that we will be able to obtain the necessary funds from other sources.

**We are subject to general economic factors that are largely out of our control, any of which could have a material adverse effect on our business, financial condition and results of operations.**

Our business is subject to a number of general economic factors that may adversely affect our business, financial condition and results of operations, many of which are largely out of our control. These factors include recessionary economic cycles and downturns in customers' business cycles and changes in their business practices, particularly in market segments and industries,

14

Table of Contents

such as retail and manufacturing, where we have a significant concentration of customers. Economic conditions may adversely affect our customers' business levels, the amount of transportation services they need and their ability to pay for our services. Because a portion of our costs are fixed, it may be difficult for us to quickly adjust our cost structure proportionally with fluctuations in volume levels. Customers encountering adverse economic conditions represent a greater potential for loss, and we may be required to increase our reserve for bad-debt losses. Further, we depend on our suppliers for equipment, parts and services that are critical to our business. A disruption in the availability of these supplies or a material increase in their cost due to adverse economic conditions or financial constraints of our suppliers could adversely impact our business, results of operations and liquidity.

**We are subject to business risks and increasing costs associated with the transportation industry that are largely out of our control, any of which could have a material adverse effect on our business, financial condition and results of operations.**

We are subject to business risks and increasing costs associated with the transportation industry that are largely out of our control, any of which could adversely affect our business, financial condition and results of operations. The factors contributing to these risks and costs include weather, excess capacity in the transportation industry, interest rates, fuel prices and taxes, fuel surcharge collection, terrorist attacks, license and registration fees, insurance premiums, self-insurance levels, and letters of credit required to support outstanding claims, difficulty in recruiting and retaining qualified drivers, the risk of widespread disruption of our technology systems, and increasing equipment and operational costs. Our results of operations may also be adversely affected by seasonal factors. Further, the future availability and support available for our current technology may make it necessary for us to upgrade or change these systems, which may be costly and could disrupt or reduce the efficiency of our operations.

**We operate in a highly competitive industry, and our business will suffer if we are unable to adequately address potential downward pricing pressures and other factors that could have a material adverse effect on our business, financial condition and results of operations.**

Numerous competitive factors could adversely affect our business, financial condition and results of operations. These factors include the following:

- We compete with many other transportation service providers of varying sizes and types, some of which have a lower cost structure, more equipment and greater capital resources than we do or have other competitive advantages.
- Some of our competitors periodically reduce their prices to gain business, especially during times of reduced growth rates in the economy, which limits our ability to maintain or increase prices or maintain or grow our business.
- Our customers may negotiate rates or contracts that minimize or eliminate our ability to offset fuel price increases through fuel surcharges.
- Many customers reduce the number of carriers they use by selecting so-called "core carriers" as approved transportation service providers, and in some instances, we may not be selected.
- Many customers periodically accept bids from multiple carriers for their shipping needs, which may depress prices or result in the loss of some business to competitors.
- The trend towards consolidation in the ground transportation industry may create other large carriers with greater financial resources and other competitive advantages relating to their size.
- Advances in technology require increased investments to remain competitive, and our customers may not be willing to accept higher prices to cover the cost of these investments.
- Competition from non-asset-based logistics and freight brokerage companies may adversely affect our customer relationships and prices.
- As a union carrier, we may have a competitive disadvantage against non-union carriers with lower cost structures and greater operating flexibility.

**If our relationship with our employees and unions were to deteriorate, we may be faced with labor disruptions or stoppages, which could have a material adverse effect on our business, financial condition and results of operations and place us at a disadvantage relative to non-union competitors.**

Virtually all of our operating subsidiaries have employees who are represented by the International Brotherhood of Teamsters ("IBT"). These employees represent the majority of our workforce at December 31, 2013. Salaries, wages and employee benefits composes over half of our operating costs.

Each of our YRC Freight, New Penn, and Holland subsidiaries employ most of their unionized employees under the terms of a common national master freight agreement with the IBT, as supplemented by additional regional supplements and local agreements, a significant majority of which will expire on March 31, 2019. The IBT also represents a number of employees at Reddaway, and Reimer under more localized agreements, which have wages, benefit contributions and other terms and conditions that better fit the cost structure and operating models of these business units.

15

Table of Contents

Our subsidiaries are regularly subject to grievances, arbitration proceedings and other claims concerning alleged past and current non-compliance with applicable labor law and collective bargaining agreements.

Neither we nor any of our subsidiaries can predict the outcome of any of these matters. These matters, if resolved in a manner unfavorable to us, could have a material adverse effect on our business, financial condition, liquidity and results of operations.

**Our pension expense and funding obligations could increase significantly and have a material adverse effect on our business, financial condition and results of operations.**

Our future funding obligations for our U.S. single-employer defined benefit pension plans qualified with the Internal Revenue Service depend upon their funded status, the future performance of assets set aside in trusts for these plans, the level of interest rates used to determine funding levels and actuarial experience and any changes in government laws and regulations.

Our subsidiaries began making contributions to most of the multi-employer pension funds (the "funds") beginning June 1, 2011 at the rate of 25% of the contribution rate in effect on July 1, 2009. A fund that did not allow our subsidiaries to begin making contributions at a reduced rate to the fund elected to either (i) apply the amount of the contributions toward paying down previously deferred contributions under our Contribution Deferral Agreement, or (ii) have the amount of the contributions placed in escrow until such time when the fund is able to accept re-entry at the reduced rate.

If the funding of the funds does not reach certain goals (including those required not to enter endangered or critical status or those required by a fund's funding improvement or rehabilitation plan), our pension expenses and required cash contributions could further increase upon the expiration of our collective bargaining agreements and, as a result, could materially adversely affect our business, financial condition and results of operations. Decreases in investment returns that are not offset by contributions could also increase our obligations under such plans.

We believe that based on information obtained from public filings and from plan administrators and trustees, our portion of the contingent liability in the case of a full withdrawal from or termination of all of the multi-employer pension plans would be an estimated $10 billion on a pre-tax basis. If we were subject to withdrawal liability with respect to a plan, ERISA provides that a withdrawing employer can pay the obligation in a lump sum or over time based upon an annual payment that is the product of the highest contribution rate to the relevant plan multiplied by the average of the three highest consecutive years measured in contribution base units, which, in some cases, could be up to 20 years. Even so, our applicable subsidiaries have no current intention of taking any action that would subject us to payment of material withdrawal obligations, however we cannot provide any assurance that such obligations will not arise in the future which would have a material adverse effect on our business, financial condition, liquidity and results of operations.

**Ongoing self-insurance and claims expenses could have a material adverse effect on our business, financial condition and results of operations.**

Our future insurance and claims expenses might exceed historical levels. We currently self-insure for a majority of our claims exposure resulting from cargo loss, personal injury, property damage and workers' compensation. If the number or severity of claims for which we are self-insured increases, our business, financial condition and results of operations could be adversely affected, and we may have to post additional letters of credit or cash collateral to state workers' compensation authorities or insurers to support our insurance policies, which may adversely affect our liquidity. Although we have significantly reduced our letter of credit expense in recent periods, there is no assurance this trend will continue. If we lose our ability to self insure, our insurance costs could materially increase, and we may find it difficult to obtain adequate levels of insurance coverage.

**We have significant ongoing capital expenditure requirements that could have a material adverse effect on our business, financial condition and results of operations if we are unable to generate sufficient cash from operations.**

Our business is capital intensive. Our capital expenditures focus primarily on revenue equipment replacement, land and structures and investments in information technology. In light of our operating results over the past few years and our liquidity needs, we have deferred certain capital expenditures in recent years and may need to continue to do so in the future, including the next twelve months. As a result, the average age of our fleet has increased and we will need to update our fleet periodically. If we are unable to generate sufficient cash from operations to fund our capital requirements, we may have to limit our growth, utilize our existing liquidity, or enter into additional financing arrangements, including leasing arrangements, or operate our revenue equipment (including tractors and trailers) for longer periods resulting in increased maintenance costs, any of which could reduce our operating income. If our cash from operations and existing financing arrangements are not sufficient to fund our capital expenditure

16

Table of Contents

requirements, we may not be able to obtain additional financing at all or on terms acceptable to us. In addition, our credit facilities contain provisions that limit our level of annual capital expenditures.

**We operate in an industry subject to extensive government regulations, and costs of compliance with, or liability for violation of, existing or future regulations could significantly increase our costs of doing business.**

The U.S. Departments of Transportation and Homeland Security and various federal, state, local and foreign agencies exercise broad powers over our business, generally governing such activities as authorization to engage in motor carrier operations, safety and permits to conduct transportation business. Our drivers are also subject to hours-of-service rules from the Federal Motor Carrier Safety Administration ("FMCSA"). In the future, we may become subject to new or more restrictive regulations that the FMSCA, Departments of Transportation and Homeland Security, the Occupational Safety and Health Administration, the Environmental Protection Agency or other authorities impose, including regulations relating to engine exhaust emissions, the hours of service that our drivers may provide in any one time period, security and other matters. Compliance with these regulations could substantially impair equipment productivity and increase our costs.

**We are subject to various Environmental Regulations, and costs of compliance with, or liabilities for violations of, existing or future laws and regulations could significantly increase our costs of doing business.**

Our operations are subject to Environmental Regulations dealing with, among other things, the handling of hazardous materials, underground fuel storage tanks and discharge and retention of storm water. We operate in industrial areas, where truck terminals and other industrial activities are located, and where groundwater or other forms of environmental contamination may have occurred. Our operations involve the risks of fuel spillage or seepage, environmental damage and hazardous waste disposal, among others. If we are involved in a spill or other accident involving hazardous substances, or if we are found to be in violation of applicable environmental laws or regulations, it could significantly increase our cost of doing business. Under specific environmental laws and regulations, we could be held responsible for all of the costs relating to any contamination at our past or present terminals and at third-party waste disposal sites. If we fail to comply with applicable environmental laws and regulations, we could be subject to substantial fines or penalties and to civil and criminal liability.

In addition, as climate change initiatives become more prevalent, federal, state and local governments and our customers are beginning to promulgate solutions for these issues. This increased focus on greenhouse gas emission reductions and corporate environmental sustainability may result in new regulations and customer requirements that could negatively affect us. This could cause us to incur additional direct costs or to make changes to our operations in order to comply with any new regulations and customer requirements, as well as increased indirect costs or loss of revenue resulting from, among other things, our customers incurring additional compliance costs that affect our costs and revenues. We could also lose revenue if our customers divert business from us because we have not complied with their sustainability requirements. These costs, changes and loss of revenue could have a material adverse effect on our business, financial condition, liquidity and results of operations.

**Our business may be harmed by anti-terrorism measures.**

In the aftermath of the terrorist attacks on the United States, federal, state and municipal authorities have implemented and are implementing various security measures, including checkpoints and travel restrictions on large trucks. Although many companies would be adversely affected by any slowdown in the availability of freight transportation, the negative impact could affect our business disproportionately. For example, we offer specialized services that guarantee on-time delivery. If the security measures disrupt or impede the timing of our deliveries, we may fail to meet the needs of our customers, or may incur increased expenses to do so. We cannot assure you that these measures will not significantly increase our costs and reduce our operating margins and income.

**The outcome of IRS audits to which we and our subsidiaries are a party could have a material adverse effect on our businesses, financial condition and results of operations.**

The IRS may issue adverse tax determinations in connection with its audit of our prior year tax returns. See the "Income Taxes" footnote to our consolidated financial statements. We may incur significant expenses defending ourselves in these audits. We may be required to pay significant taxes and/or interest to resolve these audits. These costs could have a material adverse effect on our businesses, financial condition, liquidity and results of operations.

**Current or future litigation may adversely affect our business, financial condition, liquidity or results of operations.**

We have been and continue to be involved in legal proceedings, claims and other litigation that arise in the ordinary course of business. Litigation may be related to labor and employment, competitive matters, personal injury, property damage, safety and

Table of Contents

contract compliance, environmental liability, our past financial restructurings and other matters. We are currently subject to putative class action litigation in connection with public statements made by prior management regarding our financial restructuring in 2009. We discuss legal proceedings in the "Commitments, Contingencies and Uncertainties" footnote to our consolidated financial statements included elsewhere in this Annual Report on Form 10-K. Some or all of our expenditures to defend, settle or litigate these matters may not be covered by insurance or could impact our cost and ability to obtain insurance in the future. Litigation can be expensive, lengthy and disruptive to normal business operations, including to our management due to the increased time and resources required to respond to and address the litigation. The results of complex legal proceedings are often uncertain and difficult to predict. An unfavorable outcome of any particular matter or any future legal proceedings could have a material adverse effect on our business, financial condition, liquidity or results of operations. In the future, we could incur judgments or enter into settlements of claims that could harm our financial position, liquidity and results of operations.

**We may not obtain further benefits and cost savings from operational changes and performance improvement initiatives.**

In response to our business environment, we initiated operational changes and process improvements to reduce costs and improve financial performance. These changes and initiatives include evaluating management talent, reducing overhead costs, closing redundant facilities, making upgrades to our technology, eliminating non-core assets and unnecessary activities and implementing changes of operations under our labor agreements. There is no assurance that these changes and improvements will be successful , that their implementation may not have an adverse impact on our operating results or that we will not have to initiate additional changes and improvements in order to achieve the projected benefits and cost savings.

**Our actual operating results may differ significantly from our projections.**

From time to time, we use projections regarding our future performance. These projections, which are forward-looking statements, are prepared by our management and are qualified by, and subject to, the assumptions and the other information contained or referred to in the introductory section immediately prior to "Part I" of this Report. Our projections are not prepared with a view toward compliance with published guidelines of the American Institute of Certified Public Accountants, and neither our registered public accountants nor any other independent expert or outside party compiles or examines the projections and, accordingly, no such person expresses any opinion or any other form of assurance with respect thereto.

Projections are based upon a number of assumptions and estimates that, while presented with numerical specificity, are inherently subject to significant business, economic and competitive uncertainties and contingencies, many of which are beyond our control and are based upon specific assumptions with respect to future business decisions, some of which will change.

Projections are necessarily speculative in nature, and it can be expected that some or all of the assumptions and estimates relating to the projections furnished by us will not materialize or will vary significantly from actual results. Accordingly, our projections are only an estimate of what management believes is realizable as of the date of release. Actual results will vary from the projections and the variations may be material. Investors should also recognize that the reliability of any forecasted financial data diminishes the farther in the future that the data is projected. In light of the foregoing, investors are urged not to rely upon, or otherwise consider, our projections in making investment decisions in respect of our securities.

Any failure to successfully implement our operating strategy, the failure of some or all of the assumptions and estimates relating to the projections used by us or the occurrence of any of the adverse events or circumstances described in this Annual Report on Form 10-K and in our other filings with the SEC could result in the actual operating results being different from the projections, and such differences may be adverse and material.

18

Table of Contents

Item 1B. Unresolved Staff Comments

Not applicable.

Item 2. Properties

At December 31, 2013, we operated a total of 393 transportation service facilities located in 50 states, Puerto Rico, Canada and Mexico for our YRC Freight and Regional Transportation segments. Of this total, 188 are owned and 205 are leased, generally with lease terms ranging from one month to ten years with right of renewal options. The number of customer freight servicing doors totaled 21,536, of which 12,324 are at owned facilities and 9,212 are at leased facilities. The transportation service centers vary in size ranging from one to three doors at small local facilities, to 426 doors at the largest consolidation and distribution facility. In addition, we and our subsidiaries own and occupy general office buildings in Lebanon, Pennsylvania; and Holland, Michigan. We also lease and occupy general office buildings in Overland Park, Kansas, Tualatin, Oregon and Winnipeg, Manitoba. Our owned transportation service facilities and office buildings serve as collateral under our credit agreements.

Our facilities and equipment are adequate to meet current business requirements in 2014. Refer to "Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations" for a more detailed discussion of expectations regarding capital spending in 2014.

Item 3. Legal Proceedings

We discuss legal proceedings in the "Commitments, Contingencies and Uncertainties" footnote to our consolidated financial statements.

Item 4. Mine Safety Disclosures

Not applicable.

19

Table of Contents

**Executive Officers of the Registrant**

The following are our executive officers, each of whom serves until his or her successor has been elected and qualified or until his or her earlier resignation or removal:

| Name | Age | Position(s) Held |
| --- | --- | --- |
| James L. Welch | 59 | Chief Executive Officer of YRC Worldwide Inc. (since July 2011); President of YRC Freight (subsidiary of the Company) (September 2013-February 2014); President and Chief Executive Officer, Dynamex Inc. (transportation and logistics services) (2008-July 2011); Interim Chief Executive Officer, JHT Holdings (truck transportation) (2007-2008); President and Chief Executive Officer (2000-2007), and various other positions (1978-2000), Yellow Transportation (subsidiary of the Company); Current Director: SkyWest Inc. (regional airline) (since 2007), Erickson Air-Crane, Inc. (since 2012) Former Director: Dynamex Inc., Spirit AeroSystems Holdings Inc. (commercial airplane assemblies and components), and Roadrunner Transportation (transportation and logistics services). |
| Jamie G. Pierson | 44 | Executive Vice President and Chief Financial Officer of YRC Worldwide Inc. (since November 2011); Interim Chief Financial Officer of YRC Worldwide Inc. (August 2011-November 2011); Managing Director, Alvarez & Marsal North America, LLC (professional services) (2008-November 2011); Vice President - Corporate Development and Integration, Greatwide Logistics Services, Inc. (transportation and logistics) (2007-2008); Director, FTI Capital Advisors, LLC (investment bank) (2002-2007); Vice President, FTI Consulting, Inc. (2001-2002); Vice President, Stonegate Securities, Inc. (investment bank) (2000-2001); Associate, Houlihan Lokey Howard & Zukin (investment bank) (1997-2000). |
| Michelle A. Friel | 44 | Executive Vice President, General Counsel and Secretary of YRC Worldwide Inc. (since February 2012); Senior Vice President, General Counsel and Secretary of Spirit AeroSystems Holdings, Inc. (2010-2012); Associate General Counsel of Spirit AeroSystems Holdings, Inc. (2009-2010); Vice President - Legal and Assistant General Counsel of YRC Worldwide Inc. (2003-2009). |
| Darren D. Hawkins | 44 | President (since February 2014), Senior Vice President - Sales and Marketing (January 2013-February 2014) of YRC Freight; Director of Operations (December 2011-January 2013) and Director of Sales (January 2009-December 2011) for Con-Way Freight, a subsidiary of Con-Way, Inc.; various positions of increasing responsibility with Yellow Transportation (1991-2009). |
| Scott D. Ware | 53 | President (since May 2012), Vice President Operations & Linehaul (2009-2012) and Vice President Linehaul (2007-2009) of USF Holland Inc. (subsidiary of the Company); Director of Linehaul of SAIA Inc. (2002-2007); Director of Linehaul of JEVIC (2000-2002); various industry management roles with Preston, Overnite, Con-Way and Spartan Express (1985-2000). |
| Thomas J. O'Connor | 53 | President of Reddaway (subsidiary of the Company) (since January 2007); President of USF Bestway (subsidiary of the Company) (2005-2007); Vice President - Western Division and officer of the Company (1999-2005), District Manager (1995-1999) and various management positions of increasing responsibility (1982-1995) of Roadway Express, Inc. (subsidiary of the Company). |
| Steven D. Gast | 60 | President (since January 2006), Vice President of Finance and Administration (2001-2006) and Vice President of Pricing and Strategic Planning (1997-2001) of New Penn (subsidiary of the Company). |
| Mark D. Boehmer | 53 | Vice President and Treasurer of YRC Worldwide (since July 2013); Vice President and Treasurer of Sealy Corporation (bedding manufacturer) (2003-2013). |
| Stephanie D. Fisher | 37 | Vice President and Controller of YRC Worldwide (since May 2012); Director - Financial Reporting and various positions in the Company's Corporate Accounting department (2004-2012); Member of the Supervisory Committee of CommunityAmerica Credit Union (since December 2010, Chairman of the Committee since May 2012). |

Table of Contents

**PART II**

Item 5. Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities

As of March 4, 2014, 175 shareholders of record held YRC Worldwide common stock. Trading activity averaged 621,240 shares per day during 2013, up from 135,359 per day in 2012. The NASDAQ Stock Market quotes prices for our common stock under the symbol "YRCW." As part of our 2014 Financing Transactions, on January 31, 2014, we issued 583,334 shares of YRC Worldwide preferred stock (that are convertible into 2,333,336 shares of Common Stock upon meeting certain conditions). These preferred shares were outstanding as of March 4, 2014.

On July 22, 2011, we issued an aggregate of 4,999,999 shares of Series B Preferred Stock to satisfy a portion of the outstanding credit agreement claims (3,717,948 shares) and to satisfy our obligation to the IBT for their modifications and extension of the labor agreement in October 2010 (1,282,051 shares). The 4,999,999 shares of Series B Preferred Stock were converted into 6,210,369 shares of common stock in September 2011. No shares of Series B Preferred Stock remain outstanding. See additional details in the "Shareholders' Deficit" footnote to our consolidated financial statements.

The board of directors approved a reverse stock split effective December 1, 2011 at a ratio of 1:300. The reverse stock split was effective on NASDAQ on December 2, 2011. Fractional shares were not issued in connection with the reverse stock split. Instead, fractional shares were collected and pooled by our transfer agent and sold in the open market and the proceeds were allocated to the stockholders' respective accounts pro rata exchange for their fractional shares.

The reverse stock split reduced the number of shares of our common stock available for issuance under our employee and director equity plans in proportion to the reverse stock split ratio. Under the terms of our outstanding equity awards, the reverse stock split reduced the number of shares of our common stock issuable upon exercise or vesting of such awards in proportion to the reverse stock split ratio and caused a proportionate increase in the exercise price of such awards to the extent they were stock options. The number of shares of our common stock issuable upon exercise or vesting of outstanding equity awards was rounded to the nearest whole share and no cash payment was made in respect of such rounding. Shareholders' Deficit was retroactively adjusted to give effect to the reverse stock splits for all periods presented by reclassifying from Common stock to Capital surplus, the par value of the share reduction in connection with the reverse splits. All share numbers and per share amounts in this report and the Consolidated Financial Statements and Notes to the Consolidated Financial Statements have been retroactively adjusted to give effect to the reverse stock split.

21

Table of Contents

## Quarterly Financial Information (unaudited)

| (in millions, except per share and share data) | 2013 | | | |
| --- | --- | --- | --- | --- |
| | First Quarter | Second Quarter | Third Quarter | Fourth Quarter [c] |
| Operating revenue | $ 1,162.5 | $ 1,242.5 | $ 1,252.7 | $ 1,207.7 |
| (Gains) losses on property disposals, net | (4.5) | 1.3 | 1.3 | (0.3) |
| Operating (loss) income | 9.9 | 14.3 | 5.8 | (1.6) |
| Net (income) loss | (24.5) | (15.1) | (44.4) | 0.4 |
| Diluted loss per share[b] | (2.93) | (1.72) | (4.45) | (1.71) |
| Common stock: | | | | |
| High | 9.60 | 30.49 | 36.99 | 20.58 |
| Low | 5.75 | 6.69 | 14.39 | 7.06 |

| (in millions, except per share and share data) | 2012 [a] | | | |
| --- | --- | --- | --- | --- |
| | First Quarter | Second Quarter | Third Quarter | Fourth Quarter |
| Operating revenue | $ 1,194.3 | $ 1,250.8 | $ 1,236.8 | $ 1,168.6 |
| (Gains) losses on property disposals, net | 8.3 | (6.5) | (2.3) | (9.2) |
| Operating (loss) income | (48.7) | 15.5 | 27.3 | 30.0 |
| Net (loss) income | (81.6) | (22.6) | 3.0 | (35.3) |
| Less: Net income attributable to non-controlling interest | 3.9 | — | — | — |
| Net (loss) income attributable to YRC Worldwide Inc. | (85.5) | (22.6) | 3.0 | (35.3) |
| Diluted loss per share[b] | (12.40) | (3.21) | (4.30) | (4.53) |
| Common stock: | | | | |
| High | 13.99 | 8.05 | 7.46 | 7.74 |
| Low | 6.48 | 4.61 | 5.07 | 6.52 |

(a) The fourth quarter of 2012 includes a $30.8 million impairment charge on our JHJ International Transportation Co, Ltd. ("JHJ") equity investment as a non-operating expense. Certain convertible securities contain a make-whole interest premium that requires us to pay interest as if the security were held to maturity. In calculating the third quarter 2012 diluted earnings per share under the if-converted method, this make-whole interest premium resulted in expense that exceeded our earnings and resulted in a diluted loss per share.

(b) Diluted loss per share were computed independently for each of the quarters presented. The sum of the quarters may differ from the total annual amount primarily due to change in the number of outstanding shares in the year and the impact of the if-converted method used to calculate earnings per share.

(c) The fourth quarter 2013 results were impacted by the 2013 tax rate, which included a benefit recognized due to application of ASC 740 rules regarding intra-period tax allocation.

## Purchases of Equity Securities by the Issuer

We did not repurchase any shares of our common stock in 2013, 2012 and 2011. Our credit agreement as of December 31, 2013 did not permit us to purchase shares of our common stock.

## Dividends

We did not declare any cash dividends on our common stock in 2013, 2012 and 2011. Our credit agreement as of December 31, 2013 did not permit us to declare dividends on any of our outstanding capital stock.

22

Table of Contents

**Common Stock Performance**

Set forth below is a line graph comparing the quarterly percentage change in the cumulative total stockholder return of the Company's common stock against the cumulative total return of the S&P Composite-500 Stock Index and the Dow Jones Transportation Average Stock Index for the period of five years commencing December 31, 2008 and ending December 31, 2013.



23

Table of Contents

Item 6. Selected Financial Data

Our selected financial data below should be read in conjunction with "Management's Discussion and Analysis of Financial Condition and Results of Operations" and "Financial Statements and Supplementary Data" included in this Form 10-K.

| (in millions, except share and per share data) | 2013 | 2012 | 2011 | 2010 | 2009 |
|---|---|---|---|---|---|
| **For the Year** | | | | | |
| Operating revenue | $ 4,865.4 | $ 4,850.5 | $ 4,868.8 | $ 4,334.6 | $ 4,871.0 |
| Operating income (loss) | 28.4 | 24.1 | (138.2) | (227.9) | (882.0) |
| Net loss from continuing operations | (83.6) | (136.5) | (354.4) | (304.7) | (631.7) |
| Net income (loss) from discontinued operations, net of tax | — | — | — | (23.1) | 12.2 |
| Net loss | (83.6) | (136.5) | (354.4) | (327.8) | (619.5) |
| Less: Net income (loss) attributable to non-controlling interest | — | 3.9 | (3.1) | (2.0) | — |
| Net loss attributable to YRC Worldwide Inc. | (83.6) | (140.4) | (351.3) | (325.8) | (619.5) |
| Amortization of beneficial conversion feature on preferred stock | — | — | (58.0) | — | — |
| Net loss attributable to common shareholders | (83.6) | (140.4) | (409.3) | (325.8) | (619.5) |
| Acquisition of property and equipment | (66.9) | (66.4) | (71.6) | (19.2) | (36.3) |
| Proceeds from disposal of property and equipment | 9.8 | 50.4 | 67.5 | 85.7 | 133.1 |
| Disposition of affiliates, net of cash sold | — | — | — | 34.3 | 31.9 |
| Net cash provided by (used in) operating activities | 12.1 | (25.9) | (26.0) | 0.7 | (379.3) |
| Net cash provided by (used in) investing activities | (23.5) | 19.8 | (156.6) | 106.0 | 135.1 |
| Net cash provided by (used in) financing activities | (21.0) | 14.3 | 240.1 | (61.5) | 16.7 |
| **At Year-End** | | | | | |
| Total assets | $ 2,064.9 | $ 2,225.5 | $ 2,485.8 | $ 2,571.6 | $ 3,008.0 |
| Total debt | 1,363.4 | 1,375.4 | 1,354.7 | 1,060.1 | 1,132.9 |
| Total YRC Worldwide Inc. shareholders' equity (deficit) | (597.4) | (629.1) | (353.9) | (209.5) | 149.4 |
| Non-controlling interest | — | — | (4.6) | (1.9) | — |
| Total shareholders' equity (deficit) | (597.4) | (629.1) | (358.5) | (211.4) | 149.4 |
| **Measurements** | | | | | |
| Basic & Diluted per share data: | | | | | |
| Net loss from continuing operations attributable to YRC Worldwide Inc. | $ (8.96) | $ (19.20) | $ (196.12) | $ (2,293.30) | $ (79,519.96) |
| Net income (loss) from discontinued operations | — | — | — | (174.87) | 1,540.16 |
| Net loss | (8.96) | (19.20) | (196.12) | (2,468.17) | (77,979.80) |
| Average common shares outstanding (in thousands) | 9,332 | 7,311 | 2,087 | 132 | 8 |
| **Other Data** | | | | | |
| Number of employees | 32,000 | 32,000 | 32,000 | 32,000 | 36,000 |
| Operating ratio: [a] | | | | | |
| YRC Freight | 101.0% | 101.2% | 102.8% | 105.9% | 121.0% |
| Regional Transportation | 95.4% | 95.7% | 97.9% | 99.8% | 109.6% |
| Truckload | N/A | N/A | 119.1% | 109.3% | 107.7% |
| Consolidated | 99.4% | 99.5% | 102.8% | 105.3% | 118.1% |

(a) Operating ratio is calculated as (i) 100 percent (ii) minus the result of dividing operating income by operating revenue or (iii) plus the result of dividing operating loss by operating revenue and expressed as a percentage.

Table of Contents

Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations

"Management's Discussion and Analysis of Financial Condition and Results of Operations" contains forward-looking statements within the meaning of Section 27A of the Securities Act and Section 21E of the Exchange Act. See the introductory section immediately prior to "Part I" and Risk Factors in "Item 1A" of this report regarding these statements.

## Overview

MD&A includes the following sections:

**Our Business:** a brief description of our business and a discussion of how we assess our operating results

**Consolidated Results of Operations:** an analysis of our consolidated results of operations for the years ended December 31, 2013, 2012 and 2011

**Reporting Segment Results of Operations:** an analysis of our results of operations for the years ended December 31, 2013, 2012 and 2011 for our two reporting segments: YRC Freight and Regional Transportation

**Non-GAAP Financial Measures:** an analysis of our results using certain non-GAAP financial measures, for the years ended December 31, 2013, 2012 and 2011

**Financial Condition/Liquidity and Capital Resources:** a discussion of our major sources and uses of cash as well as an analysis of our cash flows and aggregate contractual obligations and commercial commitments

## Our Business

YRC Worldwide is a holding company that, through wholly owned operating subsidiaries and its interest in a Chinese joint venture, offers its customers a wide range of transportation services. YRC Worldwide has one of the largest, most comprehensive less-than-truckload ("LTL") networks in North America with local, regional, national and international capabilities. Through its team of experienced service professionals, YRC Worldwide offers industry-leading expertise in heavyweight shipments and flexible supply chain solutions, ensuring customers can ship industrial, commercial and retail goods with confidence.

We measure the performance of our business both on a consolidated and reporting segment basis and using several metrics, but rely primarily upon (without limitation) operating revenue, operating income (loss), and operating ratio. We also use certain non-GAAP financial measures as secondary measures to assess our operating performance.

- **Operating Revenue:** Operating revenue has two primary components: volume (commonly evaluated using tonnage, tonnage per day, number of shipments, shipments per day or weight per shipment) and yield or price (commonly evaluated using picked up revenue, revenue per hundredweight or revenue per shipment). Yield includes fuel surcharge revenue which is common in the trucking industry and represents an amount charged to customers that adjusts with changing fuel prices. We base our fuel surcharges on a published national index and adjust them weekly. Rapid material changes in the index or our cost of fuel can positively or negatively impact our revenue and operating income versus prior periods as there is a lag in our adjustment of base rates in response to changes in fuel surcharge. We believe that fuel surcharge is an accepted and important component of the overall pricing of our services to our customers. Without an industry accepted fuel surcharge program, our base pricing for our transportation services would require changes. We believe the distinction between base rates and fuel surcharge has blurred over time, and it is impractical to clearly separate all the different factors that influence the price that our customers are willing to pay. In general, under our present fuel surcharge program, we believe rising fuel costs are beneficial to us and falling fuel costs are detrimental to us in the short term, which are mitigated over time.

- **Operating Income (Loss)**: Operating income (loss) is operating revenue less any operating expenses. Consolidated operating income (loss) includes certain corporate charges that are not allocated to our reporting segments.

- **Operating Ratio:** Operating ratio is a common operating performance measure used in the trucking industry. It is calculated as (i) 100 percent (ii) minus the result of dividing operating income by operating revenue or (iii) plus the result of dividing operating loss by operating revenue, and is expressed as a percentage.

- **Non-GAAP Financial Measures:** We use adjusted EBITDA and adjusted free cash flow (deficit), which are non-GAAP financial measures, to assess our performance. Adjusted EBITDA reflects earnings before interest, taxes, depreciation, and amortization expense, and further adjusts for letter of credit fees, equity-based compensation expense, net gains or

25

Table of Contents

losses on property disposals and certain other items, including restructuring professional fees, expenses associated with certain lump sum payments to our IBT employees and the impact of permitted dispositions and discontinued operations as defined in our credit facilities. Adjusted EBITDA is used for internal management purposes as a financial measure that reflects core operating performance and to measure compliance with certain financial covenants in our credit facilities. Adjusted free cash flow (deficit) is a non-GAAP measure that reflects our operating cash flow minus gross capital expenditures and excludes restructuring costs included in operating cash flow. Our non-GAAP financial measures have the following limitations:

- ◦ Adjusted EBITDA does not reflect the interest expense or the cash requirements necessary to fund restructuring professional fees, letter of credit fees, service interest or principal payments on our outstanding debt;
- ◦ Although depreciation and amortization are non-cash charges, the assets being depreciated and amortized will often have to be replaced in the future and adjusted EBITDA does not reflect any cash requirements for such replacements;
- ◦ Equity based compensation is an element of our long-term incentive compensation package, although adjusted EBITDA excludes employee equity-based compensation expense when presenting our ongoing operating performance for a particular period;
- ◦ Adjusted free cash flow (deficit) excludes the cash usage by our restructuring activities, debt issuance costs, equity issuance costs and principal payments on our outstanding debt and the resulting reduction in our liquidity position from those cash outflows; and
- ◦ Other companies in our industry may calculate adjusted EBITDA and adjusted free cash flow (deficit) differently than we do, limiting its usefulness as a comparative measure.

Because of these limitations, our non-GAAP measures should not be considered a substitute for performance measures calculated in accordance with GAAP. We compensate for these limitations by relying primarily on our GAAP results and use our non-GAAP measures as secondary measures.

## Consolidated Results of Operations

Our consolidated results for 2013, 2012 and 2011 include the consolidated results of our reporting segments and unallocated corporate charges. A more detailed discussion of the operating results of our reporting segments is presented in the "Reporting Segment Results of Operations" section below.

The table below provides summary consolidated financial information for the three years ended December 31:

| | | | | | | Percent Change | |
| (in millions) | | 2013 | 2012 | 2011 | | 2013 vs. 2012 | 2012 vs. 2011 |
|---|---|---|---|---|---|---|---|
| Operating revenue | $ | 4,865.4 | $ 4,850.5 | $ 4,868.8 | | 0.3 % | (0.4)% |
| Operating income (loss) | | 28.4 | 24.1 | (138.2) | | 17.8 % | NM[(a)] |
| Nonoperating expenses, net | | 157.9 | 175.6 | 223.7 | | (10.1)% | (21.5)% |
| Net loss from continuing operations | | (83.6) | (136.5) | (354.4) | | 38.8 % | 61.5 % |

[(a)]Not Meaningful

### 2013 Compared to 2012

Our consolidated operating revenue increased $14.9 million in 2013 compared to 2012. The increase in revenue is largely attributable to the increase in volumes at our Regional Transportation reporting segment.

Operating expenses in 2013 increased $10.6 million or 0.2% compared to 2012. The increase in operating expenses was primarily driven by a $23.7 million increase in purchased transportation and a $14.6 million increase in salaries, wages and benefits. These increases were partially offset by a $13.7 million decrease in other operating expense and a $12.0 million decrease in operating expenses and supplies.

- • The $23.7 million increase in purchased transportation was primarily driven by increased purchased rail transportation costs.
- • The $14.6 million increase in salaries, wages and benefits was primarily driven by a $28.1 million increase in wages to support higher shipping volumes primarily at our Regional Transportation reporting segment. This was partially offset by a $10.0 million decrease in Workers' Compensation expense from our safety and settlement initiatives.

26

Table of Contents

- The $13.7 million decrease in other operating expense was driven by a $9.2 million decrease in bodily injury and property damage expense due to our settlement initiatives and a $3.5 million decrease in cargo claims driven by favorable claim development compared to 2012.
- The $12.0 million decrease in operating expenses and supplies was primarily driven by a $16.5 million decrease in fuel expenses, partially offset by a $6.8 million increase in vehicle maintenance expenses to support our aging fleet.

Our consolidated operating income during 2013 includes a $2.2 million net gain from the sale of property and equipment compared to a $9.7 million net gain in 2012.

Nonoperating expenses decreased $17.7 million or 10.1% in 2013 compared to 2012. Nonoperating costs in 2012 include a $30.8 million impairment charge for our equity investment in JHJ. The adjustment was required as the estimated fair value, using a discounted cash flow model, was less than our investment. The impairment charge is reflective of market information obtained in the fourth quarter of 2012. This decrease was partially offset by a $13.1 million increase in interest expense driven by additional make whole interest on our Series B Notes that converted to equity during 2013.

Our effective tax rate for continuing operations for the years ended December 31, 2013 and 2012 was 35.4% and 9.9%, respectively. Significant items impacting the 2013 rate include a benefit recognized due to application of ASC 740 rules regarding intra-period tax allocation, a state tax provision, a foreign tax provision, certain permanent items, a decrease in the reserve for uncertain tax positions and an increase in the valuation allowance established for the net deferred tax asset balance at December 31, 2013. We recognize valuation allowances on deferred tax assets if, based on the weight of the evidence, we believe that some or all of our deferred tax assets will not be realized. Changes in valuation allowances are included in our tax provision or in equity if directly related to other comprehensive income (loss), unless affected by a specific intra-period allocation as happened in 2013 and explained in the "Income Taxes" footnote to our consolidated financial statements, in the period of change. In determining whether a valuation allowance is warranted, we evaluate factors such as prior years' earnings history, expected future earnings, loss carry-back and carry-forward periods, reversals of existing deferred tax liabilities and tax planning strategies that potentially enhance the likelihood of the realization of a deferred tax asset. Accordingly, as of December 31, 2013 and 2012, we have a full valuation allowance against our net deferred tax assets, exclusive of a deferred tax liability related to a foreign jurisdiction.

Since our debt recapitalization in July 2011, we have experienced significant changes in the ownership of our stock, as measured for Federal income tax purposes. On July 25, 2013, we reached the threshold that would trigger a change defined by IRC Code Sec. 382. Subsequent to the balance sheet date, another such ownership change occurred in January 2014. These changes will likely limit substantially the use of tax Net Operating Loss carryovers (NOLs) generated in 2013 and prior to offset future taxable income. While Sec. 382 changes may adversely affect future cash flow, they have no impact on our current financial statements. The deferred tax assets resulting from the existing NOLs for which a Sec. 382 changes would limit financial statement recognition are already fully offset by a valuation allowance.

On September 13, 2013, the U.S. Department of the Treasury and the IRS released final regulations providing guidance on the application of IRC Section 263(a) to amounts paid to acquire, produce, or improve tangible property, as well as rules for materials and supplies ("Tangible Property Regulations"). While the final regulations are generally effective for taxable years beginning on or after January 1, 2014, taxpayers are permitted to early adopt provisions for years beginning on or after January 1, 2012. The Company believes that the implementation of these regulations will have no material impact on its financial statements.

### 2012 Compared to 2011

Our consolidated operating revenue decreased $18.3 million in 2012 compared to 2011. The decrease in revenue is largely attributable to the December 2011 sale of our Truckload reporting segment, which represented $98.9 million or approximately 2% of our consolidated revenue in 2011. This decline was partially offset by an increase in yields due to customer mix management and volume increases in our Regional Transportation reporting segment.

Operating expenses in 2012 decreased $180.6 million or 3.6% compared to 2011. The decrease is partially attributable to the sale of our Truckload reporting segment, which had $117.8 million of operating expenses in 2011. Overall operating expenses decreased due to a $65.6 million decrease in operating expenses and supplies, a $46.6 million decrease in purchased transportation and a $27.8 million decrease in other operating expense.

- The $65.6 million decrease in operating expenses and supplies was primarily driven by lower professional service fees of $43.9 million or 34.5% and lower fuel expenses of $25.9 million or 4.4%. The $43.9 million decrease in professional service fees were primarily related to the 2011 restructuring fees which were not allocated to our reporting segments during that period.

27

Table of Contents

- The $46.6 million decrease in purchased transportation was primarily a result of lower volumes moved through purchased transportation lines.
- The $27.8 million decrease in other operating expense is primarily driven by a $14.3 million or 23.6% decrease in bodily injury and property damage claims outstanding driven by our employee safety initiatives.

Our consolidated operating income during 2012 includes a $9.7 million net gain from the sale of property and equipment compared to a $8.2 million net gain in 2011.

Nonoperating expenses decreased $48.1 million or 21.5% in 2012 compared to 2011. Nonoperating costs in 2012 include a $30.8 million impairment charge for our equity investment in JHJ. The adjustment was required as the estimated fair value, using a discounted cash flow model, was less than our investment. The impairment charge is reflective of market information obtained in the fourth quarter of 2012. Nonoperating costs in 2011 included a fair value adjustment on our derivative liabilities of $79.2 million and restructuring transaction costs of $17.8 million. The fair value adjustment resulted from conversion features embedded in the Series A Notes and Series B Notes issued in the July 22, 2011 restructuring. At the closing of the restructuring, the Company did not have enough authorized and unissued common shares to satisfy those conversion features. At a September 16, 2011 special meeting, shareholders approved an increase in the amount of authorized common shares to allow for the conversions. The conversion features were revalued after the shareholder meeting resulting in the fair value adjustment. The increase in the fair value of the conversion options is primarily related to market volatility of our common stock and is due to the fact that the Series B Note holders now have the ability to convert the notes to common shares. The restructuring transaction costs relate to modifications to our credit agreement, contribution deferral agreement, and issuance of Series A Notes. In addition, we recognized a $25.8 million net gain on extinguishment of debt during 2011 primarily related to the retirement of the ABS facility.

Our effective tax rate for continuing operations for the years ended December 31, 2012 and 2011 was 9.9% and 2.1%, respectively. Significant items impacting the 2012 rate include a state tax provision, a foreign tax provision, certain permanent items, an increase in the reserve for uncertain tax positions, a favorable Tax Court settlement and an increase in the valuation allowance established for the net deferred tax asset balance at December 31, 2012. We recognize valuation allowances on deferred tax assets if, based on the weight of the evidence, we believe that some or all of our deferred tax assets will not be realized. Changes in valuation allowances are included in our tax provision or in equity if directly related to other comprehensive income (loss) in the period of change. In determining whether a valuation allowance is warranted, we evaluate factors such as prior years' earnings history, expected future earnings, loss carry-back and carry-forward periods, reversals of existing deferred tax liabilities and tax planning strategies that potentially enhance the likelihood of the realization of a deferred tax asset. Accordingly, as of December 31, 2012 and 2011, we have a full valuation allowance against our net deferred tax assets.

## Reporting Segment Results of Operations

We evaluate our business using our two reporting segments:

- **YRC Freight** is the reporting segment for our transportation service providers focused on business opportunities in national, regional and international markets. YRC Freight provides for the movement of industrial, commercial and retail goods, primarily through centralized management and customer facing organizations. This unit includes our LTL subsidiary YRC Inc. and Reimer Express, a subsidiary located in Canada that specializes in shipments into, across and out of Canada. In addition to the United States and Canada, YRC Freight also serves parts of Mexico, Puerto Rico and Guam.
- **Regional Transportation** is the reporting segment for our transportation service providers focused on business opportunities in the regional and next-day delivery markets. The Regional Transportation companies each provide regional, next-day ground services in their respective regions through a network of facilities located across the United States, Canada, Mexico and Puerto Rico.

In 2011, we reported Truckload as a separate segment, which consisted of Glen Moore, a former domestic truckload carrier that represented approximately 2% of our consolidated revenue in 2011. On December 15, 2011, we sold the majority of Glen Moore's assets to a third party and concluded operations. The Truckload reporting segment reported operating revenue of $98.9 million and an operating loss of $18.9 million in 2011.

28

Table of Contents

### YRC Freight Results

YRC Freight represented 64%, 66% and 66% of our consolidated revenue in 2013, 2012 and 2011, respectively. The table below provides summary financial information for YRC Freight for the years ended December 31:

| (in millions) | 2013 | 2012 | 2011 | Percent Change | |
|---|---|---|---|---|---|
| | | | | 2013 vs. 2012 | 2012 vs. 2011 |
| Operating revenue | $ 3,136.8 | $ 3,206.9 | $ 3,203.0 | (2.2)% | 0.1% |
| Operating loss | (31.2) | (37.3) | (88.5) | 16.4 % | 57.9% |
| Operating ratio[a] | 101.0% | 101.2% | 102.8% | 0.2pp | 1.6pp |

(a)  pp represents the change in percentage points

### 2013 Compared to 2012

YRC Freight reported operating revenue of $3,136.8 million in 2013, an decrease of $70.1 million or 2.2% compared to 2012. The table below summarizes the key revenue metrics for the YRC Freight reporting segment for the years ended December 31:

| | 2013 | 2012 | Percent Change[b] |
|---|---|---|---|
| Workdays | 252.5 | 252.0 | |
| | | | |
| Total picked up revenue (in millions) [a] | $ 3,126.5 | $ 3,186.5 | (1.9)% |
| Total tonnage (in thousands) | 6,717 | 6,815 | (1.4)% |
| Total tonnage per workday (in thousands) | 26.60 | 27.04 | (1.6)% |
| Total shipments (in thousands) | 11,444 | 11,791 | (2.9)% |
| Total shipments per workday (in thousands) | 45.32 | 46.79 | (3.1)% |
| Total revenue per hundred weight | $ 23.27 | $ 23.38 | (0.4)% |
| Total revenue per shipment | $ 273 | $ 270 | 1.1 % |
| Total weight per shipment (in pounds) | 1,174 | 1,156 | 1.6 % |

| (in millions) | 2013 | 2012 |
|---|---|---|
| [a]Reconciliation of operating revenue to total picked up revenue: | | |
| Operating revenue | $ 3,136.8 | $ 3,206.9 |
| Change in revenue deferral and other | (10.3) | (20.4) |
| Total picked up revenue | $ 3,126.5 | $ 3,186.5 |

(a) Does not equal financial statement revenue due to revenue recognition adjustments between accounting periods.
(b) Percent change based on unrounded figures and not rounded figures presented.

Operating loss for YRC Freight was $31.2 million in 2013 compared to $37.3 million in 2012. The operating loss improvement was driven by a $76.2 million decrease in operating costs, which was partially offset by a $70.1 million decrease in revenue. The decrease in revenue was largely driven by decreases in shipping volumes as noted in the table above. We believe these decreases were a result of driver shortages in the summer months and service declines due to challenges implementing our network optimization plan. The operating cost decreases were driven by a $41.2 million or 5.5% decrease in operating expenses and supplies, a $33.3 million or 1.8% decrease in salaries, wages and benefits, and a $16.6 million or 10.3% decrease in other operating expenses. These decreases were partially offset by higher purchased transportation costs of $18.4 million or 4.5%.

• The $41.2 million decrease in operating expenses and supplies was driven by a $18.9 million decrease in fuel driven by a decrease in shipping volumes and slightly lower fuel prices and a $17.5 million decrease in professional services.

• The decrease in salaries, wages and employees' benefits of $33.3 million during 2013 is driven by a $14.1 million decrease in workers' compensation expense primarily driven by safety initiatives and favorable development of prior year claims and $10.6 million in lower salaries and wages due to lower shipping volumes partially offset by annual wage increases.

29

Table of Contents

- The $16.6 million reduction in other operating expense was driven by a $10.7 million decrease in our bodily injury and property damage expense due to our system-wide employee safety initiatives and favorable development of prior year claims and a $3.9 million decrease in cargo claims compared to 2012 due to improved claims frequency.

- The $18.4 million increase in purchased transportation costs was driven by increased purchased rail transportation costs due to a higher percentage of loaded rail miles in 2013.

Gains on disposals of property were $3.0 million in 2013 compared to $10.0 million in 2012.

*2012 Compared to 2011*

YRC Freight reported operating revenue of $3,206.9 million in 2012, an increase of $3.9 million compared to 2011. The table below summarizes the key revenue metrics for the YRC Freight reporting segment for the years ended December 31:

| | 2012 | | 2011 | | Percent Change[b] |
|---|---|---|---|---|---|
| Workdays | | 252.0 | | 253.0 | |
| | | | | | |
| Total picked up revenue (in millions) [a] | $ | 3,186.5 | $ | 3,182.7 | 0.1 % |
| Total tonnage (in thousands) | | 6,815 | | 7,021 | (2.9)% |
| Total tonnage per workday (in thousands) | | 27.04 | | 27.75 | (2.5)% |
| Total shipments (in thousands) | | 11,791 | | 12,121 | (2.7)% |
| Total shipments per workday (in thousands) | | 46.79 | | 47.91 | (2.3)% |
| Total revenue per hundred weight | $ | 23.38 | $ | 22.67 | 3.1 % |
| Total revenue per shipment | $ | 270 | $ | 263 | 2.9 % |
| Total weight per shipment (in pounds) | | 1,156 | | 1,158 | (0.2)% |

| (in millions) | | 2012 | | 2011 |
|---|---|---|---|---|
| [a] Reconciliation of operating revenue to total picked up revenue: | | | | |
| Operating revenue | $ | 3,206.9 | $ | 3,203.0 |
| Change in revenue deferral and other | | (20.4) | | (20.3) |
| Total picked up revenue | $ | 3,186.5 | $ | 3,182.7 |

[a] Does not equal financial statement revenue due to revenue recognition adjustments between accounting periods.
[b] Percent change based on unrounded figures and not rounded figures presented.

Operating loss for YRC Freight was $37.3 million in 2012 compared to $88.5 million in 2011. The $3.9 million increase in revenue along with a $47.3 million decrease in cost drove the operating loss improvement. The cost decreases were driven by lower purchased transportation costs of $38.8 million or 8.6%, lower salaries, wages and employees' benefits of $35.6 million or 1.9% and a $10.3 million or 6.0% decrease in other operating expenses. These decreases were partially offset by higher operating expenses and supplies of $35.8 million or 5.0%.

- The $38.8 million decrease in purchased transportation was primarily a result of lower volumes moved through purchased transportation lines. Our aggregate purchased rail transportation costs decreased 7.2% while all other purchased transportation costs decreased 10.3%.

- The decrease in salaries, wages and employees' benefits of $35.6 million during 2012 was driven by a $31.5 million decrease in workers' compensation expense primarily driven by our employee safety initiatives and $11.7 million in lower wages due to more efficient workforce deployment. These decreases were partially offset by a $24.5 million increase in benefits resulting from a full year of multi-employer pension contribution expense, as we resumed contributions in June 2011.

- The reduction of $10.3 million in other operating expense was driven by a decrease in our bodily injury and property damage expense due to our employee safety initiatives and a decrease in cargo claims compared to 2011.

Table of Contents

- The $35.8 million increase in Operating expenses and supplies was due mostly to increases in equipment maintenance driven by our aging fleet, fuel costs as a result of increased diesel prices and professional services compared to 2011.

Gains on disposals of property were $10.0 million in 2012 compared to $10.5 million in 2011.

### Regional Transportation Results

Regional Transportation represented 36%, 34% and 32% of consolidated revenue in 2013, 2012 and 2011, respectively. The table below provides summary financial information for Regional Transportation for the years ended December 31:

| (in millions) | 2013 | 2012 | 2011 | Percent Change 2013 vs. 2012 | Percent Change 2012 vs. 2011 |
|---|---|---|---|---|---|
| Operating revenue | $ 1,728.6 | $ 1,640.6 | $ 1,554.3 | 5.4% | 5.6% |
| Operating income | 79.9 | 70.0 | 32.9 | 14.1% | 112.8% |
| Operating ratio(a) | 95.4% | 95.7% | 97.9% | 0.3pp | 2.2pp |

(a) pp represents the change in percentage points

*2013 Compared to 2012*

Regional Transportation reported operating revenue of $1,728.6 million for 2013, representing an increase of $88.0 million, or 5.4%, from the same period in 2012. The table below summarizes the key revenue metrics for the Regional Transportation reporting segment for the years ended December 31:

| | 2013 | 2012 | Percent Change(b) |
|---|---|---|---|
| Workdays | 251.5 | 252.0 | |
| Total picked up revenue (in millions)(a) | $ 1,729.6 | $ 1,641.1 | 5.4 % |
| Total tonnage (in thousands) | 7,628 | 7,321 | 4.2 % |
| Total tonnage per workday (in thousands) | 30.33 | 29.05 | 4.4 % |
| Total shipments (in thousands) | 10,452 | 10,002 | 4.5 % |
| Total shipments per workday (in thousands) | 41.56 | 39.69 | 4.7 % |
| Total revenue per hundred weight | $ 11.34 | $ 11.21 | 1.2 % |
| Total revenue per shipment | $ 165 | $ 164 | 0.9 % |
| Total weight per shipment (in pounds) | 1,460 | 1,464 | (0.3)% |

| (in millions) | 2013 | 2012 |
|---|---|---|
| (a) Reconciliation of operating revenue to total picked up revenue: | | |
| Operating revenue | $ 1,728.6 | $ 1,640.6 |
| Change in revenue deferral and other | 1.0 | 0.5 |
| Total picked up revenue | $ 1,729.6 | $ 1,641.1 |

(a) Does not equal financial statement revenue due to revenue recognition adjustments between accounting periods.
(b) Percent change based on unrounded figures and not rounded figures presented.

Operating income for Regional Transportation was $79.9 million for 2013, an increase of $9.9 million from the same period in 2012, consisting of a $88.0 million increase in revenue, partially offset by a $78.1 million increase in operating expenses. The increase in revenue was driven by increases in shipping volumes and yield as indicated in the table above. We believe these increases were driven by a moderate improvement in the economic conditions in the areas where our regional carriers operate. The increase in operating expenses was driven by a $47.7 million or 5.1% increase in salaries, wages and benefits and a $18.2 million or 4.4% increase in operating expense and supplies.

- Salaries, wages and employees' benefits expense increased by $47.7 million primarily as a result of an increase in wages and associated benefits compared to the prior year driven by an increase shipping volumes.

Table of Contents

- Operating expenses and supplies increased by $18.2 million due to a $6.7 million increase in vehicle maintenance driven by our aging fleet and a $2.7 million increase in fuel expenses as a result of higher shipping volumes.

Net losses on property disposals were $0.6 million in 2013 compared to $0.7 million in 2011.

*2012 Compared to 2011*

Regional Transportation reported operating revenue of $1,640.6 million for 2012, representing an increase of $86.3 million, or 5.6%, from the same period in 2011. The table below summarizes the key revenue metrics for the Regional Transportation reporting segment for the years ended December 31:

| | 2012 | 2011 | Percent Change[b] |
|---|---|---|---|
| Workdays | 252.0 | 252.0 | |
| | | | |
| Total picked up revenue (in millions)[a] | $ 1,641.1 | $ 1,554.3 | 5.6% |
| Total tonnage (in thousands) | 7,321 | 7,155 | 2.3% |
| Total tonnage per workday (in thousands) | 29.05 | 28.39 | 2.3% |
| Total shipments (in thousands) | 10,002 | 9,870 | 1.3% |
| Total shipments per workday (in thousands) | 39.69 | 39.17 | 1.3% |
| Total revenue per hundred weight | $ 11.21 | $ 10.86 | 3.2% |
| Total revenue per shipment | $ 164 | $ 157 | 4.2% |
| Total weight per shipment (in pounds) | 1,464 | 1,450 | 1.0% |

| (in millions) | 2012 | 2011 |
|---|---|---|
| [a] Reconciliation of operating revenue to total picked up revenue: | | |
| Operating revenue | $ 1,640.6 | $ 1,554.3 |
| Change in revenue deferral and other | 0.5 | — |
| Total picked up revenue | $ 1,641.1 | $ 1,554.3 |

[a] Does not equal financial statement revenue due to revenue recognition adjustments between accounting periods.
[b] Percent change based on unrounded figures and not rounded figures presented.

Operating income for Regional Transportation was $70.0 million for 2012, an increase of $37.1 million from the same period in 2011, consisting of an $86.3 million increase in revenue, partially offset by a $49.2 million increase in operating expenses. The increase in operating expenses was driven by a $36.7 million or 4.1% increase in salaries, wages and benefits and a $10.0 million or 2.5% increase in operating expense and supplies.

- Salaries, wages and employees' benefits expense increased by $36.7 million primarily as a result of an increase in benefits compared to the prior year due to a full year of multi-employer pension contribution expense, as we resumed contributions in June 2011, and higher salary and wages due to increased shipment volumes. These increases were offset by a decline in workers' compensation expenses driven by our employee safety initiatives.

- Operating expenses and supplies increased by $49.2 million due to higher costs related to vehicle maintenance driven by our aging fleet and fuel expenses as a result of higher business volumes.

Net losses on property disposals and impairments were $0.7 million in 2012 compared to a gain on property disposals of $2.7 million in 2011.

## Certain Non-GAAP Financial Measures

As discussed in the "Our Business" section, we use certain non-GAAP financial measures to assess performance. These measures should be considered in addition to the results prepared in accordance with GAAP, but should not be considered a substitute for, or superior to, our GAAP financial measures.

Table of Contents

***Consolidated Adjusted EBITDA***

The reconciliation of operating income (loss) to adjusted EBITDA for the years ended December 31, 2013, 2012 and 2011 is as follows:

| (in millions) | | 2013 | | 2012 | | 2011 |
|---|---|---|---|---|---|---|
| Reconciliation of operating income (loss) to adjusted EBITDA: | | | | | | |
| Operating income (loss) | $ | 28.4 | $ | 24.1 | $ | (138.2) |
| Depreciation and amortization | | 172.3 | | 183.8 | | 195.7 |
| Gains on property disposals, net | | (2.2) | | (9.7) | | (8.2) |
| Letter of credit expense | | 33.9 | | 36.3 | | 35.2 |
| Restructuring professional fees | | 12.0 | | 3.0 | | 44.0 |
| Gain (loss) on permitted dispositions and other | | 1.7 | | (4.0) | | 6.2 |
| Equity based compensation expense | | 5.8 | | 3.8 | | 15.5 |
| Other nonoperating, net | | 5.8 | | 3.9 | | 3.8 |
| Add: Truckload EBITDA loss [a] | | — | | — | | 5.2 |
| Adjusted EBITDA | $ | 257.7 | $ | 241.2 | $ | 159.2 |

(a)   Due to the sale of the Glen Moore assets in December 2011, we modified our 2011 adjusted EBITDA by the amount of the Truckload EBITDA loss to be comparable to our 2012 and 2013 calculations.

***Consolidated Adjusted Free Cash Flow (Deficit)***

The reconciliation of adjusted EBITDA to adjusted free cash flow (deficit) for the years ended December 31, 2013, 2012 and 2011, is as follows:

| (in millions) | | 2013 | | 2012 | | 2011 |
|---|---|---|---|---|---|---|
| Adjusted EBITDA | $ | 257.7 | $ | 241.2 | $ | 159.2 |
| Total restructuring professional fees | | (12.0) | | (3.0) | | (44.0) |
| Cash paid for interest | | (120.5) | | (120.5) | | (67.5) |
| Cash paid for letter of credit fees | | (34.1) | | (38.0) | | (16.7) |
| Working Capital cash flows excluding income tax, net | | (87.8) | | (111.5) | | (50.5) |
| Net cash provided by (used in) operating activities before income taxes | | 3.3 | | (31.8) | | (19.5) |
| Cash received (paid) for income taxes, net | | 8.8 | | 5.9 | | (6.5) |
| Net cash provided by (used in) operating activities | | 12.1 | | (25.9) | | (26.0) |
| Acquisition of property and equipment | | (66.9) | | (66.4) | | (71.6) |
| Total restructuring professional fees | | 12.0 | | 3.0 | | 44.0 |
| Adjusted Free Cash Flow (Deficit) | $ | (42.8) | $ | (89.3) | $ | (53.6) |

***Segment Adjusted EBITDA***

The following represents adjusted EBITDA by segment for the years ended December 31, 2013, 2012 and 2011 is as follows:

| (in millions) | | 2013 | | 2012 | | 2011 |
|---|---|---|---|---|---|---|
| Adjusted EBITDA by segment: | | | | | | |
| YRC Freight | $ | 105.2 | $ | 104.9 | $ | 43.7 |
| Regional Transportation | | 150.5 | | 140.2 | | 103.1 |
| Corporate and other | | 2.0 | | (3.9) | | 12.4 |
| Adjusted EBITDA | $ | 257.7 | $ | 241.2 | $ | 159.2 |

33

Table of Contents

The reconciliation of operating income (loss), by segment, to adjusted EBITDA for the years ended December 31, 2013, 2012 and 2011 is as follows:

| YRC Freight segment (in millions) | | 2013 | | 2012 | | 2011 |
|---|---|---|---|---|---|---|
| Reconciliation of operating loss to adjusted EBITDA: | | | | | | |
| Operating loss | $ | (31.2) | $ | (37.3) | $ | (88.5) |
| Depreciation and amortization | | 109.1 | | 119.8 | | 102.9 |
| Gains on property disposals, net | | (3.0) | | (9.9) | | (10.5) |
| Letter of credit expense | | 25.8 | | 29.6 | | 28.1 |
| Equity based compensation expense | | — | | — | | 10.3 |
| Other nonoperating expenses, net | | 4.5 | | 2.7 | | 1.4 |
| Adjusted EBITDA | $ | 105.2 | $ | 104.9 | $ | 43.7 |

| Regional Transportation segment (in millions) | | 2013 | | 2012 | | 2011 |
|---|---|---|---|---|---|---|
| Reconciliation of operating income to adjusted EBITDA: | | | | | | |
| Operating income | $ | 79.9 | $ | 70.0 | $ | 32.9 |
| Depreciation and amortization | | 63.1 | | 63.3 | | 61.6 |
| (Gains) losses on property disposals, net | | 0.6 | | 0.7 | | (2.7) |
| Letter of credit expense | | 6.8 | | 6.2 | | 6.6 |
| Equity based compensation expense | | — | | — | | 4.6 |
| Other nonoperating expenses, net | | 0.1 | | — | | 0.1 |
| Adjusted EBITDA | $ | 150.5 | $ | 140.2 | $ | 103.1 |

| Corporate and other segment (in millions) | | 2013 | | 2012 | | 2011 |
|---|---|---|---|---|---|---|
| Reconciliation of operating loss to adjusted EBITDA: | | | | | | |
| Operating loss | $ | (20.3) | $ | (8.6) | $ | (63.7) |
| Depreciation and amortization | | 0.1 | | 0.7 | | 23.3 |
| (Gains) losses on property disposals, net | | 0.2 | | (0.5) | | (0.6) |
| Letter of credit expense | | 1.3 | | 0.5 | | 0.2 |
| Restructuring professional fees | | 12.0 | | 3.0 | | 44.0 |
| Gain (loss) on permitted dispositions and other | | 1.7 | | (4.0) | | 6.2 |
| Equity based compensation expense | | 5.8 | | 3.8 | | 0.6 |
| Other nonoperating expenses, net | | 1.2 | | 1.2 | | 2.4 |
| Adjusted EBITDA | $ | 2.0 | $ | (3.9) | $ | 12.4 |

## Financial Condition/Liquidity and Capital Resources

Our principal sources of liquidity are cash and cash equivalents, any prospective cash flow from operations and, as of December 31, 2013, available borrowings under our previous $400 million then-existing ABL facility. As of December 31, 2013, we had cash and cash equivalents and availability under the then-existing ABL facility of $227.8 million and the borrowing base under our then-existing ABL facility was $376.4 million. As part of our 2014 Financing Transactions, we replaced our then-existing ABL facility with a new $450 million ABL facility (the "New ABL Facility") as a source of liquidity. Refer to the "2014 Financing Transactions" footnote included in Item 8 to our consolidated financial statements for more details.

Our principal uses of cash are to fund our operations, including making contributions to our single-employer pension plans and the multi-employer pension funds, and to meet our other cash obligations, including but not limited to paying cash interest and principal on our funded debt, letter of credit fees under our credit facilities and funding capital expenditures and lease payments for operating equipment. For the year ended December 31, 2013, our cash flow from operating activities provided net cash of $12.1 million.

Table of Contents

We have a considerable amount of indebtedness. As of December 31, 2013, we had $1,363.4 million in aggregate principal amount of outstanding indebtedness. Our 2014 Financing Transactions reduced our outstanding indebtedness and extended the maturities for a substantial portion of our debt to 2019. Refer to the "2014 Financing Transactions" footnote to the financial statements for more details. Our Standard & Poor's credit rating as of December 31, 2013 was 'CCC'.

We also have a considerable amount of future funding obligations for our single-employer pension plans and the multi-employer pension funds. We expect our funding obligations for 2014 for our single-employer pension plans and the multi-employer pension funds will be $79.9 million and $88.7 million, respectively. In addition, we also have, and will continue to have, substantial operating lease obligations. As of December 31, 2013, our estimated operating lease payments for 2014 are $56.1 million.

Our capital expenditures for the years ended December 31, 2013 and 2012 were $66.9 million and $66.4 million, respectively. These amounts were principally used to fund replacement engines and trailer refurbishments for our revenue fleet, capitalized costs for our network facilities and technology infrastructure. Additionally, for the year ended December 31, 2013, we entered into new operating lease commitments for revenue equipment totaling $67.1 million, with such payments to be made over the average lease term of 6 years. The capital value of this equipment totals $70.2 million. In light of our operating results over the past few years and our liquidity needs, we have deferred certain capital expenditures and may continue to do so in the future. As a result, the average age of our fleet has increased and we will need to update our fleet periodically.

*Credit Facility Covenants*

On November 12, 2013, we entered into amendments to our amended and restated credit agreement (the "Credit Agreement Amendment") and our then-existing ABL facility (together the "Amendments"), which, among other things, reset future covenants regarding minimum Consolidated EBITDA, maximum Total Leverage Ratio and minimum Interest Coverage Ratio (as defined in Amendments, if applicable) until December 31, 2014 and reset the minimum cash balance requirement. We were in compliance with all of our covenants as of December 31, 2013.

Consolidated Adjusted EBITDA, as defined in our New Term Loan credit agreement, was a measure that reflects our earnings before interest, taxes, depreciation, and amortization expense, and is further adjusted for, among other things, letter of credit fees, equity-based compensation expense, net gains or losses on property disposals and certain other items, including restructuring professional fees, expenses associated with certain lump sum payments to our IBT employees and the results of permitted dispositions and discontinued operations.

On February 13, 2014, we completed the 2014 Financing Transactions and retired the debt associated with our prior credit facilities. We entered into a new term loan ("New Term Loan") credit agreement with new financial covenants that, among other things, restricts certain capital expenditures and requires us to maintain a maximum total leverage ratio (defined as total indebtedness divided by Adjusted EBITDA) for future test periods as follows:

| Four Consecutive Fiscal Quarters Ending | Maximum Total Leverage Ratio | Four Consecutive Fiscal Quarters Ending | Maximum Total Leverage Ratio |
|---|---|---|---|
| June 30, 2014 | 6.00 to 1.00 | June 30, 2016 | 3.50 to 1.00 |
| September 30, 2014 | 5.00 to 1.00 | September 30, 2016 | 3.50 to 1.00 |
| December 31, 2014 | 4.50 to 1.00 | December 31, 2016 | 3.25 to 1.00 |
| March 31, 2015 | 4.00 to 1.00 | March 31, 2017 | 3.25 to 1.00 |
| June 30, 2015 | 3.75 to 1.00 | June 30, 2017 | 3.25 to 1.00 |
| September 30, 2015 | 3.75 to 1.00 | September 30, 2017 | 3.25 to 1.00 |
| December 31, 2015 | 3.75 to 1.00 | December 31, 2017 and thereafter | 3.00 to 1.00 |
| March 31, 2016 | 3.50 to 1.00 | | |

In addition, we entered into the New ABL Facility credit agreement which, among other things, restricts certain capital expenditures and requires that the Company, in effect, maintain availability of at least 10% of the lesser of the aggregate amount of commitments from all lenders or the borrowing base.

We believe that our results of operations will be sufficient to allow us to comply with the covenants in our new credit agreement, fund our operations, increase working capital as necessary to support our planned revenue growth and fund capital expenditures for the foreseeable future, including the next twelve months.

Table of Contents

In the event that we fail to comply with any New Term Loan covenant or any New ABL Facility covenant, we would be considered in default, which would enable applicable lenders to accelerate the repayment of amounts outstanding, require the cash collateralization of letters of credit (in the case of the New ABL Facility) and exercise remedies with respect to collateral and we would need to seek an amendment or waiver from the applicable lender groups. In the event that our lenders under our New Term Loan or New ABL Facility demand payment or cash collateralization (in the case of the New ABL Facility), we will not have sufficient cash to repay such indebtedness. In addition, a default under our New Term Loan or New ABL Facility or the applicable lenders exercising their remedies thereunder would trigger cross-default provisions in our other indebtedness and certain other operating agreements. Our ability to amend our New Term Loan or our New ABL Facility or otherwise obtain waivers from the applicable lenders depends on matters that are outside of our control and there can be no assurance that we will be successful in that regard.

Our ability to satisfy our liquidity needs and maintain compliance of our stepped-up financial covenants beyond 2014 are dependent on a number of factors, some of which are outside of our control. These factors include:

- we must achieve improvements in our operating results, primarily at our YRC Freight operating segment, which rely upon pricing and shipping volumes and network efficiencies;
- we must continue to implement and realize cost saving measures to match our costs with business levels and in a manner that does not harm operations and our productivity and efficiency initiatives must be successful; and
- we must be able to generate operating cash flows that are sufficient to meet the cash requirements for pension contributions to our single and multi-employer pension funds, cash interest and principal payments on our funded debt, payments on our equipment leases, and for capital expenditures or additional lease payments for new revenue equipment

In the event our operating results indicate we will not meet our maximum total leverage ratio, we will take action to improve our maximum total leverage ratio which will include paying down our outstanding indebtedness with either cash on hand or with cash proceeds from equity issuances. The issuance of equity is outside of our control and there can be no assurance that we will be able to issue additional equity at terms that are agreeable to us.

### Cash Flow

#### Operating Cash Flow

Operating cash flow was a source of cash of $12.1 million for the year ended December 31, 2013 compared to a use of cash of $25.9 million during the year ended December 31, 2012. The favorable cash flow impact is largely related to a decrease in our workers' compensation and bodily injury and property damage liabilities.

Operating cash flow was a use of cash of $25.9 million for the year ended December 31, 2012 compared to a use of cash of $26.0 million during the year ended December 31, 2011. The favorable cash flow impact related to the change in net loss in 2012 was offset by an unfavorable change in our other operating liabilities primarily due to decreases in our workers' compensation and bodily injury and property damage liabilities driven by our employee safety initiatives and settlement payment activity as well as the resumption of a full year of non-union pension payments. Operating cash flow in 2011 was favorably impacted by the deferral of certain fee and interest payments under out debt and financing obligations totaling $43.6 million.

#### Investing Cash Flow

Investing cash flows used $23.5 million of cash in 2013 compared to providing cash of $19.8 million in 2012. In 2013, we received $31.8 million in restricted escrow refunds, compared to $33.4 million in 2012. Also, proceeds from the disposal of property and equipment declined in 2013 compared to 2012. See a detailed discussion of 2013 and 2012 capital expenditures below in "Capital Expenditures" for further information.

Investing cash flows provided $19.8 million of cash in 2012 compared to a use of cash of $156.6 million in 2011. The $33.4 million receipt from restricted escrow in 2012 compared favorably to the $155.9 million escrow deposit largely made to satisfy our ABL escrow requirement. See a detailed discussion of 2012 and 2011 capital expenditures below in "Capital Expenditures".

#### Financing Cash Flow

Net cash used in financing activities for 2013 was $21.0 million. During 2013, we increased our net borrowings under our then-existing ABL facility ("Prior ABL Facility") by $0.3 million, which was offset by the $9.2 million repayment of other long-term

36

Table of Contents

debt from asset sale proceeds and $12.1 million in debt issuance costs related to the November 12, 2013 credit agreement amendments.

Net cash provided by financing activities for 2012 was $14.3 million. During 2012, we increased our net borrowings under our Prior ABL Facility by $45.0 million, which was offset by a $25.6 repayment of other long-term debt from asset sale proceeds and $5.1 million in debt issuance costs.

Net cash provided by financing activities for 2011 was $240.1 million. The 2011 activity is a result of $441.6 million of proceeds from the issuance of long-term debt, offset by $46.7 million in debt repayments and by a $122.8 million pay down on the ABS facility and $30.5 million of debt issuance costs. The $441.6 million of long-term debt issued in 2011 consists of proceeds of $100.0 million from the Series B Notes, $262.3 million from the Prior ABL Facility, $70.3 million from credit agreement borrowings and $9.0 million from additional lease financing obligations.

*Capital Expenditures*

Our capital expenditures focus primarily on the replacement of revenue equipment, land and structures purchases and investments in information technology. Our business is capital intensive with significant investments in service center facilities and a fleet of tractors and trailers. We determine the amount and timing of capital expenditures based on numerous factors, including fleet age, service center condition, viability of IT systems, anticipated liquidity levels, economic conditions, new or expanded services, regulatory actions and availability of financing.

The table below summarizes our actual net capital expenditures (proceeds) by type and investments for the years ended December 31:

| (in millions) | | 2013 | | 2012 | | 2011 |
|---|---|---|---|---|---|---|
| Acquisition of property and equipment | | | | | | |
| Revenue equipment | $ | 48.0 | $ | 48.4 | $ | 55.6 |
| Land and structures | | 5.1 | | 3.9 | | 2.6 |
| Technology | | 10.3 | | 12.2 | | 9.9 |
| Other | | 3.5 | | 1.9 | | 3.5 |
| Total capital expenditures | | 66.9 | | 66.4 | | 71.6 |
| Proceeds from disposal of property and equipment | | | | | | |
| Revenue equipment | | (4.1) | | (2.6) | | (18.1) |
| Land and structures | | (5.7) | | (47.8) | | (49.4) |
| Total proceeds | | (9.8) | | (50.4) | | (67.5) |
| Total net capital expenditures | $ | 57.1 | $ | 16.0 | $ | 4.1 |

Our capital expenditures were primarily for replacement engines and trailer refurbishments for our revenue fleet. We plan to procure substantially all of our new revenue equipment using operating leases in 2014.

Our expectation regarding our ability to fund capital expenditures using operating leases is only our forecast regarding this matter. This forecast may be substantially different from actual results. In addition to the factors previously described in "*Financial Condition/Liquidity and Capital Resources*", the introduction to "Part I" and the risk factors listed in "Item 1A" of this report, the following factors could affect levels of capital expenditures: the accuracy of our estimates regarding our spending requirements; changes in our strategic direction; the need to spend additional capital on cost reduction opportunities; the need to replace any unanticipated losses in capital assets and our ability to dispose of excess real estate at our anticipated sales price. In addition, our credit facilities contain provisions that restrict our level of capital expenditures.

*Contractual Obligations and Other Commercial Commitments*

The following sections provide aggregated information regarding our contractual obligations and commercial commitments as of December 31, 2013.

*Non-Union Pension Obligations*

37

Table of Contents

We provide defined benefit pension plans for certain employees not covered by collective bargaining agreements. The Yellow Transportation and Roadway qualified plans cover approximately 14,000 employees including those currently receiving benefits and those who have left the company with deferred benefits. On January 1, 2004, the existing qualified benefit plans were closed to new participants. On July 1, 2008, the benefit accrual for participants was frozen.

The Moving Ahead for Progress in the 21st Century Act ("MAP-21") was signed into law on July 6, 2012.  In 2012, we adopted the minimum funding provisions of this law which provided for the use of longer-term, stabilized interest rate assumptions for measuring pension obligations.  We will continue to make the minimum plan contributions as required by the MAP-21 regulation.

During 2013, our pension expense was $19.7 million and our cash contributions were $62.9 million. Using our current plan assumptions, which include an assumed 7.00% return on assets and a discount rate of 5.23%, we expect to record expense of $23.4 million for the year ended December 31, 2014. Additionally, we expect our cash contributions for our non-union sponsored pension plans for the next five years to be as follows:

| (in millions) | | Expected Cash Contributions |
|---|---|---|
| 2014 | $ | 79.9 |
| 2015 | | 95.3 |
| 2016 | | 87.2 |
| 2017 | | 81.8 |
| 2018 | | 57.7 |

Our investment strategy for our pension assets and our related pension contribution funding obligation includes an active interest rate hedging program designed to mitigate the impact of changes in interest rates on each plan's funded position. If the pension discount rate falls, our investment strategy is designed to significantly mitigate such interest rate risk to each pension plan's funded status and our contribution funding obligation. Conversely, if the pension discount rate rises, some portion of the beneficial impact of a rising discount rate on the pension liability will be forgone. The investment program is dynamic and the hedging program is designed to adapt to market conditions.

If future actual asset returns fall short of the 7.00% assumption by 1.00% per year, total cash contributions would be $13.2 million higher over the next five years. If future actual asset returns exceed the 7.00% assumption by 1.00% per year, total cash contributions would be $22.3 million lower over the next five years.

If future interest rates decrease 100 basis points from January 1, 2014 levels, total cash contributions would be $42.7 million lower over the next five years. This reflects our liability hedging strategy and the impact of MAP-21 legislation. The liability hedging strategy results in additional asset returns from decreases in interest rates. However, MAP-21 limits the increase in liabilities from lower interest rates such that the net effect is lower contributions. If interest rates increase 100 basis points from January 1, 2014 levels, total cash contributions would be $0.7 million lower over the next five years. In this scenario, the liability hedging strategy minimizes the impact on contributions.

Table of Contents

*Contractual Cash Obligations*

The following table reflects our cash outflows that we are contractually obligated to make as of December 31, 2013 under our then-existing credit facilities:

| (in millions) | Less than 1 year | | 1-3 years | | 3-5 years | | After 5 years | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | **Payments Due by Period** | | | | | | | |
| Balance sheet obligations:[a] | | | | | | | | | | |
| ABL borrowings, including interest [e] | $ | 365.7 | $ | — | $ | — | $ | — | $ | 365.7 | |
| Long-term debt including interest [f] | | 103.6 | | 584.4 | | 0.2 | | — | | 688.2 | |
| Lease financing obligations | | 41.6 | | 84.6 | | 86.7 | | 50.8 | | 263.7 | [b] |
| Pension deferral obligations including interest | | 9.0 | | 126.9 | | — | | — | | 135.9 | |
| Workers' compensation, property damage and liability claims obligations [d] | | 107.5 | | 132.8 | | 63.8 | | 111.7 | | 415.8 | |
| Off balance sheet obligations: | | | | | | | | | | |
| Operating leases | | 56.1 | | 63.8 | | 28.6 | | 18.1 | | 166.6 | |
| Letter of credit fees | | 33.3 | | 8.2 | | — | | — | | 41.5 | [c] |
| Capital expenditures | | 2.3 | | — | | — | | — | | 2.3 | |
| Total contractual obligations | $ | 719.1 | $ | 1,000.7 | $ | 179.3 | $ | 180.6 | $ | 2,079.7 | |

(a)  Total liabilities for unrecognized tax benefits as of December 31, 2013 were $27.6 million and are classified on the Company's consolidated balance sheet within "Claims and Other Liabilities" and are excluded from the table above.

(b)  The lease financing obligation payments represent interest payments of $191.6 million and principal payments of $72.1 million. The remaining principle obligation is offset by the estimated book value of leased property at the expiration date of each lease agreement.

(c)  The letter of credit fees are related to the cash collateral for our outstanding letters of credit on our previous ABS facility, as well as the amended and restated credit agreement outstanding letters of credit.

(d)  The workers' compensation, property damage and liability claims obligations represent our estimate of future payments for these obligations, not all of which are contractually required.

(e)  The ABL borrowings were classified as long-term liabilities on the Consolidated Balance Sheet as they were repaid with long-term financing as part of the 2014 Financing Transactions.

(f)  Our 6% Notes, which are a part of Long-term debt including interest, were classified as long-term liabilities on the Consolidated Balance Sheet as they were repaid with long-term financing as part of the 2014 Financing Transactions.

During 2013, we entered into new operating lease commitments for revenue equipment of $67.1 million, with such lease payments to be made over the average lease term of 6 years. The capital value of this equipment totals $70.2 million.

On February 13, 2014, we completed the 2014 Financing Transactions which will change our estimate of the cash outflows of the interest and principal payments for our outstanding debt instruments shown in the above table. Please refer to the "2014 Financing Transactions" footnote to our consolidated financial statements for more details.

*Other Commercial Commitments*

The following table reflects other commercial commitments or potential cash outflows that may result from a contingent event, such as a need to borrow short-term funds due to insufficient free cash flow.

| (in millions) | Less than 1 year | | 1-3 years | | 3-5 years | | After 5 years | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | **Amount of Commitment Expiration Per Period** | | | | | | | |
| Unused line of credit | | | | | | | | | | |
| ABL Facility | $ | 51.5 | $ | — | $ | — | $ | — | $ | 51.5 | |
| Letters of credit [a] | | — | | 364.6 | | — | | — | | 364.6 | |
| Surety bonds | | 120.5 | | 0.6 | | — | | — | | 121.1 | |
| Total commercial commitments | $ | 172.0 | $ | 365.2 | $ | — | $ | — | $ | 537.2 | |

(a)  At December 31, 2013, we held $90.1 million in restricted escrow, which represents cash collateral for our outstanding letters of credit on our Previous ABL Facility.

Table of Contents

## Critical Accounting Policies

Preparation of our financial statements requires accounting policies that involve significant estimates and judgments regarding the amounts included in the financial statements and disclosed in the accompanying notes to the financial statements. We continually review the appropriateness of our accounting policies and the accuracy of our estimates including discussion with the Audit/Ethics Committee of our Board of Directors who make recommendations to management regarding these policies. Even with a thorough process, estimates must be adjusted based on changing circumstances and new information. Management has identified the policies described below as requiring significant judgment and having a potential material impact to our financial statements.

### *Revenue Reserves*

We consider our policies regarding revenue-related reserves as critical based on their significance in evaluating our financial performance by management and investors. We have an extensive system that allows us to accurately capture, record and control all relevant information necessary to effectively manage our revenue reserves.

In addition, YRC Freight and Regional Transportation recognize revenue on a gross basis because they are the primary obligors even when other transportation service providers are used who act on their behalf. YRC Freight and Regional Transportation remain responsible to their customers for complete and proper shipment, including the risk of physical loss or damage of the goods and cargo claims issues. Management believes these policies most accurately reflect revenue as earned. Our revenue-related reserves involve three primary estimates: shipments in transit, rerate reserves and uncollectible accounts.

#### *Shipments in Transit*

We assign pricing to bills of lading at the time of shipment based primarily on the weight, general classification of the product, the shipping destination and individual customer discounts. This process is referred to as rating. For shipments in transit, YRC Freight and Regional Transportation record revenue based on the percentage of service completed as of the period end and accrue delivery costs as incurred. The percentage of service completed for each shipment is based on how far along in the shipment cycle each shipment is in relation to standard transit days. Standard transit days are defined as our published service days between origin zip code and destination zip code. Based on historical cost and engineering studies, certain percentages of revenue are determined to be earned during each stage of the shipment cycle, such as initial pick up, long distance transportation, intermediate transfer and customer delivery. Using standard transit times, we analyze each shipment in transit at a particular period end to determine what stage the shipment is in. We apply that stage's percentage of revenue earned factor to the rated revenue for that shipment to determine the revenue dollars earned by that shipment in the current period. The total revenue earned is accumulated for all shipments in transit at a particular period end and recorded as operating revenue. Management believes this provides a reasonable estimation of the portion of in transit revenue actually earned. At December 31, 2013 and 2012, our financial statements included deferred revenue as a reduction to "Accounts Receivable" of $26.6 million and $20.0 million, respectively.

#### *Rerate Reserves*

At various points throughout our customer invoicing process, incorrect ratings (*i.e.* prices) could be identified based on many factors, including weight verifications or updated customer discounts. Although the majority of rerating occurs in the same month as the original rating, a portion occurs during the following periods. We accrue a reserve for rerating based on historical trends. At December 31, 2013 and 2012, our financial statements included a rerate reserve as a reduction to "Accounts Receivable" of $9.6 million and $11.9 million, respectively.

#### *Uncollectible Accounts*

We record an allowance for doubtful accounts primarily based on historical uncollectible amounts. We also take into account known factors surrounding specific customers and overall collection trends. Our process involves performing ongoing credit evaluations of customers, including the market in which they operate and the overall economic conditions. We continually review historical trends and make adjustments to the allowance for doubtful accounts as appropriate. Our allowance for doubtful accounts totaled $9.3 million and $9.8 million as of December 31, 2013 and 2012, respectively.

### *Claims and Self-Insurance*

We are self-insured up to certain limits for workers' compensation, cargo loss and damage, property damage and liability claims. We measure the liabilities associated with workers' compensation and property damage and liability claims primarily through actuarial methods performed by an independent third party. Actuarial methods include estimates for the undiscounted liability for

40

Table of Contents

claims reported, for claims incurred but not reported and for certain future administrative costs. These estimates are based on historical loss experience and judgments about the present and expected levels of costs per claim and the time required to settle claims. The effect of future inflation for costs is considered in the actuarial analysis. Actual claims may vary from these estimates due to a number of factors, including but not limited to, accident frequency and severity, claims management, changes in healthcare costs and overall economic conditions. We discount the actuarial calculations of claims liabilities for each calendar year to present value based on the average U.S. Treasury rate, during the calendar year of occurrence, for maturities that match the initial expected payout of the liabilities. As of December 31, 2013 and 2012, we had $400.4 million and $437.3 million accrued for claims and insurance, respectively.

***Pension***

Effective July 1, 2008, we froze our qualified and nonqualified defined benefit pension plans for all participating employees not covered by collective bargaining agreements. Given the frozen status of the plans, the key estimates in determining pension cost are return on plan assets and discount rate, each of which are discussed below.

*Return on Plan Assets*

The assumption for expected return on plan assets represents a long-term assumption of our portfolio performance that can impact our pension expense. With $808.4 million of plan assets for the YRC Worldwide funded pension plans, a 100-basis-point decrease in the assumption for expected rate of return on assets would increase annual pension expense by approximately $7.6 million and would have no effect on the underfunded pension liability reflected on the balance sheet at December 31, 2013.

We believe our 2014 expected rate of return of 7.00% is appropriate based on our investment portfolio as well as a review of other objective indices. Although plan investments are subject to short-term market volatility, we believe they are well diversified and closely managed. Our asset allocation as of December 31, 2013 consisted of 35% equities, 34% in debt securities, and 31% in absolute return investments and as of December 31, 2012 consisted of 27% equities, 50% in debt securities, 23% in absolute return investments. The 2013 allocation is consistent with the current long-term target asset allocation for the plans which is 33% for equities, 35% for debt securities and 32% for absolute return investments. We will continue to review our expected long-term rate of return on an annual basis and revise appropriately.

*Discount Rate*

The discount rate refers to the interest rate used to discount the estimated future benefit payments to their present value, also referred to as the benefit obligation. The discount rate allows us to estimate what it would cost to settle the pension obligations as of the measurement date, December 31, and impacts the following year's pension cost. We determine the discount rate by selecting a portfolio of high quality non-callable bonds with interest payments and maturities generally consistent with our expected benefit payments.

Changes in the discount rate can significantly impact our net pension liability. However, the liability hedging strategy mitigates this impact with additional asset returns. A 100-basis-point decrease in our discount rate would increase our underfunded pension liability by approximately $80.1 million. That same change would decrease our annual pension expense by approximately $6.6 million, driven by the return on assets. The discount rate can fluctuate considerably over periods depending on overall economic conditions that impact long-term corporate bond yields. At December 31, 2013 and 2012, we used a discount rate to determine benefit obligations of 5.23% and 4.28%, respectively.

*Gains and Losses*

Gains and losses occur due to changes in the amount of either the projected benefit obligation or plan assets from experience different than assumed and from changes in assumptions. We recognize an amortization of the net gain or loss as a component of net pension cost for a year if, as of the beginning of the year, that net gain or loss exceeds ten percent of the greater of the benefit obligation or the market-related value of plan assets. If an amortization is required, it equals the amount of net gain or loss that exceeds the ten percent corridor, amortized over the average remaining life expectancy of plan participants.

As of December 31, 2013, the pension plans have net losses of $389.2 million and a projected benefit obligation of $1,188.8 million. The average remaining life expectancy of plan participants is approximately 26 years. For 2014, we expect to amortize approximately $12.6 million of the net loss. The comparable amortization amounts for 2013 and 2012 were $14.8 million and $9.0 million, respectively.

41

Table of Contents

***Multi-Employer Pension Plans***

YRC Freight, New Penn, Holland and Reddaway contribute to 32 separate multi-employer pension plans for employees that our collective bargaining agreements cover (approximately 78% of total YRC Worldwide employees). The pension plans provide defined benefits to retired participants.

We do not directly manage multi-employer plans. Trustees, half of whom the respective union appoints and half of whom various contributing employers appoint, manage the trusts covering these plans.

Our collective bargaining agreements with the unions determine the amount of our contributions to these plans. We recognize as net pension expense the contractually required contribution for the respective period and recognize as a liability any contributions due and unpaid.

During the first quarter of 2009 through the third quarter of 2009, we deferred payment of certain of our contributions to multi-employer pension funds. These deferred payments have been expensed and the liability recorded as deferred contribution obligations. From the third quarter of 2009 through May 2011, our obligations to make certain multi-employer pension contributions under certain of our collective bargaining agreements were temporarily ceased, so no expense was required to be recognized for this period. Effective June 2011, our contribution obligations to the plans resumed at 25% of the rate in effect in July 2009.

In 2006, the Pension Protection Act became law and modified both the Internal Revenue Code (as amended, the "Code") as it applies to multi-employer pension plans and the Employment Retirement Income Security Act of 1974 (as amended, "ERISA"). The Code and ERISA (in each case, as so modified) and related regulations establish minimum funding requirements for multi-employer pension plans. The funding status of these plans is determined by many factors, including the following factors:

- the number of participating active and retired employees
- the number of contributing employers
- the amount of each employer's contractual contribution requirements
- the investment returns of the plans
- plan administrative costs
- the number of employees and retirees participating in the plan who no longer have a contributing employer
- the discount rate used to determine the funding status
- the actuarial attributes of plan participants (such as age, estimated life and number of years until retirement)
- the benefits defined by the plan

If any of our multi-employer pension plans fail to:

- meet minimum funding requirements
- meet a required funding improvement or rehabilitation plan that the Pension Protection Act may require for certain of our underfunded plans
- obtain from the IRS certain changes to or a waiver of the requirements in how the applicable plan calculates its funding levels or
- reduce pension benefits to a level where the requirements are met,

we could be required to make additional contributions to our multi-employer pension plans.

If any of our multi-employer pension plans enters critical status and our contributions are not sufficient to satisfy any rehabilitation plan schedule, the Pension Protection Act could require us to make additional contributions to the multi-employer pension plan from five to ten percent of the contributions that our collective bargaining agreements requires until the agreement expires.

If we fail to make our required contributions to a multi-employer plan under a funding improvement or rehabilitation plan or if the benchmarks that an applicable funding improvement plan provides are not met by the end of a prescribed period, the IRS could impose an excise tax on us with respect to the plan. Such an excise tax would then be assessed to the plan's contributing employers, including the Company. These excise taxes are not contributed to the deficient funds, but rather are deposited in the United States general treasury funds. The Company does not believe that the temporary cessation of certain of its contributions to applicable multi-employer pension funds from the third quarter of 2009 through May 2011 will give rise to these excise taxes as we believe these contributions were not required for that period.

Depending on the amount involved, a requirement to increase contributions beyond our contractually agreed rate or the imposition of an excise tax on us could have a material adverse impact on our business, financial condition, liquidity, and results of operations.

Table of Contents

*Funded Status of the Multi-Employer Pension Plans and Contingent Withdrawal Liabilities*

The plan administrators and trustees of multi-employer pension plans do not routinely provide us with current information regarding the funded status of the plans. Much of our information regarding the funded status has been (i) obtained from public filings using publicly available plan asset values, which are often dated, and (ii) based on the limited information available from plan administrators or trustees, which has not been independently validated.

The Pension Protection Act provides that certain plans with a funded percentage of less than 65%, or that fail other tests, will be deemed to be in critical status. Plans in critical status must create a rehabilitation plan to exit critical status within periods that the Pension Protection Act prescribes. We believe that based on information obtained from public filings and from plan administrators and trustees, many of the multi-employer pension plans in which we participate, including The Central States Southeast and Southwest Areas Pension Plan, Road Carriers Local 707 Pension Fund and Teamsters Local 641 Pension Fund, are in critical status.  If the funding of the multi-employer pension plans does not reach certain goals (including those required not to enter endangered or critical status or those required by a plan's funding improvement or rehabilitation plan), our pension expenses could further increase.

We believe that based on information obtained from public filings and from plan administrators and trustees, our portion of the contingent liability in the case of a full withdrawal or termination from all of the multi-employer pension plans would be an estimated $10 billion on a pre-tax basis. Our applicable subsidiaries have no current intention of taking any action that would subject us to payment of material withdrawal obligations.

**Property and Equipment and Definite Life Intangibles**

*Impairment Testing*

We review property and equipment and definite life intangibles for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. We evaluate recoverability of assets to be held and used by comparing the carrying amount of an asset to future undiscounted net cash flows expected to be generated by the asset. If such assets are considered to be impaired, the impairment to be recognized is measured by the amount by which the carrying amount of the assets exceeds the fair value of the assets. Assets to be disposed of are reported at the lower of the carrying amount or fair value less costs to sell.

We believe that the accounting estimate related to asset impairment is a critical accounting estimate because: (1) it requires management to make assumptions about future revenues and expenses over the life of the asset, and (2) the impact that recognizing an impairment would have on our financial position, as well as our results of operations, could be material. Management's assumptions about future revenues and expenses require significant judgment because actual revenues and expenses have fluctuated in the past and may continue to do so. In estimating future revenues and expenses, we use our internal business forecasts. We develop our forecasts based on recent revenue and expense data for existing services and other industry and economic factors. To the extent that the Company is unable to achieve its forecast, it may incur significant impairment losses on property and equipment or intangible assets.

*Depreciable Lives of Assets*

We review the appropriateness of depreciable lives for each category of property and equipment. These studies utilize models, which take into account actual usage, physical wear and tear, and replacement history to calculate remaining life of our asset base. For revenue equipment, we consider the optimal life cycle usage of each type of equipment, including the ability to utilize the equipment in different parts of the fleet or at different operating units in the organization. Capital, engine replacement, refurbishment and maintenance costs are considered in determining total cost of ownership and related useful lives for purposes of depreciation recognition. We also make assumptions regarding future conditions in determining potential salvage values. These assumptions impact the amount of depreciation expense recognized in the period and any gain or loss once the asset is disposed.

*Tires*

The cost of replacement tires are expensed at the time those tires are placed into service, as is the case with other repairs and maintenance costs. The cost of tires on newly-acquired revenue equipment is capitalized and depreciated over the estimated useful life of the related equipment.

43

Table of Contents

*Indefinite Life Intangibles*

Intangible assets with indefinite lives, which consist of our tradenames, are not subject to amortization, but are subjected to an impairment test at least annually and as triggering events may occur. The impairment test for tradenames consists of a comparison of the fair value of the tradename with its carrying amount. An impairment loss is recognized for the amount by which the carrying amount exceeds the fair value of the asset. In making this assessment, we utilized the relief from royalty method, an income approach (a level 3 fair value measurement), which includes assumptions as to future revenue, applicable royalty rate and cost of capital, among others.

We believe that the accounting estimate related to indefinite life intangibles is a critical accounting estimate because (1) it requires our management to make assumptions about fair values, and (2) the impact of recognizing an impairment could be material to our financial position, as well as our results of operations. Management's assumptions about fair values require considerable judgment because changes in broad economic factors and industry factors can result in variable and volatile fair values. Assumptions with respect to rates used to discount cash flows, a key input, are dependent upon interest rates and the cost of capital at a point in time.

*Accounting for Income Taxes*

We use the asset and liability method to reflect income taxes on our financial statements. We recognize deferred tax assets and liabilities by applying enacted tax rates to the differences between the carrying value of existing assets and liabilities and their respective tax basis and to loss carryforwards. Tax credit carryforwards are recorded as deferred tax assets. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in income in the period that the change occurs. We assess the validity of deferred tax assets and loss and tax credit carryforwards and provide valuation allowances when we determine, based on the weight of evidence, it is more likely than not that such assets, losses, or credits will not be realized. Changes in valuation allowances are included in our tax provision or in equity if directly related to other comprehensive income (loss), unless affected by a specific intra-period allocation as happened in 2013 and explained in the "Income Taxes" footnote to our consolidated financial statements, in the period of change. In determining whether a valuation allowance is warranted, we evaluate factors such as prior years' earnings, loss carry-back and carry-forward periods, reversals of existing deferred tax liabilities and tax planning strategies that potentially enhance the likelihood of the realization of a deferred tax asset. We have not recognized deferred taxes relative to foreign subsidiaries' earnings that are deemed to be permanently reinvested. Any related taxes associated with such earnings are not material.

Table of Contents

Item 7A. Quantitative and Qualitative Disclosures About Market Risk

We have exposure to a variety of market risks, including the effects of interest rates, foreign exchange rates and fuel prices.

## Interest Rates

To provide adequate funding through seasonal business cycles and minimize overall borrowing costs, we utilize both fixed rate and variable rate financial instruments with varying maturities. At December 31, 2013, we had approximately 32% of our outstanding debt at fixed rates. If interest rates for our variable rate long-term debt had averaged 10% more during the year, our interest expense would have increased, and income before taxes would have decreased by $1.5 million and $1.5 million for the years ended December 31, 2013 and 2012, respectively.

The table below provides information regarding the interest rates on our then-existing fixed-rate debt as of December 31, 2013.

| (in millions) | 2014 | 2015 | 2016 | 2017 | 2018 | Thereafter | Total |
|---|---|---|---|---|---|---|---|
| Fixed-rate debt | $ 69.6 | $ 365.2 | $ — | $ — | $ — | $ — | $ 434.8 |
| Interest rate | 5.0-6.0% | 3.0-18.0% | | | | | |

On February 13, 2014, we completed the 2014 Financing Transactions which will change the interest rate assumptions for our new outstanding debt instruments. Please refer to the "2014 Financing Transactions" footnote included to our consolidated financial statements for more details.

## Foreign Exchange Rates

Revenue, operating expenses, assets and liabilities of our Canadian and Mexican subsidiaries and our Chinese joint venture are denominated in local currencies, thereby creating exposure to fluctuations in exchange rates. The risks related to foreign currency exchange rates are not significant to our consolidated financial position or results of operations.

## Fuel Prices

YRC Freight and Regional Transportation currently have effective fuel surcharge programs in place. These programs are well established within the industry and customer acceptance of fuel surcharges remains high. Since the amount of fuel surcharge is based on average, national diesel fuel prices and is reset weekly, our exposure to fuel price volatility is significantly reduced. In general, under our present fuel surcharge program, we believe rising fuel prices are beneficial to us, and falling fuel prices are detrimental to us, in the short term.

Table of Contents

Item 8. Financial Statements and Supplementary Data

CONSOLIDATED BALANCE SHEETS
YRC Worldwide Inc. and Subsidiaries

| (Dollars in millions except share and per share data) | | December 31, 2013 | | December 31, 2012 |
|---|---|---|---|---|
| **Assets** | | | | |
| Current Assets: | | | | |
| Cash and cash equivalents | $ | 176.3 | $ | 208.7 |
| Restricted amounts held in escrow | | 90.1 | | 20.0 |
| Accounts receivable, less allowances of $9.3 and $9.8 | | 460.9 | | 460.1 |
| Fuel and operating supplies | | 17.0 | | 27.4 |
| Prepaid expenses and other | | 53.6 | | 57.9 |
| Total current assets | | 797.9 | | 774.1 |
| Property and Equipment: | | | | |
| Cost | | 2,844.2 | | 2,869.0 |
| Less – accumulated depreciation | | (1,754.4) | | (1,677.6) |
| Net property and equipment | | 1,089.8 | | 1,191.4 |
| Intangibles, net | | 79.8 | | 99.2 |
| Restricted amounts held in escrow | | 0.6 | | 102.5 |
| Deferred income taxes, net | | 18.3 | | — |
| Other assets | | 78.5 | | 58.3 |
| **Total Assets** | $ | 2,064.9 | $ | 2,225.5 |
| **Liabilities and Shareholders' Deficit** | | | | |
| Current Liabilities: | | | | |
| Accounts payable | $ | 176.7 | $ | 162.0 |
| Wages, vacations and employees' benefits | | 191.2 | | 190.9 |
| Deferred income taxes, net | | 18.6 | | 2.4 |
| Claims and insurance accruals | | 121.0 | | 156.2 |
| Other current and accrued liabilities | | 68.5 | | 74.6 |
| Current maturities of long-term debt | | 8.6 | | 9.1 |
| Total current liabilities | | 584.6 | | 595.2 |
| Other Liabilities: | | | | |
| Long-term debt, less current portion | | 1,354.8 | | 1,366.3 |
| Deferred income taxes, net | | 1.8 | | — |
| Pension and postretirement | | 384.8 | | 548.8 |
| Claims and other liabilities | | 336.3 | | 344.3 |
| Shareholders' Deficit: | | | | |
| Cumulative preferred stock, $1 par value per share - authorized 5,000,000 shares: | | | | |
| Series A Preferred stock, shares issued 1, liquidation preference $1 | | — | | — |
| Common stock, $0.01 par value per share - authorized 33,333,333 shares, issued 10,173,000 and 7,976,000 shares | | 0.1 | | 0.1 |
| Capital surplus | | 1,964.4 | | 1,926.5 |
| Accumulated deficit | | (2,154.2) | | (2,070.6) |
| Accumulated other comprehensive loss | | (315.0) | | (392.4) |
| Treasury stock, at cost (410 shares) | | (92.7) | | (92.7) |
| Total shareholders' deficit | | (597.4) | | (629.1) |
| **Total Liabilities and Shareholders' Deficit** | $ | 2,064.9 | $ | 2,225.5 |

The accompanying notes are an integral part of these statements.

Table of Contents

STATEMENTS OF CONSOLIDATED OPERATIONS
YRC Worldwide Inc. and Subsidiaries
For the Years Ended December 31

| (Dollars in millions except per share data, shares in thousands) | | 2013 | | 2012 | | 2011 |
|---|---|---|---|---|---|---|
| **Operating Revenue** | $ | 4,865.4 | $ | 4,850.5 | $ | 4,868.8 |
| **Operating Expenses:** | | | | | | |
| Salaries, wages and employees' benefits | | 2,797.3 | | 2,782.7 | | 2,798.2 |
| Equity based compensation expense | | 5.8 | | 3.8 | | 15.5 |
| Operating expenses and supplies | | 1,116.9 | | 1,128.9 | | 1,194.5 |
| Purchased transportation | | 512.5 | | 488.8 | | 535.4 |
| Depreciation and amortization | | 172.3 | | 183.8 | | 195.7 |
| Other operating expenses | | 234.4 | | 248.1 | | 275.9 |
| Gains on property disposals, net | | (2.2) | | (9.7) | | (8.2) |
| Total operating expenses | | 4,837.0 | | 4,826.4 | | 5,007.0 |
| **Operating Income (Loss)** | | 28.4 | | 24.1 | | (138.2) |
| **Nonoperating Expenses:** | | | | | | |
| Interest expense | | 163.9 | | 150.8 | | 156.2 |
| Equity investment impairment | | — | | 30.8 | | — |
| Fair value adjustment of derivative liabilities | | — | | — | | 79.2 |
| Gain on extinguishment of debt | | — | | — | | (25.8) |
| Interest income | | — | | (0.7) | | (0.4) |
| Restructuring transaction costs | | — | | — | | 17.8 |
| Other, net | | (6.0) | | (5.3) | | (3.3) |
| Nonoperating expenses, net | | 157.9 | | 175.6 | | 223.7 |
| **Net Loss Before Income Taxes** | | (129.5) | | (151.5) | | (361.9) |
| Income tax benefit | | (45.9) | | (15.0) | | (7.5) |
| **Net Loss** | | (83.6) | | (136.5) | | (354.4) |
| Less: Net Income (Loss) Attributable to Noncontrolling Interest | | — | | 3.9 | | (3.1) |
| **Net Loss Attributable to YRC Worldwide Inc.** | | (83.6) | | (140.4) | | (351.3) |
| Amortization of beneficial conversion feature on preferred stock | | — | | — | | (58.0) |
| **Net Loss Attributable to Common Shareholders** | $ | (83.6) | $ | (140.4) | $ | (409.3) |
| | | | | | | |
| **Average Common Shares Outstanding – Basic and Diluted** | | 9,332 | | 7,311 | | 2,087 |
| | | | | | | |
| **Basic and Diluted Loss Per Share:** | $ | (8.96) | $ | (19.20) | $ | (196.12) |

The accompanying notes are an integral part of these statements.

47

Table of Contents

STATEMENTS OF CONSOLIDATED COMPREHENSIVE LOSS
YRC Worldwide Inc. and Subsidiaries
For the Years Ended December 31

| (in millions) | | 2013 | | 2012 | | 2011 |
|---|---|---|---|---|---|---|
| Net loss | $ | (83.6) | $ | (136.5) | $ | (354.4) |
| Other comprehensive income (loss), net of tax: | | | | | | |
| Pension: | | | | | | |
| Net actuarial gains (losses) and other adjustments | | 70.2 | | (169.1) | | (3.6) |
| Less amortization of prior losses | | 9.6 | | 9.0 | | 9.6 |
| Changes in foreign currency translation adjustments | | (2.4) | | 1.8 | | (0.5) |
| **Other comprehensive income (loss)** | | 77.4 | | (158.3) | | 5.5 |
| Less comprehensive income (loss) attributable to non-controlling interest | | — | | 3.9 | | (3.1) |
| **Comprehensive loss attributable to YRC Worldwide Inc.** | $ | (6.2) | $ | (298.7) | $ | (345.8) |

The accompanying notes are an integral part of these statements.

48

Table of Contents

STATEMENTS OF CONSOLIDATED CASH FLOWS
YRC Worldwide Inc. and Subsidiaries
For the Year Ended December 31

| (in millions) | | 2013 | | 2012 | | 2011 |
|---|---|---|---|---|---|---|
| **Operating Activities:** | | | | | | |
| Net loss | $ | (83.6) | $ | (136.5) | $ | (354.4) |
| Noncash items included in net loss: | | | | | | |
| Depreciation and amortization | | 172.3 | | 183.8 | | 195.7 |
| Paid-in-kind interest on Series A Notes and Series B Notes | | 29.9 | | 29.2 | | 13.1 |
| Amortization of deferred debt costs | | 7.9 | | 5.6 | | 23.7 |
| Equity based compensation expense | | 5.8 | | 3.8 | | 15.5 |
| Deferred income tax expense (benefit) | | (42.4) | | 3.8 | | (0.2) |
| Equity investment impairment | | — | | 30.8 | | — |
| Gains on property disposals, net | | (2.2) | | (9.7) | | (8.2) |
| Fair value adjustment of derivative liabilities | | — | | — | | 79.2 |
| Gain on extinguishment of debt | | — | | — | | (25.8) |
| Restructuring transaction costs | | — | | — | | 17.8 |
| Other noncash items | | 4.1 | | (3.3) | | (3.7) |
| Changes in assets and liabilities, net: | | | | | | |
| Accounts receivable | | (4.6) | | 13.5 | | (36.3) |
| Accounts payable | | 13.3 | | 13.5 | | 5.0 |
| Other operating assets | | 3.9 | | 3.6 | | (5.2) |
| Other operating liabilities | | (92.3) | | (164.0) | | 57.8 |
| **Net cash provided by (used in) operating activities** | | 12.1 | | (25.9) | | (26.0) |
| **Investing Activities:** | | | | | | |
| Acquisition of property and equipment | | (66.9) | | (66.4) | | (71.6) |
| Proceeds from disposal of property and equipment | | 9.8 | | 50.4 | | 67.5 |
| Restricted escrow receipts (deposits), net | | 31.8 | | 33.4 | | (155.9) |
| Other, net | | 1.8 | | 2.4 | | 3.4 |
| **Net cash provided by (used in) investing activities** | | (23.5) | | 19.8 | | (156.6) |
| **Financing Activities:** | | | | | | |
| Asset backed securitization payments, net | | — | | — | | (122.8) |
| Issuance of long-term debt | | 0.3 | | 45.0 | | 441.6 |
| Repayment of long-term debt | | (9.2) | | (25.6) | | (46.7) |
| Debt issuance costs | | (12.1) | | (5.1) | | (30.5) |
| Equity issuance costs | | — | | — | | (1.5) |
| **Net cash provided by (used in) financing activities** | | (21.0) | | 14.3 | | 240.1 |
| **Net (Decrease) Increase In Cash and Cash Equivalents** | | (32.4) | | 8.2 | | 57.5 |
| **Cash and Cash Equivalents, Beginning of Year** | | 208.7 | | 200.5 | | 143.0 |
| **Cash and Cash Equivalents, End of Year** | $ | 176.3 | $ | 208.7 | $ | 200.5 |

The accompanying notes are an integral part of these statements.

49

Table of Contents

STATEMENTS OF CONSOLIDATED CASH FLOWS (CONTINUED)
YRC Worldwide Inc. and Subsidiaries
For the Year Ended December 31

| (in millions) | | 2013 | | 2012 | | 2011 |
|---|---|---|---|---|---|---|
| **Supplemental Cash Flow Information**: | | | | | | |
| Interest paid | $ | (120.5) | $ | (120.5) | $ | (67.5) |
| Letter of credit fees paid | | (34.1) | | (38.0) | | (16.7) |
| Interest deferred | | — | | — | | 43.6 |
| Income tax (payment) refund, net | | 8.8 | | 5.9 | | (6.5) |
| Lease financing transactions | | — | | — | | 9.0 |
| Debt redeemed for equity consideration | | 35.3 | | 20.3 | | 8.7 |
| Interest paid in stock for the 6% notes | | — | | — | | 2.1 |
| Deferred interest and fees converted to equity | | — | | — | | 43.2 |

The accompanying notes are an integral part of these statements.

50

Table of Contents

STATEMENTS OF CONSOLIDATED SHAREHOLDERS' DEFICIT
YRC Worldwide Inc. and Subsidiaries
For the Years Ended December 31

| (in millions) | 2013 | 2012 | 2011 |
|---|---|---|---|
| **Preferred Stock:** | | | |
| Beginning balance | $ — | $ — | $ — |
| Issuance of equity in exchange for debt | — | — | 5.0 |
| Conversion of preferred shares to common shares | — | — | (5.0) |
| Ending balance | $ — | $ — | $ — |
| **Common Stock:** | | | |
| Beginning and ending balance | $ 0.1 | $ 0.1 | $ 0.1 |
| **Capital Surplus:** | | | |
| Beginning balance | $ 1,926.5 | $ 1,903.0 | $ 1,643.7 |
| Conversion of preferred shares to common shares | — | — | 58.1 |
| Conversion feature embedded in the Series A Notes | — | — | 26.5 |
| Conversion feature embedded in the Series B Notes | — | — | 106.8 |
| Issuance of equity upon conversion of Series B Notes | 35.3 | 20.3 | 8.7 |
| Beneficial conversion feature on preferred stock | — | — | 58.0 |
| Interest paid in stock for the 6% Notes | — | — | 2.1 |
| Equity issuance costs | — | — | (1.5) |
| Share-based compensation | 2.6 | 3.2 | 0.6 |
| Ending balance | $ 1,964.4 | $ 1,926.5 | $ 1,903.0 |
| **Accumulated Deficit:** | | | |
| Beginning balance | $ (2,070.6) | $ (1,930.2) | $ (1,520.9) |
| Amortization of conversion feature on preferred stock | — | — | (58.0) |
| Net loss attributable to YRC Worldwide Inc. | (83.6) | (140.4) | (351.3) |
| Ending balance | $ (2,154.2) | $ (2,070.6) | $ (1,930.2) |
| **Accumulated Other Comprehensive Loss:** | | | |
| Beginning balance | $ (392.4) | $ (234.1) | $ (239.6) |
| Pension, net of tax: | | | |
| Net actuarial gains (losses) and other adjustments | 70.2 | (169.1) | (3.6) |
| Amortization of prior net losses | 9.6 | 9.0 | 9.6 |
| Foreign currency translation adjustments | (2.4) | 1.8 | (0.5) |
| Ending balance | $ (315.0) | $ (392.4) | $ (234.1) |

The accompanying notes are an integral part of these statements.

51

Table of Contents

STATEMENT OF CONSOLIDATED SHAREHOLDERS' DEFICIT (CONTINUED)
YRC Worldwide Inc. and Subsidiaries
For the Years Ended December 31
(Amounts in millions)

| (in millions) | 2013 | 2012 | 2011 |
|---|---|---|---|
| **Treasury Stock, At Cost:** | | | |
| Beginning and ending balance | $ (92.7) | $ (92.7) | $ (92.7) |
| **Noncontrolling Interest:** | | | |
| Beginning balance | $ — | $ (4.6) | $ (1.9) |
| Net income (loss) attributable to the noncontrolling interest | — | 3.9 | (3.1) |
| Other | — | 0.7 | 0.4 |
| Ending Balance | $ — | $ — | $ (4.6) |
| **Total Shareholders' Deficit** | $ (597.4) | $ (629.1) | $ (358.5) |

The accompanying notes are an integral part of these statements.

52

Table of Contents

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
YRC Worldwide Inc. and Subsidiaries

## 1. Description of Business

YRC Worldwide Inc. (also referred to as "YRC Worldwide," the "Company," "we," "us" or "our"), one of the largest transportation service providers in the world, is a holding company that through wholly owned operating subsidiaries and its interest in a Chinese joint venture offers its customers a wide range of transportation services. YRC Worldwide has one of the largest, most comprehensive less-than-truckload ("LTL") networks in North America with local, regional, national and international capabilities. Through its team of experienced service professionals, YRC Worldwide offers industry-leading expertise in heavyweight shipments and flexible supply chain solutions, ensuring customers can ship industrial, commercial and retail goods with confidence. Our reporting segments include the following:

- YRC Freight is the reporting segment for our transportation service providers focused on business opportunities in national, regional and international markets. YRC Freight provides for the movement of industrial, commercial and retail goods, primarily through centralized management and customer facing organizations. This unit includes our LTL subsidiary YRC Inc. ("YRC Freight") and Reimer Express ("YRC Reimer"), a subsidiary located in Canada that specializes in shipments into, across and out of Canada. In addition to the United States and Canada, YRC Freight also serves parts of Mexico, Puerto Rico and Guam.

- Regional Transportation is the reporting segment for our transportation service providers focused on business opportunities in the regional and next-day delivery markets. Regional Transportation is comprised of USF Holland Inc. ("Holland"), New Penn Motor Express ("New Penn") and USF Reddaway Inc. ("Reddaway"). These companies each provide regional, next-day ground services in their respective regions through a network of facilities located across the United States, Canada, Mexico and Puerto Rico.

In 2011 we reported a Truckload reporting segment, which consisted of USF Glen Moore, Inc. ("Glen Moore"), a former domestic truckload carrier. On December 15, 2011, we sold the majority of Glen Moore's assets to a third party and concluded its operations.

## 2. Principles of Consolidation

The accompanying consolidated financial statements include the accounts of YRC Worldwide and its majority owned subsidiaries. All significant intercompany accounts and transactions have been eliminated in consolidation. We report on a calendar year basis. The quarters of the Regional Transportation companies (with the exception of New Penn) consist of thirteen weeks that end on a Saturday either before or after the end of March, June and September, whereas all other operating segment quarters end on the natural calendar quarter end. Our investment in the non-majority owned affiliate in which we do not have control where the entity is either not a variable interest entity or YRC Worldwide is not the primary beneficiary is accounted for on the equity method. Other comprehensive loss attributable to our noncontrolling interest was not significant for any period presented. Management makes estimates and assumptions that affect the amounts reported in the consolidated financial statements and notes. Actual results could differ from those estimates.

Accounting policies refer to specific accounting principles and the methods of applying those principles to fairly present our financial position and results of operations in accordance with generally accepted accounting principles. The policies discussed below include those that management has determined to be the most appropriate in preparing our financial statements.

### Cash and Cash Equivalents

Cash and cash equivalents include demand deposits and highly liquid investments purchased with maturities of three months or less. Under the Company's cash management system, checks issued but not presented to banks frequently result in book overdraft balances for accounting purposes which are classified within accounts payable in the accompanying consolidated balance sheets. The change in book overdrafts are reported as a component of operating cash flows for accounts payable as they do not represent bank overdrafts.

53

Table of Contents

*Concentration of Credit Risks and Other*

We sell services and extend credit based on an evaluation of the customer's financial condition, without requiring collateral. Exposure to losses on receivables is principally dependent on each customer's financial condition. We monitor our exposure for credit losses and maintain allowances for anticipated losses.

At December 31, 2013, approximately 78% of our labor force is subject to collective bargaining agreements. As part of the 2014 Financing Transactions (which is described more fully in the "2014 Financing Transaction" footnote to our consolidated financial statements), the primary labor agreement was modified to, among other things, extend the expiration date of our previous agreement from March 31, 2015 to March 31, 2019. This extension also extended the contribution rates under our multi-employer pension plan. The modification provided for lump sum payments in lieu of wage increases in 2014 and 2015, but provided for wage increases in 2016 through 2019. We will amortize these lump sum payments over the period in which the wages will not be increased beginning on April 1, 2014. Finally, the modification provided for certain changes to work rules and our use of purchased transportation in certain situations.

*Revenue Recognition*

For shipments in transit, we record revenue based on the percentage of service completed as of the period end and accrue delivery costs as incurred. The percentage of service completed for each shipment is based on how far along in the shipment cycle each shipment is in relation to standard transit days. Standard transit days are defined as our published service days between origin zip code and destination zip code. Based on historical cost and engineering studies, certain percentages of revenue are determined to be earned during each stage of the shipment cycle, such as initial pick up, long distance transportation, intermediate transfer and customer delivery. Using standard transit times, we analyze each shipment in transit at a particular period end to determine what stage the shipment is in. We apply that stage's percentage of revenue earned factor to the rated revenue for that shipment to determine the revenue dollars earned by that shipment in the current period. The total revenue earned is accumulated for all shipments in transit at a particular period end and recorded as operating revenue.

In addition, we recognize revenue on a gross basis because we are the primary obligors even when we use other transportation service providers who act on our behalf. We remain responsible to our customers for complete and proper shipment, including the risk of physical loss or damage of the goods and cargo claims issues. We assign pricing to bills of lading at the time of shipment based primarily on the weight, general classification of the product, the shipping destination and individual customer discounts. This process is referred to as rating. At various points throughout our process, incorrect ratings could be identified based on many factors, including weight verifications or updated customer discounts. Although the majority of rerating occurs in the same month as the original rating, a portion occurs during the following periods. We accrue a reserve for rerating based on historical trends. At December 31, 2013 and 2012, our financial statements included a rerate reserve as a reduction to "Accounts Receivable" of $9.6 million and $11.9 million, respectively.

*Uncollectible Accounts*

We record an allowance for doubtful accounts primarily based on historical uncollectible amounts. We also take into account known factors surrounding specific customers and overall collection trends. Our process involves performing ongoing credit evaluations of customers, including the market in which they operate and the overall economic conditions. We continually review historical trends and make adjustments to the allowance for doubtful accounts as appropriate. Our allowance for doubtful accounts totaled $9.3 million and $9.8 million as of December 31, 2013 and 2012, respectively.

*Foreign Currency*

Our functional currency is the U.S. dollar, whereas, our foreign operations utilize the local currency as their functional currency. Accordingly, for purposes of translating foreign subsidiary financial statements to the U.S. dollar reporting currency, assets and liabilities of our foreign operations are translated at the fiscal year end exchange rates and income and expenses are translated monthly, at the average exchange rates for each respective month, with changes recognized in other comprehensive loss. Foreign currency gains and losses resulting from foreign currency transactions resulted in a $3.7 million net gain, $2.0 million net gain and a $5.2 million net gain during 2013, 2012 and 2011, respectively, and are included in "Other nonoperating (income) expense" in the accompanying statements of consolidated operations.

Table of Contents

### Claims and Insurance Accruals

Claims and insurance accruals, both current and long-term, reflect the estimated settlement cost of claims for workers' compensation, cargo loss and damage, and property damage and liability that insurance does not cover. We establish and modify reserve estimates for workers' compensation and property damage and liability claims primarily upon actuarial analyses prepared by independent actuaries. These reserves are discounted to present value using a risk-free rate based on the year of occurrence. The risk-free rate is the U.S. Treasury rate for maturities that match the expected payout of such claims and was 0.5%, 0.4% and 0.8% for workers' compensation claims incurred as of December 31, 2013, 2012 and 2011, respectively. The rate was 0.3%, 0.3% and 0.5% for property damage and liability claims incurred as of December 31, 2013, 2012 and 2011, respectively. The process of determining reserve requirements utilizes historical trends and involves an evaluation of accident frequency and severity, claims management, changes in health care costs and certain future administrative costs. The effect of future inflation for costs is considered in the actuarial analysis. Adjustments to previously established reserves are included in operating results in the year of adjustment. As of December 31, 2013 and 2012, we had $400.4 million and $437.3 million, respectively, accrued for claims and insurance.

Expected aggregate undiscounted amounts and material changes to these amounts as of December 31 are presented below:

| (in millions) | Workers' Compensation | | Property Damage and Liability Claims | | Total | |
|---|---|---|---|---|---|---|
| Undiscounted amount at December 31, 2011 | $ | 449.6 | $ | 79.9 | $ | 529.5 |
| Estimated settlement cost for 2012 claims | | 100.4 | | 27.4 | | 127.8 |
| Claim payments, net of recoveries | | (140.9) | | (43.7) | | (184.6) |
| Change in estimated settlement cost for older claim years | | (19.0) | | 1.5 | | (17.5) |
| Undiscounted amount at December 31, 2012 | $ | 390.1 | $ | 65.1 | $ | 455.2 |
| Estimated settlement cost for 2013 claims | | 89.2 | | 36.7 | | 125.9 |
| Claim payments, net of recoveries | | (115.6) | | (24.3) | | (139.9) |
| Change in estimated settlement cost for older claim years | | (16.7) | | (8.7) | | (25.4) |
| Undiscounted settlement cost estimate at December 31, 2013 | $ | 347.0 | $ | 68.8 | $ | 415.8 |
| Discounted settlement cost estimate at December 31, 2013 | $ | 316.6 | $ | 68.2 | $ | 384.8 |

In addition to the amounts above, settlement cost amounts for cargo claims and other insurance related amounts, none of which are discounted, totaled $15.6 million and $21.0 million at December 31, 2013 and 2012, respectively.

Estimated cash payments to settle claims which were incurred on or before December 31, 2013, for the next five years and thereafter are as follows:

| (in millions) | Workers' Compensation | | Property Damage and Liability Claims | | Total | |
|---|---|---|---|---|---|---|
| 2014 | $ | 84.3 | $ | 23.2 | $ | 107.5 |
| 2015 | | 59.0 | | 18.6 | | 77.6 |
| 2016 | | 41.5 | | 13.7 | | 55.2 |
| 2017 | | 30.2 | | 6.9 | | 37.1 |
| 2018 | | 22.8 | | 3.9 | | 26.7 |
| Thereafter | | 109.2 | | 2.5 | | 111.7 |
| Total | $ | 347.0 | $ | 68.8 | $ | 415.8 |

### Stock Compensation Plans

We have various stock-based employee compensation plans, which are described more fully in the "Stock Compensation Plans" footnote to our consolidated financial statements. We recognize compensation costs for non-vested shares and compensation cost for all share-based payments (*i.e.,* options) based on the grant date fair value. Additionally, we recognize compensation cost for all share-based payments granted on a straight-line basis over the requisite service period (generally three to four years) based on the grant-date fair value.

### Property and Equipment

55

Table of Contents

The following is a summary of the components of our property and equipment at cost as of December 31:

| (in millions) | | 2013 | | 2012 |
|---|---|---|---|---|
| Land | $ | 267.8 | $ | 269.6 |
| Structures | | 810.4 | | 825.8 |
| Revenue equipment | | 1,438.3 | | 1,442.8 |
| Technology equipment and software | | 133.9 | | 127.0 |
| Other | | 193.8 | | 203.8 |
| Total cost | $ | 2,844.2 | $ | 2,869.0 |

We carry property and equipment at cost less accumulated depreciation. We compute depreciation using the straight-line method based on the following service lives:

| | Years |
|---|---|
| Structures | 10 - 30 |
| Revenue equipment | 10 - 20 |
| Technology equipment and software | 3 - 7 |
| Other | 3 - 10 |

We charge maintenance and repairs to expense as incurred and betterments are capitalized. Leasehold improvements are capitalized and amortized over the remaining lease term.

Our investment in technology equipment and software consists primarily of customer service and freight management equipment and related software.

For the years ended December 31, 2013, 2012 and 2011, depreciation expense was $153.8 million, $165.2 million, and $173.8 million, respectively.

The cost of replacement tires are expensed at the time those tires are placed into service, as is the case with other repair and maintenance costs. The cost of tires on newly acquired revenue equipment is capitalized and depreciated over the estimated useful life of the related equipment.

### Impairment of Long-Lived Assets

If facts and circumstances indicate that the carrying amount of held-and-used identifiable amortizable intangibles and property, plant and equipment may be impaired, we perform an evaluation of recoverability in accordance with FASB ASC Topic 360. Our evaluation compares the estimated future undiscounted cash flows associated with the asset or asset group to its carrying amount to determine if a reduction to the carrying amount is required. The carrying amount of an impaired asset would be reduced to fair value if the estimated undiscounted cash flows are insufficient to recover the carrying value of the asset group. We performed impairment reviews for held-and-used long-lived assets during the years ended December 31, 2013, 2012 and 2011 in connection with an update of our internal business forecasts that considered current economic conditions and results of operations.

### Impairment of Equity Method Investments

During the year ended December 31, 2012, we determined that the estimated fair value of JHJ International Transportation Company, Ltd ("JHJ"), a 50% owned equity investment, did not exceed its carrying amount and resulted in an impairment charge of $30.8 million. This determination was based upon market information we obtained in the fourth quarter of 2012 (a Level 3 fair value measurement). This impairment charge was recorded in equity investment impairment in the "Corporate and Other" segment in the accompanying statements of consolidated operations.

During the year ended December 31, 2011, we determined the estimated fair value of Jiayu, a 65% owned equity investment at the time, did not exceed its carrying amount and resulted in an impairment charge of $1.3 million on the property, plant and equipment, primarily based on the used revenue equipment market in China (a Level 3 fair value measurement), and $2.7 million

56

Table of Contents

on the intangibles. These impairment charges were recorded in depreciation and amortization in the "Corporate and Other" segment in the accompanying statements of consolidated operations for the year ended December 31, 2011.

### Assets Held for Sale

When we plan to dispose of property or equipment by sale, the asset is carried in the financial statements at the lower of the carrying amount or estimated fair value, less cost to sell, and is reclassified to assets held for sale. Additionally, after such reclassification, there is no further depreciation taken on the asset. For an asset to be classified as held for sale, management must approve and commit to a formal plan, the sale should be anticipated during the ensuing year and the asset must be actively marketed, be available for immediate sale, and meet certain other specified criteria. We use level 3 inputs to determine the fair value of each property that is considered as held for sale.

At December 31, 2013 and December 31, 2012, the net book value of assets held for sale was approximately $17.2 million and $7.3 million, respectively. This amount is included in "Property and Equipment" in the accompanying consolidated balance sheets. We recorded charges of $3.9 million, $13.2 million and $17.9 million for the years ended December 31, 2013, 2012 and 2011, respectively, to reduce properties held for sale to estimated fair value, less cost to sell. These charges are included in "Gains on property disposals, net" in the accompanying statements of consolidated operations.

### Earnings from Equity Method Investments

We account for the ownership of our joint venture under the equity method and accordingly, recognize our share of the respective joint ventures earnings in "Other nonoperating (income) expense" in the accompanying statements of operations.

The following reflects the components of these results for the years ended December 31:

| (in millions) | | 2013 | | 2012 | | 2011 |
|---|---|---|---|---|---|---|
| Our share of joint venture earnings | $ | (2.1) | $ | (1.9) | $ | (2.7) |
| Impairment charge | | — | | 30.8 | | — |
| Net equity method (earnings) losses | $ | (2.1) | $ | 28.9 | $ | (2.7) |

### Fair Value of Financial Instruments

We determined fair value measurements used in our consolidated financial statements based upon the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. The fair value hierarchy distinguishes between (1) market participant assumptions developed based on market data obtained from independent sources (observable inputs) and (2) an entity's own assumptions about market participant assumptions developed based on the best information available in circumstances (unobservable inputs). The fair value hierarchy consists of three broad levels, which gives the highest priority to unadjusted quoted prices in active markets for identical assets or liabilities (Level 1) and the lowest priority to unobservable inputs (Level 3). The three levels of the fair value hierarchy are described below:

- **Level 1:** Valuations based on quoted prices in active markets for identical assets or liabilities that the entity has the ability to access.

- **Level 2:** Valuations based on quoted prices for similar assets or liabilities, quoted prices in markets that are not active, or other inputs that are observable or can be corroborated by observable data for substantially the full term of the assets or liabilities.

- **Level 3:** Valuations based on inputs that are supported by little or no market activity and that are significant to the fair value of the assets or liabilities.

The asset's or liability's fair value measurement level with the fair value hierarchy is based on the lowest level of any input that is significant to the fair value measurement. Valuation techniques used maximize the use of observable inputs and minimize the use of unobservable inputs.

The valuation methodologies described above may produce a fair value calculation that may not be indicative of net realizable value or reflective of future fair values. We believe that our valuation methods are appropriate and consistent with other market participants. The use of different methodologies or assumptions to determine the fair value of certain financial assets could result

Table of Contents

in a different fair value measurement at the reporting date. There have been no changes in the methodologies used at December 31, 2013 and 2012.

The following tables summarize the fair value hierarchy of our financial assets held at fair value on a recurring basis, which consists of our restricted cash held in escrow:

| | | | Fair Value Measurement at December 31, 2013 | | |
| (in millions) | Total Carrying Value | | Quoted prices in active market (Level 1) | Significant other observable inputs (Level 2) | Significant unobservable inputs (Level 3) |
|---|---|---|---|---|---|
| Restricted amounts held in escrow-current | $ | 90.1 | $ 90.1 | $ — | $ — |
| Restricted amounts held in escrow-long term | | 0.6 | 0.6 | — | — |
| Total assets at fair value | $ | 90.7 | $ 90.7 | $ — | $ — |

| | | | Fair Value Measurement at December 31, 2012 | | |
| (in millions) | Total Carrying Value | | Quoted prices in active market (Level 1) | Significant other observable inputs (Level 2) | Significant unobservable inputs (Level 3) |
|---|---|---|---|---|---|
| Restricted amounts held in escrow-current | $ | 20.0 | $ 20.0 | $ — | $ — |
| Restricted amounts held in escrow-long term | | 102.5 | 102.5 | — | — |
| Total assets at fair value | $ | 122.5 | $ 122.5 | $ — | $ — |

Restricted amounts held in escrow are invested in money market accounts and are recorded at fair value on quoted market prices. The carrying value of cash and cash equivalents, accounts receivable and accounts payable approximates their fair value due to the short-term nature of these instruments.

*Reclassifications Out of Accumulated Other Comprehensive Loss*

For the years ended December 31, 2013 and 2012, we reclassified the amortization of our net pension gain (loss) totaling $9.6 million and $9.0 million, respectively, from accumulated other comprehensive loss to net loss. This reclassification is a component of net periodic pension cost and is discussed in the "Employee Benefits" footnote.

## 3. Investment

*Shanghai Jiayu Logistics Co., Ltd.*

On August 19, 2008, we completed the purchase of a 65% equity interest in Shanghai Jiayu Logistics Co., Ltd. ("Jiayu"), a Shanghai, China ground transportation company with a purchase price of $59.4 million. Through March 31, 2010, we accounted for our 65% ownership interest in Jiayu as an equity method investment as the rights of the minority shareholder were considered extensive and allowed for his ability to veto many business decisions. These rights were primarily provided as a part of the General Manager role held by the minority shareholder. Effective April, 1, 2010, the minority shareholder no longer had a role in managing the operations of the business which changed the conclusions from an accounting perspective regarding the relationship of this joint venture and required that we consolidate Jiayu in our financial statements effective April 1, 2010. The results of operations for Jiayu were included in our 'Corporate and other' reporting segment from April 1, 2010 to February 29, 2012. In an effort to focus on our core operations, we entered into an agreement in March 2012 to sell our 65% equity interest in Jiayu to the minority shareholder. The transaction closed during the fourth quarter of 2012. At the time the agreement was entered into, management control was passed to the minority shareholder and, as a result, we deconsolidated our interest in Jiayu during March 2012 and returned to accounting for our ownership interest as an equity method investment. Based on the March 2012 agreement, we recorded our equity method investment at its estimated fair value of $0 and wrote off a $12.0 million note receivable from Jiayu. After consideration of the non-controlling interest and other factors, we recognized a loss of $4.2 million upon the deconsolidation of our investment during 2012. Additionally, the noncontrolling interest was allocated a $4.2 million gain on this transaction.

58

Table of Contents

## 4. Intangibles

### Definite Life Intangibles

The components of amortizable intangible assets are as follows at December 31:

| | | 2013 | | 2012 | |
|---|---|---|---|---|---|
| (in millions) | Weighted Average Life (years) | Gross Carrying Amount | Accumulated Amortization | Gross Carrying Amount | Accumulated Amortization |
| Customer related | 12 | $ 197.9 | $ (147.4) | $ 198.2 | $ (129.1) |
| Marketing related | 0 | 2.4 | (2.4) | 2.4 | (2.4) |
| Technology based | 0 | 24.2 | (24.2) | 24.2 | (24.2) |
| Intangible assets | | $ 224.5 | $ (174.0) | $ 224.8 | $ (155.7) |

Amortization expense for intangible assets recognized on a straight line basis was $18.5 million, $18.6 million and $21.9 million for the years ended December 31, 2013, 2012 and 2011, respectively. Estimated amortization expense for the next five years is as follows:

| (in millions) | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|
| Estimated amortization expense | $ 18.6 | $ 18.3 | $ 13.6 | $ — | $ — |

### Indefinite Life Intangibles

The following table shows the changes in the carrying amount of our indefinite lived tradenames attributable to each applicable segment:

| (in millions) | YRC Freight | Regional Transportation | Total |
|---|---|---|---|
| Balances at December 31, 2010 | $ 11.4 | $ 18.7 | $ 30.1 |
| Change in foreign currency exchange rates | (0.2) | — | (0.2) |
| Balances at December 31, 2011 | 11.2 | 18.7 | 29.9 |
| Change in foreign currency exchange rates | 0.2 | — | 0.2 |
| Balances at December 31, 2012 | 11.4 | 18.7 | 30.1 |
| Change in foreign currency exchange rates | (0.8) | — | (0.8) |
| Balances at December 31, 2013 | $ 10.6 | $ 18.7 | $ 29.3 |

Intangible assets with indefinite lives, which consist of our tradenames, are not subject to amortization, but are subjected to an impairment test at least annually and as triggering events may occur. The impairment test for tradenames consists of a comparison of the fair value of the tradename with its carrying amount. An impairment loss is recognized for the amount by which the carrying amount exceeds the fair value of the asset. In making this assessment, we utilized the relief from royalty method, an income approach (a level 3 fair value measurement), which includes assumptions as to future revenue, applicable royalty rate and cost of capital, among others.

59

Table of Contents

## 5. Network Optimization

In the second quarter of 2013, our YRC Freight reporting segment implemented its plan to optimize its freight network. This optimization reduced the number of handling and relay locations. Costs associated with this plan, which consist of employee separation costs and contract termination, asset impairments and other costs, are recorded at either their contractual amounts or their fair value. During the year ended December 31, 2013, we recorded $7.8 million related to these costs in the YRC Freight reporting segment.

Charges for the network optimization are included in "Salaries, wages and employees' benefits" as it relates to employee separation costs and "Operating expenses and supplies" as is relates to contract termination and other costs in the accompanying statements of consolidated operations. In addition to the charges detailed below, we have recorded impairment charges on facilities that are part of the network optimization totaling $1.5 million during the year ended December 31, 2013. These charges are included in "(Gains) losses on property disposals, net" in the accompanying statements of consolidated operations.

A rollforward of our restructuring accrual (which includes both our 2013 Network Optimization and our 2010 restructuring) is as follows:

| (in millions) | Employee Separation | | Contract Termination and Other Costs | | Total | |
|---|---|---|---|---|---|---|
| Balance at December 31, 2010 | $ | 2.6 | $ | 10.9 | $ | 13.5 |
| Payments | | (2.6) | | (6.5) | | (9.1) |
| Balance at December 31, 2011 | $ | — | $ | 4.4 | $ | 4.4 |
| Payments | | — | | (3.9) | | (3.9) |
| Balance at December 31, 2012 | $ | — | $ | 0.5 | $ | 0.5 |
| Network optimization charges | | 1.3 | | 5.0 | | 6.3 |
| Payments | | (1.1) | | (4.9) | | (6.0) |
| Balance at December 31, 2013 | $ | 0.2 | $ | 0.6 | $ | 0.8 |

## 6. Other Assets

The primary components of other assets at December 31 are as follows:

| (in millions) | | 2013 | | 2012 |
|---|---|---|---|---|
| Equity method investment for JHJ International Transportation Co., Ltd. | $ | 23.4 | $ | 22.3 |
| Deferred debt costs | | 18.5 | | 14.5 |
| Other | | 36.6 | | 21.5 |
| Total | $ | 78.5 | $ | 58.3 |

During the years ended December 31, 2013 and 2012, we received dividends in the amount of $1.8 million and $2.4 million, respectively, from our China joint venture, JHJ International Transportation Co., Ltd. ("JHJ"). As of December 31, 2013 and 2012, the excess of our investment over our interest in JHJ's equity is $4.8 million and $4.6 million, respectively.

## 7. Employee Benefits

### *Qualified and Nonqualified Defined Benefit Pension Plans*

With the exception of Regional Transportation, YRC Reimer and certain of our other foreign subsidiaries, YRC Worldwide and its operating subsidiaries sponsor qualified and nonqualified defined benefit pension plans for certain employees not covered by collective bargaining agreements (approximately 14,000 current, former and retired employees). Qualified and nonqualified pension benefits are based on years of service and the employees' covered earnings. Employees covered by collective bargaining agreements participate in various multi-employer pension plans to which YRC Worldwide contributes, as discussed below. Regional Transportation does not offer a defined benefit pension plan and instead offers retirement benefits through either contributory 401(k) savings plans or profit sharing plans, as discussed below. The existing YRC Worldwide defined benefit pension plans closed to new participants effective January 1, 2004 and the benefit accrual for active employees was frozen effective July 1, 2008. Our actuarial valuation measurement date for our pension plans is December 31.

60

Table of Contents

*Funded Status*

The reconciliation of the beginning and ending balances of the projected benefit obligation and the fair value of plan assets for the years ended December 31, 2013 and 2012, and the funded status at December 31, 2013 and 2012, is as follows:

| (in millions) | | 2013 | | 2012 |
|---|---|---|---|---|
| **Change in benefit obligation:** | | | | |
| Benefit obligation at beginning of year | $ | 1,345.7 | $ | 1,166.2 |
| Service cost | | 4.3 | | 3.9 |
| Interest cost | | 56.2 | | 59.3 |
| Benefits paid | | (76.5) | | (63.1) |
| Actuarial (gain) loss | | (131.6) | | 192.1 |
| Expenses paid from assets | | (9.6) | | (12.7) |
| Other | | 0.3 | | — |
| Benefit obligation at year end | $ | 1,188.8 | $ | 1,345.7 |
| **Change in plan assets:** | | | | |
| Fair value of plan assets at prior year end | $ | 799.4 | $ | 727.7 |
| Actual return on plan assets | | 31.9 | | 72.2 |
| Employer contributions | | 62.9 | | 75.3 |
| Benefits paid | | (76.5) | | (63.1) |
| Expenses paid from assets | | (9.6) | | (12.7) |
| Other | | 0.3 | | — |
| Fair value of plan assets at year end | $ | 808.4 | $ | 799.4 |
| Funded status at year end | $ | (380.4) | $ | (546.3) |

The underfunded status of the plans of $380.4 million and $546.3 million at December 31, 2013 and 2012, respectively, is recognized in the accompanying consolidated balance sheets as shown in the table below. No plan assets are expected to be returned to the Company during the year ending December 31, 2014.

*Benefit Plan Obligations*

Amounts recognized in the consolidated balance sheets for pension benefits at December 31 are as follows:

| (in millions) | | 2013 | | 2012 |
|---|---|---|---|---|
| Noncurrent assets | $ | 1.7 | $ | — |
| Current liabilities | | 0.6 | | 0.6 |
| Noncurrent liabilities | | 381.5 | | 545.7 |

Amounts recognized in accumulated other comprehensive loss at December 31 consist of:

| (in millions) | | 2013 | | 2012 |
|---|---|---|---|---|
| Net actuarial loss | $ | 389.2 | $ | 511.8 |

As shown above, included in accumulated other comprehensive loss at December 31, 2013, are unrecognized actuarial losses of $389.2 million ($338.4 million, net of tax). The actuarial loss included in accumulated other comprehensive income and expected to be recognized in net periodic cost during the year ending December 31, 2014, is $12.6 million.

The total accumulated benefit obligation for all plans was $1,188.8 million and $1,345.7 million at December 31, 2013 and 2012, respectively.

61

Table of Contents

As of December 31, 2012, all of our pension plans accumulated benefit obligation ("ABO") equal projected benefit obligation and exceed their plan assets. Information for pension plans with an ABO in excess of plan assets at December 31, 2013 is as follows:

| (in millions) | ABO Exceeds Assets | Assets Exceed ABO | Total |
|---|---|---|---|
| Projected benefit obligation | $ 1,182.1 | $ 5.3 | $ 1,187.4 |
| Accumulated benefit obligation | 1,182.1 | 6.7 | 1,188.8 |
| Fair value of plan assets | 799.9 | 8.5 | 808.4 |

*Assumptions*

Weighted average actuarial assumptions used to determine benefit obligations at December 31:

| | 2013 | 2012 |
|---|---|---|
| Discount rate | 5.23% | 4.28% |

Weighted average assumptions used to determine net periodic benefit cost for the years ended December 31:

| | 2013 | 2012 | 2011 |
|---|---|---|---|
| Discount rate | 4.28% | 5.23% | 5.79% |
| Expected rate of return on assets | 7.0% | 7.0% | 7.0% |
| Mortality table | RP-2000 Projected to 2013 | RP-2000 Projected to 2012 | RP-2000 Projected to 2011 |

The discount rate refers to the interest rate used to discount the estimated future benefit payments to their present value, also referred to as the benefit obligation. The discount rate allows us to estimate what it would cost to settle the pension obligations as of the measurement date, December 31, and is used as the interest rate factor in the following year's pension cost. We determine the discount rate by selecting a portfolio of high quality noncallable bonds such that the coupons and maturities exceed our expected benefit payments.

In determining the expected rate of return on assets, we consider our historical experience in the plans' investment portfolio, historical market data and long-term historical relationships as well as a review of other objective indices including current market factors such as inflation and interest rates. Although plan investments are subject to short-term market volatility, we believe they are well diversified and closely managed. Our asset allocation as of December 31, 2013, consisted of 35% equities, 34% in debt securities and 31% in absolute return investments and as of December 31, 2012 consisted of 27% equities, 50% in debt securities and 23% in absolute return investments. The 2013 allocations are consistent with the targeted long-term asset allocation for the plans which is 33% equities, 35% debt securities and 32% absolute return investments. Based on various market factors, we selected an expected rate of return on assets of 7.0% effective for the 2013 and 2012 valuations. We will continue to review our expected long-term rate of return on an annual basis and revise appropriately. The pension trust holds no YRC Worldwide securities.

*Future Contributions and Benefit Payments*

We expect to contribute approximately $79.9 million to our single employer pension plans in 2014.

Expected benefit payments from our qualified and non-qualified defined benefit pension plans for each of the next five years and the total payments for the following five years ended December 31 are as follows:

| (in millions) | 2014 | 2015 | 2016 | 2017 | 2018 | 2019-2023 |
|---|---|---|---|---|---|---|
| Expected benefit payments | $ 70.5 | $ 71.7 | $ 71.7 | $ 72.0 | $ 74.0 | $ 384.6 |

*Pension and Other Post-retirement Costs*

Table of Contents

The components of our net periodic pension cost, other post-retirement costs and other amounts recognized in other comprehensive loss for the years ended December 31, 2013, 2012 and 2011 were as follows:

| (in millions) | | 2013 | | 2012 | | 2011 |
|---|---|---|---|---|---|---|
| Net periodic benefit cost: | | | | | | |
|   Service cost | $ | 4.3 | $ | 3.9 | $ | 3.6 |
|   Interest cost | | 56.2 | | 59.3 | | 61.2 |
|   Expected return on plan assets | | (55.6) | | (51.1) | | (43.0) |
|   Amortization of prior net loss | | 14.8 | | 9.0 | | 9.6 |
| Net periodic pension cost | $ | 19.7 | $ | 21.1 | $ | 31.4 |
| Other changes in plan assets and benefit obligations recognized in other comprehensive loss: | | | | | | |
|   Net actuarial loss (gain) and other adjustments | $ | (107.7) | $ | 170.4 | $ | 3.6 |
|   Less amortization of prior losses | | (14.8) | | (9.0) | | (9.6) |
|   Total recognized in other comprehensive loss (income) | | (122.5) | | 161.4 | | (6.0) |
| Total recognized in net periodic benefit cost and other comprehensive (income) loss | $ | (102.8) | $ | 182.5 | $ | 25.4 |

During the year ended December 31, 2013 and 2012, the income tax provision (benefit) related to amounts in other comprehensive income was $42.7 million and $(1.3) million. There was no corresponding amount in 2011.

*Fair Value Measurement*

Our pension assets are stated at fair value. Fair value is the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. The majority of our assets are invested in Level 2 assets of fixed income funds and absolute return investments. These funds are valued at quoted redemption values that represent the net asset values of units held at year-end which we have determined approximates fair value.

Investments in private equities and absolute return funds do not have readily available market values. These estimated fair values may differ significantly from the values that would have been used had a ready market for these investments existed, and such differences could be material. Investments in hedge funds that do not have an established market are valued at net asset values as determined by the investment managers, which we have determined approximates fair value.

The table below details by level, within the fair value hierarchy, the pension assets at fair value as of December 31, 2013:

| (in millions) | | Pension Assets at Fair Value as of December 31, 2013 | | | | | |
|---|---|---|---|---|---|---|---|
| | | Level 1 | | Level 2 | Level 3 | | Total |
| Equities | $ | 113.3 | $ | 106.4 | $    — | $ | 219.7 |
| Private equities | | — | | — | 60.3 | | 60.3 |
| Fixed income: | | | | | | | |
|   Corporate | | 4.3 | | 106.5 | 38.6 | | 149.4 |
|   Government | | 98.0 | | 102.8 | — | | 200.8 |
|   Other | | 10.1 | | — | — | | 10.1 |
| Absolute return | | 6.2 | | 138.6 | — | | 144.8 |
| Interest bearing | | 23.3 | | — | — | | 23.3 |
| Total investments | $ | 255.2 | $ | 454.3 | 98.9 $ | | 808.4 |
| Other assets, net | | | | | | | — |
| Total plan assets | $ | 255.2 | $ | 454.3 | 98.9 $ | | 808.4 |

The table below details by level, within the fair value hierarchy, the pension assets at fair value as of December 31, 2012:

63

Table of Contents

| (in millions) | | Pension Assets at Fair Value as of December 31, 2012 | | | |
| --- | --- | --- | --- | --- | --- |
| | | Level 1 | Level 2 | Level 3 | Total |
| Equities | $ | 79.9 $ | 92.5 | — $ | 172.4 |
| Private equities | | — | — | 38.8 | 38.8 |
| Fixed income: | | | | | |
|   Corporate | | 15.3 | 89.9 | 35.5 | 140.7 |
|   Government | | 109.1 | 145.2 | — | 254.3 |
| Absolute return | | 0.6 | 157.1 | — | 157.7 |
| Interest bearing | | 34.0 | — | — | 34.0 |
| Total investments | $ | 238.9 $ | 484.7 $ | 74.3 $ | 797.9 |
| Other assets, net | | | | | 1.5 |
| Total plan assets | $ | 238.9 $ | 484.7 $ | 74.3 $ | 799.4 |

The table below presents the activity of our assets measured at fair value on a recurring basis using significant unobservable inputs (Level 3):

| (in millions) | | Private Equities | Fixed income | Total Level 3 |
| --- | --- | --- | --- | --- |
| Balance at December 31, 2011 | $ | 29.0 $ | 14.6 $ | 43.6 |
|   Purchases | | 8.4 | 25.6 | 34.0 |
|   Sales | | (2.0) | (5.2) | (7.2) |
|   Unrealized gain (loss) | | 3.4 | 0.5 | 3.9 |
| Balance at December 31, 2012 | $ | 38.8 $ | 35.5 $ | 74.3 |
|   Purchases | | 6.4 | 9.6 | 16.0 |
|   Sales | | (6.4) | (5.3) | (11.7) |
|   Unrealized gain (loss) | | 21.5 | (1.2) | 20.3 |
| Balance at December 31, 2013 | $ | 60.3 $ | 38.6 $ | 98.9 |

The following table sets forth a summary of the Level 3 assets for which the fair value is not readily determinable but a reported NAV is used to estimate the fair value as of December 31, 2013:

| (in millions) | | Fair Value | Unfunded Commitments | Redemption Frequency | Redemption Notice Period |
| --- | --- | --- | --- | --- | --- |
| | | Fair value estimated using Net Asset Value per Share | | | |
| Private equities (a) | $ | 60.3 $ | 18.0 | Redemptions not permitted | |
| Fixed income (b) | | 38.6 | 16.0 | Redemptions not permitted | |
| Total | $ | 98.9 | | | |

(a) Consists of five private equity funds investing in renewable solar energy, acquisition of pharmaceutical company interests, Chinese technology and healthcare companies.
(b) Consists of three fixed income funds which invest in debt securities secured by royalty payments from marketers of pharmaceutical products.

The following table sets forth a summary of the Level 3 assets for which the fair value is not readily determinable but a reported NAV is used to estimate the fair value as of December 31, 2012:

| (in millions) | | Fair Value | Unfunded Commitments | Redemption Frequency | Redemption Notice Period |
| --- | --- | --- | --- | --- | --- |
| | | Fair value estimated using Net Asset Value per Share | | | |
| Private equities (a) | $ | 38.8 $ | 14.2 | Redemptions not permitted | |
| Fixed income (b) | | 35.5 | 3.0 | Varies (c) | |
| Total | $ | 74.3 | | | |

(a) Consists of four private equity funds investing in renewable solar energy, acquisition of pharmaceutical company interests and Chinese technology and healthcare companies.

64

Table of Contents

(b) Consists of three fixed income funds, two of which invest in debt securities secured by royalty payments from top-tier marketers of pharmaceutical products, and one which invests in Indian mezzanine debt.

(c) Redemptions are not permitted for two of the Level 3 fixed income funds. The third fund has redemption terms of quarterly after the second anniversary and a 90 day redemption notice period.

The assets presented in the December 31, 2013 and 2012 fair value hierarchy tables classified as Level 1 and Level 2, which fair value is estimated using NAV per share, have redemption frequencies ranging from daily to annually, have redemption notice periods from approximately 1 day to 90 days and have no unfunded commitments. These assets consist of equity, fixed income, and absolute return funds. Generally, the investment strategies of the fixed income and equity funds is based on fundamental and quantitative analysis and consists of long and hedged strategies. The general strategy of the absolute return funds consists of alternative investment techniques, including derivative instruments and other unconventional assets, to achieve a stated return rate.

### Multi-Employer Pension Plans

YRC Freight, New Penn, Holland and Reddaway contribute to various separate multi-employer health, welfare and pension plans for employees that are covered by our collective bargaining agreements (approximately 78% of total YRC Worldwide employees). The collective bargaining agreements determine the amounts of these contributions. The health and welfare plans provide medical related benefits to active employees and retirees. The pension plans provide defined benefits to retired participants. We recognize as net pension cost within 'salaries, wages and employee benefits' the contractually required contributions for the period and recognize as a liability any contributions due and unpaid at period end. We do not directly manage multi-employer plans. The trusts covering these plans are generally managed by trustees, half of whom the unions appoint and half of whom various contributing employers appoint.

We expensed the following amounts related to these plans for the years ended December 31:

| (in millions) | | 2013 | | 2012 | | 2011 |
|---|---|---|---|---|---|---|
| Health and welfare | $ | 399.5 | $ | 387.5 | $ | 378.2 |
| Pension | | 89.1 | | 85.6 | | 48.7 |
| Total | $ | 488.6 | $ | 473.1 | $ | 426.9 |

### Pension

Through the third quarter of 2009, we deferred payment of certain of our contributions to multi-employer pension funds. These deferred payments have been recognized as an operating expense and the liability was recorded as deferred contribution obligations. Beginning in the third quarter of 2009 through May 2011, most of our collective bargaining agreements provided for a temporary cessation of pension contributions so no expense or liability was required to be recognized for that period. In accordance with modifications to our collective bargaining agreements, we agreed to resume making pension contributions effective June 1, 2011 at 25.0% of the contribution rate in effect as of July 1, 2009.

The following table provides additional information related to our participation in individually significant multi-employer pension plans for the year ended December 31, 2013:

Table of Contents

| Pension Fund [a] | EIN Number | Pension Protection Zone Status [b] | | Funding Improvement or Rehabilitation Plan | Employer Surcharge Imposed | Expiration Date of Collective-Bargaining Agreement |
| --- | --- | --- | --- | --- | --- | --- |
| | | 2013 | 2012 | | | |
| Central States, Southwest and Southwest Areas Pension Fund | 36-6044243 | Red | Red | Yes | No | 3/31/2019 |
| Teamsters National 401K Savings Plan [c] | 52-1967784 | N/A | N/A | N/A | No | 3/31/2019 |
| I.B. of T. Union Local No 710 Pension Fund | 36-2377656 | Green | Green | No | No | 3/31/2019 |
| Central Pennsylvania Teamsters Defined Benefit Plan | 23-6262789 | Yellow | Green | Yes | No | 3/31/2019 |
| Road Carriers Local 707 Pension Fund | 51-6106510 | Not Available | Red | Yes | No | 3/31/2019 |
| Teamsters Local 641 Pension Fund | 22-6220288 | Red | Red | Yes | No | 3/31/2019 |

[a] The determination of individually significant multi-employer plans is based on the relative contributions to the plans over the periods presented as well as other factors.

[b] The Pension Protection Zone Status is based on information that the Company obtained from the plans' Forms 5500. Unless otherwise noted, the most recent Pension Protection Act (PPA) zone status available for 2013 and 2012 is for the plan's year-end during calendar years 2012 and 2011, respectively. Among other factors, plans in the red zone are generally less than 65 percent funded, plans in the yellow zone are less than 80 percent funded, and plans in the green zone are at least 80 percent funded.

[c] The policies of the Western Conference of Teamsters Pension Trust precluded the Company from reentering the plan on June 1, 2011. The plan did not assess a withdrawal liability and has not done so since June 1, 2011. Contributions related to the employees previously covered by this plan are now being made to the Teamsters National 401(k) Plan.

YRC Worldwide was listed in the Central States, Southwest and Southwest Areas Pension Plan, Road Carriers Local 707 Pension Fund and Teamsters Local 641 Pension Fund's Forms 5500 as providing more than 5 percent of the total contributions for 2012 and 2011.

We contributed a total of $88.7 million, $84.9 million and $45.6 million to the multi-employer pension funds for the years ended December 31, 2013, 2012 and 2011. The following table provides the pension amounts contributed by fund for those funds that are considered to be individually significant:

| (in millions) | | 2013 | 2012 | 2011 |
| --- | --- | --- | --- | --- |
| Central States, Southeast and Southwest Areas Pension Plan | $ | 52.1 $ | 51.9 $ | 27.6 |
| Teamsters National 401K Savings Plan | | 11.2 | 11.0 | 5.8 |
| I.B. of T. Union Local No 710 Pension Fund | | 4.4 | 4.1 | 2.2 |
| Central Pennsylvania Teamsters Defined Benefit Plan | | 4.5 | 4.5 | 2.3 |
| Road Carriers Local 707 Pension Fund | | 2.3 | 2.5 | 1.2 |
| Teamsters Local 641 Pension Fund | | 1.6 | 1.6 | 0.8 |

The comparability of annual contributions for 2011 through 2013 is primarily impacted by the temporary cessation of contributions for the period from the third quarter of 2009 through May 2011.

In 2006, the Pension Protection Act became law and modified both the Internal Revenue Code (as amended, the "Code") as it applies to multi-employer pension plans and the Employment Retirement Income Security Act of 1974 (as amended, "ERISA"). The Code and ERISA (in each case, as so modified) and related regulations establish minimum funding requirements for multi-employer pension plans.

If any of our multi-employer pension plans fails to meet minimum funding requirements, meet a required funding improvement or rehabilitation plan that the Pension Protection Act may require for certain of our underfunded plans, obtain from the IRS certain changes to or a waiver of the requirements in how the applicable plan calculates its funding levels, or reduce pension benefits to a level where the requirements are met then we could be required to make additional contributions to the pension plan. If any of our multi-employer pension plans enters critical status and our contributions are not sufficient to satisfy any rehabilitation plan schedule, the Pension Protection Act could require us to make additional surcharge contributions to the multi-employer pension

66

Table of Contents

plan in the amount of five to ten percent of the existing contributions required by our labor agreement for the remaining term of the labor agreement.

If we fail to make our required contributions to a multi-employer plan under a funding improvement or rehabilitation plan or if the benchmarks that an applicable funding improvement plan provides are not met by the end of a prescribed period, the IRS could impose an excise tax on us with respect to the plan. Such an excise tax would then be assessed to the plan's contributing employers, including the Company. These excise taxes are not contributed to the deficient funds, but rather are deposited in the United States general treasury funds. The Company does not believe that the temporary cessation of certain of its contributions to applicable multi-employer pension funds beginning in the third quarter of 2009 and continuing through May 2011 will give rise to these excise taxes as the underlying employer contributions were not required for that period.

A requirement to materially increase contributions beyond our contractually agreed rate or the imposition of an excise tax on us could have a material adverse impact on the financial results and liquidity of YRC Worldwide.

*401(k) Savings Plans*

We sponsor the YRC Worldwide Inc. 401(k) Plan, which is a defined contribution plan primarily for employees that our collective bargaining agreements do not cover. The plan permits participants to make contributions to the plan and permits the employer of participants to make contributions on behalf of the participants. There were no employer contributions in 2013, 2012 or 2011. Our employees covered under collective bargaining agreements may also participate in union-sponsored 401(k) plans.

*Performance Incentive Awards*

YRC Worldwide and its operating subsidiaries each provide annual performance incentive awards and more frequent sales incentive awards to certain non-union employees, which are based primarily on actual operating results achieved compared to targeted operating results or sales targets and are paid in cash. Operating (loss) income in 2013, 2012, and 2011 included performance and sales incentive expense for non-union employees of $14.5 million, $12.3 million, and $13.9 million, respectively. We generally pay annual performance incentive awards in the first quarter of the following year and sales performance incentive awards on a monthly basis.

*Other*

We provide a performance based incentive plan to key management personnel that provides the opportunity annually to earn cash and equity awards to further compensate certain levels of management. The equity awards are more fully described in the "Stock Compensation Plans" footnote to our consolidated financial statements. During the years ended December 31, 2013, 2012 and 2011, compensation expense related to these awards was $5.8 million, $3.8 million and $0.6 million, respectively.

## 8. 2014 Financing Transactions

On January 31, 2014, we issued 14,333,334 shares of our Common Stock and 583,334 shares of our Convertible Preferred Stock pursuant to certain stock purchase agreements, dated as of December 22, 2013 (the "Stock Purchase Agreements"), for an aggregate $250.0 million in cash. We used the proceeds from these transactions to, among other things, (i) deposit with the trustee funds sufficient to repay our 6% Convertible Senior Notes ("6% Notes") at their maturity on February 15, 2014 and (ii) repurchase approximately $90.9 million of our Series A Convertible Senior Secured Notes ("Series A Notes"). The Company will redeem the remaining Series A Notes on August 5, 2014. In February 2014, the Company deposited approximately $89.6 million with the trustee in order to fund the redemption (including accrued interest), and thereby discharged the indenture governing the Series A Notes.

Also on January 31, 2014, certain holders of our 10% Series B Convertible Senior Secured Notes ("Series B Notes") exchanged their outstanding balances (including the make-whole premium and additional accrued interest through January 15, 2014) at a conversion price of $15.00 per share, while certain other holders converted their Series B Notes in accordance with their terms. We also amended the indenture governing our Series B Notes to eliminate substantially all of the restrictive covenants, certain events of default and other related provisions contained in the indenture and to release and discharge the liens on the collateral securing the Series B Notes.

Effective January 31, 2014, certain of our subsidiaries, various pension funds party thereto, and Wilmington Trust Company, as agent for such pension funds, entered into the Second Amended and Restated Contribution Deferral Agreement ("Second A&R CDA"), which, among other things (i) amended and restated the Amended and Restated Contribution Deferral Agreement ("A&R

67

Table of Contents

CDA") (which agreement is discussed in our "Debt and Financing footnote"), (ii) released the agent's security interest in third priority collateral on the Collateral Release Date (as defined therein), (iii) limited the value of obligations secured by the collateral to the Secured Obligations (as defined therein) and (iv) extended the maturity of deferred pension payments and deferred interest from March 31, 2015 to December 31, 2019.

On February 13, 2014, we replaced our existing credit facilities (as discussed in our "Debt and Financing" footnote) with a new $450 million New ABL Facility (the "New ABL Facility") and a new $700 million term loan facility ("New Term Loan"). The New ABL Facility will be used to support our $364.6 million of outstanding letters of credit commitments as of December 31, 2013.

We refer to transactions described above collectively as the "2014 Financing Transactions." The table below summarizes the cash flow activity for the 2014 Financing Transactions:

| Cash Sources (in millions) | | | Cash Uses (in millions) | | |
|---|---|---|---|---|---|
| New Term Loan | $ | 700.0 | Extinguish Prior ABL Facility (includes accrued interest) | $ | 326.0 |
| Proceeds from sale of common stock | | 215.0 | Extinguish Prior Term Loan (includes accrued interest) | | 299.7 |
| Proceeds from sale of preferred stock | | 35.0 | Retire 6% Notes | | 71.5 |
| Cash proceeds from restricted amounts held in escrow - existing ABL facility | | 90.0 | Repurchase Series A Notes (upon transaction closing and includes accrued interest) | | 93.9 |
| New ABL Facility | | — | Redeem Series A Notes (on August 5, 2014 and includes accrued interest) | | 89.6 |
| | | | Fees, Expenses and Original Issuance Discount | | 49.0 |
| | | | Restricted Cash to Balance Sheet (a) | | 90.0 |
| | | | Cash to Balance Sheet | | 20.3 |
| **Total sources** | $ | 1,040.0 | **Total uses** | $ | 1,040.0 |

(a)    Under the terms of the New ABL facility, a portion of the Cash to Balance sheet will be classified as "restricted cash" in the consolidated balance sheet.

The table below summarizes the non-cash activity for the 2014 Financing Transactions:

| Non-Cash Sources (in millions) | | | Non-Cash Uses (in millions) | | |
|---|---|---|---|---|---|
| Secured Second A&R CDA | $ | 51.0 | A&R CDA | $ | 124.0 |
| Unsecured Second A&R CDA | | 73.0 | Exchange/conversion of Series B Notes to common stock | | 50.6 |
| Exchange/conversion of Series B Notes to common stock | | 50.6 | | | |
| **Total sources** | $ | 174.6 | **Total uses** | $ | 174.6 |

In 2014, we will account for the A&R CDA maturity extension as a debt modification and the remaining transactions as extinguishment of debt and issuance of new debt. We anticipate recording a gain on extinguishment of debt of approximately $15 million associated with this transaction in the first quarter of 2014. We paid approximately $40 million of fees associated with these transactions of which approximately $25 million will be recorded as unamortized deferred debt costs in "Other assets" in the consolidated balance sheet in the first quarter of 2014 and will be recognized as interest expense over the term of the New Term Loan and New ABL Facility and approximately $15 million will offset the equity proceeds of our stock purchase agreements.

### *$700 Million First Lien Term Loan*

- *Overview*: On February 13, 2014, we borrowed in full $700 million, and received in cash less a 1% discount, from a syndicate of banks and other financial institutions arranged by Credit Suisse Securities (USA) and RBS Citizens, N.A. No amounts under this New Term Loan, once repaid, may be reborrowed. Certain material provisions of the New Term Loan are summarized below:

68

Table of Contents

- *Maturity and Amortization*: The New Term Loan matures on February 13, 2019. The New Term Loan will amortize in equal quarterly installments in an aggregate annual amount equal to 1% of the original principal amount of the New Term Loan commencing on the last day of the first full fiscal quarter ending after the closing date.

- *Incremental*: Subject to finding current or new lenders willing to provide such commitments, the Company has the right to incur one or more increases to the New Term Loan and/or one or more new tranches of term loans (which may be unsecured or secured on a junior basis) to be made available under the New Term Loan credit agreement which shall not exceed (i) $250 million so long as the senior secured leverage ratio on a pro forma basis does not exceed 3.25 to 1.0, plus (ii) all voluntary prepayments of the New Term Loan.

- *Interest and Fees*: The New Term Loan bears interest, at the election of the borrower, at either the applicable London interbank offer rate ("LIBOR") (subject to a floor of 1.00%) plus a margin of 7.00% per annum, or a rate determined by reference to the alternate base rate (the greater of the prime rate established by the administrative agent, the federal fund rate plus 0.50% and one month, LIBOR plus 1.00%) plus a margin of 6.00%.

- *Guarantors*: The obligations of the borrower under the New Term Loan are unconditionally guaranteed by certain wholly owned domestic restricted subsidiaries of the Company (the "Term Guarantors").

- *Collateral*: The New Term Loan is secured by a perfected first priority security interest in (subject to permitted liens) substantially all assets of the Company and the guarantors under the New Term Loan (the "Term Guarantors"), except that accounts receivable, cash, deposit accounts and other assets related to accounts receivable are subject to a second priority interest (subject to permitted liens) and certain owned real property securing the obligations under the Second A&R CDA filed January 31, 2014, do not secure the obligations under the New Term Loan credit agreement (the "CDA Collateral").

- *Mandatory Prepayments*: The New Term Loan includes the following mandatory prepayments:
  - 50% of excess cash flow (paid if permitted under the New ABL Facility), subject to step downs to (x) 25% if the total leverage ratio is less than or equal to 3.50 to 1.00 but greater than 3.00 to 1.00 and (y) 0% if the total leverage ratio is less than or equal to 3.00 to 1.00.
  - 100% of the net cash proceeds of all asset sales or similar dispositions outside of the ordinary course of business and casualty events (subject to materiality thresholds and customary reinvestment rights)
  - 100% of cash proceeds from debt issuances that are not permitted by the New Term Loan documentation.

- *Events of Default*: The New Term Loan documentation contains certain customary events of default, including but not limited to the failure to make payments due under the New Term Loan, breach of and failure to cure the breach of certain covenants, the entry of a final unpaid judgment against any of the Term Guarantors in excess of $30 million, the commencement of certain insolvency proceedings, liquidations or dissolutions, a cross-default to certain other indebtedness with an outstanding aggregate principal balance of at least $30 million (other than the New ABL Facility), and cross-acceleration to the New ABL Facility.

- *Covenants*: The New Term Loan contains certain customary affirmative and negative covenants, including, among others, covenants restricting the incurrences of debt, liens, the making of investments and repurchases, transactions with affiliates, fundamental changes and asset sales, and prepayments of junior debt. In addition, refer to the "Liquidity" footnote for financial covenants for each of the remaining test periods.

### $450 Million ABL Facility

- *Overview*: On February 13, 2014, we entered into the New ABL Facility which is an asset-based $450 million loan facility from a syndicate of banks arranged by RBS Citizens, N.A., Merrill Lynch, Pierce, Fenner & Smith and CIT Finance LLC. The New ABL Facility terminates on February 13, 2019 (the "Termination Date"). The Company, YRC Inc., USF Reddaway Inc., USF Holland Inc. and New Penn Motor Express, Inc. are borrowers under the New ABL Facility, and certain of the Company's domestic subsidiaries are guarantors thereunder. Certain material provisions of the New ABL Facility are summarized below:

- *Availability*: The aggregate amount available under the New ABL Facility is subject to a borrowing base equal to the sum of (a) 85% of the sum of (i) eligible accounts minus without duplication (ii) the dilution reserve, plus (b) 100% of eligible borrowing base cash (which constitutes cash that has been deposited from time to time in a restricted account with the agent), minus (c) the deferred revenue reserve (which constitutes 85% of the "deferred revenue liability" as reflected on the balance sheet of the Company and its restricted subsidiaries as of the last day of the most recently completed fiscal month), minus (d) the availability reserve imposed by the agent in its permitted discretion (made in good-faith and using reasonable business judgment). Upon entering the New ABL Facility on February 13, 2014, based upon the availability calculation, the New ABL Facility did not have any borrowing capacity.

Table of Contents

- Interest and Fees: Revolving loans made under the New ABL Facility bear interest, at the Company's election, of either the applicable LIBOR rate plus 2.5% or the base rate (the greater of the prime rate established by the agent, the federal funds effective rate plus 0.50% and one month LIBOR plus 1.00%) plus 1.5% from the closing date through March 31, 2014. Thereafter, the interest rates will be subject to the following price grid based on the average quarterly excess availability under the revolver:

| Level | Average Quarterly Excess Capacity | Base Rate Plus | LIBOR Plus |
|---|---|---|---|
| I | ≥ $140,000,000 | 1.00% | 2.00% |
| II | ≥ $70,000,000 < $140,000,000 | 1.25% | 2.25% |
| III | < $70,000,000 | 1.50% | 2.50% |

The rates set forth above are subject to a 0.25% reduction during any fiscal quarter for which the Company has a total leverage ratio of less than 2.50 to 1.00.

- *Fees*: Fees in respect of the New ABL Facility include: (i) an unused line fee payable quarterly in arrears calculated by multiplying the amount by which the commitments exceed the loans and letters of credit for any calendar quarter by the unused line fee percentage (such unused line fee percentage initially to 0.250% per annum through March 31, 2014, and thereafter 0.375% per annum if the average revolver usage is less than 50% or 0.250% per annum if the average revolver usage is greater than 50%); (ii) fees for the letter of credit facility payable quarterly in arrears which are comprised of the applicable margin in effect for LIBOR loans multiplied by the average daily stated amount of letters of credit; (iii) fronting fees for letters of credit payable quarterly in arrears equal to 0.125% of the stated amount of the letters of credit; (vi) fees to issuing banks to compensate for customary charges related to the issuance and administration of letters of credit; and (v) such fees as set forth in the fee letter arrangement dated as of February 13, 2014 by and between the agent and the Company

- *Collateral*: The obligations under the New ABL Facility are secured by a perfected first priority security interest in (subject to permitted liens) all accounts receivable, cash, deposit accounts and other assets related to accounts receivable of the Company and the other loan parties and an additional second priority security interest in (subject to permitted liens) substantially all remaining assets of the borrowers and the guarantors other than CDA Collateral.

- *Incremental*: The New ABL Facility provides for a $100 million uncommitted accordion to increase the revolving commitment in the future to support borrowing base growth.

- *Events of Default*: The New ABL Facility contains certain customary events of default, including but not limited to the failure to make payments due under the New ABL Facility, breach of and failure to cure the breach of certain covenants, the entry of a final unpaid judgment against any of the New ABL Facility loan parties in excess of $30 million, the commencement of any insolvency proceeding, liquidation or dissolution, and a cross-default to certain other indebtedness with an outstanding aggregate principal balance of at least $30 million (including the New Term Loan).

- *Covenants*: The New ABL Facility contains certain customary affirmative and negative covenants (including certain customary provisions regarding borrowing base reporting, and including, among others, covenants restricting the incurrences of debt, liens, the making of investments and repurchases, transactions with affiliates, fundamental changes and asset sales, and prepayments of junior debt). Certain of the covenants relating to investments, restricted payments and capital expenditures are relaxed upon meeting specified payment conditions or debt repayment conditions, as applicable. Payment conditions include (i) the absence of an event of default arising from such transaction, (ii) liquidity of at least $100 million or availability of at least $67.5 million and (iii) the Consolidated Fixed Charge Coverage Ratio for the most recent term period on a pro forma basis is equal to or greater than 1.10 to 1.00). Debt repayment conditions include (i) the absence of an event of default from repaying such debt and (ii) availability on the date of repayment is not less than $67.5 million. During any period commencing when the New ABL Facility borrowers fail to maintain availability in an amount at least equal to 10% of the collateral line cap and until the borrowers have maintained availability of at least 10% of the collateral line cap for 30 consecutive calendar days, the New ABL Facility loan parties are required to maintain a Consolidated Fixed Charge Coverage Ratio of at least 1.10 to 1.00. The "Consolidated Fixed Charge Coverage Ratio" is defined as (a) (i) consolidated adjusted EBITDA for such period, minus (ii) capital expenditures made during such period, minus (iii) the aggregate amount of net cash taxes paid in cash during such period, minus (iv) the amount, if any, by which the cash pension contribution for such period exceeds the pension expense for such period, and plus (v) the amount, if any, by which the pension expense for such period exceeds the cash pension contribution for such period, divided by (b) the consolidated fixed charges for such period. In addition, refer to the "Liquidity" footnote for covenants for each of the remaining test periods.

70

Table of Contents

## 9. Debt and Financing

As of December 31, 2013 we had two primary credit facilities that we utilized to support our liquidity needs: the amended and restated credit agreement and an asset-based lending facility (the "Prior ABL Facility," collectively referred to as our "Prior Credit Facilities") and were also party to a number of other financing arrangements. On February 13, 2014, we completed our 2014 Financing Transactions which substantially changed the makeup of our outstanding debt. Refer to the "2014 Financing Transactions" footnote for further details. We have set forth a brief description of our two primary credit facilities and our other financing arrangements in place at December 31, 2013 below.

### Amended and Restated Credit Agreement

- *Overview*: Our amended and restated credit agreement provided for a term loan in an aggregate principal amount of $307.4 million ("Prior Term Loan") and a letter of credit facility of up to $437.0 million. As of December 31, 2013, we had repaid $9.3 million in aggregate principal on the Prior Term Loan. Certain material provisions of the amended and restated credit agreement are summarized below:

- *Maturity and Amortization*: The Prior Term Loan and, subject to the ability to replace or substitute letters of credit, the letters of credit, would mature on March 31, 2015. The Prior Term Loan did not amortize.

- *Interest and Fees*: After giving effect to the Credit Agreement Amendment (defined below) on November 12, 2013, the Prior Term Loan, at our option, bore interest at either (x) 6.00% in excess of the alternate base rate (*i.e.*, the greater of the prime rate and the federal funds effective rate in effect on such day plus 1/2 of 1%) in effect from time to time, or (y) 7.00% in excess of the London interbank offer rate (adjusted for maximum reserves). The London interbank offer rate was subject to a floor of 3.50% and the alternate base rate was subject to a floor of the then-applicable London interbank offer rate plus 1.0%. The stated interest rate floor of 10.0% was in effect since issuance.

Issued but undrawn letters of credit were subject to a participation fee equal to 8.00% of the average daily amount of letter of credit exposure. Any commitment available to be used to issue letters of credit was subject to a commitment fee of 8.00% of the average daily unused commitment. Letters of credit were subject to a 1% fronting fee or as mutually agreed between the Company and the applicable issuing bank.

- *Collateral*: The collateral securing the obligations under the credit agreement and guarantees entered into pursuant thereto included, subject to certain customary exceptions, all shares of capital stock of (or other ownership equity interests in) and intercompany debt owned by the Company and each present and future Guarantor and substantially all present and future property and assets of the Company or each Guarantor, except to the extent a security interest resulted in a breach, termination or default by the terms of the collateral being granted.

Pursuant to the terms under the amended and restated credit agreement, we were required to deposit an amount into escrow accounts to secure our obligations under the credit agreement. This amount totaled $0.6 million and $12.4 million as of December 31, 2013 and 2012 and is included in "Restricted amounts held in escrow," a non-current asset on the Consolidated Balance Sheet. The majority of the 2012 balance was returned as part of the November 2013 amendment discussed below. The liens on the collateral securing the obligations under the amended and restated credit agreement and guarantees entered into pursuant thereto were junior to the liens securing the obligations under the amended and restated contribution deferral agreement solely with respect to certain parcels of owned real property on which the pension funds have a senior lien and certain other customary permitted liens.

- *Amendment*: On November 12, 2013, YRC Worldwide entered into an amendment to its amended and restated credit agreement (the "Credit Agreement Amendment"), which, among other things, reset future covenants regarding minimum Consolidated EBITDA, maximum Total Leverage Ratio and minimum Interest Coverage Ratio (as defined in the Credit Agreement Amendments, if applicable) until December 31, 2014 and reset the minimum cash balance requirement. Further, the Credit Agreement Amendment, among other things, (i) included a new definition of Pro Forma Consolidated EBITDA added for the purposes of the minimum available cash requirement as described above to be calculated by adding to Consolidated EBITDA, subject to certain limitations, the amount of cost savings, operating expense reductions, other operating improvements and initiatives and synergies associated with any restructuring transactions (and implementation thereof) (but not to exceed the actual amount deducted from revenues in determining Consolidated Net Income for any such costs and expenses), in the case of each such restructuring transaction (and implementation thereof), occurring on or after November 12, 2013, and projected by us in good faith to be reasonably anticipated to be realizable within ninety (90) days of the date thereof; (ii) increased the interest rate and commitment fee payable under our credit agreement by 50 basis points (to the interest rate commitment fee set forth in "Interest and Fees" above); (iii) waived the requirement to continue to cash collateralize letters of credit with existing net cash proceeds received from asset sales up to $12.5 million (including release of such cash proceeds); (iv) required payment of an amendment fee to each consenting

71

Table of Contents

lender of 1.0% of their outstanding exposure; and (v) added a new "Event of Default" that required the 6% Convertible Senior Notes to be repaid, refinanced, replaced, restructured or extended on or prior to February 1, 2014 using either cash generated from the sale of qualified equity by the Borrower, certain qualified equity issuances by the Borrower or certain permitted indebtedness. Refer to the "Liquidity" footnote of our consolidated financial statements for covenants for each of the remaining test periods. On January 30, 2014, YRC Worldwide entered into a subsequent amendment to its amended and restated credit agreement, which, among other things, (i) extended the date in the "Event of Default" requirement for the repayment of the 6% Convertible Senior Notes from February 1, 2014 to February 13, 2014, (ii) eased the available cash conditions through February 13, 2014 and (iii) made certain other changes to effectuate the 2014 Financing Transactions.

***Prior ABL Facility***

- *Overview*: Our Prior ABL Facility provided for a $175.0 million ABL first-out delayed draw term loan facility (the "Term A Facility") and a $225.0 million ABL last-out term loan facility (the "Term B Facility"). We collectively refer to these term loan facilities as our "Prior ABL Facility." The Prior ABL Facility was to terminate on September 30, 2014 (the "Termination Date"). Pursuant to the terms of the Prior ABL Facility, YRC Freight, Holland and Reddaway (each, one of our subsidiaries and each, an "Originator") would each sell, on an ongoing basis, all accounts receivable originated by that Originator to YRCW Receivables LLC, a bankruptcy remote, wholly owned subsidiary of the Company, which we refer to herein as the "Prior ABL Borrower."

- *Availability*: The aggregate amount available under the Prior ABL Facility was subject to a borrowing base equal to 85% of Net Eligible Receivables, plus 100% of the portion of the Prior ABL Facility that was cash collateralized, minus reserves established by the Agent in its permitted discretion.

- *Interest and Fees*: After giving effect to the ABL Credit Agreement Amendment on November 12, 2013 (described below), interest on outstanding borrowings was payable at a rate per annum equal to the reserve adjusted LIBOR rate (which is the greater of the adjusted LIBOR rate and 1.50%) or the "ABR Rate" (which was the greatest of the applicable prime rate, the federal funds rate plus 0.5%, and the LIBOR rate plus 1.0%) plus an applicable margin, which, for loans under the Term A Facility were equal to 7.50% for LIBOR rate advances and 6.50% for ABR Rate advances, and for loans under the Term B Facility are equal to 10.25% for LIBOR rate advances and 9.25% for ABR Rate advances. We were required to pay a commitment fee equal to 7.50% per annum on the average daily unused portion of the commitment in respect of the Term A Facility.

- *Collateral*: The ABL Facility was secured by a perfected first priority security interest in and lien (subject to permitted liens) upon all accounts receivable (and the related rights) of the ABL Borrower, together with deposit accounts into which the proceeds from such accounts receivable were remitted (collectively, the "ABL Collateral").

Pursuant to the terms of the Prior ABL Facility, we were required to deposit an aggregate amount equal to $90.0 million into escrow accounts to secure our obligations under the Prior ABL Facility, which amounts we expected to remain in escrow for the term of the Prior ABL Facility; this amount is included in "Restricted amounts held in escrow," a current asset on the Consolidated Balance Sheet, which includes accrued interest. Pursuant to the terms of a standstill agreement, certain trucks, other vehicles, rolling stock, terminals, depots or other storage facilities, in each case, whether leased or owned, were subject to a standstill period in favor of the collateral agent, the administrative agent and the other secured parties under the Prior ABL Facility for a period of 10 business days (absent any exigent circumstances arising as a result of fraud, theft, concealment, destruction, waste or abscondment) with respect to the exercise of rights and remedies by the secured parties with respect to those assets under our other material debt agreements.

- *Amendment*: On November 12, 2013, YRCW Receivables, LLC, a wholly-owned subsidiary of the Company, entered into an amendment to the Prior ABL Facility (the "Prior ABL Credit Agreement Amendment"), which, among other things, reset the minimum Consolidated EBITDA covenant (as defined in the Prior ABL Facility) for each of the remaining test periods in a manner identical to the amendment of minimum Consolidated EBITDA in the Prior ABL Credit Agreement Amendment and increased the interest rate payable under the ABL Facility by 50 basis points. The Company agreed to pay all consenting lenders a fee equal to 1.0% of their outstanding loans and unused commitments.

72

Table of Contents

*Series A Convertible Senior Secured Notes*

On July 22, 2011, we issued $140.0 million in aggregate principal of our Series A Notes that bear interest at a stated rate of 10% per year and mature on March 31, 2015. Interest is payable on a semiannual basis in arrears only in-kind through the issuance of additional Series A Notes. As of December 31, 2013 and 2012, there was $177.8 million and $161.2 million in aggregate principal amount of Series A Notes outstanding, after giving effect to the payment in-kind of interest on the Series A Notes. We could redeem the Series A Notes, in whole or in part, at any time at a redemption price equal to 100% of the principal amount thereof plus accrued and unpaid interest to the redemption date. As discussed in the "2014 Refinancing" footnote, on February 13, 2014, the Company deposited approximately $89.6 million (including accrued interest) with the trustee in order to fund the redemption of the remaining Series A Notes on August 5, 2014, thereby discharging the indenture governing the Series A Notes.

The Series A Notes became convertible into our common stock beginning July 22, 2013. Subject to certain limitations on conversion and issuance of shares, holders can convert any outstanding Series A Notes into shares of our common stock at the conversion price per share of approximately $34.0059 and a conversion rate of 29.4067 common shares per $1,000 of the Series A Notes. See "Conversions" section below for additional details regarding conversions on our Series A Notes.

The holders of the Series A Notes are entitled to vote with our common stock on an as-converted-to-common-stock-basis, provided that, such number of votes shall be limited to 0.1089 votes for each such share of common stock on an as-converted-to-common stock-basis.

The indenture governing the Series A Notes contained covenants limiting, among other things, us and our restricted subsidiaries' ability to (i) create liens on assets and (ii) merge, consolidate or sell all or substantially all of our and our guarantors' assets.

The Series A Notes were guaranteed by all of our domestic subsidiaries that guarantee obligations under the amended and restated credit agreement. The Series A Notes and the guarantees of the Series A Notes were our and the guarantors' senior obligations and were secured by junior priority liens on substantially the same collateral securing the amended and restated credit agreement (other than any leasehold interests and equity interests of subsidiaries to the extent such pledge of equity interests would require increased financial statement reporting obligations pursuant to Rule 3-16 of Regulation S-X). As of December 31, 2012 and 2011, the common stock of our largest operating companies, such as YRC Inc., Holland, New Penn and Reddaway, would be excluded as collateral under these kick-out provisions.

*Series B Convertible Senior Secured Notes*

On July 22, 2011, we issued $100.0 million of our Series B Notes that bear interest at a stated rate of 10.0% per year and mature on March 31, 2015. Interest is payable on a semiannual basis in arrears only in-kind through the issuance of additional Series B Notes. As of December 31, 2013 and 2012, there was $69.2 million and $91.5 million in aggregate principal amount of Series B Notes outstanding, after giving effect to the payment in-kind of interest on the Series B Notes offset by $50.9 million in aggregate principal amount of Series B Notes surrendered for conversion through December 31, 2013.

The Series B Notes are convertible into our common stock, at any time at the conversion price per share of approximately $18.5334 and a conversion rate of 53.9567 common shares per $1,000 of the Series B Notes (such conversion price and conversion rate applying also to the Series B Notes make whole premium). Upon conversion, holders of Series B Notes will not receive any cash payment representing accrued and unpaid interest; however, such holders will receive a make whole premium, equal to the total amount of interest received if the notes were held to their maturity, paid in shares of our common stock for the Series B Notes that were converted. See "Conversions" section below for additional details regarding conversions on our Series B Notes.

As of December 31, 2013, the effective conversion price and conversion rate for Series B Notes (after taking into account the make whole premium) was $16.0056 and 62.4781 common shares per $1,000 of Series B Notes, respectively.

The holders of the Series B Notes are entitled to vote with our common stock on an as-converted-to-common-stock-basis, provided that, such number of votes shall be limited to 0.0594 votes for each such share of common stock on an as-converted-to-common-stock-basis.

As discussed in the "2014 Refinancing" note, we amended the indenture governing our Series B Notes to eliminate substantially all of the restrictive covenants, certain events of default and other related provisions contained in the indenture and to release and discharge the liens on the collateral securing the Series B Notes. As of December 31, 2013, the Series B Notes indenture contained customary covenants limiting, among other things, our and our restricted subsidiaries' ability to:

- pay dividends or make certain other restricted payments or investments;

73

Table of Contents

- incur additional indebtedness and issue disqualified stock or subsidiary preferred stock;
- create liens on assets;
- sell assets;
- merge, consolidate, or sell all or substantially all of our or the guarantors' assets;
- enter into certain transactions with affiliates; and
- create restrictions on dividends or other payments by our restricted subsidiaries.

### *6% Convertible Senior Notes*

On February 11, 2010, we entered into a note purchase agreement with certain investors pursuant to which such investors agreed, subject to the terms and conditions set forth therein, to purchase up to $70 million of our notes. The outstanding 6% notes were paid at maturity on February 15, 2014. These 6% Notes bore interest at 6% which was payable on February 15 and August 15 of each year. To the extent we were not permitted to pay interest in cash under our senior secured bank credit facilities or we reasonably determine that we had insufficient funds to pay interest in cash, we were permitted to pay interest through the issuance of additional shares of our common stock subject to certain conditions. Our amended and restated credit agreement did not restrict our ability to pay cash interest to holders of the 6% Notes and we paid cash interest to holders of the 6% Notes beginning with the August 15, 2011 interest payment date and continued to make interest payments in cash in lieu of paying interest with shares of common stock as of December 31, 2013.

### *Amended and Restated Contribution Deferral Agreement*

- *Overview*: Certain of our subsidiaries are parties to the A&R CDA with certain multiemployer pension funds named therein (collectively, the "Funds") pursuant to which we are permitted to continue to defer pension payments and deferred interest owed to such Funds as of July 22, 2011 (each, "Deferred Pension Payments" and "Deferred Interest"). The A&R CDA was scheduled to mature on March 31, 2015 though the Company entered into the Second A&R CDA on January 31, 2014 which extended the maturity to December 31, 2019. There is no mandatory amortization prior to that time. The Deferred Pension Payments and Deferred Interest bears interest at a fixed rate, with respect to each Fund, per annum as set forth in its trust documentation as of February 28, 2011.

- *Application of Certain Payments*: Pursuant to the terms of the collective bargaining agreement with the IBT, the Company's subsidiaries began making contributions to the Funds for the month beginning June 1, 2011 at the rate of 25% of the contribution rate in effect on July 1, 2009. However, legislative changes to current law or other satisfactory action or arrangements are required to enable certain of the Funds (based on their funded status) to accept contributions at a reduced rate.

In accordance with the re-entry arrangements between each Fund and the primary obligors, a Fund may require the primary obligors to make payments of obligations owed to such Fund under the A&R CDA in lieu of payments required pursuant to the collective bargaining agreement with the IBT or make payments into an escrow arrangement, in each case in an amount equal to such Fund's current monthly contribution amount.

- *Collateral*: Under the A&R CDA, the Funds maintain their first lien on existing first priority collateral. The Funds allowed the secured parties under the Series A Notes and Series B Notes (as each are defined and described above) a second lien behind the secured parties to the credit agreement on certain properties and the Funds had a third lien on such collateral. However, under the Second A&R CDA, such third lien on certain properties was released on the collateral release date upon the occurrence of events specified therein.

- *Most Favored Nations*: If any of the obligors entered into an amendment, modification, supplementation or alteration of the amended and restated credit agreement after July 22, 2011 that imposed any mandatory prepayment, cash collateralization, additional interest or fee or any other incremental payment to the lenders thereunder not required as of July 22, 2011, the primary obligors were required to pay the Funds 50% of a proportionate additional payment in respect of the Deferred Pension Payments and Deferred Interest, with certain exceptions. The Second A&R CDA removed this requirement.

- *Guarantors*: The A&R CDA was guaranteed by Glen Moore and Transcontinental Lease, S. de R.L. de C.V. The Second A&R CDA released Glen Moore from such guarantee.

### *Standby Letter of Credit Agreement*

On July 22, 2011, we entered into a Standby Letter of Credit Agreement with Wells Fargo, National Association ("Wells Fargo") pursuant to which Wells Fargo issued one replacement letter of credit and permitted an existing letter of credit to remain outstanding

Table of Contents

and we pledged certain deposit accounts and securities accounts (collectively, the "Pledged Accounts") to Wells Fargo to secure its obligations in respect of the letters of credit. As of December 31, 2013, we had no standby letters of credit under this agreement outstanding.

***Total Debt Outstanding***

| As of December 31, 2013 (in millions) | Par Value | | Premium/ (Discount) | | Book Value | | Stated Interest Rate | Effective Interest Rate |
|---|---|---|---|---|---|---|---|---|
| Prior Term Loan | $ | 298.1 | $ | 37.7 | $ | 335.8 | 10.0% | —% |
| Term A Facility (capacity $175.0, borrowing base $156.5, availability $51.5)* | | 105.0 | | (2.1) | | 102.9 | 8.5% | 15.8% |
| Term B Facility (capacity $219.9, borrowing base $219.9, availability $0.0) | | 219.9 | | (3.9) | | 216.0 | 11.25% | 15.0% |
| Series A Notes | | 177.8 | | (17.8) | | 160.0 | 10.0% | 18.3% |
| Series B Notes | | 69.2 | | (10.5) | | 58.7 | 10.0% | 25.6% |
| 6% Notes | | 69.4 | | (1.1) | | 68.3 | 6.0% | 15.5% |
| A&R CDA | | 124.2 | | (0.2) | | 124.0 | 3.25-18.25% | 7.3% |
| Lease financing obligations | | 297.5 | | — | | 297.5 | 10.0-18.2% | 11.9% |
| Other | | 0.2 | | — | | 0.2 | | |
| Total debt | $ | 1,361.3 | $ | 2.1 | $ | 1,363.4 | | |
| Current maturities of lease financing obligations | | (8.4) | | — | | (8.4) | | |
| Current maturities of other | | (0.2) | | — | | (0.2) | | |
| Long-term debt | $ | 1,352.7 | $ | 2.1 | $ | 1,354.8 | | |

*The effective interest rate on the Term A Facility is calculated based upon the capacity of the facility and not the par value.

| As of December 31, 2012 (in millions) | Par Value | | Premium/ (Discount) | | Book Value | | Stated Interest Rate | Effective Interest Rate |
|---|---|---|---|---|---|---|---|---|
| Prior Term Loan | $ | 298.7 | $ | 67.6 | $ | 366.3 | 10.0% | —% |
| Term A Facility (capacity $175.0, borrowing base $147.6, availability $42.6)* | | 105.0 | | (4.8) | | 100.2 | 8.5% | 15.8% |
| Term B Facility (capacity $222.2, borrowing base $222.2, availability $0.0) | | 222.2 | | (8.5) | | 213.7 | 11.25% | 15.0% |
| Series A Notes | | 161.2 | | (27.8) | | 133.4 | 10.0% | 18.3% |
| Series B Notes | | 91.5 | | (25.4) | | 66.1 | 10.0% | 25.6% |
| 6% Notes | | 69.4 | | (6.3) | | 63.1 | 6.0% | 15.5% |
| A&R CDA | | 125.8 | | (0.4) | | 125.4 | 3.0-18.0% | 7.1% |
| Lease financing obligations | | 306.9 | | — | | 306.9 | 10.0-18.2% | 11.9% |
| Other | | 0.3 | | — | | 0.3 | | |
| Total debt | $ | 1,381.0 | $ | (5.6) | $ | 1,375.4 | | |
| Current maturities of ABL facility – Term B | | (2.3) | | — | | (2.3) | | |
| Current maturities of 5.0% and 3.375% contingent convertible senior notes and other | | (6.5) | | — | | (6.5) | | |
| Current maturities of lease financing obligations | | (0.3) | | — | | (0.3) | | |
| Long-term debt | $ | 1,371.9 | $ | (5.6) | $ | 1,366.3 | | |

*The effective interest rate on the Term A Facility is calculated based upon the capacity of the facility and not the par value.

***Conversions***

During the year ended December 31, 2013, $29.1 million of aggregate principal amount of Series B Notes converted into 1.9 million shares of our common stock. Upon conversion, during the year ended December 31, 2013, we recorded $15.2 million of additional interest expense representing the $6.6 million make whole premium and $8.6 million of accelerated amortization of the discount on Series B Notes converted. As of December 31, 2013, the effective conversion price and conversion rate for Series B

75

Table of Contents

Notes (after taking into account the make whole premium) was $16.0056 and 62.4781 common shares per $1,000 of Series B Notes, respectively.

As of December 31, 2013, there was $177.8 million in aggregate principal amount of Series A Notes outstanding that was convertible into approximately 5.6 million shares of our common stock at the maturity date. As discussed in the "2014 Financing Transactions" footnote, on January 31, 2014, we repurchased approximately $90.9 million of our Series A Notes. The Company will redeem the remaining Series A Notes on August 5, 2014. In February 2014, the Company deposited approximately $89.6 million with the trustee in order to fund the redemption. There were no conversions of our Series A Notes as of December 31, 2013 and from December 31, 2013 through March 4, 2014.

As of December 31, 2013, there was $69.2 million in aggregate principal amount of Series B Notes outstanding that was convertible into approximately 4.2 million shares of our common stock (after taking into account the make whole premium). As discussed in the "2014 Financing Transactions" footnote, on January 31, 2014, certain holders of our Series B Notes exchanged their outstanding balances as part of an exchange agreement. Outside of these exchange agreements, from December 31, 2013 through March 4, 2014, $1.2 million aggregate principal amount of Series B Notes converted into 75,900 shares of common stock.

As of December 31, 2013, a maximum of 17,600 shares of our common stock were available for future issuances in respect of the 6% Notes. As discussed in the "2014 Financing Transactions" footnote we repaid our 6% Notes on February 15, 2014.

*Maturities*

The principal maturities over the next five years and thereafter of total debt as of December 31, 2013 was as follows:

| (in millions) | Prior Term Loan | Prior ABL Facility [c] | Series A and B Notes [b] | 6% Notes [c] | Lease Financing Obligation [a] | A&R CDA | Other | Total |
|---|---|---|---|---|---|---|---|---|
| 2014 | $    — | $    324.9 | $    — | $    69.4 | $    8.4 | $    — | $    0.2 | $    402.9 |
| 2015 | 298.1 | — | 247.0 | — | 7.7 | 124.2 | — | 677.0 |
| 2016 | — | — | — | — | 9.5 | — | — | 9.5 |
| 2017 | — | — | — | — | 11.4 | — | — | 11.4 |
| 2018 | — | — | — | — | 13.6 | — | — | 13.6 |
| Thereafter | — | — | — | — | 246.9 | — | — | 246.9 |
| Total | $    298.1 | $    324.9 | $    247.0 | $    69.4 | $    297.5 | $    124.2 | $    0.2 | $    1,361.3 |

(a)   Lease financing obligations subsequent to 2018 of $246.9 million represent principal cash obligations of $23.8 million and the estimated net book value of the underlying assets at the expiration of their associated lease agreements of $223.1 million.

(b)   The Series A Notes exclude $13.4 million and the Series B Notes exclude $9.0 million of in-kind interest payments that will be due and payable if the notes are held to maturity.

(c)   The Prior ABL Facility and 6% Notes were included in long-term liabilities on the Consolidated Balance Sheet as they were repaid with long-term financing as part of the 2014 Financing Transactions.

On February 13, 2014, we completed the 2014 Financing Transactions which will change our maturity of certain portions of our outstanding debt. Please refer to the "2014 Financing Transactions" footnote for more details.

*Fair Value Measurement*

The carrying amounts and estimated fair values of our long-term debt, including current maturities and other financial instruments, are summarized as follows:

| (in millions) | December 31, 2013 | | December 31, 2012 | |
|---|---|---|---|---|
| | Carrying amount | Fair Value | Carrying amount | Fair Value |
| Prior Term Loan | $    335.8 | $    289.2 | $    366.3 | $    197.5 |
| Prior ABL Facility | 318.9 | 326.1 | 313.9 | 325.8 |
| Series A Notes and Series B Notes | 218.7 | 225.8 | 199.5 | 81.5 |
| Lease financing obligations | 297.5 | 297.5 | 306.9 | 306.9 |
| Other | 192.5 | 179.8 | 188.8 | 99.5 |
| Total debt | $    1,363.4 | $    1,318.4 | $    1,375.4 | $    1,011.2 |

Table of Contents

The fair values of the Prior Term Loan, Prior ABL Facility, Series A and Series B Notes, 6% Notes (included in "Other" above) and A&R CDA (included in "Other" above) were estimated based on observable prices (level two inputs for fair value measurements). The carrying amount of the lease financing obligations approximates fair value.

## 10. Liquidity

For a description of our outstanding debt as of December 31, 2013, please refer the "Debt and Financing" footnote to our consolidated financial statements.

*Credit Facility Covenants*

On November 12, 2013, YRC Worldwide entered into amendments to its amended and restated credit agreement (the "Credit Agreement Amendment") and its then-existing ABL facility (together the "Amendments"), which, among other things, reset future covenants regarding minimum Consolidated EBITDA, maximum Total Leverage Ratio and minimum Interest Coverage Ratio (as defined in Amendments, if applicable) until December 31, 2014 and resets the minimum cash balance requirement. We were in compliance with all of our covenants as of December 31, 2013.

Consolidated Adjusted EBITDA, as defined in our New Term Loan credit agreement, was a measure that reflects our earnings before interest, taxes, depreciation, and amortization expense, and is further adjusted for, among other things, letter of credit fees, equity-based compensation expense, net gains or losses on property disposals and certain other items, including restructuring professional fees, expenses associated with certain lump sum payments to our IBT employees and the results of permitted dispositions and discontinued operations.

On February 13, 2014, we completed our 2014 Financing Transactions and refinanced the debt associated with our prior credit facilities. We entered into a New Term Loan credit agreement with new financial covenants that, among other things, restricts certain capital expenditures and requires us to maintain a maximum total leverage ratio (defined as consolidated total debt divided by consolidated adjusted EBITDA) for future test periods as follows:

| Four Consecutive Fiscal Quarters Ending | Maximum Total Leverage Ratio | Four Consecutive Fiscal Quarters Ending | Maximum Total Leverage Ratio |
|---|---|---|---|
| June 30, 2014 | 6.00 to 1.00 | June 30, 2016 | 3.50 to 1.00 |
| September 30, 2014 | 5.00 to 1.00 | September 30, 2016 | 3.50 to 1.00 |
| December 31, 2014 | 4.50 to 1.00 | December 31, 2016 | 3.25 to 1.00 |
| March 31, 2015 | 4.00 to 1.00 | March 31, 2017 | 3.25 to 1.00 |
| June 30, 2015 | 3.75 to 1.00 | June 30, 2017 | 3.25 to 1.00 |
| September 30, 2015 | 3.75 to 1.00 | September 30, 2017 | 3.25 to 1.00 |
| December 31, 2015 | 3.75 to 1.00 | December 31, 2017 and thereafter | 3.00 to 1.00 |
| March 31, 2016 | 3.50 to 1.00 | | |

In addition, we entered into the New ABL Facility credit agreement which, among other things, restricts certain capital expenditures and requires that the Company, in effect, maintain availability of at least 10% of the lesser of the aggregate amount of commitments from all lenders or the borrowing base. Upon entering the New ABL Facility on February 13, 2014, based upon the availability calculation, the New ABL Facility did not have any borrowing capacity.

We believe that our results of operations will be sufficient to allow us to comply with the covenants in our new credit agreement, fund our operations, increase working capital as necessary to support our planned revenue growth and fund capital expenditures for the foreseeable future, including the next twelve months.

In the event that we fail to comply with any New Term Loan covenant or any New ABL Facility covenant, we would be considered in default, which would enable applicable lenders to accelerate the repayment of amounts outstanding, require the cash collateralization of letters of credit (in the case of the New ABL Facility) and exercise remedies with respect to collateral and we would need to seek an amendment or waiver from the applicable lender groups. In the event that our lenders under our New Term Loan or New ABL Facility demand payment or cash collateralization (in the case of the New ABL Facility), we will not have sufficient cash to repay such indebtedness. In addition, a default under our New Term Loan or New ABL Facility or the applicable

Table of Contents

lenders exercising their remedies thereunder would trigger cross-default provisions in our other indebtedness and certain other operating agreements. Our ability to amend our New Term Loan or our New ABL Facility or otherwise obtain waivers from the applicable lenders depends on matters that are outside of our control and there can be no assurance that we will be successful in that regard.

### Risk and Uncertainties Regarding Future Liquidity

Our principal sources of liquidity are cash and cash equivalents, any prospective cash flow from operations and, as of December 31, 2013, available borrowings under our $400 million Prior ABL Facility. As of December 31, 2013, we had cash and cash equivalents and availability under the Prior ABL Facility of $227.8 million and the borrowing base under our Prior ABL Facility was $376.4 million. As part of our 2014 Financing Transactions, we replaced our Prior ABL facility with a $450 million New ABL Facility. Refer to the "2014 Financing Transactions" footnote for more details.

Our principal uses of cash are to fund our operations, including making contributions to our single-employer pension plans and our multi-employer pension funds, and to meet our other cash obligations, including but not limited to paying cash interest and principal on our funded debt, letter of credit fees under our credit facilities and funding capital expenditures and lease payments for operating equipment. For the year ended December 31, 2013, our cash flow from operating activities provided net cash of $12.1 million.

We have a considerable amount of indebtedness. As of December 31, 2013, we had $1,363.4 million in aggregate principal amount of outstanding indebtedness. Our 2014 Financing Transactions reduced our outstanding indebtedness and extended the maturities for a substantial portion of our debt to 2019. Refer to the "2014 Financing Transactions" footnote for more details.

We also have a considerable amount of future funding obligations for our single-employer pension plans and the multi-employer pension funds. We expect our funding obligations for 2014 for our single-employer pension plans and multi-employer pension funds will be $79.9 million and $88.7 million, respectively. In addition, we also have, and will continue to have, substantial operating lease obligations. As of December 31, 2013, our operating lease obligations for 2014 are $56.1 million.

Our capital expenditures for the years ended December 31, 2013 and 2012 were $66.9 million and $66.4 million, respectively. These amounts were principally used to fund replacement engines and trailer refurbishments for our revenue fleet, capitalized costs for our network facilities and technology infrastructure. Additionally, for the year ended December 31, 2013, we entered into new operating lease commitments for revenue equipment totaling $67.1 million, with such payments to be made over the average lease term of 6 years. In light of our operating results over the past few years and our liquidity needs, we have deferred certain capital expenditures and may continue to do so in the future. As a result, the average age of our fleet has increased and we will need to update our fleet periodically.

We believe that our results of operations will provide sufficient liquidity to fund our operations and meet the covenants under our New Term Loan for the foreseeable future, including the next twelve months.

Our ability to satisfy our liquidity needs and meet future stepped-up covenants beyond 2014 is dependent on a number of factors, some of which are outside of our control. These factors include:

- we must achieve improvements in our operating results primarily at our YRC Freight operating segment which rely upon pricing and shipping volumes and network efficiencies;
- we must continue to implement and realize cost saving measures to match our costs with business levels and in a manner that does not harm operations and our productivity and efficiency initiatives must be successful; and
- we must be able to generate operating cash flows that are sufficient to meet the cash requirements for pension contributions to our single and multi-employer pension funds, cash interest and principal payments on our funded debt, payments on our equipment leases, and for capital expenditures or additional lease payments for new revenue equipment

In the event our operating results indicate we will not meet our maximum total leverage ratio, we will take action to improve our maximum total leverage ratio which will include paying down our outstanding indebtedness with either cash on hand or from cash proceeds from equity issuances. The issuance of equity is outside of our control and there can be no assurance that we will be able to issue additional equity at terms that are agreeable to us.

78

**11. 2011 Financial Restructuring**

On July 22, 2011, we completed our financial restructuring that included the following transactions (collectively referred to herein as the "restructuring"):

- an exchange offer, whereby we issued to our lenders under our then-existing credit agreement an aggregate of 3.7 million shares of our new Series B Convertible Preferred Stock, which were converted into 4.6 million shares of common stock on a post split basis, and $140.0 million in aggregate principal amount of our Series A Notes in exchange for a $305.0 million reduction of our credit agreement obligations;
- the issuance and sale for cash to such lenders of $100.0 million in aggregate principal amount of our Series B Notes;
- the execution of the Amended and Restated Credit Agreement, the Prior ABL Facility and an A&R CDA with certain multi-employer pension funds;
- the issuance of 1.3 million shares of our Series B Preferred Stock to the Teamster-National 401(k) Savings Plan for the benefit of the Company's IBT employees, which were converted into 1.6 million shares of common stock on a post split basis;
- the issuance of one share of our new Series A Voting Preferred Stock to the IBT to confer certain board representation rights;
- the repayment in full and termination of our then-outstanding ABS Facility and collateralizing a portion of our outstanding letters of credit with cash; and
- the Teamsters National Freight Industry Negotiating Committee ("TNFINC") of the IBT waived its right to terminate, and agreed not to further modify, the Agreement for the Restructuring of the YRC Worldwide Inc. Operating Companies, dated as of September 24, 2010 (as amended, the "2010 MOU") such that the collective bargaining agreement will be fully binding until its specified term of March 31, 2015.

The table below summarizes the cash flow activity as it related to the restructuring as of July 22, 2011:

| Sources of Funds (in millions) | | | Uses of Funds (in millions) | | |
|---|---|---|---|---|---|
| Issuance of Series B Notes | $ | 100.0 | Retirement of ABS facility borrowings | $ | 164.2 |
| Borrowings on the Prior ABL Facility | | 255.0 | Restricted amounts held in escrow - Standby Letter of Credit Agreement | | 64.7 |
| Additional borrowings under the revolving credit facility | | 18.5 | Fees, expenses and original issue discount of restructuring | | 57.0 |
| Company cash | | 2.4 | Restricted amounts held in escrow - Prior ABL Facility | | 90.0 |
| **Total sources of funds** | $ | 375.9 | **Total uses of funds** | $ | 375.9 |

Following the restructuring, we amended and restated our certificate of incorporation on September 16, 2011 such that, among other things, all of our outstanding Series B Preferred Stock issued in the restructuring automatically converted into shares of our common stock and effected a one-for 300 reverse stock split on December 1, 2011.

*Restructured Credit Agreement Claims*

In connection with the restructuring, we exchanged $305.0 million of amounts due under our prior credit agreement for an aggregate of 3.7 million shares of Series B Preferred Stock and $140.0 million in aggregate principal amount of our Series A Notes. We estimated the fair value of the Series B Preferred Stock to be $43.2 million. We also converted the remaining prior credit agreement borrowings from the revolving credit facility to the restructured term loan, eliminated the unused revolving credit facility capacity and extended the prior credit agreement maturity date to March 31, 2015 for the $307.4 million aggregate principal amount restructured term loan and the $437.0 million letter of credit facility.

In accordance with FASB ASC 470-60, we accounted for this element of the restructuring as a troubled debt restructuring as the Company had been experiencing financial difficulty and the lenders granted a concession to the Company. We assessed the total future cash flows of the restructured debt as compared to the carrying amount of the original debt and determined the total future cash flows to be greater than the carrying amount at the date of the restructuring. As such, the carrying amount was not adjusted and no gain was recorded, consistent with troubled debt restructuring accounting.

The prior credit agreement's carryover basis was allocated to the Prior Term Loan and Series A Notes on a relative fair value basis, after taking into account the Series B Preferred Stock and the conversion feature in the Series A Notes. The difference in the effective interest rates as compared to the stated interest rates for the restructured term loan and Series A Notes is a function of the underlying fair values of the respective instruments, due to the allocation of carryover basis on a relative fair value basis. Fair values of the respective instruments were based on a contemporaneous valuation using an option pricing model, a Level 3 fair value measurement.

The fair value of the Series B Preferred Stock was based on a contemporaneous valuation, whereas an estimated enterprise value was first calculated using assumptions related to market multiples of earnings, a market approach which is a Level 3 fair value measurement. The estimated enterprise value was then reduced by the fair value of our debt instruments post-restructuring, with the residual allocated to our Series B Preferred Stock and common stock. See further discussion regarding our Series B Preferred Stock in our "Shareholders' Deficit" footnote to our consolidated financial statements.

The conversion feature embedded in the Series A Notes was required to be bifurcated on the restructuring closing date and separately measured as a derivative liability, as the Company did not have enough authorized and unissued common shares to satisfy conversion of the Series A Notes. We estimated the fair value of the conversion feature based on a contemporaneous valuation using an option pricing model, a Level 3 fair value measurement, and determined the fair value to be $12.4 million.

On September 16, 2011, the Company held a special meeting of shareholders at which the Company's amended and restated certificate of incorporation was approved and the number of authorized common shares increased to allow for the conversions. This increase provided sufficient authorized common shares to satisfy the conversion feature in the Series A Notes, and thus the conversion feature in the Series A Notes was no longer required to be bifurcated and presented as a derivative liability. The conversion feature was adjusted to a fair value of $26.5 million on September 16, 2011, with the change of $14.1 million recorded as 'Fair value adjustment on derivative liabilities' in the accompanying statements of consolidated operations. The fair value of the conversion feature was then reclassified as an equity-classified derivative within 'Capital surplus' in the accompanying consolidated balance sheet.

We allocated $15.6 million of professional fees to this element of the restructuring, of which $14.0 million are related to the issuance of the Series A Notes and modifications to the prior credit agreement. Such amount has been recognized as 'Nonoperating restructuring transaction costs' in the accompanying statements of consolidated operations, consistent with troubled debt restructuring accounting. The remaining $1.6 million of professional fees are allocated to the issuance of the Series B Preferred Stock and have been recorded as a reduction to 'Capital surplus' in the accompanying consolidated balance sheet.

*Prior ABL Facility and Refinancing of ABS Facility*

In connection with the restructuring, the Company entered into the Prior ABL Facility, of which the Term A Facility was funded by lenders that did not participate in the ABS Facility and the Term B Facility was funded by one of the ABS Facility lenders. This element of the restructuring was accounted for as an extinguishment of debt and issuance of new debt, for the portion of Prior ABL Facility debt attributed to lenders that did not participate in the ABS Facility. For the portion of the Prior ABL Facility debt attributed to the lender that participated in the ABS Facility, this element of the transaction was being accounted for as an exchange of line-of-credit or revolving-debt arrangements.

As a part of refinancing the ABS Facility, the lenders agreed to forgive accrued interest of $11.3 million and deferred commitment fees of $15.0 million. The forgiveness of the interest and fees along with the write-off of $1.2 million of unamortized deferred debt costs associated with the ABS Facility resulted in the recognition of a gain on the extinguishment of debt of $25.1 million. Such amount has been recognized as '(Gain) loss on extinguishment of debt' in the accompanying statements of consolidated operations.

We allocated $5.2 million of professional fees to this element of the restructuring. Such costs have been recorded as unamortized deferred debt costs in "Other assets" in the accompanying consolidated balance sheet and were recognized as interest expense over the term of the Prior ABL Facility.

*Restructured Contribution Deferral Agreement*

In connection with the restructuring, we entered into the A&R CDA with certain multi-employer pension funds to which we contribute. Such amendment, among other things, revised the final maturity date from December 31, 2012 to March 31, 2015 for amounts outstanding at the date of the restructuring, converted accrued interest of $4.5 million at the time of the restructuring to principal, and increased the interest rate for the Central States Pension Fund, which represents 64.3% of the total amount outstanding under the CDA, to 7.5%. The impact of this element of the restructuring on our accompanying consolidated balance sheet was

primarily limited to the reclassification of current obligations to non-current liabilities, due to the change in maturity date for all principal to March 31, 2015.

We allocated $3.8 million of professional fees to this element of the restructuring. Such amount has been recognized as 'Nonoperating restructuring transaction costs' in the accompanying statements of consolidated operations.

*Series B Notes*

The conversion feature embedded in the Series B Notes was required to be bifurcated on the restructuring date and separately measured as a derivative liability, as the Company did not have enough authorized and unissued common shares to satisfy conversion of the Series B Notes. We estimated the fair value of the conversion feature based on a contemporaneous valuation using an option pricing model, a Level 3 fair value measurement, and determined the fair value to be $41.7 million.

On September 16, 2011, the Company held a special meeting of shareholders at which the Company's amended and restated certificate of incorporation was approved and the number of authorized common shares to allow for the conversions. This increase provided sufficient authorized common shares to satisfy the conversion feature in the Series B Notes, and thus the conversion feature in the Series B Notes was no longer required to be bifurcated and presented as a derivative liability. The conversion feature was adjusted to a fair value of $106.8 million on September 16, 2011, with the change of $65.1 million recorded as 'Fair value adjustment on derivative liabilities' in the accompanying statements of consolidated operations. The $106.8 million fair value of the conversion feature was then reclassified as an equity-classified derivative within 'Capital surplus' in the accompanying consolidated balance sheet.

We allocated $2.1 million of professional fees to this element of the restructuring. Such costs have been recorded as unamortized deferred debt costs in "Other assets" in the accompanying consolidated balance sheet and will be recognized as interest expense over the term of the Series B Notes.

## 12. Stock Compensation Plans

We have reserved 2.0 million shares for issuance to key management personnel and directors under the 2011 long-term incentive and equity award plan. As of December 31, 2013, 1.1 million shares remain available for issuance under this plan. The plan permits the issuance of restricted stock and share units, as well as options, stock appreciation rights, and performance stock and performance stock unit awards. Awards under the plan can be satisfied in cash or shares at the discretion of the Board of Directors. According to the plan provisions, the share units provide the holders the right to receive one share of our common stock upon vesting of one share unit. The plan requires the exercise price of any option equal to the closing market price of our common stock on the date of grant.

*Stock Options*

On March 1, 2010, we formalized the Second Union Employee Option Plan that provided for a grant of up to 31,000 options, including the effect of the reverse stock split, to purchase our common stock at an exercise price equal to $3,600.00 per share, of which all have been granted. As a part of the union wage reduction, we agreed to award a certain equity interest to all effected union employees. These options vested immediately, will expire 10 years from the grant date, and were exercisable upon shareholder approval, which was received on June 29, 2010, at our annual shareholder meeting. There has been no activity in these stock options for the years ended December 31, 2013, 2012 and 2011.

The following table summarizes information about stock options outstanding as of December 31, 2013:

| | Options Outstanding | | | | Options Exercisable | | |
|---|---|---|---|---|---|---|---|
| Range of exercise prices | Shares (in thousands) | Weighted Average Remaining Contractual Term (in years) | Weighted Average Exercise price | Aggregate Intrinsic Value | Shares (in thousands) | Weighted Average Exercise price | Aggregate Intrinsic Value |
| $ 3,600.00 - 35,475.00 | 33 | 6.17 | $ 3,680.09 | $ — | 33 | $ 3,680.09 | $ — |

*Restricted Stock*

A summary of the activity of our nonvested restricted stock and share unit awards is presented in the following table:

Table of Contents

| | Shares (in thousands) | | Weighted Average Grant-Date Fair Value |
|---|---|---|---|
| Nonvested at December 31, 2010 | — | | — |
| Granted | 271 | $ | 11.60 |
| Vested | (1) | | 11.60 |
| Forfeited | — | | — |
| Nonvested at December 31, 2011 | 270 | $ | 11.60 |
| Granted | 586 | | 11.34 |
| Vested | (21) | | 8.85 |
| Forfeited | (83) | | 11.63 |
| Nonvested at December 31, 2012 | 752 | $ | 11.47 |
| Granted | 429 | | 6.24 |
| Vested | (405) | | 10.27 |
| Forfeited | (118) | | 10.54 |
| Nonvested at December 31, 2013 | 658 | $ | 8.96 |

We recognize expense on a straight-line basis over the vesting term. The vesting provisions for the restricted stock and share unit awards and the related number of shares granted during the year ended December 31 are as follows:

| | Shares (in thousands) | | |
|---|---|---|---|
| Vesting Terms | 2013 | 2012 | 2011 |
| 50% immediately and 50% on the 1 year anniversary of the grant date | 187 | — | — |
| 50% on the 1 year anniversary of the grant date and 50% on the 2 year anniversary of the grant date | 150 | — | — |
| 25% per year for four years | 56 | 501 | 78 |
| 25% immediately and 25% on each employment anniversary thereafter | 18 | — | — |
| 100% immediately | 5 | — | — |
| 100% on February 20, 2013 | — | 72 | — |
| 33.3% immediately and 33.3% per year thereafter on the anniversary of the grant date | 13 | 13 | 3 |
| 25% on January 1, 2013, 25% on the 2 year anniversary of the employment date, 25% on each employment anniversary thereafter | | — | 184 |
| 100% on July 27, 2013 | — | — | 6 |
| Total restricted stock and share units granted | 429 | 586 | 271 |

As of December 31, 2013 and 2012, there was $4.8 million and $6.4 million, respectively of unrecognized compensation expense related to nonvested share-based compensation arrangements. That expense is expected to be recognized over a weighted-average period of 2.1 years. The fair value of nonvested shares is determined based on the closing trading price of our shares on the grant date. The fair value of shares vested during the years ended December 31, 2013, 2012 and 2011 was not material.

The outstanding awards under our stock compensation plans provide dividend participation features and are considered participating securities in our earnings per share calculation.

Table of Contents

*Teamster 401(k) Contribution*

On July 22, 2011, the Company delivered into escrow 1.3 million shares of our Series B Preferred Stock, which were delivered from escrow on July 25, 2011, to the Teamster-National 401(k) Savings Plan for the benefit of the Company's IBT employees. The $14.9 million fair value of the 1.3 million shares of Series B Preferred Stock issued was based on a contemporaneous valuation, whereas an estimated enterprise value was first calculated using assumptions related to market multiples of earnings, a market approach which is a level 3 fair value measurement. The estimated enterprise value was then reduced by the fair value of our debt instruments subsequent to our 2011 restructuring, with the residual allocated to our Series B Preferred Stock and common stock. On September 16, 2011, following approval from the shareholders of the Company's amended and restated certificate of incorporation the number of common shares increased and these preferred shares were automatically converted into 1.6 million shares of common stock.

This element of the restructuring was accounted for as the grant of a share-based payment award to employees and the $14.9 million charge for the share-based payments has been included in 2011 "Equity based compensation expense" in the accompanying statements of consolidated operations.

## 13. Income Taxes

We use the asset and liability method to reflect income taxes on our financial statements, pursuant to ASC 740, "Income Taxes" ("ASC 740"). We recognize deferred tax assets and liabilities by applying enacted tax rates to the differences between the carrying value of existing assets and liabilities and their respective tax basis and to loss carryforwards. Tax credit carryforwards are recorded as deferred tax assets. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in income in the period that the change occurs. We assess the validity of deferred tax assets and loss and tax credit carryforwards and provide valuation allowances when we determine it is more likely than not that such assets, losses, or credits will not be realized. We have not recognized deferred taxes relative to foreign subsidiaries' earnings that are deemed to be permanently reinvested. Any related taxes associated with such earnings are not material.

Deferred tax liabilities (assets) were comprised of the following at December 31:

| (in millions) | | 2013 | | 2012 |
|---|---|---|---|---|
| Depreciation | $ | 295.2 | $ | 327.8 |
| Deferred revenue | | 17.2 | | 12.2 |
| Intangibles | | 29.5 | | 36.3 |
| Gain on debt redemption | | 64.3 | | 63.9 |
| Other | | 54.7 | | 54.7 |
| Deferred tax liabilities | | 460.9 | | 494.9 |
| Claims and insurance | | (169.2) | | (179.6) |
| Net operating loss carryforwards | | (329.1) | | (298.8) |
| Employee benefit accruals | | (237.9) | | (288.9) |
| Other | | (176.7) | | (173.6) |
| Deferred tax assets | | (912.9) | | (940.9) |
| Valuation allowance | | 454.1 | | 448.4 |
| Net deferred tax assets | | (458.8) | | (492.5) |
| Net deferred tax liability | $ | 2.1 | $ | 2.4 |

The net deferred tax liability of $2.1 million and $2.4 million as of December 31, 2013 and 2012, respectively, is included as separate line items in the accompanying balance sheets. Current income tax receivable was $20.1 million and $27.3 million as of December 31, 2013 and 2012, respectively, and is included in "Prepaid expenses and other" in the accompanying balance sheets.

The Company has carried back the 2013 federal taxable loss to the extent allowed and claimed and received refunds of $14.4 million. As of December 31, 2013, the Company has remaining federal Net Operating Loss carryforwards of approximately $689.1 million, of which, an estimated $298.6 million will not be utilized due to limitations imposed by the Internal Revenue Code regarding the use of tax attributes following deemed ownership changes that occurred in July, 2011 and in July, 2013. Subsequent to the balance sheet date, another such ownership change occurred in January, 2014, in conjunction with the 2014 Financing Transactions described in the "2014 Financing Transactions" footnote. The impact of the 2014 ownership change on the Company's

83

Table of Contents

ability to utilize its Net Operating Loss carryforwards has not yet been determined, but it is not expected to be material. These carryforwards expire between 2028 and 2033 if not used. As of December 31, 2013, the Company has foreign tax credit and other credit carryforwards of approximately $16.9 million, none of which will likely be utilized due to the Internal Revenue Code limitations described above, and which will expire between 2014 and 2018 if not used.

As of December 31, 2013 and 2012, a valuation allowance of $454.1 million and $448.4 million has been established for deferred tax assets because, based on available sources of future taxable income, it is more likely than not that those assets will not be realized.

A reconciliation between income taxes at the federal statutory rate and the consolidated effective tax rate follows:

| | 2013 | 2012 | 2011 |
|---|---|---|---|
| Federal statutory rate | 35.0 % | 35.0 % | 35.0 % |
| State income taxes, net | (2.4)% | (1.8)% | (1.1)% |
| Foreign tax rate differential | (0.1)% | 2.6 % | — % |
| Permanent differences | 2.0 % | 8.6 % | (6.3)% |
| Valuation allowance | (31.9)% | (39.8)% | (35.4)% |
| Benefit from intraperiod tax allocation under ASC 740 | 32.2 % | — % | — % |
| Net (increase) decrease in unrecognized tax benefits | 0.6 % | (1.7)% | 3.7 % |
| Benefit from settlement of Tax Court litigation | — % | 6.4 % | — % |
| Other, net | — % | 0.6 % | 6.2 % |
| Effective tax rate | 35.4 % | 9.9 % | 2.1 % |

The income tax provision (benefit) consisted of the following:

| (in millions) | | 2013 | | 2012 | | 2011 |
|---|---|---|---|---|---|---|
| Current: | | | | | | |
| Federal | $ | (14.5) | $ | (24.0) | $ | (23.9) |
| State | | 1.4 | | 2.5 | | 11.3 |
| Foreign | | 9.6 | | 2.7 | | 5.3 |
| Current income tax benefit | $ | (3.5) | $ | (18.8) | $ | (7.3) |
| | | | | | | |
| Deferred: | | | | | | |
| Federal | $ | (41.7) | $ | 5.5 | $ | (0.2) |
| State | | — | | 0.5 | | — |
| Foreign | | (0.7) | | (2.2) | | — |
| Deferred income tax provision (benefit) | $ | (42.4) | $ | 3.8 | $ | (0.2) |
| | | | | | | |
| Income tax benefit | $ | (45.9) | $ | (15.0) | $ | (7.5) |
| | | | | | | |
| Based on the income (loss) before income taxes: | | | | | | |
| Domestic | $ | (152.8) | $ | (173.8) | $ | (366.1) |
| Foreign | | 23.3 | | 22.3 | | 4.2 |
| Loss before income taxes | $ | (129.5) | $ | (151.5) | $ | (361.9) |

During 2013, the Company recognized $41.7 million of deferred benefit in the Statement of Consolidated Operations and an equal and offsetting deferred tax expense in other comprehensive income included in the Statement of Consolidated Comprehensive Loss due to the application of intraperiod tax allocation rules under ASC 740. This allocation has no effect on total tax provision or total valuation allowance.

84

Table of Contents

*Uncertain Tax Positions*

A rollforward of the total amount of unrecognized tax benefits for the years ended December 31 is as follows:

| (in millions) | | 2013 | | 2012 |
|---|---|---|---|---|
| Unrecognized tax benefits at January 1 | $ | 29.7 | $ | 27.1 |
| **Increases related to:** | | | | |
| Tax positions taken during a prior period | | 1.3 | | 3.6 |
| Tax positions taken during the current period | | 0.9 | | 0.9 |
| **Decreases related to:** | | | | |
| Lapse of applicable statute of limitations | | (1.2) | | (1.9) |
| Settlements with taxing authorities | | (3.1) | | — |
| Unrecognized tax benefits at December 31 | $ | 27.6 | $ | 29.7 |

At December 31, 2013 and 2012, there are $24.8 million and $25.8 million of benefits that, if recognized, would affect the effective tax rate. We accrued interest of $1.4 million and $2.2 million for the years ended December 31, 2013 and 2012 and reversed $2.6 million and $5.6 million of previously accrued interest on uncertain tax positions during the years ended December 31, 2013 and 2012 for a net reduction of $1.2 million and $3.4 million for 2013 and 2012. The reversal related primarily to settlements and other favorable resolution of prior uncertain positions. The total amount of interest accrued for uncertain tax positions is $14.5 million and $15.7 million as of as of December 31, 2013 and 2012. During the year ended December 31, 2013, we paid tax of $1.2 million and interest of $0.8 million to settle certain state and foreign audits of tax years 2001-08 for certain of our subsidiaries and we reduced our previously recorded tax contingency accordingly. We have not accrued any penalties relative to uncertain tax positions. We have elected to treat interest and penalties on uncertain tax positions as interest expense and other operating expenses, respectively.

It is reasonably possible that the existing unrecognized tax benefits may decrease over the next twelve months by as much as $21.2 million as a result of developments in examinations and/or litigation, or from the expiration of statutes of limitation.

Tax years that remain subject to examination for our major tax jurisdictions as of December 31, 2013:

| | |
|---|---|
| Statute remains open | 2005-2012 |
| Tax years currently under examination/exam completed | 2005-2012 |
| Tax years not examined | 2013 |

## 14. Business Segments

We report financial and descriptive information about our reportable operating segments on a basis consistent with that used internally for evaluating segment performance and allocating resources to segments. We evaluate performance primarily on operating income and return on invested capital.

We have the following reportable segments, which are strategic business units that offer complementary transportation services to their customers. YRC Freight includes carriers that provide comprehensive national, regional and international services. Regional Transportation is comprised of carriers that focus primarily on business opportunities in the next-day and regional delivery markets. Truckload consists of Glen Moore, a former domestic truckload carrier. On December 15, 2011, we sold a majority of the assets of Glen Moore to a third party for $18.5 million and ceased the operations. We recognized a $4.6 million loss on the sale of these assets which is included in the Truckload segment for 2011.

Effective April 1, 2010 until its deconsolidation in the first quarter of 2012, the results of Jiayu are reflected in our consolidated results as part of the Corporate Segment.

Table of Contents

We charge management fees and other corporate services to our segments based upon usage or on an overhead allocation basis. Corporate and other operating losses represent operating expenses of the holding company, including compensation and benefits and professional services for all periods presented. Corporate identifiable assets primarily refer to cash, cash equivalents, restricted cash and deferred debt issuance costs as well as our investment in JHJ. Intersegment revenue relates to transportation services between our segments.

Revenue from foreign sources totaled $139.5 million, $158.3 million, and $186.8 million in 2013, 2012 and 2011, respectively, and is largely derived from Canada and Mexico. Long-lived assets located in foreign countries totaled $12.4 million, $14.7 million and $15.5 million at December 31, 2013, 2012, and 2011, respectively.

The following table summarizes our operations by business segment:

| (in millions) | YRC Freight | | Regional Transportation | | Truckload | | Corporate/Eliminations | | Consolidated | |
|---|---|---|---|---|---|---|---|---|---|---|
| **2013** | | | | | | | | | | |
| External revenue | $ | 3,136.8 | $ | 1,728.6 | $ | — | $ | — | $ | 4,865.4 |
| Intersegment revenue | | — | | — | | — | | — | | — |
| Operating income (loss) | | (31.2) | | 79.9 | | — | | (20.3) | | 28.4 |
| Identifiable Assets | | 1,513.4 | | 698.4 | | — | | (146.9) | | 2,064.9 |
| Acquisition of property and equipment | | (43.4) | | (23.3) | | — | | (0.2) | | (66.9) |
| Proceeds from disposal of property and equipment | | 6.7 | | 3.0 | | — | | 0.1 | | 9.8 |
| Depreciation and amortization | | 109.1 | | 63.1 | | — | | 0.1 | | 172.3 |
| Equity investment impairment | | — | | — | | — | | — | | — |
| **2012** | | | | | | | | | | |
| External revenue | $ | 3,206.9 | $ | 1,640.4 | $ | — | $ | 3.2 | $ | 4,850.5 |
| Intersegment revenue | | — | | 0.2 | | — | | (0.2) | | — |
| Operating income (loss) | | (37.3) | | 70.0 | | — | | (8.6) | | 24.1 |
| Identifiable Assets | | 1,315.4 | | 745.5 | | — | | 164.6 | | 2,225.5 |
| Acquisition of property and equipment | | (47.2) | | (19.0) | | — | | (0.2) | | (66.4) |
| Proceeds from disposal of property and equipment | | 54.1 | | (0.2) | | — | | (3.5) | | 50.4 |
| Depreciation and amortization | | 119.8 | | 63.3 | | — | | 0.7 | | 183.8 |
| Equity investment impairment | | — | | — | | — | | 30.8 | | 30.8 |
| **2011** | | | | | | | | | | |
| External revenue | $ | 3,203.0 | $ | 1,553.3 | $ | 86.9 | $ | 25.6 | $ | 4,868.8 |
| Intersegment revenue | | — | | 1.0 | | 12.0 | | (13.0) | | — |
| Operating income (loss) | | (88.5) | | 32.9 | | (18.9) | | (63.7) | | (138.2) |
| Identifiable Assets | | 1,410.0 | | 843.6 | | 2.7 | | 229.5 | | 2,485.8 |
| Acquisition of property and equipment | | (29.4) | | (33.1) | | (0.6) | | (8.5) | | (71.6) |
| Proceeds from disposal of property and equipment | | 48.5 | | 0.7 | | 18.2 | | 0.1 | | 67.5 |
| Depreciation and amortization | | 102.9 | | 61.6 | | 7.9 | | 23.3 | | 195.7 |

## 15. Shareholders' Deficit

The Company designated one of the authorized shares of preferred stock as its Series A Voting Preferred Stock. The Series A Voting Preferred Stock has a $1 liquidation value and entitles the holder to elect two directors to the Company's Board of Directors. The one share of Series A Voting Preferred Stock was issued to the IBT on July 22, 2011 in connection with the restructuring. The Series A Voting Preferred Stock was recorded at its liquidation value.

Table of Contents

The Company designated 4,999,999 of the authorized shares of preferred stock as its Series B Preferred Stock. As part of the 2011 restructuring, we issued an aggregate of 4,999,999 shares of Series B Preferred Stock to satisfy a portion of the outstanding credit agreement claims (3,717,948 shares) and to satisfy our obligation to the IBT for their modifications of the MOU in both 2009 and 2010 (1,282,051 shares). On September 16, 2011, these preferred shares were immediately convertible into our common stock upon effectiveness of the Charter Agreement Merger and increase in authorized common shares. At the date of issuance, the Company did not have sufficient authorized and unissued common shares to satisfy the conversion of all of the Series B Preferred Stock and as such, the Company considered the guidance under ASC Topic 815-40 and determined that conversion was not within the Company's control for the Series B Preferred Stock and therefore classified the Series B Preferred Stock as temporary equity for the period July 22, 2011 through September 16, 2011, at which such time the Series B Preferred Stock converted into common shares.

The Series B Preferred Stock contained a beneficial conversion feature that was in-the-money on July 22, 2011. The $58.0 million fair value of the Series B Preferred Stock was allocated to this beneficial conversion feature at July 22, 2011, resulting in a discount recorded against the Series B Preferred Stock of $58.0 million, with the offset recorded to 'Capital surplus'. Upon effectiveness of the Charter Agreement Merger and increase in authorized common shares on September 16, 2011, the $58.0 million discount recorded against the Series B Preferred Stock was amortized into 'Accumulated deficit'.

The amortization of the discount recorded against the Series B Preferred Stock increased the net loss attributable to common shareholders in the calculation of basic and diluted loss per share.

On September 16, 2011, the Company's stockholders approved an amendment to the Company's Certificate of Incorporation to increase the number of authorized shares of the Company's capital stock from 85.0 million shares to 10.005 billion shares of which 5.0 million shares are preferred stock, par value $1.00 per share, and 10.0 billion shares are common stock, par value $0.01 per share. On September 16, 2011, the Company filed a Certificate of Merger with the Delaware Secretary of State in connection with which the Company's certificate of incorporation was amended and restated.

On September 16, 2011, the Company's stockholders approved an amendment to the Company's Certificate of Incorporation to effect a reverse stock split of the Company's common stock following the effectiveness of the authorized share increase described above, at a ratio to be determined by the Company's board of directors and within a range of one-for-50 to one-for-300; and reduce the number of authorized shares of the Company's common stock by the reverse split ratio.

The board of directors approved the reverse stock split effective December 1, 2011 at a ratio of 1:300. The reverse stock split was effective on NASDAQ on December 2, 2011. Fractional shares were not issued in connection with the reverse stock split. Fractional shares were collected and pooled by our transfer agent and sold in the open market and the proceeds were allocated to the stockholders' respective accounts pro rata in lieu of fractional shares.

The following reflects the activity in the shares of our preferred and common stock for the years ended December 31:

| (in thousands) | Preferred Shares | | | Common Shares | | |
|---|---|---|---|---|---|---|
| | 2013 | 2012 | 2011 | 2013 | 2012 | 2011 |
| Beginning balance | — | — | — | 7,976 | 6,847 | 159 |
| Issuance of Series B preferred stock in exchange for debt | — | — | 5,000 | — | — | — |
| Conversion of Series B preferred stock to common stock | — | — | (5,000) | — | — | 6,210 |
| Issuance of equity in exchange for debt | — | — | — | 1,929 | 1,112 | 478 |
| Issuance of equity awards, net | — | — | — | 268 | 17 | — |
| Ending balance | — | — | — | 10,173 | 7,976 | 6,847 |

Our amended and restated credit agreement in place as of December 31, 2013, restricts the ability of YRC Worldwide to declare dividends on its outstanding capital stock.

As discussed in the "2014 Financing Transactions" footnote, we issued a significant number of common and preferred shares subsequent to December 31, 2013. Please refer to the "2014 Financing Transactions" footnote for additional details.

## 16. Loss Per Share

87

Table of Contents

We present both basic and diluted EPS amounts. Basic EPS is calculated by dividing net loss by the weighted average number of common shares outstanding during the year. We calculate earnings per share using the two class method where unvested share-based payment awards that contain non-forfeitable rights to dividends or dividend equivalents (whether paid or unpaid) are considered participating securities and shall be included in the computation of earnings per share. The two-class method is an earnings allocation formula that treats a participating security as having rights to earnings that would otherwise have been available to common shareholders. Participating securities do not participate in losses and therefore are excluded from the calculation of loss per share.

In periods with net income, diluted EPS is based upon the weighted average number of common and common equivalent shares outstanding during the year which is calculated using the treasury stock method for stock options and restricted stock units, the if-converted method for convertible notes, and assumes conversion of our convertible senior notes based on the related fiscal year financial data. In periods with net loss, diluted EPS uses the same shares as basic EPS with no consideration of the if-converted method on the numerator.

Given our net loss position for the years ended December 31, 2013, 2012, and 2011, there are no dilutive securities for these periods. Antidilutive options and share units were 691,000, 771,700 and 302,700 at December 31, 2013, 2012, and 2011, respectively. Antidilutive 6% convertible senior note conversion shares, including the make whole premium, were convertible into 17,600 common shares at December 31, 2013, 2012, and 2011. Antidilutive Series A convertible note conversion shares were 5,226,000, 4,740,000 and 4,300,000 at December 31, 2013, 2012, and 2011. Antidilutive Series B convertible note conversion shares, including the make whole premiums, were 4,219,000, 6,149,000 and 7,261,000 at December 31, 2013, 2012, and 2011.

## 17. Commitments, Contingencies, and Uncertainties

### Financial Matters

We incur rental expenses under noncancelable lease agreements for certain buildings and operating equipment. Rental expense is charged to "Operating expense and supplies" or "Purchased transportation" on the accompanying statements of operations. Rental expense was $76.0 million, $78.0 million, and $79.4 million for the years ended December 31, 2013, 2012 and 2011, respectively.

At December 31, 2013, we were committed under noncancelable lease agreements requiring minimum annual rentals payable as follows:

| (in millions) | 2014 | 2015 | 2016 | 2017 | 2018 | Thereafter |
|---|---|---|---|---|---|---|
| Minimum annual rentals | $ 56.1 | $ 41.4 | $ 22.4 | $ 16.6 | $ 12.0 | $ 18.1 |

We expect in the ordinary course of business that leases will be renewed or replaced as they expire. The leases provide for fixed and escalating rentals and contingent escalating rentals based on the Consumer Price Index not to exceed certain specified amounts. We record rent expense for our operating leases on a straight-line basis over the base term of the lease agreements.

As of December 31, 2013, we have $2.3 million committed for capital expenditures to be completed during 2014.

### ABF Lawsuit

On November 1, 2010, ABF Freight System, Inc. ("ABF") filed a complaint in the U.S. District Court for the Western District of Arkansas against several parties, including our subsidiaries YRC Inc., New Penn Motor Express, Inc. and USF Holland Inc. and the International Brotherhood of Teamsters and the local Teamster unions party to the National Master Freight Agreement ("NMFA") alleging violation of the NMFA due to modifications to the NMFA that provided relief to our subsidiaries without providing the same relief to ABF. The complaint sought to have the modifications to the NMFA declared null and void and damages of $750.0 million from the named defendants. We believe the allegations are without merit.

On December 17, 2010, the District Court dismissed the complaint. ABF appealed the dismissal on January 18, 2011 to the U.S. Court of Appeals for the 8th Circuit. On July 6, 2011, the Court of Appeals vacated the District Court's dismissal of the litigation on jurisdictional grounds and remanded the case back to the District Court for further proceedings. ABF filed an amended complaint on October 12, 2011, containing allegations consistent with the original complaint. Our subsidiaries filed a motion to dismiss the amended complaint. ABF appealed the dismissal to the Court of Appeals, and, on August 30, 2013, the Court of Appeals affirmed the District Court's decision. ABF did not file a petition for certiorari with the United States Supreme Court, which was due on or before November 29, 2013. Thus, the Court of Appeals' dismissal of this matter is final.

Table of Contents

*Bryant Holdings Securities Litigation*

On February 7, 2011, a putative class action was filed by Bryant Holdings LLC ("Bryant") in the U.S. District Court for the District of Kansas on behalf of purchasers of our common stock between April 24, 2008 and November 2, 2009, inclusive (the "Class Period"), seeking damages under the federal securities laws for statements and/or omissions allegedly made by us and the individual defendants during the Class Period which plaintiffs claimed to be false and misleading.

The individual defendants are former officers of our Company. No current officers or directors were named in the lawsuit. The parties participated in voluntary mediation between March 11, 2013 and April 15, 2013. Substantially all of the payments contemplated by the settlement will be covered by our liability insurance. The self-insured retention on this matter has been accrued as of December 31, 2013.

The settlement agreement requires court approval.  On August 19, 2013, the Court entered an Order denying plaintiffs' Motion for Preliminary Approval of the Settlement.  Plaintiffs filed an Amended Motion for Preliminary Approval and, on November 18, 2013, the Court denied that Motion.  Each denial was based primarily on deficiencies that the Court perceived in the plan that plaintiffs proposed for allocation of the settlement proceeds among class members. Plaintiffs have revised the plan of allocation and, on February 18, 2014, filed a Second Amended Motion for Preliminary Approval.

*Other Legal Matters*

We are involved in other litigation or proceedings that arise in ordinary business activities. We insure against these risks to the extent we deem prudent, but no assurance can be given that the nature or amount of such insurance will be sufficient to fully indemnify us against liabilities arising out of pending and future legal proceedings. Many of these insurance policies contain self-insured retentions in amounts we deem prudent. Based on our current assessment of information available as of the date of these financial statements, we believe that our financial statements include adequate provisions for estimated costs and losses that may be incurred within the litigation and proceedings to which we are a party.

## 18. Related Party Transactions

On February 20, 2013, we entered into an Advisory Agreement with MAEVA Group, LLC ("MAEVA"), a company owned and controlled by Harry J. Wilson and of which Mr. Wilson is Chairman and CEO. Mr. Wilson served as a Series A Director of the Company appointed by the IBT and was not an independent director of the Company. The Advisory Agreement called for MAEVA to provide advisory, analytical, consulting and other services to us in connection with one or more potential transactions and/or other strategic initiatives. As compensation for its services, MAEVA was entitled to receive a  $250,000 per month retainer fee for at least four months plus potential completion fees of $5.5 million.

Pursuant to the Advisory Agreement, we paid MAEVA  $3.0 million in monthly retainer fees in 2013, and we paid a $5.5 million completion fee in January 2014 in connection with the completion of the 2014 Financing Transactions. Additionally in February 2014, we paid MAEVA an incremental fee of  $3.5 million in recognition of its critical role and performance in designing and leading a series of highly complicated, challenging and interdependent transactions that were critical to the Company's refinancing that led to a capital structure with maturities extended until 2019. Although the Advisory Agreement originally was set to expire on December 31, 2013, management and the Board requested that MAEVA continue to advise the Company and the Board on the various transactions, so we continued to pay the monthly retainer for two additional months while the Financing Transactions remained outstanding. The Advisory Agreement and the fees paid to MAEVA in connection with the 2014 Financing Transactions were approved by the independent members of the board.

89

Table of Contents

<u>Report of Independent Registered Public Accounting Firm</u>

The Board of Directors and Shareholders
YRC Worldwide Inc.:

We have audited the accompanying consolidated balance sheets of YRC Worldwide Inc. and subsidiaries (the Company) as of December 31, 2013 and 2012, and the related consolidated statements of operations, comprehensive loss, shareholders' deficit, and cash flows for each of the years in the three-year period ended December 31, 2013. These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of YRC Worldwide Inc. and subsidiaries as of December 31, 2013 and 2012, and the results of their operations and their cash flows for each of the years in the three-year period ended December 31, 2013, in conformity with U.S. generally accepted accounting principles.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), YRC Worldwide Inc.'s internal control over financial reporting as of December 31, 2013, based on criteria established in *Internal Control - Integrated Framework* (1992) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO), and our report dated March 10, 2014 expressed an unqualified opinion on the effectiveness of YRC Worldwide Inc.'s internal control over financial reporting.


<u>/s/ KPMG LLP</u>


Kansas City, Missouri
March 10, 2014

90

Table of Contents

Report of Independent Registered Public Accounting Firm

The Board of Directors and Shareholders
YRC Worldwide Inc.:

We have audited YRC Worldwide Inc.'s internal control over financial reporting as of December 31, 2013, based on criteria established in *Internal Control - Integrated Framework* (1992) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). YRC Worldwide Inc.'s management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Management's Report on Internal Control over Financial Reporting appearing under Item 9A of the December 31, 2013 annual report on Form 10-K. Our responsibility is to express an opinion on YRC Worldwide Inc.'s internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audit also included performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

In our opinion, YRC Worldwide Inc. maintained, in all material respects, effective internal control over financial reporting as of December 31, 2013, based on criteria established in *Internal Control - Integrated Framework* (1992) issued by COSO.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated balance sheets of YRC Worldwide Inc. and subsidiaries as of December 31, 2013 and 2012, and the related consolidated statements of operations, comprehensive loss, shareholders' deficit, and cash flows for each of the years in the three-year period ended December 31, 2013, and our report dated March 10, 2014 expressed an unqualified opinion on those consolidated financial statements.


/s/ KPMG LLP


Kansas City, Missouri
March 10, 2014


91

Table of Contents

Item 9. Changes in and Disagreements with Accountants on Accounting and Financial Disclosure

Not applicable.

Item 9A. Controls and Procedures

*Evaluation of Disclosure Controls and Procedures*

As required by Exchange Act, we maintain disclosure controls and procedures designed to ensure that information we are required to disclose in reports that we file or submit under the Exchange Act, is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms. Our disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information we are required to disclose in reports that we file or submit under the Exchange Act is accumulated and communicated to our management, including our principal executive and principal financial officers, as appropriate to allow timely decisions regarding required disclosure. Our management, with the participation of our principal executive and financial officers, has evaluated our disclosure controls and procedures as of December 31, 2013 and has concluded that our disclosure controls and procedures were effective as of December 31, 2013.

*Management's Report on Internal Control Over Financial Reporting*

The Company's management is responsible for establishing and maintaining effective internal control over our financial reporting, which is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles.

Our management assessed the effectiveness of our system of internal control over financial reporting as of December 31, 2013. In making this assessment, our management used the criteria for effective internal control over financial reporting described in "Internal Control - Integrated Framework" (1992) issued by the Committee of Sponsoring Organizations of the Treadway Commission.

Based on its assessment using those criteria, our management concluded that, as of December 31, 2013, our system of internal control over financial reporting was effective.

KPMG LLP, the independent registered public accounting firm that audited our December 31, 2013 consolidated financial statements, has issued an audit report on our system of internal control over financial reporting. The KPMG LLP audit report is included herein.

*Changes in Internal Control Over Financial Reporting*

There were no changes in our internal control over financial reporting that occurred during the fiscal quarter ended December 31, 2013 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

Item 9B. Other Information

None.

Table of Contents

**PART III**

Item 10. Directors and Executive Officers of the Registrant

Pursuant to General Instruction G to Form 10-K, the information required by this item, other than information regarding (i) our executive officers, which is incorporated by reference to Part I of this Form 10-K under the heading "Executive Officers of the Registrant," and (ii) our code of ethics, which is described below and titled the "Code of Business Conduct", is included under the captions "Proposal to Elect Directors," "Structure and Functioning of the Board -- Audit & Ethics Committee" and "Section 16(a) Beneficial Ownership Reporting Compliance" in our Proxy Statement related to the 2014 Annual Meeting of Stockholders and is incorporated herein by reference.

We have adopted a written Code of Business Conduct that applies to all of our directors, officers and employees, including our chief executive officer, chief financial officer and chief accounting officer. It is available under "Board Committee Charters and Code of Business Conduct" on our website located at www.yrcw.com. We intend to disclose any amendments to our Code of Business Conduct by posting such information our our website located at www.yrcw.com, other than technical, administrative or non-substantive amendments, and any waivers, including implicit waivers, from any provision of our Code of Business Conduct that applies to our principal executive officer, principal financial officer, principal accounting officer or controller, which information will be disclosed via SEC filing.

Item 11. Executive Compensation

Pursuant to General Instruction G to Form 10-K, the information required by this item is included under the captions "Compensation Committee Interlocks and Insider Participation," "Director Compensation," "Compensation Discussion and Analysis," "Compensation Committee Report" and "Executive Compensation" in our Proxy Statement related to the 2014 Annual Meeting of Stockholders and is incorporated herein by reference.

Item 12. Security Ownership of Certain Beneficial Owners and Management

Pursuant to General Instruction G to Form 10-K, the information required by this item is included under the captions "Security Ownership of Management and Directors," "Security Ownership of Certain Beneficial Owners" and "Equity Compensation Plan Information" in our Proxy Statement related to the 2014 Annual Meeting of Stockholders and is incorporated herein by reference.

Item 13. Certain Relationships and Related Transactions, and Director Independence

Pursuant to General Instruction G to Form 10-K, the information required by this item is included under the captions "Structure and Functioning of the Board" and "Certain Relationships and Related Transactions" in our Proxy Statement related to the 2014 Annual Meeting of Stockholders and is incorporated herein by reference.

Item 14. Principal Accounting Fees and Services

Pursuant to General Instruction G to Form 10-K, the information required by this item is included under the caption "Audit and Audit-Related Fees" in our Proxy Statement related to the 2014 Annual Meeting of Stockholders and is incorporated herein by reference.

Table of Contents

**PART IV**

Item 15. Exhibits, Financial Statement Schedules

(a)(1) Financial Statements

The consolidated financial statements of the Company included under Item 8 - Financial Statements and Supplementary Data.

(a)(2) Financial Statement Schedules

Report of Independent Registered Public Accounting Firm on Financial Statement Schedule on page 90.

(a)(3) Exhibits

| | |
|---|---|
| 2.1 | Equity Interest Purchase Agreement, dated June 25, 2010, between the Company and CEG Holdings, Inc. (incorporated by reference to Exhibit 2.1 to Quarterly Report on Form 10-Q for the quarter ended June 30, 2010, filed on August 9, 2010, File No. 000-12255). |
| 3.1.1 | Amended and Restated Certificate of Incorporation of the Company (incorporated by reference to Exhibit 3.1 to Current Report on Form 8-K, filed on September 16, 2011, File No. 000-12255). |
| 3.1.2 | Certificate of Amendment to the Certificate of Incorporation of the Company reducing the number of authorized shares (incorporated by reference to Exhibit 3.1 to Current Report on Form 8-K, filed on December 1, 2011, File No. 000-12255). |
| 3.1.3 | Certificate of Elimination of Series B Convertible Preferred Stock (incorporated by reference to Exhibit 3.2 to Current Report on Form 8-K, filed on December 1, 2011, File No. 000-12255). |
| 3.1.4 | Certificate of Designations of Series A Voting Preferred Stock (incorporated by reference to Exhibit 3.1 to Current Report on Form 8-K, filed on July 25, 2011, File No. 000-12255). |
| 3.1.5 | Certificate of Designations of Series A Convertible Preferred Stock (incorporated by reference to Exhibit 3.1 to Current Report on Form 8-K, filed on January 31, 2014, File No. 000-12255) |
| 3.2 | Amended and Restated Bylaws of the Company, adopted as of September 16, 2011 (incorporated by reference to Exhibit 3.2 to Current Report on Form 8-K, filed on September 16, 2011, File No. 000-12255). |
| 4.1 | Amended and Restated Certificate of Incorporation of the Company (incorporated by reference to Exhibit 3.1.1 to this Annual Report on Form 10-K), Certificate of Amendment to the Certificate of Incorporation (incorporated by reference to Exhibit 3.1.2 to this Annual Report on Form 10-K) and Certificate of Elimination of Series B Convertible Preferred Stock (incorporated by reference to Exhibit 3.1.3 to this Annual Report on Form 10-K). |
| 4.2 | Amended and Restated Bylaws of the Company (incorporated by reference to Exhibit 3.2 to this Annual Report on Form 10-K). |
| 4.3 | Certificate of Designations of Series A Voting Preferred Stock (incorporated by reference to Exhibit 3.1.4 to this Annual Report on Form 10-K). |
| 4.5.1 | Indenture (including form of note), dated as of February 23, 2010, among the Company, as issuer, the Guarantors and US Bank, National Association, as trustee, relating to the Company's 6% Convertible Senior Notes due 2014 (incorporated by reference to Exhibit 4.1 to Current Report on Form 8-K, filed on February 24, 2010, File No. 000-12255). |
| 4.5.2 | Supplemental Indenture, dated August 3, 2010, among the Company, as issuer, the Guarantors and U.S. Bank National Association, as trustee, relating to the Company's 6% Convertible Senior Notes due 2014 (incorporated by reference to Exhibit 4.1 to Current Report on Form 8-K, filed on August 3, 2010, File No. 000-12255). |
| 4.5.3 | Letter Agreement, dated August 2, 2010, among the Company and certain investors in the Company's 6% Convertible Senior Notes due 2014 (incorporated by reference to Exhibit 10.2 to Quarterly Report on Form 10-Q for the quarter ended September 30, 2010, filed on November 9, 2010, File No. 000-12255). |
| 4.6 | Indenture (including form of note), dated as of July 22, 2011, among the Company, as issuer, the subsidiaries party thereto as guarantors and U.S. Bank National Association, as trustee, related to the Company's 10% Series A Convertible Senior Secured Notes due 2015 (incorporated by reference to Exhibit 10.7 to Quarterly Report on Form 10-Q for the quarter ended June 30, 2011, filed on August 8, 2011, File No. 000-12255). |
| 4.7.1 | Indenture (including form of note), dated as of July 22, 2011, among the Company, as issuer, the subsidiaries party thereto as guarantors and U.S. Bank National Association, as trustee, related to the Company's 10% Series B Convertible Senior Secured Notes due 2015 (incorporated by reference to Exhibit 10.8 to Quarterly Report on Form 10-Q for the quarter ended June 30, 2011, filed on August 8, 2011, File No. 000-12255). |

94

Table of Contents

4.7.2    Supplemental Indenture, dated as of September 14, 2011, among the Company, as issuer, the subsidiaries party thereto as guarantors and U.S. Bank National Association, as trustee, supplementing the Indenture, dated as of July 22, 2011 (as supplemented and in effect as of the date of the Supplemental Indenture), relating to the Company's 10% Series B Convertible Senior Secured Notes due 2015 (incorporated by reference to Exhibit 4.5.2 to Registration Statement on Form S-1, filed on September 23, 2011, File No. 333-176971).

4.7.3    Third Supplemental Indenture, dated as of January 31, 2014, among the Company, as issuer, the subsidiaries party thereto as guarantors and U.S. Bank National Association, as trustee, supplementing the Indenture, dated as of July 22, 2011 (as supplemented and in effect as of the date of the Supplemental Indenture), relating to the Company's 10% Series B Convertible Senior Secured Notes due 2015 (incorporated by reference to Exhibit 4.1 to Current Report on Form 8-K, filed on January 31, 2014, File No. 000-12255).

(10) Material Contracts

10.1.1    Amended and Restated Credit Agreement, dated as of July 22, 2011, among the Company, as borrower, JPMorgan Chase Bank, National Association, as administrative agent, and the lenders party thereto (incorporated by reference to Exhibit 10.2 to Quarterly Report on Form 10-Q for the quarter ended June 30, 2011, filed on August 8, 2011, File No. 000-12255).

10.1.2    Amendment No. 1 to Amended and Restated Credit Agreement, dated as of February 27, 2012, among the Company, as borrower, JPMorgan Chase Bank, National Association, as administrative agent, and the lenders party thereto (incorporated by reference to Exhibit 10.2.2 to Annual Report on Form 10-K for the year ended December 31, 2011, filed on February 28, 2012, File No. 000-12255).

10.1.3    Amendment No. 2 to Amended and Restated Credit Agreement, dated as of April 27, 2012, among the Company, as borrower, JPMorgan Chase Bank, National Association, as administrative agent, and the lenders party thereto (incorporated by reference to Exhibit 99.1 to Current Report on Form 8-K, filed on April 30, 2012, File No. 000-12255).

10.1.4    Amendment No. 3 to Amended and Restated Credit Agreement, by and among the Company, as borrower, JPMorgan Chase Bank, National Association, as administrative agent, and the lenders party thereto (incorporated by reference to Exhibit 10.1 to Current Report on Form 8-K, filed on November 12, 2013, File No. 000-12255).

10.2.1    Credit Agreement, dated as of July 22, 2011, among YRCW Receivables LLC, as borrower, the Company, as servicer, JPMorgan Chase Bank, N.A., as administrative agent, and the lenders party thereto (incorporated by reference to Exhibit 10.2 to Quarterly Report on Form 10-Q for the quarter ended September 30, 2011, filed on November 9, 2011, File No. 000-12255).

10.2.2    Amendment No. 1 to Credit Agreement and Amendment No.1 to Receivables Sale Agreement, dated as of February 27, 2012, among YRCW Receivables LLC, as borrower, the Company, as servicer, JPMorgan Chase Bank, N.A., as administrative agent, and the lenders party thereto (incorporated by reference to Exhibit 10.5.2 to Annual Report on Form 10-K for the year ended December 31, 2011, filed on February 28, 2012, File No. 000-12255).

10.2.3    Amendment No. 2 to Credit Agreement, dated as of February 27, 2012, among YRCW Receivables LLC, as borrower, and the lenders party thereto (incorporated by reference to Exhibit 10.5.2 to Annual Report on Form 10-K for the year ended December 31, 2011, filed on February 28, 2012, File No. 000-12255).

10.2.4    Amendment No. 3 to Credit Agreement dated as of April 27, 2012, among YRCW Receivables LLC, as borrower, and the lenders party thereto (incorporated by reference to Exhibit 99.2 to Current Report on Form 8-K, filed on April 30, 2012, File No. 000-12255).

10.2.5    Amendment No. 4 to Credit Agreement dated as of November 12, 2013, by and among YRCW Receivables LLC, as borrower, and the lenders party thereto(incorporated by reference to Exhibit 10.2 to Quarterly Report on Form 10-Q for the quarter ended September 30, 2013, filed on November 12, 2013, File No. 000-12255).

10.2.6    Amendment No. 5 to Credit Agreement dated as of January 30, 2014 by and among YRCW Receivables LLC, as borrower, and the lenders party thereto (incorporated by reference to Exhibit 10.1 to current report on Form 8-K, filed on February 5, 2014, File No. 000-12255).

10.3.1    National Master Freight Agreement, effective April 1, 2008, among the International Brotherhood of Teamsters, YRC Inc. (formerly, Yellow Transportation, Inc. and Roadway Express, Inc.), USF Holland Inc. and New Penn Motor Express, Inc. (incorporated by reference to Exhibit 10.1 to Current Report on Form 8-K, filed on February 11, 2008, File No. 000-12255).

10.3.2    Amended and Restated Memorandum of Understanding on the Job Security Plan, dated July 9, 2009, among the International Brotherhood of Teamsters, YRC Inc., USF Holland Inc. and New Penn Motor Express, Inc. (incorporated by reference to Exhibit 10.1 to Current Report on Form 8-K, filed on July 14, 2009, File No. 000-12255).

10.3.3    Agreement for the Restructuring of the YRC Worldwide Inc. Operating Companies and related Term Sheet/Proposal (the "Restructuring Plan"), dated September 24, 2010, among the International Brotherhood of Teamsters, YRC Inc., USF Holland Inc. and New Penn Motor Express, Inc. (incorporated by reference to Exhibit 10.1 to Current Report on Form 8-K, filed on September 29, 2010, File No. 000-12255).

Table of Contents

| | |
|---|---|
| 10.3.4 | Certification and Amendment (dated December 31, 2010) and Certification and Second Amendment (dated February 28, 2011) to the Restructuring Plan Term Sheet (incorporated by reference to Exhibit 10.3.4 to Annual Report on Form 10-K for the year ended December 31, 2010, filed on March 14, 2011, File No. 000-12255). |
| 10.3.5 | Extension of the Agreement for the Restructuring of the YRC Worldwide Inc. Operating Companies, dated February 7, 2014, by and among YRC Inc. (d/b/a YRC Freight), USF Holland Inc., New Penn Motor Express, Inc., USF Reddaway Inc. and the Teamsters National Freight Industry Negotiating Committee of the International Brotherhood of Teamsters (incorporated by reference to Exhibit 10.1 to Current Report on Form 8-K, filed on February 7, 2014, File No. 000-12255). |
| 10.4.1 | Amended and Restated Contribution Deferral Agreement, dated as of July 22, 2011, among YRC Inc., USF Holland Inc., New Penn Motor Express, Inc. and USF Reddaway Inc., collectively as primary obligors, the Trustees for the Central States, Southeast and Southwest Areas Pension Fund, the Wilmington Trust Company, as agent, and the other funds party thereto (incorporated by reference to Exhibit 10.6 to Quarterly Report on Form 10-Q for the quarter ended June 30, 2011, filed on August 8, 2011, File No. 000-12255). |
| 10.4.2 | Consent and First Amendment to the Amended and Restated Contribution Deferral Agreement, dated as of October 17, 2011, among YRC Inc., USF Holland Inc., New Penn Motor Express, Inc. and USF Reddaway Inc., collectively as primary obligors, the Trustees for the Central States, Southeast and Southwest Areas Pension Fund, the Wilmington Trust Company, as agent, and the other funds party thereto (incorporated by reference to Exhibit 10.8.2 to Annual Report on Form 10-K for the year ended December 31, 2011, filed February 28, 2012, File No. 000-12255). |
| 10.4.3 | Consent and Second Amendment to the Amended and Restated Contribution Deferral Agreement, dated as of January 31, 2014, among YRC Inc., USF Holland Inc., New Penn Motor Express, Inc. and USF Reddaway Inc., collectively as primary obligors, the Trustees for the Central States, Southeast and Southwest Areas Pension Fund, the Wilmington Trust Company, as agent, and the other funds party thereto (incorporated by reference to Exhibit 10.1 to the Current Report on Form 8-k, filed on January 31, 2014, File No. 000-12255). |
| 10.4.4 | Letter Agreement, dated as of January 29, 2014 and effective as of January 31, 2014, among Central States, Southeast and Southwest Areas Pension Fund, YRC, Inc., USF Holland Inc., New Penn Motor Express, Inc., USF Reddaway Inc., as primary obligors, YRC Worldwide Inc., as primary guarantor, and certain additional guarantors (incorporated by reference to Exhibit 10.2 to Current Report on Form 8-K, filed on January 31, 2014, File No. 000-12255). |
| 10.5 | Amended and Restated Pledge and Security Agreement, dated as of July 22, 2011, among the Company, the subsidiaries of the Company party thereto, as grantors, and JPMorgan Chase Bank, National Association, as administrative agent and as collateral agent (incorporated by reference to Exhibit 10.12 to Quarterly Report on Form 10-Q for the quarter ended June 30, 2011, filed on August 8, 2011, File No. 000-12255). |
| 10.6 | Pledge and Security Agreement, dated as of July 22, 2011, among the Company, the subsidiaries of the Company party thereto, as grantors, and U.S. Bank National Association, as collateral trustee (incorporated by reference to Exhibit 10.13 to Quarterly Report on Form 10-Q for the quarter ended June 30, 2011, filed on August 8, 2011, File No. 000-12255). |
| 10.7 | Amended and Restated Intercreditor Agreement, dated as of July 22, 2011, among the Company, the subsidiaries of the Company party thereto, JPMorgan Chase Bank, National Association, as bank group representative, Wilmington Trust Company, as pension fund representative, U.S. Bank National Association, as convertible note representative, JPMorgan Chase Bank, N.A., as ABL representative, and the other bank group loan parties party thereto (incorporated by reference to Exhibit 10.14 to Quarterly Report on Form 10-Q for the quarter ended June 30, 2011, filed on August 8, 2011, File No. 000-12255). |
| 10.8 | Collateral Trust Agreement, dated as of July 22, 2011, among the Company, the subsidiaries of the Company party thereto, U.S. Bank National Association, as Series A Notes indenture trustee, U.S. Bank National Association, as Series B Notes indenture trustee, and U.S. Bank National Association, as collateral trustee (incorporated by reference to Exhibit 10.15 to Quarterly Report on Form 10-Q for the quarter ended June 30, 2011, filed on August 8, 2011, File No. 000-12255). |
| 10.10* | Credit Agreement dated as of February 13, 2014, by and among the Company, as borrower, the subsidiaries of the borrower party thereto from time to time, the lenders from time to time party thereto, and Credit Suisse AG, Cayman Islands Branch, as administrative agent and collateral agent for the lenders. |
| 10.11*† | Loan and Security Agreement, dated as of February 13, 2014, among the Company, as administrative borrower, the other borrowers named therein, the guarantors named therein, certain financial institutions, as lenders, and RBS Citizens Business Capital a division of RBS Asset Finance, Inc., a subsidiary of RBS Citizens, N.A., as agent, and RBS Citizens, N.A., Merrill Lynch, Pierce, Fenner & Smith and CIT Finance LLC, as joint lead arrangers and joint bookrunners. |

(10) Management Contracts, Compensatory Plans and Arrangements

| | |
|---|---|
| 10.12.1 | YRC Worldwide Inc. Director Compensation Plan, effective August 30, 2011 (incorporated by reference to Exhibit 10.53.1 to Registration Statement on Form S-1, filed on September 23, 2011, File No. 333-176971). |

Table of Contents

| | |
|---|---|
| 10.12.2 | Form of Director Share Unit Agreement (incorporated by reference to Exhibit 10.53.2 to Registration Statement on Form S-1, filed on September 23, 2011, File No. 333-176971). |
| 10.12.3* | YRC Worldwide Inc. Director Compensation Plan, effective December 13, 2013. |
| 10.13.4* | Form of Director Share Unit Agreement for Non-Employee Director under 2013 Director Compensation Plan. |
| 10.14 | Form of Indemnification Agreement between the Company and each of its directors and executive officers (incorporated by reference to Exhibit 10.5 to Current Report on Form 8-K, filed on March 15, 2007, File No. 000-12255). |
| 10.15 | YRC Worldwide Inc. 2011 Incentive and Equity Award Plan (incorporated by reference to Exhibit 99.1 to Registration Statement on Form S-8, filed on November 30, 2011, File No. 333-178223). |
| 10.16 | Form of Restricted Stock Agreement under YRC Worldwide Inc. 2011 Incentive and Equity Award Plan (incorporated by reference to Exhibit 10.29 to Annual Report on Form 10-K for the year ended December 31, 2011, filed on February 28, 2012, File No. 000-12255). |
| 10.17.1 | YRC Worldwide Inc. Supplemental Executive Pension Plan, effective January 1, 2005 (incorporated by reference to Exhibit 10.1 to Current Report on Form 8-K, filed on July 25, 2006, File No. 000-12255). |
| 10.17.2 | Amendment to YRC Worldwide Inc. Supplemental Executive Pension Plan (incorporated by reference to Exhibit 10.3 to Current Report on Form 8-K, filed on July 8, 2008, File No. 000-12255). |
| 10.17.3 | Second Amendment to YRC Worldwide Inc. Supplemental Executive Pension Plan (incorporated by reference to Exhibit 10.30.3 to Annual Report on Form 10-K for the year ended December 31, 2011, filed February 28, 2012, File No. 000-12255). |
| 10.18.1 | Yellow Corporation Pension Plan, amended and restated as of January 1, 2004 (incorporated by reference to Exhibit 10.27 to Annual Report on Form 10-K for the year ended December 31, 2003, filed on March 15, 2004, File No. 000-12255). |
| 10.18.2 | Amendment No. 1 to Yellow Corporation Pension Plan, as amended and restated as of January 1, 2004 (incorporated by reference to Exhibit 10.2 to Quarterly Report on Form 10-Q for the quarter ended September 30, 2005, filed on November 9, 2005, File No. 000-12255). |
| 10.18.3 | Amendment No. 2 to Yellow Corporation Pension Plan, as amended and restated as of January 1, 2004 (incorporated by reference to Exhibit 10.28.3 to Annual Report on Form 10-K for the year ended December 31, 2010, filed on March 14, 2011, File No. 000-12255). |
| 10.18.4 | Amendment No. 3 to Yellow Corporation Pension Plan, as amended and restated as of January 1, 2004 (incorporated by reference to Exhibit 10.2 to Current Report on Form 8-K, filed on July 8, 2008, File No. 000-12255). |
| 10.18.5 | Amendment No. 4 to Yellow Corporation Pension Plan, as amended and restated as of January 1, 2004 (incorporated by reference to Exhibit 10.22.5 to Annual Report on Form 10-K for the year ended December 31, 2008, filed on March 2, 2009, File No. 000-12255). |
| 10.18.6 | Amendment No. 5 and Amendment No. 6 to Yellow Corporation Pension Plan, as amended and restated as of January 1, 2004 (incorporated by reference to Exhibit 10.28.6 to Annual Report on Form 10-K for the year ended December 31, 2009, filed on March 16, 2010, File No. 000-12255). |
| 10.18.7 | Amendment No. 7 to Yellow Corporation Pension Plan, as amended and restated as of January 1, 2004 (incorporated by reference to Exhibit 10.7 to Quarterly Report on Form 10-Q for the quarter ended June 30, 2010, filed on August 9, 2010, File No. 000-12255). |
| 10.19 | YRC Worldwide Inc. Non-Union Employee Option Plan (incorporated by reference to Exhibit 10.3 to Current Report on Form 8-K, filed on January 6, 2009, File No. 000-12255). |
| 10.20 | YRC Worldwide Inc. Union Employee Option Plan (incorporated by reference to Exhibit 10.25 to Annual Report on Form 10-K for the year ended December 31, 2008, filed on March 2, 2009, File No. 000-12255). |
| 10.21 | YRC Worldwide Inc. Second Union Employee Option Plan (incorporated by reference to Exhibit 10.1 to Current Report on Form 8-K, filed on March 5, 2010, File No. 000-12255). |
| 10.22 | Form of YRC Worldwide Inc. Cash Performance and Restricted Stock Award Agreement (incorporated by reference to Exhibit 10.1 Current Report on Form 8-K, filed on April 3, 2009, File No. 000-12255). |
| 10.23.1 | Employment Agreement, dated as of July 22, 2011, between the Company and James L. Welch (incorporated by reference to Exhibit 10.16 to Quarterly Report on Form 10-Q for the quarter ended June 30, 2011, filed on August 8, 2011, File No. 000-12255). |
| 10.24.2 | Amendment No. 1 to Employment Agreement, dated as of October 30, 2012, between the Company and James L. Welch (incorporated by reference to Exhibit 10.1 to Quarterly Report on Form 10-Q for the quarter ended September 30, 2012, filed on November 2, 2012, File No. 000-12255). |
| 10.25.1 | Employment Agreement, dated as of November 3, 2011, between the Company and Jamie G. Pierson (incorporated by reference to Exhibit 10.46 to Annual Report on Form 10-K for the year ended December 31, 2011, filed on February 28, 2012, File No. 000-12255). |
| 10.25.2 | Amendment No. 1 to Employment Agreement, dated as of October 30, 2012, between the Company and Jamie G. Pierson (incorporated by reference to Exhibit 10.2 to Quarterly Report on Form 10-Q for the quarter ended September 30, 2012, filed on November 2, 2012, File No. 000-12255). |

97

Table of Contents

| 10.26 | Escrow Agreement, dated as of November 3, 2011, among the Company, Jamie G. Pierson and BOKF, N.A., as escrow agent (incorporated by reference to Exhibit 10.47 to Annual Report on Form 10-K for the year ended December 31, 2011, filed on February 28, 2012, File No. 000-12255). |
|---|---|
| 10.27.1 | Employment Agreement, effective as of February 13, 2012, between the Company and Michelle A. Friel (formerly Russell) (incorporated by reference to Exhibit 10.4 to Quarterly Report on Form 10-Q for the quarter ended March 31, 2012, filed on May 3, 2012, File No. 000-12255). |
| 10.27.2 | Amendment No. 1 to Employment Agreement, dated as of October 30, 2012, between the Company and Michelle A. Friel (formerly Russell) (incorporated by reference to Exhibit 10.3 to Quarterly Report on Form 10-Q for the quarter ended September 30, 2012, filed on November 2, 2012, File No. 000-12255). |
| 10.28 | Advisory Agreement, dated February 20, 2013, between the Company and MAEVA Group, LLC (incorporated by reference to Exhibit 10.37 to Annual Report on Form 10-K for the year ended December 31, 2012, filed on February 21, 2013, File No. 000-12255). |
| 10.29* | General Release and Separation Agreement, dated as of September 23, 2013, between the Company and Jeffrey A. Rogers. |
| 21.1* | Subsidiaries of the Company. |
| 23.1* | Consent of KPMG LLP, Independent Registered Public Accounting Firm. |
| 31.1* | Certification of James L. Welch pursuant to Exchange Act Rules 13a-14 and 15d-14, as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 31.2* | Certification of Jamie G. Pierson pursuant to Exchange Act Rules 13a-14 and 15d-14, as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 32.1* | Certification of James L. Welch pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 32.2* | Certification of Jamie G. Pierson pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |

101.INS** XBRL Instance Document
101.SCH**XBRL Taxonomy Extension Schema
101.CAL**XBRL Taxonomy Extension Calculation Linkbase
101.DEF** BRL Taxonomy Extension Definition Linkbase
101.LAB** XBRL Taxonomy Extension Label Linkbase
101.PRE** XBRL Taxonomy Extension Presentation Linkbase

_____

\* Indicates documents filed herewith.

\*\* XBRL (Extensible Business Reporting Language) information is furnished and not filed or a part of a registration statement or prospectus for purposes of Section 11 or 12 of the Securities Act of 1933, is deemed not filed for purposes of Section 18 of the Securities Exchange Act of 1934, and otherwise is not subject to liability under these sections.

† Confidential portions of this exhibit have been filed separately with the SEC pursuant to a request for confidential treatment.

Table of Contents

<u>SIGNATURES</u>

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

YRC Worldwide Inc.

Date: March 10, 2014                                         BY: <u>/s/ James L. Welch</u>
                                                            James L. Welch
                                                            Chief Executive Officer

### POWER OF ATTORNEY

Know all people by these presents, that each person whose signature appears below constitutes and appoints James L. Welch and Jamie G. Pierson, and each of them, his or her true and lawful attorneys-in-fact and agents, with full power of substitution and resubstitution, for him or her and in his or her name, place and stead, in any and all capacities, to sign any amendments to this annual report on Form 10-K, and to file the same, with all exhibits thereto, with the Securities and Exchange Commission, granting unto said attorneys-in-fact and agents, and each of them, full power and authority to do and perform each and every act and thing requisite and necessary to be done in and about the premises, as fully and to all intents and purposes as he or she might or could do in person, hereby confirming all that said attorneys-in-fact and agents or either of them, or his or their substitute or substitutes, may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| | | |
|---|---|---|
| <u>/s/ James L. Welch</u><br>James L. Welch | Chief Executive Officer | March 10, 2014 |
| <u>/s/ Jamie G. Pierson</u><br>Jamie G. Pierson | Executive Vice President &<br>Chief Financial Officer | March 10, 2014 |
| <u>/s/ Stephanie D. Fisher</u><br>Stephanie D. Fisher | Vice President & Controller | March 10, 2014 |
| <u>/s/ Raymond J. Bromark</u><br>Raymond J. Bromark | Director | March 10, 2014 |
| <u>/s/ Douglas A. Carty</u><br>Douglas A. Carty | Director | March 10, 2014 |
| <u>/s/ Matthew Doheny</u><br>Matthew Doheny | Director | March 10, 2014 |
| <u>/s/ Robert L. Friedman</u><br>Robert L. Friedman | Director | March 10, 2014 |
| <u>/s/ James E. Hoffman</u><br>James E. Hoffman | Director | March 10, 2014 |
| <u>/s/ Michael J. Kneeland</u><br>Michael J. Kneeland | Director | March 10, 2014 |
| <u>/s/ James F. Winestock</u><br>James F. Winestock | Director | March 10, 2014 |

EXECUTION VERSION

**EXHIBIT 10.10**

CREDIT AGREEMENT

dated as of

February 13, 2014

among

YRC WORLDWIDE INC.,

THE OTHER GUARANTORS PARTY HERETO FROM TIME TO TIME
THE LENDERS PARTY HERETO

and

CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH,

as Administrative Agent and Collateral Agent

_____

CREDIT SUISSE SECURITIES (USA) LLC and RBS CITIZENS, N.A.

as Joint Lead Arrangers and Joint Bookrunners

[Reference No. 5865-866]

[[NYCORP:3444845v19:4340W: 02/12/2014--06:02 PM]]

**TABLE OF CONTENTS**

PAGE

**ARTICLE 1**
DEFINITIONS

Section 1.01.    *Defined Terms*    1
Section 1.02.    *Other Interpretive Provisions*    51
Section 1.03.    *Certifications*    52
Section 1.04.    *Accounting Terms*    52
Section 1.05.    *Rounding*    52
Section 1.06.    *References to Agreements, Laws, Etc*    52
Section 1.07.    *Times of Day*    53
Section 1.08.    *Timing of Payment of Performance*    53
Section 1.09.    *Cumulative Credit Transactions*    53
Section 1.10.    *Pro Forma Calculations*    53
Section 1.11.    *Certain Accounting Matters*    54
Section 1.12.    *Classification of Loans and Borrowings*    55
Section 1.13.    *Currency Equivalents Generally*    55
Section 1.14.    *Excluded Swap Obligations*    56

**ARTICLE 2**
THE CREDITS

Section 2.01.    *Commitments*    57
Section 2.02.    *Loans*    57
Section 2.03.    *Borrowing Procedure*    58

Section 2.04.    *Evidence of Debt; Repayment of Loans*   59
Section 2.05.    *Fees*   60
Section 2.06.    *Interest on Loans*   60
Section 2.07.    *Default Interest*   60
Section 2.08.    *Alternate Rate of Interest*   60
Section 2.09.    *Termination and Reduction of Commitments*   61
Section 2.10.    *Conversion and Continuation of Borrowings*   61
Section 2.11.    *Repayment of Term Borrowings*   63
Section 2.12.    *Voluntary Prepayment*   63
Section 2.13.    *Mandatory Prepayments*   65
Section 2.14.    *Pro Rata Treatment*   68
Section 2.15.    *Sharing of Setoffs*   68
Section 2.16.    *Payments*   69
Section 2.17.    *Incremental Credit Extensions*   70
Section 2.18.    *Refinancing Amendments*   72
Section 2.19.    *Extensions of Term Loans*   74

**ARTICLE 3**
TAXES, INCREASED COSTS PROTECTION AND ILLEGALITY

Section 3.01.    *Taxes*   76
Section 3.02.    *Illegality*   79
Section 3.03.    *Increased Cost and Reduced Return; Capital Adequacy; Reserves on Eurodollar Loans*   80
Section 3.04.    *Funding Losses*   81

Section 3.05.    *Matters Applicable to all Requests for Compensation*    82
Section 3.06.    *Replacement of Lenders under Certain Circumstances*    83
Section 3.07.    *Survival*    85

**ARTICLE 4**
CONDITIONS PRECEDENT TO CREDIT EXTENSIONS

Section 4.01.    *All Credit Extensions*    85
Section 4.02.    *First Credit Extension*    85

**ARTICLE 5**
REPRESENTATIONS AND WARRANTIES

Section 5.01.    *Existence, Qualification and Power; Compliance with Laws*    88
Section 5.02.    *Authorization; No Contravention*    88
Section 5.03.    *Governmental Authorization; Other Consents*    89
Section 5.04.    *Binding Effect*    89
Section 5.05.    *Financial Statements; No Material Adverse Effect*    89
Section 5.06.    *Compliance With Laws*    90
Section 5.07.    *Ownership of Property; Liens*    90
Section 5.08.    *Environmental Matters*    91
Section 5.09.    *Taxes*    91
Section 5.10.    *ERISA Compliance*    92
Section 5.11.    *Subsidiaries*    92
Section 5.12.    *Margin Regulations; Investment Company Act*    92
Section 5.13.    *Disclosure*    93

Section 5.14.    *Labor Matters*    93
Section 5.15.    *Insurance*    93
Section 5.16.    *Solvency*    94
Section 5.17.    *No Other Borrowed Money Indebtedness*    94
Section 5.18.    *Collateral Documents*    94
Section 5.19.    *Compliance with Anti-Terrorism and Corruption Laws*    96

**ARTICLE 6**
AFFIRMATIVE COVENANTS

Section 6.01.    *Financial Statements, Reports, Etc*    96
Section 6.02.    *Certificates; Other Information*    99
Section 6.03.    *Notices*    100
Section 6.04.    *Payment of Taxes*    101
Section 6.05.    *Preservation of Existence, Etc*    101
Section 6.06.    *Maintenance of Properties*    101
Section 6.07.    *Maintenance of Insurance*    101
Section 6.08.    *Compliance with Laws*    103
Section 6.09.    *Books and Records*    103
Section 6.10.    *Inspection Rights*    103
Section 6.11.    *Additional Collateral; Additional Guarantors*    103
Section 6.12.    *Compliance with Environmental Laws*    105
Section 6.13.    *Further Assurances and Post-Closing Conditions*    105
Section 6.14.    *Designation of Subsidiaries*    106

Section 6.15.    *Maintenance of Ratings*    106
Section 6.16.    *Use of Proceeds*    106

**ARTICLE 7**
NEGATIVE COVENANTS

Section 7.01.    *Liens*    107
Section 7.02.    *Investments*    111
Section 7.03.    *Indebtedness*    114
Section 7.04.    *Fundamental Changes*    118
Section 7.05.    *Dispositions*    120
Section 7.06.    *Restricted Payments*    123
Section 7.07.    *Change in Nature of Business; Organization Documents*    124
Section 7.08.    *Transactions with Affiliates*    125
Section 7.09.    *Burdensome Agreements*    125
Section 7.10.    *Financial Covenant*    127
Section 7.11.    *Capital Expenditures*    127
Section 7.12.    *Fiscal Year*    128
Section 7.13.    *Prepayments, Etc. of Indebtedness*    128

**ARTICLE 8**
EVENTS OF DEFAULT AND REMEDIES

Section 8.01.    *Events of Default*    129
Section 8.02.    *Remedies Upon Event of Default*    132
Section 8.03.    *Exclusion of Immaterial Subsidiaries*    133

Section 8.04.    *Application of Funds*    133

## ARTICLE 9
THE ADMINISTRATIVE AGENT AND THE COLLATERAL AGENT

## ARTICLE 10
MISCELLANEOUS

Section 10.01.    *Notices; Electronic Communications*    136
Section 10.02.    *Survival of Agreement*    139
Section 10.03.    *Binding Effect*    140
Section 10.04.    *Successors and Assigns*    140
Section 10.05.    *Expenses; Indemnity*    145
Section 10.06.    *Right of Setoff*    148
Section 10.07.    *Applicable Law*    148
Section 10.08.    *Waivers; Amendment*    148
Section 10.09.    *Interest Rate Limitation*    151
Section 10.10.    *Entire Agreement*    151
Section 10.11.    *WAIVER OF JURY TRIAL*    151
Section 10.12.    *Severability*    151
Section 10.13.    *Counterparts*    152
Section 10.14.    *Headings*    152
Section 10.15.    *Jurisdiction; Consent to Service of Process*    152
Section 10.16.    *Confidentiality*    153
Section 10.17.    *Lender Action*    153
Section 10.18.    *USA PATRIOT Act Notice*    153

Section 10.19.    *Collateral And Guaranty Matters*    154
Section 10.20.    *Secured Hedge Agreements*    155
Section 10.21.    *Payments Set Aside*    155
Section 10.22.    *No Advisory or Fiduciary Responsibility*    155
Section 10.23.    *Intercreditor Agreements*    156

**ARTICLE 11**
GUARANTEE

Section 11.01.    *The Guarantee*    157
Section 11.02.    *Obligations Unconditional*    157
Section 11.03.    *Certain Waivers. Etc*    158
Section 11.04.    *Reinstatement*    159
Section 11.05.    *Subrogation; Subordination*    159
Section 11.06.    *Remedies*    159
Section 11.07.    *Instrument for the Payment of Money*    159
Section 11.08.    *Continuing Guarantee*    159
Section 11.09.    *General Limitation on Guarantee Obligations*    160
Section 11.10.    *Release of Guarantors*    160
Section 11.11.    *Right of Contribution*    160
Section 11.12.    *Additional Guarantor Waivers and Agreements*    160

SCHEDULES

1.01(a)    Excluded Real Property
1.01(b)Guarantors
1.01(c)    Mortgaged Properties
1.01(d)    Pension Fund Entities
2.01    Lenders and Commitments
4.02(b)    Local Counsel Opinions
5.10(b)    Multiemployer Plans
5.11    Subsidiaries and Other Equity Interests
5.14    Labor Matters
6.13(a)    Certain Collateral Documents
7.01(b)    Existing Liens
7.02(e)    Existing Investments
7.03(b)    Existing Indebtedness
7.05    Asset Sales
7.08    Transactions with Affiliates
7.09    Certain Contractual Obligations


EXHIBITS

Exhibit A    Form of Administrative Questionnaire
Exhibit B    Form of Assignment and Acceptance
Exhibit C    Form of Request for Credit Extension
Exhibit D    Form of Security Agreement
Exhibit E    Form of Intercompany Note
Exhibit F    Form of Compliance Certificate
Exhibit G-1    Form of United States Tax Compliance Certificate
                (For Non-U.S. Lenders that are not Partnerships)
Exhibit G-2    Form of United States Tax Compliance Certificate
                (For Non-U.S. Lenders that are Partnerships)
Exhibit G-3    Form of United States Tax Compliance Certificate
                (For Non-U.S. Participants that are not Partnerships)
Exhibit G-4    Form of United States Tax Compliance Certificate
                (For Non-U.S. Participants that are Partnerships)
Exhibit H    Form of Solvency Certificate
Exhibit I    Form of ABL Intercreditor Agreement
Exhibit J    Form of Term Note
Exhibit K    Auction Procedures

CREDIT AGREEMENT, dated as of February 13, 2014 (this "**Agreement**"), among YRC WORLDWIDE INC., a Delaware corporation (the "**Borrower**"), the subsidiaries of the Borrower party hereto from time to time, the Lenders (such term and each other capitalized term used but not defined in this introductory statement having the meaning given it in Article 1), and CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH, as administrative agent (in such capacity, including any permitted successor or assign thereto, the "**Administrative Agent**") and as collateral agent (in such capacity, including any permitted successor or assign thereto, the "**Collateral Agent**") for the Lenders.

The Borrower has requested the Lenders to extend credit in the form of Term Loans on the Closing Date, in an aggregate principal amount of $700,000,000, the proceeds of which shall be used on the Closing Date, together with the proceeds of the ABL Facility, to repay, refinance or replace in full the Borrower's indebtedness under the Existing Credit Agreement and the Existing ABL Facility, to pay the Transaction Expenses and for working capital and other general corporate purposes. On the Closing Date, the Borrower and certain of its subsidiaries, as borrowers, will enter into the ABL Credit Agreement and will make borrowings thereunder, the proceeds of which will be used (i) on the Closing Date, solely to fund, through the issuance of letters of credit under, or the rollover of outstanding letters of credit into, the approximately $365,000,000 of letters of credit then outstanding under the Existing Credit Agreement, and (ii) after the Closing Date, solely for working capital and other general corporate purposes of the Borrower and its subsidiaries.

Accordingly, the parties hereto agree as follows:

## ARTICLE 1
### DEFINITIONS

Section 1.01.   *Defined Terms.* As used in this Agreement, the following terms shall have the meanings specified below:

"**ABL Agent**" shall mean, as the context may require, RBS Citizens Business Capital (a division of RBS Asset Finance, Inc., a subsidiary of RBS Citizens, N.A.), in its capacity as administrative agent under the ABL Facility Documentation, RBS Citizens Business Capital (a division of RBS Asset Finance, Inc., a subsidiary of RBS Citizens, N.A.), in its capacity as collateral agent under the ABL Facility Documentation, such agents collectively or any permitted successor or assignee administrative agent or collateral agent under the ABL Facility Documentation.

"**ABL Credit Agreement**" shall mean that certain asset-based revolving credit agreement dated as of the Closing Date, among the Borrower, YRC Inc., a Delaware corporation, USF Reddaway Inc., an Oregon corporation, USF Holland Inc., a Michigan corporation and New Penn Motor Express, Inc., a Pennsylvania corporation, the other subsidiaries of the Borrower party thereto, the lenders party thereto and the ABL Agent, as the same may be amended, restated, modified, supplemented, extended, renewed, restructured, refunded, replaced or refinanced from time to time in one or more agreements (in each case with the same or new lenders, institutional investors or agents and resulting in a financing that constitutes (or that

would constitute if incurred as a new financing) a Permitted Refinancing of the ABL Facility Indebtedness), including any agreement extending the maturity thereof or otherwise restructuring all or any portion of the Indebtedness thereunder or increasing the amount loaned or issued thereunder or altering the maturity thereof), in each case as and to the extent permitted by this Agreement and, if applicable, the ABL Intercreditor Agreement.

"**ABL Facility**" shall mean the asset-based revolving credit facility made available to the Borrower and certain of its Subsidiaries pursuant to the ABL Credit Agreement.

"**ABL Facility Documentation**" shall mean the ABL Credit Agreement and all security agreements, guarantees, pledge agreements and other agreements or instruments executed in connection therewith and including all "Loan Documents" (as defined in the ABL Credit Agreement) or similar term.

"**ABL Facility Indebtedness**" shall mean Indebtedness of the Borrower or any Restricted Subsidiary outstanding under the ABL Facility Documentation.

"**ABL Intercreditor Agreement**" shall mean the intercreditor agreement dated as of the Closing Date among the Administrative Agent and/or Collateral Agent, the ABL Agent and the Loan Parties, substantially in the form attached as Exhibit I together with (A) any immaterial changes and (B) material changes thereto in light of prevailing market conditions, which material changes shall be posted to the Lenders not less than five Business Days before execution thereof and, if the Required Lenders shall not have objected to such changes within five Business Days after posting, then the Required Lenders shall be deemed to have agreed that the Administrative Agent's and/or Collateral Agent's entry into such intercreditor agreement (with such changes) is reasonable and to have consented to such intercreditor agreement (with such changes) and to the Administrative Agent's and/or Collateral Agent's execution thereof, in each case in form and substance reasonably satisfactory to the Administrative Agent and/or Collateral Agent.

"**ABL Priority Collateral**" shall have the meaning assigned to such term in the ABL Intercreditor Agreement.

"**ABL Secured Parties**" shall have the meaning assigned to such term in the ABL Intercreditor Agreement.

"**ABR**", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Alternate Base Rate.

"**Additional Lender**" shall mean, with respect to any Refinancing Amendment, Incremental Amendment or in respect of any bank, financial institution or investor not theretofore a Lender that agrees to provide an Other Term Loan or Incremental Term Loan pursuant thereto, *provided* that the Administrative Agent shall have consented (not to be unreasonably withheld, conditioned or delayed) to such bank, financial institution or investor as would be required under Section 10.04(b) for an assignment of Loans to such bank, financial institution or investor.

"**Adjusted LIBO Rate**" shall mean, with respect to any Eurodollar Borrowing for any Interest Period, an interest rate per annum equal to the greater of (a) 1.00% per annum and (b) the product of (i) the LIBO Rate in effect for such Interest Period and (ii) Statutory Reserves.

"**Administrative Agent**" shall have the meaning assigned to such term in the introductory statement to this Agreement.

"**Administrative Questionnaire**" shall mean an Administrative Questionnaire in the form of Exhibit A, or such other form as may be supplied from time to time by the Administrative Agent and approved by the Borrower (such approval not to be unreasonably withheld, conditioned or delayed).

"**Affiliate**" shall mean, with respect to any Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified. "**Control**" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "**Controlling**" and "**Controlled**" have meanings correlative thereto.

"**Agents**" shall have the meaning assigned to such term in Article 9.

"**Agreement**" shall have the meaning assigned to such term in the introductory statement to this Agreement.

"**Alternate Base Rate**" shall mean, for any day, a rate per annum equal to the greatest of (a) the Prime Rate in effect on such day, (b) the Federal Funds Effective Rate in effect on such day plus 1/2 of 1% and (c) the Adjusted LIBO Rate for a one month Interest Period on such day (or if such day is not a Business Day, the immediately preceding Business Day) plus 1.00%; *provided* that, for the avoidance of doubt, the Adjusted LIBO Rate for any day shall be based on the rate determined on such day at approximately 11 a.m. (London time) by reference to the British Bankers' Association Interest Settlement Rates (or to any replacement market convention therefor selected by the Administrative Agent) for deposits in Dollars (as set forth by any service selected by the Administrative Agent that has been nominated by the British Bankers' Association as an authorized vendor for the purpose of displaying such rates). If the Administrative Agent shall have determined (which determination shall be conclusive absent manifest error) that it is unable to ascertain the Federal Funds Effective Rate for any reason, including the inability or failure of the Administrative Agent to obtain sufficient quotations in accordance with the terms of the definition thereof, the Alternate Base Rate shall be determined without regard to clause (b) of the preceding sentence until the circumstances giving rise to such inability no longer exist. Any change in the Alternate Base Rate due to a change in the Prime Rate, the Federal Funds Effective Rate or the Adjusted LIBO Rate shall be effective on the effective date of such change in the Prime Rate, the Federal Funds Effective Rate or the Adjusted LIBO Rate, as the case may be.

"**Alternative Incremental Indebtedness**" shall mean all Permitted Additional Debt incurred pursuant to Section 7.03(p); *provided* that (i) the aggregate principal amount at the time

of the incurrence thereof (when taken together with any Incremental Term Loans and Alternative Incremental Indebtedness that has been incurred or will be incurred simultaneously therewith) shall not exceed the Maximum Incremental Facility Amount, (ii) the maturity date of such Alternative Incremental Indebtedness shall not be earlier than the Latest Maturity Date and (iii) the Weighted Average Life to Maturity of such Alternative Incremental Indebtedness shall not be less than the remaining Weighted Average Life to Maturity of the then outstanding Term Loans.

"**Applicable ECF Percentage**" shall mean, for any Excess Cash Flow Period, (a) 50% if the Total Leverage Ratio as of the last day of such Excess Cash Flow Period is greater than 3.50:1.00, (b) 25% if the Total Leverage Ratio as of the last day of such Excess Cash Flow Period is less than or equal to 3.50:1.00 but is greater than 3.00:1.00, and (c) 0% if the Total Leverage Ratio as of the last day of such Excess Cash Flow Period is less than or equal to 3.00:1.00.

"**Applicable Margin**" shall mean, for any day (a) with respect to any Eurodollar Term Loan, 7.0% per annum and (b) with respect to any ABR Term Loan, 6.0% per annum.

"**Arranger**" shall mean each of Credit Suisse Securities (USA) LLC and RBS Citizens, N.A., in its capacity as joint lead arranger and joint lead bookrunner in respect of this Agreement.

"**Assignment and Acceptance**" shall mean an assignment and acceptance entered into by a Lender and an Eligible Assignee, and accepted by the Administrative Agent, in the form of Exhibit B or such other form as shall be approved by the Administrative Agent and the Borrower (such approval of the Borrower shall not be unreasonably withheld, conditioned or delayed).

"**Attorney Costs**" shall mean and shall include all reasonable and documented fees, expenses and disbursements of any law firm or other external legal counsel.

"**Attributable Indebtedness**" shall mean, on any date, in respect of any Capitalized Lease of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP.

"**Auction Manager**" shall mean Credit Suisse Securities (USA) LLC ("**CS Securities**") (or, if CS Securities declines to act as Auction Manager, an investment bank or other financial institution or advisor of recognized standing selected by the Borrower).

"**Auction Procedures**" shall mean the auction procedures with respect to non-pro rata assignments of Term Loans pursuant to Section 10.04(k) set forth in Exhibit K hereto.

"**Audited Financial Statements**" shall mean the audited consolidated balance sheets of the Borrower and its consolidated subsidiaries for the fiscal years ending December 31, 2010, December 31, 2011 and December 31, 2012 and the related consolidated statements of operations, changes in shareholders' equity and cash flows of the Borrower and its consolidated subsidiaries.

"**Blocked Person**" shall mean any Person that is publicly identified on the most current list of "Specially Designated Nationals and Blocked Persons" published by the Office of Foreign Assets Control of the U.S. Department of the Treasury ("**OFAC**").

"**Board**" shall mean the Board of Governors of the Federal Reserve System of the United States of America.

"**Borrower**" shall have the meaning assigned to such term in the introductory statement to this Agreement.

"**Borrower Materials**" shall have the meaning assigned to such term in <u>Section 10.01</u>.

"**Borrowing**" shall mean Loans of the same Class and Type made, converted or continued on the same date and, in the case of Eurodollar Loans, as to which a single Interest Period is in effect.

"**Business Day**" shall mean any day other than a Saturday, Sunday or day on which banks in New York City are authorized or required by law to close; *provided, however*, that when used in connection with a Eurodollar Loan, the term "**Business Day**" shall also exclude any day on which banks are not open for dealings in Dollar deposits in the London interbank market.

"**Capital Expenditures**" shall mean, for any period, the aggregate of (a) all amounts that would be reflected as additions to property, plant or equipment on a consolidated statement of cash flows of the Borrower and its Restricted Subsidiaries in accordance with GAAP and (b) the value of all assets under Capitalized Leases incurred by the Borrower and its Restricted Subsidiaries during such period; *provided* that, Capital Expenditures shall not include (i) the purchase price paid in connection with a Permitted Acquisition or other Investment of all or substantially all of the assets of another Person or business line permitted hereby, (ii) the purchase price of equipment that is purchased simultaneously with the trade-in of existing equipment to the extent that the gross amount of such purchase price is reduced by the credit granted by the seller of such equipment for such existing equipment being traded in at such time, (iii) expenditures made in leasehold improvements, to the extent reimbursed by the landlord, (iv) expenditures to the extent that they are actually paid for by a third party (excluding any Loan Party or any of its Restricted Subsidiaries) and for which no Loan Party or any of its Subsidiaries has provided or is required to provide or incur, directly or indirectly, any consideration or monetary obligation to such third party or any other Person (whether before, during or after such period), (v) property, plant and equipment taken in settlement of accounts and (vi) expenditures made with the Net Proceeds of any debt or equity issuance.

"**Capitalized Leases**" shall mean all leases that have been or are required to be, in accordance with GAAP, recorded as capitalized leases; *provided* that for all purposes hereunder the amount of obligations under any Capitalized Lease shall be the amount thereof accounted for as a liability in accordance with GAAP.

"**Cash Collateral Account**" shall mean a blocked account at a commercial bank reasonably satisfactory to the Administrative Agent, in the name of the Administrative Agent and

under the sole dominion and control of the Administrative Agent, and otherwise established in a manner reasonably satisfactory to the Administrative Agent.

"**Cash Equivalents**" shall mean any of the following types of Investments, to the extent owned by the Borrower or any Restricted Subsidiary:

(a)    Dollars and, to the extent consistent with past practice, Canadian Dollars;

(b)    direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States of America (or by any agency thereof to the extent such obligations are backed by the full faith and credit of the United States of America), in each case maturing within one year from the date of issuance thereof;

(c)    investments in commercial paper maturing within 270 days from the date of issuance thereof and having, at such date of acquisition, rated at least A-2 or P-2 by S&P or Moody's;

(d)    investments in demand deposits, certificates of deposit, banker's acceptances and time deposits maturing within one year from the date of acquisition thereof issued or guaranteed by or placed with, and money market deposit accounts issued or offered by, the Administrative Agent, the ABL Agent or any domestic office of any commercial bank organized under the laws of the United States of America or any State thereof that has a combined capital and surplus and undivided profits of not less than $500,000,000 and that issues (or the parent of which issues) commercial paper rated at least "Prime 1" (or the then equivalent grade) by Moody's or "A 1" (or the then equivalent grade) by S&P;

(e)    fully collateralized repurchase agreements with a term of not more than 30 days for securities described in clause (b) above and entered into with a financial institution satisfying the criteria of clause (d) above;

(f)    investments in "money market funds" within the meaning of Rule 2a-7 of the Investment Company Act of 1940, as amended, substantially all of whose assets are invested in investments of the type described in clauses (a) through (e) above; and

(g)    other short-term investments entered into in accordance with normal investment policies and practices of any Foreign Subsidiary consistent with past practices for cash management and constituting investments in governmental obligations and investment funds analogous to and having a credit risk not greater than investments of the type described in clauses (a) through (f) above.

Notwithstanding the foregoing, Cash Equivalents shall include amounts denominated in currencies other than set forth in clause (a) above; *provided* that such amounts are converted into currencies listed in clause (a) within ten Business Days following the receipt of such amounts.

"**Casualty Event**" shall mean any event that gives rise to the receipt by the Borrower or any Restricted Subsidiary of any insurance proceeds or condemnation awards in respect of any

equipment, fixed assets or Real Property (including any improvements thereon) to replace or repair such equipment, fixed assets or Real Property or as compensation for such condemnation event.

"**Change of Control**" shall mean:

(a) the acquisition of ownership, directly or indirectly, beneficially or of record, by any Person or group (within the meaning of the Securities Exchange Act of 1934 and the rules of the Securities and Exchange Commission thereunder as in effect on the date hereof), of Equity Interests representing more than 35% of the aggregate ordinary voting power represented by the issued and outstanding Equity Interests of the Borrower;

(b) occupation of a majority of the seats (other than vacant seats) on the board of directors of the Borrower by Persons who were neither (i) nominated by the board of directors of the Borrower nor (ii) appointed by directors so nominated; or

(c) a "**change of control**" (or similar event) shall occur under (i) the ABL Facility Documentation or any Permitted Refinancing thereof or (ii) any other Indebtedness for borrowed money with an aggregate principal amount (in the case of this clause (ii)) in excess of the Threshold Amount.

"**Charges**" shall have the meaning assigned to such term in Section 10.09.

"**Class**" when used in reference to (a) any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are Initial Term Loans, Incremental Term Loans, Other Term Loans or Extended Term Loans, (b) any Commitment, refers to whether such Commitment is a Term Loan Commitment, Other Term Loan Commitment (and, in the case of an Other Term Loan Commitment, the Class of Term Loans to which such commitment relates), or a commitment in respect of Term Loans to be made pursuant to an Incremental Amendment or an Extension Offer and (c) any Lender, refers to whether such Lender has a Loan or Commitment with respect to a particular Class of Loans or Commitments. Other Term Loan Commitments, Other Term Loans, Incremental Term Loans and Extended Term Loans that have different terms and conditions, and each tranche of Extended Term Loans, shall be construed to be in different Classes.

"**Closing Date**" shall mean February 13, 2014.

"**Code**" shall mean the Internal Revenue Code of 1986, as amended from time to time.

"**Collateral**" shall mean all the "**Collateral**" as defined in any Collateral Document and shall also include the Mortgaged Properties.

"**Collateral Agent**" shall have the meaning assigned to such term in the introductory statement to this Agreement.

"**Collateral and Guarantee Requirement**" shall mean, at any time, the requirement that:

(a)    on the Closing Date the Administrative Agent and the Collateral Agent shall have received each Collateral Document to the extent required to be delivered on the Closing Date pursuant to Section 4.02(d), subject to the limitations and exceptions of this Agreement, duly executed by each Loan Party party thereto;

(b)    in each case subject to the limitations and exceptions set forth in this Agreement and the Collateral Documents, and to any action required to be taken by the Collateral Agent or the Administrative Agent to effectuate the same, the Obligations shall have been secured by:

(i)    a perfected second priority security interest (subject to Liens permitted by Section 7.01) in all personal property of the Borrower and each Guarantor consisting of all accounts receivable, cash and Cash Equivalents, deposit accounts and supporting obligations and books and records related to the foregoing and, in each case, proceeds thereof;

(ii)    a perfected first priority pledge (subject to Liens permitted by Section 7.01) of all Equity Interests directly held by the Borrower or any Guarantor (which pledge, in the case of Equity Interests of any Foreign Subsidiary or of a Domestic Subsidiary that is a disregarded entity for U.S. Federal income Tax purposes if substantially all of its assets consist of the Equity Interests or Indebtedness of one or more Foreign Subsidiaries, shall be limited to 100% of the non-voting Equity Interests (if any) and 65% of the voting Equity Interests of such Foreign Subsidiary or Domestic Subsidiary, as the case may be);

(iii)    a perfected first priority security interest (subject to Liens permitted by Section 7.01) in, and Mortgages on, each Material Real Property (provided that Mortgages may be delivered after the Closing Date in accordance with Section 6.13(a));

(iv)    a perfected first priority security interest (subject to Liens permitted by Section 7.01) in substantially all plant and equipment of the Borrower and each Guarantor and in all motor vehicles (including tractors, trailers and other rolling stock) of the Borrower and each Guarantor; and

(v)    a perfected first priority security interest (subject to Liens permitted by Section 7.01) in substantially all other personal property of the Borrower and each Guarantor, including investment property, contracts, patents, copyrights, trademarks and other general intangibles (subject to a license in favor of the ABL Agent to use intellectual property, subject to the ABL Intercreditor Agreement), commercial tort claims, letter of credit rights, intercompany notes and proceeds of the foregoing;

(c)    subject to the limitations and exceptions set forth in this Agreement and the Collateral Documents, to the extent a security interest in and mortgage lien on any Material Real Property is required under Section 4.02, 6.11 or 6.13 (together with any Material Real Property that is subject to a Mortgage on the Closing Date, each, a "**Mortgaged Property**"), the Collateral Agent shall have received (i) counterparts of a Mortgage with respect to such

Mortgaged Property duly executed and delivered by the record owner of such property in form suitable for filing or recording in all filing or recording offices that the Collateral Agent may reasonably deem necessary or desirable in order to create a valid and subsisting perfected Lien on the property and/or rights described therein in favor of the Collateral Agent for the benefit of the Secured Parties, and evidence that all filing and recording taxes and fees have been paid or otherwise provided for in a manner reasonably satisfactory to the Collateral Agent (it being understood that if a mortgage tax will be owed on the entire amount of the indebtedness evidenced hereby, then the amount secured by the Mortgage shall be limited to 100% of the fair market value of the property at the time the Mortgage is entered into if such limitation results in such mortgage tax being calculated based upon such fair market value), (ii) fully paid policies of title insurance (or marked-up title insurance commitments having the effect of policies of title insurance) on the Mortgaged Property (the "**Mortgage Policies**") issued by Chicago Title or another nationally recognized title insurance company reasonably acceptable to the Collateral Agent in form and in an amount reasonably acceptable to the Collateral Agent (not to exceed 100% of the fair market value of the Real Property (or interest therein, as applicable) covered thereby), insuring the Mortgages to be valid, subsisting Liens on the property described therein, free and clear of all Liens other than Liens permitted pursuant to Section 7.01, each of which shall (A) to the extent reasonably necessary, include such reinsurance arrangements (with provisions for direct access, if reasonably necessary) as shall be reasonably acceptable to the Collateral Agent, (B) contain a "tie-in" or "cluster" endorsement, if available under applicable law (i.e., policies which insure against losses regardless of location or allocated value of the insured property up to a stated maximum coverage amount), (C) have been supplemented by such endorsements (or where such endorsements are not available, opinions of special counsel, architects or other professionals reasonably acceptable to the Collateral Agent) as shall be reasonably requested by the Collateral Agent (including endorsements on matters relating to usury, first loss, last dollar, zoning, contiguity, revolving credit (if available after the applicable Loan Party uses commercially reasonable efforts), doing business, non-imputation, public road access, variable rate, environmental lien, subdivision, mortgage recording tax, separate tax lot and so-called comprehensive coverage over covenants and restrictions), (iii) either (1) an American Land Title Association/American Congress of Surveying and Mapping (ALTA/ACSM) form of survey for which all charges have been paid, dated a date, containing a certification and otherwise being in form and substance reasonably satisfactory to the Collateral Agent or (2) such documentation as is sufficient to omit the standard survey exception to coverage under the Mortgage Policy with respect to such Mortgaged Property and affirmative endorsements reasonably requested by the Collateral Agent, including "same as" survey and comprehensive endorsements, (iv) customary legal opinions, addressed to the Collateral Agent and the Secured Parties, and (v) in order to comply with the Flood Laws, the following documents: (A) a completed standard "life of loan" flood hazard determination form (a "**Flood Determination Form**"); (B) if any of the material improvement(s) to the improved Material Real Property is located in a special flood hazard area, a notification thereof to the Borrower ("**Borrower Notice**") and, if applicable, notification to the Borrower that flood insurance coverage under the National Flood Insurance Program ("**NFIP**") is not available because the community in which the property is located does not participate in the NFIP; (C) documentation evidencing the Borrower's receipt of the Borrower Notice (e.g., a countersigned Borrower Notice or return receipt of certified U.S. Mail or overnight delivery); and (D) if the Borrower Notice is required

to be given and flood insurance is available in the community in which such Material Real Property is located, a copy of one of the following: the flood insurance policy, the Borrower's application for a flood insurance policy plus proof of premium payment, a declaration page confirming that flood insurance has been issued or such other evidence of flood insurance reasonably satisfactory to the Collateral Agent (any of the foregoing being "**Evidence of Flood Insurance**"); and

(d)    after the Closing Date, each Restricted Subsidiary of the Borrower that is not an Excluded Subsidiary shall become a Guarantor and signatory to this Agreement pursuant to a joinder agreement in accordance with Section 6.11 or 6.13; *provided* that notwithstanding the foregoing provisions, any Subsidiary of the Borrower that Guarantees any ABL Facility Indebtedness, any Junior Financing, Permitted Additional Debt, or any Permitted Refinancing of any Indebtedness thereof, or that is a borrower under the ABL Facility (or any Permitted Refinancing thereof) shall be a Guarantor hereunder for so long as it Guarantees such Indebtedness (or is a borrower with respect thereto).

Notwithstanding the foregoing provisions of this definition or anything in this Agreement or any other Loan Document to the contrary:

(A)    the foregoing definition shall not require, unless otherwise stated in this clause (A), the creation or perfection of pledges of, security interests in, Mortgages on, the obtaining of title insurance with respect to or the taking of any other actions with respect to: (i) any fee owned Real Property that is not Material Real Property or any Leasehold Property (it being understood there shall be no requirement to obtain any landlord waivers, estoppels or collateral access letters), (ii) motor vehicles (other than tractors, trailers and other rolling stock) consisting of an employee or light vehicle and other assets subject to certificates of title with an individual fair market value of less than $40,000, (iii) letter of credit rights (other than to the extent consisting of supporting obligations that can be perfected solely by the filing of a UCC financing statement) of an amount less than $5,000,000 and commercial tort claims where the amount of damages claimed by the applicable Loan Party is less than $5,000,000, (iv) any governmental licenses or state or local franchises, charters and authorizations, to the extent security interests in such licenses, franchises, charters or authorizations are prohibited or restricted thereby (except to the extent such prohibition or restriction is rendered ineffective under the UCC), (v) Collateral in which pledges or security interests are prohibited or restricted by applicable law or require the consent of any governmental authority or third party, which consent has not been obtained, (vi) Margin Stock, (vii) Equity Interests in joint ventures and other non-wholly owned Subsidiaries of the Borrower (but only to the extent that the organizational documents of such Subsidiaries or agreements with other equity holders prohibit or restrict the pledge thereof under restrictions that are enforceable under the UCC), (viii) Equity Interests of (or held as assets by) Unrestricted Subsidiaries, Immaterial Subsidiaries, or captive insurance Subsidiaries, (ix) any lease, license or agreement or any property to the extent a grant of a security interest therein would violate or invalidate such lease, license or agreement or similar arrangement or create a right of termination in favor of any other party thereto after giving effect to the applicable anti-assignment provisions of the UCC or other applicable law, other than proceeds and receivables thereof, the assignment of which is deemed effective under the UCC or other applicable law, notwithstanding such

prohibition, (x) any assets or rights subject to a purchase money security interest, Capitalized Lease or similar arrangement, (xi) with respect to ABL Priority Collateral, any asset on which perfection action is not required under the ABL Facility Documentation, (xii) any assets to the extent a security interest in such assets could result in adverse Tax consequences as reasonably determined by the Borrower, in consultation with the Administrative Agent, (xiii) any intent-to-use application trademark application prior to the filing of a "Statement of Use" or "Amendment to Allege Use" with respect thereto, to the extent, if any, that, and solely during the period, if any, in which, the grant of a security interest therein would impair the validity or enforceability of such intent-to-use trademark application under applicable Federal law, (xiv) any equipment or other collateral with a net book value in an aggregate amount not to exceed $5,000,000, and (xv) other assets not specifically included in the Collateral in circumstances where the cost of obtaining a security interest in such assets exceeds the practical benefit to the Lenders afforded thereby as reasonably determined by the Administrative Agent in consultation with the Borrower;

(B)    (i) the foregoing definition shall not require control agreements or, except with respect to Equity Interests or Indebtedness represented or evidenced by certificates or instruments, perfection by "**control**" with respect to any Collateral (including deposit accounts, securities accounts, etc.); (ii) perfection by possession or control shall not be required with respect to (x) any intercompany notes in an aggregate principal amount not to exceed $5,000,000 and (y) any other notes or other evidence of Indebtedness in an aggregate principal amount not to exceed $5,000,000; (iii) no actions in any non-U.S. jurisdiction or required by the laws of any non-U.S. jurisdiction shall be required in order to create any security interests in assets located or titled outside of the United States (including the Equity Interests of any Foreign Subsidiary) or to perfect such security interests (it being understood that there shall be no security agreements or pledge agreements governed under the laws of any non-U.S. jurisdiction); and (iii) except to the extent that perfection and priority may be achieved (w) by the filing of a financing statement under the Uniform Commercial Code with respect to the Borrower or a Guarantor, (x) with respect to Real Property and the recordation of Mortgages in respect thereof, as contemplated by clauses (b)(iii) and (c) above, (y) with respect to Equity Interests or Indebtedness, by the delivery of certificates or instruments representing or evidencing such Equity Interests or Indebtedness along with appropriate undated instruments of transfer executed in blank, or (z) by notation of liens on certificate of title, the Loan Documents shall not contain any requirements as to perfection or priority with respect to any assets or property described in clause (A) above and this clause (B);

(C)    the Collateral Agent in its reasonable discretion may grant extensions of time for the creation or perfection of security interests in, and Mortgages on, or obtaining of title insurance or taking of other actions with respect to, particular assets (including extensions beyond the Closing Date) or any other compliance with the requirements of this definition (or any similar requirements set forth herein or in any other Loan Documents) where it reasonably determines, in consultation with the Borrower, that such creation or perfection of security interests or Mortgages, or such obtaining of title insurance or taking of other actions, or any other compliance with the requirements of this definition cannot be accomplished without undue delay, burden or expense by the time or times at which such act would otherwise be required by this Agreement or any Collateral Documents; *provided* that the Collateral Agent shall have received

on or prior to the Closing Date, (i) UCC financing statements in appropriate form for filing under the UCC in the jurisdiction of incorporation or organization of each Loan Party, and (ii) any certificates or instruments representing or evidencing Equity Interests of the Borrower and each direct wholly owned Domestic Subsidiary of the Borrower or any Guarantor, in each case accompanied by undated instruments of transfer and stock powers endorsed in blank; and

(D)    Liens required to be granted from time to time pursuant to the Collateral and Guarantee Requirement shall be subject to the exceptions and limitations set forth in this Agreement and the Collateral Documents.

"**Collateral Documents**" shall mean, collectively, the Security Agreement, each of the Mortgages, collateral assignments, security agreements, pledge agreements, intellectual property security agreements or other similar agreements delivered to the Administrative Agent or the Collateral Agent pursuant to Section 4.02, Section 6.11 or Section 6.13, each of the other agreements, instruments or documents that creates or purports to create a Lien in favor of the Collateral Agent for the benefit of the Secured Parties, the ABL Intercreditor Agreement, the First Lien Intercreditor Agreement (if any) and the Second Lien Intercreditor Agreement (if any).

"**Commitment**" shall mean, with respect to any Lender, such Lender's Term Loan Commitment (including pursuant to any Incremental Amendment, Refinancing Amendment or Extension Amendment).

"**Communications**" shall have the meaning assigned to such term in Section 10.01.

"**Compliance Certificate**" shall mean a certificate substantially in the form of Exhibit F.

"**Consolidated EBITDA**" shall mean, for any period, the Consolidated Net Income for such period, plus:

(a)    without duplication and to the extent deducted (and not added back or excluded) in arriving at such Consolidated Net Income (other than clauses (viii) or (xi)), the sum of the following amounts for such period with respect to Borrower and its Restricted Subsidiaries:

(i)    total interest expense determined in accordance with GAAP and, to the extent not reflected in such total interest expense, any expenses or losses on hedging obligations or other derivative instruments entered into for the purpose of hedging interest rate risk, net of interest income and gains on such hedging obligations or other derivative obligations, letter of credit fees, costs of surety bonds in connection with financing activities and any bank fees and financing fees (including commitment, underwriting, funding, "rollover" and similar fees and commissions, discounts, yields and other fees, charges and amounts incurred in connection with the issuance or incurrence of Indebtedness and all commissions, discounts and other fees and charges owed with respect to letters of credit and bankers' acceptance financing and net costs under Swap Contracts entered into for the purpose of hedging interest or commodity rate risk) and annual agency, unused line, facility or similar fees paid under definitive documentation related to Indebtedness (whether amortized or immediately expensed),

(ii)    provision for taxes based on income, profits or capital gains of the Borrower and the Restricted Subsidiaries, including, without limitation, federal, state, local, franchise and similar taxes and foreign withholding taxes paid or accrued during such period,

(iii)    depreciation and amortization,

(iv)    extraordinary, unusual or non-recurring charges, expenses or losses,

(v)    non-cash expenses, charges and losses (including reserves, impairment charges or asset write-offs, write-offs of deferred financing fees, losses from investments recorded using the equity method, purchase accounting adjustments and stock-based awards compensation expense), in each case other than (A) any non-cash charge representing amortization of a prepaid cash item that was paid and not expensed in a prior period and (B) any non-cash charge relating to write-offs, write-downs or reserves with respect to accounts receivable in the normal course or inventory; *provided* that if any of the non-cash charges referred to in this clause (v) represents an accrual or reserve for potential cash items in any future period, (1) the Borrower may determine not to add back such non-cash charge in the current period and (2) to the extent the Borrower does decide to add back such non-cash charge, the cash payment in respect thereof in such future period shall be subtracted from Consolidated EBITDA in such future period to the extent paid,

(vi)    restructuring costs and charges, integration costs, retention, recruiting, relocation and signing bonuses and expenses, and severance costs (including, for the avoidance of doubt, any bonuses payable in connection with the IBT Transactions in 2014 or 2015),

(vii)    Transaction Expenses,

(viii)    pro forma results for acquisitions (including the commencement of activities constituting such business) and material dispositions (including the termination or discontinuance of activities constituting such business) of business entities or properties or assets, constituting a division or line of business of any business entity, division or line of business that is the subject of any such acquisition or disposition, and operational changes and operational initiatives (including, to the extent applicable, from the Transactions but excluding the IBT Transactions), including any synergies, operating expense reductions, other operating improvements and cost savings as certified by the Borrower as having been determined in good faith to be reasonably anticipated to be realizable within eighteen (18) months following any such acquisition or disposition, operational change and operational initiatives (with the total add-back pursuant to this clause (viii) or Section 1.09(c) to be limited in the aggregate to 20% of Consolidated EBITDA (prior to giving effect to any such adjustments pursuant to this clause (viii) and Section 1.09(c) but otherwise on a pro forma consolidated basis) in any Test Period; *provided*, that such limitation on add-backs shall not apply if supported by a quality of earnings report prepared by a nationally recognized accounting firm or other third-party

advisor reasonably acceptable to the Administrative Agent or if such adjustments satisfy the requirements of Regulation S-X),

(ix)   solely for purposes of calculating the Senior Secured Leverage Ratio, adjustments and addbacks described in the Confidential Information Memorandum dated January 2014,

(x)   other transaction specific accruals, costs, charges, fees and expenses (including rationalization, legal, tax, structuring and other costs and expenses) related to the Transactions, acquisitions, investments, restricted payments, dispositions or issuances, amendments, waivers or modifications of debt or equity (whether or not consummated) reasonably expected to be permitted under this Agreement or the consummation of which would result in the repayment in full of the Obligations (other than unasserted contingent indemnity and reimbursement obligations and obligations of any Loan Party arising under any Secured Hedge Agreement),

(xi)   proceeds of business interruption insurance received or reasonably expected to be received within 365 days after the end of such period; *provided* that any such expected proceeds that are not actually received in such 365 day period shall be deducted from Consolidated EBITDA in the fiscal quarter immediately following such 365 day period,

(xii)   charges, losses or expenses to the extent indemnified or insured or reimbursed or reasonably expected to be indemnified, insured or reimbursed by a third party within 365 days after the end of such period; *provided* that any such expected amounts that are not actually received in such 365 day period shall be deducted from Consolidated EBITDA in the fiscal quarter immediately following such 365 day period,

(xiii)   the amount of any minority interest expense attributable to minority interests of third parties in the positive income of any non-wholly owned Restricted Subsidiary,

(xiv)   any net loss from disposed, abandoned or discontinued operations,

(xv)   the amount of loss on sale of Securitization Assets and related assets to the Securitization Subsidiary in connection with a Qualified Securitization Financing,

(xvi)   net realized losses from Swap Obligations or embedded derivatives that require similar accounting treatment and the application of Accounting Standard Codification Topic 815 and related pronouncements,

(xvii)   the cumulative effect of a change in accounting principles,

(xviii)   realized non-cash foreign exchange losses resulting from the impact of foreign currency changes on the valuation of assets or liabilities on the balance sheet of the Borrower and its Restricted Subsidiaries,

less (b) without duplication and to the extent included in arriving at such Consolidated Net Income, (i) non-cash gains (excluding any non-cash gain to the extent it represents the reversal of an accrual or reserve for a potential cash item that reduced Consolidated EBITDA in any prior period) and all other non-cash items of income for such period, (ii) any gains and income from investments recorded using the equity method, and (iii) any gains arising out of transactions of the types described in clauses (a)(xii), (xiii), (xiv), (xv) and (xvi) above; *provided* that, for the avoidance of doubt, any gain representing the reversal of any non-cash charge referred to in clause (a)(v)(B) above for a prior period shall be added (together with, without duplication, any amounts received in respect thereof to the extent not increasing Consolidated Net Income) to Consolidated EBITDA in any subsequent period to such extent so reversed (or received).

"**Consolidated Net Income**" shall mean, with reference to any period, the net income (or loss) of the Borrower and its Subsidiaries for such period determined on a consolidated basis in accordance with GAAP on a consolidated basis (without duplication) for such period (without deduction for minority interests); *provided* that in determining Consolidated Net Income, (a) the net income of any other Person which is not a Subsidiary of the Borrower, is an Unrestricted Subsidiary or is accounted for by the Borrower by the equity method of accounting shall be included only to the extent of the payment of cash dividends or cash distributions by such other Person to the Borrower or a Guarantor that could be made during such period; *provided, however,* that for purposes of calculating the Cumulative Credit for purposes of Section 7.06(e)(y), such income shall only be included (directly or indirectly) to the extent such cash dividends or other cash distributions are actually received from such other Person by the Borrower or a Guarantor, (b) the net income of any Subsidiary of the Borrower shall be excluded to the extent that the declaration or payment of cash dividends or similar cash distributions by that Subsidiary of that net income is not at the date of determination permitted by operation of its charter or any agreement, instrument or law applicable to such Subsidiary (other than (i) restrictions that have been waived or otherwise released, (ii) restrictions pursuant to the Loan Documents and or the ABL Facility Documentation and (iii) restrictions arising pursuant to an agreement or instrument if the encumbrances and restrictions contained in any such agreement or instrument taken as a whole are not materially less favorable to the Secured Parties than the encumbrances and restrictions contained in the Loan Documents (as determined by the Borrower in good faith)) and (c) the income or loss of any Person accrued prior to the date it becomes a Subsidiary or is merged into or consolidated with the Borrower or any Subsidiary or the date that such Person's assets are acquired by the Borrower or any Subsidiary shall be excluded.

"**Consolidated Total Assets**" shall mean the total assets of the Borrower and its Restricted Subsidiaries, determined on a consolidated basis in accordance with GAAP, as shown on the consolidated balance sheet of the Borrower for the most recently completed fiscal quarter for which financial statements have been delivered pursuant to Section 6.01(a) or (b).

"**Consolidated Total Debt**" shall mean, as of any date of determination, the aggregate principal amount of Indebtedness of the Borrower and its Restricted Subsidiaries outstanding on such date, in an amount that would be reflected on a balance sheet prepared as of such date on a consolidated basis in accordance with GAAP (but excluding (a) the effects of any discounting of Indebtedness as provided in Section 1.10 and (b) Indebtedness in respect of the Existing Series A

Notes to the extent the amount thereof is fully discharged in accordance with its terms), consisting of Indebtedness for borrowed money, Attributable Indebtedness or purchase money Indebtedness, debt obligations evidenced by bonds, debentures, promissory notes, loan agreements or similar instruments, and all Guarantees of any of the foregoing; *provided* that (i) Consolidated Total Debt shall not include Indebtedness in respect of letters of credit, bankers' acceptances and other similar contingent obligations, except to the extent of unreimbursed amounts thereunder, and (ii) Consolidated Total Debt shall not include obligations under Swap Contracts permitted hereunder.

"**Consolidated Working Capital**" shall mean, with respect to the Borrower and its Restricted Subsidiaries on a consolidated basis at any date of determination, Current Assets at such date of determination minus Current Liabilities at such date of determination; *provided*, that, increases or decreases in Consolidated Working Capital shall be calculated without regard to any changes in Current Assets or Current Liabilities as a result of (a) any reclassification in accordance with GAAP of assets or liabilities, as applicable, between current and noncurrent or (b) the effects of purchase accounting.

"**Contractual Obligation**" shall mean, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"**Contribution Deferral Agreement**" means that certain Second Amended and Restated Contribution Deferral Agreement, dated as of January 31, 2014, by and between YRC Inc., USF Holland, Inc., New Penn Motor Express, Inc., USF Reddaway Inc., certain other of the Subsidiaries of the Borrower, the Trustees for the Central States, Southeast and Southwest Areas Pension Fund, the Pension Fund Entities and each other pension fund from time to time party thereto and Wilmington Trust Company, all as the same may be amended, amended and restated, restated, supplemented or otherwise modified in accordance with the terms hereof.

"**Control**" shall have the meaning specified in the definition of "Affiliate".

"**Credit Agreement Refinancing Indebtedness**" shall mean Permitted Additional Debt or Indebtedness incurred pursuant to a Refinancing Amendment, in each case, issued, incurred or otherwise obtained (including by means of the extension or renewal of existing Indebtedness) in exchange for, or to extend, renew, replace, restructure or refinance, in whole or part, existing Term Loans (including any successive Credit Agreement Refinancing Indebtedness) ("**Refinanced Debt**"); *provided* that (i) such extending, renewing, replacing, restructuring or refinancing Indebtedness is in an original aggregate principal amount (or accreted value, if applicable) not greater than the aggregate principal amount (or accreted value, if applicable) of the Refinanced Debt except by an amount equal to accrued but unpaid interest, premiums and fees payable by the terms of such Indebtedness and reasonable fees, expenses, original issue discount and upfront fees incurred in connection with such exchange, modification, refinancing, refunding, renewal, restructuring, replacement or extension, (ii) such Refinanced Debt shall be repaid, defeased or satisfied and discharged with 100% of the Net Proceeds of the applicable Credit Agreement Refinancing Indebtedness and all accrued, due and payable interest, fees and premiums (if any) in connection therewith shall be paid promptly upon receipt of the proceeds of

such Credit Agreement Refinancing Indebtedness, (iii) such Indebtedness does not have an earlier maturity and has a Weighted Average Life to Maturity equal to or greater than the Refinanced Debt and (iv) and, in the case of any high yield notes constituting Credit Agreement Refinancing Indebtedness, such Indebtedness will not have mandatory prepayment provisions (other than related to customary asset sale and change of control and similar offers and AHYDO "catch up" payments) that would result in mandatory prepayment of such Indebtedness prior to the Refinanced Debt.

"**Credit Extension**" shall mean a Borrowing.

"**Cumulative Credit**" shall mean, at any date, an amount, not less than zero in the aggregate, determined on a cumulative basis equal to, without duplication:

(a)   $20,000,000, plus

(b)   the Cumulative Retained Excess Cash Flow Amount at such time, plus

(c)   the cumulative amount of cash and Cash Equivalent proceeds from the sale of Equity Interests of the Borrower or of any direct or indirect parent of the Borrower after the Closing Date and on or prior to such time which proceeds have been received in the form of common or preferred equity (other than Disqualified Equity Interests) by, or contributed as common or preferred equity (other than Disqualified Equity Interests) to the capital of, the Borrower, to the extent Not Otherwise Applied, plus

(d)   to the extent not applied, or required to be applied, to the prepayment of Loans pursuant to Section 2.13, 100% of the aggregate after-tax amount received by the Borrower or any Restricted Subsidiary of the Borrower after the Closing Date in cash and Cash Equivalents from:

(A)   the sale (other than to the Borrower or any such Restricted Subsidiary) of the Equity Interests of an Unrestricted Subsidiary or joint ventures, or

(B)   any dividend or other distribution made by an Unrestricted Subsidiary or joint ventures, plus

(e)   the fair market value of all Qualified Equity Interests of the Borrower issued upon conversion or exchange of Indebtedness or Disqualified Equity Interests of the Borrower or any of its Restricted Subsidiaries after the Closing Date;

(f)   in the event that the Borrower redesignates any Unrestricted Subsidiary as a Restricted Subsidiary after the Closing Date (which, for purposes hereof, shall be deemed to also include (I) the merger, consolidation, liquidation or similar amalgamation of any Unrestricted Subsidiary into the Borrower or any Restricted Subsidiary, so long as the Borrower or such Restricted Subsidiary is the surviving Person, and (II) the transfer of all or substantially all of the assets of an Unrestricted Subsidiary to the Borrower or any Restricted Subsidiary), the fair

market value (as determined in good faith by the Borrower) of the Investment in such Unrestricted Subsidiary at the time of such redesignation; plus

(g)   the aggregate amount of Declined Proceeds at such time that have been retained by the Borrower in accordance with Section 2.13(d), plus

(h)   to the extent not already included in the Cumulative Retained Excess Cash Flow Amount, an amount equal to any returns in cash and Cash Equivalents (including dividends, interest, distributions, returns of principal, profits on sale, repayments, income and similar amounts) actually received by the Borrower or any Restricted Subsidiary after the Closing Date in respect of any Investments made pursuant to Section 7.02(p)(y), and *provided* in each case that such amount does not exceed the amount of such Investment made pursuant to Section 7.02(p)(y), minus

(i)   any amount of the Cumulative Credit used to make Investments pursuant to Section 7.02(p)(y) after the Closing Date and prior to such time, minus

(j)   any amount of the Cumulative Credit used to pay dividends or make distributions or other Restricted Payments pursuant to Section 7.06(d)(ii) or Section 7.06(e)(y) after the Closing Date and prior to such time, minus

(k)   any amount of the Cumulative Credit used to make Capital Expenditures pursuant to Section 7.11(ii) after the Closing Date and prior to such time, minus

(l)   any amount of the Cumulative Credit used to make payments or distributions in respect of Permitted Second Priority Additional Debt or Junior Financing (or any Permitted Refinancing thereof) pursuant to Section 7.13(a)(vi) after the Closing Date and prior to such time.

"**Cumulative Retained Excess Cash Flow Amount**" shall mean, at any date, an amount, not less than zero in any fiscal year, determined on a cumulative basis equal to the aggregate cumulative sum of the Retained Percentage of Excess Cash Flow for all Excess Cash Flow Periods ending after the Closing Date and prior to such date; *provided*, that for purposes of Section 7.06(e)(y), (a) the Cumulative Retained Excess Cash Flow Amount shall only be available if the Total Leverage Ratio at the time of the making of such Investment, Restricted Payment or prepayment, redemption, purchase, defeasance or other payment, as the case may be, calculated on a Pro Forma Basis, is less than or equal to 3.75 to 1.00 and (b) the Cumulative Retained Excess Cash Flow Amount shall be reduced by the amount of Excess Cash Flow attributable to Foreign Subsidiaries to the extent and for so long as such Excess Cash Flow is excluded from Excess Cash Flow prepayments pursuant to Section 2.13(f).

"**Current Assets**" shall mean, with respect to the Borrower and the Restricted Subsidiaries on a consolidated basis at any date of determination, all assets that would, in accordance with GAAP, be classified on a consolidated balance sheet of the Borrower and its Restricted Subsidiaries as current assets at such date of determination, other than (a) cash and Cash Equivalents, (b) amounts related to current or deferred Taxes based on income or profits,

(c) assets held for sale, (d) loans (permitted) to third parties, (e) pension assets, (f) deferred bank fees, and (g) derivative financial instruments.

"**Current Liabilities**" shall mean, with respect to the Borrower and the Restricted Subsidiaries on a consolidated basis at any date of determination, all liabilities that would, in accordance with GAAP, be classified on a consolidated balance sheet of the Borrower and its Restricted Subsidiaries as current liabilities at such date of determination, other than, without duplication (and to the extent otherwise included therein) (a) the current portion of any Indebtedness, (b) accruals of interest expense (excluding interest expense that is past due and unpaid), (c) accruals for current or deferred Taxes based on income or profits, (d) accruals of any costs or expenses related to restructuring reserves, (e) the current portion of pension liabilities and (f) revolving loans, swing line loans and letter of credit obligations under the ABL Facility or any other revolving credit facility.

"**Custodial Administration Agreement**" shall mean the custodial administration agreement, dated as of the date hereof, by and among the Borrower, the Subsidiaries from time to time parties thereto, VINtek, Inc., as custodial administrator, the Collateral Agent, as administrative and collateral agent for the benefit of the Secured Parties, the ABL Agent, as administrative and collateral agent for the benefit of the ABL Secured Parties and the Collateral Agent, as collateral agent for the benefit of the Secured Parties and the ABL Secured Parties.

"**Debtor Relief Laws**" shall mean the Bankruptcy Code of the United States and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"**December 2013 Exchange Agreements**" shall mean each of the exchange agreements dated as of December 22, 2013, as amended, restated, modified, waived, supplemented or consented to, by and among the Borrower and certain of the holders of the Series B Senior Secured Notes due 2015 that are party thereto.

"**December 2013 Registration Rights Agreement**" shall mean the Registration Rights Agreement dated as of December 22, 2013, as amended, restated modified, waived, supplemented or consented to, by and among the Borrower and each of the purchasers signatory thereto.

"**December 2013 Stock Purchase Agreements**" shall mean each of the stock purchase agreements dated as of December 22, 2013, as amended, restated, modified, waived, supplemented or consented to, by and among the Borrower and each of the purchasers party thereto.

"**Declined Proceeds**" shall have the meaning assigned to such term in Section 2.13(d).

"**Default**" shall mean any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of any grace period, or both, without cure or waiver hereunder, would be an Event of Default.

"**Disposition**" or "**Dispose**" shall mean the sale, transfer, license, lease or other disposition (including any sale and leaseback transaction and any sale or issuance of Equity Interests in a Restricted Subsidiary) of any property by any Person, including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith.

"**Disqualified Equity Interests**" shall mean any Equity Interest that, by its terms (or by the terms of any security or other Equity Interests into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition (a) matures or is mandatorily redeemable (other than solely for Qualified Equity Interests), pursuant to a sinking fund obligation or otherwise, (b) is redeemable at the option of the holder thereof (other than solely for Qualified Equity Interests), in whole or in part (except as a result of a change of control or asset sale so long as any rights of the holders thereof upon the occurrence of a change of control or asset sale event shall be subject to the prior repayment in full of the Loans and all other Obligations that are accrued and payable and the termination of the Commitments), (c) provides for scheduled payments of dividends in cash, or (d) is or becomes convertible into or exchangeable for Indebtedness or any other Equity Interests that would constitute Disqualified Equity Interests, in each case, prior to the date that is ninety-one (91) days after the then Latest Maturity Date; *provided* that if such Equity Interests are issued pursuant to, or in accordance with a plan for the benefit of employees of the Borrower or the Restricted Subsidiaries or by any such plan to such employees, such Equity Interests shall not constitute Disqualified Equity Interests solely because they may be required to be repurchased by the Borrower or its Restricted Subsidiaries in order to satisfy applicable statutory or regulatory obligations or as a result of such employee's termination, death or disability.

"**Disqualified Lenders**" shall mean (i) each of those banks, financial institutions and other entities identified in writing prior to the launch of the syndication of the Initial Term Loans by the Borrower to the Administrative Agent, (ii) competitors of the Borrower or the Guarantors identified in writing from time to time by the Borrower to the Administrative Agent and (iii) any known affiliates of the Persons identified pursuant to clause (i) or (ii); *provided* that a "competitor" or an affiliate of a competitor or an entity referenced in clause (i) shall not include any bona fide debt fund or investment vehicle (other than a Person which is excluded pursuant to clause (i) above) that is primarily engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of business and whose managers are not involved with any equity or equity-like investments or other investments with an equity component or characteristic managed by any Person described in clause (i) or (ii) above.

"**Dollars**" or "**$**" shall mean lawful money of the United States of America.

"**Domestic Subsidiary**" shall mean any Subsidiary that is organized under the Laws of the United States, any state thereof or the District of Columbia; provided, that notwithstanding

the foregoing, "Domestic Subsidiary" shall not include any Subsidiary substantially all of the assets of which are Equity Interests or Indebtedness in (or owed by) one or more Subsidiaries that are not Domestic Subsidiaries.

"**Dutch Auction**" shall mean an auction conducted by the Borrower in order to purchase Term Loans as contemplated by Section 10.04(k), in accordance in all material respects with the procedures set forth in Exhibit K.

"**Eligible Assignee**" shall mean (i) a Lender, (ii) an Affiliate of a Lender, (iii) a Related Fund of a Lender, and (iv) any other Person (other than a natural person) approved by the Administrative Agent and, unless an Event of Default under Section 8.01(a), 8.01(f) or 8.01(g) has occurred and is continuing and except during the primary syndication of the Commitments to those institutions disclosed in writing by the Arranger to the Borrower and approved by the Borrower prior to the Closing Date, the Borrower (each such approval not to be unreasonably withheld, conditioned or delayed and the Borrower's approval being deemed to have been given in the event that the Borrower does not object in writing to an assignment within 10 days after receipt of written notice of such assignment); *provided*, that notwithstanding the foregoing, "**Eligible Assignee**" shall not include the Borrower or any other Controlled Affiliate of the Borrower (it being understood that assignments to the Borrower may only be made pursuant to Section 10.04(k)). "Eligible Assignee" shall not include any Disqualified Lender without the prior written consent of the Borrower (which may be withheld in the Borrower's sole discretion). Notwithstanding the foregoing or anything else to the contrary in this Agreement, each of the parties hereto acknowledges and agrees that the Administrative Agent (in its capacity as such) (x) shall not have any responsibility or obligation to determine whether any Lender or any potential assignee Lender is a Disqualified Lender and (y) shall not have any liability with respect to any assignment or participation made to a Disqualified Lender.

"**Environmental Laws**" shall mean all federal, state, local and foreign laws (including common law), treaties, regulations, rules, ordinances, codes, decrees, judgments, directives, orders (including consent orders), and agreements in each case, relating to protection of the environment, natural resources, human health and safety (with respect to exposure to hazardous or toxic substances or wastes) or the presence, Release of, or exposure to, hazardous or toxic substances or wastes, or the generation, manufacture, processing, distribution, use, treatment, storage, transport, recycling or handling of, or the arrangement for such activities with respect to, hazardous or toxic substances or wastes.

"**Environmental Liability**" shall mean all liabilities, obligations, damages, losses, claims, actions, suits, judgments, orders, fines, penalties, fees, expenses and costs (including administrative oversight costs, capital and operating costs, injunctive relief, costs associated with financial assurance, permitting or closure requirements, natural resource damages and investigation or remediation costs), whether contingent or otherwise, arising out of or relating to (a) compliance or non-compliance with any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the Release of any Hazardous Materials or (e) any contract,

agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"**Environmental Permit**" means any permit, approval, identification number, license or other authorization required under any Environmental Law.

"**Equity Interests**" shall mean, with respect to any Person, all of the shares, interests, rights, participations or other equivalents (however designated) of capital stock of (or other ownership or profit interests or units in) such Person and all of the warrants, options or other rights for the purchase, acquisition or exchange from such Person of any of the foregoing (including through convertible securities) but excluding in each case any debt security that is convertible into, or exchanged for, Equity Interests.

"**ERISA**" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time.

"**ERISA Affiliate**" shall mean Person, any trade or business (whether or not incorporated) that, together with a Loan Party or any Restricted Subsidiary, is or, within the six year period immediately preceding the Closing Date, was treated as a single employer under Section 414(b) or (c) of the Code, or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.

"**ERISA Event**" shall mean (a) a Reportable Event; (b) the failure to satisfy the minimum funding standard with respect to a Plan within the meaning of Sections 412 or 430 of the Code or Sections 302 or 303 of ERISA, whether or not waived (unless such failure is corrected by the final due date for the plan year for which such failure occurred), (c) a determination that a Plan is, or is expected to be, in "at risk" status (as defined in Section 303(i)(4) of ERISA or Section 430(i)(4) of the Code); (d) the receipt by a Loan Party, any Restricted Subsidiary or any of their respective ERISA Affiliates of notice pursuant to Section 305(b)(3)(D) of ERISA that a Multiemployer Plan is or will be in "endangered status" or "critical status" (as defined in Section 305(b) of ERISA), or is, or is expected to be, "insolvent" (within the meaning of Section 4245 of ERISA) or in "reorganization" (within the meaning of Section 4241 of ERISA); (e) the filing pursuant to Section 431 of the Code or Section 304 of ERISA of an application for the extension of any amortization period; (f) the failure to timely make a contribution required to be made with respect to any Plan or Multiemployer Plan; (g) the filing of a notice to terminate any Plan if such termination would require material additional contributions in order to be considered a standard termination within the meaning of Section 4041(b) of ERISA; (h) the filing under Section 4041(c) of ERISA of a notice of intent to terminate any Plan or the termination of any Plan under Section 4041(c) of ERISA; (i) the filing pursuant to Section 412(c) of the Code or Section 302(c) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan; (j) the incurrence by a Loan Party, any Restricted Subsidiary or any of their respective ERISA Affiliates of any liability under Title IV of ERISA with respect to the termination of any Plan; (k) the receipt by a Loan Party, any Restricted Subsidiary or any of their respective ERISA Affiliates from the PBGC or a plan administrator of any notice of an intention to terminate any Plan or Plans or to appoint a trustee to administer any Plan under Section 4042 of ERISA; (l) the receipt by a Loan Party, any Restricted Subsidiary or any of their respective ERISA Affiliates of

any notice, or the receipt by any Multiemployer Plan from a Loan Party, any Restricted Subsidiary or any of their respective ERISA Affiliates of any notice, concerning the imposition of Withdrawal Liability; (m) the occurrence of any event or condition that would reasonably be expected to result in the termination of a Plan or the appointment of a trustee to administer a Plan; (o) the occurrence of a nonexempt prohibited transaction (within the meaning of Section 406 of ERISA or Section 4975 of the Code) with respect to any Plan which could result in liability to a Loan Party or any Restricted Subsidiary or with respect to which a Loan Party or any Restricted Subsidiary is a "disqualified person" (as defined in Section 4975 of the Code) or a "party in interest" (as defined in Section 3(14) of ERISA); (p) the incurrence of any liability with respect to any Plan or Multiemployer Plan under Title IV of ERISA (other than premiums due and not delinquent under Section 4007 of ERISA); or (q) engagement in any transaction that could be subject to Sections 4069 or 4212(c) of ERISA.

"**Eurodollar**", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate (other than the Alternate Base Rate) determined by reference to the Adjusted LIBO Rate.

"**Event of Default**" shall have the meaning assigned to such term in Article 8.

"**Excess Cash Flow**" shall mean, for any period, an amount equal to:

(a)  the sum, without duplication, of:

(i)      Consolidated Net Income for such period,

(ii)     an amount equal to the amount of all non-cash charges to the extent deducted in arriving at such Consolidated Net Income,

(iii)    decreases in Consolidated Working Capital for such period (other than any such decreases arising from acquisitions or dispositions by the Borrower and its Restricted Subsidiaries completed during such period),

(iv)    cash receipts in respect of Swap Contracts during such period to the extent such receipts were not otherwise included in arriving at such Consolidated Net Income,

(v)     the amount of tax expense deducted in determining Consolidated Net Income for such period to the extent it exceeds the amount of cash taxes paid in such period,

(vi)    an amount equal to the aggregate net non-cash loss on Dispositions by the Borrower and its Restricted Subsidiaries during such period (other than Dispositions in the ordinary course of business) to the extent deducted in arriving at such Consolidated Net Income,

minus

(b)  the sum, without duplication, of:

(i)     an amount equal to the amount of all non-cash credits included in arriving at such Consolidated Net Income,

(ii)    the amount of Capital Expenditures made in cash during such period (or committed to be made within 90 days after the end of such period) to the extent financed with Internally Generated Cash,

(iii)   the aggregate amount of payments made in cash during such period (or committed to be paid in cash within 90 days after the end of such period) (other than Capital Expenditures) and capitalized in accordance with GAAP to the extent financed with Internally Generated Cash,

(iv)    the aggregate amount of all principal payments of Indebtedness of the Borrower and its Restricted Subsidiaries during such period, in each case to the extent financed with Internally Generated Cash (including (A) the principal component of payments in respect of Capitalized Leases, (B) the amount of any scheduled repayment of Term Loans pursuant to Section 2.11 (to the extent actually made) and (C) voluntary prepayments or buybacks of Term Loans made pursuant to Section 10.04(k) (in an amount equal to the discounted amount actually paid in respect of the principal amount of such Term Loans), but excluding (W) all voluntary prepayments of Term Loans (other than voluntary prepayments made pursuant to Section 10.04(k)), (X) all prepayments of Indebtedness on the Closing Date in connection with the Recapitalization Transactions or the Refinancing Transactions, (Y) all prepayments, redemptions or repurchases in respect of (i) Permitted Second Priority Additional Debt (or any Permitted Refinancing thereof), except to the extent permitted under Section 7.13(a) and (ii) Junior Financing, except to the extent permitted under Section 7.13(a) and (Z) all prepayments of loans under the ABL Facility or any other revolving credit facility made during such period unless there is a corresponding permanent commitment reduction in connection therewith (it being agreed that any amount excluded pursuant to clause (W), (X), (Y) or (Z) may not be deducted under any other clause of this definition),

(v)     an amount equal to the aggregate net non-cash gain on Dispositions by the Borrower and its Restricted Subsidiaries during such period (other than Dispositions in the ordinary course of business) to the extent included in arriving at such Consolidated Net Income,

(vi)    increases in Consolidated Working Capital for such period (other than any such increases arising from acquisitions or dispositions by the Borrower and its Restricted Subsidiaries during such period),

(vii)   cash payments by the Borrower and its Restricted Subsidiaries during such period in respect of long-term liabilities of the Borrower and its Restricted Subsidiaries other than Indebtedness and that were made with Internally Generated Cash and were not deducted or were excluded in calculating Consolidated Net Income,

(viii)   the amount of Investments and acquisitions made during such period (or committed to be made within 90 days after the end of such period) in cash pursuant to Section 7.02 (other than Section 7.02(a) or (c)) (net of the cash return on any such Investments received during such period, except to the extent such return was included in the determination of Consolidated Net Income) to the extent that such Investments and acquisitions were not expensed and were financed with Internally Generated Cash,

(ix)   the amount of cash taxes paid in such period (or reasonably expected to be paid within 90 days of the end of such period) to the extent they exceed the amount of tax expense deducted in determining Consolidated Net Income for such period (which amounts shall be included in the calculation of Excess Cash Flow for the period in which they are expensed),

(x)   cash expenditures in respect of Swap Contracts during such fiscal year to the extent such expenditures were not deducted or were excluded in arriving at such Consolidated Net Income, and

(xi)   the aggregate amount of Restricted Payments made in cash permitted by Section 7.06(d)(i) during such period (or committed to be made or paid in cash within the next 90 days after the end of such period).

Notwithstanding anything in the definition of any term used in the definition of Excess Cash Flow to the contrary, (i) all components of Excess Cash Flow shall be computed for the Borrower and its Restricted Subsidiaries on a consolidated basis and (ii) for purposes of calculating Excess Cash Flow for any period with respect to each Permitted Acquisition or other Investment of all or substantially all of the assets of another Person or business line permitted hereby consummated during such Excess Cash Flow Period and for the purposes of calculating Consolidated Working Capital, the (A) total assets of a target of such Permitted Acquisition or other Investment of all or substantially all of the assets of another Person or business line permitted hereby (other than cash and Cash Equivalents), as calculated as at the date of consummation of the applicable Permitted Acquisition or other Investment of all or substantially all of the assets of another Person or business line permitted hereby, which may properly be classified as current assets on a consolidated balance sheet of Borrower and its Restricted Subsidiaries in accordance with GAAP (assuming, for the purpose of this clause (A), that such Permitted Acquisition or other Investment of all or substantially all of the assets of another Person or business line permitted hereby has been consummated) and (B) the total liabilities of Borrower and its Restricted Subsidiaries, as calculated as at the date of consummation of the applicable Permitted Acquisition or other Investment of all or substantially all of the assets of another Person or business line permitted hereby, which may properly be classified as current liabilities (other than the current portion of any long term liabilities and accrued interest thereon) on a consolidated balance sheet of Borrower and its Restricted Subsidiaries in accordance with GAAP (assuming, for the purpose of this clause (B), that such Permitted Acquisition or other Investment of all or substantially all of the assets of another Person or business line permitted hereby has been consummated), shall, in the case of both immediately preceding clauses (A) and

(B), be calculated as the difference between the Consolidated Working Capital at the end of the applicable period from the date of consummation of the Permitted Acquisition or other Investment of all or substantially all of the assets of another Person or business line permitted hereby. To the extent any amounts that are committed to be made or paid or are reasonably expected to be paid are deducted as permitted by clause (b) of the definition of Excess Cash Flow in respect of any period, such amounts shall not be deducted again for purposes of calculating Excess Cash Flow for the period in which such amounts are actually paid.

"**Excess Cash Flow Period**" shall mean each fiscal year of the Borrower commencing with the fiscal year ending December 31, 2014, but in all cases for purposes of calculating the Cumulative Retained Excess Cash Flow Amount shall only include such fiscal years for which financial statements and a Compliance Certificate have been delivered in accordance with Sections 6.01(a) and 6.02(a), respectively, and for which any prepayments required by Section 2.13(a)(i) (if any) have been made (it being understood that the Retained Percentage of Excess Cash Flow for any Excess Cash Flow Period shall be included in the Cumulative Retained Excess Cash Flow Amount regardless of whether a prepayment is required by Section 2.13(a)(i), except to the extent that a prepayment is not made in reliance on Section 2.13(f), in which case the Cumulative Retained Excess Cash Flow Amount shall be reduced by the Retained Percentage of the Excess Cash Flow for which the Applicable ECF Percentage has not been applied to make a prepayment pursuant to Section 2.13(a)(i)).

"**Exchange Act**" shall mean the Securities Exchange Act of 1934, as amended.

"**Excluded Property**" shall have the meaning assigned to such term in the Security Agreement.

"**Excluded Real Property**" shall mean (a) any Real Property having a fair market value of less than $2,000,000 (at the Closing Date or, with respect to any such Real Property acquired after (or held by a Person that becomes a Loan Party after) the Closing Date as described in Section 6.11 or 6.13, as applicable, at the time of acquisition (or at the time such Person becomes a Loan Party)), in each case, as reasonably estimated by the Borrower in good faith, *provided* that the aggregate value of Real Property excluded pursuant to this clause (a) shall not exceed $20,000,000 and (b) any Real Property for so long as such Real Property secures the obligations of the Borrower under the Contribution and Deferral Agreement on a first lien basis on the Closing Date and is listed on Schedule 1.01(a); and *provided further*, that in the case of each of clauses (a) and (b), the Borrower (or its counsel) shall designate any such property as an "Excluded Real Property" by written notice (which may include email or other electronic communication receipt of which is confirmed) to the Administrative Agent (or its counsel) on or prior to the Closing Date or, in the case of clause (a), from time to time thereafter.

"**Excluded Subsidiary**" shall mean (a) any Subsidiary that is not a wholly owned Subsidiary of the Borrower or a Guarantor, (b) any Immaterial Subsidiary, (c) any Subsidiary that is prohibited by applicable Law whether or not existing on the Closing Date or Contractual Obligations existing on the Closing Date (or, in the case of any newly acquired Subsidiary, in existence at the time of acquisition but not entered into in contemplation thereof) from Guaranteeing the Obligations or if Guaranteeing the Obligations would require governmental

(including regulatory) consent, approval, license or authorization (unless such contractual obligation is waived or otherwise removed or such consent, approval, license or authorization has been obtained), (d) any other Subsidiary with respect to which, in the reasonable judgment of the Administrative Agent, in consultation with the Borrower, the burden or cost or other consequences (other than adverse tax consequences) of providing a Guarantee of the Obligations shall be excessive in view of the benefits to be obtained by the Lenders therefrom, (e) any other Subsidiary with respect to which, in the reasonable judgment of the Borrower, the tax consequences of providing a Guarantee could be adverse, (f) any Foreign Subsidiary of the Borrower or of any other direct or indirect Domestic Subsidiary or Foreign Subsidiary, (g) any Unrestricted Subsidiary, (h) any Securitization Subsidiary, including without limitation YRCW Receivables LLC, captive insurance company or non-profit Subsidiary, (i) any Domestic Subsidiary that is a Subsidiary of a Foreign Subsidiary that is a controlled foreign corporation within the meaning of Section 957 of the Code (a "**CFC**"), and (j) any Domestic Subsidiary that is a disregarded entity for U.S. federal income tax purposes and all of the assets of which consist of (x) the capital stock or indebtedness of (or owed by) one or more non-U.S. subsidiaries that are CFCs and (y) not more than an immaterial amount of cash.

"**Existing Credit Agreement**" shall mean the Amended and Restated Credit Agreement, dated as of July 22, 2011 (as amended, restated, modified or supplemented from time to time prior to the date hereof), by and among the Borrower, the lenders party thereto from time to time and JPMorgan Chase Bank, National Association, as administrative agent.

"**Existing ABL Facility**" shall mean the Credit Agreement dated as of July 22, 2011 (as amended, restated, modified or supplemented from time to time prior to the date hereof), by and among YRCW Receivables LLC, as borrower, the Borrower, as servicer, the lenders party thereto from time to time and JPMorgan Chase Bank, N.A., as administrative agent.

"**Existing 6% Senior Notes**" shall mean those certain 6% Convertible Senior Notes due 2014 under that certain Indenture, dated as of February 23, 2010 (as amended, restated, modified or supplemented from time to time prior to the date hereof), among the Borrower, as issuer, the guarantors party thereto and US Bank, National Association, as trustee.

"**Existing Series A Notes**" shall mean those certain 10% Series A Convertible Senior Secured Notes due 2015 under that certain Indenture, dated as of July 22, 2011 (as amended, restated, modified or supplemented from time to time prior to the date hereof), among the Borrower, as issuer, the subsidiaries party thereto as guarantors and U.S. Bank National Association, as trustee.

"**Existing Series B Notes**" shall mean those certain 10% Series B Convertible Senior Secured Notes due 2015 under that certain Indenture, dated as of July 22, 2011 (as amended, restated, modified or supplemented from time to time prior to the date hereof), among the Borrower, as issuer, the subsidiaries party thereto as guarantors and U.S. Bank National Association, as trustee.

"**Extended Term Loans**" shall have the meaning assigned to such term in Section 2.19(a).

"**Extension**" shall have the meaning assigned to such term in Section 2.19(a).

"**Extension Amendment**" shall have the meaning assigned to such term in Section 2.19(c).

"**Extension Offer**" shall have the meaning assigned to such term in Section 2.19(a).

"**Facility**" shall mean the Initial Term Loans, the Extended Term Loans, the Incremental Term Loans or the Other Term Loans, as the context may require.

"**FATCA**" shall mean Sections 1471 through 1474 of the Code, as in effect on the Closing Date, and any applicable Treasury regulation promulgated thereunder or published administrative guidance implementing such Sections whether in existence on the Closing Date or promulgated or published thereafter.

"**Federal Funds Effective Rate**" shall mean, for any day, the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average of the quotations for the day for such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by it.

"**Fees**" shall have the meaning assigned to such term in Section 2.05.

"**First Lien Intercreditor Agreement**" shall mean a customary "*pari passu*" intercreditor agreement among the Collateral Agent, the ABL Agent and one or more Senior Representatives for holders of Permitted First Priority Additional Debt in form and substance reasonably satisfactory to the Collateral Agent.

"**Flood Laws**" shall mean the National Flood Insurance Reform Act of 1994 and related legislation (including the regulations of the Board).

"**Foreign Disposition**" shall have the meaning set forth in Section 2.13(f).

"**Foreign Subsidiary**" shall mean any direct or indirect Subsidiary of the Borrower which is not a Domestic Subsidiary.

"**GAAP**" shall mean generally accepted accounting principles in the United States of America, as in effect from time to time, subject to Section 1.11; *provided, however*, that if the Borrower notifies the Administrative Agent that the Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the Closing Date in GAAP or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the Borrower that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith.

"**Governmental Authority**" shall mean any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, administrative tribunal, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"**Granting Lender**" shall have the meaning assigned to such term in Section 10.04(i).

"**Guarantee**" shall mean, as to any Person, without duplication, (a) any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other monetary obligation payable or performable by another Person (the "**primary obligor**") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness of the payment or performance of such Indebtedness, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness, or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part), or (b) any Lien on any assets of such Person securing any Indebtedness of any other Person, whether or not such Indebtedness is assumed by such Person (or any right, contingent or otherwise, of any holder of such Indebtedness to obtain any such Lien); *provided* that the term "Guarantee" shall not include (i) endorsements for collection or deposit, in either case in the ordinary course of business, (ii) customary and reasonable indemnity obligations in effect on the Closing Date or entered into in connection with any acquisition or disposition of assets permitted under this Agreement (other than such obligations with respect to Indebtedness) or (iii) product warranties. The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith. The term "**Guarantee**" as a verb has a corresponding meaning.

"**Guaranteed Obligations**" shall have the meaning specified in Section 11.01.

"**Guarantors**" shall mean (i) each wholly owned Domestic Subsidiary of the Borrower as of the Closing Date (other than an Excluded Subsidiary) and (ii) each wholly owned Subsidiary that issues a Guarantee of the Obligations after the Closing Date pursuant to Section 6.11 (which Section 6.11, for the avoidance of doubt, does not require that any Excluded Subsidiary provide such a Guarantee) or otherwise. For avoidance of doubt, the Borrower may cause any Restricted Subsidiary that is not (and is not required to be) a Guarantor to Guarantee the Obligations by causing such Restricted Subsidiary to execute a joinder to this Agreement in form and substance reasonably satisfactory to the Administrative Agent, and any such Restricted Subsidiary shall be treated as a Guarantor hereunder for all purposes (each such Subsidiary, an "Electing Guarantor") and may also cause the Guaranty of any such Electing Guarantor, and any Liens securing such Guaranty, to be released upon providing written notice to the Administrative Agent

and the Collateral Agent that such Electing Guarantor shall be treated as an Excluded Subsidiary to the extent consistent with the definition of Excluded Subsidiary. The Guarantors as of the Closing Date are set forth on Schedule 1.01(b).

"**Guaranty**" shall mean, collectively, the guaranty of the Obligations by the Guarantors pursuant to this Agreement.

"**Hazardous Materials**" shall mean (a) any petroleum products, distillates or byproducts and all other hydrocarbons, coal ash, radon gas, asbestos, urea formaldehyde foam insulation, polychlorinated biphenyls, chlorofluorocarbons and all other ozone-depleting substances and (b) any chemical, material, substance or waste that is prohibited, limited or regulated by or pursuant to any Environmental Law.

"**Hedge Bank**" shall mean any Person that is an Agent, a Lender or an Affiliate of an Agent or a Lender at the time it enters into a Secured Hedge Agreement in its capacity as a party thereto and that is designated a "Hedge Bank" with respect to such Secured Hedge Agreement in a writing from the Borrower to the Administrative Agent, and (other than a Person already party hereto as a Lender) that delivers to the Administrative Agent a letter agreement reasonably satisfactory to it (i) appointing the Collateral Agent as its agent under the applicable Loan Documents and (ii) agreeing to be bound by Sections 10.05, 10.06, 10.07, 10.11, 10.17, 10.19, 10.20, 10.23, Section 11.10, Article 8, and Article 9 as if it were a Lender.

"**IBT**" shall mean the International Brotherhood of Teamsters.

"**IBT Agreement**" shall mean that certain National Master Freight Agreement, effective April 1, 2008, among the IBT, YRC Inc. (formerly, Yellow Transportation, Inc. and Roadway Express, Inc.), USF Holland Inc. and New Penn Motor Express, Inc., as amended, restated, modified, supplemented, extended, renewed or replaced from time to time.

"**IBT Extension Agreement**" shall mean that certain Extension of the Agreement for the Restructuring of the YRC Worldwide Inc. Operating Companies, by and among YRC Inc., USF Holland, Inc., New Penn Motor Express, Inc., USF Reddaway and the Teamsters National Freight Industry Negotiating Committee of the IBT.

"**IBT Transactions**" shall mean the modification and extension through March 31, 2019 of the IBT Agreement, and the approval and ratification of the IBT Extension Agreement by the members of the IBT in accordance in all material respects with all applicable laws, rules, regulations and other requirements relating thereto.

"**Immaterial Subsidiary**" shall mean any Subsidiary of the Borrower that does not individually have total assets or annual revenues in that exceed 1.0% of the Borrower's total assets or annual revenues as of the end of each fiscal quarter; *provided* that the aggregate amount of assets or annual revenues of such Subsidiaries shall not at any time exceed 2.5% of the Borrower's total assets or annual revenues as of the end of each fiscal quarter; *provided further* that if, as of the date the financial statements for any fiscal quarter of the Borrower are delivered or required to be delivered hereunder, the consolidated assets or revenues of all Restricted

Subsidiaries so designated by the Borrower as "Immaterial Subsidiaries" shall have, as of the last day of such fiscal quarter, exceeded the limits set forth above, then within 10 Business Days (or such later date as agreed by the Administrative Agent in its reasonable discretion) after the date such financial statements are so delivered (or so required to be delivered), the Borrower shall redesignate one or more Immaterial Subsidiaries, in each case in a written notice to the Administrative Agent, such that, as a result thereof, the consolidated assets and revenues of all Restricted Subsidiaries that are still designated as "Immaterial Subsidiaries" do not exceed such limits. Upon any such Restricted Subsidiary ceasing to be an Immaterial Subsidiary pursuant to the preceding sentence, such Restricted Subsidiary, to the extent not otherwise qualifying as an Excluded Subsidiary, shall comply with Section 6.11, to the extent applicable.

"**Increase Amount Date**" shall have the meaning assigned to such term in Section 2.17(c).

"**Incremental Amendment**" shall have the meaning assigned to such term in Section 2.17(c).

"**Incremental Facility**" shall have the meaning assigned to such term in Section 2.17(b).

"**Incremental Lenders**" shall have the meaning assigned to such term in Section 2.17(c).

"**Incremental Term Loans**" shall have the meaning assigned to such term in Section 2.17(a).

"**Indebtedness**" shall mean, as to any Person at a particular time, without duplication and without reference to what constitutes indebtedness or a liability in accordance with GAAP, all of the following:

(a)    all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

(b)    the maximum amount (after giving effect to any prior drawings or reductions which may have been reimbursed) of all outstanding letters of credit (including standby and commercial), bankers' acceptances, bank guaranties, surety bonds, performance bonds and similar instruments issued or created by or for the account of such Person;

(c)    net obligations of such Person under any Swap Contract;

(d)    all obligations of such Person to pay the deferred purchase price of property or services;

(e)    indebtedness (excluding prepaid interest thereon) described in clauses (a) through (d) and (f) through (h) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements and mortgage, industrial revenue bond, industrial development bond and similar financings), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse;

(f)    all Attributable Indebtedness;

(g)    all obligations of such Person to purchase, redeem, retire or otherwise acquire for value any Disqualified Equity Interests (but solely to the extent required to occur on or prior to the Latest Maturity Date (other than as a result of a change of control, asset sale or similar event)); and

(h)    to the extent not otherwise included above, all Guarantees of such Person in respect of any of the foregoing.

For all purposes hereof, the Indebtedness of any Person (i) shall include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or joint venturer, except to the extent such Person's liability for such Indebtedness is otherwise expressly contractually limited and only to the extent such Indebtedness would be included in the calculation of Consolidated Total Debt and (ii) shall exclude (A) trade accounts payable in the ordinary course of business, (B) any earn-out obligation until such earn-out obligation has become due and payable, (C) any current and undeferred pension contributions or health and welfare contributions due from such Person and/or its applicable Subsidiaries to any Pension Fund Entity, (D) liabilities accrued in the ordinary course, (E) deferred revenues, liabilities associated with customer prepayments and deposits and any such obligations incurred under ERISA, and other accrued obligations (including transfer pricing), in each case incurred in the ordinary course of business, (F) operating leases, (G) customary obligations under employment agreements and deferred compensation and (H) deferred tax liabilities. The amount of any net obligation under any Swap Contract on any date shall be deemed to be the Swap Termination Value thereof as of such date. The amount of Indebtedness of any Person for purposes of clause (e) that is limited in recourse to the property encumbered thereby shall be deemed to be equal to the lesser of (i) the aggregate unpaid amount of such Indebtedness and (ii) the fair market value of the property encumbered thereby as determined by such Person in good faith.

"**Indemnified Taxes**" shall have the meaning assigned to such term in Section 3.01(a).

"**Indemnitee**" shall have the meaning assigned to such term in Section 10.05(b).

"**Information**" shall have the meaning assigned to such term in Section 10.16.

"**Initial Term Loans**" shall mean the term loans made by the Lenders on the Closing Date to the Borrower pursuant to Section 2.01. For the avoidance of doubt, a Term Loan shall no longer be an "Initial Term Loan" when it shall have become an "Extended Term Loan".

"**Intellectual Property Security Agreement**" shall have the meaning given to the term "Grant of Security Interest" in the Security Agreement.

"**Intercompany Note**" shall mean (i) for existing promissory notes as of the Closing Date, each promissory note (or amended and restated promissory note) with subordination

language reasonably acceptable to the Agent and (ii) for promissory notes issued after the Closing Date, a promissory note substantially in the form of Exhibit E.

"**Intercreditor Agreement**" shall include all permitted intercreditor agreements.

"**Interest Payment Date**" shall mean (a) with respect to any ABR Loan, the last Business Day of each March, June, September and December, and (b) with respect to any Eurodollar Loan, the last day of the Interest Period applicable to the Borrowing of which such Loan is a part and, in the case of a Eurodollar Borrowing with an Interest Period of more than three months' duration, each day that would have been an Interest Payment Date had successive Interest Periods of three months' duration been applicable to such Borrowing.

"**Interest Period**" shall mean, with respect to any Eurodollar Borrowing, the period commencing on the date of such Borrowing and ending on the numerically corresponding day (or, if there is no numerically corresponding day, on the last Business Day) in the calendar month that is 1, 3 or 6 (or, if agreed by all applicable Lenders, 12) months thereafter (or any shorter period agreed by all applicable Lenders), as the Borrower may elect; *provided, however*, that (a) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day, (b) any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of the calendar month at the end of such Interest Period and (c) no Interest Period for any Loan shall extend beyond the maturity date of such Loan. Interest shall accrue from and including the first day of an Interest Period to but excluding the last day of such Interest Period. For purposes hereof, the date of a Borrowing initially shall be the date on which such Borrowing is made and thereafter shall be the effective date of the most recent conversion or continuation of such Borrowing.

"**Internally Generated Cash**" shall mean cash resulting from operations of the Borrower and the Restricted Subsidiaries and not constituting (x) proceeds of the issuance of (or contributions in respect of) Equity Interests, (y) proceeds of Dispositions (other than in the ordinary course of business) and Casualty Events or (z) proceeds of the incurrence of Indebtedness.

"**Investment**" shall mean, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of Equity Interests or debt or other securities of another Person, (b) a loan, advance or capital contribution to, Guarantee or assumption of Indebtedness of, or purchase or other acquisition of any other debt or equity participation or interest in, another Person, including any partnership or joint venture interest in such other Person, or (c) the purchase or other acquisition (in one transaction or a series of related transactions) of all or substantially all of the property and assets or business of another Person or assets constituting a business unit, line of business or division of such Person. For purposes of covenant compliance, the amount of any Investment shall equal (A) the amount actually invested, without adjustment for subsequent increases or decreases in the value of such Investment minus (B) the aggregate amount of dividends, distributions or other payments

received in cash in respect of such Investment (including by way of a sale or other disposition of such Investment).

"**Junior Financing**" shall mean any Permitted Junior Debt having an outstanding aggregate principal amount of not less than the Threshold Amount and any Subordinated Indebtedness (for greater certainty, not including the ABL Facility Indebtedness).

"**Junior Financing Documentation**" shall mean any documentation governing any Junior Financing.

"**Latest Maturity Date**" shall mean, at any date of determination, the latest maturity or expiration date applicable to any Loan hereunder at such time, including the latest maturity or expiration date of any Initial Term Loan, any Incremental Term Loan, any Other Term Loan or any Extended Term Loan, in each case as extended in accordance with this Agreement from time to time.

"**Laws**" shall mean, collectively, all international, foreign, federal, state and local laws (including common law), statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, requirements, and agreements with, any Governmental Authority.

"**Leasehold Property**" shall mean any leasehold interest of any Loan Party as lessee under any lease of Real Property.

"**Lender**" shall mean each lender from time to time party hereto. For avoidance of doubt, each Additional Lender and each Incremental Lender is a Lender to the extent any such Person has executed and delivered a Refinancing Amendment or an Incremental Amendment, as the case may be, and to the extent such Refinancing Amendment or Incremental Amendment shall have become effective in accordance with the terms hereof and thereof. As of the Closing Date, Schedule 2.01 sets forth the name of each Lender.

"**LIBO Rate**" shall mean, with respect to any Eurodollar Borrowing for any Interest Period, the rate per annum determined by the Administrative Agent at approximately 11:00 a.m. (London time) on the date that is two Business Days prior to the commencement of such Interest Period by reference to the British Bankers' Association Interest Settlement Rates (or to any replacement market convention therefor selected by the Administrative Agent) for deposits in Dollars (as set forth by any service selected by the Administrative Agent that has been nominated by the British Bankers' Association as an authorized information vendor for the purpose of displaying such rates) for a period equal to such Interest Period; *provided* that, to the extent that an interest rate is not ascertainable pursuant to the foregoing provisions of this definition, the "**LIBO Rate**" shall be the interest rate per annum determined by the Administrative Agent to be the average of the rates per annum at which deposits in Dollars are offered for such relevant Interest Period to major banks in the London interbank market in London, England by the

Administrative Agent at approximately 11:00 a.m. (London time) on the date that is two Business Days prior to the beginning of such Interest Period.

"**Lien**" shall mean any mortgage, deed of trust, pledge, hypothecation, collateral assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to Real Property, and any Capitalized Lease or financing lease having substantially the same economic effect as any of the foregoing).

"**Loan**" shall mean any Term Loan.

"**Loan Documents**" shall mean this Agreement (including, without limitation, any amendments to this Agreement), the Collateral Documents, the Custodial Administration Agreement, each Incremental Amendment, each Refinancing Amendment, each Extension Offer and each amendment of any Loan Document in connection therewith, and the Term Notes, if any, executed and delivered pursuant to Section 2.04(e) (except for any "Secured Hedge Agreement").

"**Loan Parties**" shall mean, collectively, the Borrower and each Guarantor.

"**Margin Stock**" shall have the meaning assigned to such term in Regulation U.

"**Master Agreement**" shall have the meaning specified in the definition of "**Swap Contract**".

"**Material Adverse Effect**" shall mean a (a) material adverse effect on the business, operations, assets, liabilities (actual or contingent), operating results or financial condition of the Borrower and its Restricted Subsidiaries, taken as a whole; (b) material adverse effect on the ability of the Loan Parties (taken as a whole) to fully and timely perform their payment obligations under the Loan Documents to which the Borrower or any of the Loan Parties is a party; or (c) material adverse effect on the rights and remedies available to the Lenders, the Administrative Agent or the Collateral Agent under any Loan Document (other than due to the action or inaction of any Agent or any Lender).

"**Material Real Property**" shall mean each Real Property that is (i) owned in fee by a Loan Party, (ii) located in the United States and (iii) not an Excluded Real Property.

"**Maturity Date**" shall mean (i) with respect to the Initial Term Loans borrowed on the Closing Date that have not been extended pursuant to Section 2.19, February 13, 2019 (the "**Original Term Loan Maturity Date**"), (ii) with respect to any tranche of Extended Term Loans, the final maturity date as specified in the applicable Extension Offer accepted by the respective Lender or Lenders, (iii) with respect to any Other Term Loans, the final maturity date as specified in the applicable Refinancing Amendment and (iv) with respect to any Incremental Term Loans, the final maturity date as specified in the applicable Incremental Amendment; *provided* that if any such day is not a Business Day, the applicable Maturity Date shall be the Business Day immediately succeeding such day.

"**Maximum Incremental Facility Amount**" shall have the meaning assigned to such term in Section 2.17(a).

"**Maximum Rate**" shall have the meaning assigned to such term in Section 10.09.

"**Minimum Extension Condition**" shall have the meaning assigned to such term in Section 2.19(b).

"**MNPI**" shall mean material information concerning the Borrower, Subsidiary or Controlled Affiliate of any of the foregoing or their securities that has not been disseminated in a manner making it available to investors generally, within the meaning of Regulation FD under the Securities Act and the Exchange Act. For purposes of this definition, "material information" means information concerning the Borrower, the Subsidiaries or any Controlled Affiliate of any of the foregoing or any of their securities that could reasonably be expected to be material for purposes of the United States Federal and State securities laws and, where applicable, foreign securities laws.

"**Moody's**" shall mean Moody's Investors Service, Inc., or any successor thereto.

"**Mortgage Policies**" shall have the meaning specified in the definition of "Collateral and Guarantee Requirement."

"**Mortgaged Property**" shall have the meaning specified in the definition of "Collateral and Guarantee Requirement." The Mortgaged Properties as of the Closing Date are set forth on Schedule 1.01(c).

"**Mortgages**" shall mean, collectively, the deeds of trust, trust deeds, hypothecs and mortgages made by the Loan Parties in favor or for the benefit of the Collateral Agent on behalf of the Secured Parties creating and evidencing a Lien on a Mortgaged Property in form and substance reasonably satisfactory to the Collateral Agent and the Borrower, and any other mortgages executed and delivered pursuant to Section 4.02, 6.11 or 6.13.

"**Multiemployer Plan**" shall mean any multiemployer plan as defined in Section 4001(a)(3) of ERISA subject to the provisions of Title IV of ERISA to which a Loan Party, any Restricted Subsidiary or any of their respective ERISA Affiliates is an "employer" as defined in Section 3(5) of ERISA.

"**Net Proceeds**" shall mean:

(a)    100% of the cash proceeds actually received by the Borrower or any wholly owned Restricted Subsidiaries (provided that, for the avoidance of doubt, JHJ International Transportation Co., Ltd. is not a wholly owned Restricted Subsidiary) (including any cash payments received by way of deferred payment of principal pursuant to a note or installment receivable or purchase price adjustment receivable or otherwise and including casualty insurance settlements and condemnation and similar awards, but in each case only as and when received) from any Disposition or Casualty Event, net of (i) attorneys' fees, accountants' fees, investment

banking fees, survey costs, title insurance premiums, and related search and recording charges, transfer taxes, deed or mortgage recording taxes, required debt payments and required payments of other obligations that are secured by the applicable asset or property (including without limitation principal amount, premium or penalty, if any, interest, fees and expenses and other amounts) (other than pursuant to the Loan Documents, the ABL Facility Documentation (other than in respect of ABL Priority Collateral) or any Permitted Secured Additional Debt), other expenses and brokerage, consultant and other fees actually incurred in connection therewith, (ii) in the case of any Disposition or Casualty Event by a non-wholly owned Restricted Subsidiary, the pro rata portion of the Net Proceeds thereof (calculated without regard to this clause (ii)) attributable to minority interests and not available for distribution to or for the account of the Borrower or a wholly owned Restricted Subsidiary as a result thereof, (iii) taxes paid or reasonably estimated to be payable as a result thereof (provided, that if the amount of any such estimated taxes exceeds the amount of taxes actually required to be paid in cash in respect of such Disposition or Casualty Event, the aggregate amount of such excess shall constitute Net Proceeds at the time such taxes are actually paid), (iv) the amount of any reasonable reserve established in accordance with GAAP against any adjustment to the sale price or any liabilities (other than any taxes deducted pursuant to clause (i) or (iii) above) (x) related to any of the applicable assets and (y) retained by the Borrower or any of the Restricted Subsidiaries including, without limitation, pension and other post-employment benefit liabilities and liabilities related to environmental matters or against any indemnification obligations (however, the amount of any subsequent reduction of such reserve (other than in connection with a payment in respect of any such liability) shall be deemed to be Net Proceeds of such Disposition or Casualty Event occurring on the date of such reduction) and (v) any funded escrow established pursuant to the documents evidencing any such sale or disposition to secure any indemnification obligations or adjustments to the purchase price associated with any such sale or disposition; *provided,* that if no Event of Default exists such proceeds may be applied by the Borrower or any Restricted Subsidiary to acquire, maintain, develop, construct, improve, upgrade or repair assets useful in the business of the Borrower or its Restricted Subsidiaries or to make Permitted Acquisitions or any acquisition permitted hereunder of all or substantially all the assets of, or all the Equity Interests (other than directors' qualifying shares) in, a Person or division or line of business of a Person (or any subsequent investment made in a Person, division or line of business previously acquired), in each case within 270 days of such receipt, and such portion of such proceeds shall not constitute Net Proceeds except to the extent not, within 270 days of such receipt, so used or contractually committed with a third party to be so used (it being understood that if any portion of such proceeds are not so used within such 270 day period but within such 270 day period are contractually committed with a third party to be used, then upon the termination of such contract or if such Net Proceeds are not so used within the later of such 270 day period and 180 days from the entry into such contractual commitment, such remaining portion shall constitute Net Proceeds as of the date of such termination or expiry without giving effect to this proviso; it being understood that such proceeds shall constitute Net Proceeds if there is a Specified Default at the time of a proposed reinvestment unless such proposed reinvestment is made pursuant to a binding commitment with a third party entered into at a time when no Specified Default was continuing); *provided*, *further*, that no proceeds realized in a single transaction or series of related transactions shall constitute Net Proceeds unless the aggregate net proceeds exceeds

$7,500,000 in any fiscal year (and thereafter only net cash proceeds in excess of such amount shall constitute Net Proceeds under this clause (a)), and

(b)    100% of the cash proceeds from the incurrence, issuance or sale by the Borrower or any of the Restricted Subsidiaries of any Indebtedness, net of all taxes paid or reasonably estimated to be payable as a result thereof and fees (including investment banking fees and discounts), commissions, costs and other expenses, in each case incurred in connection with such issuance or sale, *provided*, that, if the amount of any estimated taxes exceeds the amount of taxes actually required to be paid in cash, the aggregate amount of such excess shall constitute Net Proceeds at the time such taxes are actually paid.

For purposes of calculating the amount of Net Proceeds, fees, commissions and other costs and expenses payable to the Borrower or the Restricted Subsidiaries shall be disregarded.

"**Non-Consenting Lender**" has the meaning set forth in Section 3.06(b).

"**Not Otherwise Applied**" shall mean, with reference to any amount of net proceeds of any transaction or event, that such amount (a) was not required to be applied to prepay the Loans pursuant to Section 2.13(a) and (b) was not previously applied in determining the permissibility of a transaction under the Loan Documents where such permissibility was (or may have been) contingent on receipt of such amount or utilization of such amount in connection with the designation of a Restricted Subsidiary as an Unrestricted Subsidiary or pursuant to Section 7.02(p)(y), Section 7.03(ee), Section 7.06(e)(y), Section 7.11(ii) or 7.13(a)(vi).

"**Obligations**" shall mean all (x) advances to, and debts, liabilities, obligations, covenants and duties of, any Loan Party arising under any Loan Document or otherwise with respect to any Loan, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest and fees that accrue after the commencement by or against any Loan Party of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding (or would accrue but for the operation of applicable Debtor Relief Laws), regardless of whether such interest and fees are allowed or allowable claims in such proceeding and (y) subject to Section 1.14, obligations of any Loan Party arising under any Secured Hedge Agreement. Without limiting the generality of the foregoing, the Obligations of the Loan Parties under the Loan Documents include (a) the obligation (including guarantee obligations) to pay principal, interest, reimbursement obligations, charges, expenses, fees, Attorney Costs, indemnities and other amounts payable by any Loan Party under any Loan Document and (b) the obligation of any Loan Party to reimburse any amount in respect of any of the foregoing that any Agent or Lender, in its sole discretion, may elect to pay or advance on behalf of such Loan Party.

"**OFAC**" shall have the meaning assigned to such term in the definition of "Blocked Person".

"**Organization Documents**" shall mean (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability

company, the certificate or articles of formation or organization and operating agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"**Original Term Loan Maturity Date**" shall have the meaning assigned to such term in the definition of "Maturity Date".

"**Other Applicable Indebtedness**" shall have the meaning assigned to such term in Section 2.13(a)(ii).

"**Other Taxes**" shall have the meaning assigned to such term in Section 3.01(b).

"**Other Term Loan Commitments**" shall mean one or more Classes of term loan commitments hereunder that result from a Refinancing Amendment entered into after the Closing Date.

"**Other Term Loans**" shall mean one or more Classes of Term Loans that result from a Refinancing Amendment entered into after the Closing Date.

"**Participant Register**" shall have the meaning assigned to such term in Section 10.04(f).

"**PBGC**" shall mean the Pension Benefit Guaranty Corporation referred to and defined in ERISA and any successor entity performing similar functions.

"**Pension Fund Entities**" shall mean those entities identified on Schedule 1.01(d) hereto.

"**Perfection Certificate**" shall mean a certificate substantially in the form of Exhibit II to the Security Agreement or any other form reasonably approved by the Collateral Agent and the Borrower, as the same shall be supplemented from time to time.

"**Permitted Acquisition**" shall have the meaning assigned to such term in Section 7.02(h).

"**Permitted Acquisition Provisions**" shall have the meaning assigned to such term in Section 2.17(c).

"**Permitted Additional Debt**" shall mean Indebtedness incurred by the Borrower or any Guarantor, which Indebtedness may be (x) in the form of one or more series of notes and secured by the Collateral on a basis that is not junior to the Liens securing the Obligations (but without regard to the control of remedies) ("**Permitted First Priority Additional Debt**"), (y) in the form of one or more series of notes or in the form of bank loans and secured by the Collateral on a junior basis to the Obligations ("**Permitted Second Priority Additional Debt**" and, together with Permitted First Priority Additional Debt, "**Permitted Secured Additional Debt**") or (z) in

the form of one or more series of notes or in the form of bank loans and unsecured; *provided* that (i) (A) if such Indebtedness is Permitted First Priority Additional Debt, such Indebtedness may only be secured by assets consisting of Collateral on a pari passu basis (but without regard to the control of remedies) with the Obligations and may not be secured by any assets other than the Collateral and (B) if such Indebtedness is Permitted Second Priority Additional Debt, such Indebtedness may only be secured by assets consisting of Collateral on a junior lien basis to the Obligations, the obligations in respect of any Permitted First Priority Additional Debt and the obligations in respect of the ABL Facility and may not be secured by any assets other than the Collateral, (ii) such Indebtedness is not at any time guaranteed by any Subsidiaries other than Subsidiaries that are Guarantors, (iii) the other terms and conditions of such Indebtedness (excluding pricing, fees, rate floors and optional prepayment or redemption terms), if different from the Term Loans, are customary market terms for Indebtedness of such type (*provided*, that the financial maintenance covenant on the then outstanding Term Loans shall be amended to provide the Lenders the benefit of any financial maintenance covenant of such Permitted Additional Debt that is in addition to or more restrictive in any material manner than the financial maintenance covenant on the then outstanding Term Loans)(*provided* that a certificate of a Responsible Officer delivered to the Administrative Agent at least five Business Days prior to the incurrence of such Indebtedness (or such shorter period as the Administrative Agent may agree in its sole discretion), together with a reasonably detailed description of the material terms and conditions of such Indebtedness or drafts of the documentation relating thereto, stating that the Borrower has determined in good faith that such terms and conditions satisfy the requirement of this clause (iii) shall be conclusive evidence that such terms and conditions satisfy such requirement unless the Administrative Agent notifies the Borrower within such five Business Day period (or such shorter period as the Administrative Agent may agree in its sole discretion) that it disagrees with such determination (including a reasonable description of the basis upon which it disagrees)), (iv) if such Indebtedness is Permitted First Priority Additional Debt, the security agreements relating to such Indebtedness are (taken as a whole) substantially the same as or more favorable to the Loan Parties than the applicable Collateral Documents, or are otherwise reasonably satisfactory to the Administrative Agent (any expression of such satisfaction (or non-satisfaction) not to be unreasonably withheld, conditioned or delayed)), (v) no Default shall exist immediately prior to or after giving effect to such incurrence subject, in the case of any such Indebtedness which is Alternative Incremental Indebtedness, to the Permitted Acquisition Provisions (if applicable) and (vi) if such Indebtedness is Permitted Secured Additional Debt, a Senior Representative acting on behalf of the holders of such Indebtedness shall have become party to or otherwise subject to the provisions of (1) the ABL Intercreditor Agreement, (2) the First Lien Intercreditor Agreement and/or (3) the Second Lien Intercreditor Agreement, as applicable. Permitted Additional Debt will include any Registered Equivalent Notes issued in exchange therefor.

"**Permitted First Priority Additional Debt**" shall have the meaning assigned to such term in the definition of "Permitted Additional Debt".

"**Permitted Junior Debt**" shall mean unsecured Indebtedness incurred by the Borrower or a Guarantor in the form of one or more series of unsecured notes or loans; *provided* that (i) if constituting Subordinated Indebtedness, (A) such Indebtedness (including any Guarantee

thereof) is subordinated to the Obligations on terms customary for high yield subordinated debt securities or otherwise reasonably satisfactory to the Administrative Agent and (B) the Obligations at all times constitute "Designated Senior Debt" (or comparable term) under the documents governing such Indebtedness, (ii) such Indebtedness does not mature or have scheduled amortization or payments of principal and is not subject to mandatory redemption, repurchase, prepayment or sinking fund obligation (except customary asset sale, change of control or similar provisions or AHYDO "catch-up" payments), in each case prior to the date that is ninety-one (91) days after the then Latest Maturity Date, (iii) such Indebtedness is not at any time guaranteed by any Person that is not a Guarantor or Borrower and (iv) the other terms and conditions of such Indebtedness (excluding pricing, fees, rate floors and optional prepayment or optional redemption terms), if different than the Term Loans, are customary market terms for Indebtedness of such type (*provided*, the financial maintenance covenant on the then outstanding Term Loans shall be amended to provide the Lenders the benefit of any financial maintenance covenant of such Permitted Junior Debt that is in addition to or more restrictive than the financial maintenance covenant on the then outstanding Term Loans) (*provided* that a certificate of a Responsible Officer delivered to the Administrative Agent at least five Business Days prior to the incurrence of such Indebtedness (or such shorter period as the Administrative Agent may agree in its sole discretion), together with a reasonably detailed description of the material terms and conditions of such Indebtedness or drafts of the documentation relating thereto, stating that the Borrower has determined in good faith that such terms and conditions satisfy the requirement of this clause (iv) shall be conclusive evidence that such terms and conditions satisfy such requirement unless the Administrative Agent notifies the Borrower within such five Business Day period (or such shorter period as the Administrative Agent may agree in its sole discretion) that it disagrees with such determination (including a reasonable description of the basis upon which it disagrees)).

"**Permitted Refinancing**" shall mean, with respect to any Person, any modification, refinancing, refunding, renewal, replacement or extension of any Indebtedness of such Person; *provided* that (a) the original aggregate principal amount (or accreted value, if applicable) does not exceed the aggregate principal amount (or accreted value, if applicable) of the Indebtedness so modified, refinanced, refunded, renewed, replaced or extended except (i) by an amount equal to accrued but unpaid interest, premiums and fees payable by the terms of such Indebtedness and reasonable fees, expenses, original issue discount and upfront fees incurred in connection with such modification, refinancing, refunding, renewal, replacement or extension and (ii) by an amount equal to any existing available commitments unutilized thereunder, (b) other than with respect to a Permitted Refinancing in respect of Indebtedness permitted pursuant to Section 7.03(e), the Indebtedness resulting from such modification, refinancing, refunding, renewal, replacement or extension has a final maturity date equal to or later than the final maturity date of, and has a Weighted Average Life to Maturity equal to or greater than the Weighted Average Life to Maturity of, the Indebtedness being modified, refinanced, refunded, renewed, replaced or extended, (c) other than with respect to a Permitted Refinancing in respect of Indebtedness permitted pursuant to Section 7.03(e), at the time thereof, no Event of Default shall have occurred and be continuing and (d) if such Indebtedness being modified, refinanced, refunded, renewed, replaced or extended is Indebtedness permitted pursuant to Section 7.03(b) or 7.03(q), or is otherwise a Junior Financing, (i) to the extent such Indebtedness being modified,

refinanced, refunded, renewed, replaced or extended is subordinated in right of payment or in lien priority to the Obligations, the Indebtedness resulting from such modification, refinancing, refunding, renewal, replacement or extension is subordinated in right of payment or in lien priority, as applicable, to the Obligations on terms (taken as a whole) (x) at least as favorable to the Lenders as those contained in the documentation governing the Indebtedness being modified, refinanced, refunded, renewed, replaced or extended (*provided* that a certificate of a Responsible Officer delivered to the Administrative Agent at least five Business Days prior to the incurrence of such Indebtedness (or such shorter period as the Administrative Agent may agree in its sole discretion), together with a reasonably detailed description of the material terms and conditions of such Indebtedness or drafts of the documentation relating thereto, stating that the Borrower has determined in good faith that such terms and conditions satisfy the foregoing requirement shall be conclusive evidence that such terms and conditions satisfy the foregoing requirement unless the Administrative Agent notifies the Borrower within such five Business Day period that it disagrees with such determination (including a reasonable description of the basis upon which it disagrees)) or (y) otherwise reasonably acceptable to the Administrative Agent)), (ii) the obligors (including any guarantors) in respect of the Indebtedness resulting from such modification, refinancing, refunding, renewal, replacement or extension shall not include any Person other than the obligors (including any guarantors) of the Indebtedness being modified, refinanced, refunded, renewed, replaced or extended unless otherwise permitted hereby, (iii) in the case of any Permitted Refinancing in respect of the ABL Facility, such Permitted Refinancing is a revolving working capital facility and is secured only by all or any portion of the collateral securing the ABL Facility (but not by any other assets) pursuant to one or more security agreements subject, in the case of assets constituting (or required to constitute) Collateral, to the ABL Intercreditor Agreement, and (iv) in the case of any Credit Agreement Refinancing Indebtedness, the Permitted Refinancing shall constitute Credit Agreement Refinancing Indebtedness. When used with respect to any specified Indebtedness, "**Permitted Refinancing**" shall mean the Indebtedness incurred to effectuate a Permitted Refinancing of such specified Indebtedness.

"**Permitted Repricing Amendment**" shall have the meaning set forth in Section 10.08(b).

"**Permitted Second Priority Additional Debt**" shall have the meaning assigned to such term in the definition of "Permitted Additional Debt".

"**Permitted Secured Additional Debt**" shall have the meaning assigned thereto in the definition of "Permitted Additional Debt".

"**Person**" shall mean any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"**Plan**" shall mean any employee pension benefit plan within the meaning of Section 3(2) of ERISA (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Sections 412 and 430 of the Code or Sections 302 and 303 of ERISA and in respect of which a Loan Party, any Restricted Subsidiary or any of their respective ERISA Affiliates is, or if such plan were terminated would under Section 4069 of ERISA be deemed to be, or within the six

year period immediately preceding the date hereof was, a "contributing sponsor" as defined in Section 4001(a)(13) of ERISA or an "employer" as defined in Section 3(5) of ERISA.

"**Platform**" shall have the meaning assigned to such term in Section 10.01.

"**Prime Rate**" shall mean the rate of interest per annum determined from time to time by the Administrative Agent as its prime rate in effect at its principal office in New York City and notified to the Borrower. The prime rate is a rate set by the Administrative Agent based upon various factors including the Administrative Agent's costs and desired return, general economic conditions and other factors, and is used as a reference point for pricing some loans, which may be priced at, above, or below such rate.

"**Pro Forma Basis**" shall mean, with respect to compliance with any test or covenant or calculation of any ratio hereunder, the determination or calculation of such test, covenant or ratio (including in connection with Specified Transactions) in accordance with Section 1.10.

"**Pro Rata Share**" shall mean, with respect to each Lender at any time a fraction (expressed as a percentage, carried out to the ninth decimal place), the numerator of which is the amount of the Commitments (or, if Commitments have been terminated, the principal amount of the Loans) under the applicable Facility or Facilities of such Lender at such time and the denominator of which is the amount of the aggregate Commitments (or, if the Commitments have been terminated, the principal amount of the Loans) under the applicable Facility or Facilities at such time.

"**Projections**" shall have the meaning set forth in Section 6.01(c).

"**Public Lender**" shall have the meaning assigned to such term in Section 10.01.

"**Qualified Equity Interests**" shall mean any Equity Interests that are not Disqualified Equity Interests.

"**Qualified Securitization Financing**" means any Securitization Facility of a Securitization Subsidiary that meets the following conditions: (i) the Borrower shall have determined in good faith that such Securitization Facility (including financing terms, covenants, termination events and other provisions) is in the aggregate economically fair and reasonable to the Borrower and its Restricted Subsidiaries party to the Securitization Facility; (ii) all sales of Securitization Assets and related assets by the Borrower or any Restricted Subsidiary to the Securitization Subsidiary or any other Person are made at fair market value (as determined in good faith by the Borrower); (iii) the financing terms, covenants, termination events and other provisions thereof shall be on market terms (as determined in good faith by the Borrower) and may include Standard Securitization Undertakings; and (iv) the obligations under such Securitization Facility are non-recourse (except for customary representations, warranties, covenants and indemnities made in connection with such facilities) to the Borrower or any of its Restricted Subsidiaries (other than a Securitization Subsidiary).

"**Real Property**" shall mean, collectively, all right, title and interest (including any leasehold, mineral or other estate) in and to any and all parcels of or interests in real property owned or leased by any Person, whether by lease, license or other means, together with, in each case, all easements, hereditaments and appurtenances relating thereto, all improvements and appurtenant fixtures and equipment, all general intangibles and contract rights and other property and rights incidental to the ownership, lease or operation thereof.

"**Recapitalization Transactions**" shall mean (a) retiring by (x) exchanging for Equity Interests of the Borrower, (y) repaying through the net cash proceeds of one or more equity offerings by the Borrower or (z) setting aside a sufficient amount of cash to redeem at maturity, at least 90% of the aggregate outstanding principal amount of the Borrower's Existing Series A Notes and Existing Series B Notes, (b) amending and restating that certain Amended and Restated Contribution and Deferral Agreement, dated as of July 22, 2011, among YRC Inc., USF Holland Inc., New Penn Motor Express, Inc. and USF Reddaway Inc., collectively as primary obligors, the Trustees for the Central States, Southeast and Southwest Areas Pension Fund, the Wilmington Trust Company, as agent, and the other funds party thereto, to, among other changes, release all collateral (other than first lien real estate collateral constituting Excluded Real Property) currently securing such indebtedness and extend the maturity to December 31, 2019 and (c) refinancing, redeeming, defeasing or otherwise paying in full in cash (or depositing such amounts with the trustee thereof) all of the Borrower's Existing 6% Senior Notes.

"**Receivables Assets**" shall mean (a) any accounts receivable owed to the Borrower or a Restricted Subsidiary subject to a Receivables Facility and the proceeds thereof and (b) all collateral securing such accounts receivable, all contracts and contract rights, guarantees or other obligations in respect of such accounts receivable, all records with respect to such accounts receivable and any other assets customarily transferred together with accounts receivable in connection with a non-recourse accounts receivable factoring arrangement, except for Standard Securitization Undertakings, assigned or otherwise transferred or pledged by the Borrower in connection with a Receivables Facility.

"**Receivables Facility**" shall mean an arrangement between the Borrower or a Restricted Subsidiary and another Person pursuant to which (a) the Borrower or such Restricted Subsidiary, as applicable, sells (directly or indirectly) in the ordinary course of business to such Person accounts receivable owing by customers, together with Receivables Assets related thereto, (b) the obligations of the Borrower or such Restricted Subsidiary, as applicable, thereunder are non-recourse (except for Securitization Purchase Obligations) to the Borrower and such Restricted Subsidiary and (c) the financing terms, covenants, termination events and other provisions thereof shall be on market terms (as determined in good faith by the Borrower) and may include Standard Securitization Undertakings.

"**Refinanced Debt**" shall have the meaning specified in the definition of "Credit Agreement Refinancing Indebtedness".

"**Refinancing Amendment**" shall mean an amendment to this Agreement executed by each of (a) the Borrower, (b) the Administrative Agent, (c) each Additional Lender that will make an Other Term Loan pursuant to such Refinancing Amendment and (d) each existing Lender that

agrees to provide any portion of the Credit Agreement Refinancing Indebtedness being incurred pursuant thereto, in accordance with Section 2.18.

"**Refinancing Transactions**" shall mean the repayment of all amounts due or outstanding under or in respect of, and the termination of, the Existing Credit Agreement and the Existing ABL Facility, the release of all cash and other amounts restricted under or by the Existing Credit Agreement and the Existing ABL Facility and the termination and release of any and all commitments, security interests and guaranties in connection therewith on the Closing Date.

"**Register**" shall have the meaning assigned to such term in Section 10.04(d).

"**Registered Equivalent Notes**" shall mean, with respect to any notes originally issued in a Rule 144A or other private placement transaction under the Securities Act of 1933, substantially identical notes (having the same Guarantees) issued in a dollar-for-dollar exchange therefor pursuant to an exchange offer registered with the SEC.

"**Regulation T**" shall mean Regulation T of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"**Regulation U**" shall mean Regulation U of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"**Rejection Notice**" shall have the meaning assigned to such term in Section 2.13(d).

"**Related Fund**" shall mean, with respect to any Lender that is a fund or commingled investment vehicle that invests in bank loans, any other fund that invests in bank loans and is managed or advised by the same investment advisor/manager as such Lender or by an Affiliate of such investment advisor/manager.

"**Related Parties**" shall mean, with respect to any specified Person, such Person's Affiliates and the respective directors, trustees, officers, employees, agents and advisors of such Person and such Person's Affiliates.

"**Release**" shall mean any release, spill, emission, leaking, dumping, injection, pouring, deposit, disposal, discharge, dispersal, leaching or migration into or through the environment or from, within or upon any vessel, vehicle, building, structure, facility or fixture.

"**Reportable Event**" shall mean any of the events set forth in Section 4043(c) of ERISA or the regulations issued thereunder, other than events for which the thirty (30) day notice period has been waived with respect to a Plan.

"**Repricing Event**" shall have the meaning assigned to such term in Section 2.12(d).

"**Request for Credit Extension**" shall mean a request by the Borrower in accordance with the terms of Section 2.03 and substantially in the form of Exhibit C, or such other form as shall be approved by the Administrative Agent.

"**Required Class Lenders**" shall mean, as of any date of determination, Lenders of a Class having more than 50% of the sum of the outstanding Loans and unused Commitments of the applicable Class.

"**Required Lenders**" shall mean, at any time, Lenders having Loans and unused Term Loan Commitments representing more than 50% of the sum of all Loans outstanding and unused Term Loan Commitments at such time.

"**Responsible Officer**" shall mean the chief executive officer, president, vice president, chief financial officer, treasurer, assistant treasurer, director of treasury or other similar officer of a Loan Party and, as to any document delivered on the Closing Date, any secretary or assistant secretary of such Loan Party. Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed by the recipient of such document to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed by the recipient of such document to have acted on behalf of such Loan Party.

"**Restricted Payment**" shall mean any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interest of the Borrower or any Restricted Subsidiary, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, defeasance, acquisition, cancellation or termination of any such Equity Interest of the Borrower or any Restricted Subsidiary, or on account of any return of capital to the Borrower's or a Restricted Subsidiary's stockholders, partners or members (or the equivalent Persons thereof).

"**Restricted Subsidiary**" shall mean any Subsidiary of the Borrower other than an Unrestricted Subsidiary.

"**Retained Percentage**" shall mean, with respect to any Excess Cash Flow Period (a) 100% minus (b) the Applicable ECF Percentage with respect to such Excess Cash Flow Period.

"**S&P**" shall mean Standard & Poor's Ratings Service, or any successor thereto.

"**Sale and Leaseback Transaction**" shall mean any arrangement, directly or indirectly, whereby a seller or transferor shall sell or otherwise transfer any real or personal property and then or thereafter lease, or repurchase under an extended purchase contract, conditional sales or other title retention agreement, the same property.

"**SEC**" shall mean the Securities and Exchange Commission or any Governmental Authority that is the successor thereto.

"**Second Lien Intercreditor Agreement**" shall mean a "junior lien" intercreditor agreement among the Collateral Agent and one or more Senior Representatives for holders of Permitted Second Priority Additional Debt, in form and substance reasonably satisfactory to the Collateral Agent.

"**Secured Hedge Agreement**" shall mean any Swap Contract permitted under Article 7 that is entered into by and between the Borrower or any Guarantor and any Hedge Bank.

"**Secured Parties**" shall have the meaning assigned to such term in the Security Agreement.

"**Securities Act**" shall mean the Securities Act of 1933, as amended.

"**Securitization Asset**" shall mean (a) any accounts receivable or related assets and the collections and proceeds thereof, in each case subject to a Securitization Facility and (b) all collateral securing such receivable or asset, all contracts and contract rights, guaranties or other obligations in respect of such receivable or asset, lockbox accounts, books and records with respect to such account or asset and any other assets customarily transferred (or in respect of which security interests are customarily granted) together with accounts or assets in a securitization financing and which in the case of clause (a) and (b) above are sold, conveyed, assigned or otherwise transferred or pledged by any Loan Party in connection with a Qualified Securitization Financing.

"**Securitization Facility**" shall mean any transaction or series of securitization financings that may be entered into by the Borrower or any of its Restricted Subsidiaries pursuant to which the Borrower or any of its Restricted Subsidiaries may sell, convey or otherwise transfer, or may grant a security interest in, Securitization Assets to either (a) any Person that is not a Restricted Subsidiary or (b) any other Subsidiary of the Borrower (that in turn sells such Securitization Assets to a Securitization Subsidiary) or a Securitization Subsidiary that in turn sells such Securitization Assets to a Person that is not a Restricted Subsidiary, or may grant a security interest in, any Securitization Assets of the Borrower or any of its Subsidiaries; *provided* that, it is understood and agreed that the ABL Facility is deemed a Securitization Facility.

"**Securitization Fees**" shall mean distributions or payments made directly or by means of discounts with respect to any Securitization Asset or participation interest therein issued or sold in connection with, and other fees and expenses (including fees and expenses of legal counsel) paid to a Person that is not a Securitization Subsidiary in connection with, any Qualified Securitization Financing or a Receivables Facility.

"**Securitization Purchase Obligation**" shall mean any obligation of the Borrower or a Restricted Subsidiary in respect of Securitization Assets or Receivables Assets in a Qualified Securitization Financing or a Receivables Facility to purchase Securitization Assets arising as a result of a breach of a representation, warranty or covenant or otherwise, including, without limitation, as a result of a receivable or portion thereof becoming subject to any asserted defense, dispute, offset or counterclaim of any kind as a result of any action taken by, any failure to take action by or any other event relating to such party.

"**Securitization Subsidiary**" shall mean any Subsidiary the Borrower in each case formed for the purpose of and that solely engages in one or more Qualified Securitization Financings and other activities reasonably related thereto or another Person formed for the purposes of engaging in a Qualified Securitization Financing in which the Borrower or any

Subsidiary of the Borrower makes an Investment and to which the Borrower or any Subsidiary of the Borrower transfers Securitization Assets and related assets.

"**Security Agreement**" shall mean, except as the context may otherwise require, both (a) a Security Agreement substantially in the form of Exhibit D and (b) the Security and Collateral Agency Agreement, dated as of the date hereof, among the Collateral Agent, as collateral agent and term loan representative, the ABL Agent, as ABL representative, and the Borrower and the other Loan Parties party thereto.

"**Security Agreement Supplement**" shall have the meaning specified in the Security Agreement.

"**Senior Representative**" shall mean, with respect to any series of Permitted Secured Additional Debt, the trustee, administrative agent, collateral agent, security agent or similar agent under the indenture or agreement pursuant to which such Indebtedness is issued, incurred or otherwise obtained, as the case may be, and each of their successors in such capacities.

"**Senior Secured Leverage Ratio**" shall mean, as of any date, the ratio of (a) Consolidated Total Debt as of such date that is secured by a Lien on any asset or property of the Borrower or its Restricted Subsidiaries to (b) Consolidated EBITDA for the Test Period applicable as of such date.

"**Specified Default**" shall mean an Event of Default under Section 8.01(a), (f) or (g).

"**Specified Pension Fund Obligations**" shall mean the payment obligations due from the Borrower and/or its applicable Subsidiaries to the Pension Fund Entities under the terms and conditions of the Contribution Deferral Agreement.

"**Specified Representations**" shall mean those representations and warranties made by the Borrower in Sections 5.01(a) (with respect to organizational existence only), 5.01(b), 5.02(a) (with respect to the execution, delivery, and performance of the Loan Documents), 5.02(c)(i) (with respect to the execution, delivery, and performance of the Loan Documents, the incurrence of Indebtedness hereunder and the granting of the guarantees and the security interests in respect hereof), 5.02(c)(iii) (except with respect to any violation to the extent that such violation would not reasonably be expected to result in a Material Adverse Effect), 5.04, 5.12, 5.16, 5.17, 5.18(a) and 5.19.

"**Specified Transaction**" shall mean any Investment that results in a Person becoming a Restricted Subsidiary or an Unrestricted Subsidiary, any Permitted Acquisition, any Disposition that results in a Restricted Subsidiary ceasing to be a Subsidiary of the Borrower, any Investment constituting an acquisition of assets constituting a business unit, line of business or division of another Person or any Disposition of a business unit, line of business or division of the Borrower or a Restricted Subsidiary, in each case consummated after the Closing Date and whether by merger, consolidation, amalgamation or otherwise, and any incurrence or repayment of Indebtedness, Restricted Payment, or Incremental Term Loan, in each case, that by the terms of this Agreement requires a financial ratio or test to be calculated on a "Pro Forma Basis".

"**SPV**" shall have the meaning assigned to such term in Section 10.04(i).

"**Standard Securitization Undertakings**" shall mean representations, warranties, covenants, guarantees and indemnities entered into by the Borrower or any Subsidiary of the Borrower which the Borrower has determined in good faith to be customary in a Securitization Facility, it being understood that any Securitization Purchase Obligation shall be deemed to be a Standard Securitization Undertaking or, in the case of a Receivables Facility, a non-credit related recourse accounts receivable factoring arrangement.

"**Statutory Reserves**" shall mean a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one minus the aggregate of the maximum reserve percentages (including any marginal, special, emergency or supplemental reserves) expressed as a decimal established by the Board and any other banking authority, domestic or foreign, to which the Administrative Agent or any Lender (including any branch, Affiliate or other fronting office making or holding a Loan) is subject for Eurocurrency Liabilities (as defined in Regulation D of the Board). Eurodollar Loans shall be deemed to constitute Eurocurrency Liabilities (as defined in Regulation D of the Board) and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to any Lender under such Regulation D. Statutory Reserves shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

"**Subordinated Indebtedness**" shall mean any Indebtedness that is, or is required to be, subordinated in right of payment to the Obligations.

"**Subsidiary**" of a Person shall mean a corporation, partnership, joint venture, limited liability company or other business entity of which (i) a majority of the shares of securities or other interests having ordinary voting power for the election of directors or other governing body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time beneficially owned or (ii) the management of which is otherwise Controlled, directly or indirectly, through one or more intermediaries, or both, by such Person. Unless otherwise specified, all references herein to a "**Subsidiary**" or to "**Subsidiaries**" shall refer to a Subsidiary or Subsidiaries of the Borrower.

"**Successor Borrower**" shall have the meaning specified in Section 7.04(d).

"**Swap Contract**" shall mean (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms

and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "**Master Agreement**"), including any such obligations or liabilities under any Master Agreement.

"**Swap Termination Value**" shall mean, in respect of any one or more Swap Contracts, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Contracts, (a) for any date on or after the date such Swap Contracts have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Swap Contracts, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Swap Contracts (which may include a Lender or any Affiliate of a Lender).

"**Taxes**" shall have the meaning assigned to such term in Section 3.01(a).

"**Term Borrowing**" shall mean a Borrowing comprised of Term Loans.

"**Term Lender**" shall mean a Lender with a Term Loan Commitment or an outstanding Term Loan.

"**Term Loan Commitment**" shall mean, with respect to each Lender, the commitment, if any, of such Lender to make a Term Loan hereunder, expressed as an amount representing the maximum principal amount of the Term Loan to be made by such Lender hereunder, as such commitment may be (a) reduced from time to time pursuant to Section 2.09 and (b) reduced or increased from time to time pursuant to (i) assignments by or to such Lender pursuant to an Assignment and Acceptance, (ii) an Incremental Amendment, (iii) a Refinancing Amendment or (iv) an Extension. The initial amount of each Lender's Term Loan Commitment is set forth on Schedule 2.01 or, otherwise, in the Assignment and Acceptance, Incremental Amendment or Refinancing Amendment pursuant to which such Lender shall have assumed its Term Loan Commitment, as the case may be. The initial aggregate amount of the Term Loan Commitments as of the Closing Date is $700,000,000.

"**Term Loans**" shall mean the Initial Term Loans, Extended Term Loans, Incremental Term Loans and Other Term Loans.

"**Term Note**" means a promissory note of the Borrower payable to any Term Lender or its registered assigns, in substantially the form of Exhibit J hereto, evidencing the aggregate Indebtedness of the Borrower to such Term Lender resulting from the Term Loans made by such Term Lender.

"**Term Priority Collateral**" shall have the meaning assigned to such term in the ABL Intercreditor Agreement.

"**Test Period**" shall mean, for any date of determination under this Agreement, the most recent period as of such date of four consecutive fiscal quarters of the Borrower for which financial statements have been delivered (or were required to have been delivered) pursuant to Section 6.01(a) or 6.01(b), as applicable, or, prior to the first such requirement, the four fiscal quarter period ended September 30, 2013.

"**Threshold Amount**" shall mean $30,000,000.

"**Total Leverage Ratio**" shall mean, as of any date, the ratio of (a) Consolidated Total Debt as of such date to (b) Consolidated EBITDA for the Test Period applicable as of such date.

"**tranche**" shall have the meaning assigned to such term in Section 2.19(a).

"**Transaction Expenses**" shall mean any costs, fees or expenses incurred or paid by the Borrower or any of its Subsidiaries in connection with the Transactions (including costs and bonuses associated with the IBT Transactions and, for the avoidance of doubt, any costs, fees or expenses incurred under the Contribution Deferral Agreement), this Agreement and the other Loan Documents.

"**Transactions**" shall mean, collectively, (a) the consummation of the IBT Transactions, (b) the consummation of the Recapitalization Transactions, (c) the execution and delivery by the Loan Parties of the Loan Documents to which they are a party and the making of the Borrowings hereunder on the Closing Date, (d) the execution and delivery by the Borrower and the Subsidiaries party thereto of the ABL Facility Documentation and the funding under the ABL Facility on the Closing Date, (e) the execution and delivery by the Borrower and the Subsidiaries party thereto of the Contribution Deferral Agreement on January 31, 2014, (f) the performance by the Borrower of its obligations under the December 2013 Stock Purchase Agreement, December 2013 Exchange Agreements and the December 2013 Registration Rights Agreement, (g) the Refinancing Transactions and (h) the payment of the Transaction Expenses.

"**Transferred Guarantor**" shall have the meaning specified in the Section 11.10.

"**Type**", when used in respect of any Loan or Borrowing, shall refer to the Rate by reference to which interest on such Loan or on the Loans comprising such Borrowing is determined. For purposes hereof, the term "**Rate**" shall mean the Adjusted LIBO Rate and the Alternate Base Rate.

"**Unaudited Financial Statements**" shall mean the unaudited consolidated balance sheets and related statements of operations and cash flows of the Borrower and its consolidated Subsidiaries as at the end of and for the fiscal quarters ended September 30, 2013.

"**Uniform Commercial Code**" or "**UCC**" shall mean the Uniform Commercial Code as the same may from time to time be in effect in the State of New York or the Uniform Commercial Code (or similar code or statute) of another jurisdiction, to the extent it may be required to apply to any item or items of Collateral.

"**United States**" and "**U.S.**" mean the United States of America.

"**United States Tax Compliance Certificate**" shall have the meaning assigned to such term in Section 3.01(d).

"**Unrestricted Subsidiary**" shall mean any Subsidiary of the Borrower designated by the board of directors of the Borrower as an Unrestricted Subsidiary pursuant to Section 6.14 subsequent to the Closing Date.

"**USA PATRIOT Act**" shall mean The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Title III of Pub. L. No. 107-56 (signed into law October 26, 2001)).

"**Weighted Average Life to Maturity**" shall mean, when applied to any Indebtedness at any date, the number of years obtained by dividing: (i) the sum of the products obtained by multiplying (a) the amount of each then remaining scheduled installment, sinking fund, serial maturity or other required scheduled payments of principal, including payment at final scheduled maturity, in respect thereof, by (b) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment; by (ii) the then outstanding principal amount of such Indebtedness; *provided*, that for purposes of determining the Weighted Average Life to Maturity of any Refinanced Debt or any Indebtedness that is being modified, refinanced, refunded, renewed, replaced, restructured or extended (the "**Applicable Indebtedness**"), the effects of any amortization of or prepayments made on such Applicable Indebtedness prior to the date of the applicable modification, refinancing, restructuring, refunding, renewal, replacement or extension shall be disregarded.

"**wholly owned**" shall mean, with respect to a Subsidiary of a Person, a Subsidiary of such Person all of the outstanding Equity Interests of which (other than (x) director's qualifying shares and (y) shares issued to foreign nationals to the extent required by applicable Law) are owned by such Person and/or by one or more wholly owned Subsidiaries of such Person.

"**Withdrawal Liability**" shall mean liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

Section 1.02.   *Other Interpretive Provisions.* With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)   The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms.

(b)   (i) The words "herein," "hereto," "hereof" and "hereunder" and words of similar import when used in any Loan Document shall refer to such Loan Document as a whole and not to any particular provision thereof.

(i)    Article, Section, Exhibit and Schedule references are to the Loan Document in which such reference appears.

(ii)    The term "including" is by way of example and not limitation.

(c)    The term "documents" includes any and all instruments, documents, agreements, certificates, notices, reports, financial statements and other writings, however evidenced, whether in physical or electronic form.

(d)    In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including"; the words "to" and "until" each mean "to but excluding"; and the word "through" means "to and including."

(e)    The words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

(f)    All references to "knowledge" or "awareness" of any Loan Party or a Restricted Subsidiary thereof means the actual knowledge of a Responsible Officer of a Loan Party or such Restricted Subsidiary.

(g)    Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

(h)    The word "or" is not exclusive.

(i)    For purposes of determining compliance with any one of Sections 7.01, 7.02, 7.03, 7.05, 7.06, 7.08, 7.09 and 7.13, in the event that any Lien, Investment, Indebtedness, Disposition, Restricted Payment, affiliate transaction, Contractual Obligation or prepayment of Indebtedness meets the criteria of more than one of the categories of transactions permitted pursuant to any clause of such Section, such transaction (or portion thereof) at any time shall be permitted under one or more of such clauses as determined by the Borrower (and the Borrower shall be entitled to redesignate use of any such clauses from time to time) in its sole discretion at such time.

Section 1.03.    *Certifications.* All certifications to be made hereunder by an officer or representative of a Loan Party shall be made by such a Person in his or her capacity solely as an officer or representative of such Loan Party, on such Loan Party's behalf and not in such Person's individual capacity.

Section 1.04.    *Accounting Terms.* All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP, except as otherwise specifically prescribed herein or therein.

Section 1.05.  *Rounding.* Any financial ratios required to be maintained by the Borrower pursuant to this Agreement (or required to be satisfied in order for a specific action to be permitted under this Agreement) shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

Section 1.06.  *References to Agreements, Laws, Etc.* Unless otherwise expressly provided herein, (a) references to Organization Documents, agreements (including the Loan Documents) and other contractual instruments shall be deemed to include all subsequent amendments, restatements, extensions, supplements, replacements, extensions, renewals, refinancings, restructurings and other modifications thereto, but only to the extent that such amendments, restatements, extensions, supplements, replacements, extensions, renewals, refinancings, restructurings and other modifications are not prohibited by hereby; and (b) references to any Law shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such Law.

Section 1.07.  *Times of Day.* Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).

Section 1.08.  *Timing of Payment of Performance.* Except as otherwise expressly provided herein, when the payment of any obligation or the performance of any covenant, duty or obligation is stated to be due or performance required on a day which is not a Business Day, the date of such payment (other than as described in the definition of Interest Period) or performance shall extend to the immediately succeeding Business Day.

Section 1.09.  *Cumulative Credit Transactions.* If more than one action occurs on any given date the permissibility of the taking of which is determined hereunder by reference to the amount of the Cumulative Credit immediately prior to the taking of such action, the permissibility of the taking of each such action shall be determined independently and in no event may any two or more such actions be treated as occurring simultaneously.

Section 1.10.  *Pro Forma Calculations.*

(a)  Notwithstanding anything to the contrary herein, the Total Leverage Ratio and Senior Secured Leverage Ratio shall be calculated in the manner prescribed by this Section 1.10; *provided* that, notwithstanding anything to the contrary in clauses (b), (c) or (d) of this Section 1.10, when calculating the Total Leverage Ratio for purposes of the Applicable ECF Percentage of Excess Cash Flow, the events described in this Section 1.10 that occurred subsequent to the end of the applicable Test Period shall not be given pro forma effect (*provided, further*, that the foregoing limitation will not be constituted to limit the deductibility of any amounts that are committed to be made or paid or are reasonably expected to be paid in the calculation of Excess Cash Flow for any period as provided for in the definition of Excess Cash Flow).

(b)    For purposes of calculating the Total Leverage Ratio and the Senior Secured Leverage Ratio, Specified Transactions (and the incurrence or repayment of any Indebtedness in connection therewith) that have been made (i) during the applicable Test Period or (ii) subsequent to such Test Period and prior to or simultaneously with the event for which the calculation of any such ratio is made shall be calculated on a *pro forma* basis assuming that all such Specified Transactions (and any increase or decrease in Consolidated EBITDA and the component financial definitions used therein attributable to any Specified Transaction) had occurred on the first day of the applicable Test Period. If since the beginning of any applicable Test Period any Person that subsequently became a Restricted Subsidiary or was merged, amalgamated or consolidated with or into the Borrower or any of its Restricted Subsidiaries since the beginning of such Test Period shall have made any Specified Transaction that would have required adjustment pursuant to this Section 1.10, then the Total Leverage Ratio and the Senior Secured Leverage Ratio shall be calculated to give *pro forma* effect thereto in accordance with this Section 1.10.

(c)    Whenever *pro forma* effect is to be given to a Specified Transaction, the *pro forma* calculations shall be made in good faith by a responsible financial or accounting officer of the Borrower and may include, for the avoidance of doubt, any synergies, operating expense reductions, other operating improvements and cost savings as certified by the Borrower as having been determined in good faith to be reasonably anticipated to be realizable within eighteen (18) months following any such acquisition or disposition, operational change and operational initiatives. Notwithstanding the foregoing, (A) all *pro forma* adjustments under this clause (c) shall not, taken together with those added pursuant to clause (a)(viii) of the definition of "Consolidated EBITDA", increase *pro forma* Consolidated EBITDA by more than 20% for any Test Period (calculated prior to giving effect to any addback pursuant to this clause (c) or clause (a)(viii) of the definition of "Consolidated EBITDA"); provided, that such limitation on *pro forma* adjustments shall not apply if supported by a quality of earnings report prepared by a nationally recognized accounting firm or other third-party advisor reasonably acceptable to the Administrative Agent or if such adjustments satisfy the requirements of Regulation S-X and (B) no *pro forma* adjustments under this clause (c) shall be made in respect of the Transactions (including in respect of the IBT Transaction).

(d)    In the event that the Borrower or any Restricted Subsidiary incurs (including by assumption or guarantees) or repays (including by redemption, repayment, retirement or extinguishment) any Indebtedness included in the calculations of the Total Leverage Ratio or Senior Secured Leverage Ratio (other than Indebtedness incurred or repaid under any revolving credit facility in the ordinary course of business for working capital purposes and not incurred in reliance on Section 7.03(t)), (i) during the applicable Test Period or (ii) subsequent to the end of the applicable Test Period and prior to or simultaneously with the event for which the calculation of any such ratio is made, then the Total Leverage Ratio or Senior Secured Leverage Ratio shall be calculated giving *pro forma* effect to such incurrence or repayment of Indebtedness, to the extent required, as if the same had occurred on the last day of the applicable Test Period of the Total Leverage Ratio or Senior Secured Leverage Ratio. Interest on a Capitalized Lease shall be deemed

to accrue at an interest rate reasonably determined by a responsible financial or accounting officer of the Borrower to be the rate of interest implicit in such Capitalized Lease in accordance with GAAP. Interest on Indebtedness that may optionally be determined at an interest rate based upon a factor of a prime or similar rate, a London interbank offered rate, or other rate, shall be determined to have been based upon the rate actually chosen, or if none, then based upon such optional rate chosen as the Borrower or Restricted Subsidiary may designate.

(e)    Whenever any provision of this Agreement requires the Borrower to have a Total Leverage Ratio or the Senior Secured Leverage Ratio (in each case) on a Pro Forma Basis in connection with any action to be taken by the Borrower hereunder, the Borrower shall deliver to the Administrative Agent a certificate of a Responsible Officer setting forth in reasonable detail the calculations demonstrating such compliance or such Total Leverage Ratio.

Section 1.11.    *Certain Accounting Matters.* Notwithstanding any other provision contained herein or in any other Loan Document, all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made, (a) without giving effect to any election under Statement of Financial Accounting Standards 159 or Accounting Standards Codification 825-10-25 (or any other Accounting Standards Codification or Financial Accounting Standard having a similar result or effect) to value any Indebtedness or other liabilities of the Borrower or any of its Restricted Subsidiaries at "fair value", as defined therein; (b) without giving effect to any treatment of Indebtedness in respect of convertible debt instruments under Accounting Standards Codification 470-20 and/or Statement of Financial Accounting Standards 150 (or any other Accounting Standards Codification or Financial Accounting Standard having a similar result or effect) to value any such Indebtedness in a reduced or bifurcated manner as described therein, and such Indebtedness shall at all times be valued at the full stated principal amount thereof; (c) treating Unrestricted Subsidiaries as if they were not consolidated with the Borrower or any Restricted Subsidiary and otherwise eliminating all accounts of Unrestricted Subsidiaries. Furthermore, unless the Borrower elects otherwise, notwithstanding any other provision contained herein or in any other Loan Document, for all purposes under this Agreement and the other Loan Documents, including negative covenants, financials covenants and component definitions, operating leases and Capitalized Leases will be deemed to be treated in a manner consistent with their current treatment under GAAP as in effect on the Closing Date, notwithstanding any modifications or interpretive changes thereto that may occur thereafter. For the avoidance of doubt, the principal amount of any non-interest bearing Indebtedness or other discount security constituting Indebtedness at any date shall be the principal amount thereof that would be shown on a balance sheet of the Borrower dated such date prepared in accordance with GAAP, except as expressly set forth in clauses (a) and (b) of this Section 1.11.

Section 1.12.    *Classification of Loans and Borrowings.* For purposes of this Agreement, Loans may be classified and referred to by Class (e.g., an "Initial Term Loan") or by Type (e.g., a "Eurodollar Loan") or by Class and Type (e.g., a "Eurodollar Term Loan"). Borrowings also may

be classified and referred to by Class (e.g., a "Term Borrowing") or by Type (e.g., a "Eurodollar Borrowing") or by Class and Type (e.g., a "Eurodollar Term Borrowing").

Section 1.13.   *Currency Equivalents Generally*.

(a)   For purposes of determining compliance with Sections 7.01, 7.02, 7.03, 7.05, 7.06, 7.08, 7.09, 7.11 and 7.13 with respect to any amount of Indebtedness, Lien, Asset Sale, Restricted Payment, Capital Expenditure, affiliate transaction, Contractual Obligation, prepayment of Indebtedness or Investment in a currency other than Dollars, no Default or Event of Default shall be deemed to have occurred solely as a result of changes in rates of currency exchange occurring after the time such Indebtedness or Investment is incurred (so long as such Indebtedness or Investment, at the time incurred, made or acquired, was permitted hereunder) and once incurred or made, the amount of such Indebtedness, Lien, Asset Sale, Restricted Payment, Capital Expenditure, affiliate transaction, Contractual Obligation, prepayment of Indebtedness or Investment, shall be always deemed to be at the Dollar amount on such date, regardless of later changes in currency exchange rates.

(b)   For purposes of determining the Total Leverage Ratio or Senior Secured Leverage Ratio, amounts denominated in a currency other than Dollars will be converted to Dollars at the currency exchange rates used in preparing the Borrower's financial statements corresponding to the Test Period with respect to the applicable date of determination and will, in the case of Indebtedness, reflect the currency translation effects, determined in accordance with GAAP, of Swap Contracts permitted hereunder for currency exchange risks with respect to the applicable currency in effect on the date of determination of the Dollar equivalent of such Indebtedness.

Section 1.14.   *Excluded Swap Obligations*.

(a)   Notwithstanding any provision of this Agreement or any other Loan Document, no Guarantee by any Loan Party under any Loan Document shall include a Guarantee of any Excluded Swap Obligation and no Collateral provided by any Loan Party shall secure any Excluded Swap Obligation. In the event that any payment is made by, or any collection is realized from, any Loan Party for which there are Excluded Swap Obligations, or from any Collateral provided by such Loan Party, the proceeds thereof shall be applied to pay the Obligations of such Loan Party on a ratable basis determined without giving effect to such Excluded Swap Obligations and each reference in this Agreement or any other Loan Document to the ratable application of such amounts as among the Obligations or any specified portion of the Obligations that would otherwise include such Excluded Swap Obligations shall be deemed so to provide.

(b)   Each Qualified ECP Guarantor hereby jointly and severally absolutely, unconditionally and irrevocably undertakes to provide such funds or other support as may be needed from time to time by each other Loan Party to honor all of its obligations under Article 11 and the Loan Documents in respect of Swap Obligations (subject to the limitations provided in Section 11.09). The obligations of each Qualified ECP Guarantor

under this Section shall remain in full force and effect until its Guaranty under Section 11 is released. Each Qualified ECP Guarantor intends that this Section 1.14 constitute, and this Section 1.14 shall be deemed to constitute, a "keepwell, support, or other agreement" for the benefit of each other Loan Party for all purposes of Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

(c)    The following terms shall for purposes of this Section 1.14 have the meanings set forth below:

"**Commodity Exchange Act**" means the Commodity Exchange Act (7 U.S.C. § et seq.), as amended from time to time, and any successor statute.

"**Excluded Swap Obligation**" means, with respect to any Guarantor, any Swap Obligation if, and to the extent that, all or a portion of the Guarantee of such Guarantor of, or the grant by such Guarantor of a security interest to secure, such Swap Obligation (or any Guarantee thereof) is or would otherwise become illegal or unlawful under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Guarantor's failure for any reason not to constitute an "eligible contract participant" as defined in the Commodity Exchange Act at the time the Guarantee of such Guarantor would otherwise become effective with respect to such related Swap Obligation.

"**Swap Obligation**" means, with respect to any Guarantor, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of Section 1a(47) of the Commodity Exchange Act.

"**Qualified ECP Guarantor**" means, in respect of any Swap Obligation, each Loan Party that has total assets exceeding $10,000,000 at the time such Swap Obligation is incurred or such other person as constitutes an ECP under the Commodity Exchange Act or any regulations promulgated thereunder.

**ARTICLE 2**
THE CREDITS

Section 2.01.    *Commitments.* Subject to the terms and conditions and relying upon the representations and warranties set forth herein, each Lender agrees, severally and not jointly, to make a Term Loan to the Borrower on the Closing Date in a principal amount not to exceed its Term Loan Commitment. Notwithstanding anything to the contrary contained herein (and without affecting any other provisions hereof), the funded portion of each Term Loan to be made on the Closing Date (*i.e.*, the amount advanced to the Borrower on the Closing Date) shall be equal to 99% of the principal amount of such Loan (it being agreed that the full principal amount of each such Term Loan shall be the "initial" principal amount of such Term Loan and deemed outstanding on the Closing Date and the Borrower shall be obligated to repay 100% of the principal amount of each such Term Loan as provided hereunder). Amounts repaid or prepaid in respect of an Initial Term Loan may not be reborrowed.

Section 2.02.  *Loans*.

(a)  Each Loan shall be made as part of a Borrowing consisting of Loans made by the Lenders ratably in accordance with their applicable Commitments; *provided, however*, that the failure of any Lender to make any Loan shall not in itself relieve any other Lender of its obligation to lend hereunder (it being understood, however, that no Lender shall be responsible for the failure of any other Lender to make any Loan required to be made by such other Lender). The Loans comprising any Borrowing shall be in an aggregate principal amount that is (i) an integral multiple of $1,000,000 and not less than $5,000,000 (except, with respect to any Incremental Term Loans or Other Term Loans, to the extent otherwise provided in the applicable Incremental Amendment or Refinancing Amendment) or (ii) equal to the remaining available balance of the applicable Commitments.

(b)  Subject to Sections 2.08 and 3.02 each Borrowing shall be comprised entirely of ABR Loans or Eurodollar Loans as the Borrower may request pursuant to Section 2.03. Each Lender may at its option make any Eurodollar Loan by causing any domestic or foreign branch or Affiliate of such Lender to make such Loan; *provided* that any exercise of such option shall not affect the obligation of the Borrower to repay such Loan to such Lender in accordance with the terms of this Agreement. Borrowings of more than one Type may be outstanding at the same time; *provided, however*, that the Borrower shall not be entitled to request any Borrowing that, if made, would result in more than five Eurodollar Borrowings outstanding hereunder at any time plus up to an additional 3 Interest Periods in respect of each (i) Incremental Facility, (ii) Extended Term Loans and (iii) Other Term Loans, *provided* that the total number of such additional Interest Periods does not exceed 15 at any one time. For purposes of the foregoing, Borrowings having different Interest Periods, regardless of whether they commence on the same date, shall be considered separate Borrowings.

(c)  Each Lender shall make each Initial Term Loan to be made by it hereunder on the Closing Date by wire transfer of immediately available funds to such account in New York City as the Administrative Agent may designate not later than 1:00 p.m., New York City time, and the Administrative Agent shall promptly credit the amounts so received to an account designated by the Borrower in the applicable Request for Credit Extension.

(d)  Unless the Administrative Agent shall have received notice from a Lender prior to the date of any Borrowing that such Lender will not make available to the Administrative Agent such Lender's portion of such Borrowing, the Administrative Agent may assume that such Lender has made such portion available to the Administrative Agent on the date of such Borrowing in accordance with paragraph (c) above and the Administrative Agent may, in reliance upon such assumption, make available to the Borrower on such date a corresponding amount. If the Administrative Agent shall have so made funds available then, to the extent that such Lender shall not have made such portion available to the Administrative Agent, such Lender and the Borrower severally agree to

repay to the Administrative Agent forthwith on demand such corresponding amount together with interest thereon, for each day from the date such amount is made available to the Borrower to but excluding the date such amount is repaid to the Administrative Agent at (i) in the case of the Borrower, a rate per annum equal to the interest rate applicable at the time to the Loans comprising such Borrowing, and (ii) in the case of such Lender, a rate determined by the Administrative Agent to represent its cost of overnight or short-term funds (which determination shall be conclusive absent manifest error). If such Lender shall repay to the Administrative Agent such corresponding amount, such amount shall constitute such Lender's Loan as part of such Borrowing for purposes of this Agreement.

Section 2.03.    *Borrowing Procedure.* In order to request a Borrowing, the Borrower shall notify the Administrative Agent of such request by telephone (a) in the case of a Eurodollar Borrowing, not later than 1:00 p.m., New York City time, three Business Days before a proposed Borrowing (or, in the case of the initial extension of credit on the Closing Date, prior to the proposed Borrowing), and (b) in the case of an ABR Borrowing, not later than 1:00 p.m., New York City time, one Business Day before a proposed Borrowing. Each such telephonic Request for Credit Extension shall be irrevocable, and shall be confirmed promptly by hand delivery or fax to the Administrative Agent of a written Request for Credit Extension and shall specify the following information: (i) the Class of Loans to be borrowed and whether such Borrowing is to be a Eurodollar Borrowing or an ABR Borrowing (*provided* that, until the Administrative Agent shall have notified the Borrower that the primary syndication of the Commitments has been completed (which notice shall be given as promptly as practicable and, in any event, within 30 days after the Closing Date), the Borrower shall not be permitted to request a Eurodollar Borrowing with an Interest Period in excess of one month); (ii) the date of such Borrowing (which shall be a Business Day); (iii) the number and location of the account to which funds are to be disbursed; (iv) the amount of such Borrowing; and (v) if such Borrowing is to be a Eurodollar Borrowing, the Interest Period with respect thereto; *provided, however*, that, notwithstanding any contrary specification in any Request for Credit Extension, each requested Borrowing shall comply with the requirements set forth in Section 2.02. If no election as to the Type of Borrowing is specified in any such notice, then the requested Borrowing shall be an ABR Borrowing. If no Interest Period with respect to any Eurodollar Borrowing is specified in any such notice, then the Borrower shall be deemed to have selected an Interest Period of one month's duration. The Administrative Agent shall promptly advise the applicable Lenders of any notice given pursuant to this Section 2.03 (and the contents thereof), and of each Lender's portion of the requested Borrowing.

Section 2.04.    *Evidence of Debt; Repayment of Loans.*

(a)    The Borrower hereby unconditionally promises to pay to the Administrative Agent for the account of each Lender the principal amount of each Term Loan of such Lender as provided in Section 2.11 (or, in the case of Extended Term Loans, Incremental Term Loans or Other Term Loans, as provided for in the applicable Extension Offer, Incremental Amendment, Refinancing Amendment or other governing documentation).

(b)    Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to such Lender resulting from each Loan made by such Lender from time to time, including the amounts of principal and interest payable and paid to such Lender from time to time under this Agreement.

(c)    The Administrative Agent shall maintain accounts in which it will record (i) the amount of each Loan made hereunder, the Class and Type thereof and, if applicable, the Interest Period applicable thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder and (iii) the amount of any sum received by the Administrative Agent hereunder from the Borrower or any Guarantor and each Lender's share thereof.

(d)    The entries made in the accounts maintained pursuant to paragraphs (b) and (c) above shall be prima facie evidence of the existence and amounts of the obligations therein recorded; *provided, however*, that (i) the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligations of the Borrower to repay the Loans in accordance with their terms and (ii) in the event of any conflict between the accounts set forth in paragraphs (b) and (c) above, the amounts set forth in the accounts maintained pursuant to paragraph (c) shall prevail.

(e)    Any Lender may request that Loans made by it hereunder be evidenced by a Term Note. In such event, the Borrower shall promptly execute and deliver to such Lender a Term Note payable to such Lender and its registered assigns in accordance with Section 10.04. Notwithstanding any other provision of this Agreement, in the event any Lender shall request and receive a Term Note, the interests represented by such Term Note shall at all times (including after any assignment of all or part of such interests pursuant to Section 10.04) be represented by one or more promissory notes payable to the payee named therein or its registered assigns, unless such Term Note is duly cancelled.

(f)    This Section 2.04 shall at all times be interpreted and administered in such a way at the Term Notes will be issued in "registered form" within the meaning of Treasury Regulation Section 5f.163-1(a).

 Section 2.05.    *Fees*.

(a)    The Borrower agrees to pay to the Administrative Agent, for its own account, the administrative agent fees applicable to the Facilities payable in the amounts and at the times separately agreed upon between the Borrower and the Administrative Agent (the "**Fees**").

(b)    All Fees shall be paid on the dates due, in immediately available funds, to the Administrative Agent. Once paid, none of the Fees shall be refundable under any circumstances.

Section 2.06.  *Interest on Loans*.

(a)  Subject to the provisions of Section 2.07, the Loans comprising each ABR Borrowing shall bear interest (computed on the basis of the actual number of days elapsed over a year of 365 or 366 days, as the case may be, and calculated from and including the date of such Borrowing to but excluding the date of repayment thereof) at a rate per annum equal to the Alternate Base Rate plus the Applicable Margin.

(b)  Subject to the provisions of Section 2.07, the Loans comprising each Eurodollar Borrowing shall bear interest (computed on the basis of the actual number of days elapsed over a year of 360 days) at a rate per annum equal to the Adjusted LIBO Rate for the Interest Period in effect for such Borrowing plus the Applicable Margin.

(c)  Interest on each Loan shall be payable on the Interest Payment Dates applicable to such Loan except as otherwise provided in this Agreement. The applicable Alternate Base Rate or Adjusted LIBO Rate for each Interest Period or day within an Interest Period, as the case may be, shall be determined by the Administrative Agent, and such determination shall be conclusive absent manifest error.

Section 2.07.  *Default Interest.* The Borrower shall pay interest on past due amounts owing by it hereunder at a fluctuating interest rate per annum at all times, after as well as before judgment, equal to (a) in the case of principal, at the rate otherwise applicable to such Loan pursuant to Section 2.06 plus 2.00% per annum and (b) in all other cases, at a rate per annum (computed on the basis of the actual number of days elapsed over a year of 360 days at all times) equal to the rate that would be applicable to an ABR Loan plus 2.00% per annum, and such interest shall be payable on written demand.

Section 2.08.  *Alternate Rate of Interest.* In the event, and on each occasion, that on the day two Business Days prior to the commencement of any Interest Period for a Eurodollar Borrowing the Administrative Agent shall have determined that Dollar deposits in the principal amounts of the Loans comprising such Borrowing are not generally available in the London interbank market, or that the rates at which such Dollar deposits are being offered will not adequately and fairly reflect the cost to the majority of Lenders of making or maintaining Eurodollar Loans during such Interest Period, or that reasonable means do not exist for ascertaining the Adjusted LIBO Rate, the Administrative Agent shall, as soon as practicable thereafter, give written or fax notice of such determination to the Borrower and the Lenders. In the event of any such determination, until the Administrative Agent shall have revoked such notice, any request by the Borrower for a Eurodollar Borrowing pursuant to Section 2.03 or Section 2.10 shall be deemed to be a request for an ABR Borrowing. Each determination by the Administrative Agent under this Section 2.08 shall be conclusive absent manifest error.

Section 2.09.  *Termination and Reduction of Commitments*.

(f)  The Term Loan Commitment for the Initial Term Loan in effect on the Closing Date shall automatically terminate upon the making of the Initial Term Loans on the Closing Date.

(g)   Upon at least one Business Days' prior irrevocable written or fax notice to the Administrative Agent, the Borrower may at any time in whole permanently terminate, or from time to time in part permanently reduce, any Class of unfunded Term Loan Commitments; *provided, however*, that each partial reduction of any Class of Term Loan Commitments shall be in an integral multiple of $1,000,000 and in a minimum amount of $1,000,000; provided further that , a notice of termination of the Commitments of any Class delivered by the Borrower may state that such notice is conditioned upon the consummation of an acquisition or sale transaction or upon the effectiveness of other credit facilities or the receipt of proceeds from the issuance of other Indebtedness or any other specified event, in which case such notice may be revoked by the Borrower (by notice to the Administrative Agent on or prior to the specified effective date) if such condition is not satisfied.

(h)   Each reduction in the Term Loan Commitments hereunder shall be made ratably among the Lenders in accordance with their respective applicable Commitments.

Section 2.10.   *Conversion and Continuation of Borrowings.* The Borrower shall have the right at any time upon prior irrevocable written notice to the Administrative Agent (a) not later than 1:00 p.m., New York City time, on the day of any conversion, to convert any Eurodollar Borrowing into an ABR Borrowing, (b) not later than 1:00 p.m., New York City time, three Business Days prior to conversion or continuation, to convert any ABR Borrowing into a Eurodollar Borrowing or to continue any Eurodollar Borrowing as a Eurodollar Borrowing for an additional Interest Period, and (c) not later than 1:00 p.m., New York City time, three Business Days prior to conversion, to convert the Interest Period with respect to any Eurodollar Borrowing to another permissible Interest Period, subject in each case to the following:

(i)   until the Administrative Agent shall have notified the Borrower that the primary syndication of the Commitments has been completed (which notice shall be given as promptly as practicable and, in any event, within 30 days after the Closing Date), no ABR Borrowing may be converted into a Eurodollar Borrowing with an Interest Period in excess of one month;

(ii)   each conversion or continuation shall be made pro rata among the Lenders in accordance with the respective principal amounts of the Loans comprising the converted or continued Borrowing;

(iii)   if less than all the outstanding principal amount of any Borrowing shall be converted or continued, then each resulting Borrowing shall satisfy the limitations specified in Sections 2.02(a) and 2.02(b) regarding the principal amount and maximum number of Borrowings of the relevant Type;

(b)   each conversion shall be effected by each Lender and the Administrative Agent by recording for the account of such Lender the new Loan of such Lender resulting from such conversion and reducing the Loan (or portion thereof) of such Lender being converted by an equivalent principal amount; accrued interest on any Eurodollar Loan (or portion thereof) being converted shall be paid by the Borrower at the time of conversion;

(i)   if any Eurodollar Borrowing is converted on a day prior to the last day of the Interest Period applicable thereto, the Borrower shall pay, upon demand, any amounts due to the Lenders pursuant to Section 3.04;

(c)   any portion of a Borrowing maturing or required to be repaid in less than one month may not be converted into or continued as a Eurodollar Borrowing, unless agreed by all applicable Lenders;

(d)   any portion of a Eurodollar Borrowing that cannot be converted into or continued as a Eurodollar Borrowing by reason of the immediately preceding clause shall be automatically converted at the end of the Interest Period in effect for such Borrowing into an ABR Borrowing; and

(e)   upon notice to the Borrower from the Administrative Agent given at the request of the Required Lenders, after the occurrence and during the continuance of an Event of Default under Section 8.01(a), (g) or (h), no outstanding Loan may be converted into, or continued as, a Eurodollar Loan.

Each notice pursuant to this Section 2.10 shall (except as set forth herein) be irrevocable and shall refer to this Agreement and specify (i) the identity and amount of the Borrowing that the Borrower requests be converted or continued, (ii) whether such Borrowing is to be converted to or continued as a Eurodollar Borrowing or an ABR Borrowing, (iii) if such notice requests a conversion, the date of such conversion (which shall be a Business Day) and (iv) if such Borrowing is to be converted to or continued as a Eurodollar Borrowing, the Interest Period with respect thereto. If no Interest Period is specified in any such notice with respect to any conversion to or continuation as a Eurodollar Borrowing, the Borrower shall be deemed to have selected an Interest Period of one month's duration. The Administrative Agent shall promptly advise the Lenders of any notice given pursuant to this Section 2.10 and of each Lender's portion of any converted or continued Borrowing. If the Borrower shall not have given notice in accordance with this Section 2.10 to continue any Borrowing into a subsequent Interest Period (and shall not otherwise have given notice in accordance with this Section 2.10 to convert such Borrowing), such Borrowing shall, at the end of the Interest Period applicable thereto (unless repaid pursuant to the terms hereof), automatically be converted into an ABR Borrowing.

Section 2.11.   *Repayment of Term Borrowings*.

(a)   The Borrower shall repay to the Administrative Agent for the ratable account of the applicable Term Lenders (i) on the last Business Day of each March, June, September and December, commencing with the last Business Day of March 2014, an amount equal to 0.25% of the aggregate principal amount of the Initial Term Loans outstanding on the Closing Date (which payments shall be reduced as a result of the application of prepayments in accordance with the order of priority set forth in Sections 2.12 and 2.13 or, if applicable, Section 10.04(k)(vii) and as a result of the conversion of Initial Term Loans to Extended Term Loans or the refinancing of Initial Term Loans with Credit Agreement Refinancing Indebtedness) and (ii) on the applicable Maturity Date for such Initial Term Loans, the aggregate principal amount of such Initial

Term Loans outstanding on such date, together in each case with accrued and unpaid interest on the principal amount to be paid to but excluding the date of such payment. Upon the conversion of Initial Term Loans to Extended Term Loans or the refinancing of Initial Term Loans with Credit Agreement Refinancing Indebtedness, all amortization payments shall be reduced ratably by the aggregate principal amount of the Initial Term Loans so converted, refinanced or replaced. The Borrower shall repay Incremental Term Loans, Extended Term Loans and Other Term Loans in such amounts and on such date or dates as shall be specified therefor in the applicable Incremental Amendment, Extension Offer, Refinancing Amendment or other governing documentation.

(b)    To the extent not previously paid, all Term Loans (including, for avoidance of doubt, Term Loans that are not Initial Term Loans) shall be due and payable on the applicable Maturity Date, together with accrued and unpaid interest on the principal amount to be paid to but excluding the date of payment.

(c)    All repayments pursuant to this Section 2.11 shall be subject to Section 3.04, but shall otherwise be without premium or penalty.

Section 2.12.   *Voluntary Prepayment.*

(c)    The Borrower shall have the right at any time and from time to time to prepay any Borrowing, in whole or in part, upon at least three Business Days' prior written or fax notice (or telephone notice promptly confirmed by written or fax notice) in the case of Eurodollar Loans, or written or fax notice (or telephone notice promptly confirmed by written or fax notice) at least one Business Day prior to the date of prepayment in the case of ABR Loans, to the Administrative Agent before 1:00 p.m., New York City time; *provided, however*, that each partial prepayment shall be in an amount that is an integral multiple of $1,000,000 and not less than $2,500,000.

(d)    Except as may otherwise be set forth in any Extension Offer, any Refinancing Amendment or any Incremental Amendment, voluntary prepayments of Term Loans pursuant to this Section 2.12 (i) shall be applied ratably to each Class of Term Loans then outstanding and (ii) with respect to each Class of Term Loans, shall be applied against the remaining scheduled installments of principal due in respect thereof (in the case of the Initial Term Loans, as set forth in Section 2.11) as directed by the Borrower (or, absent such direction, in direct order of maturity).

(e)    Each notice of prepayment shall specify the prepayment date and the principal amount of each Borrowing (or portion thereof) to be prepaid, shall be irrevocable and shall commit the Borrower to prepay such Borrowing by the amount stated therein on the date stated therein; *provided, however*, that a notice of prepayment delivered by the Borrower may state that such notice is conditioned upon the consummation of an acquisition or sale transaction or upon the effectiveness of other credit facilities or the receipt of proceeds from the issuance of other Indebtedness or any other specified event, in which case such notice may be revoked by the Borrower (by notice to the Administrative Agent on or prior to the specified effective date) if such condition is not

satisfied (*provided*, that the provisions of Section 3.04 shall apply to any prepayment that is not made as a result of the failure of such condition). All prepayments under this Section 2.12 shall be subject to Section 2.12(d) (to the extent applicable) and Section 3.04 but otherwise without premium or penalty. All prepayments under this Section 2.12 shall be accompanied by accrued and unpaid interest on the principal amount to be prepaid to but excluding the date of payment.

(f)    In the event that (other than in connection with a refinancing of the entirety of the Credit Facilities in connection with a Change of Control, a sale of all or substantially all of the assets of the Borrower, or an acquisition or another transaction not otherwise permitted hereunder), on or prior to the two year anniversary of the Closing Date, (i) the Borrower voluntarily prepays any Initial Term Loans with the proceeds of, or any conversion of Initial Term Loans into, any new or replacement tranche of term loan Indebtedness (including any new or additional Term Loans under this Agreement and Credit Agreement Refinancing Indebtedness) incurred for the primary purpose of prepaying, repaying or replacing the Initial Term Loans and having or resulting in an effective yield (in each case, with original issue discount and upfront fees, which shall be deemed to constitute like amounts of original issue discount, being equated to interest margins in a manner consistent with generally accepted financial practice) payable generally to the lenders of such Indebtedness (but excluding the effect of any arrangement, structuring, syndication, commitment or other fees in connection therewith that are not shared with all providers of such Indebtedness), is, or upon satisfaction of the specified conditions could be, lower than the effective yield in respect of the Refinanced Debt (as determined on the same basis), (ii) any waiver, amendment or modification shall become effective with respect to any Initial Term Loans the primary purpose of which is to reduce the effective yield (determined on the basis set forth in clause (i)) with respect to such Initial Term Loans or (iii) a Term Lender is deemed a Non-Consenting Lender and must assign its Initial Term Loans pursuant to Section 3.06(a) in connection with any waiver, amendment or modification the primary purpose of which is to reduce the effective yield (determined on the basis set forth in clause (i)) with respect to such Initial Term Loans (each of clauses (i), (ii), and (iii) a "**Repricing Event**"), then in each case, the Borrower shall pay to the Administrative Agent on the date of such Repricing Event, for the ratable account of each applicable Term Loan Lender, (a) in the case of clauses (i) and (iii), (x) if such Repricing Event occurs prior to the one year anniversary of the Closing Date, a prepayment premium of 2% of the amount of the Term Loans being prepaid or assigned and (y) if such Repricing Event occurs on or after the one year anniversary of the Closing Date but on or prior to the two year anniversary of the Closing Date, a prepayment premium of 1% of the amount of the Term Loans being prepaid or assigned and (b) in the case of clause (ii), (x) if such Repricing Event occurs prior to the one year anniversary of the Closing Date, a payment equal to 2% of the aggregate amount of the applicable Initial Term Loans outstanding immediately prior to such waiver, amendment or modification and (y) if such Repricing Event occurs on or after the one year anniversary of the Closing Date but on or prior to the two year anniversary of the Closing Date, a payment equal to 1% of the aggregate amount of the applicable Initial Term Loans outstanding immediately prior to such waiver, amendment or modification.

Section 2.13.   *Mandatory Prepayments*.

(d)   (i) Within five (5) Business Days after the earlier of (x) 90 days after the end of each Excess Cash Flow Period and (y) the date on which financial statements have been delivered pursuant to Section 6.01(a) (commencing with the Excess Cash Flow Period ended December 31, 2014) and the related Compliance Certificate has been delivered pursuant to Section 6.02(a), the Borrower shall cause to be prepaid an aggregate amount of Term Loans in an amount equal to (A) the Applicable ECF Percentage of Excess Cash Flow, if any, for the Excess Cash Flow Period covered or required to have been covered by such financial statements minus (B) the sum of (1) all voluntary prepayments of principal of Term Loans that are Initial Term Loans or are *pari passu* with the Initial Term Loans and Other Applicable Indebtedness during such Excess Cash Flow Period and (2) all voluntary prepayments of loans under the ABL Facility during such fiscal year to the extent accompanied by a corresponding permanent reduction in the commitments under the ABL Facility and, in the case of each of the immediately preceding clauses (1) and (2), to the extent such prepayments are funded with Internally Generated Cash. Notwithstanding anything to the contrary contained herein, the Borrower shall not be obligated to make any such prepayments described in this Section 2.13(a)(i) (and no Default or Event of Default shall arise as a result of such nonpayment) to the extent such payment would constitute a violation or breach of the ABL Credit Agreement in respect of minimum liquidity requirements (as in effect on the date hereof in respect of such restriction, or as otherwise modified, supplemented or amended in a manner not adverse to the Lenders).

(i)   If (1) the Borrower or any Restricted Subsidiary Disposes of any property or assets pursuant to Section 7.05 (j), (l), (t) or under any transaction that would be prohibited by Section 7.05(other than so long as the ABL Credit Agreement is in effect, any Disposition of ABL Priority Collateral), or (2) any Casualty Event occurs, which results in the realization or receipt by the Borrower or a Restricted Subsidiary of Net Proceeds, the Borrower shall cause to be prepaid on or prior to the date which is ten (10) Business Days after the date of the realization or receipt by the Borrower or any Restricted Subsidiary of such Net Proceeds an aggregate principal amount of Term Loans in an amount equal to 100% of all Net Proceeds realized or received; *provided*, that if at the time that any such prepayment would be required, the Borrower is required to offer to repurchase Permitted First Priority Additional Debt (or any Permitted Refinancing thereof that is secured on a pari passu basis with the Obligations) pursuant to the terms of the documentation governing such Indebtedness with the net proceeds of such Disposition or Casualty Event (such Permitted First Priority Additional Debt (or Permitted Refinancing thereof) required to be offered to be so repurchased, "**Other Applicable Indebtedness**"), then the Borrower may apply such Net Proceeds on a pro rata basis (determined on the basis of the aggregate outstanding principal amount of the Term Loans and Other Applicable Indebtedness at such time; *provided*, that the portion of such net proceeds allocated to the Other Applicable Indebtedness shall not exceed the amount of such net proceeds required to be allocated to the Other Applicable Indebtedness pursuant to the terms thereof, and the remaining amount, if any, of such net proceeds shall be allocated to

the Term Loans in accordance with the terms hereof) to the prepayment of the Term Loans and to the repurchase of Other Applicable Indebtedness, and the amount of prepayment of the Term Loans that would have otherwise been required pursuant to this Section 2.13(a)(ii) shall be reduced accordingly; *provided further*, that to the extent the holders of Other Applicable Indebtedness decline to have such indebtedness repurchased (after giving effect to any requirement under the documentation for such Other Applicable Indebtedness to offer such declined payments to other holders of such Other Applicable Indebtedness prior to making such proceeds available to the Borrower), the declined amount shall promptly (and in any event within 10 Business Days after the date of such rejection) be applied to prepay the Term Loans in accordance with the terms hereof.

(ii)   If the Borrower or any Restricted Subsidiary incurs or issues any Indebtedness after the Closing Date (other than Indebtedness permitted under Section 7.03 (other than any Credit Agreement Refinancing Indebtedness), the Borrower shall cause to be prepaid an aggregate principal amount of Term Loans in an amount equal to 100% of all Net Proceeds received therefrom on or prior to the date which is five (5) Business Days after (or, in the case of Credit Agreement Refinancing Indebtedness, within the Business Day of the date of) the receipt by the Borrower or such Restricted Subsidiary of such Net Proceeds.

(e)   Except as may otherwise be set forth in any Extension Offer, any Refinancing Amendment, any Permitted Repricing Amendment, any Incremental Amendment, or any other governing documentation, each prepayment of Term Loans pursuant to Section 2.13(a) shall be applied ratably to each Class of Term Loans then outstanding; *provided*, that any prepayment of Term Loans pursuant to the parenthetical in Section 2.13(a)(iii) shall be applied solely to each applicable Class of Refinanced Debt.

(f)   With respect to each Class of Term Loans, each prepayment pursuant to Section 2.13(a) shall be applied in direct order of maturity to the remaining scheduled repayments of such Term Loans (in the case of the Initial Term Loans, required pursuant to Section 2.11(a)); and each such prepayment shall be paid to the Lenders in accordance with their respective Pro Rata Shares, subject to Section 2.13(d). For the avoidance of doubt, this Section 2.13(c) is applicable to any prepayment made with the Net Proceeds of Credit Agreement Refinancing Indebtedness.

(g)   The Borrower shall notify the Administrative Agent in writing of any mandatory prepayment of Term Loans required to be made pursuant to Section 2.13(a) at least three (3) Business Days prior to the date of such prepayment. Each such notice shall specify the date of such prepayment and provide a reasonably detailed calculation of the amount of such prepayment. The Administrative Agent will promptly notify each applicable Lender of the contents of the Borrower's prepayment notice and of such Lender's Pro Rata Share or other applicable share of the prepayment. Each Term Lender may reject all of its Pro Rata Share or other applicable share of any mandatory prepayment (such declined amounts, the "**Declined Proceeds**") of Term Loans required to

be made pursuant to Section 2.13(a) by providing written notice (each, a "**Rejection Notice**") to the Administrative Agent and the Borrower no later than 5:00 p.m., New York City time, one Business Day after the date of such Lender's receipt of notice from the Administrative Agent regarding such prepayment; *provided* that, for the avoidance of doubt, no Lender may reject any prepayment made with proceeds of Credit Agreement Refinancing Indebtedness. If a Term Lender fails to deliver a Rejection Notice to the Administrative Agent within the time frame specified above, any such failure will be deemed an acceptance of the total amount of such mandatory prepayment of Term Loans unless the Borrower and the Administrative Agent agree to an extension of time for such failure to be corrected. Any Declined Proceeds shall be retained by the Borrower.

(h)    *Funding Losses, Etc.* All prepayments under this Section 2.13 shall be accompanied by accrued and unpaid interest on the principal amount to be prepaid to but excluding the date of payment and shall be made together with, in the case of any such prepayment of a Eurodollar Loan on a day prior to the last day of an Interest Period therefor, any amounts owing in respect of such Eurodollar Loan pursuant to Section 3.04. All prepayments under Section 2.13(a)(iii) shall be subject to Section 2.12(d) (to the extent applicable). Notwithstanding any of the other provisions of Section 2.13(a), so long as no Event of Default shall have occurred and be continuing, if any prepayment of Eurodollar Loans is required to be made under Section 2.13(a) prior to the last day of the Interest Period therefor, the Borrower may, in its sole discretion, deposit the amount of any such prepayment otherwise required to be made thereunder (including accrued interest to the last day of such Interest Period) into a Cash Collateral Account until the last day of such Interest Period, at which time the Administrative Agent shall be authorized (without any further action by or notice to or from the Borrower or any other Loan Party) to apply such amount to the prepayment of such Loans in accordance with this Section 2.13. Upon the occurrence and during the continuance of any Event of Default, the Administrative Agent shall also be authorized (without any further action by or notice to or from the Borrower or any other Loan Party) to apply such amount to the prepayment of the outstanding Loans in accordance with Section 2.13(a).

(i)    *Foreign Dispositions; Foreign Excess Cash Flow*. Notwithstanding any other provisions of this Section 2.13, (A) to the extent that any of or all the Net Proceeds of any Disposition by a Foreign Subsidiary ("**Foreign Disposition**") or Excess Cash Flow attributable to Foreign Subsidiaries are (x) prohibited or delayed by applicable local law or (y) restricted by applicable organizational or constitutive documents or any agreement, from being repatriated to the United States, in each case the portion of such Net Proceeds or Excess Cash Flow so affected will not be required to be applied to repay Term Loans at the times provided in this Section 2.13 but may be retained by the applicable Foreign Subsidiary (the Borrower hereby agreeing to use reasonable efforts (as determined in the Borrower's reasonable business judgment) to otherwise cause the applicable Foreign Subsidiary to within one year following the date on which the respective payment would otherwise have been required, promptly take all actions reasonably required by the applicable local law, applicable organizational or constitutive document impediment to permit such repatriation), and if within one year following the date on which the

respective payment would otherwise have been required, such repatriation of any of such affected Net Proceeds or Excess Cash Flow is permitted under the applicable local law, applicable organizational or constitutive document impediment, such repatriation will be promptly effected and such repatriated Net Proceeds or Excess Cash Flow will be promptly (and in any event not later than 5 Business Days after such repatriation could be made) applied (net of additional taxes, costs and expenses payable or reserved against as a result thereof) (whether or not repatriation actually occurs) to the repayment of the Term Loans pursuant to this Section 2.13 and (B) to the extent that the Borrower has determined in good faith that repatriation of any of or all the Net Proceeds of any Foreign Disposition or Foreign Subsidiary Excess Cash Flow could cause adverse tax consequences to the Borrower, such Net Proceeds or Excess Cash Flow so affected may be retained by the applicable Foreign Subsidiary. The non-application of any prepayment amounts as a consequence of the foregoing provisions will not, for the avoidance of doubt, constitute a Default or an Event of Default.

Section 2.14.   *Pro Rata Treatment.* Except as required under Section 3.02, each Borrowing, each payment or prepayment of principal of any Borrowing, each payment of interest on the Loans, each reduction of the Term Loan Commitments and each conversion of any Borrowing to or continuation of any Borrowing as a Borrowing of any Type shall be allocated pro rata among the Lenders of the applicable Class in accordance with their respective applicable Commitments (or, if such Commitments shall have expired or been terminated, in accordance with the respective principal amounts of their outstanding Loans); *provided* that the provisions of this Section 2.14 shall not be construed to apply to any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement. Each Lender agrees that in computing such Lender's portion of any Borrowing to be made hereunder, the Administrative Agent may, in its discretion, round each Lender's percentage of such Borrowing to the next higher or lower whole Dollar amount.

Section 2.15.   *Sharing of Setoffs.* Each Lender agrees that if it shall, through the exercise of a right of banker's lien, setoff or counterclaim against the Borrower or any other Loan Party, or pursuant to a secured claim under Section 506 of Title 11 of the United States Code or other security or interest arising from, or in lieu of, such secured claim, received by such Lender under any applicable bankruptcy, insolvency or other similar law or otherwise, or by any other means, obtain payment (voluntary or involuntary) in respect of any Loan or Loans as a result of which the unpaid principal portion of its Loans shall be proportionately less than the unpaid principal portion of the Loans of any other Lender, it shall be deemed simultaneously to have purchased from such other Lender at face value, and shall promptly pay to such other Lender the purchase price for, a participation in the Loans of such other Lender, so that the aggregate unpaid principal amount of the Loans and participations in Loans held by each Lender shall be in the same proportion to the aggregate unpaid principal amount of all Loans then outstanding as the principal amount of its Loans prior to such exercise of banker's lien, setoff or counterclaim or other event was to the principal amount of all Loans outstanding prior to such exercise of banker's lien, setoff or counterclaim or other event; *provided, however*, that (i) if any such purchase or purchases or adjustments shall be made pursuant to this Section 2.15 and the payment giving rise thereto shall thereafter be recovered, such purchase or purchases or

adjustments shall be rescinded to the extent of such recovery and the purchase price or prices or adjustment restored without interest, and (ii) the provisions of this Section 2.15 shall not be construed to apply to any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement or any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant, other than to the Borrower as to which the provisions of this Section 2.15 shall apply (*provided*, that if the applicable payment, assignment, sale or participation to the Borrower is expressly permitted under Section 10.04, the provisions of this Section 2.15 shall not be construed to apply). The Borrower expressly consents to the foregoing arrangements and agrees that any Lender holding a participation in a Loan deemed to have been so purchased may exercise any and all rights of banker's lien, setoff or counterclaim with respect to any and all moneys owing by the Borrower to such Lender by reason thereof as fully as if such Lender had made a Loan directly to the Borrower in the amount of such participation. For the avoidance of doubt, neither this Section nor Section 2.14 shall not limit the ability of the Borrower to (i) purchase and retire Term Loans pursuant to an open market purchase or a  Dutch Auction or (ii) pay principal, fees, premiums and interest with respect to Other Term Loans or Incremental Term Loans following the effectiveness of any Refinancing Amendment, any Extension Offer or Incremental Amendment, as applicable, on a basis different from the Loans of such Class that will continue to be held by Lenders that were not Extending Lenders or Lenders pursuant to such Incremental Amendment or Refinancing Amendment, as applicable.

Section 2.16.  *Payments*.

(a)   The Borrower shall make each payment (including principal of or interest on any Borrowing or any Fees or other amounts due and payable) hereunder and under any other Loan Document not later than 2:00 p.m., New York City time, on the date when due in immediately available Dollars, without setoff, defense or counterclaim. Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon. Each such payment shall be made to the Administrative Agent at its offices at Eleven Madison Avenue, New York, NY 10010 or such other office notified by the Administrative Agent to the Borrower in accordance with Section 10.01. The Administrative Agent shall promptly distribute to each Lender any payments received by the Administrative Agent on behalf of such Lender.

(b)   Except as otherwise expressly provided herein, whenever any payment (including principal of or interest on any Borrowing or any Fees or other amounts) hereunder or under any other Loan Document shall become due, or otherwise would occur, on a day that is not a Business Day, such payment may be made on the next succeeding Business Day, and such extension of time shall in such case be included in the computation of interest or Fees, if applicable.

Section 2.17.  *Incremental Credit Extensions*.

(a)   The Borrower may at any time or from time to time after the Closing Date, by notice to the Administrative Agent (whereupon the Administrative Agent shall

promptly make a copy of such notice available to each of the Lenders), request one or more additional tranches or additions to an existing tranche of term loans (the "**Incremental Term Loans**") in an amount (when taken together with any Alternative Incremental Indebtedness issued or incurred prior to, or that will be issued or incurred concurrently with, the incurrence of the Incremental Term Loans) not to exceed $250,000,000, so long as the Senior Secured Leverage Ratio calculated on a Pro Forma Basis shall not be greater than 3.25 to 1.0 (calculated as if such Incremental Term Loans had been outstanding on such last day and as though any unsecured Alternative Incremental Indebtedness were secured Alternative Incremental Indebtedness), plus (z) the aggregate amount of all voluntary prepayments of Term Loans pursuant to Section 2.12(a) (the "**Maximum Incremental Facility Amount**"), *provided* that the Borrower shall have delivered a certificate of a Responsible Officer certifying that the Maximum Incremental Facility Amount has not been exceeded, together with reasonably detailed calculations with respect thereto (which calculations shall, if made as of the last day of any fiscal quarter of the Borrower for which the Borrower has not delivered to the Administrative Agent the financial statements and Compliance Certificate required to be delivered by Section 6.01(a) or 6.01(b) and Section 6.02(a), respectively, be accompanied by a reasonably detailed calculation of Consolidated EBITDA for the relevant period). Each tranche of Incremental Term Loans shall be in an aggregate principal amount that is not less than $10,000,000 and shall be in an increment of $1,000,000 (*provided* that such amount may be less than $10,000,000 if such amount represents all remaining availability under the Maximum Incremental Facility Amount).

(b)   The following terms shall apply to any Incremental Term Loans established pursuant to an Incremental Amendment: (i) such Incremental Term Loans shall rank pari passu in right of payment and of security with all other Term Loans; (ii) the maturity date of such Incremental Term Loans shall not be earlier than the Original Term Loan Maturity Date; (iii) the amortization requirements for such Incremental Term Loans may differ from that of other outstanding Initial Term Loans, *provided* the Weighted Average Life to Maturity of such Incremental Term Loans is not less than the remaining Weighted Average Life to Maturity of the then outstanding Initial Term Loans; (iv) such Incremental Term Loans, to the extent secured, shall not be secured by any Lien on any asset of the Borrower or the Guarantors that does not also secure the then outstanding applicable Term Loans; (v) any Incremental Term Loans may rank junior in right of security with the other Term Loans or be unsecured, and if such Incremental Term Loans rank junior in right of security or are unsecured, the Incremental Facility pursuant to which such Incremental Term Loans are extended shall be established as a separate Facility from the then existing Term Loan Facility; (vi) the covenants, events of default and guarantees of such Incremental Term Loans, if not consistent with the terms of the Initial Term Loans, shall be on customary market terms for Indebtedness of such type (as determined by the Borrower in good faith) (*provided*, that the financial maintenance covenant on the then outstanding Term Loans shall be amended to provide the Lenders the benefit of any financial maintenance covenant of such Incremental Term Loans that is in addition to or more restrictive in any material manner than the financial maintenance covenant on the then outstanding Term Loans) and (vii) the applicable yield relating to

any term loans incurred pursuant to such Incremental Amendment (each facility thereunder, the "**Incremental Facility**"), shall not exceed the applicable yield with respect to the Initial Term Loans by more than 0.50% per annum unless the yield applicable to the Initial Term Loans is increased so that the yield applicable to the applicable Incremental Facility does not exceed the yield applicable to the Initial Term Loans by more than 0.50% per annum; *provided* that in determining the yield applicable to the Initial Term Loans and the applicable Incremental Facility, (A) all upfront or similar fees or original issue discount (amortized over the shorter of (1) the Weighted Average Life to Maturity of such loans and (2) four years) payable by the Borrower to the Lenders of the Initial Term Loans or the applicable Incremental Facility in the primary syndication thereof shall be included, (B) if the Incremental Facility includes an interest rate floor greater than the applicable interest rate floor under the Initial Term Loans, such differential between interest rate floors shall be equated to the applicable interest rate margin for purposes of determining whether an increase to the interest rate margin under the Initial Term Loans shall be required, but only to the extent an increase in the interest rate floor in the Initial Term Loans would cause an increase in the interest rate then in effect thereunder, and in such case, the interest rate floor (but not the interest rate margin) applicable to the Initial Term Loans shall be increased to the extent of such differential between interest rate floors and (C) structuring, arrangement or other fees payable in connection therewith that are not shared with all Lenders providing such Incremental Term Loans shall be excluded.

(c)     Each notice from the Borrower pursuant to this Section 2.17 shall set forth (i) the requested amount and proposed terms of the relevant Incremental Term Loans and (ii) the date on which the relevant increase is requested to become effective (the "**Increase Amount Date**"). Incremental Term Loans may be made by any existing Lender (but no existing Lender shall have any obligation to make any Incremental Term Loan except to the extent that it has agreed to do so pursuant to an Incremental Amendment) or by any other Additional Lender (the Lenders or Additional Lenders making such Incremental Term Loans, collectively, the "**Incremental Lenders**"). Commitments in respect of Incremental Term Loans shall become Commitments under this Agreement pursuant to an amendment (an "**Incremental Amendment**") to this Agreement and, as appropriate, the other Loan Documents, executed by the Borrower, each Incremental Lender and the Administrative Agent. The Incremental Amendment shall be on the terms and pursuant to documentation to be determined by the Borrower and the Incremental Lenders providing the relevant Incremental Terms Loans; *provided* that to the extent such terms and documentation are not consistent with this Agreement in any material respect (except to the extent permitted by the foregoing clauses), they shall be reasonably satisfactory to the Administrative Agent. The effectiveness of any Incremental Amendment shall be subject to the satisfaction (or waiver) on the date thereof of each of the conditions set forth in Section 4.01 (and for purposes thereof the making of the Incremental Term Loans shall be deemed to be a Request for Credit Extension) and, to the extent reasonably requested by the Administrative Agent, receipt by the Administrative Agent of customary legal opinions, board resolutions, officers' certificates and a solvency certificate or representation, in each case consistent with those delivered on the Closing Date under Section 4.02 (other than changes to such legal opinions resulting from a change in law,

change in fact or change to counsel's form of opinion reasonably satisfactory to the Administrative Agent), and customary reaffirmation agreements. Notwithstanding anything to the contrary above, in connection with the incurrence of any Incremental Term Loans, if the proceeds of such Incremental Term Loans are to be used, in whole or in part, by the Borrower or any other Loan Party to finance, in whole or in part, a Permitted Acquisition or other permitted Investment, then (A) the only representations and warranties that will be required to be true and correct in all material respects as of the applicable Increase Amount Date shall be (x) the Specified Representations (conformed as necessary for such Permitted Acquisition or other permitted Investment) and (y) such of the representations and warranties made by or on behalf of the applicable acquired company or business in the applicable acquisition agreement as are material to the interests of the Lenders, but only to the extent that the Borrower (or any Affiliate of the Borrower) has the right to terminate the obligations of the Borrower or such Affiliate under such acquisition agreement or not consummate such acquisition as a result of a breach of such representations or warranties in such acquisition agreement and (B) no Event of Default under Section 8.1(a), (f) or (g) would exist after giving effect to such incurrence ("**Permitted Acquisition Provisions**"). The Borrower will use the proceeds of the Incremental Term Loans for any purpose not prohibited by this Agreement.

(d)    Any Incremental Amendment may, without the consent of any other Lenders, effect such amendments to this Agreement and the other Loan Documents as may be necessary or appropriate, in the reasonable opinion of the Administrative Agent and the Borrower, to effect the terms thereof, to the extent such terms are permitted under this Section 2.17. Notwithstanding the foregoing, each of the Administrative Agent and the Collateral Agent shall have the right (but not the obligation) to seek the advice or concurrence of the Required Lenders with respect to any matter contemplated by this Section 2.17 and, if either the Administrative Agent or the Collateral Agent seeks such advice or concurrence, it shall be permitted to enter into such amendments with the Borrower in accordance with any instructions actually received by such Required Lenders and shall also be entitled to refrain from entering into such amendments with the Borrower unless and until it shall have received such advice or concurrence; *provided, however*, that whether or not there has been a request by the Administrative Agent or the Collateral Agent for any such advice or concurrence, all such amendments entered into with the Borrower by the Administrative Agent or the Collateral Agent hereunder shall be binding and conclusive on the Lenders. Without limiting the foregoing, in connection with any Incremental Amendment and as required by applicable Law to protect the Collateral Agent's perfected security interest thereon (as reasonably determined by the Collateral Agent), the respective Loan Parties shall (at their expense) amend (and the Collateral Agent is hereby directed to amend) any Mortgage that has a maturity date prior to the then Latest Maturity Date so that such maturity date is extended to the Latest Maturity Date after giving effect to such Incremental Amendment (or such later date as may be advised by local counsel to the Collateral Agent).

(e)    This Section 2.17 shall supersede any provisions in Section 2.14, 2.15 or 10.08 to the contrary.

Section 2.18.   *Refinancing Amendments*.

(a)   At any time after the Closing Date, the Borrower may obtain, from any Lender or any Additional Lender, Credit Agreement Refinancing Indebtedness (other than Permitted Additional Debt) in respect of all or any portion of the Term Loans then outstanding under this Agreement, in the form of Other Term Loans or Other Term Loan Commitments pursuant to a Refinancing Amendment; *provided* that (A) such Credit Agreement Refinancing Indebtedness will rank pari passu in right of payment and of security with the other Loans and Commitments hereunder, (B) such Credit Agreement Refinancing Indebtedness will have such pricing, fees, interest, premiums and optional prepayment terms as may be agreed by the Borrower and the Lenders thereof (*provided*, that such Credit Agreement Refinancing Indebtedness may participate on a pro rata basis or on a less than pro rata basis (but not on a greater than pro rata basis) in any voluntary or mandatory prepayments hereunder, as specified in the applicable Refinancing Amendment), (C) such Credit Agreement Refinancing Indebtedness will have a maturity date later than the maturity date of, and will have a Weighted Average Life to Maturity that is not shorter than, the Refinanced Debt, (D) the covenants, events of default and guarantees of such Credit Agreement Refinancing Indebtedness, if not consistent with the terms of the Initial Term Loans, shall be on customary market terms for Indebtedness of such type (as determined by the Borrower in good faith) ((*provided*, that the financial maintenance covenant on the then outstanding Term Loans shall be amended to provide the Lenders the benefit of any financial maintenance covenant of such Credit Agreement Refinancing Indebtedness that is in addition to or more restrictive in any material manner than the financial maintenance covenant on the then outstanding Term Loans)) and (E) the proceeds of such Credit Agreement Refinancing Indebtedness shall be applied, substantially concurrently with the incurrence thereof, to the prepayment of outstanding Term Loans being so refinanced. The effectiveness of any Refinancing Amendment shall be subject to the satisfaction (or waiver) on the date thereof of each of the conditions set forth in Section 4.01 (and for purposes thereof the incurrence of the Credit Agreement Refinancing Indebtedness shall be deemed to be a Request for Credit Extension) and, to the extent reasonably requested by the Administrative Agent, receipt by the Administrative Agent of customary legal opinions, board resolutions, officers' certificates and a solvency certification or representation, in each case consistent with those delivered on the Closing Date under Section 4.02 (other than changes to such legal opinions resulting from a change in law, change in fact or change to counsel's form of opinion reasonably satisfactory to the Administrative Agent), and customary reaffirmation agreements. Each Class of Credit Agreement Refinancing Indebtedness incurred under this Section 2.18(a) shall be in an aggregate principal amount that is (x) not less than $40,000,000 and (y) an integral multiple of $1,000,000 in excess thereof. The Administrative Agent shall promptly notify each Lender as to the effectiveness of each Refinancing Amendment.

(b)   Each of the parties hereto hereby agrees that this Agreement and the other Loan Documents may be amended pursuant to a Refinancing Amendment, without the consent of any other Lenders, to the extent (but only to the extent) necessary to (i) reflect the existence and terms of the Credit Agreement Refinancing Indebtedness incurred

pursuant thereto and (ii) effect such other amendments to this Agreement and the other Loan Documents as may be necessary or appropriate, in the reasonable opinion of the Administrative Agent and the Borrower, to effect the provisions of this Section 2.18, and the Required Lenders hereby expressly authorize the Administrative Agent to enter into any such Refinancing Amendment. Without limiting the foregoing, in connection with any Refinancing Amendment, the respective Loan Parties shall (at their expense) amend (and the Collateral Agent is hereby directed to amend) any Mortgage that has a maturity date prior to the Latest Maturity Date after giving effect to such Refinancing Amendment so that such maturity date is extended to the then Latest Maturity Date (or such later date as may be advised by local counsel to the Collateral Agent).

(c)    This Section 2.18 shall supersede any provisions in Section 2.14, 2.15 or 10.08 to the contrary.

Section 2.19.    *Extensions of Term Loans*.

(a)    Notwithstanding anything to the contrary in this Agreement, pursuant to one or more offers (each, an "**Extension Offer**") made from time to time by the Borrower to all Lenders of a Class of Term Loans with a like Maturity Date on a pro rata basis (based on the aggregate outstanding principal amount of the respective Term Loans of such Class with the same Maturity Date) and on the same terms to each such Lender, the Borrower may from time to time with the consent of any Lender that shall have accepted such offer extend the maturity date of any Term Loans and otherwise modify the terms of such Term Loans of such Lender pursuant to the terms of the relevant Extension Offer (including, without limitation, by increasing the interest rate or fees payable in respect of such Term Loans and/or modifying the amortization schedule in respect of such Term Loans) (each, an "**Extension**", and each group of Term Loans as so extended, as well as the group of original Term Loans not so extended, being a "**tranche**"; any Extended Term Loans shall constitute a separate tranche of Term Loans from the tranche of Term Loans from which they were converted and a separate Class of Term Loans), so long as the following terms are satisfied (or waived): (i) no Event of Default shall exist at the time the notice in respect of an Extension Offer is delivered to the Lenders, and no Event of Default shall exist immediately prior to or after giving effect to the effectiveness of any Extended Term Loans, (ii) except as to interest rates, fees, amortization, final maturity date, premium, AHYDO "catch up" payments, required prepayment dates and participation in prepayments (which shall, subject to immediately succeeding clauses (iii), (iv) and (v), be determined by the Borrower and set forth in the relevant Extension Offer), the Term Loans of any Term Lender extended pursuant to any Extension ("**Extended Term Loans**") shall have the same terms and conditions that are substantially identical to, or less favorable to the lenders or investors providing such Extended Term Loans as the tranche of Term Loans subject to such Extension Offer and any Incremental Term Loans, (iii) the final maturity date of any Extended Term Loans shall be no earlier than the then Latest Maturity Date and the amortization schedule applicable to Term Loans pursuant to Section 2.11(a) for periods prior to the then applicable Latest Maturity Date may not be increased, (iv) the Weighted Average Life to Maturity of any Extended Term Loans shall

be no shorter than the remaining Weighted Average Life to Maturity of the Term Loans extended thereby, (v) any Extended Term Loans may participate on a pro rata basis or on a less than pro rata basis (but not on a greater than pro rata basis) in any voluntary or mandatory prepayments hereunder, as specified in the applicable Extension Offer, (vi) if the aggregate principal amount of Term Loans (calculated on the face amount thereof) in respect of which Term Lenders shall have accepted the relevant Extension Offer shall exceed the maximum aggregate principal amount of Term Loans offered to be extended by the Borrower pursuant to such Extension Offer, then the Term Loans of such Term Lenders shall be extended ratably up to such maximum amount based on the respective principal amounts (but not to exceed actual holdings of record) with respect to which such Term Lenders have accepted such Extension Offer, (vii) all documentation in respect of such Extension shall be consistent with the foregoing, and (viii) any applicable Minimum Extension Condition shall be satisfied unless waived by the Borrower.

(b)   With respect to all Extensions consummated by the Borrower pursuant to this Section 2.19, (i) such Extensions shall not constitute voluntary or mandatory payments or prepayments for purposes of Section 2.12 , 2.13 or 2.15 and (ii) no Extension Offer is required to be in any minimum amount or any minimum increment, *provided* that the Borrower may at its election specify as a condition (a "**Minimum Extension Condition**") to consummating any such Extension that a minimum amount (to be determined and specified in the relevant Extension Offer in the Borrower's sole discretion and may be waived by the Borrower) of Term Loans of any or all applicable Classes be tendered. The Administrative Agent and the Lenders hereby consent to the Extensions and the other transactions contemplated by this Section 2.19 (including, for the avoidance of doubt, payment of any interest, fees or premium in respect of any Extended Term Loans on such terms as may be set forth in the relevant Extension Offer) and hereby waive the requirements of any provision of this Agreement (including, without limitation, Sections 2.12, 2.13, 2.14 and 2.15) or any other Loan Document that may otherwise prohibit any such Extension or any other transaction contemplated by this Section 2.19.

(c)   Each of the parties hereto hereby (A) agrees that this Agreement and the other Loan Documents may be amended to give effect to each Extension (an "**Extension Amendment**"), without the consent of any other Lenders, to the extent (but only to the extent) necessary to (i) reflect the existence and terms of the Extended Term Loans incurred pursuant thereto, (ii) modify the scheduled repayments set forth in Section 2.11 with respect to any Class of Term Loans subject to an Extension to reflect a reduction in the principal amount of the Term Loans thereunder in an amount equal to the aggregate principal amount of the Extended Term Loans amended pursuant to the applicable Extension (with such amount to be applied ratably to reduce scheduled repayments of such Term Loans required pursuant to Section 2.11), (iii) modify the prepayments set forth in Sections 2.12 and 2.13 to reflect the existence of the Extended Term Loans and the application of prepayments with respect thereto, and (iv) effect such other amendments to this Agreement and the other Loan Documents as may be necessary or appropriate, in the reasonable opinion of the Administrative Agent and the Borrower, to effect the provisions of this Section 2.19, and the Required Lenders hereby expressly and irrevocably, for the

benefit of all parties hereto, authorize the Administrative Agent to enter into any such Extension Amendment and (B) consent to the transactions contemplated by this Section 2.19 (including, for the avoidance of doubt, payment of interest, fees or premiums in respect of any Extended Term Loans on such terms as may be set forth in the relevant Extension Amendment). Without limiting the foregoing, in connection with any Extension, the respective Loan Parties shall (at their expense) amend (and the Collateral Agent is hereby directed to amend) any Mortgage that has a maturity date prior to the then Latest Maturity Date so that such maturity date is extended to the Latest Maturity Date after giving effect to such Extension (or such later date as may be advised by local counsel to the Collateral Agent).

(d)   In connection with any Extension, the Borrower shall provide the Administrative Agent at least 5 Business Days' (or such shorter period as may be agreed by the Administrative Agent) prior written notice thereof, and shall agree to such procedures, if any, as may be established by, or acceptable to, the Administrative Agent, in each case acting reasonably to accomplish the purposes of this Section 2.19.

(e)   This Section 2.19 shall supersede any provisions in Section 2.14, 2.15 or 10.08 to the contrary.

## ARTICLE 3
### TAXES, INCREASED COSTS PROTECTION AND ILLEGALITY

Section 3.01.   *Taxes*.

(e)   Except as provided in this Section 3.01, any and all payments made by or on account of the Borrower or any Guarantor under any Loan Document to any Lender or Agent shall be made free and clear of and without deduction for any and all present or future taxes, duties, levies, imposts, assessments, withholdings (including backup withholding), fees or similar charges imposed by any Governmental Authority including interest, penalties and additions to tax (collectively "**Taxes**"), excluding (i) Taxes imposed on or measured by net income, however denominated, and franchise (and similar) Taxes imposed on it in lieu of net income Taxes, (ii) Taxes attributable to the failure by the relevant Lender or Agent to deliver the documentation required to be delivered pursuant to clause (d) of this Section 3.01, (iii) Taxes imposed by a jurisdiction as a result of any connection between such Lender or Agent and such jurisdiction other than any connection arising from executing, delivering, being a party to, engaging in any transactions pursuant to, performing its obligations under, or enforcing any Loan Document, (iv) any branch profits Taxes imposed by the United States or any similar Tax imposed by any other jurisdiction in which the Borrower or any Guarantor (as appropriate) is located, (v) any U.S. federal withholding tax imposed on amounts payable hereunder pursuant to a law in effect at such time the Lender or Agent becomes a party to this Agreement (other than pursuant to an assignment request by the Borrower under Section 3.06), or designates a new lending office, except in each case to the extent such Lender (or its assignor, if any) was entitled at the time of designation of a new lending office (or assignment) to receive additional amounts with respect to such withholding tax pursuant to this Section 3.01 and

(vi) any tax to the extent imposed as a result of a Lender or Agent's (A) failure to comply with the applicable requirements of FATCA in such a way to reduce such tax to zero or (B) election under Section 1471(b)(3) of the Code (all such non-excluded Taxes imposed on such payments, being hereinafter referred to as "**Indemnified Taxes**"). If the Borrower, any Guarantor or other applicable withholding agent shall be required by any Laws to deduct any Indemnified Taxes or Other Taxes (as defined below) from or in respect of any sum payable under any Loan Document to any Agent or any Lender, (i) the sum payable by the Borrower or Guarantor shall be increased as necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section 3.01), such Agent or Lender (as the case may be) receives an amount equal to the sum it would have received had no such deductions been made, (ii) the applicable withholding agent shall make such deductions, (iii) the applicable withholding agent shall pay the full amount deducted to the relevant Governmental Authority in accordance with applicable Laws, and (iv) within thirty (30) days after the date of such payment (or, if receipts or evidence are not available within thirty (30) days, as soon as possible thereafter), if the Borrower or any Guarantor is the applicable withholding agent, the applicable withholding agent shall furnish to such Agent or Lender (as the case may be) the original or a copy of a receipt evidencing payment thereof or other evidence acceptable to such Agent or Lender.

(f)   In addition, the Borrower agrees to pay any and all present or future stamp, court or documentary taxes and any other excise, property, intangible or mortgage recording taxes, or charges or levies of the same character, imposed by any Governmental Authority, which arise from any payment made under any Loan Document or from the execution, delivery, performance, enforcement or registration of, or otherwise with respect to, any Loan Document (including additions to tax, penalties and interest related thereto) excluding, in each case, such amounts that result from an Agent or Lender's Assignment and Acceptance, grant of a Participation, transfer or assignment to or designation of a new applicable lending office or other office for receiving payments under any Loan Document (collectively, "**Assignment Taxes**") except for Assignment Taxes resulting from assignment or participation that is requested or required in writing by the Borrower (all such non-excluded taxes described in this Section 3.01(b) being hereinafter referred to as "**Other Taxes**").

(g)   The Borrower and each Guarantor agree to indemnify each Agent and each Lender for (i) the full amount of Indemnified Taxes and Other Taxes paid by such Agent or Lender and (ii) any expenses arising therefrom or with respect thereto, provided such Agent or Lender, as the case may be, provides Borrower or Guarantor with a written statement thereof setting forth in reasonable detail the basis and calculation of such amounts.

(h)   Each Lender and Agent shall, at such times as are reasonably requested by the Borrower or the Administrative Agent, provide the Borrower and the Administrative Agent with any documentation prescribed by Law certifying as to any entitlement of such Lender or Agent to an exemption from, or reduction in, withholding tax with respect to

any payments to be made to such Lender under the Loan Documents. Each such Lender and Agent shall, whenever a lapse in time or change in circumstances renders such documentation obsolete or inaccurate in any material respect, deliver promptly to the Borrower and the Administrative Agent updated or other appropriate documentation (including any new documentation reasonably requested by the applicable withholding agent) or promptly notify the Borrower and the Administrative Agent of its inability to do so. Unless the applicable withholding agent has received forms or other documents satisfactory to it indicating that payments under any Loan Document to or for a Lender are not subject to withholding tax or are subject to such Tax at a rate reduced by an applicable tax treaty, the Borrower, the Administrative Agent or other applicable withholding agent shall withhold amounts required to be withheld by applicable Law from such payments at the applicable statutory rate. Notwithstanding the foregoing, a Lender shall not be required to deliver any form pursuant to this clause (d) that such Lender is not legally able to deliver. In addition, each Lender and Agent shall deliver to the Borrower and the Administrative Agent such other tax forms or other documents as shall be prescribed by applicable Law, to the extent applicable, (x) to demonstrate that payments to such Lender or Agent under this Agreement and the other Loan Documents are exempt from any United States federal withholding tax imposed pursuant to FATCA or (y) to allow the Borrower and the Administrative Agent to determine the amount to deduct or withhold under FATCA from a payment hereunder. Without limiting the foregoing:

(i)    Each Lender and Agent that is a United States person (as defined in Section 7701(a)(30) of the Code) shall deliver to the Borrower and the Administrative Agent on or before the date on which it becomes a party to this Agreement two properly completed and duly signed original copies of Internal Revenue Service Form W-9 certifying that such Lender or Agent (as the case may be) is exempt from federal backup withholding.

(ii)    Each Lender and Agent that is not a United States person (as defined in Section 7701(a)(30) of the Code) shall deliver to the Borrower and the Administrative Agent on or before the date on which it becomes a party to this Agreement whichever of the following is applicable:

(A)    two properly completed and duly signed original copies of Internal Revenue Service Form W-8BEN (or any successor forms) claiming eligibility for the benefits of an income tax treaty to which the United States is a party, and such other documentation as required under the Code,

(B)    two properly completed and duly signed original copies of Internal Revenue Service Form W-8ECI (or any successor forms) and, in the case of an Agent, a withholding certificate that satisfies the requirements of Treasury Regulation Sections 1.1441-1(b)(2)(iv) and 1.1441-1(e)(3)(v) as applicable to a U.S. branch that has agreed to be treated as a U.S. person for withholding tax purposes,

(C)    in the case of a Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (A) a certificate substantially in the form of Exhibit

G-1, G-2, G-3 or G-4, as applicable (any such certificate a "**United States Tax Compliance Certificate**") and (B) two properly completed and duly signed original copies of Internal Revenue Service Form W-8BEN, or

(D)    to the extent a Lender is not the beneficial owner (for example, where the Lender is a partnership, or is a participant holding a participation granted by a participating Lender), Internal Revenue Service Form W-8IMY (or any successor forms) of the Lender, accompanied by a Form W-8ECI, W-8BEN, United States Tax Compliance Certificate, Form W-9, Form W-8IMY or any other required information from each beneficial owner, as applicable (provided that, if one or more beneficial owners are claiming the portfolio interest exemption, the United States Tax Compliance Certificate may be provided by such Lender on behalf of such beneficial owner). Each Lender and Agent shall deliver to the Borrower and the Administrative Agent two further original copies of any previously delivered form or certification (or any applicable successor form) on or before the date that any such form or certification expires or becomes obsolete or inaccurate and promptly after the occurrence of any event requiring a change in the most recent form previously delivered by it to the Borrower or the Administrative Agent, or promptly notify the Borrower and the Administrative Agent that it is unable to do so. Each Lender and Agent shall promptly notify the Administrative Agent at any time it determines that it is no longer in a position to provide any previously delivered form or certification to the Borrower or the Administrative Agent.

(i)    Any Lender or Agent claiming any additional amounts payable pursuant to this Section 3.01 shall use its reasonable efforts to change the jurisdiction of its lending office (or take any other measures reasonably requested by the Borrower) if such a change or other measures would reduce any such additional amounts (or any similar amount that may thereafter accrue) and would not, in the reasonable, good faith determination of such Lender, result in any unreimbursed cost or expense or be otherwise materially disadvantageous to such Lender.

(j)    If any Lender or Agent determines, in its reasonable, good faith discretion, that it has received a refund in respect of any Indemnified Taxes or Other Taxes as to which indemnification or additional amounts have been paid to it by the Borrower pursuant to this Section 3.01, it shall promptly remit such refund to the Borrower or Guarantor, net of all out-of-pocket expenses of the Lender or Agent, as the case may be and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund net of any Taxes payable by any Agent or Lender on such interest); *provided* that the Borrower and Guarantors, upon the request of the Lender or Agent, as the case may be, agree promptly to return such refund (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to such party in the event such party is required to repay such refund to the relevant Governmental Authority. This section shall not be construed to require the Administrative Agent or any Lender to make available its tax returns (or any other information relating to Taxes that it deems confidential) to the Borrower or any other person.

(k)   Each party's obligations under this Section 3.01 shall survive any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Loan Document.

Section 3.02.   *Illegality.* If any Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for any Lender or its applicable lending office to make, maintain or fund Eurodollar Loans, or to determine or charge interest rates based upon the LIBO Rate, then, on notice thereof by such Lender to the Borrower through the Administrative Agent, any obligation of such Lender to make or continue Eurodollar Loans or to convert ABR Loans to Eurodollar Loans shall be suspended until such Lender notifies the Administrative Agent and the Borrower that the circumstances giving rise to such determination no longer exist. Upon receipt of such notice, the Borrower shall promptly following written demand from such Lender (with a copy to the Administrative Agent), prepay or, if applicable, convert all applicable Eurodollar Loans of such Lender to ABR Loans, either on the last day of the Interest Period therefor, if such Lender may lawfully continue to maintain such Eurodollar Loans to such day, or promptly, if such Lender may not lawfully continue to maintain such Eurodollar Loans. Upon any such prepayment or conversion, the Borrower shall also pay accrued interest on the amount so prepaid or converted and all amounts due, if any, in connection with such prepayment or conversion under Section 3.04. Each Lender agrees to designate a different lending office if such designation will avoid the need for such notice and will not, in the good faith judgment of such Lender, otherwise be materially disadvantageous to such Lender.

Section 3.03.   *Increased Cost and Reduced Return; Capital Adequacy; Reserves on Eurodollar Loans.*

(g)   If any Lender reasonably determines that as a result of the introduction of or any change in or in the interpretation of any Law, in each case after the Closing Date, or such Lender's compliance therewith, there shall be any material increase in the cost to such Lender of agreeing to make or making, funding or maintaining any Eurodollar Loans, or a material reduction in the amount received or receivable by such Lender in connection with any of the foregoing (excluding for purposes of this Section 3.03(a) any such increased costs or reduction in amount resulting from (i) Indemnified Taxes or Other Taxes for which additional amounts are payable pursuant to Section 3.01, or any Taxes excluded from the definition of Indemnified Taxes under exception (iii) thereof to the extent such Taxes are imposed on or measured by net income or profits or are franchise taxes (imposed in lieu of the foregoing taxes) and any Taxes excluded from the definition of Indemnified Taxes under exceptions (i), (ii), (iv), (v) and (vi) thereof or (ii) reserve requirements contemplated by Section 3.03(c) or reflected in the Adjusted LIBO Rate) and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any Eurodollar Loan (or of maintaining its obligations to make any Loan), or to reduce the amount of any sum received or receivable by such Lender, then from time to time within fifteen (15) days after demand by such Lender setting forth in reasonable detail such increased costs (with a copy of such demand to the Administrative Agent given

in accordance with Section 3.05), the Borrower shall pay to such Lender such additional amounts as will compensate such Lender for such increased cost or reduction.

(h)   If any Lender determines that the introduction of any Law regarding capital adequacy or liquidity or any change therein or in the interpretation thereof, in each case after the Closing Date, or compliance by such Lender (or its lending office) therewith, has the effect of reducing the rate of return on the capital of such Lender or any entity controlling such Lender as a consequence of such Lender's obligations hereunder (taking into consideration its policies with respect to capital adequacy and liquidity and such Lender's desired return on capital), then from time to time upon demand of such Lender setting forth in reasonable detail the charge and the calculation of such reduced rate of return (with a copy of such demand to the Administrative Agent given in accordance with Section 3.05), the Borrower shall pay to such Lender such additional amounts as will compensate such Lender or controlling entity for such reduction within fifteen (15) days after receipt of such demand.

(i)   Except to the extent already reflected in the Adjusted LIBO Rate, the Borrower shall pay to each Lender, (i) as long as such Lender shall be required to maintain reserves with respect to liabilities or assets consisting of or including Eurodollar funds or deposits, additional interest on the unpaid principal amount of each applicable Eurodollar Loan of the Borrower equal to the actual costs of such reserves allocated to such Loan by such Lender (as determined by such Lender in good faith, which determination shall be conclusive in the absence of manifest error), and (ii) as long as such Lender shall be required to comply with any reserve ratio requirement or analogous requirement of any other central banking or financial regulatory authority imposed in respect of the maintenance of the Commitments or the funding of any Eurodollar Loans of the Borrower, such additional costs (expressed as a percentage per annum and rounded upwards, if necessary, to the nearest five decimal places) equal to the actual costs allocated to such Commitment or Loan by such Lender (as determined by such Lender in good faith, which determination shall be conclusive absent manifest error) which in each case shall be due and payable on each date on which interest is payable on such Loan, provided the Borrower shall have received at least fifteen (15) days' prior notice (with a copy to the Administrative Agent) of such additional interest or cost from such Lender. If a Lender fails to give notice fifteen (15) days prior to the relevant Interest Payment Date, such additional interest or cost shall be due and payable fifteen (15) days from receipt of such notice.

(j)   Failure or delay on the part of any Lender to demand compensation pursuant to this Section 3.03 shall not constitute a waiver of such Lender's right to demand such compensation.

(k)   If any Lender requests compensation under this Section 3.03, then such Lender will, if requested by the Borrower, use commercially reasonable efforts to designate another lending office for any Loan affected by such event; *provided* that such efforts are made on terms that, in the reasonable judgment of such Lender, cause such

Lender and its lending office(s) to suffer no material economic, legal or regulatory disadvantage, and *provided further* that nothing in this Section 3.03(e) shall affect or postpone any of the Obligations of the Borrower or the rights of such Lender pursuant to Section 3.03(a), (b), (c) or (d).

Section 3.04.   *Funding Losses.* Promptly following written demand of any Lender (with a copy to the Administrative Agent) from time to time, which demand shall set forth in reasonable detail the basis for requesting such amount, the Borrower shall promptly compensate such Lender for and hold such Lender harmless from any loss, cost or expense actually incurred by it as a result of:

(i)   any continuation or conversion of any Eurodollar Loan of the Borrower on a day prior to the last day of the Interest Period for such Loan, or any payment or prepayment of any Eurodollar Loan of the Borrower on a day prior to the last day of the Interest Period for such Loan; or

(ii)   any failure by the Borrower (for a reason other than the failure of such Lender to make a Loan) to prepay, borrow, continue or convert any Eurodollar Loan of the Borrower on the date or in the amount notified by the Borrower;

including an amount equal to the excess, as reasonably determined by such Lender, of (1) its cost of obtaining funds for the Eurodollar Loan that is the subject of such event for the period from the date of such event to the last day of the Interest Period in effect (or that would have been in effect) for such Loan over (2) the amount of interest likely to be realized by such Lender in redeploying the funds released or not utilized by reason of such event for such period, but excluding (a) loss of anticipated profits, and (b) any loss, cost or expense resulting from Indemnified Taxes or Other Taxes for which additional amounts are payable pursuant to Section 3.01, or any Taxes excluded from the definition of Indemnified Taxes under Section 3.01.

Section 3.05.   *Matters Applicable to all Requests for Compensation.*

(d)   Any Agent or any Lender claiming compensation under this Article 3 shall deliver a certificate to the Borrower setting forth the additional amount or amounts to be paid to it hereunder which shall be conclusive in the absence of manifest error. In determining such amount, such Agent or such Lender may use any reasonable and customary averaging and attribution methods.

(e)   With respect to any Lender's claim for compensation under Section 3.01, 3.02 or 3.03, the Borrower shall not be required to compensate such Lender for any amount incurred more than one hundred and eighty (180) days prior to the date that such Lender notifies the Borrower of the event that gives rise to such claim; *provided* that, if the circumstance giving rise to such claim is retroactive, then such 180-day period referred to above shall be extended to include the period of retroactive effect thereof. If any Lender requests compensation by the Borrower under Section 3.03, the Borrower may, by notice to such Lender (with a copy to the Administrative Agent), suspend the obligation of such Lender to make or continue from one Interest Period to another any applicable

Eurodollar Loan, or, if applicable, to convert ABR Loans into Eurodollar Loans, until the event or condition giving rise to such request ceases to be in effect (in which case the provisions of Section 3.05(c) shall be applicable); *provided* that such suspension shall not affect the right of such Lender to receive the compensation so requested.

(f)    If the obligation of any Lender to make or continue any Eurodollar Loan, or to convert ABR Loans into Eurodollar Loans shall be suspended pursuant to Section 3.05(b) hereof, such Lender's applicable Eurodollar Loans shall be automatically converted into ABR Loans (or, if such conversion is not possible, repaid) on the last day(s) of the then current Interest Period(s) for such Eurodollar Loans (or, in the case of an immediate conversion required by Section 3.02, on such earlier date as required by Law) and, unless and until such Lender gives notice as provided below that the circumstances specified in Section 3.02 or 3.03 hereof that gave rise to such conversion no longer exist:

(i)    to the extent that such Lender's Eurodollar Loans have been so converted, all payments and prepayments of principal that would otherwise be applied to such Lender's applicable Eurodollar Loans shall be applied instead to its ABR Loans; and

(ii)    all Loans that would otherwise be made or continued from one Interest Period to another by such Lender as Eurodollar Loans shall be made or continued instead as ABR Loans (if possible), and all ABR Loans of such Lender that would otherwise be converted into Eurodollar Loans shall remain as ABR Loans.

(g)    If any Lender gives notice to the Borrower (with a copy to the Administrative Agent) that the circumstances specified in Section 3.02 or 3.03 hereof that gave rise to the conversion of any of such Lender's Eurodollar Loans pursuant to this Section 3.05 no longer exist (which such Lender agrees to do promptly upon such circumstances ceasing to exist) at a time when Eurodollar Loans made by other Lenders under the applicable Facility are outstanding, if applicable, such Lender's ABR Loans shall be automatically converted, on the first day(s) of the next succeeding Interest Period(s) for such outstanding Eurodollar Loans, to the extent necessary so that, after giving effect thereto, all Loans held by the Lenders holding Eurodollar Loans under such Facility and by such Lender are held pro rata (as to principal amounts, interest rate basis, and Interest Periods) in accordance with their respective Commitments for the applicable Facility.

(h)    Notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall be deemed to have been adopted or made after the Closing Date, regardless of the date enacted or adopted.

Section 3.06.    *Replacement of Lenders under Certain Circumstances*.

(a)   If at any time (i) the Borrower becomes obligated to pay additional amounts or indemnity payments described in Section 3.01 or 3.03 as a result of any condition described in such Sections or any Lender ceases to make any Eurodollar Loans as a result of any condition described in Section 3.02 or Section 3.03 or (ii) any Lender becomes a Non-Consenting Lender, then the Borrower may, on prior written notice to the Administrative Agent and such Lender, (x) replace such Lender by causing such Lender to (and such Lender shall be obligated to) assign pursuant to Section 10.04(b) (unless otherwise agreed, with the assignment fee to be paid by the Borrower in such instance) (it being understood that any such assignment shall become effective only in accordance with Section 10.04(e)), all of its rights and obligations under this Agreement (in respect of any applicable Facility only in the case of clause (i) or, with respect to a Class vote, clause (ii)) to one or more Eligible Assignees; *provided* that neither the Administrative Agent nor any Lender shall have any obligation to the Borrower to find a replacement Lender or other such Person; and *provided further* that (A) in the case of any such assignment resulting from a claim for compensation under Section 3.03 or payments required to be made pursuant to Section 3.01, such assignment will result in a reduction in such compensation or payments and (B) in the case of any such assignment resulting from a Lender becoming a Non-Consenting Lender, the applicable Eligible Assignees shall have agreed to, and shall be sufficient (together with all other consenting Lenders) to cause the adoption of, the applicable departure, waiver or amendment of the Loan Documents; or (y) terminate the Commitment of such Lender and repay all Obligations of the Borrower owing to such Lender relating to the Loans and participations held by such Lender as of such termination date; *provided* that in the case of any such termination of a Non-Consenting Lender such termination shall be sufficient (together with all other consenting Lenders) to cause the adoption of the applicable departure, waiver or amendment of the Loan Documents and such termination shall be in respect of any applicable Facility only in the case of clause (i) or, with respect to a Class vote, clause (ii);

(b)   In the event that (i) the Borrower or the Administrative Agent has requested that the Lenders consent to a departure or waiver of any provisions of the Loan Documents or agree to any amendment thereto, (ii) the consent, waiver or amendment in question requires the agreement of each Lender, each directly and adversely affected Lender, each Lender with respect to a certain Class of Loans or each directly and adversely affected Lender with respect to a certain Class of Loans, in each case in accordance with Section 10.08, and (iii) the Required Lenders (or, in the case of a consent, waiver or amendment involving all Lenders or all directly and adversely affected Lenders of a certain Class, the Required Class Lenders) have agreed to such consent, waiver or amendment, then any Lender who does not agree to such consent, waiver or amendment shall be deemed a "**Non-Consenting Lender**."

(c)   Any Lender being replaced pursuant to Section 3.06(a) above shall (i) execute and deliver an Assignment and Acceptance with respect to such Lender's applicable Commitment and outstanding Loans, and (ii) deliver any Term Notes evidencing such Loans to the Borrower or Administrative Agent. Pursuant to such Assignment and Acceptance, (A) the assignee Lender shall acquire all or a portion, as the

case may be, of the assigning Lender's outstanding Loans, (B) all obligations of the Borrower owing to the assigning Lender relating to the Loans and participations so assigned shall be paid in full by the assignee Lender to such assigning Lender concurrently with such Assignment and Acceptance and (C) upon such payment and, if so requested by the assignee Lender, delivery to the assignee Lender of the appropriate Term Note executed by the Borrower, the assignee Lender shall become a Lender hereunder and the assigning Lender shall cease to constitute a Lender hereunder with respect to such assigned Loans, Commitments and participations, except with respect to indemnification provisions under this Agreement, which shall survive as to such assigning Lender. In connection with any such replacement, if any such Non-Consenting Lender does not execute and deliver to the Administrative Agent a duly executed Assignment and Acceptance reflecting such replacement within five (5) Business Days of the date on which the assignee Lender executes and delivers such Assignment and Acceptance to such Non-Consenting Lender, then such Non-Consenting Lender shall be deemed to have executed and delivered such Assignment and Acceptance without any action on the part of the Non-Consenting Lender.

(d)   Notwithstanding anything to the contrary contained above, the Lender that acts as the Administrative Agent may not be replaced hereunder except in accordance with Article 9.

Section 3.07.   *Survival*. All of the Borrower's obligations under this Article 3 shall survive termination of the Commitments and repayment of all other Obligations hereunder.

## ARTICLE 4
### CONDITIONS PRECEDENT TO CREDIT EXTENSIONS

Section 4.01.   *All Credit Extensions.* The obligation of each Lender to honor any Request for Credit Extension (other than a Request for Credit Extension requesting only a conversion of Loans to the other Type, or a continuation of Eurodollar Loans) is subject to satisfaction (or waiver) of the following conditions precedent:

(a)   The representations and warranties set forth in Article 5 and in each other Loan Document shall be true and correct in all material respects on and as of the date of such Credit Extension with the same effect as though made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date, in which case they shall be true and correct in all material respects as of such earlier date; *provided*, that any such representation and warranty that is qualified by "materiality", "material adverse effect" or similar language shall be true and correct in all respects (after giving effect to such qualification therein) on and as of the date of such Credit Extension with the same effect as though made on and as of such date or such earlier date, as applicable.

(b)   No Default shall exist or would result from such proposed Credit Extension or from the application of the proceeds therefrom.

(c)   The Administrative Agent shall have received a Request for Credit Extension in accordance with the requirements hereof.

Each Request for Credit Extension (other than a Request for Credit Extension requesting only a conversion of Loans to the other Type, or a continuation of Eurodollar Loans) submitted by the Borrower shall be deemed to be a representation and warranty by the Borrower that the conditions specified in Sections 4.01(a) and (b) have been satisfied or waived on and as of the date of the applicable Credit Extension.

Section 4.02.   *First Credit Extension.* Each Lender shall make the Credit Extension to be made by it on the Closing Date subject to satisfaction (or waiver) of the following conditions precedent:

(l)   The Administrative Agent shall have received the following, each properly executed by a Responsible Officer of the signing Loan Party, each dated as of the Closing Date:

(i)   executed counterparts of this Agreement duly executed by the Borrower and each Guarantor; and

(ii)   a Term Note executed by the Borrower in favor of each Lender that has requested a Term Note at least two Business Days in advance of the Closing Date.

(m)   The Administrative Agent shall have received, on behalf of itself, the Collateral Agent and the Lenders, an opinion of (i) Kirkland & Ellis LLP, counsel for the Loan Parties, and (ii) from each local counsel for the Loan Parties listed on Schedule 4.02(b), in each case, dated the Closing Date and addressed to the Administrative Agent, the Collateral Agent and the Lenders and in customary form and substance, and the Borrower hereby requests such counsel to deliver such opinions.

(n)   The Administrative Agent shall have received (i) a copy of the certificate or articles of incorporation or organization or certificate of formation, including all amendments thereto, of each Loan Party, certified, if applicable, as of a recent date by the Secretary of State of the state of its organization, and a certificate as to the good standing (to the extent applicable) of each Loan Party as of a recent date, from such Secretary of State or similar Governmental Authority; (ii) a certificate of the Secretary or Assistant Secretary of each Loan Party dated the Closing Date and certifying (A) that attached thereto is a true and complete copy of the by-laws or operating (or limited liability company) agreement of such Loan Party as in effect on the Closing Date and at all times since a date prior to the date of the resolutions described in clause (B) below, (B) that attached thereto is a true and complete copy of resolutions duly adopted by the board of directors (or equivalent governing body) of such Loan Party authorizing the execution, delivery and performance of the Loan Documents to which such Loan Party is a party and, in the case of the Borrower, the borrowings hereunder, and that such resolutions have not been modified, rescinded or amended and are in full force and effect, (C) that the certificate or articles of incorporation or organization or certificate of formation of such

Loan Party have not been amended since the date of the last amendment thereto shown on the certificate of good standing furnished pursuant to clause (i) above, (D) as to the incumbency and specimen signature of each officer executing any Loan Document or any other document delivered in connection herewith on behalf of such Loan Party on the Closing Date, and (E) as to the absence of any proceeding for the dissolution or liquidation of such Loan Party; and (iii) a certificate of another officer as to the incumbency and specimen signature of the Secretary or Assistant Secretary executing the certificate pursuant to clause (ii) above.

(o)   (i) The Administrative Agent shall have received the results of (x) searches of the Uniform Commercial Code filings (or equivalent filings) and (y) judgment and tax lien searches, made with respect to each Loan Party in the states or other jurisdictions of formation of such Loan Party and with respect to such other locations and names listed on the Perfection Certificate, together with copies of the financing statements (or similar documents) disclosed by such search and (ii) each of the Security Agreement and the Intellectual Property Security Agreement shall have been duly executed and delivered by each Loan Party that is to be a party thereto, together with (x) certificates, if any, representing the Equity Interests pledged by the Borrower and the Guarantors accompanied by undated stock powers executed in blank and (y) documents and instruments to be recorded or filed that the Administrative Agent may deem, subject to Section 6.13 reasonably necessary to satisfy the Collateral and Guarantee Requirement.

(p)   [Reserved].

(q)   Prior to or substantially concurrently with the funding of the Loans on the Closing Date (i) the ABL Credit Agreement shall have become effective and all conditions to the initial credit extension thereunder satisfied and (ii) the ABL Intercreditor Agreement shall have been duly executed and delivered by the ABL Agent and each Loan Party party thereto.

(r)   Prior to or substantially concurrently with the funding of the Loans on the Closing Date (i) the IBT Transactions shall have been consummated and (ii) the IBT Agreement, as modified pursuant to the IBT Transactions, shall be in full force and effect.

(s)   Prior to or substantially concurrently with the funding of the Loans on the Closing Date, (i) the Recapitalization Transactions and the Refinancing Transactions shall have been consummated, and (ii) the Borrower shall have performed its then due obligations under the December 2013 Stock Purchase Agreement, the December 2013 Exchange Agreements and the December 2013 Registration Rights Agreement and, in each case, the Administrative Agent shall have received evidence thereof reasonably satisfactory to the Administrative Agent.

(t)   The Administrative Agent shall have received a solvency certificate, substantially in the form set forth in Exhibit H, from the chief financial officer or chief accounting officer or other officer with equivalent duties of the Borrower, or in lieu thereof at the option of the Borrower, an opinion of a nationally recognized valuation firm

as to the solvency (on a consolidated basis) of the Borrower and its Subsidiaries as of the Closing Date.

(u)   Prior to or substantially concurrently with the initial Credit Extension, all principal, premium, if any, interest, fees and other amounts due or outstanding under the Existing Credit Agreement and the Existing ABL Facility shall have been paid in full (other than contingent obligations and backstopped letters of credit) and all cash and other amounts restricted under or by the Existing Credit Agreement or the Existing ABL Facility shall have been released and the commitments thereunder terminated and all guarantees and security in support thereof terminated, discharged and released, in each case with evidence thereof reasonably satisfactory to the Administrative Agent. Immediately after giving effect to the Transactions and the other transactions contemplated hereby, the Borrower and the Subsidiaries shall have outstanding no Indebtedness for borrowed money other than (i) Indebtedness outstanding under this Agreement, (ii) the ABL Facility Indebtedness, and (iii) Indebtedness permitted pursuant to Section 7.03.

(v)   The Administrative Agent shall have received all documentation and other information about the Borrower and the Guarantors required under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act, that has been reasonably requested in writing at least five Business Days prior to the Closing Date.

(w)   The Administrative Agent shall have received a certificate from an officer of the Borrower certifying that since December 31, 2012, there has not occurred any Material Adverse Effect.

(x)   The Administrative Agent and the Arranger shall have received all applicable fees and other amounts due and payable on or prior to the Closing Date, including, to the extent invoiced at least three Business Days prior to the Closing Date (except as otherwise reasonably agreed by the Borrower), reimbursement or payment of all out-of-pocket expenses required to be reimbursed or paid by the Borrower hereunder or under any other Loan Document on or prior to the Closing Date.

(y)   To the extent required by Section 6.07, the Administrative Agent shall have received evidence that the insurance required by Section 6.07 is in effect, together with endorsements naming the Administrative Agent, for the benefit of the Secured Parties, as additional insured and loss payee thereunder.

Solely for purposes of determining whether the conditions set forth in Section 4.01 or 4.02 have been satisfied in respect of any Credit Extension, the Agents and each Lender party hereto shall be deemed to have consented to, approved, accepted or be reasonably satisfied with any document delivered prior to such Credit Extension or other matter (in each case, for which such consent, approval, acceptance or satisfaction is expressly required by Section 4.01 or 4.02, as applicable) by releasing its signature page to this Agreement or to an Assignment and Assumption, as the case may be.

**ARTICLE 5**
REPRESENTATIONS AND WARRANTIES

Each of the Borrower and each of the Guarantors party hereto represents and warrants to the Administrative Agent, the Collateral Agent and each of the Lenders that:

Section 5.01.   *Existence, Qualification and Power; Compliance with Laws.* Each Loan Party and each Restricted Subsidiary (a) is a Person duly organized or formed, validly existing and in good standing (where relevant) under the Laws of the jurisdiction of its incorporation or organization, (b) has all requisite organizational power and authority to execute, deliver and perform its obligations under the Loan Documents to which it is a party and, in the case of the Borrower, to borrow hereunder, (c) is duly qualified and in good standing (where relevant) under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification, (d) is in compliance with all Laws, orders, writs and injunctions, and (e) has all requisite franchises, licenses, authorizations, qualifications, consents and approvals to operate its business as currently conducted; except in each case, referred to in clause (a) (other than with respect to any Loan Party), (c), (d) or (e), to the extent that failure to do so, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.

Section 5.02.   *Authorization; No Contravention.* The execution, delivery and performance by each Loan Party of each Loan Document to which such Person is a party, and the consummation of the Transactions, (a) are within such Loan Party's organizational powers, (b) have been duly authorized by all necessary corporate or other organizational action, and (c) do not (i) contravene the terms of any of such Person's Organization Documents, (ii) conflict with or result in any breach or contravention of, or the creation of (or the requirement to create) any Lien under (other than as permitted by Section 7.01), or require any payment to be made under (x) any Indebtedness of such Person in excess of the Threshold Amount or (y) any material order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Person or its property is subject; or (iii) violate any material Law; except with respect to any conflict, breach or contravention or payment (but not creation of Liens) referred to in clause (c)(ii)(x), to the extent that such violation, conflict, breach, contravention or payment, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

Section 5.03.   *Governmental Authorization; Other Consents.* No approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority is necessary or required in connection with (a) the execution, delivery or performance by, or enforcement against, any Loan Party of this Agreement or any other Loan Document, or for the consummation of the Transactions, (b) the grant by any Loan Party of the Liens granted by it pursuant to the Collateral Documents, (c) the perfection or maintenance of the Liens created under the Collateral Documents (including the priority thereof) to the extent required thereunder or (d) the exercise by the Administrative Agent, the Collateral Agent or any Lender of its rights under the Loan Documents or the remedies in respect of the Collateral pursuant to the Collateral Documents, except for (i) approvals, consents, exemptions, authorizations or other actions by, or notices to, or filings necessary to perfect the Liens on the Collateral granted by the Loan Parties

in favor of the Secured Parties (or release existing Liens), (ii) the approvals, consents, exemptions, authorizations, actions, notices and filings which have been duly obtained, taken, given or made and are in full force and effect (except to the extent not required to be obtained, taken, given or made or to be in full force and effect pursuant to the Collateral and Guarantee Requirement) and (iii) those approvals, consents, exemptions, authorizations or other actions, notices or filings, the failure of which to obtain or make, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

Section 5.04.   *Binding Effect.* This Agreement and each other Loan Document has been duly executed and delivered by each Loan Party that is a party thereto. This Agreement and each other Loan Document constitutes a legal, valid and binding obligation of each such Loan Party, enforceable against each Loan Party that is a party thereto in accordance with its terms, except as such enforceability may be limited by Debtor Relief Laws and by general principles of equity.

Section 5.05.   *Financial Statements; No Material Adverse Effect.*

(i)   The Audited Financial Statements fairly present in all material respects the financial condition of the Borrower and its consolidated Subsidiaries as of the dates thereof and their results of operations for the period covered thereby in accordance with GAAP consistently applied throughout the periods covered thereby, except as otherwise expressly noted therein.

(ii)   The Unaudited Financial Statements fairly present in all material respects the financial condition of the Borrower and its consolidated Subsidiaries as of the dates thereof and their results of operations for the period covered thereby in accordance with GAAP consistently applied throughout the periods covered thereby, except as otherwise expressly noted therein and the absence of footnotes.

(b)   The forecasts of income statements of the Borrower and its Subsidiaries which have been furnished to the Administrative Agent prior to the Closing Date have been prepared in good faith on the basis of the assumptions stated therein, which assumptions were believed to be reasonable at the time of preparation of such forecasts it being understood by the Agents and the Lenders that such projections as to future events (i) are not to be viewed as facts, (ii)(A) are subject to significant uncertainties and contingencies, which may be beyond the control of the Borrower and its Restricted Subsidiaries, (B) no assurance is given by the Borrower and its Restricted Subsidiaries that the results or forecast in any such projections will be realized and (C) the actual results may differ from the forecast results set forth in such projections and such differences may be material and (iii) are not a guarantee of performance and that actual results during the period or periods covered by any such projections may vary significantly from the projected results and such differences may be material.

(c)   Since the Closing Date, there has been no event or circumstance, either individually or in the aggregate, that has had or would reasonably be expected to have a Material Adverse Effect.

Section 5.06. *Compliance With Laws.* Neither the Borrower nor any of the Restricted Subsidiaries or any of their respective properties or assets is in violation of, nor will the continued operation of their properties and assets as currently conducted violate, any law, rule or regulation (including any zoning, building, ordinance, code or approval or any building permits) or any restrictions of record or agreements affecting the Mortgaged Property, or is in default with respect to any judgment, writ, injunction, decree or order of any Governmental Authority, where in each case such violation or default, individually or in the aggregate, would reasonably be expected to result in a Material Adverse Effect.

Section 5.07. *Ownership of Property; Liens.*

(f)   Each of the Borrower and the Restricted Subsidiaries has good record title to, or valid leasehold interests in, or easements or other limited property interests in, all its properties and assets (including all Mortgaged Property material to its business), free and clear of all Liens except for minor defects in title that do not materially interfere with its ability to conduct its business or to utilize such assets for their intended purposes and Liens permitted by Section 7.01 and except where the failure to have such title would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(g)   As of the Closing Date, Schedule 9 to the Perfection Certificate dated the Closing Date contains a true and complete list of each Material Real Property owned by the Borrower each other Loan Party and its Restricted Subsidiaries.

(h)   As of the Closing Date, except as otherwise disclosed in writing to the Collateral Agent, no Mortgage encumbers improved Mortgaged Property that is located in an area that has been identified by the Secretary of Housing and Urban Development as an area having special flood hazards within the meaning of the Flood Laws unless Evidence of Flood Insurance has been delivered to the Collateral Agent.

Section 5.08. *Environmental Matters.* Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect:

(d)   Each Loan Party and each Restricted Subsidiary is and has been in compliance with all Environmental Laws, which includes obtaining and maintaining all Environmental Permits required under such Environmental Laws to carry on the business of the Loan Parties and the Restricted Subsidiaries;

(e)   the Loan Parties and the Restricted Subsidiaries have not received notice alleging any Environmental Liability or proposing or seeking to revoke, modify or deny the renewal of any Environmental Permit required to be held by the Loan Parties or the Restricted Subsidiaries, and neither the Loan Parties nor the Restricted Subsidiaries have become subject to any Environmental Liability;

(f)   there has been no Release, discharge or disposal of Hazardous Materials (i) on, to, at, under or from any Real Property or any vehicles or facilities owned or leased

by any of the Loan Parties or the Restricted Subsidiaries, or, to the knowledge of the Borrower, formerly owned, operated or leased by any Loan Party or any Restricted Subsidiary, or (ii) arising out of the conduct of the Loan Parties or the Restricted Subsidiaries that, in the case of (i) or (ii), could reasonably be expected to require investigation, remedial activity or corrective action or cleanup by or on behalf of any Loan Party or any Restricted Subsidiary or for which any Loan Party or Restricted Subsidiary reasonably could be expected to otherwise incur any Environmental Liability; and

(g)   there are no facts, circumstances or conditions arising out of or relating to, and there are no pending or reasonably anticipated requirements under Environmental Law associated with, the operations of the Loan Parties or the Restricted Subsidiaries or any Real Property, vehicles or facilities currently or, to the knowledge of the Borrower, previously owned or leased by the Loan Parties or any Restricted Subsidiary that, in such case, are known to or would reasonably be likely to require investigation, remedial activity or corrective action or cleanup by or on behalf of any Loan Party or any Restricted Subsidiary or that are known to or would reasonably be likely to result in the Borrower or any other Loan Party or Restricted Subsidiary incurring any Environmental Liability or capital expenditures to achieve or maintain compliance with Environmental Laws.

Section 5.09.   *Taxes.* Except as would not, either individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, each of the Loan Parties and their Restricted Subsidiaries have timely filed all tax returns required to be filed (taking into account any extensions), and have paid all Taxes levied or imposed upon them or their properties, that are due and payable (including in their capacity as a withholding agent), except those which are being contested in good faith by appropriate proceedings diligently conducted if such contest shall have the effect of suspending enforcement or collection of such Taxes and for which adequate reserves have been provided in accordance with GAAP. There is no proposed Tax deficiency or assessment known to any Loan Party against any Loan Party or any Restricted Subsidiary that would, if made, individually or in the aggregate, have a Material Adverse Effect.

Section 5.10.   *ERISA Compliance.*

Except as would not, either individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect:

(j)   Each Plan is in compliance with the applicable provisions of ERISA, the Code and other Federal or state Laws (and the regulations and published interpretations thereunder).

(k)   The Loan Parties, their Restricted Subsidiaries and their respective ERISA Affiliates may incur liability for ordinary course contributions to (and make payments in satisfaction of such liabilities) plans listed on Schedule 5.10(b), which are Multiemployer Plans.

(l)   No ERISA Event has occurred.

Section 5.11.  *Subsidiaries.* As of the Closing Date (after giving effect to the Transactions), no Loan Party has any direct or indirect Restricted Subsidiaries other than those specifically disclosed in Schedule 5.11, and all of the outstanding Equity Interests owned by the Loan Parties (or a Restricted Subsidiary of any Loan Party) in such Subsidiaries have been validly issued and are fully paid and (if applicable) non-assessable and all Equity Interests owned by a Loan Party (or a Restricted Subsidiary of any Loan Party) in such Subsidiaries are owned free and clear of all Liens except (a) those created under the Collateral Documents or under the ABL Facility Documentation (which Liens shall be subject to the ABL Intercreditor Agreement) and (b) any other Lien that is permitted under Section 7.01. As of the Closing Date, (i) Section 2(c) of the Perfection Certificate sets forth the name and jurisdiction of each Loan Party and (ii) Schedule 5 to the Perfection Certificate sets forth the direct ownership interest of the Borrower and any Loan Party thereof in each such Subsidiary, including the percentage of such ownership.

Section 5.12.  *Margin Regulations; Investment Company Act.*

(a)   No Loan Party or Restricted Subsidiary is engaged nor will it engage, principally, or as one of its important activities in the business of purchasing or carrying Margin Stock, or extending credit for the purpose of purchasing or carrying Margin Stock, and no proceeds of any Borrowings will be used, whether directly or indirectly, and whether immediately, incidentally or ultimately, for any purpose that entails a violation of the provisions of the Regulations of the Board, including Regulation T, U or X.

(b)   Neither the Borrower, nor any of the Restricted Subsidiaries is or is required to be registered as an "investment company" under the Investment Company Act of 1940.

Section 5.13.  *Disclosure.* No confidential information memorandum, report, financial statement, certificate or other written information furnished by or on behalf of any Loan Party (other than projected financial information, pro forma financial information, budgets, estimates and information of a general economic or industry nature) to any Agent or any Lender about the Borrower and its Subsidiaries in connection with the transactions contemplated hereby and the negotiation of this Agreement or delivered hereunder or under any other Loan Document (as modified or supplemented by other information so furnished) when taken as a whole contains or will contain any material misstatement of fact or omits or will omit to state any material fact necessary to make the statements therein (when taken as a whole), in the light of the circumstances under which they were or will be made, not materially misleading. With respect to projected financial information and pro forma financial information, the Borrower represents that such information was prepared in good faith based upon assumptions believed to be reasonable at the time of preparation;it being understood and agreed by the Agents and the Lenders that such projections as to future events (i) are not to be viewed as facts, (ii) are subject to significant uncertainties and contingencies, which may be beyond the control of the Borrower and its Restricted Subsidiaries and (iii) are not a guarantee of performance and that actual results during the period or periods covered by any such projections may vary significantly from the projected results and such differences may be material.

Section 5.14.  *Labor Matters.*

(f)   Except as, in the aggregate, would not reasonably be expected to result in a Material Adverse Effect: (i) there are no strikes or other labor disputes against the Borrower or any of its Restricted Subsidiaries pending or, to the knowledge of the Borrower, threatened in writing; (ii) hours worked by and payment made to employees of the Borrower or any of its Restricted Subsidiaries have not been in violation of the Fair Labor Standards Act or any other applicable Law dealing with such matters; and (iii) all payments due from the Borrower or any of its Restricted Subsidiaries on account of employee health and welfare insurance have been paid or accrued as a liability on the books of the relevant party. Except as disclosed on Schedule 5.14, as of the Closing Date no Loan Party is a party to or bound by any collective bargaining agreement or, with respect to any Foreign Subsidiary, any similar agreement. To the knowledge of any Loan Party, the consummation of the transactions contemplated by the Loan Documents will not give rise to any right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which any Loan Party is bound to the extent that such would be reasonably expected to result in a Material Adverse Effect.

(g)   (i) The IBT Agreement is in full force and effect and (ii) other than as contemplated by the IBT Transactions, the IBT Agreement has not been amended, waived or otherwise modified in any respect materially adverse to the Borrower and its Subsidiaries (taken as a whole). For purposes of this Section 5.14(b), it is understood that the resolution in the ordinary course of business of an employee grievance seeking to enforce the IBT Agreement terms will not be deemed to constitute an amendment, waiver of other modification to the IBT Agreement.

Section 5.15.   *Insurance.* Each of the Borrower and its Subsidiaries maintains, with financially sound and reputable insurance companies, insurance in such amounts and against such risks as are customarily maintained by companies engaged in the same or similar businesses operating in the same or similar locations; *provided*, that each of the Borrower and its Subsidiaries may self-insure to the same extent as other companies engaged in similar businesses and owning similar properties in the same general areas in which the Borrower or each such Subsidiary, as applicable, operates.

Section 5.16.   *Solvency.* Immediately after giving effect to the consummation of the Transactions to occur on the Closing Date, including the making of the Loans under this Agreement, and immediately after giving effect to the application of the proceeds of such Loans, on the Closing Date (a) the fair value of the assets of the Borrower and its Subsidiaries, on a consolidated basis (on a going concern basis), exceeds, on a consolidated basis, their debts and liabilities, subordinated, contingent or otherwise; (b) the present fair saleable value of the property of the Borrower and its Subsidiaries, on a consolidated basis, is greater than the amount that will be required to pay the probable liability, on a consolidated basis, of their debts and other liabilities, subordinated, contingent or otherwise, as such debts and other liabilities become absolute and matured in the ordinary course of business; (c) the Borrower and its Subsidiaries, on a consolidated basis, are able to pay their debts and liabilities, subordinated, contingent or otherwise, as such liabilities become absolute and matured; and (d) the Borrower and its Subsidiaries, on a consolidated basis, are not engaged in, and are not about to engage in, business

for which they have unreasonably small capital. For purposes of this Section 5.16, the amount of any contingent liability at any time shall be computed as the amount that would reasonably be expected to become an actual and matured liability in the ordinary course of business.

Section 5.17.   *No Other Borrowed Money Indebtedness.* Immediately after giving effect to the consummation of the Transactions to occur on the Closing Date the Borrower and its Subsidiaries shall have outstanding no Indebtedness for borrowed money other than (a) Indebtedness outstanding under this Agreement, (b) the ABL Facility Indebtedness, (c) Indebtedness set forth on Schedule 7.03(b) and (d) Indebtedness permitted pursuant to Section 7.03.

Section 5.18.   *Collateral Documents.*

(a)   *Valid Liens.* The Collateral Documents are, or on execution and delivery thereof by the parties thereto will be, effective to create in favor of the Collateral Agent for the benefit of the Secured Parties, legal, valid and enforceable Liens on, and security interests in, the Collateral described therein to the extent intended to be created thereby and (i) when financing statements and other filings in appropriate form are filed in the offices specified in Section 2 of the Perfection Certificate (and payments of all fees) and (ii) upon the taking of possession or control by the Collateral Agent of such Collateral with respect to which a security interest may be perfected only by possession or control (which possession or control shall be given to the Collateral Agent to the extent possession or control by the Collateral Agent is required by the Security Agreement), and (iii) the Lien of the Collateral Agent on all certificates of title in respect of any Collateral, the Liens created by the Collateral Documents (other than the Mortgages) shall constitute fully perfected Liens on, and security interests in, all right, title and interest of the grantors in such Collateral, in each case prior and superior in right to any other Person, other than Liens permitted by Section 7.01 (other than Liens securing Permitted Second Priority Additional Debt or any Permitted Refinancing thereof and Liens securing ABL Facility Indebtedness or Permitted Refinancing thereof that are intended to be junior to the Liens of the Collateral Documents).

(b)   *PTO Filing; Copyright Office Filing.* When the Security Agreement or a short form thereof is properly filed (and payments of all fees) in the United States Patent and Trademark Office and the United States Copyright Office, to the extent such filings may perfect such interests, the Liens created by such Security Agreement shall constitute fully perfected Liens on, and security interests in, all right, title and interest of the grantors thereunder in Patents and Trademarks (each as defined in the Security Agreement) registered or applied for with the United States Patent and Trademark Office or Copyrights (as defined in such Security Agreement) registered or applied for with the United States Copyright Office, as the case may be, in each case prior and superior in right to any other Person, other than Liens permitted by Section 7.01 (other than Liens securing Permitted Second Priority Additional Debt or any Permitted Refinancing thereof and Liens securing ABL Facility Indebtedness or Permitted Refinancing thereof that are intended to be junior to the Liens of the Collateral Documents) (it being understood that

subsequent recordings in the United States Patent and Trademark Office and the United States Copyright Office may be necessary to establish a Lien on registered Patents, Trademarks and Copyrights acquired by the grantors thereof after the Closing Date).

(c) *Mortgages*. Upon recording thereof in the appropriate recording office (and payments of all applicable fees), each Mortgage is effective to create, in favor of the Collateral Agent, for its benefit and the benefit of the Secured Parties, legal, valid and enforceable perfected Liens on, and a security interest in, all of the Loan Parties' right, title and interest in and to the Mortgaged Property thereunder and the proceeds thereof, subject only to Liens permitted hereunder, and when such Mortgage is filed in the offices specified in the local counsel opinion delivered with respect thereto in accordance with the provisions of Sections 6.11 and 6.13, such Mortgage shall constitute a fully perfected Lien on, and security interest in, all right, title and interest of the Loan Party to such Mortgage in the Mortgaged Property described therein and the proceeds thereof, in each case prior and superior in right to any other Person, other than Liens permitted by Section 7.01.

(d) *Rolling Stock*. Upon the recording thereof on the applicable certificate of title (and filing of financing statements and payment of applicable fees, which shall be for the account of the Borrower), the notation of the Administrative Agent's lien on any rolling stock or other goods subject to a certificate of title is effective to create, in favor of the Collateral Agent, for its benefit and the benefit of the Secured Parties, legal, valid and enforceable perfected Liens on, and a security interest in, all of the Loan Parties' right, title and interest in and to such Collateral and the proceeds thereof, subject only to Liens permitted hereunder, in each case prior and superior in right to any other Person, other than Liens permitted by Section 7.01.

Notwithstanding anything herein (including this Section 5.18 or Section 5.04) or in any other Loan Document to the contrary, neither the Borrower nor any other Loan Party makes any representation or warranty as to (A) the effects of perfection or non-perfection, the priority or the enforceability of any pledge of or security interest in any Equity Interests of any Foreign Subsidiary, or as to the rights and remedies of the Agents or any Lender with respect thereto, under foreign Law, (B) the pledge or creation of any security interest, or the effects of perfection or non-perfection, the priority or the enforceability of any pledge of or security interest to the extent such pledge, security interest, perfection or priority is not required pursuant to the Collateral and Guarantee Requirement or (C) on the Closing Date and until required pursuant to Section 4.02(d) or Section 6.13, the pledge or creation of any security interest, or the effects of perfection or non-perfection, the priority or enforceability of any pledge or security interest to the extent not required on the Closing Date pursuant to Section 4.02(d).

Section 5.19.  *Compliance with Anti-Terrorism and Corruption Laws*.

(a)  To the extent applicable, the Borrower and the Restricted Subsidiaries are in compliance, in all material respects, with (i) the Trading with the Enemy Act and each of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V) and any other enabling legislation or executive order relating thereto, and (ii) the USA PATRIOT Act.

(b)   None of the Borrower or any Restricted Subsidiary nor, to the knowledge of the Borrower, any director, officer, agent, employee or controlled Affiliate of the Borrower or any Restricted Subsidiary, (i) is a Blocked Person or (ii) is currently subject to any U.S. sanctions administered by OFAC that could, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect; and none of the Borrower or any Restricted Subsidiary will use the proceeds of the Loans for the purpose of financing the activities of any Person currently subject to any U.S. sanctions administered by OFAC.

No part of the proceeds of the Loans will be used by the Borrower or any of the Restricted Subsidiaries, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended.

## ARTICLE 6
### AFFIRMATIVE COVENANTS

So long as any Lender shall have any Commitment hereunder or any Loan or other Obligation (other than obligations under Secured Hedge Agreements or contingent indemnification or reimbursement obligations) hereunder which is accrued or payable shall remain unpaid or unsatisfied, then from and after the Closing Date, the Borrower shall and shall (except in the case of the covenants set forth in Sections 6.01, 6.02, 6.03 and 6.15) cause each of the Restricted Subsidiaries to:

Section 6.01.   *Financial Statements, Reports, Etc.* In the case of the Borrower, deliver to the Administrative Agent for prompt further distribution to each Lender:

(c)   within 90 days after the end of each fiscal year of the Borrower (beginning with the fiscal year ending December 31, 2013), a consolidated balance sheet of the Borrower and its Subsidiaries as at the end of such fiscal year, and the related consolidated statements of operations, changes in shareholders' equity and cash flows for such fiscal year, setting forth in each case in comparative form the figures for the previous fiscal year, all in reasonable detail and prepared in accordance with GAAP, audited and accompanied by a report and opinion of KPMG LLP, any other independent registered public accounting firm of nationally recognized standing or any other independent registered public accounting firm approved by the Administrative Agent (such approval not to be unreasonably withheld, conditioned or delayed), which report and opinion (i) shall be prepared in accordance with generally accepted auditing standards, (ii) shall not be subject to qualifications or exceptions as to the scope of such audit,(iii) shall be without a "going concern" disclosure or like qualification or exception (other than with respect to, or disclosure or an exception or qualification solely resulting from, (x) the impending maturity of any Indebtedness, (y) any prospective or actual default under any financial covenant, or (z) in respect of the fiscal year ending December 31, 2013 and (iv) shall be accompanied with customary management discussion analysis;

(d)   within 45 days after the end of each of the first three (3) fiscal quarters of each fiscal year of the Borrower (commencing with the fiscal quarter ended March 31, 2014), a consolidated balance sheet of the Borrower and its Subsidiaries as at the end of such fiscal quarter, and the related (x) consolidated statements of income or operations for such fiscal quarter and for the portion of the fiscal year then ended and (y) consolidated statements of cash flows for such fiscal quarter and the portion of the fiscal year then ended, setting forth in each case in comparative form the figures for the corresponding fiscal quarter of the previous fiscal year and the corresponding portion of the previous fiscal year, all in reasonable detail and certified by a Responsible Officer of the Borrower as fairly presenting in all material respects the financial condition, results of operations and cash flows of the Borrower and its Subsidiaries in accordance with GAAP, subject only to normal year-end audit adjustments and the absence of footnotes and accompanied by customary management discussion and analysis;

(e)   within 90 days after the end of each fiscal year (commencing with the fiscal year ending December 31, 2013) of the Borrower, a reasonably detailed consolidated budget for the following fiscal year on a quarterly basis (including a projected consolidated balance sheet of the Borrower and its Subsidiaries as of the end of the following fiscal year, the related consolidated statements of projected cash flows and projected income and a summary of the material underlying assumptions applicable thereto) (collectively, the "**Projections**"), which Projections shall in each case be accompanied by a certificate of a Responsible Officer stating that such Projections have been prepared in good faith on the basis of the assumptions stated therein, which assumptions were believed to be reasonable at the time of preparation of such Projections, it being understood by the Agents and the Lenders that such projections as to future events (i) are not to be viewed as facts, (ii)(A) are subject to significant uncertainties and contingencies, which may be beyond the control of the Borrower and its Restricted Subsidiaries, (B) no assurance is given by the Borrower and its Restricted Subsidiaries that the results or forecast in any such projections will be realized and (C) the actual results may differ from the forecast results set forth in such projections and such differences may be material and (iii) are not a guarantee of performance and that actual results during the period or periods covered by any such projections may vary significantly from the projected results and such differences may be material; and

(f)   within five (5) days of delivery of each set of consolidated financial statements referred to in Sections 6.01(a) and 6.01(b) above, the related consolidating financial statements reflecting the adjustments necessary to eliminate the accounts of Unrestricted Subsidiaries (if any) (which may be in footnote form) from such consolidated financial statements.

Notwithstanding the foregoing, the obligations in paragraphs (a) and (b) of this Section 6.01 or Section 6.02(b) may be satisfied with respect to information of the Borrower and the Subsidiaries by furnishing within the time period specified in the applicable paragraph (A) the applicable financial statements of the Borrower or (B) the Borrower's Form l0-K or 10-Q, as applicable, filed with the SEC; *provided* that, with respect to clauses (A) and (B), to the extent

such information is in lieu of information required to be provided under Section 6.01(a), such materials are accompanied by a report and opinion of KPMG LLP, any other independent registered public accounting firm of nationally recognized standing or any other independent registered public accounting firm approved by the Administrative Agent (such approval not to be unreasonably withheld, conditioned or delayed), which report and opinion (i) shall be prepared in accordance with generally accepted auditing standards, (ii) shall not be subject to qualifications or exceptions as to the scope of such audit and (iii) shall be without a "going concern" disclosure or like qualification or exception (other than with respect to, or disclosure or an exception or qualification solely resulting from, the (A) impending maturity of any Indebtedness or (B) any prospective or actual default under any financial covenant or (C) in respect of the fiscal year ending December 31, 2013).

Documents required to be delivered pursuant to Section 6.01(a), (b), (c) and (d) or Section 6.02(b) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the earliest date on which (i) Borrower posts such documents, or provides a link thereto on Borrower's website on the Internet and provides notice thereof to the Administrative Agent; (ii) such documents are posted on Borrower's behalf on IntraLinks/IntraAgency or another website, if any, to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent), or (iii) such financial statements and/or other documents are posted on the SEC's website on the internet at www.sec.gov; *provided* that: (i) promptly following written request by the Administrative Agent, the Borrower shall deliver paper copies of such documents to the Administrative Agent for further distribution to each Lender until a written request to cease delivering paper copies is given by the Administrative Agent and (ii) the Borrower shall notify (which may be by facsimile or electronic mail) the Administrative Agent of the posting of any such documents and provide to the Administrative Agent by electronic mail electronic versions (i.e., soft copies) of such documents. Each Lender shall be solely responsible for timely accessing posted documents or requesting delivery of paper copies of such documents from the Administrative Agent and maintaining its copies of such documents. Notwithstanding anything contained herein, in every instance the Borrower shall be required to provide paper copies of the Compliance Certificates required by Section 6.02(a) to the Administrative Agent; *provided*, however, that if such Compliance Certificate is first delivered by electronic means, the date of such delivery by electronic means shall constitute the date of delivery for purposes of compliance with Section 6.02(a).

Section 6.02.  *Certificates; Other Information.* Deliver to the Administrative Agent for prompt further distribution to each Lender:

(i)   no later than 5 days after the delivery of the financial statements referred to in Sections 6.01(a) and 6.01(b) (or the date on which such delivery is required), commencing with the first full fiscal quarter completed after the Closing Date, a duly completed Compliance Certificate signed by a Responsible Officer of the Borrower; it being understood that , if applicable for such period of delivery, such Compliance Certificate shall include (i) information about Net Proceeds received in the period for individual amounts greater than $5,000,000 and set forth statements of the Borrower's

intention regarding the use of any portion of such Net Proceeds to acquire, maintain, develop, construct, improve, upgrade or repair assets useful in the business of the Borrower or its Restricted Subsidiaries or to make Permitted Acquisitions or any acquisition permitted hereunder of all or substantially all the assets of, or all the Equity Interests (other than directors qualifying shares) in a Person, division or line of business previously acquired) and (ii) calculations setting forth in reasonable detail the amount of any Cumulative Credit available at the beginning of the applicable period and at the end of such period and the amount and application of any Cumulative Credit during such period (it being understood that the Borrower has the right to reallocate usage of the Cumulative Credit in accordance with Section 1.02(i) from time to time);

(j)   promptly after the same are publicly available, copies of all annual, regular, periodic and special reports and registration statements which the Borrower or any Restricted Subsidiary files with the SEC or with any Governmental Authority that may be substituted therefor (other than amendments to any registration statement (to the extent such registration statement, in the form it became effective, is delivered), exhibits to any registration statement and, if applicable, any registration statement on Form S-8) and in any case not otherwise required to be delivered to the Administrative Agent pursuant hereto;

(k)   promptly after the furnishing thereof, copies of any material notices of default received by any Loan Party or Restricted Subsidiary (other than in the ordinary course of business) or furnished to any holder of Indebtedness or debt securities of any Loan Party or of any of its Restricted Subsidiaries pursuant to the terms of the ABL Facility Documentation, any Junior Financing Documentation, any Permitted Additional Debt or any Permitted Refinancing of any thereof, in each case in a principal amount in excess of the Threshold Amount and not otherwise required to be furnished to the Lenders pursuant to any clause of this Section 6.02;

(l)   together with the delivery of each Compliance Certificate pursuant to Section 6.02(a), (i) in the case of annual Compliance Certificates only, a report setting forth the information required by sections of the Perfection Certificate describing the legal name and the jurisdiction of organization or formation of each Loan Party and the location of the chief executive office of each Loan Party or confirming that there has been no change in such information since the Closing Date or the date of the last such report, (ii) a description of each event, condition or circumstance during the last fiscal quarter covered by such Compliance Certificate requiring a mandatory prepayment under Section 2.13(a) and (iii) a list of each Subsidiary of the Borrower that identifies each Subsidiary as a Restricted or an Unrestricted Subsidiary and as a Loan Party or a non-Loan Party as of the date of delivery of such Compliance Certificate;

(m)   promptly, such additional information regarding the business, legal, financial or corporate affairs of the Loan Parties or any of their respective Restricted Subsidiaries, as the Administrative Agent or any Lender through the Administrative Agent may from time to time reasonably request;

(n)   promptly after the written request by any Lender, all documentation and other information that such Lender reasonably requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act;

(o)   promptly after the receipt thereof by the Borrower or any of the Restricted Subsidiaries, a copy of any final "management letter" received by any such Person from its certified public accountants and the management's response thereto; and

(p)   promptly following any request therefor by the Administrative Agent or any Lender, copies of (i) any material documents described in Section 101(k) of ERISA that any Loan Party may request with respect to any Multiemployer Plan and (ii) any material notices described in Section 101(l) of ERISA that any Loan Party may request with respect to any Plan or Multiemployer Plan, *provided* that if any Loan Party has not requested such material documents or material notices from the administrator or sponsor of the applicable Plan or Multiemployer Plan, such Loan Party shall make a request for such material documents or material notices from the such administrator or sponsor at the earliest date on which such Loan Party determines that it is commercially reasonable to so request in order to avoid the occurrence of an event that could reasonably be expected to result in a material liability, and shall provide copies of such material documents and material notices promptly after receipt thereof.

Notwithstanding anything to the contrary, neither the Borrower nor any Restricted Subsidiary will be required to disclose or permit the inspection or discussion of, any document, information or other matter (i) that constitutes trade secrets or proprietary information, (ii) in respect of which disclosure to the Administrative Agent or any Lender (or their representatives or contractors) is prohibited by law or any binding agreement, or (iii) that is subject to attorney client or similar privilege or constitutes attorney work product.

Section 6.03.   *Notices.* Promptly after the Borrower or any Guarantor has obtained knowledge thereof, notify the Administrative Agent (which shall provide notice to the Lenders):

(e)   of the occurrence of any Default;

(f)   of any matter that has resulted or could reasonably be expected to result in a Material Adverse Effect;

(g)   of the filing or commencement of, or any written threat or written notice of intention of any person to file or commence, any action, suit, litigation or proceeding, whether at law or in equity by or before any Governmental Authority, against the Borrower or any of its Restricted Subsidiaries that has a reasonable likelihood of adverse determination and such determination could reasonably be expected to result in a Material Adverse Effect;

(h)   of the occurrence of any ERISA Event following the Closing Date that, alone or together with any other ERISA Events that have occurred following the Closing Date, could reasonably be expected to result in a Material Adverse Effect and

(i)   of the redemption of the Existing Series A Notes.

Each notice pursuant to this Section shall be accompanied by a written statement of a Responsible Officer of the Borrower (x) that such notice is being delivered pursuant to Section 6.03(a), (b), (c), (d) or (e) (as applicable) and (y) setting forth details of the occurrence referred to in Section 6.03(a), (b), (c), (d) or (e), as applicable, and stating what action the Borrower has taken and proposes to take with respect thereto.

Section 6.04.   *Payment of Taxes.* Promptly pay, discharge or otherwise satisfy as the same shall become due and payable in the normal conduct of its business, all its obligations and liabilities in respect of Taxes imposed upon it or upon its income or profits or in respect of its property, except, to the extent any such Tax is being contested in good faith and by appropriate proceedings for which appropriate reserves have been established in accordance with GAAP if such contest shall have the effect of suspending enforcement or collection of such Taxes or, where the failure to pay, discharge or otherwise satisfy the same would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 6.05.   *Preservation of Existence, Etc.* (a) Preserve, renew and maintain in full force and effect its legal existence under the Laws of the jurisdiction of its organization except in a transaction permitted by Section 7.04 or Section 7.05 and (b) obtain, maintain, renew, extend and keep in full force and effect all rights, privileges (including its good standing where applicable in the relevant jurisdiction), permits, licenses and franchises necessary or desirable in the normal conduct of its business, except, in the case of clause (a) (other than with respect to the Borrower) or (b), to the extent that failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 6.06.   *Maintenance of Properties.* Except if the failure to do so could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (a) maintain, preserve and protect all of its properties and equipment necessary in the operation of its business in satisfactory working order, repair and condition, ordinary wear and tear excepted and fire, casualty or condemnation excepted, and (b) make all necessary renewals, replacements, modifications, improvements, upgrades, extensions and additions thereof or thereto in accordance with prudent industry practice and in the normal conduct of its business.

Section 6.07.   *Maintenance of Insurance*.

(h)   *Generally*. Maintain with financially sound and reputable insurance companies, insurance with respect to its properties and business against loss or damage of the kinds customarily insured against by Persons engaged in the same or similar business, of such types and in such amounts (after giving effect to any self-insurance reasonable and customary for similarly situated Persons engaged in the same or similar businesses as the

Borrower and the Restricted Subsidiaries) as are customarily carried under similar circumstances by such other Persons in such similar or same locations.

(i)  *Requirements of Insurance*. (A) Use commercially reasonable efforts to cause, not later than 30 days after the Closing Date (or such longer period as the Administrative Agent may agree in writing in its reasonable discretion), all insurance required pursuant to Section 6.07(a) (x) to provide (and to continue to provide at all times thereafter) that it shall not be canceled, modified or not renewed (i) by reason of nonpayment of premium upon not less than 10 days' prior written notice thereof by the insurer to the Administrative Agent and the Collateral Agent or (ii) for any other reason upon not less than 20 days' prior written notice thereof by the insurer to the Administrative Agent and the Collateral Agent and (y) subject to the terms, conditions and provisions of the ABL Intercreditor Agreement to name the Collateral Agent as additional insured on behalf of the Secured Parties (in the case of liability insurance) or loss payee (in the case of property insurance), as applicable (and to continue to so name the Collateral Agent at all times thereafter), (B) Use commercially reasonable efforts to deliver, not later than 30 days after the Closing Date (or such longer period as the Administrative Agent may agree in writing in its reasonable discretion), a copy of the policy (and to the extent any such policy is cancelled or not renewed, a renewal or replacement policy) or other evidence thereof to the Administrative Agent and the Collateral Agent, or insurance certificate with respect thereto, and (C) in the case of all property insurance policies located in the United States, not later than 30 days after the Closing Date (or such longer period as the Administrative Agent may agree in writing in its reasonable discretion) cause such policies to be endorsed or otherwise amended to include a "standard" or "New York" lender's loss payable endorsement, in form and substance reasonably satisfactory to the Administrative Agent and the Collateral Agent, which endorsement shall provide that, from and after such date, if the insurance carrier shall have received written notice from the Administrative Agent or the Collateral Agent of the occurrence of an Event of Default, the insurance carrier shall pay all proceeds otherwise payable to the Borrower or the Loan Parties under such policies directly to the Collateral Agent during the continuance of such Event of Default.

(j)  *Flood Insurance*. Following the Closing Date, the Borrower shall deliver to the Collateral Agent annual renewals of the flood insurance policy under the property policy or annual renewals of a force-placed flood insurance policy.

(k)  [reserved].

(l)  Notify the Administrative Agent and the Collateral Agent promptly whenever any separate insurance concurrent in form or contributing in the event of material loss with that required to be maintained under this Section 6.07 is taken out by the Borrower or another Loan Party; and promptly deliver to the Administrative Agent and the Collateral Agent a duplicate original copy of such policy or policies, or an insurance certificate with respect thereto once available.

Section 6.08.    *Compliance with Laws.* Comply with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its business or property, except if the failure to comply therewith would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 6.09.    *Books and Records.* Maintain proper books of record and account, in which entries are made that are full, true and correct in all material respects and are in conformity with GAAP (except as noted therein) and which reflect all material financial transactions and matters involving the assets and business of the Borrower or a Restricted Subsidiary, as the case may be.

Section 6.10.    *Inspection Rights.* Permit representatives and independent contractors of the Administrative Agent and each Lender to visit and inspect any of its properties, to examine its corporate, financial and operating records, and make copies thereof or abstracts therefrom, and to discuss its affairs, finances and accounts with its directors, officers, and independent public accountants (subject to such accountants' customary policies and procedures), all at the reasonable expense of the Borrower and subject to *bona fide* confidentiality obligations, limitations imposed by law and attorney-client privilege and at such reasonable times during normal business hours and as often as may be reasonably desired, upon reasonable advance notice to the Borrower; *provided* that, excluding any such visits and inspections during the continuation of an Event of Default, (x) only the Administrative Agent on behalf of the Lenders may exercise rights of the Administrative Agent and the Lenders under this Section 6.10 and (y) the Administrative Agent shall not exercise such rights more often than one time during any calendar year; *provided further* that when an Event of Default exists, the Administrative Agent or any Lender (or any of their respective representatives or independent contractors) may do any of the foregoing at the expense of the Borrower at any time during normal business hours and upon reasonable advance notice. The Administrative Agent and the Lenders shall give the Borrower the opportunity to participate in any discussions with the Borrower's independent public accountants.

Section 6.11.    *Additional Collateral; Additional Guarantors.* Subject to the terms, conditions and provisions of the Intercreditor Agreement, at the Borrower's expense, take all reasonable actions which are necessary or reasonably requested by the Administrative Agent or the Collateral Agent to ensure that the Collateral and Guarantee Requirement continues to be satisfied, including:

(c)    Upon (x) the formation or acquisition of any new direct or indirect wholly owned Domestic Subsidiary (in each case, other than an Excluded Subsidiary) by the Borrower, (y) the designation in accordance with Section 6.14 of any existing direct or indirect wholly owned Domestic Subsidiary as a Restricted Subsidiary, or (z) any wholly owned Domestic Subsidiary that is an Excluded Subsidiary ceasing to be an Excluded Subsidiary necessary such that no direct or indirect wholly owned Domestic Subsidiary will be an Excluded Subsidiary by virtue of the provisions set forth in clause (c) of the definition of "Excluded Subsidiary" in Section 1.01):

(i)    within 60 days after such formation, acquisition, designation or other event, or such longer period as the Administrative Agent may agree in writing in its reasonable discretion:

(A)    causing each such Domestic Subsidiary to duly execute and deliver to the Administrative Agent or the Collateral Agent (as appropriate) joinders to this Agreement as Guarantors, Security Agreement Supplements, Intellectual Property Security Agreements, a counterpart of the Intercompany Note and other security agreements and documents (including, with respect to such Mortgages, the documents listed in Section 6.13(b)), as reasonably requested by and in form and substance reasonably satisfactory to the Administrative Agent and the Borrower (consistent with the Mortgages (if any), Security Agreement, Intellectual Property Security Agreements and other security agreements in effect on the Closing Date), in each case granting Liens required by the Collateral and Guarantee Requirement;

(B)    causing each such Domestic Subsidiary (and the parent of each such Domestic Subsidiary that is a Loan Party) to deliver to the Collateral Agent any and all certificates representing Equity Interests (to the extent certificated) and intercompany notes (to the extent certificated) that are required to be pledged pursuant to the Collateral and Guarantee Requirement, accompanied by undated stock powers or other appropriate instruments of transfer executed in blank;

(C)    taking and causing each such Restricted Subsidiary and each direct or indirect parent of such Restricted Subsidiary to take whatever action (including the recording of Mortgages, the filing of UCC financing statements and the delivery of stock and membership interest certificates) as may be necessary in the reasonable opinion of the Collateral Agent to vest in the Collateral Agent (or in any representative of the Collateral Agent designated by it) valid and perfected Liens to the extent required by the Collateral and Guarantee Requirement, and to otherwise comply with the requirements of the Collateral and Guarantee Requirement;

(ii)    if reasonably requested by the Administrative Agent or the Collateral Agent, within 45 days after such request (or such longer period as the Administrative Agent may agree in writing in its reasonable discretion), delivering to the Administrative Agent a signed copy of an opinion, addressed to the Administrative Agent and the Lenders, of counsel for the Loan Parties as to such matters set forth in this Section 6.11(a) as the Administrative Agent may reasonably request; and

(iii)    promptly after the reasonable request therefor by the Administrative Agent or Collateral Agent, delivering to the Collateral Agent with respect to each Material Real Property, any existing surveys, title reports, abstracts or environmental assessment reports, to the extent available and in the possession or control of the Borrower; *provided, however*, that there shall be no obligation to deliver to the Collateral Agent any existing environmental assessment report whose disclosure to the Collateral Agent would require the consent of a Person other than the Borrower or one of its Subsidiaries, and where, despite the commercially reasonable efforts of the Borrower to obtain such consent, such consent cannot be obtained.

(d)   if reasonably requested by the Administrative Agent or the Collateral Agent, within 60 days after such request (or such longer period as the Administrative Agent may agree in writing in its reasonable discretion), delivering to the Collateral Agent any other items necessary from time to time to satisfy the Collateral and Guarantee Requirement with respect to the validity, perfection, existence and priority of security interests with respect to property of any Guarantor acquired after the Closing Date and subject to the Collateral and Guarantee Requirement, but not specifically covered by the preceding clauses (i), (ii) or (iii) or clause (c) below.

(e)   not later than 120 days after (i) the acquisition by any Loan Party of Material Real Property or (ii) the release of any first lien security interest on any Real Property securing the obligations under the Contribution Deferral Agreement, in each case, that is required to be provided as Collateral pursuant to the Collateral and Guarantee Requirement (or such longer period as the Administrative Agent may agree in writing in its reasonable discretion), which Material Real Property would not be automatically subject to another Lien pursuant to pre-existing Collateral Documents, causing such property to be subject to a Lien in favor of the Collateral Agent for the benefit of the Secured Parties and taking, or causing the relevant Loan Party to take, such actions as shall be necessary or reasonably requested by the Administrative Agent or the Collateral Agent to grant and perfect or record such Lien, in each case to the extent required by, and subject to the limitations and exceptions of, the Collateral and Guarantee Requirement and to otherwise comply with the requirements of the Collateral and Guarantee Requirement.

Section 6.12.   *Compliance with Environmental Laws.* Except, in each case, to the extent that the failure to do so could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect: (a) comply, and take all reasonable actions to cause all lessees and other Persons operating or occupying its properties to comply, with all applicable Environmental Laws and Environmental Permits; (b) obtain and renew all Environmental Permits necessary for its operations and properties; and, (c) in each case to the extent the Loan Parties or the Restricted Subsidiaries are required to do so by Environmental Laws, conduct any investigation, remedial or other corrective action necessary to address Hazardous Materials at any property or facility in accordance with applicable Environmental Laws.

Section 6.13.   *Further Assurances and Post-Closing Conditions.*

(h)   Within 60 days after the Closing Date (subject to extension by the Administrative Agent or the Collateral Agent in its reasonable discretion), deliver each Collateral Document set forth on Schedule 6.13(a), duly executed by each Loan Party party thereto, together with all documents and instruments required to perfect the security interest of the Collateral Agent in the Collateral free of any other pledges, security interests or mortgages, except Liens expressly permitted hereunder, to the extent required pursuant to the Collateral and Guarantee Requirement.

(i)   Promptly upon reasonable request by the Administrative Agent or the Collateral Agent (i) correct any material defect or error that may be discovered in the execution, acknowledgment, filing or recordation of any Collateral Document or other

document or instrument relating to any Collateral (including, without limitation, any defect or error related to certificates of title for vehicles and other rolling stock) as to which the Borrower reasonably agrees is a defect or error, and (ii) subject to the terms of the Collateral Documents, do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts, deeds, certificates, assurances and other instruments as the Administrative Agent or the Collateral Agent may reasonably request from time to time in order to carry out more effectively the purposes of the Loan Documents and to cause the Collateral and Guarantee Requirement to be and remain satisfied. If the Administrative Agent or the Collateral Agent reasonably determines that it is required by applicable Law to have appraisals prepared in respect of any Material Real Property of any Loan Party subject to a Mortgage, the Borrower shall cooperate with the Administrative Agent and/or Collateral Agent, as applicable, in obtaining such appraisals and shall pay all reasonable out-of-pocket costs and expenses relating thereto.

Section 6.14.   *Designation of Subsidiaries.* The Borrower may at any time after the Closing Date designate any Restricted Subsidiary of the Borrower as an Unrestricted Subsidiary or any Unrestricted Subsidiary as a Restricted Subsidiary; *provided* that (i) immediately before and after such designation, no Event of Default shall have occurred and be continuing, and (ii) no Subsidiary may be designated as an Unrestricted Subsidiary or continue as an Unrestricted Subsidiary if it is a "Restricted Subsidiary" for the purpose of the ABL Facility or any Junior Financing. The designation of any Subsidiary as an Unrestricted Subsidiary after the Closing Date shall constitute an Investment by the Borrower therein at the date of designation in an amount equal to the fair market value of the aggregate Investment therein of the Borrower and its Subsidiaries (as applicable). The designation of any Unrestricted Subsidiary as a Restricted Subsidiary shall constitute (i) the incurrence at the time of designation of any Investment, Indebtedness or Liens of such Subsidiary existing at such time and (ii) a return on any Investment by the Borrower in Unrestricted Subsidiaries pursuant to the preceding sentence in an amount equal to the lesser of (x) the fair market value at the date of such designation of the Borrower's or its Subsidiary's (as applicable) Investment in such Subsidiary and (y) the amount of the Investment originally made in respect of the designation of such Subsidiary as an Unrestricted Subsidiary.

Section 6.15.   *Maintenance of Ratings.* In the case of the Borrower, use commercially reasonable efforts to maintain a public corporate rating from S&P and a public corporate family rating from Moody's, in each case in respect of the Borrower.

Section 6.16.   *Use of Proceeds.* The Borrower shall use the proceeds of the Term Loans borrowed on the Closing Date to fund the Transactions on the Closing Date, to pay Transaction Expenses and for general corporate purposes.

**ARTICLE 7**
NEGATIVE COVENANTS

So long as any Lender shall have any Commitment hereunder or any Loan or other Obligation (other than obligations under Secured Hedge Agreements or contingent

indemnification or reimbursement obligations) hereunder which is accrued or payable shall remain unpaid or unsatisfied, then from and after the Closing Date:

Section 7.01.    *Liens.* The Borrower shall not, nor shall it permit any Restricted Subsidiary to, directly or indirectly, create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired, other than the following:

(q)   Liens created pursuant to any Loan Document;

(r)   Liens existing or contemplated on the Closing Date and listed on Schedule 7.01(b); *provided* that (i) the Lien does not extend to any additional property other than (A) any replacements of such property or assets and additions and accessions thereto, after-acquired property subjected to a Lien securing Indebtedness and other obligations incurred prior to such time and which Indebtedness and other obligations are permitted hereunder that require, pursuant to their terms at such time, a pledge of after-acquired property (it being understood that such requirement shall not be permitted to apply to any property to which such requirement would not have applied but for such acquisition, or asset of the Borrower or any Restricted Subsidiary and the proceeds and the products thereof and customary security deposits in respect thereof and in the case of multiple financings of equipment provided by any lender, other equipment financed by such lender), and (ii) such Lien does not secure any obligation (including unused commitments) other than those it secured on the Closing Date or, to the extent constituting Indebtedness, any Permitted Refinancing of the Indebtedness secured thereby on the Closing Date or, to the extent not constituting Indebtedness, any extensions, renewals, restructurings, refinancings and replacements thereof;

(s)   Liens for unpaid utilities, taxes, assessments or governmental charges that are (i) not overdue for a period of more than thirty (30) days and are not otherwise delinquent, securing obligations in an amount not to exceed $500,000, or that are being contested in good faith and by appropriate actions, if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP or (ii) otherwise not required to be paid pursuant to Section 6.04;

(t)   Statutory, lease or common law Liens of landlords, sublandlords, carriers, warehousemen, mechanics, materialmen, repairmen, construction contractors or other like Liens, or other customary Liens (other than in respect of Indebtedness) in favor of landlords, in each case arising in the ordinary course of business that secure amounts not overdue for a period of more than thirty (30) days or if more than thirty (30) days overdue, that either secure obligations in an amount not to exceed $1,000,000 or are being contested in good faith and by appropriate actions, if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP;

(u)   (i) Liens in the ordinary course of business in connection with workers' compensation, unemployment insurance and other social security legislation (other than any Lien imposed pursuant to Section 430(k) of the Code or Section 303(k) of ERISA or a

violation of Section 436 of the Code) and (ii) Liens in the ordinary course of business securing liability for reimbursement or indemnification obligations of (including obligations in respect of letters of credit or bank guarantees for the benefit of) insurance carriers providing property, casualty or liability insurance to the Borrower or any of its Restricted Subsidiaries;

(v)   Liens to secure the performance of bids, trade contracts, governmental contracts and leases (in the case of each of the foregoing, other than for Indebtedness for borrowed money), statutory obligations, surety, stay, customs and appeal bonds, performance bonds and other obligations of a like nature (including those to secure health, safety and environmental obligations), in each case incurred in the ordinary course of business;

(w)   (i) easements, rights-of-way, restrictions (including zoning restrictions and other land use regulations), encroachments, protrusions, reservations and other similar encumbrances and minor title defects affecting Real Property that do not in the aggregate materially interfere with the ordinary conduct of the business of the Borrower and the Restricted Subsidiaries, taken as a whole and (ii) ground leases in respect of Real Property on which facilities owned or leased by the Borrower or any of the Restricted Subsidiaries are located; *provided* in the case of this clause (ii) that such ground leases do not confer rights on the counter-party(ies) thereto superior to those of the Collateral Agent in the relevant property;

(x)   Liens securing judgments not constituting an Event of Default under Section 8.01(h);

(y)   leases, licenses, subleases or sublicenses granted to others in the ordinary course of business which do not (i) interfere in any material respect with the business of the Borrower and the Restricted Subsidiaries, taken as a whole, or (ii) secure any Indebtedness*;*

(z)   Liens (i) in favor of customs and revenue authorities arising as a matter of Law to secure payment of customs duties in connection with the importation of goods in the ordinary course of business or (ii) on specific items of inventory or other goods and proceeds thereof of any Person securing such Person's obligations in respect of bankers' acceptances or letters of credit issued or created for the account of such person to facilitate the purchase, shipment or storage of such inventory or such other goods in the ordinary course of business;

(aa)   Liens (i) of a collection bank arising under Section 4-210 of the Uniform Commercial Code on items in the course of collection and (ii) arising in the ordinary course of business in favor of a banking or other financial institution arising as a matter of Law or under customary general terms and conditions encumbering deposits or other funds maintained with a financial institution (including the right of set-off) and that are within the general parameters customary in the banking industry or arising pursuant to the general terms and conditions of such banking institutions;

(bb)   Liens (i) on cash earnest money deposits or other cash advances in favor of the seller of any property to be acquired in an Investment permitted pursuant to Sections 7.02(e), (h), (l), (p), (r) or (v), in each case to be applied against the purchase price for such Investment, and (ii) consisting of an agreement to Dispose of any property in a Disposition permitted under Section 7.05, in each case, solely to the extent such Investment or Disposition, as the case may be, would have been permitted on the date of the creation of such Lien;

(cc)   Liens (i) in favor of the Borrower or a Restricted Subsidiary on assets of a Restricted Subsidiary that is not a Loan Party securing Indebtedness permitted under Section 7.03 and (ii) in favor of the Borrower or any Guarantor;

(dd)   any interest or title (and all encumbrances and other matters affecting such interest or title) of a lessor, sublessor, licensor or sublicensor under leases, subleases, licenses or sublicenses entered into by the Borrower or any of the Restricted Subsidiaries in the ordinary course of business; *provided*, that no such lease or sublease shall constitute a Capitalized Lease;

(ee)   Liens deemed to exist in connection with Investments in repurchase agreements permitted under Section 7.02(a);

(ff)   Liens encumbering reasonable customary initial deposits and margin deposits and similar Liens attaching to commodity accounts or other brokerage accounts incurred in the ordinary course of business and not for speculative purposes;

(gg)   Liens (including any interest or title (and all encumbrances and other matters affecting such interest or title) of a lessor or sublessor under Capitalized Leases) securing Indebtedness permitted under Section 7.03(e) or Section 7.03(ff); *provided* that (i) such Liens are created within 270 days of the acquisition, construction, repair, lease or improvement, as applicable, of the property subject to such Liens, (ii) such Liens do not at any time encumber property (except for replacements, additions and accessions to such property) other than the property financed by such Indebtedness and the proceeds and products thereof and customary security deposits, and (iii) with respect to Capitalized Leases, such Liens do not at any time extend to or cover any assets (except for replacements, additions and accessions to such assets) other than the assets subject to such Capitalized Leases and the proceeds and products thereof and customary security deposits; *provided* that individual financings of equipment provided by one lender may be cross collateralized to other financings of equipment provided by such lender;

(hh)   Liens on property (i) of any Foreign Subsidiary that is not a Loan Party and (ii) that does not constitute Collateral, which Liens secure Indebtedness of the applicable Foreign Subsidiary permitted under Section 7.03;

(ii)   Liens existing on property at the time of its acquisition or existing on the property of any Person at the time such Person becomes a Restricted Subsidiary (other than by designation as a Restricted Subsidiary pursuant to Section 6.14), in each case after

the Closing Date; *provided* that (i) such Lien was not created in contemplation of such acquisition or such Person becoming a Restricted Subsidiary, (ii) such Lien does not extend to or cover any other assets or property (other than the proceeds or products thereof and other than after-acquired property subjected to a Lien securing Indebtedness and other obligations incurred prior to such time and which Indebtedness and other obligations are permitted hereunder that require, pursuant to their terms at such time, a pledge of after-acquired property, it being understood that such requirement shall not be permitted to apply to any property to which such requirement would not have applied but for such acquisition), and (iii) the Indebtedness secured thereby is permitted under Section 7.03;

(jj)   Liens arising from precautionary Uniform Commercial Code financing statements or similar filings;

(kk)   Liens on insurance policies and the proceeds thereof securing the financing of the premiums with respect thereto in the ordinary course of business;

(ll)   Liens on the Collateral securing Indebtedness permitted under Section 7.03(o) or other obligations otherwise secured pursuant to or in connection with the documents governing such Indebtedness; *provided*, that such Liens shall be subject to the ABL Intercreditor Agreement;

(mm)   Liens on the Collateral securing Credit Agreement Refinancing Indebtedness that is Permitted Secured Additional Debt and any Permitted Refinancing of the foregoing; *provided*, that (x) any such Liens securing any Permitted Refinancing in respect of Credit Agreement Refinancing Indebtedness that is Permitted First Priority Additional Debt are subject to the ABL Intercreditor Agreement, if applicable, and the First Lien Intercreditor Agreement and (y) any such Liens securing any Permitted Refinancing in respect of Credit Agreement Refinancing Indebtedness that is Permitted Second Priority Additional Debt are subject to the ABL Intercreditor Agreement, if applicable, and the Second Lien Intercreditor Agreement;

(nn)   Liens on the Equity Interests of any joint venture entity or other non-wholly owned Subsidiary of the Borrower consisting of a transfer restriction, purchase option, call or similar right of a third party joint venture partner;

(oo)   cash collateral posted as security for the Borrower's or any Restricted Subsidiary's obligations under Swap Contracts, in an aggregate amount for all such cash collateral at any time not to exceed $15,000,000; *provided* that cash collateral posted for the account of Lenders or Agents in respect of non-speculative currency or interest rate Swap Contracts shall not be subject to such limit;

(pp)   Liens on the Collateral securing Alternative Incremental Indebtedness that is Permitted Secured Additional Debt and any Permitted Refinancing of the foregoing; *provided*, that (x) any such Liens securing any Permitted Refinancing in respect of Alternative Incremental Indebtedness that is Permitted First Priority Additional Debt are subject to the ABL Intercreditor Agreement, if applicable, and the First Lien Intercreditor

Agreement and (y) any such Liens securing any Permitted Refinancing in respect of Alternative Incremental Indebtedness that is Permitted Second Priority Additional Debt are subject to the ABL Intercreditor Agreement, if applicable, and the Second Lien Intercreditor Agreement;

(qq)   Liens on (i) the Securitization Assets arising in connection with a Qualified Securitization Financing or (ii) the Receivables Assets arising in connection with a Receivables Facility;

(rr)   Liens (i) arising out of conditional sale, title retention, consignment or similar arrangements for the sale of goods or (ii) encumbering deposits made to secure obligations arising from contractual or warranty requirements;

(ss)   Utility and similar deposits in the ordinary course of business;

(tt)   Liens in respect of (i) the Unrestricted Subsidiaries and joint ventures or other non-wholly owned Subsidiaries or (ii) cash, Cash Equivalents, deposit accounts and securities accounts collateralizing letters of credit permitted by Sections 7.03(y) and (ff);

(uu)   Liens related to Sale and Leaseback Transactions in an aggregate amount of 50,000,000; and

(vv)   other Liens with respect to property or assets of the Borrower or any of its Restricted Subsidiaries securing obligations in an aggregate principal amount outstanding at any time not to exceed the greater of (i) $30,000,000 and (ii) 2% of Consolidated Total Assets at the time of such incurrence.

Section 7.02.   *Investments.* The Borrower shall not, nor shall it permit any Restricted Subsidiary to, directly or indirectly, make or hold any Investments, except:

(j)   Investments by the Borrower or any of the Restricted Subsidiaries in cash or Cash Equivalents;

(k)   loans or advances to officers, directors and employees of any Loan Party or any of its Restricted Subsidiaries (i) for reasonable and customary business-related travel, entertainment, relocation and analogous ordinary business purposes, in each case, consistent with past practice (including pursuant to use of any credit cards, credit card processing services, debit cards, stored value cards, purchase cards (including so-called "procurement cards" or "P-cards") or other similar cash management services), (ii) in connection with such Person's purchase of Equity Interests of the Borrower and (iii) for any other corporate purposes not described in the foregoing clauses (i) and (ii); *provided* that the aggregate principal amount of loans and advances outstanding at any time under this Section 7.02(b)(ii) and (iii) shall not exceed $2,000,000;

(l)   Investments (i) by the Borrower or any Restricted Subsidiary in any Loan Party (or any newly formed wholly owned Restricted Subsidiary that is not an Excluded

Subsidiary and is to become a Loan Party in accordance with Section 6.11), (ii) by any Restricted Subsidiary that is not a Loan Party in any other Restricted Subsidiary that is not a Loan Party and (iii) by any Loan Party in a Restricted Subsidiary that is not a Loan Party; *provided*, that the aggregate amount of Investments at any time outstanding under this clause (iii) shall not exceed $15,000,000;

(m)   Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit or other credits to suppliers in the ordinary course of business;

(n)   Investments (i) existing or contemplated on the Closing Date and set forth on Schedule 7.02(e) (including unused commitments) and any modification, replacement, renewal or extension thereof and (ii) existing on the Closing Date by the Borrower or any other Restricted Subsidiary in any Restricted Subsidiary and any modification, replacement, renewal or extension thereof; *provided*, that in the case of clause (i) and clause (ii) the amount of the original Investment is not increased except by the terms of such original Investment as set forth on Schedule 7.02(e) or as otherwise permitted by this Section 7.02 (and in such case made in reliance on the other paragraph of this Section 7.02 so permitting such modification, replacement, renewal or extension thereof);

(o)   Investments in Swap Contracts permitted under Section 7.03;

(p)   promissory notes and other non-cash consideration received in connection with Dispositions permitted by Section 7.05;

(q)   any acquisition by the Borrower or any Restricted Subsidiary of all or substantially all the assets of, or all the Equity Interests (other than directors' qualifying shares, shares issued to foreign nationals as required by applicable law or any options for Equity Interests that cannot, as a matter of law, be cancelled, redeemed or otherwise extinguished without the express agreement of the holder thereof at or prior to acquisition) in, a Person or division, business unit or line of business of a Person (or any subsequent investment made in a Person, division, business unit or line of business previously acquired in a Permitted Acquisition), in each case in a single transaction or series of related transactions, if (i) no Event of Default shall have occurred and be continuing or would result therefrom at the time of entering in the agreement to consummate such acquisition; (ii) all transactions related thereto shall be consummated in all material respects in accordance with applicable Laws; (iii) as of the most recently ended fiscal quarter for which financial statements of the Borrower and the target are available, the Borrower and the Restricted Subsidiaries shall be in compliance, on a Pro Forma Basis, with the covenant set forth in Section 7.10 after giving effect to such acquisition or investment and any related transactions; (iv) any acquired or newly formed Restricted Subsidiary shall not be liable for any Indebtedness except for Indebtedness otherwise permitted by Section 7.03; (v) to the extent required by the Collateral and Guarantee Requirement, (A) the property, assets and businesses acquired in such purchase or other acquisition shall constitute Collateral and (B) any such newly created or acquired Subsidiary (other than an Excluded Subsidiary) shall become a Guarantor, in each case, to

the extent required by and in accordance with Section 6.11; (vi) the businesses acquired in such purchase or other acquisition shall be in compliance with Section 7.07; and (vii) the Borrower shall have delivered to the Administrative Agent a certificate of a Responsible Officer of the Borrower certifying that the conditions set forth in the preceding clauses (i) through (v) have been satisfied (any such acquisition, a "**Permitted Acquisition**"); *provided* that the aggregate amount of Investments made by Loan Parties pursuant to this Section 7.02(h) in assets that are not (or do not become) owned by a Loan Party or in Equity Interests in Persons that do not become Loan Parties upon consummation of such Permitted Acquisition shall not exceed $15,000,000 at any time outstanding;

(r)    Investments in the ordinary course of business consisting of UCC Article 3 endorsements for collection or deposit and UCC Article 4 customary trade arrangements with customers consistent with past practices;

(s)    Investments (including debt obligations and Equity Interests) received in connection with the bankruptcy or reorganization of suppliers and customers or in settlement of delinquent obligations of, or other disputes with, customers and suppliers;

(t)    advances of payroll payments to employees in the ordinary course of business;

(u)    Investments to the extent that payment for such Investments is made with Equity Interests (other than Disqualified Equity Interests) of the Borrower or the Net Proceeds received from the issuance thereof;

(v)    Investments of a Restricted Subsidiary acquired after the Closing Date pursuant to a Permitted Acquisition or of a corporation merged or amalgamated or consolidated into the Borrower or merged, amalgamated or consolidated with a Restricted Subsidiary, in each case in accordance with this Section 7.02 and Section 7.04 after the Closing Date, to the extent that such Investments were not made in contemplation of or in connection with such acquisition, merger, amalgamation or consolidation and were in existence on the date of such acquisition, merger or consolidation;

(w)    Investments made by any Restricted Subsidiary that is not a Loan Party to the extent such Investments are financed with the proceeds received by such Restricted Subsidiary from an Investment in such Restricted Subsidiary made pursuant to Section 7.02(c)(i), Section 7.02(c)(iii) or Section 7.02(p); and

(x)    Guarantees by the Borrower or any Restricted Subsidiary of operating leases (other than Capitalized Leases) or of other obligations that do not constitute Indebtedness, in each case, which leases or other obligations are entered into by the Borrower or any Guarantor in the ordinary course of business.

(y)    other Investments (including for Permitted Acquisitions) in an aggregate amount outstanding pursuant to this clause (p) at any time not to exceed (x) the greater of (i) $30,000,000 and (ii) 2% of Consolidated Total Assets at the time of such Investment

plus, (y) the portion, if any, of the Cumulative Credit on the date of such election that the Borrower elects to apply to this subclause (y); *provided*, that no Event of Default shall have occurred and be continuing or would result from the making of any such Investment;

(z)    (i) make lease, utility and other similar deposits or any other advance or deposit permitted by this Agreement in the ordinary course of business or (ii) make prepayments and deposits to suppliers in the ordinary course of business;

(aa)    to the extent constituting Investments, capital expenditures otherwise permitted under this Agreement;

(bb)    Investments in deposit accounts or securities accounts opened in the ordinary course of business;

(cc)    repurchase, retirement or repayment of any Indebtedness to the extent not otherwise prohibited by this Agreement, including, without limitation, (i) acquisitions of Term Loans pursuant to Section 10.04 and (ii) the repurchase, retirement or repayment of any other Indebtedness relating to the Existing Series A Notes and Existing Series B Notes;

(dd)    (a) Investments (including by consideration in the form of cash, Cash Equivalents, contributing receivables and through subordinated notes) in any Receivables Facility or any Securitization Subsidiary or other Subsidiary that in turn then transfers Securitization Assets to a Securitization Subsidiary in order to effectuate a Qualified Securitization Financing, including the ownership of Equity Interests in such Securitization Subsidiary and (b) distributions or payments of Securitization Fees and purchases of Securitization Assets or Receivables Assets pursuant to a Securitization Purchase Obligation in connection with a Qualified Securitization Financing or a Receivables Facility;

(ee)    Investments consisting of or resulting from (i) Indebtedness permitted under Section 7.03, (ii) Liens permitted under Section 7.01, (iii) Restricted Payments permitted under Section 7.06, (iv) Dispositions permitted by Section 7.05 and (v) fundamental changes permitted by Section 7.04;

(ff)    Investments solely to the extent such Investments reflect an increase in the value of Investments otherwise permitted under this Section 7.02;

(gg)    loans and advances to Borrower in lieu of, and not in excess of the amount of (after giving effect to any other such loans or advances or Restricted Payments in respect thereof), Restricted Payments to the extent permitted to be made in accordance with Section 7.06 (other than Section 7.06(i)); and

(hh)    Guarantee obligations of the Borrower or any Restricted Subsidiary in respect of letters of support, guarantees or similar obligations issued, made or incurred for the benefit of any Restricted Subsidiary of the Borrower to the extent required by law or in

connection with any statutory filing or the delivery of audit opinions performed in jurisdictions other than within the United States.

Section 7.03.   *Indebtedness.* The Borrower shall not, nor shall it permit any Restricted Subsidiary to, directly or indirectly, create, incur, assume or suffer to exist any Indebtedness, except:

(d)   Indebtedness of any Loan Party under the Loan Documents;

(e)   (i) Indebtedness outstanding on the Closing Date and listed on Schedule 7.03(b) and any Permitted Refinancing thereof and (ii) intercompany Indebtedness outstanding on the Closing Date and any Permitted Refinancing thereof; *provided*, that (x) any intercompany Indebtedness shall be evidenced by an Intercompany Note and (y) any intercompany Indebtedness of any Loan Party owed to any Person that is not a Loan Party shall be unsecured and subordinated to the Obligations pursuant to the subordination provisions reasonably acceptable to the Administrative Agent;

(f)   Guarantees by the Borrower and any Restricted Subsidiary in respect of Indebtedness of the Borrower or any Restricted Subsidiary of the Borrower otherwise permitted hereunder; *provided* that (i) no Guarantee by any Restricted Subsidiary of any ABL Facility Indebtedness, any Junior Financing, any Permitted Additional Debt or any Permitted Refinancing of any of the foregoing shall be permitted unless such guaranteeing party shall have also provided a Guarantee of the Obligations on the terms set forth herein (*provided further* that, clause (i) shall not apply in the case of a Guarantee by any Foreign Subsidiary of any Indebtedness of another Foreign Subsidiary), and (ii) if the Indebtedness being Guaranteed is Junior Financing that is, or is required by this Agreement to be, Subordinated Indebtedness, such Guarantee shall be subordinated to the Guarantee of the Obligations on terms (taken as a whole) at least as favorable to the Lenders as those contained in the subordination of such Junior Financing;

(g)   Indebtedness (other than Indebtedness permitted under Section 7.03(b)) of the Borrower or any Restricted Subsidiary owing to any Loan Party or any other Restricted Subsidiary (or consisting of a Guaranty on behalf of any Loan Party or any other Restricted Subsidiary) to the extent constituting an Investment permitted by Section 7.02; *provided* that (x) all such Indebtedness shall be evidenced by an Intercompany Note and (y) all such Indebtedness of any Loan Party owed to any Person that is not a Loan Party shall be unsecured and subordinated to the Obligations pursuant to the subordination provisions reasonably acceptable to the Administrative Agent;

(h)   Attributable Indebtedness and other Indebtedness of the Borrower or any Restricted Subsidiary (including Capitalized Leases) financing an acquisition, construction, repair, replacement, lease or improvement of a fixed or capital asset incurred prior to or within 270 days after the acquisition, lease or improvement of the applicable asset in an aggregate amount (together with any Permitted Refinancings thereof) not to exceed $50,000,000 at any time outstanding;

(i)     Indebtedness in respect of Swap Contracts designed to hedge against the Borrower's or any Restricted Subsidiary's exposure to interest rates, foreign exchange rates or commodities (including fuel) pricing risks incurred not for speculative purposes;

(j)     Indebtedness of the Borrower or any Restricted Subsidiary (i) assumed in connection with any Permitted Acquisition or other Investment permitted hereunder, *provided*, that such Indebtedness is not incurred in contemplation of such Investment, and any Permitted Refinancing thereof or (ii) incurred to finance a Permitted Acquisition or other Investment permitted hereunder and any Permitted Refinancing thereof; *provided* that (w) in the case of clauses (i) and (ii), such Indebtedness and all Indebtedness resulting from a Permitted Refinancing thereof is unsecured (except for (A) Liens permitted by Section 7.01(s) and (B) Liens permitted by Section 7.01(ff)), (x) in the case of clauses (i) and (ii), both immediately prior and after giving effect thereto, (1) no Event of Default shall exist or result therefrom, and (2) immediately after giving effect to the incurrence of such Indebtedness, the Total Leverage Ratio calculated on a Pro Forma Basis shall not be greater than the Total Leverage Ratio immediately prior to the consummation of the transaction, and (y) in the case of any such incurred Indebtedness under clause (ii), such Indebtedness matures after, and (except for any payments in respect of a change of control, asset sales, AHYDO "catch-up" payments, and similar such payments) does not require any scheduled amortization or other scheduled payments of principal prior to, the then Latest Maturity Date;

(k)     Indebtedness representing deferred compensation to employees of the Borrower or any of its Restricted Subsidiaries incurred in the ordinary course of business and other obligations and liabilities arising under employee benefit plans in the ordinary course of business;

(l)     Indebtedness consisting of unsecured promissory notes issued by the Borrower or any of its Restricted Subsidiaries to current or former officers, managers, consultants, directors and employees, their respective estates, spouses or former spouses to finance the purchase or redemption of Equity Interests of the Borrower permitted by Section 7.06;

(m)     Indebtedness incurred by the Borrower or any of its Restricted Subsidiaries in a Permitted Acquisition, any other Investment expressly permitted hereunder or any Disposition expressly permitted hereunder, in each case, constituting indemnification obligations or obligations in respect of purchase price (including earnouts and holdbacks) or other similar adjustments;

(n)     Indebtedness in respect of treasury, depository, credit card, debit card and cash management services or automated clearinghouse transfer of funds, overdraft or any similar services incurred in the ordinary course of business or any similar cash management services relating or secured pursuant to the ABL Facility and any hedges related to the ABL Facility;

(o)   Indebtedness consisting of the financing of insurance premiums or take-or-pay obligations contained in supply arrangements that do not constitute Guarantees, in each case, in the ordinary course of business;

(p)   Indebtedness incurred by the Borrower or any of its Restricted Subsidiaries in respect of letters of credit, bank guarantees, bankers' acceptances or similar instruments issued or created in the ordinary course of business and not in connection with the borrowing of money, including in respect of workers compensation claims, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance or other Indebtedness incurred in the ordinary course of business with respect to reimbursement-type obligations regarding workers compensation claims;

(q)   obligations in respect of performance, bid, appeal and surety bonds and performance and completion guarantees and similar obligations provided by the Borrower or any of its Restricted Subsidiaries or obligations in respect of letters of credit, bank guarantees or similar instruments related thereto, in each case in the ordinary course of business or consistent with past practice and not in connection with the borrowing of money or Swap Contracts;

(r)   (i) ABL Facility Indebtedness of the Loan Parties and (ii) any Permitted Refinancing thereof; *provided* that the aggregate principal amount outstanding at any time of all such Indebtedness under clauses (i) and (ii) and Section 7.03(z)(i) shall not exceed $550,000,000;

(s)   (i) Alternative Incremental Indebtedness and (ii) any Permitted Refinancing thereof;

(t)   (i) Credit Agreement Refinancing Indebtedness (other than any Credit Agreement Refinancing Indebtedness incurred pursuant to a Refinancing Amendment) and (ii) any Permitted Refinancing thereof;

(u)   Permitted Junior Debt of a Loan Party; *provided* that (x) no Event of Default shall have occurred and be continuing at the time of the incurrence of such Indebtedness or would result therefrom and (y) immediately after giving effect to the incurrence of such Permitted Junior Debt, the Total Leverage Ratio calculated on a Pro Forma Basis shall not be greater than 5.00 to 1.0 (as of the last day of the most-recently ended Test Period);

(v)   Indebtedness of Restricted Subsidiaries that are not Guarantors, in an aggregate principal amount at any time outstanding not to exceed $25,000,000;

(w)   all premiums (if any), interest (including post-petition interest and interest paid in kind), fees, expenses, charges and additional or contingent interest on obligations described in clauses (a) through (q) above and (s) through (ff) below;

(x)   Indebtedness in respect of the Specified Pension Fund Obligations and Guarantees thereof, to the extent existing on the Closing Date, by any Guarantor in an aggregate principal amount at any time outstanding not to exceed the amount outstanding as of the Closing Date (and as adjusted from time to time pursuant to any audits), plus any interest paid in kind thereon and any accrued but unpaid interest thereon;

(y)   Indebtedness in respect of the Existing Series A Notes that is fully discharged;

(z)   Indebtedness in respect of the Existing Series B Notes in an aggregate principal amount not to exceed $17,000,000 (plus any increase in the principal amount thereof in respect of any interest paid in kind (rather than in cash) thereunder in accordance with the terms and conditions of the applicable indenture in effect as of the Closing Date, but *minus* any principal payments in respect thereof made in accordance with the terms and conditions of this Agreement) at any time outstanding;

(aa)   Indebtedness in respect of taxes, assessments or governmental charges to the extent that payment thereof shall not at the time be required to be made hereunder;

(bb)   Indebtedness under any letter of credit (to the extent collateralized with cash, Cash Equivalents, deposit accounts or securities accounts maintaining cash, Cash Equivalents or investment property or the proceeds of the foregoing); *provided* that the aggregate principal amount of Indebtedness permitted by this clause (y) shall not exceed $50,000,000 at any time outstanding;

(cc)   Indebtedness of (i) any Securitization Subsidiary arising under any Securitization Facility, *provided* that such Indebtedness together with any Indebtedness incurred pursuant to Section 7.03(o) shall not exceed $550,000,000 at any one time outstanding or (ii) the Borrower or any Restricted Subsidiary arising under any Receivables Facility or Qualified Securitization Financing in an amount not to exceed $20,000,000 at any one time outstanding, *provided* that, for purposes of this Section 7.03(z)(ii), the obligations under any such Receivables Facility or Qualified Securitization Financing may be full-recourse to the Borrower or any of its Restricted Subsidiaries;

(dd)   Indebtedness in respect of Sale and Leaseback Transactions in an amount not to exceed $50,000,000 at any time outstanding;

(ee)   Indebtedness in respect of Investments not prohibited by Section 7.02;

(ff)   Indebtedness and other obligations in respect of Disqualified Equity Interests in an amount not to exceed $25,000,000 outstanding at any time;

(gg)   Indebtedness incurred in respect of credit cards, credit card processing services, debit cards, stored value cards, purchase cards (including so-called "procurement cards" or "P-cards") or other similar cash management services, in each case, incurred in the ordinary course of business consistent with past practice;

(hh)   Indebtedness in an amount equal to 100% of the aggregate Net Proceeds received by Borrower after the Closing Date from the issue or sale of Qualified Equity Interests to the extent such Net Proceeds are Not Otherwise Applied; and

(ii)   other Indebtedness of the Borrower or any of its Restricted Subsidiaries, in an aggregate principal amount at any time outstanding not to exceed the greater of $30,000,000 and 2% of Consolidated Total Assets at the time of such incurrence.

Section 7.04.   *Fundamental Changes.* The Borrower shall not, nor shall it permit any Restricted Subsidiary to, directly or indirectly, merge, dissolve, liquidate, consolidate with or into another Person, or Dispose of (whether in one transaction or in a series of related transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to or in favor of any Person, except that:

(i)   any Restricted Subsidiary may merge, amalgamate or consolidate with (i) the Borrower (including a merger, the purpose of which is to reorganize the Borrower into a new jurisdiction); *provided* that (w) no Event of Default exists or would result therefrom, (x) the Borrower shall be the continuing or surviving Person, (y) such transaction does not result in the Borrower ceasing to be organized under the laws of the United States, any State thereof or the District of Columbia and (z) such transaction does not have a adverse effect in any material respect on the perfection or priority of the Liens granted under the Collateral Documents or (ii) one or more other Restricted Subsidiaries; *provided*, in the case of this clause (ii), that when such transaction involves a Loan Party and/or a permitted Excluded Subsidiary, a Loan Party or a permitted Excluded Subsidiary shall be the continuing or surviving Person except to the extent otherwise constituting an Investment permitted by Section 7.02;

(j)   (i) any Restricted Subsidiary that is not a Loan Party may merge, amalgamate or consolidate with or into any other Restricted Subsidiary that is not a Loan Party and (ii) any Restricted Subsidiary may liquidate or dissolve or change its legal form if the Borrower determines in good faith that such action is in the best interest of the Borrower and the Restricted Subsidiaries and is not disadvantageous to the Lenders in any material respect (it being understood that (other than a transaction constituting a permitted Investment under Section 7.02 or involving an Excluded Subsidiary) in the case of any liquidation or dissolution of a Guarantor, such Guarantor shall transfer its assets to a Loan Party, and in the case of any change in legal form, a Restricted Subsidiary that is a Guarantor will remain a Guarantor and such transaction shall not have an adverse effect on the perfection or priority of the Liens granted under the Collateral Documents);

(k)   any Restricted Subsidiary may Dispose of all or substantially all of its assets (upon voluntary liquidation or otherwise) to the Borrower or to another Restricted Subsidiary; *provided* that if the transferor in such a transaction is a Guarantor, then (i) the transferee must be a Guarantor or the Borrower or (ii) to the extent constituting an Investment, such Investment must be a permitted Investment in or Indebtedness of a Restricted Subsidiary which is not a Loan Party in accordance with Sections 7.02 and 7.03, respectively;

(l)   so long as no Event of Default exists or would result therefrom, the Borrower may merge with any other Person; *provided* that (i) the Borrower shall be the continuing or surviving corporation or (ii) if the Person formed by or surviving any such merger or consolidation is not the Borrower (any such Person, the "**Successor Borrower**"), (A) the Successor Borrower shall be an entity organized or existing under the Laws of the United States, any state thereof or the District of Columbia and such transaction shall not have an adverse effect in any material respect on the perfection or priority of the Liens granted under the Collateral Documents, (B) the Successor Borrower shall expressly assume all the obligations of the Borrower under this Agreement and the other Loan Documents to which the Borrower is a party pursuant to a supplement hereto or thereto in form reasonably satisfactory to the Administrative Agent and the Borrower, (C) each Guarantor, unless it is the other party to such merger or consolidation, shall have confirmed that its Guarantee shall apply to the Successor Borrower's obligations under the Loan Documents, (D) each Guarantor, unless it is the other party to such merger or consolidation, shall have by a supplement to the Security Agreement and other applicable Collateral Documents confirmed that the collateral granted by it to secure its obligations thereunder shall apply to secure its and the Successor Borrower's obligations under the Loan Documents, (E) if reasonably requested by the Collateral Agent, each mortgagor of a Mortgaged Property, unless it is the other party to such merger or consolidation, shall have by an amendment to or restatement of the applicable Mortgage (or other instrument reasonably satisfactory to the Collateral Agent) confirmed that the collateral granted by it to secure its obligations thereunder shall apply to secure its and the Successor Borrower's obligations under the Loan Documents, and (F) the Borrower shall have delivered to the Administrative Agent an officer's certificate and an opinion, each stating that such merger or consolidation and such supplement to this Agreement or any Collateral Document comply with this Agreement; *provided further*, that if the foregoing are satisfied (or waived), the Successor Borrower will succeed to, and be substituted for, the Borrower under this Agreement; *provided further* that the Borrower agrees to provide any documentation and other information about the Successor Borrower as shall have been reasonably requested in writing by any Lender through the Administrative Agent that is required by regulatory authorities or under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation the USA Patriot Act;

(m)   any Restricted Subsidiary may merge, amalgamate or consolidate with any other Person (other than the Borrower) in order to effect an Investment permitted pursuant to Section 7.02; *provided* that either (x) the continuing or surviving Person shall be a Restricted Subsidiary, which together with each of its Restricted Subsidiaries, shall have complied with the requirements of Section 6.11 to the extent required pursuant to the Collateral and Guarantee Requirement or (y) the transaction shall otherwise constitute a permitted Investment;

(n)   any Restricted Subsidiary may effect a merger, dissolution, liquidation or consolidation, the purpose of which is to effect a Disposition permitted pursuant to Section 7.05; and

(o)   any Restricted Subsidiary may Dispose of all or substantially all of its assets (upon voluntary liquidation or otherwise) to the extent that such Disposition (or series of related Dispositions) is not prohibited under Section 7.05.

Section 7.05.   *Dispositions.* The Borrower shall not, nor shall it permit any Restricted Subsidiary to, directly or indirectly, make any Disposition, except:

(i)   (i) Dispositions (including abandonment) of obsolete or worn out property, whether now owned or hereafter acquired, in the ordinary course of business, (ii) Dispositions (including abandonment) in the ordinary course of business of surplus property or property no longer used or useful in the conduct of the business of the Borrower or any of the Restricted Subsidiaries, (iii) Dispositions of immaterial assets (considered in the aggregate) in the ordinary course of business, and (iv) Dispositions to landlords of improvements made to leased real property pursuant to customary terms of leases entered into in the ordinary course of business;

(j)   Dispositions of property to the extent that (i) such property is exchanged for credit against the purchase price of similar replacement property, (ii) the proceeds of such Disposition are promptly applied to the purchase price of such replacement property, or (iii) such property is swapped in exchange for services or other assets of comparable or greater value or usefulness to the business of the Borrower and the Subsidiaries as whole, as determined in good faith by the management of the Borrower;

(k)   Dispositions of property to the Borrower or any Restricted Subsidiary; *provided* that if the transferor of such property is a Loan Party (i) either (x) the transferee thereof must be a Loan Party and if such property constitutes Collateral, it shall continue to constitute Collateral after such Disposition or (y) the transferee is not a Loan Party and the aggregate amount disposed of in any calendar year shall not exceed $10,000,000 or (ii) if such transaction constitutes an Investment, such transaction is permitted under Section 7.02;

(l)   Dispositions of cash and Cash Equivalents;

(m)   leases, subleases, licenses, sublicenses (including the provision of software under an open source license) or any abandonment thereof, in each case (i) in the ordinary course of business and (ii) without interfering in any material respect with the business of the Borrower or any of its Restricted Subsidiaries;

(n)   transfers of property subject to Casualty Events upon the receipt (where practical) of the Net Proceeds of such Casualty Event;

(o)   Dispositions (including write-offs, discounts, and compromises in clause (b) above) or discounts without recourse of accounts receivable and related assets in connection with the compromise or collection thereof in the ordinary course of business;

(p)   [reserved];

(q)   any sale of Equity Interests in, or Indebtedness or other securities of, an Unrestricted Subsidiary;

(r)   Dispositions of Investments in joint ventures or other non-wholly owned Subsidiaries to the extent required by, or made pursuant to, customary buy/sell arrangements between the joint venture parties set forth in joint venture arrangements and similar binding arrangements;

(s)   the unwinding of any Swap Contract or cash management agreement;

(t)   Dispositions of property not otherwise permitted under this Section 7.05; *provided* that (i) at the time of such Disposition (other than any such Disposition made pursuant to a legally binding commitment entered into at a time when no Event of Default exists), no Event of Default shall exist or would result from such Disposition, (ii) any prepayment required to be made in connection with the receipt of Net Proceeds in respect of such Disposition pursuant to Section 2.13 shall be made in accordance therewith, and (iii) with respect to any Disposition or series of related Dispositions pursuant to this clause (l) for a purchase price in excess of $5,000,000, the Borrower or any of the Restricted Subsidiaries shall receive not less than 75% of such consideration in the form of cash or Cash Equivalents (in each case, free and clear of all Liens at the time received, other than nonconsensual Liens permitted by Section 7.01 and Liens permitted by Section 7.01(a), (c), (d), (f), (i), (j), (k), (l) (o), (p), (v), (w), (z), (aa), (bb), (cc), (dd) and (ee); *provided, however*, that for the purposes of this clause (l)(iii), the following shall be deemed to be cash: (A) any liabilities contingent or otherwise (as shown on the Borrower's most recent balance sheet provided hereunder or in the footnotes thereto) of the Borrower or such Restricted Subsidiary, other than liabilities that are by their terms subordinated to the payment in cash of the Obligations, that are assumed by the transferee with respect to or in connection with the applicable Disposition and for which the Borrower and all of its Restricted Subsidiaries shall have been validly released by all applicable creditors in writing, (B) any securities received by the Borrower or the applicable Restricted Subsidiary from such transferee that are converted by the Borrower or such Restricted Subsidiary into cash or Cash Equivalents (to the extent of the cash or Cash Equivalents received) within 180 days following the closing of the applicable Disposition, (C) aggregate non-cash consideration received by the Borrower or the applicable Restricted Subsidiary having an aggregate fair market value (determined as of the closing of the applicable Disposition for which such non-cash consideration is received) not to exceed $10,000,000 at any time (net of any non-cash consideration converted into cash and Cash Equivalents), (D) Indebtedness of any Restricted Subsidiary that is no longer a Restricted Subsidiary as a result of such Disposition, to the extent the Borrower and each other Restricted Subsidiary are released from any Guarantee of payment of such Indebtedness in connection with such Disposition, (E) consideration consisting of Indebtedness of the Borrower (other than Subordinated Indebtedness) received after the Closing Date from Persons who are not the Borrower or any Restricted Subsidiary, and (F) the fair market value (as determined by the Borrower) of non-cash consideration received by the Borrower or one of its Restricted Subsidiaries in connection with a Disposition (and which

will no longer be considered to be outstanding when and to the extent it has been paid, redeemed or otherwise retired or sold or otherwise disposed of in compliance with Section 6.05);

(u)   any Disposition of Securitization Assets or Receivables Assets, or participations therein, in connection with any Qualified Securitization Financing or Receivables Facility, or the Disposition of an account receivable in connection with the collection or compromise thereof in the ordinary course of business or consistent with past practice;

(v)   the disposition of any assets existing on the Closing Date that are set forth on Schedule 7.05;

(w)   dispositions from and after the Closing Date of non-core or obsolete assets acquired in connection with any Permitted Acquisition or other permitted Investments;

(x)   the incurrence of Liens permitted hereunder;

(y)   sales or dispositions of Equity Interests of any Subsidiary (other than the Borrower) in order to qualify members of the governing body of such Subsidiary if required by applicable law;

(z)   sales, transfers and other dispositions of (i) any Equity Interests in Unrestricted Subsidiaries or their assets or (ii) Excluded Real Property or any other Excluded Property (as defined in the Security Agreement);

(aa)   Restricted Payments made pursuant to Section 7.06; and

(bb)   Sale and Leaseback Transactions in an aggregate principal amount not to exceed $50,000,000 at any time;

*provided* that any Disposition of any property pursuant to this Section 7.05 (except pursuant to Sections 7.05(a), (c), (e), (f), (g), (j), (k), (m), (n), (o), (q), (r) and (s) and except for Dispositions from a Loan Party to any other Loan Party) shall be for no less than the fair market value of such property at the time of such Disposition. To the extent any Collateral is Disposed of as expressly permitted by this Section 7.05 to any Person other than a Loan Party, such Collateral shall be automatically sold free and clear of the Liens created by the Loan Documents, and, if requested by the Borrower, upon the certification delivered to the Administrative Agent by the Borrower that such Disposition is permitted by this Agreement, the Administrative Agent or the Collateral Agent, as applicable, shall be authorized to take, and shall take, any actions reasonably requested by the Borrower in order to effect the foregoing (at the Borrower's expense) and/or to expressly subordinate any Lien in favor of the Collateral Agent on such Collateral that is disposed of.

Section 7.06.   *Restricted Payments.* The Borrower shall not, nor shall it permit any Restricted Subsidiary to, directly or indirectly, declare or make, directly or indirectly, any Restricted Payment, except:

(m)   each Restricted Subsidiary may make Restricted Payments to the Borrower or any other Restricted Subsidiary (and, in the case of a Restricted Payment by a non-wholly owned Restricted Subsidiary, to the Borrower and any other Restricted Subsidiary and to each other owner of Equity Interests of such Restricted Subsidiary based on their relative ownership interests of the relevant class of Equity Interests);

(n)   the Borrower and each Restricted Subsidiary may declare and make dividend payments or other Restricted Payments payable solely in the Equity Interests (other than Disqualified Equity Interests unless such Disqualified Equity Interests would be permitted by Section 7.03) of such Person;

(o)   (i) repurchases of Equity Interests in the Borrower deemed to occur upon the exercise of stock options or warrants or the settlement or vesting of other equity awards if such Equity Interests represent a portion of the exercise price of such options or warrants, (ii) cash payments in lieu of the issuance of fractional shares in connection with the exercise of stock options, warrants or other securities convertible into or exchangeable for Equity Interests of the Borrower or (iii) Restricted Payments made in respect of any other transaction involving fractional shares; *provided*, *however*, that any such cash payment shall not be for the purpose of evading the limitations of this Agreement;

(p)   the Borrower may pay for the repurchase, retirement or other acquisition or retirement for value of Equity Interests of the Borrower held by any present or former employee, officer, director or consultant of the Borrower or any Restricted Subsidiary or equity based awards held by such Persons, in each case, upon the death, disability, retirement or termination of employment of any such Person or pursuant to any employee or director equity plan, employee or director stock option plan or any other employee or director benefit plan or any agreement (including any stock subscription or shareholder agreement) with any employee, director, officer or consultant of the Borrower or any Restricted Subsidiary; *provided*, that the aggregate amount of Restricted Payments made pursuant to this clause (d) shall not exceed (i) $7,500,000 in any fiscal year plus (ii) the then applicable Cumulative Credit plus (iii) the proceeds of any key man insurance policies; *provided*, *further*, that to the extent that the aggregate amount of Restricted Payments made by the Borrower and the Restricted Subsidiaries pursuant to this clause (d) in any fiscal year is less than the amount set forth above, 100% of the amount of such difference may be carried forward and used to make such Restricted Payments pursuant to this clause (d) in the next two succeeding fiscal years (*provided*, that any such amount carried forward shall be deemed to be used to make such Restricted Payments in any fiscal year after the amount set forth above for such fiscal year shall be deemed to be used to make such Restricted Payments for such fiscal year);

(q)   the Borrower may make Restricted Payments in an aggregate amount not to exceed (x) the greater of (i) $30,000,000 and (ii) 2% of Consolidated Total Assets at the time of any such Restricted Payment, plus (y) the portion, if any, of the Cumulative Credit on such date that the Borrower elects to apply to this subclause (y); *provided*, that with

respect to any Restricted Payment made pursuant to this Section 7.06(e), no Event of Default has occurred and is continuing or would result therefrom;

(r)   distributions or payments of Securitization Fees, sales, contributions and other transfers of Securitization Assets or Receivables Assets and purchases of Securitization Assets or Receivables Assets pursuant to a Securitization Purchase Obligations, in each case in connection with a Qualified Securitization Financing or a Receivables Facility;

(s)   [reserved];

(t)   the Restricted Subsidiaries may make a Restricted Payment in connection with the acquisition of additional Equity Interests in any Restricted Subsidiary from minority shareholders (in accordance with Section 7.08, if applicable);

(u)   Restricted Payments made (i) in respect of working capital adjustments or purchase price adjustments pursuant to any Permitted Acquisition or other permitted Investments (other than pursuant to Section 7.02(x)) and (ii) to satisfy indemnity and other similar obligations under the Permitted Acquisitions or other permitted Investments;

(v)   the Borrower may make Restricted Payments consisting of Equity Interests in any Unrestricted Subsidiary, whether pursuant to a distribution, dividend or any other transaction not prohibited hereunder; and

(w)   Restricted Payments in respect of transactions related to (i) fundamental changes permitted under Section 7.04 and (ii) Investments permitted under Section 7.02.

Section 7.07.   *Change in Nature of Business; Organization Documents.*

(g)   The Borrower shall not, nor shall the Borrower permit any of the Restricted Subsidiaries to, directly or indirectly, engage in any material line of business substantially different from those lines of business conducted by the Borrower and the Restricted Subsidiaries on the Closing Date or any business reasonably related, complementary, synergistic or ancillary thereto or reasonable extensions thereof.

(h)   The Borrower shall not, nor shall the Borrower permit any of the Restricted Subsidiaries to, amend, restate, supplement or otherwise modify to, or waive of any of its rights under, its Organization Documents to the extent any of the foregoing could reasonably be expected to be material and adverse to the Lenders (in their capacities as such).

Section 7.08.   *Transactions with Affiliates.* The Borrower shall not, nor shall it permit any Restricted Subsidiary to, directly or indirectly, enter into any transaction of any kind with any of its Affiliates, whether or not in the ordinary course of business, other than (a) transactions between or among Loan Parties or any entity that becomes a Loan Party as a result of such transaction and transactions between or among Restricted Subsidiaries that are not Loan Parties,

(b) on terms (taken as a whole) substantially not less favorable to the Borrower in any material respect or such Restricted Subsidiary as would be obtainable by the Borrower or such Restricted Subsidiary at the time in a comparable arm's-length transaction with a Person other than an Affiliate, (c) the Transactions and the payment of fees and expenses (including Transaction Expenses) as part of or in connection with the Transactions, (d) the issuance of Equity Interests or equity based awards to any officer, director, employee or consultant of the Borrower or any of its Restricted Subsidiaries in the ordinary course of business, (e) Investments made pursuant to Section 7.02, Indebtedness incurred pursuant to Section 7.03, Dispositions made pursuant to Section 7.05(c)(i)(y) and Restricted Payments permitted under Section 7.06, (f) customary employment, consulting and severance arrangements between the Borrower and the Restricted Subsidiaries and their respective officers and employees in the ordinary course of business and transactions pursuant to stock option plans and employee benefit plans and similar arrangements in the ordinary course of business, (h) the payment of customary fees and reasonable out of pocket costs to, and customary indemnities provided on behalf of, directors, officers, employees and consultants of the Borrower and the Restricted Subsidiaries in the ordinary course of business, (i) any customary transaction with a Receivables Facility or a Securitization Subsidiary effected as part of a Qualified Securitization Financing, (j) transactions pursuant to registration rights agreements and similar arrangements, (k) transactions in which the Borrower or any Restricted Subsidiary, as the case may be, delivers to the Administrative Agent a letter from an independent financial advisor stating that such transaction is fair to the US Borrower or such Restricted Subsidiary from a financial point of view or meets the requirements of clause (b) of this Section 7.08, (l) transactions existing before an entity was designated as an Unrestricted Subsidiary (and not entered into in contemplation of such designation), and (m) transactions pursuant to agreements in existence on the Closing Date and set forth on Schedule 7.08 or any amendment thereto to the extent such an amendment (taken as a whole) is not adverse to the Lenders in any material respect.

Section 7.09.   *Burdensome Agreements.* The Borrower shall not, nor shall it permit any Restricted Subsidiary to, directly or indirectly, enter into or permit to exist any Contractual Obligation (other than (i) this Agreement or any other Loan Document, (ii) any ABL Loan Documents or (iii) any documents governing Credit Agreement Refinancing Indebtedness, Alternative Incremental Indebtedness, or a Permitted Refinancing of (ii)-(iii)) that limits the ability of (a) any Restricted Subsidiary that is not a Guarantor to make Restricted Payments to the Borrower or any Guarantor or to make or repay loans or advances to or otherwise transfer assets to or make Investments in the Borrower or any Restricted Subsidiary that is a Guarantor or (b) any Loan Party to create, incur, assume or suffer to exist Liens on property of such Person to secure the Obligations; *provided* that the foregoing clauses (a) and (b) shall not apply to Contractual Obligations which (i) (x) exist on the Closing Date and (to the extent not otherwise permitted by this Section 7.09) are listed on Schedule 7.09 hereto and (y) to the extent Contractual Obligations permitted by clause (x) are set forth in an agreement evidencing Indebtedness, are set forth in any agreement evidencing any permitted modification, replacement, renewal, extension or refinancing of such Indebtedness so long as such modification, replacement, renewal, extension or refinancing does not expand the scope of such Contractual Obligation in any material respect (as determined in good faith by the Borrower), (ii) are binding on a Restricted Subsidiary at the time such Restricted Subsidiary first becomes a

Restricted Subsidiary, so long as such Contractual Obligations were not entered into in contemplation of such Person becoming a Restricted Subsidiary, (iii) represent Indebtedness of a Restricted Subsidiary which is not a Loan Party which is permitted by Section 7.03, (iv) arise in connection with any Disposition permitted by Section 7.04 or 7.05 and relate solely to the assets or Person subject to such Disposition, (v) are customary provisions in joint venture agreements and other similar agreements applicable to joint ventures or other non-wholly owned Subsidiaries permitted under Section 7.02 and applicable solely to such joint venture or other non-wholly owned Subsidiaries and are entered into in the ordinary course of business, (vi) are negative pledges and restrictions on Liens in favor of any holder of Indebtedness (other than any Junior Financing) permitted under Section 7.03(e) or (g)(ii) but solely to the extent any negative pledge relates to the property financed by such Indebtedness, (vii) are customary restrictions in leases, subleases, licenses or asset sale agreements otherwise permitted hereby so long as such restrictions relate only to the assets subject thereto, (viii) comprise restrictions imposed by any agreement governing secured Indebtedness permitted pursuant to Section 7.03 to the extent that such restrictions apply only to the property or assets securing such Indebtedness, (ix) are customary provisions restricting subletting or assignment of any lease governing a leasehold interest of the Borrower or any Restricted Subsidiary entered into in the ordinary course of business, (x) are customary provisions restricting assignment of any agreement entered into in the ordinary course of business, (xi) are customary restrictions contained in the ABL Facility Documentation and any Qualified Securitization Financing, (xii) arise in connection with cash or other deposits permitted under Sections 7.01 and 7.02 and limited to such cash or deposit or (xiii) comprise restrictions imposed by any agreement governing Indebtedness entered into on or after the Closing Date and permitted under Section 7.03 if the restrictions contained in any such agreement taken as a whole (a) are not materially less favorable to the Secured Parties than the encumbrances and restrictions contained in the Loan Documents (as determined by the Borrower) or (b) either (I) the Borrower determines at the time of entry into such agreement or instrument that such encumbrances or restrictions will not adversely affect, in any material respect, the Borrower's ability to make principal or interest payments required hereunder or (II) such encumbrance or restriction applies only during the continuance of a default relating to such agreement or instrument.

Section 7.10. *Financial Covenant.* The Borrower shall not permit the Total Leverage Ratio as of the last day of any Test Period ending as of the end of each of its fiscal quarters, commencing with the fiscal quarter ending June 30, 2014, set forth below to exceed the applicable ratio set forth below:

| Test Period Ending | Maximum Total Ratio |
|---|---|
| June 30, 2014 | 6.00 to 1.0 |
| September 30, 2014 | 5.00 to 1.0 |
| December 31, 2014 | 4.50 to 1.0 |
| March 31, 2015 | 4.00 to 1.0 |
| June 30, 2015 | 3.75 to 1.0 |
| September 30, 2015 | 3.75 to 1.0 |
| December 31, 2015 | 3.75 to 1.0 |
| March 31, 2016 | 3.50 to 1.0 |
| June 30, 2016 | 3.50 to 1.0 |
| September 30, 2016 | 3.50 to 1.0 |
| December 31, 2016 | 3.25 to 1.0 |
| March 31, 2017 | 3.25 to 1.0 |
| June 30, 2017 | 3.25 to 1.0 |
| September 30, 2017 | 3.25 to 1.0 |
| December 31, 2017 and thereafter | 3.00 to 1.0 |

Section 7.11.  *Capital Expenditures.* The Borrower shall not, nor shall it permit any Restricted Subsidiary to, make Capital Expenditures during any period set forth below in excess of the amount set forth below for such period:

| Period | Amount |
|---|---|
| 2014 | $200,000,000 |
| 2015 | $200,000,000 |
| 2016 | $275,000,000 |
| 2017 | $350,000,000 |
| 2018 | $375,000,000 |

The amount of permitted Capital Expenditures set forth above in respect of any fiscal year commencing with the fiscal year ending on December 31, 2015, shall be increased (but not decreased) by (a) the amount of unused permitted Capital Expenditures for the immediately preceding fiscal year less (b) the amount (if any) equal to unused Capital Expenditures carried forward to such preceding fiscal year. The amount of permitted Capital Expenditures set forth above in respect of any fiscal year may at the option of the Borrower be increased by (i) the amount of Capital Expenditures scheduled to be available for the next succeeding year, with a corresponding reduction in the amount of permitted Capital Expenditures for such next succeeding year, *plus* (ii) the portion, if any, of the Cumulative Credit on such date that the Borrower elects to apply to this subclause (ii). In no event shall the Borrower permit the aggregate amount of Capital Expenditures during all periods set forth above to exceed the aggregate amount of permitted Capital Expenditures during all such periods as a result of the carry-forward and carry-back provisions set forth in the two immediately preceding sentences.

Section 7.12.  *Fiscal Year.* The Borrower shall not make any change in its fiscal year or fiscal quarters (it being understood that the Borrower's fiscal year ends on December 31 of each year, and that each of the first three fiscal quarters of each fiscal year of the Borrower ends on the March 31, June 30 and September 30, respectively); *provided, however*, that the Borrower may, upon written notice to the Administrative Agent, change its fiscal year and fiscal quarters to any other fiscal year (and any other fiscal quarters) reasonably acceptable to the Administrative Agent, in which case, the Borrower and the Administrative Agent will, and are hereby authorized by the Lenders to, make any adjustments to this Agreement that are necessary to reflect such changes.

Section 7.13.  *Prepayments, Etc. of Indebtedness.*

(d)  The Borrower shall not, nor shall it permit any Restricted Subsidiary to, directly or indirectly, voluntarily prepay, redeem, purchase, defease or otherwise satisfy prior to the scheduled maturity thereof in any manner (it being understood that payments of regularly scheduled interest shall be permitted unless such payments violate any subordination terms of any Junior Financing Documentation) any Permitted Second Priority Additional Debt or any Junior Financing that constitutes Subordinated Indebtedness (or any Permitted Refinancing thereof), or make any payment in violation of any subordination terms of any Junior Financing Documentation, if any, except (i) any Permitted Refinancing permitted in respect thereof, (ii) the conversion of any Permitted Second Priority Additional Debt or Junior Financing that constitutes Subordinated Indebtedness (or any Permitted Refinancing thereof) to Equity Interests (other than Disqualified Equity Interests unless such Disqualified Equity Interests would be permitted by Section 7.03) of the Borrower, (iii) the prepayment of Indebtedness of the Borrower or any Restricted Subsidiary to the Borrower or any Restricted Subsidiary to the extent not prohibited by applicable subordination provisions, (iv) prepayments, redemptions, purchases, defeasances and other payments or satisfaction from the proceeds of equity issuances, (v) AHYDO "catch up" payments, (vi) prepayments, redemptions, purchases, defeasances and other payments in respect of Permitted Second Priority Additional Debt (or any Permitted Refinancing thereof) and Junior Financings that constitutes Subordinated Indebtedness prior to their scheduled maturity in an aggregate amount not to exceed (x) the greater of (i) $30,000,000 and (ii) 2% of Consolidated Total Assets at the time thereof, *plus* (y) the portion, if any, of the Cumulative Credit on such date that the Borrower elects to apply to this subclause (y); *provided*, that no prepayment, redemption, purchase, defeasance or other payment shall be made pursuant to this clause (vi) if an Event of Default has occurred and is continuing or would result therefrom. For greater certainty, nothing in this Section 7.13(a) or elsewhere in this Agreement shall limit or restrict the ability of the Borrower or any Restricted Subsidiary to prepay, redeem, purchase, defease or otherwise satisfy prior to the scheduled maturity thereof (i) any Existing Series A Notes or Existing Series B Notes or any Indebtedness listed on Schedule 7.03(b), in each case, that remain outstanding after the consummation of the Recapitalization Transactions and the other Transactions on the Closing Date or (ii) any ABL Facility Indebtedness or other obligations also secured pursuant to the ABL Credit Agreement.

(e)    The Borrower shall not, nor shall it permit any Restricted Subsidiary to, directly or indirectly, amend, modify, change, terminate or release in any manner materially adverse to the interests of the Lenders any term or condition of any Junior Financing Documentation or the documentation governing any Permitted Second Priority Additional Debt (or any Permitted Refinancing thereof) if the effect thereof would be to cause such Junior Financing or Permitted Second Priority Additional Debt to no longer constitute Junior Financing or Permitted Second Priority Additional Debt, as the case may be, without the consent of the Administrative Agent (which consent shall not be unreasonably withheld, conditioned or delayed); *provided*, that the ABL Facility Indebtedness shall not be subject to this clause (b) unless expressly designated as Permitted Second Priority Additional Debt.

## ARTICLE 8
### EVENTS OF DEFAULT AND REMEDIES

Section 8.01.    *Events of Default.* Any of the following from and after the Closing Date shall constitute an event of default (an "**Event of Default**"):

(ii)    *Non-Payment.* Any Loan Party fails to pay (i) when and as required to be paid herein or in any other Loan Document, any amount of principal of any Loan, (ii) within five (5) Business Days after the same becomes due, any interest on any Loan, or (iii) within ten (10) days after the same becomes due, any other amount payable hereunder or with respect to any other Loan Document; or

(jj)    *Specific Covenants.* The Borrower fails to perform or observe any term, covenant or agreement contained in any of Sections 6.03(a) (*provided* that the delivery of a notice of Default or Event of Default at any time will cure an Event of Default under Section 6.03(a) arising from the failure of the Borrower to timely deliver such notice of Default or Event of Default) or 6.05(a) (solely with respect to the Borrower) or Article 7; or

(kk)    *Other Defaults.* Any Loan Party fails to perform or observe any other term, covenant or agreement (not specified in Section 8.01(a) or (b) above) contained in any Loan Document on its part to be performed or observed and such failure continues for thirty (30) days after receipt by the Borrower of written notice thereof from the Administrative Agent; or

(ll)    *Representations and Warranties.* Any representation, warranty, certification or statement of fact made or deemed made by or on behalf of the Borrower or any other Loan Party herein, in any other Loan Document, or in any Compliance Certificate or other document required to be delivered in connection herewith or therewith shall be incorrect or misleading in any material respect when made or deemed made; or

(mm)    *Cross-Default.* Any Loan Party or any Restricted Subsidiary (i) fails to make any payment after the applicable grace period with respect thereto, if any, (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) in

respect of any other Indebtedness (other than Indebtedness hereunder ) having an outstanding aggregate principal amount of not less than the Threshold Amount or (ii) fails to observe or perform any other agreement or condition relating to any such Indebtedness, or any other event occurs (other than, with respect to Indebtedness consisting of Swap Contracts, termination events or equivalent events pursuant to the terms of such Swap Contracts and not as a result of any other default thereunder by any Loan Party), after all grace periods having expired and all required notices having been given, the effect of which default or other event is to cause, or to permit the holder or holders of such Indebtedness (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, afterall grace periods having expired and all required notices having been given, such Indebtedness to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity; *provided* that, any such failure or the occurrence of any such other event referred to in subclause (ii) relating to Indebtedness under the ABL Credit Agreement or any Permitted Refinancing thereof shall constitute an Event of Default under this Section 8.01(e) only after any acceleration of the ABL Obligations (as defined in the ABL Intercreditor Agreement) outstanding under the ABL Credit Agreement, whether automatic or otherwise; *provided* further that this clause (e)(ii) shall not apply to (I) secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness, (II) Indebtedness which is convertible into Equity Interest and converts to Equity Interests in accordance with its terms or (III) any breach or default that (X) is remedied by the Borrower or the applicable Restricted Subsidiary or (Y) waived (including in the form of amendment) by the requisite holders of the applicable item of Indebtedness, in either case, prior to the acceleration of all the Loans pursuant to this Section 8.01; or

(nn)   *Insolvency Proceedings, Etc.* Any Loan Party or any Restricted Subsidiary institutes or consents to the institution of any voluntary or involuntary proceeding under any Debtor Relief Law, or makes a general assignment for the benefit of creditors; or applies for or consents to the appointment of any receiver, trustee, custodian, conservator, liquidator, rehabilitator, administrator, administrative receiver or similar officer for it or for all or substantially all of its property; or any receiver, trustee, custodian, conservator, liquidator, rehabilitator, administrator, administrative receiver or similar officer is appointed without the application or consent of such Person and the appointment continues undischarged or unstayed for sixty (60) consecutive calendar days; or any proceeding under any Debtor Relief Law relating to any such Person or to all or substantially all of its property is instituted without the consent of such Person and continues undismissed or unstayed for sixty (60) consecutive calendar days, or an order for relief is entered in any such proceeding; or

(oo)   *Inability to Pay Debts; Attachment.* Any Loan Party or any Restricted Subsidiary becomes unable or admits in writing its general inability or fails generally to pay its debts as they become due, or any writ or warrant of attachment or execution or similar process is issued or levied against all or substantially all of the property of the

Borrower and the Restricted Subsidiaries, taken as a whole, and is not released, vacated or fully bonded within sixty (60) consecutive days after its issue or levy; or

(pp) *Judgments*. There is entered against any Loan Party or any Restricted Subsidiary a final judgment or order for the payment of money in an aggregate amount exceeding the Threshold Amount (to the extent not covered by independent third-party insurance or indemnity as to which the insurer or third party indemnitor has been notified of such judgment or order and has not denied coverage) and such judgment or order shall not have been satisfied, vacated, discharged or stayed or bonded pending an appeal for a period of sixty (60) consecutive days; or

(qq) *Invalidity of Loan Documents*. Any material provision of the Loan Documents, at any time after their execution and delivery and for any reason other than as expressly permitted hereunder or thereunder (including as a result of a transaction permitted under Section 7.04 or 7.05) or as a result of acts or omissions by the Administrative Agent or Collateral Agent or any Lender or the satisfaction in full of all the Obligations (other than other than contingent obligations), ceases to be in full force and effect; or any Loan Party contests in writing the validity or enforceability of any provision of any Loan Document; or any Loan Party denies in writing that it has any or further liability or obligation under any Loan Document (other than as a result of repayment in full of the Obligations), or purports in writing to revoke or rescind any Loan Document; or

(rr) *Change of Control*. There occurs any Change of Control; or

(ss) *Collateral Documents*. The Collateral Documents after delivery thereof pursuant to Sections 4.02, 6.11 or 6.13 shall for any reason (other than pursuant to the terms hereof or thereof including as a result of a transaction permitted under Section 7.04 or 7.05) cease to create, or shall be asserted by any Loan Party not to create, a valid and perfected Lien, with the priority required by the Collateral Documents on and security interest in Collateral purported to be covered thereby with an aggregate value equal to or greater than $25,000,000, subject to Liens permitted under Section 7.01, (i) except to the extent that any such perfection or priority is not required pursuant to the Collateral and Guarantee Requirement or results from the failure of the Administrative Agent or the Collateral Agent to maintain possession or control of certificates representing securities, other collateral requiring possession or control, or motor vehicle certificates of title (or notation thereon) pledged under the Collateral Documents, in each case actually delivered to it, or to file Uniform Commercial Code financing statements or continuation statements or any Collateral Documents and (ii) except as to Collateral consisting of Real Property to the extent that such losses are covered by a lender's title insurance policy and such insurer has not denied coverage; or

(tt) *ERISA*. (i) An ERISA Event that occurs after the Closing Date and that, alone or together with any other ERISA Events that have occurred after the Closing Date, has resulted or could reasonably be expected to result in liability of a Loan Party, any Restricted Subsidiary or any of their respective ERISA Affiliates in an aggregate amount at any particular time that would reasonably be expected to have a Material Adverse

Effect, or (ii) a Loan Party, any Restricted Subsidiary or any of their respective ERISA Affiliates fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its Withdrawal Liability under Section 4201 of ERISA under a Multiemployer Plan in an aggregate amount, that, alone or together with any other such failures to pay, has resulted or would reasonably be expected to result in a Material Adverse Effect; or

(uu)   *Junior Financing Documentation*. (i) Any of the Obligations of the Loan Parties under the Loan Documents for any reason shall cease to be, or shall be asserted by any Loan party not to be, "Senior Indebtedness" (or any comparable term) or "Senior Secured Financing" (or any comparable term) under, and as defined in, any Junior Financing Documentation in respect of any Junior Financing that is, or is required by this Agreement to be, Subordinated Indebtedness or (ii) the subordination provisions set forth in any Junior Financing Documentation in respect of any Junior Financing that is, or is required by this Agreement to be, Subordinated Indebtedness shall, in whole or in part, cease to be, or shall be asserted by any Loan Party not to be, effective or legally valid, binding and enforceable against the holders of any such Junior Financing, if applicable (other than as a result of acts or omissions by the Administrative Agent or Collateral Agent or the satisfaction in full of all the Obligations (other than contingent obligations)); or

(vv)   *IBT Agreement*. The IBT Agreement shall be declared invalid or illegal, shall be terminated, or shall no longer be in full force and effect.

Section 8.02.   *Remedies Upon Event of Default.* If any Event of Default occurs and is continuing, the Administrative Agent may, and at the request of the Required Lenders shall, take any or all of the following actions:

(i)   declare the commitment of each Lender to make Loans to be terminated, whereupon such commitments shall be terminated;

(ii)   declare the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable or accrued hereunder or under any other Loan Document to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived (to the extent permitted by applicable law) by the Borrower and each other Loan Party; and

(iii)   subject to the terms, conditions and provisions of any Intercreditor Agreement, exercise on behalf of itself and the Lenders all rights and remedies available to it and the Lenders under the Loan Documents or applicable Law;

*provided* that upon the occurrence of an actual or deemed entry of an order for relief with respect to the Borrower under the Bankruptcy Code of the United States, the obligation of each Lender to make Loans shall automatically terminate, the unpaid principal amount of all outstanding Loans and all interest and other amounts as aforesaid shall automatically become due and payable, in each case without further act of the Administrative Agent or any Lender, and without

presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived (to the extent permitted by applicable law) by the Borrower and each other Loan Party.

Section 8.03.   *Exclusion of Immaterial Subsidiaries.* Solely for the purpose of determining whether a Default or an Event of Default has occurred under clause (f) or (g) of Section 8.01, any reference in any such clause to any Restricted Subsidiary or Loan Party shall be deemed not to include any Restricted Subsidiary affected by any event or circumstances referred to in any such clause that was not, as of the last day of the most recent completed fiscal quarter of the Borrower, an Immaterial Subsidiary.

Section 8.04.   *Application of Funds.* Subject to the terms, conditions and provisions of each Intercreditor Agreement, after the exercise of remedies provided for in Section 8.02 (or after the Loans have automatically become immediately due and payable as set forth in the proviso to Section 8.02), any amounts received on account of the Obligations shall be applied by the Administrative Agent in the following order (to the fullest extent permitted by mandatory provisions of applicable Law):

*First*, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (other than principal and interest, but including Attorney Costs payable under Section 10.05 and amounts payable under Article 3) payable to the Administrative Agent or the Collateral Agent in its capacity as such;

*Second*, to payment of that portion of the Obligations constituting fees, indemnities and other amounts (other than principal and interest) payable to the Lenders (including Attorney Costs payable under Section 10.05 and amounts payable under Article 3), ratably among them in proportion to the amounts described in this clause *Second* payable to them;

*Third*, to payment of that portion of the Obligations constituting accrued and unpaid interest on the Loans, and any fees, premiums and scheduled periodic payments due under Secured Hedge Agreements, ratably among the Secured Parties in proportion to the respective amounts described in this clause *Third* payable to them;

*Fourth*, to payment of that portion of the Obligations constituting unpaid principal of the Loans and any breakage, termination or other payments under Secured Hedge Agreements, ratably among the Secured Parties in proportion to the respective amounts described in this clause *Fourth* held by them;

*Fifth*, to the payment of all other Obligations of the Borrower that are due and payable to the Administrative Agent and the other Secured Parties on such date, ratably based upon the respective aggregate amounts of all such Obligations owing to the Administrative Agent and the other Secured Parties on such date; and

*Last*, the balance, if any, after all of the Obligations (other than contingent obligations) have been paid in full, to the Borrower or as otherwise required by Law.

Notwithstanding the foregoing, no amount received from any Guarantor shall be applied to any Excluded Swap Obligation of such Guarantor.

**ARTICLE 9**
THE ADMINISTRATIVE AGENT AND THE COLLATERAL AGENT

Each Lender hereby irrevocably appoints the Administrative Agent and the Collateral Agent (for purposes of this Article 9, the Administrative Agent and the Collateral Agent are referred to collectively as the "**Agents**") its agent and authorizes the Agents to take such actions on its behalf and to exercise such powers as are delegated to such Agent by the terms of the Loan Documents, together with such actions and powers as are reasonably incidental or related thereto. Without limiting the generality of the foregoing, the Agents are hereby expressly authorized to (i) execute any and all documents (including releases) with respect to the Collateral and the rights of the Secured Parties with respect thereto, as contemplated by and in accordance with the provisions of this Agreement and the Collateral Documents (including, for the avoidance of doubt, (x) the ABL Intercreditor Agreement, including any amendment or supplement expressly contemplated thereby and (y) upon the incurrence of any Permitted Secured Additional Debt, the First Lien Intercreditor Agreement or the Second Lien Intercreditor Agreement, respectively) and (ii) negotiate, enforce or settle any claim, action or proceeding affecting the Lenders in their capacity as such, at the direction of the Required Lenders, which negotiation, enforcement or settlement will be binding upon each Lender.

The institution serving as the Administrative Agent and/or the Collateral Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not an Agent, and such bank and its Affiliates may accept deposits from, lend money to and generally engage in any kind of business with the Borrower or any Subsidiary or other Affiliate thereof as if it were not an Agent hereunder.

Neither Agent shall have any duties or obligations except those expressly set forth in the Loan Documents. Without limiting the generality of the foregoing, (a) neither Agent shall be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing, (b) neither Agent shall have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby that such Agent is instructed in writing to exercise by the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 10.08), and (c) except as expressly set forth in the Loan Documents, neither Agent shall have any duty to disclose, nor shall it be liable for the failure to disclose, any information relating to the Borrower or any of the Subsidiaries that is communicated to or obtained by the bank serving as Administrative Agent and/or Collateral Agent or any of its Affiliates in any capacity. Neither Agent shall be liable for any action taken or not taken by it with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 10.08) or in the absence of its own gross negligence or willful misconduct. Neither Agent shall be deemed to have knowledge of any Default unless and until written notice thereof is given to such Agent by the Borrower or a Lender, and neither Agent shall be responsible for or have any duty to ascertain or inquire into

(i) any statement, warranty or representation made in or in connection with any Loan Document, (ii) the contents of any certificate, report or other document delivered thereunder or in connection therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth in any Loan Document, (iv) the validity, enforceability, effectiveness or genuineness of any Loan Document or any other agreement, instrument or document, or (v) the satisfaction of any condition set forth in Article 4 or elsewhere in any Loan Document, other than to confirm receipt of items expressly required to be delivered to such Agent.

Each Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing believed by it in good faith to be genuine and to have been signed or sent by the proper Person. Each Agent may also rely upon any statement made to it orally or by telephone and believed by it in good faith to have been made by the proper Person, and shall not incur any liability for relying thereon. Each Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

Each Agent may perform any and all its duties and exercise its rights and powers by or through any one or more sub-agents appointed by it. Each Agent and any such sub-agent may perform any and all its duties and exercise its rights and powers by or through their respective Related Parties (other than Disqualified Lenders). The exculpatory provisions of the preceding paragraphs shall apply to any such sub-agent and to the Related Parties (other than Disqualified Lenders) of each Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the Facilities as well as activities as Agent.

Subject to the appointment and acceptance of a successor Agent as provided below, either Agent may resign at any time by notifying the Lenders and the Borrower in writing. Upon any such resignation, the Required Lenders shall have the right, with the consent of the Borrower, to appoint a successor. If no successor shall have been so appointed by the Required Lenders (with the consent of the Borrower (which consent shall not be required during the continuance of an Event of Default under Sections 8.01(a), (f) or (g))) and shall have accepted such appointment within 30 days after the retiring Agent gives notice of its resignation, then the retiring Agent may, on behalf of the Lenders (with the consent of the Borrower (which consent shall not be required during the continuance of an Event of Default under Sections 8.01(a), (f) or (g))), appoint a successor Agent which shall be a bank with an office in New York, New York, or an Affiliate of any such bank. If no successor Agent has been appointed pursuant to the immediately preceding sentence by the 30th day after the date such notice of resignation was given by such Agent, such Agent's resignation shall become effective and the Required Lenders shall thereafter perform all the duties of such Agent hereunder and/or under any other Loan Document until such time, if any, as the Required Lenders (with the consent of the Borrower (which consent shall not be required during the continuance of an Event of Default under Sections 8.01(a), (f) or (g))) appoint a successor Administrative Agent and/or Collateral Agent, as the case may be. Upon the acceptance of its appointment as Agent hereunder by a successor, such successor shall succeed to

and become vested with all the rights, powers, privileges and duties of the retiring Agent, and the retiring Agent shall be discharged from its duties and obligations hereunder. The fees payable by the Borrower to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor. After an Agent's resignation hereunder, the provisions of this Article and Section 10.05 shall continue in effect for the benefit of such retiring Agent, its sub-agents and their respective Related Parties (other than Disqualified Lenders) in respect of any actions taken or omitted to be taken by any of them while acting as Agent.

Each Lender acknowledges that it has, independently and without reliance upon the Agents or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender also acknowledges that it will, independently and without reliance upon the Agents or any other Lender and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement or any other Loan Document, any related agreement or any document furnished hereunder or thereunder.

Each Lender acknowledges and agrees that Credit Suisse AG or one or more of its Affiliates may (but is not obligated to) act as collateral agent or representative for the holders of ABL Facility Indebtedness, Permitted Secured Additional Debt, any Extended Term Loan or any Permitted Refinancing thereof under the collateral agreements with respect thereto and/or under the ABL Intercreditor Agreement, the First Lien Intercreditor Agreement or the Second Lien Intercreditor Agreement. Each Lender waives any conflict of interest, now contemplated or arising hereafter, in connection therewith and agrees not to assert against Credit Suisse AG or any of its Affiliates any claims, causes of action, damages or liabilities of whatever kind or nature relating thereto.

Notwithstanding any other provision of this Agreement or any provision of any other Loan Document, the Arranger is named as such for recognition purposes only, and in its capacity as such shall have no duties, responsibilities or liabilities with respect to this Agreement or any other Loan Document; it being understood and agreed that the Arranger shall be entitled to all indemnification and reimbursement rights in favor of the Agents provided herein and in the other Loan Documents. Without limitation of the foregoing, the Arranger in its capacity as such shall not, by reason of this Agreement or any other Loan Document, have any fiduciary relationship in respect of any Lender, Loan Party or any other Person.

## ARTICLE 10
### MISCELLANEOUS

Section 10.01. *Notices; Electronic Communications.* Notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by fax, as follows:

(p)   if to the Borrower or any other Loan Party, to it at:

YRC Worldwide Inc.
Attention of Chief Financial Officer and General Counsel
10990 Roe Avenue
Overland Park, Kansas 66211
Fax No. 913-696-6116
Tel. No. 913-696-6111 or 913-696-6132
Email:jamie.pierson@yrcw.com and michelle.friel@yrcw.com

With copy to:

Kirkland & Ellis LLP
Attention of Michelle Kilkenney, Esq.
300 North LaSalle
Chicago, Illinois 60654
Fax No. 312-862-2200
Tel. No. 312-862-2487
Email: michelle.kilkenney@kirkland.com

(q)   if to the Administrative Agent, to:

Credit Suisse AG
Agency Manager
Eleven Madison Avenue, 23rd Floor
New York, NY 10010
Fax No. 212-322-2291
Tel. No. 919-994-6369
agency.loanops@credit-suisse.com

(r)   if to a Lender, to it at its address (or fax number) set forth on Schedule 2.01 or in the Assignment and Acceptance, Incremental Amendment, or Refinancing Amendment pursuant to which such Lender shall have become a party hereto.

All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt if delivered by hand or overnight courier service or sent by fax or on the date three Business Days after dispatch by certified or registered mail if mailed, in each case delivered, sent or mailed (properly addressed) to such party as provided in this Section 10.01 or in accordance with the latest unrevoked direction from such party given in accordance with this Section 10.01. As agreed to among the Borrower, the Administrative Agent and the applicable Lenders from time to time, notices and other communications may also be delivered by e-mail to the e-mail address of a representative of the applicable Person provided from time to time by such Person.

The Borrower hereby agrees, unless directed otherwise by the Administrative Agent or unless the electronic mail address referred to below has not been provided by the Administrative Agent to the Borrower, that it will, or will cause its Restricted Subsidiaries to, provide to the Administrative Agent all information, documents and other materials that it is obligated to

furnish to the Administrative Agent pursuant to the Loan Documents or to the Lenders under Article 6, including all notices, requests, financial statements, financial and other reports, certificates and other information materials, but excluding any such communication that (i) is or relates to a Request for Credit Extension or a notice pursuant to Section 2.10, (ii) relates to the payment of any principal or other amount due under this Agreement prior to the scheduled date therefor, or (iii) provides notice of any Default or Event of Default under this Agreement or any other Loan Document, (all such non-excluded communications being referred to herein collectively as "**Communications**"), by transmitting the Communications in an electronic/soft medium that is properly identified in a format reasonably acceptable to the Administrative Agent to an electronic mail address as directed by the Administrative Agent. In addition, the Borrower agrees, and agrees to cause its Restricted Subsidiaries, to continue to provide the Communications to the Administrative Agent or the Lenders, as the case may be, in the manner specified in the Loan Documents but only to the extent requested by the Administrative Agent.

The Borrower hereby acknowledges that (a) the Administrative Agent will make available to the Lenders materials and/or information provided by or on behalf of the Borrower hereunder (collectively, the "**Borrower Materials**") by posting the Borrower Materials on Intralinks or another similar electronic system (the "**Platform**") and (b) certain of the Lenders may be "public-side" Lenders (i.e., Lenders that do not wish to receive material non-public information with respect to the Borrower, its Restricted Subsidiaries or any of their respective securities) (each, a "**Public Lender**"). The Borrower hereby agrees(w) to use commercially reasonable effort to make all Borrower Materials that are to be made available to Public Lenders clearly and conspicuously "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (x) by marking Borrower Materials "PUBLIC," the Borrower shall be deemed to have authorized the Administrative Agent and the Lenders to treat such Borrower Materials as not containing any material non-public information with respect to the Borrower or any of its securities for purposes of United States federal and state securities laws (provided, however, that to the extent such Borrower Materials constitute Information, they shall be treated as set forth in Section 10.16); (y) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated as "Public Investor;" and (z) the Administrative Agent shall be entitled to treat any Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not marked as "Public Investor." Notwithstanding the foregoing, the following Borrower Materials shall be marked "PUBLIC", unless the Borrower notifies the Administrative Agent promptly that any such document contains material non-public information: (1) the Loan Documents, (2) financial statements and related documentation, in each case, provided pursuant to Section 6.01(a) or 6.01(b) and (3) notification of changes in the terms of the Facilities.

Each Public Lender agrees to cause at least one individual at or on behalf of such Public Lender to at all times have selected the "Private Side Information" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and applicable Law, including United States Federal and state securities laws, to make reference to Communications that are not made available through the "Public Side Information" portion of the Platform and that may

contain material non-public information with respect to the Borrower, its Restricted Subsidiaries or any of their respective securities for purposes of United States Federal or state securities laws.

THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE". NEITHER THE ADMINISTRATIVE AGENT NOR ANY OF ITS RELATED PARTIES WARRANTS THE ACCURACY OR COMPLETENESS OF THE COMMUNICATIONS OR THE ADEQUACY OF THE PLATFORM AND EACH EXPRESSLY DISCLAIMS LIABILITY FOR ERRORS OR OMISSIONS IN THE COMMUNICATIONS. NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS IS MADE BY THE ADMINISTRATIVE AGENT OR ANY OF ITS RELATED PARTIES IN CONNECTION WITH THE COMMUNICATIONS OR THE PLATFORM. IN NO EVENT SHALL THE ADMINISTRATIVE AGENT OR ANY OF ITS RELATED PARTIES HAVE ANY LIABILITY TO ANY LOAN PARTY, ANY LENDER OR ANY OTHER PERSON FOR DAMAGES OF ANY KIND, WHETHER OR NOT BASED ON STRICT LIABILITY AND INCLUDING DIRECT OR INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, LOSSES OR EXPENSES (WHETHER IN TORT, CONTRACT OR OTHERWISE) ARISING OUT OF ANY LOAN PARTY'S OR THE ADMINISTRATIVE AGENT'S TRANSMISSION OF COMMUNICATIONS THROUGH THE INTERNET, EXCEPT TO THE EXTENT THE LIABILITY OF ANY SUCH PERSON IS FOUND IN A FINAL NON-APPEALABLE RULING BY A COURT OF COMPETENT JURISDICTION (I) TO HAVE RESULTED FROM SUCH PERSON'S OR ITS RELATED PARTIES' GROSS NEGLIGENCE, WILLFUL MISCONDUCT OR BAD FAITH OR (II) FOR ITS (OR ANY OF ITS RELATED PARTIES') MATERIAL BREACH OF ITS OBLIGATIONS UNDER THE LOAN DOCUMENTS.

The Administrative Agent agrees that the receipt of the Communications by the Administrative Agent at its e-mail address set forth above shall constitute effective delivery of the Communications to the Administrative Agent for purposes of the Loan Documents. Each Lender agrees that receipt of notice to it (as provided in the next sentence) specifying that the Communications have been posted to the Platform shall constitute effective delivery of the Communications to such Lender for purposes of the Loan Documents. Each Lender agrees to notify the Administrative Agent in writing (including by electronic communication) from time to time of such Lender's e-mail address to which the foregoing notice may be sent by electronic transmission and that the foregoing notice may be sent to such e-mail address.

Nothing herein shall prejudice the right of the Administrative Agent or any Lender to give any notice or other communication pursuant to any Loan Document in any other manner specified in such Loan Document.

Section 10.02.  *Survival of Agreement.* All covenants, agreements, representations and warranties made by the Borrower herein and in the certificates or other instruments prepared or delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the Lenders and shall survive the making by the Lenders of the Loans, regardless of any investigation made by the Lenders or on their behalf or that any

Agent or Lender may have had notice of any Default or Event of Default at the time of any Credit Extension, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any Fee or any other amount payable under this Agreement or any other Loan Document is outstanding and unpaid and so long as the Commitments have not been terminated. The provisions of Sections 3.01, 3.03, 3.04 and 10.05 shall remain operative and in full force and effect regardless of the expiration of the term of this Agreement, the consummation of the transactions contemplated hereby, the repayment of any of the Loans, the expiration of the Commitments, the invalidity or unenforceability of any term or provision of this Agreement or any other Loan Document, or any investigation made by or on behalf of the Administrative Agent, the Collateral Agent or any Lender.

Section 10.03.    *Binding Effect.* This Agreement shall become effective when it shall have been executed and delivered by the Borrower, each other Loan Party party hereto on the Closing Date and the Administrative Agent and when the Administrative Agent shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto.

Section 10.04.    *Successors and Assigns*.

(i)    Whenever in this Agreement any of the parties hereto is referred to, such reference shall be deemed to include the permitted successors and assigns of such party; and all covenants, promises and agreements by or on behalf of the Borrower, the Administrative Agent, the Collateral Agent or the Lenders that are contained in this Agreement shall bind and inure to the benefit of their respective permitted successors and assigns.

(j)    Each Lender may assign to one or more Eligible Assignees all or a portion of its interests, rights and obligations under this Agreement (including all or a portion of the Loans at the time owing to it), with the prior written consent of the Administrative Agent (not to be unreasonably withheld, conditioned or delayed); *provided, however*, that (i) if the approval of the Borrower is required for any such assignment pursuant to the definition of "Eligible Assignee", then the Borrower must also give its prior written consent to such assignment (which consent shall not be unreasonably withheld, conditioned or delayed), and the Borrower shall be deemed to have consented to any such assignment unless it shall have objected thereto by written notice to the Administrative Agent within ten (10) days after the Borrower having received written notice thereof, (ii) the amount of the Commitment or Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Acceptance with respect to such assignment is delivered to the Administrative Agent) shall be in an integral multiple of, and not less than, $1,000,000 (or, if less, the entire remaining amount of such Lender's Commitment or Loans of the relevant Class) unless the Administrative Agent otherwise agrees; *provided* that simultaneous assignments by two or more Related Funds shall be combined for purposes of determining whether the minimum assignment requirement is met, (iii) the parties to each assignment shall (A) execute and deliver to the Administrative Agent an Assignment and Acceptance via an electronic settlement system acceptable to

the Administrative Agent or (B) if previously agreed with the Administrative Agent, manually execute and deliver to the Administrative Agent an Assignment and Acceptance, and, in each case, shall pay to the Administrative Agent a processing and recordation fee of $3,500; *provided* that (x) simultaneous assignments by two or more Related Funds shall require the payment of a single processing and recordation fee of $3,500 and (y) such processing and recordation fee may be waived or reduced in the sole discretion of the Administrative Agent and (iv) the assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire (in which the assignee shall designate one or more credit contacts to whom all syndicate-level information (which may contain material non-public information about the Loan Parties and their Related Parties or their respective securities) will be made available and who may receive such information in accordance with the assignee's compliance procedures and applicable Laws, including Federal and state securities laws) and all applicable tax forms. Upon acceptance and recording pursuant to paragraph (e) of this Section 10.04, from and after the effective date specified in each Assignment and Acceptance, (A) the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Acceptance, have the rights and obligations of a Lender under this Agreement and (B) the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Acceptance, be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all or the remaining portion of an assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 3.01, 3.03, 3.04 and 10.05). Upon request and the surrender by the assigning Lender of its Term Note (if any), the Borrower (at its expense) shall execute and deliver a Term Note to the assignee Lender.

(k)   By executing and delivering an Assignment and Acceptance, the assigning Lender thereunder and the assignee thereunder shall be deemed to confirm to and agree with each other and the other parties hereto as follows: (i) such assigning Lender warrants that it is the legal and beneficial owner of the interest being assigned thereby free and clear of any adverse claim and the outstanding balances of its Term Loans without giving effect to assignments thereof which have not become effective, are as set forth in such Assignment and Acceptance; (ii) except as set forth in (i) above, such assigning Lender makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with this Agreement, or the execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement, any other Loan Document or any other instrument or document furnished pursuant hereto, or the financial condition of the Borrower or any Subsidiary or the performance or observance by the Borrower or any Subsidiary of any of its obligations under this Agreement, any other Loan Document or any other instrument or document furnished pursuant hereto; (iii) such assignee represents and warrants that it is an Eligible Assignee legally authorized to enter into such Assignment and Acceptance; (iv) such assignee confirms that it has received a copy of this Agreement and the other Loan Documents, together with copies of the most recent financial statements referred to in Section 5.05 or delivered pursuant to Section 6.01 and such other documents and

information as it has deemed appropriate to make its own credit analysis and decision to enter into such Assignment and Acceptance; (v) such assignee will independently and without reliance upon the Administrative Agent, the Collateral Agent, such assigning Lender or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement; (vi) such assignee appoints and authorizes the Administrative Agent and the Collateral Agent to take such action as agent on its behalf and to exercise such powers under this Agreement and the other Loan Documents as are delegated to the Administrative Agent and the Collateral Agent, respectively, by the terms hereof or thereof, together with such powers as are reasonably incidental or related thereto; and (vii) such assignee agrees that it will perform in accordance with their terms all the obligations which by the terms of this Agreement are required to be performed by it as a Lender.

(l)   The Administrative Agent, acting for this purpose as an agent of the Borrower, shall maintain at one of its offices in The City of New York a copy of each Assignment and Acceptance delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitment of, and principal amount of and the interest on the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "**Register**"). The entries in the Register shall be conclusive absent manifest error and the Borrower, the Administrative Agent, the Collateral Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Borrower, the Collateral Agent and, as to entries pertaining to it, any Lender, at any reasonable time and from time to time upon reasonable prior notice. Upon reasonable request by a Lender, the Administrative Agent shall make available to such Lender a schedule of Disqualified Lenders, to the extent the Borrower has provided such a schedule to the Administrative Agent.

(m)   Upon its receipt of, and consent to, a duly completed Assignment and Acceptance executed by an assigning Lender and an assignee, an Administrative Questionnaire completed in respect of the assignee (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in paragraph (b) above, if applicable, and the written consent of the Administrative Agent and, if required, the Borrower, to such assignment and any applicable tax forms, the Administrative Agent shall promptly (i) accept such Assignment and Acceptance and (ii) record the information contained therein in the Register. No assignment shall be effective unless it has been recorded in the Register as provided in this paragraph (e).

(n)   Each Lender may without the consent of the Borrower or the Administrative Agent sell participations to one or more banks or other Persons (other than Disqualified Lenders) in all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans owing to it); *provided, however*, that (i) such Lender's obligations under this Agreement shall remain unchanged,

(ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, (iii) the participating banks or other Persons shall be entitled to the benefit of the cost protection provisions contained in Sections 3.01, 3.03 and 3.04 to the same extent as if they were Lenders (but with respect to any particular participant, to no greater extent than the Lender that sold the participation to such participant and only if such participant has complied with the requirements of such provisions as if it were a Lender) and (iv) the Borrower, the Administrative Agent and the Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement, and such Lender shall retain the sole right to enforce the obligations of the Borrower relating to the Loans and to approve any amendment, modification or waiver of (or consent under) any provision of this Agreement or any other Loan Document (*provided* that the agreement or instrument pursuant to which such Lender has sold a participation may provide that such Lender shall not agree to the following amendments without the consent of such participating bank or Person hereunder: amendments, modifications or waivers decreasing any fees payable to such participating bank or Person hereunder or the amount of principal of or the rate at which interest is payable on the Loans in which such participating bank has an interest; extending any scheduled principal payment date or scheduled date fixed for the payment of interest on the Loans in which such participating bank or Person has an interest; increasing or extending the Commitments in which such participating bank or Person has an interest; releasing all or substantially all of the Guarantors (other than in connection with the sale of any such Guarantor in a transaction permitted by Section 7.05) releasing all or substantially all of the Collateral or the Term Priority Collateral or reductions in the voting thresholds; or modifying the pro rata requirements of Section 2.13(b), Section 2.13(c) or Section 2.14, in each case, which directly and adversely affects such participants; *provided*, *further*, that, notwithstanding the foregoing, only the consent of the Required Lenders shall be required in respect of any amendment, modification or waiver of (i) the payment of default interest, (ii) the occurrence of a default or an Event of Default, or (iii) the mandatory prepayment requirements of Section 2.13). To the extent permitted by law, each participating bank or other Person also shall be entitled to the benefits of Section 10.06 as though it were a Lender, provided such participating bank or other Person agrees to be subject to Section 2.15 as though it were a Lender. Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each participant and the principal amounts (and interest thereon) of each participant's interest in the Loans or other Obligations under this Agreement (the "**Participant Register**"). The entries in the Participant Register shall be conclusive absent manifest error, and the Borrower, the Lenders and each Agent shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement, notwithstanding notice to the contrary.

(o)   Any Lender or participant may, in connection with any assignment or participation or proposed assignment or participation pursuant to this Section 10.04, disclose to the assignee or participant or proposed assignee or participant any information relating to the Borrower furnished to such Lender by or on behalf of the Borrower;

*provided* that (except during the initial syndication by the Arranger when customary confidentiality arrangements shall apply), prior to any such disclosure of Information, each such assignee or participant or proposed assignee or participant shall execute an agreement whereby such assignee or participant shall agree to preserve the confidentiality of such confidential information on terms no less restrictive in any material respect than those applicable to the Lenders pursuant to Section 10.16 for the benefit of (and enforceable by) the Borrower.

(p)    Any Lender may at any time assign all or any portion of its rights under this Agreement to secure extensions of credit to such Lender or in support of obligations owed by such Lender; *provided* that no such assignment shall release a Lender from any of its obligations hereunder or substitute any such assignee for such Lender as a party hereto.

(q)    Notwithstanding anything to the contrary contained herein, any Lender (a "**Granting Lender**") may grant to a special purpose funding vehicle (an "**SPV**"), identified as such in writing from time to time by the Granting Lender to the Administrative Agent and the Borrower, the option to provide to the Borrower all or any part of any Loan that such Granting Lender would otherwise be obligated to make to the Borrower pursuant to this Agreement; *provided* that (i) nothing herein shall constitute a commitment by any SPV to make any Loan, (ii) if an SPV elects not to exercise such option or otherwise fails to provide all or any part of such Loan, the Granting Lender shall be obligated to make such Loan pursuant to the terms hereof, and (iii) the Granting Lender shall for all purposes remain the Lender hereunder. The making of a Loan by an SPV hereunder shall utilize the Commitment of the Granting Lender to the same extent, and as if, such Loan were made by such Granting Lender. Each party hereto hereby agrees that no SPV shall be liable for any indemnity or similar payment obligation under this Agreement (all liability for which shall remain with the Granting Lender). In furtherance of the foregoing, each party hereto hereby agrees (which agreement shall survive the termination of this Agreement) that, prior to the date that is one year and one day after the payment in full of all outstanding commercial paper or other senior indebtedness of any SPV, it will not institute against, or join any other Person in instituting against, such SPV any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings under the laws of the United States or any State thereof. In addition, notwithstanding anything to the contrary contained in this Section 10.04, any SPV may (i) with notice to, but without the prior written consent of, the Borrower and the Administrative Agent and without paying any processing fee therefor, assign all or a portion of its interests in any Loans to the Granting Lender or to any financial institutions (consented to by the Borrower and Administrative Agent) providing liquidity and/or credit support to or for the account of such SPV to support the funding or maintenance of Loans, and (ii) disclose on a confidential basis any non-public information relating to its Loans to any rating agency, commercial paper dealer or provider of any surety, guarantee or credit or liquidity enhancement to such SPV.

(r)   The Borrower (except as expressly permitted by clause (ii) of Section 7.04(d)) shall not assign or delegate any of its rights or duties hereunder without the prior written consent of the Administrative Agent and each Lender, and any attempted assignment without such consent shall be null and void.

(s)   So long as no Event of Default has occurred or is continuing or would result therefrom, any Lender may, at any time, assign all or a portion of its rights and obligations under this Agreement in respect of its Term Loans to the Borrower or any of its Subsidiaries, subject to the following limitations and other provisions:

(i)   such assignment shall be made pursuant to (A) an open-market transaction on a non-pro rata basis or (B) a Dutch Auction open to all Lenders of the applicable Class of Term Loans on a pro rata basis in accordance with the Auction Procedures (it being agreed that none of the Borrower or any other Restricted Subsidiary shall have any obligation to make any representation as to the absence of MNPI in connection therewith and such assignment shall be made pursuant to the form of Assignment and Acceptance, which shall contain customary "big boy" assurance by the assignor Lender to the effect that it is a sophisticated investor and is willing to proceed with the assignment);

(ii)   the Borrower will not be entitled to receive, and will not receive, information provided solely to Lenders by the Administrative Agent or any Lender and will not be permitted to attend or participate in, and will not attend or participate in, meetings or conference calls attended solely by the Lenders and the Administrative Agent;

(iii)   [reserved];

(iv)   the aggregate principal amount of Term Loans purchased by the Borrower may not exceed 20% of the aggregate principal amount of all Initial Term Loans as of the Closing Date plus the aggregate amount of all Incremental Term Loans and Refinancing Debt incurred after the Closing Date;

(v)   any Term Loans purchased by the Borrower shall be automatically and permanently cancelled immediately upon acquisition by the Borrower;

(vi)   notwithstanding anything to the contrary contained herein (including in the definitions of "Consolidated Net Income" and "Consolidated EBITDA") any non-cash gains in respect of "cancellation of indebtedness" resulting from the cancellation of any Term Loans purchased by the Borrower shall be excluded from the determination of Consolidated Net Income and Consolidated EBITDA; and

(vii)   the cancellation of Term Loans in connection with a Dutch Auction shall not constitute a voluntary or mandatory prepayment for purposes of Section 2.12 or 2.13, but the face amount of Term Loans cancelled as provided for in clause (v) above shall be applied in direct order of maturity to the remaining scheduled installments of principal due in respect of the applicable Class of Term Loans.

Section 10.05.   *Expenses; Indemnity.*

(m)   The Borrower agrees promptly following (and in any event within 30 days of) written demand (including documentation reasonably supporting such request) therefor (i) if the Closing Date occurs, to pay or reimburse the Administrative Agent, the Collateral Agent, the Syndication Agent, the Documentation Agent and the Arranger for all reasonable and documented out-of-pocket costs and expenses incurred in connection with the preparation, negotiation, syndication and execution of this Agreement and the other Loan Documents, and any amendment, waiver, consent or other modification of the provisions hereof and thereof (whether or not the transactions contemplated thereby are consummated), and the consummation and administration of the transactions contemplated hereby and thereby (including all Attorney Costs which shall be limited to Cravath, Swaine & Moore LLP (and one local counsel in each applicable jurisdiction for each group and, in the event of any actual or reasonably perceived conflict of interest, one additional counsel of each type to similarly situated parties)) and (ii) from and after the Closing Date, to pay or reimburse the Administrative Agent, the Collateral Agent, the Syndication Agent, the Documentation Agent, the Arranger and each Lender promptly following written demand for all reasonable and documented out-of-pocket costs and expenses incurred in connection with the enforcement (whether through negotiations, legal proceedings or otherwise) of any rights or remedies under this Agreement or the other Loan Documents (including all such out-of-pocket costs and expenses incurred during any legal proceeding, including any proceeding under any Debtor Relief Law, and including all respective Attorney Costs which shall be limited to Attorney Costs of one counsel to the Administrative Agent, Arranger and the Lenders (and one local counsel in each applicable material jurisdiction for each group and, in the event of any actual or reasonably perceived conflict of interest, one additional counsel of each type to similarly situated parties)). To the extent otherwise reimbursable by the foregoing sentence of this section, the foregoing costs and expenses shall include all reasonable search, filing, recording and title insurance charges and fees related thereto, and other reasonable and documented out of pocket expenses incurred by any Agent.

(n)   Whether or not the transactions contemplated hereby are consummated, the Loan Parties shall, jointly and severally, indemnify and hold harmless the Administrative Agent, the Collateral Agent, each Lender, each Arranger and their respective Affiliates, successors and permitted assigns (or the directors, officers, employees, agents, advisors and members of each of the foregoing) (collectively the "**Indemnitees**") from and against any and all actual losses, damages, claims, liabilities and reasonable documented out-of-pocket costs and expenses (including Attorney Costs which shall be limited to Attorney Costs of one outside counsel for all Indemnitees (and, if necessary, one local counsel in each applicable jurisdiction and, in the event of any actual or reasonably perceived conflict of interest, one additional counsel for each type of similarly situated affected Indemnitees)) of any kind or nature whatsoever which may at any time be imposed on, incurred by or asserted against any such Indemnitee in any way relating to or arising out of or in connection with (i) the execution, delivery, enforcement, performance or administration of any Loan Document or any other agreement, letter or

instrument delivered in connection with the transactions contemplated thereby or the consummation of the Transactions or the other transactions contemplated thereby, (ii) any Commitment or Loan or the use or proposed use of the proceeds therefrom, (iii) any actual or alleged presence or Release of Hazardous Materials at, on, under or from any property, vehicle or facility currently or formerly owned, leased or operated by the Loan Parties or any Subsidiary, or any other Environmental Liability related in any way to any Loan Parties or any Subsidiary, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory (including any investigation of, preparation for, or defense of any pending or threatened claim, investigation, litigation or proceeding) and regardless of whether any Indemnitee is a party thereto and regardless of whether such matter is initiated by a third party or by the Borrower or any of its Affiliates or equityholders in all cases, whether or not caused by or arising, in whole or in part, out of the negligence of an Indemnitee; *provided* that, notwithstanding the foregoing, such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, damages, claims, liabilities and expenses resulted from (x) the gross negligence, bad faith or willful misconduct of such Indemnitee or of any affiliate, director, officer, employee, counsel, agent or attorney-in-fact of such Indemnitee, as determined by the final non-appealable judgment of a court of competent jurisdiction, (y) any dispute solely among the Indemnitees other than (1) any claim against an Indemnitee in its capacity or in fulfilling its role as Administrative Agent, Collateral Agent, Arranger or similar role and (2) any claim arising out of any act or omission of the Borrower or any of its Affiliates or (z) the material breach by such Indemnitee of its obligations under the Loan Documents (or any related party), as determined by the final non-appealable judgment of a court of competent jurisdiction. No Indemnitee or any other party hereto shall be liable for any damages arising from the use by others of any information or other materials obtained through IntraLinks or other similar information transmission systems in connection with this Agreement except to the extent that such damages resulted from the (A) gross negligence, bad faith or willful misconduct of such Indemnitee or of any affiliate, director, officer, employee, counsel, agent or attorney-in-fact of such Indemnitee, as determined by the final non-appealable judgment of a court of competent jurisdiction or (B) the material breach by any Indemnitee of its or of any affiliate, director, officer, employee, counsel, agent or attorney-in-fact of such Indemnitee's obligations under the Loan Documents, as determined by the final non-appealable judgment of a court of competent jurisdiction. In the case of a claim, investigation, litigation or other proceeding to which the indemnity in this Section 10.05 applies, such indemnity shall be effective whether or not such claim, investigation, litigation or proceeding is brought by any Loan Party, any Subsidiary of any Loan Party, any Loan Party's directors, stockholders or creditors or other Affiliates or an Indemnitee or any other Person, whether or not any Indemnitee is otherwise a party thereto and whether or not any of the transactions contemplated hereunder or under any of the other Loan Documents are consummated. For the avoidance of doubt, this paragraph shall not apply with respect to Taxes that are the subject of, or excluded from, Section 3.01. To the extent that any Loan Party fails to pay any amount required to be paid by them to the Administrative Agent or the Collateral Agent under paragraph (a) or (b) of this Section, each Lender severally agrees to pay to the Administrative Agent or the Collateral Agent

such Lender's pro rata share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount; *provided* that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent or the Collateral Agent in its capacity as such. For purposes hereof, a Lender's "**pro rata share**" shall be determined based upon its share of the sum of the outstanding Term Loans and unused Commitments at the time.

(o)   To the extent permitted by applicable Law, (i) no Loan Party shall assert, and each hereby waives, any claim against any Indemnitee and (ii) no Indemnitee shall assert, and each hereby waives, any claim against any Loan Party, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the Transactions or any Loan or the use of the proceeds thereof (whether before or after the Closing Date); *provided* that the foregoing shall in no event limit the Borrower's indemnification obligations under clause (b) above.

(p)   The provisions of this Section 10.05 shall remain operative and in full force and effect regardless of the expiration of the term of this Agreement, the consummation of the transactions contemplated hereby, the repayment of any of the Loans, the expiration of the Commitments, the invalidity or unenforceability of any term or provision of this Agreement or any other Loan Document, or any investigation made by or on behalf of the Administrative Agent, the Collateral Agent or any Lender. All amounts due under this Section 10.05 shall be payable within 30 days after written demand therefor (including documentation reasonably supporting such request).

Section 10.06.   *Right of Setoff.* In addition to any rights and remedies of the Lenders provided by Law, upon the occurrence and during the continuance of any Event of Default, each Lender and its Affiliates (and the Agents, in respect of any unpaid fees, costs and expenses payable hereunder) is authorized at any time and from time to time (with the prior consent of the Administrative Agent), without prior notice to any Loan Party, any such notice being waived by each Loan Party (on its own behalf and on behalf of each of its Subsidiaries), to the fullest extent permitted by applicable Law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) (other than payroll accounts, trust accounts, escrow accounts, employee benefits accounts or petty cash accounts) at any time held by, and other indebtedness at any time owing by, such Lender and its Affiliates or the Collateral Agent to or for the credit or the account of the respective Loan Parties against any and all matured Obligations (other than, with respect to any Guarantor, Excluded Swap Obligations of such Guarantor) owing to such Lender and its Affiliates or the Collateral Agent hereunder or under any other Loan Document, now or hereafter existing, irrespective of whether or not such Agent or such Lender or Affiliate shall have made demand under this Agreement or any other Loan Document and although such Obligations may be denominated in a currency different from that of the applicable deposit or Indebtedness. Each Lender agrees promptly to notify the Borrower and the Administrative Agent after any such set off and application made by such Lender; *provided*, that the failure to give

such notice shall not affect the validity of such setoff and application. The rights of the Administrative Agent, the Collateral Agent and each Lender under this Section 10.06 are in addition to other rights and remedies (including other rights of setoff) that the Administrative Agent, the Collateral Agent and such Lender may have at Law.

Section 10.07.  *Applicable Law.* THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS (OTHER THAN AS EXPRESSLY SET FORTH IN OTHER LOAN DOCUMENTS) SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK.

Section 10.08.  *Waivers; Amendment.*

(c)  No failure or delay of the Administrative Agent, the Collateral Agent or any Lender in exercising any power or right hereunder or under any other Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the Administrative Agent, the Collateral Agent and the Lenders hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have. No waiver of any provision of this Agreement or any other Loan Document or consent to any departure by the Borrower or any other Loan Party therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) below, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. No notice or demand on the Borrower in any case shall entitle the Borrower to any other or further notice or demand in similar or other circumstances.

(d)  Except as provided in Section 2.17 with respect to any Incremental Facility Amendment, in Section 2.18, with respect to any Refinancing Amendment, in Section 2.19 with respect to an Extension Offer or as otherwise provided herein or in a Loan Document, neither this Agreement nor any other Loan Document nor any provision hereof or thereof may be waived, amended or modified except (x) in the case of this Agreement, pursuant to an agreement or agreements in writing entered into by the Borrower and the Required Lenders and (y) in the case of any other Loan Document, pursuant to an agreement or agreements in writing entered into by each party thereto with the consent of the Required Lenders (*provided*, that amendments to the ABL Intercreditor Agreement, the First Lien Intercreditor Agreement or the Second Lien Intercreditor Agreement shall require the agreement of the Loan Parties (or any of them) only to the extent required pursuant to the terms thereof); *provided, however*, that no such agreement shall (i) decrease the principal amount of, or extend the maturity of or any scheduled principal payment date or date for the payment of any fee or any interest on any Loan, or waive or excuse any such payment or any part thereof (other than with respect to any default interest), or decrease the amount of any fee or the rate of interest on any Loan (other than with respect to any default interest), without the prior written consent of each Lender directly and adversely affected thereby (it being understood that (x) the waiver of

(or amendment to the terms of) any mandatory prepayment of the Loans shall not constitute a postponement of any date scheduled for the payment of principal or interest, (y) any change to the definition of "Senior Secured Leverage Ratio" or "Total Leverage Ratio" or in the component definitions thereof shall not constitute a reduction or forgiveness in any rate of interest pursuant to this clause (i), (ii) increase or extend the Commitment of any Lender without the prior written consent of such Lender (it being understood that a waiver of any condition precedent or of any Default or Event of Default, mandatory prepayment or mandatory reduction of the Commitments shall not constitute an extension or increase of any Commitment of any Lender), (iii) amend or modify the pro rata requirements of Section 2.13(b), Section 2.13(c) or Section 2.14, the provisions of Section 10.04(j) or the provisions of this Section or release all or substantially all of the Guarantors (other than in connection with the sale of such Guarantors in a transaction permitted by Sections 7.04 or 7.05) or all or substantially all of the Collateral (other than as permitted hereby), without the prior written consent of each Lender directly and adversely affected thereby (or, in the case of Section 10.04(j), each Lender), (iv) change the provisions of any Loan Document in a manner that by its terms materially and adversely affects the rights of Lenders holding Loans of one Class differently from the rights of Lenders holding Loans of any other Class without the prior written consent of the Required Class Lenders with respect to each materially and adversely affected Class, (v) modify the protections afforded to an SPV pursuant to the provisions of Section 10.04(i) without the written consent of such SPV (vi) reduce the percentage contained in the definition of the term "Required Lenders" without the prior written consent of each Lender (it being understood that, with the consent of the Required Lenders (if such consent is otherwise required), additional extensions of credit pursuant to this Agreement may be included in the determination of the Required Lenders on substantially the same basis as the Term Loan Commitments on the Closing Date) or (vii) modify the definition of "Required Class Lenders" without the consent of the Required Class Lenders with respect to each Class of Loans or Commitments; *provided further* that (w) no Lender consent is required to effect a Refinancing Amendment or an Incremental Amendment or an Extension (except as expressly provided in Sections 2.17, 2.18 or 2.19, as applicable) or to effect any amendment expressly contemplated by Section 7.12, (x) in connection with an amendment that addresses solely a re-pricing transaction in which any tranche of Term Loans is refinanced with a replacement tranche of term loans bearing (or is modified in a manner such that the resulting term loans bear) a lower effective yield (a "**Permitted Repricing Amendment**"), only the consent of each Lender holding Term Loans subject to such permitted repricing transaction that will continue as a Lender in respect of the repriced tranche of Term Loans or modified Term Loans shall be required for such Permitted Repricing Amendment, (y) modifications to Section 2.14, 2.15 or any other provision requiring pro rata payments or sharing of payments in connection with (I) any buy back of Term Loans by the Borrower pursuant to Section 10.04(k) or pursuant to any similar program that may in the future be permitted hereunder, (II) any Incremental Amendment or (III) any Extension, shall only require approval (to the extent any such approval is otherwise required) of the Lenders participating and (z) no Lender consent is required to effect any amendment or supplement to the ABL Intercreditor Agreement, the First Lien Intercreditor Agreement or the Second Lien Intercreditor Agreement (I) that the

Administrative Agent is otherwise authorized to enter into without the consent of any Lender by Section 10.23, (II) that is for the purpose of adding the holders of Permitted Secured Additional Debt, (or a Senior Representative with respect thereto) as parties thereto, as expressly contemplated by the terms of the ABL Intercreditor Agreement, the First Lien Intercreditor Agreement or the Second Lien Intercreditor Agreement, as applicable (it being understood that any such amendment or supplement may make such other changes to the applicable intercreditor agreement as, in the good faith determination of the Administrative Agent, are required to effectuate the foregoing and *provided*, that such other changes are not adverse, in any material respect, to the interests of the Lenders) or (III) that is expressly contemplated by Section 5.2(c) or the second paragraph of Section 7.4 of the ABL Intercreditor Agreement (or the comparable provisions, if any, of the First Lien Intercreditor Agreement or the Second Lien Intercreditor Agreement); *provided further* that no such agreement shall amend, modify or otherwise adversely affect the rights or duties of the Administrative Agent or the Collateral Agent hereunder or under any other Loan Document without the prior written consent of the Administrative Agent or the Collateral Agent, as applicable.

(e)   Notwithstanding the foregoing, this Agreement and any other Loan Document may be amended solely with the consent of the Administrative Agent and the Borrower without the need to obtain the consent of any other Lender if such amendment is delivered in order to correct or cure (x) ambiguities, errors, omissions, defects, (y) to effect administrative changes of a technical or immaterial nature or (z) incorrect cross references or similar inaccuracies in this Agreement or the applicable Loan Document. Guarantees, collateral documents, security documents, intercreditor agreements,  and related documents executed in connection with this Agreement may be in a form reasonably determined by the Administrative Agent or Collateral Agent, as applicable, and may be amended, modified, terminated or waived, and consent to any departure therefrom may be given, without the consent of any Lender if such amendment, modification, waiver or consent is given in order to (x) comply with local law or advice of counsel or (y) cause such guarantee, collateral document, security document or related document to be consistent with this Agreement and the other Loan Documents.  The Borrower and the Administrative Agent may, without the consent of any other Lender, effect amendments to this Agreement and the other Loan Documents as may be necessary in the reasonable opinion of the Borrower and the Administrative Agent to effect the provisions of Section 2.05, Section 2.17, Section 2.18 and Section 2.19. Notwithstanding anything to the contrary contained herein, such amendment shall become effective without any further consent of any other party to such Loan Document.

Section 10.09.   *Interest Rate Limitation.* Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Loan, together with all fees, charges and other amounts which are treated as interest on such Loan under applicable Law (collectively the "**Charges**"), shall exceed the maximum lawful rate (the "**Maximum Rate**") which may be contracted for, charged, taken, received or reserved by the Lender holding such Loan or participation in accordance with applicable Law, the rate of interest payable in respect of such Loan or participation hereunder, together with all Charges payable in respect thereof, shall be

limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Loan or participation but were not payable as a result of the operation of this Section 10.09 shall be cumulated and the interest and Charges payable to such Lender in respect of other Loans or participations or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Effective Rate to the date of repayment, shall have been received by such Lender.

Section 10.10.  *Entire Agreement.* This Agreement, the Fee Letter and the other Loan Documents constitute the entire contract between the parties relative to the subject matter hereof. Any other previous agreement among the parties with respect to the subject matter hereof is superseded by this Agreement and the other Loan Documents. Nothing in this Agreement or in the other Loan Documents, expressed or implied, is intended to confer upon any Person (other than the parties hereto and thereto, their respective successors and assigns permitted hereunder and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent, the Collateral Agent and the Lenders) any rights, remedies, obligations or liabilities under or by reason of this Agreement or the other Loan Documents.

Section 10.11.  *WAIVER OF JURY TRIAL.* EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS. EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 10.11.

Section 10.12.  *Severability.* In the event any one or more of the provisions contained in this Agreement or in any other Loan Document should be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby (it being understood that the invalidity of a particular provision in a particular jurisdiction shall not in and of itself affect the validity of such provision in any other jurisdiction). The parties shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

Section 10.13.  *Counterparts.* This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original but all of which when taken together shall constitute a single contract, and shall become effective as provided in Section 10.03. Delivery of an executed signature page to this Agreement by

facsimile or other electronic imaging transmission shall be as effective as delivery of a manually signed counterpart of this Agreement.

Section 10.14.   *Headings.* Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and are not to affect the construction of, or to be taken into consideration in interpreting, this Agreement.

Section 10.15.   *Jurisdiction; Consent to Service of Process.*

(a)   Each of the parties hereto hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of any New York State court or Federal court of the United States of America sitting in the Borough of Manhattan, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement or the other Loan Documents, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such Federal court. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(b)   Each of the parties hereto hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or the other Loan Documents in any New York State or Federal court. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(c)   Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 10.01. Nothing in this Agreement will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

Section 10.16.   *Confidentiality.* Each of the Administrative Agent, the Collateral Agent and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its and its Affiliates' officers, directors, employees and agents, including accountants, legal counsel and other advisors involved in the Transaction on a "need to know" basis (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority or quasi-regulatory authority (such as the National Association of Insurance Commissioners), (c) to the extent required by applicable Laws or regulations or by any subpoena or similar legal process (and in such case, such Person shall promptly notify the Borrower of such disclosure), (d) in connection with the exercise of any remedies hereunder or under the other Loan Documents or any suit, action or proceeding relating to the enforcement of its rights hereunder or thereunder,

(e) subject to an agreement containing provisions substantially the same as those of this Section 10.16, to (i) any actual or prospective assignee of or participant in any of its rights or obligations under this Agreement and the other Loan Documents or (ii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to the Borrower or any Subsidiary or any of their respective obligations, (f) with the prior written consent of the Borrower, (g) on a confidential basis to (x) any rating agency in connection with rating the Borrower or its Subsidiaries or the Facility or (y) the CUSIP Service Bureau or any similar agency in connection with the issuance and monitoring of CUSIP numbers with respect to the Facility, or (h) to the extent such Information becomes publicly available other than as a result of a breach of this Section 10.16 or other confidentiality obligation owed to the Borrower or any of its Subsidiaries. For the purposes of this Article, "**Information**" shall mean all information received from the Borrower and related to the Borrower or its business, other than any such information that was available to the Administrative Agent, the Collateral Agent or any Lender on a nonconfidential basis prior to its disclosure by the Borrower not in violation of any confidentiality obligation owed to the Borrower and the Subsidiaries. In addition, each Agent and each Lender may disclose the existence of this Agreement and the information about this Agreement to market data collectors, similar services providers to the lending industry, and service providers to the Agents and the Lenders in connection with the administration and management of this Agreement and the other Loan Documents. Any Person required to maintain the confidentiality of Information as provided in this Section 10.16 shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord its own confidential information.

Section 10.17.  *Lender Action.* Each Lender agrees that it shall not take or institute any actions or proceedings, judicial or otherwise, for any right or remedy against any Loan Party or any other obligor under any of the Loan Documents (including the exercise of any right of setoff, rights on account of any banker's lien or similar claim or other rights of self-help), or institute any actions or proceedings, or otherwise commence any remedial procedures, with respect to any Collateral or any other property of any such Loan Party, unless expressly provided for herein or in any other Loan Document, without the prior written consent of the Administrative Agent (which shall be given at the direction of the Required Lender).

Section 10.18.  *USA PATRIOT Act Notice.* Each Lender and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies the Borrower that pursuant to the requirements of the USA PATRIOT Act, it is required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow such Lender or the Administrative Agent, as applicable, to identify the Borrower in accordance with the USA PATRIOT Act.

Section 10.19.  *Collateral And Guaranty Matters*. The Lenders irrevocably agree:

(a)  that any Lien on any property granted to or held by the Administrative Agent or the Collateral Agent under any Loan Document shall be automatically released (i) upon termination of all Commitments hereunder and payment in full of all Obligations

(other than (x) obligations under Secured Hedge Agreements and (y) contingent obligations not yet accrued or payable), (ii) at the time the property subject to such Lien is disposed as part of or in connection with any disposition permitted hereunder or under any other Loan Document to any Person other than a Person required to grant a Lien to the Administrative Agent or the Collateral Agent under the Loan Documents (or, if such transferee is a Person required to grant a Lien to the Administrative Agent or the Collateral Agent on such asset, at the option of the applicable Loan Party, such Lien on such asset may still be released in connection with the transfer so long as (x) the transferee grants a new Lien to the Administrative Agent or Collateral Agent on such asset substantially concurrently with the transfer of such asset, (y) the transfer is between parties organized under the laws of different jurisdictions and at least one of such parties is a Foreign Subsidiary and (z) the priority of the new Lien is the same as that of the original Lien), (iii) subject to Section 10.08, if the release of such Lien is approved, authorized or ratified in writing by the Required Lenders, (iv) if the property subject to such Lien is owned by a Guarantor, upon release of such Guarantor from its obligations under its Guaranty pursuant to Section 11.10, (v) any such property constitutes Excluded Property or (vi) in accordance with any Intercreditor Agreement;

(b)   to release or subordinate any Lien on any property granted to or held by the Administrative Agent or the Collateral Agent under any Loan Document to the holder of any Lien on such property that is permitted by Sections 7.01(b), 7.01(g), 7.01(q) or 7.01(s) (in the case of Section 7.01(s), to the extent required by the terms of the obligations secured by such Liens); and

(c)   that any Guarantor shall be automatically released from its obligations under the Guaranty as provided in Section 11.10.

Upon request by the Administrative Agent or the Collateral Agent at any time, the Required Lenders will confirm in writing the Administrative Agent's or the Collateral Agent's authority to release or subordinate its interest in particular types or items of property, or to release any Guarantor from its obligations under the Guaranty pursuant to this Section 10.19. In each case as specified in this Section 10.19, the Administrative Agent or the Collateral Agent will (and each Lender irrevocably authorizes the Administrative Agent and the Collateral Agent to), at the Borrower's expense, execute and deliver to the applicable Loan Party such documents as the Borrower may reasonably request to evidence the release or subordination of such item of Collateral from the assignment and security interest granted under the Collateral Documents, or to evidence the release of such Guarantor from its obligations under the Guaranty, in each case in accordance with the terms of the Loan Documents and this Section 10.19.

Section 10.20.   *Secured Hedge Agreements.* No Hedge Bank that obtains the benefits of Section 8.04, the Guaranty or any Collateral by virtue of the provisions hereof or any Collateral Document shall have any right to notice of any action or to consent to, direct or object to any action hereunder or under any other Loan Document or otherwise in respect of the Collateral (including the release or impairment of any Collateral) other than in its capacity as a Lender and, in such case, only to the extent expressly provided in the Loan Documents. Notwithstanding any

other provision of Article 9 to the contrary, the Administrative Agent shall not be required to verify the payment of, or that other satisfactory arrangements have been made with respect to, Obligations arising under Secured Hedge Agreements unless the Administrative Agent has received written notice of such Obligations, together with such supporting documentation as the Administrative Agent may request, from the applicable Hedge Bank and the Borrower.

Section 10.21.  *Payments Set Aside.* To the extent that any payment by or on behalf of the Borrower or any other Loan Party is made to any Agent or any Lender, or any Agent or any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by such Agent or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall, to the fullest extent possible under provisions of applicable Law, be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender severally agrees to pay to the Administrative Agent upon demand its applicable share of any amount so recovered from or repaid by any Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the applicable Federal Funds Effective Rate from time to time in effect.

Section 10.22.  *No Advisory or Fiduciary Responsibility*.

(a)  In connection with all aspects of each transaction contemplated hereby, each Loan Party acknowledges and agrees, and acknowledges its Affiliates' understanding, that (i) the facilities provided for hereunder and any related arranging or other services in connection therewith (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document) are an arm's-length commercial transaction between the Borrower and its Subsidiaries, on the one hand, and the Agents, the Arranger and the Lenders, on the other hand, and the Borrower and its Subsidiaries are capable of evaluating and understanding and understands and accepts the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents (including any amendment, waiver or other modification hereof or thereof), (ii) the Agents, the Arranger, the Lenders and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from, and may conflict with, those of the Borrower and its Affiliates, and none of the Agents, the Arranger or the Lenders has any obligation to disclose any of such interests by virtue of any advisory, agency or fiduciary relationship, and (iii) the Agents, the Arranger and the Lenders have not provided and will not provide any legal, accounting, regulatory or tax advice with respect to any of the transactions contemplated hereby (including any amendment, waiver or other modification hereof or of any other Loan Document) and the Loan Parties have consulted their own legal, accounting, regulatory and tax advisors to the extent they have deemed appropriate.

(b)    Each Loan Party acknowledges and agrees that each Lender, the Arranger and any of their respective affiliates may lend money to, invest in, and generally engage in any kind of business with, the Borrower, any of its Affiliates or any other person or entity that may do business with or own securities of any of the foregoing, all as if such Lender, Arranger or Affiliate thereof were not a Lender or Arranger (or an agent or any other person with any similar role under the Facilities) and without any duty to account therefor to any other Lender, Arranger, the Borrower or any Affiliate of the foregoing. Each Lender, the Arranger and any Affiliate thereof may accept fees and other consideration from the Borrower or any of its Affiliates for services in connection with this Agreement, the Facilities, the commitment letter or otherwise without having to account for the same to any other Lender, Arranger, the Borrower or any Affiliate of the foregoing.

Section 10.23.    *Intercreditor Agreements*.

(a)    The Administrative Agent is authorized to enter into the ABL Intercreditor Agreement (including the ABL Intercreditor Agreement in respect of any Permitted Refinancing of ABL Facility Indebtedness), and each of the parties hereto acknowledges that it has received a copy of the ABL Intercreditor Agreement and that the ABL Intercreditor Agreement is binding upon it. Each Lender (a) hereby consents to the subordination of the Liens on the ABL Priority Collateral securing the Obligations on the terms set forth in the ABL Intercreditor Agreement, (b) hereby agrees that it will be bound by and will take no actions contrary to the provisions of the ABL Intercreditor Agreement and (c) hereby authorizes and instructs the Administrative Agent to enter into the ABL Intercreditor Agreement and any amendments or supplements expressly contemplated thereby, and to subject the Liens on the ABL Priority Collateral securing the Obligations to the provisions of the ABL Intercreditor Agreement. The foregoing provisions are intended as an inducement to the ABL Secured Parties to extend credit to the borrowers under the ABL Credit Agreement and such ABL Secured Parties are intended third-party beneficiaries of such provisions and the provisions of the ABL Intercreditor Agreement.

(b)    The Administrative Agent is authorized to enter into each of the First Lien Intercreditor Agreement and the Second Lien Intercreditor Agreement, and each of the parties hereto acknowledges that each such agreement shall be binding upon it. Each Lender (a) hereby consents to the intercreditor agreements in respect of the Collateral securing the Obligations on the terms set forth in each of the First Lien Intercreditor Agreement and the Second Lien Intercreditor Agreement, (b) hereby agrees that it will be bound by and will take no actions contrary to the provisions of each of the First Lien Intercreditor Agreement and the Second Lien Intercreditor Agreement and (c) hereby authorizes and instructs the Administrative Agent to enter into each of the First Lien Intercreditor Agreement and the Second Lien Intercreditor Agreement and, without the further consent, direction or other action of any Lender, to enter into any amendments or supplements thereto, in each case solely if the form of the agreement as so amended or supplemented would constitute the First Lien Intercreditor Agreement or the Second Lien Intercreditor Agreement, as applicable, if being entered into as an original agreement. The foregoing provisions are intended as an inducement to the parties providing any Permitted

Secured Additional Debt to extend credit to the borrowers thereof and such parties are intended third-party beneficiaries of such provisions and the provisions of the First Lien Intercreditor Agreement or the Second Lien Intercreditor Agreement, as the case may be.

(c)   The extent of any conflict between the Loan Documents, on the one hand, and the ABL Intercreditor Agreement or other intercreditor agreement contemplated by this Section 10.23, on the other hand, such intercreditor agreement shall control.

**ARTICLE 11**
GUARANTEE

Section 11.01.   *The Guarantee.* Each Guarantor hereby jointly and severally with the other Guarantors guarantees, as a primary obligor and not as a surety to each Secured Party and their respective permitted successors and assigns, the prompt payment in full when due (whether at stated maturity, by required prepayment, declaration, demand, by acceleration or otherwise) of the principal of and interest (including any interest, fees, costs or charges that would accrue but for the provisions of (i) Title 11 of the United States Code after any bankruptcy or insolvency petition under Title 11 of the United States Code and (ii) any other Debtor Relief Laws, whether or not such items are allowed or allowable as a claim in any applicable proceeding) on the Loans made by the Lenders to, and the Term Notes (if any) issued hereunder and held by each Lender of, the Borrower, and all other Obligations (excluding, with respect to any Guarantor, any Excluded Swap Obligations of such Guarantor) from time to time owing to the Secured Parties by any other Loan Party under any Loan Document or any Secured Hedge Agreement strictly in accordance with the terms thereof (such obligations being herein collectively called the "**Guaranteed Obligations**"). The Guarantors hereby jointly and severally agree that if the Borrower or other Guarantor(s) shall fail to pay in full when due (whether at stated maturity, by acceleration or otherwise) any of the Guaranteed Obligations, the Guarantors will promptly pay the same in cash, without any demand or notice whatsoever, and that in the case of any extension of time of payment or renewal of any of the Guaranteed Obligations, the same will be promptly paid in full when due (whether at extended maturity, by acceleration or otherwise) in accordance with the terms of such extension or renewal.

Section 11.02.   *Obligations Unconditional.* The obligations of the Guarantors under Section 11.01 shall constitute a guaranty of payment and to the fullest extent permitted by applicable Law, are absolute, irrevocable and unconditional, joint and several, irrespective of the value, genuineness, validity, regularity or enforceability of the Guaranteed Obligations of the Borrower or any other Guarantor under this Agreement, any Term Notes issued under this Agreement, or any other agreement or instrument referred to herein or therein, or any substitution, release or exchange of any other guarantee of or security for any of the Guaranteed Obligations, and, irrespective of any other circumstance whatsoever that might otherwise constitute a legal or equitable discharge or defense of a surety or Guarantor (except for payment). Without limiting the generality of the foregoing, it is agreed that the occurrence of any one or more of the following shall not alter or impair the liability of the Guarantors hereunder which shall remain absolute, irrevocable and unconditional under any and all circumstances as described above:

(x)  at any time or from time to time, without notice to the Guarantors, to the extent permitted by Law, the time for any performance of or compliance with any of the Guaranteed Obligations shall be extended, or such performance or compliance shall be waived;

(y)  any of the acts mentioned in any of the provisions of this Agreement or the Term Notes, if any, or any other agreement or instrument referred to herein or therein shall be done or omitted;

(z)  the maturity of any of the Guaranteed Obligations shall be accelerated, or any of the Guaranteed Obligations shall be amended in any respect, or any right under the Loan Documents or any other agreement or instrument referred to herein or therein shall be amended or waived in any respect or any other guarantee of any of the Guaranteed Obligations or any security therefor shall be released or exchanged in whole or in part or otherwise dealt with;

(aa)  any Lien or security interest granted to, or in favor of, any Secured Party or Agent as security for any of the Guaranteed Obligations shall fail to be perfected; or

(bb)  the release of any other Guarantor pursuant to Section 11.10.

Section 11.03.  *Certain Waivers. Etc.* The Guarantors hereby expressly waive (to the extent permitted by applicable Law) diligence, presentment, demand of payment, protest and, to the extent permitted by Law, all notices whatsoever, and any requirement that any Secured Party exhaust any right, power or remedy or proceed against the Borrower under this Agreement or the Term Notes issued hereunder, if any, or any other agreement or instrument referred to herein or therein, or against any other person under any other guarantee of, or security for, any of the Guaranteed Obligations. The Guarantors waive, to the extent permitted by Law, any and all notice of the creation, renewal, extension, waiver, termination or accrual of any of the Guaranteed Obligations and notice of or proof of reliance by any Secured Party upon this Guarantee or acceptance of this Guarantee, and the Guaranteed Obligations, and any of them, shall conclusively be deemed to have been created, contracted or incurred in reliance upon this Guarantee, and all dealings between the Borrower and the Secured Parties shall likewise be conclusively presumed to have been had or consummated in reliance upon this Guarantee. This Guarantee shall be construed as a continuing, absolute, irrevocable and unconditional guarantee of payment without regard to any right of offset with respect to the Guaranteed Obligations at any time or from time to time held by Secured Parties, and the obligations and liabilities of the Guarantors hereunder shall not be conditioned or contingent upon the pursuit by the Secured Parties or any other Person at any time of any right or remedy against the Borrower or against any other Person which may be or become liable in respect of all or any part of the Guaranteed Obligations or against any collateral security or guarantee therefor or right of offset with respect thereto. This Guarantee shall remain in full force and effect and be binding in accordance with and to the extent of its terms upon the Guarantors and the successors and permitted assigns thereof, and shall inure to the benefit of the Secured Parties, and their respective successors and permitted assigns, notwithstanding that from time to time during the term of this Agreement there may be no Guaranteed Obligations outstanding. Each Guarantor waives (to the extent

permitted by Law) any rights and defenses that are or may become available to it by reason of §§ 2787 to 2855, inclusive, and §§ 2899 and 3433 of the California Civil Code. As provided in Section 10.07, the provisions of this Article 11 shall be governed by, and construed in accordance with, the laws of the State of New York. The foregoing waivers and the provisions hereinafter set forth in this Article 11 which pertain to California law are included solely out of an abundance of caution, and shall not be construed to mean that any of the above-referenced provisions of California law are in any way applicable to this Article 11, to any other provision of this Agreement or to the Obligations.

Section 11.04.  *Reinstatement.* The obligations of the Guarantors under this Article 11 shall be automatically reinstated if and to the extent that for any reason any payment by or on behalf of the Borrower or other Loan Party in respect of the Guaranteed Obligations is rescinded or must be otherwise restored by any holder of any of the Guaranteed Obligations, whether as a result of any proceedings in bankruptcy or reorganization or otherwise.

Section 11.05.  *Subrogation; Subordination.* Each Guarantor hereby agrees that until the payment and satisfaction in full in cash of all Guaranteed Obligations (other than contingent obligations and obligations related to any Secured Hedge Agreement) and the expiration and termination of the Commitments of the Lenders under this Agreement it shall waive any claim and shall not exercise any right or remedy, direct or indirect, arising by reason of any performance by it of its guarantee in Section 11.01, whether by subrogation or otherwise, against the Borrower or any other Guarantor of any of the Guaranteed Obligations or any security for any of the Guaranteed Obligations. Any Indebtedness of any Loan Party to any Person that is not a Loan Party permitted pursuant to Section 7.03(b) or 7.03(d) shall be subordinated to such Loan Party's Obligations in an manner reasonably acceptable to the Administrative Agent.

Section 11.06.  *Remedies.* The Guarantors jointly and severally agree that, as between the Guarantors and the Lenders, the obligations of the Borrower under this Agreement and the Term Notes issued hereunder, if any, may be declared to be forthwith due and payable as provided in Section 8.02 (and shall be deemed to have become automatically due and payable in the circumstances provided in Section 8.02) for purposes of Section 11.01, notwithstanding any stay, injunction or other prohibition preventing such declaration (or such obligations from becoming automatically due and payable) as against the Borrower and that, in the event of such declaration (or such obligations being deemed to have become automatically due and payable), such obligations (whether or not due and payable by the Borrower) shall forthwith become due and payable by the Guarantors for purposes of Section 11.01.

Section 11.07.  *Instrument for the Payment of Money.* Each Guarantor hereby acknowledges that the guarantee in this Article 11 constitutes an instrument for the payment of money, and consents and agrees that any Secured Party or Agent, at its sole option, in the event of a dispute by such Guarantor in the payment of any moneys due hereunder, shall have the right to bring a motion-action under New York CPLR Section 3213.

Section 11.08.  *Continuing Guarantee.* The guarantee in this Article 11 is a continuing guarantee of payment, and shall apply to all Guaranteed Obligations whenever arising.

Section 11.09.  *General Limitation on Guarantee Obligations.* In any action or proceeding involving any state corporate, limited partnership or limited liability company law, or any applicable state, federal or foreign bankruptcy, insolvency, reorganization or other Law affecting the rights of creditors generally, if the obligations of any Guarantor under Section 11.01 would otherwise be held or determined to be void, voidable, invalid or unenforceable, or subordinated to the claims of any other creditors, on account of the amount of its liability under Section 11.01, then, notwithstanding any other provision to the contrary, the amount of such liability shall, without any further action by such Guarantor, any Loan Party or any other Person, be automatically limited and reduced to the highest amount (after giving effect to the right of contribution established in Section 11.11) that is valid and enforceable and not subordinated to the claims of other creditors as determined in such action or proceeding.

Section 11.10.  *Release of Guarantors.* If, in compliance with the terms and provisions of the Loan Documents, (i) all or substantially all of the Equity Interests or property of any Guarantor are sold or otherwise transferred to a Person or Persons none of which is a Loan Party or (ii) any Guarantor becomes an Excluded Subsidiary (any such Guarantor, and any Guarantor referred to in clause (i), a "**Transferred Guarantor**"), such Transferred Guarantor shall, upon the consummation of such sale or transfer or other transaction, be automatically released from its obligations under this Agreement (including under Section 10.05 hereof) and its obligations to pledge and grant any Collateral owned by it pursuant to any Collateral Document and, in the case of a sale of all or substantially all of the Equity Interests of the Transferred Guarantor, the pledge of such Equity Interests to the Collateral Agent pursuant to the Collateral Documents shall be automatically released, and, the Collateral Agent shall take such actions as are necessary to effect each release described in this Section 11.10 in accordance with the relevant provisions of the Collateral Documents; *provided*, that no Guarantor shall be released as provided in this paragraph if such Guarantor continues to be a guarantor in respect of any Indebtedness incurred pursuant to Section 7.03(o), any Permitted Additional Debt, any Junior Financing or any Permitted Refinancing of any of the foregoing.

When all Commitments hereunder have terminated, and all Loans or other Obligations hereunder which are accrued and payable have been paid or satisfied, this Agreement and the Guarantees made herein shall automatically terminate with respect to all Obligations, except with respect to Obligations that expressly survive such repayment pursuant to the terms of this Agreement.

Section 11.11.  *Right of Contribution.* Each Guarantor hereby agrees that to the extent that a Guarantor shall have paid more than its proportionate share of any payment made hereunder, such Guarantor shall be entitled to seek and receive contribution from and against any other Guarantor hereunder which has not paid its proportionate share of such payment. Each Guarantor's right of contribution shall be subject to the terms and conditions of Section 11.05. The provisions of this Section 11.11 shall in no respect limit the obligations and liabilities of any Guarantor to the Administrative Agent and the Secured Parties, and each Guarantor shall remain liable to the Administrative Agent and the Secured Parties for the full amount guaranteed by such Guarantor hereunder.

Section 11.12.    *Additional Guarantor Waivers and Agreements*.

(e)    Each Guarantor understands and acknowledges that if the Collateral Agent or any other Secured Party forecloses judicially or nonjudicially against any real property security for the Obligations, that foreclosure could impair or destroy any ability that such Guarantor may have to seek reimbursement, contribution, or indemnification from the Borrower or others based on any right such Guarantor may have of subrogation, reimbursement, contribution, or indemnification for any amounts paid by such Guarantor under the Guaranty. Each Guarantor further understands and acknowledges that in the absence of this paragraph, such potential impairment or destruction of such Guarantor's rights, if any, may entitle such Guarantor to assert a defense to this Guaranty based on Section 580d of the California Code of Civil Procedure as interpreted in Union Bank v. Gradsky, 265 Cal. App. 2d 40 (1968). By executing this Guaranty, each Guarantor freely, irrevocably, and unconditionally: (i) waives (to the extent permitted by Law) and relinquishes that defense and agrees that such Guarantor will be fully liable under this Guaranty even though the Collateral Agent or any other Secured Party may foreclose, either by judicial foreclosure or by exercise of power of sale, any deed of trust securing the Obligations; (ii) agrees that such Guarantor will not assert that defense in any action or proceeding which the Administrative Agent, the Collateral Agent or any other Secured Party may commence to enforce this Guaranty; (iii) acknowledges and agrees that the rights and defenses waived by such Guarantor in this Guaranty include any right or defense that such Guarantor may have or be entitled to assert based upon or arising out of any one or more of §§ 580a, 580b, 580d, or 726 of the California Code of Civil Procedure or § 2848 of the California Civil Code; and (iv) acknowledges and agrees that the Secured Parties are relying on this waiver in creating the Obligations, and that this waiver is a material part of the consideration which the Secured Parties are receiving for creating the Obligations.

(f)    Each Guarantor waives (to the extent permitted by Law) all rights and defenses that such Guarantor may have because any of the Obligations is secured by real property. This means, among other things: (i) the Administrative Agent, the Collateral Agent and the other Secured Parties may collect from such Guarantor without first foreclosing on any real or personal property Collateral pledged by the other Loan Parties; and (ii) if the Collateral Agent or any other Secured Party forecloses on any real property Collateral pledged by the other Loan Parties: (A) the amount of the Obligations may be reduced only by the price for which that Collateral is sold at the foreclosure sale, even if the collateral is worth more than the sale price, and (B) the Administrative Agent, the Collateral Agent and the other Secured Parties may collect from such Guarantor even if the Secured Parties, by foreclosing on the real property Collateral, have destroyed any right such Guarantor may have to collect from the Borrower. This is an unconditional and irrevocable waiver of any rights and defenses such Guarantor may have because any of the Obligations is secured by real property. These rights and defenses include, but are not limited to, any rights or defenses based upon § 580a, 580b, 580d, or 726 of the California Code of Civil Procedure.

(g)   Each Guarantor waives (to the extent permitted by Law)any right or defense it may have at law or equity, including California Code of Civil Procedure § 580a, to a fair market value hearing or action to determine a deficiency judgment after a foreclosure.

IN WITNESS WHEREOF, the parties hereto have caused this agreement to be     duly executed as of the day and year first above written.

YRC WORLDWIDE INC.,

by:    /s/ Mark Boehmer

Name: Mark Boehmer
Title:    Vice President & Treasurer


EXPRESS LANE SERVICE, INC.,

by:    /s/ Mark Boehmer

Name: Mark Boehmer
Title:    Vice President


NEW PENN MOTOR EXPRESS, INC.,

by:    /s/ Mark Boehmer

Name:    Mark Boehmer
Title:    Vice President


ROADWAY EXPRESS INTERNATIONAL, INC.,

by:    /s/ Mark Boehmer

Name: Mark Boehmer
Title:    Vice President


ROADWAY LLC,

by:    /s/ Mark Boehmer

Name: Mark Boehmer
Title:    Vice President


ROADWAY NEXT DAY CORPORATION

by:    /s/ Mark Boehmer

Name: Mark Boehmer
Title:    Vice President

ROADWAY REVERSE LOGISTICS. INC.,

      by:   /s/ Phil J. Gaines

      Name: Phil J. Gaines
      Title:   Senior Vice President - Finance

USF BESTWAY INC.,

      by:   /s/ Mark Boehmer

      Name: Mark Boehmer
      Title:   Vice President

USF DUGAN INC.,

      by:   /s/ Mark Boehmer

      Name: Mark Boehmer
      Title:   Vice President

USF GLEN MOORE INC.,

      by:   /s/ Mark Boehmer

      Name: Mark Boehmer
      Title:   Vice President

USF HOLLAND INC.,

      by:   /s/ Mark Boehmer

      Name: Mark Boehmer
      Title:   Vice President

USF REDSTAR LLC,

      by:   /s/ Mark Boehmer

      Name: Mark Boehmer

Title:    Vice President


USF REDDAWAY INC.,

   by: /s/ Mark Boehmer

   Name: Mark Boehmer
   Title:    Vice President


YRC ASSOCIATION SOLUTIONS, INC.,

   by: /s/ Mark Boehmer

   Name: Mark Boehmer
   Title:    Vice President


YRC INC.,

   by: /s/ Mark Boehmer

   Name: Mark Boehmer
   Title:    Vice President


YRC LOGISTICS SERVICES, INC.,

   by: /s/ Mark Boehmer

   Name: Mark Boehmer
   Title:    Vice President


YRC MORTGAGES, LLC,

   by: /s/ Mark Boehmer

   Name: Mark Boehmer
   Title:    Vice President


YRC ENTERPRISE SERVICES, INC.,

   by: /s/ Mark Boehmer

   Name: Mark Boehmer
   Title:    Vice President

YRC REGIONAL TRANSPORTATION, INC.,

by:    /s/ Mark Boehmer

Name: Mark Boehmer
Title:   Vice President

CREDIT SUISSE AG, CAYMAN ISLANDS    BRANCH., as Administrative Agent and Collateral    Agent,

by:    /s/ John D. Toronto

Name:    John D. Toronto
Title:    Authorized Signatory

by:    /s/ Whitney Gaston

Name: Whitney Gaston
Title:    Authorized Signatory

(h)

 

EXHIBIT A

ADMINISTRATIVE QUESTIONNAIRE

YRC WORLDWIDE INC.

Agent Information
Credit Suisse AG, Cayman Islands Branch
Eleven Madison Avenue
New York, NY 10010

Agent Closing Contact
[___]
Tel: [___]
Fax: [___]
E-Mail: [___]

Agent Wire Instructions
[___]
[___]
Account Name: [___]
Account Number: [___]

---

It is very important that **all** of the requested information be completed accurately and that this questionnaire be returned promptly. If your institution is sub-allocating its allocation, please fill out an administrative questionnaire for each legal entity.

---

Legal Name of Lender to appear in Documentation:

___

Signature Block Information: ___

- Signing Credit Agreement

|  | Yes |  | No |

- Coming in via Assignment

|  | Yes |  | No |

Type of Lender: ___
(Bank, Asset Manager, Broker/Dealer, CLO/CDO; Finance Company, Hedge Fund, Insurance, Mutual Fund, Pension Fund, Other Regulated Investment Fund, Special Purpose Vehicle, Other-please specify)

Lender Parent: ___

Lender Domestic Address          Lender Eurodollar Address

_____        _____

_____        _____

_____        _____

| **Contacts/Notification Methods: Borrowings, Paydowns, Interest, Fees, etc.** |
| --- |

Primary Credit Contact          Secondary Credit Contact

Name: _____     _____

Company: _____     _____

Title: _____     _____

Address: _____     _____

Telephone: _____     _____

Facsimile: _____     _____

E-Mail Address: _____     _____

Primary Operations Contact       Secondary Operations Contact

Name: _____     _____

Company: _____     _____

Title: _____     _____

Address: _____     _____

| **Lender's Domestic Wire Instructions** |
| --- |

Bank Name: _____

ABA/Routing No.: _____

Account Name: _____

Account No.: _____

FFC Account Name: _____

FFC Account No.: _____

Attention: _____

Reference: _____

**Tax Documents**

**NON-U.S. LENDER INSTITUTIONS:**

**I. *Non-Flow Through Entities:***
If your institution is organized outside of the United States for U.S. federal income tax purposes, and is the beneficial owner of the interest and other income it receives, you must, without limiting the obligations to deliver certain forms and documents under Section 3.01 of the Credit Agreement, complete one of the following three tax forms, as applicable to your institution: *a.) Form W-8BEN (Certificate of Foreign Status of Beneficial Owner), b.) Form W-8ECI (Income Effectively Connected to a U.S. Trade or Business),* or *c.) Form W-8EXP (Certificate of Foreign Government or Governmental Agency).*

A U.S. taxpayer identification number is required for any institution submitting Form W-8ECI. It is also required on Form W-8BEN for certain institutions claiming the benefits of a tax treaty with the U.S. Please refer to the instructions when completing the form applicable to your institution. In addition, please be advised that U.S. tax regulations do not permit the acceptance of faxed forms. **Two original copies of each applicable tax form must be submitted.**

**II. *Flow-Through Entities:***
If your institution is organized outside the U.S., and is classified for U.S. federal income tax purposes as either a partnership, trust, qualified or non-qualified Intermediary, or other non-U.S. flow-through entity, an original *Form W-8IMY (Certificate of Foreign Intermediary, Foreign Flow-Through Entity, or Certain U.S. Branches for United States Tax Withholding)* must, without limiting the obligations to deliver certain forms and documents under Section 3.01 of the Credit Agreement, be completed by the intermediary together with a withholding statement. Flow-through entities other than Qualified Intermediaries are required to include tax forms for each of the underlying beneficial owners.

Please refer to the instructions when completing this form. In addition, please be advised that U.S. tax regulations do not permit the acceptance of faxed forms. **Two original copies of each applicable tax form must be submitted.**

**U.S. LENDER INSTITUTIONS**:

If your institution is incorporated or organized <u>within</u> the United States, you must complete and return *Form W-9 (Request for Taxpayer Identification Number and Certification).* **Please be advised that you must submit an original Form W-9.**

*Pursuant to the Credit Agreement, the applicable tax forms and documents for your institution must be completed and returned on or prior to the date on which it becomes a party to the Credit Agreement. Failure to provide the proper tax form when requested may subject your institution to U.S. tax withholding.*

EXHIBIT B

FORM OF ASSIGNMENT AND ACCEPTANCE

This Assignment and Acceptance Agreement (this "**Assignment and Acceptance**") is dated as of the Effective Date set forth below and is entered into by and between the Assignor (as defined below) and the Assignee (as defined below). Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the Credit Agreement identified below (as amended, amended and restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**").

Receipt of a copy of the Credit Agreement is hereby acknowledged by the Assignee. The Standard Terms and Conditions set forth in Annex 1 attached hereto are hereby agreed to and incorporated herein by reference and made a part of this Assignment and Acceptance as if set forth herein in full.

For an agreed consideration, the Assignor hereby irrevocably sells and assigns to the Assignee, and the Assignee hereby irrevocably purchases and assumes from the Assignor, subject to and in accordance with the Standard Terms and Conditions and the Credit Agreement, as of the Effective Date inserted by the Administrative Agent as contemplated below, (i) all of the Assignor's rights and obligations in its capacity as a Lender under the Credit Agreement, any other Loan Documents and any other documents or instruments delivered pursuant thereto to the extent related to the amount and percentage interest identified below of all of such outstanding rights and obligations of the Assignor under the respective facilities identified below and (ii) to the extent permitted to be assigned under applicable law, all claims, suits, causes of action and any other right of the Assignor (in its capacity as a Lender) against any Person, whether known or unknown, arising under or in connection with the Credit Agreement, any other Loan Document and any other documents or instruments delivered pursuant thereto or the loan transactions governed thereby or in any way based on or related to any of the foregoing, including, but not limited to, contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the rights and obligations sold and assigned pursuant to clause (i) above (the rights and obligations sold and assigned pursuant to clauses (i) and (ii) above being referred to herein collectively as the "**Assigned Interest**"). Such sale and assignment is without recourse to the Assignor and, except as expressly provided in this Assignment and Acceptance, without representation or warranty by the Assignor.

1.  Assignor (the "**Assignor**"):

2.  Assignee (the "**Assignee**"):

    Assignee is an Affiliate of: [Name of Lender]

Assignee is a Related Fund of: [Name of Lender]

3.    Borrower: YRC Worldwide Inc.

4.    Administrative Agent: Credit Suisse AG, Cayman Islands Branch

5.    Credit Agreement: The Credit Agreement, dated as of February 13, 2014, among YRC Worldwide Inc., a Delaware corporation, the subsidiaries of the Borrower party thereto from time to time, the Lenders party thereto from time to time and Credit Suisse AG, Cayman Islands Branch, as Administrative Agent and Collateral Agent.

6.    Assigned Interest:

| Facility | Aggregate Amount of Commitment/Loans of all Lenders | Amount of Commitment/ Loans Assigned | Percentage Assigned of Aggregate Commitment/ Loans of all Lenders |
|---|---|---|---|
| [Initial] [Extended] [Incremental] [Other] Term Loans | $ | $ | % |

Effective Date of Assignment (the "**Effective Date**"):

The terms set forth in this Assignment and Acceptance are hereby agreed to:

[NAME OF ASSIGNOR], as Assignor

By: _____
      Name:
      Title:

[NAME OF ASSIGNEE], as Assignee

By: _____
      Name:
      Title:

[Consented to and] Accepted:

CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH
as Administrative Agent

By: _____
      Name:
      Title:

By: _____
      Name:
      Title:

YRC WORLDWIDE INC.,

By: _____
      Name:
      Title:

**STANDARD TERMS AND CONDITIONS FOR
ASSIGNMENT AND ACCEPTANCE**

1.    *Representations and Warranties.*

1.1    *Assignor.* The Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of the Assigned Interest, (ii) the Assigned Interest is free and clear of any lien, encumbrance or other adverse claim and (iii) it has full power and authority, and has taken all action necessary, including to obtain such consents, if any, as are required under the Credit Agreement, to execute and deliver this Assignment and Acceptance and to consummate the transactions contemplated hereby; and (b) assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with the Credit Agreement or any other Loan Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Loan Documents or any collateral thereunder, (iii) the financial condition of YRC Worldwide Inc., or any of its Subsidiaries or Affiliates or any other Person obligated in respect of the Credit Agreement or any other Loan Document or (iv) the performance or observance by YRC Worldwide Inc., or any of its Subsidiaries or Affiliates or any other Person of any of their respective obligations under any Loan Document.

1.2.    *Assignee.* The Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Acceptance and to consummate the transactions contemplated hereby and to become a Lender under the Credit Agreement, (ii) it satisfies all requirements, if any, specified in the Credit Agreement that are required to be satisfied by it in order to acquire the Assigned Interest and become a Lender thereunder, including that such Assignee is not a Disqualified Lender, (iii) from and after the Effective Date, it shall be bound by the provisions of the Credit Agreement and each other Loan Document, as a Lender, and, to the extent provided in this Assignment and Acceptance, shall have the rights and obligations of a Lender under the Credit Agreement, (iv) it is sophisticated with respect to decisions to acquire assets of the type represented by the Assigned Interest and either it, or the person exercising discretion in making its decision to acquire the Assigned Interest, is experienced in acquiring assets of such type, (v) it has received a copy of the Credit Agreement, and has received or has been afforded the opportunity to receive the other Loan Documents, together with copies of the most recent financial statements delivered pursuant to Sections 5.05 or 6.01 of the Credit Agreement, as applicable, and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and Acceptance and to purchase the Assigned Interest, (vi) it has independently and without reliance on the Administrative Agent, the Collateral Agent, the Assignor or any other Lender or Agent, made its own credit analysis and decision to enter into this Assignment and Acceptance and to purchase the Assigned Interest, (vii) if it is not already a Lender under the Credit Agreement,

attached to the Assignment and Acceptance is an Administrative Questionnaire as required by the Credit Agreement and (viii) the Administrative Agent has received a processing and recordation fee of $3,500 as of the Effective Date (to the extent required by the Credit Agreement, unless waived) and (b) agrees that (i) it will, independently and without reliance on the Administrative Agent, the Collateral Agent, the Assignor or any other Lender or Agent, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Loan Documents, and (ii) it will perform in accordance with their terms all of the obligations which by the terms of the Loan Documents are required to be performed by it as a Lender, including its obligations pursuant to Section 3.01 of the Credit Agreement.

2.    *Payments*. From and after the Effective Date, the Administrative Agent shall make all payments in respect of the Assigned Interest (including payments of principal, interest, fees and other amounts) to the Assignor for amounts which have accrued to but excluding the Effective Date and to the Assignee for amounts which have accrued from and after the Effective Date.

3.    *General Provisions*.

3.1    In accordance with Section 10.04 of the Credit Agreement, upon execution, delivery and acceptance of this Assignment and Acceptance and the recording in the Register of the assignment effectuated hereby, from and after the Effective Date, (a) the Assignee shall be a party to the Credit Agreement and, to the extent provided in this Assignment and Acceptance, have the rights and obligations of a Lender under the Credit Agreement with Term Loans as set forth herein and (b) the Assignor shall, to the extent of the Assigned Interest assigned pursuant to this Assignment and Acceptance, be released from its obligations under the Credit Agreement (and, in the case that this Assignment and Acceptance covers all of the Assignor's rights and obligations under the Credit Agreement, the Assignor shall cease to be a party to the Credit Agreement but shall continue to be entitled to the benefits of Sections 3.01, 3.03, 3.04 and 10.05 thereof with respect to facts and circumstances occurring prior to the effective date of this assignment).

3.2    This Assignment and Acceptance shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns. This Assignment and Acceptance may be executed by one or more of the parties to this Assignment and Acceptance on any number of separate counterparts (including by facsimile or other electronic transmission), and all of said counterparts taken together shall be deemed to constitute one and the same instrument. This Assignment and Acceptance and the rights and obligations of the parties hereunder shall be governed by, and construed in accordance with the law of the state of New York.

EXHIBIT C

FORM OF REQUEST FOR CREDIT EXTENSION

To:    Credit Suisse AG, Cayman Islands Branch
       as Administrative Agent
       Eleven Madison Avenue
       New York, NY 10010
       Facsimile: 212-322-2291
       Telephone: 919-994-6369
       Email: agency.loanops@credit-suisse.com
       Attention: Agency Manager

[Date]

Ladies and Gentlemen:

Reference is made to the Credit Agreement, dated as of February 13, 2014 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), among YRC Worldwide Inc., a Delaware corporation, the subsidiaries of the Borrower party thereto from time to time, the Lenders party thereto from time to time and Credit Suisse AG, Cayman Islands Branch, as Administrative Agent and Collateral Agent. Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the Credit Agreement.

The undersigned Borrower hereby requests (select one):

A Borrowing of new Loans

A conversion of Loans made on _____

A continuation of Eurodollar Loans made on _____

to be made on the terms set forth below:

(A) Class of Borrowing

(B) Date of Borrowing, conversion or continuation (which is a Business Day)

(C) Principal amount

(D) Type of Loan

(E) Interest Period and the last day thereof

(F) Location and number of Borrower's account to which proceeds of Borrowings are to be disbursed:

[The undersigned Borrower hereby represents and warrants to the Administrative Agent and the Lenders that, on the date of this Borrowing Request and on the date of the related Borrowing, the conditions to lending specified in Section 4.01 of the Credit Agreement will be satisfied or waived as of the date of the Borrowing set forth above.]

YRC WORLDWIDE INC.

By:
       Name: _____
       Title:

EXHIBIT D

FORM OF SECURITY AGREEMENT

*Attached*

SECURITY AGREEMENT, dated as of February 13, 2014, among YRC Worldwide Inc., a Delaware corporation (the "Borrower")), the other Grantors party hereto from time to time and Credit Suisse AG, Cayman Islands Branch as Collateral Agent for the Secured Parties (as defined below).

Reference is made to the Credit Agreement, dated as of February 13, 2014 (as amended, restated, amended and restated, supplemented and/or otherwise modified from time to time, the "Credit Agreement"), among the Borrower, the other Guarantors party thereto from time to time, the Lenders party thereto from time to time and Credit Suisse AG, Cayman Islands Branch as Administrative Agent and Collateral Agent.

The Lenders have agreed to extend credit to the Borrower subject to the terms and conditions set forth in the Credit Agreement and the Hedge Banks have agreed to enter into and/or maintain one or more Secured Hedge Agreements on the terms and conditions set forth in the Credit Agreement and the Secured Hedge Agreements, as applicable. The obligations of the Lenders to extend such credit and the obligation of the Hedge Banks to enter into and/or maintain such Secured Hedge Agreements are, in each case, conditioned upon, among other things, the execution and delivery of this Agreement by each Grantor. The Grantors are affiliates of one another, will derive substantial direct and indirect benefits from (i) the extensions of credit to the Borrower pursuant to the Credit Agreement and (ii) the entering into and/or maintaining by the Hedge Banks of Secured Hedge Agreements with the Borrower and/or one or more of its Restricted Subsidiaries, and are willing to execute and deliver this Agreement in order to induce the Lenders to extend such credit and to induce the Hedge Banks to enter into and/or maintain such Secured Hedge Agreements. The ABL Intercreditor Agreement governs the relative rights and priorities of the Secured Parties and the ABL Secured Parties in respect of the Term Priority Collateral and the ABL Priority Collateral (and with respect to certain other matters as described therein). Accordingly, the parties hereto agree as follows:

ARTICLE I

Definitions

Section 1.01.   Credit Agreement and UCC. Capitalized terms used in this Agreement, including the preamble and the introductory paragraphs hereto, and not otherwise defined herein have the meanings specified in the Credit Agreement.

(a)   As used herein, each of the following terms has the meaning specified in the UCC (as defined herein):

1

| Term | UCC Section |
| --- | --- |
| Certificated Security | 8-102 |
| Chattel Paper | 9-102 |
| Commercial Tort Claim | 9-102 |
| Control | 8-106 & 9-106 |
| Commodity Contract | 9-102 |
| Commodity Intermediary | 9-102 |
| Deposit Account | 9-102 |
| Document | 9-102 |
| Entitlement Holder | 8-102 |
| Entitlement Order | 8-102 |
| Financial Asset | 8-102 & 103 |
| Fixtures | 9-102 |
| Goods | 9-102 |
| Instrument | 9-102 |
| Inventory | 9-102 |
| Investment Property | 9-102 |
| Letter-of-Credit Right | 9-102 |
| Location | 9-307 |
| Money | 1-201 |
| Proceeds | 9-102 |
| Promissory Note | 9-102 |
| Securities Account | 8-501 |
| Securities Intermediary | 8-102 |
| Security Entitlement | 8-102 |
| Supporting Obligations | 9-102 |
| Uncertificated Security | 8-102 |

(b)   The rules of construction specified in Article 1 of the Credit Agreement also apply to this Agreement.

Section 1.02.    Other Defined Terms. As used in this Agreement, the following terms have the meanings specified below:

"ABL Priority Collateral" has the meaning assigned to such term in the ABL Intercreditor Agreement.

"Accommodation Payment" has the meaning assigned to such term in Article VI.

"Account(s)" means "accounts" as defined in Section 9-102 of the UCC, and also means a right to payment of a monetary obligation, whether or not earned by performance, (a) for property that has been or is to be sold, leased, licensed, assigned, or otherwise disposed of, (b) for services rendered or to be rendered, or (c) arising out of the use of a credit or charge card.

2

"Account Debtor" means any Person who is or who may become obligated to any Grantor under, with respect to or on account of an Account.

"After-Acquired Intellectual Property" has the meaning assigned to such term in Section 4.02(d).

"Agreement" means this Security Agreement.

"Allocable Amount" has the meaning assigned to such term in Article VI.

"Article 9 Collateral" has the meaning assigned to such term in Section 3.01(a).

"Bankruptcy Event of Default" means any Event of Default under Sections 8.01(f) or (g) of the Credit Agreement, provided that, for the purposes of this Agreement only and notwithstanding Section 8.03 of the Credit Agreement, in determining whether such an Event of Default has occurred, any reference in any such clause to any Restricted Subsidiary or Loan Party shall be deemed not to include any Immaterial Subsidiary affected by any event or circumstances referred to in any such clause.

"Blue Sky Laws" has the meaning assigned to such term in Section 5.01.

"Closing Date Grantor" has the meaning assigned to such term in Section 2.02 of this Agreement.

"Collateral" means the Article 9 Collateral and the Pledged Collateral; provided that all references to "Collateral" in Section 5.02 shall, unless the context requires otherwise, also refer to Mortgaged Properties; provided further, that in no event will "Collateral" refer to any Excluded Property.

"Collateral Account" means any Cash Collateral Account, if any, established by a Grantor pursuant to, or in connection with, any Loan Document, which Cash Collateral Account shall be maintained with, and under the sole dominion and control of, the Collateral Agent for the benefit of the relevant Secured Parties. For the avoidance of doubt, it is undisputed that there is no Collateral Account on the Closing Date.

"Commercial Software License" means any non-exclusive license of commercially available (on non-discriminatory pricing terms) computer software to a Grantor from a commercial software provider (e.g., "shrink-wrap", "browse-wrap" or "click-wrap" software licenses) or a license of freely available computer software from a licensor of free or open source software.

"Copyright License" means any written agreement, now or hereafter in effect, granting any right to any third party under any Copyright now or hereafter owned by any Grantor material to the operation of the business of the Grantors or otherwise of significant value or that such Grantor otherwise has the right to license material to the operation of the business of the Grantors or otherwise of significant value, or granting any right to any Grantor under any Copyright now or hereafter owned by any third party, and all rights of such Grantor under any such agreement.

3

"Copyrights" means all of the following now owned or hereafter acquired by or assigned to any Grantor: (a) all copyright rights in any work subject to the copyright laws of the United States or any other country, whether as author, assignee, transferee or otherwise, whether registered or unregistered and whether published or unpublished, (b) all registrations and applications for registration of any such copyright in the United States or any other country, including registrations, recordings, supplemental registrations and pending applications for registration in the United States Copyright Office, including those listed on Schedule III, (c) all rights and privileges arising under applicable Law with respect to such Grantor's use of such copyrights, (d) all derivatives, reissues, renewals, continuations and extensions thereof and amendments thereto, (e) all income, fees, royalties, damages, claims and payments now or hereafter due and/or payable with respect to the foregoing, including damages and payments for past, present or future infringements thereof, (f) all rights corresponding thereto throughout the world and (g) all rights to sue for past, present or future infringements thereof.

"Credit Agreement" has the meaning assigned to such term in the preliminary statement of this Agreement.

"Discharge of ABL Obligations" has the meaning assigned to such term in the ABL Intercreditor Agreement.

"Domain Names" means all Internet domain names and associated URL addresses in or to which any Grantor now or hereafter has any right, title or interest.

"Equipment" means (x) any "equipment" as such term is defined in Article 9 of the UCC and shall also include, but shall not be limited to, all machinery, equipment, furnishings, appliances, furniture, fixtures, tools, vehicles, Tractor Trailers and Rolling Stock now or hereafter owned by any Grantor in each case, regardless of whether characterized as equipment under the UCC and (y) and any and all additions, substitutions and replacements of any of the foregoing and all accessions thereto, wherever located, whether or not at any time of determination incorporated or installed therein or attached thereto, and all replacements therefore, together with all attachments, components, parts, equipment and accessories installed thereon or affixed thereto.

"Excluded Property" has the meaning set forth in Section 3.01.

"General Intangibles" has the meaning provided in Article 9 of the UCC and shall in any event include all choses in action and causes of action and all other intangible personal property of every kind and nature (other than Accounts) now owned or hereafter acquired by any Grantor, as the case may be, including corporate or other business records, indemnification claims, contract rights (including rights under leases, whether entered into as lessor or lessee, Swap Contracts and other agreements), goodwill, registrations, franchises, tax refund claims and any letter of credit, guarantee, claim, security interest or other security held by or granted to any Grantor.

"Grant of Security Interest" means a Grant of Security Interest in certain Intellectual Property Collateral in the form of Exhibit III, IV or V attached hereto.

"Grantor" means each of the Borrower and each Guarantor.

4

"Intellectual Property" means all registered intellectual property of every kind and nature now owned or hereafter acquired by any Grantor, including inventions, designs, Patents, Copyrights, Licenses, Trademarks, trade secrets, confidential or proprietary technical and business information, know how, show how or other data or information, software (including all data and source code and related documentation), databases, all other proprietary information, including but not limited to Domain Names, social media identifications and tags including Twitter usernames and Facebook usernames and all embodiments or fixations thereof and related documentation, registrations and franchises, and all additions, improvements and accessions to, and books and records describing or used in connection with, any of the foregoing.

"Intellectual Property Collateral" means Collateral consisting of Intellectual Property.

"License" means any Patent License, Trademark License, Copyright License, Commercial Software License or other license or sublicense agreement granting rights under Intellectual Property to which any Grantor is a party, including those listed on Schedule III.

"Patent License" means any written agreement, now or hereafter in effect, granting to any third party any right to develop, commercialize, import, make, have made, offer for sale, use or sell any invention on which a Patent, now or hereafter owned by any Grantor or that any Grantor otherwise has the right to license, is in existence, or granting to any Grantor any such right with respect to any invention on which a Patent, now or hereafter owned by any third party, is in existence, and all rights of any Grantor under any such agreement.

"Patents" means all of the following now owned or hereafter acquired by any Grantor: (a) all letters patent of the United States or the equivalent thereof in any other country, all registrations and recordings thereof, and all applications for letters patent of the United States or the equivalent thereof in any other country, including registrations, recordings and pending applications in the United States Patent and Trademark Office or any similar offices in any other country, including those listed on Schedule III, (b) all rights and privileges arising under applicable Law with respect to such Grantor's use of any patents, (c) all inventions and improvements described and claimed therein, (d) all reissues, divisions, continuations, renewals, extensions and continuations-in-part thereof and amendments thereto, (e) all income, fees, royalties, damages, claims and payments now or hereafter due and/or payable with respect to any of the foregoing including damages and payments for past, present or future infringements thereof, (f) all rights corresponding thereto throughout the world and (g) rights to sue for past, present or future infringements thereof.

"Perfection Certificate" means a certificate substantially in the form of Exhibit II, completed and supplemented with the schedules and attachments contemplated thereby, and duly executed by any officer of the Borrower.

"Pledged Collateral" has the meaning assigned to such term in Section 2.01.

"Pledged Debt" has the meaning assigned to such term in Section 2.01.

"Pledged Equity" has the meaning assigned to such term in Section 2.01.

5

"Pledged Securities" means any Promissory Notes, stock certificates or other Securities, certificates or Instruments now or hereafter included in the Pledged Collateral, including all Pledged Equity, Pledged Debt and all other certificates, instruments or other documents representing or evidencing any Pledged Collateral.

"Rolling Stock" means any railroad car, locomotive, stacktrain or other rolling stock, or accessories used on such railroad cars, locomotives or other rolling stock (including superstructures and racks); provided that, Rolling Stock shall exclude Tractor Trailers.

"Secured Credit Document" means each Loan Document and each Secured Hedge Agreement.

"Secured Obligations" means the "Obligations" as defined in the Credit Agreement; it being acknowledged and agreed that the term "Secured Obligations" as used herein shall include each extension of credit under the Credit Agreement and all obligations of the Borrower and/or its Restricted Subsidiaries under the Secured Hedge Agreements whether outstanding on the date of this Agreement or extended or arising from time to time after the date of this Agreement.

"Secured Parties" means the holders from time to time of the Secured Obligations.

"Securities Act" has the meaning assigned to such term in Section 5.01

"Security" means a "security" as such term is defined in Article 8 of the UCC.

"Security Agreement Supplement" means an instrument substantially in the form of Exhibit I hereto.

"Security and Collateral Agency Agreement" means that certain security and collateral agency agreement, dated as of the date hereof, among Credit Suisse AG, Cayman Islands Branch, as collateral agent, the Collateral Agent, as term loan representative, the ABL Agent, as ABL representative, and the Borrower and the other Loan Parties party thereto.

"Security Interest" has the meaning assigned to such term in Section 3.01(a).

"Term Priority Collateral" has the meaning assigned to such term in the ABL Intercreditor Agreement.

"Tractor Trailers" means any vehicle, truck, tractor, trailer, tank trailer or other trailer, or similar vehicle or trailer.

"Trademark License" means any written agreement, now or hereafter in effect, granting to any third party any right to use any Trademark now or hereafter owned by any Grantor material to the operation of the business of the Grantors or otherwise of significant value or that any Grantor otherwise has the right to license material to the operation of the business of the Grantors or otherwise of significant value, or granting to any Grantor any right to use any Trademark now or hereafter owned by any third party, and all rights of any Grantor under any such agreement.

6

"Trademarks" means all of the following now owned or hereafter acquired by any Grantor: (a) all trademarks, service marks, trade names, corporate names, company names, business names, fictitious business names, trade styles, trade dress, logos, other source or business identifiers, designs and general intangibles of like nature, the goodwill of the business symbolized thereby or associated therewith, all registrations and recordings thereof, and all registration and recording applications filed in connection therewith, including registrations and registration applications in the United States Patent and Trademark Office or any similar offices in any State of the United States or any other country or any political subdivision thereof, and all extensions or renewals thereof, including those listed on Schedule III, (b) all rights and privileges arising under applicable Law with respect to such Grantor's use of any trademarks, (c) all reissues, continuations, extensions and renewals thereof and amendments thereto, (d) all income, fees, royalties, damages and payments now and hereafter due and/or payable with respect to any of the foregoing, including damages, claims and payments for past, present or future infringements thereof, (e) all rights corresponding thereto throughout the world and (f) rights to sue for past, present and future infringements or dilutions thereof or other injuries thereto.

"UCC" means the Uniform Commercial Code as the same may from time to time be in effect on the Closing Date in the State of New York; provided that, if by reason of mandatory provisions of law, perfection, or the effect of perfection or non-perfection, of a security interest in any Collateral or the availability of any remedy hereunder is governed by the Uniform Commercial Code as in effect in a jurisdiction other than New York, "UCC" means the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection or effect of perfection or non-perfection or availability of such remedy, as the case may be.

"UFCA" has the meaning assigned to such term in Article VI.

"UFTA" has the meaning assigned to such term in Article VI.

ARTICLE II

Pledge of Securities

Section 2.01.    Pledge. As security for the payment or performance, as the case may be, in full of the Secured Obligations, each Grantor hereby collaterally assigns and pledges to the Collateral Agent, its successors and assigns, for the benefit of the Secured Parties, and hereby grants to the Collateral Agent, its permitted successors and assigns, for the benefit of the Secured Parties, a continuing security interest in, all of such Grantor's right, title and interest in, to and under (i) all Equity Interests held by it (including those Equity Interests listed on Schedule I) and any other Equity Interests obtained in the future by such Grantor and the certificates representing all such Equity Interests (the "Pledged Equity"); provided that (A) the Pledged Equity shall not include more than 65% of the voting Equity Interests of (x) each Foreign Subsidiary and (y) each Domestic Subsidiary that is a disregarded entity for U.S. federal income tax purposes substantially all of the assets of which consist of Equity Interests or Indebtedness of one or more Foreign Subsidiaries and

7

(B) the Pledged Equity shall not include (x) Margin Stock, (y) Equity Interests in any joint venture, alliance or marketing arrangement or in any Subsidiary that is not a wholly owned Subsidiary of the Borrower (but shall include Proceeds thereof), but only to the extent that the creation of a security interest in such Equity Interests is prohibited or restricted by the Organization Documents of such joint venture, alliance or marketing arrangement or Subsidiary or by any contractual restriction contained in any agreement with third party holders (which holders are not Affiliates of the Borrower) of other Equity Interests in such joint venture, alliance or marketing arrangement or Subsidiary (except to the extent any such prohibition or restriction is deemed ineffective under the UCC or other applicable Law) or (z) Equity Interests of (or held as assets by) Unrestricted Subsidiaries, Immaterial Subsidiaries or captive insurance Subsidiaries; (ii)(A) the Promissory Notes and any Instruments evidencing indebtedness owned by it listed opposite the name of such Grantor on Schedule I and (B) any Promissory Notes and Instruments evidencing indebtedness obtained in the future by such Grantor (the "Pledged Debt"); (iii) all other property that may be delivered to and held by the Collateral Agent pursuant to the terms of this Section 2.01; (iv) subject to Section 2.06, all payments of principal or interest, dividends, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of, in exchange for or upon the conversion of, and all other Proceeds received in respect of, the securities referred to in clauses (i) and (ii) above; (v) subject to Section 2.06, all rights and privileges of such Grantor with respect to the securities and other property referred to in clauses (i), (ii), (iii) and (iv) above; and (vi) all Proceeds of, and Security Entitlements in respect of, any of the foregoing (the items referred to in clauses (i) through (vi) above being collectively referred to as the "Pledged Collateral"). Notwithstanding the foregoing, if after the date hereof any Grantor shall acquire any Equity Interest or Promissory Note (1) in which a pledge (or other security interest) is prohibited or restricted by applicable law or requires the consent of any governmental authority or third party, (2) to the extent a pledge of such Equity Interests or Promissory Note could result in adverse tax consequences as reasonably determined by the Borrower in consultation with the Administrative Agent and as to which the Borrower shall have confirmed such determination by written notice to the Collateral Agent or is otherwise listed on Schedule I on the Closing Date; provided such asset is not specifically included in the Collateral or (3) in circumstances where the cost of obtaining a pledge of such Equity Interests or Promissory Note exceeds the practical benefit to the Lenders afforded thereby as reasonably determined between the Borrower and the Collateral Agent and as to which the Collateral Agent shall have confirmed such determination by written notice to the Borrower or is otherwise listed on Schedule I on the Closing Date then such Equity Interest or Promissory Note shall not be included in the Pledged Collateral. In addition, notwithstanding the foregoing or anything else to the contrary in this Agreement or in any Loan Document, in no event shall any Excluded Property constitute Pledged Collateral.

TO HAVE AND TO HOLD the Pledged Collateral, together with all right, title, interest, powers, privileges and preferences pertaining or incidental thereto, unto the Collateral Agent, its successors and assigns, for the benefit of the applicable Secured Parties, forever; subject, however, to the terms, covenants and conditions hereinafter set forth.

Section 2.02.  Delivery of the Pledged CollateralOn the Closing Date (in the case of any Grantor that grants a Lien on any of its assets hereunder on the Closing Date (each a "Closing Date Grantor")) or on the date on which it signs and delivers its first Security Agreement Supplement

8

(in the case of any other Grantor), each Grantor shall deliver or cause to be delivered to the Collateral Agent, for the benefit of the applicable Secured Parties, any and all Pledged Securities (other than any Uncertificated Securities, but only for so long as such Securities remain uncertificated) to the extent such Pledged Securities, in the case of Promissory Notes and Instruments evidencing Indebtedness, are required to be delivered pursuant to paragraph (b) of this Section 2.02. Thereafter, whenever such Grantor acquires any other Pledged Security (other than any Uncertificated Securities, but only for so long as such Uncertificated Securities remain uncertificated), such Grantor shall concurrently with the first Compliance Certificate required to be delivered thereafter pursuant to Section 6.02(a) of the Credit Agreement deliver or cause to be delivered to the Collateral Agent such Pledged Security as Collateral hereunder to the extent such Pledged Securities, in the case of Promissory Notes and Instruments evidencing Indebtedness, are required to be delivered pursuant to paragraph (b) of Section 2.02.

(a)    Each Grantor will cause (i) all indebtedness of the Borrower and each other Guarantor that, in each case, is owing to such Grantor to be evidenced by the Intercompany Note or other Promissory Note, (ii) the Intercompany Note or such other Promissory Note to be pledged and delivered to the Collateral Agent pursuant to the terms hereof and (iii) any Indebtedness for borrowed money having an aggregate principal amount equal to or in excess of $5,000,000 owed to such Grantor by any Person (other than the Borrower or a Restricted Subsidiary) to be evidenced by a duly executed Promissory Note that is pledged and delivered to the Collateral Agent within 30 days after creation or acquisition thereof, for the benefit of the applicable Secured Parties, pursuant to the terms hereof.

(b)    Upon delivery to the Collateral Agent, (i) any Pledged Securities shall be accompanied by undated stock powers duly executed in blank or other instruments of transfer reasonably satisfactory to the Collateral Agent and by such other instruments and documents as the Collateral Agent may reasonably request and (ii) all other property comprising part of the Pledged Collateral shall be accompanied by instruments of assignment duly executed by the applicable Grantor and such other instruments or documents as the Collateral Agent may reasonably request. For any period in which Pledged Securities are delivered to the Collateral Agent, the Borrower shall provide with the first Compliance Certificate required to be delivered thereafter pursuant to Section 6.02(a) of the Credit Agreement a schedule describing the securities, which schedule shall be deemed to supplement Schedule I and be made a part hereof; provided that failure to attach any such schedule hereto shall not affect the validity of such pledge of such Pledged Securities. Each schedule so delivered shall supplement any prior schedules so delivered.

(c)    Notwithstanding the foregoing, to the extent that any Closing Date Grantor does not or cannot deliver any Pledged Collateral (other than Pledged Collateral consisting of the Equity Interests of the Borrower or any wholly-owned Domestic Subsidiary of the Borrower) on the Closing Date notwithstanding its use of commercially reasonable efforts to do so, such Closing Date Grantor shall not be required to deliver such Pledged Collateral until the date that is 60 days following the Closing Date (or such longer period as the Collateral Agent may agree in its reasonable discretion).

9

(d)   The assignment, pledge and security interest granted in Section 2.01 are granted as security only and shall not subject the Collateral Agent or any other Secured Party to, or in any way alter or modify, any obligation or liability of any Grantor with respect to or arising out of the Pledged Collateral.

Section 2.03.   Representations, Warranties and CovenantsEach Grantor represents, warrants and covenants, as to itself and the other Grantors, to and with the Collateral Agent, for the benefit of the Secured Parties, that:

(a)   Schedule I correctly sets forth, as of the Closing Date and as of each date on which a supplement to Schedule I is delivered pursuant to Section 2.02(c), the percentage of the issued and outstanding units of each class of the Equity Interests of the issuer thereof represented by the Pledged Equity and includes all Equity Interests, Promissory Notes and Instruments required to be pledged hereunder in order to satisfy the Collateral and Guarantee Requirement;

(b)   the Pledged Equity issued by a wholly owned Restricted Subsidiary of the Borrower and the Pledged Debt (solely with respect to Pledged Debt issued by a Person other than the Borrower or a wholly owned Restricted Subsidiary of the Borrower, to the best of the Borrower's knowledge) have been duly and validly authorized and issued by the issuers thereof and (i) in the case of Pledged Equity (other than Pledged Equity consisting of limited liability company interests or partnership interests which, pursuant to the relevant organizational or formation documents, cannot be fully paid and non-assessable), are fully paid and nonassessable and (ii) in the case of Pledged Debt (solely with respect to Pledged Debt issued by a Person other than the Borrower or a wholly owned Restricted Subsidiary of the Borrower, to the best of the Borrower's knowledge), are legal, valid and binding obligations of the issuers thereof, subject to applicable Debtor Relief Laws and general principles of equity.

(c)   (i) each Grantor holds the Pledged Securities indicated on Schedule I as owned by such Grantor free and clear of all Liens, other than (A) Liens created by the Collateral Documents and (B) Liens expressly permitted pursuant to Section 7.01 of the Credit Agreement, and (ii) will defend its title or interest thereto or therein against any and all Liens (other than the liens permitted pursuant to this Section 2.03(c)), however arising, of all Persons whomsoever;

(d)   (i) except for (x) restrictions and limitations imposed by the Loan Documents or securities laws generally or Liens expressly permitted pursuant to Section 7.01 of the Credit Agreement and (y) in the case of Pledged Equity of Persons that are not Subsidiaries, transfer restrictions that exist at the time of acquisition of Equity Interests in such Persons, and (ii) except as described in the Perfection Certificate or any other Loan Document, including, without limitation, Section 7.01 of the Credit Agreement, the Pledged Collateral is and will continue to be freely transferable and assignable, and none of the Pledged Collateral is or will be subject to any option, right of first refusal, shareholders agreement, charter or by-law provisions or contractual restriction of any nature that would prohibit, impair, delay or otherwise affect in any manner material and adverse to the Secured Parties

10

the pledge of such Pledged Collateral hereunder, the sale or disposition thereof pursuant hereto or the exercise by the Collateral Agent of rights and remedies hereunder;

(e)   each of the Grantors has the power and authority to pledge the Pledged Collateral pledged by it hereunder in the manner hereby done or contemplated;

(f)   no consent or approval of any Governmental Authority in the United States, any securities exchange or any other Person was or is necessary to the validity and perfection of the pledge effected hereby (other than such as have been obtained and are in full force and effect);

(g)   by virtue of the execution and delivery by the Grantors of this Agreement, when any Pledged Securities are delivered to the Collateral Agent in accordance with this Agreement together with such stock powers or similar instruments of transfer executed in blank, the Collateral Agent will obtain a legal, valid and, to the extent governed by the UCC, first-priority (subject to any Liens permitted pursuant by Section 7.01 of the Credit Agreement) perfected lien upon and security interest in such Pledged Securities as security for the payment and performance of the Secured Obligations; and

(h)   the pledge effected hereby is effective to vest in the Collateral Agent, for the benefit of the Secured Parties, the rights of the Collateral Agent in the Pledged Collateral as set forth herein.

Notwithstanding anything herein to the contrary, none of the Grantors shall be required: (i) other than in respect of Pledged Collateral constituting Certificated Securities of wholly-owned Restricted Subsidiaries directly owned by the Borrower or any Grantor, to perfect the security interests hereunder through "control" (including for the avoidance of doubt, to enter into any deposit account control agreement, securities account control agreement or any other control agreement with respect to any deposit account, securities account or any other Collateral that requires perfection by "control" other than the Collateral Account), (ii) to perfect by possession of Promissory Notes or any other Instruments evidencing a face principal amount not in excess of $5,000,000 and (iii) to take any actions in any non-U.S. jurisdiction or required by the laws of any non-U.S. jurisdiction to create any security interests in assets located or titled outside of the U.S. or to perfect any security interest in such assets (it being understood that there shall be no security agreements or pledge agreements governed under the laws of any non-U.S. jurisdiction).

Section 2.04.    Certification of Limited Liability Company and Limited Partnership InterestsEach Grantor acknowledges and agrees that, to the extent any interest in any limited liability company or limited partnership controlled by any Grantor and pledged under Section 2.01 is a "security" within the meaning of Article 8 of the UCC and is governed by Article 8 of the UCC, such interest shall be represented by a certificate. Each Grantor further acknowledges and agrees that with respect to any interest in any limited liability company or limited partnership controlled on or after the Closing Date by such Grantor and pledged hereunder that is not a "security" within the meaning of Article 8 of the UCC, such Grantor shall at no time elect to treat any such interest as a "security" within the meaning of Article 8 of the UCC, nor shall such interest be represented

11

by a certificate, unless such election and such interest is thereafter represented by a certificate that is delivered to the Collateral Agent pursuant to the terms hereof.

Section 2.05.   Registration in Nominee Name; DenominationsIf an Event of Default shall occur and be continuing and the Collateral Agent shall give the Borrower 5 Business Days prior written notice of its intent to exercise such rights, (a) the Collateral Agent, on behalf of the Secured Parties, shall have the right (in its sole and absolute discretion) to cause each of the Pledged Securities to be transferred of record into the name of the Collateral Agent and (b) the Collateral Agent shall have the right to exchange the certificates representing Pledged Securities for certificates of smaller or larger denominations for any purpose consistent with this Agreement; provided that, notwithstanding the foregoing, if a Bankruptcy Event of Default shall have occurred and be continuing, the Collateral Agent shall not be required to give the notice referred to above in order to exercise the rights described above. Each Grantor will use commercially reasonable efforts to take any and all actions reasonably requested by the Collateral Agent to facilitate compliance with this Section.

Section 2.06.   Voting Rights; Dividends and InterestUnless and until an Event of Default shall have occurred and be continuing and the Collateral Agent shall have notified the Borrower in writing 5 Business Days prior thereto that the rights of the Grantors under this Section 2.06 are being suspended:

(i)    Each Grantor shall be entitled to exercise any and all voting and/or other consensual rights and powers inuring to an owner of Pledged Securities or any part thereof for any purpose consistent with the terms of this Agreement, the Credit Agreement and the other Loan Documents; provided that such rights and powers shall not be exercised in any manner that could materially and adversely affect the rights inuring to a holder of any Pledged Securities or the rights and remedies of any of the Collateral Agent or the other Secured Parties under this Agreement, the Credit Agreement or any other Loan Document or the ability of the Secured Parties to exercise the same.

(ii)    The Collateral Agent shall promptly execute and deliver to each Grantor, or cause to be executed and delivered to such Grantor, all such proxies, powers of attorney and other instruments as such Grantor may reasonably request in writing for the purpose of enabling such Grantor to exercise the voting and/or consensual rights and powers it is entitled to exercise pursuant to subparagraph (i) above, in each case as shall be specified in such request and be in form reasonably satisfactory to the Collateral Agent.

(iii)    Each Grantor shall be entitled to receive and retain any and all dividends, interest, principal and other distributions paid on or distributed in respect of the Pledged Securities, to the extent (and only to the extent) that such dividends, interest, principal and other distributions are permitted by, and otherwise paid or distributed in accordance with, the terms and conditions of the Credit Agreement, the other Loan Documents and applicable Laws; provided that any noncash dividends, interest, principal or other distributions that would constitute Pledged

12

Equity or Pledged Debt, whether resulting from a subdivision, combination or reclassification of the outstanding Equity Interests of the issuer of any Pledged Securities or received in exchange for Pledged Securities or any part thereof, or in redemption thereof, or as a result of any merger, consolidation, acquisition or other exchange of assets to which such issuer may be a party or otherwise, shall be and become part of the Pledged Collateral, and, if received by any Grantor, shall not be commingled by such Grantor with any of its other funds or property but shall be held separate and apart therefrom, shall be held in trust for the benefit of the Collateral Agent and the applicable Secured Parties and shall be forthwith delivered to the Collateral Agent in the same form as so received (with any necessary endorsement reasonably requested by the Collateral Agent). So long as no Event of Default has occurred and is continuing, the Collateral Agent shall promptly deliver to each Grantor any Pledged Securities in its possession if requested to be delivered to the issuer thereof in connection with any exchange or redemption of such Pledged Securities.

(b)     Upon the occurrence and during the continuance of an Event of Default, after the Collateral Agent shall have notified the Borrower in writing and within 5 Business Days of the suspension of the rights of the Grantors under Section 2.06(a)(iii), then all rights of any Grantor to dividends, interest, principal or other distributions that such Grantor is authorized to receive pursuant to Section 2.06(a)(iii) shall cease, and all such rights shall thereupon become vested in the Collateral Agent, which shall have the sole and exclusive right and authority to receive and retain such dividends, interest, principal or other distributions. All dividends, interest, principal or other distributions received by any Grantor contrary to the provisions of this Section 2.06 shall be held in trust for the benefit of the Collateral Agent, shall be segregated from other property or funds of such Grantor and shall be forthwith delivered to the Collateral Agent upon demand in the same form as so received (with any necessary endorsement reasonably requested by the Collateral Agent). Any and all Money and other property paid over to or received by the Collateral Agent pursuant to the provisions of this paragraph (b) shall be retained by the Collateral Agent in an account to be established by the Collateral Agent upon receipt of such Money or other property and shall be applied in accordance with the provisions of Section 5.02. After all Events of Default have been cured or waived and, other than in the case of a waiver of which the Collateral Agent is aware, the Borrower has delivered to the Collateral Agent a certificate to such effect, the Collateral Agent shall promptly repay to each Grantor (without interest) all dividends, interest, principal or other distributions that such Grantor would otherwise be permitted to retain pursuant to the terms of Section 2.06(a)(iii) in the absence of an Event of Default and that remain in such account.

(c)     Upon the occurrence and during the continuance of an Event of Default, after the Collateral Agent shall have notified the Borrower in writing and within 5 Business Days of the suspension of the rights of the Grantors under Section 2.06(a)(i), then all rights of any Grantor to exercise the voting and consensual rights and powers it is entitled to exercise pursuant to Section 2.06(a)(i), and the obligations of the Collateral Agent under Section 2.06(a)(ii), shall cease, and all such rights shall thereupon become, subject to the rights of the

13

ABL Agent under the ABL Intercreditor Agreement, vested in the Collateral Agent, which shall have the sole and exclusive right and authority to exercise such voting and consensual rights and powers; provided that, unless otherwise directed by the Required Lenders, the Collateral Agent shall have the right from time to time following and during the continuance of an Event of Default to permit the Grantors to exercise such rights. After all Events of Default have been cured or waived and, other than in the case of a waiver of which the Collateral Agent is aware, the Borrower has delivered to the Collateral Agent a certificate to such effect, each Grantor shall have the exclusive right to exercise the voting and/or consensual rights and powers that such Grantor would otherwise be entitled to exercise pursuant to the terms of Section 2.06(a)(i), and the obligations of the Collateral Agent under Section 2.06(a)(ii) shall be reinstated.

(d)    Any notice given by the Collateral Agent to the Borrower suspending the rights of the Grantors under Section 2.06(a)(i) shall be given in writing, (ii) may be given with respect to one or more of the Grantors at the same or different times and (iii) may suspend the rights of the Grantors under Section 2.06(a)(i) or (iii) in part without suspending all such rights (as specified by the Collateral Agent in its sole and absolute discretion) and without waiving or otherwise affecting the Collateral Agent's rights to give additional notices from time to time suspending other rights so long as an Event of Default has occurred and is continuing. Notwithstanding anything to the contrary contained in Section 2.06(a), (b) or (c), if a Bankruptcy Event of Default shall have occurred and be continuing, the Collateral Agent shall not be required to give any notice referred to in said Section in order to exercise any of its rights described in such Section, and the suspension of the rights of each of the Grantors under each such Section shall be automatic upon the occurrence of such Bankruptcy Event of Default.

Section 2.07.    Collateral Agent Not a Partner or Limited Liability Company MemberNothing contained in this Agreement shall be construed to make the Collateral Agent or any other Secured Party liable as a member of any limited liability company or as a partner of any partnership and neither the Collateral Agent nor any other Secured Party by virtue of this Agreement or otherwise (except as referred to in the following sentence) shall have any of the duties, obligations or liabilities of a member of any limited liability company or as a partner in any partnership. The parties hereto expressly agree that, unless the Collateral Agent shall become the absolute owner of Pledged Equity consisting of a limited liability company interest or a partnership interest pursuant hereto, this Agreement shall not be construed as creating a partnership or joint venture among the Collateral Agent, any other Secured Party, any Grantor and/or any other Person.

ARTICLE III

Security Interests in Personal Property

Section 3.01.   Security InterestAs security for the payment or performance, as the case may be, in full of the Secured Obligations, each Grantor hereby collaterally assigns and pledges to the Collateral Agent, its successors and assigns, for the benefit of the Secured Parties, and hereby grants to the Collateral Agent, its permitted successors and assigns, for the benefit of the Secured Parties, a security interest (the "Security Interest") in, all right, title or interest in, to or under any

14

and all of the following assets and properties now owned or at any time hereafter acquired by such Grantor or in which such Grantor now has or at any time in the future may acquire any right, title or interest (collectively, the "Article 9 Collateral"):

(i)   all Accounts;

(ii)   all Chattel Paper;

(iii)   all Documents;

(iv)   all Equipment (including, without limitation, all Tractor Trailers and Rolling Stock);

(v)   all General Intangibles;

(vi)   all Instruments;

(vii)   all Inventory;

(viii)   all Investment Property;

(ix)   all books and records pertaining to the Article 9 Collateral;

(x)   all Goods and Fixtures;

(xi)   all Money, cash, Cash Equivalents and Deposit Accounts;

(xii)   all Letter-of-Credit Rights;

(xiii)   all Commercial Tort Claims described on Schedule II from time to time;

(xiv)   each Collateral Account, and all cash, Money, Securities and other investments deposited therein;

(xv)   all Supporting Obligations;

(xvi)   all Security Entitlements in any or all of the foregoing;

(xvii)   all Intellectual Property; and

(xviii)   to the extent not otherwise included, all Proceeds and products of any and all of the foregoing (including proceeds of all insurance policies) and all collateral security and guarantees given by any Person with respect to any of the foregoing;

provided that (i) with respect to any Trademarks, applications in the United States Patent and Trademark Office to register Trademarks or service marks on the basis of any Grantor's "intent to use" such Trademarks or service marks will not be deemed to be Collateral unless and until a

15

"Statement of Use" or "Amendment to Allege Use" has been filed and accepted in the United States Patent and Trademark Office, whereupon such application shall be automatically subject to the security interest granted herein and deemed to be included in the Collateral and (ii) notwithstanding anything to the contrary in this Agreement, this Agreement shall not constitute a grant of a security interest in or a pledge of (A) more than 65% of the voting Equity Interests of any Foreign Subsidiary, (B) more than 65% of the voting Equity Interests of any Domestic Subsidiary that is a disregarded entity for U.S. federal income tax purposes substantially all of the assets of which consist of Equity Interests or Indebtedness of one or more Foreign Subsidiaries, (C) any specifically identified asset with respect to which (1) the grant of a security interest in such asset could result in adverse tax consequences as reasonably determined by the Borrower in consultation with the Administrative Agent and as to which the Borrower shall have confirmed such determination by written notice to the Collateral Agent or is otherwise listed on Schedule I on the Closing Date or (2) the burden or cost of obtaining or perfecting a security interest in such asset exceeds the practical benefit to the Lenders afforded thereby as reasonably determined by the Administrative Agent in consultation with the Borrower and as to which the Collateral Agent shall have confirmed such determination by written notice to the Borrower or is otherwise listed on Schedule I on the Closing Date; provided such asset is not specifically included in the Collateral, (D) any particular asset, if the pledge thereof or the security interest therein is prohibited or restricted by applicable Law (including, without limitation, any requirement to obtain the consent of any governmental authority or third party, which consent has not been obtained), (E) Margin Stock and Equity Interests in any joint venture or any Subsidiary that is not a wholly owned Restricted Subsidiary, other than Proceeds thereof, but only to the extent that the creation of a security interest in such Equity Interests is prohibited or restricted by the Organizational Documents of such joint venture or Subsidiary or by any contractual restriction contained in any agreement with third party holders of the other Equity Interests in such joint venture or Subsidiary which holders are not Affiliates of the Borrower (except to the extent any such prohibition or restriction is deemed ineffective under the UCC or other applicable Law), (F) Equity Interests of (or held as assets by) Unrestricted Subsidiaries, Immaterial Subsidiaries or captive insurance Subsidiaries, (G) any lease, license or agreement or any property to the extent that a grant of a security interest therein would violate or invalidate such lease, license or agreement or create a right of termination in favor of any other party thereto after giving effect to the applicable anti-assignment provisions of the UCC or other applicable Law, other than proceeds and receivables thereof, the assignment of which is expressly deemed effective under the UCC or other applicable Law notwithstanding such prohibition or restriction, (H) any property, assets or rights subject to a purchase money security interest, Capitalized Lease or similar arrangement, (I) any governmental licenses or state or local franchises, charters and authorizations, to the extent security interests in such licenses, franchises, charters or authorizations are prohibited or restricted thereby (except to the extent such prohibition or restriction is rendered ineffective under the UCC), (except that cash Proceeds of dispositions thereof in accordance with applicable Law (including, without limitation, rules and regulations of any Governmental Authority) shall constitute Collateral), provided that Collateral shall include to the maximum extent permitted by applicable Law all rights incident or appurtenant to such licenses, property and assets (except to the extent any Lien on such asset in favor of the Collateral Agent requires consent, approval or authorization from any Governmental Authority) and the right to receive all Proceeds realized from the sale, assignment or transfer of

16

such licenses, property and assets, (J) any fee-owned real property (but not any property located thereon that is not real property) (it being understood, for the avoidance of doubt, there is no requirement to obtain landlord waivers, estoppels, and consents) that does not constitute Material Real Property and any leasehold interest in real property (but not any property located thereon that is not real property), (K) motor vehicles (other than Tractor Trailers and other Rolling Stock) consisting of an employee or light vehicle and other assets subject to certificates of title with an individual market value of less than $40,000, (L) Letter-of-Credit Rights (other than to the extent consisting of supporting obligations that can be perfected solely by the filing of a UCC financing statement) of an amount less than $5,000,000, (M) any Commercial Tort Claim in an amount (taking the greater of the aggregate claimed damages thereunder or the reasonably estimated value thereof) of less than $5,000,000, (N) with respect to ABL Priority Collateral, any asset on which perfection action is not required under the ABL Facility Documentation, (O) any equipment or other collateral with a net book value on the Closing Date in an aggregate amount not to exceed $5,000,000, (P) any non-U.S. assets or assets of the Borrower and Guarantors that require action under the law of any non-U.S. jurisdiction to create or perfect a security interest in such assets, including any Intellectual Property in any non-U.S. jurisdiction (and no security agreements or pledge agreements governed under the laws of any non-U.S. jurisdiction shall be required in respect of such assets), (Q) solely for purposes of this Agreement, the Limited States Vehicle Collateral (as defined in the Security and Collateral Agency Agreement), such security interest in the Limited States Vehicle Collateral being granted as of the date hereof to Credit Suisse AG, Cayman Islands Branch, as collateral agent for the Term Secured Parties (as defined in the ABL Intercreditor Agreement) and the ABL Secured Parties (as defined in the ABL Intercreditor Agreement), under the Security and Collateral Agency Agreement and (R) any other property excluded from the definition of Collateral and Guarantee Requirement in the Credit Agreement. The property referenced in each of the foregoing clauses (i)-(ii) is collectively referred to herein as the "Excluded Property".

(e)    Each Grantor hereby irrevocably authorizes the Collateral Agent for the benefit of the Secured Parties at any time and from time to time to (i) file in any relevant jurisdiction any financing statements or continuation statements (including fixture filings on the premises of Material Real Property) with respect to the Article 9 Collateral or any part thereof and amendments thereto that (A) indicate the Collateral as "all assets" or "all personal property" of such Grantor or words of similar effect and (B) contain the information required by Article 9 of the UCC of each applicable jurisdiction for the filing of any financing statement or amendment, including (1) whether such Grantor is an organization, the type of organization and any organizational identification number issued to such Grantor and (2) in the case of a financing statement filed as a fixture filing, a sufficient description of the real property to which such Article 9 Collateral relates and (ii) notate its lien on certificates of title with respect to Collateral covered by a certificate of title, including all Tractor Trailers and Rolling Stock, and hold or file such certificates of title (or take any other action) as may be necessary to perfect its security interest in such Collateral. Each Grantor agrees to provide such information to the Collateral Agent promptly upon request.

(f)    The Security Interest is granted as security only and shall not subject the Collateral Agent or any other Secured Party to, or in any way alter or modify, any obligation or liability of any Grantor with respect to or arising out of the Article 9 Collateral.

17

(g)   Each Grantor hereby further authorizes the Collateral Agent to file a Grant of Security Interest substantially in the form of Exhibit III, IV or V, as applicable, covering Intellectual Property Collateral with the United States Patent and Trademark Office or United States Copyright Office (or any successor office), as applicable, and such other documents as may be necessary or advisable for the purpose of perfecting, confirming, continuing, enforcing or protecting the Security Interest granted by such Grantor hereunder, without the signature of such Grantor, and naming such Grantor, as debtor, and the Collateral Agent, as secured party.

Section 3.02.   Representations and WarrantiesEach Grantor represents and warrants, as to itself and the other Grantors, to the Collateral Agent and the Secured Parties that as of the Closing Date:

(i)   Each Grantor has good and valid rights (not subject to any Liens other than Liens permitted by Section 7.01 of the Credit Agreement) and/or good and marketable title in the Article 9 Collateral with respect to which it has purported to grant a Security Interest hereunder (which rights and/or title, are in any event, sufficient under Section 9-203 of the UCC), and has full power and authority to grant to the Collateral Agent the Security Interest in such Article 9 Collateral pursuant hereto and to execute, deliver and perform its obligations in accordance with the terms of this Agreement, without the consent or approval of any other Person other than any consent or approval that has been obtained.

(j)   A Perfection Certificate has been duly executed and delivered to the Collateral Agent and the information set forth therein, including the exact legal name of each Grantor and its jurisdiction of organization, is correct and complete in all material respects as of the Closing Date. The UCC financing statements (including fixture filings, as applicable) prepared by the Collateral Agent based upon the information provided to the Collateral Agent in the Perfection Certificate (or specified by notice from the applicable Grantor to the Collateral Agent after the Closing Date in the case of filings, recordings or registrations required by Section 6.11 of the Credit Agreement), are all the filings, recordings and registrations (other than any filings required to be made in the United States Patent and Trademark Office, the United States Copyright Office in order to perfect the Security Interest in Article 9 Collateral consisting of Intellectual Property and any filing required to be made by notating a lien on any certificate of title) that are necessary to establish a legal, valid and perfected security interest in favor of the Collateral Agent (for the benefit of the Secured Parties) in respect of all Article 9 Collateral in which the Security Interest may be perfected by filing, recording or registration in the United States (or any political subdivision thereof) and its territories and possessions, and no further or subsequent filing, refiling, recording, rerecording, registration or reregistration with respect to such Article 9 Collateral is necessary in any such jurisdiction, except as provided under applicable Law with respect to the filing of continuation statements. Each Grantor represents and warrants that, as of the Closing Date, fully executed Grants of Security Interest in the form attached as Exhibit III, IV or V, as applicable, containing a description of all Intellectual Property Collateral consisting of Patents (other than any Patents that are not material to the operation of the business of the Grantors taken as a whole or do not otherwise have significant value), registered Trademarks (and Trademarks for which registration applications are pending) (other than any Trademarks or Trademark registrations that are not material to the operation of the business of the Grantors, taken as a whole or do not otherwise have significant value) or registered Copyrights (and

18

Copyrights for which registration applications are pending) (other than with respect to any Copyright that is not material to the operation of the business of the Grantors, taken as a whole or do not otherwise have significant value), as applicable, have been delivered to the Collateral Agent for recording by the United States Patent and Trademark Office or the United States Copyright Office, as applicable, pursuant to 35 U.S.C. § 261, 15 U.S.C. § 1060 or 17 U.S.C. § 205 and the regulations thereunder.

(k)    The Security Interest constitutes (i) a legal and valid security interest in all the Article 9 Collateral securing the payment and performance of the Secured Obligations, (ii) subject to the filings described in Section 3.02(b), a perfected security interest in all Article 9 Collateral in which a security interest may be perfected by filing, recording or registering a financing statement in the United States (or any political subidivision thereof) and its territories and possessions pursuant to the UCC, (iii) a security interest that shall be perfected in all Article 9 Collateral (other than with respect to any Copyright that is not material to the business of the Grantors, taken as a whole) in which a security interest may be perfected upon the receipt and recording of the relevant Grants of Security Interest with the United States Patent and Trademark Office and the United States Copyright Office, as applicable, within the three month period (commencing as of the date hereof) pursuant to 35 U.S.C. § 261 or 15 U.S.C. § 1060 or the one month period (commencing as of the date hereof) pursuant to 17 U.S.C. § 205 and (iv) subject to the notations of lien described in Section 3.02(b), a perfected security interest in all Article 9 Collateral covered by a certificate of title. The Security Interest is and shall be prior to any other Lien on any of the Article 9 Collateral, other than Liens expressly permitted pursuant to Section 7.01 of the Credit Agreement (other than Liens securing Permitted Second Priority Additional Debt or any Permitted Refinancing thereof).

(l)    None of the Grantors has filed or consented to the filing of (i) any financing statement or analogous document under the UCC or any other applicable Laws covering any Article 9 Collateral, (ii) any assignment in which any Grantor assigns any Article 9 Collateral or any security agreement or similar instrument covering any Article 9 Collateral with the United States Patent and Trademark Office or the United States Copyright Office, or (iii) any assignment in which any Grantor assigns any Article 9 Collateral or any security agreement or similar instrument covering any Article 9 Collateral with any foreign governmental, municipal or other office, which financing statement or analogous document, assignment, security agreement or similar instrument is still in effect, except, in each case, for Liens expressly permitted pursuant to Section 7.01 of the Credit Agreement.

(m)    All Commercial Tort Claims of each Grantor where the amount of damages claimed by such Grantor is equal to or in excess of $5,000,000 in existence on the Closing Date (or on the date upon which such Grantor becomes a party to this Agreement) are described on Schedule II hereto.

Section 3.03.    CovenantsThe Borrower agrees to promptly (and in any event within 30 calendar days thereafter) notify the Collateral Agent of any change (i) in the legal name of any Grantor, (ii) in the identity or type of organization or corporate structure of any Grantor, (iii) in the jurisdiction of organization of any Grantor, (iv) in the Location of any Grantor or (v) in the organizational identification number of any Grantor. The Grantors agree not to effect or permit any change referred to in the preceding sentence unless all filings, publications and registrations have

19

been made (or will be made in a timely fashion) under the UCC or any other applicable Law that are required in order for the Collateral Agent to continue at all times following such change to have a valid, legal and first-priority (subject only to (i) any nonconsensual Lien that is expressly permitted pursuant to Section 7.01 of the Credit Agreement and has priority as a matter of law and (ii) Liens expressly permitted pursuant to Section 7.01 of the Credit Agreement (other than Liens securing Permitted Second Priority Additional Debt or any Permitted Refinancing thereof)) perfected security interest in all Article 9 Collateral. In addition, if any Grantor does not have an organizational identification number on the Closing Date (or the date such Grantor becomes a party to this Agreement) and later obtains one, the Borrower shall promptly thereafter notify the Collateral Agent of such organizational identification number and shall take all actions reasonably satisfactory to the Collateral Agent to the extent necessary to maintain the security interests (and the priority thereof) of the Collateral Agent in the Collateral intended to be granted hereby fully perfected and in full force and effect.

(a)    Subject to Section 3.03(h), each Grantor shall, at its own expense, take any and all commercially reasonable actions necessary to defend title to the Article 9 Collateral against all Persons and to defend the Security Interest of the Collateral Agent in the Article 9 Collateral and the priority thereof against any known Lien not expressly permitted pursuant to Section 7.01 of the Credit Agreement.

(b)    Each year, at the time of delivery of annual financial statements with respect to the preceding fiscal year pursuant to Section 6.01 of the Credit Agreement, the Borrower shall deliver to the Collateral Agent a certificate executed by a Responsible Officer of the Borrower setting forth the information required pursuant to Sections 1(a), 1(e), 2(a), 2(b), 2(c), 2(d), 2(e), 2(g), 5, 6, 7 and 12 of the Perfection Certificate or confirming that there has been no change in such information since the date of such certificate or the date of the most recent certificate delivered pursuant to this Section 3.03(c).

(c)    Subject to Section 3.03(h) and any other limitations on creation, perfection or protection of the Collateral Agent's security interest set forth herein or in any other Loan Document, each Grantor agrees, at its own expense, to execute, acknowledge, deliver and cause to be duly filed all such further instruments and documents with respect to Collateral and take all such actions as the Collateral Agent may from time to time reasonably request to better assure, preserve, protect and perfect the Security Interest and the rights and remedies created hereby, including the payment of any fees and taxes required in connection with the execution and delivery of this Agreement, the granting of the Security Interest and the filing of any financing statements (including fixture filings) or other documents in connection herewith or therewith. Each Grantor will, at its own expense, promptly make, execute, endorse, acknowledge, file and/or deliver to the Collateral Agent from time to time such lists, descriptions and designations of its then owned Tractor Trailers and Rolling Stock (including certificate of title numbers and jurisdictions of registration of each such Tractor Trailer and Rolling Stock), documents of title, schedules, confirmatory assignments, conveyances, financing statements, transfer endorsements, powers of attorney, certificates, reports and other assurances or instruments and take such further steps and actions relating to such Tractor Trailers, Rolling Stock and other property or rights covered by the security interest hereby granted necessary to perfect, preserve or protect its security interest in such Tractor Trailers, Rolling Stock

20

and other property or rights. Each Grantor agrees to execute all documentation reasonably required to effect such recordations and to cause the notation of lien and filing of relevant certificates of title with the appropriate state governmental agency. If any amount payable under or in connection with any of the Article 9 Collateral (other than by a Loan Party) that equals or exceeds $5,000,000 shall be or become evidenced by any Promissory Note or Instrument, such Promissory Note or Instrument shall be, concurrently with the first Compliance Certificate required to be delivered pursuant to Section 6.02(a) of the Credit Agreement thereafter, pledged and, subject to the ABL Intercreditor Agreement, delivered to the Collateral Agent, for the benefit of the Secured Parties, duly endorsed in a manner reasonably satisfactory to the Collateral Agent.

(d)    At its option, the Collateral Agent may discharge past due taxes, assessments, charges, fees, Liens, security interests or other encumbrances at any time levied or placed on the Article 9 Collateral and not permitted pursuant to Section 7.01 of the Credit Agreement, and may pay for the maintenance and preservation of the Article 9 Collateral to the extent any Grantor fails to do so as required by the Credit Agreement or this Agreement and within a reasonable period of time after the Collateral Agent has requested that it do so, and each Grantor jointly and severally agrees to reimburse the Collateral Agent within 10 days after written demand for any payment made or any reasonable expense incurred by the Collateral Agent pursuant to the written foregoing authorization. Nothing in this paragraph shall be interpreted as excusing any Grantor from the performance of, or imposing any obligation on the Collateral Agent or any Secured Party to cure or perform, any covenants or other promises of any Grantor with respect to taxes, assessments, charges, fees, Liens, security interests or other encumbrances and maintenance as set forth herein or in the other Loan Documents.

(e)    If at any time any Grantor shall take a security interest in any property of an Account Debtor or any other Person the value of which equals or exceeds $5,000,000 to secure payment and performance of an Account, such Grantor shall, concurrently with the first Compliance Certificate required to be delivered pursuant to Section 6.02(a) of the Credit Agreement thereafter, collaterally assign such security interest to the Collateral Agent for the benefit of the applicable Secured Parties. Such assignment need not be filed of public record unless necessary to continue the perfected status of the security interest against creditors of and transferees from the Account Debtor or other Person granting the security interest.

(f)    Each Grantor (rather than the Collateral Agent or any Secured Party) shall remain liable (as between itself and any relevant counterparty) to observe and perform all the conditions and obligations to be observed and performed by it under each contract agreement or instrument relating to the Article 9 Collateral, all in accordance with the terms and conditions thereof, and each Grantor jointly and severally agrees to indemnify and hold harmless the Collateral Agent and the Secured Parties from and against any and all liability for such performance, to the extent of, and subject to the terms, conditions and limitations set forth in, Section 7.03(b) below.

(g)    Notwithstanding anything herein to the contrary, none of the Grantors shall be required: (i) other than in respect of Pledged Collateral constituting Certificated Securities of wholly-owned Restricted Subsidiaries directly owned by the Borrower or any Grantor, to perfect the security interests hereunder through "control" (including for the avoidance of doubt, to enter

21

into any deposit account control agreement, securities account control agreement or any other control agreement with respect to any deposit account, securities account or any other Collateral that requires perfection by "control" other than the Collateral Account), (ii) to complete any filings or other action with respect to the perfection of the security interests, including of any Intellectual Property, created hereby in any jurisdiction outside of the United States or any State thereof, (iii) to perfect by possession of any intercompany notes evidencing an aggregate principal amount not in excess of $5,000,000, (iv) to perfect by possession of Promissory Notes or any other Instruments evidencing an aggregate principal amount not in excess of $5,000,000, and (iv) to take any actions in any non-U.S. jurisdiction or required by the laws of any non-U.S. jurisdiction to create any security interests in assets located or titled outside of the U.S. (including the Equity Interests of any Foreign Subsidiary) or to perfect any security interest in such assets, including any Intellectual Property registered in any non-U.S. jurisdiction (it being understood that there shall be no security agreements or pledge agreements governed under the laws of any non-U.S. jurisdiction).

Section 3.04.   Other ActionsIn order to further insure the attachment, perfection and priority of, and the ability of the Collateral Agent to enforce, the Security Interest, each Grantor agrees, in each case at such Grantor's own expense and subject to the ABL Intercreditor Agreement, to take the following actions with respect to the following Article 9 Collateral:

(a)   Instruments. If any Grantor shall at any time hold or acquire any Instruments constituting Collateral and evidencing a face principal amount equal to or in excess of $5,000,000 such Grantor shall, concurrently with the first Compliance Certificate required to be delivered pursuant to Section 6.02(a) of the Credit Agreement thereafter, endorse, assign and deliver the same to the Collateral Agent for the benefit of the applicable Secured Parties, accompanied by such instruments of transfer or assignment duly executed in blank as the Collateral Agent may from time to time reasonably request.

(b)   Investment Property. Except to the extent otherwise provided in Article II or in Section 3.03(h), if any Grantor shall at any time hold or acquire any Certificated Securities that constitutes Collateral, such Grantor shall, concurrently with the first Compliance Certificate required to be delivered pursuant to Section 6.02(a) of the Credit Agreement thereafter, endorse, assign and deliver the same to the Collateral Agent for the benefit of the applicable Secured Parties, accompanied by such instruments of transfer or assignment duly executed in blank as the Collateral Agent may from time to time reasonably request.

(c)   Commercial Tort Claims. If any Grantor shall at any time after the date of this Agreement acquire a Commercial Tort Claim in an amount (taking the greater of the aggregate claimed damages thereunder or the reasonably estimated value thereof) of $5,000,000 or more, the Borrower (on behalf of such Grantor) will provide concurrently with the first Compliance Certificate required to be delivered pursuant to Section 6.02(a) of the Credit Agreement thereafter supplements to Schedule II describing the details thereof and shall grant to the Collateral Agent a security interest therein and in the proceeds thereof, all upon the terms of this Agreement.

22

ARTICLE IV

Special Provisions Concerning Intellectual Property Collateral

Section 4.01.   Grant of License to Use Intellectual Property.

Without limiting the provisions of Section 3.01 hereof or any other rights of the Collateral Agent as the holder of a Security Interest in any Intellectual Property Collateral, for the purpose of enabling the Collateral Agent to exercise rights and remedies under this Agreement at such time as the Collateral Agent shall be lawfully entitled to exercise such rights and remedies, each Grantor hereby grants to the Collateral Agent an irrevocable, nonexclusive license (exercisable without payment of rent, royalty or other compensation to the Grantors) to use, license or sublicense any of the Intellectual Property Collateral now owned or hereafter acquired by such Grantor, and wherever the same may be located (whether or not any license agreement by and between any Grantor and any other Person relating to the use of such Intellectual Property Collateral may be terminated hereafter), and including in such license reasonable access to all media in which any of the licensed items may be recorded or stored and to all computer software and programs used for the compilation or printout thereof, provided, however, that any license granted by the Collateral Agent to a third party shall include reasonable and customary terms necessary to preserve the existence, validity, and value of the affected Intellectual Property Collateral, including, without limitation, provisions requiring the continuing confidential handling of trade secrets, requiring the use of appropriate notices and prohibiting the use of false notices, protecting Trademarks in the manner set forth below (it being understood and agreed that, without limiting any other rights and remedies of the Collateral Agent under this Agreement, any other Loan Document or applicable Law, nothing in the foregoing license grant shall be construed as granting the Collateral Agent rights in and to such Intellectual Property Collateral above and beyond (x) the rights to such Intellectual Property Collateral that each Grantor has reserved for itself and (y) in the case of Intellectual Property Collateral that is licensed to any such Grantor by a third party, the extent to which such Grantor has the right to grant a sublicense to such Intellectual Property Collateral hereunder). The use of such license by the Collateral Agent may only be exercised, at the option of the Collateral Agent, during the continuation of an Event of Default; provided that any license, sublicense or other transaction entered into by the Collateral Agent in accordance herewith shall be binding upon the Grantors notwithstanding any subsequent cure of an Event of Default. In the event the license set forth in this Section 4.01 is exercised with regard to any Trademarks, then the following shall apply: (i) all goodwill arising from any licensed or sublicensed use of any Trademark shall inure to the benefit of the Grantor; (ii) the licensed or sublicensed Trademarks shall only be used in association with goods or services of a quality and nature consistent with the quality and reputation with which such Trademarks were associated when used by Grantor prior to the exercise of the license rights set forth herein; and (iii) at the Grantor's request and expense, licensees and sublicensees shall provide reasonable cooperation in any effort by the Grantor to maintain the registration or otherwise secure the ongoing validity and effectiveness of such licensed Trademarks, including, without limitation the actions and conduct described in Section 4.02 below. The license granted to the Collateral Agent herein shall be inapplicable to any Commercial Software License that constitutes Intellectual Property Collateral to the extent the

23

applicable Grantor is prohibited by written agreement from granting a license in such Commercial Software License to the Collateral Agent, except to the extent such prohibition is ineffective (or deemed ineffective) under the UCC or other applicable Law.

Section 4.02.   Protection of Collateral Agent's Security.

(h)   Except to the extent permitted by subsection 4.02(f) below, or to the extent that failure to act could not reasonably be expected to have a Material Adverse Effect, with respect to registration or pending application of each item of its Intellectual Property Collateral for which such Grantor has standing to do so, each Grantor agrees to take, at its expense, all steps, including, without limitation, in the U.S. Patent and Trademark Office, the U.S. Copyright Office and any other governmental authority located in the United States to (i) maintain the validity and enforceability of any registered Intellectual Property Collateral and maintain such Intellectual Property Collateral in full force and effect, and (ii) pursue the registration and maintenance of each Patent, Trademark, or Copyright registration or application, now or hereafter included in such Intellectual Property Collateral of such Grantor, including, without limitation, the payment of required fees and taxes, the filing of responses to office actions issued by the U.S. Patent and Trademark Office, the U.S. Copyright Office or other governmental authorities, the filing of applications for renewal or extension, the filing of affidavits under Sections 8 and 15 of the U.S. Trademark Act, the filing of divisional, continuation, continuation-in-part, reissue and renewal applications or extensions, the payment of maintenance fees and the participation in interference, reexamination, opposition, cancellation, infringement and misappropriation proceedings.

(i)   Except to the extent permitted by subsection 4.02(f) below, or to the extent that failure to act could not reasonably be expected to have a Material Adverse Effect, no Grantor shall do or permit any act or knowingly omit to do any act whereby any of its Intellectual Property Collateral may lapse, be terminated, or become invalid or unenforceable or placed in the public domain (or in case of a trade secret, lose its competitive value).

(j)   Except to the extent permitted by subsection 4.02(f) below, or to the extent that failure to act could not reasonably be expected to have a Material Adverse Effect, each Grantor shall take all steps to preserve and protect each item of its Intellectual Property Collateral, including, without limitation, maintaining the quality of any and all products or services used or provided in connection with any of the Trademarks, consistent with the quality of the products and services as of the date hereof, and taking all steps necessary to ensure that all licensed users of any of the Trademarks abide by the applicable license's terms with respect to the standards of quality.

(k)   Each Grantor agrees that, should it obtain an ownership or other interest in any Intellectual Property Collateral after the Closing Date (the "After-Acquired Intellectual Property") (i) the provisions of this Agreement shall automatically apply thereto, and (ii) any such After-Acquired Intellectual Property and, in the case of Trademarks, the goodwill symbolized thereby, shall automatically become part of the Intellectual Property Collateral subject to the terms and conditions of this Agreement with respect thereto.

(l)   Concurrently with the delivery of a Compliance Certificate for each fiscal quarter, each Grantor shall sign and deliver to the Collateral Agent an appropriate Security

24

Agreement Supplement and related Grant of Security Interest with respect to applications for registration or registrations of Intellectual Property Collateral (other than with respect to any Copyright that is not material to the business of the Grantors, taken as a whole) owned or exclusively licensed by it as of the last day of such fiscal quarter, to the extent that such Intellectual Property Collateral is not covered by any previous Security Agreement Supplement (and Grant of Security Interests) so signed and delivered by it. In each case, it will promptly cooperate as reasonably necessary to enable the Collateral Agent to make any necessary or reasonably desirable recordations with the U.S. Copyright Office or the U.S. Patent and Trademark Office, as appropriate

(m)    Notwithstanding the foregoing provisions of this Section 4.02 or elsewhere in this Agreement, nothing in this Agreement shall prevent any Grantor from discontinuing the use or maintenance of any or its Intellectual Property Collateral, the enforcement of license agreements or the pursuit of actions against infringers, to the extent permitted by the Credit Agreement if such Grantor determines in its reasonable business judgment that such discontinuance is desirable in the conduct of its business.

(n)    Upon and during the continuance of an Event of Default, each Grantor shall, if requested by the Collateral Agent, use its commercially reasonable efforts to obtain all requisite consents or approvals by the licensor of each License to effect the assignment of all such Grantor's right, title and interest thereunder to the Collateral Agent or its designee.

ARTICLE V

Remedies

Section 5.01.    Remedies Upon DefaultUpon the occurrence and during the continuance of an Event of Default, subject to the ABL Intercreditor Agreement, it is agreed that the Collateral Agent shall have the right to exercise any and all rights afforded to a secured party under this Agreement, the UCC or other applicable Law, and, subject to the ABL Intercreditor Agreement, also may (i) require each Grantor to, and each Grantor agrees that it will at its expense and upon request of the Collateral Agent forthwith, assemble all or part of the Collateral as directed by the Collateral Agent and make it available to the Collateral Agent at a place and time to be designated by the Collateral Agent that is reasonably convenient to both parties; (ii) occupy any premises owned or, to the extent lawful and permitted, leased by any of the Grantors where the Collateral or any part thereof is assembled or located for a reasonable period in order to effectuate its rights and remedies hereunder or under law, without obligation to such Grantor in respect of such occupation; provided that the Collateral Agent shall provide the applicable Grantor with notice thereof prior to or promptly after such occupancy; (iii) exercise any and all rights and remedies of any of the Grantors under or in connection with the Collateral, or otherwise in respect of the Collateral; provided that subject to any additional notification requirements in Section 2.06 the Collateral Agent shall provide the applicable Grantor with notice thereof prior to or promptly after such exercise; (iv) withdraw any and all cash or other Collateral from any Collateral Account (if any) and apply such cash and other Collateral to the payment of any and all Secured Obligations in the manner provided in Section 5.02 of this Agreement; (v) subject to the mandatory requirements of applicable Law and the notice requirements described below, sell or otherwise dispose of all or any part of the Collateral securing the Secured Obligations at a public or private sale or at any

25

broker's board or on any securities exchange, for cash, upon credit or for future delivery as the Collateral Agent shall deem appropriate and (vi) with respect to any Intellectual Property Collateral, on demand, cause the Security Interest to become an assignment, transfer and conveyance of any of or all such Intellectual Property Collateral by the applicable Grantors to the Collateral Agent, or license or sublicense, whether general, special or otherwise, and whether on an exclusive or nonexclusive basis, any such Intellectual Property Collateral throughout the world on such terms and conditions and in such manner as the Collateral Agent shall determine, provided, however, that such terms shall include all terms and restrictions that customarily required to ensure the continuing validity and effectiveness of the Intellectual Property Collateral at issue, such as, without limitation, notice, quality control and inurement provisions with regard to Trademarks, patent designation provisions with regard to patents, and copyright notices and restrictions or decompilation and reverse engineering of copyrighted software, and confidentiality protections for trade secrets. Each Grantor acknowledges and recognizes that (a) the Collateral Agent may be unable to effect a public sale of all or a part of the Collateral consisting of securities by reason of certain prohibitions contained in the Securities Act of 1933, 15 U.S.C. §77, (as amended and in effect, the "Securities Act") or the securities laws of various states (the "Blue Sky Laws"), but may be compelled to resort to one or more private sales to a restricted group of purchasers who will be obliged to agree, among other things, to acquire such securities for their own account, for investment and not with a view to the distribution or resale thereof, (b) private sales so made may be at prices and upon other terms less favorable to the seller than if such securities were sold at public sales, (c) neither the Collateral Agent nor any other Secured Party has any obligation to delay sale of any of the Collateral for the period of time necessary to permit such securities to be registered for public sale under the Securities Act or the Blue Sky Laws, and (d) private sales made under the foregoing circumstances shall be deemed to have been made in a commercially reasonable manner. To the maximum extent permitted by Law, each Grantor hereby waives any claim against any Secured Party arising because the price at which any Collateral may have been sold at a private sale was less than the price that might have been obtained at a public sale, even if the Collateral Agent accepts the first offer received and does not offer such Collateral to more than one offeree. Upon consummation of any such sale the Collateral Agent shall have the right to assign, transfer and deliver to the purchaser or purchasers thereof the Collateral so sold. Each such purchaser at any sale of Collateral shall hold the property sold absolutely, free from any claim or right on the part of any Grantor, and each Grantor hereby waives (to the extent permitted by applicable Law) all rights of redemption, stay and appraisal which such Grantor now has or may at any time in the future have under any rule of law or statute now existing or hereafter enacted.

The Collateral Agent shall give the applicable Grantors 10 days' written notice (which each Grantor agrees is reasonable notice within the meaning of Section 9-611 of the UCC or its equivalent in other jurisdictions) of the Collateral Agent's intention to make any sale of Collateral. Such notice, in the case of a public sale, shall state the time and place for such sale and, in the case of a sale at a broker's board or on a securities exchange, shall state the board or exchange at which such sale is to be made and the day on which the Collateral, or portion thereof, will first be offered for sale at such board or exchange. Any such public sale shall be held at such time or times within ordinary business hours and at such place or places as the Collateral Agent may fix and state in the notice (if any) of such sale. The Collateral Agent may conduct one or more going out of business sales, in the Collateral Agent's own right or by one or

26

more agents and contractors. Such sale(s) may be conducted upon any premises owned, leased, or occupied by any Grantor. The Collateral Agent and any such agent or contractor, in conjunction with any such sale, may augment the Inventory with other goods (all of which other goods shall remain the sole property of the Collateral Agent or such agent or contractor). Any amounts realized from the sale of such goods which constitute augmentations to the Inventory (net of an allocable share of the costs and expenses incurred in their disposition) shall be the sole property of the Collateral Agent or such agent or contractor and neither any Grantor nor any Person claiming under or in right of any Grantor shall have any interest therein. At any such sale, the Collateral, or portion thereof, to be sold may be sold in one lot as an entirety or in separate parcels, as the Collateral Agent may (in its sole and absolute discretion) determine. The Collateral Agent shall not be obligated to make any sale of any Collateral if it shall determine not to do so, regardless of the fact that notice of sale of such Collateral shall have been given. The Collateral Agent may, without notice or publication, adjourn any public or private sale or cause the same to be adjourned from time to time by announcement at the time and place fixed for sale, and such sale may, without further notice, be made at the time and place to which the same was so adjourned. In case any sale of all or any part of the Collateral is made on credit or for future delivery, the Collateral so sold may be retained by the Collateral Agent until the sale price is paid by the purchaser or purchasers thereof, but the Collateral Agent shall not incur any liability in case any such purchaser or purchasers shall fail to take up and pay for the Collateral so sold and, in case of any such failure, such Collateral may be sold again upon like notice. At any public (or, to the extent permitted by applicable Law, private) sale made pursuant to this Agreement, any Secured Party may bid for or purchase, free (to the extent permitted by applicable Law) from any right of redemption, stay, valuation or appraisal on the part of any Grantor (all said rights being also hereby waived and released to the extent permitted by applicable Law), the Collateral or any part thereof offered for sale and may make payment on account thereof by using any claim then due and payable to such Secured Party from any Grantor as a credit against the purchase price, and such Secured Party may, upon compliance with the terms of sale, hold, retain and dispose of such property without further accountability to any Grantor therefor. For purposes of determining the Grantors' rights in the Collateral, a written agreement to purchase the Collateral or any portion thereof shall be treated as a sale thereof; the Collateral Agent shall be free to carry out such sale pursuant to such agreement and no Grantor shall be entitled to the return of the Collateral or any portion thereof subject thereto, notwithstanding the fact that after the Collateral Agent shall have entered into such an agreement all Events of Default shall have been remedied and the Secured Obligations paid in full, provided, however, that such terms shall include all terms and restrictions that are customarily required to ensure the continuing validity and effectiveness of the Intellectual Property Collateral at issue, such as, without limitation, quality control and inurement provisions with regard to Trademarks, patent designation provisions with regard to patents, and copyright notices and restrictions or decompilation and reverse engineering of copyrighted software, and protecting the confidentiality of trade secrets. As an alternative to exercising the power of sale herein conferred upon it, the Collateral Agent may proceed by a suit or suits at law or in equity to foreclose this Agreement and to sell the Collateral or any portion thereof pursuant to a judgment or decree of a court or courts having competent jurisdiction or pursuant to a proceeding by a court appointed receiver. Any sale pursuant to the provisions of this Section 5.01 shall be deemed to conform to the commercially reasonable standards as provided in Section 9-610(b) of the UCC or its equivalent in other jurisdictions.

27

Each Grantor irrevocably makes, constitutes and appoints the Collateral Agent (and all officers, employees or agents designated by the Collateral Agent) as such Grantor's true and lawful agent (and attorney-in-fact) during the continuance of an Event of Default and after notice to the Borrower of its intent to exercise such rights (except in the case of a Bankruptcy Event of Default, in which case no such notice shall be required), for the purpose of, subject to the ABL Intercreditor Agreement, (i) making, settling and adjusting claims in respect of Article 9 Collateral under policies of insurance, endorsing the name of such Grantor on any check, draft, instrument or other item of payment for the proceeds of such policies of insurance, (ii) making all determinations and decisions with respect thereto and (iii) obtaining or maintaining the policies of insurance required by Section 6.07 of the Credit Agreement or to pay any premium in whole or in part relating thereto. All sums disbursed by the Collateral Agent in connection with this paragraph, including reasonable attorneys' fees, court costs, expenses and other charges relating thereto, shall be payable, within 10 days of demand, by the Grantors to the Collateral Agent and shall be additional Secured Obligations secured hereby.

By accepting the benefits of this Agreement and each other Collateral Document, the Secured Parties expressly acknowledge and agree that this Agreement and each other Collateral Document may be enforced only by the action of the Collateral Agent and that no other Secured Party shall have any right individually to seek to enforce or to enforce this Agreement or to realize upon the security to be granted hereby, it being understood and agreed that such rights and remedies may be exercised by the Collateral Agent for the benefit of the Secured Parties upon the terms of this Agreement and the other Collateral Documents.

Section 5.02.    Application of ProceedsSubject to the ABL Intercreditor Agreement, the Collateral Agent shall apply the proceeds of any collection or sale of Collateral, including any Collateral consisting of cash, in accordance with the provisions of Section 8.04 of the Credit Agreement. The Collateral Agent shall have absolute discretion as to the time of application of any such proceeds, moneys or balances in accordance with this Agreement. Upon any sale of Collateral by the Collateral Agent (including pursuant to a power of sale granted by statute or under a judicial proceeding), the receipt of the Collateral Agent or of the officer making the sale shall be a sufficient discharge to the purchaser or purchasers of the Collateral so sold and such purchaser or purchasers shall not be obligated to see to the application of any part of the purchase money paid over to the Collateral Agent or such officer or be answerable in any way for the misapplication thereof. It is understood and agreed that, to the extent expressly assumed under the Loan Documents, the Grantors shall remain jointly and severally liable to the extent of any deficiency between the amount of the proceeds of the Collateral and the aggregate amount of the Secured Obligations.

ARTICLE VI

Indemnity, Subrogation and Subordination

Upon payment by any Grantor of any Secured Obligations, all rights of such Grantor against the Borrower or any other Grantor arising as a result thereof by way of right of subrogation, contribution, reimbursement, indemnity or otherwise shall in all respects be subordinate and junior in right of payment to the prior payment in full in cash of all the Secured Obligations (other than contingent indemnity obligations for then unasserted claims). If any amount shall

28

erroneously be paid to any Grantor on account of (i) such subrogation, contribution, reimbursement, indemnity or similar right or (ii) any such indebtedness of any Grantor, such amount shall be held in trust for the benefit of the Secured Parties and shall forthwith be paid to the Collateral Agent to be credited against the payment of the Secured Obligations, whether matured or unmatured, in accordance with the terms of the Credit Agreement and the other Loan Documents. Subject to the foregoing, to the extent that any Grantor (other than the Borrower) shall, under this Agreement or the Credit Agreement as a joint and several obligor, repay any of the Secured Obligations (an "Accommodation Payment"), then the Grantor making such Accommodation Payment shall be entitled to contribution and indemnification from, and be reimbursed by, each of the other Grantors in an amount equal to a fraction of such Accommodation Payment, the numerator of which fraction is such other Grantor's Allocable Amount and the denominator of which is the sum of the Allocable Amounts of all of the Grantors. As of any date of determination, the "Allocable Amount" of each Grantor shall be equal to the maximum amount of liability for Accommodation Payments which could be asserted against such Grantor hereunder and under the Credit Agreement without (a) rendering such Grantor "insolvent" within the meaning of Section 101 (31) of the Bankruptcy Code, Section 2 of the Uniform Fraudulent Transfer Act ("UFTA") or Section 2 of the Uniform Fraudulent Conveyance Act ("UFCA"), (b) leaving such Grantor with unreasonably small capital or assets, within the meaning of Section 548 of the Bankruptcy Code, Section 4 of the UFTA, or Section 5 of the UFCA, or (c) leaving such Grantor unable to pay its debts as they become due within the meaning of Section 548 of the Bankruptcy Code or Section 4 of the UFTA, or Section 5 of the UFCA.

ARTICLE VII

Miscellaneous

Section 7.01.   NoticesAll communications and notices hereunder shall (except as otherwise expressly permitted herein) be in writing and given as provided in Section 10.01 of the Credit Agreement. All communications and notices hereunder to a Grantor other than the Borrower shall be given to it in care of the Borrower.

Section 7.02.   Waivers; Amendment%3. No failure or delay by the Collateral Agent in exercising any right or power hereunder or under any other Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the Collateral Agent hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have under applicable Law. No waiver of any provision of this Agreement or consent to any departure by any Grantor therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section 7.02, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. Without limiting the generality of the foregoing, the making of a Loan shall not be construed as a waiver of any Default, regardless of whether the Collateral Agent or any Lender may have had notice or knowledge of such Default at the time.

29

(b) Neither this Agreement nor any provision hereof may be waived, amended or modified except pursuant to an agreement or agreements in writing entered into by the Collateral Agent and the Grantor or Grantors with respect to which such waiver, amendment or modification is to apply, subject to any consent required in accordance with Section 10.08 of the Credit Agreement. For the avoidance of doubt, no Hedge Bank (in its capacity as such) shall have the right to consent to any waiver, amendment, supplement or other modification hereto.

Section 7.03.    Collateral Agent's Fees and Expenses; Indemnification%3. The parties hereto agree that the Collateral Agent shall be entitled to reimbursement of its expenses incurred hereunder to the extent of, and as expressly provided in, Section 10.05 of the Credit Agreement.

%3.The parties agree that Section 10.05(b) of the Credit Agreement shall apply, *mutatis mutandis*, to this Agreement.

(a)    Any such amounts payable as provided hereunder shall be additional Secured Obligations secured hereby and by the other Collateral Documents. The provisions of this Section 7.03 shall remain operative and in full force and effect regardless of the termination of this Agreement or any other Loan Document, the consummation of the transactions contemplated hereby, the repayment of any of the Secured Obligations, the invalidity or unenforceability of any term or provision of this Agreement or any other Loan Document, or any investigation made by or on behalf of the Collateral Agent or any other Secured Party. All amounts due under this Section 7.03 shall be payable within 10 Business Days of written demand therefor.

Section 7.04.    Successors and AssignsWhenever in this Agreement any of the parties hereto is referred to, such reference shall be deemed to include the permitted successors and assigns of such party; and all covenants, promises and agreements by or on behalf of any Grantor or the Collateral Agent that are contained in this Agreement shall bind and inure to the benefit of their respective permitted successors and assigns. No Grantor or Grantors may assign any of its or their rights or obligations hereunder without the written consent of the Collateral Agent.

Section 7.05.    Survival of AgreementAll covenants, agreements, representations and warranties made by the Grantors in the Loan Documents and in the certificates or other instruments prepared or delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the Lenders and shall survive the execution and delivery of the Loan Documents and the making of any Loans, regardless of any investigation made by any Lender or on its behalf and notwithstanding that the Collateral Agent or any Lender may have had notice or knowledge of any Default or Event of Default or incorrect representation or warranty at the time any credit is extended under the Credit Agreement, and shall continue in full force and effect until this Agreement is terminated as provided in Section 7.13 hereof or, with respect to the covenants, agreements, representations and warranties of any individual Grantor, until such Grantor is otherwise released from its obligations under this Agreement in accordance with Section 7.13(b).

Section 7.06.    Counterparts; Effectiveness; Several AgreementThis Agreement may be executed by facsimile and in counterparts (and by different parties hereto on different

30

counterparts), each of which shall constitute an original but all of which when taken together shall constitute a single contract. Delivery of an executed signature page to this Agreement by facsimile or other electronic imaging transmission shall be as effective as delivery of a manually signed counterpart of this Agreement. This Agreement shall become effective as to any Grantor when a counterpart hereof executed on behalf of such Grantor shall have been delivered to the Collateral Agent and a counterpart hereof shall have been executed on behalf of the Collateral Agent, and thereafter shall be binding upon such Grantor and the Collateral Agent and their respective permitted successors and assigns, and shall inure to the benefit of such Grantor, the Collateral Agent and the other Secured Parties and their respective permitted successors and assigns, except that no Grantor shall have the right to assign or transfer its rights or obligations hereunder or any interest herein or in the Collateral (and any such assignment or transfer shall be void) except as expressly contemplated by this Agreement or the Credit Agreement. This Agreement shall be construed as a separate agreement with respect to each Grantor and may be amended, modified, supplemented, waived or released with respect to any Grantor without the approval of any other Grantor and without affecting the obligations of any other Grantor hereunder.

Section 7.07.    Severability. In the event any one or more of the provisions contained in this Agreement should be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby (it being understood that the invalidity of a particular provision in a particular jurisdiction shall not in and of itself affect the validity of such provision in any other jurisdiction). The parties shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

Section 7.08.    [Reserved.] GOVERNING LAW

Section 7.09.    Headings. Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and are not to affect the construction of, or to be taken into consideration in interpreting, this Agreement.

Section 7.10.    Security Interest Absolute. All rights of the Collateral Agent hereunder, the Security Interest, the grant of a security interest in the Pledged Collateral and all obligations of each Grantor hereunder shall be absolute and unconditional irrespective of (a) any lack of validity or enforceability of the Credit Agreement, any other Loan Document, the Secured Hedge Agreements, any agreement with respect to any of the Secured Obligations or any other agreement or instrument relating to any of the foregoing, (b) any change in the time, manner or place of payment of, or in any other term of, all or any of the Secured Obligations, or any other amendment or waiver of or any consent to any departure from the Credit Agreement, any other Loan Document, the Secured Hedge Agreements, or any other agreement or instrument, (c) any exchange, release or non-perfection of any Lien on other collateral, or any release or amendment or waiver of or consent under or departure from any guarantee, securing or guaranteeing all or any of the Secured Obligations or (d) subject only to termination of a Guarantor's obligations hereunder in accordance with the terms of Section 11.10 of the Credit Agreement, but without prejudice to reinstatement rights under Section 11.04 of the Credit Agreement, any other circumstance that might

31

otherwise constitute a defense available to, or a discharge of, any Grantor in respect of the Secured Obligations or this Agreement.

Section 7.11. Termination or Release%3. This Agreement, the Security Interest and all other security interests granted hereby shall terminate automatically (without further action required) with respect to all Secured Obligations when all the outstanding Secured Obligations (other than obligations that may thereafter arise in respect of the Secured Hedging Agreements not yet due and payable and contingent indemnification and reimbursement obligations not yet accrued and payable) have been paid in full and the Lenders have no further commitment to lend under the Credit Agreement.

(a) A Subsidiary Guarantor shall automatically be released from its obligations hereunder and the Security Interest in the Collateral of such Subsidiary Guarantor shall be automatically released in the circumstances set forth in Section 11.10 of the Credit Agreement.

(b) The Security Interest in any Collateral shall be automatically released or subordinated, as applicable, in the circumstances set forth in the last paragraph of Section 7.05 of the Credit Agreement or Section 10.19 of the Credit Agreement.

(c) In connection with any termination or release pursuant to paragraph (a), (b), or (c), the Collateral Agent shall promptly execute and deliver to any Grantor, at such Grantor's expense, all documents that such Grantor shall reasonably request to evidence such termination or release or subordination. Any execution and delivery of documents pursuant to this Section 7.13 shall be without recourse to or warranty by the Collateral Agent.

(d) At any time that the respective Grantor desires that the Collateral Agent take any action described in immediately preceding clause (d), it shall, upon request of the Collateral Agent, deliver to the Collateral Agent an officer's certificate certifying that the release of the respective Collateral is permitted pursuant to paragraph (a), (b) or (c). The Collateral Agent shall have no liability whatsoever to any Secured Party as the result of any release of Collateral by it as permitted (or which the Collateral Agent in good faith believes to be permitted) by this Section 7.13.

(e) Notwithstanding anything to the contrary set forth in this Agreement, each Hedge Bank by the acceptance of the benefits under this Agreement hereby acknowledges and agrees that (i) the obligations of the Borrower or any Subsidiary under any Secured Hedge Agreement shall be secured pursuant to this Agreement only to the extent that, and for so long as, the other Secured Obligations are so secured and (ii) any release of Collateral effected in the manner permitted by this Agreement shall not require the consent of any Hedge Bank.

Section 7.12. Additional Restricted SubsidiariesPursuant to Section 6.11 of the Credit Agreement, certain Restricted Subsidiaries of the Borrower that were not in existence on the date of the Credit Agreement are required to enter in this Agreement as Grantors upon becoming Restricted Subsidiaries. Upon execution and delivery by the Collateral Agent and a Restricted

32

Subsidiary of a Security Agreement Supplement, such Restricted Subsidiary shall become a Grantor hereunder with the same force and effect as if originally named as a Grantor herein. The execution and delivery of any such instrument shall not require the consent of any other Grantor hereunder. The rights and obligations of each Grantor hereunder shall remain in full force and effect notwithstanding the addition of any new Grantor as a party to this Agreement.

Section 7.13.   Collateral Agent Appointed Attorney-in-FactEach Grantor hereby appoints the Collateral Agent the true and lawful attorney-in-fact of such Grantor for the purpose of carrying out the provisions of this Agreement and taking any action and executing any instrument that the Collateral Agent may deem necessary or advisable to accomplish the purposes hereof at any time after and during the continuance of an Event of Default, which appointment is irrevocable and coupled with an interest. Without limiting the generality of the foregoing, the Collateral Agent shall have the right, subject to the ABL Intercreditor Agreement, upon the occurrence and during the continuance of an Event of Default and upon and after delivery of notice by the Collateral Agent to the Borrower of its intent to exercise such rights (unless a Bankruptcy Event of Default has occurred and is continuing, in which case no such notice shall be required), with full power of substitution either in the Collateral Agent's name or in the name of such Grantor (a) to receive, endorse, assign and/or deliver any and all notes, acceptances, checks, drafts, money orders or other evidences of payment relating to the Collateral or any part thereof; (b) to demand, collect, receive payment of, give receipt for and give discharges and releases of all or any of the Collateral; (c) to sign the name of any Grantor on any invoice or bill of lading relating to any of the Collateral; (d) to send verifications of Accounts to any Account Debtor; (e) to commence and prosecute any and all suits, actions or proceedings at law or in equity in any court of competent jurisdiction to collect or otherwise realize on all or any of the Collateral or to enforce any rights in respect of any Collateral; (f) to settle, compromise, compound, adjust or defend any actions, suits or proceedings relating to all or any of the Collateral; (g) to notify, or to require any Grantor to notify, Account Debtors to make payment directly to the Collateral Agent or to a Collateral Account and adjust, settle or compromise the amount of payment of any Account; (h) to make, settle and adjust claims in respect of Collateral under policies of insurance and to endorse the name of such Grantor on any check, draft, instrument or any other item of payment with respect to the proceeds of such policies of insurance and for making all determinations and decisions with respect thereto; and (i) to use, sell, assign, transfer, pledge, make any agreement with respect to or otherwise deal with all or any of the Collateral, and to do all other acts and things necessary to carry out the purposes of this Agreement, as fully and completely as though the Collateral Agent were the absolute owner of the Collateral for all purposes; provided that nothing herein contained shall be construed as requiring or obligating the Collateral Agent to make any commitment or to make any inquiry as to the nature or sufficiency of any payment received by the Collateral Agent, or to present or file any claim or notice, or to take any action with respect to the Collateral or any part thereof or the moneys due or to become due in respect thereof or any property covered thereby. The Collateral Agent and the other Secured Parties shall be accountable only for amounts actually received as a result of the exercise of the powers granted to them herein, and neither they nor their officers, directors, employees or agents shall be responsible to any Grantor for any act or failure to act hereunder, except for their own gross negligence or willful misconduct or that of any of their Affiliates, directors, officers, employees, counsel, agents or attorneys-in-fact (as determined the final non-appealable judgment of a court of competent jurisdiction.

Section 7.14.   General Authority of the Collateral Agent By acceptance of the benefits of this Agreement and any other Collateral Documents, each Secured Party (whether or not a signatory hereto) shall be deemed irrevocably (a) to consent to the appointment of the Collateral Agent as its agent hereunder and under such other Collateral Documents, (b) to confirm that the Collateral Agent shall have the authority to act as the exclusive agent of such Secured Party for the enforcement of any provisions of this Agreement and such other Collateral Documents against any Grantor, the exercise of remedies hereunder or thereunder and the giving or withholding of any consent or approval hereunder or thereunder relating to any Collateral or any Grantor's obligations with respect thereto, (c) to agree that it shall not take any action to enforce any provisions of this Agreement or any other Collateral Document against any Grantor, to exercise any remedy hereunder or thereunder or to give any consents or approvals hereunder or thereunder except as expressly provided in this Agreement or any other Collateral Document and (d) to agree to be bound by the terms of this Agreement and any other Collateral Documents.

Section 7.15.   Recourse; Limited Obligations This Agreement is made with full recourse to each Grantor and pursuant to and upon all the warranties, representations, covenants and agreements on the part of such Grantor contained herein, in the Credit Agreement and the other Secured Credit Documents and otherwise in writing in connection herewith or therewith, with respect to the Secured Obligations of each applicable Secured Party. It is the desire and intent of each Grantor and each applicable Secured Party that this Agreement shall be enforced against each Grantor to the fullest extent permissible under the Laws applied in each jurisdiction in which enforcement is sought. Notwithstanding anything to the contrary contained herein, and in furtherance of the foregoing, it is noted that if the obligations of any Guarantor under Section 11.01 of the Credit Agreement have been limited as expressly provided in Section 1.14 or 11.09 of the Credit Agreement, then such obligations shall be limited hereunder as and to the same extent provided therein.

Section 7.16.   Mortgages.

In the event that any of the Collateral hereunder is also subject to a valid and enforceable Lien under the terms of a Mortgage and the terms thereof are inconsistent with the terms of this Agreement, then with respect to such Collateral, the terms of such Mortgage shall control in the case of Fixtures and Real Estate leases, letting and licenses of, and contracts, and agreements relating to the lease of, Real Estate, and the terms of this Agreement shall control in the case of all other Collateral.

Section 7.17.   ABL Intercreditor Agreement; Possession and Control of ABL Priority Collateral.

(a)   Notwithstanding anything herein to the contrary, the Liens granted to the Collateral Agent under this Agreement and the exercise of the rights and remedies of the Collateral Agent hereunder and under any other Collateral Document are subject to the provisions of the ABL Intercreditor Agreement. In the event of any conflict between the terms of the ABL Intercreditor Agreement and this Agreement or any other Collateral Document, the terms of the ABL Intercreditor Agreement shall govern and control. Notwithstanding anything to the contrary herein, the Collateral Agent acknowledges and

34

agrees that no Grantor shall be required to take or refrain from taking any action at the request of the Collateral Agent with respect to the Collateral if such action or inaction would be inconsistent with the terms of the ABL Intercreditor Agreement.

(b)    Subject to (but without limiting) the foregoing, at any time prior to the Discharge of ABL Obligations, any provision hereof (i) requiring Grantors to deliver possession of any ABL Priority Collateral to the Collateral Agent or its representatives, or to cause the Collateral Agent or its representatives to control any ABL Priority Collateral, shall be deemed to have been complied with if and for so long as the ABL Agent shall have such possession or control for the benefit of the Secured Parties and as bailee or sub-agent of the Collateral Agent as provided in the ABL Intercreditor Agreement or (ii) requiring Grantors to name the Collateral Agent as an additional insured or a loss payee under any insurance policy or a beneficiary of any letter of credit, such requirement shall have been complied with notwithstanding that any such insurance policy or letter of credit also names the ABL Agent as an additional insured, loss payee or beneficiary, as the case may be, in each case pursuant to the terms of the ABL Intercreditor Agreement.

(c)    Furthermore, at all times prior to the Discharge of ABL Obligations, the Collateral Agent is authorized by the parties hereto to effect transfers of ABL Priority Collateral at any time in its possession (and any "control" or similar agreements with respect to ABL Priority Collateral) to the ABL Agent.

(d)    Notwithstanding anything to the contrary herein but subject to the ABL Intercreditor Agreement, in the event the ABL Facility Documentation provides for the grant of a security interest or pledge over the assets of any Grantor and such assets do not otherwise constitute Collateral under this Agreement or any other Loan Document, such Grantor shall (i) promptly grant a security interest in or pledge such assets to secure the Secured Obligations, (ii) promptly take any actions necessary to perfect such security interest or pledge to the extent set forth in the ABL Facility Documentation and (iii) take all other steps reasonably requested by the Collateral Agent in connection with the foregoing.

(e)    Nothing contained in the ABL Intercreditor Agreement shall be deemed to modify any of the provisions of this Agreement, which, as among the Grantors and the Collateral Agent shall remain in full force and effect in accordance with its terms.

35

[SEPARATE SIGNATURE PAGES TO BE ATTACHED]

EXHIBIT E

FORM OF INTERCOMPANY NOTE

[ ], 2014

FOR VALUE RECEIVED, each of the undersigned, to the extent a borrower from time to time from any other entity listed on the signature page hereto (each, in such capacity, an "**Issuer**"), hereby promises to pay on demand to such other entity listed below (each, in such capacity, a "**Holder**" and, together with each Issuer, a "**Note Party**"), in immediately available funds in the currencies as shall be agreed from time to time and at such location as the applicable Holder shall from time to time designate, the unpaid principal amount of all loans and advances or other credit extensions (including trade payables) made by such Holder to such Issuer. Each Issuer promises also to pay interest on the unpaid principal amount of all such loans and advances or other credit extensions in like money at said location from the date of such loans and advances until paid at such rate per annum as shall be agreed upon from time to time by such Issuer and such Holder.

Reference is made to (x) the Credit Agreement, dated as of February 13, 2014 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "**Term Loan Credit Agreement**"), among YRC Worldwide Inc., a Delaware corporation, the other Guarantors party thereto from time to time, the Lenders party thereto from time to time and Credit Suisse AG, Cayman Islands Branch, as Administrative Agent and Collateral Agent, and (y) the Credit Agreement, dated as of February 13, 2014 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "**ABL Credit Agreement**", and together with the Term Loan Credit Agreement, the "**Credit Agreements**"), among the Borrower, the other Guarantors party thereto from time to time, the Lenders party thereto from time to time and RBS Citizens Business Capital, as Administrative Agent and Collateral Agent. Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the Term Loan Credit Agreement.

This note (as amended, modified or supplemented from time to time, the "**Note**") is an Intercompany Note referred to in the Credit Agreements and is subject to the terms thereof, and shall be pledged by each Holder pursuant to the respective Security Agreements (as defined in each of the Credit Agreements), to the extent required pursuant to the terms thereof. Each Holder hereby acknowledges and agrees that the Administrative Agent, Collateral Agent and the ABL Agent may exercise all rights provided in the Term Loan Credit Agreement, the ABL Credit Agreement and the respective Security Agreements (as defined therein) with respect to this Note, subject to the ABL Intercreditor Agreement.

Anything in this Note to the contrary notwithstanding, the Indebtedness evidenced by this Note owed by any Issuer that is a Loan Party to any Holder that is not a Loan Party shall be subordinate and junior in right of payment, to the extent and in the manner hereinafter set forth, to (i) all Obligations of such Issuer under the Loan Documents, including, without limitation, where applicable, under such Issuer's guarantee of the Obligations under the Term Loan Credit Agreement and (ii) all "Obligations" (as defined in the ABL Credit Agreement) of such Issuer under the "Loan Documents" (as defined in the ABL Credit Agreement), including, without limitation, where applicable, under such Issuer's guarantee thereof (the foregoing, collectively, and together with obligations in connection with any renewal, refunding, restructuring or refinancing of any thereof, including interest thereon accruing after the commencement of any proceedings referred to in clause (i) below, whether or not such interest is an allowed claim in such proceeding, being hereinafter collectively referred to as "**Senior Indebtedness**"):

(i)      In the event of any insolvency or bankruptcy proceedings, and any receivership, liquidation, reorganization or other similar proceedings in connection therewith, relative to any Issuer or to its creditors, as such, or to its property, and in the event of any proceedings for voluntary liquidation, dissolution or other winding up of such Issuer, whether or not involving insolvency or bankruptcy, except as otherwise permitted by the Senior Indebtedness, then (x) the holders of Senior Indebtedness shall be paid in full in cash in respect of all amounts constituting Senior Indebtedness (other than obligations that are contingent at the time of payment) before any Holder is entitled to receive (whether directly or indirectly), or make any demands for, any payment on account of this Note and (y) until the holders of Senior Indebtedness are paid in full in cash in respect of all amounts constituting Senior Indebtedness, any payment or distribution to which such Holder would otherwise be entitled (other than (A) equity securities or (B) debt securities of such Issuer that are subordinated, to at least the same extent as this Note, to the payment of all Senior Indebtedness then outstanding (such securities being hereinafter referred to as "**Restructured Debt Securities**")) shall be made to the holders of Senior Indebtedness;

(ii)   if any payment or bankruptcy Event of Default (as defined in the Term Loan Credit Agreement or the ABL Credit Agreement) occurs and is continuing with respect to any Senior Indebtedness, then no payment or distribution of any kind or character to any Person that is not a Loan Party shall be made by or on behalf of the Issuer or any other Person on its behalf with respect to this Note unless otherwise agreed in writing by the Administrative Agent or the ABL Agent (as applicable) in its reasonable discretion; and

(iii)      if any payment or distribution of any character, whether in cash, securities or other property (other than Restructured Debt Securities),

in respect of this Note shall (despite these subordination provisions) be received by any Holder in violation of clause (i) or (ii) before all Senior Indebtedness shall have been paid in full in cash, such payment or distribution shall be held in trust for the benefit of, and shall be paid over or delivered to, the holders of Senior Indebtedness (or their representatives), ratably according to the respective aggregate amounts remaining unpaid thereon, to the extent necessary to pay all Senior Indebtedness in full in cash.

To the fullest extent permitted by law, no present or future holder of Senior Indebtedness shall be prejudiced in its right to enforce the subordination of this Note by any act or failure to act on the part of any Issuer or by any act or failure to act on the part of such holder or any trustee or agent for such holder. Each Holder and each Issuer hereby agrees that the subordination of this Note is for the benefit of the Administrative Agent, the Secured Parties under the Term Loan Credit Agreement (the " **Term Loan Lenders**"), the ABL Agent, and the Secured Parties under the ABL Credit Agreement (the " **ABL Lenders**"), and the Administrative Agent, the Lenders, the ABL Agent and the ABL Lenders are obligees under this Note to the same extent as if their names were written herein as such and the Administrative Agent, on behalf of itself and the Lenders, and the ABL Agent, on behalf of itself and the ABL Lenders, may proceed to enforce the subordination provisions herein.

The Indebtedness evidenced by this Note owed by any Issuer that is not a Loan Party shall not be subordinated to, and shall rank pari passu in right of payment with, any other obligation of such Issuer.

Notwithstanding the foregoing, nothing contained in the subordination provisions set forth above is intended to or will impair, as between each Issuer and each Holder, the obligations of such Issuer, which are absolute and unconditional, to pay to such Holder the principal of and interest on this Note as and when due and payable in accordance with its terms, or is intended to or will affect the relative rights of such Holder and other creditors of such Issuer other than the holders of Senior Indebtedness.

Each Holder is hereby authorized to record all loans and advances or other credit extensions made by it to any Issuer (all of which shall be evidenced by this Note), and all repayments or prepayments thereof, in its books and records, such books and records constituting prima facie evidence of the accuracy of the information contained therein. For the avoidance of doubt, this Note as between each Issuer and each Holder contains additional terms to any intercompany loan agreement between them and this Note does not in any way replace such intercompany loans between them nor does this Note in any way change the principal amount of any intercompany loans between them.

Upon execution and delivery after the date hereof by any Subsidiary of YRC Worldwide Inc. of a counterpart signature page hereto, such Subsidiary shall become a Note Party hereunder with the same force and effect thereafter as if originally

named as a Note Party hereunder. The rights and obligations of each Note Party hereunder shall remain in full force and effect notwithstanding the addition of any new Note Party as a party to this Note.

Each Issuer hereby waives (to the extent permitted by applicable law) presentment, demand, protest or notice of any kind in connection with this Note. All payments under this Note shall be made without offset, counterclaim or deduction of any kind.

Notwithstanding anything to the contrary, in no event shall amounts owed under intercompany promissory notes existing as of the Closing Date constitute a part of this Note.

**THIS NOTE SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.**

[SEPARATE SIGNATURE PAGES TO BE
ATTACHED]

EXHIBIT F

FORM OF COMPLIANCE CERTIFICATE

Reference is made to the Credit Agreement, dated as of February 13, 2014 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), among YRC Worldwide Inc., a Delaware corporation, the subsidiaries of the Borrower party thereto from time to time, the Lenders party thereto from time to time and Credit Suisse AG, Cayman Islands Branch, as Administrative Agent and Collateral Agent. Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the Credit Agreement.

Pursuant to Section 6.01 and 6.02 of the Credit Agreement, the undersigned, solely in his/her capacity as a Responsible Officer of the Borrower, certifies as follows:

1.    Attached hereto as Exhibit A is the consolidated balance sheet of the Borrower and its Subsidiaries as of [December][•], 201[•] and the related consolidated statements of operations, changes in shareholders' equity and cash flows for such fiscal year, setting forth in each case in comparative form the figures for the previous fiscal year, all in reasonable detail and prepared in accordance with GAAP, audited and accompanied by a report and opinion of KPMG LLP, any other independent registered public accounting firm of nationally recognized standing or any other independent registered public accounting firm approved by the Administrative Agent (such approval not to be unreasonably withheld, conditioned or delayed), which report and opinion (i) has been prepared in accordance with generally accepted auditing standards, (ii) is not subject to qualifications or exceptions as to the scope of such audit, (iii) is without a "going concern" disclosure or like qualification or exception (other than with respect to, or disclosure of an exception or qualification solely resulting from, the impending maturity of any Indebtedness, any prospective or actual default under any financial covenant, or in respect of the fiscal year ending December 31, 2013). Also attached hereto as Exhibit A are the related (x) consolidating financial statements reflecting the adjustments necessary to eliminate the accounts of Unrestricted Subsidiaries (if any) (which may be in footnote form only) from such consolidated financial statements] and (iv) is accompanied with customary management discussion analysis.

2.    Attached hereto as Exhibit A is the consolidated balance sheet of the Borrower and its Subsidiaries as of [ ] and the related (i) consolidated statements of income or operations for such fiscal quarter and for the portion of the fiscal year then ended and (ii) consolidated statements of cash flows for such fiscal quarter and the portion of the fiscal year then ended, setting forth in each case in comparative form the figures for the corresponding fiscal quarter of the previous fiscal year and the corresponding portion of the previous fiscal year, all

in reasonable detail. These present fairly in all material respects the financial condition, results of operations and cash flows of the Borrower and its Subsidiaries in accordance with GAAP, subject only to normal year-end audit adjustments and the absence of footnotes. Also attached hereto as Exhibit A are the related consolidating financial statements reflecting the adjustments necessary to eliminate the accounts of Unrestricted Subsidiaries (if any) (which may be in footnote form only) from such consolidated financial statements] and (y) customary management discussion and analysis.

3.     Attached as Exhibit B hereto is a reasonably detailed consolidated budget for 20[ ] on a quarterly basis (including a projected consolidated balance sheet of the Borrower and its Subsidiaries as of the end of 20[ ], the related consolidated statements of projected cash flow and projected income and a summary of the material underlying assumptions applicable thereto) (collectively, the "**Projections**"), which Projections are prepared in good faith and are based on assumptions stated therein and believed to be reasonable at the time of preparation of such Projections. It is understood by the Agents and Lenders that such projections as to future events (i) are not to be viewed as facts, (ii) are subject to significant uncertainties and contingencies, which may be beyond the control of the Borrower and its Restricted Subsidiaries, (iii) are not assured by the Borrower and its Restricted Subsidiaries as to whether the results or forecasts in any such projections will be realized, (iv) may differ from the actual results and such differences may be material, (v) are not a guarantee of performance and (vi) may vary significantly from the actual results during the period or periods covered by any such projections and such differences may be material.

4.     Attached hereto as Exhibit C is the information about Net Proceeds received in the period for individual amounts greater than $5,000,000 and a statement regarding the Borrower's intention regarding the use of any portion of such Net Proceeds to acquire, maintain, develop, construct, improve, upgrade or repair assets useful in the business of the Borrower or its Restricted Subsidiaries or to make Permitted Acquisitions or any acquisition or investment permitted under the Credit Agreement.

5.      Attached hereto as Exhibit D are the calculations setting forth in reasonable detail the amount of any Cumulative Credit available at the beginning of the applicable period and at the end of such period and the amount and application of any Cumulative Credit during such period; provided that such amount may be reallocated from time to time in accordance with Section 1.02(i) of the Credit Agreement.

6.     To my knowledge, except as otherwise disclosed to the Administrative Agent pursuant to the Credit Agreement, no Default has occurred. [If unable to provide the foregoing certification, describe in reasonable detail the

reasons therefor and circumstances thereof and any action taken or proposed to be taken with respect thereto on Annex A attached hereto.

[7.   The following represent true and accurate calculations, as of [ ]:

Total Leverage Ratio:

| | | |
|---|---|---|
| Consolidated Total Debt | = | [ ] |
| Consolidated EBITDA | = | [ ] |
| Ratio | = | [ ] to 1.0 |

Senior Secured Leverage Ratio:

| | | |
|---|---|---|
| Consolidated Total Debt that is secured | = | [ ] |
| Consolidated EBITDA | = | [ ] |
| Ratio | = | [ ] to 1.0 |

Supporting detail showing the calculations of Total Leverage Ratio and Senior Secured Leverage Ratio is attached hereto as Schedule 1.]

8.   Attached hereto as Schedule 2 are detailed calculations setting forth Excess Cash Flow.

9.   Attached hereto is the information required by Section 6.02(d) of the Credit Agreement.

SCHEDULE 1

## Total Leverage Ratio Calculation

*Consolidated Total Net Debt to Consolidated EBITDA*

**(1) Consolidated Total Debt as of [ ], 20[ ]:**

(a) As of any date of determination, the aggregate principal amount of Indebtedness of the Borrower and its Restricted Subsidiaries outstanding on such date, in an amount that would be reflected on a balance sheet prepared as of such date on a consolidated basis in accordance with GAAP (but excluding (a) the effects of any discounting of Indebtedness as provided in Section 1.10 and (b) Indebtedness in respect of the Existing Series A Notes to the extent the amount thereof is fully discharged in accordance with its terms), consisting of:

(i) Indebtedness for borrowed money                                               _____

(ii) Attributable Indebtedness or purchase money Indebtedness                      _____

(iii) debt obligations evidenced by bonds, debentures, promissory notes, loan agreements or similar instruments

                                                                                  _____

(iv) all Guarantees of any of the foregoing                                        _____

*provided* that (i) Consolidated Total Debt shall not include Indebtedness in respect of letters of credit, bankers' acceptances and other similar contingent obligations, except to the extent of unreimbursed amounts thereunder, and (ii) Consolidated Total Debt shall not include obligations under Swap Contracts permitted hereunder

**Consolidated Total Debt =**                                                      _____

*divided by*

**(2) Consolidated EBITDA:**

**(a) Consolidated Net Income:**

(i)    the net income (or loss) of the Borrower and its Subsidiaries for such period determined on a consolidated basis in accordance with GAAP on a consolidated basis (without duplication) for such period (without deduction for minority interests);                                                          _____

*provided* that in determining Consolidated Net Income, (a) the net income of any other Person which is not a Subsidiary of the Borrower, is an Unrestricted Subsidiary or is accounted for by the Borrower by the equity method of accounting shall be included only to the extent of the payment of cash dividends or cash distributions by such other Person to the Borrower or a Guarantor that could be made during such period; *provided, however,* that for purposes of calculating the Cumulative Credit for purposes of <u>Section 7.06(e)(y)</u>, such income shall only be included (directly or indirectly) to the extent such cash dividends or other cash distributions are actually received from such other Person by the Borrower or a Guarantor, (b) the net income of any Subsidiary of the Borrower shall be excluded to the extent that the declaration or payment of cash dividends or similar cash distributions by that Subsidiary of that net income is not at the date of determination permitted by operation of its charter or any agreement, instrument or law applicable to such Subsidiary (other than (i) restrictions that have been waived or otherwise released, (ii) restrictions pursuant to the Loan Documents and or the ABL Facility Documentation and (iii) restrictions arising pursuant to an agreement or instrument if the encumbrances and restrictions contained in any such agreement or instrument taken as a whole are not materially less favorable to the Secured Parties than the encumbrances and restrictions contained in the Loan Documents (as determined by the Borrower in good faith)) and (c) the income or loss of any Person accrued prior to the date it becomes a Subsidiary or is merged into or consolidated with the Borrower or any Subsidiary or the date that such Person's assets are acquired by the Borrower or any Subsidiary shall be excluded.

**Consolidated Net Income =**                                                                    _____

(b) *plus*, without duplication and to the extent deducted (and not added back or excluded) in arriving at such Consolidated Net Income (other than clauses (viii) or (xi)), the sum of the following amounts for such period with respect to Borrower and its Restricted Subsidiaries:

(i) total interest expense determined in accordance with GAAP and, to the extent not reflected in such total interest expense, any expenses or losses on hedging obligations or other derivative instruments entered into for the purpose of hedging interest rate risk, net of interest income and gains on such hedging obligations or other derivative obligations, letter of credit fees, costs of surety bonds in connection with financing activities and any bank fees and financing fees (including commitment, underwriting, funding, "rollover" and similar fees and commissions, discounts, yields and other fees, charges and amounts incurred in connection with the issuance or incurrence of Indebtedness and all commissions, discounts and other fees and charges owed with respect to letters of credit and bankers' acceptance financing and net costs under Swap Contracts entered into for the purpose of hedging interest or commodity rate risk) and annual agency, unused line, facility or similar fees paid under definitive documentation related to Indebtedness (whether amortized or immediately expensed)                _____

(ii) provision for taxes based on income, profits or capital gains of the Borrower and the Restricted Subsidiaries, including, without limitation, federal, state, local, franchise and similar taxes and foreign withholding taxes paid or accrued during such period                _____

(iii) depreciation and amortization                _____

(iv) extraordinary, unusual or non-recurring charges, expenses or losses                _____

(v) non-cash expenses, charges and losses (including reserves, impairment charges or asset write-offs, write-offs of deferred financing fees, losses from investments recorded using the equity method, purchase accounting adjustments and stock-based awards compensation expense), in each case other than (A) any non-cash charge representing amortization of a prepaid cash item that was paid and not expensed in a prior period and (B) any non-cash charge relating to write-offs, write-downs or reserves with respect to accounts receivable in the normal course or inventory; *provided* that if any of the non-cash charges referred to in this clause (v) represents an accrual or reserve for potential cash items in any future period, (1) the Borrower may determine not to add back such non-cash charge in the current period and (2) to the extent the Borrower does decide to add back such non-cash charge, the cash payment in respect thereof in such future period shall be subtracted from Consolidated EBITDA in such future period to the extent paid _____

(vi) restructuring costs, integration costs, retention, recruiting, relocation and signing bonuses and expenses, and severance costs (including, for the avoidance of doubt, any bonuses payable in connection with the IBT Transactions in 2014 or 2015) _____

(vii) Transaction Expenses _____

(viii) pro forma results for acquisitions (including the commencement of activities constituting such business) and material dispositions (including the termination or discontinuance of activities constituting such business) of business entities or properties or assets, constituting a division or line of business of any business entity, division or line of business that is the subject of any such acquisition or disposition, and operational changes and operational initiatives (including, to the extent applicable, from the Transactions but excluding the IBT Transactions), including any synergies, operating expense reductions, other operating improvements and cost savings as certified by the Borrower as having been determined in good faith to be reasonably anticipated to be realizable within eighteen (18) months following any such acquisition or disposition, operational change and operational initiatives (with the total add-back pursuant to this clause (viii) or Section 1.09(c) to be limited in the aggregate to 20% of Consolidated EBITDA (prior to giving effect to any such adjustments pursuant to this clause (viii) and Section 1.09(c) but otherwise on a pro forma consolidated basis) in any Test Period; *provided*, that such limitation on add-backs shall not apply if supported by a quality of earnings report prepared by a nationally recognized accounting firm or other third-party advisor reasonably acceptable to the Administrative Agent or if such adjustments satisfy the requirements of Regulation S-X) _____

(ix) solely for purposes of calculating the Senior Secured Leverage Ratio, adjustments and addbacks described in the Confidential Information Memorandum dated January 2014 _____

(x) other transaction specific accruals, costs, charges, fees and expenses (including rationalization, legal, tax, structuring and other costs and expenses) related to the Transactions, acquisitions, investments, restricted payments, dispositions or issuances, amendments, waivers or modifications of debt or equity (whether or not consummated) reasonably expected to be permitted under this Agreement or the consummation of which would result in the repayment in full of the Obligations (other than unasserted contingent indemnity and reimbursement obligations and obligations of any Loan Party arising under any Secured Hedge Agreement)  _____

(xi) proceeds of business interruption insurance received or reasonably expected to be received within 365 days after the end of such period; *provided* that any such expected proceeds that are not actually received in such 365 day period shall be deducted from Consolidated EBITDA in the fiscal quarter immediately following such 365 day period  _____

(xii) charges, losses or expenses to the extent indemnified or insured or reimbursed or reasonably expected to be indemnified, insured or reimbursed by a third party within 365 days after the end of such period; *provided* that any such expected amounts that are not actually received in such 365 day period shall be deducted from Consolidated EBITDA in the fiscal quarter immediately following such 365 day period  _____

(xiii) the amount of any minority interest expense attributable to minority interests of third parties in the positive income of any non-wholly owned Restricted Subsidiary  _____

(xiv) any net loss from disposed, abandoned or discontinued operations  _____

(xv) the amount of loss on sale of Securitization Assets and related assets to the Securitization Subsidiary in connection with a Qualified Securitization Financing  _____

(xvi) net realized losses from Swap Obligations or embedded derivatives that require similar accounting treatment and the application of Accounting Standard Codification Topic 815 and related pronouncements  _____

(xvii) the cumulative effect of a change in accounting principles

(xvii) realized non-cash foreign exchange losses resulting from the impact of foreign currency changes on the valuation of assets or liabilities on the balance sheet of the Borrower and its Restricted Subsidiaries  _____

(c) *less*, without duplication and to the extent included in arriving at such Consolidated Net Income:

(i) non-cash gains (excluding any non-cash gain to the extent it represents the reversal of an accrual or reserve for a potential cash item that reduced Consolidated EBITDA in any prior period) and all other non-cash items of income for such period  _____

(ii) any gains and income from investments recorded using the equity method  _____

(iii) any gains arising out of transactions of the types described in clauses (a)(xii), (xiii), (xiv), (xv) and (xvi) above  _____

*provided* that, for the avoidance of doubt, any gain representing the reversal of any non-cash charge referred to in clause (a)(v)(B) above for a prior period shall be added (together with, without duplication, any amounts received in respect thereof to the extent not increasing Consolidated Net Income) to Consolidated EBITDA in any subsequent period to such extent so reversed (or received)

**Consolidated EBITDA =**                                                          _____

**Consolidated Total Net Debt to Consolidated EBITDA =**                           [ ]:1.00

## Senior Secured Leverage Ratio Calculation

*Consolidated Total Net Debt (secured) to Consolidated EBITDA*

**(1) Consolidated Total Debt (secured)**

*divided by*

**(2) Consolidated EBITDA =**                                                      _____

**(3) Consolidated Total Net Debt (secured) to Consolidated EBITDA =**             [ ]:1.00

SCHEDULE 2

## **Excess Cash Flow Calculation**

(a) *the sum*, without duplication, of:

(i) Consolidated Net Income for such period

_____

(ii) an amount equal to the amount of all non-cash charges to the extent deducted in arriving at such Consolidated Net Income

_____

(iii) decreases in Consolidated Working Capital for such period (other than any such decreases arising from acquisitions or dispositions by the Borrower and its Restricted Subsidiaries completed during such period)

_____

(iv) cash receipts in respect of Swap Contracts during such period to the extent such receipts were not otherwise included in arriving at such Consolidated Net Income

_____

(v) the amount of net tax expense deducted in determining Consolidated Net Income for such period to the extent it exceeds the amount of net cash taxes paid in such period

_____

(vi) an amount equal to the aggregate net non-cash loss on Dispositions by the Borrower and its Restricted Subsidiaries during such period (other than Dispositions in the ordinary course of business) to the extent deducted in arriving at such Consolidated Net Income

_____

(b) *minus the sum, without duplication, of:*

(i) an amount equal to the amount of all non-cash credits included in arriving at such Consolidated Net Income,

_____

(ii) the amount of Capital Expenditures made in cash during such period (or committed to be made within 90 days after the end of such fiscal period) to the extent financed with Internally Generated Cash,

_____

(iii) the aggregate amount of payments made in cash during such period (or committed to be paid in cash within 90 days after the end of such period) (other than Capital Expenditures) and capitalized in accordance with GAAP to the extent financed with Internally Generated Cash,

(iv) the aggregate amount of all principal payments of Indebtedness of the Borrower and its Restricted Subsidiaries during such period, in each case to the extent financed with Internally Generated Cash (including (A) the principal component of payments in respect of Capitalized Leases, (B) the amount of any scheduled repayment of Term Loans pursuant to Section 2.11 (to the extent actually made) and (C) voluntary prepayments or buybacks of Term Loans made pursuant to Section 10.04(k) (in an amount equal to the discounted amount actually paid in respect of the principal amount of such Term Loans), but excluding (W) all voluntary prepayments of Term Loans (other than voluntary prepayments made pursuant to Section 10.04(k)), (X) all prepayments of Indebtedness on the Closing Date in connection with the Recapitalization Transactions or the Refinancing Transactions, (Y) all prepayments, redemptions or repurchases in respect of (i) Permitted Second Priority Additional Debt (or any Permitted Refinancing thereof), except to the extent permitted under Section 7.13(a) and (ii) Junior Financing, except to the extent permitted under Section 7.13(a) and (Z) all prepayments of loans under the ABL Facility or any other revolving credit facility made during such period unless there is a corresponding permanent commitment reduction in connection therewith (it being agreed that any amount excluded pursuant to clause (W), (X), (Y) or (Z) may not be deducted under any other clause of this definition)    _____

(v) an amount equal to the aggregate net non-cash gain on Dispositions by the Borrower and its Restricted Subsidiaries during such period (other than Dispositions in the ordinary course of business) to the extent included in arriving at such Consolidated Net Income    _____

(vi) increases in Consolidated Working Capital for such period (other than any such increases arising from acquisitions or dispositions by the Borrower and its Restricted Subsidiaries during such period)    _____

(vii) cash payments by the Borrower and its Restricted Subsidiaries during such period in respect of long-term liabilities of the Borrower and its Restricted Subsidiaries other than Indebtedness and that were made with Internally Generated Cash and were not deducted or were excluded in calculating Consolidated Net Income    _____

(viii) the amount of Investments and acquisitions made during such period (or committed to be made within 90 days after the end of such period) in cash pursuant to Section 7.02 (other than Section 7.02(a) or (c)) (net of the cash return on any such Investments received during such period, except to the extent such return was included in the determination of Consolidated Net Income) to the extent that such Investments and acquisitions were not expensed and were financed with Internally Generated Cash    _____

(ix) the amount of cash taxes paid in such period to the extent they exceed the amount of tax expense deducted in determining Consolidated Net Income for such period (which amounts shall be included in the calculation of Excess Cash Flow for the period in which they are expensed), and

(x) cash expenditures in respect of Swap Contracts during such fiscal year to the extent such expenditures were not deducted or were excluded in arriving at such Consolidated Net Income

(xi) the aggregate amount of Restricted Payments made in cash permitted by Section 7.06(d) or € during such period (or committed to be made or paid in cash within the next 90 days after the end of such period)

Notwithstanding anything in the definition of any term used in the definition of Excess Cash Flow to the contrary, (i) all components of Excess Cash Flow shall be computed for the Borrower and its Restricted Subsidiaries on a consolidated basis and (ii) for purposes of calculating Excess Cash Flow for any period with respect to each Permitted Acquisition or other Investment of all or substantially all of the assets of another Person or business line permitted hereby consummated during such Excess Cash Flow Period and for the purposes of calculating Consolidated Working Capital, the (A) total assets of a target of such Permitted Acquisition or other Investment of all or substantially all of the assets of another Person or business line permitted hereby (other than cash and Cash Equivalents), as calculated as at the date of consummation of the applicable Permitted Acquisition or other Investment of all or substantially all of the assets of another Person or business line permitted hereby, which may properly be classified as current assets on a consolidated balance sheet of Borrower and its Restricted Subsidiaries in accordance with GAAP (assuming, for the purpose of this clause (A), that such Permitted Acquisition or other Investment of all or substantially all of the assets of another Person or business line permitted hereby has been consummated) and (B) the total liabilities of Borrower and its Restricted Subsidiaries, as calculated as at the date of consummation of the applicable Permitted Acquisition or other Investment of all or substantially all of the assets of another Person or business line permitted hereby, which may properly be classified as current liabilities (other than the current portion of any long term liabilities and accrued interest thereon) on a consolidated balance sheet of Borrower and its Restricted Subsidiaries in accordance with GAAP (assuming, for the purpose of this clause (B), that such Permitted Acquisition or other Investment of all or substantially all of the assets of another Person or business line permitted hereby has been consummated), shall, in the case of both immediately preceding clauses (A) and (B), be calculated as the difference between the Consolidated Working Capital at the end of the applicable period from the date of consummation of the Permitted Acquisition or other Investment of all or substantially all of the assets of another Person or business line permitted hereby.

**<u>Excess Cash Flow =</u>**

_____

_____

IN WITNESS WHEREOF, the undersigned, solely in his/her capacity as a Responsible Officer of YRC Worldwide Inc., has executed this certificate for and on behalf of YRC Worldwide Inc. and has caused this certificate to be delivered this _____ day of _____, 20[__].

YRC WORLDWIDE INC.

By: _____

Name:

Title:

EXHIBIT G-1

FORM OF
UNITED STATES TAX COMPLIANCE CERTIFICATE
(For Non-U.S. Lenders That Are Not Partnerships or Pass-Thru Entities For U.S. Federal Income Tax Purposes)

Reference is made to the Credit Agreement, dated as of February 13, 2014 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), among YRC Worldwide Inc., a Delaware corporation, the subsidiaries of the Borrower party thereto from time to time, the Lenders party thereto from time to time and Credit Suisse AG, Cayman Islands Branch, as Administrative Agent and Collateral Agent. Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the Credit Agreement.

Pursuant to the provisions of Section 3.01(d) of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the Loan(s) (as well as any Term Note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) it is not a "bank" as such term is used in Section 881(c)(3)(A) of the Internal Revenue Code of 1986, as amended, (the "**Code**"), (iii) it is not a "10-percent shareholder" of the Borrower within the meaning of Code Section 871(h)(3)(B), (iv) it is not a "controlled foreign corporation" within the meaning of Section 881(c)(3)(C) of the Code and (v) no payments in connection with the Loan Documents are effectively connected with the undersigned's conduct of a U.S. trade or business.

The undersigned has furnished the Administrative Agent with a certificate of its non-U.S. person status on Internal Revenue Service Form W-8BEN. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, or if a lapse in time or change in circumstance renders the information on this certificate obsolete, expired or inaccurate in any material respect, the undersigned shall promptly so inform the Borrower and the Administrative Agent in writing and deliver promptly to the Borrower and the Administrative Agent an updated certificate or other appropriate documentation (including any new documentation reasonably requested by the Borrower or Administrative Agent) or promptly notify the Borrower and Administrative Agent in writing of its inability to do so, and (2) the undersigned shall furnish the Borrower and the Administrative Agent a properly completed and currently effective certificate in either the calendar year in which payment is to be made by the Borrower or the Administrative Agent to the undersigned, or in either of the two calendar years preceding such payment.

[Signature Page Follows]

[Lender]

By: ____
    Name:
    Title:


[Address]



Dated: _____, 20[ ]

EXHIBIT G-2

FORM OF

UNITED STATES TAX COMPLIANCE CERTIFICATE

(For Non-U.S. Lenders That Are Partnerships or Pass-Thru Entities For U.S. Federal Income Tax Purposes)

Reference is made to the Credit Agreement, dated as of February 13, 2014 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), among YRC Worldwide Inc., a Delaware corporation, the subsidiaries of the Borrower party thereto from time to time, the Lenders party thereto from time to time and Credit Suisse AG, Cayman Islands Branch, as Administrative Agent and Collateral Agent. Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the Credit Agreement.

Pursuant to the provisions of Section 3.01(d) of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the Loan(s) (as well as any Term Note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) its partners/members are the sole beneficial owners of such Loan(s) (as well as any Term Note(s) evidencing such Loan(s)), (iii) neither the undersigned nor any of its partners/members is a "bank" within the meaning of Section 881(c)(3)(A) of the Internal Revenue Code of 1986, as amended, (the "**Code**"), (iv) none of its partners/members is a "10-percent shareholder" of the Borrower within the meaning of Code Section 871(h)(3)(B), (v) none of its partners/members is a "controlled foreign corporation" related to the Borrower within the meaning of Section 881(c)(3)(C) of the Code and (vi) no payments in connection with the Loan Documents are effectively connected with the undersigned's conduct of a U.S. trade or business.

The undersigned has furnished the Administrative Agent and the Borrower with Internal Revenue Service Form W-8IMY accompanied by an Internal Revenue Service Form W-8BEN from each of its partners/members claiming the portfolio interest exemption, *provided* that, for the avoidance of doubt, the foregoing shall not limit the obligation of the Lender to provide, in the case of a partner/member not claiming the portfolio interest exemption, a Form W-8ECI, Form W-9 or Form W-8IMY (including appropriate underlying certificates from each interest holder of such partner/member), in each case establishing such partner/member's any available exemption from U.S. federal withholding tax. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, or if a lapse in time or change in circumstance renders the information on this certificate obsolete, expired or inaccurate in any material respect, the undersigned shall promptly so inform the Borrower and the Administrative Agent and deliver promptly to the Borrower and the Administrative Agent an updated certificate or other appropriate documentation (including any new documentation reasonably requested by the Borrower or the Administrative Agent) or promptly notify the Borrower and Administrative Agent in writing of its inability to do so, and (2) the undersigned shall have at all times furnished the Borrower and the Administrative Agent in writing with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

[Signature Page Follows]

[Lender]

By: ____
    Name:
    Title:

[Address]

Dated: _____, 20[ ]

EXHIBIT G-3

FORM OF
UNITED STATES TAX COMPLIANCE CERTIFICATE
(For Non-U.S. Participants That Are Not Partnerships or Pass-Thru Entities For U.S. Federal Income Tax Purposes)

Reference is made to the Credit Agreement, dated as of February 13, 2014 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), among YRC Worldwide Inc., a Delaware corporation, the subsidiaries of the Borrower party thereto from time to time, the Lenders party thereto from time to time and Credit Suisse AG, Cayman Islands Branch, as Administrative Agent and Collateral Agent. Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the Credit Agreement.

Pursuant to the provisions of Section 3.01(d) and Section 10.04(f) of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the participation in respect of which it is providing this certificate, (ii) it is not a "bank" within the meaning of Section 881(c)(3)(A) of the Internal Revenue Code of 1986, as amended, (the "**Code**"), (iii) it is not a "10-percent shareholder" of the Borrower within the meaning of Code Section 871(h)(3)(B), (iv) it is not a "controlled foreign corporation" related to the Borrower within the meaning of Section 881(c)(3)(C) of the Code and (v) no payments in connection with the Loan Documents are effectively connected with the undersigned's conduct of a U.S. trade or business.

The undersigned has furnished its participating non-U.S. Lender with a certificate of its non-U.S. person status on Internal Revenue Service Form W-8BEN. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, or if a lapse in time or change in circumstance renders the information on this certificate obsolete, expired or inaccurate in any material respect, the undersigned shall promptly so inform such non-U.S. Lender in writing and deliver promptly to the Borrower and the Administrative Agent an updated certificate or other appropriate documentation (including any new documentation reasonably requested by the Borrower or Administrative Agent) or promptly notify the Borrower and Administrative Agent in writing of its inability to do so, and (2) the undersigned shall have at all times furnished such Non-U.S. Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

[Signature Page Follows]

[Lender]

By: \_\_\_\_
Name:
Title:

[Address]

Dated: _____, 20[ ]

EXHIBIT G-4

FORM OF
UNITED STATES TAX COMPLIANCE CERTIFICATE
(For Non-U.S. Participants That Are Partnerships or Pass-Thru Entities For U.S. Federal Income Tax Purposes)

Reference is made to the Credit Agreement, dated as of February 13, 2014 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), among YRC Worldwide Inc., a Delaware corporation, the subsidiaries of the Borrower party thereto from time to time, the Lenders party thereto from time to time and Credit Suisse AG, Cayman Islands Branch, as Administrative Agent and Collateral Agent. Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the Credit Agreement.

Pursuant to the provisions of Section 3.01(d) and Section 10.04(f) of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the participation in respect of which it is providing this certificate, (ii) its partners/members are the sole beneficial owners of such participation, (iii) neither the undersigned nor any of its partners/members is a "bank" within the meaning of Section 881(c)(3)(A) of the Internal Revenue Code of 1986, as amended, (the "**Code**"), (iv) none of its partners/members is a "10-percent shareholder" of the Borrower within the meaning of Code Section 871(h)(3)(B), (v) none of its partners/members is a "controlled foreign corporation" related to the Borrower within the meaning of Section 881(c)(3)(C) of the Code and (vi) no payments in connection with the Loan Documents are effectively connected with the undersigned's conduct of a U.S. trade or business.

The undersigned has furnished its participating non-U.S. Lender with Internal Revenue Service Form W-8IMY accompanied by an Internal Revenue Service Form W-8BEN from each of its partners/members claiming the portfolio interest exemption, *provided* that, for the avoidance of doubt, the foregoing shall not limit the obligation of the Lender to provide, in the case of a partner/member not claiming the portfolio interest exemption, a Form W-8ECI, Form W-9 or Form W-8IMY (including appropriate underlying certificates from each interest holder of such partner/member), in each case establishing such partner/member's any available exemption from U.S. federal withholding tax. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the under-signed shall promptly so inform such non-U.S. Lender in writing and (2) the undersigned shall have at all times furnished such non-U.S. Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the under-signed, or in either of the two calendar years preceding such payments.

[Signature Page Follows]

[Lender]

By: _____
    Name:
    Title:

[Address]

Dated: _____, 20[ ]

EXHIBIT H

FORM OF SOLVENCY CERTIFICATE

**SOLVENCY CERTIFICATE**
**of**
**YRC WORLDWIDE INC.**
**AND ITS SUBSIDIARIES**

Pursuant to the Term Loan Credit Agreement, dated as of February 13, 2014, among YRC Worldwide Inc., a Delaware corporation, the subsidiaries of the Borrower party thereto from time to time, the Lenders party thereto from time to time, and Credit Suisse AG, Cayman Islands Branch as administrative agent and as collateral agent for the Lenders (as amended, supplemented and restated or otherwise modified from time to time (the "*Term Loan Credit Agreement*")), the undersigned hereby certifies, solely in such undersigned's capacity as chief financial officer of the Borrower, and not individually, as follows:

As of the date hereof, on a pro forma basis after giving effect to the consummation of the Transactions, including the making of the Loans under the Term Loan Credit Agreement and after giving effect to the application of the proceeds of such indebtedness:

a. The fair value of the assets (on a going concern basis) of the Borrower and its Subsidiaries, on a consolidated basis, exceeds, on a consolidated basis, their debts and liabilities, subordinated, contingent or otherwise;

b. The present fair saleable value of the property of the Borrower and its Subsidiaries, on a consolidated basis, is greater than the amount that will be required to pay the probable liability, on a consolidated basis, of their debts and other liabilities, subordinated, contingent or otherwise, as such debts and other liabilities become absolute and matured;

c. The Borrower and its Subsidiaries, on a consolidated basis, are able to pay their debts and liabilities, subordinated, contingent or otherwise, as such liabilities become absolute and matured; and

d. The Borrower and its Subsidiaries, on a consolidated basis, are not engaged in, and are not about to engage in, business for which they have unreasonably small capital.

For purposes of this Certificate, the amount of any contingent liability at any time shall be computed as the amount that would reasonably be expected to become an actual and matured liability. Capitalized terms used but not otherwise defined herein shall have the meanings assigned to them in the Credit Agreements, as applicable.

[*Signature Page Follows*]

IN WITNESS WHEREOF, the undersigned has executed this Certificate in such undersigned's capacity as chief financial officer of the Borrower, on behalf of the Borrower, and not individually, as of the date first stated above.

YRC WORLDWIDE INC.

By:_____
Name:    [●]
Title:    [●]

EXHIBIT I

FORM OF ABL INTERCREDITOR AGREEMENT

*Attached*

INTERCREDITOR AGREEMENT

THIS INTERCREDITOR AGREEMENT (this "**Agreement**") is entered into as of February 13, 2014 by and among **RBS CITIZENS BUSINESS CAPITAL** (a subsidiary of RBS Asset Finance, Inc., a subsidiary of RBS Citizens, N.A.), in its capacities as administrative agent and collateral agent (together with its successors and permitted assigns in such capacities, the "**ABL Agent**") for (i) the financial institutions, lenders and investors party from time to time to the ABL Credit Agreement referred to below (such financial institutions, lenders and investors together with their respective successors, assigns and transferees, including any letter of credit issuers under the ABL Credit Agreement, the "**ABL Lenders**") and (ii) all other secured parties under the ABL Facility Documentation (as hereinafter defined) (together with the ABL Agent and the ABL Lenders, the "**ABL Secured Parties**"), and **CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH,** in its capacities as administrative agent and collateral agent (together with its successors and permitted assigns in such capacities, the "**Term Agent**") for (i) the financial institutions, lenders and investors party from time to time to the Term Credit Agreement referred to below (such financial institutions, lenders and investors together with their respective successors, permitted assigns and transferees, the "**Term Lenders**"), and (ii) all other secured parties under the Term Facility Documentation (as hereinafter defined), including all Hedge Banks, as defined in the Term Credit Agreement (together with the Term Agent and the Term Lenders, the "**Term Secured Parties**").

RECITALS

A.    Pursuant to that certain Loan and Security Agreement, dated as of the date hereof, by and among **YRC WORLDWIDE INC.**, a Delaware corporation (the "**Company**"), the ABL Guarantors party thereto from time to time, the ABL Lenders and the ABL Agent (as amended, supplemented, restated or otherwise modified from time to time pursuant to the terms hereof, the "**ABL Credit Agreement**"), the ABL Lenders have agreed to make certain loans and other financial accommodations to or for the benefit of the ABL Borrower (as hereinafter defined) and the other ABL Loan Parties party thereto.

B.    Pursuant to the ABL Credit Agreement, the ABL Guarantors (as hereinafter defined) have agreed to guarantee in favor of the ABL Secured Parties, inter alia, the payment and performance of the ABL Borrower's and any ABL Guarantor's obligations under the ABL Facility Documentation.

C.    As a condition to the effectiveness of the ABL Credit Agreement and to secure the obligations of the ABL Borrower and the ABL Guarantors (collectively, the "**ABL Loan Parties**") under or pursuant to the ABL Facility Documentation, the ABL Loan Parties have granted to the ABL Agent (for the benefit of the ABL Secured Parties) Liens on the Collateral.

D.    Pursuant to that certain Credit Agreement dated as of the date hereof by and among the Company, the Term Guarantors party thereto from time to time, the Term

Lenders and the Term Agent (the "**Term Credit Agreement**"), the Term Lenders have agreed to make certain loans to the Term Borrower (as hereinafter defined).

E.    Pursuant to the Term Credit Agreement, the Term Guarantors (as hereinafter defined) have agreed to guarantee in favor of the Term Secured Parties, inter alia, the payment and performance of the Term Borrower's and any Term Guarantor's obligations under the Term Facility Documentation.

F.    As a condition to the effectiveness of the Term Credit Agreement and to secure the obligations of the Term Borrower and the Term Guarantors (collectively, the "**Term Loan Parties**") under or pursuant to the Term Facility Documentation, the Term Loan Parties have granted to the Term Agent (for the benefit of the Term Secured Parties) Liens on the Collateral.

G.    Each of the ABL Agent (on behalf of the ABL Secured Parties) and the Term Agent (on behalf of the Term Secured Parties) and, by their acknowledgment hereof, each of the ABL Loan Parties and each of the Term Loan Parties, desires to agree to the relative priority of Liens on the Collateral and certain other rights, priorities and interests as provided herein.

**NOW THEREFORE**, in consideration of the foregoing and for other good and valuable consideration, receipt of which is hereby acknowledged, the parties hereto agree as follows:

**ARTICLE 1**
**DEFINITIONS**

**Section 1.1    UCC Definitions**. The following terms which are defined in the Uniform Commercial Code are used herein as so defined: Account; Chattel Paper; Commercial Tort Claim; Deposit Account; Document; Electronic Chattel Paper; Financial Asset; Fixtures; General Intangible; Instrument; Inventory; Investment Property; Letter-of-Credit Right; Money, Payment Intangible; Promissory Note; Records; Securities Account; Security; Security Entitlement; Supporting Obligation; and Tangible Chattel Paper.

**Section 1.2    Other Definitions**. Subject to Section 1.1, as used in this Agreement, the following terms shall have the meanings set forth below. Capitalized terms used but not defined herein shall have the meanings assigned to them in the Term Credit Agreement.

"**ABL Agent**" shall have the meaning assigned to that term in the introduction to this Agreement and shall include any successor thereto as well as any Person designated as the "Agent", "Collateral Agent", "Trustee" or "Collateral Trustee" under the ABL Credit Agreement.

"**ABL Borrower**" shall mean, collectively the Company, YRC Inc., USF Holland Inc., New Penn Motor Express, Inc.and USF Reddaway Inc. and any other

"Borrower" (as designated therein), each in their respective capacities as a borrower under the ABL Credit Agreement.

"**ABL Collateral Documents**" shall mean all "Security Documents" (or similar term) as defined in the ABL Credit Agreement.

"**ABL Credit Agreement**" shall have the meaning assigned to that term in the recitals to this Agreement and shall include such agreement as it may be amended, restated, modified, supplemented, extended, renewed, refunded, replaced or refinanced from time to time in one or more agreements (in each case with the same or new lenders, institutional investors or agents and resulting in a financing that constitutes (or that would constitute if incurred as a new financing) a Permitted Refinancing (as defined in the Term Credit Agreement, as in effect on the date hereof) of the ABL Facility Indebtedness), including any agreement extending the maturity thereof or otherwise restructuring all or any portion of the Indebtedness thereunder or increasing the amount loaned or issued thereunder or altering the maturity thereof), including pursuant to an Incremental Amendment (as defined therein), in each case as and to the extent permitted by the Term Credit Agreement and this Agreement or otherwise incurred consistent with Section 6.1.

"**ABL Deposit and Securities Accounts**" means all Deposit Accounts, Securities Accounts, collection accounts and lockbox accounts (and all related lockboxes) of the ABL Loan Parties (other than the Term Loan Priority Accounts).

"**ABL Facility Documentation**" shall mean all "Loan Documents" (or similar term) (each, an "**ABL Facility Document**") as defined in the ABL Credit Agreement.

"**ABL Guarantors**" shall mean (i) each wholly owned Domestic Subsidiary of the ABL Borrower as of the Closing Date (other than an Excluded Subsidiary) and (ii) each Subsidiary that issues a Guarantee of the ABL Borrower's Obligations after the Closing Date pursuant to the ABL Credit Agreement. The term "ABL Guarantors" shall include all "Guarantors" under and as defined in the ABL Credit Agreement.

"**ABL Joint Collateral**" shall have the meaning set forth in Section 3.6.

"**ABL Lenders**" shall have the meaning assigned to that term in the introduction to this Agreement, as well as any Person designated as a "Lender" under the ABL Credit Agreement.

"**ABL Loan Parties**" shall have the meaning assigned to that term in the recitals to this Agreement.

"**ABL Obligations**" shall mean the "Obligations" (or similar term) as defined in the ABL Credit Agreement, "ABL Obligations" shall include all interest, fees and expenses accrued or accruing (or which would, absent commencement of an Insolvency Proceeding, accrue) after commencement of an Insolvency Proceeding in accordance

with the rate specified in the relevant ABL Facility Documentation whether or not the claim for such interest is allowed or allowable as a claim in such Insolvency Proceeding.

"**ABL Priority Collateral**" shall mean all Collateral consisting of the following (including, for the avoidance of doubt, any such assets that, but for the application of Section 552 of the Bankruptcy Code (or any similar provision of any foreign Debtor Relief Laws), would be ABL Priority Collateral):

(1)    all Accounts, other than Accounts which constitute identifiable Proceeds of Term Priority Collateral;

(2)    cash, Money and cash equivalents;

(3)    all (x) Deposit Accounts (other than Term Loan Priority Accounts) and Money and all cash, checks, other negotiable instruments, funds and other evidences of payments properly held therein, including intercompany indebtedness between or among the Loan Parties or their Affiliates, to the extent owing in respect of ABL Priority Collateral, and (y) Securities Accounts (other than Term Loan Priority Accounts), Security Entitlements and Securities credited to such Securities Accounts (other than Equity Interests (as defined in the Term Credit Agreement, as in effect on the date hereof) in the Borrower or any Subsidiary), and, in each case, all cash, Money, cash equivalents, checks and other property properly held therein or credited thereto (other than Equity Interests); provided, however, that to the extent that identifiable Proceeds of Term Priority Collateral are deposited in any such Deposit Accounts or Securities Accounts, such identifiable Proceeds shall be treated as Term Priority Collateral;

(4)    to the extent relating to, evidencing or governing any of the items referred to in the preceding clauses (1) through (3) all Documents, General Intangibles (including all rights under contracts and Payment Intangibles but excluding any Intellectual Property), Instruments (including Promissory Notes), Chattel Paper (including Tangible Chattel Paper and Electronic Chattel Paper) and Commercial Tort Claims; provided that to the extent any of the foregoing also relates to Term Priority Collateral, only that portion related to the items referred to in the preceding clauses (1) through (3) shall be included in the ABL Priority Collateral;

(5)    to the extent relating to any of the items referred to in the preceding clauses (1) through (4) constituting ABL Priority Collateral, all Supporting Obligations and Letter-of-Credit Rights; provided that to the extent any of the foregoing also relates to Term Priority Collateral, only that portion related to the items referred to in the preceding clauses (1) through (4) shall be included in the ABL Priority Collateral;

(6)    all books and Records relating to the items referred to in the preceding clauses (1) through (5) constituting ABL Priority Collateral (including all books, databases, customer lists, engineer drawings and Records, whether tangible or electronic, which contain any information relating to any of the items referred to in the

preceding clauses (1) through (5) constituting ABL Priority Collateral but, in each case, excluding any Intellectual Property); and

(7)    all collateral security and guarantees with respect to any of the foregoing constituting ABL Priority Collateral and all cash, Money, cash equivalents, insurance Proceeds (including, for the avoidance of doubt, all business interruption insurance Proceeds), Instruments, Securities and Financial Assets received as Proceeds of any of the foregoing constituting ABL Priority Collateral (such Proceeds, "**ABL Priority Proceeds**"); provided, however, that (a) no Proceeds of ABL Priority Proceeds will constitute ABL Priority Collateral unless such Proceeds of ABL Priority Proceeds would otherwise constitute ABL Priority Collateral and (b) identifiable Proceeds of Term Priority Collateral in the form of cash, Money and cash equivalents or Deposit Accounts or Securities Accounts or assets contained therein will not constitute ABL Priority Collateral.

"**ABL Recovery**" shall have the meaning set forth in Section 5.3(a).

"**ABL Secured Parties**" shall have the meaning assigned to that term in the introduction to this Agreement.

"**ABL Security Agreement**" shall mean, collectively, the ABL Credit Agreement and the "Security Documents" as defined in the ABL Credit Agreement, in the form delivered on the date hereof.

"**Affiliate**" shall mean, with respect to any Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified. "**Control**" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "**Controlled**" has a meaning correlative thereto.

"**Agent(s)**" shall mean, individually, the ABL Agent or the Term Agent and, collectively, both the ABL Agent and the Term Agent.

"**Agreement**" shall have the meaning assigned to that term in the introduction to this Agreement.

"**Bankruptcy Code**" shall mean Title 11 of the United States Code, as now or hereafter in effect or any successor thereto.

"**Borrower**" shall mean each of the ABL Borrower and the Term Borrower.

"**Business Day**" shall mean any day that is not a Saturday, Sunday or other day on which commercial banks in New York, New York are authorized or required by law to remain closed (or are in fact closed).

"**Cash Management Obligations**" means obligations owed by the Company or any Restricted Subsidiary to any Agent, Lender or any Affiliate of an Agent or a Lender in respect of any overdraft and related liabilities arising from treasury, depository and cash management services or any automated clearinghouse transfers of funds, including all Bank Products (or similar term) (as defined in the ABL Credit Agreement).

"**Capital Stock**" shall mean, with respect to any Person, all of the shares, interests, rights, participations or other equivalents (however designated) of capital stock of (or other ownership or profit interests or units in) such Person and all of the warrants, options or other rights for the purchase, acquisition or exchange from such Person of any of the foregoing (including through convertible securities) but excluding in each case any debt security that is convertible into, or exchanged for, Capital Stock.

"**Capitalized Leases**" shall mean all leases that have been or are required to be, in accordance with GAAP, recorded as capitalized leases; provided that for all purposes hereunder the amount of obligations under any Capitalized Lease shall be the amount thereof accounted for as a liability in accordance with GAAP.

"**Certificated Collateral**" means each item of Collateral which is or is required to be evidenced by a Certificate of Title issued under the motor vehicle or other applicable Laws of any jurisdiction.

"**Certificate of Title**" shall mean a certificate of title, certificate of ownership or other registration certificate issued or required to be issued under the certificate of title or other similar laws of any state for any equipment or inventory of any Loan Party.

"**Collateral**" shall mean all Property now owned or hereafter acquired by any Borrower or any Guarantor in or upon which a Lien is granted or purported to be granted to the ABL Agent or the Term Agent under any of the ABL Collateral Documents or the Term Collateral Documents, excluding in all events the Excluded Property (as defined therein).

"**Control**" shall have the meaning specified in the definition of "Affiliate".

"**Control Collateral**" shall mean (i) any Collateral consisting of any Certificated Security (as defined in Section 8-102 of the Uniform Commercial Code), Investment Property, Deposit Account, Instruments, (ii) any other Collateral as to which a Lien may be perfected through possession or control by the secured party, or any agent therefor and (iii) until the Discharge of Term Obligations, all Certificated Collateral.

"**Credit Agreements**" shall mean the ABL Credit Agreement and the Term Credit Agreement.

"**Debtor Relief Laws**" shall mean the Bankruptcy Code of the United States and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization or similar debtor

relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"**DIP Financing**" shall have the meaning set forth in Section 6.1(a).

"**Discharge of ABL Obligations**" shall mean (a) the payment in full in cash of all outstanding ABL Obligations, excluding contingent obligations, Obligations under Hedging Agreements (as defined in the ABL Credit Agreement), Cash Management Obligations and Letters of Credit, (b) with respect to any Obligations under Secured Hedge Agreements or Cash Management Obligations secured by the ABL Facility Documentation, either (i) such Obligations under Hedging Agreements (as defined in the ABL Credit Agreement) or Cash Management Obligations have either been paid in full or are no longer secured by the Collateral pursuant to the terms of the documentation governing the ABL Obligations, (ii) such Obligations under Secured Hedge Agreements or Cash Management Obligations shall have been cash collateralized on terms reasonably satisfactory to each applicable counterparty (or other arrangements reasonably satisfactory to the applicable counterparty shall have been made) (c) any letters of credit issued under the ABL Facility Documentation have been terminated or been cash collateralized or backstopped (in the amount and form required under the ABL Facility Documentation) and (d) the termination of all commitments to extend credit under the ABL Facility Documentation.

"**Discharge of Term Obligations**" shall mean (a) the payment in full in cash of all outstanding Term Obligations (other than contingent obligations with respect to then unasserted claims and all obligations under Secured Hedge Agreements) (b) with respect to any obligations under Secured Hedge Agreements or Cash Management Obligations secured by the Term Facility Documentation, either (i) such Obligations under Secured Hedge Agreements have been paid in full or are no longer secured by the Collateral pursuant to the terms of the Term Facility Documentation or (ii) such Obligations under Secured Hedge Agreements shall have been cash collateralized on terms reasonably satisfactory to each applicable counterparty (or other arrangements reasonably satisfactory to the applicable counterparty shall have been made) and (c) the termination of all commitments to extend credit under the Term Facility Documentation.

"**Enforcement Notice**" shall mean a written notice delivered by either the ABL Agent or the Term Agent to the other announcing that an Enforcement Period has commenced.

"**Enforcement Period**" shall mean the period of time following the receipt by either the ABL Agent or the Term Agent of an Enforcement Notice from the other and continuing until the earliest of (a) in the case of an Enforcement Period commenced by the Term Agent, the Discharge of Term Obligations, (b) in the case of an Enforcement Period commenced by the ABL Agent, the Discharge of ABL Obligations, and (c) the ABL Agent's or the Term Agent's, as applicable, termination, or agreement in writing to terminate, the Enforcement Period.

"**Equipment**" shall have the meaning assigned to that term in the Security Agreements.

"**Event of Default**" shall mean an "Event of Default" under and as defined in the ABL Credit Agreement or the Term Credit Agreement, as applicable.

"**Excluded Subsidiary**" means (a) with respect to the ABL Guarantors, any "Excluded Subsidiary" (or such other similar term) under and as defined in the ABL Credit Agreement and (b) with respect to the Term Guarantors, any "Excluded Subsidiary" (or such other similar term)under and as defined in the Term Credit Agreement.

"**Exercise of Any Secured Creditor Remedies**" or "**Exercise of Secured Creditor Remedies**" shall mean, except as otherwise provided in the final sentence of this definition:

(a)    the taking by any Secured Party of any action to enforce or realize upon any Lien, including the institution of any foreclosure proceedings or the noticing of any public or private sale pursuant to Article 9 of the Uniform Commercial Code or other applicable law;

(b)    the exercise by any Secured Party of any right or remedy provided to a secured creditor on account of a Lien under any of the Loan Documents, under applicable law, in an Insolvency Proceeding or otherwise, including the election to retain any of the Collateral in satisfaction of a Lien;

(c)    the taking of any action by any Secured Party or the exercise of any right or remedy by any Secured Party in respect of the collection on, set off against, marshalling of, injunction respecting or foreclosure on the Collateral or the Proceeds thereof;

(d)    the appointment on the application of a Secured Party, of a receiver, receiver and manager or interim receiver of all or part of the Collateral;

(e)    the sale, lease, license or other disposition of all or any portion of the Collateral by private or public sale conducted by a Secured Party or any other means at the direction of a Secured Party permissible under applicable law;

(f)    the exercise of any other right of a Secured Party under Part 6 of Article 9 of the Uniform Commercial Code or under provisions of similar effect under other applicable law; and

(g)    the exercise by a Secured Party of any voting rights relating to any Capital Stock included in the Collateral.

For the avoidance of doubt, none of the following shall be deemed to constitute an Exercise of Secured Creditor Remedies: (i) the filing of a proof of claim in any Insolvency Proceeding

or the seeking of adequate protection; (ii) the exercise of rights by the ABL Agent during a Cash Dominion Period (as defined in the ABL Credit Agreement), including the notification of account debtors, depository institutions or any other Person to deliver Proceeds of ABL Priority Collateral to the ABL Agent; (iii) the consent by the ABL Agent to a disposition by any Loan Party of any of the ABL Priority Collateral; (iv) the consent by the Term Agent to a disposition by any Loan Party of any of the Term Priority Collateral; (v) the reduction of advance rates or sub-limits by the ABL Agent and the ABL Lenders; or (vi) the imposition of Availability Reserves (or similar term) (as defined in the ABL Credit Agreement) by the ABL Agent.

"**Governmental Authority**" shall mean any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, administrative tribunal, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"**Guarantor**" shall mean any of the ABL Guarantors or Term Guarantors.

"**Hedge Bank**" shall mean any Person that is an Agent, a Lender or an Affiliate of an Agent or a Lender at the time it enters into a Secured Hedge Agreement in its capacity as a party thereto and that complies with the applicable requirements under the Term Facility Documentation or the ABL Facility Documentation.

"**Indebtedness**" shall have the meaning assigned to that term in the Term Credit Agreement as in effect on the date hereof.

"**Insolvency Proceeding**" shall mean (a) any case, action or proceeding before any court or other Governmental Authority relating to bankruptcy, reorganization, insolvency, liquidation, receivership, dissolution, winding-up or relief of debtors, or (b) any general assignment for the benefit of creditors, composition, marshalling of assets for creditors or other similar arrangement in respect of a Person's creditors generally or any substantial portion of a Person's creditors; in each case covered by clauses (a) and (b) undertaken under any Debtor Relief Laws.

"**Intellectual Property**" shall have the meaning assigned to that term in the Security Agreements.

"**Intellectual Property Collateral**" shall mean Collateral consisting of Intellectual Property.

"**Lenders**" shall mean, collectively, the ABL Lenders and the Term Lenders.

"**Lien**" shall mean any mortgage, deed of trust, pledge, hypothecation, collateral assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any

easement, right of way or other encumbrance on title to Real Property, and any Capitalized Lease or financing lease having substantially the same economic effect as any of the foregoing).

"**Lien Priority**" shall mean with respect to any Lien of the ABL Secured Parties or the Term Secured Parties in the Collateral, the order of priority of such Lien as specified in Section 2.1.

"**Loan Documents**" shall mean the ABL Facility Documentation and the Term Facility Documentation.

"**Loan Parties**" shall mean the ABL Loan Parties and the Term Loan Parties.

"**Party**" shall mean the ABL Agent or the Term Agent, and "**Parties**" shall mean both the ABL Agent and the Term Agent.

"**Permitted Refinancing**" shall mean any "Permitted Refinancing" as defined in the Term Credit Agreement, as in effect as of the date hereof.

"**Permitted Second Priority Additional Debt**" shall mean any "Permitted Second Priority Additional Debt" as defined in the Term Credit Agreement.

"**Person**" shall mean any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"**Priority Collateral**" shall mean the ABL Priority Collateral or the Term Priority Collateral, as applicable.

"**Proceeds**" shall mean (a) all "proceeds," as defined in Article 9 of the Uniform Commercial Code, with respect to the Collateral, and (b) whatever is recoverable or recovered when any Collateral is sold, exchanged, collected or disposed of, whether voluntarily or involuntarily.

"**Property**" shall mean any interest in any kind of property or asset, whether real, personal or mixed, or tangible or intangible.

"**Purchase Date**" shall have the meaning set forth in Section 3.8(a).

"**Purchase Notice**" shall have the meaning set forth in Section 3.8(a).

"**Purchase Option Event**" shall have the meaning set forth in Section 3.8(a).

"**Purchasing Creditors**" shall have the meaning set forth in Section 3.8(a).

"**Real Property**" shall mean any right, title or interest in and to real property, including any fee interest, leasehold interest, easement, or license and any other right to use or occupy real property.

"**Replacement Agent**" shall have the meaning set forth in Section 3.8(d).

"**Secured Parties**" shall mean the ABL Secured Parties and the Term Secured Parties.

"**Security Agreements**" shall mean the ABL Security Agreement and the Term Security Agreement.

"**Subsidiary**" of a Person shall mean a corporation, partnership, joint venture, limited liability company or other business entity of which (a) a majority of the shares of securities or other interests having ordinary voting power for the election of directors or other governing body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time beneficially owned or (b) the management of which is otherwise controlled, directly or indirectly, through one or more intermediaries, or both, by such Person. Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of the Company.

"**Term Agent**" shall have the meaning assigned to that term in the introduction to this Agreement and shall include any successor thereto as well as any Person designated as the "Agent", "Administrative Agent", "Collateral Agent", "Trustee" or "Collateral Trustee" under the Term Credit Agreement.

"**Term Borrower**" shall mean the Company or such other Person identified as "Borrower" thereunder, in its capacity as the borrower under the Term Credit Agreement.

"**Term Cash Proceeds Notice**" shall mean a written notice delivered by the Term Agent to the ABL Agent (a) stating that an Event of Default has occurred and is continuing under the Term Facility Documentation and specifying the relevant Event of Default and (b) stating that certain cash Proceeds which may be deposited in an ABL Deposit and Securities Account constitute Term Priority Collateral, and reasonably identifying the amount of such Proceeds and specifying the origin thereof.

"**Term Collateral Documents**" shall mean all "Collateral Documents" (or a similar term) as defined in the Term Credit Agreement.

"**Term Credit Agreement**" shall have the meaning assigned to that term in the recitals to this Agreement and shall include such agreement as it may be amended, restated, modified, supplemented, extended, renewed, refunded, replaced or refinanced pursuant to a Refinancing Amendment (as defined in the Term Credit Agreement) from time to time in one or more agreements (in each case with the same or new lenders, institutional investors or agents), including any agreement extending the maturity thereof

or otherwise restructuring all or any portion of the Indebtedness thereunder or increasing the amount loaned or issued thereunder or altering the maturity thereof, in each case as and to the extent permitted by this Agreement and the ABL Credit Agreement or otherwise incurred consistent with Section 6.1.

"**Term Facility Documentation**" shall mean all "Loan Documents" (each, a "**Term Facility Document**") as defined in the Term Credit Agreement.

"**Term Guarantors**" shall mean (a) each wholly owned Domestic Subsidiary of the Term Borrower as of the Closing Date (other than an Excluded Subsidiary) and (b) each wholly owned Subsidiary that issues a Guarantee of the Term Borrower's Obligations after the Closing Date pursuant to the Term Credit Agreement. The term "Term Guarantors" shall include all "Guarantors" under and as defined in the Term Credit Agreement.

"**Term Lenders**" shall have the meaning assigned to that term in the introduction to this Agreement, as well as any Person designated as a "Lender" under the Term Credit Agreement.

"**Term Loan Parties**" shall have the meaning assigned to that term in the recitals to this Agreement.

"**Term Loan Priority Accounts**" means any Deposit Accounts or Securities Accounts that are intended to contain solely Term Priority Collateral or identifiable Proceeds of the Term Priority Collateral (it being understood that any property in such Deposit Accounts or Securities Accounts which is not Term Priority Collateral or identifiable Proceeds of Term Priority Collateral shall not be Term Priority Collateral solely by virtue of being on deposit in any such Deposit Account or Securities Account).

"**Term Obligations**" shall mean the "Obligations" as defined in the Term Credit Agreement, "Term Obligations" shall include all interest accrued or accruing (or which would, absent commencement of an Insolvency Proceeding, accrue) after commencement of an Insolvency Proceeding in accordance with the rate specified in the relevant Term Facility Documentation, whether or not the claim for such interest is allowed or allowable as a claim in such Insolvency Proceeding.

"**Term Priority Collateral**" shall mean all Collateral consisting of the following (including, for the avoidance of doubt, any such assets that, but for the application of Section 552 of the Bankruptcy Code (or any similar provision of any foreign Debtor Relief Laws) would be Term Priority Collateral):

(1)    all Equipment, Inventory, Fixtures, Real Property, Intellectual Property, intercompany indebtedness (except to the extent constituting ABL Priority Collateral) between or among the Loan Parties or their Affiliates and Equity Interests (as defined in the Term Credit Agreement, as in effect on the date hereof) and other

Investment Property (other than any Investment Property described in clauses 3(y) and 7 of the definition of ABL Priority Collateral);

(2) except to the extent constituting ABL Priority Collateral, all Instruments, Commercial Tort Claims, Documents and General Intangibles;

(3) Term Loan Priority Accounts; provided, however, that to the extent that identifiable Proceeds of ABL Priority Collateral are deposited in any such Term Loan Priority Accounts, such identifiable Proceeds shall be treated as ABL Priority Collateral;

(4) all other Collateral (other than the ABL Priority Collateral and ABL Priority Proceeds); and

(5) all collateral security and guarantees with respect to any of the foregoing, and all cash, Money, insurance Proceeds (other than business interruption insurance Proceeds), Instruments, Securities and Financial Assets received as Proceeds of any Term Priority Collateral (such Proceeds, "**Term Priority Proceeds**"); provided, however, that no Proceeds of Term Priority Proceeds will constitute Term Priority Collateral unless such Proceeds of Term Priority Proceeds would otherwise constitute Term Priority Collateral.

"**Term Recovery**" shall have the meaning set forth in Section 5.3(b).

"**Term Secured Parties**" shall have the meaning assigned to that term in the introduction to this Agreement.

"**Term Security Agreement**" shall mean the "Security Agreement" as defined in the Term Credit Agreement, in the form delivered on the date hereof.

"**Trade Secret Licenses**" shall mean any and all agreements, whether written or oral, providing for the grant by or to any Loan Party of any right in or to Trade Secrets, to the extent that a grant of a security interest in such Trade Secret License is not prohibited by applicable law or the applicable Trade Secret License.

"**Trade Secrets**" shall mean, with respect to any Loan Party, all of such Loan Party's right, title and interest in and to all U.S. trade secrets, including know how, processes, formulae, compositions, designs and confidential business and technical information, and all rights of any kind whatsoever accruing thereunder or pertaining thereto, including (a) all income, royalties, damages and payments now and hereafter due and/or payable with respect thereto, including payments under all licenses, non disclosure agreements and memoranda of understanding entered into in connection therewith, and damages and payments for past or future misappropriations thereof, and (b) the right to sue or otherwise recover for past, present or future misappropriations thereof.

"**Trademarks**" shall have the meaning assigned to that term in the Security Agreements.

"**Uniform Commercial Code**" shall mean the Uniform Commercial Code as the same may, from time to time, be in effect in the State of New York; <u>provided</u> that to the extent that the Uniform Commercial Code is used to define any term in this Agreement and such term is defined differently in differing Articles of the Uniform Commercial Code, the definition of such term contained in Article 9 shall govern; <u>provided</u> that in the event that, by reason of mandatory provisions of law, any or all of the attachment, perfection, publication or priority of, or remedies with respect to, Liens of any Party is governed by the Uniform Commercial Code as enacted and in effect in a jurisdiction other than the State of New York, the term "Uniform Commercial Code" will mean the Uniform Commercial Code as enacted and in effect in such other jurisdiction solely for purposes of the provisions thereof relating to such attachment, perfection, priority or remedies and for purposes of definitions related to such provisions.

"**Use Period**" shall mean the period commencing on the date that the ABL Agent or an agent acting on its behalf (or an ABL Loan Party acting with the consent of the ABL Agent) commences the liquidation and sale of the ABL Priority Collateral in a manner as provided in Section 3.6 (having theretofore furnished the Term Agent with an Enforcement Notice) and ending 180 days thereafter. If any stay or other order that prohibits any of the ABL Agent, the other ABL Secured Parties or any ABL Loan Party (with the consent of the ABL Agent) from commencing and continuing to Exercise Any Secured Creditor Remedies or from liquidating and selling the ABL Priority Collateral has been entered by a court of competent jurisdiction, such 180-day period shall be tolled during the pendency of any such stay or other order and the Use Period shall be so extended.

**Section 1.3    Rules of Construction**. Unless the context of this Agreement clearly requires otherwise, references to the plural include the singular, references to the singular include the plural, the term "including" is not limiting and shall be deemed to be followed by the phrase "without limitation," and the term "or" has, except where otherwise indicated, the inclusive meaning represented by the phrase "and/or." The words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights. All references to "knowledge" or "awareness" of any Person means the actual knowledge of such Person. The words "hereof," "herein," "hereby," "hereunder" and similar terms in this Agreement refer to this Agreement as a whole and not to any particular provision of this Agreement. Article, section, subsection, clause, subclause, schedule and exhibit references herein are to this Agreement unless otherwise specified. Any reference in this Agreement to any agreement, instrument or document shall include all alterations, amendments, changes, restatements, extensions, modifications, renewals, replacements, substitutions, joinders and supplements thereto and thereof, as applicable (subject to any restrictions on such alterations, amendments, changes, restatements, extensions, modifications, renewals, replacements, substitutions, joinders and supplements set forth herein). Section headings herein are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document. Any reference herein to any Person shall be construed to include such Person's successors and permitted

assigns. Each agreement herein of any Agent shall bind the Secured Parties represented by such Agent and any reference herein to the parties hereto shall also bind all such Secured Parties. References to any Law shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such Law.

## ARTICLE 2
## <u>LIEN PRIORITY</u>

**Section 2.1**   **<u>Priority of Liens.</u>**

(a)   Notwithstanding (i) the date, time, method, manner or order of grant, attachment or perfection (including any defect or deficiency or alleged defect or deficiency in any of the foregoing) of any Liens granted to the ABL Secured Parties or to the ABL Agent on behalf of the ABL Secured Parties, in respect of all or any portion of the Collateral or of any Liens granted to the Term Secured Parties in respect of all or any portion of the Collateral and regardless of how any such Lien was acquired (whether by grant, statute, operation of law, subrogation or otherwise), (ii) the order or time of filing or recordation of any document or instrument for perfecting the Liens in favor of the ABL Agent or the Term Agent (or ABL Secured Parties or Term Secured Parties) in any Collateral, (iii) any provision of the Uniform Commercial Code, Debtor Relief Laws or any other applicable law, or of the ABL Facility Documents or the Term Facility Documents, (iv) whether the ABL Agent or the Term Agent, in each case, either directly or through agents, holds possession of, or has control over, all or any part of the Collateral, (v) the date on which the ABL Obligations or the Term Obligations are advanced or made available to the Loan Parties, (vi) the fact that any such Liens in favor of the ABL Agent or the ABL Lenders or the Term Agent or the Term Lenders securing any of the ABL Obligations or Term Obligations, respectively, are (x) subordinated to any Lien securing any obligation of any Loan Party other than the Term Obligations or the ABL Obligations, respectively, or (y) otherwise subordinated, voided, avoided, invalidated or lapsed, or (vii) any other circumstance of any kind or nature whatsoever, the ABL Agent, on behalf of itself and the ABL Secured Parties, and the Term Agent, on behalf of itself and the Term Secured Parties, hereby agree that:

(i)     any Lien in respect of all or any portion of the ABL Priority Collateral now or hereafter held by or on behalf of the Term Agent or any Term Secured Party that secures all or any portion of the Term Obligations shall in all respects be junior and subordinate to all Liens granted to the ABL Agent and the ABL Secured Parties in such ABL Priority Collateral to secure all or any portion of the ABL Obligations;

(ii)     any Lien in respect of all or any portion of the ABL Priority Collateral now or hereafter held by or on behalf of the ABL Agent or any ABL Secured Party that secures all or any portion of the ABL Obligations shall in all respects be senior and prior to all Liens granted to the Term Agent or any Term Secured Party in such ABL Priority Collateral to secure all or any portion of the Term Obligations;

(iii)    any Lien in respect of all or any portion of the Term Priority Collateral now or hereafter held by or on behalf of the ABL Agent or any ABL Secured Party that secures all or any portion of the ABL Obligations shall in all respects be junior and subordinate to all Liens granted to the Term Agent and the Term Secured Parties in such Term Priority Collateral to secure all or any portion of the Term Obligations; and

(iv)    any Lien in respect of all or any portion of the Term Priority Collateral now or hereafter held by or on behalf of the Term Agent or any Term Secured Party that secures all or any portion of the Term Obligations shall in all respects be senior and prior to all Liens granted to the ABL Agent or any ABL Secured Party in such Term Priority Collateral to secure all or any portion of the ABL Obligations.

(b)    Notwithstanding any failure by any ABL Secured Party or Term Secured Party to perfect its security interests in the Collateral or any avoidance, invalidation, priming or subordination by any third party or court of competent jurisdiction of the security interests in the Collateral granted to the ABL Secured Parties or the Term Secured Parties, the priority and rights as between the ABL Secured Parties and the Term Secured Parties with respect to the Collateral shall be as set forth herein.

(c)    The Term Agent, for and on behalf of itself and the Term Secured Parties, acknowledges and agrees that, concurrently herewith, the ABL Agent, for the benefit of itself and the ABL Secured Parties, has been, or may be, granted Liens upon all of the Collateral in which the Term Agent has been granted Liens and the Term Agent hereby consents thereto.  The ABL Agent, for and on behalf of itself and the ABL Secured Parties, acknowledges and agrees that, concurrently herewith, the Term Agent, for the benefit of itself and the Term Secured Parties, has been, or may be, granted Liens upon all of the Collateral in which the ABL Agent has been granted Liens and the ABL Agent hereby consents thereto.  The subordination of Liens by the Term Agent and the ABL Agent in favor of one another as set forth herein shall not be deemed to subordinate the Term Agent's Liens or the ABL Agent's Liens to the Liens of any other Person, nor shall such subordination be affected by the subordination of such Liens to any Lien of any other Person.

**Section 2.2    <u>Waiver of Right to Contest Liens.</u>**

(a)    The Term Agent, for and on behalf of itself and the Term Secured Parties, agrees that it and they shall not (and hereby waives any right to) take any action to contest or challenge (or assist or support any other Person in contesting or challenging), directly or indirectly, whether or not in any proceeding (including in any Insolvency Proceeding), the validity, priority, enforceability, or perfection of the Liens of the ABL Agent and the ABL Secured Parties in respect of the Collateral or the provisions of this Agreement. The Term Agent, for itself and on behalf of the Term Secured Parties, agrees that none of the Term Agent or the Term Secured Parties will take any action that would interfere with any Exercise of Secured Creditor Remedies undertaken by the ABL Agent or any ABL Secured Party under the ABL Facility Documentation with respect to the ABL Priority

Collateral. The Term Agent, for itself and on behalf of the Term Secured Parties, hereby waives any and all rights it or the Term Secured Parties may have as a junior lien creditor or otherwise to contest, protest, object to, or interfere with the manner in which the ABL Agent or any ABL Secured Party seeks to enforce its Liens in any ABL Priority Collateral.  The foregoing shall not be construed to prohibit the Term Agent from enforcing the provisions of this Agreement.

(b)    The ABL Agent, for and on behalf of itself and the ABL Secured Parties, agrees that it and they shall not (and hereby waives any right to) take any action to contest or challenge (or assist or support any other Person in contesting or challenging), directly or indirectly, whether or not in any proceeding (including in any Insolvency Proceeding), the validity, priority, enforceability, or perfection of the Liens of the Term Agent or the Term Secured Parties in respect of the Collateral or the provisions of this Agreement. Except to the extent expressly set forth in Section 3.6 of this Agreement, the ABL Agent, for itself and on behalf of the ABL Secured Parties, agrees that none of the ABL Agent or the ABL Secured Parties will take any action that would interfere with any Exercise of Secured Creditor Remedies undertaken by the Term Agent or any Term Secured Party under the Term Facility Documentation with respect to the Term Priority Collateral. The ABL Agent, for itself and on behalf of the ABL Secured Parties, hereby waives any and all rights it or the ABL Secured Parties may have as a junior lien creditor or otherwise to contest, protest, object to, or interfere with the manner in which the Term Agent or any Term Secured Party seeks to enforce its Liens in any Term Priority Collateral. The foregoing shall not be construed to prohibit the ABL Agent from enforcing the provisions of this Agreement.

**Section 2.3    Remedies Standstill.**

(a)    The Term Agent, on behalf of itself and the Term Secured Parties, agrees that, from the date hereof until the date upon which the Discharge of ABL Obligations shall have occurred, neither the Term Agent nor any Term Secured Party will Exercise Any Secured Creditor Remedies with respect to any of the ABL Priority Collateral (including the exercise of any right of setoff or any right under any lockbox agreement, account control agreement, landlord waiver or bailee's letter or similar agreement or arrangement to which the Term Agent  or any Term Secured Party is a party) without the written consent of the ABL Agent, and will not take, receive or accept any Proceeds of ABL Priority Collateral, it being understood and agreed that the temporary deposit of Proceeds of ABL Priority Collateral in a Deposit Account controlled by the Term Agent shall not constitute a breach of this Agreement so long as such Proceeds are promptly (but in no event later than five Business Days after receipt) remitted to the ABL Agent.  From and after the date upon which the Discharge of ABL Obligations shall have occurred (or prior thereto upon obtaining the written consent of the ABL Agent), the Term Agent or any Term Secured Party may Exercise Any Secured Creditor Remedies under the Term Facility Documentation or applicable law as to any ABL Priority Collateral; provided, however, that any Exercise of Secured Creditor Remedies with respect to any Collateral by the Term Agent or the Term Secured Parties is at all times subject to the provisions of this Agreement.

(b)    The ABL Agent, on behalf of itself and the ABL Secured Parties, agrees that, from the date hereof until the date upon which the Discharge of Term Obligations shall have occurred, neither the ABL Agent nor any ABL Secured Party will Exercise Any Secured Creditor Remedies with respect to any of the Term Priority Collateral (including the exercise of any right of setoff or any right under any lockbox agreement, account control agreement, landlord waiver or bailee's letter or similar agreement or arrangement to which the ABL Agent or any ABL Secured Party is a party, solely to the extent the underlying accounts constitute Term Priority Collateral) without the written consent of the Term Agent, and will not take, receive or accept any Proceeds of the Term Priority Collateral, it being understood and agreed that the temporary deposit of Proceeds of Term Priority Collateral in a Deposit Account controlled by the ABL Agent shall not constitute a breach of this Agreement so long as such Proceeds are promptly (but in no event later than five Business Days after receipt) remitted to the Term Agent. From and after the date upon which the Discharge of Term Obligations shall have occurred (or prior thereto upon obtaining the written consent of the Term Agent), the ABL Agent or any ABL Secured Party may Exercise Any Secured Creditor Remedies under the ABL Facility Documentation or applicable law as to any Term Priority Collateral; provided, however, that any Exercise of Secured Creditor Remedies with respect to any Collateral by the ABL Agent or the ABL Secured Parties is at all times subject to the provisions of this Agreement.

(c)    Notwithstanding the provisions of Sections 2.3(a), 2.3(b) or any other provision of this Agreement, nothing contained herein shall be construed to prevent any Agent or any Secured Party from (i) filing a claim or statement of interest with respect to the ABL Obligations or Term Obligations owed to it in any Insolvency Proceeding commenced by or against any Loan Party, (ii) taking any action (not adverse to the priority status of the Liens of the other Agent or other Secured Parties on the Collateral in which such other Agent or other Secured Party has a priority Lien or the rights of the other Agent or any of the other Secured Parties to Exercise Any Secured Creditor Remedies in respect thereof) in order to create, perfect, preserve or protect (but not enforce its Lien) on any Collateral, (iii) filing any necessary or responsive pleadings in opposition to any motion, adversary proceeding or other pleading filed by any Person objecting to or otherwise seeking disallowance of the claim or Lien of such Agent or Secured Party, (iv) filing any pleadings, objections, motions, or agreements which assert rights available to unsecured creditors of the Loan Parties arising under any Insolvency Proceeding or applicable non-bankruptcy law, to the extent not inconsistent with the other express terms of this Agreement (including Section 6.1), (vi) voting on any plan of reorganization or filing any proof of claim in any Insolvency Proceeding of any Loan Party, or (vii) objecting to the proposed retention of Collateral by the other Agent or any other Secured Party in full or partial satisfaction of any ABL Obligations or Term Obligations due to such other Agent or Secured Party.

**Section 2.4    Exercise of Rights.**

(a)    No Other Restrictions. Except as expressly set forth in this Agreement, each Term Secured Party and each ABL Secured Party shall have any and all rights and remedies it may have as a creditor under applicable law, including the right to

the Exercise of Secured Creditor Remedies; provided, however, that the Exercise of Secured Creditor Remedies with respect to the Collateral shall be subject to the Lien Priority and to the provisions of this Agreement. The ABL Agent may enforce the provisions of the ABL Facility Documents, the Term Agent may enforce the provisions of the Term Facility Documents and each may Exercise Any Secured Creditor Remedies, all in such order and in such manner as each may determine in the exercise of its sole discretion, consistent with the terms of this Agreement, the ABL Facility Documents or Term Facility Documents, as applicable, and mandatory provisions of applicable law; provided, however, that each of the ABL Agent and the Term Agent agrees to provide to the other (x) an Enforcement Notice prior to the commencement of an Exercise of Any Secured Creditor Remedies and (y) copies of any notices that it is required under applicable law to deliver to any Loan Party; provided further, however, that the ABL Agent's failure to provide the Enforcement Notice (other than in connection with Section 3.6) or any such copies to the Term Agent shall not impair any of the ABL Agent's rights hereunder or under any of the ABL Facility Documents and the Term Agent's failure to provide the Enforcement Notice or any such copies to the ABL Agent shall not impair any of the Term Agent's rights hereunder or under any of the Term Facility Documents. Each of the Term Agent, each Term Secured Party, the ABL Agent and each ABL Secured Party agrees that it will not institute any suit or other proceeding or assert in any suit, Insolvency Proceeding or other proceeding any claim, in the case of the Term Agent and each other Term Secured Party, against either the ABL Agent or any other ABL Secured Party, and in the case of the ABL Agent and each other ABL Secured Party, against either the Term Agent or any other Term Secured Party, seeking damages from or other relief by way of specific performance, instructions or otherwise, with respect to any action taken or omitted to be taken by such Person with respect to the Collateral which is consistent with the terms of this Agreement, and none of such Parties shall be liable for any such action taken or omitted to be taken.

      (b)   Release of Liens.

      (i)   In the event of (A) any private or public sale of all or any portion of the ABL Priority Collateral in connection with any Exercise of Secured Creditor Remedies by or with the consent of the ABL Agent (other than in connection with a refinancing as described in Section 5.2(c)), or (B) any sale, transfer or other disposition of all or any portion of the ABL Priority Collateral (other than in connection with a refinancing as described in Section 5.2(c)), so long as such sale, transfer or other disposition is then permitted by the ABL Facility Documentation or consented to by the requisite ABL Lenders, irrespective of whether an Event of Default has occurred, the Term Agent agrees, on behalf of itself and the Term Secured Parties that, so long as the Term Agent, for the benefit of the Term Secured Parties, shall retain a Lien on the Proceeds of such sale, transfer or other disposition (to the extent that such Proceeds are not applied to the ABL Obligations as provided in Section 4.1(b) hereof), such sale, transfer or other disposition will be free and clear of the Liens on such ABL Priority Collateral (but not the Proceeds thereof) securing the Term Obligations, and the Term Agent's and the Term Secured Parties' Liens with respect to the ABL Priority Collateral (but not the Proceeds thereof) so sold, transferred, or disposed shall terminate and be automatically released without further action concurrently with, and

to the same extent as, the release of the ABL Secured Parties' Liens on such ABL Priority Collateral.  In furtherance of, and subject to, the foregoing, the Term Agent agrees that it will promptly execute any and all Lien releases or other documents reasonably requested by the ABL Agent in connection therewith. The Term Agent hereby appoints the ABL Agent and any officer or duly authorized person of the ABL Agent, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power of attorney in the place and stead of the Term Agent and in the name of the Term Agent or in the ABL Agent's own name, from time to time, in the ABL Agent's sole discretion, for the purposes of carrying out the terms of this paragraph, to take any and all appropriate action and to execute and deliver any and all documents and instruments as may be necessary or desirable to accomplish the purposes of this paragraph, including any financing statements, endorsements, assignments, releases or other documents or instruments of transfer (which appointment, being coupled with an interest, is irrevocable).

(ii)    In the event of (A) any private or public sale of all or any portion of the Term Priority Collateral in connection with any Exercise of Secured Creditor Remedies by or with the consent of the Term Agent (other than in connection with a refinancing as described in Section 5.2(c)), or (B) any sale, transfer or other disposition of all or any portion of the Term Priority Collateral (other than in connection with a refinancing as described in Section 5.2(c)), so long as such sale, transfer or other disposition is then permitted by the Term Facility Documentation or consented to by the requisite Term Lenders, irrespective of whether an Event of Default has occurred, the ABL Agent agrees, on behalf of itself and the ABL Secured Parties that, so long as the ABL Agent, for the benefit of the ABL Secured Parties, shall retain a Lien on the Proceeds of such sale, transfer or other disposition (to the extent that such Proceeds are not applied to the Term Obligations as provided in Section 4.1(c) hereof), such sale, transfer or disposition will be free and clear of the Liens on such Term Priority Collateral (but not the Proceeds thereof) securing the ABL Obligations and the ABL Agent's and the ABL Secured Parties' Liens with respect to the Term Priority Collateral (but not the Proceeds thereof) so sold, transferred, or disposed shall terminate and be automatically released without further action concurrently with, and to the same extent as, the release of the Term Secured Parties' Liens on such Term Priority Collateral.  In furtherance of, and subject to, the foregoing, the ABL Agent agrees that it will promptly execute any and all Lien releases or other documents reasonably requested by the Term Agent in connection therewith. The ABL Agent hereby appoints the Term Agent and any officer or duly authorized person of the Term Agent, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power of attorney in the place and stead of the ABL Agent and in the name of the ABL Agent or in the Term Agent's own name, from time to time, in the Term Agent's sole discretion, for the purposes of carrying out the terms of this paragraph, to take any and all appropriate action and to execute and deliver any and all documents and instruments as may be necessary or desirable to accomplish the purposes of this paragraph, including any financing statements, endorsements, assignments, releases or other documents or instruments of transfer (which appointment, being coupled with an interest, is irrevocable).

**Section 2.5**   **No New Liens** Subject to the terms set forth in Sections 2.5(c), 2.5(d) and 6.1:

(a)   It is the anticipation of the parties that, until the date upon which the Discharge of ABL Obligations shall have occurred, no Term Secured Party shall acquire or hold any consensual Lien on any assets securing any Term Obligation which assets are not also subject to the Lien of the ABL Agent under the ABL Facility Documentation. If any Term Secured Party shall (nonetheless and in breach hereof) acquire or hold any Lien on any assets of any Loan Party securing any Term Obligation which assets are not also subject to the Lien of the ABL Agent under the ABL Facility Documentation, then the Term Agent (or the relevant Term Secured Party) shall, without the need for any further consent of any other Term Secured Party, any Term Borrower or any Term Guarantor and notwithstanding anything to the contrary in any other Term Facility Documentation, be deemed to also hold and have held such Lien as agent or bailee for the benefit of the ABL Agent as security for the ABL Obligations (subject to the Lien Priority and other terms hereof) and shall promptly notify the ABL Agent in writing of the existence of such Lien upon becoming aware thereof.

(b)   It is the anticipation of the parties that, until the date upon which the Discharge of Term Obligations shall have occurred, no ABL Secured Party shall acquire or hold any consensual Lien on any assets securing any ABL Obligation which assets are not also subject to the Lien of the Term Agent under the Term Facility Documentation. If any ABL Secured Party shall (nonetheless and in breach hereof) acquire or hold any Lien on any assets of any Loan Party securing any ABL Obligation which assets are not also subject to the Lien of the Term Agent under the Term Facility Documentation, then the ABL Agent (or the relevant ABL Secured Party) shall, without the need for any further consent of any other ABL Secured Party or any ABL Loan Party and notwithstanding anything to the contrary in any other ABL Facility Document, be deemed to also hold and have held such Lien as agent or bailee for the benefit of the Term Agent as security for the Term Obligations (subject to the Lien Priority and other terms hereof) and shall promptly notify the Term Agent in writing of the existence of such Lien upon becoming aware thereof.

(c)   The existence of a maximum claim with respect to any real property subject to a mortgage which applies to all Secured Obligations shall not be deemed to be a difference in Collateral among any series, issue or class of Term Obligations or ABL Obligations.

(d)    Notwithstanding anything in this Agreement or any other Term Facility Documentation or ABL Facility Documentation to the contrary, Collateral consisting of cash and Cash Equivalents specifically pledged to any Secured Party or group of Secured Parties secures only the Secured Obligations owing to such Secured Parties and shall be applied as specified in the applicable Term Facility Documentation or ABL Facility Documentation pursuant to which such Secured Obligations are issued and secured and will not constitute Collateral hereunder.

**Section 2.6**   **Waiver of Marshalling.**

(a)    Until the Discharge of the ABL Obligations, the Term Agent, on behalf of itself and the other Term Secured Parties, agrees not to assert and hereby waives, to the fullest extent permitted by law, any right to demand, request, plead or otherwise assert or otherwise claim the benefit of, any marshalling, appraisal, valuation or other similar right that may otherwise be available under applicable law with respect to the ABL Priority Collateral or any other similar rights a junior secured creditor may have under applicable law.

(b)    Until the Discharge of the Term Obligations, the ABL Agent, on behalf of itself and the other ABL Secured Parties, agrees not to assert and hereby waives, to the fullest extent permitted by law, any right to demand, request, plead or otherwise assert or otherwise claim the benefit of, any marshalling, appraisal, valuation or other similar right that may otherwise be available under applicable law with respect to the Term Priority Collateral or any other similar rights a junior secured creditor may have under applicable law.

**ARTICLE 3**
**ACTIONS OF THE PARTIES**

**Section 3.1    Certain Actions Permitted**. The Term Agent and the ABL Agent may make such demands or file such claims in respect of the Term Obligations or the ABL Obligations, as applicable, as are necessary to prevent the waiver or bar of such claims under applicable statutes of limitations or other statutes, court orders, or rules of procedure at any time. Nothing in this Agreement shall prohibit the receipt by the Term Agent or any Term Secured Party of the required payments of interest, principal and other amounts owed in respect of the Term Obligations so long as such receipt is not the direct or indirect result of the exercise by the Term Agent or any Term Secured Party of rights or remedies as a secured creditor (including set-off) with respect to ABL Priority Collateral or enforcement in contravention of this Agreement of any Lien held by any of them. Nothing in this Agreement shall prohibit the receipt by the ABL Agent or any ABL Secured Party of the required payments of interest, principal and other amounts owed in respect of the ABL Obligations so long as such receipt is not the direct or indirect result of the exercise by the ABL Agent or any ABL Secured Party of rights or remedies as a secured creditor (including set-off) with respect to Term Priority Collateral or enforcement in contravention of this Agreement of any Lien held by any of them.

**Section 3.2    Agent for Perfection**. The ABL Agent, for and on behalf of itself and each ABL Secured Party, and the Term Agent, for and on behalf of itself and each Term Secured Party, as applicable, each agree to (i) hold all Control Collateral in their respective possession, custody, or control (including as defined in Sections 9-104, 9-105, 9-106, 9-107 and 8-106 of the UCC) (or in the possession, custody, or control of agents or bailees for either) and (ii) be notated on all certificated collateral, in each case as gratuitous bailee (or subagent) for the other solely for the purpose of perfecting the security interest granted to each in such Control Collateral, subject to the terms and conditions of this Section 3.2. None of the ABL Agent, the ABL Secured Parties, the Term Agent, or the Term Secured Parties,

as applicable, shall have any obligation whatsoever to the others to assure that the Control Collateral is genuine or owned by the Borrower, any Guarantor, or any other Person or to preserve rights or benefits of any Person.  The duties or responsibilities of the ABL Agent and the Term Agent under this Section 3.2 are and shall be limited solely to holding or maintaining control, possession or notation of the Control Collateral as gratuitous bailee (or sub agent) for the other Party for purposes of perfecting the Lien held by the Term Agent or the ABL Agent, as applicable.  The ABL Agent is not and shall not be deemed to be a fiduciary of any kind for the Term Secured Parties or any other Person. Without limiting the generality of the foregoing, the ABL Secured Parties shall not be obligated to see to the application of any Proceeds of the Term Priority Collateral deposited into any Deposit Account or be answerable in any way for the misapplication thereof. The Term Agent is not and shall not be deemed to be a fiduciary of any kind for the ABL Secured Parties, or any other Person. Without limiting the generality of the foregoing, the Term Secured Parties shall not be obligated to see to the application of any Proceeds of the ABL Priority Collateral deposited into any Deposit Account or be answerable in any way for the misapplication thereof. In addition, the Term Collateral Agent, on behalf of the Term Secured Parties, hereby agrees and acknowledges that other than with respect to ABL Priority Collateral that may be perfected through the filing of a UCC financing statement, the ABL Agent's Liens may be perfected on certain items of ABL Priority Collateral with respect to which the Term Agent's Liens would not be perfected but for the provisions of this Section 3.2, and the Term Agent, on behalf of the Term Secured Parties, hereby further agrees that the foregoing described in this sentence shall not be deemed a breach of this Agreement.

**Section 3.3  Sharing of Information and Access**. In the event that the ABL Agent shall, in the exercise of its rights under the ABL Facility Documentation or otherwise, receive possession or control of any books and records of any Term Loan Party which contain information identifying or pertaining to any of the Term Priority Collateral, the ABL Agent shall (subject to confidentiality obligations imposed by applicable law, obligation otherwise), upon request from the Term Agent and as promptly as practicable thereafter, either make available to the Term Agent such books and records for inspection and duplication or provide the Term Agent copies thereof. In the event that the Term Agent shall, in the exercise of its rights under the Term Collateral Documents or otherwise, receive possession or control of any books and records of any ABL Loan Party which contain information identifying or pertaining to any of the ABL Priority Collateral, the Term Agent shall (subject to confidentiality obligations imposed by applicable law, obligation otherwise), upon request from the ABL Agent and as promptly as practicable thereafter, either make available to the ABL Agent such books and records for inspection and duplication or provide the ABL Agent copies thereof.

**Section 3.4   Insurance**. Proceeds of Collateral include insurance Proceeds and, therefore, the Lien Priority shall govern the ultimate disposition of casualty insurance Proceeds. The ABL Agent and the Term Agent shall each be named as additional insured or loss payee, as applicable, with respect to all insurance policies relating to the Collateral as set forth in the ABL Facility Documentation or the Term Facility Documentation, as applicable. The ABL Agent shall have the sole and exclusive right, as against the Term

Agent, to adjust settlement of insurance claims in the event of any covered loss, theft or destruction of ABL Priority Collateral, in each case in accordance with the ABL Facility Documentation. The Term Agent shall have the sole and exclusive right, as against the ABL Agent, to adjust settlement of insurance claims in the event of any covered loss, theft or destruction of Term Priority Collateral, in each case in accordance with the Term Facility Documentation. Subject to the terms of the ABL Facility Documentation and Term Facility Documentation, if any insurance claim includes both ABL Priority Collateral and Term Priority Collateral, the insurer will not settle such claim separately with respect to ABL Priority Collateral and Term Priority Collateral, and if the Parties are unable after negotiating in good faith to agree on the settlement for such claim, either Party may apply to a court of competent jurisdiction to make a determination as to the settlement of such claim, and the court's determination shall be binding upon the Parties. All Proceeds of such insurance shall be remitted to the ABL Agent or the Term Agent, as the case may be, and each of the ABL Agent and Term Agent shall cooperate (if necessary) in a reasonable manner in effecting the payment of insurance Proceeds in accordance with Section 4.1 hereof.

**Section 3.5    No Additional Rights For the Loan Parties Hereunder.** Except as provided in Section 3.6 or as expressly set forth in the ABL Facility Documentation or Term Facility Documentation, if any ABL Secured Party or Term Secured Party shall enforce its rights or remedies in violation of the terms of this Agreement, the Loan Parties shall not be entitled to use such violation as a defense to any action by any ABL Secured Party or Term Secured Party, nor to assert such violation as a counterclaim or basis for set off or recoupment against any ABL Secured Party or Term Secured Party.

**Section 3.6    Inspection and Access Rights**. (a) Without limiting any rights the ABL Agent or any other ABL Secured Party may otherwise have under applicable law or by agreement, in the event of any liquidation of the ABL Priority Collateral (or any other Exercise of Any Secured Creditor Remedies by the ABL Agent), and whether or not the Term Agent or any other Term Secured Party has commenced and is continuing to Exercise Any Secured Creditor Remedies of the Term Agent, the ABL Agent or any other Person (including any ABL Loan Party) acting with the consent, or on behalf, of the ABL Agent, during the Use Period, (a) shall have the right, during normal business hours on any Business Day, to access ABL Priority Collateral that (i) is stored or located in or on, (ii) has become an accession with respect to (within the meaning of Section 9-335 of the Uniform Commercial Code), or (iii) has been commingled with (within the meaning of Section 9-336 of the Uniform Commercial Code) Term Priority Collateral (collectively, the "**ABL Joint Collateral**"), and (b) shall have the irrevocable right to use the Term Priority Collateral (including Equipment, Inventory, Fixtures, Intellectual Property, General Intangibles and Real Property) on a rent-free, royalty-free basis, each of the foregoing solely for the limited purposes of assembling, inspecting, copying or downloading information stored on, taking actions to perfect its Lien on, taking possession of, moving, preparing and advertising for sale, selling (by public auction, private sale or a "going out of business" or similar sale, whether in bulk, in lots or to customers in the ordinary course of business or otherwise and which sale may include augmented Inventory of the same type sold in any ABL Loan Party's business), storing or otherwise dealing with the ABL Priority Collateral, in each case without

notice to, the involvement of or interference by any Term Secured Party or liability to any Term Secured Party; provided, however, that the expiration of the Use Period shall be without prejudice to the sale or other disposition of the ABL Priority Collateral in accordance with this Agreement and applicable law. In the event that any ABL Secured Party has commenced and is continuing the Exercise of Any Secured Creditor Remedies with respect to any ABL Joint Collateral or any other sale or liquidation of the ABL Joint Collateral has been commenced by an ABL Loan Party (with the consent of the ABL Agent), the Term Agent may not sell, assign or otherwise transfer the related Term Priority Collateral prior to the expiration of the Use Period, unless the purchaser, assignee or transferee thereof agrees in writing to be bound by the provisions of this Section 3.6.

(b)    During the period of actual occupation, use and/or control by the ABL Secured Parties and/or the ABL Agent (or their respective employees, agents, advisers and representatives) of any Term Priority Collateral, the ABL Secured Parties and the ABL Agent shall be obligated to repair at their expense any physical damage (but not any diminution in value) to such Term Priority Collateral resulting from such occupancy, use or control, and to leave such Term Priority Collateral in substantially the same condition as it was at the commencement of such occupancy, use or control, ordinary wear and tear excepted. Notwithstanding the foregoing, in no event shall the ABL Secured Parties or the ABL Agent have any liability to the Term Secured Parties and/or to the Term Agent pursuant to this Section 3.6 as a result of any condition (including any environmental condition, claim or liability) on or with respect to the Term Priority Collateral existing prior to the date of the exercise by the ABL Secured Parties or the ABL Agent of their rights under this Section 3.6, and the ABL Secured Parties and the ABL Agent shall have no duty or liability to maintain the Term Priority Collateral in a condition or manner better than that in which it was maintained prior to the occupation, use or control thereof by the ABL Secured Parties or the ABL Agent, or for any diminution in the value of the Term Priority Collateral that results from ordinary wear and tear resulting from the occupation, use or control of the Term Priority Collateral by the ABL Secured Parties or the ABL Agent in the manner and for the time periods specified under this Section 3.6. Without limiting the rights granted in this Section 3.6, the ABL Secured Parties and the ABL Agent shall cooperate with the Term Secured Parties and/or the Term Agent in connection with any efforts made by the Term Secured Parties and/or the Term Agent to sell the Term Priority Collateral.

(c)    The ABL Agent and the ABL Secured Parties shall not be obligated to pay any amounts to the Term Agent or the Term Secured Parties (or any person claiming by, through or under the Term Secured Parties, including any purchaser of the Term Priority Collateral) or to the ABL Loan Parties, for or in respect of the use by the ABL Agent and the ABL Secured Parties of the Term Priority Collateral.

(d)    The ABL Secured Parties shall (i) use the Term Priority Collateral in accordance with applicable law, (ii) insure or cause to be insured for damage to property and liability to persons, including property and liability insurance for the benefit of the Term Secured Parties and (iii) reimburse the Term Secured Parties for any injury or damage to Persons or property (ordinary wear and tear excepted) caused by the gross negligence or

willful misconduct of Persons under their control (except for those arising from the gross negligence or willful misconduct of any Term Secured Party); provided, however, that the ABL Secured Parties will not be liable for any diminution in the value of the Term Priority Collateral caused by the absence of the ABL Priority Collateral therefrom.

(e)    The Term Agent and the other Term Secured Parties shall use commercially reasonable efforts not to hinder or obstruct the ABL Agent and the other ABL Secured Parties from exercising the rights described in Section 3.6(a) hereof.

(f)    Subject to the terms hereof, the Term Agent may advertise and conduct public auctions or private sales of the Term Priority Collateral without notice to (except as required by applicable law), the involvement of or interference by any ABL Secured Party or liability to any ABL Secured Party as long as, in the case of an actual sale, the purchaser assumes and agrees to the obligations of the Term Agent and the Term Secured Parties under this Section 3.6.

(g)    In furtherance of the foregoing in this Section 3.6, the Term Agent, in its capacity as a Secured Party (or as a purchaser, assignee or transferee, as applicable), and to the extent of its interest therein, hereby grants to the ABL Agent a nonexclusive, irrevocable, royalty-free, worldwide license to use, license or sublicense (solely for the purposes described below) any and all Intellectual Property now owned or hereafter acquired by the Loan Parties (except to the extent such grant is prohibited by any rule of law, statute, regulation), included as part of the Term Priority Collateral (and including in such license access to all media in which any of the licensed items may be recorded or stored and to all computer software and programs used for the compilation or printout thereof) solely as is or may be necessary or advisable in the ABL Agent's reasonable judgment for the ABL Agent to process, ship, produce, store, supply, lease, complete, sell, liquidate or otherwise deal with the ABL Priority Collateral, or to collect or otherwise realize upon any Accounts (as defined in the ABL Credit Agreement) comprising ABL Priority Collateral, in each case solely in connection with any Exercise of Secured Creditor Remedies; provided that (i) any such license shall terminate upon the sale of the applicable ABL Priority Collateral and shall not extend or transfer to the purchaser of such ABL Priority Collateral, (ii) the ABL Agent's use of such Intellectual Property shall be reasonable and lawful, and (iii) any such license is granted on an "AS IS" basis, without any representation or warranty whatsoever, provided, further, however, that any license granted by the ABL Agent to a third party shall include reasonable and customary terms necessary to preserve the existence, validity and value of the affected Intellectual Property Collateral, including provisions requiring the continuing confidential handling of Trade Secrets, requiring the use of appropriate notices and prohibiting the use of false notices, protecting Trademarks in the manner provided in Section 4.01 of the Term Security Agreement and other reasonable and customary provisions and restrictions. The Term Agent (i) acknowledges and consents to the grant to the ABL Agent by the Loan Parties of the license referred to in Section 4.01 of the Term Security Agreement and (ii) agrees that its Liens in the Term Priority Collateral shall be subject in all respects to such license. Furthermore, the Term Agent agrees that, in connection with any Exercise of Secured Creditor Remedies conducted by the Term Agent in respect of Term Priority

Collateral, (x) any notice required to be given by the Term Agent in connection with such Exercise of Secured Creditor Remedies shall contain an acknowledgement of the existence of such license and (y) the Term Agent shall provide written notice to any purchaser, assignee or transferee pursuant to an Exercise of Secured Creditor Remedies that the applicable assets are subject to such license.

Section 3.7    **Tracing of and Priorities in Proceeds**. The ABL Agent, for itself and on behalf of the ABL Secured Parties, and the Term Agent, for itself and on behalf of the Term Secured Parties, further agree that prior to an issuance of any notice of Exercise of Any Secured Creditor Remedies by a Secured Party (unless a bankruptcy or insolvency Event of Default then exists), any Proceeds of Collateral, whether or not deposited under control agreements, which are used by any Loan Party to acquire other property which is Collateral shall not (solely as between the Agents and the Lenders) be treated as Proceeds of Collateral for purposes of determining the relative priorities in the Collateral which was so acquired.

Section 3.8    **Purchase Right**

(a)    If (i) the ABL Agent or "Required Lenders" (or similar term) (as defined in the ABL Credit Agreement) shall sell, lease, license or dispose of all or substantially all of the ABL Priority Collateral by private or public sale, (ii) an Insolvency Proceeding with respect to the Borrower shall have occurred or shall have been commenced, or (iii) the ABL Obligations under the ABL Credit Agreement shall have been accelerated (including as a result of any automatic acceleration) or shall remain unpaid 30 days following the Maturity Date (as defined in the ABL Credit Agreement), (each such event described in clauses (i) through (iii) herein above, a "**Purchase Option Event**"), the Term Secured Parties shall have the opportunity to purchase (at par and without premium) all (but not less than all) of the ABL Obligations pursuant to this Section 3.8; provided, that such option shall expire if the applicable Term Secured Parties fail to deliver a written notice (a "**Purchase Notice**") to the ABL Agent within ten (10) Business Days following the first date the Term Agent obtains actual knowledge of the occurrence of the earliest Purchase Option Event, which Purchase Notice shall (A) be signed by the applicable Term Secured Parties committing to such purchase (the "**Purchasing Creditors**") and indicate the percentage of the ABL Obligations to be purchased by each Purchasing Creditor (which aggregate commitments must add up to 100% of the ABL Obligations) and (B) state that (1) it is a Purchase Notice delivered pursuant to Section 3.8 of this Agreement and (2) the offer contained therein is irrevocable. Upon receipt of such Purchase Notice by the ABL Agent, the Purchasing Creditors shall have from the date of delivery thereof to and including the date that is ten (10) Business Days after the Purchase Notice was received by the ABL Agent to purchase all (but not less than all) of the ABL Obligations pursuant to this Section 3.8 (the date of such purchase, the "**Purchase Date**").

(b)    On the Purchase Date, the ABL Agent and the other ABL Secured Parties shall, subject to any required approval of any Governmental Authority and any limitation in the ABL Credit Agreement, in each case then in effect, if any, sell to the

Purchasing Creditors all (but not less than all) of the ABL Obligations. On such Purchase Date, the Purchasing Creditors shall (i) pay to the ABL Agent, for the benefit of the ABL Secured Parties, as directed by the ABL Agent, in immediately available funds the full amount (at par and without premium) of all ABL Obligations then outstanding together with all accrued and unpaid interest and fees thereon, all in the amounts specified by the ABL Agent and determined in accordance with the applicable ABL Facility Documents, (ii) furnish such amount of cash collateral in immediately available funds as the ABL Agent determines is reasonably necessary to secure the ABL Secured Parties in connection with any (x) contingent "Cash Management Obligations" (as defined in the ABL Credit Agreement) or (y) issued and outstanding letters of credit issued under the ABL Credit Agreement but not in any event in an amount greater than 102% of the aggregate undrawn amount of all such outstanding letters of credit (<u>provided</u> that in the case of clauses (x) and (y) herein above, any excess of such cash collateral for such contingent Secured Cash Management Services Obligations or letters of credit remaining at such time when there are no longer any such contingent Secured Cash Management Services Obligations or letters of credit outstanding and there are no unreimbursed amounts then owing in respect of such Secured Cash Management Services Obligations or drawings under such letters of credit shall be promptly paid over to the Term Agent) and (iii) agree to reimburse the ABL Secured Parties for any loss, cost, damage or expense resulting from the granting of provisional credit for any checks, wire or ACH transfers that are reversed or not final or other payments provisionally credited to the ABL Obligations under the ABL Credit Agreement and as to which the ABL Agent and ABL Secured Parties have not yet received final payment as of the Purchase Date. Such purchase price shall be remitted by wire transfer in immediately available funds to such bank account of the ABL Agent (for the benefit of the ABL Secured Parties) as the ABL Agent shall have specified in writing to the Term Agent.  Interest and fees shall be calculated to but excluding the Purchase Date if the amounts so paid by the Purchasing Creditors to the bank account designated by the ABL Agent are received in such bank account prior to 1:00 p.m., New York time, and interest shall be calculated to and including such Purchase Date if the amounts so paid by the Purchasing Creditors to the bank account designated by the ABL Agent are received in such bank account after 1:00 p.m., New York time.

(c)     Any purchase pursuant to the purchase option set forth in this Section 3.8 shall, except as provided below, be expressly made without representation or warranty of any kind by the ABL Agent or the other ABL Secured Parties as to the ABL Obligations, the collateral or otherwise, and without recourse to the ABL Agent and the other ABL Secured Parties as to the ABL Obligations, the collateral or otherwise, except that the ABL Agent and each of the ABL Secured Parties, as to itself only, shall represent and warrant only as to the matters set forth in the assignment agreement to be entered into as provided herein in connection with such purchase, which shall include (i) the principal amount of the ABL Obligations being sold by it, (ii) that such Person has not created any Lien on any ABL Obligations being sold by it, and (iii) that such Person has the right to assign the ABL Obligations being assigned by it and its assignment agreement has been duly authorized.

(d)    Upon notice to the Loan Parties by the Term Agent that the purchase of ABL Obligations pursuant to this Section 3.8 has been consummated by delivery of the purchase price to the ABL Agent, the Loan Parties shall treat the Purchasing Creditors as holders of the ABL Obligations and the Term Agent shall be deemed appointed to act in such capacity as the "agent" or "administrative agent" (or analogous capacity) (the "**Replacement Agent**") under the ABL Facility Documentation, for all purposes hereunder and under each ABL Facility Document (it being agreed that the ABL Agent shall have no obligation to act as such replacement "agent" or "administrative agent" (or analogous capacity)). In connection with any purchase of ABL Obligations pursuant to this Section 3.8, each ABL Lender and ABL Agent agrees to enter into and deliver to the applicable Term Lenders on the Purchase Date, as a condition to closing, an assignment agreement customarily used by the ABL Agent in connection with the ABL Credit Agreement and, at the expense of the Loan Parties, the ABL Agent and each other ABL Lender shall deliver all possessory collateral (if any), together with any necessary endorsements and other documents (including any applicable stock powers or bond powers), then in its possession or in the possession of its agent or bailee, or turn over control as to any pledged collateral, deposit accounts or securities accounts of which it or its agent or bailee then has control, as the case may be, to the Replacement Agent, and deliver the loan register and participant register, if applicable and all other records pertaining to the ABL Obligations to the Replacement Agent and otherwise take such actions as may be reasonably appropriate to effect an orderly transition to the Replacement Agent. Upon the consummation of the purchase of the ABL Obligations pursuant to this Section 3.8, the ABL Agent (and all other agents under the ABL Credit Agreement) shall be deemed to have resigned as an "agent" or "administrative agent" for the ABL Secured Parties under the ABL Facility Documentation; provided that the ABL Agent (and all other agents under the ABL Credit Agreement) shall be entitled to all of the rights and benefits of a former "agent" or "administrative agent" under the ABL Credit Agreement.

(e)    Notwithstanding the foregoing purchase of the ABL Obligations by the Purchasing Creditors, the ABL Secured Parties shall retain those contingent indemnification obligations and other obligations under the ABL Facility Documentation which by their express terms would survive any repayment of the ABL Obligations pursuant to this Section 3.8.

**Section 3.9    Payments Over.**

(a)    So long as the Discharge of Term Obligations has not occurred, any Term Priority Collateral or Proceeds thereof not constituting ABL Priority Collateral received by the ABL Agent or any other ABL Secured Party in connection with the exercise of any right or remedy (including set off) relating to the Term Priority Collateral in contravention of this Agreement shall be segregated and held in trust and forthwith paid over by such person to the Term Agent for the benefit of the Term Secured Parties in the same form as received, with any necessary endorsements or as a court of competent jurisdiction may otherwise direct. The Term Agent is hereby authorized to make any such endorsements as agent for the ABL Agent or any other ABL Secured Party. This authorization

is coupled with an interest and is irrevocable until such time as this Agreement is terminated in accordance with its terms.

(b)    So long as the Discharge of ABL Obligations has not occurred, any ABL Priority Collateral or Proceeds thereof not constituting Term Priority Collateral received by the Term Agent or any other Term Secured Party in connection with the exercise of any right or remedy (including set off) relating to the ABL Priority Collateral in contravention of this Agreement shall be segregated and held in trust and forthwith paid over by such person to the ABL Agent for the benefit of the ABL Secured Parties in the same form as received, with any necessary endorsements or as a court of competent jurisdiction may otherwise direct. The ABL Agent is hereby authorized to make any such endorsements as agent for the Term Agent or any other Term Secured Party. This authorization is coupled with an interest and is irrevocable until such time as this Agreement is terminated in accordance with its terms.

## ARTICLE 4
## APPLICATION OF PROCEEDS

**Section 4.1    Application of Proceeds.**

(d)    Revolving Nature of ABL Obligations. The Term Agent, for and on behalf of itself and the Term Secured Parties, expressly acknowledges and agrees that (i) the ABL Credit Agreement includes a revolving commitment, that in the ordinary course of business the ABL Agent and the ABL Lenders will apply payments and make advances thereunder, and that no application of any ABL Priority Collateral or the release of any Lien by the ABL Agent upon any portion of the Collateral in connection with a permitted disposition by the ABL Loan Parties under the ABL Credit Agreement shall constitute the Exercise of Secured Creditor Remedies under this Agreement; (ii) the amount of the ABL Obligations that may be outstanding at any time or from time to time may be increased or reduced and subsequently reborrowed, and that the terms of the ABL Obligations may be modified, extended or amended from time to time, and that the aggregate amount of the ABL Obligations may be increased, replaced or refinanced, in each event, without notice to or consent by the Term Secured Parties and without affecting the provisions hereof; and (iii) all ABL Priority Collateral received by the ABL Agent may be applied, reversed, reapplied, credited, or reborrowed, in whole or in part, to the ABL Obligations at any time in accordance with the ABL Documentation; provided, however, that from and after the date on which the ABL Agent (or any ABL Secured Party) or the Term Agent (or any Term Secured Party) commences (and for so long as it continues) the Exercise of Any Secured Creditor Remedies, all amounts received by the ABL Agent or any ABL Lender shall be applied as specified in this Section 4.1. The Lien Priority shall not be altered or otherwise affected by any such amendment, modification, supplement, extension, repayment, reborrowing, increase, replacement, renewal, restatement or refinancing of either the ABL Obligations or the Term Obligations, or any portion thereof. Notwithstanding anything to the contrary contained in this Agreement, any Term Facility Document or any ABL Facility Document, the Term Agent, for itself and on behalf of the Term Secured Parties, agrees that

(i) only Term Priority Collateral or Proceeds of the Term Priority Collateral received by the Term Agent shall be deposited in the Term Loan Priority Accounts and (ii) prior to the receipt of a Term Cash Proceeds Notice, the ABL Secured Parties are hereby permitted to treat all cash, cash equivalents, Money, collections and payments deposited in any ABL Deposit and Securities Account or otherwise received by any ABL Secured Parties as ABL Priority Collateral, and no such amounts credited to any such ABL Deposit and Securities Account or received by any ABL Secured Parties or applied to the ABL Obligations shall be subject to disgorgement or deemed to be held in trust for the benefit of the Term Secured Parties (and all claims of the Term Agent or any other Term Secured Party to such amounts are hereby waived).

(e)    Application of Proceeds of ABL Priority Collateral. The ABL Agent and the Term Agent hereby agree that all ABL Priority Collateral, ABL Priority Proceeds and all other Proceeds thereof, received by either of them in connection with any Exercise of Secured Creditor Remedies with respect to the ABL Priority Collateral, shall be applied,

first, to the payment of costs and expenses of the ABL Agent in connection with such Exercise of Secured Creditor Remedies in accordance with the ABL Facility Documentation,

second, to the payment or discharge of the ABL Obligations in accordance with the ABL Facility Documentation until the Discharge of ABL Obligations shall have occurred,

third, to the payment of the Term Obligations in accordance with the Term Facility Documentation until the Discharge of Term Obligations shall have occurred, and

fourth, the balance, if any, to the Loan Parties or as a court of competent jurisdiction may direct.

(f)    Application of Proceeds of Term Priority Collateral. The ABL Agent and the Term Agent hereby agree that all Term Priority Collateral, Term Priority Proceeds and all other Proceeds thereof, received by either of them in connection with any Exercise of Secured Creditor Remedies with respect to the Term Priority Collateral shall be applied,

first, to the payment of costs and expenses of the Term Agent in connection with such Exercise of Secured Creditor Remedies in accordance with the Term Facility Documentation,

second, to the payment of the Term Obligations in accordance with the Term Facility Documentation until the Discharge of Term Obligations shall have occurred,

third, to the payment of the ABL Obligations in accordance with the ABL Facility Documentation until the Discharge of ABL Obligations shall have occurred, and

<u>fourth</u>, the balance, if any, to the Loan Parties or as a court of competent jurisdiction may direct.

(g)    <u>Limited Obligation or Liability</u>. In exercising remedies, whether as a secured creditor or otherwise, the ABL Agent shall have no obligation or liability to the Term Agent or to any Term Secured Party, and the Term Agent shall have no obligation or liability to the ABL Agent or any ABL Secured Party, regarding the adequacy of any Proceeds or for any action or omission, except solely for an action or omission that breaches the express obligations undertaken by each Party under the terms of this Agreement. Notwithstanding anything to the contrary herein contained, none of the Parties hereto waives any claim that it may have against a Secured Party on the grounds that any sale, transfer or other disposition by the Secured Party was not commercially reasonable in every respect as required by the Uniform Commercial Code.

(h)    <u>Turnover of Collateral After Discharge</u>. Upon the Discharge of ABL Obligations, the ABL Agent shall deliver to the Term Agent or shall execute such documents as the Term Agent may reasonably request (at the expense of the Term Borrower) to enable the Term Agent to have control over any Control Collateral still in the ABL Agent's possession, custody or control in the same form as received with any necessary endorsements, or as a court of competent jurisdiction may otherwise direct. Upon the Discharge of Term Obligations, the Term Agent shall deliver to the ABL Agent or shall execute such documents as the ABL Agent may reasonably request (at the expense of the ABL Borrower) to enable the ABL Agent to have control over any Control Collateral still in the Term Agent's possession, custody or control in the same form as received with any necessary endorsements, or as a court of competent jurisdiction may otherwise direct.

**Section 4.2    Specific Performance**.

(c)    Each of the ABL Agent and the Term Agent is hereby authorized to demand specific performance of this Agreement, whether or not the Borrower or any Guarantor shall have complied with any of the provisions of any of the Loan Documents, at any time when the other Party shall have failed to comply with any of the provisions of this Agreement applicable to it. Each of the ABL Agent, for and on behalf of itself and the ABL Secured Parties, and the Term Agent, for and on behalf of itself and the Term Secured Parties, hereby irrevocably waives any defense based on the adequacy of a remedy at law that might be asserted as a bar to such remedy of specific performance.

(d)    The Borrower is hereby authorized to demand specific performance of Sections 1.1, 1.2, 2.1, 2.3, 2.4 2.5, 3.2, 3.4, 3.5, 3.8, 3.9, 4.1, 4.2(b), 5.1(c), 5.2, 6.1, 7.4, 7.7, 7.8 and 7.10 (and not any other provisions of this Agreement unless the Borrower had the right to consent to the inclusion of such provision) at any time when any other Party shall have failed to comply with such Sections to the extent applicable to it. Each of the ABL Agent, for and on behalf of itself and the ABL Secured Parties, and the Term Agent, for and on behalf of itself and the Term Secured Parties, hereby irrevocably waives any defense based on the adequacy of a remedy at law that might be asserted as a bar to such remedy of specific performance.

## ARTICLE 5
## INTERCREDITOR ACKNOWLEDGEMENTS AND WAIVERS

**Section 5.1   Notice of Acceptance and Other Waivers.**

(e)   All ABL Obligations at any time made or incurred by the ABL Borrower or any ABL Guarantor shall be deemed to have been made or incurred in reliance upon this Agreement, and the Term Agent, on behalf of itself and the Term Secured Parties, hereby waives notice of acceptance, or proof of reliance, by the ABL Agent or any ABL Secured Party of this Agreement, and notice of the existence, increase, renewal, extension, accrual, creation, or non-payment of all or any part of the ABL Obligations. All Term Obligations at any time made or incurred by the Term Borrower or any Term Guarantor shall be deemed to have been made or incurred in reliance upon this Agreement, and the ABL Agent, on behalf of itself and the ABL Secured Parties, hereby waives notice of acceptance, or proof of reliance, by the Term Agent or any Term Secured Party of this Agreement, and notice of the existence, increase, renewal, extension, accrual, creation, or non-payment of all or any part of the Term Obligations.

(f)    None of the ABL Agent, any ABL Secured Party, or any of their respective Affiliates, directors, officers, employees, or agents shall be liable for failure to demand, collect, or realize upon any of the Collateral or any Proceeds, or for any delay in doing so, or shall be under any obligation to sell or otherwise dispose of any Collateral or Proceeds thereof or to take any other action whatsoever with regard to the Collateral or any part or Proceeds thereof, except as specifically provided in this Agreement. If the ABL Agent or any ABL Secured Party honors (or fails to honor) a request by the ABL Borrower for an extension of credit pursuant to the ABL Credit Agreement or any other ABL Facility Document, whether the ABL Agent or such ABL Secured Party has knowledge that the honoring of (or failure to honor) any such request would constitute a default under the terms of the Term Credit Agreement or any other Term Facility Document or an act, condition, or event that, with the giving of notice or the passage of time, or both, would constitute such a default, or if the ABL Agent or any ABL Secured Party otherwise should exercise any of its contractual rights or remedies under any ABL Facility Document (subject to the express terms and conditions hereof), neither the ABL Agent nor any ABL Secured Party shall have any liability whatsoever to the Term Agent or any Term Secured Party as a result of such action, omission, or exercise (so long as any such exercise does not breach the express terms and provisions of this Agreement). The ABL Agent and the ABL Secured Parties shall be entitled to manage and supervise their loans and extensions of credit under the ABL Credit Agreement and any other ABL Facility Document as they may, in their sole discretion, deem appropriate, and may manage their loans and extensions of credit without regard to any rights or interests that the Term Agent or any of the Term Secured Parties have in the Collateral, except as otherwise expressly set forth in this Agreement. The Term Agent, on behalf of itself and the Term Secured Parties, agrees that neither the ABL Agent nor any ABL Secured Party shall incur any liability as a result of a sale, lease, license, application, or other disposition of all or any portion of the Collateral or Proceeds thereof, pursuant to the ABL Facility Documentation, so long as such disposition is conducted in accordance

with mandatory provisions of applicable law and does not breach the provisions of this Agreement.

(g)    None of the Term Agent, any Term Secured Party or any of their respective Affiliates, directors, officers, employees, or agents shall be liable for failure to demand, collect, or realize upon any of the Collateral or any Proceeds, or for any delay in doing so, or shall be under any obligation to sell or otherwise dispose of any Collateral or Proceeds thereof or to take any other action whatsoever with regard to the Collateral or any part or Proceeds thereof, except as specifically provided in this Agreement or the respective ABL Facility Documentation or Term Facility Documentation, as applicable. If the Term Agent or any Term Secured Party honors (or fails to honor) a request by the Term Borrower for an extension of credit pursuant to the Term Credit Agreement or any other Term Facility Document, whether the Term Agent or such Term Secured Party has knowledge that the honoring of (or failure to honor) any such request would constitute a default under the terms of the ABL Credit Agreement or any other ABL Facility Document or an act, condition, or event that, with the giving of notice or the passage of time, or both, would constitute such a default, or if the Term Agent or any Term Secured Party otherwise should exercise any of its contractual rights or remedies under any Term Facility Document (subject to the express terms and conditions hereof), neither the Term Agent nor any Term Secured Party shall have any liability whatsoever to the ABL Agent or any ABL Secured Party as a result of such action, omission, or exercise (so long as any such exercise does not breach the express terms and provisions of this Agreement). The Term Agent and the Term Secured Parties shall be entitled to manage and supervise their loans and extensions of credit under the Term Credit Agreement and any other Term Facility Document as they may, in their sole discretion, deem appropriate, and may manage their loans and extensions of credit without regard to any rights or interests that the ABL Agent or any of the ABL Secured Parties have in the Collateral, except as otherwise expressly set forth in this Agreement. The ABL Agent, on behalf of itself and the ABL Secured Parties, agrees that neither the Term Agent nor any Term Secured Party shall incur any liability as a result of a sale, lease, license, application, or other disposition of all or any portion of the Collateral or Proceeds thereof, pursuant to the Term Facility Documentation, so long as such disposition is conducted in accordance with mandatory provisions of applicable law and does not breach the provisions of this Agreement.

**Section 5.2    Modifications to ABL Facility Documentation and Term Facility Documentation.**

(e)    The Term Agent, on behalf of itself and the Term Secured Parties, hereby agrees that, without affecting the obligations of the Term Agent and the Term Secured Parties hereunder, the ABL Agent and the ABL Secured Parties may, at any time and from time to time, in their sole discretion without the consent of or notice to the Term Agent or any Term Secured Party (except to the extent such notice or consent is required pursuant to the express provisions of this Agreement), and without incurring any liability to the Term Agent or any Term Secured Party or impairing or releasing the subordination provided for herein, amend, restate, supplement, replace, refinance, extend, consolidate, restructure, or

otherwise modify any of the ABL Facility Documentation in any manner whatsoever (other than in a manner which would contravene the provisions of this Agreement), including to:

(i)     change the manner, place, time, or terms of payment or renew, alter or increase, all or any of the ABL Obligations or otherwise amend, restate, supplement, or otherwise modify in any manner, or grant any waiver or release with respect to, all or any part of the ABL Obligations or any of the ABL Facility Documentation;

(ii)    subject to Section 2.5 and Section 6.1, retain or obtain a Lien on any Property of any Person to secure any of the ABL Obligations, and in connection therewith to enter into any additional ABL Facility Documentation;

(iii)   amend, or grant any waiver, compromise, or release with respect to, or consent to any departure from, any guaranty or other obligations of any Person obligated in any manner under or in respect of the ABL Obligations;

(iv)    release its Lien on any Collateral or other Property;

(v)     exercise or refrain from exercising any rights against the ABL Borrower, the ABL Guarantors, or any other Person;

(vi)    subject to Section 2.5 and Section 6.1, retain or obtain the primary or secondary obligation of any other Person with respect to any of the ABL Obligations; and

(vii)   otherwise manage and supervise the ABL Obligations as the ABL Agent shall deem appropriate.

(f)     The ABL Agent, on behalf of itself and the ABL Secured Parties, hereby agrees that, without affecting the obligations of the ABL Agent and the ABL Secured Parties hereunder, the Term Agent and the Term Secured Parties may, at any time and from time to time, in their sole discretion without the consent of or notice to the ABL Agent or any ABL Secured Party (except to the extent such notice or consent is required pursuant to the express provisions of this Agreement), and without incurring any liability to the ABL Agent or any ABL Secured Party or impairing or releasing the subordination provided for herein, amend, restate, supplement, replace, refinance, extend, consolidate, restructure, or otherwise modify any of the Term Facility Documentation in any manner whatsoever (other than in a manner which would contravene the provisions of this Agreement), including to:

(i)     change the manner, place, time, or terms of payment or renew, alter or increase, all or any of the Term Obligations or otherwise amend, restate, supplement, or otherwise modify in any manner, or grant any waiver or release with respect to, all or any part of the Term Obligations or any of the Term Facility Documentation;

(ii)    subject to Section 2.5 and Section 6.1, retain or obtain a Lien on any Property of any Person to secure any of the Term Obligations, and in connection therewith to enter into any additional Term Facility Documentation;

(iii)    amend, or grant any waiver, compromise, or release with respect to, or consent to any departure from, any guaranty or other obligations of any Person obligated in any manner under or in respect of the Term Obligations;

(iv)    release its Lien on any Collateral or other Property;

(v)    exercise or refrain from exercising any rights against the Term Borrower, the Term Guarantors, or any other Person;

(vi)    subject to Section 2.5 and Section 6.1, retain or obtain the primary or secondary obligation of any other Person with respect to any of the Term Obligations; and

(vii)    otherwise manage and supervise the Term Obligations as the Term Agent shall deem appropriate.

(g)    The ABL Obligations and the Term Obligations may be refinanced, in whole or in part, in each case, without notice to, or the consent (except to the extent a consent is required to permit the refinancing transaction under any ABL Facility Document or any Term Facility Document) of the ABL Agent, the ABL Secured Parties, the Term Agent or the Term Secured Parties, as the case may be, all without affecting the Lien Priority provided for herein or the other provisions hereof, provided that the holders of such refinancing Indebtedness (or an authorized agent or trustee on their behalf) bind themselves in writing to the terms of this Agreement pursuant to such documents or agreements (including amendments or supplements to this Agreement) as the ABL Agent or the Term Agent, as the case may be, shall reasonably request and in form and substance reasonably acceptable to the ABL Agent or the Term Agent, as the case may be, and any such refinancing transaction shall be in accordance with any applicable provisions of both the ABL Facility Documentation and the Term Facility Documentation (to the extent such documents survive the refinancing).

**Section 5.3    Reinstatement and Continuation of Agreement.**

(c)    If the ABL Agent or any ABL Secured Party is required in any Insolvency Proceeding or otherwise to turn over or otherwise pay to the estate of the ABL Borrower, any ABL Guarantor, or any other Person any payment made in satisfaction of all or any portion of the ABL Obligations (an "**ABL Recovery**"), then the ABL Obligations shall be reinstated to the extent of such ABL Recovery. If this Agreement shall have been terminated prior to such ABL Recovery, this Agreement shall be reinstated in full force and effect in the event of such ABL Recovery, and such prior termination shall not diminish, release, discharge, impair, or otherwise affect the obligations of the Parties from such date of reinstatement. All rights, interests, agreements, and obligations of the ABL Agent, the

Term Agent, the ABL Secured Parties, and the Term Secured Parties under this Agreement shall remain in full force and effect and shall continue irrespective of the commencement of, or any discharge, confirmation, conversion, or dismissal of, any Insolvency Proceeding by or against the Borrower or any Guarantor or any other circumstance which otherwise might constitute a defense available to, or a discharge of, the Borrower or any Guarantor in respect of the ABL Obligations or the Term Obligations. No priority or right of the ABL Agent or any ABL Secured Party shall at any time be prejudiced or impaired in any way by any act or failure to act on the part of the ABL Borrower or any ABL Guarantor or by the noncompliance by any Person with the terms, provisions, or covenants of any of the ABL Facility Documentation, regardless of any knowledge thereof which the ABL Agent or any ABL Secured Party may have.

(d)    If the Term Agent or any Term Secured Party is required in any Insolvency Proceeding or otherwise to turn over or otherwise pay to the estate of the Term Borrower, any Term Guarantor, or any other Person any payment made in satisfaction of all or any portion of the Term Obligations (a "**Term Recovery**"), then the Term Obligations shall be reinstated to the extent of such Term Recovery. If this Agreement shall have been terminated prior to such Term Recovery, this Agreement shall be reinstated in full force and effect in the event of such Term Recovery, and such prior termination shall not diminish, release, discharge, impair, or otherwise affect the obligations of the Parties from such date of reinstatement. All rights, interests, agreements, and obligations of the ABL Agent, the Term Agent, the ABL Secured Parties, and the Term Secured Parties under this Agreement shall remain in full force and effect and shall continue irrespective of the commencement of, or any discharge, confirmation, conversion, or dismissal of, any Insolvency Proceeding by or against the Borrower or any Guarantor or any other circumstance which otherwise might constitute a defense available to, or a discharge of, the Borrower or any Guarantor in respect of the ABL Obligations or the Term Obligations. No priority or right of the Term Agent or any Term Secured Party shall at any time be prejudiced or impaired in any way by any act or failure to act on the part of the Term Borrower or any Term Guarantor or by the noncompliance by any Person with the terms, provisions, or covenants of any of the Term Facility Documentation, regardless of any knowledge thereof which the Term Agent or any Term Secured Party may have.

## ARTICLE 6
## INSOLVENCY PROCEEDINGS

**Section 6.1    DIP Financing.**

(h)    If the ABL Borrower or any ABL Guarantor shall be subject to any Insolvency Proceeding at any time prior to the Discharge of ABL Obligations, and the ABL Agent or the ABL Secured Parties shall seek to provide the ABL Borrower or any ABL Guarantor with, or consent to a third party providing, any financing under Section 364 of the Bankruptcy Code or consent to any order for the use of cash collateral constituting ABL Priority Collateral under Section 363 of the Bankruptcy Code (or any similar provision of any foreign Debtor Relief Laws or under a court order in respect of measures granted with

similar effect under any foreign Debtor Relief Laws) (each, a "**DIP Financing**"), with such DIP Financing to be secured by all or any portion of the Collateral (including assets that, but for the application of Section 552 of the Bankruptcy Code (or any similar provision of any foreign Debtor Relief Laws) would be Collateral) (it being agreed that the ABL Agent and the ABL Secured Parties shall not propose any DIP Financing that purports to be secured by a priming or pari passu lien on the Term Priority Collateral without the consent of the Term Agent), then the Term Agent, on behalf of itself and the Term Secured Parties, agrees that it will raise no objection (and hereby consents) and will not support any objection to such DIP Financing or use of cash collateral or to the Liens securing the same on the grounds of a failure to provide "adequate protection" for the Liens of the Term Agent securing the Term Obligations or on any other grounds (and will not request any adequate protection solely as a result of such DIP Financing or use of cash collateral that is ABL Priority Collateral except as permitted by Section 6.3(c)(i)), so long as (i) the Term Agent retains its Lien on the Collateral to secure the Term Obligations (in each case, including Proceeds thereof arising after the commencement of the case under any Debtor Relief Laws) and, as to the Term Priority Collateral only, such Lien has the same priority as existed prior to the commencement of the case under the subject Debtor Relief Laws and any Lien on the Term Priority Collateral securing such DIP Financing is junior and subordinate to the Lien of the Term Agent on the Term Priority Collateral (other than in respect of any "carve-out") and (ii) all Liens on ABL Priority Collateral securing any such DIP Financing shall be senior to or on a parity with the Liens of the ABL Agent and the ABL Secured Parties securing the ABL Obligations on ABL Priority Collateral.  Nothing in this Section 6.1(a) is intended to or shall prevent the Term Agent and the Term Secured Parties from objecting to any DIP Financing to the extent (and only to the extent)  such DIP Financing requires any material terms of a plan of reorganization or other dispositive arrangement of similar effect under any Debtor Relief Laws (other than the payment in full of such DIP Facility).

(i)   If the Term Borrower or any Term Guarantor shall be subject to any Insolvency Proceeding at any time prior to the Discharge of Term Obligations, and the Term Agent or the Term Secured Parties shall seek to provide the Term Borrower or any Term Guarantor with, or consent to a third party providing, any DIP Financing, with such DIP Financing to be secured by all or any portion of the Collateral (including assets that, but for the application of Section 552 of the Bankruptcy Code (or any similar provision of any foreign Debtor Relief Laws) would be Collateral) (it being agreed that the Term Agent and the Term Secured Parties shall not propose any DIP Financing that purports to be secured by a priming or pari passu lien on the ABL Priority Collateral without the consent of the ABL Agent), then the ABL Agent, on behalf of itself and the ABL Secured Parties, agrees that it will raise no objection (and hereby consents) and will not support any objection to such DIP Financing or to the Liens securing the same on the grounds of a failure to provide "adequate protection" for the Liens of the ABL Agent securing the ABL Obligations or on any other grounds (and will not request any adequate protection solely as a result of such DIP Financing), so long as (i) the ABL Agent retains its Lien on the Collateral to secure the ABL Obligations (in each case, including Proceeds thereof arising after the commencement of the case under any Debtor Relief Laws) and, as to the ABL Priority Collateral only, such Lien has the same priority as existed prior to the commencement of the case under the subject

Debtor Relief Laws and any Lien on the ABL Priority Collateral securing such DIP Financing furnished by the Term Agent or Term Secured Parties is junior and subordinate to the Lien of the ABL Agent on the ABL Priority Collateral (other than in respect of any "carve-out") and (ii) all Liens on Term Priority Collateral securing any such DIP Financing furnished by the Term Agent or Term Secured Parties shall be senior to or on a parity with the Liens of the Term Agent and the Term Secured Parties securing the Term Obligations on Term Priority Collateral. Nothing in this Section 6.1(b) is intended to or shall prevent the ABL Agent and the ABL Secured Parties from objecting to any DIP Financing to the extent (and only to the extent) such DIP Financing requires any material terms of a plan of reorganization or other dispositive arrangement of similar effect under any Debtor Relief Laws (other than the payment in full of such DIP Facility).

(j)    All Liens granted to the ABL Agent or the Term Agent in any Insolvency Proceeding, whether as adequate protection or otherwise, are intended by the Parties to be and shall be deemed to be subject to the Lien Priority and the other terms and conditions of this Agreement. For clarity, the Term Agent and the Term Secured Parties shall not, without the consent of the ABL Agent, seek to "prime" the Lien of the ABL Agent and the ABL Secured Parties on the ABL Priority Collateral or request, seek or receive a Lien on the ABL Priority Collateral pursuant to Section 364(d) or 363(c)(4) of the Bankruptcy Code on the ABL Priority Collateral. For clarity, the ABL Agent and the ABL Secured Parties shall not, without the consent of the Term Agent, seek to "prime" the Lien of the Term Agent and the Term Secured Parties on the Term Priority Collateral or request, seek or receive a Lien on the Term Priority Collateral pursuant to Section 364(d) or 363(c)(4) of the Bankruptcy Code on the Term Priority Collateral.

Section 6.2    **Relief From Stay**. Until the Discharge of ABL Obligations has occurred, the Term Agent, on behalf of itself and the Term Secured Parties, agrees not to seek relief from the automatic stay or any other stay in any Insolvency Proceeding in respect of any portion of the ABL Priority Collateral without the ABL Agent's express written consent.  Until the Discharge of Term Obligations has occurred, the ABL Agent, on behalf of itself and the ABL Secured Parties, agrees not to seek relief from the automatic stay or any other stay in any Insolvency Proceeding in respect of any portion of the Term Priority Collateral without the Term Agent's express written consent. In addition, neither the Term Agent nor the ABL Agent shall seek any relief from the automatic stay with respect to any Collateral without providing three (3) days' prior written notice to the other, unless such period is agreed by both the ABL Agent and the Term Agent to be modified or unless the ABL Agent or Term Agent, as applicable, makes a good faith determination that either (A) the ABL Priority Collateral or the Term Priority Collateral, as applicable, will decline speedily in value or (B) the failure to take any action will have a reasonable likelihood of endangering the ABL Agent's or the Term Agent's ability to realize upon its Collateral.

Section 6.3    **No Contest; Adequate Protection**. (h) The Term Agent, on behalf of itself and the Term Secured Parties, agrees that, prior to the Discharge of ABL Obligations, none of them shall seek or accept any form of adequate protection under any or all of §361, §362, §363 or §364 of the Bankruptcy Code with respect to the ABL Priority Collateral,

except as set forth in Section 6.1 and this Section 6.3 or as may otherwise be consented to in writing by the ABL Agent in its sole and absolute discretion. The Term Agent, on behalf of itself and the Term Secured Parties, agrees that, prior to the Discharge of ABL Obligations, none of them shall contest (or support any other Person contesting) (i) any request by the ABL Agent or any ABL Secured Party for adequate protection of its interest in the Collateral (unless in contravention of Section 6.1(b) above), (ii) any proposed provision of DIP Financing by the ABL Agent and the ABL Secured Parties (or any other Person proposing to provide DIP Financing with the consent of the ABL Agent) (unless in contravention of Section 6.1(a) above) or (iii) any objection by the ABL Agent or any ABL Secured Party to any motion, relief, action or proceeding based on a claim by the ABL Agent or any ABL Secured Party that its interests in the Collateral (unless in contravention of Section 6.1(b) above) are not adequately protected (or any other similar request under any law applicable to an Insolvency Proceeding), so long as any Liens granted to the ABL Agent as adequate protection of its interests are subject to this Agreement.

(i)     The ABL Agent, on behalf of itself and the ABL Secured Parties, agrees that, prior to the Discharge of Term Obligations, none of them shall seek or accept any form of adequate protection under any or all of §361, §362, §363 or §364 of the Bankruptcy Code with respect to the Term Priority Collateral, except as set forth in Section 6.1 and this Section 6.3 or as may otherwise be consented to in writing by the Term Agent in its sole and absolute discretion. The ABL Agent, on behalf of itself and the ABL Secured Parties, agrees that, prior to the Discharge of Term Obligations, none of them shall contest (or support any other Person contesting) (i) any request by the Term Agent or any Term Secured Party for adequate protection of its interest in the Collateral (unless in contravention of Section 6.1(a) above), (ii) any proposed provision of DIP Financing by the Term Agent and the Term Secured Parties (or any other Person proposing to provide DIP Financing with the consent of the Term Agent) (unless in contravention of Section 6.1(b) above) or (iii) any objection by the Term Agent or any Term Secured Party to any motion, relief, action or proceeding based on a claim by the Term Agent or any Term Secured Party that its interests in the Collateral (unless in contravention of Section 6.1(a) above) are not adequately protected (or any other similar request under any law applicable to an Insolvency Proceeding), so long as any Liens granted to the Term Agent as adequate protection of its interests are subject to this Agreement.

(j)    Notwithstanding the foregoing provisions in this Section 6.3, in any Insolvency Proceeding:

(i)    if the ABL Secured Parties (or any subset thereof) are granted adequate protection with respect to the ABL Priority Collateral in the form of additional collateral (even if such collateral is not of a type which would otherwise have constituted ABL Priority Collateral), then the ABL Agent, on behalf of itself and the ABL Secured Parties, agrees that the Term Agent, on behalf of itself or any of the Term Secured Parties, may seek or request (and the ABL Secured Parties will not oppose such request) adequate protection with respect to its interests in such Collateral in the form of a Lien on the same additional collateral, which Lien will be subordinated to the Liens securing the ABL

Obligations on the same basis as the other Liens of the Term Agent on ABL Priority Collateral;

(ii)    in the event the Term Agent, on behalf of itself or any of the Term Secured Parties, is granted adequate protection with respect to the Term Priority Collateral in the form of additional collateral (even if such collateral is not of a type which would otherwise have constituted Term Priority Collateral), then the Term Agent, on behalf of itself and any of the Term Secured Parties, agrees that the ABL Agent, on behalf of itself or any of the ABL Secured Parties, may seek or request (and the Term Secured Parties will not oppose such request) adequate protection with respect to its interests in such Collateral in the form of a Lien on the same additional collateral, which Lien will be subordinated to the Liens securing the Term Obligations on the same basis as the other Liens of the ABL Agent on Term Priority Collateral; and

(iii)    Except as otherwise expressly set forth in Section 6.1 or in connection with the exercise of remedies with respect to the ABL Priority Collateral, nothing herein shall limit the rights of the Term Agent or the Term Secured Parties from seeking adequate protection with respect to their rights in the Term Priority Collateral in any Insolvency Proceeding (including adequate protection in the form of a cash payment, periodic cash payments or otherwise from Proceeds of, or in respect of the value of Term Priority Collateral). Except as otherwise expressly set forth in Section 6.1 or in connection with the exercise of remedies with respect to the Term Priority Collateral, nothing herein shall limit the rights of the ABL Agent or the ABL Secured Parties from seeking adequate protection with respect to their rights in the ABL Priority Collateral in any Insolvency Proceeding (including adequate protection in the form of a cash payment, periodic cash payments or otherwise from Proceeds of ABL Priority Collateral).

Section 6.4    **Asset Sales**. (a) The Term Agent agrees, on behalf of itself and the Term Secured Parties, that it will not oppose and shall be deemed to have consented to any sale consented to by the ABL Agent of any ABL Priority Collateral pursuant to Section 363(f) of the Bankruptcy Code (or any similar provision under the law applicable to any Insolvency Proceeding or under a court order in respect of measures granted with similar effect under any foreign Debtor Relief Laws) so long as the Term Agent, for the benefit of the Term Secured Parties, shall retain a Lien on the Proceeds of such sale (to the extent such Proceeds are not applied to the ABL Obligations in accordance with Section 4.1(b)). The ABL Agent agrees, on behalf of itself and the ABL Secured Parties, that it will not oppose and shall be deemed to have consented to any sale consented to by the Term Agent of any Term Priority Collateral pursuant to Section 363(f) of the Bankruptcy Code (or any similar provision under the law applicable to any Insolvency Proceeding or under a court order in respect of measures granted with similar effect under any foreign Debtor Relief Laws) so long as (i) any such sale is made in accordance with Section 3.6 and (ii) the ABL Agent, for the benefit of the ABL Secured Parties, shall retain a Lien on the Proceeds of such sale (to the extent such Proceeds are not applied to the Term Obligations in accordance with Section 4.1(c)). If such sale of Collateral includes both ABL Priority Collateral and Term Priority Collateral and the Parties are unable after negotiating in good faith to agree on the allocation

of the purchase price between the ABL Priority Collateral and Term Priority Collateral, either Party may apply to the court in such Insolvency Proceeding to make a determination of such allocation, and the court's determination shall be binding upon the Parties.

(b)   The Term Agent agrees, on behalf of itself and the Term Secured Parties, that the ABL Secured Parties shall have the right to credit bid under Section 363(k) of the Bankruptcy Code with respect to the ABL Priority Collateral; provided that the Term Secured Parties shall not be deemed to have agreed to any credit bid in connection with the sale of Collateral consisting of Term Priority Collateral, and the ABL Agent agrees, on behalf of the ABL Secured Parties, that the Term Secured Parties shall have the right to credit bid under Section 363(k) of the Bankruptcy Code with respect to the Term Priority Collateral; provided that the ABL Secured Parties shall not be deemed to have agreed to any credit bid in connection with the sale of Collateral consisting of ABL Priority Collateral. The Term Agent, on behalf of itself and the Term Secured Parties, agrees that, so long as the Discharge of ABL Obligations has not occurred, no Term Secured Party shall, without the prior written consent of the ABL Agent, credit bid under Section 363(k) of the Bankruptcy Code with respect to the ABL Priority Collateral. The ABL Agent, on behalf of itself and the ABL Secured Parties, agrees that, so long as the Discharge of Term Obligations has not occurred, no ABL Secured Party shall, without the prior written consent of the Term Agent, credit bid under Section 363(k) of the Bankruptcy Code with respect to the Term Priority Collateral.

Section 6.5   **Separate Grants of Security and Separate Classification**. Each Term Secured Party and each ABL Secured Party acknowledges and agrees that (i) the grants of Liens pursuant to the ABL Collateral Documents and the Term Collateral Documents constitute two separate and distinct grants of Liens and (ii) because of, among other things, their differing rights in the Collateral, the Term Obligations are fundamentally different from the ABL Obligations and must be separately classified in any plan of reorganization (or other plan of similar effect under any Debtor Relief Laws) proposed or adopted in an Insolvency Proceeding. To further effectuate the intent of the parties as provided in the immediately preceding sentence, if it is held that the claims of the ABL Secured Parties and the Term Secured Parties in respect of the Collateral constitute only one secured claim (rather than separate classes of senior and junior secured claims), then the ABL Secured Parties and the Term Secured Parties hereby acknowledge and agree that all distributions shall be made as if there were separate classes of ABL Obligation claims and Term Obligation claims against the Loan Parties, with the effect being that, to the extent that the aggregate value of the ABL Priority Collateral or Term Priority Collateral, as applicable, is sufficient (for this purpose ignoring all claims held by the other class of Secured Parties), the ABL Secured Parties or the Term Secured Parties, respectively, shall be entitled to receive, in addition to amounts distributed to them in respect of principal, pre-petition interest and other claims, all amounts owing in respect of post-petition interest that is available from each pool of Priority Collateral for each of the ABL Secured Parties and the Term Secured Parties, respectively, before any distribution is made in respect of the claims held by the other class of Secured Parties from such Collateral, with the other class of Secured Parties hereby acknowledging and agreeing to turn over to the first class of Secured Parties amounts

otherwise received or receivable by them to the extent necessary to effectuate the intent of this sentence, even if such turnover has the effect of reducing the aggregate recoveries.

**Section 6.6    Enforceability**. The provisions of this Agreement are intended to be and shall be enforceable under Section 510(a) of the Bankruptcy Code.

**Section 6.7    ABL Obligations Unconditional**. All rights of the ABL Agent hereunder, and all agreements and obligations of the Term Agent and the Loan Parties (to the extent applicable) hereunder, shall remain in full force and effect irrespective of:

A.    any lack of validity or enforceability of any ABL Facility Document;

B.    any change in the time, place or manner of payment of, or in any other term of, all or any portion of the ABL Obligations, or any amendment, waiver or other modification, whether by course of conduct or otherwise, or any refinancing, replacement, refunding or restatement of any ABL Facility Document;

C.    any exchange, release, voiding, avoidance or non perfection of any security interest in any Collateral or any other collateral, or any release, amendment, waiver or other modification, whether by course of conduct or otherwise, or any refinancing, replacement, refunding, restatement or increase of all or any portion of the ABL Obligations or any guarantee or guaranty thereof; or

D.    any other circumstances that otherwise might constitute a defense available to, or a discharge of, any Loan Party in respect of the ABL Obligations, or of any of the Term Agent or any Loan Party, to the extent applicable, in respect of this Agreement.

**Section 6.8    Term Obligations Unconditional**. All rights of the Term Agent hereunder, and all agreements and obligations of the ABL Agent and the Loan Parties (to the extent applicable) hereunder, shall remain in full force and effect irrespective of:

A.    any lack of validity or enforceability of any Term Facility Document;

B.    any change in the time, place or manner of payment of, or in any other term of, all or any portion of the Term Obligations, or any amendment, waiver or other modification, whether by course of conduct or otherwise, or any refinancing, replacement, refunding or restatement of any Term Facility Document;

C.    any exchange, release, voiding, avoidance or non perfection of any security interest in any Collateral, or any other collateral, or any release, amendment, waiver or other modification, whether by course of conduct or otherwise, or any refinancing, replacement, refunding, restatement or increase of all or any portion of the Term Obligations or any guarantee or guaranty thereof; or

D.    any other circumstances that otherwise might constitute a defense available to, or a discharge of, any Loan Party in respect of the Term Obligations, or of

any of the ABL Agent or any Loan Party, to the extent applicable, in respect of this Agreement.

## ARTICLE 7
## MISCELLANEOUS

**Section 7.1    Rights of Subrogation**. The Term Agent, for and on behalf of itself and the Term Secured Parties, agrees that no payment to the ABL Agent or any ABL Secured Party pursuant to the provisions of this Agreement shall entitle the Term Agent or any Term Secured Party to exercise any rights of subrogation in respect thereof until the Discharge of ABL Obligations shall have occurred. Following the Discharge of ABL Obligations, the ABL Agent agrees to execute such documents, agreements, and instruments as the Term Agent or any Term Secured Party may reasonably request to evidence the transfer by subrogation to any such Person of an interest in the ABL Obligations resulting from payments to the ABL Agent by such Person, so long as all costs and expenses (including all reasonable legal fees and disbursements) incurred in connection therewith by the ABL Agent are paid by such Person upon request for payment thereof. The ABL Agent, for and on behalf of itself and the ABL Secured Parties, agrees that no payment to the Term Agent or any Term Secured Party pursuant to the provisions of this Agreement shall entitle the ABL Agent or any ABL Secured Party to exercise any rights of subrogation in respect thereof until the Discharge of Term Obligations shall have occurred. Following the Discharge of Term Obligations, the Term Agent agrees to execute such documents, agreements, and instruments as the ABL Agent or any ABL Secured Party may reasonably request to evidence the transfer by subrogation to any such Person of an interest in the Term Obligations resulting from payments to the Term Agent by such Person, so long as all costs and expenses (including all reasonable legal fees and disbursements) incurred in connection therewith by the Term Agent are paid by such Person upon request for payment thereof.

**Section 7.2    Further Assurances**. The Parties will, at their own expense and at any time and from time to time, promptly execute and deliver all further instruments and documents, and take all further action, that may be necessary or desirable, or that either Party may reasonably request, in order to protect any right or interest granted or purported to be granted hereby or to enable the ABL Agent or the Term Agent to exercise and enforce its rights and remedies hereunder; provided, however, that no Party shall be required to pay over any payment or distribution, execute any instruments or documents, or take any other action referred to in this Section 7.2, to the extent that such action would contravene any law, order or other legal requirement or any of the terms or provisions of this Agreement, and in the event of a controversy or dispute, such Party may interplead any payment or distribution in any court of competent jurisdiction, without further responsibility in respect of such payment or distribution under this Section 7.2.

**Section 7.3    Representations**. The Term Agent represents and warrants to the ABL Agent that it has the requisite power and authority under the Term Facility Documentation to enter into, execute, deliver, and carry out the terms of this Agreement on behalf of itself and the Term Secured Parties and that this Agreement shall be binding

obligations of the Term Agent and the Term Secured Parties, enforceable against the Term Agent and the Term Secured Parties in accordance with its terms. The ABL Agent represents and warrants to the Term Agent that it has the requisite power and authority under the ABL Facility Documentation to enter into, execute, deliver, and carry out the terms of this Agreement on behalf of itself and the ABL Secured Parties and that this Agreement shall be binding obligations of the ABL Agent and the ABL Secured Parties, enforceable against the ABL Agent and the ABL Secured Parties in accordance with its terms.

**Section 7.4    Amendments**. No amendment or waiver of any provision of this Agreement nor consent to any departure by any Party hereto shall be effective unless it is in a written agreement executed by the Term Agent and the ABL Agent and, in the case of any amendment, modification, supplement or waiver to Sections 1.1, 1.2, 2.1, 2.3, 2.4 2.5, 3.2, 3.4, 3.5, 3.8, 3.9, 4.1, 4.2(b), 5.1(c), 5.2, 6.1, 7.4, 7.7, 7.8 and 7.10 or any other amendment, modification, supplement or waiver which is otherwise adverse to the Borrower, the applicable Borrower, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

It is understood that the ABL Agent and the Term Agent, without the consent of any other ABL Secured Party or Term Secured Party, may in their discretion (or at the reasonable request of the Company) determine that a supplemental agreement (which may take the form of an amendment and restatement of this Agreement) is necessary or appropriate (i) to facilitate having additional indebtedness or other obligations of any of the Loan Parties become ABL Obligations or Term Obligations, as the case may be, under this Agreement or (ii) to effectuate the subordination of Liens securing any Permitted Second Priority Additional Debt (or any Permitted Refinancing thereof) to the Liens on the Term Priority Collateral securing the ABL Obligations and to the Liens on the ABL Priority Collateral securing the Term Obligations (the indebtedness or other obligations described in clauses (i) and (ii), "**Additional Debt**"), which supplemental agreement shall, except in the case of Permitted Second Priority Additional Debt or any Permitted Refinancing thereof, specify whether such Additional Debt constitutes ABL Obligations or Term Obligations; <u>provided</u> that such Additional Debt is permitted to be incurred under the ABL Credit Agreement and the Term Credit Agreement then extant in accordance with the terms thereof.

**Section 7.5    Addresses for Notices**. Unless otherwise specifically provided herein, any notice or other communication herein required or permitted to be given shall be in writing and shall be personally served, telecopied, or sent by overnight express courier service or United States certified or registered mail and shall be deemed to have been given on the date of receipt when delivered in person or by courier service or sent by telecopy or five (5) Business Days after deposit in the United States mail (with postage prepaid and properly addressed). For the purposes hereof, the addresses of the parties hereto (until notice of a change thereof is delivered as provided in this Section 7.5) shall be as set forth below or, as to each party, at such other address as may be designated by such party in a written notice to all of the other parties.

|  | |
|---|---|
| ABL Agent: | RBS Citizens Business Capital<br>71 South Wacker Drive, Suite 2900<br>Chicago, Illinois 60606<br>Attention: Kimberly A. Crotty, Vice President |
| Term Agent: | Credit Suisse AG, Cayman Islands Branch<br>7033 Louis Stephens Drive<br>Research Triangle Park, NC 27709<br>Attention: Sean Portrait |

**Section 7.6** **No Waiver; Remedies**. No failure on the part of any Party to exercise, and no delay in exercising, any power or right hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any power or right hereunder, or any abandonment or discontinuance of steps to enforce such power or right, preclude any other or further exercise thereof or the exercise of any other power or right. The rights and remedies herein provided are cumulative and not exclusive of any rights or remedies provided by law.

**Section 7.7** **Continuing Agreement, Transfer of Secured Obligations**. This Agreement is a continuing agreement and shall (a) remain in full force and effect until the Discharge of ABL Obligations and the Discharge of Term Obligations shall have occurred, (b) be binding upon the Parties and their successors and assigns, and (c) inure to the benefit of and be enforceable by the Parties and their respective successors, transferees and assigns. Except as set forth in Section 7.4, nothing herein is intended, or shall be construed to give, any other Person any right, remedy or claim under, to or in respect of this Agreement or any Collateral. All references to any Loan Party shall include any Loan Party as debtor-in-possession and any receiver or trustee for such Loan Party in any Insolvency Proceeding. Without limiting the generality of the foregoing clause (c), the ABL Agent, any ABL Secured Party, the Term Agent, or any Term Secured Party may assign or otherwise transfer all or any portion of the ABL Obligations or the Term Obligations in accordance with the ABL Credit Agreement or the Term Credit Agreement, in each case, as applicable, to any other Person (other than the Borrower, any Guarantor or any Affiliate of the Borrower or any Guarantor and any Subsidiary of the Borrower or any Guarantor (except as provided in the ABL Credit Agreement or the Term Credit Agreement, as applicable)), and such other Person shall thereupon become vested with all the rights and obligations in respect thereof granted to the ABL Agent, the Term Agent, any ABL Secured Party, or any Term Secured Party, as the case may be, herein or otherwise. The ABL Secured Parties and the Term Secured Parties may continue, at any time and without notice to the other parties hereto, to extend credit and other financial accommodations, lend monies and provide Indebtedness to, or for the benefit of, any Loan Party on the faith hereof.

**Section 7.8** **Governing Law; Entire Agreement**. The validity, performance, and enforcement of this Agreement shall be governed by, and construed in accordance with, the laws of the State of New York. This Agreement constitutes the entire agreement and understanding among the Parties with respect to the subject matter hereof and supersedes any prior agreements, written or oral, with respect thereto.

**Section 7.9     Counterparts**. This Agreement may be executed in any number of counterparts, and it is not necessary that the signatures of all Parties be contained on any one counterpart hereof, each counterpart shall be deemed to be an original, and all together shall constitute one and the same document. Delivery of an executed signature page to this Agreement by facsimile or other electronic transmission (in .pdf or similar format) shall be as effective as delivery of a manually signed counterpart of this Agreement.

**Section 7.10     No Third Party Beneficiaries**. This Agreement is solely for the benefit of the ABL Agent, ABL Secured Parties, Term Agent and Term Secured Parties. No other Person shall be deemed to be a third party beneficiary of this Agreement; provided that the Borrower shall be deemed to be a third party beneficiary in respect of the Sections 1.1, 1.2, 2.1, 2.3, 2.4 2.5, 3.2, 3.4, 3.5, 3.8, 3.9, 4.1, 4.2(b), 5.1(c), 5.2, 6.1, 7.4, 7.7, 7.8, 7.10 and any other provision expressly providing for the Company's consent.

**Section 7.11     Headings**. The headings of the articles and sections of this Agreement are inserted for purposes of convenience only, are not part of this Agreement and shall not be construed to affect the meaning or construction of any of the provisions hereof.

**Section 7.12     Severability**. If any of the provisions in this Agreement shall, for any reason, be held invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect or impair the validity, legality or enforceability of any other provision of this Agreement (it being understood that the invalidity of a particular provision in a particular jurisdiction shall not in and of itself affect the validity of such provision in any other jurisdiction) and shall not invalidate the Lien Priority or the application of Proceeds and other priorities set forth in this Agreement. The Parties shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid, legal and/or enforceable provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

**Section 7.13     Attorneys' Fees**. The Parties agree that if any dispute, arbitration, litigation, or other proceeding is brought with respect to the enforcement of this Agreement or any provision hereof, the prevailing party in such dispute, arbitration, litigation, or other proceeding shall be entitled to recover its reasonable attorneys' fees and all other costs and expenses incurred in the enforcement of this Agreement, irrespective of whether suit is brought.

**Section 7.14     VENUE; JURY TRIAL WAIVER; CONSENT TO SERVICE OF PROCESS.**

(a)   EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION OF ANY NEW YORK STATE COURT OR FEDERAL COURT OF THE UNITED STATES OF AMERICA SITTING IN THE BOROUGH OF MANHATTAN, AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS

AGREEMENT OR THE LOAN DOCUMENTS, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH NEW YORK STATE OR, TO THE EXTENT PERMITTED BY LAW, IN SUCH FEDERAL COURT.  EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.

(b)    EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE LOAN DOCUMENTS. EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE LOAN DOCUMENTS, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 7.14(b).

(c)    EACH PARTY TO THIS AGREEMENT IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 7.5. NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY TO THIS AGREEMENT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW.

**Section 7.15    <u>Intercreditor Agreement</u>**. This Agreement is the "ABL Intercreditor Agreement" referred to in the Term Credit Agreement and the "Term Debt Intercreditor Agreement" referred to in the ABL Credit Agreement. Nothing in this Agreement shall be deemed to subordinate the obligations due to (i) any ABL Secured Party to the obligations due to any Term Secured Party or (ii) any Term Secured Party to the obligations due to any ABL Secured Party (in each case, whether before or after the occurrence of an Insolvency Proceeding), it being the intent of the Parties that this Agreement shall effectuate a subordination of Liens but not a subordination of Indebtedness.

**Section 7.16    <u>No Warranties or Liability</u>**. The Term Agent and the ABL Agent acknowledge and agree that neither has made any representation or warranty with respect to the execution, validity, legality, completeness, collectability or enforceability of any other ABL Facility Document or any Term Facility Document.  Except as otherwise provided in this Agreement, the Term Agent and the ABL Agent will be entitled to manage and supervise their respective extensions of credit to any Loan Party in accordance with law and their usual practices, modified from time to time as they deem appropriate.

**Section 7.17  Conflicts**. In the event of any conflict between the provisions of this Agreement and the provisions of any ABL Facility Document or any Term Facility Document, the provisions of this Agreement shall govern.

**Section 7.18  Information Concerning Financial Condition of the Loan Parties**. Each of the Term Agent and the ABL Agent hereby assumes responsibility for keeping itself informed of the financial condition of the Loan Parties and all other circumstances bearing upon the risk of nonpayment of the Term Obligations or the ABL Obligations. The Term Agent and the ABL Agent hereby agree that no party shall have any duty to advise any other party of information known to it regarding such condition or any such circumstances. In the event the Term Agent or the ABL Agent, in its sole discretion, undertakes at any time or from time to time to provide any information to any other party to this Agreement, (a) it shall be under no obligation (i) to provide any such information to such other party or any other party on any subsequent occasion, (ii) to undertake any investigation not a part of its regular business routine, or (iii) to disclose any other information, (b) it makes no representation as to the accuracy or completeness of any such information and shall not be liable for any information contained therein, and (c) the Party receiving such information hereby agrees to hold the other Party harmless from any action the receiving Party may take or conclusion the receiving Party may reach or draw from any such information, as well as from and against any and all losses, claims, damages, liabilities, and expenses to which such receiving Party may become subject arising out of or in connection with the use of such information.

[SIGNATURE PAGES FOLLOW]

IN WITNESS WHEREOF, the ABL Agent, for and on behalf of itself and the ABL Lenders, and the Term Agent, for and on behalf of itself and the Term Lenders, have caused this Agreement to be duly executed and delivered as of the date first above written.

[SEPARATE SIGNATURE PAGES TO BE ATTACHED]

## ACKNOWLEDGMENT

The Borrower and each Guarantor hereby acknowledges that it has received a copy of this Agreement as in effect on the date hereof and consents thereto, agrees to recognize all rights granted thereby to the ABL Agent, the ABL Secured Parties, the Term Agent, and the Term Secured Parties and will not do any act or perform any obligation which is not in accordance with the agreements set forth in this Agreement as in effect on the date hereof. Each Borrower and each Guarantor further acknowledges and agrees that (except as set forth in Section 7.4 and Section 7.10) it is not an intended beneficiary or third party beneficiary under this Agreement and (i) as between the ABL Secured Parties, the ABL Borrower and the ABL Guarantors, the ABL Facility Documentation remain in full force and effect as written, and (ii) as between the Term Secured Parties, the Term Borrower and the Term Guarantors, the Term Facility Documentation remain in full force and effect as written. Without limiting the foregoing, the Company and the other Loan Parties consent to the performance by the Term Agent of the obligations set forth in Section 3.6 of this Agreement and acknowledge and agree that neither the Term Agent nor any other Term Secured Party shall ever be accountable or liable for any action taken or omitted by the ABL Agent or any other ABL Secured Party or its or any of their officers, employees, agents, successors or assigns in connection therewith or incidental thereto or in consequence thereof, including any improper use or disclosure of any proprietary information or other Intellectual Property by the ABL Agent or any other ABL Secured Party or its or any of their officers, employees, agents, successors or assigns or any other damage to or misuse or loss of any property of the Loan Parties as a result of any action taken or omitted by the ABL Agent or its officers, employees, agents, successors or assigns pursuant to, and in accordance with, Section 3.6 of this Agreement.

**<u>LOAN PARTIES</u>:**

[SEPARATE SIGNATURE PAGES TO BE ATTACHED]

EXHIBIT J

FORM OF TERM NOTE

[New York, New York]

[Date]

FOR VALUE RECEIVED, the undersigned, YRC Worldwide Inc., a Delaware corporation (the " Borrower"), hereby promises to pay to the Lender set forth above (the "Lender") or its registered assigns in accordance with Section 10.04 of the Credit Agreement (as defined below), in lawful money of the United States of America in immediately available funds at the office of the Administrative Agent (such term, and each other capitalized term used but not defined herein, having the meaning assigned to it in the Credit Agreement, dated as of February 13, 2014 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), among YRC Worldwide Inc., a Delaware corporation, the subsidiaries of the Borrower party thereto from time to time, the Lenders party thereto from time to time and Credit Suisse AG, Cayman Islands Branch, as Administrative Agent and Collateral Agent) at Eleven Madison Avenue, New York, New York 10010 (or such other office notified by the Administrative Agent to the Borrower in accordance with Section 10.01 of the Credit Agreement) (i) on the dates set forth in the Credit Agreement, the principal amounts set forth in the Credit Agreement with respect to Term Loans made by the Lender to Borrower pursuant to the Credit Agreement and (ii) on each Interest Payment Date, interest at the rate or rates per annum as provided in the Credit Agreement on the unpaid principal amount of all Term Loans made by the Lender to the Borrower pursuant to the Credit Agreement.

The Borrower promises to pay interest, on written demand, on any overdue principal and, to the extent permitted by law, overdue interest from their due dates at the rate or rates provided in the Credit Agreement.

The Borrower hereby waives (to the extent permitted by applicable law) diligence, presentment, demand, protest and notice of any kind whatsoever. The nonexercise by the holder hereof of any of its rights hereunder in any particular instance shall not constitute a waiver thereof in that or any subsequent instance.

All borrowings evidenced by this note and all payments and prepayments of the principal hereof and interest hereon and the respective dates thereof shall be endorsed by the holder hereof on the schedule attached hereto and made a part hereof or on a continuation thereof which shall be attached hereto and made a part hereof, or otherwise recorded by such holder in its internal records; provided, however, that the failure of the holder hereof to make such a notation or any error in such notation shall not affect the obligations of the Borrower under this note.

This note is one of the Term Notes referred to in the Credit Agreement that, among other things, contains provisions for the acceleration of the maturity hereof upon the happening of certain events, for optional and mandatory prepayment of the principal hereof prior to the maturity hereof and for the amendment or waiver of certain provisions of the Credit Agreement, all upon the terms and conditions therein specified.

**THIS NOTE MAY NOT BE TRANSFERRED EXCEPT IN COMPLIANCE WITH THE TERMS OF THE CREDIT AGREEMENT.**

**THIS TERM NOTE WAS ISSUED WITH ORIGINAL ISSUE DISCOUNT. BEGINNING NO LATER THAN TEN (10) DAYS AFTER THE ISSUE DATE OF THIS TERM NOTE, THE HOLDER OF THIS TERM NOTE MAY REQUEST, AND WILL PROMPTLY BE MADE AVAILABLE UPON REQUEST, THE FOLLOWING INFORMATION WITH RESPECT TO THE TERM NOTE: ISSUE PRICE, AMOUNT OF ORIGINAL ISSUE DISCOUNT, ISSUE DATE AND YIELD TO MATURITY. SUCH INFORMATION WILL BE PREPARED BY YRC WORLDWIDE INC., 10990 ROE AVENUE, OVERLAND PARK, KANSAS 66211, ATTENTION: GENERAL COUNSEL AND CHIEF FINANCIAL OFFICER.**

**THIS NOTE SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK, WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES THEREOF TO THE EXTENT SUCH PRINCIPLES WOULD CAUSE THE APPLICATION OF THE LAW OF ANOTHER STATE.**

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the parties hereto have caused this Term Note to be duly executed by their respective authorized officers as of the day and year first above written.

YRC WORLDWIDE INC.

By: _____

Name:

Title:

LOANS AND PAYMENTS

| Date | Amount of Loan | Maturity Date | Payments of Principal/Interest | Principal Balance of Note | Name of Person Making the Notation |
|------|----------------|---------------|-------------------------------|---------------------------|------------------------------------|
| | | | | | |

EXHIBIT K

AUCTION PROCEDURES

*This outline is intended to summarize certain basic terms and procedures with respect to Auctions pursuant to and in accordance with the terms and conditions of Section 10.04(k) of the credit agreement, of which this Exhibit K is a part (as amended, modified or supplemented from time to time, the "**Credit Agreement**"). It is not intended to be a definitive list of all of the terms and conditions of an Auction and all such terms and conditions shall be set forth in the applicable Auction Procedures set for each Auction (the "**Offer Documents**"). None of the Administrative Agent, the Auction Manager, any other Agent or any of their respective affiliates makes any recommendation pursuant to the Offer Documents as to whether or not any Lender should sell by assignment any of its Term Loans pursuant to the Offer Documents (including, for the avoidance of doubt, by participating in the Auction as a Lender) or whether or not the Borrower or any of its Subsidiaries should purchase by assignment any Term Loans from any Lender pursuant to any Auction. Each Lender should make its own decision as to whether to sell by assignment any of its Term Loans and, if so, the principal amount of and price to be sought for such Term Loans. In addition, each Lender should consult its own attorney, business advisor or tax advisor as to legal, business, tax and related matters concerning any Auction and the Offer Documents. Capitalized terms not otherwise defined in this Exhibit have the meanings assigned to them in the Credit Agreement.*

**Summary**. The Borrower or any of its Subsidiaries may purchase (by assignment) Term Loans on a pro rata basis by conducting one or more auctions (each, an "**Auction**") pursuant to the procedures described herein; *provided*, that no more than one Auction may be ongoing at any one time and no more than five Auctions may be made in any period of four consecutive fiscal quarters of the Borrower.

**Notice Procedures**. In connection with each Auction, the Borrower or the applicable Subsidiary (the "**Offeror**") will provide notification to the Auction Manager (for distribution to the Lenders) of the Term Loans that will be the subject of the Auction by delivering to the Auction Manager a written notice (an "**Auction Notice**"). Each Auction Notice shall contain (i) the maximum principal amount of Term Loans the Offeror is willing to purchase (by assignment) in the Auction (the "**Auction Amount**"), which shall be no less than $5,000,000 or an integral multiple of $1,000,000 in excess of thereof; (ii) the range of discounts to par (the "**Discount Range**"), expressed as a range of prices per $1,000, at which the Offeror would be willing to purchase Term Loans in the Auction; and (iii) the date on which the Auction will conclude, on which date Return Bids (defined below) will be due at the time provided in the Auction Notice (such time, the "**Expiration Time**"), as such date and time may be extended upon reasonable notice by the Offeror to the Auction Manager.

**Reply Procedures**. In connection with any Auction, each Lender holding Term Loans wishing to participate in such Auction shall, prior to the Expiration Time, provide the Auction Manager with a notice of participation in form reasonably satisfactory to the Auction Manager and the Borrower (the "**Return Bid**", to be included in the Offer Documents) which shall specify (i) a discount to par that must be expressed as a price per $1,000 of Term Loans (the "**Reply**

Price") within the Discount Range and (ii) the principal amount of Term Loans, in an amount not less than $1,000,000, that such Lender is willing to offer for sale at its Reply Price (the "**Reply Amount**"); *provided*, that each Lender may submit a Reply Amount that is less than the minimum amount and incremental amount requirements described above only if the Reply Amount comprises the entire amount of the Term Loans held by such Lender at such time. A Lender may only submit one Return Bid per Auction, but each Return Bid may contain up to three component bids, each of which may result in a separate Qualifying Bid and each of which will not be contingent on any other component bid submitted by such Lender resulting in a Qualifying Bid. In addition to the Return Bid, a participating Lender must execute and deliver, to be held by the Auction Manager, an Assignment and Acceptance in the form included in the Offer Documents which shall be in form reasonably satisfactory to the Auction Manager, the Administrative Agent and the Borrower (the "**Auction Assignment and Acceptance**"). The Offeror will not purchase any Term Loans at a price that is outside of the applicable Discount Range, nor will any Return Bids (including any component bids specified therein) submitted at a price that is outside such applicable Discount Range be considered in any calculation of the Applicable Threshold Price (as defined below).

> **Acceptance Procedures**. Based on the Reply Prices and Reply Amounts received by the Auction Manager, the Auction Manager, with the consent of (not to be unreasonably withheld or delayed) the Offeror, will calculate the lowest purchase price (the "**Applicable Threshold Price**") for the Auction within the Discount Range for the Auction that will allow the Offeror to complete the Auction by purchasing the full Auction Amount (or such lesser amount of Term Loans for which the Offeror has received Qualifying Bids). The Offeror shall purchase (by assignment) Term Loans from each Lender whose Return Bid is within the Discount Range and contains a Reply Price that is equal to or less than the Applicable Threshold Price (each, a "**Qualifying Bid**"). All principal amount of Term Loans included in Qualifying Bids received at a Reply Price lower than the Applicable Threshold Price will be purchased at a purchase price equal to the applicable Reply Price and shall not be subject to proration. If a Lender has submitted a Return Bid containing multiple component bids at different Reply Prices, then all Term Loans of such Lender offered in any such component bid that constitutes a Qualifying Bid with a Reply Price lower than the Applicable Threshold Price shall also be purchased at a purchase price in cash equal to the applicable Reply Price and shall not be subject to proration.

> **Proration Procedures**. All Term Loans offered in Return Bids (or, if applicable, any component bid thereof) constituting Qualifying Bids equal to the Applicable Threshold Price will be purchased at a purchase price equal to the Applicable Threshold Price; *provided* that if the aggregate principal amount of all Term Loans for which Qualifying Bids have been submitted in any given Auction equal to the Applicable Threshold Price would exceed the remaining portion of the Auction Amount (after deducting all Term Loans purchased below the Applicable Threshold Price), the Offeror shall purchase the Term Loans for which the Qualifying Bids submitted were at the Applicable Threshold Price ratably based on the respective principal amounts offered and in an aggregate amount up to the amount necessary to complete the purchase of the Auction Amount. For the avoidance of doubt, no Return Bids (or any component thereof) will be accepted above the Applicable Threshold Price.

**Notification Procedures**. The Auction Manager will calculate the Applicable Threshold Price in accordance with the terms hereinno later than the next Business Day after the date that the Return Bids were due. The Auction Manager will insert the amount of Term Loans to be assigned and the applicable settlement date determined by the Auction Manager with the consent of (not to be unreasonably withheld or delayed) the Offeror onto each applicable Auction Assignment and Acceptance received in connection with a Qualifying Bid. Upon written request of the submitting Lender, the Auction Manager will promptly return any Auction Assignment and Acceptance received in connection with a Return Bid that is not a Qualifying Bid.

**Additional Procedures**. Once initiated by an Auction Notice, the Offeror may withdraw an Auction by written notice to the Auction Manager prior to the original Expiration Time. Any Return Bid (including any component bid thereof) delivered to the Auction Manager may not be modified, revoked, terminated or cancelled; *provided* that a Lender may modify a Return Bid at any time prior to the Expiration Time solely to reduce the Reply Price included in such Return Bid. However, an Auction shall become void if the Offeror fails to satisfy one or more of the conditions to the purchase of Term Loans set forth in Section 10.04(k) of the Credit Agreement, as applicable, or to otherwise comply with any of the provisions of such Section 10.04(k). The purchase price for all Term Loans purchased in an Auction shall be paid in cash by the Offeror directly to the respective assigning Lender on a settlement date as determined by the Auction Manager with the consent of (not to be unreasonably withheld or delayed) the Offeror (which shall be no later than ten (10) Business Days after the date Return Bids are due unless extended with the consent of the Offeror), along with accrued and unpaid interest (if any) on the applicable Term Loans up to the settlement date. The Offeror shall execute each applicable Auction Assignment and Acceptance received in connection with a Qualifying Bid.

All questions as to the form of documents and validity and eligibility of Term Loans that are the subject of an Auction will be determined by the Auction Manager, with the consent of (not to be unreasonably withheld or delayed) the Offeror, and the Auction Manager's determination will be final and binding absent manifest error. The Auction Manager's interpretation of the terms and conditions of the Offer Document, with the consent of the Offeror, will be final and binding absent manifest error.

None of the Administrative Agent, the Auction Manager, any other Agent or any of their respective affiliates assumes any responsibility for the accuracy or completeness of the information concerning the Borrower, the Loan Parties, or any of their affiliates contained in the Offer Documents or otherwise or for any failure to disclose events that may have occurred and may affect the significance or accuracy of such information.

Immediately upon the consummation of an Auction pursuant to Section 10.04(k) of the Credit Agreement, the Term Loans subject to such Auction and all rights and obligations as a Lender related to such Term Loans shall for all purposes (including under the Credit Agreement, the other Loan Documents and otherwise) be deemed to be irrevocably prepaid, terminated, extinguished, cancelled and of no further force and effect, and neither the Borrower nor any of its Subsidiaries shall obtain or have any rights as a Lender under the Credit Agreement or under the other Loan Documents by virtue of the acquisition of any Term Loans subject to such Auction.

The Auction Manager acting in its capacity as such under an Auction shall be entitled to the benefits of the provisions of Article 9 and Section 10.05 of the Credit Agreement to the same extent as if each reference therein to the "Administrative Agent" were a reference to the Auction Manager, and the Administrative Agent shall cooperate with the Auction Manager as reasonably requested by the Auction Manager in order to enable it to perform its responsibilities and duties in connection with each Auction.

This Exhibit K shall not require the Borrower or any of its Subsidiaries to initiate any Auction, nor shall any Lender be obligated to participate in any Auction.

(i)

**Schedule 1.01(a) Excluded Real Property**

| JPM Site No. | Location | Street Address | City | State | Zip Code | Company | Approx. Gross Book Value (Feb. 2009) | Approx Gross Book Value (Dec. 31, 2013) | Number |
|---|---|---|---|---|---|---|---|---|---|
| 400 | Dothan, AL | 686 Murray Road | Dothan | AL | 36303 | YRC Inc. | $627,267 | $627,416 | 1 |
| 401 | Huntsville, AL | 1901 Highway 20 West | Decatur | AL | 35601 | YRC Inc. | $544,545 | $543,999 | 2 |
| 402 | Mobile, AL | 1111 Virginia St | Mobile | AL | 36604 | YRC Inc. | $406,210 | $406,210 | 3 |
| 403 | Montgomery, AL | 5680 Old Hayneville Rd | Montgomery | AL | 36108 | YRC Inc. | $549,344 | $581,083 | 4 |
| 410 | Springdale, AR | 1543 Ford Avenue | Springdale | AR | 72764 | YRC Inc. | $249,443 | $253,787 | 5 |
| 413 | Lake Havasu City, AZ | 1951 San Juan Dr | Lake Havasu City | AZ | 86403 | USF Reddaway | $260,066 | $260,066 | 6 |
| 414 | Flagstaff, AZ | 1814 N Main | Flagstaff | AZ | 86004 | YRC Inc. | $138,666 | $198,903 | 7 |
| 416 | Grand Junction, CO | 3207 "F" Road | Clifton | CO | 81520 | YRC Inc. | $68,152 | $801,895 | 8 |
| 420 | LaGrange, GA | 677 Hudson Road | LaGrange | GA | 30240 | YRC Inc. | $332,400 | $332,400 | 9 |
| 422 | Macon, GA | 4241 Interstate Dr | Macon | GA | 31210 | YRC Inc. | $275,909 | $275,723 | 10 |
| 423 | Savannah, GA | 3501 Edwin Avenue | Savannah | GA | 31405 | YRC Inc. | $263,437 | $272,386 | 11 |
| 427 | Dubuque, IA | 18806 Kapp Drive | Peosta | IA | 52068 | YRC Inc. | $371,400 | $371,507 | 12 |
| 432 | Sioux City, IA | 2425 Bridgeport Dr | Sioux City | IA | 51111 | YRC Inc. | $250,687 | $249,898 | 13 |
| 433 | Mason City, IA | 1514 S Pierce | Mason City | IA | 50401 | YRC Inc. | $158,366 | $163,737 | 14 |
| 434 | Quincy, IL | 2620 N 36th St | Quincy | IL | 62301 | YRC Inc. | $176,258 | $177,297 | 15 |
| 442 | Monroe, LA | 158 Parker Rd | Monroe | LA | 71202 | YRC Inc. | $220,696 | $220,206 | 16 |
| 443 | Alexandria, LA | 333 N 3rd St | Alexandria | LA | 71301 | YRC Inc. | $89,903 | $89,803 | 17 |
| 446 | Saginaw, MI | 3770 Hess Street | Saginaw | MI | 48601 | YRC Inc. | $630,000 | $630,221 | 18 |
| 450 | Worthington, MN | 172 Industrial Parkway | Jackson | MN | 56143 | USF Holland | $568,141 | $568,141 | 19 |
| 452 | Duluth, MN | 4425 W First St | Duluth | MN | 55807 | YRC Inc. | $284,653 | $286,663 | 20 |
| 456 | Tupelo, MS | 2226 McCullough Blvd. | Tupelo | MS | 38801 | YRC Inc. | $370,000 | $370,046 | 21 |

| JPM Site No. | Location | Street Address | City | State | Zip Code | Company | Approx. Gross Book Value (Feb. 2009) | Approx Gross Book Value (Dec. 31, 2013) | Number |
|---|---|---|---|---|---|---|---|---|---|
| 458 | Hattiesburg, MS | 96 Wesley Grant Road | Hattiesburg | MS | 39401 | YRC Inc. | $604,086 | $604,141 | 22 |
| 459 | Greenville, MS | 152 Seven Oaks Road | Leland | MS | 38756 | YRC Inc. | $630,000 | $630,000 | 23 |
| 460 | Kalispell, MT | 3340 Hwy 2 East | Kalispell | MT | 59901 | USF Reddaway | $687,452 | $687,452 | 24 |
| 463 | Fayetteville, NC | 1061 River Rd | Fayetteville | NC | 28301 | YRC Inc. | $51,399 | $51,590 | 25 |
| 466 | Jacksonville, NC | 161 Center Street | Jacksonville | NC | 28546 | YRC Inc. | $260,000 | $260,045 | 26 |
| 468 | Wilmington, NC | 3511 Hwy 421 N | Wilmington | NC | 28401 | YRC Inc. | $295,557 | $294,552 | 27 |
| 469 | Fargo, ND | 2502 7th Ave N | Fargo | ND | 58102 | YRC Inc. | $461,871 | $460,506 | 28 |
| 470 | Kearney, NE | 614 Third Ave | Kearney | NE | 68845 | YRC Inc. | $262,151 | $263,246 | 29 |
| 473 | Atlantic City, NJ | 1641 Eden Road | Millville | NJ | 8332 | YRC Inc. | $560,000 | $560,000 | 30 |
| 475 | Youngstown, OH | 3020 Gale Ave | Hubbard | OH | 44425 | YRC Inc. | $790,000 | $790,056 | 31 |
| 476 | Lima, OH | 1505 Bowman Road | Lima | OH | 45804 | YRC Inc. | $539,348 | $539,478 | 32 |
| 477 | Parkersburg, WV | 300 Drag Strip Road | Belpre | OH | 45714 | YRC Inc. | $760,538 | $759,000 | 33 |
| 483 | Erie, PA | 3111 McCain Ave | Erie | PA | 16510 | YRC Inc. | $581,941 | $605,012 | 34 |
| 488 | Florence, SC | 2257 S Main St | Florence | SC | 29501 | YRC Inc. | $301,427 | $304,273 | 35 |
| 492 | Waco, TX | 3230 Clay Ave | Waco | TX | 76711 | YRC Inc. | $297,325 | $297,062 | 36 |
| 496 | Sherman, TX | 211 Dorset | Sherman | TX | 75092 | YRC Inc. | $235,107 | $232,136 | 37 |
| 499 | Wichita Falls, TX | 4020 Reilly Rd | Wichita Falls | TX | 76305 | YRC Inc. | $395,451 | $395,321 | 38 |
| 515 | Madison, WI | 2573 Progress Rd | Madison | WI | 53716 | YRC Inc. | $1,139,281 | $1,188,825 | 39 |
| 517 | Eau Claire, WI | 3617 McIntyre Ave | Eau Claire | WI | 54703 | YRC Inc. | $360,060 | $362,103 | 40 |

11

| JPM Site No. | Location | Street Address | City | State | Zip Code | Company | Approx. Gross Book Value (Feb. 2009) | Approx Gross Book Value (Dec. 31, 2013) | Number |
|---|---|---|---|---|---|---|---|---|---|
| 522 | Clarksburg, WV | Route #2 Box 142A | Bridgeport | WV | 26330 | YRC Inc. | $288,153 | $288,153 | 41 |
| 523 | Mexico City, MX | Col. Nuevo Industrial | Mexico City | MX | | Transcontinental Lease, S. de R.L. de C.V. | $1,962,807 | $1,871,429 | 42 |
| 524 | Puebla, MX | Carretera Federal Puebla- | | MX | | Transcontinental Lease, S. de R.L. de C.V. | $268,766 | $168,259 | 43 |
| 601 | Sacramento, CA | 3210 52nd Ave | Sacramento | CA | 95823 | YRC Inc. | $2,378,667 | $2,393,976 | 44 |
| 602 | San Jose, CA | 750 Capitol Ave. | Milipitas | CA | 95035 | YRC Inc. | $3,900,060 | $3,901,502 | 45 |
| 604 | Stockton, CA | 3233 Loomis Road | Stockton | CA | 95205 | YRC Inc. | $1,185,615 | $1,185,615 | 46 |
| 606 | Sacramento, CA | 620 Harbor Blvd | W Sacramento | CA | 95691 | USF Reddaway | $939,902 | $968,914 | 47 |
| 615 | Lafayette, IN | 3221 Imperial Parkway | LaFayette | IN | 47905 | YRC Inc. | $470,000 | $470,762 | 48 |
| 622 | South Kearny, NJ | 19 Hackensack Avenue | South Kearny | NJ | 7032 | New Penn | $658,190 | $703,941 | 49 |
| 628 | Providence, RI | 2110 Plainfield Pike | Cranston | RI | 02910-2038 | New Penn | $1,943,397 | $2,032,223 | 50 |
| 630 | White Pine, TN (R30) | 2730 Valley Home Road | White Pine | TN | 37890 | YRC Inc. | $613,356 | $613,356 | 51 |
| 631 | Burlington, VT | 123 Orion Dr | Colchester | VT | 5446 | YRC Inc. | $469,175 | $469,175 | 52 |
| 640 | Fall River/New Bedford, MA | 30 Borden Street | Westport | MA | 2790 | YRC Inc. | $490,000 | $490,000 | 53 |

12

**Schedule 1.01(b) Guarantors**

| Exact Legal Name of Each Guarantor |
| --- |
| YRC Worldwide Inc. |
| Express Lane Service, Inc. |
| New Penn Motor Express, Inc. |
| Roadway Express International, Inc. |
| Roadway LLC |
| Roadway Next Day Corporation |
| Roadway Reverse Logistics, Inc. |
| USF Bestway Inc. |
| USF Dugan Inc. |
| USF Glen Moore Inc. |
| USF Holland Inc. |
| USF RedStar LLC |
| USF Reddaway Inc. |
| YRC Association Solutions, Inc. |
| YRC Inc. |
| YRC LOGISTICS SERVICES, INC. |
| YRC MORTGAGES, LLC |
| YRC Enterprise Services, Inc. |
| YRC Regional Transportation, Inc. |

**Schedule 1.01(c) Mortgaged Properties**

| Street Address | City | Terminal Number | Loan Party | Acres | Age | Gross Building Area | NBV 9/30/13 | Appraisal 12/1/13 |
|---|---|---|---|---|---|---|---|---|
| 2702 Newman Rd | Joplin | JP | USF Holland | 8.10 | 1969 | 15,958 SF | $617,614 | $800,000.00 |
| 35 Transport Dr | Rochester | NPME19 | New Penn | 6.60 | 1973 | 12,134 SF | $381,527 | $800,000.00 |
| 601 W Flores | Tucson | 842 | YRC Freight | 3.03 | 1962 | 16,914 SF | $595,744 | $810,000.00 |
| 1308 Pineview Dr | Columbia | 683 | YRC Freight | 8.12 | 1972 | 7,883 SF | $413,595 | $810,000.00 |
| 8989 E Columbus Ct | Columbia | 343 | YRC Freight | 7.00 | 1993 | 15,330 SF | $229,568 | $837,000.00 |
| 4650 Lafin Rd | Beaumont | 504 | YRC Freight | 5.15 | 1975 | 8,850 SF | $127,690 | $868,000.00 |
| 201 Stage Coach Trail | Greensboro | GB | USF Holland | 6.20 | 1981 | 33,300 SF | $1,027,650 | $870,000.00 |
| 460 Transport Ct | Lexington | 245 | YRC Freight | 7.78 | 1983 | 16,440 SF | $802,940 | $880,000.00 |
| 1212 Hilton Rd | Knoxville | 432 | YRC Freight | 7.38 | 1968 | 26,443 SF | $968,635 | $884,000.00 |
| 2350 W Wetmore Rd | Tucson | TUC | USF Reddaway | 4.50 | 1979 | 7,240 SF | $361,380 | $896,000.00 |
| 99 Murphree Rd | Birmingham | 421 | YRC Freight | 8.20 | 1963 | 23,657 SF | $619,630 | $900,000.00 |
| 480 Republic Circle | Birmingham | BHM | YRC Freight | 8.71 | 1980 | 17,630 SF | $344,620 | $900,000.00 |
| 11740 Dixie Hwy | Birch Run | BR | USF Holland | 9.50 | 1962 | 18,300 SF | $792,214 | $1,000,000.00 |
| 1400 SW 30th Ave | Boynton Beach | 757 | YRC Freight | 10.00 | 1985 | 15,000 SF | $1,738,928 | $1,008,000.00 |
| 3705 Highway 321 | W Columbia | CB | USF Holland | 12.00 | 1996 | 14,240 SF | $1,238,917 | $1,056,000.00 |
| 4431 South Avenue | Toledo | 251 | YRC Freight | 6.29 | 1964 | 9,760 SF | $495,451 | $1,066,000.00 |
| 9600 Express Ln | Richmond | 172 | YRC Freight | 22.05 | 1980 | 27,020 SF | $452,297 | $1,080,000.00 |
| 9018 Tuscany Way | Austin | 522 | YRC Freight | 6.20 | 1968 | 10,183 SF | $676,465 | $1,088,000.00 |
| 3219 Nebraska Ave | Council Bluffs | OM | USF Holland | 5.10 | - | 25,960 SF | $452,008 | $1,131,000.00 |
| 5337 NE 22nd St | Des Moines | 375 | YRC Freight | 13.56 | 1977 | 9,740 SF | $832,661 | $1,230,000.00 |
| 6144 NE 22nd St | Des Moines | DS | USF Holland | 16.70 | 1996 | 18,200 SF | $1,284,630 | $1,247,000.00 |
| 2685 Sherwin Ave | Ventura | 625 | YRC Freight | 4.99 | 1979 | 9,380 SF | $172,467 | $1,323,000.00 |
| 900 64th St NW | Albuquerque | 859 | YRC Freight | 19.98 | 1966 | 51,743 SF | $434,285 | $1,323,000.00 |
| 956 Hwy 190 West | Port Allen | 473 | YRC Freight | 5.88 | 1979 | 9,850 SF | $192,454 | $1,360,000.00 |
| 111 Gembler Rd | San Antonio | 555 | YRC Freight | 6.91 | 1979 | 26,720 SF | $207,718 | $1,380,000.00 |
| 4901 Lisa Marie Ct | Bakersfield | BKF | USF Reddaway | 4.00 | 1989 | 17,100 SF | $874,517 | $1,400,000.00 |

| Street Address | City | Terminal Number | Loan Party | Acres | Age | Gross Building Area | NBV 9/30/13 | Appraisal 12/1/13 |
|---|---|---|---|---|---|---|---|---|
| 4556 S Chestnut Avenue | Fresno | 846 | YRC Freight | 26.63 | 1971 | 8,502 SF | $82,508 | $1,425,000.00 |
| 2230 Holland Rd | Appleton | 315 | YRC Freight | 9.86 | 2002 | 21,050 SF | $159,119 | $1,470,000.00 |
| 2440 E Church Ave | Fresno | 814 | YRC Freight | 4.41 | 1951 | 12,408 SF | $721,938 | $1,508,000.00 |
| 5501 Campus Dr | Fort Worth | 525 | YRC Freight | 10.30 | 1979 | 35,845 SF | $1,514,168 | $1,539,000.00 |
| 3140 Massillon Rd | Akron | AK | USF Holland | 13.60 | 1964 | 26,620 SF | $1,406,706 | $1,740,000.00 |
| 3045 S 43rd Ave | Phoenix | PHX | USF Reddaway | 11.00 | 1979 | 21,450 SF | $1,079,596 | $1,792,000.00 |
| 1330 Henry Brennan | El Paso | 851 | YRC Freight | 16.20 | 1979 | 26,543 SF | $2,085,899 | $1,820,000.00 |
| 27411 Wick Rd | Romulus | DE | USF Holland | 20.60 | 1978 | 62,800 SF | $1,822,105 | $1,876,000.00 |
| 750 County Line Rd | Line Lexington | 143 | YRC Freight | 7.41 | 1973 | 13,099 SF | $1,061,229 | $2,120,000.00 |
| 7600 Preston Dr | Landover | 183 | YRC Freight | 6.74 | 1962 | 10,750 SF | $950,190 | $2,124,000.00 |
| 99 Express St | Plainview | 132 | YRC Freight | 2.41 | 1964 | 21,600 SF | $437,243 | $2,128,000.00 |
| 160 Falcon Dr | Westfield | 179 | YRC Freight | 10.00 | 1997 | 10,700 SF | $237,791 | $2,150,000.00 |
| 1059 Hurst Rd | Jackson | JA | USF Holland | 10.40 | 1990 | 18,344 SF | $988,756 | $2,209,000.00 |
| 12100 Montague | Pacoima | SFV | USF Reddaway | 3.20 | 1977 | 10,665 SF | $3,036,393 | $2,272,000.00 |
| 200 32nd Ave NW | Owatonna | OW | USF Holland | 10.58 | 1996 | 23,978 SF | $1,814,034 | $2,301,000.00 |
| 1284 S Main Rd | Mountain Top | WB | USF Holland | 51.00 | 1973 | 24,916 SF | $1,590,294 | $2,448,000.00 |
| 94-164 Leokane St | Waipahu | 800 | YRC Freight | 1.03 | 1971 | 12,720 SF | $288,984 | $2,467,680.00 |
| 8011 Killam Industrial Blvd | Laredo | 557 | YRC Freight | 22.00 | 1993 | 49,227 SF | $2,832,201 | $2,490,000.00 |
| 10855 Market St | N Lima | R07 | YRC Freight | 75.91 | 2008 | 31,843 SF | $500,000 | $2,496,000.00 |
| 50 Boulder Brook Circle | Lawrenceville | 405 | YRC Freight | 10.80 | 1995 | 23,146 SF | $1,473,688 | $2,650,000.00 |
| 501 Spring Rd | Mosinee | WS | USF Holland | 15.00 | 2001 | 22,735 SF | $1,802,168 | $2,808,000.00 |
| 4000 Hamrick Rd | Central Point | MED | USF Reddaway | 20.24 | 2000 | 32,080 SF | $2,943,521 | $2,842,000.00 |
| 6990 Northern Blvd | East Syracuse | 266 | YRC Freight | 8.16 | 1975 | 29,876 SF | $609,737 | $2,976,000.00 |
| 130 Canal St | Southington | NPME12 | New Penn | 5.46 | 1986 | 23,100 SF | $900,056 | $3,036,000.00 |
| 9991 Commerce Park Dr | Cincinnati | 216 | YRC Freight | 12.55 | 1971 | 34,500 SF | $1,313,154 | $3,100,000.00 |
| 4600 Clyde Park SW | Grand Rapids | GR | USF Holland | 10.40 | 1997 | 56,189 SF | $1,656,078 | $3,200,000.00 |
| 4480 S 90th St | Omaha | 381 | YRC Freight | 8.60 | 1971 | 25,754 SF | $243,986 | $3,216,000.00 |
| PO Box 630, 625 S 5th Ave | Lebanon | NPME04 | New Penn | 20.00 | 1990 | 54,550 SF | $1,491,994 | $3,273,000.00 |
| 12169 Old Gentilly Rd | New Orleans | 471 | YRC Freight | 5.51 | 1974 | 20,160 SF | $556,149 | $3,402,000.00 |
| 9970 Farr Ct | Cincinnati | CI | USF Holland | 8.00 | 1967 | 39,836 SF | $3,441,195 | $3,470,000.00 |

15

| Street Address | City | Terminal Number | Loan Party | Acres | Age | Gross Building Area | NBV 9/30/13 | Appraisal 12/1/13 |
|---|---|---|---|---|---|---|---|---|
| 9711 State Ave | Kansas City | KS | USF Holland | 16.10 | 1955 | 58,631 SF | $2,646,603 | $3,500,000.00 |
| 5250 Brecksville Rd | Richfield | 218 | YRC Freight | 39.47 | 1973 | 86,540 SF | $1,561,539 | $3,525,000.00 |
| 22701 Van Born Rd | Taylor | 261 | YRC Freight | 14.33 | 1958 | 47,765 SF | $2,223,444 | $3,666,000.00 |
| 5575 E State Hwy 00 | Strafford | 547 | YRC Freight | 51.46 | 1970 | 79,931 SF | $2,518,855 | $3,672,000.00 |
| 6311 E Lombard Street | Baltimore | 155 | YRC Freight | 10.66 | 1982 | 25,185 SF | $2,005,411 | $3,726,000.00 |
| 6640 Transit Rd | Williamsville | NPME20 | New Penn | 8.10 | 2000 | 24,175 SF | $1,113,149 | $3,752,000.00 |
| 750 East 40th St | Holland | HO | USF Holland | 10.50 | 1971 | 76,555 SF | $1,715,714 | $3,840,000.00 |
| 4500 W 65th St | Little Rock | 580 | YRC Freight | 27.13 | 1982 | 102,430 SF | $606,015 | $3,850,000.00 |
| 95 Concord St | North Reading | 100 | YRC Freight | 10.34 | 1990 | 35,820 SF | $1,623,937 | $3,905,000.00 |
| 316 New Churchmans Rd | New Castle | 184 | YRC Freight | 7.09 | 1964 | 12,160 SF | $181,470 | $3,948,000.00 |
| 464 Hartford Turnpike | Shrewsbury | 186 | YRC Freight | 8.21 | 1967 | 10,500 SF | $319,167 | $4,029,000.00 |
| 3725 Pottsville Pike | Reading | NPME02 | New Penn | 13.86 | 1984 | 27,108 SF | $1,385,736 | $4,071,000.00 |
| 8601 W. 53rd St | McCook | CH | USF Holland | 16.40 | 1971 | 80,680 SF | $3,743,141 | $4,107,000.00 |
| 10 E Industrial Drive | S Troy | NPME17 | New Penn | 7.00 | 2000 | 26,390 SF | $1,580,948 | $4,118,000.00 |
| 4800 Journal St | Columbus | CO | USF Holland | 29.40 | 1999 | 54,150 SF | $4,299,813 | $4,300,000.00 |
| 2530 S Tibbs Ave | Indianapolis | 321 | YRC Freight | 32.95 | 1955 | 85,567 SF | $1,677,324 | $4,498,000.00 |
| 400 Barton St | St Louis | 621 | YRC Freight | 33.99 | 1968 | 111,584 SF | $3,131,877 | $4,512,000.00 |
| 3700 78th Ave W | Rock Island | 371 | YRC Freight | 30.95 | 1976 | 82,386 SF | $2,875,643 | $4,672,000.00 |
| 5049 W Post Rd | Las Vegas | 878 | YRC Freight | 15.85 | 2005 | 35,236 SF | $1,008,515 | $4,788,000.00 |
| 1818 S High School Rd | Indianapolis | 324 | YRC Freight | 29.84 | 1975 | 154,860 SF | $1,603,213 | $4,844,000.00 |
| 1100 Chaddick Dr | Wheeling | WH | USF Holland | 14.00 | 1995 | 52,825 SF | $3,793,370 | $5,103,000.00 |
| 8000 SW 15th St | Oklahoma City | 531 | YRC Freight | 60.13 | 1979 | 149,333 SF | $2,132,453 | $5,115,000.00 |
| 575 E Weber Ave | Compton | LAX | USF Reddaway | 10.50 | 1981 | 30,480 SF | $4,972,349 | $5,200,000.00 |
| 4885 Keystone Blvd | Jeffersonville | LO | USF Holland | 21.90 | 1999 | 37,115 SF | $2,331,710 | $5,200,000.00 |
| 20820 Midstar Dr | Bowling Green | TO | USF Holland | 24.00 | 2001 | 43,735 SF | $2,900,664 | $5,200,000.00 |
| 2700 Valley Pike | Dayton | DA | USF Holland | 13.00 | 1998 | 36,770 SF | $2,688,262 | $5,360,000.00 |
| 1275 Oh Ave | Copley | 211 | YRC Freight | 46.25 | 1976 | 114,600 SF | $3,987,118 | $5,376,000.00 |
| 8401 51st St | Rock Island | RI | USF Holland | 24.00 | 1999 | 37,015 SF | $2,608,185 | $5,520,000.00 |
| 580 Shackelford Rd | Piedmont | 682 | YRC Freight | 41.09 | 1975 | 124,068 SF | $2,707,137 | $5,564,000.00 |
| 5201 Sunset Rd | Charlotte | CN | USF Holland | 20.00 | 1973 | 71,914 SF | $2,334,460 | $5,624,000.00 |

16

| Street Address | City | Terminal Number | Loan Party | Acres | Age | Gross Building Area | NBV 9/30/13 | Appraisal 12/1/13 |
|---|---|---|---|---|---|---|---|---|
| 12400 Dupont Ave S | Burnsville | 347 | YRC Freight | 66.26 | 1978 | 70,458 SF | $3,835,429 | $5,650,000.00 |
| 4700 Hwy 42 | Ellenwood | AT | USF Holland | 37.80 | 1974 | 80,760 SF | $4,569,746 | $5,700,000.00 |
| 5400 Fisher Rd | Columbus | 857 | YRC Freight | 54.26 | 1979 | 90,200 SF | $1,519,672 | $5,705,000.00 |
| 7173 Schuyler Rd | East Syracuse | NPME18 | New Penn | 18.76 | 2003 | 21,500 SF | $1,539,200 | $5,824,000.00 |
| 10720 Memphis Ave | Brooklyn | CL | USF Holland | 31.80 | 1975 | 52,530 SF | $2,759,125 | $5,858,000.00 |
| 6880 S Howell Rd | Oak Creek | 313 | YRC Freight | 56.90 | 1993 | 74,631 SF | $4,156,367 | $5,928,000.00 |
| 6650 Transit Rd | Williamsville | | USF Holland | 9.21 | 1968 | 17,920 SF | $1,955,500 | $6,090,000 |
| 1000 Chaddick Dr | Wheeling | 303 | YRC Freight | 14.21 | 1980 | 48,215 SF | $3,134,082 | $6,248,000.00 |
| 10074 Princeton-Glendale | Cincinnati | 241 | YRC Freight | 42.93 | 1975 | 113,433 SF | $6,602,964 | $6,264,000.00 |
| 1280 Joslyn Avenue | Pontiac | PN | USF Holland | 30.30 | 1999 | 37,025 SF | $2,859,716 | $6,320,000.00 |
| 8100 W Sandidge Rd | Olive Branch | ME | USF Holland | 20.50 | 1999 | 37,085 SF | $2,856,127 | $6,400,000.00 |
| 500 Oak Bluff Ln | Goodlettsville | NA | USF Holland | 36.20 | 1999 | 53,880 SF | $4,869,590 | $6,700,000.00 |
| 24 Gateway Commerce Cen | Edwardsville | SL | USF Holland | 28.70 | 2004 | 50,622 SF | $5,713,212 | $6,760,000.00 |
| 102 Carrier Blvd | Richland | 455 | YRC Freight | 31.56 | 1978 | 77,550 SF | $1,265,913 | $6,786,000.00 |
| 4375 W 1385 | Salt Lake City | SLC | USF Reddaway | 28.91 | 2006 | 72,209 SF | $10,115,706 | $7,020,000.00 |
| 200 North Beltline Rd | Irving | 511 | YRC Freight | 36.44 | 1969 | 133,253 SF | $6,485,502 | $7,047,000.00 |
| 2627 State Rd | Bensalem | 152 | YRC Freight | 12.79 | 1973 | 51,120 SF | $789,093 | $8,272,000.00 |
| 345 Roadway Dr | Ringgold | 433 | YRC Freight | 95.00 | 1983 | 111,550 SF | $4,764,670 | $8,320,000.00 |
| 2300 Garry Rd | Cinnaminson | NPME14 | New Penn | 12.72 | 1968 | 45,075 SF | $2,825,235 | $8,463,000.00 |
| 475 Terminal Road | Camp Hill | NPME03 | New Penn | 9.90 | 1971 | 56,128 SF | $1,128,213 | $8,500,000.00 |
| 37 Frontage Road | Glenmont | AY | USF Holland | 30.00 | 1962 | 132,000 SF | $2,077,441 | $8,502,000.00 |
| 10301 S Harlem Ave | Chicago Ridge | 301 | YRC Freight | 75.91 | 1961 | 234,467 SF | $5,301,625 | $8,570,000.00 |
| 7300 Centennial Blvd | Nashville | 422 | YRC Freight | 55.36 | 1989 | 192,535 SF | $5,578,912 | $8,950,000.00 |
| 3310 Gill Rd | Memphis | 431 | YRC Freight | 51.58 | 1966 | 93,542 SF | $4,820,329 | $9,110,000.00 |
| 15 Thomas J. Rhodes Industr | Mercerville | NPME24 | New Penn | 13.44 | 2004 | 32,500 SF | $3,843,587 | $9,234,000.00 |
| 1255 NC Hwy 66 S | Kernersville | 671 | YRC Freight | 70.10 | 1965 | 273,717 SF | $6,290,845 | $9,423,000.00 |
| 1000 Homestead Ave | Maybrook | 123 | YRC Freight | 63.56 | 1980 | 177,600 SF | $2,074,247 | $10,214,400.00 |
| 10510 N Vancouver Way | Portland | 635 | YRC Freight | 19.02 | 1982 | 102,585 SF | $2,571,428 | $10,465,000.00 |
| 55 Industrial Rd | Cumberland | 108 | YRC Freight | 10.00 | 1980 | 41,900 SF | $2,347,092 | $11,316,000.00 |

| Street Address | City | Terminal Number | Loan Party | Acres | Age | Gross Building Area | NBV 9/30/13 | Appraisal 12/1/13 |
|---|---|---|---|---|---|---|---|---|
| 311 East Oak Ridge Dr | Hagerstown | 153 | YRC Freight | 39.23 | 1975 | 70,506 SF | $2,856,264 | $12,810,000.00 |
| 2000 Lincoln Hwy | Chicago Heights | 309 | YRC Freight | 103.57 | 1970 | 262,343 SF | $11,732,853 | $13,419,000.00 |
| 36 N Hackensack Ave | South Kearny | NPME06 | New Penn | 12.03 | 2004 | 32,074 SF | $7,100,702 | $14,006,000.00 |
| 66 Milens Rd | Tonawanda | 205 | YRC Freight | 31.52 | 1966 | 129,795 SF | $3,117,155 | $14,706,000.00 |
| 1535 E Pescadero Ave | Tracy | 813 | YRC Freight | 78.01 | 1991 | 136,668 SF | $7,713,238 | $16,867,000.00 |
| 100 Roadway Dr | Carlisle | 135 | YRC Freight | 163.00 | 1987 | 206,160 SF | $10,016,159 | $16,932,000.00 |
| 135 Power Line Rd | Tannersville | 120 | YRC Freight | 70.31 | 1973 | 127,205 SF | $3,347,154 | $19,200,000.00 |

**Schedule 1.01(d) Pension Fund Entities**

- Central States, Southeast and Southwest Areas Pension Fund
- Western Conference of Teamsters Pension Trust
- I.B. of T. Union Local No. 710 Pension Fund
- Central Pennsylvania Teamsters Pension Fund
- Road Carriers Local 707 Pension Fund
- Teamsters Local 641 Pension Fund
- Teamsters Pension Trust Fund of Philadelphia and Vicinity
- Western Conference of Teamsters Supplemental Benefit Trust Fund
- Suburban Teamsters of No. IL. Pension Fund
- Freight Drivers and Helpers Local 557 Pension Fund
- Teamsters JC 83 Pension Fund
- Hagerstown Motor Carriers and Teamsters Pension Plan
- Trucking Employees of North Jersey Welfare Fund Inc. - Pension Fund
- Mid-Jersey Trucking Ind. & Teamsters Local 701 Pension Fund
- Management Labor Welfare & Pension Funds Local 1730, I.L.A.
- Employer-Teamsters Local Nos. 175/505 Pension Trust Fund
- International Association of Machinists Motor City Pension Fund
- Hawaii Truckers-Teamsters Union Pension Fund
- Southwestern Pennsylvania and Western Maryland Teamsters & Employers Pension Fund
- Teamsters Local 617 Pension Fund
- New England Teamsters & Trucking Industry Pension Fund
- New York State Teamsters Conference Pension and Retirement Fund
- Local 705 International Brotherhood of Teamsters Pension Fund
- Western Pennsylvania Teamsters and Employers Pension Fund
- Teamsters Local 639 Employer's Pension Trust
- Teamsters Local 445 Pension Fund
-

**Schedule 2.01 Lenders and Commitments**

| Lender | Term Loan Commitment |
|---|---|
| Credit Suisse AG | $700,000,000 |

**Schedule 4.02(b) Local Counsel Opinions**

- Ohio: Baker & Hostetler LLP
- Oregon: Stoel Rives LLP
- Michigan: Clark Hill PLC
- Pennsylvania: Morgan, Lewis & Bockius LLP
- Kansas: Stinson Leonard Street LLP
- Arizona: Snell & Wilmer L.L.P

**Schedule 5.10(b) Multiemployer Plans**

| Multiemployer Plans |
| --- |
| Central States, Southeast and Southwest Areas Pension Plan |
| Teamsters National 401K Savings Plan (formerly Western Conference of Teamsters Pension Plan) |
| I.B.of T. Union Local No 710 Pension Fund |
| Central Pennsylvania Teamsters Defined Benefit Plan |
| New York State Teamsters Conference Pension & Retirement Fund |
| Road Carriers Local 707 Pension Fund |
| New England Teamsters & Trucking Industry Pension |
| Teamsters Local 641 Pension Fund |
| Local 705 Int'l Brotherhood of Teamsters Pension Tr. Fd. |
| Teamsters Pension Trust Fund of Philadelphia & Vicinity |
| Western Pennsylvania Teamsters and Employers Pension Plan |
| Local 557 Pension Plan - Baltimore |
| Teamsters Joint Council No. 83 of Virginia Pension Fund |
| Hagerstown Motor Carriers & Teamsters Pension Fund |
| Pension Plan of the Welfare and Pension Fd Mid-Jersey Trucking (Local 701) |
| Trucking Employees of North Jersey Pension Fund |
| Suburban Teamsters of Northern Illinois Pension Plan |
| Teamsters Local 639 - Employers Pension Trust Fund |
| Management-Labor Pension Fund Local 1730 |
| National Pension Plan |
| Employer-Teamsters Local Nos. 175 & 505 Pension Trust Fund |
| Pension Fund Local 445 |
| International Association of Machinists Motor City Pension Fund |
| District No. 9 International Association of Machinists and Aerospace Workers Pension Plan (Local 777 & 737) |
| Automobile Mechanics' Local 701 Union and Industry Welfare Fund |
| Local 805 Pension & Retirement Fund |
| Minnesota Teamsters Member 401K Plan |
| Transportation Communications Int'l Union Pension |
| Teamsters Local 617 Pension Fund |
| Southwestern Pennsylvania & Western Maryland Area Teamsters & Employers Pension Fund |
| Hawaii Truckers - Teamsters Union Pension Plan |
| Western States Office |

**Schedule 5.11    Subsidiaries and Other Equity Interests**

| Subsidiary | Direct Owner | Status |
|---|---|---|
| 1105481 Ontario, Inc. | YRC Worldwide Inc. | Restricted |
| Express Lane Service, Inc. | YRC Worldwide Inc. | Restricted |
| OPK Insurance Co. Ltd. | YRC Worldwide Inc. | Restricted |
| Roadway LLC | YRC Worldwide Inc. | Restricted |
| YRC Association Solutions, Inc. | YRC Worldwide Inc. | Restricted |
| YRC Logistics Asia Limited | YRC Worldwide Inc. | Restricted |
| YRC International Investments, Inc. | YRC Worldwide Inc. | Restricted |
| YRC Mortgages, LLC | YRC Worldwide Inc. | Restricted |
| JHJ International Transportation Co., Ltd. | YRC Worldwide Inc. | Restricted |
| YRC Regional Transportation, Inc. | YRC Worldwide Inc. | Restricted |
| YRC Enterprise Services, Inc. | YRC Worldwide Inc. | Restricted |
| YRCW Receivables LLC | YRC Worldwide Inc. | Restricted |
| YRC Inc. | Roadway LLC | Restricted |
| Roadway Next Day Corporation | .Roadway LLC | Restricted |
| Reimer Express Lines Ltd. | YRC Inc. | Restricted |
| Roadway Express International, Inc. | YRC Inc. | Restricted |
| Roadway Express, S.A. de C. V. | YRC Inc. | Restricted |
| Roadway Reverse Logistics, Inc. | YRC Inc. | Restricted |
| Transcontinental Lease, S. de R.L. de C.V. | YRC Inc. | Restricted |
| YRC Transportation, S.A. de C.V. | YRC Inc. | Restricted |
| YRC Services S. de R.L. de C.V. | YRC Transportation, S.A. de C.V. | Restricted |
| New Penn Motor Express, Inc. | Roadway Next Day Corporation | Restricted |
| YRC (Shanghai) Management Consulting CO., LTD. | YRC Logistics Asia Limited | Restricted |

23

| Subsidiary | Direct Owner | Status |
|---|---|---|
| PT Meridian IQ Indonesia International | YRC (Shanghai) Management Consulting CO., LTD. | Restricted |
| YRC Worldwide Pte. Ltd. | YRC International Investments, Inc. | Restricted |
| YRC Logistics Services, Inc. | YRC Regional Transportation, Inc. | Restricted |
| YRC Logistics Inc. | YRC Logistics Services, Inc. | Restricted |
| USF Bestway Inc. | YRC Regional Transportation, Inc. | Restricted |
| USF Dugan Inc. | YRC Regional Transportation, Inc. | Restricted |
| USF Glen Moore Inc. | YRC Regional Transportation, Inc. | Restricted |
| USF Holland Inc. | YRC Regional Transportation, Inc. | Restricted |
| USF Holland International Sales Corporation | USF Holland Inc. | Restricted |
| USF RedStar LLC | YRC Regional Transportation, Inc. | Restricted |
| USF Reddaway Inc. | YRC Regional Transportation Inc. | Restricted |

24

**Schedule 5.14 Labor Matters**

- IBT Agreement
- IBT Extension Agreement

Other Collective Bargaining Agreements

| Operating Company | Contract Name | Union Name | Union Type |
|---|---|---|---|
| Holland | Office and Clerical Employees Agreement | Teamsters Local Union No. 364 | Teamsters |
| Holland | St. Louis Office Employees Rider | Teamsters Local Union No. 688 | Teamsters |
| Holland | Office Clerical Supplemental / NMFA Agreement | Teamsters Local No. 24 | Teamsters |
| Holland | Office and Clerical Employees Agreement | Local Union No. 20 | Teamsters |
| Holland | USF Holland Local Cartage Agreement of General Teamsters Local 179 | Local Union No. 179 | Teamsters |
| Holland | USF Holland and Teamsters Truck Drivers Union, Local No. 407 Cleveland Office Clerical | Local Union No. 407 | Teamsters |
| Holland | USF Holland and General Drivers, Warehousemen and Helpers Teamsters Local Union No. 89 Louisville, KY Clerical Agreement | Local Union No. 89 | Teamsters |
| Holland | Office Employees Rider to the National Master Freight Agreement and Central States Area Local Cartage Supplemental Agreement | Teamsters Local 600 | Teamsters |
| Holland | USF Holland & Teamsters Local Union No. 371 Office Clerical Employees Addendum | Teamsters Local Union No. 371 | Teamsters |
| Holland | Agreement between Teamsters Local Union No. 120 and USF Holland, Coon Rapids, MN Terminal NMFA Office Personnel Addendum | Teamsters Local Union No. 120 | Teamsters |

| Operating Company | Contract Name | Union Name | Union Type |
|---|---|---|---|
| Holland | Addendum to the National Master Freight Agreement and the Central States Area Local Cartage Supplement Agreement between USF Holland and Chauffeurs, Teamsters and Helpers Local #26 | Chauffeurs, Teamsters and Helpers Local #26 | Teamsters |
| Holland | USF Holland Motor Express, Inc. Office and Miscellaneous Truck Terminal Employee's Agreement Rockford, IL | Teamsters Local Union No. 325 | Teamsters |
| Holland | Kansas City Garage Addendum | Teamsters Local Union #41 | Teamsters |
| Holland | Addendum to the National Master Freight Agreement and the Central States Area Local Cartage Supplement Agreement between USF Holland and General Drivers and Helpers Union Local No. 554 | General Drivers and Helpers Union Local No. 554 | Teamsters |
| Holland | Agreement between Central States Motor Carriers Association, Inc. and IA of M & AW District Lodge 60 | IA of M & AW District Lodge 60 and Local Union No. 698 | Machinists and Aerospace Workers |
| Holland | USF Holland, Inc. Youngstown Terminal Office Clerical Supplemental/NMFA Agreement | Teamsters Local Union 377 | Teamsters |
| Holland | Appleton Area and Vicinity Office and Clerical Employees Supplement to the Central States Area Local Cartage Supplemental Agreement to the National Master Freight Agreement | Teamsters Local Union 662 | Teamsters |
| Holland | Uniform Indiana Automotive Maintenance Agreement | Teamsters Joint Council 69 | Teamsters |

26

| Operating Company | Contract Name | Union Name | Union Type |
|---|---|---|---|
| Holland | Philadelphia, Pennsylvania and Vicinity Supplemental Agreement Covering Local Cartage and Over the Road | Highway Truck Drivers and Helpers Local No. 107, 676, Teamsters Locals No. 312, 326, 331, 470, Truck Drivers Chauffeurs Helpers Local 384, Food Drivers, Helpers and Warehouse Employees Local No. 500 | Teamsters |
| Holland | Cincinnati Garage Employees Agreement | Teamsters Local Union 100 | Teamsters |
| Holland | Agreement Between Teamsters Local Union 160 and USF Holland, Owatonna, MN Terminal | Teamsters Local Union 160 | Teamsters |
| Holland | Addendum to the 2008 - 2013 Local 710 Dock Agreement Covering Custodial Employees | Teamsters Local 710 | Teamsters |
| Holland | Central Region Local Cartage Supplemental Agreement | Central Region of Teamsters | Teamsters |
| Holland | Central Region Over-the-Road Supplemental Agreement | Central Region of Teamsters | Teamsters |
| Holland | Supplement to the Central Region Local Cartage Supplemental Agreement to the National Master Freight Agreement covering Milwaukee and Waukesha Areas | Local Union No. 200 | Teamsters |
| Holland | Indiana Uniform Office Clerical Agreement | Teamsters Local Unions 135, 215, 364, 414 | Teamsters |
| Holland | Addendum to the National Master Freight Agreement and the Central States Area Local Cartage Supplemental Agreement | Teamsters Local Union 554 | Teamsters |
| Holland | Agreement between Mechanic's Local 701 IAM & AW and Central States Motor Carrier's Association (CSMCA) and Trucking Management Inc: For: YRC Inc; YRC Holland, Inc | Mechanic's Local 701 IAM & AW and Central States Motor Carrier's Association | Machinists and Aerospace Workers |

27

| Operating Company | Contract Name | Union Name | Union Type |
|---|---|---|---|
| Holland | Supplement to the Central Region Over-the-Road Supplemental Agreement to the National Master Freight Agreement Covering Milwaukee-based Over-the-Road Drivers | Teamsters Local Union 200 | Teamsters |
| Holland | National Master Freight Agreement | International Brotherhood of Teamsters | Teamsters |
| Holland | Teamsters State of Michigan Office Workers Supplemental Agreement to the National Master Freight Agreement | Teamsters State of Michigan | Teamsters |
| Holland | Southern Region Local Freight Forwarding Garage Supplemental Agreement | International Brotherhood of Teamsters | Teamsters |
| Holland | Southern Region Area Over-the-Road Motor Freight Supplemental Agreement | International Brotherhood of Teamsters | Teamsters |
| Holland | Upstate Michigan Garage Addendum to NMFA and Central States Area Local Cartage Supplemental Agreement | Teamster Union 406 | Silent |
| New Penn | Mechanics Areawide Agreement | Teamsters Local Union No. 677 | Teamsters |
| New Penn | Appendix Covering the Classifications of Mechanics and Garage Employees | Local Union 707 | Teamsters |
| New Penn | Appendix to New Jersey / New York Area General Trucking Supplement Agreement | Merchandise Drivers Local No. 641 | Teamsters |
| New Penn | Highway and Local Motor Freight Drivers Dockmen and Helpers Local Union 707 Clerical Appendix | Local Union 707 | Teamsters |
| New Penn | Addendum between New Penn and Teamsters Local Union No. 355 | Teamsters Local Union 355 | Teamsters |
| New Penn | Mechanics Agreement between New Penn and Teamsters Local Union No. 251 | Local Union 251 | Teamsters |
| New Penn | National Master Freight Agreement and Central Pennsylvania Supplemental Agreement | Central Pennsylvania and Local Cartage Unions 229, 401, 429, 764, 777, 773 and 776 | Teamsters |

28

| Operating Company | Contract Name | Union Name | Union Type |
|---|---|---|---|
| New Penn | PPA Pension Proposal Outline | ILA Local Union 1730 | Longshoremen |
| New Penn | General Freight Agreement Between Inland Terminal Workers 1730 and New Penn Motor Express, Inc. | ILA Local Union 1730 | Longshoremen |
| New Penn | New York State Freight Division Supplemental Agreement Covering Over the Road and Cartage | Locals 118,118A,182, 264, 264A, 294, 317, 375, 449, 529, 687, 693 | Teamsters |
| New Penn | Philadelphia, Pennsylvania and Vicinity Supplemental Agreement covering Local Cartage and Over the Road | Highway Truck Drivers and Helpers Local No. 107, 676, Teamsters Locals No. 312, 326, 331, 470, Truck Drivers Chauffeurs Helpers Local 384, Food Drivers, Helpers and Warehouse Employees Local No. 500 | Teamsters |
| New Penn | Central Region Local Cartage Supplemental Agreement | Central Region of Teamsters | Teamsters |
| New Penn | Central Region Over-the-Road Supplemental Agreement | Central Region of Teamsters | Teamsters |
| New Penn | Joint Council No. 40 Freight Council Supplemental Agreement | Teamsters Local Unions 30, 110, 249 261, 397, 491, 538, 585 | Teamsters |
| New Penn | Central Pennsylvania Mechanics and Office Employees Agreement | Teamsters Local Unions 229, 401, 429, 764, 771, 773, 776 | Teamsters |
| New Penn | Addendum to the Central Pennsylvania Mechanics and Office Employees Agreement | Teamsters Local Unions 776 | Teamsters |
| New Penn | National Master Freight Agreement | International Brotherhood of Teamsters | Teamsters |
| Reddaway | USF Reddaway Western Contract | Teamsters Local Unions Nos. 63, 70, 104, 492 | Teamsters |
| Reddaway | Master Agreements, Supplement Agreements, and Letters of Understanding | Teamsters Local Unions 162, 206, 324, 962, 37, 174 | Teamsters |

29

| Operating Company | Contract Name | Union Name | Union Type |
|---|---|---|---|
| Reddaway | Master Agreement Supplemental Agreements and Memos of Understanding | Teamsters Local Unions 63, 70, 104, 492 | Teamsters |
| Reddaway | USF Reddaway Negotiations Tentative Agreement on Economic Terms | International Brotherhood of Teamsters | Teamsters |
| Reddaway | Rider to the USF Reddaway Western Contract Regarding Freight Handler Employee Classification | Teamsters Local Unions 63, 70, 104, 492 | Teamsters |
| Roadway Express, Inc. | Memorandum of Agreement Between Inland Terminal Workers, Local 1730, ILA, and Roadway Express, Inc. | ILA Local Union 1730 | Longshoremen |
| Roadway Express, Inc. | Line-Haul Mechanic Maintenance Addendum to the National Master Freight Agreement and the Maryland/District of Columbia Supplemental Agreement | General Teamsters Allied Workers Local 992 | Teamsters |
| Roadway Express, Inc. | Terminal Office Clerical Agreement Winston-Salem, NC | Teamsters Local Union 391 | Teamsters |
| Roadway Express, Inc. | Addendum to the NMFA and the Carolina Automotive Maintenance Agreement | Teamsters Local Union 391 | Teamsters |
| Roadway Express, Inc. | Addendum to the NMFA and MD-DC Supplemental Agreements | Teamsters Local Union 355 | Teamsters |
| Roadway Express, Inc. | Collective Agreement between Roadway Express, Inc. and Canada Council of Teamsters represented by Teamsters Local Unions 879 & 880 | Teamsters Local Unions 879 & 880 | Teamsters |
| Roadway Express, Inc. | Roadway Express Akron Garage Employees Agreement | Local Union No. 24 | Teamsters |
| Roadway Express, Inc. | Teamsters Local Union No. 413 Roadway Express, Inc. Columbus, OH Garage Contract | Local Union No. 413 | Teamsters |

30

| Operating Company | Contract Name | Union Name | Union Type |
|---|---|---|---|
| Roadway Express, Inc. | Garage Employees Agreement between Truck Drivers, Chauffeurs and Helpers, Public Employees Construction Division, Airlines - Greater Cincinnati / Northern Kentucky Airport and Miscellaneous Jurisdiction, Local Union No. 100 | Local Union No. 100 | Teamsters |
| Roadway Express, Inc. | Kansas City Janitor Service Contract | Local Union No. 41 | Teamsters |
| Roadway Express, Inc. | Office and Clerical Employees Agreement between Roadway Express, Inc. and Local Union No. 20 | Local Union No. 20 | Teamsters |
| Roadway Express, Inc. | Agreement with Teamsters Local Union No. 25 | Local Union No. 25 | Teamsters |
| Roadway Express, Inc. | Breakbulk Building Maintenance Appendix [sic] | Teamsters Local Union 707 | Teamsters |
| Roadway Express, Inc. | Kansas City Shop Service Contract | Teamsters Local Union 41 | Teamsters |
| Roadway Express, Inc. | Toledo Garage Employees Agreement | Teamsters Local Union 20 | Teamsters |
| Roadway Express, Inc. | Office Employees Addendum to the Maryland-District of Columbia Supplemental Agreement National Master Freight Agreement ("NMFA") | Teamsters Local Union 992 | Teamsters |
| Roadway Express, Inc. | Agreement Between IBT Local 677 and Roadway Express, Inc. Terminal 107 Cheshire, CT Office Employees and Rider to the New England Supplemental and Master Freight Agreement | Teamsters Local Union 677 | Teamsters |
| Roadway Express, Inc. | Roadway Express Clerical Contract | Teamsters Local Union 701 | Teamsters |
| Roadway Express, Inc. | Line-Haul Mechanic Maintenance Addendum to the National Master Freight Agreement (NMFA) and the Maryland/District of Columbia Supplemental Agreement | Teamsters Local Union 992 | Teamsters |
| Roadway Express, Inc. | Joint Area Cartage Agreement Covering Local Cartage Employees of Road Carriers of Local 179, 330, 673 | Teamsters Local Unions 142, 179, 301, 330, 673 | Teamsters |

31

| Operating Company | Contract Name | Union Name | Union Type |
|---|---|---|---|
| Roadway Express, Inc. | Addendum to the Terminal Maintenance Which is an Addendum to the NMFA and the Carolina Automotive Maintenance Agreement | Teamsters Local Union 391 | Teamsters |
| Roadway Express, Inc. | Agreement between Roadway Express Inc and Office and Professional employees. International Union, Local 29, AFL-CIO | Office and Professional employees International Union, Local 29, AFL-CIO | Professional Employees International Union |
| Roadway Express, Inc. | Central Pennsylvania Mechanics and Office Employees Agreement Teamsters Local Unions No. 229 - Scranton Pa. No. 401 - Wilkes-Barre, Pa. No. 429 - Reading Pa. No. 764 - Milton Pa. No. 771 - Lancaster Pa. No. 773 - Allentown Pa. No. 776 - Harristown Pa. And Transport Employers Association, Inc | Teamsters Local Unions No. 229 - Scranton Pa.; No. 401 - Wilkes-Barre, Pa.; No. 429 - Reading, Pa.; No. 764 - Milton, Pa.; No. 771 - Lancaster, Pa.; No. 773 - Allentown Pa.; No. 776 - Harristown Pa. | Teamsters |
| Roadway Express, Inc. | Roadway Express, Inc. Terminal Maintenance, Mechanic, and Janitor Addendum to the National Master Freight Agreement (NMFA) and the Maryland/DC Supplemental Agreement | Teamsters Local Union 992 | Teamsters |
| Silent | Carolina Freight Council Over-the-Road Supplemental Agreement | Local Union No. __ | Teamsters |
| Silent | Truckload Proposed Contract | Silent | Teamsters |
| Yellow Freight System, Inc. | Agreement between Teamsters Local Union No. 688 and St. Louis Office Employees Rider | Teamsters Local Union #688 | Teamsters |
| Yellow Freight System, Inc. | Office Clerical Contract between Teamsters Local Union No. 651 and Yellow Freight Systems, Inc. for Lexington, KY Office | Teamsters Local Union No. 651 | Teamsters |

32

| Operating Company | Contract Name | Union Name | Union Type |
|---|---|---|---|
| Yellow Transportation | Yellow Transportation, Inc. Leadmen, Preventative Maintenance, Preventative Maintenance Helpers, Tiremen, Lubricators and Tankers, Parts Department, Washers, Janitors, and Other Garage Miscellaneous Help Employees Supplement to the Central Region Local Cartage Supplemental Agreement to the National Master Freight Agreement | Teamsters Local Union 200 | Teamsters |
| Yellow Transportation | Supplement to the Central Region Local Cartage Supplemental Agreement to the National Master Freight Agreement Covering Milwaukee and Waukesha Areas for the Period April 1, 2008 through March 31, 2013 | Teamsters Local Union 200 | Teamsters |
| Yellow Transportation | Buffalo Area Office Agreement | Teamsters Local Union No. 375 | Teamsters |
| Yellow Transportation | Cleveland, OH Shop Agreement | Teamsters Local Union #964 | Teamsters |
| Yellow Transportation | Cleveland Janitor / Dock Maintenance Employee Rider to the Central States Local Cartage Supplemental Agreement | Teamsters Local #407 | Teamsters |
| Yellow Transportation | Cleveland Office Employees Rider to the Central States Area Local Cartage Supplemental Agreement | Teamsters Local #407 | Teamsters |
| Yellow Transportation | Pittsburgh, PA and Local 926's Office Employees' Rider to the Teamsters Joint Council No. 40 Freight Council Supplemental Agreement and NMFA | Teamsters Local 926 | Teamsters |
| Yellow Transportation | Richmond Office Clerical Agreement | Teamsters Local Union No. 592 | Teamsters |
| Yellow Transportation | Office Clerical Agreement between Teamsters Local Union 71 and Yellow Transportation | Teamsters Local Union No. 71 | Teamsters |

33

| Operating Company | Contract Name | Union Name | Union Type |
|---|---|---|---|
| Yellow Transportation | Office Employees Collective Bargaining Agreement between Yellow Transportation and Local Union #639 | Local Union #639 | Teamsters |
| Yellow Transportation | Office Employees Agreement Appendix to New Jersey-New York Area General Trucking Supplemental Agreement | Teamsters Local Union No. 641 | Teamsters |
| Yellow Transportation | Collective Agreement between Yellow Transportation, Inc. and Teamsters Local Unions No. 91, 879, 938 and Teamsters, Chauffeurs, Warehousemen and Helpers Local Union No. 880 | Teamsters Local Unions No. 91, 879, 938 and 880 | Teamsters |
| Yellow Transportation | Tentative Agreement Yellow Freight Transportation, Inc and International Association of Machinists and Aerospace Workers, IAM and AW | International Association of Machinists and Aerospace Workers, IAM and AW | Machinists and Aerospace Workers |
| Yellow Transportation | Multi-States Area Agreement with the International Association of Machinists and Aero-space Workers, AFL-CIO | International Association of Machinists and Aerospace Workers, ALF-CIO and participating Local Unions (Districts 9, 10, 71, Lodge 778, 77 IAMAW) | Machinists and Aerospace Workers |
| Yellow Transportation | International Association of Machinists and Aerospace Workers Yellow Transportation, Inc Western States Trucking Maintenance Agreement April 1, 2008 through March 31, 2013 | International Association of Machinists and Aerospace Workers | Machinists and Aerospace Workers |
| Yellow Transportation | Office and Clerical Employees Agreement between Teamsters Local Union No. 325 and Yellow Transportation | Teamsters Local Union No. 325 | Teamsters |
| Yellow Transportation | Local 618 White Paper Agreement with Yellow Transportation | Local 618 | Silent |
| Yellow Transportation | Cleveland Office Employees Rider to the Central States Area Local Cartage Supplemental Agreement | Teamsters Truck Drivers Union No. 407 | Teamsters |

34

| Operating Company | Contract Name | Union Name | Union Type |
|---|---|---|---|
| Yellow Transportation | Sioux Falls Area Office and Clerical Employees Supplement To the Central Region Local Cartage Supplemental Agreement to the NMFA | General Drivers and Helpers Union Local No. 120 | Teamsters |
| Yellow Transportation | Middletown Office Employees Rider to the New England Supplemental Freight Agreement Rider | Teamsters Local 671 | Teamsters |
| Yellow Transportation | Tentative Agreement between Hawaii Teamsters and Allied Workers, Local 996 and Yellow Transportation | Hawaii Teamsters and Allied Workers, Local Union 996 | Teamsters |
| Yellow Transportation | Agreement between General States Motor Carriers Association, Inc and IA of M & AW District Lodge 60 | IA of M & AW District Lodge 60; IAM Local 698 | Machinists and Aerospace Workers |
| Yellow Transportation | Area Cartage Agreement Covering Local Cartage Employees of Road Carriers (T.M.I./C.S.M.C.A.) | Teamsters Local Union 705 | Teamsters |
| Yellow Transportation | Highway & Local Motor Freight Drivers, Dockworkers and Helpers, Local Union 707, IBT Breakbulk Clerical Appendix | Local Union 707, IBT | Teamsters |
| Yellow Transportation | Springfield Office Employee's Rider to the New England Supplemental Freight Agreement [sic] | Teamsters Local Union 404 | Teamsters |
| Yellow Transportation | Agreement by and between: Yellow Transportation Inc, Buffalo, NY and Automobile Mechanics Local Union #447 - of District 15 International Association of Machinists and Aerospace Workers AFL-CIO | Automobile Mechanics Local Union #447 - of District 15 International Association of Machinists and Aerospace Workers AFL-CIO | Machinists and Aerospace Workers |
| Yellow Transportation | Highway and Local Motor Freight Drivers, Dockmen and Helpers Local Union 707 I.B.T. Appendix Covering the classification of Mechanics and Garage Employees of Break Bulk Terminals | Teamsters Local Union 707 | Teamsters |

35

| Operating Company | Contract Name | Union Name | Union Type |
|---|---|---|---|
| Yellow Transportation | Office Employees Collective Bargaining Agreement By and Between Yellow Transportation, Inc. and Teamsters Local Union 355 | Teamsters Local Union 355 | Teamsters |
| Yellow Transportation | CSMCA/Yellow Transportation, Inc. Teamsters Local Union 673 Office and Clerical Employees Addendum to the Joint Area Cartage Agreement | Teamsters Local Union 673 | Teamsters |
| Yellow Transportation | Supplement to the Central Region Over-the-Road Supplemental Agreement to the National Master Freight Agreement Covering Milwaukee-based Over-the-Road Drivers | Teamsters Local Union 200 | Teamsters |
| Yellow Transportation | Yellow Transportation INC, Multi States Area Agreement With the International Association of Machinists and Aerospace Workers, AFL-CIO | International Association of Machinists and Aerospace Workers, AFL-CIO | Machinists and Aerospace Workers |
| Yellow Transportation | Yellow Transportation Inc Kansas City Addendum to the Multi States Area Agreement Local Lodge 778, International Association of Machinists and Aerospace Workers | Local Lodge 778, International Association of Machinists and Aerospace Workers | Machinists and Aerospace Workers |
| Yellow Transportation | Local Contract and Working Agreement Covering Office and Miscellaneous Truck Terminal Employees | Teamsters Local Union 710 | Teamsters |
| Yellow Transportation | Yellow Transportation and Teamster Local Union 371 Office Clerical Employees Addendum | Teamsters Local Union 371 | Teamsters |
| Yellow Transportation | Appendix Covering the Classifications of Mechanics and Garage Employees | Teamsters Local Union 707 | Teamsters |
| Yellow Transportation | Louisville, Kentucky Clerical Agreement | Teamsters Local Union 89 | Teamsters |
| Yellow Transportation | Cincinnati Office Agreement between Local Union No. 100 and Yellow Transportation System, Inc. | Teamsters Local Union 100 | Teamsters |

36

| Operating Company | Contract Name | Union Name | Union Type |
|---|---|---|---|
| Yellow Transportation | Appendix to the Western States Trucking Maintenance Agreement for San Francisco Local Lodge 1305 | Local Lodge 1305, International Association of Machinists and Aerospace Workers | Machinists and Aerospace Workers |
| YRC Freight | National Master Freight Agreement | International Brotherhood of Teamsters | Teamsters |
| YRC Freight | Upstate Michigan Garage Addendum to NMFA and Central States Area Local Cartage Supplemental Agreement | Teamster Union 406 | Silent |
| YRC Freight | Tentative Agreement St. Louis Addendum to the Multi-States Area Agreement International Association of Machinists and Aerospace Workers, Yellow Freight Transportation, Inc. | International Association of Machinists and Aerospace Workers | Machinists and Aerospace Workers |
| YRC Freight | Office Agreement | Teamsters Local Union No. 251 | Teamsters |
| YRC Freight | Agreement between Yellow Transportation Company and General Drivers and Helpers, Local Union No. 823 | Local Union No. 823 | Teamsters |
| YRC Freight | Agreement between YRC Inc. and General Drivers and Helpers, Local Union No. 696 | Local Union No. 696 | Teamsters |
| YRC Freight | Carolina Freight Council City Cartage Supplemental Agreement | Silent | Silent |
| YRC Freight | West Virginia Freight Council of the Eastern Region of Teamsters Supplemental Agreement | Teamsters Local Union 175 | Teamsters |
| YRC Freight | Office Employees Agreement Appendix to New Jersey-New York Area General Trucking Supplemental Agreement | Teamsters Local Union 560 | Teamsters |
| YRC Freight | Virginia Freight Council Over-the-Road Supplemental Agreement | International Brotherhood of Teamsters | Teamsters |
| YRC Freight | Virginia Freight Council City Pickup and Delivery Over-the-Road Supplemental Agreement | Teamsters Local Unions 22, 29, 171, 592, 822 | Teamsters |

| Operating Company | Contract Name | Union Name | Union Type |
|---|---|---|---|
| YRC Freight | Teamsters State of Michigan Office Workers Supplemental Agreement to the National Master Freight Agreement | Teamsters State of Michigan | Teamsters |
| YRC Freight | Southern Region Office Clerical Employees Supplemental Agreement | International Brotherhood of Teamsters | Teamsters |
| YRC Freight | Addendum to the National Master Freight Agreement and the Central States Area Local Cartage Supplemental Agreement | Teamsters Local Union 554 | Teamsters |
| YRC Freight | Southern Region Local Freight Forwarding Garage Supplemental Agreement | International Brotherhood of Teamsters | Teamsters |
| YRC Freight | Mechanics Agreement Appendix to New Jersey-New York Area General Trucking Supplemental Agreement | Teamsters Local Union 641 | Teamsters |
| YRC Freight | New Jersey-New York General Trucking Supplemental Agreement and Local 701 | Teamsters Joint Council Nos. 16, 73 | Teamsters |
| YRC Freight | New Jersey-New York Over-the-Road Supplemental Agreement Covering Employers of Private, Common and Contract Carriers | Teamsters Joint Council Nos. 16, 73 | Teamsters |
| YRC Freight | New Jersey-New York General Trucking Supplemental Agreement | Teamsters Joint Council Nos. 16, 73 | Teamsters |
| YRC Freight | Maintenance Employees (Porters) Agreement Appendix to New Jersey-New York Area General Trucking Supplemental Agreement | Teamsters Local Union 560 | Teamsters |
| YRC Freight | Tentative Agreement: Yellow Freight Transportation, Inc., and International Association of Machinists and Aerospace Workers, IAM and AW | IAM District 9 | Machinists and Aerospace Workers |
| YRC Freight | Tentative Agreement: Yellow Freight Transportation, Inc., and International Association of Machinists and Aerospace Workers, IAM and AW (Kansas City Addendum) | IAM Local Lodge 778 | Machinists and Aerospace Workers |

38

| Operating Company | Contract Name | Union Name | Union Type |
|---|---|---|---|
| YRC Freight | Tentative Agreement: Yellow Freight Transportation, Inc., and International Association of Machinists and Aerospace Workers, IAM and AW (Twin Cities Addendum) | IAM District 77 | Machinists and Aerospace Workers |
| YRC Freight | Tentative Agreement: St. Louis Addendum to the Multi-States Agreement | IAM District 9 | Machinists and Aerospace Workers |
| YRC Freight | Agreement for the Restructuring of the YRC Worldwide, Inc. Operating Companies | International Brotherhood of Teamsters | Teamsters |
| YRC Freight | Agreement Between Yellow Transportation, Inc. and Transportation Communications International Union | Teamsters Local Union 998, 1908 | Teamsters |
| YRC Freight | Appendix to the Western States Trucking Maintenance Agreement for the designated Southern California Area District 947 and affiliated Lodges | District 947 and Affiliated Lodges | Machinists |
| YRC Freight | New York State Freight Division Supplemental Agreement Covering Over the Road and Cartage | Locals 118,118A,182, 264, 264A, 294, 317, 375, 449, 529, 687, 693 | Teamsters |
| YRC Freight | Western States Area Supplemental Agreements | The Western Master Freight Division and Local Union | Teamsters |
| YRC Freight | New Jersey - New York General Trucking Supplemental Agreement and Local 701 | Local 701 | Teamsters |
| YRC Freight | Addendum to the 2008 - 2013 Local 710 Dock Agreement Covering Custodial Employees | Teamsters Local 710 | Teamsters |
| YRC Freight | Cincinnati Office Agreement between Local Union No. 100 and Yellow Freight System, Inc. | Local Union No. 100 | Teamsters |
| YRC Freight | Southern Region Area Over-the-Road Motor Freight Supplemental Agreement | International Brotherhood of Teamsters | Teamsters |

39

| Operating Company | Contract Name | Union Name | Union Type |
|---|---|---|---|
| YRC Reimer | Agreement Between Reimer Express Lines, Ltd. and General Teamsters Local Union 979 | Teamsters Local Union 979 | Teamsters |
| YRC Reimer | Agreement between Reimer Express Line Employees Association and Reimer Express Lines Ltd | Reimer Express Line Employees Association | Silent |
| YRC Reimer | Collective Agreement between Reimer Express Lines Ltd and General Teamsters Local Union No. 979 | General Teamsters Local Union No.979 - Winnipeg Terminal | Teamsters |
| YRC Reimer | Collective Agreement between Reimer Express Lines Ltd and General Teamsters Local Union No. 362 | General Teamsters Local Union No.362 - Edmington Terminal | Teamsters |
| YRC Reimer | Collective Agreement between Reimer Express Lines Ltd and Teamsters Local Union No. 879 (Woodstock) and Teamsters, Chauffeurs, Warehousemen and Helps of America Local 880 and Teamsters Local Union 938 | Teamsters Union Local 938, 880 and 879 | Teamsters |
| YRC Reimer | Memorandum of Agreement between Reimer Express Lines Ltd and Teamsters Quebec Local 106 | Teamsters Quebec Local 106 | Teamsters |
| YRC Reimer | Agreement between Reimer Express Lines Ltd (Kenora, Dryden and Thunder Bay) and Teamster's Local Union 938 | Teamsters Local Union 938 | Teamsters |
| YRC Reimer | Collective Agreement between Reimer Express Lines Limited (Clerical) and Teamsters, Chauffeurs, Warehousemen and Helpers Local Union No. 879 and Teamsters Canada | Teamsters, Chauffeurs, Warehousemen and Helpers Local Union No. 879 and Teamsters Canada | Teamsters |
| YRC Reimer | Collective Agreement between Reimer Express Lines Ltd Drivers and National Automobile, Aerospace, Transportation and General Workers Union of Canada (CAW-Canada) Local 4209 | National Automobile, Aerospace, Transportation and General Workers Union of Canada (CAW - Canada) Local 4209 | National Automobile, Aerospace, Transportation and General Workers Union of Canada |

40

| Operating Company | Contract Name | Union Name | Union Type |
|---|---|---|---|
| YRC Reimer | Collective Agreement between Reimer Express Lines Ltd. Owner Operators and National Automobile, AeroSpace Transportation and General Workers Union of Canada (CAW-Canada) Local 4209 | National Automobile, AeroSpace Transportation and General Workers Union of Canada (CAW-Canada) Local 4209 | National Automobile, Aerospace, Transportation and General Workers Union of Canada |
| YRC Reimer | Agreement between Reimer Express Lines Ltd. Maintenance Facility Winnipeg and General Teamsters Local Union No. 979 | General Teamsters Local Union No. 979 | Teamsters |
| YRC Reimer | Collective Labour Agreement between Transport Drivers, Warehousemen and General Workers, Teamsters Quebec Section Locale 106 (FTQ) and Reimer Express Lines Ltd. | Transport Drivers, Warehousemen and General Workers, Teamsters Quebec Section Locale 106 (FTQ) | Teamsters |
| YRC Reimer | Collective Agreement between Roadway Express Inc. and Canada Council of Teamsters represented by Teamsters Local Unions 879 and 880 | Teamsters Local Unions 879 and 880 | Teamsters |
| YRC Reimer | Collective Agreement between Yellow Transportation, Inc. and the Teamsters Local Unions No's 91, 879, 938 and the Teamsters, Chauffeurs, Warehousemen and Helpers Local Union No, 880 | Teamsters Local Unions No's 91, 879, 938 and the Teamsters, Chauffeurs, Warehousemen and Helpers Local Union No. 880 | Teamsters |
| YRC Reimer | Agreement Between Reimer Express Lines Ltd Employees Association and Reimer Express Lines Ltd. | Reimer Express Lines Ltd. Employees Association | Silent |
| YRC Reimer | Collective Agreement between Reimer Express Lines Ltd. And Teamsters, Chauffeurs, Warehousemen and Helpers Local Union No. 879 | Teamsters Local Union No. 879 | Teamsters |
| YRC Reimer | Collective Agreement Between YellowTransportation of British Columbia, Inc. and Teamsters Local Union No. 31 | Teamsters Local Union 31 | Teamsters |
| YRC Inc. | Office Agreement Between YRC Inc. - Office, Dayton, OH and Teamsters Local Union 957 | Teamsters Local Union 957 | Teamsters |

41

| Operating Company | Contract Name | Union Name | Union Type |
|---|---|---|---|
| YRC Inc. | Freight Line Office Contract Supplemental Agreement to the 2008-2013 Central Region Local Cartage Supplement to the National Master Freight Agreement between Teamsters Union Local 795, Wichita, Kansas | Teamsters Union Local 795 | Teamsters |
| YRC Inc. | Agreement between Mechanic's Local 701 IAM & AW and Central States Motor Carrier's Association (CSMCA) and Trucking Management Inc: For: YRC Inc; YRC Holland, Inc | Mechanic's Local 701 IAM & AW and Central States Motor Carrier's Association | Machinists and Aerospace Workers |
| YRC Inc. | Addendum to the National Master Freight Agreement and the Carolina Automotive Maintenance Agreement | Teamsters Local Union 509 | Teamsters |
| YRC Inc. | Addendum to the National Master Freight Agreement and Carolina Supplemental Agreement for the Period April 1, 2008 through March 31, 2013 Covering Janitor Employs Domiciled at YRC Inc. Charlotte, North Carolina | Teamsters Local Union 71 | Teamsters |
| YRC Inc. | Upstate Michigan Garage Addendum to the National Master Freight Agreement Central States Area Local Cartage Supplemental Agreement | Silent | Silent |
| YRC Inc. | Philadelphia, Pennsylvania and Vicinity Supplemental Agreement covering Local Cartage and Over the Road | Highway Truck Drivers and Helpers Local No. 107, 676, Teamsters Locals No. 312, 326, 331, 470, Truck Drivers Chauffeurs Helpers Local 384, Food Drivers, Helpers and Warehouse Employees Local No. 500 | Teamsters |
| YRC Inc. | Roadway Express Garage Office Clerical Agreement | Teamsters Local Union No. 391 | Teamsters |

42

| Operating Company | Contract Name | Union Name | Union Type |
|---|---|---|---|
| YRC Inc. | Labor Contract and Working Agreement covering Office and Miscellaneous Truck Terminal Employees with Local Union No. 301 | Local Union No. 301 | Teamsters |
| YRC Inc. | Joint Area Cartage Agreement Covering Local Cartage Employees of Road Carriers with Local 301 | Local Union No. 301, 142, 179, 330, 673 | Teamsters |
| YRC Inc. | Central Region Local Cartage Supplemental Agreement | Central Region of Teamsters | Teamsters |
| YRC Inc. | Central Region Over-the-Road Supplemental Agreement | Central Region of Teamsters | Teamsters |
| YRC Inc. | Supplement to the Central Region Local Cartage Supplemental Agreement to the National Master Freight Agreement covering Milwaukee and Waukesha Areas | Local Union No. 200 | Teamsters |
| YRC Inc. | New England Supplemental Agreement | Local Unions No. 25, 59, 170, 191, 251, 404, 443, 493, 653, 671, 677 | Teamsters |
| YRC Inc. | Joint Council No. 7 Bay Area Local Pickup and Delivery Supplemental Agreement | Locals 70, 287, 315, 624, 890, 912, 2785 | Teamsters |
| YRC Inc. | Carolina Freight Council Automotive Maintenance Supplemental Agreement | International Brotherhood of Teamsters | Teamsters |
| YRC Inc. | Northern New England General Freight Supplemental Agreement to the National Master Freight Agreement | International Brotherhood of Teamsters | Teamsters |
| YRC Inc. | Mechanics Agreement | Teamsters Local Union 560 | Teamsters |
| YRC Inc. | Multi-Employer Kansas City City Office Contract | Teamsters Local Union 41 | Teamsters |
| YRC Inc. | Norfolk Office Agreement | Teamsters Local Union 822 | Teamsters |
| YRC Inc. | Milwaukee Area Office and Clerical Employees Supplement to the Central Region Local Cartage Supplemental Agreement to the National Master Freight Agreement | Teamsters Local Union 200 | Teamsters |

43

| Operating Company | Contract Name | Union Name | Union Type |
|---|---|---|---|
| YRC Inc. | Office Employee's Rider to the New York State Supplemental Freight Agreement | Teamsters Local Union 294 | Teamsters |
| YRC Inc. | Roadway Addendum to the 710 Custodial Addendum to Cover Maintenance Employees | Teamsters Local Union 710 | Teamsters |
| YRC Inc. | Labor Contract and Working Agreement | Teamsters Local Union 710 | Teamsters |
| YRC Inc. | Addendum to the National Master Freight Agreement Between YRC Inc. - Office Personnel and Teamsters Local Union 120 | Teamsters Local Union 120 | Teamsters |
| YRC Inc. | Indiana Uniform Office Clerical Agreement | Teamsters Local Unions 135, 215, 364, 414 | Teamsters |
| YRC Inc. | Indiana Maintenance Agreement | Teamsters Local Union 135 | Teamsters |
| YRC Inc. | Sacramento Janitor | Teamsters Local Union 150 | Teamsters |
| YRC Inc. | Mason City Office Contract | Teamsters Local Union 238 | Teamsters |
| YRC Inc. | Albuquerque Shop | Teamsters Local Union 492 | Teamsters |
| YRC Inc. | Albuquerque Janitor | Teamsters Local Union 492 | Teamsters |
| YRC Inc. | Denver Shop | Teamsters Local Union 961 | Teamsters |
| YRC Inc. | Denver Janitor | Teamsters Local Union 691 | Teamsters |
| YRC Inc. | Charlotte Clerical | Teamsters Local Union 71 | Teamsters |
| YRC Inc. | Albany Office Clerical | Teamsters Local 294 | Teamsters |
| YRC Inc. | Scranton Office Clerical | Teamsters Local 401 | Teamsters |
| YRC Inc. | Scranton Garage Mechanics | Teamsters Local 401 | Teamsters |
| YRC Inc. | Union City Mechanics | Teamsters Local 560 | Teamsters |
| YRC Inc. | Union City Janitorial | Teamsters Local 560 | Teamsters |

•

44

## Schedule 6.13(a) Certain Collateral Documents

- Within 60 days of the Closing Date, or such later date as the Administrative Agent may agree in its sole discretion, Mortgage Releases in favor of JPMorgan Chase Bank, N.A., as first lien agent, and US Bank, National Association, as second lien agent.

- Within 30 days of the Closing Date, or such later date as the Administrative Agent may agree in its sole discretion, evidence reasonably satisfactory to the Agent or the Administrative Agent of the termination of that certain unauthorized lien filing against USF Glen Moore, Inc.

- Within 60 days of the Closing Date, or such later date as the Administrative Agent may agree in its sole discretion, delivery of any equity interest in Newgistics, Inc., to the extent that it has not been otherwise disposed of or tendered in that ongoing tender offer by Littlejohn & Co.

- Within 60 days of the Closing Date, or such later date as the Administrative Agent may agree in its sole discretion, delivery of Mortgages with respect to owned real property to the extent required by the Collateral and Guarantee Requirement.

- Within 90 days of the Closing Date, or such later date as the Administrative Agent may agree in its sole discretion, evidence reasonably satisfactory to the Administrative Agent of the fulfillment by the custodial administrator of its obligations under the Custodial Administration Agreement.

- Within 5 Business Days of the Closing Date, or such later date as the Administrative Agent may agree in its sole discretion, delivery of reasonably necessary intellectual property releases from each of JP Morgan Chase Bank, National Association, as agent, in respect of the Existing Credit Agreement and US Bank, National Association, as collateral trustee, in relation to the Existing Series A Notes and Existing Series B Notes.

-

**Schedule 7.01(b) Existing Liens**

- Incorporated by reference are all capital lease obligations provided in Schedule 7.03(b).

**New Penn Motor Express, Inc.**

| JURISDICTION | FILING TYPE/ SEARCHED THRU | FILE NUMBER/ FILE DATE | DEBTOR | SECURED PARTY | COLLATERAL DESCRIPTION |
|---|---|---|---|---|---|
| Secretary of the Commonwealth, Pennsylvania | UCC 11/19/2013 | 2008121704739 12/17/2008 | New Penn Motor Express, Inc.<br><br>625 s 5th Ave Lebanon, PA 17042 | Toyota Material Handling, U.S.A., Inc.<br><br>P.O. Box 17419 Irvine, CA 92623-74419 | Inventory of all new Toyota. |
| Secretary of the Commonwealth, Pennsylvania | CONT 11/19/2013 | 2013091204428 09/12/2013 | | | Continuation. |
| Secretary of the Commonwealth, Pennsylvania | UCC 11/19/2013 | 2009030605236 03/06/2009 | New Penn Motor Express, Inc.<br><br>625 S. 5th Avenue Lebanon, PA 17042 | RBS Asset Finance, Inc.<br><br>71 S. Wacker Drive 28th Floor Chicago, IL 60606 | Lease of specific equipment. |
| Secretary of the Commonwealth, Pennsylvania | UCC 11/19/2013 | 2012032103205 03/20/2012 | NEW PENN MOTOR EXPRESS, INC.<br><br>625 S. 5TH AVENUE LEBANON, PA 17042 | Nations Fund I, Inc.<br><br>101 Merritt Seven Norwalk, CT 06851 | Lease of specific equipment. |

| JURISDICTION | FILING TYPE/ SEARCHED THRU | FILE NUMBER/ FILE DATE | DEBTOR | SECURED PARTY | COLLATERAL DESCRIPTION |
|---|---|---|---|---|---|
| Secretary of the Commonwealth, Pennsylvania | UCC 11/19/2013 | 2012050301334 05/02/2012 | NEW PENN MOTOR EXPRESS, INC.<br><br>625 S. 5TH AVENUE LEBANON, PA 17042 | Nations Fund I, Inc.<br><br>101 Merritt Seven Norwalk, CT 06851 | Lease of specific equipment. |
| Secretary of the Commonwealth, Pennsylvania | UCC 11/19/2013 | 2012091300672 09/11/2012 | NEW PENN MOTOR EXPRESS, INC.<br><br>625 S. 5TH AVENUE LEBANON, PA 17042 | Nations Fund I, Inc.<br><br>101 Merritt Seven Norwalk, CT 06851 | Lease of specific equipment. |
| Secretary of the Commonwealth, Pennsylvania | UCC 11/19/2013 | 2012092509194 09/25/2012 | | UTICA LEASECO, LLC<br><br>44225 UTICA ROAD UTICA, MI 48317 | Secured Party assignment to: UTICA LEASECO, LLC 44225 UTICA ROAD UTICA, MI 48317 |
| Secretary of the Commonwealth, Pennsylvania | UCC 02/03/2014 | 2014010301188 12/31/2013 | NEW PENN MOTOR EXPRESS, INC.<br><br>625 S. 5TH AVENUE LEBANON, PA 17042 | U.S. Bank Equipment Finance, a Division of U.S. Bank National Association<br><br>1310 Madrid Street Marshall, MN 56258 | Lease of specific equipment. |

47

**Roadway, LLC**

| JURISDICTION | FILING TYPE/ SEARCHED THRU | FILE NUMBER/ FILE DATE | DEBTOR | SECURED PARTY | COLLATERAL DESCRIPTION |
|---|---|---|---|---|---|
| Secretary of State, Kansas | FTL 12/05/2013 | 6714554 07/16/2010 | ROADWAY CORPORATION, a Corporation<br><br>10990 ROE AVE OVERLAND PARK, KS 66211-1213 | Internal Revenue Service | $10,413.73 |
| Secretary of State, Kansas | Release of FTL 12/05/2013 | 677901 03/04/2011 | | | Release of Federal Tax Lien in the amount of $10,413.73. |

48

**USF Glen Moore Inc.**

| JURISDICTION | FILING TYPE/ SEARCHED THRU | FILE NUMBER/ FILE DATE | DEBTOR | SECURED PARTY | COLLATERAL DESCRIPTION |
|---|---|---|---|---|---|
| Secretary of the Commonwealth, Pennsylvania | UCC 11/19/2013 | 33030586 09/05/2000 | USF Glen Moore Inc. P.O. Box 760 Carlisle, PA 17013 | Financial Federal Credit Inc. 201 McCullough Drive Suite 320 Charlotte, NC 28262 | Blanket lien. |
| Secretary of the Commonwealth, Pennsylvania | CONT 11/19/2013 | 2005071900586 07/18/2005 | | | Continuation. |
| Secretary of the Commonwealth, Pennsylvania | TERM 11/19/2013 | 2008050701369 05/05/2008 | | | Termination by Finance Federal Credit Inc. |
| Secretary of the Commonwealth, Pennsylvania | CONT 11/19/2013 | 2010032301617 03/22/2010 | | | Continuation. |
| Secretary of the Commonwealth, Pennsylvania | UCC 11/19/2013 | 33030589 09/05/2000 | USF Glen Moore Inc. P.O. Box 760 Carlisle, PA 17013 | Financial Federal Credit Inc. 201 McCullough Drive Suite 320 Charlotte, NC 28262 | Blanket lien. |
| Secretary of the Commonwealth, Pennsylvania | CONT 11/19/2013 | 2005071900574 07/18/2005 | | | Continuation. |
| Secretary of the Commonwealth, Pennsylvania | TERM 11/19/2013 | 2008050701371 05/05/2008 | | | Termination by Financial Federal Credit Inc. |
| Secretary of the Commonwealth, Pennsylvania | CONT 11/19/2013 | 2010032301605 03/22/2010 | | | Continuation. |

49

**USF Holland Inc.**

| JURISDICTION | FILING TYPE/ SEARCHED THRU | FILE NUMBER/ FILE DATE | DEBTOR | SECURED PARTY | COLLATERAL DESCRIPTION |
|---|---|---|---|---|---|
| US District Court, Kansas | LIT 12/03/2013 | 2:13-cv-02205-EFM-GLR 05/02/2013 | Defendant: USF Holland, Inc. | Plaintiff: Zachary Alden | Wrongful termination. Family Medical Leave Act. |
| US District Court, Kansas | LIT 12/03/2013 | 2:13-cv-02575-EFM-JPO 11/05/2013 | Defendant: Ronald Beckham USF Holland, Inc. YRC Worldwide, Inc. | Plaintiff: Mary Eastwood | Wrongful Death Seeking damages in excess of $75,000 |
| Department of State, Michigan | UCC 12/09/2013 | 2008194256-2 12/22/2008 | USF Holland, Inc. 750 E 40th St Holland, MI 49423 | Toyota Material Handling, U.S.A., Inc. P.O. Box 17419 Irvine, CA 92637419 | Inventory of all new Toyota, manufactured industrial, construction and agricultural equipment and all similar used equipment, whether now owned or hereafter acquired and wherever located, including in transit trucks that have been delivered by or on behalf of Toyota Material Handling, USA, Inc. and that have not yet been paid for in whole. |
| Department of State, Michigan | CONT 12/09/2013 | | | | Continuation. |
| Department of State, Michigan | UCC 12/09/2013 | 2012042144-1 03/20/2012 | USF HOLLAND, INC. 750 EAST 40TH STREET HOLLAND, MI 49423 | Nations Fund I, Inc. 101 Merritt Seven Norwalk, CT 06851 | Lease of specific equipment. |

50

| JURISDICTION | FILING TYPE/ SEARCHED THRU | FILE NUMBER/ FILE DATE | DEBTOR | SECURED PARTY | COLLATERAL DESCRIPTION |
|---|---|---|---|---|---|
| Department of State, Michigan | UCC 12/09/2013 | 2012052055-4 04/06/2012 | USF HOLLAND, INC. 750 EAST 40TH STREET HOLLAND, MI 49423 | Nations Fund I, Inc. 101 Merritt Seven Norwalk, CT 06851 | Lease of specific equipment. |
| Department of State, Michigan | UCC 12/09/2013 | 2012095428-6 07/02/2012 | USF HOLLAND, INC. 750 EAST 40TH STREET HOLLAND, MI 49423 | Nations Fund I, Inc. 101 Merritt Seven Norwalk, CT 06851 | Lease of specific equipment. |
| Department of State, Michigan | UCC 12/09/2013 | 2012129194-0 09/11/2012 | USF HOLLAND, INC. 750 EAST 40TH STREET HOLLAND, MI 49423 | Nations Fund I, Inc. 101 Merritt Seven Norwalk, CT 06851 | Lease of specific equipment. |
| Department of State, Michigan | AMEND 12/09/2013 | 2012133070-4 09/19/2012 | YRC, INC. 10990 ROE AVE OVERLAND PARK, KS 66211 | | Debtor change to: YRC, INC. 10990 ROE AVE OVERLAND PARK, KS 66211 |
| Department of State, Michigan | ASSGN 12/09/2013 | 2012140129-8 10/03/2012 | | Utica Leaseco, LLC 44225 UTICA ROAD UTICA, MI 48317 | Secured Party assignment to: Utica Leaseco, LLC 44225 UTICA ROAD UTICA, MI 48317 |

51

| JURISDICTION | FILING TYPE/ SEARCHED THRU | FILE NUMBER/ FILE DATE | DEBTOR | SECURED PARTY | COLLATERAL DESCRIPTION |
|---|---|---|---|---|---|
| Department of State, Michigan | UCC 12/09/2013 | 2012179056-8 12/27/2012 | USF HOLLAND INC. 750 E. 40TH STREET HOLLAND, MI 49423 | Oce Financial Services, Inc. 5450 North Cumberland Chicago, IL 60656 | All of Debtor's rights in all equipment subject to a lease between Debtor and Secured Party. |
| Department of State, Michigan | UCC 2/5/2014 | 2013177855-2 12/17/2013 | USF HOLLAND INC. 750 E. 40TH STREET HOLLAND, MI 49423 | Canon Financial Services, Inc. 158 Gaither Drive Suite 200 Mt. Laurel, NJ 08054 | All equipment subject to lease and other rights arising from lease equipment |

52

**USF Reddaway Inc.**

| JURISDICTION | FILING TYPE/ SEARCHED THRU | FILE NUMBER/ FILE DATE | DEBTOR | SECURED PARTY | COLLATERAL DESCRIPTION |
|---|---|---|---|---|---|
| Secretary of State, Oregon | UCC 11/22/2013 | 8154506 12/17/2008 | USF REDDAWAY, INC 16277 SE 130TH AVE CLACKAMAS, OR 97015 | TOYOTA MATERIAL HANDLING, U.S.A., INC. P.O. BOX 17419 IRVINE, CA 92623-7419 | INVENTORY OF ALL NEW TOYOTA, MANUFACTURED INDUSTRIAL, CONSTRUCTION AND AGRICULTURAL EQUIPMENT AND ALL SIMILAR USED EQUIPMENT, WHETHER NOW OWNED OR HEREAFTER ACQUIRED AND WHEREVER LOCATED, INCLUDING IN TRANSIT TRUCKS THAT HAVE BEEN DELIVERED BY OR ON BEHALF OF TOYOTA MATERIAL HANDLING, USA, INC. AND THAT HAVE NOT YET BEEN PAID FOR IN WHOLE. |
| Secretary of State, Oregon | CONT 11/22/2013 | 8154506-1 09/12/2013 | | | Continuation. |

53

| JURISDICTION | FILING TYPE/ SEARCHED THRU | FILE NUMBER/ FILE DATE | DEBTOR | SECURED PARTY | COLLATERAL DESCRIPTION |
|---|---|---|---|---|---|
| Secretary of State, Oregon | UCC 11/22/2013 | 8433679 01/04/2010 | USF REDDAWAY INC.<br><br>PO BOX 1035 CLACKAMAS, OR 97015<br><br>USF REDDAWAY, INC.<br><br>16277 SE 130TH AVE CLACKAMAS, OR 97015<br><br>USF REDDAWAY INC.<br><br>12250 SE FORD DRIVE CLACKAMAS, OR 97015<br><br>USF REDDAWAY INC.<br><br>10990 ROE AVENUE MS A515 OVERLAND PARK, KS 66211 | FLUID CONNECTOR PRODUCTS, INC.<br><br>PO BOX 10308 PORTLAND, OR 97296 | Specific equipment. |
| Secretary of State, Oregon | UCC 11/22/2013 | 89146492 03/20/2012 | USF REDDAWAY, INC.<br><br>16277 S.E. 130TH AVENUE CLACKAMAS, OR 97015 | Nations Fund I, Inc.<br><br>101 Merritt Seven Norwalk, CT 06851 | Lease of specific equipment. |

54

| JURISDICTION | FILING TYPE/ SEARCHED THRU | FILE NUMBER/ FILE DATE | DEBTOR | SECURED PARTY | COLLATERAL DESCRIPTION |
|---|---|---|---|---|---|
| Secretary of State, Oregon | UCC 11/22/2013 | 89162685 04/09/2012 | USF REDDAWAY, INC. 16277 S.E. 130TH AVENUE CLACKAMAS, OR 97015 | Nations Fund I, Inc. 101 Merritt Seven Norwalk, CT 06851 | Lease of specific equipment. |
| Secretary of State, Oregon | UCC 11/22/2013 | 89210013 06/01/2012 | USF REDDAWAY, INC. 16277 S.E. 130TH AVENUE CLACKAMAS, OR 97015 | Nations Fund I, Inc. 101 Merritt Seven Norwalk, CT 06851 | Lease of specific equipment. |
| Secretary of State, Oregon | UCC 11/22/2013 | 89283578 08/22/2012 | USF REDDAWAY, INC. 16277 S.E. 130TH AVENUE CLACKAMAS, OR 97015 | Nations Fund I, Inc. 101 Merritt Seven Norwalk, CT 06851 | Lease of specific equipment. |
| Secretary of State, Oregon | UCC 11/22/2013 | 89759879 06/18/2013 | USF REDDAWAY INC. D/B/A REDDAWAY 7720 S.W. MOHAWK ST, BUILDING H TULATIN, OR 97062 | STOUGHTON TRAILERS ACCEPTANCE BY LLC 416 S. ACADEMY STREET STOUGHTON, WI 53589 | Lease of specific equipment. *Debtor name is not compliant with Article 9. |

55

| JURISDICTION | FILING TYPE/ SEARCHED THRU | FILE NUMBER/ FILE DATE | DEBTOR | SECURED PARTY | COLLATERAL DESCRIPTION |
|---|---|---|---|---|---|
| Secretary of State, Oregon | UCC 11/22/2013 | 89890102 11/19/2013 | USF REDDAWAY INC. D/B/A REDDAWAY 7720 S.W. MOHAWK ST, BUILDING H TULATIN, OR 97062 | STOUGHTON TRAILERS ACCEPTANCE BY LLC 416 S. ACADEMY STREET STOUGHTON, WI 53589 | Lease of specific equipment. *Debtor name is not compliant with Article 9. |

56

**USFreightways Corporation**

| JURISDICTION | FILING TYPE/ SEARCHED THRU | FILE NUMBER/ FILE DATE | DEBTOR | SECURED PARTY | COLLATERAL DESCRIPTION |
|---|---|---|---|---|---|
| Secretary of State, Delaware | UCC 12/03/2013 | 31630311 06/26/2003 | US FREIGHTWAYS CORPORATION<br><br>630 E KENMOOR, STE 200 GRAND RAPIDS, MI 49546 | DELL FINANCIAL SERVICES, L.P.<br><br>12234 N. IH-35 BLDG B AUSTIN, TX 78753 | Lease of specific equipment. |
| Secretary of State, Delaware | CONT 12/03/2013 | 20081862471 06/01/2008 | | | Continuation. |
| Secretary of State, Delaware | AMEND 12/03/2013 | 20083248935 09/24/2008 | | DELL FINANCIAL SERVICES L.L.C.<br><br>12234 N. IH-35 BLDG B AUSTIN, TX 78753. | Secured Party change to: DELL FINANCIAL SERVICES L.L.C. 12234 N. IH-35 BLDG B AUSTIN, TX 78753. |
| Secretary of State, Delaware | CONT 12/03/2013 | 20131370056 04/10/2013 | | | Continuation. |

57

**YRC Inc.**

| JURISDICTION | FILING TYPE/ SEARCHED THRU | FILE NUMBER/ FILE DATE | DEBTOR | SECURED PARTY | COLLATERAL DESCRIPTION |
|---|---|---|---|---|---|
| Secretary of State, Delaware | UCC 12/03/2013 | 20102884538 08/18/2010 | YRC INC. 200 N BELTLINE RD IRVING, TX 75061 | GENERAL ELECTRIC CAPITAL CORPORATION PO BOX 35701 BILLINGS, MT 59107-570 | Lease of specific equipment |
| Secretary of State, Delaware | UCC 12/03/2013 | 20121040460 03/19/2012 | YRC, INC. 10990 ROE AVENUE OVERLAND PARK, KS 66211 | NATIONS FUND I, INC. 1201 MERRITT SEVEN NORWALK, CT 06851 | Lease of specific equipment. |
| Secretary of State, Delaware | UCC 12/03/2013 | 20121537473 04/20/2012 | YRC, INC. 10990 ROE AVENUE OVERLAND PARK, KS 66211 | NATIONS FUND I, INC. 1201 MERRITT SEVEN NORWALK, CT 06851 | Lease of specific equipment. |
| Secretary of State, Delaware | ASSGN 12/03/2013 | 20123708577 09/26/2012 | | MILESTONE EQUIPMENT CORPORATION 1660 TIBURON BLVD, SUITE E TIBURON, CA 94920 | Secured Party assignment to: MILESTONE EQUIPMENT CORPORATION 1660 TIBURON BLVD, SUITE E TIBURON, CA 94920 |

58

| JURISDICTION | FILING TYPE/ SEARCHED THRU | FILE NUMBER/ FILE DATE | DEBTOR | SECURED PARTY | COLLATERAL DESCRIPTION |
|---|---|---|---|---|---|
| Secretary of State, Delaware | UCC 12/03/2013 | 20122075275 05/30/2012 | YRC, INC.<br><br>10990 ROE AVENUE OVERLAND PARK, KS 66211 | NATIONS FUND I, INC.<br><br>1201 MERRITT SEVEN NORWALK, CT 06851 | Lease of specific equipment. |
| Secretary of State, Delaware | UCC 12/03/2013 | 20122075648 05/30/2012 | YRC, INC.<br><br>10990 ROE AVENUE OVERLAND PARK, KS 66211 | NATIONS FUND I, INC.<br><br>1201 MERRITT SEVEN NORWALK, CT 06851 | Lease of specific equipment. |
| Secretary of State, Delaware | ASSGN 12/03/2013 | 20123708825 09/26/2012 | | MILESTONE EQUIPMENT CORPORATION<br><br>1660 TIBURON BLVD, SUITE E TIBURON, CA 94920 | Secured Party assignment to: MILESTONE EQUIPMENT CORPORATION 1660 TIBURON BLVD, SUITE E TIBURON, CA 94920 |
| Secretary of State, Delaware | UCC 12/03/2013 | 20122680124 07/12/2012 | YRC INC.<br><br>10990 ROE AVENUE OVERLAND PARK, KS 66211 | NATIONS FUND I, INC.<br><br>1201 MERRITT SEVEN NORWALK, CT 06851 | Lease of specific equipment. |
| Secretary of State, Delaware | UCC 12/03/2013 | 20122922427 07/30/2012 | YRC INC.<br><br>10990 ROE AVENUE OVERLAND PARK, KS 66211 | NATIONS FUND I, INC.<br><br>1201 MERRITT SEVEN NORWALK, CT 06851 | Lease of specific equipment. |

59

| JURISDICTION | FILING TYPE/ SEARCHED THRU | FILE NUMBER/ FILE DATE | DEBTOR | SECURED PARTY | COLLATERAL DESCRIPTION |
|---|---|---|---|---|---|
| Secretary of State, Delaware | UCC 12/03/2013 | 20123001106 08/03/2012 | YRC INC. 10990 ROE AVENUE OVERLAND PARK, KS 66211 | NATIONS FUND I, INC. 1201 MERRITT SEVEN NORWALK, CT 06851 | Lease of specific equipment. |
| Secretary of State, Delaware | ASSGN 12/03/2013 | 20123708890 09/26/2012 | | MILESTONE EQUIPMENT CORPORATION 1660 TIBURON BLVD, SUITE E TIBURON, CA 94920 | Secured Party assignment to: MILESTONE EQUIPMENT CORPORATION 1660 TIBURON BLVD, SUITE E TIBURON, CA 94920 |
| Secretary of State, Delaware | UCC 12/03/2013 | 20123241256 08/21/2012 | YRC INC. 10990 ROE AVENUE OVERLAND PARK, KS 66211 | NATIONS FUND I, INC. 1201 MERRITT SEVEN NORWALK, CT 06851 | Lease of specific equipment. |
| Secretary of State, Delaware | UCC 12/03/2013 | 20123592468 09/18/2012 | YRC INC. 10990 ROE AVENUE OVERLAND PARK, KS 66211 | NATIONS FUND I, INC. 1201 MERRITT SEVEN NORWALK, CT 06851 | Lease of specific equipment. |
| Secretary of State, Delaware | ASSGN 12/03/2013 | 20123819424 10/03/2012 | | UTICA LEASECO, LLC 44225 UTICA ROAD UTICA, MI 48317 | Secured Party assignment to: UTICA LEASECO, LLC 44225 UTICA ROAD UTICA, MI 48317 |

60

| JURISDICTION | FILING TYPE/ SEARCHED THRU | FILE NUMBER/ FILE DATE | DEBTOR | SECURED PARTY | COLLATERAL DESCRIPTION |
|---|---|---|---|---|---|
| Secretary of State, Delaware | UCC 12/03/2013 | 20123667005 09/13/2012 | YRC INC.<br><br>10990 Roe Avenue Overland Park, KS 66211 | Nations Fund I, Inc.<br><br>101 Merritt Seven Norwalk, CT 06851 | Lease of specific equipment. |
| Secretary of State, Delaware | ASSGN 12/03/2013 | 20124032142 10/03/2012 | | PMC FINANCIAL SERVICES GROUP, LLC<br><br>3816 EAST LA PALMA AVE ANAHEIM, CA 92807 | Secured Party assignment to:<br>PMC FINANCIAL SERVICES GROUP, LLC<br>3816 EAST LA PALMA AVE<br>ANAHEIM, CA 92807 |
| Secretary of State, Delaware | UCC 12/03/2013 | 20125096484 12/31/2012 | YRC, INC.<br><br>10990 ROE AVENUE OVERLAND PARK, KS 66211 | NATIONS FUND I, INC.<br><br>1201 MERRITT SEVEN NORWALK, CT 06851 | Lease of specific equipment. |
| Secretary of State, Delaware | UCC 12/03/2013 | 20131036327 03/18/2013 | YRC INC.<br><br>10990 ROE AVENUE OVERLAND PARK, KS 66211 | CIT FINANCE LLC<br><br>10201 CENTURION PARKWAY N. JACKSONVILLE, FL 32256 | Specific equipment. |
| Secretary of State, Delaware | TERM 12/03/2013 | 20131074971 03/20/2013 | | | Termination by CIT Finance LLC. |
| Secretary of State, Delaware | UCC 12/03/2013 | 20131074690 03/20/2013 | YRC INC.<br><br>10990 ROE AVENUE OVERLAND PARK, KS 66211 | CIT FINANCE LLC<br><br>10201 CENTURION PARKWAY N. JACKSONVILLE, FL 32256 | Specific equipment. |

61

| JURISDICTION | FILING TYPE/ SEARCHED THRU | FILE NUMBER/ FILE DATE | DEBTOR | SECURED PARTY | COLLATERAL DESCRIPTION |
|---|---|---|---|---|---|
| Secretary of State, Delaware | UCC 12/03/2013 | 20132927771 07/18/2013 | YRC INC. 10990 ROE AVENUE OVERLAND PARK, KS 66211 | Nations Fund I, Inc. PO Box 203106 Dallas, TX 75320-3106 | Lease of specific equipment. |
| Secretary of State, Delaware | UCC 12/03/2013 | 20134021334 10/08/2013 | YRC INC. 10990 ROE AVENUE OVERLAND PARK, KS 66211 | Nations Fund I, Inc. PO Box 203106 Dallas, TX 75320-3106 | Lease of specific equipment. |
| Secretary of State, Delaware | UCC 12/03/2013 | 20134369279 11/04/2013 | YRC INC. 10990 ROE AVENUE OVERLAND PARK, KS 66211 | Nations Fund I, Inc. PO Box 203106 Dallas, TX 75320-3106 | Lease of specific equipment. |
| Secretary of State, Delaware | UCC 1/30/2014 | 20135162830 12/30/2014 | YRC, INC. 10990 ROE AVENUE OVERLAND PARK, KS 66211 | Nations Fund I, Inc. 101 Merritt Seven 5th Floor Norwalk, CT 06851 | All equipment subject to lease and other rights arising from lease equipment. |
| Secretary of State, Kansas | UCC 12/05/2013 | 6887905 03/20/2012 | YRC, INC. 10990 ROE AVENUE OVERLAND PARK, KS 66211 | Nations Fund I, Inc. 101 Merrit Seven Norwalk, CT 06851 | Lease of specific equipment. |

62

| JURISDICTION | FILING TYPE/ SEARCHED THRU | FILE NUMBER/ FILE DATE | DEBTOR | SECURED PARTY | COLLATERAL DESCRIPTION |
|---|---|---|---|---|---|
| Secretary of State, Kansas | UCC 12/05/2013 | 6896716 04/23/2012 | YRC, INC. 10990 ROE AVENUE OVERLAND PARK, KS 66211 | Nations Fund I, Inc. 101 Merrit Seven Norwalk, CT 06851 | Lease of specific equipment. |
| Secretary of State, Kansas | ASSGN 12/05/2013 | 71253509 09/26/2012 | | MILESTONE EQUIPMENT CORPORATION 1660 TIBURON BLVD, SUITE E TIBURON, CA 94920 | Secured Party assignment to: MILESTONE EQUIPMENT CORPORATION 1660 TIBURON BLVD, SUITE E TIBURON, CA 94920 |
| Secretary of State, Kansas | UCC 12/05/2013 | 6909386 06/01/2012 | YRC, INC. 10990 ROE AVENUE OVERLAND PARK, KS 66211 | Nations Fund I, Inc. 101 Merrit Seven Norwalk, CT 06851 | Lease of specific equipment. |
| Secretary of State, Kansas | UCC 12/05/2013 | 6909402 06/01/2012 | YRC, INC. 10990 ROE AVENUE OVERLAND PARK, KS 66211 | Nations Fund I, Inc. 101 Merrit Seven Norwalk, CT 06851 | Lease of specific equipment. |
| Secretary of State, Kansas | ASSGN 12/05/2013 | 71253780 09/26/2012 | | MILESTONE EQUIPMENT CORPORATION 1660 TIBURON BLVD, SUITE E TIBURON, CA 94920 | Secured Party assignment to: MILESTONE EQUIPMENT CORPORATION 1660 TIBURON BLVD, SUITE E TIBURON, CA 94920 |

63

| JURISDICTION | FILING TYPE/ SEARCHED THRU | FILE NUMBER/ FILE DATE | DEBTOR | SECURED PARTY | COLLATERAL DESCRIPTION |
|---|---|---|---|---|---|
| Secretary of State, Kansas | UCC 12/05/2013 | 6920961 07/13/2012 | YRC INC. 10990 ROE AVENUE OVERLAND PARK, KS 66211 | Nations Fund I, Inc. 101 Merrit Seven Norwalk, CT 06851 | Lease of specific equipment. |
| Secretary of State, Kansas | UCC 12/05/2013 | 6924781 07/31/2012 | YRC INC. 10990 ROE AVENUE OVERLAND PARK, KS 66211 | Nations Fund I, Inc. 101 Merrit Seven Norwalk, CT 06851 | Lease of specific equipment. |
| Secretary of State, Kansas | UCC 12/05/2013 | 6926026 08/06/2012 | YRC INC. 10990 ROE AVENUE OVERLAND PARK, KS 66211 | Nations Fund I, Inc. 101 Merrit Seven Norwalk, CT 06851 | Lease of specific equipment. |
| Secretary of State, Kansas | ASSGN 12/05/2013 | 71253798 09/26/2012 | | MILESTONE EQUIPMENT CORPORATION 1660 TIBURON BLVD, SUITE E TIBURON, CA 94920 | Secured Party assignment to: MILESTONE EQUIPMENT CORPORATION 1660 TIBURON BLVD, SUITE E TIBURON, CA 94920 |
| Secretary of State, Kansas | UCC 12/05/2013 | 6930549 08/22/2012 | YRC INC. 10990 ROE AVENUE OVERLAND PARK, KS 66211 | Nations Fund I, Inc. 101 Merrit Seven Norwalk, CT 06851 | Lease of specific equipment. |

64

| JURISDICTION | FILING TYPE/ SEARCHED THRU | FILE NUMBER/ FILE DATE | DEBTOR | SECURED PARTY | COLLATERAL DESCRIPTION |
|---|---|---|---|---|---|
| Secretary of State, Kansas | UCC 12/05/2013 | 6933816 09/07/2012 | YRC INC.<br><br>10990 ROE AVENUE OVERLAND PARK, KS 66211 | Nations Fund I, Inc.<br><br>101 Merrit Seven Norwalk, CT 06851 | Lease of specific equipment. |
| Secretary of State, Kansas | ASSGN 12/05/2013 | 6939532 10/03/2012 | | PMC FINANCIAL SERVICES GROUP, LLC<br><br>3816 EAST LA PALMA AVE ANAHEIM, CA 92807 | Secured Party assignment to: PMC FINANCIAL SERVICES GROUP, LLC 3816 EAST LA PALMA AVE ANAHEIM, CA 92807 |
| Secretary of State, Kansas | UCC 12/05/2013 | 6936462 09/19/2012 | YRC, INC.<br><br>10990 ROE AVENUE OVERLAND PARK, KS 66211 | Nations Fund I, Inc.<br><br>101 Merrit Seven Norwalk, CT 06851 | Lease of specific equipment. |
| Secretary of State, Kansas | ASSGN 12/05/2013 | 71258987 10/03/2012 | | UTICA LEASECO, LLC<br><br>44225 UTICA ROAD UTICA, MI 48317 | Secured Party assignment to: UTICA LEASECO, LLC 44225 UTICA ROAD UTICA, MI 48317 |
| Secretary of State, Kansas | UCC 12/05/2013 | 6959944 01/02/2013 | YRC, INC.<br><br>10990 ROE AVENUE OVERLAND PARK, KS 66211 | Nations Fund I, Inc.<br><br>101 Merrit Seven Norwalk, CT 06851 | Lease of specific equipment. |

65

| JURISDICTION | FILING TYPE/ SEARCHED THRU | FILE NUMBER/ FILE DATE | DEBTOR | SECURED PARTY | COLLATERAL DESCRIPTION |
|---|---|---|---|---|---|
| Secretary of State, Kansas | UCC 12/05/2013 | 6999189 05/28/2013 | YRC INC. D/B/A YRC FREIGHT<br><br>10990 ROE AVENUE OVERLAND PARK, KS 66211 | STOUGHTON TRAILERS ACCEPTANCE COMPANY, LLC<br><br>416 S. ACADEMY STREET STOUGHTON, WI 53589 | Lease of specific equipment.<br><br>*Debtor name is not compliant with Article 9. |
| Secretary of State, Kansas | UCC 12/05/2013 | 7008287 07/01/2013 | YRC INC.<br><br>10990 ROE AVENUE OVERLAND PARK, KS 66211 | Nations Fund I, Inc.<br><br>PO Box 203106 Dallas, TX 75320-3106 | Lease of specific equipment. |

66

## YRC Enterprise Services, Inc.

| JURISDICTION | FILING TYPE/ SEARCHED THRU | FILE NUMBER/ FILE DATE | DEBTOR | SECURED PARTY | COLLATERAL DESCRIPTION |
|---|---|---|---|---|---|
| Secretary of State, Delaware | UCC 12/03/2013 | 20103749383 10/26/2010 | YRC ENTERPRISE SERVICES, INC. 10990 ROE AVENUE OVERLAND PARK, KS 66211 | COMSOURCE, INC. 8104 CAZENOVIA ROAD MANLIUS, NY 13104 | Lease of specific equipment. |
| Secretary of State, Delaware | ASSGN 12/03/2013 | 20104533489 12/21/2010 | | MB FINANCIAL BANK, N.A. 6111 N. RIVER ROAD ROSEMONT, IL 60018 | Secured Party assignment to: MB FINANCIAL BANK, N.A. 6111 N. RIVER ROAD ROSEMONT, IL 60018 |
| Secretary of State, Delaware | ASSGN 12/03/2013 | 20110265101 01/24/2011 | | MB FINANCIAL BANK, N.A. 6111 N. RIVER ROAD ROSEMONT, IL 60018 | Secured Party assignment to: MB FINANCIAL BANK, N.A. 6111 N. RIVER ROAD ROSEMONT, IL 60018 |
| Secretary of State, Delaware | UCC 12/03/2013 | 20111360844 03/30/2011 | YRC Enterprise Services, Inc. 10990 Roe Ave Overland Park, KS 66211 | Forsythe Solutions Group, Inc. 7770 Frontage Road Skokie, IL 60077 | Specific equipment. |

67

| JURISDICTION | FILING TYPE/ SEARCHED THRU | FILE NUMBER/ FILE DATE | DEBTOR | SECURED PARTY | COLLATERAL DESCRIPTION |
|---|---|---|---|---|---|
| Secretary of State, Delaware | UCC 12/03/2013 | 20114124858 10/26/2011 | YRC ENTERPRISES SERVICES, INC.<br><br>10990 ROE AVENUE OVERLAND PARK, KS 62207 | NORTH AMERICAN COMMUNICATIONS RESOURCE, INC.<br><br>3344 HWY 149 EAGAN, MN 55121 | Telecommunications equipment. |
| Secretary of State, Delaware | TERM 12/03/2013 | 20130167164 01/11/2013 | | | Termination by North American Communications Resource, Inc. |

68

**YRC Logistics Services, Inc.**

| JURISDICTION | FILING TYPE/ SEARCHED THRU | FILE NUMBER/ FILE DATE | DEBTOR | SECURED PARTY | COLLATERAL DESCRIPTION |
|---|---|---|---|---|---|
| Secretary of State, Illinois | UCC 12/04/2013 | 14278044 05/08/2009 | YRC LOGISTICS SERVICES, INC.<br><br>10990 ROE AVE OVERLAND PARK, KS 66211 | NMHG FINANCIAL SERVICES, INC.<br><br>44 OLD RIDGEBURY ROAD DANBURY, CT 06810 | All equipment now or hereafter leased by Lessor to Lessee. |
| Secretary of State, Illinois | CONT 12/04/2013 | 09270983 11/22/2013 | | | Continuation. |
| Secretary of State, Illinois | AMEND 12/04/2013 | 09270982 11/22/2013 | | NMHG FINANCIAL SERVICES, INC.<br><br>PO BOX 35701 Billings, MT 59107-5701 | Secured Party change to:<br>NMHG FINANCIAL SERVICES, INC.<br>PO BOX 35701<br>Billings, MT 59107-5701 |
| Secretary of State, Illinois | UCC 12/04/2013 | 14814787 12/02/2009 | YRC LOGISTICS SERVICES, INC.<br><br>10990 ROE AVENUE OVERLAND PARK, KS 66211 | GREATWIDE DEDICATED TRANSPORT, LLC<br><br>12404 PARK CENTRAL DR, STE 300 SOUTH DALLAS, TX 75251 | Reference is made to (i) that certain Indemnification Escrow Agreement, dated as of November 23,2009 (the "Indemnification Escrow Agreement") between Debtor, Secured Party and JPMorgan Chase Bank, N.A. and (ii) that certain Adjustment Escrow Agreement, dated as of November 23,2009 (the "Adjustment Escrow Agreement") between Debtor, Secured Party and JPMorgan Chase Bank, N.A.<br><br>This financing statement covers (1) all of the Debtor's rights under the Indemnification Escrow Agreement, (2) the Indemnification Escrow Account, the Indemnification Escrow Amount and all investments thereof, in each case, as referred to in the Indemnification Escrow Agreement, (3) all of the Debtor's rights under the Adjustment Escrow Agreement and (4) the Adjustment Escrow Account, the Adjustment Escrow Amount and all, investments thereof, in each case, as referred to in the Adjustment Escrow Agreement. |

71

**YRC Worldwide Inc.**

| JURISDICTION | FILING TYPE/ SEARCHED THRU | FILE NUMBER/ FILE DATE | DEBTOR | SECURED PARTY | COLLATERAL DESCRIPTION |
|---|---|---|---|---|---|
| Secretary of State, Delaware | UCC 12/03/2013 | 20084198477 12/17/2008 | YRC WORLDWIDE, INC. 10990 ROE AVE. OVERLAND PARK, KS 66211 | TOYOTA MATERIAL HANDLING, U.S.A., INC. P.O. BOX 17419 IRVINE, CA 92623-741 | Inventory of all new Toyota, manufactured industrial, construction and agricultural equipment and all similar used equipment, whether now owned or hereafter acquired and wherever located, including in transit trucks that have been delivered by or on behalf of Toyota Material Handling, USA, Inc. and that have not yet been paid for in whole. |
| Secretary of State, Delaware | CONT 12/03/2013 | 20133558716 09/12/2013 | | | Continuation. |
| Secretary of State, Delaware | UCC 12/03/2013 | 20101549991 05/04/2010 | YRC WORLDWIDE INC. 10990 ROE AVE OVERLAND PARK, KS 66211 | GENERAL ELECTRIC CAPITAL CORPORATION PO BOX 35701 BILLINGS, MT 59107-570 | Lease of specific equipment. |
| Secretary of State, Delaware | UCC 12/03/2013 | 20122122051 06/04/2012 | YRC WORLDWIDE INC. 10990 ROE AVENUE OVERLAND PARK, KS 66211 | MACQUARIE EQUIPMENT FINANCE, LLC 2285 FRANKLIN ROAD SUITE 100 BLOOMFIELD HILLS, MI 48302 | Lease of specific equipment. |

72

| JURISDICTION | FILING TYPE/ SEARCHED THRU | FILE NUMBER/ FILE DATE | DEBTOR | SECURED PARTY | COLLATERAL DESCRIPTION |
|---|---|---|---|---|---|
| Register of Deeds, Johnson County, Kansas | STL 12/04/2013 | 20130411-0004822 04/11/2013 | YRC WORLDWIDE INC. (as a corporation) 10990 Roe Ave Shawnee Mission, KS 66211-1213 | State of Kansas Department of Labor Delinquent Account Unit 401 S.W. Topeka Blvd. Topeka, KS 66603-3182 | $10,008.26 |
| Register of Deeds, Johnson County, Kansas | STL 12/04/2013 | 20130729-0012027 07/29/2013 | YRC WORLDWIDE INC. (as a corporation) 10990 Roe Ave Shawnee Mission, KS 66211-1213 | State of Kansas Department of Labor Delinquent Account Unit 401 S.W. Topeka Blvd. Topeka, KS 66603-3182 | $236.48 |
| US District Court, Kansas | LIT 12/03/2013 | 2:11-cv-02072-KHV-JPO 02/07/2011 | Defendant: YRC Worldwide Inc. | Plaintiff: Stan Better YRC Investors Group | Securities Exchange Act Plaintiffs suing in class action against YRC Worldwide Inc. for misleading conduct in company valuation. |
| US District Court, Kansas | LIT 12/03/2013 | 2:13-cv-02575-EFM-JPO 11/05/2013 | Defendant: Ronald Beckham USF Holland, Inc. YRC Worldwide, Inc. | Plaintiff: Mary Eastwood | Wrongful death. |

73

**Schedule 7.02(e) Existing Investments**

- Included by reference are all Intercompany Notes listed on Schedule 7.03(b).
- YRC Regional Transportation, Inc. owns preferred shares of Newgistics, Inc., which were converted into right to receive $3.4 million on Newgistics, Inc. merger

**Wholly Owned Subsidiaries**

| Issuer | Issued and Outstanding Shares/Equity Interests | Record and Beneficial Owner |
|---|---|---|
| YRC Worldwide Inc. | 28,629,938<br>583,334 shares of Class A Convertible Preferred Stock<br>1 share of Series A Preferred Stock | Publicly traded |
| 1105481 Ontario, Inc. | 100 shares | 100% by YRC Worldwide Inc. |
| Express Lane Service, Inc. | 100 shares | 100% by YRC Worldwide Inc. |
| OPK Insurance Co. Ltd. | Unknown | 100% by YRC Worldwide Inc. |
| Roadway LLC | 100 shares | 100% by YRC Worldwide Inc. |
| YRC Association Solutions, Inc. | 10,000 shares | 100% by YRC Worldwide Inc. |
| YRC Logistics Asia Limited | 357,501,711 shares | 100% by YRC Worldwide Inc. |
| YRC International Investments, Inc. | 1,000 shares | 100% by YRC Worldwide Inc. |
| YRC MORTGAGES, LLC | 10,000 units | 100% by YRC Worldwide Inc. |
| YRC Regional Transportation, Inc. | 1,000 shares | 100% by YRC Worldwide Inc. |
| YRC Enterprise Services, Inc. | 1,000 shares | 100% by YRC Worldwide Inc. |
| YRCW Receivables LLC | $1,000 paid in capital | 100% by YRC Worldwide Inc. |
| YRC Inc. | 200 shares | 100% by Roadway LLC |
| Roadway Next Day Corporation | 100 shares | 100% by Roadway LLC |
| Reimer Express Lines Ltd. | 100 Class B Common<br>7,511,100 Class A Voting Common | 100% by YRC Inc. |

| | | |
|---|---|---|
| Roadway Express International, Inc. | 1,000 shares | 100% by YRC Inc. |
| Roadway Reverse Logistics, Inc. | 100 shares | 100% by YRC Inc. |
| YRC Services S. de R.L. de C.V. | N/A | 100% by YRC Transportation, S.A. de C.V. |
| New Penn Motor Express, Inc. | 7 shares | 100% by Roadway Next Day Corporation |
| YRC (Shanghai) Management Consulting CO., LTD. | No shares | 100% by YRC Logistics Asia Limited |
| PT Meridian IQ Indonesia International | $50,000 paid in capital | 100% by YRC Logistics Asia Limited |
| YRC Worldwide Pte. Ltd. | 100 shares | 100% by YRC International Investments, Inc. |
| YRC LOGISTICS SERVICES, INC. | 50 shares | 100% by YRC Regional Transportation, Inc. |
| YRC Logistics Inc. | 100 shares | 100% by YRC LOGISTICS SERVICES, INC. |
| USF Bestway Inc. | 283.4 shares | 100% by YRC Regional Transportation, Inc. |
| USF Dugan Inc. | 1,000,000 shares | 100% by YRC Regional Transportation, Inc. |
| USF Glen Moore Inc. | 100,000 | 100% by YRC Regional Transportation, Inc. |
| USF Holland Inc. | 1,131 Common Stock 2,610 Preferred Stock | 100% by YRC Regional Transportation, Inc. |
| USF Holland International Sales Corporation | 100,000 shares | 100% by USF Holland Inc. |
| USF RedStar LLC | Unknown | 100% by YRC Regional Transportation, Inc. |
| USF Reddaway Inc. | 40.5 shares | 100% by YRC Regional Transportation, Inc. |

**Less Than Wholly Owned Subsidiaries**

75

| Issuer | Issued and Outstanding Shares/Equity Interests | Record and Beneficial Owner |
|---|---|---|
| JHJ International Transportation | $10,000,000 paid in capital | 50% by YRC Worldwide Inc. and 50% by Shanghai Jin Jiang International Industrial Investment Co., Ltd. |
| Roadway Express, S.A. de C.V. | 9,210,800 shares | 99.99% by YRC Inc. .01% by Transcontinental Lease, S. de R.L de C.V. |
| Transcontinental Lease, S. de R.L. de C.V. | 50 shares | 99.99% by YRC Inc. .01% by Roadway Express International, Inc. |
| YRC Transportation, S.A. de C.V. | 5,000 shares | 58.9% by YRC Inc. 41.1% by Reimer Express Lines Ltd. |

- .

76

**Schedule 7.03(b) Existing Indebtedness**

- 5.0% Net Share Settled Contingent Convertible Senior Notes due 2023 and the subsidiary guarantees of them, with remaining aggregate principal amount of $177,000.
- Indebtedness arising under contracts entered into in the ordinary course of business for the purchase of goods and services, whether or not delivered or accepted, which constitute take or pay obligations.
- Included by reference are all liens listed on Schedule 7.01(b).

Additional Outstanding Notes

| Maker | Payee | Original Principal Amount |
|---|---|---|
| Each Loan Party | Each Loan Party | N/A |
| YRC Inc. (fka Roadway Express, Inc.) | Roadway LLC | $ 500,000,000.00 |
| YRC Inc. (fka Roadway Express, Inc.) | YRC Worldwide Inc. | $ 200,000,000.00 |
| New Penn Motor Express, Inc. | Roadway LLC | $ 150,000,000.00 |
| YRC Logistics Asia Limited | YRC Worldwide Inc. | $ 10,203,693.27 |
| YRC Logistics Asia Limited | YRC Worldwide Inc. | 1, 563,062.02 |
| Reimer Express Lines Ltd. | YRC Logistics Inc. | $ 3,674,434.39 CAD |
| YRC Worldwide Inc. | Reimer Express Lines Ltd. | $19,000,000.00 |
| YRC Inc. | Reimer Express Lines Ltd. | $ 5,870,361.00 CAD |
| Transcontinental Lease, S. de R.L. de C.V. | YRC Transportation, S.A. de C.V. | $1,047,718.92 |

Capital Lease Obligations

| Grantor / Lessee | Lessor | Operating Company | Location/Description | Balance as of 1/31/14 |
|---|---|---|---|---|
| YRC Worldwide Inc. | Bloomington Industrial Property Owner, LLC | YRC | NAT #1 Bloomington - Terminal C4 | 19,078,779.20 |
| YRC Worldwide Inc. | 1313 Grand Street Realty, LLC | YRC | NAT #1 Brooklyn - Terminal C4 | 5,898,925.60 |
| YRC Worldwide Inc. | NATMI Truck Terminals, LLC c/o NorthAmerican Terminals Management, Inc. | YRC | NAT #1 Chula Vista - Terminal C4 | 2,074,577.49 |
| YRC Worldwide Inc. | NATMI Truck Terminals, LLC c/o NorthAmerican Terminals Management, Inc. | YRC | NAT #1 Denver - Terminal C4 | 4,898,324.72 |
| YRC Worldwide Inc. | KTR Property Trust I | URD | NAT #1 Fontana - Terminal C4 | 10,324,335.07 |
| YRC Worldwide Inc. | Prologis Targeted US Logistics Fund, LP | YRC | NAT #1 Gardena - Terminal C4 | 4,634,586.79 |
| YRC Worldwide Inc. | NATMI Truck Terminals, LLC c/o NorthAmerican Terminals Management, Inc. | URD | NAT #1 Henderson - Terminal C4 | 3,155,981.50 |
| YRC Worldwide Inc. | NATMI Truck Terminals, LLC c/o NorthAmerican Terminals Management, Inc. | URD | NAT #1 Las Vegas - Terminal C4 | 2,691,607.83 |
| YRC Worldwide Inc. | NATMI Truck Terminals, LLC c/o NorthAmerican Terminals Management, Inc. | YRC | NAT #1 Manassas - Terminal C4 | 1,994,214.80 |
| YRC Worldwide Inc. | Orange Batavia I LLC | URD | NAT #1 Orange - Terminal C4 | 5,469,230.22 |
| YRC Worldwide Inc. | GPT Orlando Terminal Owner LLC c/o Gramercy Capital Corp. | YRC | NAT #1 Orlando - Terminal C4 | 1,781,154.80 |
| YRC Worldwide Inc. | Bel Air T.T., LLC (c/o Pacific Industrial, LLC) | YRC | NAT #1 San Diego - Terminal C4 | 2,197,405.00 |
| YRC Worldwide Inc. | M4 Terminals, LLC c/o Mark IV Capital, Inc. | YRC | NAT #1 San Jose - Terminal C4 | 1,956,910.11 |
| YRC Worldwide Inc. | M4 Terminals, LLC c/o Mark IV Capital, Inc. | URD | NAT #1 Santa Clara - Terminal C4 | 2,537,893.92 |
| YRC Worldwide Inc. | KTR Property Trust I | YRC | NAT #1 Seattle - Terminal C4 | 6,450,485.73 |
| YRC Worldwide Inc. | NATMI Truck Terminals, LLC c/o NorthAmerican Terminals Management, Inc. | YRC | NAT #1 Sparks - Terminal C4 | 1,732,906.54 |

78

| Grantor / Lessee | Lessor | Operating Company | Location/Description | Balance as of 1/31/14 |
|---|---|---|---|---|
| YRC Worldwide Inc. | NATMI Truck Terminals, LLC c/o NorthAmerican Terminals Management, Inc. | NPM | NAT #2 Billerica - Terminal C4 | 3,991,776.29 |
| YRC Worldwide Inc. | Terreno Dell LLC | YRC | NAT #2 Carlstadt - Terminal C4 | 3,517,707.62 |
| YRC Worldwide Inc. | GPT Houston Terminal Owner LLC c/o Gramercy Capital Corp. | YRC | NAT #3 - Houston - Terminal C4 | 3,563,775.63 |
| YRC Worldwide Inc. | NATMI Truck Terminals, LLC c/o NorthAmerican Terminals Management, Inc. | YRC | NAT #3 Phoenix - Terminal C4 | 4,384,666.83 |
| YRC Worldwide Inc. | NATMI Truck Terminals, LLC c/o NorthAmerican Terminals Management, Inc. | YRC | NAT #3 Portland - Terminal C4 | 7,627,074.06 |
| YRC Worldwide Inc. | DCT Regentview Avenue LLC c/o DCT Industrial Trust Inc. | URD | NAT #4 - Downey CA v2 - Terminal C4 | 5,330,837.07 |
| YRC Worldwide Inc. | DCT Eckhoff Street LLC c/o DCT Industrial Trust Inc. | YRC | NAT #4 - Orange CA v2 - Terminal C4 | 5,580,927.72 |
| YRC Worldwide Inc. | DCT Peoria Street LLC c/o DCT Industrial Trust Inc. | YRC | NAT #4 - Sun Valley CA - Terminal C4 | 3,648,379.41 |
| YRC Worldwide Inc. | GPT Deer Park Terminal Owner LLC c/o Gramercy Property Trust | YRC | NAT #5 - Deer Park NY - Terminal C4 | 2,179,445.82 |
| YRC Worldwide Inc. | Terreno Clawiter LLC c/o Cassidy Turley | YRC | NAT #5 - Hayward/Okland CA - Terminal C4 | 3,756,728.40 |
| YRC Worldwide Inc. | Prologis Targeted US Logistics Fund, LP | YRC | NAT #5 - Tacoma WA - Terminal C4 | 2,727,643.28 |
| YRC Worldwide Inc. | Estes Express Lines | YRC | Estes - Charlotte, NC - Terminal C4 | 5,586,472.44 |
| YRC Worldwide Inc. | Estes Express Lines | UHL | Estes - Coon Rapids - Terminal C4 | 4,645,616.92 |
| YRC Worldwide Inc. | Estes Express Lines (G. I. Trucking Company) | URD | Estes - Eugene, OR - Terminal C4 | 1,293,636.81 |
| YRC Worldwide Inc. | Estes Terminals LLC | UHL | Estes - Joilet - Terminal C4 | 7,249,164.66 |
| YRC Worldwide Inc. | Estes Express Lines | YRC | Estes - Kearny, NJ - Terminal C4 | 7,446,011.87 |

79

| Grantor / Lessee | Lessor | Operating Company | Location/Description | Balance as of 1/31/14 |
|---|---|---|---|---|
| YRC Worldwide Inc. | Estes Express Lines | YRC | Estes - Lake Park, GA - Terminal C4 | 3,834,690.79 |
| YRC Worldwide Inc. | Estes Express Lines, Inc. | UHL | Estes - Milwaukee - Terminal C4 | 4,553,172.52 |
| YRC Worldwide Inc. | Estes Express Lines | YRC | Estes - Morrisville, NC - Terminal C4 | 2,166,992.91 |
| YRC Worldwide Inc. | Estes Express Lines (G. I. Trucking Company) | URD | Estes - Redmond, OR - Terminal C4 | 638,874.55 |
| YRC Worldwide Inc. | Estes Terminals LLC | UHL | Estes - Rockford - Terminal C4 | 3,717,940.43 |
| YRC Worldwide Inc. | Estes Express Lines, Inc. | UHL | Estes - South Bend - Terminal C4 | 4,660,177.30 |
| YRC Worldwide Inc. | Estes Terminals LLC | YRC | Estes - Sparks, NV - Terminal C4 | 5,104,767.77 |
| YRC Worldwide Inc. | Estes Express Lines (G. I. Trucking Company) | URD | Estes - Tacoma, WA - Terminal C4 | 5,615,755.75 |
| YRC Worldwide Inc. | Estes Express Lines | URD | Estes - Three Forks, MT - Terminal C4 | 309,384.59 |
| YRC Worldwide Inc. | Estes Express Lines | UHL | Estes - Tomah Monroe County - Terminal C4 | 1,137,914.92 |
| YRC Worldwide Inc. | Estes Express Lines | YRC | Estes - Wichita, KS - Terminal C4 | 1,190,145.94 |
| YRC Worldwide Inc. | NATMI National San Bernardino, LP | YRC | Centerpoint - San Bernardino CA - Terminal C4 | 8,648,015.83 |
| YRC Worldwide Inc. | EXOL Properties, LLC | URD | EXOL - Boise ID - Terminal C4 | 1,034,275.43 |
| YRC Worldwide Inc. | EXOL Properties, LLC | YRC | EXOL - Meridian ID - Terminal C4 | 1,462,257.79 |
| YRC Worldwide Inc. | Freight Line Properties LLC | YRC | Freight Line - Salt Lake City, UT - Terminal C4 | 2,949,166.55 |
| YRC Worldwide Inc. | Kestrel Crossdock LLC | URD | Kestrel Crossdock - Missoula, MT - Terminal C4 | 1,293,227.68 |

80

| Grantor / Lessee | Lessor | Operating Company | Location/Description | Balance as of 1/31/14 |
|---|---|---|---|---|
| YRC Worldwide Inc. | Mad Acquisitions, LLC | YRC | Other - Roanoke, VA - Terminal C4 | 633,638.46 |
| YRC Worldwide Inc. | RLR Investments, LLC (Attn: Corp Legal Dept) | UHL | RLR - Appleton WI - Terminal C4 | 3,380,468.85 |
| YRC Worldwide Inc. | RLR Investments LLC (Attn: Corp Legal Dept) | YRC | RLR - Atlanta GA - Terminal C4 | 6,924,155.14 |
| YRC Worldwide Inc. | RL Roberts LLC (Attn: Corp Legal Dept) | YRC | RLR - Chicago West IL - Terminal C4 | 3,796,028.10 |
| YRC Worldwide Inc. | RLF Booth SPE, LLC | YRC | RLR - Kansas City, MO - Terminal C4 | 4,931,781.34 |
| YRC Worldwide Inc. | R. L. Roberts, LLC | NPM | RLR - Scranton PA - Terminal C4 | 1,489,923.38 |
| YRC Worldwide Inc. | ProLogis Targeted U.S. Logistics Fund, L.P. (Attn: Diane Obringer) | YRC | SSF - San Francisco CA - Terminal C4 | 6,943,267.76 |
| YRC Worldwide Inc. | RLR Investments LLC | URD | TAC - Spokane WA (URD) - Terminal C4 | 1,477,082.54 |
| YRC Worldwide Inc. | TAC Spokane, LLC | YRC | TAC - Spokane, WA - Terminal C4 | 975,798.60 |
| YRC Worldwide Inc. | Thunderbolt Management Group Inc (Attn Barry Jenkins) | YRC | Thunderbolt Colorado Springs CO - Terminal C4 | 639,191.61 |
| YRC Worldwide Inc. | Dauntless ULC c/o Crown Enterprises | YRC | Other - Mississauga/Toronto Canada - Terminal C4 | 9,229,920.84 |
| YRC Worldwide Inc. | Price Property and Investments LLC and Green-Blue 1818 LLC | YRC | Tower and 5200 Building - Terminal C4 | 20,368,745.70 |
| YRC Worldwide Inc. | GPT Elkridge Terminal Owner LLC c/o Gramercy Property Trust Inc. | NPM | SE - Elkridge/Baltimore MD - Terminal C4 | 5,210,767.90 |
| YRC Worldwide Inc. | Southeastern Freight Lines, Inc. | YRC | SE - Lubbock TX - Terminal C4 | 946,780.16 |
| YRC Worldwide Inc. | A. Duie Pyle, Inc. | NPM | SE - Maspeth - Terminal C4 | 11,049,181.97 |
| YRC Worldwide Inc. | A. Duie Pyle, Inc. | NPM | SE - Newburgh - Terminal C4 | 2,734,071.72 |

81

| Grantor / Lessee | Lessor | Operating Company | Location/Description | Balance as of 1/31/14 |
|---|---|---|---|---|
| YRC Worldwide Inc. | Southeastern Freight Lines, Inc. | YRC | SE - Odessa TX - Terminal C4 | 557,574.47 |
| YRC Worldwide Inc. | Southeastern Freight Lines, Inc. | YRC | SE - Amarillo, TX - Terminal C4 | 1,240,096.86 |
| YRC Worldwide Inc. | Southeastern Freight Lines, Inc. | YRC | SE - McAllen, TX - Terminal C4 | 1,479,453.46 |
| YRC Worldwide Inc. | Southeastern Freight Lines, Inc. | YRC | SE - Miami, FL - Terminal C4 | 10,574,256.99 |
| YRC Worldwide Inc. | Southeastern Freight Lines, Inc. | YRC | SE - Tulsa - Terminal C4 | 1,374,813.83 |
| YRC Worldwide Inc. | Southeastern Freight Lines, Inc. | YRC | SE - Van Buren - Terminal C4 | 620,383.41 |
| YRC Worldwide Inc. | A. Duie Pyle, Inc. | YRC | SE - Westbrook (Portland, ME) - Terminal C4 | 742,826.07 |
| YRC Worldwide Inc. | A. Duie Pyle, Inc. | YRC | SE - Williston - Terminal C4 | 879,862.09 |
| YRC Inc. | Clean Energy Finance, LLC | YRC | (4) 2011 Peterbuilt LNG 384 Series Tractors | 231,502.46 |
| YRC Enterprise Services, Inc. | Kronos | YRC | HRIS Workforce Software | 910,335.59 |

Letters of Credit

| Issuing Bank | LOC # | Beneficiary | Letter of Credit Total |
|---|---|---|---|
| SunTrust Bank | **F844353** | Old Republic Insurance Company | $132,243,850.00 |
| SunTrust Bank | **F856462** | National Union Fire Insurance Company of Pittsburgh, PA, et al | $9,900,000.00 |

82

| **Issuing Bank** | **LOC #** | **Beneficiary** | **Letter of Credit Total** |
|---|---|---|---|
| Wells Fargo Bank, N.A. | **517615P** | Hartford Fire Insurance Co. | $450,000.00 |
| Wells Fargo Bank, N.A. | **IS0014715U** | QBE Insurance Corporation | $878,775.00 |
| JPMorgan Chase Bank, N.A. | **CPCS-742627** | Bank of America, National Association, Canada Branch, FIA Card Services, National Association | $2,710,000.00 |
| JPMorgan Chase Bank, N.A. | **CPCS-793046** | Liberty Mutual Insurance Company | $8,000,000.00 |
| JPMorgan Chase Bank, N.A. | **CPCS-918562** | Safety National Casualty Corporation | $3,000,000.00 |
| JPMorgan Chase Bank, N.A. | **TFTS-239248** | Westchester Fire Insurance Company | $4,060,000.00 |
| JPMorgan Chase Bank, N.A. | **TFTS-271022** | ExxonMobil Oil Corporation | $150,000.00 |
| JPMorgan Chase Bank, N.A. | **TFTS-333618** | Macquarie Equipment Finance, LLC | $3,860,000.00 |
| JPMorgan Chase Bank, N.A. | **TFTS-359598** | Canadian National Railway Company | $100,000.00 |
| JPMorgan Chase Bank, N.A. | **TFTS-777114** | Truman Arnold Companies | $480,000.00 |
| JPMorgan Chase Bank, N.A. | **TFTS-780064** | Musket Corporation | $1,500,000.00 |
| JPMorgan Chase Bank, N.A. | **TFTS-780065** | Southern Counties Oil Co., a CA limited partnership | $250,000.00 |

83

| Issuing Bank | LOC # | Beneficiary | Letter of Credit Total |
|---|---|---|---|
| JPMorgan Chase Bank, N.A. | **TFTS-796000** | Mansfield Oil Company of Gainesville, Inc. | $450,000.00 |

- 

84

**Schedule 7.05 Asset Sales**

- Sale of property located at 2385 Route 715, Tannersville, PA 18372.

- Sale of property located at 9711 State Avenue, Kansas City, Wyandotte County, Kansas

- Sale of property located at 9717 State Avenue, Kansas City, Wyandotte County, Kansas

- Sale of preferred shares of Newgistics, Inc.

**Schedule 7.08 Transactions with Affiliates**

Included by reference are all transactions with affiliates provided for in the 10-Q filed on November 12, 2013 and the 10-K filed on February 21, 2013 by YRC Worldwide Inc.

86

**Schedule 7.09 Certain Contractual Obligations**

Included by reference are all contractual obligations provided for in the 10-Q filed on November 12, 2013 and the 10-K filed on February 21, 2013 by YRC Worldwide Inc.

**EXHIBIT 10.11**

**LOAN AND SECURITY AGREEMENT**

**YRC WORLDWIDE INC.,**
**as**
**Administrative Borrower,**

**BORROWERS NAMED HEREIN,**

**GUARANTORS NAMED HEREIN,**

**CERTAIN FINANCIAL INSTITUTIONS,**
**as Lenders**

**and**

**RBS CITIZENS BUSINESS CAPITAL,**
**a division of RBS Asset Finance, Inc.,**
**a subsidiary of RBS Citizens, N.A.,**
**as Agent**

**RBS CITIZENS, N.A.,**
**MERRILL LYNCH, PIERCE, FENNER & SMITH and CIT FINANCE LLC**

**As Joint Lead Arrangers**
**and**
**Joint Bookrunners**

**BANK OF AMERICA, N.A.**
**as Syndication Agent**

**ALLY COMMERCIAL FINANCE and PNC BANK**
**As Co-Documentation Agents**

**Dated as of February 13, 2014**

**TABLE OF CONTENTS**

SECTION 1.  DEFINITIONS; RULES OF CONSTRUCTION    1

1.1    Definitions.    1

1.2    Terms Defined in UCC.    53

1.3    Accounting Terms.    54

1.4    Certain Matters of Construction.    54

1.5    Pro Forma Calculations.    55

SECTION 2.  CREDIT FACILITIES    57

2.1    Commitment.    57

2.2    Letter of Credit Facility.    59

2.3    Increase in Commitments.    62

2.4    Extensions of Commitments.    64

SECTION 3.  INTEREST, FEES AND CHARGES    66

3.1    Interest.    66

3.2    Fees.    67

3.3    Computation of Interest, Fees, Yield Protection.    68

3.4    Reimbursement Obligations.    68

3.5    Illegality.    69

3.6    Increased Costs.    69

3.7    Increased Capital Costs.    69

3.8    Mitigation; Replacement of Lenders.    70

3.9    Indemnities.    71

3.10   Maximum Interest.    71

SECTION 4.  LOAN ADMINISTRATION    72

4.1    Manner of Borrowing and Funding Loans.    72

4.2    Defaulting Lender.    73

4.3    Number and Amount of LIBOR Loans; Determination of Rate.    74

4.4    Administrative Borrower.    75

4.5    One Obligation.    75

4.6    Effect of Termination.    75

SECTION 5.  PAYMENTS    76

5.1    General Payment Provisions.    76

5.2    Repayment of Loans.    76

5.3    Reserved.    76

5.4    Mandatory Prepayments.    76

5.5    Payment of LIBOR Loans and Other Obligations.    77

5.6    Marshaling; Payments Set Aside.    78

5.7    Post-Default Allocation of Payments.    78

5.8    Application of Payments.    79

5.9    Loan Account; Account Stated.    79

5.10    Taxes.    79

5.11    Withholding Tax Exemption.    80

5.12    Nature and Extent of Each Borrower's Liability.    82

SECTION 6.    CONDITIONS PRECEDENT    85

6.1    Conditions Precedent to Initial Loans.    85

6.2    Conditions Precedent to All Credit Extensions.    88

6.3    Limited Waiver of Conditions Precedent.    88

SECTION 7.    COLLATERAL    88

7.1    Grant of Security Interest.    88

7.2    Cash Collateral.    91

7.3    Real Property Collateral.    91

7.4    Other Collateral.    91

7.5    No Assumption of Liability.    92

7.6    Further Assurances.    92

SECTION 8.    COLLATERAL ADMINISTRATION    92

8.1    Borrowing Base Certificates.    92

8.2    Administration of Accounts.    93

8.3    Administration of Deposit Accounts; Cash Dominion Trigger Period; Borrowing Base Cash Account.    93

8.4    General Provisions.    95

8.5    Power of Attorney.    95

SECTION 9.    REPRESENTATIONS AND WARRANTIES    96

9.1    General Representations and Warranties.    96

SECTION 10. COVENANTS AND CONTINUING AGREEMENTS    103

10.1    Affirmative Covenants.    103

10.2    Negative Covenants.    112

SECTION 11. EVENTS OF DEFAULT; REMEDIES ON DEFAULT    132

11.1     Events of Default.     132

11.2     Remedies upon Default.     134

11.3     License.     135

11.4     Setoff.     135

11.5     Remedies Cumulative; No Waiver; Commercial Reasonableness.     135

SECTION 12. AGENT     136

12.1     Appointment, Authority and Duties of Agent.     136

12.2     Agreements Regarding Collateral and Field Examination Reports.     138

12.3     Reliance By Agent.     139

12.4     Action Upon Default.     139

12.5     Ratable Sharing.     139

12.6     Indemnification of Agent Indemnitees.     139

12.7     Limitation on Responsibilities of Agent.     140

12.8     Successor Agent and Co-Agents.     140

12.9     Due Diligence and Non-Reliance.     141

12.10    Replacement of Certain Lenders.     142

12.11    Remittance of Payments and Collections.     142

12.12    Agent in its Individual Capacity.     142

12.13    Agent Titles.     143

12.14    No Third Party Beneficiaries.     143

SECTION 13. BENEFIT OF AGREEMENT; ASSIGNMENTS AND PARTICIPATIONS     143

13.1     Successors and Assigns.     143

13.2     Participations.     143

13.3     Assignments.     144

13.4     Tax Treatment.     145

13.5     Representation of Lenders.     145

SECTION 14. GUARANTY.     145

14.1     Guaranty.     145

14.2     Waivers.     146

14.3     No Defense.     146

14.4     Guaranty of Payment.     146

14.5    Liabilities Absolute.    146

14.6    Waiver of Notice.    147

14.7    Agent's Discretion.    148

14.8    Reinstatement.    148

14.9    Action Upon Event of Default.    149

14.10    Statute of Limitations.    149

14.11    Reserved.    149

14.12    Guarantor's Investigation.    149

14.13    Keepwell.    149

14.14    Termination.    150

SECTION 15. MISCELLANEOUS    150

15.1    Consents, Amendments and Waivers.    150

15.2    Indemnity.    152

15.3    Notices and Communications.    152

15.4    Performance of Loan Parties' Obligations.    154

15.5    Credit Inquiries.    154

15.6    Severability.    155

15.7    Cumulative Effect; Conflict of Terms.    155

15.8    Counterparts; Facsimile Signatures.    155

15.9    Entire Agreement.    155

15.10    Obligations of Lenders.    155

15.11    Confidentiality.    155

15.12    Reserved.    156

15.13    GOVERNING LAW.    156

15.14    Consent to Forum.    157

15.15    Waivers by Loan Parties.    157

15.16    Patriot Act Notice.    158

15.17    No Oral Agreement.    158

15.18    Term Debt Intercreditor Agreement.    158

15.19    Release of Guarantors.    159

15.20    Release of Liens.    159

## LIST OF EXHIBITS AND SCHEDULES

| | |
|---|---|
| Exhibit A | Form of Assignment and Acceptance |
| Exhibit B | Form of Borrowing Base Certificate |
| Exhibit C | Form of Compliance Certificate |
| Exhibit D | Form of Notice of Borrowing |
| Exhibit E | Form of Grant of Security Interest in Trademarks |
| Exhibit F | Form of Grant of Security Interest in Patents |
| Exhibit G | Form of Grant of Security Interest in Copyrights |
| Exhibit H | Form of Perfection Certificate |
| Exhibit I | Form of Notice of Continuation/Conversion |
| Exhibit J | Form of Assignment Notice |
| | |
| Schedule 1.1(a) | Guarantors as of the Closing Date |
| Schedule 1.1(b) | Commitments of Lenders |
| Schedule 1.1(c) | Copyrights |
| Schedule 1.1(d) | Excluded Real Property |
| Schedule 1.1(e) | Existing Letters of Credit |
| Schedule 1.1(f) | Licenses |
| Schedule 1.1(g) | Patents |
| Schedule 1.1(h) | Pension Fund Entities |
| Schedule 1.1(i) | Trademarks |
| Schedule 6.1.6 | Local Counsel |
| Schedule 7.1.1(a) | Pledged Collateral |
| Schedule 7.1.1(b) | Additional Collateral Provisions |
| Schedule 7.1(c) | Commercial Tort Claims |
| Schedule 8.3 | Deposit Accounts ***CONFIDENTIAL*** |
| Schedule 9.1.11 | Subsidiaries |
| Schedule 9.1.14 | Labor Matters |
| Schedule 10.1.13(a) | Further Assurances and Post-Closing Conditions |
| Schedule 10.2.1(b) | Liens |
| Schedule 10.2.2(e) | Investments |
| Schedule 10.2.3(b) | Debt |
| Schedule 10.2.5 | Closing Date Dispositions |
| Schedule 10.2.8 | Transactions with Affiliates |
| Schedule 10.2.9 | Burdensome Agreements |

## LOAN AND SECURITY AGREEMENT

THIS LOAN AND SECURITY AGREEMENT (this "Agreement") is dated as of February 13, 2014, by and among YRC WORLDWIDE INC., a Delaware Corporation ("Parent"), as administrative borrower (in such capacity, "Administrative Borrower"), Parent, YRC INC., a Delaware Corporation ("YRC"), USF REDDAWAY INC., an Oregon Corporation ("Reddaway"), USF HOLLAND INC., a Michigan Corporation ("Holland"), and NEW PENN MOTOR EXPRESS, INC., a Pennsylvania Corporation ("New Penn", and together with Parent, YRC, Holland and Reddaway, "Borrowers" and each a "Borrower"), those Subsidiaries of Parent identified on Schedule 1.1(a) attached hereto (as updated from time to time) (collectively, "Guarantors" and each, a "Guarantor"); the financial institutions from time to time party to this Agreement as lenders (collectively, "Lenders" and each a "Lender"), the financial institutions from time to time party to this Agreement as issuing banks (collectively, "Issuing Banks" and each an "Issuing Bank"), and RBS CITIZENS BUSINESS CAPITAL, a division of RBS Asset Finance, Inc., a subsidiary of RBS Citizens, N.A., as agent for Lenders and Issuing Banks (in such capacity, "Agent").

**R E C I T A L S :**

Borrowers have requested that Agent, Lenders and Issuing Banks make available a credit facility, to be used by Parent and Restricted Subsidiaries to finance their business enterprises. Agent, Lenders and Issuing Banks are willing to provide such credit facility on the terms and conditions set forth in this Agreement.

NOW, THEREFORE, for valuable consideration hereby acknowledged, the parties agree as follows:

**SECTION 1.DEFINITIONS; RULES OF CONSTRUCTION**

**1.1  Definitions**. As used herein, the following terms have the meanings set forth below:

1  ABL Priority Collateral – as defined in the Term Debt Intercreditor Agreement.

2  Accelerated Reporting Trigger Event – shall occur when Availability is less than or equal to fifteen percent (15%) of the Collateral Line Cap.

3  Accelerated Reporting Trigger Period – shall commence upon the occurrence of an Accelerated Reporting Trigger Event, and shall continue until the date that the Accelerated Reporting Trigger Event shall have ceased to exist for a period of at least thirty (30) consecutive calendar days.

4  Account(s) - "accounts" as defined in Section 9-102 of the UCC, and also means a right to payment of a monetary obligation, whether or not earned by performance, (a) for property that has been sold, leased, licensed, assigned, or otherwise disposed of, (b) for services rendered, or (c) arising out of the use of a credit or charge card.

5  Account Debtor - any Person who is or who may become obligated to any Loan Party under, with respect to or on account of an Account.

6  Administrative Borrower - as defined in the preamble to this Agreement.

7  Affiliate - with respect to any Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified. Control shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. Controlling and Controlled have meanings correlative thereto.

8  Agent - as defined in the preamble to this Agreement.

9  Agent Indemnitees - Agent and its respective officers, directors, employees, Affiliates, agents and attorneys.

10  Agent Payment Account - an account designated by Agent to Administrative Borrower on the Closing Date and such other account as Agent may from time to time designate to Administrative Borrower as the "Agent Payment Account" for purposes of this Agreement and the other Loan Documents.

11  Agent Professionals - attorneys, accountants, appraisers, auditors, business valuation experts, environmental engineers or consultants, turnaround consultants, and other professionals and experts retained by Agent, as applicable.

12  Agreed 1Q2014 Amount - as defined in the definition of Consolidated Fixed Charges.

13  Applicable Debt - as defined in the definition of Weighted Average Life to Maturity.

14  Applicable Law - with respect to any Person, all laws, rules, regulations and governmental guidelines applicable to such Person, conduct, transaction, agreement or matter in question, including all applicable statutory law, common law and equitable principles, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, requirements, and agreements with, any Governmental Authority.

15  Applicable Margin - with respect to any Type of Loan on any day, the margin set forth below for such type of Loan, as determined by the Average Availability for the most recently completed calendar quarter:

| Level | Average Availability | Base Rate Loans | LIBOR Loans |
| --- | --- | --- | --- |

| I | Greater than or equal to $140,000,000 | 1.00% | 2.00% |
|---|---|---|---|
| II | Less than $140,000,000 but greater than or equal to $70,000,000 | 1.25% | 2.25% |
| III | Less than $70,000,000 | 1.50% | 2.50% |

The Applicable Margin shall be determined through March 31, 2014 as if Level III were applicable. Thereafter, the Applicable Margin shall be subject to increase or decrease based upon the Average Availability for the most recently completed calendar quarter (or, for Applicable Margin for the calendar quarter ending June 30, 2014, for the period from the Closing Date through March 31, 2014), which change shall be effective on the first (1st) day of each calendar quarter. In the event that, at any time after the end of a calendar quarter, and prior to Full Payment of the Obligations, it is determined that the Average Availability for such calendar quarter used for the determination of the Applicable Margin was (i) less than the actual amount of the Average Availability for such calendar quarter, the Applicable Margin for such prior calendar quarter shall be adjusted to the applicable percentage based on such actual Average Availability and any additional interest for the applicable period as a result of such recalculation shall be promptly paid to Agent upon written demand therefor (and in no event later than three (3) Business Days after such written demand) or (ii) greater than the actual amount of the Average Availability for such calendar quarter, the Applicable Margin for such prior calendar quarter shall be adjusted to the applicable percentage based on such actual Average Availability and any reduction in interest for the applicable period as a result of such recalculation shall be promptly credited to the loan account of Borrowers. Notwithstanding the foregoing, any additional interest described in clause (i) above shall not be due and payable until written demand is made for such payment pursuant to clause (i) above and, accordingly, any nonpayment of such interest as a result of any such inaccuracy shall not constitute a Default (whether retroactively or otherwise), and no such amounts shall be deemed overdue (and no amounts shall accrue interest at the Default Rate), at any time prior to a failure to pay when due following such written demand.

Notwithstanding the foregoing, the Applicable Margin set forth above shall be reduced by 0.25% during each period when the financial statements most recently submitted by Administrative Borrower pursuant to Section 10.1.1 demonstrate that the Total Leverage Ratio of Parent and Restricted Subsidiaries, on a consolidated basis, is less than 2.50:1.00 for the Test Period covered by such financial statements.

16    Approved Fund - any Person (other than a natural person) that is primarily engaged in making, holding or investing in extensions of credit in its ordinary course of business and is administered or managed by a Lender, an entity that administers or manages a Lender, or an Affiliate of either.

17    Assignment and Acceptance - an assignment agreement between a Lender and Eligible Assignee, substantially in the form of Exhibit A.

18    Attributable Debt - on any date, in respect of any Capitalized Lease of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP.

Audited Financial Statements - shall mean the audited consolidated balance sheets of Parent and its consolidated Subsidiaries for the Fiscal Years ending December 31, 2010, December 31, 2011 and December 31, 2012 and the related consolidated statements of operations, changes in shareholders' equity and cash flows of Parent and its consolidated Subsidiaries.

Auto-Extension Letter of Credit – is defined in Section 2.2.1(f).

19    Availability - as of any date of determination calculated on a Pro Forma Basis, the amount equal to: (a) the Collateral Line Cap, minus (b) the then outstanding Facility Exposure; provided, that solely for the purposes of determining whether an Accelerated Reporting Trigger Event has occurred, Availability may be increased by the amount of cash maintained by Loan Parties in one or more Dominion Accounts (excluding the Borrowing Base Cash Account) in an aggregate amount not to exceed $25,000,000 at any time; provided, that during the period from the Closing Date to the date that is forty-five (45) days after the Closing Date (or such longer period as Agent may agree in its reasonable discretion), Dominion Accounts shall be deemed to include any deposit account of Loan Parties as to which a Deposit Account Control Agreement is required to be delivered (or other method of control effected) under this Agreement whether or not such requirement has been satisfied.

Availability Reserve - on any day, the sum (without duplication of any other reserve or eligibility criteria) of (a) the aggregate amount of liabilities secured by Liens (other than Permitted Liens) upon Collateral that are senior to Agent's Liens (but imposition of any such reserve shall not waive an Event of Default arising therefrom); (b)  amounts to reflect events, conditions, contingencies or risks which, as determined by Agent in its Permitted Discretion, adversely affect, or would have a reasonable likelihood of adversely affecting, the ability of Agent to realize upon the Collateral of the type that is included in the Borrowing Base; (c) amounts to reflect

Agent's good faith belief that any collateral report or financial information furnished by or on behalf of any Borrower or Loan Party to Agent is or may have been incomplete, inaccurate or misleading in any material respect (to the extent thereof); or (d) amounts in respect of any state of facts which Agent determines in its Permitted Discretion constitutes an Event of Default. The amount of any Availability Reserve established by Agent shall have a reasonable relationship to the event, condition or other matter which is the basis for such reserve as determined by Agent in its Permitted Discretion.

20    Agent shall have the right to establish and modify components of the Availability Reserve against the Borrowing Base assets from time to time in its Permitted Discretion in accordance with the terms above, provided, that so long as no Specified Event of Default has occurred and is continuing, Agent has provided Administrative Borrower with at least two (2) Business Days' prior written notice of such establishment or modification and Administrative Borrower shall have the opportunity during such two (2) Business Day period to discuss such establishment or modification with Agent; provided, that (x) no Letters of Credit shall be issued or Loans funded during such two (2) Business Day period if, after giving effect to such establishment or modification, the requested issuance or funding would result in an Overadvance, and (y) no such notice shall be required for changes resulting by virtue of mathematical calculations or if a Material Adverse Effect would occur if such reserves were not established.

21    Average Availability - for any period, the daily average of Availability for such period as calculated by Agent.

22    Average Revolver Usage - for any period, the average daily aggregate Facility Exposure for such period divided by the Commitments on the last day of such period.

23    Bank Product - any of the following products, services or facilities extended to any Loan Party or Subsidiary by a Bank Product Provider: (a) Cash Management Services; (b) products under Hedging Agreements; (c) commercial credit card, purchase card, corporate credit card and merchant card services; and (d) other banking products or services as may be requested by any Loan Party or Subsidiary, other than Letters of Credit; provided, however, that for any of the foregoing to be included as an "Obligation" for purposes of a distribution under Section 5.7.1, the applicable Bank Product Provider must have previously provided written notice to Agent and Administrative Borrower of (i) the existence of such Bank Product, (ii) the maximum dollar amount of obligations arising thereunder ("Bank Product Amount") and (iii) the methodology to be used by such parties in determining the Bank Product Debt owing from time to time. The Bank Product Amount may be changed from time to time upon written notice to Agent and Administrative Borrower by the applicable Bank Product Provider. No Bank Product Amount may be established or increased (other than increases in connection with marking to market products under Hedging Agreements) at any time that a Default or Event of Default exists, or if a reserve in such amount would cause an Overadvance.

24    Bank Product Amount - as defined in the definition of Bank Product.

25    Bank Product Debt - Debt and other obligations of a Loan Party relating to Bank Products.

26    Bank Product Provider - RBS, any other Lender or any of their respective Affiliates (other than a Disqualified Lender) that provides Bank Products to any Loan Party or Subsidiary.

27    Bankruptcy Code - the United States Bankruptcy Code, being Title 11 of the United States Code, as the same now exists or may from time to time hereafter be amended, modified, recodified or supplemented.

28    Base Rate - for any day, a variable rate of interest per annum equal to the highest of (a) the "prime rate" as determined by Agent announced from time to time by RBS at its offices in Boston, Massachusetts (or any successor to the foregoing) as its "prime rate", subject to each increase or decrease in such prime rate, effective as of the day any such change occurs (with the understanding that any such rate may merely be a reference rate and may not necessarily represent the lowest or best rate actually charged to any customer by such bank), (b) the Federal Funds Effective Rate (as defined below) from time to time plus one-half of one percent (0.50%), and (c) the LIBOR Rate for a one (1) month Interest Period on such day plus one percent (1%). The term "Federal Funds Effective Rate" shall mean, for any period, a fluctuating interest rate per annum equal, for each day during such period, to the weighted average of the rates on overnight Federal Funds transactions with members of the Federal Reserve System arranged by Federal Funds brokers, as published for such day (or, if such day is not a Business Day, for the next preceding Business Day) by the Federal Reserve Bank of New York, or, if such rate is not published for any day that is a Business Day, the average of the quotations for such day on such transactions received by Agent from three Federal Funds brokers of recognized standing selected by it.

29    Base Rate Loan - a Loan that bears interest based on the Base Rate.

30    Blocked Person - any Person that is publicly identified on the most current list of "Specially Designated Nationals and Blocked Persons" published by OFAC.

31    Board - the Board of the Federal Reserve System of the United States of America.

32    Borrower or Borrowers - as defined in the preamble to this Agreement and any other Person that at any time after the date hereof becomes a Borrower.

33    Borrowing - a group of Loans of one Type that are made on the same day or are converted into Loans of one Type on the same day.

34    Borrowing Base - on any date of determination and without duplication, an amount equal to the sum of:

(a)    eighty five percent (85%) of the sum of (x) Eligible Accounts minus (y) the Dilution Reserve, plus

(b)    one hundred percent (100%) of the amount of Eligible Borrowing Base Cash, minus

(c)    the Deferred Revenue Reserve, minus

(d)    the Availability Reserve.

Borrowing Base Cash Account - account maintained by Administrative Borrower, on behalf of Borrowers, with Agent as designated in a letter agreement between Administrative Borrower and Agent on the Closing Date and any other account maintained with Agent and designated as the "Borrowing Base Cash Account" by Administrative Borrower and Agent from time to time.

Borrowing Base Cash Release - as defined in Section 8.3.3.

35    Borrowing Base Certificate - a certificate substantially in the form attached hereto as Exhibit B, as such form may be modified by Agent and Administrative Borrower from time to time in a manner consistent with the terms of this Agreement, by which Administrative Borrower, on behalf of Borrowers, certifies calculation of the Borrowing Base as of the date delivered.

36    Business Day - any day (a) which is neither a Saturday or Sunday nor a day on which commercial banks are authorized or required to be closed in New York City;  (b) when such term is used to describe a day on which a borrowing, payment, prepayment, or repayment is to be made in respect of any LIBOR Loan, any day which is: (i) neither a Saturday or Sunday nor a day on which commercial banks are authorized or required to be closed in New York City; and  (ii) a London Banking Day; and (c) when such term is used to describe a day on which an interest rate determination is to be made in respect of any LIBOR Loan, any day which is a London Banking Day.

37    Capital Expenditures - for any period of determination with respect to Parent and Restricted Subsidiaries, the aggregate of (a) all amounts that would be reflected as additions to property, plant or equipment on a consolidated statement of cash flows of Parent and Restricted Subsidiaries in accordance with GAAP and (b) the value of all assets under Capitalized Leases incurred by Parent and Restricted Subsidiaries during such period; provided, that, Capital Expenditures shall not include (i) the purchase price paid in connection with a Permitted Acquisition or other Investment of all or substantially all of the assets of another Person or business line permitted hereby, (ii) the purchase price of equipment that is purchased simultaneously with the trade-in of existing equipment to the extent that the gross amount of such purchase price is reduced by the credit granted by the seller of such equipment for such existing equipment being traded in at such time, (iii) expenditures made in leasehold improvements, to the extent reimbursed by the landlord, (iv) expenditures to the extent that they are actually paid for by a third party (excluding Parent or any Restricted Subsidiary) and for which none of Parent nor any Subsidiary has provided or is required to provide or incur, directly or indirectly, any consideration or monetary obligation to such third party or any other Person (whether before, during or after such period), (v) property, plant and equipment taken in settlement of accounts, and (vi) expenditures made with the net proceeds of any Debt (other than Loans advanced hereunder) or equity issuance.

38    Capitalized Lease - any lease that is required to be capitalized for financial reporting purposes and reflected as a liability on a balance sheet of such Person in accordance with GAAP.

39    Cash Collateral - cash, and any interest or other income earned thereon, that is delivered to Agent to Cash Collateralize any Obligations.

40    Cash Collateral Account - a demand deposit, money market or other account established by Agent at such financial institution as Agent may select in its Permitted Discretion, which account shall be subject to Agent's Liens for the benefit of Secured Parties.

41    Cash Collateralize - the delivery of cash to Agent, as security for the payment of the Obligations, with respect to any LC Obligations, in an amount equal to one hundred two percent (102%) of such LC Obligations (excluding amounts owing pursuant to clause (c) of the definition thereof). Cash Collateralization has a correlative meaning.

Cash Dominion Trigger Event - shall occur when either (i) a Specified Event of Default has occurred; or (ii) Borrowers fail to maintain Availability in an amount at least equal to twelve and one-half percent (12.5%) of the Collateral Line Cap for five (5) consecutive Business Days; or (iii) Borrowers shall fail to maintain at any time Availability in an amount at least equal to ten percent (10%) of the Collateral Line Cap.

Cash Dominion Trigger Period - shall commence upon the occurrence of a Cash Dominion Trigger Event, and shall continue until the date that (i) no Specified Event of Default exists; and (ii) Borrowers have maintained Availability of not less than twelve and one-half percent (12.5%) of the Collateral Line Cap for a period of thirty (30) consecutive calendar days.

Cash Equivalents –

(a) Dollars and, to the extent consistent with past practice, Canadian Dollars;

(b) direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States of America (or by any agency thereof to the extent such obligations are backed by the full faith and credit of the United States of America), in each case maturing within one year from the date of issuance thereof;

(c) investments in commercial paper maturing within 270 days from the date of issuance thereof and having, at such date of acquisition, rated at least A-1 or P-1 by S&P or Moody's;

(d) investments in demand deposits, certificates of deposit, banker's acceptances and time deposits maturing within one year from the date of acquisition thereof issued or guaranteed by or placed with, and money market deposit accounts issued or offered by, Agent, Term Agent or any domestic office of any commercial bank organized under the laws of the United States of America or any State thereof that has a combined capital and surplus and undivided profits of not less than $500,000,000 and that issues (or the parent of which issues) commercial paper rated at least "Prime 1" (or the then equivalent grade) by Moody's or "A 1" (or the then equivalent grade) by S&P;

(e) fully collateralized repurchase agreements with a term of not more than 30 days for securities described in clause (b) above and entered into with a financial institution satisfying the criteria of clause (d) above;

(f) investments in "money market funds" within the meaning of Rule 2a-7 of the Investment Company Act of 1940, as amended, substantially all of whose assets are invested in investments of the type described in clauses (a) through (e) above; and

(g) other short-term investments of any Foreign Subsidiary entered into in accordance with normal investment policies and practices of such Foreign Subsidiary consistent with past practices for cash management and constituting investments in governmental obligations and investment funds analogous to and having a credit risk not greater than investments of the type described in clauses (a) through (f) above.

Notwithstanding the foregoing, Cash Equivalents shall include amounts denominated in currencies other than set forth in clause (a) above; provided, that such amounts are converted into currencies listed in clause (a) within ten Business Days following the receipt of such amounts.

Cash Management Services - any services provided from time to time by RBS or any other Lender or any of its Affiliates to any Loan Party or Subsidiary in connection with operating, collections, payroll, trust, or other depository or disbursement accounts, including automatic clearinghouse, controlled disbursement, depository, electronic funds transfer, information reporting, lockbox, stop payment, overdraft and/or wire transfer services.

Cash Pension Contribution - as to any period of determination, the actual cash pension funding payments made by Parent and Restricted Subsidiaries with respect to pension funding obligations during such period.

Casualty Event - any event that gives rise to the receipt by Parent or any Restricted Subsidiary of any insurance proceeds or condemnation awards in respect of any equipment, fixed assets or Real Property (including any improvements thereon) to replace or repair such equipment, fixed assets or Real Property or as compensation for such condemnation event.

CFC – a "controlled foreign corporation" within the meaning of Section 957 of the Code.

Change in Law - the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation or application thereof by any Governmental Authority or (c) the making or issuance of any request, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided, however, for the purposes of this Agreement: (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection

therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

57    Change of Control - shall mean:

(a)    the acquisition of ownership, directly or indirectly, beneficially or of record, by any Person or group (within the meaning of the Securities Exchange Act of 1934 and the rules of the Securities and Exchange Commission thereunder as in effect on the date hereof), of Equity Interests representing more than 35% of the aggregate ordinary voting power represented by the issued and outstanding Equity Interests of Parent;

(b)    occupation of a majority of the seats (other than vacant seats) on the board of directors of Parent by Persons who were neither (i) nominated by the board of directors of Parent nor (ii) appointed by directors so nominated; or

(c)    a "change of control" (or similar event) shall occur under (i) the Term Debt Documents or any Permitted Refinancing thereof or (ii) any other Debt for borrowed money with an aggregate principal amount (in the case of this clause (ii)) in excess of the Threshold Amount.

1    Claims - all liabilities, obligations, actual losses, damages, penalties, judgments, proceedings, costs and expenses of any kind (including remedial response costs, reasonable and documented out-of-pocket attorneys' fees (limited in the case of attorney's fees to one primary counsel for Agent and Lenders taken as a whole and one additional counsel in each relevant jurisdiction and, in the event of any actual or reasonably perceived conflict of interest, one additional counsel of each type to similarly situated parties) and Extraordinary Expenses) at any time incurred by or asserted against any Indemnitee in any way relating to (a) any Loan Documents or transactions contemplated thereby, (b) any action taken or omitted to be taken by any Indemnitee in connection with any Loan Documents, (c) the existence or perfection of any Liens under the Loan Documents, or realization upon any Collateral, (d) exercise of any rights or remedies under any Loan Documents or under Applicable Law in connection with the Loan Documents, or (e) failure by any Loan Party to perform or observe any terms of any Loan Document, in each case including all reasonable and documented out-of-pocket costs and expenses relating to any investigation, litigation, arbitration or other proceeding (including an Insolvency Proceeding or appellate proceedings), whether or not the applicable Indemnitee is a party thereto (limited in the case of attorney's fees to one primary counsel for Agent and Lenders taken as a whole and one additional counsel in each relevant jurisdiction and, in the event of any actual or reasonably perceived conflict of interest, one additional counsel of each type to similarly situated parties).

2    Closing Date - as defined in Section 6.1.

3    Code - the U.S. Internal Revenue Code of 1986, as amended.

Collateral - all Property described in Section 7.1, all Property described in any Security Documents as security for any Obligations, and all other Property that now or hereafter secures (or is intended to secure) any Obligations; provided, that it shall exclude all Excluded Property and all defined terms used therein shall exclude Excluded Property.

Collateral and Guarantee Requirement - shall mean, at any time, the requirement that:

(a)    on the Closing Date, Agent shall have received each Security Document to the extent required to be delivered on the Closing Date pursuant to Section 6.1, subject to the limitations and exceptions of this Agreement, duly executed by each Loan Party party thereto;

(b)    in each case subject to the limitations and exceptions set forth in this Agreement and the Security Documents, any action required to be taken by Agent to effectuate the same and the lien subordination set forth in the Term Debt Intercreditor Agreement, the Obligations shall have been secured by:

(i)    a perfected first priority security interest (subject to Liens permitted by Section 10.2.1) in all personal property of Loan Parties consisting of all accounts receivable, Cash and Cash Equivalents, deposit accounts and supporting obligations and books and records related to the foregoing and, in each case, proceeds thereof;

(ii)    a perfected second priority pledge (subject to Liens permitted by Section 10.2.1) of all Equity Interests directly held by any Loan Party (provided, that (A) such pledge of Equity Interests shall not include more than 65% of the voting Equity Interests of (x) each Foreign Subsidiary and (y) each Domestic Subsidiary that is a disregarded entity for U.S. Federal income Tax purposes if substantially all of its assets consist of the Equity Interests or Debt of one or more Foreign Subsidiaries, and (B) such pledge of Equity Interests shall not include (x) margin stock and (y) Equity Interests in any joint venture, alliance or marketing arrangement or in any Subsidiary that is not a wholly owned Subsidiary of Parent (but shall include proceeds thereof), but only to the

extent that the creation of a security interest in such Equity Interests is prohibited or restricted by the Organization Documents of such joint venture, alliance or marketing arrangement or Subsidiary or by any contractual restriction contained in any agreement with third party holders of other Equity Interests in such joint venture, alliance or marketing arrangement or Subsidiary which holders are not Affiliates of Parent (except to the extent any such prohibition or restriction is deemed ineffective under the UCC or other applicable Law) or (z) Equity Interests of (or held as assets by) Unrestricted Subsidiaries, Immaterial Subsidiaries or captive insurance Subsidiaries);

(iii)    a perfected second priority security interest (subject to Liens permitted by Section 10.2.1) in, and Mortgages on, each Material Real Property (provided, that Mortgages may be delivered after the Closing Date in accordance with the Post-Closing Side Letter);

(iv)    a perfected second priority security interest (subject to Liens permitted by Section 10.2.1) in substantially all plant and equipment of Loan Parties and in substantially all motor vehicles (including tractors, trailers and other Rolling Stock but excluding employee or light vehicles and other assets subject to certificates of title with an individual fair market value of $40,000) of Loan Parties; and

(v)    a perfected second priority security interest (subject to Liens permitted by Section 10.2.1) in substantially all other personal property of Loan Parties, including investment property, contracts, Patents, Copyrights, Trademarks and other general intangibles (subject to the Term Debt Intercreditor Agreement), commercial tort claims, letter of credit rights, intercompany notes and proceeds of the foregoing;

(c)    subject to the limitations and exceptions set forth in this Agreement and the Security Documents, to the extent a security interest in and mortgage lien on any Material Real Property is required under Section 6.1, 10.1.11 or 10.1.13 (together with any Material Real Property that is subject to a Mortgage on the Closing Date, each, a "Mortgaged Property"), Agent shall have received (i) counterparts of a Mortgage with respect to such Mortgaged Property duly executed and delivered by the record owner of such property in form suitable for filing or recording in all filing or recording offices that Agent may reasonably deem necessary or desirable in order to create a valid and subsisting perfected Lien on the property and/or rights described therein in favor of Agent for the benefit of Lenders, and evidence that all filing and recording taxes and fees have been paid or otherwise provided for in a manner reasonably satisfactory to Agent (it being understood that if a mortgage tax will be owed on the entire amount of the indebtedness evidenced hereby, then the amount secured by the Mortgage shall be limited to 100% of the fair market value of the property at the time the Mortgage is entered into if such limitation results in such mortgage tax being calculated based upon such fair market value), (ii) fully paid policies of title insurance (or marked-up title insurance commitments having the effect of policies of title insurance) on the Mortgaged Property (the "Mortgage Policies") issued by Chicago Title or another nationally recognized title insurance company reasonably acceptable to Agent in form and in an amount reasonably acceptable to Agent (not to exceed 100% of the fair market value of the Real Property (or interest therein, as applicable) covered thereby), insuring the Mortgages to be valid, subsisting Liens on the property described therein, free and clear of all Liens other than Liens permitted pursuant to Section 10.2.1, each of which shall (A) to the extent reasonably necessary, include such reinsurance arrangements (with provisions for direct access, if reasonably necessary) as shall be reasonably acceptable to Agent, (B) contain a "tie-in" or "cluster" endorsement, if available under Applicable Law (i.e., policies which insure against losses regardless of location or allocated value of the insured property up to a stated maximum coverage amount), (C) have been supplemented by such endorsements (or where such endorsements are not available, opinions of special counsel, architects or other professionals reasonably acceptable to Agent) as shall be reasonably requested by Agent (including endorsements on matters relating to usury, first loss, last dollar, zoning, contiguity, revolving credit (if available after the applicable Loan Party uses commercially reasonable efforts), doing business, non-imputation, public road access, variable rate, environmental lien, subdivision, mortgage recording tax, separate tax lot and so-called comprehensive coverage over covenants and restrictions), (iii) either (1) an American Land Title Association/American Congress of Surveying and Mapping (ALTA/ACSM) form of survey for which all charges have been paid, dated a date, containing a certification and otherwise being in form and substance reasonably satisfactory to Agent or (2) such documentation as is sufficient to omit the standard survey exception to coverage under the Mortgage Policy with respect to such Mortgaged Property and affirmative endorsements reasonably requested by Agent, including "same as" survey and comprehensive endorsements, (iv) customary legal opinions, addressed to Agent and Lenders, and (v) in order to comply with the Flood Laws, the following documents: (A) a completed standard "life of loan" flood hazard determination form (a "Flood Determination Form"); (B) if any of the material improvement(s) to the improved Material Real Property is located in a special flood hazard area, a notification thereof to the applicable Loan Party ("Flood Notice") and, if applicable, notification to the applicable Loan Party that flood insurance coverage under the National Flood Insurance Program ("NFIP") is not available because the community in which the property is located does not participate in the NFIP; (C) documentation evidencing the applicable Loan Party's receipt of the Flood Notice (e.g., a countersigned Flood Notice or return receipt of certified U.S. Mail or overnight delivery); and (D) if the Flood Notice is required to be given and flood insurance is available in the community in which such Material Real Property is located, a copy of one of the following: the flood insurance policy, the applicable Loan Party's application for a flood insurance policy plus proof of premium payment, a declaration page confirming that flood insurance has been issued or such other evidence of flood insurance reasonably satisfactory to Agent and documentation reasonably satisfactory to Agent supporting the amount of flood insurance required for such Material Real Property (any of the foregoing being "Evidence of Flood Insurance"); and

(d)    after the Closing Date, each Restricted Subsidiary of Parent that is not an Excluded Subsidiary shall become a Guarantor pursuant to a joinder agreement in accordance with Section 10.1.11 or 10.1.13, as applicable, and signatory to this Agreement; provided, that notwithstanding the foregoing provisions, any Subsidiary of Parent that Guarantees any Term Debt, any Term Refinancing Debt, any Permitted Junior Debt or any Permitted Refinancing of any of the foregoing, or that is a borrower under the Term Debt Documents (or any Permitted Refinancing thereof) shall be a Guarantor hereunder for so long as it Guarantees such Debt (or is a borrower with respect thereto).

Notwithstanding the foregoing provisions of this definition or anything in this Agreement or any other Loan Document to the contrary:

(A)    the foregoing definition shall not require, unless otherwise stated in this clause (A), the creation or perfection of pledges of, security interests in, Mortgages on, the obtaining of title insurance with respect to or the taking of any other actions with respect to: (i) any fee owned Real Property that is not Material Real Property or any Leasehold Property (it being understood there shall be no requirement to obtain any landlord waivers, estoppels, consents or collateral access letters), (ii) motor vehicles (other than tractors, trailers and other Rolling Stock) consisting of an employee or light vehicle and other assets subject to certificates of title with an individual fair market value of less than $40,000, (iii) letter of credit rights (other than to the extent consisting of supporting obligations that can be perfected solely by the filing of a UCC financing statement) of an amount less than $5,000,000 and commercial tort claims where the amount of damages claimed by the applicable Loan Party is less than $5,000,000, (iv) any governmental licenses or state or local franchises, charters and authorizations, to the extent security interests in such licenses, franchises, charters or authorizations are prohibited or restricted thereby (except to the extent such prohibition or restriction is rendered ineffective under the UCC or other Applicable Law), (v) Collateral in which pledges or security interests are prohibited or restricted by Applicable Law or require the consent of any governmental authority or third party, which consent has not been obtained, (vi) Margin Stock, (vii) Equity Interests in joint ventures and other non-wholly owned Subsidiaries of Parent (but only to the extent that the organizational documents of such Subsidiaries or agreements with other equity holders prohibit or restrict the pledge thereof under restrictions that are enforceable under the UCC or other Applicable Law), (viii) Equity Interests of (or held as assets by) Unrestricted Subsidiaries, Immaterial Subsidiaries, or captive insurance Subsidiaries, (ix) any lease, license or agreement or any Property to the extent a grant of a security interest therein would violate or invalidate such lease, license or agreement or create a right of termination in favor of any other party thereto after giving effect to the applicable anti-assignment provisions of the UCC or other Applicable Law, other than proceeds and receivables thereof, the assignment of which is deemed effective under the UCC or other Applicable Law, notwithstanding such prohibition, (x) any assets or rights subject to a purchase money security interest, Capitalized Lease or similar arrangement, (xi) with respect to Term Priority Collateral, any asset on which perfection action is not required under the Term Debt Documents, (xii) any assets to the extent a security interest in such assets could result in an adverse Tax consequences as reasonably determined by Parent, in consultation with Agent; provided, that no Collateral described in subclauses (b)(i) through (iv) above will be subject to this clause (xii), (xiii) any intent-to-use Trademark application prior to the filing of a "Statement of Use" or "Amendment to Allege Use" with respect thereto, to the extent, if any, that, and solely during the period, if any, in which, the grant of a security interest therein would impair the validity or enforceability of such intent-to-use Trademark application under applicable Federal law, (xiv) any equipment or other collateral with a net book value in an aggregate amount not to exceed $5,000,000, (xv) other assets not specifically included in the Collateral in circumstances where the cost of obtaining a security interest in such assets exceeds the practical benefit to Lenders afforded thereby as reasonably determined by Agent in consultation with Parent, and (xvi) any non-U.S. assets or assets of the Loan Parties that require action under the law of any non-U.S. jurisdiction to create or perfect a security interest in such assets, including any Intellectual Property in any non-U.S. jurisdiction other than foreign deposit accounts of any Loan Party containing the proceeds of ABL Priority Collateral at any time (and no security agreements or pledge agreements governed under the laws of any non-U.S. jurisdiction shall be required in respect of such assets);

(B)    (i) perfection by possession or control shall not be required with respect to (x) any intercompany notes in an aggregate principal amount not to exceed $5,000,000 and (y) any other notes or other evidence of Debt in an aggregate principal amount not to exceed $5,000,000; (ii) no actions in any non-U.S. jurisdiction or required by the laws of any non-U.S. jurisdiction shall be required in order to create any security interests in assets located or titled outside of the United States (including the Equity Interests of any Foreign Subsidiary) or to perfect such security interests (it being understood that there shall be no security agreements or pledge agreements governed under the laws of any non-U.S. jurisdiction); and (iii) except to the extent that perfection and priority may be achieved (w) by the filing of a financing statement under the Uniform Commercial Code with respect to a Loan Party, (x) with respect to Real Property and the recordation of Mortgages in respect thereof, as contemplated by clauses (b)(iii) and (c) above, (y) with respect to Equity Interests or Debt, by the delivery of certificates or instruments representing or evidencing such Equity Interests or Debt along with appropriate undated instruments of transfer executed in blank, or (z) by notation of liens on certificate of title, the Loan Documents shall not contain any requirements as to perfection or priority with respect to any assets or property described in clause (A) above and this clause (B);

(C)    Agent in its reasonable discretion may grant extensions of time for the creation or perfection of security interests in, and Mortgages on, or obtaining of title insurance or taking of other actions with respect to, particular assets (including extensions beyond

the Closing Date) or any other compliance with the requirements of this definition (or any similar requirements set forth herein or in any other Loan Documents) where it reasonably determines, in consultation with Parent, that such creation or perfection of security interests or Mortgages, or such obtaining of title insurance or taking of other actions, or any other compliance with the requirements of this definition cannot be accomplished without undue delay, burden or expense by the time or times at which such act would otherwise be required by this Agreement or any Security Documents; provided, that Agent shall have received on or prior to the Closing Date, (i) UCC financing statements in appropriate form for filing under the UCC in the jurisdiction of incorporation or organization of each Loan Party, and (ii) evidence that the Term Agent shall be in possession of any certificates or instruments representing or evidencing Equity Interests of Loan Parties and each directly wholly owned Domestic Subsidiary of Loan Parties, in each case accompanied by undated instruments of transfer and stock powers endorsed in blank; and

(D)    Liens required to be granted from time to time pursuant to the Collateral and Guarantee Requirement shall be subject to the exceptions and limitations set forth in this Agreement and the Security Documents.

1    Collateral Line Cap - at any date of determination, the lesser of (x) the Commitments and (y) the Borrowing Base.

2    Commitment - for any Lender, its obligation to make Loans and to participate in LC Obligations (excluding amounts owing pursuant to clause (c) of the definition of LC Obligations) up to the maximum principal amount shown on Schedule 1.1(b), or as specified hereafter in the most recent Assignment and Acceptance to which it is a party. "Commitments" means the aggregate amount of such commitments of all Lenders. The Commitments on the Closing Date are equal to $450,000,000.

3    Commercial Software License - any non-exclusive license of commercially available (on non-discriminatory pricing terms) computer software to a Loan Party from a commercial software provider (e.g., "shrink-wrap", "browse-wrap" or "click-wrap" software licenses) or a license of freely available computer software from a licensor of free or open source software.

4    Commitment Termination Date - the earliest to occur of (a) the Latest Maturity Date; (b) the date on which Borrowers terminate the Commitments pursuant to Section 2.1.4; or (c) the date on which the Commitments are terminated pursuant to Section 11.2.

5    Commodity Exchange Act - the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

6    Compliance Certificate - a certificate substantially in the form attached hereto as Exhibit C, as such form may be modified by Agent and Administrative Borrower from time to time in a manner consistent with the terms of this Agreement, by which Administrative Borrower, on behalf of Loan Parties, calculates the Fixed Charge Coverage Ratio for the period covered by the most recent financial statements delivered pursuant to Section 10.1.1 whether or not such Compliance Certificate is delivered during a Financial Reporting Trigger Period.

7    Concentration Account - account maintained by Administrative Borrower, on behalf of Borrowers, with Agent as designated in a letter agreement between Administrative Borrower and Agent on the Closing Date and any other account designated as the "Concentration Account" by Administrative Borrower and Agent from time to time.

8    Consolidated EBITDA - for any period of determination calculated on a Pro Forma Basis, the Consolidated Net Income for such period, plus:

(a)    without duplication and to the extent deducted (and not added back or excluded) in arriving at such Consolidated Net Income (other than clauses (viii) or (xi)), the sum of the following amounts for such period with respect to Parent and Restricted Subsidiaries:

(ii)    total interest expense determined in accordance with GAAP and, to the extent not reflected in such total interest expense, any expenses or losses on hedging obligations or other derivative instruments entered into for the purpose of hedging interest rate risk, net of interest income and gains on such hedging obligations or other derivative obligations, letter of credit fees, costs of surety bonds in connection with financing activities and any bank fees and financing fees (including commitment, underwriting, funding, "rollover" and similar fees and commissions, discounts, yields and other fees, charges and amounts incurred in connection with the issuance or incurrence of Debt and all commissions, discounts and other fees and charges owed with respect to letters of credit and bankers' acceptance financing and net costs under Hedging Agreements entered into for the purpose of hedging interest or commodity rate risk) and annual agency, unused line, facility or similar fees paid under definitive documentation related to Debt (whether amortized or immediately expensed),

(iii)    provision for taxes based on income, profits or capital gains of Parent and Restricted Subsidiaries, including, without limitation, federal, state, local, franchise and similar taxes and foreign withholding taxes paid or accrued during such period,

(iv)   depreciation and amortization,

(v)   extraordinary, unusual or non-recurring charges, expenses or losses,

(vi)   non-cash expenses, charges and losses (including reserves, impairment charges or asset write-offs, write-offs of deferred financing fees, losses from investments recorded using the equity method, purchase accounting adjustments and stock-based awards compensation expense), in each case other than (A) any non-cash charge representing amortization of a prepaid cash item that was paid and not expensed in a prior period and (B) any non-cash charge relating to write-offs, write-downs or reserves with respect to accounts receivable in the normal course or inventory; provided, that if any of the non-cash charges referred to in this clause (v) represents an accrual or reserve for potential cash items in any future period, (1) Parent may determine not to add back such non-cash charge in the current period and (2) to the extent Parent does decide to add back such non-cash charge, the cash payment in respect thereof in such future period shall be subtracted from Consolidated EBITDA in such future period to the extent paid,

(vii)   restructuring costs and charges, integration costs, retention, recruiting, relocation and signing bonuses and expenses, and severance costs (including, for the avoidance of doubt, any bonuses payable in connection with the IBT Transactions in 2014 and 2015),

(viii)   Transaction Expenses,

(ix)   pro forma results for acquisitions (including the commencement of activities constituting such business) and material dispositions (including the termination or discontinuance of activities constituting such business) of business entities or properties or assets, constituting a division or line of business of any business entity, division or line of business that is the subject of any such acquisition or disposition, and operational changes and operational initiatives (including, to the extent applicable, from the Transactions but excluding the IBT Transactions), including any synergies, operating expense reductions, other operating improvements and cost savings as certified by Parent as having been determined in good faith to be reasonably anticipated to be realizable within twelve (12) months following any such acquisition or disposition, operational change and operational initiatives (with the total add-back pursuant to this clause (viii) or Section 1.5(c) to be limited in the aggregate to 20% of Consolidated EBITDA (prior to giving effect to any such adjustments pursuant to this clause (viii) and Section 1.5 but otherwise on a pro forma consolidated basis) in any Test Period; provided, that such limitation on add-backs shall not apply if supported by a quality of earnings report prepared by a nationally recognized accounting firm or other third-party advisor reasonably acceptable to Agent or if such adjustments satisfy the requirements of Regulation S-X),

(x)   other transaction specific accruals, costs, charges, fees and expenses (including rationalization, legal, tax, structuring and other costs and expenses) related to the Transactions, acquisitions, investments, restricted payments, dispositions or issuances, amendments, waivers or modifications of debt or equity (whether or not consummated) reasonably expected to be permitted under this Agreement or the consummation of which would result in the repayment in full of the Obligations (other than unasserted contingent indemnity and reimbursement obligations and obligations of any Loan Party arising under any Hedging Agreement),

(xi)   proceeds of business interruption insurance received or reasonably expected to be received within 365 days; provided, that any such expected amounts that are not actually received in such 365 day period shall be deducted from Consolidated EBITDA in fiscal quarter immediately following such 365 day period,

(xii)   charges, losses or expenses to the extent indemnified or insured or reimbursed or reasonably expected to be indemnified, insured or reimbursed by a third party within 365 days after such charge, loss or expense; provided, that any such expected amounts that are not actually received in such 365 day period shall be deducted from Consolidated EBITDA in fiscal quarter immediately following such 365 day period,

(xiii)   the amount of any minority interest expense attributable to minority interests of third parties in the positive income of any non-wholly owned Restricted Subsidiary,

(xiv)   any net loss from disposed, abandoned or discontinued operations,

(xv)   net realized losses from Swap Obligations or embedded derivatives that require similar accounting treatment and the application of Accounting Standard Codification Topic 815 and related pronouncements,

(xvi)   the cumulative effect of a change in accounting principles,

(xvii)   realized non-cash foreign exchange losses resulting from the impact of foreign currency changes on the valuation of assets or liabilities on the balance sheet of Parent and Restricted Subsidiaries, less

(b)    without duplication and to the extent included in arriving at such Consolidated Net Income, (i) non-cash gains (excluding any non-cash gain to the extent it represents the reversal of an accrual or reserve for a potential cash item that reduced Consolidated EBITDA in any prior period) and all other non-cash items of income for such period, (ii) any gains and income from investments recorded using the equity method, and (iii) any gains arising out of transactions of the types described in clauses (a)(xii), (xiii), (xiv), (xv) and (xvi) above; provided, that, for the avoidance of doubt, any gain representing the reversal of any non-cash charge referred to in clause (a)(v)(B) above for a prior period shall be added (together with, without duplication, any amounts received in respect thereof to the extent not increasing Consolidated Net Income) to Consolidated EBITDA in any subsequent period to such extent so reversed (or received).

1    Consolidated Fixed Charges - for any period of determination calculated on a Pro Forma Basis, (a) cash interest expense payable during such period (including amounts payable under Capitalized Leases), (b) regularly scheduled principal payments payable in cash during such period (including amounts payable under Capitalized Leases), and (c) letter of credit fees payable in cash during such  period. Notwithstanding the foregoing, (i) Consolidated Fixed Charges for the Test Period ending March 31, 2014 (or, if necessary under Section 10.2.10, December 31, 2013) shall be calculated by multiplying (x) $[30,225,000] (the "Agreed 1Q2014 Amount") by (y) four, (ii) Consolidated Fixed Charges for the Test Period ending June 30, 2014 shall be calculated by multiplying (x) the sum of the Agreed 1Q2014 Amount plus the actual amount of Consolidated Fixed Charges for the Fiscal Quarter ending June 30,  2014 by (y) two, (iii) Consolidated Fixed Charges for the Test Period ending September 31, 2014 shall be calculated by multiplying (x) the sum of the Agreed 1Q2014 Amount plus the actual amount of Consolidated Fixed Charges for the two Fiscal Quarters ending September 30, 2014 by (y) the product of four divided by three, and (iv) Consolidated Fixed Charges for the Test Period ending December 31, 2014 shall equal the sum of the Agreed 1Q2014 Amount plus the actual amount of Consolidated Fixed Charges for the three (3) Fiscal Quarters ending December 31, 2014.

Consolidated Fixed Charge Coverage Ratio - for any period of determination calculated on a Pro Forma Basis, the ratio of: (a) (i) Consolidated EBITDA calculated on a Pro Forma Basis for such period, minus (ii) Capital Expenditures made during such period, minus (iii) the aggregate amount of net cash taxes paid in cash during such period, minus (iv) the amount, if any, by which the Cash Pension Contribution for such period exceeds the Pension Expense for such period, and plus (v) the amount, if any, by which the Pension Expense for such period exceeds the Cash Pension Contribution for such period, divided by (b) the Consolidated Fixed Charges for such period.

2    Consolidated Net Income - for any period of determination, the net income (or loss) of Parent and Restricted Subsidiaries for such period determined on a consolidated basis in accordance with GAAP on a consolidated basis (without duplication) for such period (without deduction for minority interests); provided, that (a) in determining Consolidated Net Income, the net income of any other Person which is not a Restricted Subsidiary, is an Unrestricted Subsidiary or is accounted for by Parent by the equity method of accounting shall be included only to the extent of the payment of cash dividends or cash distributions by such other Person to Parent, Restricted Subsidiaries or another Restricted Subsidiary during such period, (b) the net income of any Subsidiary of Parent shall be excluded to the extent that the declaration or payment of cash dividends or similar cash distributions by that Subsidiary of that net income is not at the date of determination permitted by operation of its charter or any agreement, instrument or law applicable to such Subsidiary (other than (x) restrictions that have been waived or otherwise released, (y) restrictions pursuant to the Loan Documents and or the Term Debt Documents and (z) restrictions arising pursuant to an agreement or instrument if the encumbrances and restrictions contained in any such agreement or instrument taken as a whole are not materially less favorable to Secured Parties than the encumbrances and restrictions contained in the Loan Documents (as determined by Parent in good faith)) and (c) the income or loss of any Person accrued prior to the date it becomes a Subsidiary or is merged into or consolidated with a Loan Party or any Subsidiary or the date that such Person's assets are acquired by Parent or any Subsidiary shall be excluded.

Consolidated Total Assets - total assets of Parent and Restricted Subsidiaries, determined on a consolidated basis in accordance with GAAP, as shown on the consolidated balance sheet of Parent and Restricted Subsidiaries for the most recently completed Fiscal Quarter for which financial statements have been delivered pursuant to Section 10.1.1(a) or (b).

Consolidated Total Debt - as of any date of determination calculated on a Pro Forma Basis, the aggregate principal amount of Debt of Parent and Restricted Subsidiaries outstanding on such date, in an amount that would be reflected on a balance sheet prepared as of such date on a consolidated basis in accordance with GAAP (but excluding the effects of any discounting of Debt as provided in Section 1.4), consisting of Debt for borrowed money, Attributable Debt or purchase money Debt, debt obligations evidenced by bonds, debentures, promissory notes, loan agreements or similar instruments, and all Guarantees of any of the foregoing; provided, that (i) Consolidated Total Debt shall not include Debt in respect of letters of credit, bankers' acceptances and other similar contingent obligations, except to the extent of unreimbursed amounts thereunder, (ii) Consolidated Total Debt shall not include obligations under Hedging Agreements permitted hereunder, and (iii) Consolidated Total Debt shall not include any Debt which Parent or any Restricted Subsidiary has either defeased or discharged and satisfied.

Contractual Obligation – as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

Contribution Deferral Agreement - that certain Second Amended and Restated Contribution Deferral Agreement, dated as of January 31, 2014, among YRC, Holland, New Penn, Reddaway, certain other of the Subsidiaries of Parent, the Trustees for the Central States, Southeast and Southwest Areas Pension Fund, the Pension Fund Entities and each other pension fund from time to time party thereto and Wilmington Trust Company, all as the same may be amended, amended and restated, restated, supplemented or otherwise modified in accordance with the terms hereof.

3    Control – as defined in the definition of Affiliate.

4    Copyright License - any written agreement, now or hereafter in effect, granting any right to any third party under any Copyright now or hereafter owned by any Loan Party material to the operation of the business of any Loan Party or that such Loan Party otherwise has the right to license material to the operation of the business of any Loan Party, or granting any right to any Loan Party under any Copyright now or hereafter owned by any third party, and all rights of such Loan Party under any such agreement.

5    Copyrights - all of the following now owned or hereafter acquired by or assigned to any Loan Party: (a) all copyright rights in any work subject to the copyright laws of the United States or any other country, whether as author, assignee, transferee or otherwise, whether registered or unregistered and whether published or unpublished, (b) all registrations and applications for registration of any such Copyright in the United States or any other country, including registrations, recordings, supplemental registrations and pending applications for registration in the USCO, including those listed on Schedule 1.1(c), (c) all rights and privileges arising under Applicable Law with respect to such Loan Party's use of such Copyrights, (d) all derivatives, reissues, renewals, continuations and extensions thereof and amendments thereto, (e) all income, fees, royalties, damages, claims and payments now or hereafter due and/or payable with respect to the foregoing, including damages and payments for past, present or future infringements thereof, (f) all rights corresponding thereto throughout the world and (g) all rights to sue for past, present or future infringements thereof.

Debt - as to any Person at any time, without duplication and without reference to what constitutes indebtedness or a liability in accordance with GAAP, all of the following: (a) all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments; (b) the maximum amount (after giving effect to any prior drawings or reductions which may have been reimbursed) of all outstanding letters of credit (including standby and commercial), bankers' acceptances, bank guaranties, surety bonds, performance bonds and similar instruments issued or created by or for the account of such Person; (c) net obligations of such Person under any Hedging Agreement; (d) all obligations of such Person to pay the deferred purchase price of property or services; (e) indebtedness (excluding prepaid interest thereon) described in clauses (a) through (d) and (f) through (h) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements and mortgage, industrial revenue bond, industrial development bond and similar financings), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse; (f) all Attributable Debt; (g) all obligations of such Person to purchase, redeem, retire or otherwise acquire for value any Disqualified Equity Interests (but solely to the extent required to occur on or prior to the Latest Maturity Date (other than as a result of a change of control, asset sale or similar event)); and (h) to the extent not otherwise included above, all Guarantees of such Person in respect of any of the foregoing.

For all purposes hereof, the Debt of any Person (i) shall include the Debt of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or joint venturer, except to the extent such Person's liability for such Debt is otherwise expressly contractually limited and only to the extent such Debt would be included in the calculation of Consolidated Total Debt and (ii) shall exclude (A) trade accounts payable in the ordinary course of business, (B) any earn-out obligation until such earn-out obligation has become due and payable, (C) any current and undeferred pension contributions or health and welfare contributions due from such Person and/or its applicable Subsidiaries to any Pension Fund Entity, (D) liabilities accrued in the ordinary course, (E) deferred revenues, liabilities associated with customer prepayments and deposits and any such obligations incurred under ERISA, and other accrued obligations (including transfer pricing), in each case incurred in the ordinary course of business, (F) operating leases, (G) customary obligations under employment agreements and deferred compensation, and (H) deferred tax liabilities. The amount of any net obligation under any Hedging Agreement on any date shall be deemed to be the Hedge Termination Value thereof as of such date. The amount of Debt of any Person for purposes of clause (e) that is limited in recourse to the property encumbered thereby shall be deemed to be equal to the lesser of (i) the aggregate unpaid amount of such Debt and (ii) the fair market value of the property encumbered thereby as determined by such Person in good faith.

Debtor Relief Laws - the Bankruptcy Code as now or hereafter in effect or any successor thereto, as well as all other liquidation, conservatorship, bankruptcy, assignment for benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States federal or state law or of any applicable foreign law from time to time in effect affecting the rights of creditors generally.

Debt Repayment Conditions - at the time of determination with respect to any proposed repayment of Debt (to the extent that such repayment is subject to the Debt Repayment Conditions in accordance with the terms of this Agreement), and subject to

Section 2.3.4, that (a) no Event of Default then exists or would arise as a result of repaying such Debt, and (b) Availability on the date of such proposed repayment (after giving effect thereto) is not less than $67,500,000. Prior to consummating any proposed transaction which is subject to the Debt Repayment Conditions, Administrative Borrower shall deliver to Agent evidence acceptable to Agent of the satisfaction of the conditions set forth above on a basis (including, without limitation, giving due consideration to results for prior periods) reasonably satisfactory to Agent.

6    December 2013 Exchange Agreements - each of the exchange agreements dated as of December 22, 2013, as amended, restated, modified, waived, supplemented or consented to, by and among Administrative Borrower and certain of the holders of the Series B Senior Secured Notes due 2015 that are party thereto.

7    December 2013 Registration Rights Agreement - the Registration Rights Agreement dated as of December 22, 2013, as amended, restated modified, waived, supplemented or consented to, by and among Administrative Borrower and each of the purchasers signatory thereto.

8    December 2013 Stock Purchase Agreements - each of the stock purchase agreements dated as of December 22, 2013, as amended, restated, modified, waived, supplemented or consented to, by and among Administrative Borrower and each of the purchasers party thereto.

9    Default - an event or condition that, with the lapse of time or giving of notice, without any waiver or cure hereunder, would constitute an Event of Default.

Defaulting Lender - any Lender that (a) has failed to fund any amounts required to be funded by it under this Agreement within one (1) Business Day of the date that it is required to do so under the Agreement, (b) notified Administrative Borrower, Agent, or any Lender in writing that it does not intend to comply with all or any portion of its funding obligations under the Agreement, (c) has made a public statement to the effect that it does not intend to comply with its funding obligations under the Agreement, (d) failed, within one (1) Business Day after written request by Agent, to confirm that it will comply with the terms of the Agreement relating to its obligations to fund any amounts required to be funded by it under the Agreement, (e) otherwise failed to pay over to Agent or any other Lender any other amount required to be paid by it under the Agreement within one (1) Business Day of the date that it is required to do so under the Agreement, or (f) (i) becomes or is insolvent or has a parent company that has become or is insolvent or (ii) becomes the subject of a bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee, or custodian appointed for it, or has taken any action in furtherance of, or indicating its consent to, approval of or acquiescence in any such proceeding or appointment or has a parent company that has become the subject of a bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee, or custodian appointed for it, or has taken any action in furtherance of, or indicating its consent to, approval of or acquiescence in any such proceeding or appointment; provided, that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any equity interest in such Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority or instrumentality) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender. Any determination made in good faith by Agent that a Lender is a Defaulting Lender under clauses (a) through (f) above shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender upon delivery of written notice of such determination to Administrative Borrower, each Issuing Bank and each Lender.

10    Default Rate - for any Obligation described in Section 3.1.1(b) (including, to the extent permitted by law, accrued but unpaid interest), two percent (2%) plus the interest rate otherwise applicable thereto.

11    Deferred Revenue Reserve – at any date of determination, 85% of "deferred revenue liability" as reflected on the balance sheet of Parent and Restricted Subsidiaries as of the last day of the most recently completed Fiscal Month.

12    Deposit Account Control Agreements - the written agreements, in form and substance reasonably satisfactory to Agent and Administrative Borrower, by and among Agent, for the benefit of Secured Parties, each Loan Party with a deposit account at any bank and the bank at which such deposit account is at any time maintained, which provides that such bank will comply with instructions originated by Agent directing disposition of the funds in such deposit account without further consent by such Loan Party and has such other terms and conditions as Agent may reasonably require.

13    Dilution – as of any date of determination on a consolidated basis for all Loan Parties, a percentage, based upon the experience of the immediately prior 365 consecutive days, that is the result of dividing the Dollar amount of (a) bad debt write-downs, discounts, advertising allowances, credits or other dilutive items with respect to Loan Parties' Accounts during such period, by (b) Loan Parties' billings with respect to Accounts during such period.

14    Dilution Reserve - as of any date of determination, an amount sufficient to reduce the advance rate against Eligible

Accounts by one (1) percentage point for each percentage point by which Dilution is in excess of five percent (5%).

Disposition or Dispose - the sale, transfer, license, lease or other disposition (including any sale and leaseback transaction and any sale of Equity Interests in a Restricted Subsidiary) of any property by any Person, including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith.

Disqualified Equity Interests - any Equity Interest that, by its terms (or by the terms of any security or other Equity Interests into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition (a) matures or is mandatorily redeemable (other than solely for Qualified Equity Interests), pursuant to a sinking fund obligation or otherwise, (b) is redeemable at the option of the holder thereof (other than solely for Qualified Equity Interests), in whole or in part (except as a result of a change of control or asset sale so long as any rights of the holders thereof upon the occurrence of a change of control or asset sale event shall be subject to the prior repayment in full of the Loans and all other Obligations that are accrued and payable and the termination of the Commitments), (c) provides for scheduled payments of dividends in cash, or (d) is or becomes convertible into or exchangeable for Debt or any other Equity Interests that would constitute Disqualified Equity Interests, in each case, prior to the date that is ninety-one (91) days after the then Latest Maturity Date; provided, that if such Equity Interests are issued pursuant to, or in accordance with, a plan for the benefit of employees of Parent or Restricted Subsidiaries or by any such plan to such employees, such Equity Interests shall not constitute Disqualified Equity Interests solely because they may be required to be repurchased by Parent or Restricted Subsidiaries in order to satisfy applicable statutory or regulatory obligations or as a result of such employee's termination, death or disability.

15    Disqualified Lender – (i) those banks, financial institutions and other entities identified in writing by Administrative Borrower to Agent prior to the date hereof, (ii) any competitors of Parent or its Subsidiaries, and (iii) any of their known Affiliates; provided, that a "competitor" or an affiliate of a competitor or an entity referenced in clause (i) above shall not include any bona fide debt fund or investment vehicle (other than a person which is excluded pursuant to clause (i) above) that is engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of business.

16    Dollar(s) - lawful money of the United States.

17    Domain Names - all internet domain names and associated URL addresses in or to which any Loan Party now or hereafter has any right, title or interest.

18    Domestic Subsidiary - any Subsidiary that is organized under the laws of the United States, any state thereof or the District of Columbia; provided, that notwithstanding the foregoing, "Domestic Subsidiary" shall not include any Subsidiary substantially all of the assets of which are Equity Interests or Debt in (or owed by) one or more Subsidiaries that are not Domestic Subsidiaries.

19    Dominion Account - any special account, lockbox, blocked account or other deposit account established by Loan Parties at RBS, JPMorgan Chase Bank, National Association, Bank of Nova Scotia, The Toronto-Dominion Bank, or another bank reasonably acceptable to Agent which is subject to a Deposit Account Control Agreement in favor of Agent.

20    Eligible Account - an Account owing to a Loan Party that arises in the Ordinary Course of Business (or, subject to Section 10.2.2, acquired by a Loan Party in connection with any Permitted Acquisition or other acquisition permitted hereunder and, in any such instance, has been reviewed as part of a field exam conducted by the Agent pursuant to Section 10.1.10) from the sale or lease of goods or rendition of services and is payable in Dollars or Canadian Dollars; provided, that in no event shall an Account be an Eligible Account if:

21    (a)    such Account is unpaid for more than one hundred twenty (120) days after the original invoice date; provided, that, on any date of determination, the aggregate amount of Accounts which remain unpaid for more than ninety (90) days after the original invoice date thereof and are included in the calculation of Eligible Accounts may not exceed 3.5% of all Eligible Accounts on such date;

22    (b)    fifty percent (50%) or more of the aggregate Accounts owing by the Account Debtor to such Loan Party are not Eligible Accounts under the foregoing clause (a);

23    (c)    such Account, when aggregated with other Accounts owing by the applicable Account Debtor, exceeds fifteen percent (15%) of the aggregate Eligible Accounts of Loan Parties (or such higher percentage as Agent may establish for any specific Account Debtor from time to time);

24    (d)    such Account is owing by an account debtor appearing on the most recently published OFAC Specially Designated Nationals and Blocked Persons List;

25    (e)    such Account is owing by a creditor or supplier, or is otherwise subject to a potential offset, counterclaim,

dispute, deduction, discount, recoupment, reserve, defense, chargeback, credit or allowance including, without limitation, off bill discounts, overcharge claims, cargo claims, due to interlines, A/R credits payable (but ineligibility shall be limited solely to the amount thereof);

(f)    an Insolvency Proceeding has been commenced by or against the Account Debtor, or the Account Debtor has failed, has suspended or ceased doing business, is liquidating, dissolving or winding up its affairs, or to Loan Parties' knowledge, is not Solvent; provided, that, in the case of an Insolvency Proceeding, so long as (x) an order exists permitting such Account Debtor to pay the applicable Loan Party as a "critical vendor", and (y) such Account Debtor has obtained adequate postpetition financing to pay the Accounts of such Loan Party arising postpetition, the Accounts of such Loan Party that arise postpetition shall not be deemed ineligible under the provisions of this clause (f) to the extent that the order permitting such financing allows the payment of such postpetition Accounts.

(g)    the Account Debtor does not maintain its principal place of business inside the United States or Canada; except, that at Agent's option, such Account owing by an Account Debtor that does not maintain its principal place of business inside the United States or Canada may be deemed an Eligible Account if either: (x) the applicable Account Debtor has delivered to such Loan Party an irrevocable letter of credit issued or confirmed by a bank reasonably satisfactory to Agent and payable only in the United States and in Dollars, sufficient to cover such Account, in form and substance reasonably satisfactory to Agent and if required by Agent, the original of such letter of credit has been delivered to Agent or Agent's agent, and such Loan Party has complied with the terms of Section 7.4.2 with respect to the assignment of any Letter-of-Credit-Rights to Agent or naming Agent as transferee beneficiary thereunder, as Agent may specify, (y) such Account is subject to credit insurance payable to Agent issued by an insurer and on terms and in an amount reasonably acceptable to Agent, or (z) such Account is otherwise reasonably acceptable in all respects to Agent (subject to such lending formula with respect thereto as Agent may determine in its Permitted Discretion);

(h)    such Account is owing by a Governmental Authority, unless the applicable Account Debtor is the United States, any state or territory thereof or any department, agency or instrumentality thereof and the Account has been assigned to Agent in compliance with the Assignment of Claims Act or other Applicable Law; provided, that, notwithstanding the foregoing provisions of this clause (h), Accounts owing by a Governmental Authority that have not been assigned to Agent in compliance with the Assignment of Claims Act or other Applicable Law may be included in the Borrowing Base at any time so long as such Accounts otherwise constitute Eligible Accounts and the aggregate amount of such Accounts included in the calculation of Eligible Accounts (before giving effect to the applicable advance rate) does not exceed 2.5% of the aggregate amount of all Eligible Accounts at such time; and provided, further, that, notwithstanding the foregoing provisions of this clause (h), during a Cash Dominion Trigger Period no Account owing by a Governmental Authority shall be deemed an Eligible Account unless the Account Debtor is the United States, any state or territory thereof or any department, agency or instrumentality thereof and the Account has been assigned to Agent in compliance with the Assignment of Claims Act or other Applicable Law;

(i)    such Account is not subject to a duly perfected, first priority Lien in favor of Agent, or is subject to any other Lien (including, without limitation, any Lien to secure the performance of a surety, performance bond or similar instrument);

(j)    such Account is evidenced by Chattel Paper or an Instrument of any kind, or has been reduced to judgment unless such Chattel Paper or Instrument has been delivered to Agent;

(k)    payment has been extended as to such Account, the applicable Account Debtor has made a partial payment, or such Account arises from a sale on a cash-on-delivery or cash-in-advance basis;

(l)    such Account arises from a sale to an Affiliate, or from a sale on a bill-and-hold, guaranteed sale, sale or return, sale on approval, consignment, or other repurchase or return basis; provided, that, this clause (l) shall not apply to Accounts generated by Loan Parties in the Ordinary Course of Business from any Account Debtor that constitutes an Affiliate solely because such Account Debtor shares a common material equityholder with Parent;

(m)    such Account represents a progress billing or retainage or has not been invoiced;

(n)    such Account includes a billing for interest, fees or late charges, but ineligibility shall be limited to the extent thereof;

(o)    such Account is subject to a legally binding commitment to be sold to a third party or was generated by a Loan Party or any division or operating unit thereof that is subject to a legally binding commitment to be sold to a third party;

(p)    payment of such Account is being administered by an outside collection agency; or

(q)    Loan Parties' records with respect to such Account do not identify the Account Debtor with respect thereto.

Any Accounts that are not Eligible Accounts shall nevertheless be part of the Collateral except to the extent that they constitute Excluded Property.

Eligible Assignee - a Person that is (a) a Lender (other than a Defaulting Lender), an Affiliate of a Lender or Approved Fund; (b) prior to the occurrence of an Event of Default under Section 11.1(a) or (j), any other Person approved by Agent and Administrative Borrower (which approval by Administrative Borrower shall (i) not be unreasonably withheld or delayed, and (ii) be deemed granted if the Administrative Borrower has not objected thereto in writing to the Agent within ten days of receiving a request for approval), that is organized under the laws of the United States or any state or district thereof, has total assets in excess of $5 billion, extends asset-based lending facilities in its ordinary course of business and whose becoming an assignee would not constitute a non-exempt prohibited transaction under Section 4975 of ERISA or any other Applicable Law; and (c) during the continuance of any Event of Default under Section 11.1(a) or (j), any Person acceptable to Agent in its Permitted Discretion; provided, that notwithstanding the foregoing, no Disqualified Lender or Defaulting Lender shall qualify as an Eligible Assignee, and in any event no Loan Party shall qualify as an Eligible Assignee.

Eligible Borrowing Base Cash - cash from time to time deposited in the Borrowing Base Cash Account.

Enforcement Action - any action to enforce any Obligations or Loan Documents or to realize upon any Collateral (whether by judicial action, self-help, notification of Account Debtors, exercise of setoff or recoupment, or otherwise).

Environmental Laws - all federal, state, local and foreign laws (including common law), treaties, regulations, rules, ordinances, codes, decrees, judgments, directives, orders (including consent orders), and agreements in each case, relating to protection of the environment, natural resources, human health and safety (with respect to exposure to hazardous or toxic substances or wastes) or the presence, Release of, or exposure to, hazardous or toxic substances or wastes, or the generation, manufacture, processing, distribution, use, treatment, storage, transport, recycling or handling of, or the arrangement for such activities with respect to, hazardous or toxic substances or wastes.

Environmental Liability - all liabilities, obligations, damages, losses, claims, actions, suits, judgments, orders, fines, penalties, fees, expenses and costs (including administrative oversight costs, capital and operating costs, injunctive relief, costs associated with financial assurance, permitting or closure requirements, natural resource damages and investigation or remediation costs), whether contingent or otherwise, arising out of or relating to (a) compliance or non-compliance with any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the Release of any Hazardous Materials, or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

Environmental Permit - any permit, approval, identification number, license or other authorization required under any Environmental Law.

Equipment - means (x) any "equipment" as such term is defined in Article 9 of the UCC and shall also include, but shall not be limited to, all machinery, equipment, furnishings, appliances, furniture, fixtures, tools, vehicles, Tractor Trailers and Rolling Stock now or hereafter owned by any Loan Party in each case, regardless of whether characterized as equipment under the UCC and (y) and any and all additions, substitutions and replacements of any of the foregoing and all accessions thereto, wherever located, whether or not at any time of determination incorporated or installed therein or attached thereto, and all replacements therefore, together with all attachments, components, parts, equipment and accessories installed thereon or affixed thereto.

Equity Interests - with respect to any Person, all of the shares, interests, rights, participations or other equivalents (however designated) of capital stock of (or other ownership or profit interests or units in) such Person and all of the warrants, options or other rights for the purchase, acquisition or exchange from such Person of any of the foregoing (including through convertible securities) but excluding in each case any debt security that is convertible into, or exchange for, Equity Interest.

ERISA - the Employee Retirement Income Security Act of 1974.

ERISA Affiliate - any corporation that is part of the same controlled group of corporations as Parent and/or its Subsidiaries within the meaning of Section 414(b) of the Code, and any trade or business (whether or not incorporated) under common control with Parent and/or its Subsidiaries within the meaning of Section 414(c) of the Code.

ERISA Event - (a) a Reportable Event; (b) the failure to satisfy the minimum funding standard with respect to a Plan within the meaning of Sections 412 or 430 of the Code or Sections 302 or 303 of ERISA, whether or not waived (unless such failure is corrected by the final due date for the plan year for which such failure occurred), (c) a determination that a Plan is, or is expected to be, in "at risk" status (as defined in Section 303(i)(4) of ERISA or Section 430(i)(4) of the Code); (d) the receipt by Parent, any Restricted

Subsidiary or any of their respective ERISA Affiliates of notice pursuant to Section 305(b)(3)(D) of ERISA that a Multiemployer Plan is or will be in "endangered status" or "critical status" (as defined in Section 305(b) of ERISA), or is, or is expected to be, "insolvent" (within the meaning of Section 4245 of ERISA) or in "reorganization" (within the meaning of Section 4241 of ERISA); (e) the filing pursuant to Section 431 of the Code or Section 304 of ERISA of an application for the extension of any amortization period; (f) the failure to timely make a contribution required to be made with respect to any Plan or Multiemployer Plan; (g) the filing of a notice to terminate any Plan if such termination would require material additional contributions in order to be considered a standard termination within the meaning of Section 4041(b) of ERISA; (h) the filing under Section 4041(c) of ERISA of a notice of intent to terminate any Plan or the termination of any Plan under Section 4041(c) of ERISA; (i) the filing pursuant to Section 412(c) of the Code or Section 302(c) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan; (j) the incurrence by Parent, any Restricted Subsidiary or any of their respective ERISA Affiliates of any liability under Title IV of ERISA with respect to the termination of any Plan; (k) the receipt by Parent, any Restricted Subsidiary or any of their respective ERISA Affiliates from the PBGC or a plan administrator of any notice of an intention to terminate any Plan or Plans or to appoint a trustee to administer any Plan under Section 4042 of ERISA; (l) the receipt by Parent, any Restricted Subsidiary or any of their respective ERISA Affiliates of any notice, or the receipt by any Multiemployer Plan from Parent, any Restricted Subsidiary or any of their respective ERISA Affiliates of any notice, concerning the imposition of Withdrawal Liability; (m) the occurrence of any event or condition that would reasonably be expected to result in the termination of a Plan or the appointment of a trustee to administer a Plan; or (o) the occurrence of a nonexempt prohibited transaction (within the meaning of Section 406 of ERISA or Section 4975 of the Code) with respect to any Plan which could result in liability to Parent or any Restricted Subsidiary or with respect to which Parent or any Restricted Subsidiary is a "disqualified person" (as defined in Section 4975 of the Code) or a "party in interest" (as defined in Section 3(14) of ERISA).

45    Event of Default - as defined in Section 11.1.

46    Evidence of Flood Insurance - as defined in the definition of Collateral and Guarantee Requirement.

47    Excluded Deposit Accounts - collectively, (a) deposit accounts specifically and exclusively used for payroll, payroll taxes and other employee wage and benefit payments to or for the benefit of Loan Parties' salaried employees, (b) petty cash accounts to the extent the balances therein do not exceed (x) $1,000,000 in the aggregate for more than five (5) Business Days, and/or (y) $5,000,000 in the aggregate for more than one (1) Business Day, (c) zero-balance accounts, (d) deposit accounts specifically and exclusively used to maintain cash collateral required pursuant to the Term Debt Agreement, or (e) escrow amounts; provided, that any deposits or other amounts in excess of the amounts permitted under clause (b) and maintained in petty cash accounts above shall be remitted promptly to a Dominion Account.

48    Excluded Property - assets described in clause (A) of the "notwithstanding" clause in the definition of Collateral and Guarantee Requirement.

49    Excluded Real Property - (a) any Real Property having a fair market value of less than $2,000,000 (at the Closing Date or, with respect to any such Real Property acquired after (or held by a Person that becomes a Loan Party after) the Closing Date as described in Section 10.1.11 or 10.1.13, as applicable, at the time of acquisition (or at the time such Person becomes a Loan Party)), in each case, as reasonably estimated by Administrative Borrower in good faith; provided, that the aggregate value of Real Property excluded pursuant to this clause (a) shall not exceed $20,000,000 or (b) any Real Property for so long as such Real Property secures the obligations of certain Loan Parties under the Contribution and Deferral Agreement on a first lien basis on the Closing Date and is listed on Schedule 1.1(d); and provided, further, that in the case of each of clauses (a) and (b), Administrative Borrower (or its counsel) shall designate any such property as an "Excluded Real Property" by written notice (which may include email or other electronic communication) to Agent (or its counsel) on or prior to the Closing Date or, in the case of clause (a), from time to time thereafter.

50    Excluded Subsidiary - (a) any Subsidiary that is not a wholly owned Subsidiary of Parent, (b) any Immaterial Subsidiary, (c) any Subsidiary that is prohibited by Applicable Law whether or not existing on the Closing Date or Contractual Obligations existing on the Closing Date (or, in the case of any newly acquired Subsidiary, in existence at the time of acquisition but not entered into in contemplation thereof) from Guaranteeing the Obligations or if Guaranteeing the Obligations would require governmental (including regulatory) consent, approval, license or authorization (unless such contractual obligation is waived or otherwise removed or such consent, approval, license or authorization has been obtained), (d) any other Subsidiary with respect to which, in the reasonable judgment of Agent, in consultation with Administrative Borrower, the burden or cost or other consequences (other than adverse tax consequences) of providing a Guarantee of the Obligations shall be excessive in view of the benefits to be obtained by Secured Parties therefrom, (e) any other Subsidiary with respect to which, in the reasonable judgment of Administrative Borrower, the tax consequences of providing a Guarantee could be adverse, (f) any Foreign Subsidiary of Parent or of any other direct or indirect Domestic Subsidiary or Foreign Subsidiary, (g) any Unrestricted Subsidiary, (h) any captive insurance company or non-profit Subsidiary, (i) any Domestic Subsidiary that is a Subsidiary of a Foreign Subsidiary that is a CFC, (j) Receivables SPV (so long as Receivables SPV does not hold any ABL Priority Collateral), and (k) any Domestic Subsidiary that is a disregarded entity for U.S. federal income tax purposes and substantially all of the assets of which consist of (x) the capital stock or indebtedness of (or owed by) one or more CFCs and (y) not more than an immaterial amount of cash. The Excluded Subsidiaries as of the Closing Date are

identified on Schedule 9.1.11.

51    Excluded Swap Obligation - with respect to any Loan Party, any Swap Obligation if, and to the extent that, all or a portion of the Guaranty of such Loan Party of, or the grant by such Loan Party of a security interest to secure, such Swap Obligation (or any Guaranty thereof) is or would otherwise become illegal or unlawful under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Loan Party's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act and the regulations thereunder at the time the Guaranty of such Loan Party or the grant of such security interest would otherwise become effective with respect to such Swap Obligation. If a Swap Obligation arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to swaps for which such Guaranty or security interest is or becomes illegal or unlawful.

52    Excluded Tax - with respect to any Lender or any other recipient of any payment to be made by or on account of any obligation of any Loan Party hereunder, (a) income or franchise (or similar) Taxes imposed on (or measured by) its gross or net income by the United States, or by the jurisdiction under the laws of which such recipient is organized or in which its principal office is located or, in the case of any Lender, in which its applicable lending office is located, (b) any branch profits Taxes imposed by the United States or any similar Tax imposed by any other jurisdiction in which any Borrower or Guarantor, as applicable, is located, (c) any U.S. Tax that is imposed on amounts payable to a Lender at the time it becomes a party to this Agreement, acquires additional interests in the credit facility contemplated hereunder, or designates a new lending office (except to the extent a Foreign Lender (or its assignor, if any) was entitled, at the time of designation of a new lending office (or assignment), to receive additional amounts from Borrowers with respect to such Tax pursuant to Section 5.10, (d) Taxes attributable to a failure to comply with Section 5.11, (e) Taxes imposed by a jurisdiction as a result of any connection between such party and such jurisdiction other than any connection arising solely from executing, delivering, being a party to, engaging in any transactions pursuant to, performing its obligations under, or enforcing any, Loan Document, (f) any Taxes, charges or similar levies arising from an Assignment and Acceptance, grant of a participation described in Section 13.2 hereof or a transfer or assignment to or designation of a new applicable lending office for receiving payment under any loan document, (g) any withholding Taxes imposed pursuant to FATCA, and (h) interest, penalties and additions to Tax on the foregoing amounts.

53    Existing 6% Senior Notes - those certain 6% Convertible Senior Notes due 2014 under that certain Indenture, dated as of February 23, 2010 (as amended, restated, modified or supplemented from time to time prior to the date hereof), among Parent, as issuer, the guarantors party thereto and US Bank, National Association, as trustee.

54    Existing ABL Facility - the credit facility governed by that certain Credit Agreement, dated as of July 22, 2011 (as amended, restated, modified or supplemented from time to time prior to the date hereof), among Receivables SPV, as borrower, Parent, as servicer, the lenders party thereto from time to time and JPMorgan Chase Bank, N.A., as agent.

55    Existing Term Facility - the term loan facility governed by that certain Amended and Restated Credit Agreement, dated as of July 22, 2011 (as amended, restated, modified or supplemented from time to time prior to the date hereof), among Parent, the lenders party thereto from time to time and JPMorgan Chase Bank, National Association, as agent.

56    Existing Letters of Credit – those Letters of Credit identified on Schedule 1.1(e) hereto.

57    Existing Series A Notes - those certain 10% Series A Convertible Senior Secured Notes due 2015 under that certain Indenture, dated as of July 22, 2011 (as amended, restated, modified or supplemented from time to time prior to the date hereof), among Parent, as issuer, the subsidiaries party thereto as guarantors and U.S. Bank National Association, as trustee.

58    Existing Series B Notes - those certain 10% Series B Convertible Senior Secured Notes due 2015 under that certain Indenture, dated as of July 22, 2011 (as amended, restated, modified or supplemented from time to time prior to the date hereof), among Parent, as issuer, the subsidiaries party thereto as guarantors and U.S. Bank National Association, as trustee.

59    Extended Commitment – as defined in Section 2.4.1.

60    Extension – as defined in Section 2.4.1.

61    Extension Amendment – as defined in Section 2.4.3.

62    Extension Offer – as defined in Section 2.4.1.

63    Extraordinary Expenses - all reasonable and documented out-of-pocket costs, expenses or advances that Agent (or, to the extent expressly provided herein, a Lender) may incur during an Event of Default, or during the pendency of an Insolvency Proceeding of a Loan Party (limited (i) in the case of legal fees, to one primary outside counsel for Agent and Lenders taken as a

whole, one additional counsel in each relevant foreign jurisdiction and, in the event of any actual or reasonably perceived conflict of interest, one additional counsel of each type to similarly situated parties and (ii) in the case of third party advisors, to one such advisor approved by Agent with the prior consultation of Administrative Borrower), including those relating to (a) any audit, inspection, repossession, storage, repair, appraisal, insurance, manufacture, preparation or advertising for sale, sale, collection, or other preservation of or realization upon any Collateral; (b) any action, arbitration or other proceeding (whether instituted by or against Agent, any Lender, any Loan Party, any representative of creditors of a Loan Party or any other Person) in any way relating to any Collateral (including the validity, perfection, priority or avoidability of Agent's Liens with respect to any Collateral), Loan Documents or Obligations, including any lender liability or other Claims; (c) the exercise, protection or enforcement of any rights or remedies of Agent in, or the monitoring of, any Insolvency Proceeding; (d) settlement or satisfaction of any taxes, charges or Liens with respect to any Collateral in accordance with the terms herein; (e) any Enforcement Action; (f) negotiation and documentation of any modification, waiver, workout, restructuring or forbearance with respect to any Loan Documents, Loans or Letters of Credit; or (g) Protective Advances.

64   Facility Exposure - the aggregate outstanding Loans plus LC Obligations (excluding amounts owing pursuant to clause (c) of the definition of LC Obligations).

65   FATCA - Sections 1471 through 1474 of the Code, as in effect on the date hereof (or any amended or successor version that is substantively comparable), and any applicable Treasury regulation promulgated thereunder or published administrative guidance implementing such Sections or any intergovernmental agreement between the United States and any other jurisdiction in connection therewith whether in existence on the Closing Date or promulgated or published thereafter.

66   Federal Funds Effective Rate – as defined in the definition of Base Rate.

67   Fee Letter –the fee letter agreement, dated as of the Closing Date, between Agent and Parent, on behalf of itself and the other Loan Parties.

Financial Covenant Trigger Event- shall occur when Borrowers fail to maintain Availability in an amount at least equal to ten percent (10%) of the Collateral Line Cap.

68   Financial Covenant Trigger Period – shall commence on the occurrence of a Financial Covenant Trigger Event, and shall continue until the date that the Financial Covenant Trigger Event shall have ceased to exist for a period of at least thirty (30) consecutive calendar days.

69   Fiscal Month – a calendar month.

70   Fiscal Quarter – a consecutive three-month period ending March 31, June 30, September 30 or December 31, as adjusted from time to time to the extent not prohibited hereunder.

71   Fiscal Year  - a consecutive twelve-month period ending December 31, as adjusted from time to time to the extent not prohibited hereunder.

72   Flood Laws - the National Flood Insurance Reform Act of 1994 and related legislation (including the regulations of the Board).

73   Flood Notice – as defined in the definition of Collateral and Guarantee Requirement.

74   FLSA - the Fair Labor Standards Act of 1938.

75   Foreign Lender - any Lender that is organized under the laws of a jurisdiction other than the laws of the United States, or any state or district thereof.

76   Foreign Subsidiary - a Subsidiary other than a Domestic Subsidiary.

77   Full Payment of the Obligations - the occurrence of the following: (a) the Commitments have terminated, (b) all Obligations have been paid in full (other than contingent indemnification obligations and Bank Product Debt as to which arrangements with respect thereto reasonably satisfactory the applicable Bank Product Provider shall have been made), and (c) all Letters of Credit have terminated, expired or Cash Collateralized (other than Letters of Credit as to which other arrangements with respect thereto satisfactory to the applicable Issuing Bank shall have been made). For the avoidance of doubt, "Full Payment of the Obligations" shall not include payment of Bank Product Debt.

78   GAAP - generally accepted accounting principles in the United States in effect from time to time; provided, however, that

if Administrative Borrower notifies Agent that Administrative Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the Closing Date in GAAP or in the application thereof on the operation of such provision (or if Agent notifies Administrative Borrower that Required Lenders request an amendment to any provision hereof for such purposes), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith.

General Intangibles - has the meaning provided in Article 9 of the UCC and shall in any event include all choses in action and causes of action and all other intangible personal property of every kind and nature (other than Accounts) now owned or hereafter acquired by any Loan Party, as the case may be, including corporate or other business records, indemnification claims, contract rights (including rights under leases, whether entered into as lessor or lessee, Hedging Agreements and other agreements), goodwill, registrations, franchises, tax refund claims and any letter of credit, guarantee, claim, security interest or other security held by or granted to any Loan Party.

79    Governmental Authority - any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, administrative tribunal, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank) and any group or body charged with setting financial accounting or regulatory capital rules or standards (including, without limitation, the Financial Accounting Standards Board, the Bank for International Settlements or the Basel Committee on Banking Supervision or any successor or similar authority to any of the foregoing).

80   Grant of Security Interest - a Grant of Security Interest in certain Intellectual Property Collateral substantially in the form of Exhibit E, F or G attached hereto.

Guarantee - as to any Person, without duplication, (a) any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Debt or other monetary obligation payable or performable by another Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Debt, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Debt of the payment or performance of such Debt, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Debt, or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Debt of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part), or (b) any Lien on any assets of such Person securing any Debt of any other Person, whether or not such Debt is assumed by such Person (or any right, contingent or otherwise, of any holder of such Debt to obtain any such Lien); provided, that the term Guarantee shall not include (i) endorsements for collection or deposit, in either case in the ordinary course of business, (ii) customary and reasonable indemnity obligations in effect on the Closing Date or entered into in connection with any acquisition or disposition of assets permitted under this Agreement (other than such obligations with respect to Debt), or (iii) product warranties. The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith. The term Guarantee as a verb has a corresponding meaning.

81   Guarantor or Guarantors - as defined in the preamble to this Agreement and any other Person that at any time after the date hereof becomes a Guarantor (together with their respective successors and assigns).

82    Guaranty - the guaranty set forth in Section 14 of this Agreement and any other guaranty of the Obligations of Borrowers now or hereafter executed by a Guarantor in favor of Agent, for the benefit of Secured Parties.

Hazardous Materials - (a) any petroleum products, distillates or byproducts and all other hydrocarbons, coal ash, radon gas, asbestos, urea formaldehyde foam insulation, polychlorinated biphenyls, chlorofluorocarbons and all other ozone-depleting substances and (b) any chemical, material, substance or waste that is prohibited, limited or regulated by or pursuant to any Environmental Law.

Hedge Termination Value  - in respect of any one or more Hedging Agreements, after taking into account the effect of any legally enforceable netting agreement relating to such Hedging Agreements, (a) for any date on or after the date such Hedging Agreements have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Hedging Agreements, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Hedging Agreements (which may include a Lender or any Affiliate of a Lender).

83    Hedging Agreement - an agreement relating to any swap, cap, floor, collar, option, forward, cross right or obligation, or

combination thereof or similar transaction, with respect to interest rate, foreign exchange, currency, commodity, credit or equity risk.

84  Holland - as defined in the preamble to this Agreement.

IBT - the International Brotherhood of Teamsters.

85  IBT Agreement - that certain National Master Freight Agreement, effective April 1, 2008, among the IBT, YRC, Holland and New Penn, as amended, restated, modified, supplemented, extended, renewed or replaced from time to time.

86  IBT Extension Agreement - that certain Extension of the Agreement for the Restructuring of the YRC Worldwide Inc. Operating Companies, by and among YRC, Holland, New Penn, Reddaway and the Teamsters National Freight Industry Negotiating Committee of the IBT.

87  IBT Transactions - the modification and extension through March 31, 2019 of the IBT Agreement and the approval and ratification of the IBT Extension Agreement by the members of the IBT in all material respects in accordance with all Applicable Law and other requirements relating thereto.

88  Immaterial Subsidiary - any Subsidiary of Parent constituting a Restricted Subsidiary that does not individually have total assets or annual revenues in that exceed 1% of Parent's and Restricted Subsidiaries' total assets or annual revenues as of the end of each Fiscal Quarter; provided, that the aggregate amount of assets or annual revenues of such all Immaterial Subsidiaries shall not, at any time, exceed 2.5% of Parent's and Restricted Subsidiaries' total assets or annual revenues as of the end of each Fiscal Quarter; and provided, further, that if, as of the date the financial statements for any Fiscal Quarter of Parent and Restricted Subsidiaries are delivered or required to be delivered hereunder, the consolidated assets or revenues of all Restricted Subsidiaries so designated by Parent as Immaterial Subsidiaries shall have, as of the last day of such Fiscal Year, exceeded the limits set forth above, then within ten (10) Business Days (or such later date as agreed by Agent in its reasonable discretion) after the date such financial statements are so delivered (or so required to be delivered), Parent shall redesignate one or more Immaterial Subsidiaries, in each case in a written notice to Agent, such that, as a result thereof, the consolidated assets and revenues of all Restricted Subsidiaries that are still designated as Immaterial Subsidiaries do not exceed such limits. Upon any such Restricted Subsidiary ceasing to be an Immaterial Subsidiary pursuant to the preceding sentence, such Restricted Subsidiary, to the extent not otherwise qualifying as an Excluded Subsidiary, shall comply with Section 10.1.11, to the extent applicable. The Immaterial Subsidiaries as of the Closing Date are identified on Schedule 9.1.11.

89  Increase Effective Date – as defined in Section 2.3.3.

90  Incremental Amendment – as defined in Section 2.3.3.

91  Increase Notice – as defined in Section 2.3.1.

92  Incremental Facility – as defined in Section 2.3.1.

93  Incremental Lenders – as defined in Section 2.3.3.

94  Indemnitees - Agent Indemnitees, Lender Indemnitees, and Issuing Bank Indemnitees.

95  Insolvency Proceeding - any case or proceeding commenced by or against a Person under any state, federal or foreign law for, or any agreement of such Person to, (a) the entry of an order for relief under the Bankruptcy Code, or any other insolvency, debtor relief or debt adjustment law; (b) the appointment of a receiver, trustee, liquidator, administrator, conservator or other custodian for such Person or substantially all of its Property; or (c) a general assignment or trust mortgage for the benefit of creditors.

96  Intellectual Property - all intellectual and similar property of every kind and nature now owned or hereafter acquired by any Loan Party, including inventions, designs, Patents, Copyrights, Licenses, Trademarks, trade secrets, confidential or proprietary technical and business information, know how, show how or other data or information, software (including all data and source code and related documentation), databases, all other proprietary information, including but not limited to Domain Names, social media identifications and tags including Twitter usernames and Facebook usernames, and all embodiments or fixations thereof and related documentation, registrations and franchises, and all additions, improvements and accessions to, and books and records describing or used in connection with, any of the foregoing.

97  Intellectual Property Collateral - Collateral consisting of Intellectual Property.

98  Intercompany Claims – as defined in Section 14.9.

99    Intercompany Note – one or more promissory notes evidencing Debt owed among Parent and Restricted Subsidiaries subordinated to the Obligations on terms reasonably acceptable to Agent.

100    Intercreditor Provisions – as defined in Section 11.1(o).

101    Interest Period - relative to any LIBOR Loan:

(a)    initially, the period beginning on (and including) the date on which such LIBOR Loan is made or continued as, or converted into, a LIBOR Loan pursuant to this Agreement and ending on (but excluding) the day which numerically corresponds to such date one, two, three or six months thereafter (or, if such month has no numerically corresponding day, on the last Business Day of such month), in each case as Administrative Borrower may select in its notice pursuant to this Agreement; and

(b)    thereafter, each period commencing on the last day of the next preceding Interest Period applicable to such LIBOR Loan and ending one, two, three or six months thereafter, as selected by Administrative Borrower by irrevocable notice to Agent not less than two (2) Business Days prior to the last day of the then current Interest Period with respect thereto; provided, however, that:

(i)    Administrative Borrower shall not be permitted to select Interest Periods to be in effect at any one time which have expiration dates occurring on more than eight different dates;

(ii)    Interest Periods commencing on the same date for LIBOR Loans comprising part of the same advance under this Agreement shall be of the same duration;

(iii)    if such Interest Period would otherwise end on a day which is not a Business Day, such Interest Period shall end on the next following Business Day unless such day falls in the next calendar month, in which case such Interest Period shall end on the first preceding Business Day; and

(iv)    no Interest Period may end later than the Commitment Termination Date.

102    Investment - any acquisition of all or substantially all assets of another Person; any acquisition of record or beneficial ownership of any Equity Interests of another Person; or any advance or capital contribution to or other investment in another Person.

103    Issuing Bank - RBS (or one or more designated Affiliates of RBS), PNC Bank, Bank of America, N.A. and any other Lender or Affiliate of a Lender designated as an Issuing Bank by Administrative Borrower from time to time with the approval of Agent (such approval not to be unreasonably withheld, conditioned or delayed). As of the Closing Date, the Issuing Banks are RBS, PNC Bank and Bank of America, N.A.

104    Issuing Bank Indemnitees - Issuing Banks and their respective officers, directors, employees, Controlled Affiliates, agents and attorneys.

105    Junior Financing - any Subordinated Debt and any other Debt that is required to be subordinated in right of payment to the Obligations.

106    Junior Financing Documentation - any documentation governing any Junior Financing.

107    Knowledge - as to any Person, the actual knowledge of any Responsible Officer of such Person.

Latest Maturity Date - at any date of determination, the latest maturity or expiration date applicable to any Commitment hereunder at such time.

LC Application - an application by Administrative Borrower, on behalf of any Borrower, to any Issuing Bank for the issuance of a Letter of Credit, in customary form and substance which shall be reasonably satisfactory to Agent and such Issuing Bank.

108    LC Conditions - the following conditions necessary for issuance of a Letter of Credit: (a) each of the conditions set forth in Section 6.2; (b) after giving effect to such issuance, total LC Obligations under clauses (a) and (b) of the definition thereof do not exceed the Letter of Credit Subline, no Overadvance exists or would be caused thereby, and, if no Loans are outstanding, the LC Obligations under clauses (a) and (b) of the definition thereto do not exceed the Collateral Line Cap; (c) the expiration date of such Letter of Credit is (i) no more than three hundred sixty-five (365) days from issuance (or in the case of any renewal or extension thereof, three hundred sixty-five (365) days from such renewal or extension), in the case of standby Letters of Credit, (ii) no more than one hundred twenty (120) days from issuance, in the case of documentary Letters of Credit, and (iii) no later than the Latest Maturity Date unless the requested Letter of Credit is Cash Collateralized on the date of issuance in a manner acceptable to the applicable Issuing Bank; (d) the Letter of Credit and payments thereunder are denominated in Dollars; (e) the form of the proposed Letter of

Credit is reasonably satisfactory to Agent and Issuing Bank in their Permitted Discretion; and (f) with respect to any Issuing Bank, the stated amount of all outstanding Letters of Credit issued by such Issuing Bank in the aggregate shall not exceed such Issuing Bank's, LC Issuance Sublimit following the issuance of such Letter of Credit without the consent of such Issuing Bank in its sole discretion.

109    LC Documents - all documents, instruments and agreements (including LC Requests and LC Applications) delivered by Administrative Borrower, Loan Parties or any other Person to any Issuing Bank or Agent in connection with issuance, amendment or renewal of, or payment under, any Letter of Credit.

110    LC Issuance Sublimit – for any Issuing Bank, its obligation to issue Letters of Credit up to the maximum aggregate stated amount shown on Schedule 1.1(b), or as specified hereafter in the most recent Assignment and Acceptance to which it is a party.  The LC Issuance Sublimit of any Issuing Bank may be increased from time to time with the consent of such Issuing Bank and the approval of Agent.

111    LC Obligations - the sum (without duplication) of (a) all amounts owing by Borrowers for any drawings under Letters of Credit; (b) the aggregate undrawn amount of all outstanding Letters of Credit; and (c) all fees and other amounts owing by Borrowers with respect to Letters of Credit.

112    LC Request - a request for issuance of a Letter of Credit, to be provided by Administrative Borrower, on behalf of a Borrower, to Issuing Bank, in customary form which shall be in form and substance reasonably satisfactory to Agent and Issuing Bank.

113    Leasehold Property – any leasehold interest of any Loan Party as lessee under any lease of Real Property.

114    Lender Indemnitees - Lenders and their officers, directors, employees, Controlled Affiliates, agents and attorneys.

115    Lenders - as defined in the preamble to this Agreement, including Agent and any other Person who hereafter becomes a "Lender" pursuant to an Assignment and Acceptance or otherwise.

116    Letter of Credit - any standby or documentary letter of credit, including all Existing Letters of Credit, issued by any Issuing Bank for the account of any Loan Party.

117    Letter of Credit Subline - $450,000,000.

118    LIBOR Lending Rate - relative to any LIBOR Loan to be made, continued or maintained as, or converted into, a LIBOR Loan for any Interest Period, a rate per annum determined pursuant to the following formula:

$$\text{LIBOR Lending Rate} \quad = \quad \frac{\text{LIBOR Rate}}{(1.00 - \text{LIBOR Reserve Percentage})}$$

119    LIBOR Loan - any Loan that bears interest based on the LIBOR Lending Rate.

120    LIBOR Loan Prepayment Fee - as defined in Section 5.5.1.

121    LIBOR Rate - with respect to any LIBOR Loan for the Interest Period applicable thereto, the rate appearing on Reuters Screen LIBOR01 Page (or on any successor or substitute page of such service, or any successor to or substitute for such service, providing rate quotations comparable to those currently provided on such page of such service, as determined by Agent from time to time for purposes of providing quotations of interest rates applicable to eurodollar deposits in dollars in the London interbank market) at approximately 11:00 a.m. (London time) two (2) Business Days prior to the first day of such Interest Period for a term comparable to such Interest Period; provided, that if more than one rate is specified on such Page for such comparable period, the applicable rate shall be the arithmetic mean of all such rates. In the event that such rate is not available at such time for any reason, then the term "LIBOR Rate" shall mean, with respect to any LIBOR Loan for the Interest Period applicable thereto, the rate of interest per annum at which dollar deposits in the approximate amount of the LIBOR Loan being made, continued or converted and for a term comparable to such Interest Period are offered by the principal London office of Agent in immediately available funds to major banks in the London interbank market at approximately 11:00 a.m. London time two (2) Business Days prior to the commencement of such Interest Period.

122    LIBOR Reserve Percentage - relative to any day of any Interest Period for LIBOR Loans, the maximum aggregate (without duplication) of the rates (expressed as a decimal fraction) of reserve requirements (including all basic, emergency, supplemental, marginal and other reserves and taking into account any transitional adjustments or other scheduled changes in reserve requirements) under any regulations of the Board or other Governmental Authority having jurisdiction with respect thereto as issued from time to time and then applicable to assets or liabilities consisting of "Eurocurrency Liabilities", as currently defined in Regulation D of the Board, having a term approximately equal or comparable to such Interest Period.

123   License - any Patent License, Trademark License, Copyright License, Commercial Software License or other license or sublicense agreement granting rights under Intellectual Property to which any Loan Party is a party, including those listed on Schedule 1.1(f).

124   Lien - any mortgage, deed of trust, pledge, hypothecation, collateral assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to Real Property, and any Capitalized Lease or financing lease having substantially the same economic effect as any of the foregoing).

125   Liquidity - as of any date of determination calculated on a Pro Forma Basis, the amount equal to: (a) Availability on such date, plus (b) all cash maintained by Loan Parties in one or more Dominion Accounts on such date (excluding the Borrowing Base Cash Account); provided, that during the period from the Closing Date to the date that is forty-five (45) days after the Closing Date (or such longer period as Agent may agree in its reasonable discretion), Dominion Accounts shall be deemed to include any deposit account of Loan Parties as to which a Deposit Account Control Agreement is required to be delivered (or other method of control effected) under this Agreement whether or not such requirement has been satisfied.

126   Loan - a loan made pursuant to Section 2.1, and any Overadvance Loan or Protective Advance; collectively, Loans.

127   Loan Account - the loan account established by each Lender on its books pursuant to Section 5.9.

128   Loan Documents - this Agreement, Other Agreements and Security Documents. For the avoidance of doubt, Hedging Agreements and any agreements in respect of Bank Product Debt do not constitute Loan Documents.

129   Loan Party or Loan Parties - each Borrower and/or Guarantor as applicable.

130   London Banking Day - a day on which dealings in US dollars deposits are transacted in the London interbank market.

131   Margin Stock - as defined in Regulation U of the Board.

Master Account – account maintained by Administrative Borrower, on behalf of Borrowers, with Agent as designated in a letter agreement between Administrative Borrower and Agent on the Closing Date and any other account designated as the "Master Account" by Administrative Borrower and Agent from time to time.

Material Adverse Effect - a (a) material adverse effect on the business, operations, assets, liabilities (actual or contingent), operating results or financial condition of Parent and Restricted Subsidiaries, taken as a whole; (b) material adverse effect on the ability of Loan Parties (taken as a whole) to fully and timely perform their payment obligations under the Loan Documents to which any Loan Party is a party; or (c) material adverse effect on the rights and remedies available to Lenders or Agent under any Loan Document (other than due to the action or inaction of Agent or any Lender).

132   Material Real Property - each Real Property that is (i) owned in fee by a Loan Party, (ii) located in the United States and (iii) not an Excluded Real Property; provided, that Material Real Property shall include any Real Property subject to a mortgage under the Term Debt Documents.

133   Maturity Date - (i) with respect to the Commitments in existence on the Closing Date that have not been extended pursuant to Section 2.4, February 13, 2019 (the "Original Maturity Date"), (ii) with respect to any Commitments as to which the final maturity date has been extended pursuant to Section 2.4, the final maturity date as specified in the Extension Offer accepted by the applicable Lender or Lenders holding such Commitments, and (iii) with respect to any Incremental Facility, the final maturity date as specified in the Incremental Amendment governing the Commitments.

134   Maximum Incremental Facility Amount - as defined in Section 2.3.1.

135   Minimum Extension Condition - as defined in Section 2.4.2.

136   Moody's - Moody's Investors Service, Inc., and its successors.

137   Mortgage - each mortgage, deed of trust or deed to secure debt pursuant to which a Loan Party grants to Agent, for the benefit of Secured Parties, Liens upon the Real Property owned by such Loan Party, as security for the Obligations.

138   Mortgage Policies - as defined in the definition of Collateral and Guarantee Requirement.

139   Mortgaged Property - as defined in the definition of Collateral and Guarantee Requirement.

140    Multiemployer Plan - any employee benefit plan or arrangement described in Section 4001(a)(3) of ERISA that is contributed to by any Loan Party or Subsidiary or ERISA Affiliate.

141    Net Proceeds - 100% of the cash proceeds actually received by Parent or any wholly-owned Restricted Subsidiary (provided that, for the avoidance of doubt, JHJ International Transportation Co., Ltd. is not a wholly-owned Restricted Subsidiary) (including any cash payments received by way of deferred payment of principal pursuant to a note or installment receivable or purchase price adjustment receivable or otherwise and including casualty insurance settlements and condemnation and similar awards, but in each case only as and when received) from any Casualty Event, net of (i) attorneys' fees, accountants' fees, investment banking fees, survey costs, title insurance premiums, and related search and recording charges, transfer taxes, deed or mortgage recording taxes, required debt payments and required payments of other obligations that are secured by the applicable asset or property (including without limitation principal amount, premium or penalty, if any, interest, fees and expenses and other amounts) (other than pursuant to the Loan Documents, the Term Debt Documents (other than in respect of Term Priority Collateral) or any Term Refinancing Debt), other expenses and brokerage, consultant and other fees actually incurred in connection therewith, (ii) in the case of any Casualty Event by a non-wholly owned Restricted Subsidiary, the pro rata portion of the Net Proceeds thereof (calculated without regard to this clause (ii)) attributable to minority interests and not available for distribution to or for the account of Parent or a wholly owned Restricted Subsidiary as a result thereof, (iii) taxes paid or reasonably estimated to be payable as a result thereof (provided, that if the amount of any such estimated taxes exceeds the amount of taxes actually required to be paid in cash in respect of such Disposition or Casualty Event, the aggregate amount of such excess shall constitute Net Proceeds at the time such taxes are actually paid), and (iv) the amount of any reasonable reserve established in accordance with GAAP against any adjustment to the sale price or any liabilities (other than any taxes deducted pursuant to clause (i) or (iii) above) (x) related to any of the applicable assets and (y) retained by Parent or any of the Restricted Subsidiaries including, without limitation, pension and other post-employment benefit liabilities and liabilities related to environmental matters or against any indemnification obligations (however, the amount of any subsequent reduction of such reserve (other than in connection with a payment in respect of any such liability) shall be deemed to be Net Proceeds of such Casualty Event occurring on the date of such reduction); provided, that if no Event of Default exists such proceeds may be applied by Parent or any Restricted Subsidiary to acquire, maintain, develop, construct, improve, upgrade or repair assets useful in the business of Parent or Restricted Subsidiaries or to make Permitted Acquisitions or any acquisition permitted hereunder of all or substantially all the assets of, or all the Equity Interests (other than directors' qualifying shares) in, a Person or division or line of business of a Person (or any subsequent investment made in a Person, division or line of business previously acquired), in each case within 270 days of such receipt, such portion of such proceeds shall not constitute Net Proceeds except to the extent not, within 270 days of such receipt, so used or contractually committed with a third party that is not to be so used (it being understood that if any portion of such proceeds are not so used within such 270 day period but within such 270 day period are contractually committed with a third party that is not to be used, then upon the termination of such contract or if such Net Proceeds are not so used within the later of such 270 day period and 180 days from the entry into such contractual commitment, such remaining portion shall constitute Net Proceeds as of the date of such termination or expiry without giving effect to this proviso; it being understood that such proceeds shall constitute Net Proceeds notwithstanding any investment notice if there is a Specified Event of Default at the time of a proposed reinvestment unless such proposed reinvestment is made pursuant to a binding commitment with a third party that is not entered into at a time when no Specified Event of Default was continuing); provided, further, that no proceeds realized in a single transaction or series of related transactions shall constitute Net Proceeds unless the aggregate net proceeds exceeds $7,500,000 in any Fiscal Year (and thereafter only net cash proceeds in excess of such amount shall constitute Net Proceeds under this clause (a)), and

For purposes of calculating the amount of Net Proceeds, fees, commissions and other costs and expenses payable to Parent or any Restricted Subsidiary shall be disregarded.

142    New Penn - as defined in the preamble to this Agreement.

143    NFIP - as defined in the definition of Collateral and Guarantee Requirement.

144    Note - any promissory note to be executed by Borrowers in favor of a Lender, which shall be in the amount of such Lender's Commitment and shall evidence the Loans made by such Lender.

145    Notice of Borrowing - a Notice of Borrowing to be provided by Administrative Borrower to request the funding of a Borrowing of Loans, in substantially the form attached as Exhibit D hereto.

146    Notice of Conversion/Continuation - a Notice of Conversion/Continuation to be provided by Administrative Borrower to request a conversion or continuation of any Loans as LIBOR Loans, in substantially the form attached as Exhibit I hereto.

147    Obligations - all (a) principal of and premium, if any, on the Loans, (b) LC Obligations, (c) interest, expenses, fees and other sums payable by Loan Parties under Loan Documents, (d) obligations of Loan Parties under any indemnity for Claims, (e) Extraordinary Expenses, (f) Bank Product Debt, and (g) other Debts, obligations and liabilities of any kind owing by Loan Parties

pursuant to the Loan Documents, whether now existing or hereafter arising, whether evidenced by a note or other writing, whether allowed in any Insolvency Proceeding, whether arising from an extension of credit, issuance of a letter of credit, acceptance, loan, guaranty, indemnification or otherwise, and whether direct or indirect, absolute or contingent, due or to become due, primary or secondary, or joint or several. Subject to Section 14.13, in no event shall the Obligations include any Excluded Swap Obligations.

148    OFAC – the Office of Foreign Assets Control of the U.S. Department of the Treasury.

149    Ordinary Course of Business - any business practice currently or previously engaged in by Parent and Restricted Subsidiaries, and any similar, ancillary, complementary or other business practice reasonably related thereto or that is a reasonable extension, development or expansion thereof.

150    Organization Documents - (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

151    Original Maturity Date - as defined in the definition of Maturity Date.

152    Other Agreement - each Note; LC Document; Fee Letter; Borrowing Base Certificate; Compliance Certificate; Perfection Certificate; Term Debt Intercreditor Agreement; Post-Closing Side Letter; custodial administration agreement; subordination agreement; or other document, instrument or agreement (other than this Agreement or a Security Document) now or hereafter executed or delivered by a Loan Party to Agent or a Lender pursuant to this Agreement or any other Loan Document.

153    Overadvance - as defined in Section 2.1.5.

154    Overadvance Loan - a Base Rate Loan made when an Overadvance exists or is caused by the funding thereof.

155    Parent - as defined in the preamble to this Agreement.

156    Participant - as defined in Section 13.2.1.

157    Participant Register - as defined in Section 13.2.4.

158    Patent License - any written agreement, now or hereafter in effect, granting to any third party any right to develop, commercialize, import, make, have made, offer for sale, use or sell any invention on which a Patent, now or hereafter owned by any Loan Party or that any Loan Party otherwise has the right to license, is in existence, or granting to any Loan Party any such right with respect to any invention on which a Patent, now or hereafter owned by any third party, is in existence, and all rights of any Loan Party under any such agreement.

159    Patents - means all of the following now owned or hereafter acquired by any Loan Party: (a) all letters patent of the United States or the equivalent thereof in any other country, all registrations and recordings thereof, and all applications for letters patent of the United States or the equivalent thereof in any other country, including registrations, recordings and pending applications in the United States Patent and Trademark Office or any similar offices in any other country, including those listed on Schedule 1.1(g), (b) all rights and privileges arising under Applicable Law with respect to such Loan Party's use of any Patents, (c) all inventions and improvements described and claimed therein, (d) all reissues, divisions, continuations, renewals, extensions and continuations-in-part thereof and amendments thereto, (e) all income, fees, royalties, damages, claims and payments now or hereafter due and/or payable with respect to any of the foregoing including damages and payments for past, present or future infringements thereof, (f) all rights corresponding thereto throughout the world and (g) rights to sue for past, present or future infringements thereof.

160    Patriot Act - the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Pub. L. No. 107-56, 115 Stat. 272 (2001).

161    Payment Conditions - at the time of determination with respect to any proposed transaction, and subject to Section 2.3.4, that (a) no Event of Default then exists or would arise as a result of consummating such transaction, and (b) (i) Liquidity on the date of such proposed transaction (after giving effect thereto) is not less than $100,000,000 (with not less than $67,500,000 of such Liquidity being attributable to Availability), or (ii) (x) Availability on the date of such proposed transaction (after giving effect thereto) is not less than $67,500,000, and (y) the Consolidated Fixed Charge Coverage Ratio for the most recently completed Test Period for which financial statements have been provided pursuant to Section 10.1.1 calculated on a Pro Forma Basis (giving effect to such proposed

transaction) is equal to or greater than 1.10 to 1.00. Prior to consummating any proposed transaction which is subject to the Payment Conditions, Administrative Borrower shall deliver to Agent evidence acceptable to Agent of the satisfaction of the conditions set forth above on a basis (including, without limitation, giving due consideration to results for prior periods) reasonably satisfactory to Agent.

162    Payment Item - each check, draft or other item of payment payable to a Loan Party, including those constituting proceeds of any Collateral.

163    PBGC - the Pension Benefit Guaranty Corporation referred to and defined in ERISA and any successor entity performing similar functions.

Pension Expense - the actual pension expense for the applicable period of Parent and its Subsidiaries pursuant to the profit and loss statement charge (or benefit) with respect to such pension funding obligations for such period.

Pension Fund Entities - those entities identified on Schedule 1.1(h) hereto.

Perfection Certificate  - means a certificate substantially in the form of Exhibit H, completed and supplemented with the schedules and attachments contemplated thereby, and duly executed by any Responsible Officer of Administrative Borrower.

164    Permitted Acquisition - as defined in Section 10.2.2.

Permitted Additional Debt - shall mean Debt incurred by any Loan Party; provided, that (i) such Debt may only be secured by assets consisting of Collateral and may not be secured by any assets other than the Collateral, (ii) such Debt is not at any time guaranteed by any Subsidiaries that are not Loan Parties, (iii) the other terms and conditions of such Debt (excluding pricing, fees, rate floors and optional prepayment or redemption terms), if different from those contained herein or in the Term Debt Documents, are customary market terms for Debt of such type (provided, that a certificate of a Responsible Officer of Parent delivered to Agent at least five (5) Business Days prior to the incurrence of such Debt (or such shorter period as Agent may agree in its sole discretion), together with a reasonably detailed description of the material terms and conditions of such Debt or drafts of the documentation relating thereto, stating that Parent has determined in good faith that such terms and conditions satisfy the requirement of this clause (iii) shall be conclusive evidence that such terms and conditions satisfy such requirement unless Agent notifies Parent within such five (5) Business Day period (or such shorter period as Agent may agree in its sole discretion) that it disagrees with such determination (including a reasonable description of the basis upon which it disagrees)), (iv) the security agreements (taken as a whole) relating to such Debt, if applicable, are substantially the same as or more favorable to the Loan Parties than the security documents governing the Term Debt, with such differences as are reasonably satisfactory to Agent, (v) no Event of Default shall exist immediately prior to or after giving effect to such incurrence, (vi) a representative acting on behalf of the holders of such Debt shall have become party to or otherwise subject to the provisions of the Term Debt Intercreditor Agreement or another intercreditor agreement in form and substance reasonably satisfactory to Agent and Administrative Borrower that contains terms substantially similar to the Term Debt Intercreditor Agreement or other intercreditor agreement on market terms as determined by the Agent in good faith, and (vii) if applicable, the priority position of the holders of such Debt with respect to the Collateral under the Term Debt Intercreditor Agreement shall be equivalent or junior to the position of the holders of the Term Debt and all obligations under such Debt shall constitute Term Obligations under (and as defined in) the Term Debt Intercreditor Agreement. Notwithstanding the foregoing, Permitted Additional Debt shall include all Permitted Additional Debt (as defined in the Term Debt Agreement as in effect on the date hereof).

165    Permitted Discretion - Agent's judgment exercised in good faith and in the exercise of reasonable (from the perspective of a secured asset-based lender) business judgment.

166    Permitted Junior Debt - unsecured Debt incurred by any Loan Party in the form of one or more series of unsecured notes or loans; provided, that (i) if constituting Subordinated Debt, (A) such Debt (including any Guarantee thereof) is subordinated to the Obligations on terms customary for high yield subordinated debt securities or otherwise reasonably satisfactory to Agent and (B) the Obligations at all times constitute "Designated Senior Debt" (or comparable term) under the documents governing such Debt, (ii) such Debt does not mature or have scheduled amortization or payments of principal and is not subject to mandatory redemption, repurchase, prepayment or sinking fund obligation (except customary asset sale, change of control or similar provisions or AHYDO "catch-up" payments), in each case prior to the date that is ninety-one (91) days after the then Latest Maturity Date, (iii) such Debt is not at any time guaranteed by any Person that is not a Loan Party and (iv) the other terms and conditions of such Debt (excluding pricing, fees, rate floors and optional prepayment or optional redemption terms), if different than the terms hereof, are customary market terms for Debt of such type (provided, that a certificate of a Responsible Officer of Parent delivered to Agent at least five (5) Business Days prior to the incurrence of such Debt (or such shorter period as Agent may agree in its sole discretion), together with a reasonably detailed description of the material terms and conditions of such Debt or drafts of the documentation relating thereto, stating that Parent has determined in good faith that such terms and conditions satisfy the requirement of this clause (iv) shall be conclusive evidence that such terms and conditions satisfy such requirement unless Agent notifies Parent within such five (5) Business Day period (or such shorter period as Agent may agree in its sole discretion) that it disagrees with such determination (including a reasonable description of

the basis upon which it disagrees)).

167    Permitted Lien - as defined in Section 10.2.1.

168    Permitted Refinancing - with respect to any Person, any modification, refinancing, refunding, renewal, replacement or extension of any Debt of such Person; provided, that (a) the original aggregate principal amount of such Debt (or accreted value, if applicable) does not exceed the aggregate principal amount (or accreted value, if applicable) of the Debt so modified, refinanced, refunded, renewed, replaced or extended except (i) by an amount equal to accrued but unpaid interest, premiums and fees payable by the terms of such Debt and reasonable fees, expenses, original issue discount and upfront fees incurred in connection with such modification, refinancing, refunding, renewal, replacement or extension and (ii) by an amount equal to any existing available commitments unutilized thereunder, (b) other than with respect to a Permitted Refinancing in respect of Debt permitted pursuant to Section 10.2.3(e), the Debt resulting from such modification, refinancing, refunding, renewal, replacement or extension has a final maturity date equal to or later than the final maturity date of, and has a Weighted Average Life to Maturity equal to or greater than the Weighted Average Life to Maturity of, the Debt being modified, refinanced, refunded, renewed, replaced or extended, (c) other than with respect to a Permitted Refinancing in respect of Debt permitted pursuant to Sections 10.2.3(e), at the time thereof, no Event of Default shall have occurred and be continuing and (d) if such Debt being modified, refinanced, refunded, renewed, replaced or extended is Debt permitted pursuant to Section 10.2.3(b) or 10.2.3(r), or is otherwise a Junior Financing, (i) to the extent such Debt being modified, refinanced, refunded, renewed, replaced or extended is subordinated in right of payment or in lien priority to the Obligations, the Debt resulting from such modification, refinancing, refunding, renewal, replacement or extension is subordinated in right of payment or in lien priority, as applicable, to the Obligations on terms (taken as a whole) (x) at least as favorable to Lenders as those contained in the documentation governing the Debt being modified, refinanced, refunded, renewed, replaced or extended (provided, that a certificate of a Responsible Officer of Parent delivered to Agent at least five (5) Business Days prior to the incurrence of such Debt (or such shorter period as Agent may agree in its sole discretion), together with a reasonably detailed description of the material terms and conditions of such Debt or drafts of the documentation relating thereto, stating that Parent has determined in good faith that such terms and conditions satisfy the foregoing requirement shall be conclusive evidence that such terms and conditions satisfy the foregoing requirement unless Agent notifies Parent within such five Business Day period that it disagrees with such determination (including a reasonable description of the basis upon which it disagrees)) or (y) otherwise reasonably acceptable to Agent, (ii) the obligors (including any guarantors) in respect of the Debt resulting from such modification, refinancing, refunding, renewal, replacement or extension shall not include any Person other than the obligors (including any guarantors) of the Debt being modified, refinanced, refunded, renewed, replaced or extended unless otherwise permitted hereby, and (iii) in the case of any Permitted Refinancing in respect of the Term Debt or any Term Refinancing Debt, such Permitted Refinancing is secured, if at all, only by all or any portion of the collateral securing the Term Debt (but not by any other assets) pursuant to one or more security agreements subject, in the case of assets constituting (or required to constitute) Collateral, to the Term Debt Intercreditor Agreement or any replacement intercreditor agreement reasonably satisfactory to Agent, that contains terms substantially similar to the Term Debt Intercreditor Agreement or other intercreditor agreement on market terms as determined by the Agent in good faith. When used with respect to any specified Debt, Permitted Refinancing shall mean the Debt incurred to effectuate a Permitted Refinancing of such specified Debt.

169    Person - any individual, corporation, limited liability company, partnership, joint venture, joint stock company, land trust, business trust, unincorporated organization, Governmental Authority or other entity.

170    Plan - an employee pension benefit plan (other than a Multiemployer Plan) that is either (a) maintained by a Loan Party or Subsidiary for employees or (b) maintained pursuant to a collective bargaining agreement, or other arrangement under which more than one employer makes contributions and to which a Loan Party or Subsidiary is making or accruing an obligation to make contributions or has within the preceding five years made or accrued such contributions.

Pledged Collateral – as defined in Section 7.1.1.

Pledged Debt – as defined in Section 7.1.1.

Pledged Equity – as defined in Section 7.1.1.

Pledged Securities - means any Promissory Notes, stock certificates or other Securities, certificates or Instruments now or hereafter included in the Pledged Collateral, including all Pledged Equity, Pledged Debt and all other certificates, instruments or other documents representing or evidencing any Pledged Collateral.

Post-Closing Side Letter – the post-closing side letter as of the date hereof among certain Loan Parties and Agent.

Projections – as defined in Section 10.1.1(c).

171    Pro Rata - with respect to any Lender, a percentage (expressed as a decimal, rounded to the third (3rd) decimal place) determined (a) while Commitments are outstanding, by dividing the amount of such Lender's Commitment by the aggregate amount of

all Commitments; and (b) at any other time, by dividing the amount of such Lender's outstanding Loans and LC Obligations (under clauses (a) and (b) of the definition thereof) by the aggregate amount of all outstanding Loans and LC Obligations (under clauses (a) and (b) of the definition thereof).

172    Pro Forma Basis - with respect to compliance with any test or covenant or calculation of any ratio hereunder, the determination or calculation of such test, covenant or ratio (including in connection with Specified Transactions) in accordance with Section 1.5.

173    Property - any interest in any kind of property or asset, whether real, personal or mixed, or tangible or intangible.

174    Protective Advances - as defined in Section 2.1.6.

175    Qualified ECP Loan Party - in respect of any Swap Obligation, each Loan Party that has total assets exceeding $10,000,000 at the time the relevant guarantee or grant of the relevant security interest becomes effective with respect to such Swap Obligation or such other Person as constitutes an "eligible contract participant" under the Commodity Exchange Act or any regulations promulgated thereunder and can cause another Person to qualify as an "eligible contract participant" at such time by entering into a keepwell under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

176    RBS - RBS Citizens Business Capital, a division of RBS Asset Finance, Inc., a New York corporation, a subsidiary of RBS Citizens, N.A.

177    Real Property - collectively, all right, title and interest (including any leasehold, mineral or other estate) in and to any and all parcels of or interests in real property owned or leased by any Person, whether by lease, license or other means, together with, in each case, all easements, hereditaments and appurtenances relating thereto, all improvements and appurtenant fixtures and equipment, all general intangibles and contract rights and other property and rights incidental to the ownership, lease or operation thereof.

178    Recapitalization Transactions - (a) retiring by (x) exchanging for equity interests of Parent, (y) repaying through the net cash proceeds of one or more equity offerings by Parent or (z) setting aside a sufficient amount of cash to redeem at maturity, at least 90% of the aggregate outstanding principal amount of Parent's Existing Series A Notes and Existing Series B Notes, (b) amending and restating that certain Amended and Restated Contribution and Deferral Agreement, dated as of July 22, 2011, among YRC, Holland, New Penn and Reddaway, collectively as primary obligors, the Trustees for the Central States, Southeast and Southwest Areas Pension Fund, the Wilmington Trust Company, as agent, and the other funds party thereto, to, among other changes, release all collateral currently securing such indebtedness (other than first lien real estate collateral constituting Excluded Property) and extend the maturity to December 31, 2019 and (c) refinancing, redeeming, defeasing or otherwise paying in full in cash (or depositing such amount with the trustee thereof) all of Parent's Existing 6% Senior Notes.

179    Receivables Assets - (a) any Accounts owed to Parent or a Restricted Subsidiary subject to a Receivables Facility and the proceeds thereof and (b) all Accounts, all contracts and contract rights, guarantees or other obligations in respect of such Accounts, all records with respect to such Accounts and any other assets customarily transferred together with Accounts in connection with a non-recourse accounts receivable factoring arrangement, except for Standard Receivables Undertakings, assigned or otherwise transferred or pledged by Parent in connection with a Receivables Facility.

180    Receivables Facility - an arrangement between Parent or a Restricted Subsidiary and another Person pursuant to which (a) Parent or such Restricted Subsidiary, as applicable, sells (directly or indirectly) in the Ordinary Course of Business to such Person Accounts owing from by customers, together with Receivables Assets related thereto, (b) the obligations of Parent or such Restricted Subsidiary, as applicable, thereunder are non-recourse (except for Receivables Purchase Obligations) to Parent and such Restricted Subsidiary and (c) the financing terms, covenants, termination events and other provisions thereof shall be on market terms (as determined in good faith by Parent) and may include Standard Receivables Undertakings.

181    Receivables Purchase Obligation - any obligation of Parent or a Restricted Subsidiary in respect of Receivables Assets in a Receivables Facility to purchase Receivables Assets arising as a result of a breach of a representation, warranty or covenant otherwise, including as a result of receive or portion thereof becoming subject to any asserted defense, dispute, offset or counterclaim of any kind as a result of any action taken by, any failure to take action by or any other event relating to such party.

182    Receivables SPV - YRCW Receivables LLC, a Delaware limited liability company.

183    Reddaway - as defined in the preamble to this Agreement.

Refinancing Transactions - the repayment of all amounts due or outstanding under or in respect of, and the termination of, the Existing Term Facility and the Existing ABL Facility, the release of all cash and other amounts restricted under or by the Existing Term Facility and the Existing ABL Facility and the termination and release of any and all commitments, security interests and

guaranties in connection therewith on the Closing Date.

184   Register – as defined in Section 13.3.3.

185   Reimbursement Date - as defined in Section 2.3.2.

Release - any release, spill, emission, leaking, dumping, injection, pouring, deposit, disposal, discharge, dispersal, leaching or migration into or through the environment.

186   Report - as defined in Section 12.2.3.

187   Reportable Event - any of the events set forth in Section 4043(c) of ERISA or the regulations issued thereunder, other than events for which the thirty (30) day notice period has been waived with respect to a Plan.

188   Required Lenders - subject to Section 4.2, (a) Lenders holding in excess of fifty-one percent (51%) of the Commitments; or (b) if the Commitments have terminated, Lenders holding Facility Exposure in excess fifty-one percent (51%) of the aggregate Facility Exposure. For the avoidance of doubt, no Defaulting Lender shall be included in the calculation of Required Lenders.

189   Resignation Effective Date - as defined in Section 12.8.1.

Responsible Officer - the chief executive officer, president, vice president, chief financial officer, treasurer, assistant treasurer, director of treasury or other similar officer of a Loan Party and, as to any document delivered on the Closing Date, any secretary or assistant secretary of such Loan Party. Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed by the recipient of such document to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed by the recipient of such document to have acted on behalf of such Loan Party.

190   Restricted Payment - any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interest of Parent or any Restricted Subsidiary, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, defeasance, acquisition, cancellation or termination of any such Equity Interest of Parent or any Restricted Subsidiary, or on account of any return of capital to Parent's or a Restricted Subsidiary's stockholders, partners or members (or the equivalent Persons thereof).

191   Restricted Subsidiary - any Subsidiary of Parent other than an Unrestricted Subsidiary. The Restricted Subsidiaries as of the Closing Date are identified on Schedule 9.1.11.

192   Rolling Stock - any railroad car, locomotive, stacktrain or other rolling stock, or accessories used on such railroad cars, locomotives or other rolling stock (including superstructures and racks); provided, that Rolling Stock shall exclude Tractor Trailers.

Sale and Leaseback Transaction - shall mean any arrangement, directly or indirectly, whereby a seller or transferor shall sell or otherwise transfer any real or personal property and then or thereafter lease, or repurchase under an extended purchase contract, conditional sales or other title retention agreement, the same property.

193   S&P - Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., and its successors.

SEC - the Securities and Exchange Commission or any Governmental Authority that is the successor thereto.

194   Secured Parties - Agent, Issuing Bank, Lenders and Bank Product Providers.

195   Security Documents – the Vehicle Collateral Agreement, the Vehicle Custodial Administration Agreement, any Guaranty, Mortgages, Deposit Account Control Agreements and all Loan Documents, Grants of Security Interest, instruments and agreements now or hereafter securing (or given with the intent to secure) any Obligations.

Security – means a "security" as such term is defined in Article 8 of the UCC and, in any event, shall include any stock, shares, partnership interests, voting trust certificates, certificates of interest or participation in any profit sharing agreement or arrangement, options, warrants, bonds, debentures, notes, or other evidences of indebtedness, secured or unsecured, convertible, subordinated or otherwise, or in general any instruments commonly known as "securities" or any certificates of interest, shares or participations in temporary or interim certificates for the purchase or acquisition of, or any right to subscribe to, purchase or acquire, any of the foregoing.

Security Interest – as defined in Section 7.1.2

196    Solvent - as to Parent and Restricted Subsidiaries on a consolidated basis on any date of determination, (a) the fair value of the assets of Parent and Restricted Subsidiaries, on a consolidated basis (on a going concern basis), exceeds, on a consolidated basis, their debts and liabilities, subordinated, contingent or otherwise; (b) the present fair saleable value (on a going concern basis) of the property of Parent and Restricted Subsidiaries, on a consolidated basis, is greater than the amount that will be required to pay the probable liability, on a consolidated basis, of their debts and other liabilities, subordinated, contingent or otherwise, as such debts and other liabilities become absolute and matured in the ordinary course of business; (c) Parent and Restricted Subsidiaries, on a consolidated basis, are able to pay their debts and liabilities, subordinated, contingent or otherwise, as such liabilities become absolute and matured; and (d) Parent and Restricted Subsidiaries, on a consolidated basis, are not engaged in, and are not about to engage in, business for which they have unreasonably small capital.

197    Specified Event of Default - any Event of Default under Section 11.1(a), 11.1(b) (solely to the extent arising from a material breach of any certification, representation or warranty made or deemed made by Administrative Borrower in any Borrowing Base Certificate), 11.1(c) (solely to the extent arising with respect to a breach of Section 8.l, 8.3, 10.1.10 or 10.2.10 (during a Financial Covenant Trigger Period)), 11.1(f) (solely to the extent arising from a payment default or acceleration under any such document, instrument or agreement), 11.1(i) or 11.1(j).

Specified Pension Fund Obligations - the payment obligations due from Parent and/or its applicable Subsidiaries to the Pension Fund Entities under the terms and conditions of the Contribution Deferral Agreement.

Specified Transaction - any Investment that results in a Person becoming a Restricted Subsidiary or an Unrestricted Subsidiary, any Permitted Acquisition, any Disposition that results in a Restricted Subsidiary ceasing to be a Subsidiary of Parent, any Investment constituting an acquisition of assets constituting a business unit, line of business or division of another Person or any Disposition of a business unit, line of business or division of Parent or a Restricted Subsidiary, in each case consummated after the Closing Date and whether by merger, consolidation, amalgamation or otherwise, and any incurrence or repayment of Debt or Restricted Payment, in each case, that by the terms of this Agreement requires a financial ratio or test to be calculated on a "Pro Forma Basis".

Standard Receivables Undertakings - representations, warranties, covenants, guarantees and indemnities entered into by Parent or any Restricted Subsidiary, which Parent has determined in good faith to be customary in a Receivables Facility, it being understood that any Receivables Repurchase Obligation shall be deemed to be a non-credit related recourse accounts receivable factoring arrangement.

198    Subordinated Debt - Debt incurred by a Loan Party that is expressly subordinate and junior in right of payment to Full Payment of the Obligations.

199    Subsidiary - any entity at least fifty percent (50%) of whose voting securities or Equity Interests is owned by a Loan Party or any combination of Loan Parties (including indirect ownership by a Loan Party through other entities in which any Loan Party directly or indirectly owns fifty percent (50%) of the voting securities or Equity Interests).

200    Successor Parent – as defined in Section 10.2.4(d).

201    Supermajority Lenders – subject to Section 4.2 (a) Lenders holding in excess of sixty-six and two thirds percent (66 2/3%) of the aggregate Commitments; and (b) the Commitments have terminated, at least two Lenders holding Facility Exposure in excess of sixty-six and two thirds percent (66 2/3%) of the aggregate Facility Exposure. For the avoidance of doubt, no Defaulting Lender shall be included in the calculation of Supermajority Lenders.

202    Swap Obligation - with respect to any Guarantor, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of Section 1a(47) of the Commodity Exchange Act.

203    Tax or Taxes - any taxes, levies, imposts, duties, fees, assessments, deductions, withholdings or other charges in the nature of taxes imposed by any Governmental Authority, including income, receipts, excise, property, sales, use, transfer, license, payroll, withholding, social security, franchise, intangibles, stamp or recording taxes, and all interest, penalties and similar liabilities relating thereto.

204    Term Agent – Credit Suisse AG, Cayman Islands Branch, as Agent and Collateral Agent under the Term Debt Agreement, any affiliate thereof, or successor or replacement thereto (subject to the Term Debt Intercreditor Agreement).

205    Term Debt Agreement - that certain Credit Agreement by and among Parent, the guarantors party thereto, Term Agent, and the lenders from time to time party thereto, dated as of February __, 2014, as amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with the Term Debt Intercreditor Agreement.

206    Term Debt - means Debt and all other obligations outstanding under or secured by the Term Debt Documents (including,

for the avoidance of doubt, Term Refinancing Debt and Incremental Term Loans (as defined in the Term Debt Agreement as in effect on the date hereof) and, in each case, all Permitted Refinancings thereof.

207    Term Debt Documents - the Term Debt Agreement and the "Loan Documents" as defined therein.

208    Term Debt Intercreditor Agreement - that certain intercreditor agreement, dated as of even date hereof, between Agent and Term Agent as acknowledged by Loan Parties, as amended, restated, amended and restated, supplemented or otherwise modified in accordance with the terms thereof.

209    Term Priority Collateral - as defined in the Term Debt Intercreditor Agreement.

210    Term Refinancing Amendment - an amendment to the Term Debt Agreement executed by each of (a) Parent, (b) Term Agent, (c) each additional lender under the Term Debt Agreement that will make an Other Term Loan (as defined in the Term Debt Agreement as in effect on the date hereof) pursuant to such Term Refinancing Amendment and (d) each existing lender under the Term Debt Agreement that agrees to provide any portion of the Credit Agreement Refinancing Indebtedness (as defined in the Term Debt Agreement as in effect on the date hereof) being incurred pursuant thereto, in accordance with Section 2.18 of the Term Debt Agreement.

211    Term Refinancing Debt - Permitted Additional Debt or Indebtedness incurred pursuant to a Term Refinancing Amendment, in each case, issued, incurred or otherwise obtained (including by means of the extension or renewal of existing Debt) in exchange for, or to extend, renew, replace, restructure or refinance, in whole or part, existing Term Debt (including any successive Credit Agreement Refinancing Indebtedness (as defined in the Term Debt Agreement as in effect on the date hereof).

212    Test Period - for any date of determination, the most recent period as of such date of four consecutive Fiscal Quarters for which financial statements have been delivered (or were required to have been delivered) pursuant to Section 10.1.1(a) or 10.1.1(b), as applicable.

213    Threshold Amount - $30,000,000.

214    Total Leverage Ratio - as of any date of determination calculated on a Pro Forma Basis, the ratio of (a) Consolidated Total Debt as of such date to (b) Consolidated EBITDA for the Test Period ending on such date of determination.

215    Tractor Trailers - shall mean any vehicle, truck, tractor, trailer, tank trailer or other trailer or similar vehicle or other trailer.

216    Trademark License - any written agreement, now or hereafter in effect, granting to any third party any right to use any Trademark now or hereafter owned by any Loan Party material to the operation of the business of any Loan Party or that any Loan Party otherwise has the right to license material to the operation of the business of any Loan Party, or granting to any Loan Party any right to use any Trademark now or hereafter owned by any third party, and all rights of any Loan Party under any such agreement.

217    Trademarks - all of the following now owned or hereafter acquired by any Loan Party: (a) all Trademarks, service marks, trade names, corporate names, company names, business names, fictitious business names, trade styles, trade dress, logos, other source or business identifiers, designs and general intangibles of like nature, the goodwill of the business symbolized thereby or associated therewith, all registrations and recordings thereof, and all registration and recording applications filed in connection therewith, including registrations and registration applications in the United States Patent and Trademark Office or any similar offices in any State of the United States or any other country or any political subdivision thereof, and all extensions or renewals thereof, including those listed on Schedule 1.1(i), (b) all rights and privileges arising under Applicable Law with respect to such Loan Party's use of any Trademarks, (c) all reissues, continuations, extensions and renewals thereof and amendments thereto, (d) all income, fees, royalties, damages and payments now and hereafter due and/or payable with respect to any of the foregoing, including damages, claims and payments for past, present or future infringements thereof, (e) all rights corresponding thereto throughout the world and (f) rights to sue for past, present and future infringements or dilutions thereof or other injuries thereto.

218    Transaction Expenses - any costs, fees or expenses incurred or paid by Parent and its Subsidiaries in connection with the Transactions (including costs and bonuses associated with the IBT Transactions and, for the avoidance of doubt, any costs, fees or expenses under the Contribution Deferral Agreement in connection with the closing of the second amendment and restatement thereof), this Agreement and the other Loan Documents.

219    Transactions - collectively, (a) the consummation of the IBT Transactions, (b) the consummation of the Recapitalization Transactions, (c) the execution and delivery by Loan Parties of the Loan Documents to which they are a party and the making of the Loans hereunder on the Closing Date, (d) the execution and delivery by Parent and its Subsidiaries party thereto of the Term Debt Documents and the funding under the Term Debt on the Closing Date, (e) the execution and delivery by Parent and its Subsidiaries party thereto of the Contribution Deferral Agreement on January 31, 2014, (f) the performance by Parent of its obligations under the

December 2013 Stock Purchase Agreements, December 2013 Exchange Agreements and the December 2013 Registration Rights Agreement, (g) the consummation of the Refinancing Transactions, and (h) the payment of the Transaction Expenses.

220   Transferee - any actual or potential Eligible Assignee, Participant or other Person acquiring an interest in any Obligations.

221   Type - any type of a Loan (i.e., Base Rate Loan or LIBOR Loan) that has the same interest option and, in the case of LIBOR Loans, the same Interest Period.

Unaudited Financial Statement - the unaudited consolidated balance sheets and related statements of operations and cash flows of Parent and its consolidated Subsidiaries as at the end of and for the Fiscal Quarters ended September 30, 2013.

222   Unused Line Fee Percentage - for any day, a percentage per annum equal to (a) initially, 0.250% per annum; and (b) following March 31, 2014, the following percentages per annum of the Commitments based upon the Average Revolver Usage for the immediately preceding calendar month:

223   Average Revolver Usage        Unused Line Fee Percentage

224   Less than 50%            0.375%

225   Greater than or equal to 50%       0.250%

226   UCC - the Uniform Commercial Code as in effect in the State of New York or, when the laws of any other jurisdiction govern the perfection or enforcement of any Lien, the Uniform Commercial Code of such jurisdiction.

227   Unrestricted Subsidiary – any Subsidiary of Parent designated by the Board of Directors of Parent as an Unrestricted Subsidiary pursuant to Section 10.1.14. The Unrestricted Subsidiaries as of the Closing Date are identified on Schedule 9.1.11.

228   U.S. Lender – as defined in Section 5.11.1(b).

USCO – means the U.S. Copyright Office.

USPTO – means the U.S. Patent and Trademark Office.

229   U.S. Tax Compliance Certificate – as defined in Section 5.11.1(a).

230   Vehicle Collateral Agreement – the security and collateral agency agreement, dated as of the date hereof, among Credit Suisse AG, Cayman Islands Branch, as collateral agent, Term Agent, as term loan representative, Agent, as ABL representative, and Loan Parties.

231   Vehicle Custodial Administration Agreement - the custodial administration agreement, dated as of the date hereof, among Parent, the Subsidiaries of Parent from time to time party thereto, Vintek, Inc., as custodial administrator, Term Agent, Agent and Credit Suisse AG, Cayman Islands Branch, as collateral agent under the Vehicle Collateral Agreement.

232   Weighted Average Life to Maturity - when applied to any Debt at any date, the number of years obtained by dividing: (i) the sum of the products obtained by multiplying (a) the amount of each then remaining scheduled installment, sinking fund, serial maturity or other required scheduled payments of principal, including payment at final scheduled maturity, in respect thereof, by (b) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment; by (ii) the then outstanding principal amount of such Debt; provided, that for purposes of determining the Weighted Average Life to Maturity of any Debt that is being modified, refinanced, refunded, renewed, replaced, restructured or extended (the "Applicable Debt"), the effects of any amortization of or prepayments made on such Applicable Debt prior to the date of the applicable modification, refinancing, restructuring, refunding, renewal, replacement or extension shall be disregarded.

233   wholly owned - with respect to a Subsidiary of a Person, a Subsidiary of such Person all of the outstanding Equity Interests of which (other than (x) director's qualifying shares and (y) shares issued to foreign nationals to the extent required by applicable Law) are owned by such Person and/or by one or more wholly owned Subsidiaries of such Person.

234   Withdrawal Liability - shall mean liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

235   YRC - as defined in the preamble to this Agreement.

**1.2**   **Terms Defined in UCC.** Capitalized terms used in this Agreement and not otherwise defined herein but defined in the

UCC shall have the meanings specified therefor in the UCC.

**1.3    Accounting Terms.** Notwithstanding any other provision contained herein or in any other Loan Document, all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made, (a) without giving effect to any election under Statement of Financial Accounting Standards 159 or Accounting Standards Codification 825-10-25 (or any other Accounting Standards Codification or Financial Accounting Standard having a similar result or effect) to value any Debt or other liabilities of Parent or any Restricted Subsidiaries at "fair value", as defined therein; (b) without giving effect to any treatment of Debt in respect of convertible debt instruments under Accounting Standards Codification 470-20 and/or Statement of Financial Accounting Standards 150 (or any other Accounting Standards Codification or Financial Accounting Standard having a similar result or effect) to value any such Debt in a reduced or bifurcated manner as described therein, and such Debt shall at all times be valued at the full stated principal amount thereof; and (c) treating Unrestricted Subsidiaries as if they were not consolidated with Parent or any Restricted Subsidiary and otherwise eliminating all accounts of Unrestricted Subsidiaries. Furthermore, unless Administrative Borrower elects otherwise, notwithstanding any other provision contained herein or in any other Loan Document, for all purposes under this Agreement and the other Loan Documents, including negative covenants, financials covenants and component definitions, operating leases and Capitalized Leases will be deemed to be treated in a manner consistent with their current treatment under GAAP as in effect on the Closing Date, notwithstanding any modifications or interpretive changes thereto that may occur thereafter. For the avoidance of doubt, the principal amount of any non-interest bearing Debt or other discount security constituting Debt at any date shall be the principal amount thereof that would be shown on a balance sheet of Parent dated such date prepared in accordance with GAAP, except as expressly set forth in clauses (a) and (b) of this Section 1.3.

**1.4    Certain Matters of Construction.** The terms "herein," "hereof," "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular section, paragraph or subdivision. Any pronoun used shall be deemed to cover all genders. In the computation of periods of time from a specified date to a later specified date, "from" means "from and including," and "to" and "until" each mean "to but excluding." The terms "including" and "include" shall mean "including, without limitation" and, for purposes of each Loan Document, the parties agree that the rule of ejusdem generis shall not be applicable to limit any provision. Section titles appear as a matter of convenience only and shall not affect the interpretation of any Loan Document. All references to (a) laws or statutes include all related rules, regulations, interpretations, amendments and successor provisions; (b) any document, instrument or agreement include any amendments, waivers and other modifications, extensions, refinancings, replacements, restructuring or renewals (solely to the extent applicable, to the extent permitted by the Loan Documents and subject, in any event, to the definition of Permitted Refinancings as applicable); (c) any section mean, unless the context otherwise requires, a section of this Agreement; (d) any exhibits or schedules mean, unless the context otherwise requires, exhibits and schedules attached hereto, which are hereby incorporated by reference; (e) any Person includes successors and permitted assigns; or (f) time of day means time of day in New York, New York.  All certifications to be made hereunder by an officer or representative of a Loan Party shall be made by such a Person in his or her capacity solely as an officer or representative of such Loan Party, on such Loan Party's behalf and not in such Person's individual capacity. Any financial ratios required to be maintained by Parent pursuant to this Agreement (or required to be satisfied in order for a specific action to be permitted under this Agreement) shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number). All calculations of fundings of Loans, issuances of Letters of Credit and payments of Obligations shall be in Dollars and, unless the context otherwise requires, all determinations (including calculations of Borrowing Base and financial covenants) made from time to time under the Loan Documents shall be made in light of the circumstances existing at such time. Borrowing Base calculations shall be consistent with historical methods of valuation and calculation, and otherwise reasonably satisfactory to Agent in its Permitted Discretion (and not necessarily calculated in accordance with GAAP). When the performance of any covenant, duty or obligation under any Loan Document is stated to be required on a day which is not a Business Day, the date of such performance shall extend to the immediately succeeding Business Day. No provision of any Loan Documents shall be construed against any party by reason of such party having, or being deemed to have, drafted the provision. Whenever the phrase "to the best knowledge" of any Loan Party or words of similar import are used in any Loan Documents, it means "Knowledge," as defined herein. For purposes of determining compliance with any one of Sections 10.2.1, 10.2.2, 10.2.3, 10.2.5, 10.2.6, 10.2.8, 10.2.9 and 10.2.13, in the event that any Lien, Investment, Debt, Disposition, Restricted Payment, affiliate transaction, Contractual Obligation or prepayment of Debt meets the criteria of more than one of the categories of transactions permitted pursuant to any clause of such Section, such transaction (or portion thereof) at any time shall be permitted under one or more of such clauses as determined by Administrative Borrower (and Administrative Borrower shall be entitled to redesignate use of any such clauses from time to time) in its sole discretion at such time. For purposes of determining the Total Leverage Ratio or Consolidated Fixed Charge Ratio, amounts denominated in a currency other than Dollars will be converted to Dollars at the currency exchange rates used in preparing Parent's financial statements corresponding to the test period with respect to the applicable date of determination and will, in the case of Debt, reflect the currency translation effects, determined in accordance with GAAP, of Hedging Agreements permitted hereunder for currency exchange risks with respect to the applicable currency in effect on the date of determination of the Dollar equivalent of such Debt. All certifications to be made hereunder by an officer or representative of a Loan Party shall be made by such a Person in his or her capacity solely as an officer or representative of such Loan Party, on such Loan Party's behalf and not in such Person's individual capacity. The words "asset" and "property" shall be construed to have the

same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

**1.5  Pro Forma Calculations**.

1.5.1    Notwithstanding anything to the contrary herein, the Total Leverage Ratio, Consolidated Fixed Charge Ratio, Availability and Liquidity shall be calculated in the manner prescribed by this Section 1.5.

1.5.2    For purposes of calculating the Total Leverage Ratio and the Consolidated Fixed Charge Coverage Ratio, the pro forma calculations shall be made in good faith by a responsible financial or accounting officer of Parent and may include, for the avoidance of doubt, any synergies, operating expense reductions, other operating improvements and cost savings as certified by Parent as having been determined in good faith to be reasonably anticipated to be realizable within twelve (12) months following any such acquisition or disposition, operational change and operational initiatives. Notwithstanding the foregoing, (A) all pro forma adjustments under this Section 1.5.2 shall not, taken together with those added pursuant to clause (a)(viii) of the definition of "Consolidated EBITDA", increase pro forma Consolidated EBITDA by more than 20% for any test period (calculated prior to giving effect to any addback pursuant to this Section 1.5.2 or clause (a)(viii) of the definition of "Consolidated EBITDA"); provided, that such limitation on pro forma adjustments shall not apply if supported by a quality of earnings report prepared by a nationally recognized accounting firm or other third-party advisor reasonably acceptable to Agent or if such adjustments satisfy the requirements of Regulation S-X and (B) no pro forma adjustments under this Section 1.5.2 shall be made in respect of the Transactions (including in respect of the IBT Transaction).

1.5.3    Whenever pro forma effect is to be given to a Specified Transaction, the pro forma calculations shall be made in good faith by a responsible financial or accounting officer of the Parent and may include, for the avoidance of doubt, any synergies, operating expense reductions, other operating improvements and cost savings as certified by the Parent as having been determined in good faith to be reasonably anticipated to be realizable within eighteen (18) months following any such acquisition or disposition, operational change and operational initiatives. Notwithstanding the foregoing, (A) all pro forma adjustments under this Section 1.5.3 shall not, taken together with those added pursuant to clause (a)(viii) of the definition of "Consolidated EBITDA" and Section 1.5.2, increase pro forma Consolidated EBITDA by more than 20% for any test period (calculated prior to giving effect to any addback pursuant to this Section 1.5.3 or clause (a)(viii) of the definition of "Consolidated EBITDA" and Section 1.5.2); provided, that such limitation on pro forma adjustments shall not apply if supported by a quality of earnings report prepared by a nationally recognized accounting firm or other third-party advisor reasonably acceptable to Agent or if such adjustments satisfy the requirements of Regulation S-X and (B) no pro forma adjustments under this Section 1.5.3 shall be made in respect of the Transactions (including in respect of the IBT Transaction).

1.5.4    In the event that Parent or any Restricted Subsidiary incurs (including by assumption or guarantees) or repays (including by redemption, repayment, retirement or extinguishment) any Debt included in the calculations of the Total Leverage Ratio, Consolidated Fixed Charge Coverage Ratio, Availability and Liquidity (other than Debt incurred or repaid under any revolving credit facility in the ordinary course of business for working capital purposes), (i) during the applicable Test Period or (ii) subsequent to the end of the applicable Test Period and prior to or simultaneously with the event for which the calculation of any such ratio is made, then the Total Leverage Ratio, Consolidated Fixed Charge Coverage Ratio, Availability, and Liquidity shall be calculated giving pro forma effect to such incurrence or repayment of Debt, to the extent required, as if the same had occurred on the last day of the applicable Test Period (or, with respect to the calculation of Availability and Liquidity, the applicable date of determination) of the Total Leverage Ratio, Availability and Liquidity. Interest on a Capitalized Lease shall be deemed to accrue at an interest rate reasonably determined by a responsible financial or accounting officer of Parent to be the rate of interest implicit in such Capitalized Lease in accordance with GAAP. Interest on Debt that may optionally be determined at an interest rate based upon a factor of a prime or similar rate, a London interbank offered rate, or other rate, shall be determined to have been based upon the rate actually chosen, or if none, then based upon such optional rate chosen as Parent or such Restricted Subsidiary may designate.

1.5.5    For purposes of calculating the Consolidated Fixed Charge Coverage Ratio in any Test Period in which a Specified Transaction occurs, Capital Expenditures in clause (ii) of the definition of Consolidated Fixed Charge Coverage Ratio shall (a) include any Capital Expenditures of the target of a Permitted Acquisition consummated in such Test Period (whether or not such Permitted Acquisition was consummated at the time such Capital Expenditures were made) and (b) exclude any Capital Expenditures made by any Person or that are attributable to any division or line of business, in each case, that is disposed of in such Test Period.

1.5.6    In determining the Consolidated Fixed Charges for any period in which a Specified Transaction occurs, (a) pro forma effect will be given to the incurrence, repayment or retirement of any Debt of Parent and/or any of its Restricted Subsidiaries since the first day of such period as if such Debt was incurred, repaid or retired on the first day of such period and if such Debt bears, at the option of Parent and/or any Restricted Subsidiaries, a fixed or floating rate of interest, interest thereon will be computed by applying, at the option of Parent, either the fixed or floating rate, and (b) Consolidated Fixed Charges will include fees attributable to any letters of credit issued for the account of the target of a Permitted Acquisition consummated in such Test Period to the extent that such letters of

credit (or replacements thereof) remain outstanding after the consummation of such Permitted Acquisition.

1.5.7    Whenever any provision of this Agreement requires Parent to have a Total Leverage Ratio or a Consolidated Fixed Charge Coverage Ratio (in each case) on a Pro Forma Basis in connection with any action to be taken by Parent or any Restricted Subsidiary hereunder, Parent shall deliver to Agent a certificate of a Responsible Officer setting forth in reasonable detail the calculations demonstrating such compliance or such Total Leverage Ratio or Consolidated Fixed Charge Coverage Ratio, as applicable.

## SECTION 2.    CREDIT FACILITIES

**2.1    Commitment**.

2.1.1    <u>Loans</u>. Each Lender agrees, severally on a Pro Rata basis up to its Commitment, on the terms set forth herein, to make Loans to Borrowers from time to time through the Commitment Termination Date. The Loans may be repaid and reborrowed (without premium or penalty other than any LIBOR Loan Prepayment Fee) as provided herein. In no event shall Lenders have any obligation to honor a request for a Loan if the Facility Exposure (including after giving effect to the requested Loan) would exceed an amount equal to the Collateral Line Cap.

2.1.2    <u>Notes</u>. The Loans made by each Lender and interest accruing thereon shall be evidenced by the records of Agent and such Lender. Promptly following the request of any Lender, Borrowers shall deliver a Note to such Lender.

2.1.3    <u>Use of Proceeds</u>. The proceeds of Loans shall be used by Borrowers solely (in each case to the extent permitted hereunder) (a) on the Closing Date, (ii) to pay Transaction Expenses; and (iii) to consummate the Refinancing Transactions; and (b) after the Closing Date (i) to pay Obligations in accordance with this Agreement; and (ii) for working capital and other lawful purposes of Borrowers (including Permitted Acquisitions, investments, capital expenditures and restricted payments), and to pay all other payments expressly permitted under this Agreement. None of the proceeds will be used, directly or indirectly, for the purpose of purchasing or carrying any margin security or for the purposes of reducing or retiring any Debt which was originally incurred to purchase or carry any margin security or for any other purpose which might cause any of the Loans to be considered a "purpose credit" within the meaning of Regulation U of the Board of the Federal Reserve System, as amended.

2.1.4    <u>Voluntary Reduction or Termination of Commitments</u>.

(a)    The Commitments shall terminate on the Commitment Termination Date. Upon at least three (3) Business Days prior written notice to Agent at any time, Administrative Borrower, on behalf of Borrowers, may, at its option, terminate the Commitments and this credit facility. Any notice of termination given by Administrative Borrower, on behalf of Borrowers, shall be irrevocable; <u>provided</u>, that a notice of termination of the Commitments delivered by Administrative Borrower may state that such notice is conditioned upon the effectiveness of other events, in which case such notice may be revoked by Administrative Borrower (by notice to Agent on or prior to the specified effective date) if such condition is not satisfied. On the termination date, Borrowers shall make Full Payment of the Obligations.

(b)    Borrowers may permanently reduce the Commitments, on a Pro Rata basis for each Lender, from time to time upon written notice to Agent, which notice shall specify the amount of the reduction, shall be irrevocable once given, shall be given at least three (3) Business Days prior to the end of a calendar month and shall be effective as of the first (1st) day of the next calendar month. Each reduction shall be in a minimum amount of $2,500,000, or an increment of $1,000,000 in excess thereof, <u>provided</u>, that in no event shall the Commitments be reduced to an amount less than $350,000,000.

2.1.5    <u>Overadvances</u>. If the Facility Exposure exceeds, at any time, the Collateral Line Cap ("Overadvance"), the excess amount (which shall nevertheless constitute Obligations secured by the Collateral and entitled to all benefits of the Loan Documents) shall be payable by Borrowers on demand by Agent (or within two (2) Business Days with respect to the repayment of outstanding Loans in the event of an Overadvance caused by an establishment or modification of any component of the Availability Reserve then in effect to the extent that such establishment or modification is not subject to a two (2) Business Day notice period under the definition of Availability Reserve). Unless its authority has been revoked in writing by Required Lenders, Agent may require Lenders to honor requests for Overadvance Loans and to forbear from requiring Borrowers to cure an Overadvance, (i) when no other Event of Default is known to Agent, as long as (A) the Overadvance does not continue for more than thirty (30) consecutive days (and no Overadvance may exist for at least five (5) consecutive days thereafter before further Overadvance Loans are required), and (B) the Overadvance is not known by Agent to exceed, when combined with Protective Advances under Section 2.1.6, ten percent (10%) of the Borrowing Base; and (ii) regardless of whether an Event of Default exists, if Agent discovers an Overadvance not previously known by it to exist, as long as from the date of such discovery the Overadvance (A) is not increased by more than $10,000,000, and (B) does not continue for more than thirty (30) consecutive days. In no event shall an Overadvance Loan be made that would cause the outstanding Facility Exposure to exceed the aggregate Commitments. Any funding of an Overadvance Loan or sufferance of an Overadvance shall not

constitute a waiver by Agent or Lenders of the Event of Default caused thereby. In no event shall any Loan Party be deemed a beneficiary of this Section nor authorized to enforce any of its terms. Overadvances may be made even if the conditions precedent set forth in Section 6.2 have not been satisfied (or waived).

2.1.6    Protective Advances. Agent shall be authorized, in its Permitted Discretion (with written notice to Administrative Borrower, provided, that Agent's failure to provide such notice shall not in any way impair Agent's right to make such a Protective Advance or the enforceability of such Protective Advance as part of the Obligations), at any time that an Event of Default exists or any conditions in Section 6 are not satisfied (or waived) to make Base Rate Loans ("Protective Advances") (a) up to an aggregate amount (together with Overadvances under Section 2.1.5) equal to the greater of (i) $45,000,000 and (ii) ten percent (10%) of the Commitments at such time, if Agent deems such Loans necessary or desirable to preserve or protect any Collateral, or to enhance the collectibility or repayment of Obligations; or (b) to pay any other amounts chargeable to Loan Parties under any Loan Documents, including costs, fees and expenses not paid by Borrowers when required hereunder. All Protective Advances shall be Obligations, secured by the Collateral, and shall be treated for all purposes as Extraordinary Expenses. Each Lender shall participate in each Protective Advance on a Pro Rata basis. Required Lenders may at any time revoke Agent's authorization to make further Protective Advances by written notice to Agent with a copy to Administrative Borrower. Absent such revocation, Agent's determination that funding of a Protective Advance is appropriate shall be conclusive. In no event shall any Protective Advance be made that would cause the outstanding Facility Exposure to exceed the aggregate Commitments. Protective Advances may be made even if the conditions precedent set forth in Section 6.2 have not been satisfied or waived.

**2.2    Letter of Credit Facility**.

2.2.1    Issuance of Letters of Credit. Subject to the LC Conditions, each Issuing Bank agrees to issue Letters of Credit from time to time until one (1) Business Day prior to the Latest Maturity Date, on the terms set forth herein, including the following:

(a)    Each Borrower acknowledges that each Issuing Bank's willingness to issue any Letter of Credit is conditioned upon such Issuing Bank's and Agent's receipt of a LC Application with respect to the requested Letter of Credit, as well as such other instruments and agreements as Issuing Bank may customarily require for issuance of a letter of credit of similar type and amount. No Issuing Bank shall have any obligation to issue any Letter of Credit unless (ii) such Issuing Bank and Agent receives a LC Request and LC Application at least two (2) Business Days prior to the requested date of issuance; and (iii) each LC Condition is satisfied or waived. No Issuing Bank shall issue a Letter of Credit if any LC Condition has not been satisfied. All Existing Letters of Credit shall be deemed to be Letters of Credit issued hereunder on the Closing Date

(b)    Letters of Credit may be requested by Administrative Borrower, for the benefit of a Loan Party, only (iv) to support obligations of such Loan Party; or (v) for other lawful purposes. The renewal or extension of any Letter of Credit shall be treated as the issuance of a new Letter of Credit; except, that delivery of a new LC Application shall be required at the discretion of the applicable Issuing Bank.

(c)    Borrowers assume all risks of the acts, omissions or misuses of any Letter of Credit by the beneficiary. In connection with the issuance of any Letter of Credit, other than the gross negligence, willful misconduct or bad faith of Agent, any Issuing Bank or any Lender as determined in a final, non-appealable judgment by a court of competent jurisdiction, none of Agent, any Issuing Bank or any Lender shall be responsible for the existence, character, quality, quantity, condition, packing, value or delivery of any goods purported to be represented by any Documents; any differences or variation in the character, quality, quantity, condition, packing, value or delivery of any goods from that expressed in any Documents; the form, validity, sufficiency, accuracy, genuineness or legal effect of any Documents or of any endorsements thereon; the time, place, manner or order in which shipment of goods is made; partial or incomplete shipment of, or failure to ship, any goods referred to in a Letter of Credit or Documents; any deviation from instructions, delay, default or fraud by any shipper or other Person in connection with any goods, shipment or delivery; any breach of contract between a shipper or vendor and a Borrower; errors, omissions, interruptions or delays in transmission or delivery of any messages, by mail, cable, telegraph, telex, telecopy, e-mail, telephone or otherwise; errors in interpretation of technical terms; the misapplication by a beneficiary of any Letter of Credit or the proceeds thereof; or any consequences arising from causes beyond the control of any Issuing Bank, Agent or any Lender, including any act or omission of a Governmental Authority. The rights and remedies of any Issuing Bank under the Loan Documents shall be cumulative.

(d)    In connection with its administration of and enforcement of rights or remedies under any Letters of Credit or LC Documents, the applicable Issuing Bank shall be entitled to act, and shall be fully protected in acting, upon any certification, notice or other communication in whatever form believed by such Issuing Bank, in good faith, to be genuine and correct and to have been signed, sent or made by a proper Person. Each Issuing Bank may consult with and employ legal counsel, accountants and other experts to advise it concerning its obligations, rights and remedies, and shall be entitled to act upon, and shall be fully protected in any action taken in good faith reliance upon, any advice given by such experts. Each Issuing Bank may employ agents and attorneys-in-fact in connection with any matter relating to Letters of Credit or LC Documents, and shall not be liable for the negligence (other than gross negligence) or misconduct (other than willful misconduct) of any such agents or attorneys-in-fact selected with reasonable care.

(e)   Notwithstanding anything contained herein to the contrary, no Issuing Bank shall be under any obligation to issue any Letter of Credit if any Lender is at such time a Defaulting Lender hereunder, unless (w) Defaulting Lender has been replaced pursuant to Section 3.8.2 or otherwise, (x) the LC Obligations of such Defaulting Lender have been Cash Collateralized, (y) the Commitments of the other Lenders have been increased by an amount sufficient to satisfy Agent that all future LC Obligations will be covered by all Lenders that are not Defaulting Lenders, or (z) all of the LC Obligations of such Defaulting Lenders are able to be reallocated to other Lenders in a manner consistent with the last sentence of Section 4.2.

(f)   If Administrative Borrower requests in any LC Request, the applicable Issuing Bank shall agree to issue a Letter of Credit that has automatic extension provisions (each, an "Auto-Extension Letter of Credit"); provided, that any such Auto-Extension Letter of Credit must permit such Issuing Bank to prevent any such extension at least once in each twelve-month period (commencing with the date of issuance of such Letter of Credit) by giving prior notice to the beneficiary thereof and Administrative Borrower not later than a day (the "Non-Extension Notice Date") in each such twelve-month period to be agreed upon at the time such Letter of Credit is issued. Unless otherwise directed by such Issuing Bank, Administrative Borrower shall not be required to make a specific request to Issuing Bank for any such extension. Once an Auto-Extension Letter of Credit has been issued, Lenders shall be deemed to have authorized (but may not require) such Issuing Bank to permit the extension of such Letter of Credit at any time to an expiry date not later than the Latest Maturity date, unless otherwise agreed upon by Agent and Issuing Bank; provided, however, that such Issuing Bank shall not permit any such extension if (A) such Issuing Bank has reasonably determined that it would not be permitted, or would have no obligation, at such time to issue such Letter of Credit in its revised form (as extended) under the terms hereof (by reason of the provisions of the LC Conditions), or (B) it has received written notice on or before the day that is seven (7) Business Days before the Non-Extension Notice Date from Agent, any Lender or Administrative Borrower that one or more of the applicable conditions specified in Sections 6.2 are not then satisfied, and in each such case directing such Issuing Bank not to permit such extension.

2.2.2   Reimbursement; Participations.

(c)   If any Issuing Bank honors any request for payment under a Letter of Credit, Borrowers shall pay to such Issuing Bank, on the same day ("Reimbursement Date"), the amount paid by such Issuing Bank under such Letter of Credit, together with interest at the interest rate for Base Rate Loans from the Reimbursement Date until date of payment by Borrowers. The obligation of Borrowers to reimburse an Issuing Bank for any payment made under a Letter of Credit issued by it shall be absolute, unconditional, irrevocable, and joint and several, and shall be paid without regard to any lack of validity or enforceability of any Letter of Credit or the existence of any claim, setoff, defense or other right that Borrowers may have at any time against the beneficiary. Whether or not Administrative Borrower submits a Notice of Borrowing, Borrowers shall be deemed to have requested a Borrowing of Base Rate Loans in an amount necessary to pay all amounts due to the applicable Issuing Bank on any Reimbursement Date and each Lender agrees to fund its Pro Rata share of such Borrowing whether or not the Commitments have terminated, an Overadvance exists or is created thereby, or the conditions in Section 6 are satisfied (or waived).

(d)   Upon issuance of a Letter of Credit, each Lender shall be deemed to have irrevocably and unconditionally purchased from the applicable Issuing Bank, without recourse or warranty, an undivided Pro Rata interest and participation in all LC Obligations (excluding amounts owing pursuant to clause (c) of the definition of LC Obligations) relating to the Letter of Credit. If any Issuing Bank makes any payment under a Letter of Credit and Borrowers do not reimburse such payment on the Reimbursement Date, Agent shall promptly notify Lenders and each Lender shall promptly (within one (1) Business Day) and unconditionally pay to Agent, for the benefit of such Issuing Bank, Lender's Pro Rata share of such payment. Upon request by a Lender, each Issuing Bank shall furnish copies of any Letters of Credit and LC Documents in its possession at such time.

(e)   The obligation of each Lender to make payments to Agent for the account of each Issuing Bank in connection with such Issuing Bank's payment under a Letter of Credit shall be absolute, unconditional and irrevocable, not subject to any counterclaim, setoff, qualification or exception whatsoever, and shall be made in accordance with this Agreement under all circumstances, irrespective of any lack of validity or unenforceability of any Loan Documents; any draft, certificate or other document presented under a Letter of Credit having been determined to be forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any respect; or the existence of any setoff or defense that any Loan Party may have with respect to any Obligations. No Issuing Bank assumes any responsibility for any failure or delay in performance or any breach by any Borrower or other Person of any obligations under any LC Documents. No Issuing Bank makes to Lenders any express or implied warranty, representation or guaranty with respect to the Collateral, LC Documents or any Loan Party. No Issuing Bank shall be responsible to any Lender for any recitals, statements, information, representations or warranties contained in, or for the execution, validity, genuineness, effectiveness or enforceability of any LC Documents; the validity, genuineness, enforceability, collectibility, value or sufficiency of any Collateral or the perfection of any Lien therein; or the assets, liabilities, financial condition, results of operations, business, creditworthiness or legal status of any Loan Party.

(f)   No Issuing Bank Indemnitee shall be liable to any Lender or other Person for any action taken or omitted to be taken in connection with any LC Documents except as a result of (i) its own (or its affiliates', directors', officers', employees' or

agents') gross negligence, bad faith or willful misconduct, or (ii) its own (or its affiliates', directors', officers', employees' or agents') material breach of its obligations hereunder. No Issuing Bank shall have any liability to any Lender if such Issuing Bank refrains from any action under any Letter of Credit or LC Documents until it receives written instructions from Required Lenders.

(g)     In the event of any conflict between the terms hereof and the terms of any LC Document, the terms hereof shall control and any grant of security interest in any LC Documents shall be void.

2.2.3     <u>Cash Collateral</u>. If any LC Obligations, whether or not then due or payable, shall for any reason be outstanding at any time (c) that an Event of Default exists, (d) that Availability is less than zero, or (e) on or after the Latest Maturity Date (to the extent not otherwise Cash Collateralized at the time of issuance in accordance with the terms hereof), then Borrowers shall, at the applicable Issuing Bank's or Agent's request, pay to the applicable Issuing Bank the amount of all outstanding LC Obligations under clauses (a) and (c) of the definition thereof and Cash Collateralize the undrawn amount of all outstanding Letters of Credit within two (2) Business Days after written request therefor. If Borrowers fail to Cash Collateralize outstanding Letters of Credit as required herein, Lenders may (and shall upon direction of Agent) advance, as Loans, the amount of the Cash Collateral required (whether or not the Commitments have terminated, an Overadvance exists, or the conditions in Section 6 are satisfied or waived).

**2.3     Increase in Commitments.**

2.3.1     <u>General</u>. Administrative Borrower may at any time or from time to time after the Closing Date, by notice to Agent (any such notice, an "Increase Notice") (whereupon Agent shall promptly make a copy of such Increase Notice available to Lenders), request one or more increases to the Commitments (any such increase, an "Incremental Facility") in an aggregate amount not to exceed $100,000,000 (the "Maximum Incremental Facility Amount"). Each Incremental Facility shall be in an aggregate amount that is not less than $5,000,000 and shall be in an increment of $1,000,000 (<u>provided</u>, that such amount may be less than $5,000,000 and in lower increments if such amount represents all remaining availability under the Maximum Incremental Facility Amount).

2.3.2     <u>Terms of Incremental Facilities</u>. The following terms shall apply to any Incremental Facility established pursuant to an Incremental Amendment: (i) such Incremental Facility shall rank pari passu in right of payment and of security with all other Commitments; (ii) the maturity date of such Incremental Facility shall not be earlier than the Original Maturity Date; (iii) such Incremental Facility shall not be secured by any Lien on any asset of Loan Parties that does not also secure the then outstanding Commitments; (iv) the covenants, events of default and guarantees of such Incremental Facility shall be consistent with the terms of then outstanding Commitments, (v) pricing in connection with the Incremental Facility shall be consistent with the terms of the then outstanding Commitments, and (vi) fees to be paid in connection with such Incremental Facility shall be mutually agreed upon by Administrative Borrower, Agent and the financial institutions participating in such Incremental Facility. To the extent commitments from additional financial institutions are required in connection with any Incremental Facility, Agent shall control all aspects of the selection and syndication process (in consultation with Administrative Borrower) and be compensated for the arranging of the Incremental Facility in an amount to be mutually agreed with Administrative Borrower.

2.3.3     <u>Increase Notices</u>. Each Increase Notice shall set forth (i) the requested amount and proposed terms of the relevant Incremental Facility and (ii) the date on which the relevant Incremental Facility is requested to become effective (the "Increase Effective Date"). Commitments under any Incremental Facility may be provided by any existing Lender (but no existing Lender shall have any obligation to participate in make any Incremental Facility except to the extent that it has agreed to do so pursuant to an Incremental Amendment) or by any other additional Lender (Lenders or additional Lenders participating in such Incremental Facility, collectively, "Incremental Lenders"). Commitments in respect of Incremental Facilities shall become Commitments under this Agreement pursuant to an amendment (an "Incremental Amendment") to this Agreement and, as appropriate, the other Loan Documents, executed by Administrative Borrower, each Incremental Lender and Agent.  Each Incremental Amendment shall be on the terms and pursuant to documentation to be determined by Administrative Borrower and the relevant Incremental Lenders; <u>provided</u>, that to the extent such terms and documentation (taken as a whole) are not consistent with this Agreement in any material respect (except to the extent permitted by the foregoing clauses), they shall be reasonably satisfactory to Agent; provided, in any event that such terms shall be consistent with Section 2.3.2 above. The effectiveness of any Incremental Facility shall be subject to the satisfaction (or waiver) on the date thereof of each of the conditions set forth in Section 6.2 (and for purposes thereof the closing of the Incremental Facility shall be deemed to be a request for a credit extension) and, to the extent reasonably requested by Agent, receipt by Agent of customary legal opinions, board resolutions, officers' certificates and a solvency certificate or representation, in each case consistent with those delivered on the Closing Date under Section 6.1 (other than changes to such legal opinions resulting from a change in law, change in fact or change to counsel's form of opinion reasonably satisfactory to Agent), and customary reaffirmation agreements.

2.3.4     <u>Incremental Amendment</u>. Notwithstanding anything to the contrary in Section 15.1 or otherwise in this Agreement, any Incremental Amendment may, without the consent of any other Lenders, effect such amendments to this Agreement and the other Loan Documents as may be necessary or appropriate, in the reasonable opinion of Agent and Administrative Borrower, to effect the terms thereof, to the extent such terms are permitted under this Section 2.3. Any such Incremental Amendment may include ratable increases in the thresholds set forth in the definition of Payment Conditions and Debt Repayment Conditions. Notwithstanding the

foregoing, Agent shall have the right (but not the obligation) to seek the advice or concurrence of Required Lenders with respect to any matter contemplated by this Section 2.3 and, if Agent seeks such advice or concurrence, it shall be permitted to enter into such amendments with Administrative Borrower in accordance with any instructions actually received by such Required Lenders and shall also be entitled to refrain from entering into such amendments with Administrative Borrower unless and until it shall have received such advice or concurrence; provided, however, that whether or not there has been a request by Agent for any such advice or concurrence, all such amendments entered into with Administrative Borrower by Agent hereunder shall be binding and conclusive on Lenders. Without limiting the foregoing, in connection with any Incremental Amendment and as required by Applicable Law to protect Agent's perfected security interest thereon, the respective Loan Parties shall (at their expense) amend (and Agent is hereby directed to amend) any Mortgage that has a maturity date prior to the then Latest Maturity Date so that such maturity date is extended to the Latest Maturity Date after giving effect to such Incremental Amendment (or such later date as may be advised by local counsel to Agent).

2.3.5   Incremental Facility. Except as otherwise specifically set forth herein or in the Incremental Amendment, all of the other terms and conditions applicable to any Incremental Facility shall be identical to the terms and conditions applicable to the Commitments immediately prior to the Incremental Facility.

**2.4   Extensions of Commitments.**

2.4.8   Notwithstanding anything to the contrary in Section 15.1 or any other provision of this Agreement, pursuant to one or more offers (each, an "Extension Offer") made from time to time by Administrative Borrower to all Lenders on a Pro Rata basis and on the same terms to each such Lender, Administrative Borrower may from time to time with the consent of any Lender that shall have accepted such offer extend the maturity date of the Commitments and modify the interest rate or fees payable in respect of the Commitments of such Lender pursuant to the terms of the relevant Extension Offer (including, without limitation, by increasing the interest rate or fees payable in respect of such Commitments) (each, an "Extension", and each group of Commitments as so extended, as well as the group of original Commitments not so extended, being a "tranche"; any Extended Commitments shall constitute a separate tranche of Commitments from the tranche of Commitments from which they were converted and a separate class of Commitments), so long as the following terms are satisfied (or waived): (i) except as to interest rates, fees and final maturity date, the Commitments of any Lender extended pursuant to any Extension ("Extended Commitments") shall have the terms and conditions that are substantially identical to all other Commitments; provided, that (1) the borrowing and repayment (except for (A) payments of interest and fees at different rates on Extended Commitments (and related outstandings), (B) repayments required upon the maturity date of the non-extended Commitments and (C) repayments made in connection with a permanent repayment and termination of commitments) of Loans with respect to Extended Commitments after the effective date of the applicable Extension shall be made on a pro rata basis or less in the event the Borrowers elect to reduce the Commitments of non-extending Lenders with all other Commitments, (2) all Letters of Credit shall be participated on a pro rata basis or less in the event the Borrowers elect to reduce the Commitments of non-extending Lenders by all Lenders with Commitments in accordance with their percentage of the Commitments, (3) the permanent repayment of Loans with respect to, and termination of, Extended Commitments after the effective date of the applicable Extension shall be made on a pro rata basis with all other Commitments, except that Administrative Borrower shall be permitted to permanently repay and terminate commitments of any such class on a non-pro rata basis at maturity as compared to any other class with a later maturity date than such class, and (4) assignments and participations of Extended Commitments and Extended Loans shall be governed by the same assignment and participation provisions applicable to Commitments and Loans, (iii) the final maturity date of any Extended Commitment shall be no earlier than the then Latest Maturity Date, (iv) if the aggregate amount of Commitments in respect of which Lenders shall have accepted the relevant Extension Offer shall exceed the maximum aggregate principal amount of Commitments offered to be extended by Administrative Borrower pursuant to such Extension Offer, then the Commitments of such Lenders shall be extended ratably up to such maximum amount based on the respective amounts with respect to which such Lenders have accepted such Extension Offer, (v) all documentation in respect of such Extension shall be consistent with the foregoing, and (vi) any applicable Minimum Extension Condition shall be satisfied unless waived by Administrative Borrower.

2.4.9   With respect to all Extensions consummated pursuant to this Section 2.4, (i) no Extension Offer is required to be in any minimum amount or any minimum increment, provided, that Administrative Borrower may at its election specify as a condition (a "Minimum Extension Condition") to consummating any such Extension that a minimum amount (to be determined and specified in the relevant Extension Offer in Administrative Borrower's sole discretion and may be waived by Administrative Borrower) of Commitments of any or all applicable classes to participate in such Extension. Agent and Lenders hereby consent to the Extensions and the other transactions contemplated by this Section 2.4 (including, for the avoidance of doubt, payment of any interest, fees or premium in respect of any Extended Commitments on such terms as may be set forth in the relevant Extension Offer) and hereby waive the requirements of any other provision of this Agreement or any other Loan Document that may otherwise prohibit any such Extension or any other transaction contemplated by this Section 2.4.

2.4.10   Each of the parties hereto hereby (A) agrees that this Agreement and the other Loan Documents may be amended to give effect to each Extension (an "Extension Amendment"), without the consent of any other Lenders, to the extent (but only to the extent) necessary to (i) reflect the existence and terms of the Extended Commitments incurred pursuant thereto, and (ii) effect such

other amendments to this Agreement and the other Loan Documents as may be necessary or appropriate, in the reasonable opinion of Agent and Administrative Borrower, to effect the provisions of this Section 2.4, and Required Lenders hereby expressly and irrevocably, for the benefit of all parties hereto, authorize Agent to enter into any such Extension Amendment and (B) consent to the transactions contemplated by this Section 2.4 (including, for the avoidance of doubt, payment of interest, fees or premiums in respect of any Extended Commitments on such terms as may be set forth in the relevant Extension Amendment). Without limiting the foregoing, in connection with any Extension, if necessary, the respective Loan Parties shall (at their expense) amend (and Agent is hereby directed to amend) any Mortgage that has a maturity date prior to the then Latest Maturity Date so that such maturity date is extended to the Latest Maturity Date after giving effect to such Extension (or such later date as may be advised by local counsel to Agent).

2.4.11   Notice. In connection with any Extension, Administrative Borrower shall provide Agent at least five (5) Business Days' (or such shorter period as may be agreed by Agent) prior written notice thereof, and shall agree to such procedures, if any, as may be established by, or acceptable to, Agent, in each case acting reasonably to accomplish the purposes of this Section 2.4.

## SECTION 3.   INTEREST, FEES AND CHARGES

### 3.1  Interest.

3.1.4   Rates and Payment of Interest.

(b)   The Obligations shall bear interest (i) if a Base Rate Loan, at the Base Rate in effect from time to time, plus the Applicable Margin; (ii) if a LIBOR Loan, at the LIBOR Lending Rate for the applicable Interest Period, plus the Applicable Margin; and (iii) if any other Obligation (including, to the extent permitted by law, interest not paid when due), at the Base Rate in effect from time to time, plus the Applicable Margin for Base Rate Loans. Interest shall accrue from the date the Loan is advanced or the Obligation is incurred or payable, until paid by Borrowers. If a Loan is repaid on the same day made, one (1) day's interest shall accrue.

(c)   During an Insolvency Proceeding with respect to any Loan Party (other than an Immaterial Subsidiary), or during any other Event of Default if Required Lenders so elect, Obligations consisting of principal and accrued but unpaid interest on the Loans shall bear interest at the Default Rate; provided, that the Default Rate shall not accrue on the Obligations of a Defaulting Lender so long as such Lender shall be a Defaulting Lender. Each Loan Party acknowledges that the cost and expense to Agent and each Lender due to an Event of Default are difficult to ascertain and that the Default Rate is a fair and reasonable estimate to compensate Agent and Lenders for such added cost and expense.

(d)   Interest accrued on the Loans shall be due and payable in arrears, (i) for any Base Rate Loan, on the first (1st) day of each calendar quarter and, for any LIBOR Loan, the last day of its Interest Period provided, that in the case of Interest Periods of more than three (3) months, accrued interest on LIBOR Loans shall also be paid on the 90th day of the Interest Period; (ii) on any date of prepayment, with respect to the principal amount of LIBOR Loans being prepaid; and (iii) on the Maturity Date applicable thereto. Interest accrued on any other Obligations shall be due and payable as provided in the Loan Documents and, if no payment date is specified, shall be due and payable promptly after written demand. Notwithstanding the foregoing, interest accrued at the Default Rate shall be due and payable promptly after written demand.

3.1.5   Continuation and Conversion Elections. By delivering a Notice of Conversion/Continuation to Agent on or before 2:00 p.m. on a Business Day, Administrative Borrower may from time to time irrevocably elect, on not less than three (3) nor more than five (5) Business Days' notice, that, subject to Section 4.3 below, (c) any Base Rate Loan be converted to a LIBOR Loan or (d) any LIBOR Loan be converted on the last day of an Interest Period into a LIBOR Loan with a different Interest Period, or continued on the last day of an Interest Period as a LIBOR Loan with a similar Interest Period; provided, however, that, upon election of Required Lenders by written notice to Administrative Borrower, no portion of the outstanding principal amount of any Loans may be converted to, or continued as, LIBOR Loans when any Event of Default has occurred and is continuing. In the absence of delivery of a Notice of Conversion/Continuation with respect to any LIBOR Loan at least three (3) Business Days before the last day of the then current Interest Period with respect thereto, such LIBOR Loan shall, on such last day, automatically convert to a Base Rate Loan.

3.1.6   Repayments, Continuations and Conversions of LIBOR Loans. LIBOR Loans shall mature and become payable in full on the last day of the Interest Period relating to such LIBOR Loan. Upon maturity, a LIBOR Loan may be continued for an additional Interest Period or may be converted to a Base Rate Loan, as set forth in Section 3.1.2.

3.1.7   Substitute Rate.

(a)   If Agent shall have determined in good faith after the Closing Date that:

(iv)   Dollar deposits in the relevant amount and for the relevant Interest Period are not available to Agent in the London interbank market or that the rates at which such Dollar deposits are being offered will not adequately and fairly reflect the cost

to the majority of Lenders of making or maintaining LIBOR Loans during such Interest Period; or

(v)    by reason of circumstances affecting Agent in the London interbank market, adequate means do not exist for ascertaining the LIBOR Rate applicable hereunder to LIBOR Loans of any duration,

then, upon written notice from Agent to Administrative Borrower, the obligations of Lenders hereunder to make or continue any Loans as, or to convert any Loans into, LIBOR Loans of such duration shall forthwith be suspended until Agent shall notify Administrative Borrower that the circumstances causing such suspension no longer exist.

(b)    If any Lender shall have determined in good faith that the LIBOR Rate no longer adequately reflects such Lender's cost of funding loans, then, upon notice from such Lender to Administrative Borrower and Agent, the obligations of such Lender under this Section to make or continue any Loans as, or to convert any Loans into, LIBOR Loans of such duration shall forthwith be suspended until such Lender shall notify Administrative Borrower and Agent that the circumstances causing such suspension no longer exist.

**3.2  Fees**.

3.2.6  <u>Unused Line Fee</u>. Borrowers shall pay to Agent, for the Pro Rata benefit of Lenders (other than any Defaulting Lender), a fee equal to the applicable Unused Line Fee Percentage multiplied by the amount by which the Commitments exceed the average daily principal balance of Loans and the stated amount of Letters of Credit during any calendar quarter. Such fee shall be payable in arrears, on the first (1st) day of each calendar quarter and on the Maturity Date applicable thereto. For the avoidance of doubt, no fees shall accrue under this Section 3.2.1 in favor of any Defaulting Lender for so long as it remains a Defaulting Lender.

3.2.7    <u>LC Facility Fees</u>. Borrowers shall pay (a) to Agent, for the Pro Rata benefit of Lenders (other than any Defaulting Lender), a fee equal to the Applicable Margin in effect for LIBOR Loans multiplied by the average daily stated amount of Letters of Credit, which fee shall be payable quarterly in arrears, on the first (1st) day of each calendar quarter; (b) to Agent, for the account of Issuing Bank, a fronting fee equal to one-eighth of one percent (.125%) of the stated amount of each Letter of Credit, which fee shall be payable upon issuance of the Letter of Credit and quarterly in arrears, on the first (1st) day of each calendar quarter thereafter, and shall be payable on any increase in stated amount made between any such dates; and (c) to Issuing Bank, for its own account, all customary charges associated with the issuance, amending, negotiating, payment, processing, transfer and administration of Letters of Credit, which charges shall be paid as and when incurred. During an Insolvency Proceeding with respect to any Loan Party (other than an Immaterial Subsidiary), or during any other Event of Default if Required Lenders so elect, the fee payable under clause (a) shall be increased by two percent (2%) per annum. For the avoidance of doubt, no fees shall accrue under this Section 3.2.2 in favor of any Defaulting Lender for so long as it remains a Defaulting Lender.

3.2.8  <u>Other Fees</u>. Borrowers shall pay to Agent the other fees and amounts set forth in the Fee Letter in the amounts and at the times specified therein. To the extent payment in full of the applicable fee as set forth in the Fee Letter is received by Agent from Borrowers on or about the date hereof, Agent shall pay to each Lender its share of such fees in accordance with the terms of the arrangements of Agent with such Lender.

**3.3    Computation of Interest, Fees, Yield Protection.** All interest, as well as fees and other charges calculated on a per annum basis, shall be computed for the actual days elapsed, based on a year of three hundred sixty (360) days (or 365/366 days, in the case of Base Rate Loans). Each determination by Agent of any interest, fees or interest rate hereunder shall be final, conclusive and binding for all purposes, absent manifest error. All fees shall be fully earned when due and shall not be subject to rebate or refund, nor subject to proration except as specifically provided herein. All fees payable under Section 3.2 are compensation for services and are not, and shall not be deemed to be, interest or any other charge for the use, forbearance or detention of money. A certificate as to amounts payable by Borrowers under Section 3.4, 3.6, 3.7, 3.9 or 5.10 (which shall include the method for calculating such amount), submitted to Administrative Borrower by Agent or the affected Lender, as applicable, shall be final, conclusive and binding for all purposes, absent manifest error. Failure to or delay on the part of Agent or any Lender to demand compensation pursuant to any of Sections 3.4, 3.6, 3.7, 3.9 or 5.10 shall not constitute a waiver of Agent's or such Lender's right to demand such compensation; <u>provided</u>, that Borrowers shall not be required to compensate Agent or any Lender pursuant to any such Section for any increased costs, reductions or other amounts incurred more than 180 days prior to the date that such Agent or such Lender, as applicable, notifies Administrative Borrower of circumstances and/or events giving rise to such increased costs, reductions or other amounts and of Agent's or such Lender's intention to claim compensation therefor; <u>provided</u>, further, that, if the circumstance and/or event giving rise to such increased costs, reductions or other amounts is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof.

**3.4    Reimbursement Obligations.** Borrowers shall reimburse Agent for all Extraordinary Expenses. Borrowers shall also reimburse Agent for all reasonable and documented out-of-pocket legal, accounting, appraisal, consulting, and other fees, costs and expenses incurred by it in connection with (e) negotiation and preparation of any Loan Documents, including any amendment or other

modification thereof; (f) administration of and actions relating to any Collateral, Loan Documents and transactions contemplated thereby, including any actions taken to perfect or maintain priority of Agent's Liens on any Collateral, to maintain any insurance required hereunder or to verify Collateral; and (g) subject to the limits of Section 10.1.10, each inspection, audit or appraisal with respect to any Loan Party or Collateral, whether prepared by Agent's personnel or a third party. All amounts reimbursable by Borrowers under this Section shall constitute Obligations secured by the Collateral and shall be payable (x) in the case of Extraordinary Expenses, promptly upon written demand, and (y) with respect to all other amounts due pursuant to this Section 3.4, within thirty (30) days of written demand thereof, in each case including customary documentation supporting such request.

**3.5    Illegality.** If a Lender shall reasonably determine (which determination shall, upon notice thereof to Administrative Borrower and Agent be conclusive and binding on Borrowers) that any Change in Law makes it unlawful, or any central bank or other Governmental Authority asserts that it is unlawful, for such Lender to make, continue or maintain any LIBOR Loan as, or to convert any Loan into, a LIBOR Loan of a certain duration, the obligations of such Lender to make, continue, maintain or convert into any such LIBOR Loans shall, upon such determination, forthwith be suspended until such Lender shall notify Borrower and Agent that the circumstances causing such suspension no longer exist, and all LIBOR Loans of such type shall automatically convert into Base Rate Loans at the end of the then current Interest Periods with respect thereto or sooner, if required by such law or assertion.

**3.6    Increased Costs.** If on or after the date hereof any Change in Law:

(a)    shall subject any Lender to any Tax with respect to its LIBOR Loans or its obligation to make LIBOR Loans, or shall change the basis of taxation of payments to such Lender of the principal of or interest on its LIBOR Loans or any other amounts due under this Agreement in respect of its LIBOR Loans or its obligation to make LIBOR Loans (except for Excluded Taxes); or

(b)    shall impose, modify or deem applicable any reserve, special deposit or similar requirement (including, without limitation, any such requirement imposed by the Board) against assets of, deposits with or for the account of, or credit extended by, such Lender or shall impose on such Lender or on the London interbank market any other condition affecting its LIBOR Loans or its obligation to make LIBOR Loans;

and the result of any of the foregoing is to increase the cost to such Lender of making or maintaining any available LIBOR Loan, or to reduce the amount of any sum received or receivable by such Lender under this Agreement with respect thereto, by an amount deemed by such Lender to be material, then, within fifteen (15) days after written demand (including customary documentation supporting such request) by such Lender, Borrowers shall pay to such Lender such additional amount or amounts as will compensate such Lender for such increased cost or reduction; provided, that Borrowers shall not be required to compensate any Lender pursuant to this Section 3.6 for any Taxes which are otherwise the subject of Section 5.10 or for any Excluded Tax.

**3.7    Increased Capital Costs.** If any Change in Law affects the amount of capital or liquidity required or expected to be maintained by any Lender, or Person Controlling such Lender, and such Lender determines (in its Permitted Discretion) that the rate of return on its or such Controlling Person's capital as a consequence of its Commitments or the Loans made by such Lender is reduced to a level below that which such Lender or such Controlling Person could have achieved but for the occurrence of any such circumstance, then, in any such case upon notice from time to time by such Lender to Borrower and Agent, Borrowers shall promptly pay, after presentment of the certificate described in Section 3.3, directly to such Lender additional amounts sufficient to compensate such Lender or such Controlling Person for such reduction in rate of return. A statement of such Lender as to any such additional amount or amounts (including calculations thereof in reasonable detail) shall, in the absence of manifest error, be conclusive and binding on Borrowers. In determining such amount, such Lender may use any method of averaging and attribution that it (in its Permitted Discretion) shall deem applicable.

**3.8    Mitigation; Replacement of Lenders.**

3.8.1    Mitigation. Each Lender agrees that, upon becoming aware that it is subject to Section 3.5, 3.6, 3.7 or 5.10, it will take reasonable measures to reduce Borrowers' obligations under such Sections, including funding or maintaining its Commitments or Loans through another office, as long as use of such measures would not adversely affect Lender's Commitments, Loans, business or interests, and would not be inconsistent with any internal policy or applicable legal or regulatory restriction.

3.8.2    Replacement of Lenders.

(a)    If any Lender requests compensation under Section 3.6 or Section 3.7, or if any Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 5.10 or 5.11, or if any Lender ceases to make LIBOR Loans as a result of any of the conditions in Section 3.5, then Administrative Borrower may, at its sole expense and effort, upon notice to such Lender and Agent, require such Lender (and such Lender shall be obligated) to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in Section 13.3), all its interests, rights and obligations under this Agreement to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender

accepts such assignment), provided, that (i) such Lender shall have received payment of an amount equal to the outstanding principal of its Loans and funded participations in drawn Letters of Credit and, other than in the case of a Defaulting Lender, accrued interest thereon, accrued fees and all other amounts payable to it hereunder from the assignee (to the extent of such outstanding principal and accrued interest and fees) or Administrative Borrower (in the case of all other amounts), and (ii) in the case of any such assignment resulting from a claim for compensation under Section 3.6 or 3.7 or payments required to be made pursuant to Section 5.10 or 5.11, such assignment will result in a reduction in such compensation or payments.

(b)    Any Lender being replaced pursuant to clause (a) above shall (i) execute and deliver an Assignment and Acceptance with respect to such Lender's Commitment and outstanding Loans and participations in drawn Letters of Credit, as applicable (provided, that the failure of any such Lender to execute an Assignment and Acceptance shall not render such assignment invalid and such assignment shall be recorded in the Register) and (ii) deliver Notes, if any, evidencing such Loans to Administrative Borrower or Agent. Pursuant to such Assignment and Acceptance, (A) the assignee Lender shall acquire all or a portion, as the case may be, of the assigning Lender's Commitments and outstanding Loans and participations in drawn Letters of Credit, as applicable, (B) all obligations of Loan Parties owing to the assigning Lender relating to the Loan Documents and participations so assigned shall be paid in full by the assignee Lender or Administrative Borrower (as applicable) to such assigning Lender concurrently with such Assignment and Acceptance, any amounts owing to the assigning Lender (other than a Defaulting Lender) under Section 13.1 as a consequence of such assignment and (C) upon such payment and, if so requested by the assignee Lender, the assignor Lender shall deliver to the assignee Lender the appropriate Note or Notes executed by Borrowers, the assignee Lender shall become a Lender hereunder and the assigning Lender shall cease to constitute a Lender hereunder with respect to such assigned Loans, Commitments and participations, except with respect to indemnification provisions under this Agreement, which shall survive as to such assigning Lender.

**3.9    Indemnities.** In addition to (but without duplication of) the LIBOR Loan Prepayment Fee payable under Section 5.5.1, Borrowers agree to reimburse each Lender (without duplication) for any increase in the cost to such Lender, or reduction in the amount of any sum receivable by such Lender, in respect, or as a result of:

(c)    any conversion or repayment or prepayment of the principal amount of any LIBOR Loans on a date prior to the scheduled last day of the Interest Period applicable thereto;

(d)    any Loans not being made as LIBOR Loans in accordance with the Notice of Borrowing thereof;

(e)    any Loans not being continued as, or converted into, LIBOR Loans in accordance with the Notice of Conversion/ Continuation notice thereof; or

(f)    any costs associated with marking to market any obligations under any Hedging Agreement with a Bank Product Provider that (in the reasonable determination of Agent) are required to be terminated as a result of any conversion, repayment or prepayment of the principal amount of any LIBOR Loan on a date other than the scheduled last day of the Interest Period applicable thereto.

Such Lender shall promptly notify Administrative Borrower and Agent in writing of the occurrence of any such event, such notice to state, in reasonable detail, the reasons therefor and the additional amount required to fully compensate such Lender for such increased cost or reduced amount. Such additional amounts shall be payable by Borrowers to such Lender within fifteen (15) days of its receipt of such notice, and such notice shall, in the absence of manifest error, be conclusive and binding on Borrowers. Borrowers understand, agree and acknowledge the following: (i) no Lender has any obligation to purchase, sell and/or match funds in connection with the use of LIBOR Rate as a basis for calculating the rate of interest on a LIBOR Loan, (ii) the LIBOR Rate may be used merely as a reference in determining such rate, and (iii) each Borrower has accepted the LIBOR Rate as a reasonable and fair basis for calculating such rate, the LIBOR Loan Prepayment Fee, and other funding losses incurred by Lenders. Borrowers further agree to pay the LIBOR Loan Prepayment Fee and other funding losses (except for lost profits), if any, whether or not the applicable Lender elects to purchase, sell and/or match funds. Notwithstanding anything to the contrary in this Section 3.9, Borrowers shall not be required to compensate any Lender pursuant to this Section 3.9 for any Taxes which are otherwise the subject of Section 5.10 or for any Excluded Tax.

**3.10    Maximum Interest.** In no event shall interest, charges or other amounts that are contracted for, charged or received by Agent and Lenders pursuant to any Loan Documents and that are deemed interest under Applicable Law ("interest") exceed the highest rate permissible under Applicable Law ("maximum rate"). If, in any calendar month, any interest rate, absent the foregoing limitation, would have exceeded the maximum rate, then the interest rate for that month shall be the maximum rate and, if in a future month, that interest rate would otherwise be less than the maximum rate, then the rate shall remain at the maximum rate until the amount of interest actually paid equals the amount of interest which would have accrued if it had not been limited by the maximum rate. If, upon Full Payment of the Obligations, the total amount of interest actually paid under the Loan Documents is less than the total amount of interest that would, but for this Section, have accrued under the Loan Documents, then Borrowers shall, to the extent permitted by Applicable Law, pay to Agent, for the account of Lenders, (a) the lesser of (i) the amount of interest that would have been

charged if the maximum rate had been in effect at all times, or (ii) the amount of interest that would have accrued had the interest rate otherwise set forth in the Loan Documents been in effect, minus (b) the amount of interest actually paid under the Loan Documents. If a court of competent jurisdiction determines that Agent or any Lender has received interest in excess of the maximum amount allowed under Applicable Law, such excess shall be deemed received on account of, and shall automatically be applied to reduce, Obligations other than interest (regardless of any erroneous application thereof by Agent or any Lender), and upon Full Payment of the Obligations, any balance shall be refunded to Borrowers. In determining whether any excess interest has been charged or received by Agent or any Lender, all interest at any time charged or received from Borrowers in connection with the Loan Documents shall, to the extent permitted by Applicable Law, be amortized, prorated, allocated and spread in equal parts throughout the full term of the Obligations.

## SECTION 4.   LOAN ADMINISTRATION

**4.1   Manner of Borrowing and Funding Loans**.

4.1.9   <u>Notice of Borrowing</u>.

(c)   Whenever Borrowers desire funding of a Borrowing of Loans, Administrative Borrower shall give Agent a Notice of Borrowing. Such notice must be received by Agent no later than 2:00 p.m. (i) on the Business Day of the requested funding date, in the case of Base Rate Loans, and (ii) at least two (2) Business Days prior to the requested funding date, in the case of LIBOR Loans. Notices received after 2:00 p.m. shall be deemed received on the next Business Day. Each Notice of Borrowing shall be irrevocable and shall specify (A) the principal amount of the Borrowing, (B) the requested funding date (which must be a Business Day), (C) whether the Borrowing is to be made as Base Rate Loans or LIBOR Loans, and (D) in the case of LIBOR Loans, the duration of the applicable Interest Period (which shall be deemed to be one (1) month if not specified).

(d)   Unless payment is otherwise timely made by Borrowers, the becoming due of any Obligations (whether principal, interest, fees or other charges, including Extraordinary Expenses, LC Obligations, Cash Collateral and Bank Product Debt) shall be deemed to be a request for Base Rate Loans on the due date, in the amount of such Obligations. The proceeds of such Loans shall be disbursed as direct payment of the relevant Obligation.

(e)   At such time as Borrowers have established and maintain controlled disbursement accounts with Agent or Agent's Affiliate, the parties agree that the presentation for payment of any check or other item of payment drawn on, or other transfer made from, such account at a time when there are insufficient funds to cover it shall be deemed to be a request for Base Rate Loans on the date of such presentation, in the amount of the check and items presented for payment. At such time, the proceeds of such Loans may be disbursed directly to the controlled disbursement accounts or other appropriate account.

4.1.10   <u>Fundings by Lenders</u>. Each Lender shall timely honor its Commitment by funding its Pro Rata share of each Borrowing of Loans that is properly requested hereunder. Agent shall endeavor to notify Lenders of each Notice of Borrowing (or deemed request for a Borrowing) by 2:00 p.m. on the proposed funding date for Base Rate Loans or by 3:00 p.m. at least two (2) Business Days before the proposed funding date for LIBOR Loans. Each Lender shall fund to Agent such Lender's Pro Rata share of the Borrowing to the account specified by Agent in immediately available funds not later than 3:00 p.m. on the requested funding date, unless Agent's notice is received after the times provided in the immediately preceding sentence, in which event Lender shall fund its Pro Rata share by 11:00 a.m. on the Business Day immediately following the requested funding date. Subject to its receipt of such amounts from Lenders, Agent shall disburse the proceeds of the Loans as directed by Administrative Borrower. Unless Agent shall have received (in sufficient time to act) written notice from a Lender that it does not intend to fund its Pro Rata share of a Borrowing, Agent may assume that such Lender has deposited or promptly will deposit its share with Agent, and Agent may disburse a corresponding amount to Borrowers. If a Lender's share of any Borrowing is not in fact received by Agent, then Borrowers agree to repay to Agent on demand the amount of such share, together with interest thereon from the date disbursed until repaid, at the rate applicable to such Borrowing.

4.1.11   <u>Notices</u>. Each Loan Party authorizes Agent and Lenders to extend, convert or continue Loans, effect selections of interest rates, and transfer funds to or on behalf of Borrowers based on telephonic or e-mailed instructions. Administrative Borrower, for the account of Borrowers, shall confirm each such request by prompt delivery to Agent of a Notice of Borrowing or Notice of Conversion/Continuation, if applicable, but if it differs in any material respect from the action taken by Agent or Lenders, the records of Agent and Lenders shall govern absent manifest error. Neither Agent nor any Lender shall have any liability for any loss suffered by a Loan Party as a result of Agent or any Lender acting upon its understanding of telephonic or e-mailed instructions from a person believed in good faith by Agent or any Lender to be a person authorized to give such instructions on a Loan Party's behalf.

**4.2   Defaulting Lender.** Agent shall not be obligated to transfer to a Defaulting Lender any payments received by Agent for the Defaulting Lender's benefit, nor shall a Defaulting Lender be entitled to the sharing of any payments hereunder (including any principal, interest or fees and whether in respect of Loans, participation interests or otherwise). For purposes of voting or consenting to

matters with respect to this Agreement and the other Loan Documents and determining Pro Rata, such Defaulting Lender shall be deemed not to be a "Lender" and such Lender's Commitment shall be deemed to be zero (0). At any time that there is a Defaulting Lender, payments received for application to the Obligations payable to Lenders (other than the Defaulting Lender) in accordance with the terms of this Agreement shall be distributed to such non-defaulting Lenders on a Pro Rata basis calculated after giving effect to the reduction of the Defaulting Lender's Loan to zero (0) as provided herein or at Agent's option, Agent may instead receive and retain such amounts that would be otherwise attributable to the Pro Rata share of the Defaulting Lender. To the extent that Agent elects to receive and retain such amounts, Agent may hold them and, in its reasonable discretion, relend such amounts to Borrowers. To the extent that Agent exercises its option to relend such amounts, such amounts shall be treated as Loans for the account of Agent in addition to the Loans that are made by Lenders, other than Defaulting Lenders, on a Pro Rata basis as calculated after giving effect to the reduction of the Defaulting Lender's Commitment to zero (0) as provided herein but shall be repaid in the same order of priority as Protective Advances for purposes of Section 5.7.1 hereof, except as Agent may otherwise elect. Agent shall determine whether any Loans requested shall be made from relending such amounts or from Loans from Lenders other than the Defaulting Lenders and any allocation of requested Loans between them. The rights of a Defaulting Lender shall be limited as provided herein until such time as the Defaulting Lender (a) has made all payments to Agent of the amounts that it had failed to pay causing it to become a Defaulting Lender, (b) has made any other payments as it would have been required to make as a Lender during the period that it was a Defaulting Lender other than in respect of the principal amount of Loans, which payments as to the principal amount of Loans shall be settled and funded based on the outstanding principal balance of the Loans on the date that Defaulting Lender makes all of the payments required to be made under Section 4.2(a) above or shall be settled and funded by such Lender at such other time thereafter as Agent may specify, and (c) is otherwise in compliance with the terms of this Agreement. Upon the making of such payment or payments by Defaulting Lender with respect to the event that is the basis for it having become a Defaulting Lender, such Lender shall (i) cease to be a Defaulting Lender, (ii) only be entitled to receive the payment of interest (and no other amounts) accrued during the period that such Lender was a Defaulting Lender to the extent previously received and retained by Agent from or for the account of Borrowers relating to the funds constituting Loans funded by such Lender prior to the date that such Lender became a Defaulting Lender (and not previously paid to such Lender), (iii) have its Commitment reinstated for all purposes and (iv) fund Loans and settle in respect of the Loans and other Obligations in accordance with the terms hereof. The existence of a Defaulting Lender and the operation of this Section shall not be construed to increase or otherwise affect the Commitment of any Lender, or relieve or excuse (except as otherwise expressly provided herein with respect to such Defaulting Lender) the performance by any Borrower or Guarantor of its duties and obligations hereunder. During any period in which there is a Defaulting Lender with a Commitment, for purposes of computing the amount of the obligation of each non-Defaulting Lender to acquire, refinance or fund participations in Letters of Credit the Pro Rata share of each non-Defaulting Lender with a Commitment shall be computed without giving effect to the Commitment of that Defaulting Lender, and such obligation to so acquire, refinance or fund participations in such Letters of Credit shall automatically be reallocated among the non-Defaulting Lenders with Commitments or Commitments, as applicable, upon such Defaulting Lender becoming a Defaulting Lender; provided, that the aggregate obligation of each non-Defaulting Lender to acquire, refinance or fund participations in such Letters of Credit shall not exceed the positive difference, if any, of (1) the Commitment of that non-Defaulting Lender minus (2) the aggregate outstanding amount of the Loans of that Lender. No reallocation hereunder shall constitute a waiver or release of any claim of any party hereunder against a Defaulting Lender with a Commitment arising from that Lender having become a Defaulting Lender, including any claim of a non-Defaulting Lender as a result of such Non-Defaulting Lender's increased exposure following such reallocation.

**4.3   Number and Amount of LIBOR Loans; Determination of Rate.** For ease of administration, all LIBOR Loans having the same length and beginning date of their Interest Periods shall be aggregated together, and such Loans shall be allocated among Lenders on a Pro Rata basis. No more than eight aggregated LIBOR Loans may be outstanding at any time, and each aggregate LIBOR Loan when made, continued or converted shall be in a minimum amount of $1,000,000, or an increment of $250,000 in excess thereof.

Upon determining the LIBOR Lending Rate for any Interest Period requested by Borrowers, Agent shall promptly notify Administrative Borrower thereof by telephone or electronically and, if requested by Administrative Borrower, shall confirm any telephonic notice in writing.

**4.4   Administrative Borrower**.

(e)   Each Borrower hereby irrevocably appoints and constitutes Administrative Borrower as its agent to request and receive Loans and Letters of Credit pursuant to this Agreement and the Loan Documents from Agent or any Lender in the name or on behalf of such Borrower, Agent and Lenders may disburse the Loans to such bank account of Administrative Borrower or a Borrower or otherwise make such Loans to a Borrower and provide such Letters of Credit to a Borrower as Administrative Borrower may designate or direct, without notice to any other Borrower or Loan Party. Notwithstanding anything to the contrary contained herein, Agent may at any time and from time to time require that Loans to or for the account of any Borrower be disbursed directly to an operating account of such Borrower.

(f)   Administrative Borrower hereby accepts the appointment by Borrowers to act as Agent of Borrowers pursuant to

this Section 4.4. Administrative Borrower shall ensure that the disbursement of any Loans to each Borrower requested by or paid to or for the account of Borrowers, or the issuance of any Letters of Credit for a Borrower hereunder, shall be paid to or for the account of such Borrower.

(g)    Each Borrower and Guarantor hereby irrevocably appoints and constitutes Administrative Borrower as its agent to receive statements on account and all other notices from Agent and Lenders with respect to the Obligations or otherwise under or in connection with this Agreement and the Loan Documents.

(h)    Any notice, election, representation, warranty, agreement or undertaking by or on behalf of any other Loan Party by Administrative Borrower shall be deemed for all purposes to have been made by such Loan Party, as the case may be, and shall be binding upon and enforceable against such Loan Party to the same extent as if made directly by such Loan Party.

(i)    No purported termination of the appointment of Administrative Borrower as agent as aforesaid shall be effective, except after ten (10) days' prior written notice to Agent (or such shorter period as approved by Agent).

**4.5    One Obligation.** The Loans, LC Obligations and other Obligations shall constitute one general obligation of Borrowers and shall be secured by Agent's Lien upon all Collateral; provided, however, that Agent and each Lender shall be deemed to be a creditor of, and the holder of a separate claim against, each Borrower to the extent of any Obligations jointly or severally owed by such Borrower.

**4.6    Effect of Termination.** On the effective date of any termination of the Commitments, all Obligations (other than Bank Product Debt) shall be immediately due and payable, and any Lender may terminate its and its Affiliates' Bank Products (including, with the consent of Agent, any Cash Management Services). All undertakings of Loan Parties contained in the Loan Documents shall survive any termination of the Commitments, and Agent shall retain its Liens in the Collateral and all of its rights and remedies under the Loan Documents, in each case, until Full Payment of the Obligations. The provisions of Sections 2.3, 3.4, 3.6, 3.7, 3.9, 5.6, 5.10, 12, 15.2, 15.11 and this Section, and the obligation of each Loan Party and Lender with respect to each indemnity given by it in any Loan Document, shall survive Full Payment of the Obligations and any release relating to this credit facility (except as expressly provided for in any such release) provided, that the survival of Section 15.11 following Full Payment of the Obligations shall be limited to the period of two (2) years following such Full Payment of the Obligations. In addition to (and not in any way limiting) Section 15.20 hereunder, upon Full Payment of the Obligations (other than contingent indemnity Obligations which have not been asserted) and termination of all Commitments, Agent will, at Borrowers' sole expense, execute and deliver any termination statements, lien releases, discharges of security interests, and other similar discharge or release documents (and, if applicable, in recordable form) as are reasonably necessary to release, as of record, Agent's Liens and all notices of security interests and liens previously filed by Agent.

## SECTION 5.    PAYMENTS

**5.1    General Payment Provisions.** All payments of Obligations shall be made in Dollars, without offset, counterclaim or defense of any kind, and subject to Section 5.10, free of (and without deduction for) any Taxes, and in immediately available funds, not later than 2:00 p.m. on the due date. Any payment after such time, at the election of Agent, shall be deemed made on the next Business Day. Administrative Borrower, on behalf of Borrowers, may, at the time of payment, specify to Agent the Obligations to which such payment is to be applied; provided, that if not specified, such amounts shall be applied to repay outstanding Loans without a corresponding Commitment reduction. If any payment under the Loan Documents shall be stated to be due on a day other than a Business Day, the due date shall be extended to the next Business Day and such extension of time shall be included in any computation of interest and fees. Any payment of a LIBOR Loan prior to the end of its Interest Period shall be accompanied by the LIBOR Loan Prepayment Fee and all amounts due under Section 3.9. Subject to Section 5.7.1, any payment or prepayment of Loans shall be applied to each Lender's Loans on a Pro Rata basis. Subject to the immediately preceding sentence, any prepayment of Loans shall be applied first to Base Rate Loans and then to LIBOR Loans.

**5.2    Repayment of Loans.** Loans shall be due and payable in full on the Commitment Termination Date. Loans may be prepaid from time to time, without penalty or premium, other than the LIBOR Loan Prepayment Fee, if applicable. If an Overadvance exists, Borrowers shall immediately (or within two (2) Business Days with respect to the repayment of outstanding Loans in the event of an Overadvance caused by an establishment or modification of any component of the Availability Reserve then in effect to the extent that such establishment or modification is not subject to a two (2) Business Day notice period under the definition of Availability Reserve) repay the outstanding Loans and Cash Collateralize LC Obligations, in each case in an amount sufficient to reduce the Facility Exposure to the Collateral Line Cap; provided, that once any such Overadvance no longer exists any funds on deposit as Cash Collateral for LC Obligations shall be returned.

**5.3    Reserved.**

**5.4    Mandatory Prepayments**. Subject to Section 5.7, during any Cash Dominion Trigger Period, Borrowers shall (a) prepay the Loans, and (b) pay other amounts outstanding under this Agreement and the other Loan Documents with the proceeds and collections received by Loan Parties to the extent so required under the provisions of Section 8.3 (it being understood and agreed that for purposes of this sentence, LC Obligations shall be deemed to not be outstanding). Prepayments made pursuant to this Section 5.4, first, shall be applied ratably to the outstanding Loans (without any reduction in the Commitments), second, shall be applied ratably to all other amounts outstanding under this Agreement and the other Loan Documents, third, shall, if required by Agent during an Event of Default, be used to Cash Collateralize the LC Obligations, and fourth, so long as no Event of Default is continuing, shall be remitted to Borrowers.

**5.5    Payment of LIBOR Loans and Other Obligations**.

5.5.1    LIBOR Loans. LIBOR Loans may be prepaid upon the terms and conditions set forth herein. Administrative Borrower shall give Agent, no later than 2:00 p.m. at least two (2) Business Days' notice of any proposed prepayment of any LIBOR Loans, specifying the proposed date of payment of such LIBOR Loans, and the principal amount to be paid. Each partial prepayment of the principal amount of LIBOR Loans shall be in a minimum amount of $1,000,000 and integral multiples of $250,000 in excess thereof and accompanied by the payment of all charges outstanding on such LIBOR Loans and of all accrued interest on the principal repaid to the date of payment. Borrowers acknowledge that prepayment or acceleration of a LIBOR Loan during an Interest Period may result in Lenders incurring additional costs, expenses and/or liabilities and that it is extremely difficult and impractical to ascertain the extent of such costs, expenses and/or liabilities. Therefore, all full or partial prepayments of LIBOR Loans on any date prior to the last day of an Interest Period shall be accompanied by, and Borrowers hereby promise to pay to Agent for the Pro Rata benefit of Lenders, on each such date or the date all sums payable hereunder become due and payable, by acceleration or otherwise, in addition to all other sums then owing, an amount (excluding in all events the loss of anticipated profits) ("LIBOR Loan Prepayment Fee") determined by Agent pursuant to the following formula:

(c)    the then current LIBOR Rate applicable to an Interest Period with a maturity date closest to the end of the Interest Period with respect to the LIBOR Loans being prepaid as to which prepayment is made, subtracted from

(d)    the LIBOR Lending Rate applicable to the LIBOR Loan being prepaid.

If the result of this calculation is zero (0) or a negative number, then there shall be no LIBOR Loan Prepayment Fee. If the result of this calculation is a positive number, then the resulting percentage shall be multiplied by:

(iii)    the amount of the LIBOR Loan being prepaid.

The resulting amount shall be divided by:

(iv)    360

and multiplied by:

(v)    the number of days remaining in the Interest Period as to which the prepayment is being made.

The resulting amount of these calculations shall be the LIBOR Loan Prepayment Fee.

5.5.2    Other Obligations. Obligations (other than Loans, obligations under Hedging Agreements and Bank Product Debt), including LC Obligations and Extraordinary Expenses, shall be paid by Borrowers as provided in the Loan Documents or, if no payment date is specified, on written demand.

**5.6    Marshaling; Payments Set Aside.** None of Agent or Lenders shall be under any obligation to marshal any assets in favor of any Loan Party or against any Obligations. If any Loan Party makes a payment to Agent or Lenders, or if Agent or any Lender receives payment from the proceeds of Collateral, exercise of setoff or otherwise, and such payment is subsequently invalidated or required to be repaid to a trustee, receiver or any other Person, then the Obligations originally intended to be satisfied, and all Liens, rights and remedies therefor, shall be revived and continued in full force and effect as if such payment had not been received and any enforcement or setoff had not occurred.

**5.7    Post-Default Allocation of Payments**.

5.7.2    Allocation. Notwithstanding anything herein to the contrary (except, in the case of LC Obligations, Section 8.3.2), during an Event of Default, monies to be applied to the Obligations, whether arising from payments by Loan Party, realization on Collateral, setoff or otherwise, shall be allocated as follows:

(f)    <u>first</u>, to all costs and expenses, including Extraordinary Expenses, and indemnities owing to Agent pursuant to the Loan Documents;

(g)    <u>second</u>, to interest owing to Agent on Protective Advances or Overadvance Loans;

(h)    <u>third</u>, to pay the principal of all Protective Advances and Overadvance Loans;

(i)    <u>fourth</u>, to all Obligations constituting fees (excluding amounts relating to Bank Products);

(j)    <u>fifth</u>, to all Obligations constituting interest (excluding amounts relating to Bank Products, Protective Advances; and Overadvance Loans);

(k)    <u>sixth</u>, to pay the principal of all Loans not paid pursuant to clause (d) above and/or to Cash Collateralize LC Obligations;

(l)    <u>seventh</u>, to pay all other Obligations other than Obligations in connection with any Bank Product Debt;

(m)    <u>eighth</u>, to Bank Product Debt; and

(n)    <u>ninth</u>, as directed by a court of competent jurisdiction.

Amounts shall be applied to each category of Obligations set forth above until Full Payment of the Obligations thereof and then to the next category. If amounts are insufficient to satisfy a category, they shall be applied on a pro rata basis among the Obligations in the category. Amounts distributed with respect to any Bank Product Debt shall be the lesser of the applicable Bank Product Amount last reported to Agent and Administrative Borrower or the actual Bank Product Debt as calculated by the methodology reported to Agent and Administrative Borrower for determining the amount due. Agent shall have no obligation to calculate the amount to be distributed with respect to any Bank Product Debt, but may rely upon written notice of the amount (setting forth a reasonably detailed calculation) from the relevant Bank Product Provider. In the absence of such notice, Agent may assume the amount to be distributed is the Bank Product Amount last reported to it.

5.7.3    <u>Erroneous Application</u>. Agent shall not be liable for any application of amounts made by it in good faith and, if any such application is subsequently determined to have been made in error, the sole recourse of any Lender or other Person to which such amount should have been made shall be to recover the amount from the Person that actually received it (and, if such amount was received by any Lender, such Lender hereby agrees to return it).

**5.8    Application of Payments.** During a Cash Dominion Trigger Period, in accordance with Section 8.3.2, the collected funds in each Dominion Account as of the end of each Business Day (or less frequently if agreed to by Agent) shall be swept to the Master Account and promptly applied in accordance with Sections 5.4 and 8.3. If, as a result of Agent's receipt of Payment Items or proceeds of Collateral, a credit balance exists, the balance shall not accrue interest in favor of any Loan Party and shall be made available to Borrowers as long as no Event of Default exists in accordance with Section 5.4.

**5.9    Loan Account; Account Stated**.

5.9.1    <u>Loan Account</u>. Agent shall maintain in accordance with its usual and customary practices an account or accounts ("Loan Account") evidencing the Debt of Borrowers resulting from each Loan or issuance of a Letter of Credit from time to time. Any failure of Agent to record anything in the Loan Account, or any error in doing so, shall not limit or otherwise affect the obligation of Loan Parties to pay any amount owing hereunder. Agent may maintain a single Loan Account in the name of Administrative Borrower, and each Borrower confirms that such arrangement shall have no effect on the joint and several character of its liability for the Obligations.

5.9.2    <u>Entries Binding</u>. Entries made in the Loan Account shall constitute presumptive evidence of the information contained therein. If any information contained in the Loan Account is provided to or inspected by any Person, then such information shall be conclusive and binding on such Person for all purposes absent manifest error, except to the extent such Person notifies Agent in writing within forty-five (45) days after receipt or inspection that specific information is subject to dispute.

**5.10    Taxes.**

5.10.1    Except as required by Applicable Law, any and all payments by Borrowers to or for the account of Agent or any Lender under any Loan Document shall be made free and clear of and without deduction for any and all present or future Taxes, other than Excluded Taxes. If Borrowers shall be required by Applicable Law to withhold or deduct any Taxes with respect to any sum payable under any Loan Documents, (a) except with respect to withholding or deductions in respect of Excluded Taxes, the sum

payable to Agent or such Lender shall be increased as may be necessary so that, after making all required withholding or deductions, Agent or such Lender (as the case may be) receives an amount equal to the sum it would have received had no such withholding or deductions been made; (b) Borrowers shall make such withholding or deductions; and (c) Borrowers shall pay the full amount withheld or deducted to the relevant taxing or other authority in accordance with Applicable Law.

5.10.2    Borrowers shall indemnify Lenders, within thirty (30) days after written demand therefor, for the full amount of any Taxes (other than Excluded Taxes) paid or payable by such Lender on or with respect to any payment by or on account of any Obligations and any penalties, interest and reasonable expenses arising therefrom or with respect thereto; provided, that if any Borrower reasonably believes that such Taxes were not correctly or legally asserted, each Lender will use reasonable efforts to cooperate with such Borrower to obtain a refund of such Taxes so long as such efforts would not, in the reasonable determination of such Lender, result in any unreimbursed additional costs, expenses or risks or be otherwise disadvantageous to it; provided, further, that Borrowers shall not be required to compensate any Lender pursuant to this Section 5.10.2 for any amounts paid or incurred in any Fiscal Year for which such Lender is claiming compensation if such Lender does not furnish notice of such claim within 270 days from the end of such Fiscal Year; provided, further, that if the circumstances giving rise to such claim have a retroactive effect, then the beginning of such 270-day period shall be extended to include such period of retroactive effect. A certificate as to the amount of such payment or liability delivered to Administrative Borrower by a Lender, or by Agent on its own behalf or on behalf of any Lender, setting forth in reasonable detail the manner in which such amount was determined, shall be conclusive absent manifest error. Without limiting the provisions of Sections 5.10.1 or 5.10.2, each Lender shall, and does hereby, indemnify each Borrower and Agent, and shall make payment in respect thereof within ten (10) days after demand therefor, against any and all Excluded Taxes and any and all related losses, claims, liabilities, penalties, interest and expenses (including the fees, charges and disbursements of any counsel for such Borrower or Agent) incurred by or asserted against such Borrower or Agent by any Governmental Authority. Each Lender hereby authorizes Agent, Administrative Borrower or any Borrower to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any other Loan Document against any amount due to Agent under this Section 5.10.2. The agreements in this Section 5.10.2 shall survive the resignation and/or replacement of Agent, any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all other Obligations.

**5.11    Withholding Tax Exemption.**

5.11.1    Each Lender (with respect to the relevant lending office) and Agent shall, if reasonably requested by Administrative Borrower or Agent, deliver such documentation prescribed by Applicable Law or as reasonably requested by such party, as will enable such party to determine whether such Lender (with respect to the relevant lending office) is subject to withholding under Applicable Law, is entitled to an exemption from such withholding or is eligible for a reduced rate of withholding with respect to payments to be made to such Lender under the Loan Documents. In addition, each Lender (with respect to the relevant lending office) and Agent shall deliver updated or appropriate documentation (including any new documentation reasonably requested by the applicable withholding agent) promptly upon the obsolescence or invalidity of any documentation previously delivered by such party or promptly notify Administrative Borrower and Agent. In addition, each Lender (with respect to the relevant lending office) shall deliver to Administrative Borrower and Agent such other tax forms or other documents as shall be prescribed by Applicable Law, to the extent applicable, (x) to demonstrate that payments to such Lender (with respect to the relevant lending office) under this Agreement and the other Loan Documents are exempt from any withholding tax imposed pursuant to FATCA or (y) to allow Administrative Borrower and Agent to determine the amount to deduct or withhold. Without limiting the foregoing:

(d)    On or before the date on which a Foreign Lender (or Agent that is not a "United States person" as defined under Section 7701(a)(30) of the Code) becomes a party to this Agreement, the Foreign Lender (or Agent that is not a "United States person" as defined under Section 7701(a)(30) of the Code) shall deliver to Administrative Borrower and Agent two duly completed and executed copies of IRS Form W-8BEN, W-8ECI or W-8IMY (or any subsequent replacement or substitute form therefor), certifying that such Lender (or Agent that is not a "United States person" as defined under Section 7701(a)(30) of the Code) can receive payment of Obligations or other amounts payable hereunder without deduction or withholding of any United States federal income taxes and such other form or forms, certificates or documentation as reasonably requested by Administrative Borrower or Agent to confirm or establish that such party can receive payment of Obligations or other amounts payable hereunder without deduction or withholding of U.S. taxes. Without limiting the foregoing, any Foreign Lender that is relying on the portfolio interest exception of Section 871(h) or Section 881(c) of the Code, shall also provide Agent and Administrative Borrower with IRS Form W-8BEN (claiming exemption from U.S. withholding tax under the portfolio interest exemption) and a certificate, in a form acceptable to Agent and Administrative Borrower, representing to Agent and Administrative Borrower that such Foreign Lender is not: (1) a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (2) a "10 percent shareholder" of any Loan Party within the meaning of Section 871(h)(3)(B) of the Code, (3) a "controlled foreign corporation" receiving interest from a related person (within the meaning of Sections 881(c)(3)(C) of the Code) and (4) a conduit entity participating in a conduit financing arrangement as defined in Treasury Regulation Section 1.881-3 (a "U.S. Tax Compliance Certificate"). To the extent a Foreign Lender is not the beneficial owner, the Foreign Lender shall provide two (2) executed originals of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN, a U.S. Tax Compliance Certificate, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided, that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest

exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate on behalf of each such direct and indirect partner. Each Foreign Lender shall deliver to Administrative Borrower and Agent two additional copies of any such form and any such other forms and certifications from time to time if requested by Administrative Borrower or Agent and before the preceding form expires or becomes obsolete or after the occurrence of any event requiring a change in the form, as well as any amendments, extensions or renewals thereof as may be reasonably requested by Administrative Borrower or Agent, in each case, certifying that the Foreign Lender can receive payment of Obligations without deduction or withholding of any such taxes, unless an event (including any change in treaty or law) has occurred that renders such forms inapplicable or prevents the Foreign Lender from certifying that it can receive payments without deduction or withholding of such taxes. During any period that a Foreign Lender does not or is unable to establish that it can receive payments without deduction or withholding of such taxes, other than by reason of an event (including any change in treaty or law) that occurs after it becomes a Lender, Agent may withhold taxes from payments to such Foreign Lender at the applicable statutory and treaty rates, and Borrowers shall not be required to pay any additional amounts under this Section 5.11 or Section 5.10 as a result of such withholding.

(e)    On or before the date on which such a Lender or Agent becomes a party to this Agreement, each Lender or Agent that is a "United States person" as defined under Section 7701(a)(30) of the Code (a "U.S. Lender") shall deliver to Administrative Borrower and Agent such form or forms, certificates or documentation, including two (2) original executed copies of IRS Form W-9, and at all other times as reasonably requested by Administrative Borrower or Agent to confirm or establish that such Lender or Agent is not subject to deduction, withholding, or backup withholding of United States Tax with respect to any payments to such Lender. Such forms shall be delivered by each Lender to Administrative Borrower and Agent on or before the date such Lender becomes a party to this Agreement.

(f)    Each Lender having sold a participation in any of its obligations shall collect from such Participant the documents described in this Section 5.11.1 and provide them to Administrative Borrower and Agent.

5.11.2    If the Internal Revenue Service or any other Governmental Authority of the United States or any other jurisdiction asserts a claim that Agent did not properly withhold tax from amounts paid to or for the account of any Lender due to a failure on the part of Lender to comply with the provisions of Section 5.11.1, such Lender shall indemnify and hold Agent harmless for all amounts paid, directly or indirectly, by Agent, as tax or otherwise, including penalties and interest, and including any taxes imposed by any jurisdiction on the amounts payable to Agent under this Section 5.11.2, together with all costs and expenses (including attorney's fees and expenses). The obligation of Lenders under this subsection shall survive the payment of all Obligations and the resignation or replacement of Agent.

5.11.3    If a Lender or Agent receives a refund of Taxes for which a payment has been made by a Borrower pursuant to Section 5.10, then such Lender or Agent shall reimburse such Borrower for such amount (but only to the extent of indemnity payments made, or additional amounts paid, by Borrowers under Section 5.10 with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses by such Lender or Agent and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund).

**5.12    Nature and Extent of Each Borrower's Liability**.

5.12.1    <u>Joint and Several Liability</u>.

(a)    All Borrowers shall be liable for all amounts due to Agent and Lenders under this Agreement, regardless of which Borrower actually receives the Loans or Letters of Credit hereunder or the amount of such Loans received or the manner in which Agent and Lenders account for such Loans, Letters of Credit or other extensions of credit on its books and records. The Obligations with respect to Loans made to a Borrower, and the Obligations arising as a result of the joint and several liability of a Borrower hereunder, with respect to Loans made to the other Borrowers hereunder, shall be separate and distinct obligations, but all such Obligations shall be primary obligations of all Borrowers. The Obligations arising as a result of the joint and several liability of a Borrower hereunder with respect to Loans, Letters of Credit or other extensions of credit made to the other Borrowers hereunder shall, to the fullest extent permitted by law, be unconditional irrespective of (iv) the validity or enforceability, avoidance or subordination of the Obligations of the other Borrowers or of any promissory note or other document evidencing all or any part of the Obligations of the other Borrowers, (v) the absence of any attempt to collect the Obligations from the other Borrowers or any other security therefor, or the absence of any other action to enforce the same, (vi) the waiver, consent, extension, forbearance or granting of any indulgence by Agent or Lenders with respect to any provisions of any instrument evidencing the Obligations of the other Borrowers, or any part thereof, or any other agreement now or hereafter executed by the other Borrowers and delivered to Agent, for itself and on behalf of Lenders, except to the extent such waiver, consent, extension, forbearance or granting of any indulgence explicitly is effective with respect to such Borrower, (vii) the failure by Agent or Lenders to take any steps to perfect and maintain its security interest in, or to preserve its rights and maintain its security or collateral for the Obligations of the other Borrowers, (viii) the election of Agent or Lenders in any proceeding instituted under the Bankruptcy Code, of the application of Section 1111(b)(2) of the Bankruptcy Code, (ix) the disallowance of all or any portion of the claim(s) of Agent or Lenders for the repayment of the Obligations of the other

Borrowers under Section 502 of the Bankruptcy Code, or (x) any other circumstances which might constitute a legal or equitable discharge or defense of the other Borrowers other than Full Payment of the Obligations. With respect to the Obligations arising as a result of the joint and several liability of a Borrower hereunder with respect to Loans, Letters of Credit or other extensions of credit made to the other Borrowers hereunder, each Borrower waives, until Full Payment of the Obligations and this Agreement shall have been terminated, any right to enforce any right of subrogation or any remedy which Agent or Lenders now has or may hereafter have against Borrowers, any endorser or any guarantor of all or any part of the Obligations, and any benefit of, and any right to participate in, any security or collateral given to Agent and Lenders. Upon any Event of Default and for so long as the same is continuing, Agent and Lenders may proceed directly and at once, without notice, against any Borrower to collect and recover the full amount, or any portion of the Obligations, without first proceeding against the other Borrowers or any other Person, or against any security or collateral for the Obligations. Each Borrower consents and agrees that Agent and Lenders shall be under no obligation to marshal any assets in favor of Borrower(s) or against or in payment of any or all of the Obligations.

(b) Each Borrower expressly subordinates (to the extent permitted by Applicable Law) any and all rights of subrogation, reimbursement, indemnity, exoneration, contribution of any other claim which such Borrower may now or hereafter have against the other Borrowers or other Person directly or contingently liable for the Obligations hereunder, or against or with respect to the other Borrowers' property (including, without limitation, any property which is Collateral for the Obligations), arising from the existence or performance of this Agreement until Full Payment of the Obligations.

5.12.2  <u>Waivers</u>.

(a) Each Borrower expressly subordinates all rights that it may have now or in the future under any statute, at common law, in equity or otherwise, to compel Agent or Lenders to marshal assets or to proceed against any Loan Party, other Person or security for the payment or performance of any Obligations before, or as a condition to, proceeding against such Borrower. It is agreed among each Borrower, Agent and Lenders that the provisions of this Section are of the essence of the transaction contemplated by the Loan Documents and that, but for such provisions, Agent and Lenders would decline to make Loans and issue Letters of Credit.

(b) Agent and Lenders may, in their discretion, pursue such rights and remedies as they deem appropriate, including realization upon Collateral or any Real Property by judicial foreclosure or nonjudicial sale or enforcement, without affecting any rights and remedies under this Section 5.12. If, in the exercise of any rights or remedies, Agent or any Lender shall forfeit any of its rights or remedies, including its right to enter a deficiency judgment against any Loan Party, whether because of any Applicable Laws pertaining to "election of remedies" or otherwise, each Borrower consents to such action by Agent or such Lender and waives (to the extent permitted by Applicable Law) any claim based upon such action, even if the action may result in loss of any rights of subrogation that any Borrower might otherwise have had but for such action. Any election of remedies that results in denial or impairment of the right of Agent or any Lender to seek a deficiency judgment against any Borrower shall not impair any other Borrower's obligation to pay the full amount of the Obligations. Each Borrower waives all rights and defenses arising out of an election of remedies, such as nonjudicial foreclosure with respect to any security for the Obligations, even though that election of remedies destroys such Borrower's rights of subrogation against any other Person. If Agent bids at any foreclosure or trustee's sale or at any private sale, Agent may bid all or a portion (in Agent's discretion) of the Obligations and the amount of such bid need not be paid by Agent but shall be credited against the Obligations. Subject to Applicable Law, the amount of the successful bid at any such sale, whether Agent or any other Person is the successful bidder, shall be conclusively deemed to be commercially reasonable, and the difference between such bid amount and the remaining balance of the Obligations shall be conclusively deemed to be the amount of such Borrower's Obligations to Agent and Lenders, notwithstanding that any present or future law or court decision may have the effect of reducing the amount of any deficiency claim to which Agent or any Lender might otherwise be entitled but for such bidding at any such sale.

5.12.3  <u>Joint Enterprise</u>. Each Borrower has requested that Agent and Lenders make this credit facility available to Borrowers on a combined basis, in order to finance Borrowers' business most efficiently and economically. Borrowers hereby represent and warrant to Agent and Lenders that (a) Borrowers' business is a mutual and collective enterprise, (b) Borrowers make up a related organization of various entities constituting a single economic and business enterprise in which Borrowers share an identity of interests such that any benefit received by any one of them benefits the other Borrowers; and (c) certain of Borrowers render services to or for the benefit of other Borrowers, as the case may be, purchase or sell and supply goods to or from or for the benefit of the others, make loans, advances and provide other financial accommodations to or for the benefit of the other Borrowers (including, inter alia, the payment by Borrowers of creditors of the other Borrowers and guarantees by Borrowers of indebtedness of the other Borrowers and the provision of administrative, marketing, payroll and management services to or for the benefit of the other Borrowers). Borrowers believe that consolidation of their credit facility will enhance the borrowing power of each Borrower and ease the administration of their relationship with Lenders, all to the mutual advantage of Borrowers. Borrowers acknowledge and agree that Agent's and Lenders' willingness to extend credit to Borrowers and to administer the Collateral on a combined basis, as set forth herein, is done solely as an accommodation to Borrowers and at Borrowers' request.

**SECTION 6.  CONDITIONS PRECEDENT**

**6.1**    **Conditions Precedent to Initial Loans.** In addition to the conditions set forth in Section 6.2, Lenders shall not be required to fund any requested Loan or issue any Letter of Credit until the date ("Closing Date") that each of the following conditions has been satisfied or waived in writing by Agent:

6.1.2    Loan Documents. This Agreement and the other Loan Documents, which shall be in form and substance reasonably satisfactory to Agent and Parent, shall have been duly executed by each Loan Party that is to be a party thereto. Agent on behalf of the Secured Parties shall, upon the filing of the applicable documentation (and the payment of applicable fees), notation of title, maintenance of control or possession, have a Lien in the Collateral (other than as set forth in the Post-Closing Side Letter) of the type and priority necessary to satisfy the Collateral and Guarantee Requirement.

6.1.3    Transactions. Prior to or substantially concurrently with the funding of the Loans on the Closing Date, each of the Transactions shall be consummated and Loan Parties shall have paid all fees and expenses which have been invoiced at least two (2) Business Days prior to the Closing Dates and were incurred in connection with the Transactions to the extent earned, due and payable on or before the Closing Date.

6.1.4    Dominion Accounts. Agent shall have received duly executed Deposit Account Control Agreements with respect to each deposit account maintained by Loan Parties at RBS on the Closing Date (other than Excluded Deposit Accounts).

6.1.5    Officer's Certificates. Agent shall have received certificates, in form and substance reasonably satisfactory to it, from a knowledgeable Responsible Officer of Administrative Borrower certifying that, after giving effect to the Transactions and the initial Loans and transactions hereunder, (i) Loan Parties on a consolidated basis are Solvent; (ii) no Default or Event of Default exists; (iii) the representations and warranties set forth in Section 9 are true and correct in all material respects (without duplication of other materiality qualifications contained therein) as of such date (except for representations and warranties that expressly relate to an earlier date and in such case are true and correct in all material respects (without duplication of other materiality qualifications contained therein) as of such date); and (iv) since December 31, 2012, there has not occurred any event or condition which could reasonably be expected to have a Material Adverse Effect.

6.1.6    Resolutions, Organization Documents, Incumbency Certificate. Agent shall have received a certificate of a duly authorized officer of each Loan Party, certifying (g) that attached copies of such Loan Party's Organization Documents are true and complete, and in full force and effect, without amendment except as shown, (h) that an attached copy of resolutions authorizing execution and delivery of the Loan Documents is true and complete, and that such resolutions are in full force and effect, were duly adopted, have not been amended, modified or revoked, and constitute all resolutions adopted with respect to this credit facility, and (i) to the title, name and signature of each Person authorized to sign the Loan Documents on the Closing Date. Agent may conclusively rely on this certificate until it is otherwise notified by the applicable Loan Party in writing. For the avoidance of doubt, it is understood and agreed that the same certificate delivered pursuant to the Term Debt Documents shall satisfy the requirement set forth herein; provided, that, (i) appropriate the certifications made in such certificate are also made to Agent and Lenders under this facility and (ii) such certificate is in form reasonably satisfactory to Agent.

6.1.7    Opinion. Agent shall have received, on behalf of itself and Lenders, an opinion of (i) Kirkland & Ellis LLP, counsel for Loan Parties, and (ii) from each local counsel for Loan Parties listed on Schedule 6.1.6, in each case, dated the Closing Date and addressed to Agent, Loan Parties and Lenders and in customary form and substance, and Loan Parties hereby request such counsel to deliver such opinions.

6.1.8    Good Standing Certificates. Agent shall have received copies of the charter documents of each Loan Party, certified as appropriate by the Secretary of State or another official of such Loan Party's jurisdiction of organization. Agent shall have received good standing certificates for each Loan Party, issued by the Secretary of State or other appropriate official of (a) such Loan Party's jurisdiction of organization and (b) for Borrowers, each jurisdiction of such Borrower's chief executive office (to the extent such concept exists within such jurisdiction).

6.1.9    Insurance. To the extent required by Section 10.1.7, Agent shall have received (to the extent it is commercially reasonable for Loan Parties to provide) evidence of insurance and loss payee and additional insured endorsements required hereunder and under the other Loan Documents, in substance reasonably satisfactory to Agent, and certificates of insurance policies and/or endorsements naming Agent as loss payee and an additional insured.

6.1.10    Due Diligence.

(g)    Agent shall have received a set of projections of Parent and Restricted Subsidiaries for the Fiscal Year 2014 and 2015 (on a month-by-month basis) and for Fiscal Years 2016, 2017 and 2018 (on a year-by-year basis).

(h)    Agent shall have received, in form and substance reasonably satisfactory to Agent and Lenders, the results of

background checks on the chairman, chief financial officer and chief executive officer of Parent.

6.1.11    Borrowing Base Certificate. Agent shall have received a Borrowing Base Certificate prepared as of the Closing Date or as of such other date as Agent and Administrative Borrower may mutually agree, accompanied by applicable documentation supporting the information contained therein, including but not limited to account aging reports.

6.1.12    Availability. After giving effect to the Transactions, (a) Availability shall not be less than fifteen percent (15%) of the Collateral Line Cap, and (b) Availability plus cash on the balance sheet of Parent and Restricted Subsidiaries (other than the Eligible Borrowing Base Cash or other restricted cash) shall not be less than $200,000,000.

6.1.13    Searches/Discharge of Liens. Agent shall have received UCC, tax lien and judgment search results for the jurisdiction of organization of each Loan Party and each other jurisdiction or location reasonably requested by Agent, which search results shall be in substance reasonably satisfactory to Agent. Agent shall have received evidence that all Liens (other than Permitted Liens) affecting the assets of Loan Parties have been or will be discharged on or before the Closing Date.

6.1.14    Possessory Collateral. Term Agent shall have received all possessory collateral required to be delivered to Term Lender pursuant to the Term Debt Documents which shall contain provisions reasonably satisfactory to Agent pursuant to which the Term Lender agrees to hold such possessory collateral as agent (on a second priority basis) for Agent.

6.1.15    Third Party Waivers and Consents. Except as could not reasonably be expected to cause a Material Adverse Effect, Agent shall have received all consents, waivers, acknowledgements and other agreements from third persons necessary in order to permit, protect and perfect its Lien upon the Collateral or to effectuate the provisions and purposes of this Agreement and the other Loan Documents.

6.1.16    USA PATRIOT Act . Lenders shall have received all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the Patriot Act, in each case, to the extent requested in writing to Administrative Borrower at least three (3) Business Days in advance of the Closing Date.

6.1.17    Absence of Material Litigation. There shall not be pending any litigation or other proceeding relating to this Agreement or the Transactions.

6.1.18    Organizational and Capital Structure. After giving effect to the Transactions, the organizational and capital structure of Parent and its Subsidiaries shall be reasonably satisfactory to Agent.

6.1.19    Governmental Approvals. All material governmental approvals necessary in connection with this Agreement shall have been obtained and be in full force and effect, and all waiting periods shall have expired without any action being taken or threatened by any Governmental Authority that would restrain or otherwise impose adverse conditions on this Agreement.

6.1.20    Other Debt for Borrowed Money. After giving effect to the Transactions, Loan Parties shall have outstanding no Debt for borrowed money other than (a) Debt under this Agreement, (b) the Term Debt, (c) Debt set forth on Schedule 10.2.3(b), and (d) Debt otherwise permitted pursuant to Section 10.2.

6.1.21    Intercompany Sale of Accounts. Substantially concurrent with the consummation of the Transactions, evidence reasonably satisfactory to Agent that all Accounts held by Receivables SPV prior to the Closing Date and intended to constitute Eligible Accounts have been duly transferred to one or more Loan Parties.

Execution and delivery to Agent by a Lender of a counterpart of this Agreement shall be deemed confirmation by such Lender that (i) all conditions precedent in this Section 6.1 have been fulfilled to the satisfaction of such Lender, (ii) the decision of such Lender to execute and deliver to Agent an executed counterpart of this Agreement was made by such Lender independently and without reliance on an Agent or any other Lender as to the satisfaction of any condition precedent set forth in this Section 6.1, and (iii) all documents sent to such Lender for approval, consent, or satisfaction were acceptable to such Lender.

6.2    **Conditions Precedent to All Credit Extensions.** Agent, Issuing Bank and Lenders shall not be required to fund any Loans or arrange for issuance of any Letters of Credit (or any amendment, renewal or extension of any Letter of Credit which increases the stated amount thereof) to or for the benefit of Borrowers, unless the following conditions are satisfied (or waived):

6.2.2    No Default or Event of Default. No Default or Event of Default shall exist at the time of, or result from, such funding, issuance or grant;

6.2.3    Representations and Warranties. The representations and warranties of each Loan Party in the Loan Documents shall be true and correct in all material respects (without duplication of any materiality qualifications contained therein) on the date of, and upon

giving effect to, such funding, issuance or grant (except for representations and warranties that expressly relate to an earlier date and on such date are true and correct in all material respects (without duplication of any materiality qualifications contained therein) as of such date);

       6.2.4   <u>No Overadvance</u>. No Overadvance or unfunded Cash Collateralizing obligation shall exist or result from such funding or issuance; and

       6.2.5   <u>LC Conditions</u>. With respect to issuance of a Letter of Credit, the LC Conditions shall be satisfied (or waived).

Each request (or deemed request) by Administrative Borrower, on behalf of Borrowers, for funding of a Loan or issuance of a Letter of Credit to or for the benefit of Borrowers (other than, for the avoidance of doubt, any conversion or continuation of an existing Loan) shall constitute a representation by Borrowers that the foregoing conditions are satisfied on the date of such request and on the date of such funding or issuance.

       **6.3  Limited Waiver of Conditions Precedent.** If Agent, Issuing Bank or Lenders fund any Loans or arrange for issuance of any Letters of Credit to or for the benefit of Borrowers when any conditions precedent are not satisfied (regardless of whether the lack of satisfaction was known or unknown at the time), it shall not operate as a waiver of (c) the right of Agent, Issuing Bank and Lenders to insist upon satisfaction of all conditions precedent with respect to any subsequent funding or issuance; nor (d) any Default or Event of Default due to such failure of conditions or otherwise.

## SECTION 7.  COLLATERAL

       **7.1  Grant of Security Interest.**

       7.1.6   <u>Pledge</u>. As security for the payment or performance, as the case may be, in full of the Obligations, each Loan Party hereby collaterally assigns and pledges to Agent, for the benefit of Secured Parties, and hereby grants to Agent, for the benefit of Secured Parties, a continuing security interest in, all of such Loan Party's right, title and interest in, to and under (i) all Equity Interests held by it (including those Equity Interests listed on Schedule 7.1.1(a)) and any other Equity Interests obtained in the future by such Loan Party and the certificates representing all such Equity Interests (the "<u>Pledged Equity</u>"); <u>provided</u>, that (A) the Pledged Equity shall not include more than 65% of the voting Equity Interests of (x) each Foreign Subsidiary and (y) each Domestic Subsidiary that is a disregarded entity for U.S. federal income tax purposes substantially all of the assets of which consist of Equity Interests or Debt of one or more Foreign Subsidiaries and (B) the Pledged Equity shall not include (x) Margin Stock, (y) Equity Interests in any joint venture, alliance or marketing arrangement or in any Subsidiary that is not a wholly owned Subsidiary of Parent (but shall include Proceeds thereof), but only to the extent that the creation of a security interest in such Equity Interests is prohibited or restricted by the Organization Documents of such joint venture, alliance or marketing arrangement or Subsidiary or by any contractual restriction contained in any agreement with third party holders of other Equity Interests in such joint venture, alliance or marketing arrangement or Subsidiary which holders are not Affiliates of Parent (except to the extent any such prohibition or restriction is deemed ineffective under the UCC or other Applicable Law) or (z) Equity Interests of (or held as assets by) Unrestricted Subsidiaries, Immaterial Subsidiaries or captive insurance Subsidiaries; (ii)(A) the Promissory Notes and any Instruments evidencing indebtedness owned by it listed opposite the name of such Loan Party on Schedule 7.1.1(a) and (B) any Promissory Notes and Instruments evidencing indebtedness obtained in the future by such Loan Party (the "<u>Pledged Debt</u>"); (iii) all other property that may be delivered to and held by Agent pursuant to the terms of this Section 7.1; (iv) subject to Section 8.5, all payments of principal or interest, dividends, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of, in exchange for or upon the conversion of, and all other Proceeds received in respect of, the securities referred to in clauses (i) and (ii) above; (v) subject to Section 8.5, all rights and privileges of such Loan Party with respect to the securities and other property referred to in clauses (i), (ii), (iii) and (iv) above; and (vi) all Proceeds of, and Security Entitlements in respect of, any of the foregoing (the items referred to in clauses (i) through (vi) above being collectively referred to as the "<u>Pledged Collateral</u>"). Notwithstanding the foregoing, if after the date hereof any Loan Party shall acquire any Equity Interest or Promissory Note (1) in which a pledge (or other security interest) is prohibited or restricted by applicable law or requires the consent of any governmental authority or third party, (2) to the extent a pledge of such Equity Interests or Promissory Note could result in adverse tax consequences as reasonably determined by Parent in consultation with Agent and as to which Parent shall have confirmed such determination by written notice to Agent or is otherwise listed on Schedule 7.1.1(a) on the Closing Date; <u>provided</u>, such asset is not specifically included in the Collateral or (3) in circumstances where the cost of obtaining a pledge of such Equity Interests or Promissory Note exceeds the practical benefit to Lenders afforded thereby as reasonably determined between Parent and the Collateral Agent and as to which Agent shall have confirmed such determination by written notice to Administrative Borrower or is otherwise listed on Schedule 7.1.1(a) on the Closing Date then such Equity Interest or Promissory Note shall not be included in the Pledged Collateral. In addition, notwithstanding the foregoing or anything else to the contrary in this Agreement or in any Loan Document, in no event shall any Excluded Property constitute Pledged Collateral.

       TO HAVE AND TO HOLD the Pledged Collateral, together with all right, title, interest, powers, privileges and preferences pertaining or incidental thereto, unto the Collateral Agent, its successors and assigns, for the benefit of the applicable

Secured Parties, forever; subject, however, to the terms, covenants and conditions hereinafter set forth.

7.1.7    Security Interests in Personal Property. As security for the payment or performance, as the case may be, in full of the Obligations, each Loan Party hereby collaterally assigns and pledges to Agent, for the benefit of Secured Parties, and hereby grants to Agent, for the benefit of Secured Parties, a security interest (the "Security Interest") in, all right, title or interest in, to or under any and all of the following assets and properties now owned or at any time hereafter acquired by such Loan Party or in which such Loan Party now has or at any time in the future may acquire any right, title or interest (collectively, the "Article 9 Collateral"):

(c)   all Accounts;

(d)   all Chattel Paper;

(e)   all Documents;

(f)   all Equipment (including, without limitation, all Tractor Trailers and Rolling Stock);

(g)   all General Intangibles;

(h)   all Instruments;

(i)   all Inventory;

(j)   all Investment Property;

(k)   all books and records pertaining to the Article 9 Collateral;

(l)   all Goods and Fixtures;

(m)   all Money, cash, Cash Equivalents and Deposit Accounts;

(n)   all Letter-of-Credit Rights;

(o)   all Commercial Tort Claims described on Schedule 7.1(c) from time to time;

(p)   each Collateral Account, and all cash, Money, Securities and other investments deposited therein;

(q)   all Supporting Obligations;

(r)   all Security Entitlements in any or all of the foregoing;

(s)   all Intellectual Property; and

(t)   to the extent not otherwise included, all Proceeds and products of any and all of the foregoing (including proceeds of all insurance policies) and all collateral security and guarantees given by any Person with respect to any of the foregoing; provided, that notwithstanding anything to the contrary in this Agreement, this Agreement shall not constitute a grant of a security interest in or a pledge of Excluded Property or solely for purposes of this Agreement, the Limited States Vehicle Collateral (as defined in the Vehicle Collateral Agreement), such security interest in the Limited States Vehicle Collateral being granted as of the date hereof to Credit Suisse AG, Cayman Islands Branch, as collateral agent under the Vehicle Collateral Agreement.

**7.2    Cash Collateral**. Any Cash Collateral may be invested, in Agent's reasonable discretion in consultation with Administrative Borrower, in Cash Equivalents (it being further understood and agreed that all interest on such Cash Equivalents belongs to Loan Parties), but Agent shall have no duty to do so, regardless of any agreement, understanding or course of dealing with any Loan Party, and shall have no responsibility for any investment or loss (other than in the case of gross negligence, willful misconduct or bad faith of the terms of this Agreement). Each Loan Party hereby grants to Agent, for the benefit of Secured Parties, a security interest in all Cash Collateral held from time to time and all proceeds thereof, as security for the Obligations, whether such Cash Collateral is held in the Cash Collateral Account or elsewhere. Agent may apply Cash Collateral to the payment of any Obligations, as they become due and payable in accordance with the terms of this Agreement. The Cash Collateral Account and all Cash Collateral shall be under the sole dominion and control of Agent. No Loan Party or other Person claiming through or on behalf of any Loan Party shall have any right to any Cash Collateral, until the Full Payment of the Obligations or the termination or cancellation of such Obligations that are Cash Collateralized or until the conditions resulting in the requirement to provide such Cash Collateral cease to exist, whereupon all rights to such Cash Collateral will automatically revert to Loan Parties without further action of any

Person.

**7.3   Real Property Collateral**. The Obligations shall also be secured by Mortgages upon all Material Real Property owned by Loan Parties. If any Loan Party acquires a fee interest in any Material Real Property after the Closing Date, Loan Parties shall, within sixty (60) days (or such later date as Agent may agree in its reasonable discretion), execute and deliver a Mortgage in form for recording and sufficient to create a second priority Lien, subject to the Term Debt Intercreditor Agreement, in favor of Agent on such Material Real Property, and shall deliver all other documents, certificates and information required by the Collateral and Guaranty Requirements.

**7.4   Other Collateral**.

7.4.3   Commercial Tort Claims. Each Loan Party shall concurrently with the delivery of next required Compliance Certificate notify Agent in writing if any Loan Party has a Commercial Tort Claim solely to the extent such claim is asserted in writing (other than a Commercial Tort Claim for less than $5,000,000) and, promptly following upon Agent's reasonable written request, shall promptly execute such documents and take such actions as Agent deems reasonably necessary to confer upon Agent (for the benefit of Secured Parties) a duly perfected, second priority Lien upon such claim, subject to the Term Debt Intercreditor Agreement and Permitted Liens.

7.4.4   Certain After-Acquired Collateral. Subject to the Collateral and Guarantee Requirement, the Term Debt Agreement and the Loan Documents, each Loan Party shall, with the delivery of the next required Compliance Certificate, notify Agent in writing in such Compliance Certificate if, after the Closing Date, any Loan Party obtains any interest in any Collateral consisting of Deposit Accounts, Chattel Paper, Documents, Instruments, Intellectual Property, Investment Property or Letter-of-Credit Rights and, upon Agent's reasonable written request, shall promptly execute such documents and take such actions as Agent reasonably deems appropriate to effect Agent's duly perfected, Lien (subject to Permitted Liens) upon such Collateral, including obtaining any necessary possession or control agreement subject, in each instance, to the Term Debt Intercreditor Agreement. Within the same delivery period as required for the delivery of the annual Compliance Certificate required to be delivered under 10.1.2 of this Agreement, Administrative Borrower shall provide a list of any additional USPTO or USCO registrations of Intellectual Property of all Loan Parties not previously disclosed to Agent including such information as is necessary to make appropriate filings in the USPTO and USCO.

**7.5   No Assumption of Liability.** The Lien on Collateral granted hereunder is given as security only and shall not subject Agent or any Lender to, or in any way modify, any obligation or liability of Loan Parties relating to any Collateral.

**7.6   Further Assurances.** To the extent required under the Collateral and Guarantee Requirement, promptly following reasonable written request from Agent, Loan Parties shall deliver such instruments, assignments, supplements, title certificates, or Loan Documents or agreements, and shall take such actions, as Agent deems reasonably necessary under Applicable Law to evidence or perfect, preserve and protect its Lien on any Collateral, or otherwise to give effect to the intent of this Section 7, in each instance subject to the Term Debt Intercreditor Agreement and the Collateral and Guarantee Requirement. Each Loan Party authorizes Agent to file in any relevant jurisdiction any financing statement and any amendments thereto that indicates the Collateral as "all assets" or "all personal property" of such Loan Party, or words to similar effect. To the extent consistent with the Collateral and Guarantee Requirement, each Loan Party hereby further authorizes Agent to file filings with the USPTO and USCO (or any successor office or any similar office) or other necessary documents for the purpose of perfecting, confirming, continuing, enforcing or protecting the security interest granted by such Loan Party hereunder in any Intellectual Property, without the signature of such Loan Party, and naming such Loan Party, as debtor, and Agent, as secured party.

**SECTION 8.   COLLATERAL ADMINISTRATION**

**8.1   Borrowing Base Certificates.** By (i) the fifteenth (15th) day of each calendar month, or (ii) during an Accelerated Reporting Trigger Event or the continuance of an Event of Default, on the third (3rd) Business Day of each week, Administrative Borrower, on behalf of Borrowers, shall deliver to Agent (and Agent shall promptly deliver same to Lenders) a Borrowing Base Certificate prepared (x) as of the close of business on the last Business Day of the previous calendar month in the case of clause (i) above and (y) as of the close of business on the preceding Friday in the case of clause (ii) above; provided, that Administrative Borrower shall be entitled to give notice to Agent (no more frequently than once per Fiscal Quarter) of its intent to submit weekly Borrowing Base Certificates, and, upon giving such notice, shall submit weekly Borrowing Base Certificates in the manner set forth in clause (ii) above through the full month following the month during which such notice is delivered; provided further that the first weekly Borrowing Base Certificate may be delivered sooner than the third (3rd) Business Day of a week. All calculations of Availability in any Borrowing Base Certificate shall originally be made by Administrative Borrower, on behalf of Borrowers, and certified by a Responsible Officer of Administrative Borrower; provided, that Agent may from time to time review (with 2 Business Days prior written notice to Administrative Borrower) and adjust any such calculation in its Permitted Discretion after consultation with Administrative Borrower solely to the extent the calculation is not made in accordance with this Agreement or does not accurately reflect the Availability Reserve.

**8.2    Administration of Accounts**.

8.2.3    <u>Records and Schedules of Accounts</u>. Each Loan Party shall keep accurate and complete records of its Accounts in all material respects, including all payments and collections thereon, and shall submit to Agent, on such periodic basis as Agent may reasonably request (provided, that absent the occurrence and continuance of an Event of Default or an Accelerated Reporting Trigger Period, such reports shall not be required more than one time per month), a sales and collections report, in form reasonably satisfactory to Agent. Each Loan Party shall also provide to Agent, on or before the fifteenth (15th) day of each calendar month (or on the third (3rd) Business Day of each week during an Accelerated Reporting Trigger Period), (x) a detailed aged trial balance of all Accounts as of the end of the preceding calendar month (or week, as the case may be), specifying each Account's Account Debtor name and address, amount, invoice date and due date, and (y) a reasonably detailed dilution report.

8.2.4    <u>Taxes</u>. If an Account of any Loan Party includes a charge for any Taxes, and if an Event of Default has occurred and is continuing, Agent, upon providing ten (10) days' prior notice to such Loan Party, is authorized, in its discretion, to pay the amount thereof to the proper taxing authority for the account of such Loan Party and to charge such Loan Party therefor; provided, however, that neither Agent nor Lenders shall be liable by exercise of Agent's rights under this Section 8.2.2 for any Taxes that may be due from any Loan Party or with respect to any Collateral.

8.2.5    <u>Account Verification</u>. Upon the occurrence and during the continuance of an Event of Default, upon notice to Administrative Borrower, Agent shall have the right at any time, in the name of Agent, any designee of Agent or any Loan Party to verify the validity, amount or any other matter relating to any Accounts of Loan Party by mail, telephone or otherwise. Loan Parties shall cooperate fully with Agent in an effort to facilitate and promptly conclude any such verification process.

8.2.6    <u>Proceeds of Collateral</u>. Loan Parties shall take all reasonable steps to ensure that all payments on Accounts or otherwise relating to Collateral and all other amounts received by any Loan Party or any Subsidiary are made directly to a Dominion Account. If any Loan Party or Subsidiary receives cash or Payment Items with respect to any Collateral, it shall hold same in trust for Agent and promptly deposit the same into a Dominion Account or, during a Cash Dominion Trigger Event, remit same to the Master Account in accordance with Section 8.3.

**8.3    Administration of Deposit Accounts; Cash Dominion Trigger Period; Borrowing Base Cash Account.**

8.3.5    <u>Deposit Accounts; Deposit Account Control Agreements</u>.

(d)    Schedule 8.3 sets forth all deposit accounts maintained by Loan Parties. Each Loan Party shall promptly notify Agent of any opening or closing of a deposit account and will amend Schedule 8.3 to reflect same at the next required delivery of a Compliance Certificate. Except for Excluded Deposit Accounts, each Loan Party shall be the sole account holder (unless co-owned with another Loan Party) of each deposit account owned by it and shall not allow any other Person (other than Agent and Term Agent or any of its agents or designees) to have control over any deposit account of Loan Parties or any Property deposited therein.

(e)    Loan Parties shall obtain a Deposit Account Control Agreement covering, or otherwise take all reasonable actions necessary to establish Agent's control of, each deposit account of Loan Parties other than Excluded Deposit Accounts. Notwithstanding anything to the contrary contained in this Section 8.3, Agent and Lenders hereby agree that Loan Parties may have (x) up to forty-five (45) days following the Closing Date (or such later date as Agent shall agree in its reasonable discretion) to obtain a Deposit Account Control Agreement covering, or otherwise take all reasonable actions necessary to establish Agent's control of, each deposit account (other than Excluded Deposit Accounts) maintained by Loan Parties with any bank or depository other than RBS, and (y) up to sixty (60) days following the consummation of any Permitted Acquisition or acquisition constituting an Investment permitted under this Agreement (or such later date as Agent shall agree in its reasonable discretion (not to be unreasonably withheld, delayed or conditioned)) to obtain a Deposit Account Control Agreement covering, or otherwise take all reasonable actions necessary to establish Agent's control of, each deposit account (other than Excluded Deposit Accounts) acquired by any Loan Party in connection with such transaction.

8.3.6    <u>Cash Dominion Trigger Period</u>.

(i)    Loan Parties acknowledge and agree that, during a Cash Dominion Trigger Period, all available funds constituting the proceeds of ABL Priority Collateral (whether or not on deposit in a Dominion Account) shall be transferred daily to the Master Account and, to the extent that there are any amounts outstanding hereunder or under any other Loan Document, to Agent Payment Account and applied by Agent in accordance with Sections 5.4 and 5.8 and this Section 8.3. Accordingly, each Loan Party hereby authorizes and directs each Dominion Account bank to deliver to the Master Account, on a daily basis, all balances in each Dominion Account. Each Loan Party irrevocably appoints Agent as such Loan Party's attorney-in-fact, during a Cash Dominion Trigger Period, to collect such balances to the extent any such delivery is not so made. Agent agrees that it shall not give any instructions under any Deposit Account Control Agreement, or withhold any withdrawal rights with respect to funds in any Dominion Account, unless, until

and only for so long as a Cash Dominion Trigger Period is in effect.

(j)    During the continuance of a Cash Dominion Trigger Period or, at the election of Agent, if an Event of Default has occurred and is continuing, Agent agrees that (x) each Loan Party may have unfettered access to cash on deposit in all Dominion Accounts to the extent not used to pay outstanding amounts under this Agreement in accordance with Sections 5.4 and 5.8 and this Section 8.3, and (y) Loan Parties shall have no obligation to Cash Collateralize the LC Obligations outstanding at such time.

(k)    Following the end of any Cash Dominion Trigger Period, (x) those automatic transfers to the Master Account described above shall cease, (y) Agent shall promptly transfer all amounts on deposit in the Master Account to the Concentration Account or such other deposit account as directed by Administrative Borrower, and (z) Agent shall promptly revoke those instructions delivered by Agent during such Cash Dominion Trigger Period to each Dominion Account bank with respect to each Dominion Account.

8.3.7    <u>Borrowing Base Cash Account</u>. Loan Parties may deposit cash in the Borrowing Base Cash Account from time to time which cash, once deposited in such account, shall constitute Eligible Borrowing Base Cash for all purposes hereunder. No amounts may be withdrawn from the Borrowing Base Cash Account without the consent of Agent. Without limiting Agent's "control" over all amounts on deposit in the Borrowing Base Cash Account under Article 9 of the UCC, Agent hereby agrees to authorize the withdrawal of cash from the Borrowing Base Cash Account from time to time at the request of Administrative Borrower (any such withdrawal, a "Borrowing Base Cash Release") so long as (x) no Event of Default then exists or would arise as a result of the proposed Borrowing Base Cash Release, and (y) Availability as of the proposed date of such Borrowing Base Cash Release after giving effect thereto is not less than fifteen percent (15%) of the Collateral Line Cap, in each case as certified by a Responsible Officer of Administrative Borrower and accompanied by such evidence as Agent may reasonably request.

8.3.8    <u>Cash Management</u>. Administrative Borrower, on behalf of Borrowers, will maintain the Borrowing Base Cash Account, Borrowers' primary unrestricted excess cash account, and their Master Account with Agent.

**8.4    General Provisions**.

8.4.4    <u>Protection of Collateral</u>. All expenses of protecting, storing, warehousing, insuring, handling, maintaining and shipping any Collateral, all Taxes payable with respect to any Collateral (including any sale thereof), and all other payments required to be made by Agent to any Person to realize upon any Collateral, shall be borne and paid by Loan Parties. Agent shall not be liable or responsible for the safekeeping of any Collateral, for any loss or damage thereto (except for reasonable care in its custody while Collateral is in Agent's actual possession and except for acts or omissions arising from Agent's gross negligence, willful misconduct or bad faith), for any diminution in the value thereof, or for any act or default of any warehouseman, carrier, forwarding agency or other Person whatsoever, but the same shall be at Loan Parties' sole risk.

8.4.5    <u>Defense of Title to Collateral</u>. Unless otherwise agreed by Administrative Borrower and Agent, each Loan Party shall at all times, at the reasonable request of Agent, use commercially reasonable actions necessary to defend its title to Collateral and Agent's Liens therein against all Persons, claims and demands whatsoever, except Permitted Liens.

8.4.6    <u>Information Regarding Collateral</u>. Each Loan Party shall within a reasonable time after written request by Agent, furnish or cause to be furnished to Agent, in such manner and in such detail as may be reasonably requested by Agent, additional information with respect to the Collateral which is necessary for the perfection of security interests in the Collateral.

**8.5    Power of Attorney.** Subject to the terms herein and, in any event, subject to five (5) Business Days' prior written notice to directly or indirectly exercise voting rights with respect to the Equity Interests of any Loan Party, each Loan Party hereby irrevocably constitutes and appoints Agent (and all Persons designated by Agent) as such Loan Party's true and lawful agent (and attorney-in-fact) for the purposes provided in this Section. Subject to the terms of the Term Debt Intercreditor Agreement, upon the occurrence and during the continuance of an Event of Default, Agent, or Agent's designee, may, without notice (except as otherwise expressly provided herein) and in either its or a Loan Party's name, but at the cost and expense of Loan Parties:

(o)    endorse a Loan Party's name on any Payment Item or other proceeds of Collateral (including proceeds of insurance) that come into Agent's possession or control; and

(p)    (i) subject to five (5) Business Days' prior written notice, notify any Account Debtors of the assignment of their Accounts, demand and enforce payment of Accounts, by legal proceedings or otherwise, and generally exercise any rights and remedies with respect to Accounts; (ii) settle, adjust, modify, compromise, discharge or release any Accounts or other Collateral, or any legal proceedings brought to collect Accounts or Collateral; (iii) sell or assign any Accounts and other Collateral upon such terms, for such amounts and at such times as Agent deems advisable; (iv) take control, in any manner, of any proceeds of Collateral; (v) prepare, file and sign a Loan Party's name to a proof of claim or other document in a bankruptcy of an Account Debtor, or to any notice,

assignment or satisfaction of Lien or similar document; (vi) receive, open and dispose of mail addressed to a Loan Party, and notify postal authorities to change the address for delivery thereof to such address as Agent may designate; (vii) endorse any Chattel Paper, Document, Instrument, invoice, freight bill, bill of lading, or similar document or agreement relating to any Accounts, Inventory or other Collateral; (viii) use a Loan Party's stationery and sign its name to verifications of Accounts and notices to Account Debtors; (ix) use the information recorded on or contained in any data processing Equipment and computer hardware and software relating to any Collateral; (x) make and adjust claims under policies of insurance; (xi) take any action as may be necessary or appropriate to obtain payment under any letter of credit or banker's acceptance for which a Loan Party is a beneficiary; and (xii) take all other actions as Agent deems appropriate in its Permitted Discretion to fulfill any Loan Party's obligations under the Loan Documents.

## SECTION 9.    REPRESENTATIONS AND WARRANTIES

**9.1    General Representations and Warranties.** To induce Agent and Lenders to enter into this Agreement and to make available the Commitments, Loans and Letters of Credit, each Loan Party represents and warrants that:

9.1.7    Existence, Qualification and Power; Compliance with Laws. Each Loan Party and each Restricted Subsidiary (a) is a Person duly organized or formed, validly existing and in good standing (where relevant) under the Laws of the jurisdiction of its incorporation or organization, (b) has all requisite organizational power and authority to execute, deliver and perform its obligations under the Loan Documents to which it is a party and, in the case of Borrowers, to borrow hereunder, (c) is duly qualified and in good standing (where relevant) under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification, (d) is in compliance with all Laws, orders, writs and injunctions, and (e) has all requisite franchises, licenses, authorizations, qualifications, consents and approvals to operate its business as currently conducted; except in each case, referred to in clause (a) (other than with respect to any Borrower), (c), (d) or (e), to the extent that failure to do so, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.

9.1.8    Authorization; No Contravention. The execution, delivery and performance by each Loan Party of each Loan Document to which such Person is a party, and the consummation of the Transactions, (a) are within such Loan Party's organizational powers, (b) have been duly authorized by all necessary corporate or other organizational action, and (c) do not (i) contravene the terms of any of such Person's Organization Documents, (ii) conflict with or result in any breach or contravention of, or the creation of (or the requirement to create) any Lien under (other than as permitted by Section 10.2.1), or require any payment to be made under (x) any Debt of such Person in excess of the Threshold Amount or (y) any material order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Person or its property is subject; or (iii) violate any material Law; except with respect to any conflict, breach or contravention or payment (but not creation of Liens) referred to in clauses (c)(ii) and (iii), to the extent that such violation, conflict, breach, contravention or payment, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

9.1.9    Governmental Authorization; Other Consents. No approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority is necessary or required in connection with (a) the execution, delivery or performance by, or enforcement against, any Loan Party of this Agreement or any other Loan Document, or for the consummation of the Transactions, (b) the grant by any Loan Party of the Liens granted by it pursuant to the Loan Documents, (c) the perfection or maintenance of the Liens created under the Loan Documents (including the priority thereof) to the extent required thereunder or (d) the exercise by Agent, or any Lender of its rights under the Loan Documents or the remedies in respect of the Collateral pursuant to the Loan Documents, except for (i) approvals, consents, exemptions, authorizations or other actions by, or notices to, or filings necessary to perfect the Liens on the Collateral granted by Loan Parties in favor of the Secured Parties (or release existing Liens), (ii) the approvals, consents, exemptions, authorizations, actions, notices and filings which have been duly obtained, taken, given or made and are in full force and effect (except to the extent not required to be obtained, taken, given or made or to be in full force and effect pursuant to the Collateral and Guarantee Requirement), and (iii) those approvals, consents, exemptions, authorizations or other actions, notices or filings, the failure of which to obtain or make, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

9.1.10   Binding Effect. This Agreement and each other Loan Document has been duly executed and delivered by each Loan Party that is a party thereto. This Agreement and each other Loan Document constitutes a legal, valid and binding obligation of each such Loan Party, enforceable against each Loan Party that is a party thereto in accordance with its terms, except as such enforceability may be limited by Debtor Relief Laws and by general principles of equity.

9.1.11   Financial Statements; No Material Adverse Effect.

(a)    The Audited Financial Statements fairly present in all material respects the financial condition of Parent and its consolidated Subsidiaries as of the dates thereof and their results of operations for the period covered thereby in accordance with GAAP consistently applied throughout the periods covered thereby, except as otherwise expressly noted therein.

(b)   The Unaudited Financial Statements fairly present in all material respects the financial condition of Parent and its consolidated Subsidiaries as of the dates thereof and their results of operations for the period covered thereby in accordance with GAAP consistently applied throughout the periods covered thereby, except as otherwise expressly noted therein and the absence of footnotes.

(c)   The forecasts of income statements of Parent and its Subsidiaries which have been furnished to Agent prior to the Closing Date have been prepared in good faith on the basis of the assumptions stated therein, which assumptions were believed to be reasonable at the time of preparation of such forecasts it being understood by Agent and Lenders that such projections as to future events (i) are not to be viewed as facts, (ii)(A) are subject to significant uncertainties and contingencies, which may be beyond the control of Parent and Restricted Subsidiaries, (B) no assurance is given by Parent and Restricted Subsidiaries that the results or forecast in any such projections will be realized and (C) the actual results may differ from the forecast results set forth in such projections and such differences may be material and (iii) are not a guarantee of performance and that actual results during the period or periods covered by any such projections may vary significantly from the projected results and such differences may be material.

(d)   Since the Closing Date, there has been no event or circumstance, either individually or in the aggregate, that has had or would reasonably be expected to have a Material Adverse Effect.

9.1.12   <u>Compliance With Laws</u>. Neither Parent nor any Restricted Subsidiary or any of their respective properties or assets is in violation of, nor will the continued operation of their properties and assets as currently conducted violate, any law, rule or regulation (including any zoning, building, ordinance, code or approval or any building permits) or any restrictions of record or agreements affecting the Mortgaged Property, or is in default with respect to any judgment, writ, injunction, decree or order of any Governmental Authority, where in each case such violation or default, individually or in the aggregate, would reasonably be expected to result in a Material Adverse Effect.

9.1.13   <u>Ownership of Property; Liens</u>.

(a)   Each of Parent and Restricted Subsidiaries has good record title to, or valid leasehold interests in, or easements or other limited property interests in, all its properties and assets (including all Mortgaged Property material to its business), free and clear of all Liens except for minor defects in title that do not materially interfere with its ability to conduct its business or to utilize such assets for their intended purposes and Liens permitted by Section 10.2.1 and except where the failure to have such title would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(b)    As of the Closing Date, Schedule 9 to the Perfection Certificate dated the Closing Date contains a true and complete list of each Material Real Property owned by each Loan Party.

(c)    As of the Closing Date, except as otherwise disclosed in writing to Agent, no Mortgage encumbers improved Mortgaged Property that is located in an area that has been identified by the Secretary of Housing and Urban Development as an area having special flood hazards within the meaning of the Flood Laws unless Evidence of Flood Insurance has been delivered to Agent.

9.1.14    <u>Environmental Matters</u>. Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect:

(a)    Parent and each Restricted Subsidiary is and has been in compliance with all applicable Environmental Laws, which includes obtaining and maintaining all Environmental Permits required under such Environmental Laws to carry on the business of Loan Parties and Restricted Subsidiaries;

(b)    None of Parent nor any Restricted Subsidiary has received notice alleging any Environmental Liability or proposing or seeking to revoke, modify or deny the renewal of any Environmental Permit required to be held by Loan Parties or Restricted Subsidiaries, and none of Parent nor any Restricted Subsidiary have become subject to any Environmental Liability;

(c)    there has been no Release, discharge or disposal of Hazardous Materials (i) on, to, at, under or from any Real Property or any vehicles or facilities owned or leased by Parent or any Restricted Subsidiary, or, to the Knowledge of Loan Parties, formerly owned, operated or leased by Parent or any Restricted Subsidiary, or (ii) arising out of the conduct of Parent or any Restricted Subsidiary; that, in the case of (i) or (ii), could reasonably be expected to require investigation, remedial activity or corrective action or cleanup by or on behalf of Parent or any Restricted Subsidiary or for which Parent or any Restricted Subsidiary reasonably could be expected to otherwise incur any Environmental Liability; and

(d)   there are no facts, circumstances or conditions arising out of or relating to, and there are no pending or reasonably anticipated requirements under applicable Environmental Law associated with, the operations of Parent or Restricted Subsidiaries or any Real Property, vehicles or facilities currently or, to the knowledge of Loan Parties, previously owned or leased by Parent or any

Restricted Subsidiary; that, in such case, are known to or would reasonably be likely to require investigation, remedial activity or corrective action or cleanup by or on behalf of Parent or any Restricted Subsidiary or that in such case are known to or would reasonably be likely to result in Parent or any Restricted Subsidiary incurring any Environmental Liability or capital expenditures to achieve or maintain compliance with applicable Environmental Laws.

This Section 9.1.8 contains the sole and exclusive representations and warranties of Loan Parties with respect to any environmental, health or safety matters, including any matters arising under Environmental Laws.

9.1.15    Taxes. Except as would not, either individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, each of Parent and Restricted Subsidiaries have timely filed all tax returns required to be filed (including any extensions thereof), and have paid all Taxes levied or imposed upon them or their properties, that are due and payable (including in their capacity as a withholding agent), except those which are being contested in good faith by appropriate proceedings diligently conducted if such contest shall have the effect of suspending enforcement or collection of such Taxes and for which adequate reserves have been provided in accordance with GAAP.

9.1.16    ERISA Compliance. Except as would not, either individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect:

(a)    Each Plan is in compliance with the applicable provisions of ERISA, the Code and other Federal or state Laws (and the regulations and published interpretations thereunder); and

(b)    No ERISA Event has occurred.

9.1.17    Subsidiaries. As of the Closing Date (after giving effect to the Transactions), none of Parent nor any Restricted Subsidiary has any direct or indirect Subsidiaries other than those specifically disclosed in Schedule 9.1.11, and all of the outstanding Equity Interests owned by Parent or any Restricted Subsidiary in such Subsidiaries have been validly issued and are fully paid and (if applicable) non-assessable and all Equity Interests owned by Parent or any Restricted Subsidiary in such Subsidiaries are owned free and clear of all Liens except (a) those created hereunder, under the other Security Documents or under the Term Debt Documents (which Liens shall be subject to the Term Debt Intercreditor Agreement) and (b) any other Lien that is permitted under Section 10.2.1. As of the Closing Date, (i) Section 2(c) of the Perfection Certificate sets forth the name and jurisdiction of each Loan Party and (ii) Schedule 5 to the Perfection Certificate sets forth the direct ownership interest of any Loan Party in each such Subsidiary, including the percentage of such ownership. Schedule 9.1.11 indicates, as of the Closing Date, whether each of the Subsidiaries identified therein is a Borrower, a Guarantor, a Restricted Subsidiary, an Unrestricted Subsidiary, an Excluded Subsidiary and/or an Immaterial Subsidiary.

9.1.18    Margin Regulations; Investment Company Act.

(b)    None of Parent nor any Restricted Subsidiary is engaged nor will it engage principally, or as one of its important activities, in the business of purchasing or carrying Margin Stock, or extending credit for the purpose of purchasing or carrying Margin Stock, and no proceeds of any Borrowings will be used, whether directly or indirectly, and whether immediately, incidentally or ultimately, for any purpose that entails a violation of the provisions of the Regulations of the Board, including Regulation T, U or X.

(c)    None of Parent nor any Restricted Subsidiary is or is required to be registered as an "investment company" under the Investment Company Act of 1940.

9.1.19    Disclosure. No confidential information memorandum, report, financial statement, certificate or other written information furnished by or on behalf of any Loan Party (other than projected financial information, pro forma financial information, budgets, estimates and information of a general economic or industry nature) to Agent or any Lender about Parent and its Subsidiaries in connection with the transactions contemplated hereby and the negotiation of this Agreement or delivered hereunder or under any other Loan Document (as modified or supplemented by other information so furnished) when taken as a whole contains or will contain any material misstatement of fact or omits or will omit to state any material fact necessary to make the statements therein (when taken as a whole as modified or supplemented by other information so furnished), in the light of the circumstances under which they were or will be made, not materially misleading. With respect to projected financial information and pro forma financial information, Loan Parties represent that such information was prepared in good faith based upon assumptions believed to be reasonable at the time of preparation; it being understood and agreed by Agent and Lenders that such projections as to future events (i) are not to be viewed as facts, (ii)(A) are subject to significant uncertainties and contingencies, which may be beyond the control of Parent and Restricted Subsidiaries, (B) no assurance is given by Parent and Restricted Subsidiaries that the results or forecast in any such projections will be realized and (C) the actual results may differ from the forecast results set forth in such projections and such differences may be material and (iii) are not a guarantee of performance and that actual results during the period or periods covered by any such projections may vary significantly from the projected results and such differences may be material.

9.1.20    Labor Matters.

(a)    Except as, in the aggregate, would not reasonably be expected to result in a Material Adverse Effect: (i) there are no strikes or other labor disputes against Parent or any of Restricted Subsidiaries pending or, to the knowledge of Loan Parties, threatened in writing; (ii) hours worked by and payment made to employees of Parent or any of Restricted Subsidiaries have not been in violation of the FLSA or any other Applicable Law dealing with such matters; and (iii) all payments due from Parent or any of Restricted Subsidiaries on account of employee health and welfare insurance have been paid or accrued as a liability on the books of the relevant party. Except as disclosed on Schedule 9.1.14, as of the Closing Date no Loan Party is a party to or bound by any collective bargaining agreement or, with respect to any Foreign Subsidiary, any similar agreement. To the knowledge of any Loan Party, the consummation of the transactions contemplated by the Loan Documents will not give rise to any right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which any Loan Party is bound to the extent that such would be reasonably expected to result in a Material Adverse Effect.

(b)    (i) the IBT Agreement is in full force and effect and (ii) other than as contemplated by the IBT Transactions, the IBT Agreement has not been amended, waived or otherwise modified in any respect materially adverse to Parent and its Subsidiaries (taken as a whole). For purposes of this Section 9.1.14(b), it is understood that the resolution in the ordinary course of business of an employee grievance seeking to enforce the IBT Agreement terms will not be deemed to constitute an amendment, waiver of other modification to the IBT Agreement.

9.1.21    Insurance. Each of Parent and Restricted Subsidiaries maintains, with financially sound and reputable insurance companies, insurance in such amounts and against such risks as are customarily maintained by companies engaged in the same or similar businesses operating in the same or similar locations; provided, that each of Parent and its Subsidiaries may self-insure to the same extent as other companies engaged in similar businesses and owning similar properties in the same general areas in which Parent or each such Subsidiary, as applicable, operates.

9.1.22    Solvency. Parent and Restricted Subsidiaries, on a consolidated basis, are Solvent.

9.1.23    Reserved.

9.1.24    Security Documents.

(a)    Valid Liens. The Security Documents are, or on execution and delivery thereof by the parties thereto will be, effective to create in favor of Agent for the benefit of the Secured Parties, legal, valid and enforceable Liens on, and security interests in, the Collateral described therein to the extent intended to be created thereby (except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally) and (i) when financing statements and other filings in appropriate form are filed in the offices specified in Section 2 of the Perfection Certificate (and payments of all applicable fees) and (ii) upon the taking of possession or control by Agent of such Collateral with respect to which a security interest may be perfected only by possession or control (which possession or control shall be given to Agent to the extent possession or control by Agent is required hereby), and (iii) the Lien of Agent on all certificates of title in respect of any Collateral, the Liens created hereby or by the other Security Documents (other than the Mortgages) shall constitute fully perfected Liens on, and security interests in, all right, title and interest of the grantors in such Collateral, in each case prior and superior in right to any other Person, other than Liens permitted by Section 10.2.1 or any Permitted Refinancing thereof and Liens securing Term Debt, Term Refinancing Debt or any Permitted Refinancing thereof that are intended to be junior to the Liens of the Security Documents).

(b)    PTO Filing; USCO Filing. When the Grant of Security Interest is properly filed (and payments of all fees) in the United States Patent and Trademark Office and the USCO, to the extent such filings may perfect such interests, the Liens created by such agreement shall constitute fully perfected Liens on, and security interests in, all right, title and interest of the grantors thereunder in Patents and Trademarks registered or applied for with the United States Patent and Trademark Office or Copyrights registered or applied for with the United States Copyright Office, as the case may be, in each case prior and superior in right to any other Person, other than Liens permitted by Section 10.2.1 (it being understood that subsequent recordings in the United States Patent and Trademark Office and the United States Copyright Office may be necessary to establish a Lien on registered Patents, Trademarks and Copyrights acquired by the grantors thereof after the Closing Date).

(c)    Mortgages. Upon recording thereof in the appropriate recording office (and payments of all fees), each Mortgage is effective to create, in favor of Agent, for the benefit of Secured Parties, legal, valid and enforceable perfected Liens on, and a security interest in, all of Loan Parties' right, title and interest in and to the Mortgaged Property thereunder and the proceeds thereof, subject only to Liens permitted hereunder, and when such Mortgage is filed in the offices specified in the local counsel opinion delivered with respect thereto in accordance with the provisions of Sections 10.1.11 and 10.1.13 such Mortgage shall constitute a fully perfected Lien on, and security interest in, all right, title and interest of Loan Party to such Mortgage in the Mortgaged Property described therein and the proceeds thereof, in each case prior and superior in right to any other Person, other than Liens permitted by Section 10.2.1.

(d)    Rolling Stock. Upon the recording thereof on the applicable certificate of title (and the filing of financing statements and payment of applicable fees, which shall be for the account of the Loan Parties), the notation of Agent's lien on any Rolling Stock or other goods subject to a certificate of title is effective to create, in favor of Agent, for the benefit of the Secured Parties, legal, valid and enforceable perfected Liens on, and a security interest in, all of Loan Parties' right, title and interest in and to such Collateral and the proceeds thereof, subject only to the Term Debt Intercreditor Agreement and Liens permitted hereunder, in each case prior and superior in right to any other Person, other than Liens permitted by Section 10.2.1.

Notwithstanding anything herein (including this Section 9.1.18 or Section 9.1.4) or in any other Loan Document to the contrary, no Loan Party makes any representation or warranty as to (A) the effects of perfection or non-perfection, the priority or the enforceability of any pledge of or security interest in any Equity Interests of any Foreign Subsidiary, or as to the rights and remedies of Agent or any Lender with respect thereto, under foreign Law, (B) the pledge or creation of any security interest, or the effects of perfection or non-perfection, the priority or the enforceability of any pledge of or security interest to the extent such pledge, security interest, perfection or priority is not required pursuant to the Collateral and Guarantee Requirement or (C) on the Closing Date and until required pursuant to Section 10.1.13, the pledge or creation of any security interest, or the effects of perfection or non-perfection, the priority or enforceability of any pledge or security interest to the extent not required on the Closing Date pursuant to Section 6.1.

9.1.25    Compliance with Anti-Terrorism and Corruption Laws.

(a)    To the extent applicable, Parent and Restricted Subsidiaries are in compliance, in all material respects, with (i) the Trading with the Enemy Act and each of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V) and any other enabling legislation or executive order relating thereto, and (ii) the USA PATRIOT Act.

(b)    None of Parent nor any Restricted Subsidiary nor, to the knowledge of Loan Parties, any director, officer, agent, employee or Controlled Affiliate of Parent or any Restricted Subsidiary, (i) is a Blocked Person or (ii) is currently subject to any U.S. sanctions administered by OFAC that could, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect; and none of Parent nor any Restricted Subsidiary will use the proceeds of the Loans on the Closing Date for the purpose of financing the activities of any Person currently subject to any U.S. sanctions administered by OFAC.

(c)    No part of the proceeds of the Loans will be used by Parent or any Restricted Subsidiary for any payments to any governmental official or employee, political party, official of a political party, candidate for political office or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation in any material respect of the United States Foreign Corrupt Practices Act of 1977, as amended.

## SECTION 10.  COVENANTS AND CONTINUING AGREEMENTS

**10.1    Affirmative Covenants.** Until Full Payment of the Obligations, each Loan Party shall, and shall cause each Restricted Subsidiary to:

10.1.9    Financial Statements, Reports, Etc. In the case of Parent, deliver to Agent for prompt further distribution to each Lender:

(d)    within 90 days after the end of each Fiscal Year of Parent and its Subsidiaries (beginning with the Fiscal Year ending December 31, 2013), a consolidated balance sheet of Parent and its Subsidiaries as at the end of such Fiscal Year, and the related consolidated statements of operations, changes in shareholders' equity and cash flows for such Fiscal Year, setting forth in each case in comparative form the figures for the previous Fiscal Year, all in reasonable detail and prepared in accordance with GAAP, audited and accompanied by a report and opinion of KPMG LLP, any other independent registered public accounting firm of nationally recognized standing or any other independent registered public accounting firm approved by Agent (such approval not to be unreasonably withheld, delayed or conditioned), which report and opinion (i) shall be prepared in accordance with generally accepted auditing standards, (ii) shall not be subject to qualifications or exceptions as to the scope of such audit, (iii) shall be without a "going concern" disclosure or like qualification or exception (it being understood that for the Fiscal Year ending December 31, 2013, the audit may have a going concern explanatory paragraph); provided, that solely with respect of the Fiscal Year ending December 31, 2018, the audited financial statements may have a "going concern" qualification arising solely due to the pending maturity of the Obligations and/or the Term Debt (or any replacement or refinancing thereof), and (iv) shall be accompanied by customary management discussion and analysis;

(e)    within 45 days after the end of each of the first three (3) Fiscal Quarters of each Fiscal Year of Parent (commencing with the Fiscal Quarter ended March 31, 2014), a consolidated balance sheet of Parent and its Subsidiaries as at the end of such Fiscal Quarter, and the related (x) consolidated statements of income or operations for such Fiscal Quarter and for the portion of the Fiscal Year then ended and (y) consolidated statements of cash flows for such Fiscal Quarter and the portion of the Fiscal Year then ended, setting forth in each case in comparative form the figures for the corresponding Fiscal Quarter of the previous Fiscal Year

and the corresponding portion of the previous Fiscal Year, all in reasonable detail and certified by a Responsible Officer of Parent as fairly presenting in all material respects the financial condition, results of operations and cash flows of Parent and its Subsidiaries in accordance with GAAP, subject only to normal year-end audit adjustments and the absence of footnotes (and accompanied by customary management discussion and analysis);

(f)    within 90 days after the end of each Fiscal Year (commencing with the Fiscal Year ending December 31, 2013) of Parent, a reasonably detailed consolidated budget for the following Fiscal Year on a quarterly basis (including a projected consolidated balance sheet of Parent and its Subsidiaries as of the end of the following Fiscal Year, the related consolidated statements of projected cash flows and projected income and a summary of the material underlying assumptions applicable thereto) (collectively, the "Projections"), which Projections shall in each case be accompanied by a certificate of a Responsible Officer of Parent stating that such Projections have been prepared in good faith on the basis of the assumptions stated therein, which assumptions were believed to be reasonable at the time of preparation of such Projections, it being understood by Agent and Lenders that such projections as to future events (i) are not to be viewed as facts, (ii)(A) are subject to significant uncertainties and contingencies, which may be beyond the control of Parent and Restricted Subsidiaries, (B) no assurance is given by Parent and Restricted Subsidiaries that the results or forecast in any such projections will be realized and (C) the actual results may differ from the forecast results set forth in such projections and such differences may be material and (iii) are not a guarantee of performance and that actual results during the period or periods covered by any such projections may vary significantly from the projected results and such differences may be material; and

(g)    within five (5) days of delivery of each set of consolidated financial statements referred to in Sections 10.1.1(a) and 10.1.1(b) above, the related consolidating financial statements reflecting the adjustments necessary to eliminate the accounts of Unrestricted Subsidiaries (if any) (which may be in footnote form) from such consolidated financial statements.

Notwithstanding the foregoing, the obligations in paragraphs (a) and (b) of this Section 10.1.1 or Section 10.1.2(b) may be satisfied with respect to information of Parent and Restricted Subsidiaries by furnishing within the time period specified in the applicable paragraph (A) the applicable financial statements of Parent or (B) Parent's Form 10-K or 10-Q, as applicable, filed with the SEC; provided, that, with respect to clauses (A) and (B), to the extent such information is in lieu of information required to be provided under Section 10.1.1, such materials are accompanied by a report and opinion of KPMG LLP, any other independent registered public accounting firm of nationally recognized standing or any other independent public accounting firm approved by Agent (such approval not to be unreasonably withheld, conditioned or delayed), which report and opinion (i) shall be prepared in accordance with generally accepted auditing standards, (ii) shall not be subject to qualifications or exceptions as to the scope of such audit and (iii) shall be without a "going concern" disclosure or like qualification or exception (other than with respect to, or disclosure or an exception or qualification solely resulting from, the (A) impending maturity of any Debt or (B) any prospective or actual default under any financial covenant or (C) in respect of the fiscal year ending December 31, 2013).

Documents required to be delivered pursuant to Section 10.1.1(a), (b), (c) and (d) or Section 10.1.2(b) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the earliest date on which (i) Parent posts such documents, or provides a link thereto on Parent's website on the Internet and provides notice thereof to Agent; (ii) such documents are posted on Parent's behalf on IntraLinks/IntraAgency or another website, if any, to which each Lender and Agent have access (whether a commercial, third-party website or whether sponsored by Agent), or (iii) such financial statements and/or other documents are posted on the SEC's website on the internet at www.sec.gov; provided, that: (i) promptly following written request by Agent, Parent shall deliver paper copies of such documents to Agent for further distribution to each Lender until a written request to cease delivering paper copies is given by Agent and (ii) Parent shall notify (which may be by facsimile or electronic mail) Agent of the posting of any such documents and provide to Agent by electronic mail electronic versions (i.e., soft copies) of such documents. Each Lender shall be solely responsible for timely accessing posted documents or requesting delivery of paper copies of such documents from Agent and maintaining its copies of such documents. Notwithstanding anything contained herein, in every instance Parent shall be required to provide paper copies of the Compliance Certificates required by Section 10.1.2(a) to Agent; provided, however, that if such Compliance Certificate is first delivered by electronic means, the date of such delivery by electronic means shall constitute the date of delivery for purposes of compliance with Section 10.1.2(a).

10.1.10    Certificates; Other Information. Deliver to Agent for prompt further distribution to each Lender:

(e)    Concurrently with the delivery of the financial statements referred to in Sections 10.1.1(a) and 10.1.1(b) (or the date on which such delivery is required), commencing with the first full Fiscal Quarter completed after the Closing Date, a duly completed Compliance Certificate signed by a Responsible Officer of Parent;

(f)    promptly after the same are publicly available, copies of all annual, regular, periodic and special reports and registration statements which Parent or any Restricted Subsidiary files with the SEC or with any Governmental Authority that may be substituted therefor (other than amendments to any registration statement (to the extent such registration statement, in the form it became effective, is delivered), exhibits to any registration statement and, if applicable, any registration statement on Form S-8) and in any case not otherwise required to be delivered to Agent pursuant hereto;

(g)   promptly after the furnishing thereof, copies of any material notices of default received by Parent or any Restricted Subsidiary (other than in the ordinary course of business) or furnished to any holder of Debt or debt securities of Parent or any Restricted Subsidiary pursuant to the terms of the Term Debt, any Junior Financing Documentation, any documentation governing Permitted Junior Debt or Term Refinancing Debt or any Permitted Refinancing of any of the foregoing, in each case (other than with respect to the Term Debt) in a principal amount in excess of the Threshold Amount and not otherwise required to be furnished to Lenders pursuant to any clause of this Section 10.1.2;

(h)   together with the delivery of each Compliance Certificate pursuant to Section 10.1.2(a), (i) in the case of annual Compliance Certificates only, a report setting forth the information required by sections of the Perfection Certificate describing the legal name and the jurisdiction of organization or formation of each Loan Party and the location of the chief executive office of each Loan Party or confirming that there has been no change in such information since the Closing Date or the date of the last such report, (ii) a description of each event, condition or circumstance during the last Fiscal Quarter covered by such Compliance Certificate requiring a mandatory prepayment under Section 5.4 and (iii) a list of each Subsidiary of Parent that identifies each Subsidiary as a Restricted or an Unrestricted Subsidiary and as a Loan Party or a non-Loan Party as of the date of delivery of such Compliance Certificate;

(i)   promptly, such additional information regarding the business, legal, financial or corporate affairs of Loan Parties or any of their respective Restricted Subsidiaries, as Agent or any Lender through Agent may from time to time reasonably request;

(j)   promptly after the written request by any Lender, all documentation and other information that such Lender reasonably requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the PATRIOT Act;

(k)   promptly after the receipt thereof by Parent or any of Restricted Subsidiaries, a copy of any final "management letter" received by any such Person from its certified public accountants and the management's response thereto; and

(l)   promptly following any request therefor by Agent or any Lender, copies of (i) any material documents described in Section 101(k) of ERISA that any Loan Party may request with respect to any Multiemployer Plan and (ii) any material notices described in Section 101(l) of ERISA that any Loan Party may request with respect to any Plan or Multiemployer Plan, provided, that if any Loan Party have not requested such material documents or material notices from the administrator or sponsor of the applicable Plan or Multiemployer Plan, such Loan Party shall make a request for such material documents or material notices from the such administrator or sponsor at the earliest date on which such Loan Party determines that it is commercially reasonable to so request in order to avoid the occurrence of an event that could reasonably be expected to result in a material liability, and shall provide copies of such material documents and material notices promptly after receipt thereof.

Notwithstanding anything to the contrary, neither Parent nor any Restricted Subsidiary will be required to disclose or permit the inspection or discussion of, any document, information or other matter (i) that constitutes trade secrets or proprietary information, (ii) in respect of which disclosure to Agent or any Lender (or their representatives or contractors) is prohibited by law or any binding agreement, or (iii) that is subject to attorney client or similar privilege or constitutes attorney work product.

10.1.11   Notices. Promptly after Parent or any Loan Party has obtained knowledge thereof, notify Agent:

(a)   of the occurrence of any Default;

(b)   of any matter that has resulted or could reasonably be expected to result in a Material Adverse Effect;

(c)   of the filing or commencement of, or any written threat or written notice of intention of any person to file or commence, any action, suit, litigation or proceeding, whether at law or in equity by or before any Governmental Authority, against Parent or any Restricted Subsidiary that has a reasonable likelihood of adverse determination and such determination could reasonably be expected to result in a Material Adverse Effect; and

(d)   of the occurrence of any ERISA Event following the Closing Date that, alone or together with any other ERISA Events that have occurred following the Closing Date, could reasonably be expected to result in a Material Adverse Effect.

Each notice pursuant to this Section shall be accompanied by a written statement of a Responsible Officer of Parent (x) that such notice is being delivered pursuant to Section 10.1.3(a), (b), (c) or (d) (as applicable) and (y) setting forth details of the occurrence referred to in Section 10.1.3(a), (b), (c) or (d), as applicable, and stating what action Parent has taken and proposes to take with respect thereto.

10.1.12   Payment of Taxes. Promptly pay, discharge or otherwise satisfy as the same shall become due and payable in the normal conduct of its business, all its obligations and liabilities in respect of Taxes imposed upon it or upon its income or profits or in

respect of its property, except, to the extent any such Tax is being contested in good faith and by appropriate proceedings for which appropriate reserves have been established in accordance with GAAP if such contest shall have the effect of suspending enforcement or collection of such Taxes or, where the failure to pay, discharge or otherwise satisfy the same would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

10.1.13    Preservation of Existence, Etc. (a)Preserve, renew and maintain in full force and effect its legal existence under the Laws of the jurisdiction of its organization except in a transaction permitted by Section 11.1.4 or Section 11.1.5 and (b) obtain, maintain, renew, extend and keep in full force and effect all rights, privileges (including its good standing where applicable in the relevant jurisdiction), permits, licenses and franchises necessary or desirable in the normal conduct of its business, except, in the case of clause (a) (other than with respect to Parent) or (b), to the extent that failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

10.1.14    Maintenance of Properties. Except if the failure to do so could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (a) maintain, preserve and protect all of its properties and equipment necessary in the operation of its business in satisfactory working order, repair and condition, ordinary wear and tear excepted and fire, casualty or condemnation excepted, and (b) make all necessary renewals, replacements, modifications, improvements, upgrades, extensions and additions thereof or thereto in accordance with prudent industry practice and in the normal conduct of its business.

10.1.15   Maintenance of Insurance.

(c)    Generally. Maintain with financially sound and reputable insurance companies, insurance with respect to its properties and business against loss or damage of the kinds customarily insured against by Persons engaged in the same or similar business, of such types and in such amounts (after giving effect to any self-insurance reasonable and customary for similarly situated Persons engaged in the same or similar businesses as Parent and Restricted Subsidiaries) as are customarily carried under similar circumstances by such other Persons in such similar or same locations.

(d)    Requirements of Insurance. (A) Use commercially reasonable efforts to cause, not later than 30 days after the Closing Date (or such longer period as Agent may agree in writing in its reasonable discretion), all insurance required pursuant to Section 10.1.7(a) (x) to provide (and to provide at all times thereafter) that it shall not be canceled, modified or not renewed (i) by reason of nonpayment of premium upon not less than ten (10) days' prior written notice thereof by the insurer to Agent or (ii) for any other reason (except for events related to Inventory) upon not less than twenty (20) days' prior written notice thereof by the insurer to Agent and (y) subject to the terms, conditions and provisions of the Term Loan Agreement to name Agent as additional insured on behalf of the Secured Parties (in the case of liability insurance) or loss payee (in the case of property insurance), as applicable (and to continue to so name Agent at all times thereafter), (B) use commercially reasonable efforts to deliver, not later than 30 days after the Closing Date (or such longer period as Agent may agree in writing in its reasonable discretion), a copy of the policy (and to the extent any such policy is cancelled or not renewed, a renewal or replacement policy) or other evidence thereof to Agent, or insurance certificate with respect thereto, and (C) in the case of all such property insurance policies located in the United States, not later than twenty (20) days after such date (or such longer period as Agent may agree in writing in its reasonable discretion) cause such policies to be endorsed or otherwise amended to include a "standard" or "New York" lender's loss payable endorsement, in form and substance reasonably satisfactory to Agent, which endorsement shall provide that, from and after such date, if the insurance carrier shall have received written notice from Agent of the occurrence of an Event of Default, the insurance carrier shall pay all proceeds otherwise payable to Loan Parties under such policies directly to Agent during the continuance of an Event of Default.

(e)    Flood Insurance. Following the Closing Date, Parent shall deliver to Agent annual renewals of the flood insurance policy under the property policy or annual renewals of a force-placed flood insurance policy.

(f)    Reserved.

(g)    Notify Agent promptly whenever any separate insurance concurrent in form or contributing in the event of material loss with that required to be maintained under this Section 10.1.7 is taken out by any Loan Party; and promptly deliver to Agent a duplicate original copy of such policy or policies, or an insurance certificate with respect thereto once available.

10.1.16    Compliance with Laws. Comply with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its business or property, except if the failure to comply therewith would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

10.1.17    Books and Records. Maintain proper books of record and account, in which entries are made that are full, true and correct in all material respects and are in conformity with GAAP (except as noted therein) and which reflect all material financial transactions and matters involving the assets and business of Parent or a Restricted Subsidiary, as the case may be.

10.1.18     Inspection Rights. Permit representatives and independent contractors of Agent and each Lender to visit and inspect any of its properties, to examine its corporate, financial and operating records, and make copies thereof or abstracts therefrom, to conduct commercial field exams, and to discuss its affairs, finances and accounts with its directors, officers, and independent public accountants (subject to such accountants' customary policies and procedures), all at the reasonable expense of Parent and subject to bona fide confidentiality obligations, limitations imposed by law and attorney-client privilege and at such reasonable times during normal business hours and as often as may be reasonably desired, upon reasonable advance notice to Parent; provided, that, excluding any such visits and inspections during the continuation of an Event of Default, (x) only Agent on behalf of Lenders may exercise rights of Agent and Lenders under this Section 10.1.10 and (y) Agent shall not exercise such rights more often than one (1) time during any calendar year (or two (2) times per calendar year during an Accelerated Reporting Trigger Period); provided, further, that when an Event of Default exists, Agent or any Lender (or any of their respective representatives or independent contractors) may do any of the foregoing at the expense of Borrowers at any time during normal business hours and upon reasonable advance notice. Agent and Lenders shall give Loan Parties the opportunity to participate in any discussions with Loan Parties' independent public accountants. For purposes of clarity, Agent confirms that it shall conduct the commercial field exams referenced in clause (y) above.

10.1.19     Additional Collateral; Additional Guarantors. Subject to the terms, conditions and provisions of the Term Debt Intercreditor Agreement, at Borrowers' expense, take all actions which are necessary or reasonably requested by Agent to ensure that the Collateral and Guarantee Requirement continues to be satisfied, including:

(c)     Upon (x) the formation or acquisition of any new direct or indirect wholly owned Domestic Subsidiary (in each case, other than an Excluded Subsidiary) by any Loan Party, (y) the designation in accordance with Section 10.1.14 of any existing direct or indirect wholly owned Domestic Subsidiary as a Restricted Subsidiary, or (z) any wholly owned Domestic Subsidiary that is an Excluded Subsidiary ceasing to be an Excluded Subsidiary necessary such that no direct or indirect wholly owned Domestic Subsidiary will be an Excluded Subsidiary by virtue of the provisions set forth in clause (c) of the definition of "Excluded Subsidiary" in Section 1.1):

(i)     within sixty (60) days after such formation, acquisition, designation or other event, or such longer period as Agent may agree in writing in its reasonable discretion:

(A)     causing each such Domestic Subsidiary that is not an Excluded Subsidiary to duly execute and deliver to Agent joinders to this Agreement as Guarantors, Grants of Security Interest, and other security agreements and documents (including, with respect to such Mortgages, the documents listed in Section 10.1.13(b)), as reasonably requested by and in form and substance reasonably satisfactory to Agent (consistent with the Mortgages (if any), intellectual property security agreements, this Agreement and other security agreements in effect on the Closing Date) and Borrowers, in each case granting Liens required by the Collateral and Guarantee Requirement;

(B)     subject to the Term Debt Intercreditor Agreement, causing each such Domestic Subsidiary that is not an Excluded Subsidiary (and the parent of each such Domestic Subsidiary that is a Loan Party) to deliver to Agent (or its bailee) any and all certificates representing Equity Interests (to the extent certificated) and intercompany notes (to the extent certificated) that are required to be pledged pursuant to the Collateral and Guarantee Requirement, accompanied by undated stock powers or other appropriate instruments of transfer executed in blank;

(C)     taking and causing each such Restricted Subsidiary and each direct or indirect parent of such Restricted Subsidiary to take whatever action (including the recording of Mortgages, the filing of UCC financing statements and the delivery of stock and membership interest certificates to Agent (or its bailee)) as may be necessary in the reasonable opinion of Agent to vest in Agent (or in any representative of Agent designated by it) valid and perfected Liens to the extent required by the Collateral and Guarantee Requirement, and to otherwise comply with the requirements of the Collateral and Guarantee Requirement;

(ii)     if reasonably requested by Agent, within 45 days after such request (or such longer period as Agent may agree in writing in its reasonable discretion), delivering to Agent a signed copy of an opinion, addressed to Agent and Lenders, of counsel for Loan Parties as to such matters set forth in this Section 10.1.11(a) as Agent may reasonably request;

(iii)     promptly after the reasonable request therefor by Agent, delivering to Agent with respect to each Material Real Property, any existing surveys, title reports, abstracts or environmental assessment reports, to the extent available and in the possession or control of Borrowers; provided, however, that there shall be no obligation to deliver to Agent any existing environmental assessment report whose disclosure to Agent would require the consent of a Person other than a Loan Party or one of its Subsidiaries, and where, despite the commercially reasonable efforts of Loan Parties to obtain such consent, such consent cannot be obtained; and

(d)     if reasonably requested by Agent, within 60 days (or 30 days with respect to the delivery of any Deposit Account Control Agreement) after such request (or such longer period as Agent may agree in writing in its reasonable discretion), delivering to Agent any other items necessary from time to time to satisfy the Collateral and Guarantee Requirement with respect to the validity,

perfection, existence and priority of security interests with respect to property of any Guarantor acquired after the Closing Date and subject to the Collateral and Guarantee Requirement, but not specifically covered by the preceding clauses (i), (ii) or (iii) or clause (c) below.

(e)   not later than 120 days after (or such longer period as granted pursuant to the Term Loan Debt Documents) (i) the acquisition by any Loan Party of any Material Real Property or (ii) the release of any first lien security interest on any Real Property securing the obligations under the Contribution and Deferral Agreement, in each case that is required to be provided as Collateral pursuant to the Collateral and Guarantee Requirement (or such longer period as granted under the Term Loan Debt Documents or otherwise that Agent may agree in writing in its reasonable discretion), which Material Real Property would not be automatically subject to another Lien pursuant to pre-existing Security Documents, causing such property to be subject to a Lien in favor of Agent for the benefit of Secured Parties and taking, or causing the relevant Loan Party to take, such actions as shall be necessary or reasonably requested by Agent to grant and perfect or record such Lien, in each case to the extent required by, and subject to the limitations and exceptions of, the Collateral and Guarantee Requirement and to otherwise comply with the requirements of the Collateral and Guarantee Requirement.

10.1.20    Compliance with Environmental Laws. Except, in each case, to the extent that the failure to do so could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect: (a) comply, and take all reasonable actions to cause all lessees and other Persons operating or occupying its properties to comply, with all applicable Environmental Laws and Environmental Permits; (b) obtain and renew all Environmental Permits necessary for its operations and properties; and, (c) in each case to the extent Loan Parties or Restricted Subsidiaries are required to do so by applicable Environmental Laws, conduct any investigation, remedial or other corrective action necessary to address Hazardous Materials at any property or facility in accordance with applicable Environmental Laws.

10.1.21    Further Assurances and Post-Closing Conditions.

(a)    Within sixty (60) days after the Closing Date (subject to, solely with respect to the Term Priority Collateral, extension granted under the Term Loan Debt Documents or otherwise that the by Agent agrees to in its reasonable discretion), deliver each Loan Document set forth on Schedule 10.1.13(a) , duly executed by each Loan Party party thereto, together with all documents and instruments required to perfect the security interest of Agent in the Collateral free of any other pledges, security interests or mortgages, except Liens expressly permitted hereunder, to the extent required pursuant to the Collateral and Guarantee Requirement.

(b)    Promptly upon reasonable request by Agent (i) correct any material defect or error that may be discovered in the execution, acknowledgment, filing or recordation of any Loan Document or other document or instrument relating to any Collateral (including, without limitation, any defect or error related to certificates of title for vehicles and other Rolling Stock) as to which Parent reasonably agrees is a defect or error, and (ii) subject to the terms of the Loan Documents, do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts, deeds, certificates, assurances and other instruments as Agent may reasonably request from time to time in order to carry out more effectively the purposes of the Loan Documents and to cause the Collateral and Guarantee Requirement to be and remain satisfied. If Agent reasonably determines that it is required by Applicable Law to have appraisals prepared in respect of each Material Real Property of any Loan Party subject to a Mortgage, Borrowers shall cooperate with Agent, as applicable, in obtaining such appraisals and shall pay all reasonable costs and expenses relating thereto.

10.1.22    Designation of Subsidiaries. Parent may at any time after the Closing Date designate any Restricted Subsidiary of Parent or other Borrower as an Unrestricted Subsidiary or any Unrestricted Subsidiary as a Restricted Subsidiary; provided, that (i) immediately before and after such designation, no Event of Default shall have occurred and be continuing, and (ii) no Subsidiary may be designated as an Unrestricted Subsidiary or continue as an Unrestricted Subsidiary if it is a "Restricted Subsidiary" for the purpose of the Term Debt Documents, any Junior Financing Documentation or the documentation governing any Permitted Junior Debt or Term Refinancing Debt. The designation of any Subsidiary as an Unrestricted Subsidiary after the Closing Date shall constitute an Investment by Parent therein at the date of designation in an amount equal to the fair market value of the aggregate Investment therein of Parent and its Subsidiaries (as applicable). The designation of any Unrestricted Subsidiary as a Restricted Subsidiary shall constitute (i) the incurrence at the time of designation of any Investment, Debt or Liens of such Subsidiary existing at such time and (ii) a return on any Investment by Parent in Unrestricted Subsidiaries pursuant to the preceding sentence in an amount equal to the lesser of (x) the fair market value at the date of such designation of Parent's or its Subsidiary's (as applicable) Investment in such Subsidiary and (y) the amount of the Investment originally made in respect of the designation of such Subsidiary as an Unrestricted Subsidiary.

10.1.23    Reserved.

10.1.24    Use of Proceeds. Borrowers shall use the proceeds of the Loans borrowed on the Closing Date to fund the Transactions on the Closing Date, to pay Transaction Expenses, for working capital and for other general corporate purposes.

**10.2  Negative Covenants.** Until Full Payment of the Obligations, Parent shall not, and shall cause each Restricted Subsidiary not to:

10.2.7  <u>Liens</u>. Parent shall not, nor shall it permit any Restricted Subsidiary to, directly or indirectly, create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired, other than the following (each, a "Permitted Lien"):

(c)  Liens created pursuant to any Loan Document;

(d)  Liens existing or contemplated on the Closing Date and listed on Schedule 10.2.1(b); provided, that (i) the Lien does not extend to any additional property other than (A) any replacements of such property or assets and additions and accessions thereto, after-acquired property subjected to a Lien securing Debt and other obligations incurred prior to such time and which Debt and other obligations are permitted hereunder that require, pursuant to their terms at such time, a pledge of after-acquired property (it being understood that such requirement shall not be permitted to apply to any property to which such requirement would not have applied but for such acquisition, or asset of Parent or any Restricted Subsidiary and the proceeds and the products thereof and customary security deposits in respect thereof and in the case of multiple financings of equipment provided by any lender, other equipment financed by such lender), and (ii) such Lien does not secure any obligation (including unused commitments) other than those it secured on the Closing Date or, to the extent constituting Debt, any Permitted Refinancing of the Debt secured thereby on the Closing Date or, to the extent not constituting Debt, any extensions, renewals, restructurings, refinancings and replacements thereof;

(e)  Liens for unpaid utilities, taxes, assessments or governmental charges that are (i) not overdue for a period of more than thirty (30) days and are not otherwise delinquent, securing obligations in an amount not to exceed $5,000,000, or that are being contested in good faith and by appropriate actions, if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP or (ii) otherwise not required to be paid pursuant to Section 10.1.4;

(f)  Statutory, lease, contractual or common law Liens of landlords, sublandlords, carriers, warehousemen, mechanics, materialmen, repairmen, construction contractors or other like Liens, or other customary Liens (other than in respect of Debt) in favor of landlords, in each case arising in the ordinary course of business that secure amounts not overdue for a period of more than thirty (30) days or if more than thirty (30) days overdue, that either secure obligations in an amount not to exceed $1,000,000 or are being contested in good faith and by appropriate actions if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP;

(g)  (i) Liens in the ordinary course of business in connection with workers' compensation, unemployment insurance and other social security legislation (other than any Lien imposed pursuant to Section 430(k) of the Code or Section 303(k) of ERISA or a violation of Section 436 of the Code) and (ii) Liens in the ordinary course of business securing liability for reimbursement or indemnification obligations of (including obligations in respect of letters of credit or bank guarantees for the benefit of) insurance carriers providing property, casualty or liability insurance to Parent or any of Restricted Subsidiaries;

(h)  Liens to secure the performance of bids, trade contracts, governmental contracts and leases (in the case of each of the foregoing, other than for Debt for borrowed money), statutory obligations, surety, stay, customs and appeal bonds, performance bonds and other obligations of a like nature (including those to secure health, safety and environmental obligations), in each case incurred in the ordinary course of business;

(i)  (i) easements, rights-of-way, restrictions (including zoning restrictions and other land use regulations), rights of way, encroachments, protrusions, reservations and other similar encumbrances and minor title defects affecting Real Property that do not in the aggregate materially interfere with the ordinary conduct of the business of Parent and Restricted Subsidiaries, taken as a whole, (ii) any exceptions to the Mortgage Policies issued in connection with the Mortgaged Properties (including, without limitation, any exceptions issued after the Closing Date in the reasonable discretion of Agent), and (iii) ground leases in respect of Real Property on which facilities owned or leased by Parent or any of Restricted Subsidiaries are located; provided in the case of this clause (ii) that such ground leases do not confer rights on the counter-party(ies) thereto superior to those of Agent in the relevant property;

(j)  Liens securing judgments not constituting an Event of Default under Section 11.1(g);

(k)  leases, licenses, subleases or sublicenses granted to others in the ordinary course of business which do not (i) interfere in any material respect with the business of Parent and Restricted Subsidiaries, taken as a whole, or (ii) secure any Debt;

(l)  Liens (i) in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods in the ordinary course of business or (ii) on specific items of inventory or other goods and proceeds thereof of any Person securing such Person's obligations in respect of bankers' acceptances or letters of credit issued or created for the account of such person to facilitate the purchase, shipment or storage of such inventory or such other goods in the

ordinary course of business;

(m)   Liens (i) of a collection bank arising under Section 4-210 of the UCC on items in the course of collection and (ii) arising in the ordinary course of business in favor of a banking or other financial institution arising as a matter of law or under customary general terms and conditions encumbering deposits or other funds maintained with a financial institution (including the right of set-off) and that are within the general parameters customary in the banking industry or arising pursuant to the general terms and conditions of such banking institutions;

(n)   Liens (i) on cash earnest money deposits or other cash advances in favor of the seller of any property to be acquired in an Investment permitted pursuant to Sections 10.2.2(e), (h), (l), (p), (r) or (v) in each case to be applied against the purchase price for such Investment, and (ii) consisting of an agreement to Dispose of any property in a Disposition permitted under Section 10.2.5 in each case, solely to the extent such Investment or Disposition, as the case may be, would have been permitted on the date of the creation of such Lien;

(o)   Liens (i) in favor of Parent or a Restricted Subsidiary on assets of a Restricted Subsidiary that is not a Loan Party securing Debt permitted under Section 10.2.3 and (ii) in favor of any Loan Party;

(p)   any interest or title (and all encumbrances and other matters affecting such interest or title) of a lessor, sublessor, licensor or sublicensor under leases, subleases, licenses or sublicenses entered into by Parent or any of Restricted Subsidiaries in the ordinary course of business; provided, that no such lease or sublease shall constitute a Capitalized Lease;

(q)   Liens deemed to exist in connection with Investments in repurchase agreements permitted under Section 10.2.2(a);

(r)   Liens encumbering reasonable customary initial deposits and margin deposits and similar Liens attaching to commodity accounts or other brokerage accounts incurred in the ordinary course of business and not for speculative purposes;

(s)   Liens (including any interest or title (and all encumbrances and other matters affecting such interest or title) of a lessor or sublessor under Capitalized Leases) securing Debt permitted under Section 10.2.3(e) or (ee); provided, that (i) such Liens are created within 270 days of the acquisition, construction, repair, lease or improvement, as applicable, of the property subject to such Liens, (ii) such Liens do not at any time encumber property (except for replacements, additions and accessions to such property) other than the property financed by such Debt and the proceeds and products thereof and customary security deposits, and (iii) with respect to Capitalized Leases, such Liens do not at any time extend to or cover any assets (except for replacements, additions and accessions to such assets) other than the assets subject to such Capitalized Leases and the proceeds and products thereof and customary security deposits; provided, that individual financings of equipment provided by one lender may be cross collateralized to other financings of equipment provided by such lender;

(t)   Liens on property (i) of any Foreign Subsidiary that is not a Loan Party and (ii) that does not constitute Collateral, which Liens secure Debt of the applicable Foreign Subsidiary permitted under Section 10.2.3;

(u)   Liens existing on property at the time of its acquisition or existing on the property of any Person at the time such Person becomes a Restricted Subsidiary (other than by designation as a Restricted Subsidiary pursuant to Section 10.1.14), in each case after the Closing Date; provided, that (i) such Lien was not created in contemplation of such acquisition or such Person becoming a Restricted Subsidiary, (ii) such Lien does not extend to or cover any other assets or property (other than the proceeds or products thereof and other than after-acquired property subjected to a Lien securing Debt and other obligations incurred prior to such time and which Debt and other obligations are permitted hereunder that require, pursuant to their terms at such time, a pledge of after-acquired property, it being understood that such requirement shall not be permitted to apply to any property to which such requirement would not have applied but for such acquisition), and (iii) the Debt secured thereby is permitted under Section 10.2.3(g);

(v)   Liens arising from precautionary UCC financing statements or similar filings;

(w)   Liens on insurance policies and the proceeds thereof securing the financing of the premiums with respect thereto in the ordinary course of business;

(x)   Liens on the Collateral securing Debt permitted under Section 10.2.3(o) or other obligations secured pursuant to the documentation governing such Debt; provided, that such Liens shall be subject to the Term Debt Intercreditor Agreement or other intercreditor agreement reasonably satisfactory to Agent;

(y)   Reserved;

(z)   Liens on the Equity Interests of any joint venture entity or non-wholly owned Subsidiary of Parent consisting of a transfer restriction, purchase option, call or similar right of a third party joint venture partner;

(aa)    cash collateral posted as security for Parent's or any Restricted Subsidiary's obligations under Hedging Agreements, in an aggregate amount for all such cash collateral at any time not to exceed $15,000,000; provided, that cash collateral posted for the account of Lenders or Agent in respect of non-speculative currency or interest rate Hedging Agreements shall not be subject to such limit;

(bb)   Reserved;

(cc)   Liens arising in connection with a Receivables Facility;

(dd)   Liens (i) arising out of conditional sale, title retention, consignment or similar arrangements for the sale of goods, or (ii) encumbering deposits made to secure obligations arising from contractual or warranty requirements;

(ee)   Utility and similar deposits in the ordinary course of business;

(ff)   Liens in respect of (i) Unrestricted Subsidiaries and joint ventures or non-wholly owned Subsidiaries, or (ii) cash and Cash Equivalents, deposit accounts and securities accounts collateralizing letters of credit permitted by Section 10.2.3(y);

(gg)   Liens related to Sale and Leaseback Transactions in an aggregate amount not to exceed $50,000,000; and

(hh)   other Liens with respect to Property of Parent or any of Restricted Subsidiaries securing obligations in an aggregate principal amount outstanding at any time not to exceed the greater of (i) $30,000,000 and (ii) 2% of Consolidated Total Assets at the time of such incurrence.

10.2.8   Investments. Parent shall not, nor shall it permit any Restricted Subsidiary to, directly or indirectly, make or hold any Investments, except:

(h)   Investments by Parent or any of Restricted Subsidiaries in cash or Cash Equivalents;

(i)   loans or advances to officers, directors and employees of any Loan Party or any of Restricted Subsidiaries (i) for reasonable and customary business-related travel, entertainment, relocation and analogous ordinary business purposes, in each case, consistent with past practices (including pursuant to use of any credit cards, credit card processing services, debit cards, stored value cards, purchase cards (including so-called "procurement cards" or "P-cards") or other similar cash management services), (ii) in connection with such Person's purchase of Equity Interests of Parent and (iii) for any other corporate purposes not described in the foregoing clauses (i) and (ii); provided, that the aggregate principal amount of loans and advances outstanding at any time under this Section 10.2.2(b)(ii) and (iii) shall not exceed $2,000,000;

(j)   Investments (i) by Parent or any Restricted Subsidiary in any Loan Party (or any newly formed wholly owned Restricted Subsidiary that is not an Excluded Subsidiary and is to become a Loan Party in accordance with Section 10.1.11), (ii) by any Restricted Subsidiary that is not a Loan Party in any other Restricted Subsidiary that is not a Loan Party, and (iii) by any Loan Party in a Restricted Subsidiary that is not a Loan Party; provided, that the aggregate amount of Investments at any time outstanding under this clause (iii) shall not exceed $15,000,000;

(k)   Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit or other credits to suppliers in the ordinary course of business;

(l)   Investments (i) existing or contemplated on the Closing Date and set forth on Schedule 10.2.2(e) (including unused commitments) and any modification, replacement, renewal or extension thereof and (ii) existing on the Closing Date by Parent or any other Restricted Subsidiary in any Restricted Subsidiary and any modification, replacement, renewal or extension thereof; provided, that in the case of clause (i) and clause (ii) the amount of the original Investment is not increased except by the terms of such original Investment as set forth on Schedule 10.2.2(e) or as otherwise permitted by this Section 10.2.2 (and in such case made in reliance on the other paragraph of this Section 10.2.2 so permitting such modification, replacement, renewal or extension thereof);

(m)   Investments in Hedging Agreements permitted under Section 10.2.3;

(n)   promissory notes and other non-cash consideration received in connection with Dispositions permitted by Section 10.2.5;

(o)   subject to the satisfaction (or waiver) of the Payment Conditions, any acquisition by Parent or any Restricted Subsidiary of all or substantially all the assets of, or all the Equity Interests (other than directors' qualifying shares, shares issued to foreign nationals as required by Applicable Law or any options for Equity Interests that cannot, as a matter of law, be cancelled,

redeemed or otherwise extinguished without the express agreement of the holder thereof at or prior to acquisition) in, a Person or division, business unit or line of business of a Person (or any subsequent investment made in a Person, division, business unit or line of business previously acquired in a Permitted Acquisition), in each case in a single transaction or series of related transactions, if (i) all transactions related thereto shall be consummated in all material respects in accordance with Applicable Laws; (ii) any acquired or newly formed Restricted Subsidiary shall not be liable for any Debt except for Debt otherwise permitted by Section 10.2.3; (iii) to the extent required by the Collateral and Guarantee Requirement, (x) the property, assets and businesses acquired in such purchase or other acquisition shall constitute Collateral and (y) any such newly created or acquired Subsidiary (other than an Excluded Subsidiary) shall become a Guarantor, in each case, to the extent required by and in accordance with Section 10.1.11; (iv) the businesses acquired in such purchase or other acquisition shall be in compliance with Section 10.2.7; and (v) Administrative Borrower shall have delivered to Agent a certificate of a Responsible Officer of Administrative Borrower certifying that the conditions set forth in the preceding clauses (i) through (iv) have been satisfied and that the Payment Conditions have been satisfied (any such acquisition, a "Permitted Acquisition"); provided, that the aggregate amount of Investments made by Loan Parties pursuant to this Section 10.2.2(h) in assets that are not (or do not become) owned by a Loan Party or in Equity Interests in Persons that do not become Loan Parties upon consummation of such Permitted Acquisition shall not exceed $15,000,000 at any time outstanding;

(p)   Investments in the ordinary course of business consisting of UCC Article 3 endorsements for collection or deposit and UCC Article 4 customary trade arrangements with customers consistent with past practices;

(q)    Investments (including debt obligations and Equity Interests) received in connection with the bankruptcy or reorganization of suppliers and customers or in settlement of delinquent obligations of, or other disputes with, customers and suppliers;

(r)   advances of payroll payments to employees in the ordinary course of business;

(s)   Investments to the extent that payment for such Investments is made with Equity Interests (other than Disqualified Equity Interests) of Parent or the Net Proceeds received from the issuance thereof;

(t)   Investments of a Restricted Subsidiary acquired after the Closing Date pursuant to a Permitted Acquisition or of a corporation merged or amalgamated or consolidated into Parent or any Restricted Subsidiary, in each case in accordance with this Section 10.2.2 and Section 10.2.4 after the Closing Date, to the extent that such Investments were not made in contemplation of or in connection with such acquisition, merger, amalgamation or consolidation and were in existence on the date of such acquisition, merger or consolidation;

(u)   Investments made by any Restricted Subsidiary that is not a Loan Party to the extent such Investments are financed with the proceeds received by such Restricted Subsidiary from an Investment in such Restricted Subsidiary made pursuant to Section 10.2.2(c)(i), Section 10.2.2(c)(iii) or Section 10.2.2(p);

(v)   Guarantees by Parent or any Restricted Subsidiary of operating leases (other than Capitalized Leases) or of other obligations that do not constitute Debt, in each case, which leases or other obligations are entered into by any Loan Party in the ordinary course of business.

(w)    other Investments (including for Permitted Acquisitions) in an aggregate amount outstanding pursuant to this clause (p) at any time not to exceed $20,000,000;

(x)   (i) make lease, utility and other similar deposits or any other advance or deposit permitted by this Agreement in the ordinary course of business or (ii) make prepayments and deposits to suppliers in the ordinary course of business;

(y)   to the extent constituting Investments, capital expenditures otherwise permitted under this Agreement;

(z)   Investments in deposit accounts or securities accounts opened in the ordinary course of business;

(aa)   solely to the extent not prohibited under Section 10.2.13, subject, in any event, to the conditions set forth therein (as applicable), the repurchase, retirement or repayment of any Debt, including, without limitation, the acquisitions of Term Debt in accordance with the Term Debt Documents;

(bb)   Investments made in connection with a Receivables Facility;

(cc)   Investments consisting of or resulting from (i) Debt permitted under Section 10.2.3, (ii) Liens permitted under Section 10.2.1, (iii) Restricted Payments permitted under Section 10.2.6, (iv) Dispositions permitted by Section 10.2.5, and (v) fundamental changes permitted by Section 10.2.4;

(dd)    Investments solely to the extent such Investments reflect an increase in the value of Investments otherwise

permitted under this Section 10.2.2;

(ee)   loans and advances to Parent in lieu of, and not in excess of the amount of (after giving effect to any other such loans or advances or Restricted Payments in respect thereof), Restricted Payments to the extent permitted to be made in accordance with Section 10.2.6 (other than Section 10.2.6(e));

(ff)   Guarantee obligations of Parent or any Restricted Subsidiary in respect of letters of support, guarantees or similar obligations issued, made or incurred for the benefit of any Restricted Subsidiary of Parent to the extent required by law or in connection with any statutory filing or the delivery of audit opinions performed in jurisdictions other than within the United States;

(gg)   the repurchase, retirement, repayment, redemption, discharge, conversion or exchange of any other Debt relating to the Existing Series A Notes and Existing Series B Notes; and

(hh)   other Investments not to exceed $10,000,000 in any Fiscal Year, in each case so long as no Event of Default shall have occurred and be continuing at the time of such Investment or would result therefrom.

10.2.9   <u>Debt</u>. Parent shall not, nor shall it permit any Restricted Subsidiary to, directly or indirectly, create, incur, assume or suffer to exist any Debt, except:

(m)   Debt of any Loan Party under the Loan Documents;

(n)   (i) Debt outstanding on the Closing Date and listed on Schedule 10.2.3(b) and any Permitted Refinancing thereof and (ii) intercompany Debt outstanding on the Closing Date and listed on Schedule 10.2.3(b) and any Permitted Refinancing thereof; <u>provided</u>, that (x) any intercompany Debt in excess of $5,000,000 shall be evidenced by an Intercompany Note, and (y) any Intercompany Debt of any Loan Party owed to any Person that is not a Loan Party shall be unsecured and subordinated to the Obligations pursuant to the subordination provisions reasonably acceptable to Agent;

(o)   Guarantees by Parent and any Restricted Subsidiary in respect of Debt of Parent or any Restricted Subsidiary otherwise permitted hereunder; <u>provided</u>, that (i) no Guarantee by any Restricted Subsidiary of any Term Debt, any Permitted Junior Debt, any Term Refinancing Debt or any Permitted Refinancing of any of the foregoing shall be permitted unless such guaranteeing party shall have also provided a Guarantee of the Obligations on the terms set forth herein (<u>provided</u>, <u>further</u>, that, this clause (i) shall not apply in the case of a Guarantee by any Foreign Subsidiary of any Debt of another Foreign Subsidiary), and (ii) if the Debt being Guaranteed is, or is required by this Agreement to be, Subordinated Debt, such Guarantee shall be subordinated to the Guarantee of the Obligations on terms (taken as a whole) at least as favorable to Lenders as those contained in the subordination of such Debt;

(p)   Debt (other than Debt permitted under Section 10.2.3(b)) of Parent or any Restricted Subsidiary owing to any Loan Party or any other Restricted Subsidiary (or consisting of a Guaranty on behalf of Parent or any Restricted Subsidiary) to the extent constituting an Investment permitted by Section 10.2.2; <u>provided</u>, that (x) all such Debt of any Loan Party shall be evidenced by any Intercompany Note, and (y) any intercompany Debt owed to any Person that is not a Loan Party shall be unsecured and subordinated to the Obligations pursuant to the subordination provisions reasonably acceptable to Agent;

(q)   Attributable Debt and other Debt of Parent or any Restricted Subsidiary (including Capitalized Leases) financing an acquisition, construction, repair, replacement, lease or improvement of a fixed or capital asset incurred prior to or within 270 days after the acquisition, lease or improvement of the applicable asset in an aggregate amount (together with any Permitted Refinancings thereof) not to exceed $50,000,000 at any time outstanding;

(r)   Debt in respect of Hedging Agreements designed to hedge against Parent's or any Restricted Subsidiary's exposure to interest rates, foreign exchange rates or commodities (including fuel) pricing risks incurred not for speculative purposes;

(s)   Debt of Parent or any Restricted Subsidiary (i) assumed in connection with any Permitted Acquisition or other Investment permitted hereunder, <u>provided</u>, that such Debt is not incurred in contemplation of such Investment, and any Permitted Refinancing thereof or (ii) incurred to finance a Permitted Acquisition or other Investment permitted hereunder and any Permitted Refinancing thereof; <u>provided</u>, that (w) in the case of clauses (i) and (ii), such Debt and all Debt resulting from a Permitted Refinancing thereof is unsecured (except for (A) Liens permitted by Section 10.2.1(s) and (B) Liens permitted by Section 10.2.1(ff)), (x) in the case of clauses (i) and (ii), both immediately prior and after giving effect thereto, (1) no Event of Default shall exist or result therefrom, and (2) immediately after giving effect to the incurrence of such Debt, the Total Leverage Ratio calculated on a Pro Forma Basis shall not be greater than the Total Leverage Ratio immediately prior to the consummation of the transaction, and (y) in the case of any such incurred Debt under clause (ii), such Debt matures after, and (except for any payments in respect of a Change of Control, asset sales, AHYDO catch-ups, and similar such payments) does not require any scheduled amortization or other scheduled payments of principal prior to, the then Latest Maturity Date;

(t)    Debt representing deferred compensation to employees of Parent or any Restricted Subsidiary incurred in the ordinary course of business and other obligations and liabilities arising under employee benefit plans in the ordinary course of business;

(u)    Debt consisting of unsecured promissory notes issued by Parent or any Restricted Subsidiary to current or former officers, managers, consultants, directors and employees, their respective estates, spouses or former spouses to finance the purchase or redemption of Equity Interests of Parent permitted by Section 10.2.6;

(v)    Debt incurred by Parent or any Restricted Subsidiary in a Permitted Acquisition, any other Investment expressly permitted hereunder or any Disposition expressly permitted hereunder, in each case, constituting indemnification obligations or obligations in respect of purchase price (including earnouts and holdbacks) or other similar adjustments;

(w)    Debt in respect of treasury, depository, credit card, debit card and cash management services or automated clearinghouse transfer of funds, overdraft or any similar services incurred in the ordinary course of business or any similar cash management services relating or secured pursuant to this Agreement or the Term Debt Documents (including Bank Product Debt) and any hedges related to the Term Debt Documents or this Agreement;

(x)    Debt consisting of the financing of insurance premiums or take-or-pay obligations contained in supply arrangements that do not constitute Guarantees, in each case, in the ordinary course of business;

(y)    Debt incurred by Parent or any Restricted Subsidiary in respect of letters of credit, bank guarantees, bankers' acceptances or similar instruments issued or created in the ordinary course of business and not in connection with the borrowing of money, including in respect of workers compensation claims, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance or other Debt incurred in the ordinary course of business with respect to reimbursement-type obligations regarding workers compensation claims;

(z)    obligations in respect of performance, bid, appeal and surety bonds and performance and completion guarantees and similar obligations provided by the Term Debt Documents or any of Restricted Subsidiaries or obligations in respect of letters of credit, bank guarantees or similar instruments related thereto, in each case in the ordinary course of business or consistent with past practice and not in connection with the borrowing of money or Hedging Agreements;

(aa)    Term Debt of any Loan Party (including any Incremental Term Loans (as defined in the Term Debt Agreement)), (y) Term Refinancing Debt of any Loan Party and (z) any Permitted Refinancing of either of the foregoing, in each case to the extent permitted under, and subject to, the Term Debt Intercreditor Agreement or another intercreditor agreement in form and substance reasonably satisfactory to Agent and Administrative Borrower;

(bb)    Reserved.

(cc)    Reserved.

(dd)    Permitted Junior Debt of a Loan Party; provided, that (x) no Event of Default shall have occurred and be continuing at the time of the incurrence of such Debt or would result therefrom and (y) immediately after giving effect to the incurrence of such Permitted Junior Debt, the Total Leverage Ratio calculated on a Pro Forma Basis shall not be greater than 5.00 to 1.00 (as of the last day of the most-recently ended Fiscal Quarter for which financials statements have been delivered);

(ee)    Debt of Restricted Subsidiaries that are not Loan Parties in an aggregate principal amount at any time outstanding not to exceed $25,000,000;

(ff)    all premiums (if any), interest (including post-petition interest and interest paid in kind), fees, expenses, charges and additional or contingent interest on obligations described in clauses (a) through (0) above and (u) through (ee) below;

(gg)    Debt in respect of the Specified Pension Fund Obligations and Guarantees thereof, to the extent existing on the Closing Date, by any Guarantor in an aggregate principal amount at any time outstanding not to exceed the amount outstanding as of the Closing Date (and as adjusted from time to time pursuant to any audits), plus any interest paid in kind thereon and any accrued but unpaid interest thereon;

(hh)    Debt in respect of the Existing Series A Notes that is fully discharged;

(ii)    Debt in respect of the Existing Series B Notes in an aggregate principal amount not to exceed $17,000,000 (plus any increase in the principal amount thereof in respect of any interest paid in kind (rather than in cash) thereunder in accordance with the terms and conditions of the applicable indenture in effect as of the Closing Date, but minus any principal payments in respect thereof made in accordance with the terms and conditions of this Agreement) at any time outstanding;

(jj)   Debt in respect of taxes, assessments or governmental charges to the extent that payment thereof shall not at the time be required to be made hereunder;

(kk)   Debt under any letter of credit (to the extent that such letter of credit is collateralized with cash, Cash Equivalents, deposit accounts or securities accounts maintaining cash, Cash Equivalents or investment property or the proceeds of the foregoing); provided, that the aggregate principal amount of Debt permitted by this clause (y) shall not exceed $25,000,000 at any time outstanding;

(ll)   Debt arising under any Receivables Facility in an amount not to exceed $20,000,000 in the aggregate at any one time outstanding; provided, that, for purposes of this clause (z), the obligations under any such Receivables Facility may be full-recourse to Parent or any Restricted Subsidiary; and provided, further, that Accounts sold or otherwise disposed of in connection with any full-recourse Receivables Facility described in the preceding proviso are limited to those Accounts permitted to be sold under Section 10.2.5(g);

(mm)    Debt in respect of Sale and Leaseback Transactions in an amount not to exceed $50,000,000 at any time outstanding;

(nn)   Debt in respect of Investments not prohibited by Section 10.2.2;

(oo)   Debt and other obligations in respect of Disqualified Equity Interests in an amount not to exceed $25,000,000 outstanding at any time;

(pp)   Debt incurred in respect of credit cards, credit card processing services, debit cards, stored value cards, purchase cards (including so-called "procurement cards" or "P-cards") or other similar cash management services, in each case, incurred in the Ordinary Course of Business; and

(qq)   other Debt of Parent or any Restricted Subsidiary, in an aggregate principal amount at any time outstanding not to exceed the greater of $30,000,000 and 2% of Consolidated Total Assets at the time of such incurrence.

Notwithstanding the provisions of Section 10.2.3(c) or any other provision hereof, no Restricted Subsidiary that is not a Loan Party may Guarantee any Term Debt, any Permitted Junior Debt, any Junior Financing or any Term Refinancing Debt (except for any Permitted Refinancing of any of the foregoing.

10.2.10    Fundamental Changes. Parent shall not, nor shall it permit any Restricted Subsidiary to, directly or indirectly, merge, dissolve, liquidate, consolidate with or into another Person, or Dispose of (whether in one transaction or in a series of related transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to or in favor of any Person, except that:

(e)   any Restricted Subsidiary may merge, amalgamate or consolidate with (i) Parent (including a merger, the purpose of which is to reorganize Parent into a new jurisdiction); provided, that (w) no Event of Default exists or would result therefrom, (x) Parent shall be the continuing or surviving Person, (y) such transaction does not result in Parent ceasing to be organized under the laws of the United States, any State thereof or the District of Columbia and (z) such transaction does not have an adverse effect in any material respect on the perfection or priority of the Liens granted under the Loan Documents or (ii) one or more other Restricted Subsidiaries; provided, in the case of this clause (ii), that when such transaction involves a Loan Party and/or a permitted Excluded Subsidiary, a Loan Party or a permitted Excluded Subsidiary shall be the continuing or surviving Person except to the extent otherwise constituting an Investment permitted by Section 10.2.2;

(f)   (i) any Restricted Subsidiary that is not a Loan Party may merge, amalgamate or consolidate with or into any other Restricted Subsidiary that is not a Loan Party and (ii) any Restricted Subsidiary may liquidate or dissolve or change its legal form if Parent determines in good faith that such action is in the best interest of Parent and Restricted Subsidiaries and is not disadvantageous to Lenders in any material respect (it being understood that (other than a transaction constituting a permitted Investment under Section 10.2.2 or involving a permitted Excluded Subsidiary) in the case of any liquidation or dissolution of a Guarantor, such Guarantor shall transfer its assets to a Loan Party, and in the case of any change in legal form, a Restricted Subsidiary that is a Guarantor will remain a Guarantor and such transaction shall not have an adverse effect on the perfection or priority of the Liens granted under the Security Documents);

(g)    any Restricted Subsidiary may Dispose of all or substantially all of its assets (upon voluntary liquidation or otherwise) to Parent or to another Restricted Subsidiary; provided, that if the transferor in such a transaction is a Guarantor, then (i) the transferee must be a Guarantor or Parent or (ii) to the extent constituting an Investment, such Investment must be a permitted Investment in or Debt of a Restricted Subsidiary which is not a Loan Party in accordance with Sections 10.2.2 and 10.2.3, respectively;

(h)    so long as no Event of Default exists or would result therefrom, Parent may merge with any other Person; provided, that (i) Parent shall be the continuing or surviving corporation or (ii) if the Person formed by or surviving any such merger or consolidation is not Parent (any such Person, "Successor Parent"), (A) Successor Parent shall be an entity organized or existing under the laws of the United States, any state thereof or the District of Columbia and such transaction shall not have an adverse effect in any material respect on the perfection or priority of the Liens granted under the Security Documents, (B) Successor Parent shall expressly assume all the obligations of Parent under this Agreement and the other Loan Documents to which Parent is a party pursuant to a supplement hereto or thereto in form reasonably satisfactory to Agent and Parent, (C) each Guarantor, unless it is the other party to such merger or consolidation, shall have confirmed that its Guarantee shall apply to the Successor Parent's obligations under the Loan Documents, (D) each Guarantor, unless it is the other party to such merger or consolidation, shall have by a supplement to the Security Agreement and other applicable Security Documents confirmed that the collateral granted by it to secure its obligations thereunder shall apply to secure its and Successor Parent's obligations under the Loan Documents, (E) if reasonably requested by Agent, each mortgagor of a Mortgaged Property, unless it is the other party to such merger or consolidation, shall have by an amendment to or restatement of the applicable Mortgage (or other instrument reasonably satisfactory to Agent) confirmed that the collateral granted by it to secure its obligations thereunder shall apply to secure its and Successor Parent's obligations under the Loan Documents, and (F) Parent shall have delivered to Agent an officer's certificate stating that such merger or consolidation and such supplement to this Agreement or any Security Document comply with this Agreement; provided, further, that if the foregoing are satisfied (or waived), Successor Parent will succeed to, and be substituted for, Parent under this Agreement; provided, further, that Parent agrees to provide any documentation and other information about Successor Parent as shall have been reasonably requested in writing by any Lender through Agent that is required by regulatory authorities or under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation the USA Patriot Act;

(i)    any Restricted Subsidiary may merge, amalgamate or consolidate with any other Person (other than Parent) in order to effect an Investment permitted pursuant to Section 10.2.2; provided, that either (x) the continuing or surviving Person shall be a Restricted Subsidiary, which together with each of Restricted Subsidiaries, shall have complied with the requirements of Section 10.11 to the extent required pursuant to the Collateral and Guarantee Requirement or (y) the transaction shall otherwise constitute a permitted Investment;

(j)    reserved;

(k)    any Restricted Subsidiary may effect a merger, dissolution, liquidation or consolidation, the purpose of which is to effect a Disposition permitted pursuant to Section 10.2.5; and

(l)    any Restricted Subsidiary may Dispose of all or substantially all of its assets (upon voluntary liquidation or otherwise) to the extent that such Disposition (or series of related Dispositions) is not prohibited under Section 10.2.5.

10.2.11    Dispositions. Parent shall not, nor shall it permit any Restricted Subsidiary to, directly or indirectly, make any Disposition, except:

(d)    (w) Dispositions (including abandonment) of obsolete or worn out property, whether now owned or hereafter acquired, in the ordinary course of business, (x) Dispositions (including abandonment) in the ordinary course of business of surplus property or property no longer used or useful in the conduct of the business of Parent or any Restricted Subsidiary, (y) Dispositions of immaterial assets (considered in the aggregate) in the ordinary course of business; and (z) Dispositions to landlords of improvements made to leased real property pursuant to customary terms of leases entered into in the ordinary course of business;

(e)    Dispositions of property to the extent that (i) such property is exchanged for credit against the purchase price of similar replacement property, (ii) the proceeds of such Disposition are promptly applied to the purchase price of such replacement property, or (iii) such property is swapped in exchange for services or other assets of comparable or greater value or usefulness to the business of Parent and its Subsidiaries taken as a whole, as determined in good faith by the management of Parent;

(f)    Dispositions of property to Parent or any Restricted Subsidiary; provided, that if the transferor of such property is a Loan Party (i) either (x) the transferee thereof must be a Loan Party and if such property constitutes Collateral, it shall continue to constitute Collateral after such Disposition or (y) the transferee is not a Loan Party and the aggregate amount disposed of in any calendar year shall not exceed $10,000,000 or (ii) if such transaction constitutes an Investment, such transaction is permitted under Section 10.2.2;

(g)    Dispositions of cash and Cash Equivalents;

(h)    leases, subleases, licenses or sublicenses (including the provision of software under an open source license) or any abandonment thereof, in each case (i) in the ordinary course of business and without interfering in any material respect with the business of Parent or any of Restricted Subsidiaries, in each case, and any abandonment thereof;

(i)     transfers of property subject to Casualty Events upon the receipt (where practical) of the Net Proceeds of such Casualty Event;

(j)   the Disposition of Accounts that do not constitute Eligible Accounts in connection with the collection thereof in the Ordinary Course of Business; provided, that the aggregate face amount of all Accounts subject to Disposition under this clause (g) shall not exceed $10,000,000 in any Fiscal Year;

(k)     Dispositions consisting of write-offs, compromises and discounts without recourse of accounts receivable and related assets in connection with the compromise or collection thereof in the Ordinary Course of Business;

(l)   any sale of Equity Interests in, or Debt or other securities of, an Unrestricted Subsidiary;

(m)   Dispositions of Investments in joint ventures or other non-wholly owned Subsidiaries to the extent required by, or made pursuant to, customary buy/sell arrangements between the joint venture parties set forth in joint venture arrangements and similar binding arrangements;

(n)   the unwinding of any Hedging Agreement or cash management agreement;

(o)     Dispositions of Property not otherwise permitted under this Section 10.2.5; provided, that (i) at the time of such Disposition (other than any such Disposition of Property made pursuant to a legally binding commitment entered into at a time when no Event of Default exists (including any Event of Default arising due to a change to the Borrowing Base arising from such Disposition) so long as such Disposition is consummated no later than ninety (90) days following the date Loan Parties entered into such legally binding commitment), no Event of Default shall exist or would result from such Disposition (including any Event of Default arising due to a change to the Borrowing Base arising from such Disposition), and (ii) with respect to any Disposition or series of related Dispositions pursuant to this clause (l) for a purchase price in excess of $10,000,000, Parent or any Restricted Subsidiary shall receive not less than 75% of such consideration in the form of cash or Cash Equivalents (in each case, free and clear of all Liens at the time received, other than nonconsensual Liens permitted by Section 10.2.1 and Liens permitted by Section 10.2.1(a), (c), (d), (f), (i), (j), (k), (l) (o), (p), (v), (w), (z), (aa), (bb), (cc), (dd) and (ee); provided, however, that for the purposes of this clause (l)(iii), the following shall be deemed to be cash: (A) any liabilities contingent or otherwise (as shown on Parent's most recent consolidated balance sheet provided hereunder or in the footnotes thereto) of Parent or such Restricted Subsidiary, other than liabilities that are by their terms subordinated to the payment in cash of the Obligations, that are assumed by the transferee with respect to or in connection with the applicable Disposition and for which Parent and all Restricted Subsidiaries shall have been validly released by all applicable creditors in writing, (B) any securities received by Parent or the applicable Restricted Subsidiary from such transferee that are converted by Parent or such Restricted Subsidiary into cash or Cash Equivalents (to the extent of the cash or Cash Equivalents received) within 180 days following the closing of the applicable Disposition, (C) aggregate non-cash consideration received by Administrative Borrower or the applicable Restricted Subsidiary having an aggregate fair market value (determined as of the closing of the applicable Disposition for which such non-cash consideration is received) not to exceed $10,000,000 at any time (net of any non-cash consideration converted into cash and Cash Equivalents), (D) Debt of any Restricted Subsidiary that is no longer a Restricted Subsidiary as a result of such Disposition, to the extent Parent and each other Restricted Subsidiary are released from any Guarantee of payment of such Debt in connection with such Disposition, (E) consideration consisting of Debt of Parent (other than Subordinated Debt) received after the Closing Date from Persons who are not Parent or any Restricted Subsidiary, and (F) the fair market value (as determined by Parent) of non-cash consideration received by Parent or a Restricted Subsidiary in connection with a Disposition (and which will no longer be considered to be outstanding when and to the extent it has been paid, redeemed or otherwise retired or sold or otherwise disposed of in compliance with Section 10.2.5);

(p)   any Disposition of Receivables Assets in connection with a Receivables Facility;

(q)   the disposition of any assets existing on the Closing Date that are set forth on Schedule 10.2.5;

(r)     dispositions from and after the Closing Date of non-core or obsolete assets acquired in connection with any Permitted Acquisition or other permitted Investments;

(s)   the incurrence of Liens permitted hereunder;

(t)   sales or dispositions of Equity Interests of any Subsidiary (other than Parent) in order to qualify members of the governing body of such Subsidiary if required by Applicable Law;

(u)   sales, transfers and other dispositions of (i) any Equity Interests in Unrestricted Subsidiaries or their assets or (ii) other Excluded Property;

(v)    Restricted Payments made pursuant to Section 10.2.6; and

(w)    Permitted Sale and Leaseback Transactions in an aggregate principal amount not to exceed $50,000,000 at any time;

provided, that any Disposition of any property pursuant to this Section 10.2.5 (except pursuant to Sections 10.2.5(a), (c), (e), (f), (g), (j), (k), (m), (n), (o), (q), (r), (s) and (t) and except for Dispositions from a Loan Party to any other Loan Party) shall be for no less than the fair market value of such property at the time of such Disposition. To the extent any Collateral is Disposed of as expressly permitted by this Section 10.2.5 to any Person other than a Loan Party, such Collateral shall be automatically sold free and clear of the Liens created by the Loan Documents, and, if requested by Parent, upon the certification delivered to Agent by Parent that such Disposition is permitted by this Agreement, Agent shall be authorized to take, and shall take, any actions reasonably requested by Parent in order to effect the foregoing (at Borrowers' expense) and/or to expressly subordinate any Lien in favor of Agent on such Collateral that is disposed of.

10.2.12    Restricted Payments. Parent shall not, nor shall it permit any Restricted Subsidiary to, directly or indirectly, declare or make, directly or indirectly, any Restricted Payment, except:

(e)    each Restricted Subsidiary may make Restricted Payments to Parent or any other Restricted Subsidiary (and, in the case of a Restricted Payment by a non-wholly owned Restricted Subsidiary, to Parent and any other Restricted Subsidiary and to each other owner of Equity Interests of such Restricted Subsidiary based on their relative ownership interests of the relevant class of Equity Interests);

(f)    Parent and each Restricted Subsidiary may declare and make dividend payments or other Restricted Payments payable solely in the Equity Interests (other than Disqualified Equity Interests unless such Disqualified Equity Interests would be permitted by Section 10.2.3) of such Person;

(g)    (i) repurchases of Equity Interests in Parent deemed to occur upon the exercise of stock options or warrants or the settlement or vesting of other equity awards if such Equity Interests represent a portion of the exercise price of such options or warrants, (ii) cash payments in lieu of the issuance of fractional shares in connection with the exercise of stock options, warrants or other securities convertible into or exchangeable for Equity Interests of Parent or (iii) Restricted Payments made in respect of any other transaction involving fractional shares; provided, however, that any such cash payment shall not be for the purpose of evading the limitations of this Agreement;

(h)    Parent may pay for the repurchase, retirement or other acquisition or retirement for value of Equity Interests of Parent held by any present or former employee, officer, director or consultant of Parent or any Restricted Subsidiary or equity based awards held by such Persons, in each case, upon the death, disability, retirement or termination of employment of any such Person or pursuant to any employee or director equity plan, employee or director stock option plan or any other employee or director benefit plan or any agreement (including any stock subscription or shareholder agreement) with any employee, director, officer or consultant of Parent or any Restricted Subsidiary; provided, that the aggregate amount of Restricted Payments made pursuant to this clause (d) shall not exceed $7,500,000 in any Fiscal Year plus the proceeds of any key man life insurance; and provided, further, that to the extent that the aggregate amount of Restricted Payments made by Parent and Restricted Subsidiaries pursuant to this clause (d) in any fiscal year is less than the amount set forth above, 100% of the amount of such difference may be carried forward and used to make such Restricted Payments pursuant to this clause (d) in the next two succeeding fiscal years (provided, that any such amount carried forward shall be deemed to be used to make such Restricted Payments in any fiscal year after the amount set forth above for such fiscal year shall be deemed to be used to make such Restricted Payments for such fiscal year;

(i)    Restricted Payments made (i) in respect of working capital adjustments or purchase price adjustments pursuant to any Permitted Acquisition or other permitted Investments (other than pursuant to Section 10.2.2(x)) and (ii) to satisfy indemnity and other similar obligations under the Permitted Acquisitions or other permitted Investments;

(j)    Parent may make Restricted Payments consisting of Equity Interests in any Unrestricted Subsidiary, whether pursuant to a distribution, dividend or any other transaction not prohibited hereunder;

(k)    Restricted Payments in respect of transactions related to (i) fundamental changes permitted under Section 10.2.4 and (ii) Investments permitted under Section 10.2.5; and

(l)    additional Restricted Payments subject to the satisfaction of the Payment Conditions in connection therewith.

10.2.13    Change in Nature of Business; Organization Documents.

(a)    Parent shall not, nor shall Parent permit any Restricted Subsidiary to, directly or indirectly, engage in any material

line of business substantially different from those lines of business conducted by Parent and Restricted Subsidiaries on the Closing Date or any business reasonably related, complementary, synergistic or ancillary thereto or reasonable extensions thereof.

(b)     Parent shall not, nor shall Parent permit any Restricted Subsidiary to, amend, restate, supplement or otherwise modify to, or waive of any of its rights under, its Organization Documents to the extent any of the foregoing could reasonably be expected to be material or adverse to Lenders (in their capacities as such).

10.2.14    Transactions with Affiliates. Parent shall not, nor shall it permit any Restricted Subsidiary to, directly or indirectly, enter into any transaction of any kind with any of its Affiliates, whether or not in the ordinary course of business, other than (a) transactions between or among Loan Parties or any entity that becomes a Loan Party as a result of such transaction and transactions between or among Restricted Subsidiaries that are not Loan Parties, (b) on terms (taken as a whole) substantially not less favorable to Parent or such Restricted Subsidiary as would be obtainable by Parent or such Restricted Subsidiary at the time in a comparable arm's-length transaction with a Person other than an Affiliate, (c) the Transactions and the payment of fees and expenses (including Transaction Expenses) as part of or in connection with the Transactions, (d) the issuance of Equity Interests or equity based awards to any officer, director, employee or consultant of Parent or any of Restricted Subsidiaries in the ordinary course of business, (e) Investments made pursuant to Section 10.2.2, Debt incurred pursuant to Section 10.2.3, Dispositions made pursuant to Section 10.2.5(c)(i)(y) and Restricted Payments permitted under Section 10.2.6, (f) customary employment, consulting and severance arrangements between Parent and Restricted Subsidiaries and their respective officers and employees in the ordinary course of business and transactions pursuant to stock option plans and employee benefit plans and similar arrangements in the ordinary course of business, (h) the payment of customary fees and reasonable out of pocket costs to, and customary indemnities provided on behalf of, directors, officers, employees and consultants of Parent and Restricted Subsidiaries in the ordinary course of business, (i) any customary transaction in connection with a Receivables Facility, (j) transactions pursuant to registration rights agreements and similar arrangements, (k) transactions in which Parent or any Restricted Subsidiary, as the case may be, delivers to Agent a letter from an independent financial advisor stating that such transaction is fair to Parent or such Restricted Subsidiary from a financial point of view or meets the requirements of clause (b) of this Section 10.2.8, and (l) transactions pursuant to agreements in existence on the Closing Date and set forth on Schedule 10.2.8 or any amendment thereto to the extent such an amendment (taken as a whole) is not adverse to Lenders in any material respect.

10.2.15    Burdensome Agreements. Parent shall not, nor shall it permit any Restricted Subsidiary to, directly or indirectly, enter into or permit to exist any Contractual Obligation (other than (i) this Agreement or any other Loan Document or (ii) any Term Debt Documents, documents governing any Term Refinancing Debt or any Permitted Refinancing thereof) that limits the ability of (a) any Restricted Subsidiary that is not a Loan Party to make Restricted Payments to any Loan Party or to make or repay loans or advances to or otherwise transfer assets to or make Investments in any Loan Party or (b) any Loan Party to create, incur, assume or suffer to exist Liens on property of such Person to secure the Obligations; provided, that the foregoing clauses (a) and (b) shall not apply to Contractual Obligations which (i) (x) exist on the Closing Date and (to the extent not otherwise permitted by this Section 10.2.9) are listed on Schedule 10.2.9 hereto and (y) to the extent Contractual Obligations permitted by clause (x) are set forth in an agreement evidencing Debt, are set forth in any agreement evidencing any permitted modification, replacement, renewal, extension or refinancing of such Debt so long as such modification, replacement, renewal, extension or refinancing does not expand the scope of such Contractual Obligation in any material respect (as determined in good faith by Administrative Borrower), (ii) are binding on a Restricted Subsidiary at the time such Restricted Subsidiary first becomes a Restricted Subsidiary, so long as such Contractual Obligations were not entered into in contemplation of such Person becoming a Restricted Subsidiary, (iii) represent Debt of a Restricted Subsidiary which is not a Loan Party which is permitted by Section 10.2.3, (iv) arise in connection with any Disposition permitted by Section 10.2.4 or 10.2.5 and relate solely to the assets or Person subject to such Disposition, (v) are customary provisions in joint venture agreements and other similar agreements applicable to joint ventures or other` non-wholly owned Subsidiaries permitted under Section 10.2.2 and applicable solely to such joint venture or non-wholly owned Subsidiaries and are entered into in the ordinary course of business, (vi) are negative pledges and restrictions on Liens in favor of any holder of Debt (other than any Junior Financing) permitted under Section 10.2.3 but solely to the extent any negative pledge relates to the property financed by such Debt, (vii) are customary restrictions in leases, subleases, licenses or asset sale agreements otherwise permitted hereby so long as such restrictions relate only to the assets subject thereto, (viii) comprise restrictions imposed by any agreement governing secured Debt permitted pursuant to Section 10.2.3 to the extent that such restrictions apply only to the property or assets securing such Debt, (ix) are customary provisions restricting subletting or assignment of any lease governing a leasehold interest of Parent or any Restricted Subsidiary entered into in the ordinary course of business, (x) are customary provisions restricting assignment of any agreement entered into in the ordinary course of business, (xi) are customary restrictions contained in the Term Debt Documents, (xii) arise in connection with cash or other deposits permitted under Sections 10.2.1 and 10.2.2 and limited to such cash or deposit, (xiii) are customary restrictions set forth in the documentation governing any Receivables Facility covering the Receivables Assets related thereto, (xiv) comprise restrictions imposed by any agreement governing Debt entered into on or after the Closing Date and permitted under Section 10.2.3 if the restrictions contained in any such agreement taken as a whole (a) are not materially less favorable to Secured Parties than the encumbrances and restrictions contained in the Loan Documents (as determined by Parent) or (b) either (I) Parent determines at the time of entry into such agreement or instrument that such encumbrances or restrictions will not adversely affect, in any material respect, Borrowers' ability to make principal or interest payments required hereunder or (II) such encumbrance or

restriction applies only during the continuance of a default relating to such agreement or instrument.

10.2.16    Financial Covenant. At all times on or after March 31, 2014 during a Financial Covenant Trigger Period, Parent and Restricted Subsidiaries, on a consolidated basis, shall not permit the Consolidated Fixed Charge Coverage Ratio to be less than 1.10 to 1.00 tested (x) immediately upon the occurrence of a Financial Covenant Trigger Event as of the last day of the most recent Fiscal Quarter for which financial statements have been delivered pursuant to Section 10.1.1 (or, in the event of the occurrence of a Financial Covenant Trigger Event prior to delivery of the financial statements for the Fiscal Quarter ended March 31, 2014, as of December 31, 2013), and (y) thereafter, as of the last day of each Fiscal Quarter, in each case calculated for the immediately preceding twelve Fiscal Months.

10.2.17    Capital Expenditures. Parent and Restricted Subsidiaries shall not make Capital Expenditures during any period set forth below in excess of the amount set forth below for such period:

| Calendar Year | Amount |
|---|---|
| 2014 | $200,000,000 |
| 2015 | $200,000,000 |
| 2016 | $200,000,000 |
| 2017 | $200,000,000 |
| 2018 | $200,000,000 |

The amount of permitted Capital Expenditures set forth above in respect of any Fiscal Year commencing with the Fiscal Year ending on December 31, 2015, shall be increased (but not decreased) by (a) the amount of unused permitted Capital Expenditures for the immediately preceding Fiscal Year less (b) the amount (if any) equal to unused Capital Expenditures carried forward to such preceding Fiscal Year. The amount of permitted Capital Expenditures set forth above in respect of any Fiscal Year may at the option of Administrative Borrower be increased by the amount of Capital Expenditures scheduled to be available for the next succeeding year, with a corresponding reduction in the amount of permitted Capital Expenditures for such next succeeding year. In no event shall Parent or Restricted Subsidiaries permit the aggregate amount of Capital Expenditures during all periods set forth above to exceed the aggregate amount of permitted Capital Expenditures during all such periods as a result of the carry-forward and carry-back provisions set forth in the two immediately preceding sentences and/or the unlimited amount subject to meeting Payment Conditions when such Capital Expenditures are incurred.

Notwithstanding the foregoing, Parent and Restricted Subsidiaries may make additional Capital Expenditures subject to the satisfaction of the Payment Conditions.

10.2.18    Fiscal Year. Neither Parent nor any Restricted Subsidiary shall make any change in its Fiscal Year or Fiscal Quarters (it being understood that Parent's Fiscal Year ends on December 31 of each year, and that each of the first three Fiscal Quarters of each Fiscal Year of Parent ends on the March 31, June 30 and September 30, respectively); provided, however, that Parent may on its own behalf and on behalf of Restricted Subsidiaries, upon written notice to Agent, change its and Restricted Subsidiaries' Fiscal Year and Fiscal Quarters to any other Fiscal Year (and any other Fiscal Quarters), in which case, Parent and Agent will, and are hereby authorized by Lenders to, make any adjustments to this Agreement that are necessary to reflect such changes.

10.2.19    Prepayments, Etc. of Debt.

(a)    Parent shall not, nor shall it permit any Restricted Subsidiary to, directly or indirectly, (x) voluntarily prepay, redeem, purchase, defease or otherwise satisfy prior to the scheduled maturity thereof in any manner (it being understood that payments of regularly scheduled interest shall be permitted unless such payments violate any subordination terms of any Junior Financing Documentation) any Permitted Junior Debt, Term Debt, Term Refinancing Debt or any Permitted Refinancing of any of the foregoing, or (y) prepay the Term Debt or Term Refinancing Debt out of excess cash flow (or an equivalent terms) in accordance with the terms thereof, or (z) make any payment in violation of any subordination terms of any Junior Financing Documentation except (i) any Permitted Refinancing permitted in respect thereof, (ii) the conversion of any such Debt (or any Permitted Refinancing thereof) to Equity Interests (other than Disqualified Equity Interests unless such Disqualified Equity Interests would be permitted by Section 10.2.3) of Parent, (iii) the prepayment of Debt of Parent or any Restricted Subsidiary to Parent or any Restricted Subsidiary to the extent not prohibited by applicable subordination provisions, (iv) prepayments, redemptions, purchases, defeasances, other payments and satisfaction from the proceeds of equity issuances, (v) AHYDO catch-up payments, (vi) any payment permitted to be made pursuant to Section 10.2.6(i) if it were a Restricted Payment, and (vii) other prepayments, redemptions, purchases, defeasances and other payments in respect of Debt subject to the satisfaction of the Debt Repayment Conditions in connection therewith. For greater certainty, nothing in this Section 10.2.13(a) or elsewhere in this Agreement shall limit or restrict the ability of Parent or any Restricted Subsidiary to prepay, redeem, purchase, defease or otherwise satisfy prior to the scheduled maturity thereof any Existing Series A

Notes or Existing Series B Notes or any Debt listed on Schedule 10.2.3(b), in each case that remain outstanding after the consummation of the Recapitalization Transactions and the other Transactions on the Closing Date.

(b)    Parent shall not, nor shall it permit any Restricted Subsidiary to, directly or indirectly, amend, modify, change, terminate or release in any manner materially adverse to the interests of Lenders any term or condition of any Junior Financing Documentation (or any Permitted Refinancing thereof) if the effect thereof would be to cause such Junior Financing to no longer constitute Junior Financing without the consent of Agent (which consent shall not be unreasonably withheld, conditioned or delayed).

## SECTION 11.   EVENTS OF DEFAULT; REMEDIES ON DEFAULT

**11.1    Events of Default.** Each of the following shall be an "Event of Default" hereunder, if the same shall occur for any reason whatsoever, whether voluntary or involuntary, by operation of law or otherwise:

(c)    Any Loan Party fails to pay (i) when and as required to be paid herein or in any other Loan Document, any amount of principal of any Loan, (ii) within five (5) Business Days after the same becomes due, any interest on any Loan, or (iii) within ten (10) days after the same becomes due, any other amount payable hereunder or with respect to any other Loan Document;

(d)    Any representation or warranty made or deemed made or other written statement of any Loan Party made in connection with any Loan Documents is incorrect or misleading in any material respect when given;

(e)    Any Loan Party breaches or fails to perform any covenant contained in Sections 7.2, 8.1, 10.1.3(a), 10.1.5 (solely as it relates to the maintenance of existence) or 10.2;

(f)    Any Loan Party breaches or fails to perform any covenant contained in any Loan Document (and not specified in clause (c) above), and such breach or failure is not cured within thirty (30) days (or (x) three (3) Business Days with respect to a breach or failure under Section 8.2.4 or 8.3, or (y) five (5) Business Days with respect to a breach or failure under Section 10.1.1 or 10.1.2(a)) after a Responsible Officer of such Loan Party receives notice thereof from Agent, whichever is sooner;

(g)    Any Guarantor repudiates, revokes or attempts to revoke in writing the Guaranty (other than in accordance with its terms); any Loan Party denies or contests in writing the validity or enforceability of the Loan Documents or the Loans, or the perfection or priority of any Lien granted to Agent; or Loan Document ceases to be in full force or effect for any reason (other than a waiver or release by Agent and Lenders);

(h)    Any Loan Party or any Restricted Subsidiary (i) fails to make any payment after the applicable grace period with respect thereto, if any, (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) in respect of any other Debt (other than Debt hereunder) having an outstanding aggregate principal amount of not less than the Threshold Amount or (ii) fails to observe or perform any other agreement or condition relating to any such Debt, or any other event occurs (other than, with respect to Debt consisting of swap contracts, termination events or equivalent events pursuant to the terms of such swap contracts and not as a result of any other default thereunder by any Loan Party), after all grace periods having expired and all required notices having been given, the effect of which default or other event is to cause, or to permit the holder or holders of such Debt (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, after all grace periods having expired and all required notices having been given, such Debt to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Debt to be made, prior to its stated maturity;

(i)    One or more final judgments, orders or decrees for the payment of money is entered against a Loan Party in an amount that exceeds, individually or cumulatively with all unsatisfied judgments or orders against all Loan Parties, the Threshold Amount (to the extent not covered by independent third-party insurance or indemnity and such insurer or indemnitor has not denied coverage thereof), unless a stay of enforcement of such judgment or order is in effect, by reason of a pending appeal or otherwise, unless such judgment is vacated, discharged or satisfied in full, in each case within sixty (60) consecutive days;

(j)    Except as otherwise permitted hereunder, Parent and Restricted Subsidiaries (or any one of them) is enjoined, restrained or in any way prevented by any Governmental Authority from conducting any material part of the business of Parent and Restricted Subsidiaries (taken as a whole) or there is a cessation of any material part of the business of Parent and Restricted Subsidiaries (taken as a whole) for a material period of time;

(k)    Any Loan Party agrees to or commences any liquidation, dissolution or winding up of its affairs, except to the extent otherwise permitted under this Agreement; or Loan Parties on a consolidated basis cease to be Solvent;

(l)    (i) Any Insolvency Proceeding is commenced by any Loan Party; (ii) an Insolvency Proceeding is commenced against any Loan Party and such Loan Party consents to the institution of the proceeding against it, the petition commencing the

proceeding is not timely controverted by such Loan Party, such petition is not dismissed within sixty (60) consecutive days after its filing, or an order for relief is entered in the proceeding; a trustee (including an interim trustee) is appointed to take possession of any substantial Property of or to operate any of the business of any Loan Party and such appointment continues undischarged or unstayed for sixty (60) days; or (iii) any Loan Party makes an offer of settlement, extension or composition to its unsecured creditors generally;

(m)   an ERISA Event occurs that could reasonably be expected to result in a Material Adverse Effect;

(n)   a Change of Control occurs;

(o)   any security interest and Lien purported to be created by this Agreement or any Security Document shall cease to be in full force and effect, or shall cease to give Agent, for the benefit of Lenders, the Liens, rights, powers and privileges purported to be created and granted under such Security Documents (including a perfected first priority security interest in and Lien on all of the Collateral thereunder (except as otherwise expressly provided in this Agreement or in such Security Document and except to the extent such failure to be in full force and effect, or loss of rights, powers and privileges, results from the failure of Agent to maintain possession of Collateral actually delivered to it and pledged under the Security Documents or to file UCC amendments relating to a Loan Party's change of name or jurisdiction of formation (solely to the extent that a Loan Party provides Agent written notice thereof in accordance with the Loan Documents) and continuation statements) in favor of Agent, or shall be asserted in writing by Borrower or any other Borrower not to be a valid, perfected, first priority (except as otherwise expressly provided in this Agreement or such Security Document) security interest in or Lien on the Collateral covered thereby;

(p)   any Loan Document or any material provisions thereof shall at any time and for any reason be declared by a court of competent jurisdiction to be null and void, or a proceeding shall be commenced by any Loan Party or any Affiliate thereof, or by any Governmental Authority, seeking to establish the invalidity or unenforceability thereof (exclusive of questions of interpretation of any provision thereof), or any Loan Party shall repudiate or deny any portion of its liability or obligation for the Obligations in writing;

(q)   the subordination and intercreditor provisions of the documents evidencing or governing any Term Debt, Term Refinancing Debt or Junior Financing (the "Intercreditor Provisions") shall, in whole or in part, terminate, cease to be effective or cease to be legally valid, binding and enforceable against any holder of the applicable Term Debt, Term Refinancing Debt or Junior Financing (other than expressly in accordance with the terms hereof or thereof); or (ii) any Loan Party shall, directly or indirectly, disavow or contest in any manner (A) the effectiveness, validity or enforceability of any of the Intercreditor Provisions, (B) that the Intercreditor Provisions exist for the benefit of the Secured Parties, or (C) that all payments of principal of or premium and interest on the applicable Term Debt, Term Refinancing Debt or Junior Financing or realized from the liquidation of any property of any Loan Party, shall be subject to any of the Intercreditor Provisions; or

(r)   The IBT Agreement, as modified and extended through the IBT Extension Agreement, shall terminate or cease to be legally valid and in full force and effect.

**11.2   Remedies upon Default.** If an Event of Default described in Section 11.1(j) occurs with respect to any Loan Party, then to the extent permitted by Applicable Law, all Obligations (other than Bank Product Debt and obligations of Loan Parties under Hedging Agreements) shall become automatically due and payable and all Commitments shall terminate, without any action by Agent or notice of any kind. In addition, if any Event of Default exists, Agent may (and shall upon written direction of Required Lenders) do any one or more of the following from time to time:

(q)   declare any Obligations immediately due and payable, whereupon they shall be due and payable without diligence, presentment, demand, protest or notice of any kind, all of which are hereby waived by Loan Parties to the fullest extent permitted by law;

(r)   terminate, reduce or condition any Commitment, or make any adjustment to the Borrowing Base;

(s)   require Loan Parties to Cash Collateralize LC Obligations to the extent required by the definition of Cash Collateralization, and, if Loan Parties fail promptly to deposit such Cash Collateral, Agent may (and shall upon the direction of Required Lenders) advance the required Cash Collateral as Loans (whether or not an Overadvance exists or is created thereby, or the conditions in Section 6 are satisfied); and

(t)   subject to the Term Debt Intercreditor Agreement, exercise any other rights or remedies afforded under any agreement, by law, at equity or otherwise, including the rights and remedies of a secured party under the UCC. Such rights and remedies include the rights to (i) take possession of any Collateral; (ii) require Loan Parties to assemble Collateral, at Loan Parties' expense, and make it available to Agent at a mutually convenient place designated by Agent; (iii) peaceably enter any premises where Collateral is located and store Collateral on such premises until sold (and if the premises are owned or leased by a Loan Party, Loan Parties agree not to charge for such storage); and (iv) sell or otherwise dispose of any Collateral in its then condition, or after any

further manufacturing or processing thereof, at public or private sale, with such notice as may be required by Applicable Law, in lots or in bulk, at such locations, all as Agent, in its discretion, deems advisable. Each Loan Party agrees that ten (10) days' notice of any proposed sale or other disposition of Collateral by Agent shall be reasonable. Agent shall have the right to conduct such sales on any Loan Party's premises, without charge, and such sales may be adjourned from time to time in accordance with Applicable Law. Subject to the Term Debt Intercreditor Agreement, Agent shall have the right to sell, lease or otherwise dispose of any Collateral for cash, credit or any combination thereof, and Agent may purchase any Collateral at public or, if permitted by law, private sale and, in lieu of actual payment of the purchase price, may set off the amount of such price against the Obligations.

**11.3    License.** Upon the occurrence and during the continuance of an Event of Default, subject to the Term Debt Intercreditor Agreement, Agent is hereby granted an irrevocable, non-exclusive license or other right to use, license or sub-license (without payment of royalty or other compensation to any Person) any or all Intellectual Property owned by Loan Parties (including any software, trade secrets, brochures, customer lists, promotional and advertising materials, labels, packaging materials and other Property), solely for the purpose of exercising Loan Parties' other rights or remedies with respect to, any Collateral.

**11.4    Setoff.** Agent, Lenders and their Affiliates are each authorized by Loan Parties at any time during an Event of Default with the consent of Agent, without notice to Loan Parties, to set off and to appropriate and apply any deposits (general or special (other than deposits in Excluded Deposit Accounts)), funds, claims, obligations, liabilities or other Debt at any time held or owing by Agent, any Lender or any such Affiliate to or for the account of any Loan Party against any Obligations then due.

**11.5    Remedies Cumulative; No Waiver; Commercial Reasonableness**.

11.5.4    <u>Cumulative Rights</u>. All covenants, conditions, provisions, warranties, guaranties, indemnities and other undertakings of Loan Parties contained in the Loan Documents are cumulative and not in derogation or substitution of each other. In particular, the rights and remedies of Agent and Lenders are cumulative, may be exercised at any time and from time to time, concurrently or in any order, and shall not be exclusive of any other rights or remedies that Agent and Lenders may have, whether under any agreement, by law, at equity or otherwise.

11.5.5    <u>Waivers</u>. The failure or delay of Agent or any Lender to require strict performance by Loan Parties with any terms of the Loan Documents, or to exercise any rights or remedies with respect to Collateral or otherwise, shall not operate as a waiver thereof nor as establishment of a course of dealing. All rights and remedies shall continue in full force and effect until Full Payment of the Obligations. No modification of any terms of any Loan Documents (including any waiver thereof) shall be effective, unless such modification is made in accordance with Section 15.1. No waiver of any Default or Event of Default shall constitute a waiver of any other Default or Event of Default that may exist at such time, unless expressly stated. If Agent or any Lender accepts performance by any Loan Party under any Loan Documents in a manner other than that specified therein, or during any Default or Event of Default, or if Agent or any Lender shall delay or exercise any right or remedy under any Loan Documents, such acceptance, delay or exercise shall not operate to waive any Default or Event of Default nor to preclude exercise of any other right or remedy. It is expressly acknowledged by Loan Parties that any failure to satisfy a financial covenant on a measurement date shall not be cured or remedied by satisfaction of such covenant on a subsequent date other than in respect of the covenant in Section 10.2.10.

11.5.6    <u>Commercial Reasonableness</u>. To the extent that Applicable Law imposes duties on Agent or any Lender to exercise remedies in a commercially reasonable manner (which duties cannot be waived under such law), each Loan Party acknowledges and agrees that it is not commercially unreasonable for Agent or any Lender (m) to fail to incur expenses reasonably deemed significant by Agent or any Lender to prepare Collateral for disposition or otherwise to complete raw material or work in process into finished goods or other finished products for disposition, (n) to fail to obtain third party consents for access to Collateral to be disposed of, or to obtain or, if not required by other law, to fail to obtain consents of any Governmental Authority or other third party for the collection or disposition of Collateral to be collected or disposed of, (o) to fail to exercise collection remedies against account debtors, secondary obligors or other persons obligated on Collateral or to remove liens or encumbrances on or any adverse claims against Collateral, (p) to exercise collection remedies against account debtors and other persons obligated on Collateral directly or through the use of collection agencies and other collection specialists, (q) to advertise dispositions of Collateral through publications or media of general circulation, whether or not the Collateral is of a specialized nature, (r) to contact other persons, whether or not in the same business as any Loan Party, for expressions of interest in acquiring all or any portion of the Collateral, (s) to hire one or more professional auctioneers to assist in the disposition of Collateral, whether or not the collateral is of a specialized nature, (t) to dispose of Collateral by utilizing Internet sites that provide for the auction of assets of the types included in the Collateral or that have the reasonable capability of doing so, or that match buyers and sellers of assets, (u) to dispose of assets in wholesale rather than retail markets, (v) to disclaim disposition warranties, (w) to purchase insurance or credit enhancements to insure Agent or Lenders against risks of loss, collection or disposition of Collateral or to provide to Agent or Lenders a guaranteed return from the collection or disposition of Collateral, or (x) to the extent deemed appropriate by Agent, to obtain the services of other brokers, investment bankers, consultants and other professionals to assist Agent in the collection or disposition of any of the Collateral. Each Loan Party acknowledges that the purpose of this Section is to provide non-exhaustive indications of what actions or omissions by Agent or any Lender would not be commercially unreasonable in the exercise by Agent or any Lender of remedies against the Collateral and that other actions or omissions by Agent or any Lender

shall not be deemed commercially unreasonable solely on account of not being indicated in this Section. Without limitation of the foregoing, nothing contained in this Section shall be construed to grant any rights to any Loan Party or to impose any duties on Agent or Lenders that would not have been granted or imposed by this Agreement or by Applicable Law in the absence of this Section.

**SECTION 12.   AGENT**

    **12.1   Appointment, Authority and Duties of Agent**.

    12.1.2   <u>Appointment and Authority</u>. Each Lender appoints and designates RBS as Agent hereunder. Agent may, and each Lender authorizes Agent to, enter into all Loan Documents to which Agent is intended to be a party and accept all Security Documents, for Agent's benefit and the Pro Rata benefit of Lenders. Each Lender agrees that any action taken by Agent or Required Lenders in accordance with the provisions of the Loan Documents, and the exercise by Agent or Required Lenders of any rights or remedies set forth therein, together with all other powers reasonably incidental thereto, shall be authorized and binding upon all Lenders. Without limiting the generality of the foregoing, Agent shall have the sole and exclusive authority to (u) act as the disbursing and collecting agent for Lenders with respect to all payments and collections arising in connection with the Loan Documents; (v) execute and deliver as Agent each Loan Document, including any intercreditor or subordination agreement, and accept delivery of each Loan Document from any Loan Party or other Person; (w) act as collateral agent for Secured Parties for purposes of perfecting and administering Liens under the Loan Documents, and for all other purposes stated therein; (x) manage, supervise or otherwise deal with Collateral; and (y) exercise all rights and remedies given to Agent with respect to any Collateral under the Loan Documents, Applicable Law or otherwise. The duties of Agent shall be ministerial and administrative in nature, and Agent shall not have a fiduciary relationship with any Lender, Secured Party, Participant or other Person, by reason of any Loan Document or any transaction relating thereto. Agent, on behalf of Lenders, shall be authorized to determine whether any Accounts constitute Eligible Accounts or whether to impose or release any component of the Availability Reserve in its Permitted Discretion, and to exercise its Permitted Discretion in connection therewith, which determinations and judgments, if exercised in good faith, shall exonerate Agent from liability to any Lender or other Person for any error in judgment.

    12.1.3   <u>Duties</u>. Agent shall not have any duties except those expressly set forth in the Loan Documents, nor be required to initiate or conduct any Enforcement Action except to the extent directed to do so by Required Lenders while an Event of Default exists. The conferral upon Agent of any right shall not imply a duty on Agent's part to exercise such right, unless instructed to do so by Required Lenders in accordance with this Agreement.

    12.1.4   <u>Agent Professionals</u>. Agent may perform its respective duties through agents and employees. Agent may consult with and employ Agent Professionals, and shall be entitled to act upon, and shall be fully protected in any action taken in good faith reliance upon, any advice given by an Agent Professional. Agent shall not be responsible for the negligence (other than gross negligence) or misconduct (other than willful misconduct) of any agents, employees or Agent Professionals selected by it with reasonable care.

    12.1.5   <u>Instructions of Required Lenders</u>. The rights and remedies conferred upon Agent under the Loan Documents may be exercised without the necessity of joinder of any other party, unless required by Applicable Law.  Agent may request instructions from Required Lenders with respect to any act (including the failure to act) in connection with any Loan Documents, and may seek assurances to its satisfaction from Lenders of their indemnification obligations under Section 12.6 against all Claims that could be incurred by Agent in connection with any act. Agent shall be entitled to refrain from any act until it has received such instructions or assurances, and Agent shall not incur liability to any Person by reason of so refraining. Instructions of Required Lenders shall be binding upon all Lenders, and no Lender shall have any right of action whatsoever against Agent as a result of Agent acting or refraining from acting in accordance with the instructions of Required Lenders. Notwithstanding the foregoing, instructions by and consent of all Lenders shall be required in the circumstances described in Section 15.1.1, and in no event shall Required Lenders, without the prior written consent of each Lender, direct Agent to accelerate and demand payment of Loans held by one Lender without accelerating and demanding payment of all other Loans, nor to terminate the Commitments of one Lender without terminating the Commitments of all Lenders. In no event shall Agent be required to take any action that, in its opinion, is contrary to Applicable Law or any Loan Documents or could subject any Agent Indemnitee to personal liability.

    **12.2   Agreements Regarding Collateral and Field Examination Reports**.

    12.2.3   <u>Lien Releases; Care of Collateral</u>. Lenders authorize Agent to release any Lien with respect to any Collateral (a) upon Full Payment of the Obligations in accordance with Section 4.6, (b) that is the subject of a Disposition permitted hereunder, (c) subject to a Lien permitted hereunder and entitled to priority over Agent's Liens (to the extent required by the terms of the obligations secured by such Liens), (d) constitutes Excluded Property, (e) in the case of Collateral subject to a Lien that is owned by a Guarantor (or Equity Interests issued by such Guarantor), automatically upon the release of such Guarantor from its obligations under the Guaranty as permitted hereunder, (f) to release or subordinate any Lien (or other easement or encumbrance) on any property granted to or held by Agent under any Loan Document to the holder of any Lien on such property permitted hereunder (to the extent required by the terms of the obligations secured by such Liens (or other easements or encumbrances) and (g) in all other cases, the release us

approved, ratified or consented to by Required Lenders or, in the case of a release of substantially all of the Collateral, all Lenders (except as otherwise permitted). In connection with any release pursuant to the immediately preceding sentence of this Section 12.2.1, Agent shall promptly (after reasonable advance notice) execute and deliver to any Loan Party, at such Loan Party's expense, all documents that such Loan Party shall reasonably request to evidence such release. Agent shall have no obligation whatsoever to any Lenders to assure that any Collateral exists or is owned by a Loan Party, or is cared for, protected, insured or encumbered, nor to assure that Agent's Liens have been properly created, perfected or enforced, or are entitled to any particular priority, nor to exercise any duty of care with respect to any Collateral.

12.2.4    <u>Possession of Collateral</u>. Agent and Lenders appoint each other Lender as agent for the purpose of perfecting Liens (for the benefit of Secured Parties) in any Collateral that, under the UCC or other Applicable Law, can be perfected by possession or control. If any Lender obtains possession or control of any such Collateral, it shall notify Agent thereof and, promptly upon Agent's request, deliver such Collateral to Agent or otherwise deal with such Collateral in accordance with Agent's instructions.

12.2.5    <u>Reports</u>. Agent shall promptly, upon receipt thereof, forward to each Lender copies of the results of any field audit or other examination or any appraisal prepared by or on behalf of Agent with respect to any Loan Party or Collateral ("Report"). Each Lender agrees (ii) that neither RBS nor Agent makes any representation or warranty as to the accuracy or completeness of any Report, and shall not be liable for any information contained in or omitted from any Report; (jj) that the Reports are not intended to be comprehensive audits or examinations, and that Agent or any other Person performing any audit or examination will inspect only specific information regarding Obligations or the Collateral and will rely significantly upon Loan Parties' books and records as well as upon representations of Loan Parties' officers and employees; and (kk) to keep all Reports confidential and strictly for such Lender's internal use, and not to distribute any Report (or the contents thereof) to any Person (except to such Lender's Participants, attorneys and accountants) or use any Report in any manner other than administration of the Loans and other Obligations. Each Lender agrees to indemnify and hold harmless Agent and any other Person preparing a Report from any action such Lender may take as a result of or any conclusion it may draw from any Report, as well as any Claims arising in connection with any third parties that obtain all or any part of a Report through such Lender.

**12.3    Reliance By Agent.** Agent shall be entitled to rely, and shall be fully protected in relying, upon any certification, notice or other communication (including those by telephone, telex, telegram, telecopy or e-mail) believed by it in good faith to be genuine and correct and to have been signed, sent or made by the proper Person, and upon the advice and statements of Agent Professionals.

**12.4    Action Upon Default.** Agent shall not be deemed to have knowledge of any Default or Event of Default unless it has received written notice from a Lender or a Loan Party specifying the occurrence and nature thereof. If any Lender acquires knowledge of a Default or Event of Default, it shall promptly notify Agent and the other Lenders thereof in writing. Each Lender agrees that, except with the written consent of Agent and Required Lenders, it will not take any Enforcement Action, accelerate its Obligations, or exercise any right that it might otherwise have under Applicable Law to credit bid at foreclosure sales, UCC sales or other similar dispositions of Collateral. Notwithstanding the foregoing, however, a Lender may take action to preserve or enforce its rights against a Loan Party where a deadline or limitation period is applicable that would, absent such action, bar enforcement of Obligations held by such Lender, including the filing of proofs of claim in an Insolvency Proceeding.

**12.5    Ratable Sharing.** If any Lender shall obtain any payment or reduction of any Obligation, whether through set-off or otherwise, in excess of its share of such Obligation, determined on a Pro Rata basis or in accordance with Section 5.7.1, as applicable, such Lender shall forthwith purchase from Agent, Issuing Bank and the other Lenders such participations in the affected Obligation as are necessary to cause the purchasing Lender to share the excess payment or reduction on a Pro Rata basis or in accordance with Section 5.7.1, as applicable. If any of such payment or reduction is thereafter recovered from the purchasing Lender, the purchase shall be rescinded and the purchase price restored to the extent of such recovery, but without interest.

**12.6    Indemnification of Agent Indemnitees**.

12.6.1    <u>Indemnification</u>. EACH LENDER SHALL INDEMNIFY AND HOLD HARMLESS AGENT INDEMNITEES, TO THE EXTENT NOT REIMBURSED BY LOAN PARTIES (BUT WITHOUT LIMITING THE INDEMNIFICATION OBLIGATIONS OF LOAN PARTIES UNDER ANY LOAN DOCUMENTS), ON A PRO RATA BASIS, AGAINST ALL CLAIMS THAT MAY BE INCURRED BY OR ASSERTED AGAINST ANY AGENT INDEMNITEE, EXCEPT TO THE EXTENT SUCH CLAIMS ARE DETERMINED BY A COURT OF COMPETENT JURISDICTION TO RESULT FROM AGENT INDEMNITEE'S GROSS NEGLIGENCE OF WILFUL MISCONDUCT. If Agent is sued by any receiver, trustee in bankruptcy, debtor-in-possession or other Person for any alleged preference from a Loan Party or fraudulent transfer, then any monies paid by Agent in settlement or satisfaction of such proceeding, together with all interest, costs and expenses (including attorneys' fees) incurred in the defense of same, shall be promptly reimbursed to Agent, as applicable, by Lenders to the extent of each Lender's Pro Rata share.

12.6.2    <u>Proceedings</u>. Without limiting the generality of the foregoing, if at any time (whether prior to or after the Commitment

Termination Date) any proceeding is brought against any Agent Indemnitees by a Loan Party, or any Person claiming through a Loan Party, to recover damages for any act taken or omitted by Agent in connection with any Obligations, Collateral, Loan Documents or matters relating thereto, or otherwise to obtain any other relief of any kind on account of any transaction relating to any Loan Documents, each Lender agrees to indemnify and hold harmless Agent Indemnitees with respect thereto and to pay to Agent Indemnitees such Lender's Pro Rata share of any amount that any Agent Indemnitee is required to pay under any judgment or other order entered in such proceeding or by reason of any settlement, including all interest, costs and expenses (including attorneys' fees) incurred in defending same, except to the extent such claims are determined by a court of competent jurisdiction to result from Agent Indemnitee's gross negligence of wilful misconduct. In Agent's Permitted Discretion, Agent may reserve for any such proceeding, and may satisfy any judgment, order or settlement, from proceeds of Collateral prior to making any distributions of Collateral proceeds to Lenders.

**12.7    Limitation on Responsibilities of Agent.** Agent shall not be liable to Lenders for any action taken or omitted to be taken under the Loan Documents, except for losses to the extent caused by Agent's, as applicable, gross negligence or willful misconduct. Agent do not assume any responsibility for any failure or delay in performance or any breach by any Loan Party or Lender of any obligations under the Loan Documents. Agent does not make to Lenders any express or implied warranty, representation or guarantee with respect to any Obligations, Collateral, Loan Documents or Loan Party. No Agent Indemnitee shall be responsible to Lenders for any recitals, statements, information, representations or warranties contained in any Loan Documents; the execution, validity, genuineness, effectiveness or enforceability of any Loan Documents; the genuineness, enforceability, collectibility, value, sufficiency, location or existence of any Collateral, or the validity, extent, perfection or priority of any Lien therein; the validity, enforceability or collectibility of any Obligations; or the assets, liabilities, financial condition, results of operations, business, creditworthiness or legal status of any Loan Party or Account Debtor.  No Agent Indemnitee shall have any obligation to any Lender to ascertain or inquire into the existence of any Default or Event of Default, the observance or performance by any Loan Party of any terms of the Loan Documents, or the satisfaction of any conditions precedent contained in any Loan Documents.

**12.8   Successor Agent and Co-Agents**.

12.8.1    Resignation; Successor Agent. Subject to the appointment and acceptance of a successor Agent as provided below, Agent may resign at any time by giving at least thirty (30) days written notice thereof to Lenders and Administrative Borrower (the date of resignation elected by Agent subject to the notice requirements set forth herein, the "Resignation Effective Date"). Upon receipt of such notice, Required Lenders shall have the right to appoint a successor Agent which shall be (rr) a Lender or an Affiliate of a Lender; or (ss) a commercial bank that is organized under the laws of the United States or any state or district thereof, has a combined capital surplus of at least $200,000,000 and (provided no Event of Default exists under Sections 11.1(a) or (j)) is reasonably acceptable to Administrative Borrower.  If no successor agent is appointed prior to the effective date of the resignation of Agent, then Agent may (but shall not be obligated to) appoint a successor agent from among Lenders which successor (provided no Event of Default exists under Sections 11.1(a) or (j)) shall be reasonably acceptable to Administrative Borrower. Whether or not a successor has been appointed, such resignation shall become effective in accordance with such notice on the Resignation Effective Date. Upon acceptance by a successor Agent of an appointment to serve as Agent hereunder, such successor Agent shall thereupon succeed to and become vested with all the powers and duties of the retiring Agent without further act, and the retiring Agent shall be discharged from its duties and obligations hereunder but shall continue to have the benefits of the indemnification expressly set forth in Sections 12.6 and 15.2. Notwithstanding any Agent's resignation, the provisions of this Section 12 shall continue in effect for its benefit with respect to any actions taken or omitted to be taken by it while Agent and such Agent shall continue to be subject to the confidentiality obligations set forth in Section 15.11. Any successor by merger or acquisition of the stock or assets of RBS shall continue to be Agent hereunder without further act on the part of the parties hereto, unless such successor resigns as provided above.

12.8.2    Separate Collateral Agent. It is the intent of the parties that there shall be no violation of any Applicable Law denying or restricting the right of financial institutions to transact business in any jurisdiction. If Agent believes that it may be limited in the exercise of any rights or remedies under the Loan Documents due to any Applicable Law, Agent may appoint an additional Person who is not so limited, as a separate collateral agent or co-collateral agent; provided, that such Person shall not be a Disqualified Lender. If Agent so appoints a collateral agent or, each right and remedy intended to be available to Agent under the Loan Documents shall also be vested in such separate agent. Every covenant and obligation necessary to the exercise thereof by such agent shall run to and be enforceable by it as well as Agent. Lenders shall execute and deliver such documents as Agent deems appropriate to vest any rights or remedies in such agent. If any collateral agent shall die or dissolve, become incapable of acting, resign or be removed, then all the rights and remedies of such agent, to the extent permitted by Applicable Law, shall vest in and be exercised by Agent until appointment of a new agent.

**12.9    Due Diligence and Non-Reliance.** Each Lender acknowledges and agrees that it has, independently and without reliance upon Agent or any Lender, and based upon such documents, information and analyses as it has deemed appropriate, made its own credit analysis of each Loan Party and its own decision to enter into this Agreement and to fund Loans and participate in LC Obligations hereunder. Each Lender has made such inquiries concerning the Loan Documents, the Collateral and each Loan Party as such Lender feels necessary. Each Lender further acknowledges and agrees that the other Lenders and Agent have made no

representations or warranties concerning any Loan Party, any Collateral or the legality, validity, sufficiency or enforceability of any Loan Documents or Obligations. Each Lender will, independently and without reliance upon the other Lenders or Agent, and based upon such financial statements, documents and information as it deems appropriate at the time, continue to make and rely upon its own credit decisions in making Loans and participating in LC Obligations, and in taking or refraining from any action under any Loan Documents. Except for notices, reports and other information expressly requested by a Lender, Agent shall have no duty or responsibility to provide any Lender with any notices, reports or certificates furnished to Agent by any Loan Party or any credit or other information concerning the affairs, financial condition, business or Properties of any Loan Party (or any of its Affiliates) which may come into possession of Agent, or any of its respective Affiliates.

**12.10   Replacement of Certain Lenders.** In the event that any Lender (a) fails to fund its Pro Rata share of any Loan or LC Obligation hereunder, and such failure is not cured within two (2) Business Days or such Lender is otherwise a Defaulting Lender, (b) defaults in performing any of its obligations under the Loan Documents, (c) fails to give its consent to any amendment, waiver or action for which consent of all directly and adversely affected Lenders, all Lenders or Supermajority Lenders was required and Required Lenders consented, then, in addition to any other rights and remedies that any Person may have, of the then Administrative Borrower, may require such Lender to assign all of its rights and obligations under the Loan Documents to Eligible Assignee(s) pursuant to appropriate Assignment and Acceptance(s). Agent is irrevocably appointed as attorney-in-fact to execute any such Assignment and Acceptance if Lender fails to execute same. Such Lender shall be entitled to receive, in cash, concurrently with any such assignment, all amounts owed to it under the Loan Documents, including all principal, interest and fees through the date of assignment (but excluding any prepayment charge).

**12.11   Remittance of Payments and Collections**.

12.11.1   <u>Remittances Generally</u>. All payments by any Lender to Agent shall be made by the time and on the day set forth in this Agreement, in immediately available funds. If no time for payment is specified or if payment is due on demand by Agent and request for payment is made by Agent by 11:00 a.m. on a Business Day, payment shall be made by Lender not later than 2:00 p.m. on such day, and if request is made after 11:00 a.m., then payment shall be made by 11:00 a.m. on the next Business Day.  Payment by Agent to any Lender shall be made by wire transfer, in the type of funds received by Agent. Any such payment shall be subject to Agent's right of offset for any amounts due from such Lender under the Loan Documents.

12.11.2   <u>Failure to Pay</u>. If any Lender fails to pay any amount when due by it to Agent pursuant to the terms hereof, such amount shall bear interest from the due date until paid at the rate determined by Agent as customary in the banking industry for interbank compensation. In no event shall Loan Parties be entitled to receive credit for any interest paid by a Lender to Agent.

12.11.3   <u>Recovery of Payments</u>. If Agent pays any amount to a Lender in the expectation that a related payment will be received by Agent from a Loan Party and such related payment is not received, then Agent may recover such amount from each Lender that received it. If Agent determines at any time that an amount received under any Loan Document must be returned to a Loan Party or paid to any other Person pursuant to Applicable Law or otherwise, then, notwithstanding any other term of any Loan Document, Agent shall not be required to distribute such amount to any Lender. If any amounts received and applied by Agent to any Obligations are later required to be returned by Agent pursuant to Applicable Law, Lenders shall pay to Agent, on demand, such Lender's Pro Rata share of the amounts required to be returned.

**12.12   Agent in its Individual Capacity.** As a Lender, RBS shall have the same rights and remedies under the other Loan Documents as any other Lender, and the terms "Lenders," "Required Lenders" or any similar term shall include RBS in its capacity as a Lender. Each of RBS and its Affiliates may accept deposits from, maintain deposits or credit balances for, invest in, lend money to, provide Bank Products to, act as trustee under indentures of, serve as financial or other advisor to, and generally engage in any kind of business with, Loan Party and their Affiliates, as if RBS were any other bank, without any duty to account therefor (including any fees or other consideration received in connection therewith) to the other Lenders. In their individual capacity, RBS and its Affiliates may receive information regarding Loan Party, their Affiliates and their Account Debtors (including information subject to confidentiality obligations), and each Lender agrees that RBS and its Affiliates shall be under no obligation to provide such information to Lenders, if acquired in such individual capacity and not as Agent hereunder.

**12.13   Agent Titles.** Each Lender, other than RBS, that is designated (on the cover page of this Agreement or otherwise) by RBS as an "Agent" or "Arranger" of any type shall not have any right, power, responsibility or duty under any Loan Documents other than those applicable to all Lenders, and shall in no event be deemed to have any fiduciary relationship with any other Lender.

**12.14   No Third Party Beneficiaries.** Except for Section 12.1.1, Section 12.2.5, Section 12.8, Section 12.10 and this Section 12.14 is an agreement solely among Lenders and Agent, and does not confer any rights or benefits upon Loan Parties or any other Person. As between Loan Parties and Agent, any action that Agent may take under any Loan Documents shall be conclusively presumed to have been authorized and directed by Lenders as herein provided.

## SECTION 13.   BENEFIT OF AGREEMENT; ASSIGNMENTS AND PARTICIPATIONS

**13.1   Successors and Assigns.** This Agreement shall be binding upon and inure to the benefit of Loan Parties, Agent and Lenders and their respective successors and permitted assigns, except, that, (ll) no Loan Party shall have the right to assign its rights or delegate its obligations under any Loan Documents except as permitted hereby, and (mm) any assignment by a Lender must be made in compliance with Section 13.3. Agent may treat the Person which made any Loan as the owner thereof for all purposes until such Person makes an assignment in accordance with Section 13.3. Any authorization or consent of a Lender shall be conclusive and binding on any subsequent transferee or assignee of such Lender.

**13.2   Participations**.

13.2.3   Permitted Participants; Effect. Any Lender may, in the ordinary course of its business and in accordance with Applicable Law, at any time sell to a financial institution ("Participant") a participating interest in the rights and obligations of such Lender under any Loan Documents; provided, that no Disqualified Lender shall be permitted to be a Participant. Despite any sale by a Lender of participating interests to a Participant, such Lender's obligations under the Loan Documents shall remain unchanged, such Lender shall remain solely responsible to the other parties hereto for performance of such obligations, such Lender shall remain the holder of its Loans and Commitments for all purposes, all amounts payable by Loan Parties shall be determined as if such Lender had not sold such participating interests, and Loan Parties and Agent shall continue to deal solely and directly with such Lender in connection with the Loan Documents. Each Lender shall be solely responsible for notifying its Participants of any matters under the Loan Documents, and Agent and the other Lenders shall not have any obligation or liability to any such Participant. A Participant that would be a Foreign Lender if it were a Lender shall not be entitled to the benefits of Section 5.10 and Section 5.11 unless (x) the Participant agrees to comply with, and does in fact comply with, Sections 5.10 and 5.11, and (y) Administrative Borrower agrees otherwise in writing that such Participant is so entitled.

13.2.4   Voting Rights. Each Lender shall retain the sole right to approve, without the consent of any Participant, any amendment, waiver or other modification of any Loan Documents other than pursuant to Section 15.1.1(c), 15.1.1(d)(ii) or 15.1.1(d)(iv).

13.2.5   Benefit of Set-Off. Loan Parties agree that each Participant shall have a right of set-off in respect of its participating interest to the same extent as if such interest were owing directly to a Lender, and each Lender shall also retain the right of set-off with respect to any participating interests sold by it (without duplication of any amounts that may be set off by such Participant). By exercising any right of set-off, a Participant agrees to share with Lenders all amounts received through its set-off, in accordance with Section 12.5 as if such Participant were a Lender.

13.2.6   Participant Register. Each Lender that sells a participation shall, acting solely for this purpose as an agent of Borrowers, maintain a register on which it enters the name and address of each participant and the principal amounts (and interest thereon) of each participant's interest in the Loans or other Obligations under this Agreement (the "Participant Register"). Notwithstanding any other provision of this Agreement, no sale, grant or other transfer of a participation shall be effective until recorded in the Participant Register. The entries in the Participant Register shall be conclusive and Borrowers, Lenders and Agent shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement, notwithstanding notice to the contrary. The Participant Register shall be available for inspection by Agent, any Borrower and any Lender at any reasonable time and from time to time upon reasonable prior notice. This Section 13.2.4 shall be construed so that all loans and other indebtedness pursuant to this Agreement are at all times maintained in "registered form" within the meaning of Sections 163(f), 871(h)(2) and 881(c)(2) of the Code and any related Treasury regulations (or any other relevant or successor provisions of the Code or of such Treasury regulations).

**13.3   Assignments**.

13.3.7   Permitted Assignments. A Lender may assign to any Eligible Assignee any of its rights and obligations under the Loan Documents, as long as (x) each assignment is of a constant, and not a varying, percentage of the transferor Lender's rights and obligations under the Loan Documents and, in the case of a partial assignment, is in a minimum principal amount of $5,000,000 (unless otherwise agreed by Agent, and so long as no Event of Default under Section 11.1(a) or (j) has occurred or is continuing, Administrative Borrower in their discretion) and integral multiples of $1,000,000 in excess of that amount; (y) except in the case of an assignment in whole of a Lender's rights and obligations, the aggregate amount of the Commitments retained by the transferor Lender is at least $10,000,000 (unless otherwise agreed by Agent in its Permitted Discretion); (c) reserved; (d) the parties to each such assignment shall execute and deliver to Agent, for its acceptance and recording, an Assignment and Acceptance; and (e) such assignment shall be recorded in the Register. Nothing herein shall limit the right of a Lender to pledge or assign any rights under the Loan Documents to (i) any Federal Reserve Bank or the United States Treasury as collateral security pursuant to Regulation A of the Board and any Operating Circular issued by such Federal Reserve Bank or to any central bank having authority over such Lender in accordance with Applicable Law, or (ii) counterparties to swap agreements relating to any Loans; provided, however, that any

payment by Loan Parties to the assigning Lender in respect of any Obligations assigned as described in this sentence shall satisfy such Loan Parties' obligations hereunder to the extent of such payment, and no such assignment shall release the assigning Lender from its obligations hereunder. Notwithstanding anything contained in this Agreement to the contrary, no Lender shall need the prior consent of Administrative Borrower or Agent to consolidate with or merge into any other Person or to convey or transfer all or substantially all of its properties and assets to any Person.

13.3.8  Effect; Effective Date. Upon delivery to Agent of an assignment notice in the form of Exhibit J and a processing fee of $3,500, and subject to acceptance and recording thereof by Agent pursuant to Section 13.3.3, such assignment shall become effective as specified in the notice, if it complies with this Section 13.3. From the effective date of such assignment, the Eligible Assignee shall for all purposes be a Lender under the Loan Documents, and shall have all rights and obligations of a Lender thereunder. Upon consummation of an assignment, the transferor Lender, Agent and Borrowers shall make appropriate arrangements for issuance of replacement and/or new Notes, as appropriate.

13.3.9  Register. Agent, acting solely for this purpose as an agent of Borrowers, shall maintain at Agent's office a copy of each Assignment and Acceptance delivered to it and a register for the recordation of the names and addresses of Lenders, and the Commitments of, and principal amounts (and related interest amounts) of the Loans and LC Obligations owing to, each Lender pursuant to the terms hereof from time to time (the "Register"). The entries in the Register shall be conclusive, absent manifest error, and Agent, Borrowers and Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as the owner of the related Commitments and Obligations as set forth next to the name of such Person in the Register, notwithstanding notice to the contrary. The Register shall be available for inspection by any Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior notice. This Section 13.3.3 shall be construed so that all loans and other indebtedness pursuant to this Agreement are at all times maintained in "registered form" within the meaning of Sections 163(f), 871(h)(2) and 881(c)(2) of the Code and any related Treasury regulations (or any other relevant or successor provisions of the Code or of such Treasury regulations).

**13.4  Tax Treatment.** If any interest in a Loan Document is transferred, the transferor Lender shall cause such Transferee, concurrently with the effectiveness of such transfer, to comply with the provisions of Sections 5.10 and 5.11.

**13.5  Representation of Lenders.** Each Lender represents and warrants to each Loan Party, Agent and other Lenders that none of the consideration used by it to fund its Loans or to participate in any other transactions under this Agreement constitutes for any purpose of ERISA or Section 4975 of the Code assets of any "plan" as defined in Section 3(3) of ERISA or Section 4975 of the Code and the interests of such Lender in and under the Loan Documents shall not constitute plan assets under ERISA.

## SECTION 14.  GUARANTY.

**14.1  Guaranty.** Each Guarantor hereby unconditionally guarantees, as a primary obligor and not merely as a surety, jointly and severally with each other Guarantor when and as due, whether at maturity, by acceleration, by notice of prepayment or otherwise, the Full Payment of the Obligations. Each payment made by any Guarantor pursuant to this Guaranty shall be made in lawful money of the United States in immediately available funds.

**14.2  Waivers.** Each Guarantor hereby absolutely, unconditionally and irrevocably waives, to the maximum extent permitted by law, (c) promptness, diligence, notice of acceptance, notice of presentment of payment and any other notice hereunder, (d) demand of payment, protest, notice of dishonor or nonpayment, notice of the present and future amount of the Obligations and any other notice with respect to the Obligations, (e) any requirement that Agent or any Lender protect, secure, perfect or insure any security interest or Lien or any Property subject thereto or exhaust any right or take any action against any other Loan Party, or any Person or any Collateral, (f) any other action, event or precondition to the enforcement hereof or the performance by each such Guarantor of the Obligations (other than Full Payment of the Obligations), and (g) any defense arising by any lack of capacity or authority or any other defense of any Loan Party or any notice, demand or defense by reason of cessation from any cause of Obligations other than Full Payment of the Obligations by Loan Parties and any defense that any other guarantee or security was or was to be obtained by Agent.

**14.3  No Defense.** No invalidity, irregularity, voidableness, voidness or unenforceability of this Agreement or any Loan Document or any other agreement or instrument relating thereto, or of all or any part of the Obligations or of any collateral security therefor shall affect, impair or be a defense hereunder (except (i) as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally and (ii) any defense of payment or performance).

**14.4  Guaranty of Payment.** The Guaranty hereunder is one of payment and performance, not collection, and the obligations of each Guarantor hereunder are independent of the Obligations of the other Loan Parties, and a separate action or actions may be brought and prosecuted against any Guarantor to enforce the express terms and conditions of this Section 14, irrespective of whether any action is brought against any other Loan Party or other Persons or whether any other Loan Party or other Persons are joined in any such action or actions. Each Guarantor waives, to the maximum extent permitted by law, any right to require that any resort be had by Agent or any Lender to any security held for payment of the Obligations or to any balance of any deposit account or credit on the

books of any Agent or any Lender in favor of any Loan Party or any other Person. No election to proceed in one form of action or proceedings, or against any Person, or on any Obligations, shall constitute a waiver of Agent's right to proceed in any other form of action or proceeding or against any other Person unless Agent has expressed any such right in writing. Without limiting the generality of the foregoing, no action or proceeding by Agent against any other Loan Party under any document evidencing or securing indebtedness of any such Loan Party to Agent shall diminish the liability of any Guarantor hereunder, except to the extent Agent receives actual payment on account of Obligations by such action or proceeding, notwithstanding the effect of any such election, action or proceeding upon the right of subrogation of any Guarantor in respect of any Loan Party.

14.5  **Liabilities Absolute.** The liability of each Guarantor hereunder shall be absolute, unlimited and unconditional, other than in connection with payment of the Obligations, shall not be subject to any reduction, limitation, impairment, discharge or termination for any reason, including, without limitation, any claim of waiver, release, surrender, alteration or compromise, and shall not be subject to any claim, defense or setoff, counterclaim, recoupment or termination whatsoever by reason of the invalidity, illegality or unenforceability of any other Obligation or otherwise (except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally). Without limiting the generality of the foregoing, the obligations of each Guarantor shall not be discharged or impaired, released, limited or otherwise affected by:

(ii)  any change in the manner, place or terms of payment or performance, and/or any change or extension of the time of payment or performance of, release, renewal or alteration of, or any new agreements relating to any Obligation, any security therefor, or any liability incurred directly or indirectly in respect thereof, or any rescission of, or amendment, waiver or other modification of, or any consent to departure from, this Agreement or any Loan Document, including any increase in the Obligations resulting from the extension of additional credit to Borrowers or otherwise;

(jj)  any sale, exchange, release, surrender, loss, abandonment, realization upon any property by whomsoever at any time pledged or mortgaged to secure, or howsoever securing, all or any of the Obligations, and/or any offset there against, or failure to perfect, or continue the perfection of, any Lien in any such property, or delay in the perfection of any such Lien, or any amendment or waiver of or consent to departure from any other guaranty for all or any of the Obligations;

(kk)  the failure of Agent or any Lender to assert any claim or demand or to enforce any right or remedy against any Loan Party or any other Person under the provisions of this Agreement or any Loan Document or any Loan Document or instrument executed an delivered in connection herewith or therewith;

(ll)  any settlement or compromise of any Obligation, any security therefor or any liability (including any of those hereunder) incurred directly or indirectly in respect thereof or hereof, and any subordination of the payment of all or any part thereof to the payment of any obligation (whether due or not) of any Loan Party to creditors of any Loan Party other than any other Loan Party;

(mm)  any manner of application of Collateral, or proceeds thereof, to all or any of the Obligations, or any manner of sale or other disposition of any Collateral for all or any of the Obligations or any other assets of any Loan Party; and

(nn)  other than payment of the Obligations, any other agreements or circumstance of any nature whatsoever that may or might in any manner or to any extent vary the risk of any Guarantor, or that might otherwise at law or in equity constitute a defense available to, or a discharge of, the Guaranty hereunder and/or the obligations of any Guarantor, or a defense to, or discharge of, any Loan Party or any other Person or party hereto or the Obligations or otherwise with respect to the Advances, Letters of Credit or other financial accommodations to Borrowers pursuant to this Agreement and/or the Loan Documents.

14.6  **Waiver of Notice.** Agent shall have the right to do any of the above without notice to or the consent of any Guarantor and each Guarantor expressly waives, to the maximum extent permitted by law, any right to notice of, consent to, knowledge of and participation in any agreements relating to any of the above or any other present or future event relating to Obligations whether under this Agreement or otherwise or any right to challenge or question any of the above.

14.7  **Agent's Discretion.** Upon and during the continuance of an Event of Default, Agent may at any time and from time to time (during the term of this Agreement) without the consent of, or notice to, any Guarantor, and without incurring responsibility to any Guarantor or impairing or releasing the Obligations, apply any sums by whomsoever paid or howsoever realized to any Obligations regardless of what Obligations remain unpaid but otherwise in accordance with the terms of this Agreement.

14.8  **Reinstatement**.

(z)  The Guaranty provisions herein contained shall continue to be effective or be reinstated, as the case may be, if claim is ever made upon Agent or any Lender for repayment or recovery of any amount or amounts received by Agent or such Lender in payment or on account of any of the Obligations and Agent or such Lender repays all or part of said amount by reason of any final judgment, decree or order of any court or administrative body having jurisdiction over Agent or such Lender or the respective property

of each, or any settlement or compromise of any claim effected by Agent or such Lender with any such claimant (including any Loan Party); and in such event each Guarantor hereby agrees that any such final judgment, decree, order, settlement or compromise or other circumstances shall be binding upon such Guarantor, notwithstanding any revocation hereof or the cancellation of any note or other instrument evidencing any Obligation, and each Guarantor shall be and remain liable to Agent and/or Lenders for the amount so repaid or recovered to the same extent as if such amount had never originally been received by Agent or such Lenders.

(aa)    Agent shall not be required to marshal any assets in favor of any Guarantor, or against or in payment of Obligations.

(bb)    No Guarantor shall be entitled to claim against any present or future security held by Agent from any Person for Obligations in priority to or equally with any claim of Agent, or assert any claim for any liability of any Loan Party to any Guarantor in priority to or equally with claims of Agent for Obligations, and no Guarantor shall be entitled to compete with Agent with respect to, or to advance any equal or prior claim to any security held by Agent for Obligations.

(cc)    If any Loan Party makes any payment to Agent, which payment is wholly or partly subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to any Person under any federal or provincial statute or at common law or under equitable principles, then to the extent of such payment, the Obligation intended to be paid shall be revived and continued in full force and effect as if the payment had not been made, and the resulting revived Obligation shall continue to be guaranteed, uninterrupted, by each Guarantor hereunder.

(dd)    All present and future monies payable by any Loan Party to any Guarantor as a result of its Guarantee hereunder, whether arising out of a right of subrogation or otherwise, are collaterally assigned to Agent for its benefit and for the ratable benefit of Lenders as security for such Guarantor's liability to Agent and Lenders hereunder and are postponed and subordinated to Agent's prior right to Full Payment of the Obligations. Except to the extent prohibited otherwise by this Agreement, all monies received by any Guarantor from any Loan Party as a result of its Guarantee hereunder shall be held by such Guarantor for the benefit of Agent on behalf of Secured Parties. This assignment, postponement and subordination shall only terminate upon the Full Payment of the Obligations and this Agreement is irrevocably terminated.

(ee)    Each Loan Party acknowledges this assignment, postponement and subordination and, except as otherwise set forth herein, agrees to make no payments to any Guarantor on account of its Guarantee of the Obligations hereunder without the prior written consent of Agent. Each Loan Party agrees to give full effect to the provisions hereof, except as permitted hereunder.

**14.9    Action Upon Event of Default.** Upon the occurrence and during the continuance of any Event of Default, Agent at written request of Required Lenders shall, without notice to or demand upon any Loan Party or any other Person, declare any Obligations of such Guarantor hereunder immediately due and payable, and shall be entitled to enforce the Obligations of each Guarantor. Subject to the Term Debt Intercreditor Agreement, each Guarantor agrees that at no time hereafter will any claims (other than those claims referred to in the immediately preceding paragraph) of any Guarantor against any Loan Party (the "Intercompany Claims") be represented by any notes, other negotiable instruments or writings, except and in such event they shall, to the extent such Intercompany Claim exceeds $5,000,000, either be made payable to Agent (or its bailee), or if payable to any Guarantor, shall promptly be endorsed by such Guarantor to Agent (or its bailee). Each Guarantor agrees that no payment on account of the Intercompany Claims shall be created, received, accepted or retained during the continuance of an Event of Default described in Section 11.1(j) and notice with respect thereto by any Guarantor.

**14.10    Statute of Limitations.** To the extent permitted by Applicable Law, any new promise, whether by payment of principal or interest or otherwise by any Loan Party with respect to any of the Obligations shall, if the statute of limitations in favor of any Guarantor against Agent or Lenders shall have commenced to run, toll the running of such statute of limitations and, if the period of such statute of limitations shall have expired, prevent the operation of such statute of limitations.

**14.11    Reserved.**

**14.12    Guarantor's Investigation.** Each Guarantor acknowledges receipt of a copy of each of this Agreement and the Loan Documents. Each Guarantor has made an independent investigation of Loan Parties and of the financial condition of Loan Parties. Neither Agent nor any Lender has made, and Agent and Lenders do not hereby make, any representations or warranties as to the income, expense, operation, finances or any other matter or thing affecting any Loan Party nor has Agent or any Lender made any representations or warranties as to the amount or nature of the Obligations of any Loan Party to which this Section 14 applies as specifically herein set forth, nor has Agent or any Lender or any officer, agent or employee of Agent or any Lender or any representative thereof, made any other oral representations, agreements or commitments of any kind or nature, and each Guarantor hereby expressly acknowledges that no such representations or warranties have been made and such Guarantor expressly disclaims reliance on any such representations or warranties.

**14.13    Keepwell.** Each Qualified ECP Loan Party, jointly and severally, absolutely, unconditionally and irrevocably undertakes to provide such funds or other support as may be needed from time to time by any other Loan Party hereunder to honor all of such Loan Party's obligations under this Agreement in respect of Swap Obligations (provided, however, that each Qualified ECP Loan Party shall only be liable under this Section 14.13 for the maximum amount of such liability that can be hereby incurred without rendering its obligations under this Section 14.13, or otherwise under this Agreement, voidable under Applicable Law, including Applicable Law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount). The obligations of each Qualified ECP Loan Party under this Section 14.13 shall remain in full force and effect until Full Payment of the Obligations. Each Qualified ECP Loan Party intends that this Section 14.12 constitute, and this Section 14.13 shall be deemed to constitute, a "keepwell, support, or other agreement" for the benefit of each other Loan Party for all purposes of Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

**14.14    Termination.** The provisions of this Section 14 shall remain in effect until Full Payment of the Obligations and irrevocable termination of the Commitments; provided, that with respect to any Guarantor released pursuant to Section 15.19, the provisions of this Section 14 shall no longer apply to such Guarantor on and after such release.

## SECTION 15.    MISCELLANEOUS

**15.1    Consents, Amendments and Waivers.**

15.1.10    Amendment. Except as provided in Section 2.3 and Section 2.4, no modification of any Loan Document, including any extension or amendment of a Loan Document or any waiver of an Event of Default, shall be effective without the prior written agreement of Required Lenders, and each Loan Party party to such Loan Document; provided, however, that:

(h)    without the prior written consent of Agent, no modification shall be effective with respect to any provision in a Loan Document that adversely affects any rights, duties or discretion of Agent;

(i)    without the prior written consent of each Issuing Bank, no modification shall be effective that would alter Section 2.3 in a manner adverse to the Issuing Bank, and without the prior written consent of the applicable Issuing Bank, no adverse modification shall be effective with respect to any LC Obligation of such Issuing Bank;

(j)    without the prior written consent of each directly and adversely affected Lender or Issuing Bank, as applicable, no modification shall be effective that would (i) increase the Commitment of such Lender; (ii) increase the LC Issuance Sublimit of such Issuing Bank or (iii) reduce the amount of, or waive or delay payment of, any principal, interest (other than any waiver of any increase in the interest rate applicable to any Loan pursuant to Section 3.1.1, as a result of a change to the definition of Availability or waiver of a mandatory prepayment) or fees payable to such Lender or Issuing Bank, as applicable, or (iv) amend Section 15.1.1;

(k)    without the prior written consent of all Lenders (except a Defaulting Lender), no modification shall be effective that would (i) alter Sections 5.4 (for the avoidance of doubt, amendments to the Borrowing Base shall not be deemed amendments to Section 5.4, but shall be governed by Section 15.1.1(e)), 5.7, 7.1 (except to add Collateral); (ii) amend the definitions of Pro Rata or Required Lenders, or Supermajority Lenders in a manner reducing the percent required to consent; (iii) except as permitted under this Agreement, release all or substantially all of the Collateral; or (iv) except as permitted under this Agreement, release all or substantially all Loan Parties from liability for any Obligations, if such Loan Party is Solvent at the time of the release; and

(l)    without the prior written consent of the Supermajority Lenders amend the definition of Borrowing Base or component definitions thereof in a manner that would increase the Borrowing Base or increase Availability, provided, that nothing herein shall limit the discretion of Agent to change, establish, or eliminate any portion of the Availability Reserve in its Permitted Discretion.

Notwithstanding the foregoing, this Agreement and any other Loan Document may be amended solely with the consent of Agent and Administrative Borrower without the need to obtain the consent of any Lender if such amendment is delivered in order to (x) correct or cure ambiguities, errors, omissions, defects, (y) effect administrative changes of a technical or immaterial nature or (z) incorrect cross references or similar inaccuracies in this Agreement or any other Loan Document. Guaranties, collateral documents, security documents, control agreements, custodial rights agreements, intercreditor agreements and related documents executed in connection with this Agreement may be in a form reasonably determined by Agent and may be amended, modified, terminated or waived, and consent to any departure therefrom (or any requirement of delivery including, without limitation, timeframe) may be given, without the consent of any Lender if such amendment, modification, waiver or consent is given in order to (x) comply with local law or advice of counsel or (y) cause such guaranty, collateral document, security document or related document to be consistent with this Agreement and the other Loan Documents or (z) due to administrative convenience. Administrative Borrower and Agent may, without the consent of any Lender, effect amendments to this Agreement and the other Loan Documents as may be necessary in the reasonable opinion of the Administrative Borrower and Agent to effect the provisions of Sections 2.3, 2,4 and 3.2. Notwithstanding

anything to the contrary contained herein, such amendment shall become effective without any further consent of any other party to such Loan Document.

In addition, notwithstanding anything else contained herein, Loan Parties (or any one of them) and Agent may enter into any other applicable intercreditor agreements for their financing sources without the consent, approval or ratification of Required Lenders.

15.1.11   Limitations. Only the consent of the parties to the Fee Letter shall be required for any modification of such agreement, and no Affiliate of a Lender that is party to a Bank Product agreement shall have any other right to consent to or participate in any manner in modification of any other Loan Document. The making of any Loans during the existence of a Default or Event of Default shall not be deemed to constitute a waiver of such Default or Event of Default, nor to establish a course of dealing. Any waiver or consent granted by Lenders hereunder shall be effective only if in writing, and then only in the specific instance and for the specific purpose for which it is given.

15.1.12   Payment for Consents. No Loan Party will, directly or indirectly, pay any remuneration or other thing of value, whether by way of additional interest, fee or otherwise, to any Lender (in its capacity as a Lender hereunder) as consideration for agreement by such Lender with any modification of any Loan Documents, unless such remuneration or other thing of value is offered to all Lenders and is paid to all such Lenders that so agree to modify in the time frame set forth in the solicitation documents relating to such modification.

**15.2    Indemnity.** EACH LOAN PARTY SHALL INDEMNIFY AND HOLD HARMLESS THE INDEMNITEES AGAINST ANY CLAIMS THAT MAY BE INCURRED BY OR ASSERTED AGAINST ANY INDEMNITEE, INCLUDING CLAIMS ARISING FROM THE NEGLIGENCE OF AN INDEMNITEE. In no event shall any Loan Party have any obligation hereunder to indemnify or hold harmless an Indemnitee with respect to a Claim to the extent that is determined in a final, non-appealable judgment by a court of competent jurisdiction to have arisen from, for each such Indemnitee, (i) its own (or its affiliates', directors', officers', employees' or agents') gross negligence, bad faith or willful misconduct, (ii) its own (or its affiliates', directors', officers', employees' or agents') material breach of its obligations hereunder or (iii) any dispute among Indemnities that does not involve an act or omission by the Loan Parties or any of their subsidiaries (other than any claims against Agent or an Arranger in their capacity as such but subject to clause (i) above. This Section 15.2 does not apply with respect to Taxes other than any Taxes that represent losses, claims, damages, expenses, etc. arising from any non-Tax claim.

**15.3   Notices and Communications**.

15.3.3   Notice Address. Any notice or request hereunder may be given to any Loan Party or to Agent or any Lender at their respective addresses set forth below or at such other address as may hereafter be specified in a notice designated as a notice of change of address under this Section 15.3.1:

If to Agent and RBS as Agent and Issuing Bank:

> RBS Citizens Business Capital,
> a division of RBS Asset Finance, Inc.,
> a subsidiary of RBS Citizens, N.A.
> 71 South Wacker Drive, Suite 2900
> Chicago, Illinois 60606
> Attention: Kimberly A. Crotty, Vice President
> Direct: 312.777.3508
> Facsimile: 312.777.4001
> Email: kim.crotty@rbscitizens.com

If to a Lender or Issuing Bank other than RBS, as specified on the signature pages hereof.

If to any Borrower
or any Loan Party

> c/o Administrative Borrower:
> YRC Worldwide Inc.
> Attention of Chief Financial Officer and General Counsel
> 10990 Roe Avenue
> Overland Park, Kansas 66211
> Fax No. 913-696-6116
> Tel. No. 913-696-6111 or 913-696-6132
> Email:jamie.pierson@yrcw.com and          michelle.friel@yrcw.com

with a copy to:

Kirkland & Ellis LLP
300 North LaSalle
Chicago, Illinois 60654
Attention:   Michelle Kilkenney
Facsimile:   312-862-2487
E-mail:   michelle.kilkenney@kirkland.com

Subject to Section 4.1.3, all notices, requests and other communications by or to a party hereto shall be in writing and shall be given to any Loan Party, at Administrative Borrower's address shown above, and to any other Person at its address shown above (or, in the case of a Person who becomes a Lender after the Closing Date, at the address shown on its Assignment and Acceptance), or at such other address as a party may hereafter specify by notice in accordance with this Section 15.3.1. Each such notice, request or other communication shall be effective only (tt) if given by facsimile transmission, when transmitted to the applicable facsimile number, if confirmation of receipt is received; (uu) if given by mail, three (3) Business Days after deposit in the U.S. mail, with first-class postage pre-paid, addressed to the applicable address; or (vv) if given by electronic mail, when transmitted to the applicable e-mail address; (d) if given by personal delivery, when duly delivered to the notice address with receipt acknowledged. Notwithstanding the foregoing, no notice to Agent pursuant to Section 2.1.4, 2.3, 3.1.2, 4.1.1 or 5.3.2 shall be effective until actually received by the individual to whose attention at Agent such notice is required to be sent. Any written notice, request or other communication that is not sent in conformity with the foregoing provisions shall nevertheless be effective on the date actually received by the noticed party. Any notice received by Administrative Borrower shall be deemed received by all Loan Parties.

15.3.4   <u>Electronic Communications; Voice Mail</u>. Unless otherwise agreed by Agent, electronic mail and internet websites may be used only for routine communications, such as financial statements, Borrowing Base Certificates and other information required by Section 10.1.2, administrative matters, distribution of Loan Documents for execution, and matters permitted under Section 4.1.3. Electronic and voice mail may not be used as effective notice under the Loan Documents.

15.3.5   <u>Non-Conforming Communications</u>. Agent and Lenders may rely upon any notices purportedly given by or on behalf of any Loan Party even if such notices were not made in a manner specified herein, were incomplete or were not confirmed, or if the terms thereof, as understood by the recipient, varied from a later confirmation. Each Loan Party shall indemnify and hold harmless each Indemnitee from any liabilities, losses, costs and expenses arising from any telephonic communication purportedly given by or on behalf of a Loan Party, other than any liabilities, actual losses, costs and expenses resulting from (i) its own (or its affiliates', directors', officers', employees' or agents') gross negligence or willful misconduct as determined by a court of competent jurisdiction, (ii) its own (or its affiliates', directors', officers', employees' or agents') material breach of its obligations hereunder or (iii) any dispute among Indemnities that does not involve an act or omission by any Loan Party or any of Loan Party's subsidiaries (other than any claims against Agent or an Arranger in their capacity as such but subject to clause (i) above. Each Indemnitee agrees (by accepting the benefits hereof) to refund and return any and all amounts paid by any Loan Party to such indemnities to the extent any of the foregoing items described in clauses (i), (ii) or, if applicable, (iii) occurs. The Loan Parties shall not, without the prior written consent of each Indemnitee affected thereby (which consent will not be unreasonably withheld, delayed or conditioned), settle any threatened or pending claim or action that would give rise to the right of any Indemnified Party to claim indemnification hereunder unless such settlement includes a full and unconditional release of all liabilities arising out of such claim or action against such Indemnitee and (b) does not include any statement as to or an admission of fault, culpability or failure to act by or on behalf of any Indemnitee. In case any proceeding is instituted involving any Indemnitee for which indemnification is to be sought hereunder by such Indemnitee, then such Indemnitee will promptly notify the Administrative Borrower of the commencement of any proceeding; <u>provided</u>, however, that the failure so to notify the Administrative Borrower will not relieve the Loan Parties from any liability that they may have to such Indemnitee pursuant to this "Indemnity" section or from any liability that the Loan Parties may have to such Indemnitee other than pursuant to this "Indemnity" section, except and solely to the extent that the Loan Parties are materially prejudiced by such failure. Notwithstanding the above, following such notification, the Loan Parties may elect in writing to assume the defense of such proceeding, and, upon such election, the Loan Parties will not be liable for any legal costs subsequently incurred by such Indemnitee (other than reasonable costs (including reasonable attorneys' fees and out-of-pocket expenses of one counsel for the Indemnitees of monitoring such proceeding, investigation and providing evidence) in connection therewith, unless (i) the Loan Parties have failed to provide counsel reasonably satisfactory to such Indemnitee in a timely manner, (ii) counsel provided by the Loan Parties reasonably determines that its representation of such Indemnitee would present it with a conflict of interest, or (iii) the Indemnitee reasonably determines that there are actual conflicts of interest between the Loan Parties and the Indemnitee, including situations in which there may be legal defenses available to it which are different from or in addition to those available to the Loan Parties. In connection with any one proceeding, the Loan Parties will not be responsible for the fees and expenses of more than one separate law firm for all Indemnitee plus additional conflicts and local counsel as provided herein.

**15.4   Performance of Loan Parties' Obligations.** Upon the occurrence and during the continuance of an Event of Default,

Agent may, in its Permitted Discretion at any time and from time to time with ten (10) days' prior notice, at Loan Parties' expense, pay any amount or do any act required of a Loan Party under any Loan Documents or otherwise lawfully requested by Agent to (oo) enforce any Loan Documents or collect any Obligations; (pp) protect, insure, maintain or realize upon any Collateral; or (qq) defend or maintain the validity or priority of Agent's Liens in any Collateral, including any payment of a judgment, insurance premium, warehouse charge, finishing or processing charge, or landlord claim, or any discharge of a Lien. All payments, costs and expenses (including Extraordinary Expenses) of Agent under this Section shall be reimbursed to Agent by Loan Parties, promptly following written demand. Any payment made or action taken by Agent under this Section shall be without prejudice to any right to assert an Event of Default or to exercise any other rights or remedies under the Loan Documents.

**15.5    Credit Inquiries.** Subject to Section 15.11, each Loan Party hereby authorizes Agent and Lenders (but they shall have no obligation) to respond to usual and customary credit inquiries from third parties concerning any Loan Party or Subsidiary.

**15.6    Severability.** Wherever possible, each provision of the Loan Documents shall be interpreted in such manner as to be valid under Applicable Law. If any provision is found to be invalid under Applicable Law, it shall be ineffective only to the extent of such invalidity and the remaining provisions of the Loan Documents shall remain in full force and effect.

**15.7    Cumulative Effect; Conflict of Terms.** The provisions of the Loan Documents are cumulative. The parties acknowledge that the Loan Documents may use several different limitations, tests or measurements to regulate the same or similar matters, and they agree that these are cumulative and that each must be performed as provided. Except as otherwise specifically provided in another Loan Document (by specific reference to the applicable provision of this Agreement), if any provision contained herein is in direct conflict with any provision in another Loan Document, the provision herein shall govern and control.

**15.8    Counterparts; Facsimile Signatures.** Any Loan Document may be executed in counterparts, each of which taken together shall constitute one instrument. Loan Documents may be executed and delivered by facsimile or other electronic transmission, and they shall have the same force and effect as manually signed originals. Agent may require confirmation by a manually-signed original, but failure to request or deliver same shall not limit the effectiveness of any facsimile signature.

**15.9    Entire Agreement.** The Loan Documents embody the entire understanding of the parties with respect to the subject matter thereof and supersede all prior understandings regarding the same subject matter.

**15.10    Obligations of Lenders.** The obligations of each Lender hereunder are several, and no Lender shall be responsible for the obligations or Commitments of any other Lender. Amounts payable hereunder to each Lender shall be a separate and independent debt, and each Lender shall be entitled, to the extent not otherwise restricted hereunder, to protect and enforce its rights arising out of the Loan Documents. It shall not be necessary for Agent or any other Lender to be joined as an additional party in any proceeding for such purposes. Nothing in this Agreement and no action of Agent or Lenders pursuant to the Loan Documents shall be deemed to constitute Agent and Lenders to be a partnership, association, joint venture or any other kind of entity, nor to constitute Control of any Loan Party. Each Loan Party acknowledges and agrees that in connection with all aspects of any transaction contemplated by the Loan Documents, Loan Parties, Agent, any Issuing Bank and Lenders have an arms-length business relationship that creates no fiduciary duty on the part of Agent, any Issuing Bank or any Lender, and each Loan Party, Agent, Issuing Bank and Lender expressly disclaims any fiduciary relationship.

**15.11    Confidentiality.** Agent and Lenders agree to maintain the confidentiality of any information that Loan Parties deliver to Agent and Lenders and only use such information in connection herewith; except, that, Agent and any Lender may disclose such information (a) to their respective officers, directors, employees, Affiliates and agents, including legal counsel, auditors and other professional advisors on a need to know basis (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such information and instructed to keep such information confidential; (b) to any party to the Loan Documents from time to time; (c) pursuant to the order of any court or administrative agency; provided, that Agent or such Lender, as applicable, agrees that it will notify Administrative Borrower as soon as practicable prior to any such disclosure by such Person unless such notification is prohibited by law, rule or regulation; (d) upon the request of any Governmental Authority exercising regulatory authority over Agent or such Lender; provided, that Agent or such Lender, as applicable, agrees that it will notify Administrative Borrower as soon as practicable prior to any such disclosure by such Person unless such notification is prohibited by law, rule or regulation; (e) which becomes available to Agent or any Lender on a nonconfidential basis; (f) to the extent reasonably required in connection with any litigation relating to any Loan Documents or transactions contemplated thereby, or otherwise as required by Applicable Law; provided, that Agent or such Lender, as applicable, agrees that it will notify Administrative Borrower as soon as practicable prior to any such disclosure by such Person unless such notification is prohibited by law, rule or regulation; (g) to the extent reasonably required for the exercise of any rights or remedies under the Loan Documents; (h) to any actual or proposed party to a Bank Product or to any Transferee, as long as such Person agrees to be bound by the provisions of this Section for the benefit of the Loan Parties; (i) to the National Association of Insurance Commissioners or any similar organization, or to any nationally recognized rating agency that requires access to information about a Lender's portfolio in connection with ratings issued with respect to such Lender; (j) to any investor or potential investor in an Approved Fund that is a Lender or Transferee, but solely for use by such investor to evaluate

an investment in such Approved Fund, or to any manager, servicer or other Person in connection with its administration of any such Approved Fund; or (k) with the prior consent of Loan Parties provided, that in no event shall any such information be given to a Disqualified Lender. Notwithstanding the foregoing, Agent and Lenders may issue and disseminate to the public general information describing this credit facility, including the names and addresses of Loan Parties and a general description of Loan Parties' businesses, and may use Loan Parties' names in advertising and other promotional materials with the prior consent of Administrative Borrower.

**15.12**    **Reserved**.

**15.13**    **GOVERNING LAW.**

(a)    GOVERNING LAW. THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO THE CONFLICTS OF LAWS PRINCIPLES THEREOF, BUT INCLUDING SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW.

(b)    SUBMISSION TO JURISDICTION. EACH LOAN PARTY IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE NONEXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK SITTING IN THE BOROUGH OF MANHATTAN AND OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF LOAN PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH NEW YORK STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT. EACH OF LOAN PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. NOTHING IN THIS AGREEMENT OR IN ANY OTHER LOAN DOCUMENT SHALL AFFECT ANY RIGHT THAT ANY CREDIT PARTY MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AGAINST ANY LOAN PARTY OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.

(c)    WAIVER OF VENUE. EACH LOAN PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT IN ANY COURT REFERRED TO IN PARAGRAPH (B) OF THIS SECTION. EACH OF LOAN PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

(d)    SERVICE OF PROCESS. EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 15.3. NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

(e)    ACTIONS COMMENCED BY LOAN PARTIES. EACH LOAN PARTY AGREES THAT ANY ACTION COMMENCED BY ANY LOAN PARTY ASSERTING ANY CLAIM OR COUNTERCLAIM ARISING UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT SHALL BE BROUGHT SOLELY IN A COURT OF THE STATE OF NEW YORK SITTING IN THE BOROUGH OF MANHATTAN OR ANY FEDERAL COURT SITTING THEREIN AS AGENT MAY ELECT IN ITS SOLE DISCRETION AND CONSENTS TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS WITH RESPECT TO ANY SUCH ACTION..

**15.14**    **Consent to Forum**. EACH LOAN PARTY HEREBY CONSENTS TO THE NON-EXCLUSIVE JURISDICTION OF ANY FEDERAL OR STATE COURT SITTING IN OR WITH JURISDICTION OVER THE STATE OF NEW YORK, IN ANY PROCEEDING OR DISPUTE RELATING IN ANY WAY TO ANY LOAN DOCUMENTS, AND AGREES THAT ANY SUCH PROCEEDING SHALL BE BROUGHT BY IT SOLELY IN ANY SUCH COURT. EACH LOAN PARTY IRREVOCABLY WAIVES ALL CLAIMS, OBJECTIONS AND DEFENSES THAT IT MAY HAVE REGARDING SUCH COURT'S PERSONAL OR SUBJECT MATTER JURISDICTION, VENUE OR INCONVENIENT FORUM. Nothing herein shall limit the right of Agent or any Lender to bring proceedings against any Loan Party in any other court if required to realize upon any Collateral. Nothing in this Agreement shall be deemed to preclude enforcement by Agent of any judgment or order obtained in any forum or jurisdiction.

**15.15    Waivers by Loan Parties.** To the fullest extent permitted by Applicable Law, each Loan Party waives (s) the right to trial by jury (which Agent and each Lender hereby also waives) in any proceeding, claim or counterclaim of any kind relating in any way to any Loan Documents, Obligations or Collateral; (t) except as expressly set forth in this Agreement, presentment, demand, protest, notice of presentment, default, non-payment, maturity, release, compromise, settlement, extension or renewal of any commercial paper, accounts, contract rights, documents, instruments, chattel paper and guaranties at any time held by Agent on which a Loan Party may in any way be liable, and hereby ratifies anything Agent may do in this regard; (u) except as expressly set forth in this Agreement, notice prior to taking possession or control of any Collateral; (v) any bond or security that might be required by a court prior to allowing Agent to exercise any rights or remedies; (w) the benefit of all valuation, appraisement and exemption laws; (x) any claim against Agent or any Lender, on any theory of liability, for special, indirect, consequential, exemplary or punitive damages (as opposed to direct or actual damages) in any way relating to any material Enforcement Action, Obligations, Loan Documents or transactions relating thereto; and (y) notice of acceptance hereof. Each Loan Party acknowledges that the foregoing waivers are a material inducement to Agent and Lenders entering into this Agreement and that Agent and Lenders are relying upon the foregoing in their dealings with Loan Parties. Each Loan Party has reviewed the foregoing waivers with its legal counsel and has knowingly and voluntarily waived its jury trial and other rights following consultation with legal counsel. In the event of litigation, this Agreement may be filed as a written consent to a trial by the court.

**15.16    Patriot Act Notice.** Agent and Lenders hereby notify Loan Parties that pursuant to the requirements of the Patriot Act, Agent and Lenders are required to obtain, verify and record information that identifies each Loan Party, including its legal name, address, tax ID number and other information that will allow Agent and Lenders to identify it in accordance with the Patriot Act. In order to comply with the requirements of the Patriot Act, Agent and Lenders may require information regarding Loan Parties' management and owners, such as legal name, address, social security number and date of birth.

**15.17    No Oral Agreement.** THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS BETWEEN THE PARTIES. THERE ARE NO UNWRITTEN AGREEMENTS BETWEEN THE PARTIES.

**15.18    Term Debt Intercreditor Agreement.** Agent and each Lender hereunder, by its acceptance of the benefits provided hereunder, (a) consents to the Term Debt Intercreditor Agreement, (b) agrees that it will be bound by, and will take no actions contrary to, the provisions of the Term Debt Intercreditor Agreement, and (c) authorizes and instructs Agent to enter into the Term Debt Intercreditor Agreement as Agent on behalf of each Lender. Agent and each Lender hereby agrees that the terms, conditions and provisions contained in this Agreement are subject to the Term Debt Intercreditor Agreement and, in the event of a conflict between the terms of the Term Debt Intercreditor Agreement and this Agreement, the terms of the Term Debt Intercreditor Agreement shall govern and control. No Lender that obtains the benefits of the Guaranty or any Collateral by virtue of the provisions hereof or of the Guaranty or any Security Document shall have any right to notice of any action or to consent to, direct or object to any action hereunder or under any other Loan Document or otherwise in respect of the Collateral (including the release or impairment of any Collateral) other than in its capacity as a Lender and, in such case, only to the extent expressly provided in the Loan Documents. Notwithstanding any other provision of this Section 15 to the contrary, Agent shall not be required to verify the payment of, or that other satisfactory arrangements have been made with respect to, Swap Obligations or obligations under Hedging Agreements with Lenders unless Agent has received written notice of such obligations, together with such supporting documentation as Agent may request, from the applicable Lender. Notwithstanding anything to the contrary herein, prior to the Discharge of Term Obligations (as defined in the Term Debt Intercreditor Agreement), the requirements of this Agreement to deliver possession, control or notations of Collateral to Agent shall be deemed satisfied by the delivery of possession, control or notation of such Collateral to a representative of the Secured Parties (as defined in the Term Debt Intercreditor Agreement) and as bailee for the Collateral Agent as provided in the Term Debt Intercreditor Agreement.

**15.19    Release of Guarantors**. If, in compliance with the terms and provisions of the Loan Documents, (i) all or substantially all of the Equity Interests or Property of any Guarantor are sold or otherwise transferred to a Person or Persons none of which is a Loan Party or (ii) any Guarantor becomes an Excluded Subsidiary (any such Guarantor, and any Guarantor referred to in clause (i), a "Transferred Guarantor"), such Transferred Guarantor shall, upon the consummation of such sale or transfer or other transaction, be automatically released from its obligations under this Agreement and its obligations to pledge and grant any Collateral owned by it pursuant to any Collateral Document and, in the case of a sale of all or substantially all of the Equity Interests of the Transferred Guarantor, the pledge of such Equity Interests to the Collateral Agent pursuant to the Collateral Documents shall be automatically released, and, the Collateral Agent shall take such actions as are necessary to effect each release described in this Section 15.19 in accordance with the relevant provisions of the Collateral Documents; provided, that no Guarantor shall be released as provided in this paragraph if such Guarantor continues to be a guarantor in respect of any Term Debt, any Term Refinancing Debt, any Permitted Junior Debt, any Junior Financing or any Permitted Refinancing of any of the foregoing.

When all Commitments hereunder have terminated, and all Loans or other Obligations hereunder which are accrued and payable have been paid or satisfied, this Agreement and the Guarantees made herein shall automatically terminate with respect to all

Obligations, except with respect to Obligations that expressly survive such repayment pursuant to the terms of this Agreement.

**15.20    Release of Liens.** Upon any of (i) Payment in Full of the Obligations, (ii) the release of any Guarantor pursuant to Section 15.19, (iii) pursuant to a Disposition not prohibited hereunder or (iv) the release of such Lien in accordance with the Term Debt Intercreditor Agreement, then, in each case, the Liens on the relevant portion of the Collateral shall be released and discharged automatically without further action.

**[SIGNATURE PAGES FOLLOW]**

IN WITNESS WHEREOF, this Agreement has been executed and delivered as of the date set forth above.

**BORROWERS**:

**YRC WORLDWIDE INC.**

By:    /s/ Mark Boehmer
Name: Mark Boehmer
Title:    Vice President and Treasurer

**YRC INC.**

By:    /s/ Mark Boehmer
Name: Mark Boehmer
Title:    Vice President

**USF REDDAWAY INC.**

By:    /s/ Mark Boehmer
Name: Mark Boehmer
Title:    Vice President

**USF HOLLAND INC.**

By:    /s/ Mark Boehmer
Name: Mark Boehmer
Title:    Vice President

**NEW PENN MOTOR EXPRESS, INC.**

By:    /s/ Mark Boehmer
Name: Mark Boehmer
Title:    Vice President

**[SIGNATURES CONTINUED ON NEXT PAGE]**
**[SIGNATURES CONTINUED FROM PREVIOUS PAGE]**

**GUARANTORS:**

**EXPRESS LANE SERVICE, INC.**

By:    /s/ Mark Boehmer

Name: Mark Boehmer
Title:    Vice President

**ROADWAY LLC**

By:    /s/ Mark Boehmer
Name: Mark Boehmer
Title:    Vice President

**YRC ASSOCIATION SOLUTIONS, INC.**

By:    /s/ Mark Boehmer
Name: Mark Boehmer
Title:    Vice President

**YRC MORTGAGES, LLC**

By:    /s/ Mark Boehmer
Name: Mark Boehmer
Title:    Vice President

**YRC REGIONAL TRANSPORTATION, INC.**

By:    /s/ Mark Boehmer
Name: Mark Boehmer
Title:    Vice President

**YRC ENTERPRISE SERVICES, INC.**

By:    /s/ Mark Boehmer
Name: Mark Boehmer
Title:    Vice President

**ROADWAY EXPRESS INTERNATIONAL, INC.**

By:    /s/ Mark Boehmer
Name: Mark Boehmer
Title:    Vice President

**ROADWAY NEXT DAY CORPORATION**

By:    /s/ Mark Boehmer
Name: Mark Boehmer
Title:    Vice President

**YRC LOGISTICS SERVICES, INC.**

By:   /s/ Mark Boehmer
Name: Mark Boehmer
Title:   Vice President

**USF BESTWAY INC.**

By:   /s/ Mark Boehmer
Name: Mark Boehmer
Title:   Vice President

**USF DUGAN INC.**

By:   /s/ Mark Boehmer
Name: Mark Boehmer
Title:   Vice President

**USF GLEN MOORE INC.**

By:   /s/ Mark Boehmer
Name: Mark Boehmer
Title:   Vice President

**USF REDSTAR LLC**

By:   /s/ Mark Boehmer
Name: Mark Boehmer
Title:   Vice President

**ROADWAY REVERSE LOGISTICS, INC.**

By:   /s/ Phil J. Gaines
Name:   Phil J. Gaines
Title:   Senior Vice President - Finance

**[SIGNATURES CONTINUED ON NEXT PAGE]**

**[SIGNATURES CONTINUED FROM PREVIOUS PAGE]**

**AGENT AND LENDERS:**

**RBS CITIZENS BUSINESS CAPITAL,**
a division of RBS Asset Finance, Inc.,
a subsidiary of RBS Citizens, N.A.,
as Agent and Lender


By:    /s/ Brian J. Baker
Name:    Brian J. Baker
Title:    Senior Vice President




**[SIGNATURES CONTINUED ON NEXT PAGE]**

**[SIGNATURES CONTINUED FROM PREVIOUS PAGE]**


**ISSUING BANK:**

**RBS CITIZENS, NATIONAL ASSOCIATION**,
as Issuing Bank


By:    /s/ Brian J. Baker
Name:    Brian J. Baker
Title:    Senior Vice President

**[SIGNATURES CONTINUED FROM PREVIOUS PAGE]**


**LENDER:**

Bank of America, N.A.,
as Lender


By:    /s/ Steve Teufel
Name:    Steve Teufel
Title:    Assistant Vice President

**[SIGNATURES CONTINUED FROM PREVIOUS PAGE]**


**ISSUING BANK:**

Bank of America, N.A.,
as Issuing Bank


By:    /s/ Steve Teufel
Name:    Steve Teufel
Title:    Assistant Vice President

**[SIGNATURES CONTINUED FROM PREVIOUS PAGE]**

**LENDER: CIT FINANCE LLC,**
as Lender


By:    /s/ Donna H. Evans
Name:    Donna H. Evans
Title:    Director


**[SIGNATURES CONTINUED FROM PREVIOUS PAGE]**


**LENDER:**

PNC Bank, National Association,
as Lender


By:    /s/ Walt Hill
Name:    Walt Hill
Title:    Vice President

**[SIGNATURES CONTINUED FROM PREVIOUS PAGE]**


**ISSUING BANK:**

PNC Bank, National Association,
as Issuing Bank


By:    /s/ Walt Hill
Name:    Walt Hill
Title:    Vice President

**[SIGNATURES CONTINUED FROM PREVIOUS PAGE]**


**LENDER:**

ALLY COMMERCIAL FINANCE LLC,
as Lender


By:    /s/ Michael Malcangi
Name:    Michael Malcangi
Title:    Director

**[SIGNATURES CONTINUED FROM PREVIOUS PAGE]**

**LENDER:**

ING Capital LLC,
as Lender


By:    /s/ Doug S. Clarida
Name:    Doug S. Clarida
Title:    Director



By:    /s/ William C. Beddingfield
Name:    William C. Beddingfield
Title:    Managing Director

**[SIGNATURES CONTINUED FROM PREVIOUS PAGE]**


**Lender:**

Deutsche Bank AG New York Branch,
as Lender


By:    /s/ Michael Getz
Name:    Michael Getz
Title:    Vice President



By:    /s/ Peter Cucchiara
Name:    Peter Cucchiara
Title:    Vice President

**[SIGNATURES CONTINUED FROM PREVIOUS PAGE]**


**CITY NATIONAL BANK, A NATIONAL BANKING ASSOCIATION:**

as Lender


By:    /s/ Brent Phillips
Name:    Brent Phillips
Title:    Senior Vice President

**[SIGNATURES CONTINUED FROM PREVIOUS PAGE]**


**LENDER:**

Signature Bank,
as Lender

By:   /s/ Robert Love
Name:   Robert Love
Title:   Group Director - ABL

**[SIGNATURES CONTINUED FROM PREVIOUS PAGE]**

**LENDER:**

**SIEMENS FINANCIAL SERVICES, INC.,**
as Lender

By:   /s/ Jeffrey B. Iervese
Name:   Jeffrey B. Iervese
Title:   Vice President

By:   /s/ Andrew Beneduce
Name:   Andrew Beneduce
Title:   Collateral Specialist

**[SIGNATURES CONTINUED FROM PREVIOUS PAGE]**

**LENDER:**

Webster Business Credit Corporation,
as Lender

By:   /s/ Harvey Winter
Name:   Harvey Winter
Title:   SVP

**[SIGNATURES CONTINUED FROM PREVIOUS PAGE]**

**LENDER:**

First Niagara Commercial Finance, Inc.,
as Lender

By:   /s/ Peter Drooff
Name:   Peter Drooff
Title:   First Vice President

**Exhibit A**
**to**
**Loan and Security Agreement**

**Form of Assignment and Acceptance Agreement**

This ASSIGNMENT AND ACCEPTANCE AGREEMENT (this "Assignment and Acceptance") dated as of _____, 20__ is made between _____ (the "Assignor") and _____ (the

"Assignee").

**W I T N E S S E T H :**

Reference is made to the Loan and Security Agreement, dated as of February [●], 2014 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "Loan Agreement"), among YRC Worldwide Inc., a Delaware Corporation ("Parent"), as administrative borrower (in such capacity, "Administrative Borrower"), Parent, YRC Inc., a Delaware Corporation ("YRC"), USF Reddaway Inc., an Oregon Corporation ("Reddaway"), USF Holland, Inc., a Michigan Corporation ("Holland"), and New Penn Motor Express, Inc., a Pennsylvania Corporation ("New Penn", and together with Parent, YRC, Holland and Reddaway, "Borrowers" and each a "Borrower"), those Subsidiaries of Parent identified on Schedule 1.1(a) attached thereto (as updated from time to time) (collectively, "Guarantors" and each, a "Guarantor"); the financial institutions from time to time party to this Agreement as lenders (collectively, "Lenders" and each a "Lender"), the financial institutions from time to time party to this Agreement as issuing banks (collectively, "Issuing Banks" and each an "Issuing Bank"), and RBS Citizens Business Capital, a division of RBS Asset Finance, Inc., a subsidiary of RBS Citizens, N.A., as agent for Lenders and Issuing Banks (in such capacity, "Agent"). Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the Loan Agreement. The Loan Agreement and the other agreements, documents and instruments referred to therein or at any time executed and/or delivered in connection therewith or related thereto (all of the foregoing, together with the Loan Agreement, as the same now exist or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced are collectively referred to herein as the "Loan Documents."

WHEREAS, as provided under the Loan Agreement, Assignor committed to making Loans (the "Committed Loans") to Borrowers in an aggregate amount not to exceed $_____ (the "Commitment"); and

WHEREAS, Assignor wishes to assign to Assignee **[**part of the**] [**all**]** rights and obligations of Assignor under the Loan Agreement in respect of its Commitment in an amount equal to $_____ (the "Assigned Commitment Amount") on the terms and subject to the conditions set forth herein and Assignee wishes to accept assignment of such rights and to assume such obligations from Assignor on such terms and subject to such conditions.

NOW, THEREFORE, in consideration of the foregoing and the mutual agreements contained herein, the parties hereto agree as follows:

1.    Assignment and Acceptance.

(a)    Subject to the terms and conditions of this Assignment and Acceptance, Assignor hereby sells, transfers and assigns to Assignee, and Assignee hereby purchases, assumes and undertakes from Assignor, without recourse and without representation or warranty (except as provided in this Assignment and Acceptance) an interest in (i) the Assigned Commitment Amount and [part of the] [all] of the Committed Loans of Assignor and (ii) all related rights, benefits, obligations, liabilities and indemnities of the Assignor under and in connection with the Loan Agreement and the other Loan Documents, so that after giving effect thereto, the Commitment of Assignee shall be as set forth below and the Pro Rata share of Assignee shall be _____ percent (__%).

(b)    With effect on and after the Effective Date (as defined in Section 5 hereof), Assignee shall be a party to the Loan Agreement and succeed to all of the rights and be obligated to perform all of the obligations of a Lender under the Loan Agreement and, to the extent applicable, the other Loan Documents, including, without limitation, the requirements concerning confidentiality and the payment of indemnification, with a Commitment in an amount equal to the Assigned Commitment Amount. Assignee agrees that it will perform in accordance with their terms all of the obligations which by the terms of the Loan Agreement and the other Loan Documents are required to be performed by it as a Lender. It is the intent of the parties hereto that the Commitment of Assignor shall, as of the Effective Date, be reduced by an amount equal to the Assigned Commitment Amount and Assignor shall relinquish its rights and be released from its obligations under the Loan Agreement to the extent such obligations have been assumed by Assignee; provided, that Assignor shall not relinquish its rights under Sections 2.2, 5.5, 12.6, 14.8 and 15.2 of the Loan Agreement to the extent such rights relate to the time prior to the Effective Date, and the Assignor shall continue to be subject to the confidentiality obligations set forth in Section 15.11 of the Loan Agreement.

(c)    After giving effect to the assignment and assumption set forth herein, on the Effective Date Assignee's Commitment will be $_____.

(d)    After giving effect to the assignment and assumption set forth herein, on the Effective Date Assignor's Commitment will be $_____ (as such amount may be further reduced by any other assignments by Assignor on or after the date hereof).

2.    Payments.

(a)    As consideration for the sale, assignment and transfer contemplated in Section 1 hereof, Assignee shall pay to Assignor on

the Effective Date in immediately available funds an amount equal to $_____, representing Assignee's Pro Rata share of the principal amount of all Committed Loans.

(b)    Assignee shall pay to Agent the processing fee in the amount specified in Section 13.3.2 of the Loan Agreement.

3.    Reallocation of Payments. Any interest, fees and other payments accrued to the Effective Date with respect to the Commitment, Committed Loans and outstanding LC Obligations shall be for the account of Assignor. Any interest, fees and other payments accrued on and after the Effective Date with respect to the Assigned Commitment Amount shall be for the account of Assignee. Each of Assignor and Assignee agrees that it will hold in trust for the other party any interest, fees and other amounts which it may receive to which the other party is entitled pursuant to the preceding sentence and pay to the other party any such amounts which it may receive promptly upon receipt.

4.    Independent Credit Decision. Assignee acknowledges that it has received a copy of the Loan Agreement and the Schedules and Exhibits thereto, together with copies of the most recent financial statements of Parent and its Subsidiaries, and such other documents and information as it has deemed appropriate to make its own credit and legal analysis and decision to enter into this Assignment and Acceptance and agrees that it will, independently and without reliance upon Assignor, Agent or any Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit and legal decisions in taking or not taking action under the Loan Agreement.

5.    Effective Date; Notices.

(a)    As between Assignor and Assignee, the effective date for this Assignment and Acceptance shall be _____, 20\_\_ (the "Effective Date"); provided, that the following conditions precedent have been satisfied on or before the Effective Date:

(i)    this Assignment and Acceptance shall be executed and delivered by Assignor and Assignee;

(ii)    the consent of Agent as required for an effective assignment of the Assigned Commitment Amount by Assignor to Assignee shall have been duly obtained and shall be in full force and effect as of the Effective Date;

(iii)    if required, the approval of the Administrative Borrower (which approval shall not be unreasonably withheld or delayed) shall have been obtained;

(iv)    written notice of such assignment, together with payment instructions, addresses and related information with respect to Assignee, shall have been given to Administrative Borrower and Agent;

(v)    Assignee shall pay to Assignor all amounts due to Assignor under this Assignment and Acceptance;

(vi)    the processing fee referred to in Section 2(b) hereof shall have been paid to Agent; and

(vii)    the recording of this Assignment and Acceptance in the Register.

(6)    Promptly following the execution of this Assignment and Acceptance, Assignor shall deliver to Administrative Borrower and Agent for acknowledgment by Agent, a Notice of Assignment in the form attached as Exhibit J to the Loan Agreement.

7.    [Agent. **[**INCLUDE ONLY IF ASSIGNOR IS AN AGENT**]**

(a)    Assignee hereby appoints and authorizes Assignor in its capacity as Agent to take such action as agent on its behalf to exercise such powers under the Loan Agreement and the other Loan Documents as are delegated to Agent by Lenders pursuant to the terms of the Loan Agreement.

(b)    Assignee shall assume no duties or obligations held by Assignor in its capacity as Agent under the Loan Agreement.**]**

8.    Withholding Tax. Assignee shall, if reasonably requested by Administrative Borrower or Agent, deliver such documentation prescribed by Applicable Law or as reasonably requested by such party, as will enable such party to determine whether such Assignee (with respect to the relevant lending office) is subject to withholding under Applicable Law, is entitled to an exemption from such withholding or is eligible for a reduced rate of withholding with respect to payments to be made to such Assignee under the Loan Documents. Without limiting the foregoing, Assignee agrees to deliver such documentation required to be delivered by it pursuant to Section 5.11 of the Loan Agreement.

9.    Representations and Warranties.

(a)    Assignor represents and warrants that (i) it is the legal and beneficial owner of the interest being assigned by it hereunder

and that such interest is free and clear of any security interest, lien, encumbrance or other adverse claim, (ii) it is duly organized and existing and it has the full power and authority to take, and has taken, all action necessary to execute and deliver this Assignment and Acceptance and any other documents required or permitted to be executed or delivered by it in connection with this Assignment and Acceptance and to fulfill its obligations hereunder, (iii) no notices to, or consents, authorizations or approvals of, any Person are required (other than any already given or obtained) for its due execution, delivery and performance of this Assignment and Acceptance, and apart from any agreements or undertakings or filings required by the Loan Agreement, no further action by, or notice to, or filing with, any Person is required of it for such execution, delivery or performance, (iv) this Assignment and Acceptance has been duly executed and delivered by it and constitutes the legal, valid and binding obligation of Assignor, enforceable against Assignor in accordance with the terms hereof, subject, as to enforcement, to bankruptcy, insolvency, moratorium, reorganization and other laws of general application relating to or affecting creditors' rights and to general equitable principles, and (v) it is [not] a Defaulting Lender as of the date hereof.

(b)    Assignor makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with the Loan Agreement or any of the other Loan Documents or the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Loan Agreement or any other instrument or document furnished pursuant thereto. Assignor makes no representation or warranty in connection with, and assumes no responsibility with respect to, the solvency, financial condition or statements of Borrowers, Guarantors or any of their respective Affiliates, or the performance or observance by Borrowers, Guarantors or any other Person, of any of its respective obligations under the Loan Agreement or any other instrument or document furnished in connection therewith.

(c)    Assignee represents and warrants that (i) it is duly organized and existing and it has full power and authority to take, and has taken, all action necessary to execute and deliver this Assignment and Acceptance and any other documents required or permitted to be executed or delivered by it in connection with this Assignment and Acceptance, and to fulfill its obligations hereunder, (ii) no notices to, or consents, authorizations or approvals of, any Person are required (other than any already given or obtained) for its due execution, delivery and performance of this Assignment and Acceptance, and apart from any agreements or undertakings or filings required by the Loan Agreement, no further action by, or notice to, or filing with, any Person is required of it for such execution, delivery or performance; (iii) it meets all requirements of an Eligible Assignee under the Loan Agreement, (iv) from and after the Effective Date, it shall be bound by the provisions of the Loan Agreement and, to the extent applicable, the other Loan Documents and, to the extent of the Assigned Commitment Amount, shall have the obligations of a Lender thereunder, and (v) this Assignment and Acceptance has been duly executed and delivered by it and constitutes the legal, valid and binding obligation of Assignee, enforceable against Assignee in accordance with the terms hereof, subject, as to enforcement, to bankruptcy, insolvency, moratorium, reorganization and other laws of general application relating to or affecting creditors' rights to general equitable principles.

10.    Further Assurances. Assignor and Assignee each hereby agree to execute and deliver such other instruments, and take such other action, as either party may reasonably request in connection with the transactions contemplated by this Assignment and Acceptance, including the delivery of any notices or other documents or instruments to Borrowers or Agent, which may be required in connection with the assignment and assumption contemplated hereby.

11.    Miscellaneous.

(a)    Any amendment or waiver of any provision of this Assignment and Acceptance shall be in writing and signed by the parties hereto. No failure or delay by either party hereto in exercising any right, power or privilege hereunder shall operate as a waiver thereof and any waiver of any breach of the provisions of this Assignment and Acceptance shall be without prejudice to any rights with respect to any other for further breach thereof.

(b)    All payments made hereunder shall be made without any set-off or counterclaim.

(c)    Assignor and Assignee shall each pay its own costs and expenses incurred in connection with the negotiation, preparation, execution and performance of this Assignment and Acceptance.

(d)    This Assignment and Acceptance may be executed in any number of counterparts, each of which taken together shall constitute one instrument. This Assignment and Acceptance may be executed and delivered by facsimile or other electronic transmission, and it shall have the same force and effect as manually signed originals.

(e)    THIS ASSIGNMENT AND ACCEPTANCE SHALL BE GOVERNED BY THE LAWS OF THE STATE OF NEW YORK WITHOUT GIVING EFFECT TO ANY PRINCIPLES OF CONFLICTS OF LAW OR OTHER RULE THAT WOULD CAUSE THE APPLICATION OF THE LAW OF ANY JURISDICTION OTHER THAN THE LAWS OF THE STATE OF NEW YORK (BUT GIVING EFFECT TO FEDERAL LAWS RELATING TO NATIONAL BANKS). Assignor and Assignee each irrevocably submits to the non-exclusive jurisdiction of any State or Federal court sitting in or with jurisdiction over the City of New York, in any proceeding or dispute relating in any way to this Assignment and Acceptance and agrees that any such proceeding shall be brought by it solely in any such court. Each party to this Assignment and Acceptance irrevocably waives all claims, objections

and defenses that it may have regarding such court's personal or subject matter jurisdiction, venue or inconvenient forum.

(f)    TO THE FULLEST EXTENT PERMITTED BY LAW, ASSIGNOR AND ASSIGNEE EACH WAIVE ANY RIGHTS THEY MAY HAVE TO A TRIAL BY JURY IN ANY PROCEEDING, CLAIM OR COUNTERCLAIM OF ANY KIND RELATING IN ANY WAY TO THIS ASSIGNMENT AND ACCEPTANCE, THE LOAN AGREEMENT, OBLIGATIONS OR COLLATERAL.

IN WITNESS WHEREOF, Assignor and Assignee have caused this Assignment and Acceptance to be executed and delivered by their duly authorized officers as of the date first above written.

**[ASSIGNOR]**

By: _____
Name: _____
Title: _____


**[ASSIGNEE]**

By: _____
Name: _____
Title: _____


**Exhibit B**
**to**
**Loan and Security Agreement**

**Form of Borrowing Base Certificate**


**[See attached]**

**RBS CITIZENS BUSINESS CAPITAL**
**YRC Worldwide Inc.**
**Summary Availability calculation**

**Amounts as of:**                    1/31/2014

**Summary Availability calculation**

| $'000 | YRCW (Parent) | YRC | Reddaway | Holland | New Penn | Total Before Caps | Adjusted Total |
|---|---|---|---|---|---|---|---|
| Accounts receivable | - | - | - | - | - | - | - |
| Total ineligible accounts receivable | - | - | - | - | - | - | - |
| Eligible Accounts (less Dilution Reserve if applicable) | - | - | - | - | - | - | - |
| *Advance rate* | | | | | | | *85%* |
| **Accounts Availability** | | | | | | | - |
| | | | | | | | |
| Eligible Borrowing Base Cash | - | | | | | - | - |
| *Advance rate* | | | | | | | *100%* |
| **Borrowing Base Cash Availability** | | | | | | | - |
| | | | | | | | |
| **Deferred Revenue Reserve** | - | - | - | - | - | - | - |

**Availability Reserves**

| | |
|---|---|
| **Borrowing Base** | - |
| **Revolving Loan Commitments** | 450,000 |
| **Lesser of Borrowing Base or Revolving Loan Commitments** | - |
| Outstanding revolving loans balance | |
| Outstanding letters of credit balance | |
| **Availability / (Overadvance)** | - |

**CERTIFICATION**

This Borrowing Base Certificate is delivered pursuant to the Loan and Security Agreement dated as of February 13, 2014 (as amended, supplemented, increased, extended, restated, refinanced, repl. from time to time, the "Agreement"), among YRC WORLDWIDE INC., a Delaware Corporation ("Parent") as administrative borrower (in such capacity, "Administrative Borrower"), Parent, YRC INC., a D USF REDDAWAY INC., an Oregon Corporation ("Reddaway"), USF HOLLAND INC., a Michigan Corporation ("Holland"), and NEW PENN MOTOR EXPRESS, INC., a Pennsylvania Corporation ("New Penn", a YRC, Reddaway and Holland, "Borrowers", and each a "Borrower"); the Guarantors from time to time party thereto; the financial institutions from time to time party thereto as lenders (the "Lenders") time to time party thereto as issuing banks (the "Issuing Banks"), and RBS CITIZENS BUSINESS CAPITAL, a division of RBS Asset Finance, Inc., a subsidiary of RBS Citizens, N.A., as agent for Lenders a capacity, "Agent").  Any capitalized term used but not defined herein shall have that meaning given to it in the Agreement.  The undersigned, a Responsible Officer of Administrative Borrower, certifi. Borrower and Borrowers, that the information set forth above and in the supporting documentation and information delivered herewith (i) is true, correct and complete in all material respects, and (ii accordance with the requirements of the Agreement.

**Prepared by:**


**Authorized Signature:**


**Date:**

Location level BBC

**RBS CITIZENS BUSINESS CAPITAL**
**YRCW (Parent)**
**AR & Cash borrowing base**


**$'000**
**Accounts receivable**
**Ineligibles:**
> 120 days past invoice
Past due credits
Cross-age (50%)
Balances over 15% of consolidated agings
Contra accounts
Off bill discounts
Overcharge claims
Cargo claims
Due from interlines
A/R credits payable
Insolvent accounts
Foreign accounts (non-US or Canadian)
Government accounts without assignment of claims (when applicable)
Not subject to perfected 1st lien
Evidenced by chattel paper unless delivered to Agent
Cash / COD accounts
Intercompany / related party accounts
Progress billing or retainage
Subject to legally binding commitment to be sold to a 3rd party
Collections agency
Unidentified account debtor
Unapplied cash
Unworked cash
Other

| | |
|---|---|
| Dilution Reserve | - |
| Total ineligible accounts receivable | - |


**$'000**
**Eligible Borrowing Base Cash**


**$'000**

| | |
|---|---|
| Deferred revenue liability | |
| A/R Advance Rate | 85% |
| **Deferred Revenue Reserve** | - |

**RBS CITIZENS BUSINESS CAPITAL**
**YRC**
**AR borrowing base**

$'000
**Accounts receivable**
**Ineligibles:**
> 120 days past invoice
Past due credits
Cross-age (50%)
Balances over 15% of consolidated agings
Contra accounts
Off bill discounts
Overcharge claims
Cargo claims
Due from interlines
A/R credits payable
Insolvent accounts
Foreign accounts (non-US or Canadian)
Government accounts without assignment of claims (when applicable)
Not subject to perfected 1st lien
Evidenced by chattel paper unless delivered to Agent
Cash / COD accounts
Intercompany / related party accounts
Progress billing or retainage
Subject to legally binding commitment to be sold to a 3rd party
Collections agency
Unidentified account debtor
Unapplied cash
Unworked cash
Other

| | |
|---|---:|
| Dilution Reserve | - |
| Total ineligible accounts receivable | - |

$'000

| | |
|---|---:|
| Deferred revenue liability | |
| A/R Advance Rate | 85% |
| **Deferred Revenue Reserve** | - |

**RBS CITIZENS BUSINESS CAPITAL**
**Reddaway**
**AR borrowing base**

**$'000**
**Accounts receivable**
**Ineligibles:**
> 120 days past invoice
Past due credits
Cross-age (50%)
Balances over 15% of consolidated agings
Contra accounts
Off bill discounts
Overcharge claims
Cargo claims
Due from interlines
A/R credits payable
Insolvent accounts
Foreign accounts (non-US or Canadian)
Government accounts without assignment of claims (when applicable)
Not subject to perfected 1st lien
Evidenced by chattel paper unless delivered to Agent
Cash / COD accounts
Intercompany / related party accounts
Progress billing or retainage
Subject to legally binding commitment to be sold to a 3rd party
Collections agency
Unidentified account debtor
Unapplied cash
Unworked cash
Other
Dilution Reserve                                                    -
Total ineligible accounts receivable                               -


**$'000**
Deferred revenue liability
A/R Advance Rate                                                 85%
**Deferred Revenue Reserve**                                       -

**RBS CITIZENS BUSINESS CAPITAL**
**Holland**
**AR borrowing base**

**$'000**
**Accounts receivable**
**Ineligibles:**
> 120 days past invoice
Past due credits
Cross-age (50%)
Balances over 15% of consolidated agings
Contra accounts
Off bill discounts
Overcharge claims
Cargo claims
Due from interlines
A/R credits payable
Insolvent accounts
Foreign accounts (non-US or Canadian)
Government accounts without assignment of claims (when applicable)
Not subject to perfected 1st lien
Evidenced by chattel paper unless delivered to Agent
Cash / COD accounts
Intercompany / related party accounts
Progress billing or retainage
Subject to legally binding commitment to be sold to a 3rd party
Collections agency
Unidentified account debtor
Unapplied cash
Unworked cash
Other

| | |
|---|---|
| Dilution Reserve | - |
| Total ineligible accounts receivable | - |

**$'000**

| | |
|---|---|
| Deferred revenue liability | |
| A/R Advance Rate | 85% |
| **Deferred Revenue Reserve** | - |

**RBS CITIZENS BUSINESS CAPITAL**
**New Penn**
**AR borrowing base**

$'000
**Accounts receivable**
**Ineligibles:**
> 120 days past invoice
Past due credits
Cross-age (50%)
Balances over 15% of consolidated agings
Contra accounts
Off bill discounts
Overcharge claims
Cargo claims
Due from interlines
A/R credits payable
Insolvent accounts
Foreign accounts (non-US or Canadian)
Government accounts without assignment of claims (when applicable)
Not subject to perfected 1st lien
Evidenced by chattel paper unless delivered to Agent
Cash / COD accounts
Intercompany / related party accounts
Progress billing or retainage
Subject to legally binding commitment to be sold to a 3rd party
Collections agency
Unidentified account debtor
Unapplied cash
Unworked cash
Other

| | |
|---|---|
| Dilution Reserve | - |
| Total ineligible accounts receivable | - |

$'000
Deferred revenue liability

| | |
|---|---|
| A/R Advance Rate | 85% |
| **Deferred Revenue Reserve** | - |

**RBS CITIZENS BUSINESS CAPITAL**
**Ineligibles Caps**

$'000

| | |
|---|---|
| Eligible Accounts | - |
| Cap Based on 3.5% of Eligible Accounts | - |
| Actual 91-120 days past invoice before cap | |
| **Additional ineligible due to cap** | - |

$'000

| | |
|---|---|
| Eligible Accounts | - |
| Cap Based on 2.5% of Eligible Accounts | - |
| Actual government accounts without assignment of claims | |
| **Additional ineligible due to cap** | - |

$'000
Total dilutive adjustments

| | |
|---|---|
| Gross sales | 1 |
| **Dilution** | **0.0%** |

**Exhibit C**

to
**Loan and Security Agreement**

**Form of Compliance Certificate**

Reference is made to the Loan and Security Agreement, dated as of February [●], 2014 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "Loan Agreement"), among YRC Worldwide Inc., a Delaware Corporation ("Parent"), as administrative borrower (in such capacity, "Administrative Borrower"), Parent, YRC Inc., a Delaware Corporation ("YRC"), USF Reddaway Inc., an Oregon Corporation ("Reddaway"), USF Holland, Inc., a Michigan Corporation ("Holland"), and New Penn Motor Express, Inc., a Pennsylvania Corporation ("New Penn", and together with Parent, YRC, Holland and Reddaway, "Borrowers" and each a "Borrower"), those Subsidiaries of Parent identified on Schedule 1.1(a) attached thereto (as updated from time to time) (collectively, "Guarantors" and each, a "Guarantor"); the financial institutions from time to time party to this Agreement as lenders (collectively, "Lenders" and each a "Lender"), the financial institutions from time to time party to this Agreement as issuing banks (collectively, "Issuing Banks" and each an "Issuing Bank"), and RBS Citizens Business Capital, a division of RBS Asset Finance, Inc., a subsidiary of RBS Citizens, N.A., as agent for Lenders and Issuing Banks (in such capacity, "Agent"). Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the Loan Agreement.

Pursuant to Section 10.1.1 and 10.1.2 of the Loan Agreement, the undersigned, solely in his/her capacity as a Responsible Officer of Administrative Borrower, certifies, as of the date hereof, as follows:

1.    Attached hereto as Exhibit A is the consolidated balance sheet of Parent and its Subsidiaries as of [December][•], 201[•] and the related consolidated statements of operations, changes in shareholders' equity and cash flows for such Fiscal Year, setting forth in each case in comparative form the figures for the previous Fiscal Year, all in reasonable detail and prepared in accordance with GAAP, audited and accompanied by a report and opinion of KPMG LLP, any other independent registered public accounting firm of nationally recognized standing or any other independent registered public accounting firm approved by Agent (such approval not to be unreasonably withheld, conditioned or delayed), which report and opinion (i) has been prepared in accordance with generally accepted auditing standards, (ii) shall not be subject to qualifications or exceptions as to the scope of such audit, (iii) shall be without a "going concern" disclosure or like qualification or exception (it being understood that for the Fiscal Year ending December 31, 2013, the audit may have a going concern explanatory paragraph); provided, that solely with respect of the Fiscal Year ending December 31, 2018, the audited financial statements may have a "going concern" qualification arising solely due to the pending maturity of the Obligations and/or the Term Debt (or any replacement or refinancing thereof), and (iv) is accompanied with customary management discussion analysis. Also attached hereto as Exhibit A are the related (x) consolidating financial statements reflecting the adjustments necessary to eliminate the accounts of Unrestricted Subsidiaries (if any) (which may be in footnote form only) from such consolidated financial statements.

2.    Attached hereto as Exhibit A is the consolidated balance sheet of Parent and its Subsidiaries as of [ ] and the related (i) consolidated statements of income or operations for such Fiscal Quarter and for the portion of the Fiscal Year then ended and (ii) consolidated statements of cash flows for such Fiscal Quarter and the portion of the Fiscal Year then ended, setting forth in each case in comparative form the figures for the corresponding Fiscal Quarter of the previous Fiscal Year and the corresponding portion of the previous Fiscal Year, all in reasonable detail. These present fairly in all material respects the financial condition, results of operations and cash flows of Parent and its Subsidiaries in accordance with GAAP, subject only to normal year-end audit adjustments and the absence of footnotes (and accompanied by customary management discussion and analysis). Also attached hereto as Exhibit A are the related consolidating financial statements reflecting the adjustments necessary to eliminate the accounts of Unrestricted Subsidiaries (if any) (which may be in footnote form only) from such consolidated financial statements.

3.    Attached as Exhibit B hereto is a reasonably detailed consolidated budget for 20[ ] on a quarterly basis (including a projected consolidated balance sheet of Parent and its Subsidiaries as of the end of 20[ ], the related consolidated statements of projected cash flow and projected income and a summary of the material underlying assumptions applicable thereto) (collectively, the "Projections"), which Projections are prepared in good faith and are based on assumptions believed to be reasonable at the time of preparation of such Projections. It is understood by Agent and Lenders that such projections as to future events (i) are not to be viewed as facts, (ii) are subject to significant uncertainties and contingencies, which may be beyond the control of Parent and Restricted Subsidiaries, (iii) are not assured by Parent and Restricted Subsidiaries as to whether the results or forecasts in any such projections will be realized, (iv) may differ from the actual results and such differences may be material, (v) are not a guarantee of performance, and (vi) may vary significantly from the actual results during the period or periods covered by any such projections and such differences may be material.

4.    To my knowledge, except as otherwise disclosed to Agent pursuant to the Loan Agreement, no Default has occurred as of the date hereof. [If unable to provide the foregoing certification, describe in reasonable detail the reasons therefor and circumstances thereof and any action taken or proposed to be taken with respect thereto on Annex A attached hereto.]

[5.   The following represent true and accurate calculations, as of [ ]:

Consolidated Fixed Charge Coverage Ratio:

| | | |
|---|---|---|
| Adjusted Consolidated EBITDA | = | [ ] |
| Consolidated Fixed Charges | = | [ ] |
| Ratio as Calculated | = | [ ] to 1.0 |
| [Required Ratio | = | 1.10 to 1.00] |

[6.   The following represent true and accurate calculations for the Fiscal Year ending December 31, [_____]:

Capital Expenditures:

| | | |
|---|---|---|
| Capital Expenditures: | = | $_____ |
| Rollover: | = | $_____ |
| Capital Expenditures made in compliance with the Payment Conditions | = | $_____ |
| Capital Expenditures Applied to Cap | = | $_____ ] |

7.   Attached hereto is the information required by Section 10.1.2(d) of the Loan Agreement.

[8.   The following represent true and accurate calculations, as of [ ]:

Total Leverage Ratio:

| | | |
|---|---|---|
| Consolidated Total Debt | = | [ ] |
| Consolidated EBITDA | = | [ ] |
| Ratio | = | [ ] to 1.0 |
| Required Ratio | = | 5.00 to 1.00 |

Supporting detail showing the calculations of Total Leverage Ratio is attached hereto as Schedule 2.]

SCHEDULE 1

## Consolidated Fixed Charge Coverage Ratio Calculation

*Consolidated EBITDA (with those reductions reflected below) divided by Consolidated Fixed Charges*

**(1) Consolidated EBITDA:**

**(a) Consolidated Net Income:**

(i)   the net income (or loss) of Parent and its Subsidiaries for such period determined on a consolidated basis in accordance with GAAP on a consolidated basis (without duplication) for such period (without deduction for minority interests);                    _____

provided, that in determining Consolidated Net Income, (a) the net income of any other Person which is not a Restricted Subsidiary, is an Unrestricted Subsidiary or is accounted for by Parent by the equity method of accounting shall be included only to the extent of the payment of cash dividends or cash distributions by such other Person to Parent, Restricted Subsidiaries or another Restricted Subsidiary that are made during such period, (b) the net income of any Subsidiary of Parent shall be excluded to the extent that the declaration or payment of cash dividends or similar cash distributions by that Subsidiary of that net income is not at the date of determination permitted by operation of its charter or any agreement, instrument or law applicable to such Subsidiary (other than (i) restrictions that have been waived or otherwise released, (ii) restrictions pursuant to the Loan Documents and or the Term Debt Documentation, and (iii) restrictions arising pursuant to an agreement or instrument if the encumbrances and restrictions contained in any such agreement or instrument taken as a whole are not materially less favorable to the Secured Parties than the encumbrances and restrictions contained in the Loan Documents (as determined by Parent in good faith)), and (c) the income or loss of any Person accrued prior to the date it becomes a Subsidiary or is merged into or consolidated with Parent or any Subsidiary or the date that such Person's assets are acquired by Parent or any Subsidiary shall be excluded.

**Consolidated Net Income =**                                                                                  _____

(b) *plus*, without duplication and to the extent deducted (and not added back or excluded) in arriving at such Consolidated Net Income (other than clauses (viii) or (xi)), the sum of the following amounts for such period with respect to Parent and Restricted Subsidiaries:

(i) total interest expense determined in accordance with GAAP and, to the extent not reflected in such total interest expense, any expenses or losses on hedging obligations or other derivative instruments entered into for the purpose of hedging interest rate risk, net of interest income and gains on such hedging obligations or other derivative obligations, letter of credit fees, costs of surety bonds in connection with financing activities and any bank fees and financing fees (including commitment, underwriting, funding, "rollover" and similar fees and commissions, discounts, yields and other fees, charges and amounts incurred in connection with the issuance or incurrence of Debt and all commissions, discounts and other fees and charges owed with respect to letters of credit and bankers' acceptance financing and net costs under Hedging Agreements entered into for the purpose of hedging interest or commodity rate risk) and annual agency, unused line, facility or similar fees paid under definitive documentation related to Debt (whether amortized or immediately expensed)                _____

(ii) provision for taxes based on income, profits or capital gains of Parent and the Restricted Subsidiaries, including, without limitation, federal, state, local, franchise and similar taxes and foreign withholding taxes paid or accrued during such period                                                                                  _____

(iii) depreciation and amortization                                                                          _____

(iv) extraordinary, unusual or non-recurring charges, expenses or losses

                                                                                                         _____

(v) non-cash expenses, charges and losses (including reserves, impairment charges or asset write-offs, write-offs of deferred financing fees, losses from investments recorded using the equity method, purchase accounting adjustments and stock-based awards compensation expense), in each case other than (A) any non-cash charge representing amortization of a prepaid cash item that was paid and not expensed in a prior period and (B) any non-cash charge relating to write-offs, write-downs or reserves with respect to accounts receivable in the normal course or inventory; provided, that if any of the non-cash charges referred to in this clause (v) represents an accrual or reserve for potential cash items in any future period, (1) Parent may determine not to add back such non-cash charge in the current period and (2) to the extent Parent does decide to add back such non-cash charge, the cash payment in respect thereof in such future period shall be subtracted from Consolidated EBITDA in such future period to the extent paid                                              _____

(vi) restructuring costs, integration costs, retention, recruiting, relocation and signing bonuses and expenses, and severance costs (including, for the avoidance of doubt, any bonuses payable in connection with the IBT Transactions in 2014 or 2015)                                                                       _____

(vii) Transaction Expenses

                                                                                                         _____

(viii) pro forma results for acquisitions (including the commencement of activities constituting such business) and material dispositions (including the termination or discontinuance of activities constituting such business) of business entities or properties or assets, constituting a division or line of business of any business entity, division or line of business that is the subject of any such acquisition or disposition, and operational changes and operational initiatives (including, to the extent applicable, from the Transactions but excluding the IBT Transactions), including any synergies, operating expense reductions, other operating improvements and cost savings as certified by Parent as having been determined in good faith to be reasonably anticipated to be realizable within twelve (12) months following any such acquisition or disposition, operational change and operational initiatives (with the total add-back pursuant to Section 1.5.3 of the Loan Agreement to be limited in the aggregate to 20% of Consolidated EBITDA (prior to giving effect to any such adjustments pursuant to this clause (viii) and Section 1.5 of the Loan Agreement but otherwise on a pro forma consolidated basis) in any Test Period; provided, that such limitation on add-backs shall not apply if supported by a quality of earnings report prepared by a nationally recognized accounting firm or other third-party advisor reasonably acceptable to Agent or if such adjustments satisfy the requirements of Regulation S-X)     _____

(ix) other transaction specific accruals, costs, charges, fees and expenses (including rationalization, legal, tax, structuring and other costs and expenses) related to the Transactions, acquisitions, investments, restricted payments, dispositions or issuances, amendments, waivers or modifications of debt or equity (whether or not consummated) reasonably expected to be permitted under the Loan Agreement or the consummation of which would result in the repayment in full of the Obligations (other than unasserted contingent indemnity and reimbursement obligations and obligations of any Loan Party arising under any Hedging Agreement)     _____

(x) proceeds of business interruption insurance received or reasonably expected to be received within 365 days after the end of such period; provided that any such expected proceeds that are not actually received in such 365 day period shall be deducted from Consolidated EBITDA in the fiscal quarter immediately following such 365 day period     _____

(xi) charges, losses or expenses to the extent indemnified or insured or reimbursed or reasonably expected to be indemnified, insured or reimbursed by a third party within 365 days after the end of such period; provided that any such expected amounts that are not actually received in such 365 day period shall be deducted from Consolidated EBITDA in the fiscal quarter immediately following such 365 day period     _____

(xii) the amount of any minority interest expense attributable to minority interests of third parties in the positive income of any non-wholly owned Restricted Subsidiary     _____

(xiii) any net loss from disposed, abandoned or discontinued operations     _____

(xiv) net realized losses from Swap Obligations or embedded derivatives that require similar accounting treatment and the application of Accounting Standard Codification Topic 815 and related pronouncements     _____

(xv) the cumulative effect of a change in accounting principles

(xvi) realized non-cash foreign exchange losses resulting from the impact of foreign currency changes on the valuation of assets or liabilities on the balance sheet of Parent and Restricted Subsidiaries     _____

(c) less, without duplication and to the extent included in arriving at such Consolidated Net Income:

(i) non-cash gains (excluding any non-cash gain to the extent it represents the reversal of an accrual or reserve for a potential cash item that reduced Consolidated EBITDA in any prior period) and all other non-cash items of income for such period     _____

(ii) any gains and income from investments recorded using the equity method     _____

(iii) any gains arising out of transactions of the types described in clauses (a)(xii), (xiii), (xiv), (xv) and (xvi) above     _____

provided, that, for the avoidance of doubt, any gain representing the reversal of any non-cash charge referred to in clause (a)(v)(B) above for a prior period shall be added (together with, without duplication, any amounts received in respect thereof to the extent not increasing Consolidated Net Income) to Consolidated EBITDA in any subsequent period to such extent so reversed (or received)

(1) **Consolidated EBITDA =**                                                                    _____

*minus*

(2) Capital Expenditures made during such Test Period

_____

*minus*

(3) the aggregate amount of net cash taxes paid in cash during such Test Period

_____

*minus*

(4) the amount, if any, by which the Cash Pension Contribution for such period exceeds the Pension Expense for such period                                                                                _____

*plus*

(5) the amount, if any, by which the Pension Expense for such period exceeds the Cash Pension Contribution for such Test Period                                                                           _____

(6) Adjusted Consolidated EBITDA for such Test Period (Item (1) minus Items (2) through (4) plus Item (5))

_____

**(7) Consolidated Fixed Charges for the Test Period**

(a) cash interest expense payable during such Test Period (including amounts payable under Capitalized Leases)

_____

*Plus*

(b) regularly scheduled principal payments payable in cash during such Test Period (including amounts payable under Capitalized Leases)                                                                     _____

*plus*

(c) letter of credit fees payable in cash during such period

_____

**(7) Consolidated Fixed Charges for the Test Period** (Item (7)(a) plus (7)(b) plus (7)(c))        _____

**(8) Consolidated Fixed Charge Coverage Ratio for the Test Period**
(Item (6) divided by Item (7))                                                                      _____

SCHEDULE 1

## Total Leverage Ratio Calculation
*Consolidated Total Debt to Consolidated EBITDA*

**(1) Consolidated Total Debt as of [ ], 20[ ]**

(a) As of any date of determination on a Pro Forma Basis, the aggregate principal amount of Debt of Parent and Restricted Subsidiaries outstanding on such date, in an amount that would be reflected on a balance sheet prepared as of such date on a consolidated basis in accordance with GAAP (but excluding the effects of any discounting of Debt as provided in Section 1.4 of the Loan Agreement), consisting of:

(i) Debt for borrowed money

_____

(ii) Attributable Debt or purchase money Debt

_____

(iii) debt obligations evidenced by bonds, debentures, promissory notes, loan agreements or similar instruments

_____

(iv) all Guarantees of any of the foregoing                                                         _____

*provided* that (i) Consolidated Total Debt shall not include Debt in respect of letters of credit, bankers' acceptances and other similar contingent obligations, except to the extent of unreimbursed amounts thereunder, (ii) Consolidated Total Debt shall not include obligations under Hedging Agreements permitted hereunder and (iii) Consolidated Total Debt shall not include any Debt which Parent or any Restricted Subsidiary has either defeased or discharged and satisfied.

**(1) Consolidated Total Debt =**                                                                    _____

*divided by*

**(2) Consolidated EBITDA** (Item 1 of Schedule 1)                                                   _____

**Consolidated Total Debt to Consolidated EBITDA** (Item (1) divided by Item (2)) =

[ ]:1.00

IN WITNESS WHEREOF, the undersigned, solely in his/her capacity as a Responsible Officer of YRC Worldwide Inc., has executed this certificate for and on behalf of YRC Worldwide Inc. and the other Loan Parties and has caused this certificate to be delivered this ____ day of _____, 20[__].

YRC WORLDWIDE INC.,
as Administrative Borrower

By: _____

    Name:

    Title:

**Exhibit D**
**to**
**Loan and Security Agreement**

**Form of Notice of Borrowing**

Date: _____, _____

To:    RBS CITIZENS BUSINESS CAPITAL, a division of RBS Asset Finance, Inc., a subsidiary of RBS Citizens, N.A., as Agent

Ladies and Gentlemen:

Reference is made to the Loan and Security Agreement, dated as of February [●], 2014 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "Loan Agreement"), among YRC Worldwide Inc., a Delaware Corporation ("Parent"), as administrative borrower (in such capacity, "Administrative Borrower"), Parent, YRC Inc., a Delaware Corporation ("YRC"), USF Reddaway Inc., an Oregon Corporation ("Reddaway"), USF Holland, Inc., a Michigan Corporation ("Holland"), and New Penn Motor Express, Inc., a Pennsylvania Corporation ("New Penn", and together with Parent, YRC, Holland and Reddaway, "Borrowers" and each a "Borrower"), those Subsidiaries of Parent identified on Schedule 1.1(a) attached thereto (as updated from time to time) (collectively, "Guarantors" and each, a "Guarantor"); the financial institutions from time to time party to this Agreement as lenders (collectively, "Lenders" and each a "Lender"), the financial institutions from time to time party to this Agreement as issuing

banks (collectively, "Issuing Banks" and each an "Issuing Bank"), and RBS Citizens Business Capital, a division of RBS Asset Finance, Inc., a subsidiary of RBS Citizens, N.A., as agent for Lenders and Issuing Banks (in such capacity, "Agent"). Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the Loan Agreement.

Administrative Borrower hereby requests a Borrowing of Loans:

1.  On __ (a Business Day);

2.  In the amount of $_____;

3.  Comprised of _____ (Type of Borrowing); and

4.  For LIBOR Loans: with an Interest Period of _____ months.

Administrative Borrower hereby represents and warrants that (a) the Borrowing requested herein complies with the provisions of Section 4.1.1 of the Loan Agreement and (b) the conditions specified in Section 6.2 of the Loan Agreement have been satisfied on and as of the date of the applicable Borrowing.

> YRC WORLDWIDE, INC.,
> as Administrative Borrower
>
> By: _____
> Name: _____
> Title: _____

**EXHIBIT E**

*Form of Grant of Security Interest in Trademarks*

GRANT OF SECURITY INTEREST
IN UNITED STATES TRADEMARKS

FOR GOOD AND VALUABLE CONSIDERATION, receipt and sufficiency of which are hereby acknowledged, each of (i) YRC Worldwide Inc., a Delaware Corporation, with principal offices at 10990 Roe Avenue, Overland Park, Kansas 66211; (ii) YRC Inc., a Delaware Corporation, with principal offices at 10990 Roe Avenue, Overland Park, Kansas 66211; (iii) USF Holland Inc., a Michigan Corporation, with principal office at 750 East 40th Street, Holland, Michigan 49423; and (iv) YRC Regional Transportation, Inc., a Delaware Corporation, with principal offices at 10990 Roe Avenue, Overland Park, Kansas 66211 (each a "Grantor" and collectively, the "Grantors") hereby grants to RBS CITIZENS BUSINESS CAPITAL, a division of RBS Asset Finance, Inc., a subsidiary of RBS Citizens, N.A., as Agent, with principal offices at 71 South Wacker Drive, Suite 2900, Chicago, Illinois 60606, Attention: Kimberly A. Crotty, Vice President (the "Grantee"), a continuing security interest in (i) all of such Grantor's right, title and interest in, to and under the United States trademarks, trademark registrations and trademark applications (collectively, the "Marks") set forth on Schedule A attached hereto, (ii) all Proceeds (as such term is defined in the Loan and Security Agreement referred to below) and products of the Marks, (iii) the goodwill of the businesses with which the Marks are associated and (iv) all causes of action arising on, prior to or after the date hereof for infringement, or dilution of, or other injury to, any of the Marks or unfair competition regarding the same.

THIS GRANT is made to secure the payment or performance, as the case may be, in full of the Obligations, as such term is defined in the Loan and Security Agreement among the Grantors, the Borrowers from time to time party thereto, the other Guarantors from time to time party thereto, the Lenders from time to time party thereto; the Issuing Banks from time to time party thereto, and Grantee, as Agent, dated as of February 13, 2014 (as amended, modified, restated and/or supplemented from time to time, the "Loan and Security Agreement").

This Grant has been granted in conjunction with the security interest granted to the Grantee under the Loan and Security Agreement. The rights and remedies of the Grantee with respect to the security interest granted herein are as set forth in the Loan and Security Agreement, all terms and provisions of which are incorporated herein by reference. In the event that any provisions of this Grant are deemed to conflict with the Loan and Security Agreement, the provisions of the Loan and Security Agreement shall govern.

IN WITNESS WHEREOF, the undersigned have executed this Grant as of the [●] day of February, 2014.

YRC WORLDWIDE INC., Grantor

By_____
Name:
Title:

YRC INC., Grantor

By_____
Name:
Title:

USF HOLLAND INC., Grantor

By_____
Name:
Title:

YRC REGIONAL TRANSPORTATION, INC., Grantor

By_____

Name:
Title:

RBS CITIZENS BUSINESS CAPITAL,
a division of RBS Asset Finance, Inc.,
a subsidiary of RBS Citizens, N.A.,
as Agent

By: _____
Name:
Title:

**EXHIBIT F**

*Form of Grant of Security Interest in Patents*

GRANT OF SECURITY INTEREST
<u>IN UNITED STATES PATENTS</u>

FOR GOOD AND VALUABLE CONSIDERATION, receipt and sufficiency of which are hereby acknowledged, YRC WORLDWIDE INC., a Delaware Corporation (the "<u>Grantor</u>") with principal offices at 10990 Roe Avenue, Overland Park, Kansas 66211, hereby grants to RBS CITIZENS BUSINESS CAPITAL, a division of RBS Asset Finance, Inc., a subsidiary of RBS Citizens, N.A., as Agent, with principal offices at 71 South Wacker Drive, Suite 2900, Chicago, Illinois 60606, Attention: Kimberly A. Crotty, Vice President (the "<u>Grantee</u>"), a continuing security interest in (i) all of the Grantor's rights, title and interest in, to and under the United States patents and patent applications (collectively, the "<u>Patents</u>") set forth on Schedule A attached hereto, in each case together with (ii) all Proceeds (as such term is defined in the Loan and Security Agreement referred to below) and products of the Patents, and (iii) all causes of action arising on, prior to or after the date hereof for infringement of any of the Patents or unfair competition regarding the same.

THIS GRANT is made to secure the payment or performance, as the case may be, in full of the Obligations, as such term is defined in the Loan and Security Agreement among the Grantor, the Borrowers from time to time party thereto, the other Guarantors from time to time party thereto, the Lenders from time to time party thereto; the Issuing Banks from time to time party thereto, and Grantee, as Agent, dated as of February 13, 2014 (as amended, modified, restated and/or supplemented from time to time, the "<u>Loan and Security Agreement</u>").

This Grant has been granted in conjunction with the security interest granted to the Grantee under the Loan and Security Agreement. The rights and remedies of the Grantee with respect to the security interest granted herein are as set forth in the Loan and Security Agreement, all terms and provisions of which are incorporated herein by reference. In the event that any provisions

of this Grant are deemed to conflict with the Loan and Security Agreement, the provisions of the Loan and Security Agreement shall govern.

IN WITNESS WHEREOF, the undersigned have executed this Grant as of the [13th] day of February, 2014.

YRC WORLDWIDE INC., Grantor

By_____
Name:
Title:

RBS CITIZENS BUSINESS CAPITAL,
a division of RBS Asset Finance, Inc.,
a subsidiary of RBS Citizens, N.A.,
as Agent

By:  _____
Name:
        Title:

**EXHIBIT G**

*Form of Grant of Security Interest in Copyrights*

GRANT OF SECURITY INTEREST
IN UNITED STATES COPYRIGHTS

WHEREAS, (i) New Penn Motor Express, Inc., a Pennsylvania Corporation, having its chief executive offices at 625 South Fifth Avenue, Lebanon, Pennsylvania 17042; (ii) YRC Inc., a Delaware Corporation, having its chief executive offices at 10990 Roe Avenue, Overland Park, Kansas 66211; and (iii) YRC Regional Transportation, Inc., a Delaware corporation, having its chief executive office at 10990 Roe Avenue, Overland Park, KS 66211 (each a "Grantor" and collectively, the "Grantors"), are the owners of all right, title and interest in and to the United States copyrights and associated United States copyright registrations and applications for registration set forth in Schedule A attached hereto (collectively, the "Copyrights") and is an exclusive licensee of registered copyrights pursuant to each Copyright License (as such term is defined in the Loan and Security Agreement referred to below) set forth in Schedule A;

WHEREAS, RBS CITIZENS BUSINESS CAPITAL, a division of RBS Asset Finance, Inc., a subsidiary of RBS Citizens, N.A., as Agent, having its principal offices at 71 South Wacker Drive, Suite 2900, Chicago, Illinois 60606, Attention: Kimberly A. Crotty, Vice President (the "Grantee"), desires to acquire a security interest in said Copyrights and Copyright Licenses; and

WHEREAS, the Grantors are willing to grant to the Grantee a security interest in and lien upon the Copyrights and Copyright Licenses described above.

NOW, THEREFORE, for good and valuable consideration, the receipt of which is hereby acknowledged, and subject to the terms and conditions of the Loan and Security Agreement, dated as of February 13, 2014, made by the Grantors; the Borrowers from time to time party thereto; the other Guarantors from time to time party thereto, the Lenders from time to time party thereto; the Issuing Banks from time to time party thereto; and Grantee, as Agent (as amended, modified, restated and/or supplemented from time to time, the "Loan and Security Agreement"), each Grantor hereby assigns to the Grantee as collateral security, and grants to the

Grantee a continuing security interest in, to and under (i) all of such Grantor's right, title and interest in, to and under the Copyrights and exclusive Copyright Licenses set forth in Schedule A attached hereto, in each case together with, (ii) all Proceeds (as such term is defined in the Loan and Security Agreement) and products of the foregoing, (iii) all causes of action arising on, prior to or after the date hereof for infringement of any of the Copyrights or unfair competition regarding the same, and (iv) all rights and benefits of such Grantor under the exclusive Copyright Licenses set forth in Schedule A. The assignment and security interest granted herein is made to secure the payment or performance, as the case may be, in full of the Obligations, as such term is defined in the Loan and Security Agreement.

This Grant has been granted in conjunction with the security interest granted to the Grantee under the Loan and Security Agreement. The rights and remedies of the Grantee with respect to the security interest granted herein are as set forth in the Loan and Security Agreement, all terms and provisions of which are incorporated herein by reference. In the event that any provisions of this Grant are deemed to conflict with the Loan and Security Agreement, the provisions of the Loan and Security Agreement shall govern.

**[Remainder of this page intentionally left blank; signature page follows]**

IN WITNESS WHEREOF, the undersigned have executed this Grant as of the [13th] day of February 2014.

NEW PENN MOTOR EXPRESS, INC., Grantor

By_____
Name:
Title:

YRC INC., Grantor

By_____
Name:
Title:

YRC REGIONAL TRANSPORTATION, INC.,
Grantor

By_____
Name:
Title:

RBS CITIZENS BUSINESS CAPITAL,
a division of RBS Asset Finance, Inc.,
a subsidiary of RBS Citizens, N.A.,
as Agent

By:  _____
Name:
**Title:**
**EXHIBIT H**

*Form of Perfection Certificate*

PERFECTION CERTIFICATE

Reference is made to (i) the Loan and Security Agreement (as amended, supplemented or otherwise modified from time to time, the "***ABL Credit Agreement***") dated as of the date hereof by and among YRC Worldwide Inc., a Delaware corporation ("***Parent***") as administrative borrower (in such capacity, the "***ABL Administrative Borrower***"), Parent, YRC Inc., a Delaware corporation ("YRC"), USF Reddaway Inc., an Oregon Corporation ("Reddaway"), USF Holland Inc., a Michigan Corporation ("Holland"), and New Penn Motor Express, Inc., a Pennsylvania Corporation ("New Penn", and jointly and severally with the Parent, YRC, Holland and Reddaway, the "ABL Borrowers" or each individually an "ABL Borrower"), Guarantors party thereto from time to time, the financial institutions party thereto from time to time as lenders (the "***ABL Lenders***"), the financial institutions party thereto from time to time as issuing banks (the "***Issuing Banks***"), and RBS Citizens Business Capital, a division of RBS Asset Finance, Inc., a corporation organized under the laws of the State of New York, a subsidiary of RBS Citizens, N.A., as agent for the Lenders and the Issuing Banks (in such capacity, the "***ABL Agent***") and (ii) the Credit Agreement (as amended, supplemented or otherwise modified from time to time, the "***Term Loan Credit Agreement***", and together with the ABL Credit Agreement, the "***Credit Agreements***") dated as of the date hereof by and among YRC Worldwide Inc., a Delaware corporation (the "***Term Loan Borrower***", together with the other Guarantors under the Term Loan Credit Agreement, the "***Term Loan Grantors***"; the ABL Borrowers and the Term Loan Borrower, collectively, the "***Borrowers***"; the ABL Borrowers and the Term Loan Grantors, collectively, the "***Grantors***"), the lenders from time to time party thereto, Credit Suisse AG, Cayman Islands Branch, as administrative agent (in such capacity, the "***Term Loan Administrative Agent***", and together with the ABL Agent, the "***Administrative Agents***") and Credit Suisse AG, Cayman Islands Branch, as collateral agent (in such capacity, the "***Term Loan Collateral Agent***", and together with the ABL Agent, the "***Collateral Agents***"). Capitalized terms used but not defined herein have the meanings set forth in either the Credit Agreements or the Security Agreements referred to therein, as applicable.

The undersigned Responsible Officer of the ABL Administrative Borrower and Term Loan Borrower hereby certifies, solely in the official capacity listed below and not in any individual capacity, to the Administrative Agents and each other Secured Party, that as of the date hereof:

1. <u>Names.</u> (a) The exact legal name of each Grantor, as such name appears in its respective certificate of formation, is as follows:

| Exact Legal Name of Each Grantor |
| --- |
|  |

(b)  Set forth below is each other legal name each Grantor has had in the past five years, together with the date of the relevant change:

| Grantor | Other Legal Name in Past 5 Years | Date of Name Change |
| --- | --- | --- |
|  |  |  |

(c)  Except as set forth below, no Grantor has changed its identity or corporate structure in any way that requires an amendment to such Grantor's articles of organization, certificate of formation or certificate of incorporation (or similar governing document) within the past five years. Changes in identity or corporate structure would include mergers, consolidations and acquisitions, as well as any change in the form, nature or jurisdiction of organization. If any such change has occurred, include in Schedule 1 the information required by Sections 1 and 2 of this certificate as to each acquiree or constituent party to a merger or consolidation.

| Grantor | Change in Identity or Corporate Structure | Date of Such Change |
| --- | --- | --- |
|  |  |  |
|  |  |  |

(d)  The following is a list of all other names (including trade names or similar appellations) used by each Grantor or any of its divisions or other business units in connection with the conduct of its business or the ownership of its properties at any time during the past five years:

| Grantor | Other Name Used |
|---|---|
|  |  |

(e)  Set forth below is the organizational identification number, if any, issued by the jurisdiction of formation, organization or incorporation of each Grantor that is a registered organization:

| Grantor | Organizational Identification Number |
|---|---|
|  |  |

(f)  Set forth below is the Federal Taxpayer Identification Number of each Grantor:

| Grantor | Federal Taxpayer Identification Number |
|---|---|
|  |  |

2.  <u>Current Locations.</u> (a)  The chief executive office of each Grantor is located at the address set forth opposite its name below:

| Grantor | Mailing Address | County | State |
|---|---|---|---|
|  |  |  |  |

(b)  Set forth below opposite the name of each Grantor are all locations where such Grantor maintains any books or records relating to any Accounts Receivable (with each location at which chattel paper, if any, is kept being indicated by an "*"):

| Grantor | Mailing Address | County | State |
|---|---|---|---|
|  |  |  |  |

(c)  The jurisdiction of formation, organization or incorporation of each Grantor that is a registered organization is set forth opposite its name below:

| Grantor | Jurisdiction |
|---|---|
|  |  |

(d) Attached hereto as Schedule 2 is a schedule setting forth, opposite the name of each Grantor, all the locations where such Grantor maintains any Equipment or other Collateral not identified above (other than any such Equipment or other Collateral with a net book value in an aggregate amount not to exceed $500,000 or any of same which is in transit, subject to being repaired or in use in the ordinary course of business, or vehicles).

(e)  Set forth below opposite the name of each Grantor are all the places of business of such Grantor not identified in paragraph (a), (b) or (d) above:

| Grantor | Mailing Address | County | State |
|---|---|---|---|
|  |  |  |  |

(f)  Set forth below is a list of all real property held by each Grantor, whether owned or leased, the name of the Grantor that owns or leases said property:

(g) Set forth below opposite the name of each Grantor are the names and addresses of all Persons other than such Grantor that have possession of any of the Collateral of such Grantor (other than such Collateral with a net book value in an aggregate amount not to exceed $500,000 or any of same which is in transit, subject to being repaired or in use in the ordinary course of business):

| Grantor | Mailing Address | County | State |
|---|---|---|---|
|  |  |  |  |

3.  Unusual Transactions. Except as set forth below, all Accounts Receivable have been originated by the Grantors and all Inventory has been acquired by the Grantors in the ordinary course of business:

4.  File Search Reports. File search reports reasonably acceptable to the Borrowers and Administrative Agent have been previously obtained from each Uniform Commercial Code filing office identified with respect to such Grantor in Section 2 hereof, and such search reports reflect no liens against any of the Collateral other than (i) those liens permitted under the Credit Agreements, (ii) those liens to be terminated in connection with entry into the Credit Agreements, (iii) any liens which the Borrowers believe are unauthorized, and (iv) any other liens for which evidence of termination has been provided to the Administrative Agents on or prior to the date hereof.

5.  Stock Ownership and other Equity Interests. Attached hereto as Schedule 5 is a true and correct list of all the issued and outstanding stock, partnership interests, limited liability company membership interests or other equity interest of the Borrower and each Subsidiary and (except for equity interests that are publicly traded) the record and beneficial owners of such stock, partnership interests, membership interests or other equity interests. Also set forth on Schedule 5 is each equity investment of the Borrower or any Subsidiary that represents 50% or less of the equity of the entity in which such investment was made. Notwithstanding anything else to the contrary, it is understood that the percentage of equity interests owned of each Subsidiary (in lieu of the number of issued and outstanding equity interests) shall fulfill the requirements of this paragraph.

6.  Debt Instruments. Attached hereto as Schedule 6 is a true and correct list of all promissory notes and other evidence of indebtedness in excess of $5,000,000 held by the Borrower and each Subsidiary that are required to be pledged under the Credit Agreements or Security Agreements, as applicable, including all intercompany notes in excess of $5,000,000 between the Borrower and each subsidiary of the Borrower and each subsidiary of the Borrower and each other such subsidiary.

7. Deposit Accounts. Attached hereto as Schedule 7 is a true and correct list of deposit accounts, brokerage accounts or securities investment accounts maintained by each Grantor, including the name of the depositary institution, the type of account and the account number.

8. Assignment of Claims Act. Attached hereto as Schedule 8 is a true and correct list of all written contracts between the Borrower or any Subsidiary and the United States government or any department or agency thereof that have a remaining value of at least $5,000,000, setting forth the contract number, name and address of contracting officer (or other party to whom a notice of assignment under the Assignment of Claims Act should be sent), contract start date and end date, agency with which the contract was entered into, and a description of the contract type.

9.  Mortgaged Property. Attached hereto as Schedule 9 is a schedule setting forth, with respect to each mortgaged property, (a) the address of such property and (b) an indication of the ownership of such property, with additional information related to the applicable Collateral and Guarantee requirements to be provided post-closing as is reasonably requested by the Collateral Agent and the ABL Agent.

10. Intellectual Property. Attached hereto as Schedule 10A in proper form for filing with the United States Patent and Trademark Office is a schedule setting forth all of each Grantor's Patents, Patent Licenses, Trademarks and Trademark Licenses, including the name of the registered owner, the registration number and the expiration date of each Patent, Patent License, Trademark and Trademark License owned by any Grantor. Attached hereto as Schedule 10B in proper form for filing with the United States

Copyright Office is a schedule setting forth all of each Grantor's Copyrights and Copyright Licenses, including the name of the registered owner, the registration number and the expiration date of each Copyright or Copyright License owned by any Grantor.

11. <u>Commercial Tort Claims.</u> Attached hereto as Schedule 11 is a true and correct list of commercial tort claims in excess of $5,000,000 held by any Grantor, including a brief description thereof.

12. <u>Vehicles</u>. Attached hereto as Schedule 12 is a true and correct list of all vehicles covered by certificates of title (other than employee or light vehicles (but including Tractor Trailers, Rolling Stock and equipment) having an individual fair market value not in excess of $40,000) ("**Vehicles**") owned by the Grantors, identifying the VIN numbers and the state where such vehicle is titled.

IN WITNESS WHEREOF, the undersigned have duly executed this certificate on this ___ day of _____.

YRC WORLDWIDE INC.,

by

_____

Name:
Title:

**Exhibit I**
**to**
**Loan and Security Agreement**

**Form of Notice of Continuation / Conversion**

Date: _____, _____

To:    RBS CITIZENS BUSINESS CAPITAL, a division of RBS Asset Finance, Inc., a subsidiary of RBS Citizens, N.A., as Agent

Ladies and Gentlemen:

Reference is made to the Loan and Security Agreement, dated as of February [●], 2014 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "Loan Agreement"), among YRC Worldwide Inc., a Delaware Corporation ("Parent"), as administrative borrower (in such capacity, "Administrative Borrower"), Parent, YRC Inc., a Delaware Corporation ("YRC"), USF Reddaway Inc., an Oregon Corporation ("Reddaway"), USF Holland, Inc., a Michigan Corporation ("Holland"), and New Penn Motor Express, Inc., a Pennsylvania Corporation ("New Penn", and together with Parent, YRC, Holland and Reddaway, "Borrowers" and each a "Borrower"), those Subsidiaries of Parent identified on Schedule 1.1(a) attached thereto (as updated from time to time) (collectively, "Guarantors" and each, a "Guarantor"); the financial institutions from time to time party to this Agreement as lenders (collectively, "Lenders" and each a "Lender"), the financial institutions from time to time party to this Agreement as issuing banks (collectively, "Issuing Banks" and each an "Issuing Bank"), and RBS Citizens Business Capital, a division of RBS Asset Finance, Inc., a subsidiary of RBS Citizens, N.A., as agent for Lenders and Issuing Banks (in such capacity, "Agent"). Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the Loan Agreement.

Administrative Borrower hereby requests a [conversion of Loans from one Type to the other][a continuation of LIBOR Loans]:

1.    On ___ (a Business Day);

2.    In the amount of $_____;

3.    Comprised of _____ (Type of Borrowing); and

4.    For LIBOR Loans: with an Interest Period of _____ months.

Administrative Borrower hereby represents and warrants that the conditions specified in Sections 6.2.2 and 6.2.3 of the Loan Agreement have been satisfied on and as of the date of the applicable Borrowing; <u>provided</u>, <u>however</u>, that, upon election of Required

Lenders by written notice to Administrative Borrower, no portion of the outstanding principal amount of any Loans may be converted to, or continued as, LIBOR Loans when any Event of Default has occurred and is continuing.

YRC WORLDWIDE, INC.,
as Administrative Borrower


By: _____
Name: _____
Title: _____


**Exhibit J**
**to**
**Loan and Security Agreement**

**Form of Assignment Notice**


_____ __, 20__


RBS CITIZENS BUSINESS CAPITAL,
a division of RBS Asset Finance, Inc. a subsidiary of RBS Citizens, N.A., as Agent
28 State Street
Boston, Massachusetts 02109
Attention: _____

Re: _____

Ladies and Gentlemen:

Reference is made to the Loan and Security Agreement, dated as of February [●], 2014 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "Loan Agreement"), among YRC Worldwide Inc., a Delaware Corporation ("Parent"), as administrative borrower (in such capacity, "Administrative Borrower"), Parent, YRC Inc., a Delaware Corporation ("YRC"), USF Reddaway Inc., an Oregon Corporation ("Reddaway"), USF Holland, Inc., a Michigan Corporation ("Holland"), and New Penn Motor Express, Inc., a Pennsylvania Corporation ("New Penn", and together with Parent, YRC, Holland and Reddaway, "Borrowers" and each a "Borrower"), those Subsidiaries of Parent identified on Schedule 1.1(a) attached thereto (as updated from time to time) (collectively, "Guarantors" and each, a "Guarantor"); the financial institutions from time to time party to this Agreement as lenders (collectively, "Lenders" and each a "Lender"), the financial institutions from time to time party to this Agreement as issuing banks (collectively, "Issuing Banks" and each an "Issuing Bank"), and RBS Citizens Business Capital, a division of RBS Asset Finance, Inc., a subsidiary of RBS Citizens, N.A., as agent for Lenders and Issuing Banks (in such capacity, "Agent"). Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the Loan Agreement.

Capitalized terms used herein without definition shall have the meanings given to such terms in the Loan Agreement.

1. We hereby give you notice of, and request your consent to, the assignment by _____ (the "Assignor") to _____ (the "Assignee") such that after giving effect to the assignment Assignee shall have an interest equal to _____ percent (__%) of the total Commitments pursuant to the Assignment and Acceptance Agreement attached hereto (the "Assignment and Acceptance"). We understand that the Assignor's Commitment shall be reduced by $_____, as the same may be further reduced by other assignments on or after the date hereof.

2. Assignee agrees that, upon receiving the consent of Agent and the approval of Administrative Borrower (if required) to such assignment, Assignee will be bound by the terms of the Loan Agreement as fully and to the same extent as if the Assignee were Lender originally holding such interest under the Loan Agreement.

3. The following administrative details apply to Assignee:

(A)    Notice address:

Assignee name: _____

Address: _____

Attention: _____

Telephone: _____

Facsimile: _____

(B)  Payment instructions:

Account No.: _____

At: _____

Reference: _____

Attention: _____

4. You are entitled to rely upon the representations, warranties and covenants of each of Assignor and Assignee contained in the Assignment and Acceptance.

IN WITNESS WHEREOF, Assignor and Assignee have caused this Notice of Assignment and Acceptance to be executed by their respective duly authorized officials, officers or agents as of the date first above mentioned.

Very truly yours,

**[**NAME OF ASSIGNOR**]**

By: _____
Name: _____
Title: _____

**[**NAME OF ASSIGNEE**]**

By: _____
Name: _____
Title: _____

ACKNOWLEDGED AND ASSIGNMENT
CONSENTED TO:

RBS CITIZENS BUSINESS CAPITAL,
a division of RBS Asset Finance, Inc. a subsidiary
of RBS Citizens, N.A., as Agent

By: _____
Name: _____
Title: _____

YRC WORLDWIDE, INC.,
as Administrative Borrower

By: _____
Name: _____
Title: _____]

**Schedule 1.1(a)**
**Guarantors as of the Closing Date**

| Guarantors |
| --- |
| Express Lane Service, Inc. |
| Roadway Express International, Inc. |
| Roadway LLC |
| Roadway Next Day Corporation |
| Roadway Reverse Logistics, Inc. |
| USF Bestway Inc. |
| USF Dugan Inc. |
| USF Glen Moore Inc. |
| USF RedStar LLC |
| YRC Association Solutions, Inc. |
| YRC LOGISTICS SERVICES, INC. |
| YRC MORTGAGES, LLC |
| YRC Enterprise Services, Inc. |
| YRC Regional Transportation, Inc. |

SCHEDULE 1.1(b)

COMMITMENTS OF LENDERS

| Lender | Commitment ($) | Allocation (%) |
| --- | --- | --- |
| RBS Citizens Business Capital, a division of RBS Asset Finance, Inc., a subsidiary of RBS Citizens, N.A. | 60,000,000.00 | 13.333 |
| Bank of America, N.A. | 60,000,000.00 | 13.333 |
| CIT Finance LLC | 47,500,000.00 | 10.556 |
| PNC Bank, National Association | 55,000,000.00 | 12.222 |
| Ally Commercial Finance LLC | 50,000,000.00 | 11.111 |
| ING Capital LLC | 45,000,000.00 | 10.000 |
| Deutsche Bank AG, New York Branch | 25,000,000.00 | 5.556 |
| City National Bank, a national banking association | 25,000,000.00 | 5.556 |
| Signature Bank | 25,000,000.00 | 5.556 |

| | | |
|---|---|---|
| Siemens Financial Services, Inc. | 30,000,000.00 | 6.667 |
| Webster Business Credit Corporation | 15,000,000.00 | 3.333 |
| First Niagara Commercial Finance, Inc. | 12,500,000.00 | 2.778 |
| TOTAL | 450,000,000.00 | 100.000 |

OBLIGATIONS TO ISSUE LETTERS OF CREDIT

| Lender | LC Issuance Sublimit ($) |
|---|---|
| RBS Citizens Business Capital, a division of RBS Asset Finance, Inc., a subsidiary of RBS Citizens, N.A. | 125,000,000.00 |
| Bank of America, N.A. | 250,000,000.00 |

## Schedule 1.1(c)
## Copyrights

| **LOAN PARTY = NEW PENN MOTOR EXPRESS, INC.** | | | | |
|---|---|---|---|---|
| **Title** | **Country** | **Registration No.** | **Registration Date** | **Expiration Date** |
| National class rate tariff 572 for New Penn Motor Express, Inc.: ICC MAC 572. | U.S. | TX 3-426-361 | 10/05/92 | 10/05/2087 |
| Tariff 572-B for New Penn Motor Express, Inc.: local and joint class rates. | U.S. | TX 3-780-931 | 03/31/94 | 03/31/2089 |
| Tariff 573 for New Penn Motor Express, Inc., MC-70832: local and joint class rates ... between points in the United States (except Alaska and Hawaii) and points in the provinces of Ontario and Quebec, Canada. | U.S. | TX 3-784-219 | 03/31/94 | 03/31/2089 |

| **LOAN PARTY = YRC INC. (YRC INC. (F/K/A ROADWAY EXPRESS, INC., YELLOW FREIGHT SYSTEM, INC., YELLOW FREIGHT SYSTEMS, INC. and/or YELLOW TRANSPORTATION, INC.)** | | | | | |
|---|---|---|---|---|---|
| **Title** | **Country** | **Registration No.** | **Registration Date** | **Expiration Date** | |
| Spotlight. (serial publication) | U.S. | CSN 007-390 See below | 1978-1980 | | |
| "Promises" to keep. | U.S. | PA 039-409 | 03/07/1979 | 03/07/2074 | |
| Equal employment opportunity and the law. | U.S. | PA 055-826 | 08/01/1979 | 08/01/2074 | |
| Equal employment opportunity: Equal employment opportunity (R E X policy). | U.S. | PA 055-827 | 08/01/1979 | 08/01/2074 | |
| Hazardous materials vehicle placards. | U.S. | PA 061-661 | 09/28/1979 | 09/28/2074 | |
| Hazardous materials: pt. 1 (A). | U.S. | PA 061-662 | 09/28/1979 | 09/28/2074 | |
| Hazardous materials: pt. 1 (B). | U.S. | PA 061-663 | 09/28/1979 | 09/28/2074 | |
| Spotlight. (serial publication) | U.S. | CSN 035-279 See below | 1980-1982 | 2075 | |
| It's not a laughing matter!: Skids--cause, control, prevention!. | U.S. | PA 062-684 | 01/21/1980 | 01/21/2075 | |
| Overcoming objections! | U.S. | PA 072-681 | 05/21/1980 | 05/21/2075 | |
| A Treacherous season!: Surviving winter driving conditions | U.S. | PA 109-280 | 10/27/1980 | 10/27/2075 | |
| Looking back and moving ahead. | U.S. | PA 095-569 | 01/16/1981 | 01/16/2076 | |
| Financial comments and highlights. | U.S. | PA 095-570 | 01/16/1981 | 101/16/2076 | |
| How will Roadway survive?. | U.S. | PA 095-571 | 01/16/1981 | 01/16/2076 | |
| Getting it done in '81. | U.S. | PA 095-572 | 01/16/1981 | 01/16/2076 | |
| The "New" environment. | U.S. | PA 095-573 | 01/16/1981 | 01/16/2076 | |
| Selling in a changing marketplace. | U.S. | PA 095-574 | 01/16/1981 | 01/16/2076 | |
| Roadway's '81 E. E. O. offense. | U.S. | PA 095-575 | 01/16/1981 | 01/16/2076 | |
| Keep the momentum in '81. | U.S. | PA 095-576 | 01/16/1981 | 01/16/2076 | |

| | | | | | |
|---|---|---|---|---|---|
| Scoring the point: or, How to close the sale. | U.S. | PA 105-855 | 02/05/1981 | 02/05/2076 | |
| Unionism!: From journeyman associations to the Teamsters. | U.S. | PA 105-642 | 04/20/1981 | 04/20/2076 | |
| Tuning the 6V 92TT Detroit diesel engine/produced in association with Detroit Diesel Allison. | U.S. | PA 105-643 | 04/20/1981 | 04/20/2076 | |
| Traction improver, air bag retrofit. | U.S. | PA 104-567 | 04/27/1981 | 04/27/2076 | |
| The Decision is yours. | U.S. | PA 110-764 | 07/14/1981 | 07/14/2076 | |
| The Road to excellence. | U.S. | PA 128-471 | 10/15/1981 | 10/15/2076 | |
| How well can we do in '82?. | U.S. | PA 131-425 | 01/29/1982 | 01/29/2077 | |
| Pulling your E. E. O. weight in '82. | U.S. | PA 131-426 | 01/29/1982 | 01/29/2077 | |
| Roadway and crew in '82. | U.S. | PA 131-427 | 01/29/1982 | 01/29/2077 | |
| Comments from the chairman. | U.S. | PA 131-428 | 01/29/1982 | 01/29/2077 | |
| Roadway and crew in '82. | U.S. | PA 131-429 | 01/29/1982 | 01/29/2077 | |
| Honing the crew for '82. | U.S. | PA 131-430 | 01/29/1982 | 01/29/2077 | |
| Following through in '82. | U.S. | PA 131-431 | 01/29/1982 | 01/29/2077 | |
| Here we go again!. | U.S. | PA 131-432 | 01/29/1982 | 01/29/2077 | |
| Reflections and directions. | U.S. | PA 131-433 | 01/29/1982 | 01/29/2077 | |
| The Best just got better for you!/Produced by Roadway Express, Inc., Video Productions. | U.S. | PA 136-539 | 04/01/1982 | 04/01/2077 | |
| Antitrust: pt. 2 / produced by Roadway Express, Inc., Video Productions. | U.S. | PA 141-716 | 05/24/1982 | 05/24/2077 | |
| Antitrust : pt. 1. | U.S. | PA 141-717 | 05/24/1982 | 05/24/2077 | |
| Class tariff/Roadway Express, Inc. (serial publication) | U.S. | TX 1-205-935 | 1983 | 2078 | |
| Roadway responds. | U.S. | PA 169-809 | 01/06/1983 | 01/06/2078 | |
| Roadway responds. | U.S. | PA 169-810 | 01/06/1983 | 01/06/2078 | |
| Administrative reactions. | U.S. | PA 169-811 | 01/06/1983 | 01/06/2078 | |
| Responses. | U.S. | PA 169-812 | 01/06/1983 | 01/06/2078 | |
| Planning for change in marketing and sales. | U.S. | PA 169-813 | 01/06/1983 | 01/06/2078 | |
| The Roadway response. | U.S. | PA 169-814 | 01/06/1983 | 01/06/2078 | |
| You. | U.S. | PA 169-815 | 01/06/1983 | 01/06/2078 | |
| Work. | U.S. | PA 174-753 | 04/28/1983 | 04/28/2078 | |
| The Shipping game. | U.S. | PA 174-754 | 04/28/1983 | 04/28/2078 | |
| More is less!. | U.S. | PA 176-846 | 05/23/1983 | 05/23/2078 | |
| The Champ. | U.S. | PA 186-536 | 08/22/1983 | 08/22/2078 | |
| Leadership program--Rex activity pac. | U.S. | TX 1-205-796 | 10/11/1983 | 10/11/2078 | |
| Leadership program with coach's guide: Roadway supervisor enrichment programs--training, orientation, leadership. | U.S. | TX 1-205-879 | 10/11/1983 | 10/11/2078 | |
| Roadway Express, Inc., leadership program: pts. I & II, pre-act & re-act. | U.S. | TX 1-205-936 | 10/11/1983 | 10/11/2078 | |
| Roadway Express, Inc., leadership program: pt. I, pre-act. | U.S. | TX 1-205-937 | 10/11/1983 | 10/11/2078 | |
| The Name of the game. | U.S. | PA 347-097 | 01/16/1984 | 01/16/2079 | |
| Soaring and scoring. | U.S. | PA 347-098 | 01/16/1984 | 01/16/2079 | |
| Kickoff ; Whoever said it would be easy? | U.S. | PA 347-099 | 01/16/1984 | 01/16/2079 | |
| Continue to soar in '84. | U.S. | PA 347-100 | 01/16/1984 | 01/16/2079 | |
| You did it! | U.S. | PA 347-101 | 01/16/1984 | 01/16/2079 | |
| The Right stuff. | U.S. | PA 347-102 | 01/16/1984 | 01/16/2079 | |
| Administration update for '84. | U.S. | PA 347-103 | 01/16/1984 | 01/16/2079 | |
| Quiktrak plus. | U.S. | PA 347-104 | 01/16/1984 | 01/16/2079 | |
| Transportation of hazardous materials. | U.S. | PA 199-196 | 02/02/1984 | 02/02/2079 | |
| There is a difference. | U.S. | PA 208-333 | 03/05/1984 | 03/05/2079 | |
| Roadway's 1970 consent decree. | U.S. | PA 210-939 | 04/30/1984 | 04/30/2079 | |
| International freight: an overview. | U.S. | PA 221-498 | 06/11/1984 | 06/11/2079 | |
| International freight (terms and flow). | U.S. | PA 221-806 | 07/12/1984 | 07/12/2079 | |
| Survival : work II. | U.S. | PA 234-175 | 10/29/1984 | 10/29/2079 | |
| EEO'85--what else is there?. | U.S. | PA 240-716 | 01/08/1985 | 01/08/2080 | |
| Quality thru good administration. | U.S. | PA 240-717 | 01/08/1985 | 01/08/2080 | |
| Survival through quality. | U.S. | PA 240-718 | 01/08/1985 | 01/08/2080 | |
| Quality & the marketplace. | U.S. | PA 240-719 | 01/08/1985 | 01/08/2080 | |
| Minding our P's and Q's. | U.S. | PA 240-720 | 01/08/1985 | 01/08/2080 | |
| Quality comes alive in '85: [Hoss]. | U.S. | PA 240-721 | 01/08/1985 | 01/08/2080 | |
| Quality comes alive in '85: [Zodrow]. | U.S. | PA 240-722 | 01/08/1985 | 01/08/2080 | |

| | | | | |
|---|---|---|---|---|
| The State of the industry--Roadway versus the competition. | U.S. | PA 245-484 | 03/25/1985 | 03/25/2080 |
| Preventing back injuries. | U.S. | PA 260-350 | 05/06/1985 | 05/06/2080 |
| Roadway's position in the market. | U.S. | PA 255-282 | 06/17/1985 | 06/17/2080 |
| Eliminate checking errors. | U.S. | PA 257-009 | 07/15/1985 | 07/15/2080 |
| A Growing partnership. | U.S. | PA 263-288 | 08/13/1985 | 08/13/2080 |
| The Roadway road driver's manual. | U.S. | TX 1-882-230 | 08/08/1986 | 08/08/2081 |
| The Roadway dockworker's manual. | U.S. | TX 1-882-231 | 08/08/1986 | 08/08/2081 |
| KIP System handbook: Keys to Injury Prevention on the dock. | U.S. | TX 5-030-985 | 05/28/1999 | 05/28/2094 |
| ISO 9002 certification : sales and marketing plan. | U.S. | TX 5-437-064 | 09/10/2001 | 09/10/2096 |
| Commercial Vehicle Safe Training Guidebook | U.S. | TX 5-589-226 | 05/14/2002 | 05/14/2097 |
| Spotlight. | U.S. | TX 959-667 | 08/04/1982 | 08/04/2077 |
| Spotlight. | U.S. | TX 914-896 | 06/01/1982 | 06/01/2077 |
| Spotlight. | U.S. | TX 914-897 | 06/01/1982 | 06/01/2077 |
| Spotlight. | U.S. | TX 914-898 | 06/01/1982 | 06/01/2077 |
| Spotlight. | U.S. | TX 914-899 | 06/01/1982 | 06/01/2077 |
| Spotlight. | U.S. | TX 914-900 | 06/01/1982 | 06/01/2077 |
| Spotlight. | U.S. | TX 914-902 | 06/01/1982 | 06/01/2077 |
| Spotlight. | U.S. | TX 914-901 | 06/01/1982 | 06/01/2077 |
| Spotlight. | U.S. | TX 914-903 | 06/01/1982 | 06/01/2077 |
| Spotlight. | U.S. | TX 767-577 | 09/17/1981 | 09/17/2076 |
| Spotlight. | U.S. | TX 767-576 | 09/17/1981 | 09/17/2076 |
| Spotlight. | U.S. | TX 767-579 | 09/17/1981 | 09/17/2076 |
| Spotlight. | U.S. | TX 767-580 | 09/17/1981 | 09/17/2076 |
| Spotlight. | U.S. | TX 767-581 | 09/17/1981 | 09/17/2076 |
| Spotlight. | U.S. | TX 767-582 | 09/17/1981 | 09/17/2076 |
| Spotlight. | U.S. | TX 767-583 | 09/17/1981 | 09/17/2076 |
| Spotlight. | U.S. | TX 767-578 | 09/17/1981 | 09/17/2076 |
| Spotlight. | U.S. | TX 615-041 | 01/19/1981 | 01/19/2076 |
| Spotlight. | U.S. | TX 615-042 | 01/19/1981 | 01/19/2076 |
| Spotlight. | U.S. | TX 615-043 | 01/19/1981 | 01/19/2076 |
| Spotlight. | U.S. | TX 615-044 | 01/19/1981 | 01/19/2076 |
| Spotlight. | U.S. | TX 615-045 | 01/19/1981 | 01/19/2076 |
| Spotlight. | U.S. | TX 615-046 | 01/19/1981 | 01/19/2076 |
| Spotlight. | U.S. | TX 615-047 | 01/19/1981 | 01/19/2076 |
| Spotlight. | U.S. | TX 615-048 | 01/19/1981 | 01/19/2076 |
| Spotlight. | U.S. | TX 615-040 | 01/19/1981 | 01/19/2076 |
| Spotlight. | U.S. | TX 508-126 | 01/23/1980 | 01/23/2075 |
| Spotlight. | U.S. | TX 508-125 | 01/23/1980 | 01/23/2075 |
| Spotlight. | U.S. | TX 508-124 | 01/23/1980 | 01/23/2075 |
| Spotlight. | U.S. | TX 508-123 | 01/23/1980 | 01/23/2075 |
| Spotlight. | U.S. | TX 508-122 | 01/23/1980 | 01/23/2075 |
| Spotlight. | U.S. | TX 508-121 | 01/23/1980 | 01/23/2075 |
| Spotlight. | U.S. | TX 508-119 | 01/23/1980 | 01/23/2075 |
| Spotlight. | U.S. | TX 508-120 | 01/23/1980 | 01/23/2075 |
| Spotlight. | U.S. | TX 508-118 | 01/23/1980 | 01/23/2075 |
| Spotlight. | U.S. | TX 508-117 | 01/23/1980 | 01/23/2075 |
| Spotlight. | U.S. | TX 513-196 | 04/21/1980 | 04/21/2075 |
| Spotlight. | U.S. | TX 513-195 | 04/21/1980 | 04/21/2075 |
| Spotlight. | U.S. | TX 513-194 | 04/21/1980 | 04/21/2075 |
| Spotlight. | U.S. | TX 182-803 | 07/20/1978 | 07/20/2073 |
| Spotlight. | U.S. | TX 180-643 | 01/22/1979 | 01/22/2074 |
| Spotlight. | U.S. | TX 180-649 | 01/22/1979 | 01/22/2074 |
| Spotlight. | U.S. | TX 180-648 | 01/22/1979 | 01/22/2074 |
| Spotlight. | U.S. | TX 180-647 | 01/22/1979 | 01/22/2074 |
| Spotlight. | U.S. | TX 180-646 | 01/22/1979 | 01/22/2074 |
| Spotlight. | U.S. | TX 180-645 | 01/22/1979 | 01/22/2074 |

| | Country | Registration No. | Registration Date | Expiration Date | |
|---|---|---|---|---|---|
| Spotlight. | U.S. | TX 180-644 | 01/22/1979 | 01/22/2074 | |
| Spotlight. | U.S. | TX 212-580 | 03/21/1979 | 03/21/2074 | |
| Spotlight. | U.S. | TX 212-581 | 03/21/1979 | 03/21/2074 | |
| Spotlight. | U.S. | TX 212-579 | 03/21/1979 | 03/21/2074 | |
| Spotlight. | U.S. | TX6301 | 03/02/1978 | 03/02/2073 | |
| Spotlight. | U.S. | TX 27-229 | 04/20/1978 | 04/20/2073 | |
| Spotlight. | U.S. | TX 47-189 | 05/30/1978 | 05/30/2073 | |
| Customer driven sales: yellow open lock. | U.S. | TX 6-074-751 | 10/22/2004 | 10/22/2099 | |
| Open lock selling skills. | U.S. | TX 6-074-737 | 10/22/2004 | 10/22/2099 | |
| General provisions regarding yellow tariff 500 | U.S. | TX 1-284-414 | 10/11/1983 | 10/11/2078 | |
| Zone index pricing (yellow tariff 500) | U.S. | TX 1-284-415 | 10/11/1983 | 10/11/2078 | |
| Zone index pricing. | U.S. | TX 1-284-416 | 02/15/1984 | 02/15/2079 | |
| Yellow central collection accounts. | U.S. | TX 1-305-383 | 02/07/1984 | 02/07/2079 | |
| Zone index pricing: text of computer program. | U.S. | TX 1-534-191 | 03/05/1985 | 03/05/2080 | |
| Zone index pricing: IBM personal computer application, version 2.0. | U.S. | TX 1-568-275 | 03/5/1985 | 03/05/2080 | |
| Shipment information retrieval system/SIRSINST. | U.S. | TX 1-833-674 | 06/19/1986 | 06/19/2081 | |
| Shipment information retrieval system/reindex. | U.S. | TX 1-835-066 | 06/20/1986 | 06/20/2081 | |
| Autocode of city routes. | U.S. | TX 1-836-145 | 06/20/1986 | 06/20/2081 | |
| Shipment information retrieval system/SIRSMENU. | U.S. | TX 1-836-161 | 06/20/1986 | 06/20/2081 | |
| Zip disk: U.S./Canadian instruction manual. | U.S. | TX 2-105-688 | 06/24/1987 | 06/24/2082 | |
| International three character postal code rate basis/distance tariff. | U.S. | TX 2-172-914 | 06/22/1987 | 06/22/2082 | |
| PC resource. | U.S. | TX 3-507-845 | 03/15/1993 | 03/15/2088 | |
| International class rates; class tariff, international, tariff 510. | U.S. | TX 2-098-502 | 06/18/1987 | 06/18/2082 | |
| National three digit zip zone rate basis; distance tariff, tariff 125. | U.S. | TX 2-098-503 | 06/18/1987 | 06/18/2082 | |
| Yellow freight system pro-rate factors. | U.S. | TX 326-161 | 1979 | 2074 | |

| LOAN PARTY = YRC REGIONAL TRANSPORTATION, INC. (F/K/A USFREIGHTWAYS CORPORATION) | | | | |
|---|---|---|---|---|
| **Title** | **Country** | **Registration No.** | **Registration Date** | **Expiration Date** |
| USFreightways. | U.S. | TX 5-817-696 | 02/10/2003 | 02/10/2098 |
| USFreightways corporation 1st quarter earnings conference call: date of transcription, April 23, 2002 | U.S. | TX 5-701-131 | 02/20/2003 | 02/20/2098 |
| USFreightways corporation 2nd quarter earnings conference call: 07/19/2002 | U.S. | TX 5-702-324 | 02/06/2003 | 02/06/2098 |
| USFreightways corporation 3rd quarter earnings conference call | U.S. | TX 5-664-311 | 01/21/2003 | 01/21/2098 |
| 3rd quarter earnings conference call | U.S. | TX 5-672-526 | 03/10/2003 | 03/10/2098 |

## Schedule 1.1(d)
## Excluded Real Property

| JPM Site No. | Location | Street Address | City | State | Zip Code | Company | Approx. Gross Book Value (Feb. 2009) | Approx Gross Book Value (Dec. 31, 2013) | Number |
|---|---|---|---|---|---|---|---|---|---|
| 400 | Dothan, AL | 686 Murray Road | Dothan | AL | 36303 | YRC Inc. | $627,267 | $627,416 | 1 |
| 401 | Huntsville, AL | 1901 Highway 20 West | Decatur | AL | 35601 | YRC Inc. | $544,545 | $543,999 | 2 |
| 402 | Mobile, AL | 1111 Virginia St | Mobile | AL | 36604 | YRC Inc. | $406,210 | $406,210 | 3 |
| 403 | Montgomery, AL | 5680 Old Hayneville Rd | Montgomery | AL | 36108 | YRC Inc. | $549,344 | $581,083 | 4 |
| 410 | Springdale, AR | 1543 Ford Avenue | Springdale | AR | 72764 | YRC Inc. | $249,443 | $253,787 | 5 |
| 413 | Lake Havasu City, AZ | 1951 San Juan Dr | Lake Havasu City | AZ | 86403 | USF Reddaway | $260,066 | $260,066 | 6 |
| 414 | Flagstaff, AZ | 1814 N Main | Flagstaff | AZ | 86004 | YRC Inc. | $138,666 | $198,903 | 7 |
| 416 | Grand Junction, CO | 3207 "F" Road | Clifton | CO | 81520 | YRC Inc. | $68,152 | $801,895 | 8 |
| 420 | LaGrange, GA | 677 Hudson Road | LaGrange | GA | 30240 | YRC Inc. | $332,400 | $332,400 | 9 |
| 422 | Macon, GA | 4241 Interstate Dr | Macon | GA | 31210 | YRC Inc. | $275,909 | $275,723 | 10 |

| 423 | Savannah, GA | 3501 Edwin Avenue | Savannah | GA | 31405 | YRC Inc. | $263,437 | $272,386 | 11 |
|---|---|---|---|---|---|---|---|---|---|
| 427 | Dubuque, IA | 18806 Kapp Drive | Peosta | IA | 52068 | YRC Inc. | $371,400 | $371,507 | 12 |
| 432 | Sioux City, IA | 2425 Bridgeport Dr | Sioux City | IA | 51111 | YRC Inc. | $250,687 | $249,898 | 13 |
| 433 | Mason City, IA | 1514 S Pierce | Mason City | IA | 50401 | YRC Inc. | $158,366 | $163,737 | 14 |
| 434 | Quincy, IL | 2620 N 36th St | Quincy | IL | 62301 | YRC Inc. | $176,258 | $177,297 | 15 |
| 442 | Monroe, LA | 158 Parker Rd | Monroe | LA | 71202 | YRC Inc. | $220,696 | $220,206 | 16 |
| 443 | Alexandria, LA | 333 N 3rd St | Alexandria | LA | 71301 | YRC Inc. | $89,903 | $89,803 | 17 |
| 446 | Saginaw, MI | 3770 Hess Street | Saginaw | MI | 48601 | YRC Inc. | $630,000 | $630,221 | 18 |
| 450 | Worthington, MN | 172 Industrial Parkway | Jackson | MN | 56143 | USF Holland | $568,141 | $568,141 | 19 |
| 452 | Duluth, MN | 4425 W First St | Duluth | MN | 55807 | YRC Inc. | $284,653 | $286,663 | 20 |
| 456 | Tupelo, MS | 2226 McCullough Blvd. | Tupelo | MS | 38801 | YRC Inc. | $370,000 | $370,046 | 21 |
| 458 | Hattiesburg, MS | 96 Wesley Grant Road | Hattiesburg | MS | 39401 | YRC Inc. | $604,086 | $604,141 | 22 |
| 459 | Greenville, MS | 152 Seven Oaks Road | Leland | MS | 38756 | YRC Inc. | $630,000 | $630,000 | 23 |
| 460 | Kalispell, MT | 3340 Hwy 2 East | Kalispell | MT | 59901 | USF Reddaway | $687,452 | $687,452 | 24 |
| 463 | Fayetteville, NC | 1061 River Rd | Fayetteville | NC | 28301 | YRC Inc. | $51,399 | $51,590 | 25 |
| 466 | Jacksonville, NC | 161 Center Street | Jacksonville | NC | 28546 | YRC Inc. | $260,000 | $260,045 | 26 |
| 468 | Wilmington, NC | 3511 Hwy 421 N | Wilmington | NC | 28401 | YRC Inc. | $295,557 | $294,552 | 27 |
| 469 | Fargo, ND | 2502 7th Ave N | Fargo | ND | 58102 | YRC Inc. | $461,871 | $460,506 | 28 |
| 470 | Kearney, NE | 614 Third Ave | Kearney | NE | 68845 | YRC Inc. | $262,151 | $263,246 | 29 |
| 473 | Atlantic City, NJ | 1641 Eden Road | Millville | NJ | 8332 | YRC Inc. | $560,000 | $560,000 | 30 |
| 475 | Youngstown, OH | 3020 Gale Ave | Hubbard | OH | 44425 | YRC Inc. | $790,000 | $790,056 | 31 |
| 476 | Lima, OH | 1505 Bowman Road | Lima | OH | 45804 | YRC Inc. | $539,348 | $539,478 | 32 |
| 477 | Parkersburg, WV | 300 Drag Strip Road | Belpre | OH | 45714 | YRC Inc. | $760,538 | $759,000 | 33 |
| 483 | Erie, PA | 3111 McCain Ave | Erie | PA | 16510 | YRC Inc. | $581,941 | $605,012 | 34 |
| 488 | Florence, SC | 2257 S Main St | Florence | SC | 29501 | YRC Inc. | $301,427 | $304,273 | 35 |
| 492 | Waco, TX | 3230 Clay Ave | Waco | TX | 76711 | YRC Inc. | $297,325 | $297,062 | 36 |
| 496 | Sherman, TX | 211 Dorset | Sherman | TX | 75092 | YRC Inc. | $235,107 | $232,136 | 37 |
| 499 | Wichita Falls, TX | 4020 Reilly Rd | Wichita Falls | TX | 76305 | YRC Inc. | $395,451 | $395,321 | 38 |
| 515 | Madison, WI | 2573 Progress Rd | Madison | WI | 53716 | YRC Inc. | $1,139,281 | $1,188,825 | 39 |
| 517 | Eau Claire, WI | 3617 McIntyre Ave | Eau Claire | WI | 54703 | YRC Inc. | $360,060 | $362,103 | 40 |
| 522 | Clarksburg, WV | Route #2 Box 142A | Bridgeport | WV | 26330 | YRC Inc. | $288,153 | $288,153 | 41 |
| 523 | Mexico City, MX | Col. Nuevo Industrial | Mexico City | MX | | Transcontinental Lease, S. de R.L. de C.V. | $1,962,807 | $1,871,429 | 42 |
| 524 | Puebla, MX | Carretera Federal Puebla- | | MX | | Transcontinental Lease, S. de R.L. de C.V. | $268,766 | $168,259 | 43 |
| 601 | Sacramento, CA | 3210 52nd Ave | Sacramento | CA | 95823 | YRC Inc. | $2,378,667 | $2,393,976 | 44 |
| 602 | San Jose, CA | 750 Capitol Ave. | Milipitas | CA | 95035 | YRC Inc. | $3,900,060 | $3,901,502 | 45 |
| 604 | Stockton, CA | 3233 Loomis Road | Stockton | CA | 95205 | YRC Inc. | $1,185,615 | $1,185,615 | 46 |
| 606 | Sacramento, CA | 620 Harbor Blvd | W Sacramento | CA | 95691 | USF Reddaway | $939,902 | $968,914 | 47 |
| 615 | Lafayette, IN | 3221 Imperial Parkway | LaFayette | IN | 47905 | YRC Inc. | $470,000 | $470,762 | 48 |
| 622 | South Kearny, NJ | 19 Hackensack Avenue | South Kearny | NJ | 7032 | New Penn | $658,190 | $703,941 | 49 |
| 628 | Providence, RI | 2110 Plainfield Pike | Cranston | RI | 02910-2038 | New Penn | $1,943,397 | $2,032,223 | 50 |
| 630 | White Pine, TN (R30) | 2730 Valley Home Road | White Pine | TN | 37890 | YRC Inc. | $613,356 | $613,356 | 51 |
| 631 | Burlington, VT | 123 Orion Dr | Colchester | VT | 5446 | YRC Inc. | $469,175 | $469,175 | 52 |
| 640 | Fall River/New Bedford, MA | 30 Borden Street | Westport | MA | 2790 | YRC Inc. | $490,000 | $490,000 | 53 |

**Schedule 1.1(e)**
**Existing Letters of Credit**

| Issuing Bank | LOC # | Beneficiary | Letter of Credit Total |
|---|---|---|---|
| Bank of America, N.A. | 64143132 | Protective Insurance Company | $6,245,473.00 |
| Bank of America, N.A. | 64143741 | Safety National Casualty Corp. | $8,500,000.00 |
| Bank of America, N.A. | 64144452 | Travelers Casualty and Surety Co. of America | $1,586,500.00 |
| Bank of America, N.A. | 64145088 | AI Transport, a Division of the Insurance Company of the State of Pennsylvania | $3,385,262.00 |
| Bank of America, N.A. | 64145089 | Insurance Company of North America | $1,000,000.00 |
| Bank of America, N.A. | 64146146 | Old Republic Insurance Company of Canada | $1,931,160.00 |
| Bank of America, N.A. | 68001404 | Michael Bertone, ESQ | $250,000.00 |
| Bank of America, N.A. | 68001413 | North Central Electric Power Association | $11,000.00 |
| Bank of America, N.A. | 68001416 | Old Republic Insurance Company | $104,773,257.00 |
| Bank of America, N.A. | 68001422 | Liberty Mutual Insurance Co. | $25,676,488.00 |
| Bank of America, N.A. | 68001434 | Matrix Hamilton Land Development | $295,387.50 |
| Bank of America, N.A. | 68001440 | RKA Petroleum Companies, Inc. | $1,250,000.00 |
| Bank of America, N.A. | 68006224 | United States Fidelity and Guaranty Company | $600,000.00 |
| Bank of America, N.A. | 68067360 | Argonaut Insurance Co. | $2,907,000.00 |
| Bank of America, N.A. | 68067361 | Mansfield Oil Company of Gainesville | $1,750,000.00 |
| Bank of America, N.A. | 68067362 | Atlantic Specialty Insurance Company | $11,339,906.00 |
| Bank of America, N.A. | 68067359A | Westchester Fire Insurance Company | $25,074,812.12 |

**Schedule 1.1(f)**
**Licenses**

None.

**Schedule 1.1(g)**
**Patents**

LOAN PARTY = YRC WORLDWIDE INC.

| Title | Country | Application No. | Registration No. | Status – Appl. Pending/Registered | Expiration Date |
|---|---|---|---|---|---|
| CONTAINER FOR SECURE TRANSPORT OF CARGO | U.S. | 10/677,998 | 6981828 B2 | Registered | 10/02/2023 |
| REVERSE LOGISTICS PROCESS | U.S. | 10/878,808 | 7,596,516 | Registered | 06/28/2024 |
| CONTAINER FOR SECURE TRANSPORT OF CARGO | Canada | 2483353 | 2483353 | Registered | 09/30/2024 |
| CONTAINER FOR SECURE TRANSPORT OF CARGO | Mexico | PA/a/2004/009623 | 256441 | Registered | 10/01/2024 |
| REVERSE LOGISTICS PROCESS | Canada | 2472706 | | Application Pending | |
| SYSTEMS AND METHODS FOR PREDICTIVE BILL ENTRY | U.S. | 12/171964 | | Application Pending | |

## Schedule 1.1(h)
## Pension Fund Entities

- Central States, Southeast and Southwest Areas Pension Fund
- Western Conference of Teamsters Pension Trust
- I.B. of T. Union Local No. 710 Pension Fund
- Central Pennsylvania Teamsters Pension Fund
- Road Carriers Local 707 Pension Fund
- Teamsters Local 641 Pension Fund
- Teamsters Pension Trust Fund of Philadelphia and Vicinity
- Western Conference of Teamsters Supplemental Benefit Trust Fund
- Suburban Teamsters of No. IL. Pension Fund
- Freight Drivers and Helpers Local 557 Pension Fund
- Teamsters JC 83 Pension Fund
- Hagerstown Motor Carriers and Teamsters Pension Plan
- Trucking Employees of North Jersey Welfare Fund Inc. - Pension Fund
- Mid-Jersey Trucking Ind. & Teamsters Local 701 Pension Fund
- Management Labor Welfare & Pension Funds Local 1730, I.L.A.
- Employer-Teamsters Local Nos. 175/505 Pension Trust Fund
- International Association of Machinists Motor City Pension Fund
- Hawaii Truckers-Teamsters Union Pension Fund
- Southwestern Pennsylvania and Western Maryland Teamsters & Employers Pension Fund
- Teamsters Local 617 Pension Fund
- New England Teamsters & Trucking Industry Pension Fund
- New York State Teamsters Conference Pension and Retirement Fund
- Local 705 International Brotherhood of Teamsters Pension Fund
- Western Pennsylvania Teamsters and Employers Pension Fund
- Teamsters Local 639 Employer's Pension Trust
- Teamsters Local 445 Pension Fund

## Schedule 1.1(i)
## Trademarks

| GRANTOR = YRC INC. (FORMERLY KNOWN AS ROADWAY EXPRESS, INC.) | | | | | |
|---|---|---|---|---|---|
| Mark | Country | Application No. | Registration No. | Status – Appl. Pending/Registered | Expiration Date |
| R ROADWAY & Design | Mexico | 239170 | 312947 | Registered | 9/26/2014 |
| R ROADWAY & Design | New Zealand | 229101 | 229101 | Registered | 2/14/2016 |
| R ROADWAY & Design | Puerto Rico | 42,190 | 42,190 | Registered | 01/13/2018 |
| ROADWAY | Mexico | UNKNOWN | 306610 | Registered | 09/26/2014 |
| ROADWAY | Puerto Rico | 7,254 | 7,254 | Registered | 10/10/2016 |

| ROADWAY EXPRESS | Puerto Rico | 39,059 | 39,059 | Registered | 10/10/2016 |
|---|---|---|---|---|---|

| **GRANTOR = USF BESTWAY INC.** | | | | | |
|---|---|---|---|---|---|
| **Mark** | **Country** | **Application No.** | **Registration No.** | **Status – Appl. Pending/Registered** | **Expiration Date** |
| USF | Hong Kong | 14226/1999 | B15392/2000 | Registered | 10/11/2016 |
| USF | Hong Kong | 9972/1999 | B15381/2000 | Registered | 07/29/2016 |
| USF & Design | Hong Kong | 14227/1999 | B15393/2000 | Registered | 10/11/2016 |
| USF & Design | Hong Kong | 9973/1999 | B15382/2000 | Registered | 07/29/2016 |

| **GRANTOR = USF CORPORATION (n/k/a YRC Regional Transportation, Inc.)** | | | | | |
|---|---|---|---|---|---|
| **Mark** | **Country** | **Application No.** | **Registration No.** | **Status – Appl. Pending/Registered** | **Expiration Date** |
| RED STAR EXPRESS (Stylized) | U.S | 73/770,118 | 1,581,923 | Registered | 02/06/2010 |
| U.S. FREIGHTWAYS | Canada | 807799 | TMA501,615 | Registered | 09/30/2028 |
| USF | Canada | 807801 | TMA515,982 | Registered | 08/31/2014 |
| USF | European Community | 782045 | 782045 | Registered | 03/26/2018 |
| USF & Design | Canada | 807800 | TMA495,691 | Registered | 06/08/2028 |
| USF & Design | European Community | 782094 | 782094 | Registered | 03/26/2018 |
| USF EXPEDITED | Canada | 1127992 | TMA630,054 | Registered | 01/12/2015 |
| USF GUARANTEED | Canada | 1128007 | TMA629,892 | Registered | 1/11/2015 |
| USF PREMIER | Canada | 1128537 | TMA635,986 | Registered | 03/23/2015 |
| USF PREMIERPLUS | Canada | 1128538 | TMA630,051 | Registered | 01/12/2015 |
| USFREIGHTWAYS | Canada | 808741 | TMA516,951 | Registered | 09/23/2014 |
| USFREIGHTWAYS (Stylized) | Canada | 810118 | TMA500,330 | Registered | 09/10/2028 |
| USFREIGHTWAYS & Design (Wave Design) | Canada | 810117 | TMA513,904 | Registered | 08/04/2014 |

| **GRANTOR = USF HOLLAND INC.** | | | | | |
|---|---|---|---|---|---|
| **Mark** | **Country** | **Application No.** | **Registration No.** | **Status – Appl. Pending/Registered** | **Expiration Date** |
| A GREAT WAY TO GO | U.S. | 73/360,302 | 1,226,218 | Registered | 02/01/2013 |

| **GRANTOR = YRC WORLDWIDE INC.** | | | | | |
|---|---|---|---|---|---|
| **Mark** | **Country** | **Application No.** | **Registration No.** | **Status – Appl. Pending/Registered** | **Expiration Date** |
| ANY NEED. ANY SPEED. GUARANTEED. | Canada | 1545212 | TMA837,599 | Registered | 12/04/2027 |
| ANY NEED. ANY SPEED. GUARANTEED. | Mexico | 1216266 | 1340501 | Registered | 09/30/2021 |
| ANY NEED. ANY SPEED. GUARANTEED. | Mexico | 1216270 | 1341389 | Registered | 09/30/2021 |
| ANY NEED. ANY SPEED. GUARANTEED. | U.S. | 85/315,834 | 4,073,936 | Registered | 12/20/2021 |
| "Around the World Group Company Ltd." In Mandarin (YRC Worldwide Inc.'s Chinese Name) | Hong Kong | 300592506 | 300592506 | Registered | 03/02/2016 |
| "Around the World Group" in Mandarin (YRC Worldwide's Chinese Name) | Taiwan | 95013410 | 1267782 | Registered | 06/15/2017 |
| 2-DAY USA | U.S. | 74/726,752 | 2,014,616 | Registered | 11/05/2016 |
| BE CONFIDENT. IT'S A YRC DELIVERY. | Canada | 1445718 | TMA785,033 | Registered | 12/15/2025 |
| BE CONFIDENT. IT'S A YRC DELIVERY. | Mexico | 1021878 | 1170844 | Registered | 07/23/2019 |
| BE CONFIDENT. IT'S A YRC DELIVERY. | Mexico | 1021881 | 1131031 | Registered | 07/23/2019 |
| BE CONFIDENT. IT'S A YRC DELIVERY. | U.S. | 77/655,694 | 3,775,974 | Registered | 04/13/2020 |
| CONFIDENCE DELIVERED. | Mexico | 1030012 | 1181672 | Registered | 08/27/2019 |
| CONFIDENCE DELIVERED. | U.S. | 77/680,626 | 3,765,099 | Registered | 03/23/2020 |
| CREATING POSSIBILITIES | Canada | 1321043 | TMA705,985 | Registered | 01/29/2023 |
| CREATING POSSIBILITIES | Mexico | 809966 | 971073 | Registered | 09/29/2016 |
| DEFINITE DELIVERY | Canada | 1321479 | TMA700,726 | Registered | 11/13/2022 |
| EXACT | U.S. | 75/585,614 | 2,359,522 | Registered | 06/20/2020 |
| EXACT EXPRESS | Canada | 1325080 | TMA718,033 | Registered | 07/08/2023 |
| EXACT EXPRESS | European Community | 5833728 | 5833728 | Registered | 04/16/2017 |
| EXACT EXPRESS | Mexico | 848872 | 1000875 | Registered | 04/17/2017 |
| EXACT EXPRESS | U.S. | 75/513,434 | 2,230,978 | Registered | 03/19/2019 |
| EXACT EXPRESS | U.S. | 77/022,884 | 3,278,704 | Registered | 08/14/2017 |

| | | | | | |
|---|---|---|---|---|---|
| EXACT EXPRESS EXPEDITED AIR & GROUND DELIVERY and Design | U.S. | 75/800,721 | 2,375,251 | Registered | 08/08/2020 |
| EXPEDITED PRECISION | Canada | 1453897 | TMA780,394 | Registered | 10/22/2025 |
| EXPEDITED PRECISION | U.S. | 77/708,039 | 3,760,194 | Registered | 03/16/2020 |
| EXPRESS LANE SERVICES | U.S. | 76/615,074 | 3,273,174 | Registered | 08/07/2017 |
| EXPRESSWORKS | U.S. | 74/703,902 | 2,037,882 | Registered | 02/11/2017 |
| E-Z EXPORT | U.S. | 74/145,006 | 1,671,364 | Registered | 01/07/2022 |
| FAST-AS-FLITE | Canada | 483535 | TMA275948 | Registered | 01/21/2028 |
| GENUINE HEAVYWEIGHT EXPERTS | U.S. | 77/770,478 | 3,805,032 | Registered | 06/15/2020 |
| GLOBAL QBT | U.S. | 77/065,043 | 3,305,695 | Registered | 10/09/2017 |
| GUARANTEED PRECISION | Canada | 1453898 | TMA780,739 | Registered | 10/26/2025 |
| GUARANTEED PRECISION | U.S. | 77/708,034 | 3,760,193 | Registered | 03/16/2020 |
| GUARANTEED WINDOW | U.S. | 77/564,415 | 3,888,216 | Registered | 12/07/2020 |
| HOLLAND | U.S. | 77/728,792 | 3,801,991 | Registered | 06/15/2020 |
| MERGE-IN-TRANSIT | U.S. | 74/513,843 | 1,895,361 | Registered | 05/23/2015 |
| MY ROADWAY | Canada | 1,321,030 | TMA696,915 | Registered | 0920/2022 |
| MY ROADWAY | Mexico | 809964 | 1012665 | Registered | 09/29/2016 |
| NEW PENN & Design | U.S. | 74/160,265 | 1,712,273 | Registered | 09/01/2022 |
| PREVIEW | U.S. | 74/332,721 | 1,829,003 | Registered | 03/29/2014 |
| QUIKTRAK | U.S. | 73/386,468 | 1,288,108 | Registered | 07/31/2014 |
| R & Design | Canada | 491,500 | TMA283,088 | Registered | 09/09/2028 |
| R ROADWAY & Design | Canada | 689,722 | TMA419,149 | Registered | 11/05/2023 |
| R ROADWAY & Design | U.S. | 73/097,035 | 1,068,287 | Registered | 06/21/2017 |
| REDDAWAY | U.S. | 77/728,774 | 3,801,990 | Registered | 06/15/2020 |
| REGIONAL OUTFITTERS | U.S. | 77/065,059 | 3,279,235 | Registered | 08/14/2017 |
| REIMER | Canada | 1443006 | | Application Pending | |
| REIMER | U.S. | 77/682,160 | 3,766,225 | Registered | 03/30/2020 |
| REIMER EXPRESS LINES LTD. | Canada | 1306265 | TMA725,159 | Registered | 10/02/2023 |
| REIMER EXPRESS LINES LTD. | U.S. | 76/560,709 | 2,961,833 | Registered | 06/14/2014 |
| REIMER EXPRESS LINES LTD. ROADWAY EXPRESS & Design | Canada | 1194843 | TMA730,354 | Registered | 12/08/2023 |
| RELAY | U.S. | 73/642,383 | 1,458,659 | Registered | 09/22/2007 |
| RELAY (Stylized) | U.S. | 73/642,381 | 1,474,437 | Registered | 01/26/2008 |
| RESIDENTIAL CONNECT | Canada | 1,360,955 | TMA724,085 | Registered | 09/19/2023 |
| RESIDENTIAL CONNECT | Mexico | 877860 | 1009544 | Registered | 08/27/2017 |
| RESIDENTIAL CONNECT | U.S. | 77/121,992 | 3,323,647 | Registered | 10/30/2017 |
| ROADWAY | Canada | 491,502 | TMA354,213 | Registered | 3/31/2019 |
| ROADWAY | China | 5264419 | 5264419 | Registered | 08/20/2019 |
| ROADWAY | China | 5264418 | 5264418 | Registered | 08/20/2019 |
| ROADWAY | Singapore | T06/06549D | T06/06549D | Registered | 04/06/2016 |
| ROADWAY | Singapore | T06/06552D | T06/06552D | Registered | 04/06/2016 |
| ROADWAY | Taiwan | 95016084 | 1259891 | Registered | 04/15/2017 |
| ROADWAY | U.S. | 73/059,298 | 1,050,952 | Registered | 10/19/2016 |
| ROADWAY EXPRESS | Canada | 491,501 | TMA354,212 | Registered | 3/31/2019 |
| ROADWAY EXPRESS | U.S. | 75/099,548 | 2,115,325 | Registered | 11/25/2017 |
| ROADWAY TIME-ADVANTAGE | U.S. | 77/352,942 | 3,593,844 | Registered | 03/24/2019 |
| ROADWAY TIME-CRITICAL | Mexico | 865686 | 1156767 | Registered | 07/03/2017 |
| ROADWAY TIME-CRITICAL | Mexico | 865685 | 1083039 | Registered | 07/03/2017 |
| ROADWAY TIME-CRITICAL | U.S. | 77/079,193 | 3,274,110 | Registered | 08/07/2017 |
| SEALED EXHIBIT | Canada | 1321850 | TMA696,747 | Registered | 09/18/2022 |
| SEALED EXHIBIT | Mexico | 815679 | 1275513 | Registered | 10/27/2016 |
| SEALED EXHIBIT | U.S. | 78/877,811 | 3,198,956 | Registered | 01/16/2017 |
| SHIFT TO HIGHER PERFORMANCE | Canada | 1321029 | 698,631 | Registered | 10/16/2022 |
| SPECIALIZED SOLUTIONS | U.S. | 77/347,139 | 3,593,359 | Registered | 03/17/2019 |
| SWAMP HOLLY | Canada | 1358900 | TMA718,242 | Registered | 07/09/2023 |
| SWAMP HOLLY | China | 6220566 | 6220566 | Registered | 09/20/2020 |
| SWAMP HOLLY | Mexico | 873654 | 1020991 | Registered | 08/07/2017 |
| SWAMP HOLLY | U.S. | 77/108,361 | 3,316,864 | Registered | 10/23/2017 |
| TRANSPORTE A SU MANERA | Mexico | 41779 | 58485 | Registered | 06/29/2017 |
| TRANSPORTE A SU MANERA | Mexico | 41780 | 43510 | Registered | 06/29/2017 |
| USF | Mexico | 327379 | 578430 | Registered | 03/26/2018 |
| USF | U.S. | 75/048,801 | 2,076,453 | Registered | 07/01/2017 |
| USF & Design | Mexico | 327,378 | 594802 | Registered | 03/26/2018 |

| | | | | | |
|---|---|---|---|---|---|
| USF & Design | U.S. | 75/048,800 | 2,076,452 | Registered | 07/01/2017 |
| USFREIGHTWAYS | Mexico | 327380 | 578431 | Registered | 03/26/2018 |
| USFREIGHTWAYS | U.S. | 75/054,518 | 2,154,111 | Registered | 04/28/2018 |
| USFREIGHTWAYS (Stylized) | U.S. | 75/054,822 | 2,154,112 | Registered | 04/28/2018 |
| YELLOW | China | 5264421 | 5264421 | Registered | 06/06/2020 |
| YELLOW | China | 5264420 | 5264420 | Registered | 01/27/2020 |
| YELLOW | Hong Kong | 10891/95 | 10680/96 | Registered | 08/30/2016 |
| YELLOW | Mexico | 243256 | 243256 | Registered | 03/12/2014 |
| YELLOW | Singapore | 7594/95 | T95/07594F | Registered | 08/16/2015 |
| YELLOW | Taiwan | 84047409 | 87916 | Registered | 01/15/2017 |
| YELLOW | United Kingdom | 1,317,266A | 1,317,264 | Registered | 07/30/2018 |
| YELLOW | U.S. | 78/490,508 | 3,666,792 | Registered | 08/11/2019 |
| YELLOW | U.S. | 73/340,429 | 1,212,749 | Registered | 10/12/2022 |
| YELLOW & Design | Canada | 545,475 | TMA324,496 | Registered | 3/06/2017 |
| YELLOW & Design | Japan | 104205/95 | 4120400 | Registered | 03/06/2018 |
| YELLOW & Design | United Kingdom | 1,317,266A | 1,317,266 | Registered | 07/30/2018 |
| YELLOW & Design | U.S. | 77/382,468 | 3,575,015 | Registered | 02/17/2019 |
| YELLOW & Design | U.S. | 73/340,431 | 1,212,751 | Registered | 10/12/2022 |
| YELLOW & Design (in black border) | U.S. | 73/340,430 | 1,212,750 | Registered | 10/12/2022 |
| YELLOW CORPORATION | U.S. | 74/370,304 | 1,866,137 | Registered | 12/06/2014 |
| YELLOW RACING | Mexico | 830099 | 987173 | Registered | 01/16/2017 |
| YELLOW RACING & Design | Mexico | 840585 | 1049705 | Registered | 03/06/2017 |
| YELLOW RACING & Design | Mexico | 840583 | 994940 | Registered | 03/06/2017 |
| YELLOW RACING & Design | Mexico | 840581 | 994939 | Registered | 03/06/2017 |
| YELLOW RACING & Design | Mexico | 840584 | 994941 | Registered | 03/06/2017 |
| YELLOW RACING & Design | Mexico | 840586 | 994942 | Registered | 03/06/2017 |
| YELLOW ROADWAY | Canada | 1218708 | TMA687,059 | Registered | 05/04/2022 |
| YELLOW ROADWAY | European Community | 3860475 | 3860475 | Registered | 05/24/2014 |
| YELLOW ROADWAY | Mexico | 657658 | 884278 | Registered | 05/24/2014 |
| YELLOW ROADWAY | U.S. | 76/561,489 | 3,886,496 | Registered | 12/07/2020 |
| YELLOW ROADWAY CORP. | U.S. | 77/578,559 | 4,364,940 | Registered | 07/09/2023 |
| YELLOW ROADWAY CORPORATION & Design | China | 4913699 | 4913699 | Registered | 05/06/2019 |
| YELLOW TRANSPORTATION | Canada | 1218707 | TMA688,475 | Registered | 05/29/2022 |
| YELLOW TRANSPORTATION | European Community | 3860483 | 3860483 | Registered | 05/24/2014 |
| YELLOW TRANSPORTATION | Mexico | 657659 | 884279 | Registered | 05/24/2014 |
| YELLOW TRANSPORTATION | U.S. | 76/561,486 | 3,570,947 | Registered | 02/10/2019 |
| YELLOW VOLUME ADVANTAGE | Canada | 1402102 | TMA759,984 | Registered | 02/22/2025 |
| YELLOW VOLUME ADVANTAGE | China | 6822543 | 6822543 | Registered | 09/20/2020 |
| YELLOW VOLUME ADVANTAGE | Mexico | 945763 | 1068824 | Registered | 07/07/2018 |
| YELLOW VOLUME ADVANTAGE | U.S. | 77/365,873 | 3,653,148 | Registered | 07/14/2019 |
| YR & Design (Flag) | China | 5686693 | 5686693 | Registered | 11/06/2019 |
| YR & Design (Flag) | China | 5686692 | 5686692 | Registered | 11/06/2019 |
| YR & Design (Flag) | Hong Kong | 300747405 | 300747405 | Registered | 10/24/2016 |
| YR & Design (Flag) | Thailand | 674896 | Bor42382 | Registered | 09/30/2017 |
| YR & Design (Flag) | Thailand | 674897 | Bor41172 | Registered | 09/30/2017 |
| YR & Design (Flag) | U.S. | 76/582,306 | 2,935,940 | Registered | 03/29/2015 |
| YRC | Argentina | 2,754,176 | 2231943 | Registered | 05/28/2018 |
| YRC | Argentina | 2,754,178 | 2231945 | Registered | 05/28/2018 |
| YRC | Australia | 1176437 | 1176437 | Registered | 05/16/2017 |
| YRC | Brazil | 829193782 | 829193782 | Registered | 12/22/2019 |
| YRC | Brazil | 829193766 | 829193766 | Registered | 08/02/2021 |
| YRC | Canada | 1348235 | TMA712,782 | Registered | 04/24/2023 |
| YRC | Chile | 774.101 | 805.325 | Registered | 01/10/2018 |
| YRC | China | 5111454 | 5111454 | Registered | 04/27/2019 |
| YRC | China | 5111455 | 5111455 | Registered | 04/27/2019 |
| YRC | Colombia | 07-050113 | 397178 | Registered | 03/08/2020 |
| YRC | Colombia | 07-050110 | 344036 | Registered | 01/16/2018 |
| YRC | Costa Rica | 2007-5701 | 175999 | Registered | 06/12/2018 |
| YRC | European Community | 5911491 | 5911491 | Registered | 05/16/2017 |
| YRC | Guatemala | M-4048-2007 | 158219 | Registered | 07/29/2018 |
| YRC | Guatemala | M-4049-2007 | 154053 | Registered | 02/04/2018 |
| YRC | Honduras | 16.750-2007 | 14.677 | Registered | 05/05/2019 |

| | | | | | |
|---|---|---|---|---|---|
| YRC | Honduras | 16.751-2007 | 13.157 | Registered | 02/28/2018 |
| YRC | Hong Kong | 300560934 | 300560934 | Registered | 01/05/2016 |
| YRC | India | 1559716 | | Application Pending | |
| YRC | Indonesia | J00-2007-020128 | IDM000187241 | Registered | 06/22/2017 |
| YRC | Indonesia | J00-2007-020129 | IDM000187242 | Registered | 06/22/2017 |
| YRC | Japan | 2007-48664 | 5287128 | Registered | 12/11/2019 |
| YRC | Malaysia | 7008801 | 7008801 | Registered | 5/16/2017 |
| YRC | Malaysia | 7008802 | 7008802 | Registered | 05/16/2017 |
| YRC | Mexico | 855399 | 1156491 | Registered | 05/18/2017 |
| YRC | Mexico | 855397 | 997753 | Registered | 05/18/2017 |
| YRC | New Zealand | 768478 | 768478 | Registered | 05/16/2017 |
| YRC | Nicaragua | 2007-01728 | 0800864 LM | Registered | 04/22/2018 |
| YRC | Norway | 200705668 | 244264 | Registered | 02/14/2018 |
| YRC | Panama | 161539 | 161539 | Registered | 05/17/2017 |
| YRC | Panama | 161540 | 161540 | Registered | 05/17/2017 |
| YRC | Peru | 315072 | 49766 | Registered | 03/07/2018 |
| YRC | Peru | 315073 | 48506 | Registered | 11/29/2017 |
| YRC | Republic of Korea | 2007-13560 | 169948 | Registered | 07/02/2018 |
| YRC | Singapore | T07/10577E | T0710577E | Registered | 05/16/2017 |
| YRC | Singapore | T07/10580E | T07/10580E | Registered | 05/16/2017 |
| YRC | Suriname | 20901 | 20901 | Registered | 10/10/2021 |
| YRC | Switzerland | 55404/2007 | 564686 | Registered | 05/21/2017 |
| YRC | Taiwan | 95001470 | 1262082 | Registered | 04/30/2017 |
| YRC | U.S. | 78/653,745 | 3,272,882 | Registered | 07/31/2017 |
| YRC | Venezuela | 12153-2007 | | Application Pending | |
| YRC | Venezuela | 12154-2007 | S042861 | Registered | 07/28/2024 |
| YRC | Vietnam | 4-2007-10951 | 127315 | Registered | 06/14/2017 |
| YRC & Design (Banner Logo) | Canada | 1445712 | TMA784,289 | Registered | 12/07/2025 |
| YRC & Design (Banner Logo) | Mexico | 1021874 | 1170843 | Registered | 07/23/2019 |
| YRC & Design (Banner Logo) | Mexico | 1021876 | 1133478 | Registered | 07/23/2019 |
| YRC & Design (Banner Logo) | U.S. | 77/655,672 | 3,775,973 | Registered | 04/13/2020 |
| YRC CONFIDENCE DELIVERED. & Design | Mexico | 1024832 | 1171479 | Registered | 08/05/2019 |
| YRC CONFIDENCE DELIVERED. & Design | Mexico | 1024833 | 1133511 | Registered | 08/05/2019 |
| YRC CONFIDENCE DELIVERED. & Design | U.S. | 77/665,523 | 3,773,115 | Registered | 04/06/2020 |
| YRC FREIGHT | Canada | 1,570,540 | TMA852,311 | Registered | 06/03/2028 |
| YRC FREIGHT | European Community | 10736973 | 10736973 | Registered | 03/19.2022 |
| YRC FREIGHT | Mexico | 1261023 | 1308340 | Registered | 03/26/2022 |
| YRC FREIGHT | Mexico | 1261024 | 1303655 | Registered | 03/26/2022 |
| YRC FREIGHT | U.S. | 85/567,937 | 4,190,840 | Registered | 08/14/2022 |
| YRC FREIGHT & Design (Black & White) | Canada | 1,570,539 | | Application Pending | |
| YRC FREIGHT & Design (Black & White) | European Community | 10971992 | 10971992 | Registered | 06/30/2022 |
| YRC FREIGHT & Design (Black & White) | Mexico | 1261029 | 1308343 | Registered | 03/26/2022 |
| YRC FREIGHT & Design (Black & White) | Mexico | 1261030 | 1303658 | Registered | 03/26/2022 |
| YRC FREIGHT & Design (Black & White) | U.S. | 85/508,410 | 4,259,092 | Registered | 12/11/2022 |
| YRC FREIGHT & Design (Orange) | Canada | 1,570,538 | | Application Pending | |
| YRC FREIGHT & Design (Orange) | Mexico | 1261027 | 1308342 | Registered | 03/26/2022 |
| YRC FREIGHT & Design (Orange) | Mexico | 1261028 | 1303657 | Registered | 03/26/2022 |
| YRC FREIGHT & Design (Orange) | U.S. | 85/508,429 | 4,369,431 | Registered | 07/16/2023 |
| YRC FREIGHT & Design (Blue) | Canada | 1,570,541 | TMA865,819 | Registered | 11/25/2028 |
| YRC FREIGHT & Design (Blue) | Mexico | 1261025 | 1308341 | Registered | 03/26/2022 |
| YRC FREIGHT & Design (Blue) | Mexico | 1261026 | 1303656 | Registered | 03/26/2022 |
| YRC FREIGHT & Design (Blue) | U.S. | 85/508,470 | 4,259,093 | Registered | 12/11/2022 |
| YRC GLEN MOORE | U.S. | 77/728,783 | 3,809,215 | Registered | 06/29/2020 |
| YRC LOGISTICS | U.S. | 78/745,566 | 3,341,439 | Registered | 11/20/2017 |
| YRC LOGISTICS in Chinese Characters | China | 6329154 | 6329154 | Registered | 06/27/2020 |

| | | | | | |
|---|---|---|---|---|---|
| YRC LOGISTICS in Chinese Characters | China | 6329153 | 6329153 | Registered | 06/27/2020 |
| YRC NORTH AMERICAN TRANSPORTATION | U.S. | 77/498,875 | 3,656,715 | Registered | 07/21/2019 |
| YRC REGIONAL TRANSPORTATION | Canada | 1354791 | TMA729,810 | Registered | 12/01/2023 |
| YRC REGIONAL TRANSPORTATION | Mexico | 867335 | 1160940 | Registered | 07/10/2017 |
| YRC REGIONAL TRANSPORTATION | Mexico | 867334 | 1036846 | Registered | 07/10/2017 |
| YRC REGIONAL TRANSPORTATION | U.S. | 77/100,428 | 3,395,557 | Registered | 03/11/2018 |
| YRC REIMER | Canada | 1432725 | | Application Pending | |
| YRC REIMER | U.S. | 77/680,597 | 3,776,056 | Registered | 04/13/2020 |
| YRC REIMER & Design | Canada | 1,564,688 | | Application Pending | |
| YRC REIMER & Design | Mexico | 1284673 | 1397648 | Registered | 06/20/2022 |
| YRC REIMER & Design | Mexico | 1284674 | 1397649 | Registered | 06/20/2022 |
| YRC REIMER & Design | U.S. | 85/544,719 | 4,198,525 | Registered | 08/28/2022 |
| YRC TIME-ADVANTAGE | Canada | 1428085 | TMA784,137 | Registered | 12/06/2025 |
| YRC TIME-ADVANTAGE | China | 7202131 | 7202131 | Registered | 11/20/2020 |
| YRC TIME-ADVANTAGE | Mexico | 989998 | 1099634 | Registered | 02/16/2019 |
| YRC TIME-ADVANTAGE | U.S. | 77/640,863 | 3,764,931 | Registered | 03/23/2020 |
| YRC TRANSPORTATION | U.S. | 77/500,305 | 3,569,587 | Registered | 02/03/2019 |
| YRC WORLDWIDE | Australia | A0004617 | 1158924 | Registered | 05/02/2016 |
| YRC WORLDWIDE | China | 5285484 | 5285484 | Registered | 06/27/2019 |
| YRC WORLDWIDE | China | 5285483 | 5285483 | Registered | 06/27/2019 |
| YRC WORLDWIDE | European Community | 910134 | 910134 | Registered | 05/02/2016 |
| YRC WORLDWIDE | Hong Kong | 300560943 | 300560943 | Registered | 01/05/2016 |
| YRC WORLDWIDE | Japan | 910134 | 910134 | Registered | 05/02/2016 |
| YRC WORLDWIDE | Madrid Protocol (TM) | 910134 | 910134 | Registered | 05/02/2016 |
| YRC WORLDWIDE | Norway | 910134 | 910134 | Registered | 05/02/2016 |
| YRC WORLDWIDE | Singapore | T07/02324H | T07/02324H | Registered | 05/02/2016 |
| YRC WORLDWIDE | Singapore | T07/02325F | T07/02325F | Registered | 05/02/2016 |
| YRC WORLDWIDE | Taiwan | 95016086 | 1259892 | Registered | 04/15/2017 |
| YRC WORLDWIDE | U.S. | 78/745,559 | 3,266,262 | Registered | 07/17/2017 |
| YRC WORLDWIDE & Design | Canada | 1,308,618 | TMA695,673 | Registered | 09/06/2022 |
| YRC WORLDWIDE & Design | Mexico | 791849 | 1098092 | Registered | 06/30/2016 |
| YRC WORLDWIDE & Design | Mexico | 791848 | 982536 | Registered | 06/30/2016 |
| YRC WORLDWIDE & Design | U.S. | 78/785,744 | 3,174,011 | Registered | 11/21/2016 |
| YRC WORLDWIDE BIZCONNECT | U.S. | 77/498,793 | 3,569,563 | Registered | 02/03/2019 |
| YRCRT | U.S. | 77/101,711 | 3,285,422 | Registered | 08/28/2017 |
| YRCW | China | 5111452 | 5111452 | Registered | 04/27/2019 |
| YRCW | China | 5111453 | 5111453 | Registered | 04/27/2019 |
| YRCW | Hong Kong | 300560925 | 300560925 | Registered | 01/05/2016 |
| YRCW | Taiwan | 95001468 | 1262081 | Registered | 04/30/2017 |
| YRCW | U.S. | 78/784,239 | 3,393,133 | Registered | 03/04/2018 |
| ZIP DISK | U.S. | 76/292,907 | 3,089,016 | Registered | 05/09/2016 |

| GRANTOR = YRC WORLDWIDE INC. (TRANSFERRED BY ASSIGNMENT FROM YRC REGIONAL TRANSPORTATION, INC. TO YRC WORLDWIDE INC.) | | | | | |
|---|---|---|---|---|---|
| Mark | Country | Application No. | Registration No. | Status – Appl. Pending/Registered | Expiration Date |
| HOLLAND | Canada | 806071 | TMA515,885 | Registered | 08/31/2014 |
| REDDAWAY | Canada | 806070 | TMA485,808 | Registered | 11/19/2027 |

## Schedule 6.1.6
### Local Counsel

- Ohio: Baker & Hostetler LLP
- Oregon: Stoel Rives LLP
- Michigan: Clark Hill PLC
- Pennsylvania: Morgan, Lewis & Bockius LLP
- Kansas: Stinson Leonard Street LLP

- Arizona: Snell & Wilmer L.L.P.

**Schedule 7.1.1(a)**
**Pledged Collateral**

---

**Pledged Equity**

| Grantor | Issuer | Issued and Outstanding Shares/Equity Interests | Record and Beneficial Owner | Pledged Equity % |
|---|---|---|---|---|
| YRC Worldwide Inc. | 1105481 Ontario, Inc. | 100 shares | 100% by YRC Worldwide Inc. | 65% |
| YRC Worldwide Inc | Express Lane Service, Inc. | 100 shares | 100% by YRC Worldwide Inc. | 100% |
| YRC Worldwide Inc | YRC Association Solutions, Inc. | 10,000 shares | 100% by YRC Worldwide Inc. | 100% |
| YRC Worldwide Inc | YRC International Investments, Inc. | 1,000 shares | 100% by YRC Worldwide Inc. | 65% |
| YRC Worldwide Inc | YRC MORTGAGES, LLC | 10,000 units | 100% by YRC Worldwide Inc. | 100% |
| YRC Worldwide Inc | YRC Regional Transportation, Inc. | 1,000 shares | 100% by YRC Worldwide Inc. | 100% |
| YRC Worldwide Inc | YRC Enterprise Services, Inc. | 1,000 shares | 100% by YRC Worldwide Inc. | 100% |
| Roadway LLC | YRC Inc. | 200 shares | 100% by Roadway LLC | 100% |
| Roadway LLC | Roadway Next Day Corporation | 100 shares | 100% by Roadway LLC | 100% |
| YRC Inc. | Reimer Express Lines Ltd. | 100 Class B Common 7,511,000 Class A Voting Common | 100% by YRC Inc. | 65% |
| YRC Inc. | Roadway Express International, Inc. | 1,000 shares | 100% by YRC Inc. | 100% |
| YRC Inc. | Roadway Reverse Logistics, Inc. | 100 shares | 100% by YRC Inc. | 100% |
| Roadway Next Day Corporation | New Penn Motor Express, Inc. | 7 shares | 100% by Roadway Next Day Corporation | 100% |
| YRC Regional Transportation, Inc | YRC LOGISTICS SERVICES, INC. | 50 shares | 100% by YRC Regional Transportation, Inc. | 100% |
| YRC Regional Transportation, Inc | USF Bestway Inc. | 283.4 shares | 100% by YRC Regional Transportation, Inc. | 100% |
| YRC Regional Transportation, Inc | USF DUGAN INC. | 1,000,000 shares | 100% by YRC Regional Transportation, Inc. | 100% |
| YRC Regional Transportation, Inc | USF Glen Moore Inc. | 100,000 | 100% by YRC Regional Transportation, Inc. | 100% |
| YRC Regional Transportation, Inc | USF Holland Inc. | 1,131 Common Stock 2,610 Preferred Stock | 100% by YRC Regional Transportation, Inc. | 100% |
| YRC Regional Transportation, Inc | USF Reddaway Inc. | 40.5 shares | 100% by YRC Regional Transportation, Inc. | 100% |

**Pledged Debt**

| Grantor | Maker | Payee | Original Principal Amount |
|---|---|---|---|
| Each Loan Party | Each Loan Party | Each Loan Party | N/A |
| Roadway LLC | YRC Inc. (fka Roadway Express, Inc.) | Roadway LLC | $500,000,000.00 |
| YRC Worldwide Inc. | YRC Inc. (fka Roadway Express, Inc.) | YRC Worldwide Inc. | $200,000,000.00 |
| Roadway LLC | New Penn Motor Express, Inc. | Roadway LLC | $150,000,000.00 |
| YRC Worldwide Inc. | YRC Logistics Asia Limited | YRC Worldwide Inc. | $10,203,693.27 |

SCHEDULE 7.1.1(b)

*Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Loan and Security Agreement to which this Schedule 7.1.1(b) is appended (the "Agreement"). Unless otherwise noted, all references to sections and schedules herein are to the sections and schedules of the Agreement.*

**1.1    Pledge of Securities.**

1.1.1    Delivery of the Pledged Collateral.

(a)    On the Closing Date (in the case of any Loan Party that grants a Lien on any of its assets hereunder on the Closing Date (a "Closing Date Grantor") or on the date on which it signs and delivers a joinder to the Agreement as a Guarantor and such other security agreements and documents required under Section 10.1.11(a)(i)(A) of the Agreement, each Loan Party shall deliver or cause to be delivered to Agent, for the benefit of the Secured Parties (or Term Agent so long as the Term Debt Intercreditor Agreement is in effect), any and all Pledged Securities (other than any Uncertificated Securities, but only for so long as such Securities remain uncertificated) to the extent such Pledged Securities, in the case of Promissory Notes and Instruments evidencing Debt, are required to be delivered pursuant to paragraph (b) of this Section 1.1.1. Thereafter, whenever such Loan Party acquires any other Pledged Security (other than any Uncertificated Securities, but only for so long as such Uncertificated Securities remain uncertificated), such Loan Party shall concurrently with the first Compliance Certificate required to be delivered thereafter pursuant to Section 10.1.2 of the Agreement deliver or cause to be delivered to Agent (or Term Agent so long as the Term Debt Intercreditor Agreement is in effect) such Pledged Security as Collateral hereunder to the extent such Pledged Securities, in the case of Promissory Notes and Instruments evidencing Debt, are required to be delivered pursuant to Section 1.1.1(b) hereof.

(b)    Each Loan Party will cause (i) all Debt of Parent and Restricted Subsidiaries that, in each case, is owing to such Loan Party to be evidenced by the Intercompany Note or other Promissory Note, (ii) the Intercompany Note or such other Promissory Note to be pledged and delivered to Agent (or Term Agent so long as the Term Debt Intercreditor Agreement is in effect) pursuant to the terms hereof and (iii) any Debt for borrowed money having an aggregate principal amount equal to or in excess of $5,000,000 owed to such Loan Party by any Person (other than Parent or a Restricted Subsidiary) to be evidenced by a duly executed Promissory Note that is pledged and delivered to Agent, for the benefit of the Secured Parties, (or Term Agent so long as the Term Debt Intercreditor Agreement is in effect), within 30 days after creation or acquisition thereof, pursuant to the terms hereof.

(c)    Upon delivery to Agent (or Term Agent so long as the Term Debt Intercreditor Agreement is in effect), (i) any Pledged Securities shall be accompanied by undated stock powers duly executed in blank or other instruments of transfer reasonably satisfactory to Agent and by such other instruments and documents as Agent may reasonably request and (ii) all other property comprising part of the Pledged Collateral shall be accompanied by instruments of assignment duly executed by the applicable Loan Party and such other instruments or documents as Agent may reasonably request. For any period in which Pledged Securities are delivered to the Agent (or Term Agent so long as the Term Debt Intercreditor Agreement is in effect), the Loan Parties shall provide with the first Compliance Certificate required to be delivered thereafter pursuant to Section 10.1.2 of the Agreement a schedule describing the securities, which schedule shall be deemed to supplement Schedule 7.1.1(a) to the Agreement and be made a part hereof; provided, that failure to attach any such schedule hereto shall not affect the validity of such pledge of such Pledged Securities. Each schedule so delivered shall supplement any prior schedules so delivered.

(d)    Notwithstanding the foregoing, to the extent that any Closing Date Grantor does not or cannot deliver any Pledged

Collateral (other than Pledged Collateral consisting of the Equity Interests of Parent or any wholly-owned Domestic Subsidiary of Parent) on the Closing Date notwithstanding its use of commercially reasonable efforts to do so, such Closing Date Grantor shall not be required to deliver such Pledged Collateral until the date that is sixty (60) days following the Closing Date (or such longer period as Agent may agree in its reasonable discretion).

(e)    The assignment, pledge and security interest granted in Section 7.1.1 of the Agreement are granted as security only and shall not subject Agent or any other Secured Party to, or in any way alter or modify, any obligation or liability of any Loan Party with respect to or arising out of the Pledged Collateral.

1.1.2    Representations, Warranties and Covenants. Each Loan Party represents, warrants and covenants, as to itself and the other Loan Parties, to and with Agent, for the benefit of the Secured Parties, that:

(a)    Schedule 7.1.1(a) to the Agreement correctly sets forth, as of the Closing Date and as of each date on which a supplement to such Schedule 7.1.1(a) is delivered pursuant to Section 1.1.1(c) hereof, the percentage of the issued and outstanding units of each class of the Equity Interests of the issuer thereof represented by the Pledged Equity and includes all Equity Interests, Promissory Notes and Instruments required to be pledged hereunder in order to satisfy the Collateral and Guarantee Requirement;

(b)    the Pledged Equity issued by a Restricted Subsidiary and the Pledged Debt (solely with respect to Pledged Debt issued by a Person other than Parent or a Restricted Subsidiary, to the best of Parent's knowledge) have been duly and validly authorized and issued by the issuers thereof and (i) in the case of Pledged Equity (other than Pledged Equity consisting of limited liability company interests or partnership interests which, pursuant to the relevant Organization Documents, cannot be fully paid and non-assessable), are fully paid and nonassessable and (ii) in the case of Pledged Debt (solely with respect to Pledged Debt issued by a Person other than Parent or a wholly owned Restricted Subsidiary of Parent, to the best of Parent's knowledge), are legal, valid and binding obligations of the issuers thereof, subject to applicable Debtor Relief Laws and general principles of equity.

(c)    (i) each Loan Party holds the Pledged Securities indicated on Schedule 7.1.1(a) to the Agreement as owned by such Loan Party free and clear of all Liens, other than (A) Liens created by the Security Documents and (B) Liens expressly permitted pursuant to Section 10.2.1, and (ii) will defend its title or interest thereto or therein against any and all Liens (other than the Liens permitted pursuant to this Section 1.1.2(c)), however, arising, of all Persons whomsoever;

(d)    (i) except for (x) restrictions and limitations imposed by the Loan Documents or securities laws generally or Liens expressly permitted pursuant to Section 10.2.1 and (y) in the case of Pledged Equity of Persons that are not Subsidiaries, transfer restrictions that exist at the time of acquisition of Equity Interests in such Persons, and (ii) except as described in the Perfection Certificate, or any other Loan Document, including, without limitation, 10.2.1 of the Agreement, the Pledged Collateral is and will continue to be freely transferable and assignable, and none of the Pledged Collateral is or will be subject to any option, right of first refusal, shareholders agreement, charter or by-law provisions or contractual restriction of any nature that would prohibit, impair, delay or otherwise affect in any manner material and adverse to Secured Parties the pledge of such Pledged Collateral hereunder, the sale or disposition thereof pursuant hereto or the exercise by Agent of rights and remedies hereunder;

(e)    each of Loan Parties has the power and authority to pledge the Pledged Collateral pledged by it hereunder in the manner hereby done or contemplated;

(f)    no consent or approval of any Governmental Authority in the United States, any securities exchange or any other Person was or is necessary to the validity and perfection of the pledge effected hereby (other than such as have been obtained and are in full force and effect);

(g)    by virtue of the execution and delivery by Loan Parties of this Agreement, when any Pledged Securities are delivered to Agent (or Term Agent so long as the Term Debt Intercreditor Agreement is in effect) in accordance with this Agreement together with such stock powers or similar instruments of transfer executed in blank, Agent will obtain a legal, valid and, to the extent governed by the UCC, first-priority (subject to any Liens permitted pursuant by Section 10.2.1) perfected lien upon and security interest in such Pledged Securities as security for the payment and performance of the Obligations; and

(h)    the pledge effected hereby is effective to vest in Agent, for the benefit of Secured Parties, the rights of Agent in the Pledged Collateral as set forth herein.

Notwithstanding anything herein to the contrary, none of Loan Parties shall be required: (i) other than in respect of Pledged Collateral constituting Certificated Securities of wholly-owned Restricted Subsidiaries directly owned by any Loan Party and Dominion Accounts (subject to the provisions of Section 8.3.1), to perfect the security interests hereunder through "control", (ii) to perfect by possession of Promissory Notes or any other Instruments evidencing a face principal amount not in excess of $5,000,000 and (iii) to take any actions in any non-U.S. jurisdiction or required by the laws of any non-U.S. jurisdiction to create any security interests in assets located or titled outside of the U.S. or to perfect any security interest in such assets (it being understood that there

shall be no security agreements or pledge agreements governed under the laws of any non-U.S. jurisdiction).

    1.1.3  <u>Certification of Limited Liability Company and Limited Partnership Interests</u>. Each Loan Party acknowledges and agrees that, to the extent any interest in any limited liability company or limited partnership controlled by any Loan Party and pledged under Section 7.1.1 of the Agreement is a "security" within the meaning of Article 8 of the UCC and is governed by Article 8 of the UCC, such interest shall be represented by a certificate. Each Loan Party further acknowledges and agrees that with respect to any interest in any limited liability company or limited partnership controlled on or after the Closing Date by such Loan Party and pledged hereunder that is not a "security" within the meaning of Article 8 of the UCC, such Loan Party shall at no time elect to treat any such interest as a "security" within the meaning of Article 8 of the UCC, nor shall such interest be represented by a certificate, unless such election and such interest is thereafter represented by a certificate that is delivered to Agent (or Term Agent so long as the Term Debt Intercreditor Agreement is in effect) pursuant to the terms hereof.

    1.1.4  <u>Registration in Nominee Name; Denominations</u>. If an Event of Default shall occur and be continuing and Agent shall give Administrative Borrower 5 Business Days prior written notice of its intent to exercise such rights, (a) Agent, on behalf of Secured Parties, shall have the right (in its sole and absolute discretion) to cause each of the Pledged Securities to be transferred of record into the name of Agent and (b) Agent shall have the right to exchange the certificates representing Pledged Securities for certificates of smaller or larger denominations for any purpose consistent with this Agreement; <u>provided</u>, that, notwithstanding the foregoing, if a Bankruptcy Event of Default (defined below) shall have occurred and be continuing, Agent shall not be required to give the notice referred to above in order to exercise the rights described above.. Each Loan Party will use commercial reasonable efforts to take any and all actions reasonably requested by Agent to facilitate compliance with this Section 1.1.4. "Bankruptcy Event of Default" shall mean any Event of Default under Sections 11.01(j) or (k) of the Agreement, <u>provided</u> that, for the purposes of this Agreement only in determining whether such an Event of Default has occurred, any reference in any such clause to any Restricted Subsidiary or Loan Party shall be deemed not to include any Immaterial Subsidiary affected by any event or circumstances referred to in any such clause.

    1.1.5  <u>Voting Rights; Dividends and Interest</u>.

    (a)  Unless and until an Event of Default shall have occurred and be continuing and Agent shall have notified Administrative Borrower in writing 5 Business Days prior thereto that the rights of Loan Parties under this Section 1.1.5 are being suspended:

    (i)  Each Loan Party shall be entitled to exercise any and all voting and/or other consensual rights and powers inuring to an owner of Pledged Securities or any part thereof for any purpose consistent with the terms of this Agreement and the other Loan Documents; <u>provided</u>, that such rights and powers shall not be exercised in any manner that could materially and adversely affect the rights inuring to a holder of any Pledged Securities or the rights and remedies of any of Agent or the other Secured Parties under this Agreement or any other Loan Document or the ability of Secured Parties to exercise the same.

    (ii)  Agent shall promptly execute and deliver to each Loan Party, or cause to be executed and delivered to such Loan Party, all such proxies, powers of attorney and other instruments as such Loan Party may reasonably request in writing for the purpose of enabling such Loan Party to exercise the voting and/or consensual rights and powers it is entitled to exercise pursuant to subparagraph (i) above, in each case as shall be specified in such request and be in form reasonably satisfactory to Agent.

    (iii)  Each Loan Party shall be entitled to receive and retain any and all dividends, interest, principal and other distributions paid on or distributed in respect of the Pledged Securities, to the extent (and only to the extent) that such dividends, interest, principal and other distributions are permitted by, and otherwise paid or distributed in accordance with, the terms and conditions hereof, the other Loan Documents and Applicable Law; <u>provided</u>, that any noncash dividends, interest, principal or other distributions that would constitute Pledged Equity or Pledged Debt, whether resulting from a subdivision, combination or reclassification of the outstanding Equity Interests of the issuer of any Pledged Securities or received in exchange for Pledged Securities or any part thereof, or in redemption thereof, or as a result of any merger, consolidation, acquisition or other exchange of assets to which such issuer may be a party or otherwise, shall be and become part of the Pledged Collateral, and, if received by any Loan Party, shall not be commingled by such Loan Party with any of its other funds or property but shall be held separate and apart therefrom, shall be held in trust for the benefit of Agent and the Secured Parties and shall be forthwith delivered to Agent (or Term Agent so long as the Term Debt Intercreditor Agreement is in effect) in the same form as so received (with any necessary endorsement reasonably requested by Agent). So long as no Event of Default has occurred and is continuing, Agent shall promptly deliver to each Loan Party any Pledged Securities in its possession if requested to be delivered to the issuer thereof in connection with any exchange or redemption of such Pledged Securities.

    (b)  Upon the occurrence and during the continuance of an Event of Default, after Agent shall have notified Administrative Borrower in writing and within 5 Business Days of the suspension of the rights of Loan Parties under Section 1.1.5(a)(iii) hereof, then all rights of any Loan Party to dividends, interest, principal or other distributions that such Loan Party is authorized to receive pursuant to Section 1.1.5(a)(iii) hereof shall cease, and all such rights shall thereupon become vested in Agent, which shall have the sole and exclusive right and authority to receive and retain such dividends, interest, principal or other distributions, subject to the rights of the Term Agent under the Term Debt Intercreditor Agreement. All dividends, interest, principal or other distributions received by any Loan Party contrary to the provisions of this Section 1.1.5 shall be held in trust for the benefit of Agent, shall be segregated from other property or funds of such Loan Party and shall be forthwith delivered to Agent upon demand in the same form as so received (with any necessary endorsement reasonably requested by Agent). Any and all money and other property paid over to or received by Agent pursuant to the provisions of this paragraph (b) shall be retained by Agent in an account to be established by Agent

upon receipt of such money or other property and shall be applied in accordance with the provisions of Section 5.7 of the Agreement. After all Events of Default have been cured or waived and, other than in the case of a waiver of which Agent is aware, Administrative Borrower has delivered to Agent a certificate to such effect, Agent shall promptly repay to each Loan Party (without interest) all dividends, interest, principal or other distributions that such Loan Party would otherwise be permitted to retain pursuant to the terms of Section 1.1.5(a)(iii) hereof in the absence of an Event of Default and that remain in such account.

(c)    Upon the occurrence and during the continuance of an Event of Default, after Agent shall have notified Administrative Borrower in writing and within 5 Business Days of the suspension of the rights of Loan Parties under Section 1.1.5(a)(iii) hereof, then all rights of any Loan Party to exercise the voting and consensual rights and powers it is entitled to exercise pursuant to Section 1.1.5(a)(i) hereof, and the obligations of Agent under Section 1.1.5(a)(ii) hereof, shall cease, and all such rights shall thereupon become, subject to the rights of the Term Agent under the Term Debt Intercreditor Agreement, vested in Agent, which shall have the sole and exclusive right and authority to exercise such voting and consensual rights and powers; provided, that, unless otherwise directed by Required Lenders, Agent shall have the right from time to time following and during the continuance of an Event of Default to permit Loan Parties to exercise such rights. After all Events of Default have been cured or waived and, other than in the case of a waiver of which Agent is aware, Administrative Borrower has delivered to Agent a certificate to such effect, each Loan Party shall have the exclusive right to exercise the voting and/or consensual rights and powers that such Loan Party would otherwise be entitled to exercise pursuant to the terms of Section 1.1.5(a)(i) hereof, and the obligations of Agent under Section 1.1.5(a)(ii) hereof shall be reinstated.

(d)    Any notice given by Agent to Administrative Borrower suspending the rights of Loan Parties under Section 1.1.5(a) hereof (i) shall be given in writing, (ii) may be given with respect to one or more of Loan Parties at the same or different times and (iii) may suspend the rights of Loan Parties under Section 1.1.5(a)(i) or (iii) hereof in part without suspending all such rights (as specified by Agent in its sole and absolute discretion) and without waiving or otherwise affecting Agent's rights to give additional notices from time to time suspending other rights so long as an Event of Default has occurred and is continuing. Notwithstanding anything to the contrary contained in Section 1.1.5(a), (b) or (c) hereof, if a Bankruptcy Event of Default shall have occurred and be continuing, Agent shall not be required to give any notice referred to in said Section in order to exercise any of its rights described in such Section, and the suspension of the rights of each Loan Party under each such Section shall be automatic upon the occurrence of such Bankruptcy Event of Default.

1.1.6    Agent Not a Partner or Limited Liability Company Member. Nothing contained in this Agreement shall be construed to make Agent or any other Secured Party liable as a member of any limited liability company or as a partner of any partnership and neither Agent nor any other Secured Party by virtue of this Agreement or otherwise (except as referred to in the following sentence) shall have any of the duties, obligations or liabilities of a member of any limited liability company or as a partner in any partnership. The parties hereto expressly agree that, unless Agent shall become the absolute owner of Pledged Equity consisting of a limited liability company interest or a partnership interest pursuant hereto, this Agreement shall not be construed as creating a partnership or joint venture among Agent, any other Secured Party, any Loan Party and/or any other Person.

**1.2    Security Interests in Personal Property.**

1.2.1    Each Loan Party hereby further authorizes Agent to file a Grant of Security Interest substantially in the form of Exhibit E, F, or G, as applicable, covering Intellectual Property Collateral with the United States Patent and Trademark Office or United States Copyright Office (or any successor office), as applicable, and such other documents as may be necessary or advisable for the purpose of perfecting, confirming, continuing, enforcing or protecting the Security Interest granted by such Loan Party hereunder, without the signature of such Loan Party, and naming such Loan Party, as debtor, and Agent, as secured party.

1.2.2    Representations and Warranties. Each Loan Party represents and warrants, as to itself and the other Loan Parties, to Agent and the Secured Parties that as of the Closing Date:

(a)    Each Loan Party has good and valid rights (not subject to any Liens other than Liens permitted by Section 10.2.1) and/or good and marketable title in the Article 9 Collateral with respect to which it has purported to grant a Security Interest hereunder (which rights and/or title, are in any event, sufficient under Section 9-203 of the UCC), and has full power and authority to grant to Agent the Security Interest in such Article 9 Collateral pursuant hereto and to execute, deliver and perform its obligations in accordance with the terms of this Agreement, without the consent or approval of any other Person other than any consent or approval that has been obtained.

(b)    A Perfection Certificate has been duly executed and delivered to Agent and the information set forth therein, including the exact legal name of each Loan Party and its jurisdiction of organization, is correct and complete in all material respects as of the Closing Date. The UCC financing statements (including fixture filings, as applicable) prepared by Agent based upon the information provided to Agent in the Perfection Certificate (or specified by notice from the applicable Loan Party to Agent after the Closing Date in the case of filings, recordings or registrations required by Section 10.1.11), are all the filings, recordings and registrations (other than any filings required to be made in the United States Patent and Trademark Office, the United States Copyright Office in order to perfect the Security Interest in Article 9 Collateral consisting of Intellectual Property and any filing required to be made by notating a lien on any certificate of title) that are necessary to establish a legal, valid and perfected security interest in favor of Agent (for the benefit of the Secured Parties) in respect of all Article 9 Collateral in which the Security Interest may be perfected by

filing, recording or registration in the United States (or any political subdivision thereof) and its territories and possessions, and no further or subsequent filing, refiling, recording, rerecording, registration or reregistration with respect to such Article 9 Collateral is necessary in any such jurisdiction, except as provided under Applicable Law with respect to the filing of continuation statements. Each Loan Party represents and warrants that, as of the Closing Date, fully executed Grants of Security Interest in the form attached as Exhibit E, F, or G, as applicable, containing a description of all Intellectual Property Collateral consisting of Patents (other than any Patents that are not material to the operation of the business of the Loan Parties taken as a whole or do not otherwise have significant value), registered Trademarks (and Trademarks for which registration applications are pending) (other than any Trademarks or Trademark registrations that are not material to the operation of the business of Grantors, taken as a whole or do not otherwise have significant value) or registered Copyrights (and Copyrights for which registration applications are pending) (other than with respect to any Copyright that is not material to the operation of the business of Loan Parties, taken as a whole or do not otherwise have significant value), as applicable, have been delivered to Agent for recording by the United States Patent and Trademark Office or the United States Copyright Office, as applicable, pursuant to 35 U.S.C. § 261, 15 U.S.C. § 1060 or 17 U.S.C. § 205 and the regulations thereunder.

(c)   The Security Interest constitutes (i) a legal and valid security interest in all the Article 9 Collateral securing the payment and performance of the Secured Obligations, (ii) subject to the filings described in Section 1.2.2(b) hereof, a perfected security interest in all Article 9 Collateral in which a security interest may be perfected by filing, recording or registering a financing statement in the United States (or any political subdivision thereof) and its territories and possessions pursuant to the UCC, (iii) a security interest that shall be perfected in all Article 9 Collateral (other than with respect to any Copyright that is not material to the business of Loan Parties taken as a whole) in which a security interest may be perfected upon the receipt and recording of the relevant Grants of Security Interest with the United States Patent and Trademark Office and the United States Copyright Office, as applicable, within the three month period (commencing as of the date hereof) pursuant to 35 U.S.C. § 261 or 15 U.S.C. § 1060 or the one month period (commencing as of the date hereof) pursuant to 17 U.S.C. § 205 and (iv) subject to the notations of lien described in Section 1.2.2(b) hereof, a perfected security interest in all Article 9 Collateral covered by a certificate of title. The Security Interest is and shall be prior to any other Lien on any of the Article 9 Collateral, other than Liens expressly permitted pursuant to 10.2.1 (other than Liens securing Debt permitted under Section 10.2.3(o) and any Permitted Refinancing to the extent set forth in the Term Debt Intercreditor Agreement).

(d)   No Loan Party has filed or consented to the filing of (i) any financing statement or analogous document under the UCC or any other Applicable Laws covering any Article 9 Collateral, (ii) any assignment in which any Loan Party assigns any Article 9 Collateral or any security agreement or similar instrument covering any Article 9 Collateral with the United States Patent and Trademark Office or the United States Copyright Office, or (iii) any assignment in which any Loan Party assigns any Article 9 Collateral or any security agreement or similar instrument covering any Article 9 Collateral with any foreign governmental, municipal or other office, which financing statement or analogous document, assignment, security agreement or similar instrument is still in effect, except, in each case, for Liens expressly permitted pursuant to Section 10.2.1.

(e)   All Commercial Tort Claims of each Loan Party where the amount of damages claimed by such Loan Party is equal to or in excess of $5,000,000 in existence on the Closing Date of this Agreement (or on the date upon which such Loan Party becomes a party to this Agreement) are described on Schedule 7.1(c) to the Agreement.

1.2.3    Covenants.

(a)   Administrative Borrower agrees to promptly (and in any event within 30 calendar days thereafter) notify Agent of any change (i) in the legal name of any Loan Party, (ii) in the identity or type of organization or corporate structure of any Loan Party, (iii) in the jurisdiction of organization of any Loan Party, (iv) in the Location of any Loan Party or (v) in the organizational identification number of any Loan Party. Loan Parties agree not to effect or permit any change referred to in the preceding sentence unless all filings, publications and registrations have been made (or will be made in a timely fashion) under the UCC or any other Applicable Law that are required in order for Agent to continue at all times following such change to have a valid, legal and first-priority (subject only to (i) any nonconsensual Lien that is expressly permitted pursuant to Section 10.2.1 and has priority as a matter of law and (ii) Liens expressly permitted pursuant to Section 10.2.1 (other than Liens securing Debt permitted under Section 10.2.3(o) and any Permitted Refinancing to the extent set forth in the Term Debt Intercreditor Agreement).) perfected security interest in all Article 9 Collateral. In addition, if any Loan Party does not have an organizational identification number on the Closing Date (or the date such Loan Party becomes a party to this Agreement) and later obtains one, Administrative Borrower shall promptly thereafter notify Agent of such organizational identification number and shall take all actions reasonably satisfactory to Agent to the extent necessary to maintain the security interests (and the priority thereof) of Agent in the Collateral intended to be granted hereby fully perfected and in full force and effect.

(b)   Subject to Section 1.2.3(h) hereof, each Loan Party shall, at its own expense, take any and all commercially reasonable actions necessary to defend title to the Article 9 Collateral against all Persons and to defend the Security Interest of Agent in the Article 9 Collateral and the priority thereof against any known Lien not expressly permitted pursuant to Section 10.2.1.

(c)    Each year, at the time of delivery of annual financial statements with respect to the preceding fiscal year pursuant to Section 10.1.1, Administrative Borrower shall deliver to Agent a certificate executed by a Responsible Officer of Administrative Borrower setting forth the information required pursuant to Sections 1(a), 1(e), 2(a), 2(b), 2(c), 2(d), 2(e), 2(g), 5, 6, 7 and 12 of the Perfection Certificate or confirming that there has been no change in such information since the date of such certificate or the date of the most recent certificate delivered pursuant to this Section 1.2.3(c).

(d)    Subject to Section 1.2.3(h) hereof and any other limitations on creation, perfection or protection of the Agent's security interest set forth herein or in any other Loan Document, each Loan Party agrees, at its own expense, to execute, acknowledge, deliver and cause to be duly filed all such further instruments and documents with respect to Collateral and take all such actions as Agent may from time to time reasonably request to better assure, preserve, protect and perfect the Security Interest and the rights and remedies created hereby, including the payment of any fees and taxes required in connection with the execution and delivery of this Agreement, the granting of the Security Interest and the filing of any financing statements (including fixture filings) or other documents in connection herewith or therewith. Each Loan Party will, at its own expense, promptly make, execute, endorse, acknowledge, file and/or deliver to Agent from time to time such lists, descriptions and designations of its then owned Tractor Trailers and Rolling Stock (including certificate of title numbers and jurisdictions of registration of each such Tractor Trailer and Rolling Stock), documents of title, schedules, confirmatory assignments, conveyances, financing statements, transfer endorsements, powers of attorney, certificates, reports and other assurances or instruments and take such further steps and actions relating to such Tractor Trailers, Rolling Stock and other property or rights covered by the security interest hereby granted necessary to perfect, preserve or protect its security interest in such Tractor Trailers, Rolling Stock and other property or rights. Each Loan Party agrees to execute all documentation reasonably required to effect such recordations and to cause the notation of lien and filing of relevant certificates of title with the appropriate state governmental agency. If any amount payable under or in connection with any of the Article 9 Collateral (other than by a Loan Party) that equals or exceeds $5,000,000 shall be or become evidenced by any Promissory Note or Instrument, such Promissory Note or Instrument shall be, concurrently with the first Compliance Certificate required to be delivered pursuant to Section 10.1.2 of the Agreement thereafter pledged delivered to Agent, for the benefit of the Secured Parties (or Term Agent so long as the Term Debt Intercreditor Agreement is in effect), duly endorsed in a manner reasonably satisfactory to Agent.

(e)    At its option, Agent may discharge past due taxes, assessments, charges, fees, Liens, security interests or other encumbrances at any time levied or placed on the Article 9 Collateral and not permitted pursuant to Section 10.2.1, and may pay for the maintenance and preservation of the Article 9 Collateral to the extent any Loan Party fails to do so as required by this Agreement and within a reasonable period of time after Agent has requested that it do so, and each Loan Party jointly and severally agrees to reimburse Agent within 10 days after written demand for any payment made or any reasonable expense incurred by Agent pursuant to the written foregoing authorization. Nothing in this paragraph shall be interpreted as excusing any Loan Party from the performance of, or imposing any obligation on Agent or any Secured Party to cure or perform, any covenants or other promises of any Loan Party with respect to taxes, assessments, charges, fees, Liens, security interests or other encumbrances and maintenance as set forth herein or in the other Loan Documents.

(f)    If at any time any Loan Party shall take a security interest in any property of an Account Debtor or any other Person the value of which equals or exceeds $1,000,000 to secure payment and performance of an Account, such Loan Party shall, concurrently with the first Compliance Certificate required to be delivered pursuant to Section 10.2.1 of the Agreement thereafter, collaterally assign such security interest to Agent for the benefit of the Secured Parties. Such assignment need not be filed of public record unless necessary to continue the perfected status of the security interest against creditors of and transferees from the Account Debtor or other Person granting the security interest.

(g)    Each Loan Party (rather than Agent or any Secured Party) shall remain liable (as between itself and any relevant counterparty) to observe and perform all the conditions and obligations to be observed and performed by it under each contract agreement or instrument relating to the Article 9 Collateral, all in accordance with the terms and conditions thereof, and each Loan Party jointly and severally agrees to indemnify and hold harmless Agent and the Secured Parties from and against any and all liability for such performance, to the extent of, and subject to the terms, conditions and limitations set forth in, the Agreement, including, without limitation, Section 3.4 thereof.

(h)    Notwithstanding anything herein to the contrary, no Loan Party shall be required: (i) other than in respect of Pledged Collateral constituting Certificated Securities of wholly-owned Restricted Subsidiaries directly owned by any Loan Party and Dominion Accounts (subject to the provisions of Section 8.3.1), to perfect the security interests hereunder through "control", (ii) to complete any filings or other action with respect to the perfection of the security interests, including of any Intellectual Property, created hereby in any jurisdiction outside of the United States or any State thereof, (iii) to perfect by possession of any intercompany notes evidencing an aggregate principal amount not in excess of $5,000,000, (iv) to perfect by possession of Promissory Notes or any other Instruments evidencing an aggregate principal amount not in excess of $5,000,000, and (iv) to take any actions in any non-U.S. jurisdiction or required by the laws of any non-U.S. jurisdiction to create any security interests in assets located or titled outside of the U.S. (including the Equity Interests of any Foreign Subsidiary) or to perfect any security interest in such assets, including any Intellectual Property registered in any non-U.S. jurisdiction (it being understood that there shall be no security agreements or pledge

agreements governed under the laws of any non-U.S. jurisdiction).

**1.3    Special Provisions Concerning Intellectual Property Collateral.**

1.3.1    <u>Grant of License to Use Intellectual Property</u>. Without limiting the provisions of Section 7.1.2 of the Agreement or any other rights of Agent as the holder of a Security Interest in any Intellectual Property Collateral, for the purpose of enabling Agent to exercise rights and remedies under this Agreement at such time as Agent shall be lawfully entitled to exercise such rights and remedies, each Loan Party hereby grants to Agent an irrevocable, nonexclusive license (exercisable without payment of rent, royalty or other compensation to Loan Parties) to use, license or sublicense any of the Intellectual Property Collateral now owned or hereafter acquired by such Loan Party, and wherever the same may be located (whether or not any license agreement by and between any Loan Party and any other Person relating to the use of such Intellectual Property Collateral may be terminated hereafter), and including in such license reasonable access to all media in which any of the licensed items may be recorded or stored and to all computer software and programs used for the compilation or printout thereof, provided, however, that any license granted by Agent to a third party shall include reasonable and customary terms necessary to preserve the existence, validity, and value of the affected Intellectual Property Collateral, including, without limitation, provisions requiring the continuing confidential handling of trade secrets, requiring the use of appropriate notices and prohibiting the use of false notices, protecting Trademarks in the manner set forth below (it being understood and agreed that, without limiting any other rights and remedies of Agent under this Agreement, any other Loan Document or Applicable Law, nothing in the foregoing license grant shall be construed as granting Agent rights in and to such Intellectual Property Collateral above and beyond (x) the rights to such Intellectual Property Collateral that each Loan Party has reserved for itself and (y) in the case of Intellectual Property Collateral that is licensed to any such Loan Party by a third party, the extent to which such Loan Party has the right to grant a sublicense to such Intellectual Property Collateral hereunder). The use of such license by Agent may only be exercised, at the option of Agent, during the continuation of an Event of Default; <u>provided</u> that any license, sublicense or other transaction entered into by Agent in accordance herewith shall be binding upon Loan Parties notwithstanding any subsequent cure of an Event of Default. In the event the license set forth in this Section 1.3.1 is exercised with regard to any Trademarks, then the following shall apply: (i) all goodwill arising from any licensed or sublicensed use of any Trademark shall inure to the benefit of Loan Party; (ii) the licensed or sublicensed Trademarks shall only be used in association with goods or services of a quality and nature consistent with the quality and reputation with which such Trademarks were associated when used by Loan Party prior to the exercise of the license rights set forth herein; and (iii) at Loan Party's request and expense, licensees and sublicensees shall provide reasonable cooperation in any effort by Loan Party to maintain the registration or otherwise secure the ongoing validity and effectiveness of such licensed Trademarks, including, without limitation the actions and conduct described in Section 1.3.2 below. The license granted to Agent herein shall be inapplicable to any Commercial Software License that constitutes Intellectual Property Collateral to the extent the applicable Loan Party is prohibited by written agreement from granting a license in such Commercial Software License to Agent, except to the extent such prohibition is ineffective (or deemed ineffective) under the UCC or other Applicable Law.

1.3.2    <u>Protection of Agent's Security</u>.

(a)    Except to the extent permitted by subsection 1.3.2(f) below, or to the extent that failure to act could not reasonably be expected to have a Material Adverse Effect, with respect to registration or pending application of each item of its Intellectual Property Collateral for which such Loan Party has standing to do so, each Loan Party agrees to take, at its expense, all steps, including, without limitation, in the USPTO, the USCO and any other Governmental Authority located in the United States to (i) maintain the validity and enforceability of any registered Intellectual Property Collateral and maintain such Intellectual Property Collateral in full force and effect, and (ii) pursue the registration and maintenance of each Patent, Trademark, or Copyright registration or application, now or hereafter included in such Intellectual Property Collateral of such Loan Party, including, without limitation, the payment of required fees and taxes, the filing of responses to office actions issued by the USPTO, the USCO or other Governmental Authorities, the filing of applications for renewal or extension, the filing of affidavits under Sections 8 and 15 of the U.S. Trademark Act, the filing of divisional, continuation, continuation-in-part, reissue and renewal applications or extensions, the payment of maintenance fees and the participation in interference, reexamination, opposition, cancellation, infringement and misappropriation proceedings.

(b)    Except to the extent permitted by subsection 1.3.2(f) below, or to the extent that failure to act could not reasonably be expected to have a Material Adverse Effect, no Loan Party shall do or permit any act or knowingly omit to do any act whereby any of its Intellectual Property Collateral may lapse, be terminated, or become invalid or unenforceable or placed in the public domain (or in case of a trade secret, lose its competitive value).

(c)    Except to the extent permitted by subsection 1.3.2(f) below, or to the extent that failure to act could not reasonably be expected to have a Material Adverse Effect, each Loan Party shall take all steps to preserve and protect each item of its Intellectual Property Collateral, including, without limitation, maintaining the quality of any and all products or services used or provided in connection with any of the Trademarks, consistent with the quality of the products and services as of the date hereof, and taking all steps necessary to ensure that all licensed users of any of the Trademarks abide by the applicable license's terms with respect to the standards of quality.

(d)    Each Loan Party agrees that, should it obtain an ownership or other interest in any Intellectual Property Collateral after the Closing Date (i) the provisions of this Agreement shall automatically apply thereto, and (ii) any such after-acquired Intellectual Property Collateral and, in the case of Trademarks, the goodwill symbolized thereby, shall automatically become part of the Intellectual

Property Collateral subject to the terms and conditions of this Agreement with respect thereto.

(e)   Concurrently with the delivery of a Compliance Certificate for each fiscal quarter, each Loan Party shall sign and deliver to Agent a security agreement in form and substance reasonably satisfactory to Agent and related Grant of Security Interest with respect to applications for registration or registrations of Intellectual Property Collateral (other than with respect to any Copyright that is not material to the business of Loan Parties, taken as a whole) owned or exclusively licensed by it as of the last day of such fiscal quarter, to the extent that such Intellectual Property Collateral is not covered by any previous such security agreement (and Grant of Security Interests) so signed and delivered by it. In each case, it will promptly cooperate as reasonably necessary to enable Agent to make any necessary or reasonably desirable recordations with the USCO or the USPTO, as appropriate.

(f)   Notwithstanding the foregoing provisions of this Section 1.3.2 or elsewhere in this Agreement, nothing in this Agreement shall prevent any Loan Party from discontinuing the use or maintenance of any or its Intellectual Property Collateral, the enforcement of license agreements or the pursuit of actions against infringers, to the extent permitted herein if such Loan Party determines in its reasonable business judgment that such discontinuance is desirable in the conduct of its business.

(g)   Upon and during the continuance of an Event of Default, each Loan Party shall, if requested by Agent, use its commercially reasonable efforts to obtain all requisite consents or approvals by the licensor of each License to effect the assignment of all such Loan Party's right, title and interest thereunder to Agent or its designee.

**1.4   Conflicts.**

Agent and each Lender hereby agrees that the terms, conditions and provisions contained in this Schedule are subject to the Term Debt Intercreditor Agreement and, in the event of a conflict between the terms of the Term Debt Intercreditor Agreement and this Agreement, the terms of the Term Debt Intercreditor Agreement shall govern and control. Notwithstanding anything to the contrary herein, prior to the Discharge of Term Obligations (as defined in the Term Debt Intercreditor Agreement), the requirements of this Agreement to deliver possession, control or notations of Collateral to Agent shall be deemed satisfied by the delivery of possession, control or notation of such Collateral to a representative of the Secured Parties (as defined in the Term Debt Intercreditor Agreement) and as bailee for the Collateral Agent as provided in the Term Debt Intercreditor Agreement.

**Schedule 7.1(c)**
**Commercial Tort Claims**

Certain commercial tort claims set forth in the complaint which was filed on April 12, 2012 in the United States District Court for the District of South Carolina, Charleston Division (Case No. 2:12-cv-1008-CWH) (subsequently re-filed in the United States District Court for the Middle District of Florida, Case No. 3:12-cv-01180-J-32JBT) by certain plaintiffs, including YRC Worldwide Inc., New Penn Motor Express, Inc., USF Reddaway, Inc., YRC Inc., YRC Enterprise Services, Inc. and YRC Logistics Services against Sea Star Line, LLC, Saltchuk Resourses, Inc., Totem Ocean Trailer Express, Inc., Crowley Maritime Corporation, Crowley Liner Services, Inc. and Leanard Sharpiro as defendants.

Certain commercial tort claims set forth in a complaint filed in 2008 (No. 08 L 6760, Cook Co., IL) by USF Holland against a former law firm representing Holland in a vehicle accident lawsuit.

**Schedule 8.3**
**Deposit Accounts**

| Name of Loan Party | Name of Institution | Account Number | Account Type |
|---|---|---|---|
| New Penn Motor Express, Inc. | Bank of America | **REDACTED** | Checking (Field Deposit) |
| New Penn Motor Express, Inc. | Bank of Nova Scotia | **REDACTED** | Checking (Depository and PR) |
| New Penn Motor Express, Inc. | JPMorgan | **REDACTED** | Lockbox |
| New Penn Motor Express, Inc. | US Bank | **REDACTED** | Checking (Payroll) |

| | | | |
|---|---|---|---|
| New Penn Motor Express, Inc. | Valley National Bank | **REDACTED** | Checking (Pier Account) |
| Roadway Reverse Logistics, Inc. | JPMorgan | **REDACTED** | Checking (Concentration) |
| USF Holland Inc. | Bank of Nova Scotia | **REDACTED** | Checking (General Acct) |
| USF Holland Inc. | JPMorgan | **REDACTED** | Checking (Accounts Payable) |
| USF Holland Inc. | JPMorgan | **REDACTED** | Checking (Payroll) |
| USF Holland Inc. | JPMorgan | **REDACTED** | Checking (ACH Prefund) |
| USF Reddaway Inc. | JPMorgan | **REDACTED** | Checking (Operating) |
| USF Reddaway Inc. | US Bank | **REDACTED** | Checking (Payroll) |
| YRC Regional Transportation, Inc. | JPMorgan | **REDACTED** | Checking (Concentration) |
| YRC Inc. | Bank of America | **REDACTED** | Checking (PR Field Drafts) |
| YRC Inc. | Bank of America | **REDACTED** | Checking (AP Field Drafts) |
| YRC Inc. | Bank of America | **REDACTED** | CD (Utility Deposit) |
| YRC Worldwide Inc. | Bank of Nova Scotia | **REDACTED** | Checking |
| YRC Worldwide Inc. | Bank of Nova Scotia | **REDACTED** | Checking (EFT Account) |
| YRC Inc. | JPMorgan | **REDACTED** | Checking (Non PeopleSoft Payables) |
| YRC Inc. | JPMorgan | **REDACTED** | Checking (Concentration) |
| YRC Inc. | Toronto Dominion | **REDACTED** | Checking |
| YRC Worldwide Inc. | United Missouri Bank | **REDACTED** | Trust Account |
| YRC Worldwide Inc. | United Missouri Bank | **REDACTED** | Trust Account |
| YRC Inc. | Wells Fargo | **REDACTED** | CD (Landscaping) |
| YRC Worldwide Inc. | Bank of America | **REDACTED** | Checking (Concentration) |
| YRC Worldwide Inc. | JPMorgan | **REDACTED** | Checking (Concentration) |
| YRC Worldwide Inc. | JPMorgan | **REDACTED** | Checking (ATM) |
| YRC Worldwide Inc. | JPMorgan | **REDACTED** | Checking (AP/PR Concentration) |
| YRC Worldwide Inc. | JPMorgan | **REDACTED** | Checking (PeopleSoft Payables) |
| YRC Worldwide Inc. | JPMorgan | **REDACTED** | Checking (Govt Debits) |
| YRC Worldwide Inc. | JPMorgan | **REDACTED** | Checking (Workers Comp) |

| | | | |
|---|---|---|---|
| YRC Worldwide Inc. | JPMorgan | **REDACTED** | Checking (BIPD) |
| YRC Worldwide Inc. | JPMorgan | **REDACTED** | Checking (Prefund PeopleSoft Payables) |
| YRC Worldwide Inc. | JPMorgan | **REDACTED** | Checking (Group Life AD&D) |
| YRC Worldwide Inc. | USBank | **REDACTED** | Checking |
| YRC Worldwide Inc. | USBank | **REDACTED** | Checking (Direct Deposit) |
| YRC Worldwide Inc. | JPMorgan | **REDACTED** | Escrow (WC & BIPD) |
| YRC Worldwide Inc. | RBS Citizens, N.A. | **REDACTED** | Commercial Checking (ABL Cash Dominion Account) |
| YRC Worldwide Inc. | RBS Citizens, N.A. | **REDACTED** | Commercial Checking (ABL Cash Collateral Account) |
| YRC Worldwide Inc. | RBS Citizens, N.A. | **REDACTED** | Commercial Checking (Concentration Account) |
| YRC Worldwide Inc. | RBS Citizens, N.A. | **REDACTED** | Commercial Checking (Investment Account) |
| YRC Inc. | JPMorgan | **REDACTED** | YRC Inc Lockbox |
| YRC Inc. | JPMorgan | **REDACTED** | Merchant Card Deposit |
| USF Reddaway Inc. | JPMorgan | **REDACTED** | Reddaway Lockbox |
| USF Holland Inc. | JPMorgan | **REDACTED** | Holland Lockbox |
| YRC Inc. | JPMorgan | **REDACTED** | YRC Inc. ACH Deposit |

**Schedule 9.1.11**
**Subsidiaries**

| Subsidiary | Direct Owner | Status |
|---|---|---|
| 1105481 Ontario, Inc. | YRC Worldwide Inc. | Excluded Subsidiary |
| Express Lane Service, Inc. | YRC Worldwide Inc. | Guarantor |
| OPK Insurance Co. Ltd. | YRC Worldwide Inc. | Immaterial Subsidiary and Excluded Subsidiary |
| Roadway LLC | YRC Worldwide Inc. | Guarantor and Immaterial Subsidiary and Excluded Subsidiary |
| YRC Association Solutions, Inc. | YRC Worldwide Inc. | Guarantor |
| YRC Logistics Asia Limited | YRC Worldwide Inc. | Immaterial Subsidiary and Excluded Subsidiary |
| YRC International Investments, Inc. | YRC Worldwide Inc. | Excluded Subsidiary |
| YRC Mortgages, LLC | YRC Worldwide Inc. | Guarantor |
| JHJ International Transportation Co., Ltd. | YRC Worldwide Inc. | Excluded Subsidiary |
| YRC Regional Transportation, Inc. | YRC Worldwide Inc. | Guarantor |
| YRC Enterprise Services, Inc. | YRC Worldwide Inc. | Guarantor |

| | | |
|---|---|---|
| YRCW Receivables LLC | YRC Worldwide Inc. | Immaterial Subsidiary and Excluded Subsidiary |
| YRC Inc. | Roadway LLC | Borrower and Guarantor |
| Roadway Next Day Corporation | Roadway LLC | Guarantor |
| Reimer Express Lines Ltd. | YRC Inc. | Excluded Subsidiary |
| Roadway Express International, Inc. | YRC Inc. | Guarantor |
| Roadway Express, S.A. de C. V. | YRC Inc. | Immaterial Subsidiary and Excluded Subsidiary |
| Roadway Reverse Logistics, Inc. | YRC Inc. | Guarantor |
| Transcontinental Lease, S. de R.L. de C.V. | YRC Inc. | Immaterial Subsidiary and Excluded Subsidiary |
| YRC Transportation, S.A. de C.V. | YRC Inc. | Immaterial Subsidiary and Excluded Subsidiary |
| YRC Services S. de R.L. de C.V. | YRC Transportation, S.A. de C.V. | Excluded Subsidiary |
| New Penn Motor Express, Inc. | Roadway Next Day Corporation | Borrower and Guarantor |
| YRC (Shanghai) Management Consulting CO., LTD. | YRC Logistics Asia Limited | Excluded Subsidiary |
| PT Meridian IQ Indonesia International | YRC (Shanghai) Management Consulting CO., LTD. | Excluded Subsidiary |
| YRC Worldwide Pte. Ltd. | YRC International Investments, Inc. | Excluded Subsidiary |
| YRC Logistics Services, Inc. | YRC Regional Transportation, Inc. | Guarantor |
| YRC Logistics Inc. | YRC Logistics Services, Inc. | Immaterial Subsidiary and Excluded Subsidiary |
| USF Bestway Inc. | YRC Regional Transportation, Inc. | Guarantor |
| USF Dugan Inc. | YRC Regional Transportation, Inc. | Guarantor |
| USF Glen Moore Inc. | YRC Regional Transportation, Inc. | Guarantor |
| USF Holland Inc. | YRC Regional Transportation, Inc. | Borrower and Guarantor |
| USF Holland International Sales Corporation | USF Holland Inc. | Immaterial Subsidiary and Excluded Subsidiary |
| USF RedStar LLC | YRC Regional Transportation, Inc. | Guarantor and Immaterial Subsidiary and Excluded Subsidiary |
| USF Reddaway Inc. | YRC Regional Transportation Inc. | Borrower and Guarantor |

**Schedule 9.1.14**
**Labor Matters**

- IBT Agreement

• IBT Extension Agreement

| Operating Company | Contract Name | Union Name | Union Type |
|---|---|---|---|
| Holland | Office and Clerical Employees Agreement | Teamsters Local Union No. 364 | Teamsters |
| Holland | St. Louis Office Employees Rider | Teamsters Local Union No. 688 | Teamsters |
| Holland | Office Clerical Supplemental / NMFA Agreement | Teamsters Local No. 24 | Teamsters |
| Holland | Office and Clerical Employees Agreement | Local Union No. 20 | Teamsters |
| Holland | USF Holland Local Cartage Agreement of General Teamsters Local 179 | Local Union No. 179 | Teamsters |
| Holland | USF Holland and Teamsters Truck Drivers Union, Local No. 407 Cleveland Office Clerical | Local Union No. 407 | Teamsters |
| Holland | USF Holland and General Drivers, Warehousemen and Helpers Teamsters Local Union No. 89 Louisville, KY Clerical Agreement | Local Union No. 89 | Teamsters |
| Holland | Office Employees Rider to the National Master Freight Agreement and Central States Area Local Cartage Supplemental Agreement | Teamsters Local 600 | Teamsters |
| Holland | USF Holland & Teamsters Local Union No. 371 Office Clerical Employees Addendum | Teamsters Local Union No. 371 | Teamsters |
| Holland | Agreement between Teamsters Local Union No. 120 and USF Holland, Coon Rapids, MN Terminal NMFA Office Personnel Addendum | Teamsters Local Union No. 120 | Teamsters |
| Holland | Addendum to the National Master Freight Agreement and the Central States Area Local Cartage Supplement Agreement between USF Holland and Chauffeurs, Teamsters and Helpers Local #26 | Chauffeurs, Teamsters and Helpers Local #26 | Teamsters |
| Holland | USF Holland Motor Express, Inc. Office and Miscellaneous Truck Terminal Employee's Agreement Rockford, IL | Teamsters Local Union No. 325 | Teamsters |
| Holland | Kansas City Garage Addendum | Teamsters Local Union #41 | Teamsters |
| Holland | Addendum to the National Master Freight Agreement and the Central States Area Local Cartage Supplement Agreement between USF Holland and General Drivers and Helpers Union Local No. 554 | General Drivers and Helpers Union Local No. 554 | Teamsters |
| Holland | Agreement between Central States Motor Carriers Association, Inc. and IA of M & AW District Lodge 60 | IA of M & AW District Lodge 60 and Local Union No. 698 | Machinists and Aerospace Workers |
| Holland | USF Holland, Inc. Youngstown Terminal Office Clerical Supplemental/NMFA Agreement | Teamsters Local Union 377 | Teamsters |

| Holland | Appleton Area and Vicinity Office and Clerical Employees Supplement to the Central States Area Local Cartage Supplemental Agreement to the National Master Freight Agreement | Teamsters Local Union 662 | Teamsters |
|---|---|---|---|
| Holland | Uniform Indiana Automotive Maintenance Agreement | Teamsters Joint Council 69 | Teamsters |
| Holland | Philadelphia, Pennsylvania and Vicinity Supplemental Agreement Covering Local Cartage and Over the Road | Highway Truck Drivers and Helpers Local No. 107, 676, Teamsters Locals No. 312, 326, 331, 470, Truck Drivers Chauffeurs Helpers Local 384, Food Drivers, Helpers and Warehouse Employees Local No. 500 | Teamsters |
| Holland | Cincinnati Garage Employees Agreement | Teamsters Local Union 100 | Teamsters |
| Holland | Agreement Between Teamsters Local Union 160 and USF Holland, Owatonna, MN Terminal | Teamsters Local Union 160 | Teamsters |
| Holland | Addendum to the 2008 - 2013 Local 710 Dock Agreement Covering Custodial Employees | Teamsters Local 710 | Teamsters |
| Holland | Central Region Local Cartage Supplemental Agreement | Central Region of Teamsters | Teamsters |
| Holland | Central Region Over-the-Road Supplemental Agreement | Central Region of Teamsters | Teamsters |
| Holland | Supplement to the Central Region Local Cartage Supplemental Agreement to the National Master Freight Agreement covering Milwaukee and Waukesha Areas | Local Union No. 200 | Teamsters |
| Holland | Indiana Uniform Office Clerical Agreement | Teamsters Local Unions 135, 215, 364, 414 | Teamsters |
| Holland | Addendum to the National Master Freight Agreement and the Central States Area Local Cartage Supplemental Agreement | Teamsters Local Union 554 | Teamsters |
| Holland | Agreement between Mechanic's Local 701 IAM & AW and Central States Motor Carrier's Association (CSMCA) and Trucking Management Inc: For: YRC Inc; YRC Holland, Inc | Mechanic's Local 701 IAM & AW and Central States Motor Carrier's Association | Machinists and Aerospace Workers |
| Holland | Supplement to the Central Region Over-the-Road Supplemental Agreement to the National Master Freight Agreement Covering Milwaukee-based Over-the-Road Drivers | Teamsters Local Union 200 | Teamsters |
| Holland | National Master Freight Agreement | International Brotherhood of Teamsters | Teamsters |
| Holland | Teamsters State of Michigan Office Workers Supplemental Agreement to the National Master Freight Agreement | Teamsters State of Michigan | Teamsters |
| Holland | Southern Region Local Freight Forwarding Garage Supplemental Agreement | International Brotherhood of Teamsters | Teamsters |
| Holland | Southern Region Area Over-the-Road Motor Freight Supplemental Agreement | International Brotherhood of Teamsters | Teamsters |

| Holland | Upstate Michigan Garage Addendum to NMFA and Central States Area Local Cartage Supplemental Agreement | Teamster Union 406 | Silent |
|---|---|---|---|
| New Penn | Mechanics Areawide Agreement | Teamsters Local Union No. 677 | Teamsters |
| New Penn | Appendix Covering the Classifications of Mechanics and Garage Employees | Local Union 707 | Teamsters |
| New Penn | Appendix to New Jersey / New York Area General Trucking Supplement Agreement | Merchandise Drivers Local No. 641 | Teamsters |
| New Penn | Highway and Local Motor Freight Drivers Dockmen and Helpers Local Union 707 Clerical Appendix | Local Union 707 | Teamsters |
| New Penn | Addendum between New Penn and Teamsters Local Union No. 355 | Teamsters Local Union 355 | Teamsters |
| New Penn | Mechanics Agreement between New Penn and Teamsters Local Union No. 251 | Local Union 251 | Teamsters |
| New Penn | National Master Freight Agreement and Central Pennsylvania Supplemental Agreement | Central Pennsylvania and Local Cartage Unions 229, 401, 429, 764, 777, 773 and 776 | Teamsters |
| New Penn | PPA Pension Proposal Outline | ILA Local Union 1730 | Longshoremen |
| New Penn | General Freight Agreement Between Inland Terminal Workers 1730 and New Penn Motor Express, Inc. | ILA Local Union 1730 | Longshoremen |
| New Penn | New York State Freight Division Supplemental Agreement Covering Over the Road and Cartage | Locals 118,118A,182, 264, 264A, 294, 317, 375, 449, 529, 687, 693 | Teamsters |
| New Penn | Philadelphia, Pennsylvania and Vicinity Supplemental Agreement covering Local Cartage and Over the Road | Highway Truck Drivers and Helpers Local No. 107, 676, Teamsters Locals No. 312, 326, 331, 470, Truck Drivers Chauffeurs Helpers Local 384, Food Drivers, Helpers and Warehouse Employees Local No. 500 | Teamsters |
| New Penn | Central Region Local Cartage Supplemental Agreement | Central Region of Teamsters | Teamsters |
| New Penn | Central Region Over-the-Road Supplemental Agreement | Central Region of Teamsters | Teamsters |
| New Penn | Joint Council No. 40 Freight Council Supplemental Agreement | Teamsters Local Unions 30, 110, 249 261, 397, 491, 538, 585 | Teamsters |
| New Penn | Central Pennsylvania Mechanics and Office Employees Agreement | Teamsters Local Unions 229, 401, 429, 764, 771, 773, 776 | Teamsters |
| New Penn | Addendum to the Central Pennsylvania Mechanics and Office Employees Agreement | Teamsters Local Unions 776 | Teamsters |
| New Penn | National Master Freight Agreement | International Brotherhood of Teamsters | Teamsters |
| Reddaway | USF Reddaway Western Contract | Teamsters Local Unions Nos. 63, 70, 104, 492 | Teamsters |

| Reddaway | Master Agreements, Supplement Agreements, and Letters of Understanding | Teamsters Local Unions 162, 206, 324, 962, 37, 174 | Teamsters |
|---|---|---|---|
| Reddaway | Master Agreement Supplemental Agreements and Memos of Understanding | Teamsters Local Unions 63, 70, 104, 492 | Teamsters |
| Reddaway | USF Reddaway Negotiations Tentative Agreement on Economic Terms | International Brotherhood of Teamsters | Teamsters |
| Reddaway | Rider to the USF Reddaway Western Contract Regarding Freight Handler Employee Classification | Teamsters Local Unions 63, 70, 104, 492 | Teamsters |
| Roadway Express, Inc. | Memorandum of Agreement Between Inland Terminal Workers, Local 1730, ILA, and Roadway Express, Inc. | ILA Local Union 1730 | Longshoremen |
| Roadway Express, Inc. | Line-Haul Mechanic Maintenance Addendum to the National Master Freight Agreement and the Maryland/District of Columbia Supplemental Agreement | General Teamsters Allied Workers Local 992 | Teamsters |
| Roadway Express, Inc. | Terminal Office Clerical Agreement Winston-Salem, NC | Teamsters Local Union 391 | Teamsters |
| Roadway Express, Inc. | Addendum to the NMFA and the Carolina Automotive Maintenance Agreement | Teamsters Local Union 391 | Teamsters |
| Roadway Express, Inc. | Addendum to the NMFA and MD-DC Supplemental Agreements | Teamsters Local Union 355 | Teamsters |
| Roadway Express, Inc. | Collective Agreement between Roadway Express, Inc. and Canada Council of Teamsters represented by Teamsters Local Unions 879 & 880 | Teamsters Local Unions 879 & 880 | Teamsters |
| Roadway Express, Inc. | Roadway Express Akron Garage Employees Agreement | Local Union No. 24 | Teamsters |
| Roadway Express, Inc. | Teamsters Local Union No. 413 Roadway Express, Inc. Columbus, OH Garage Contract | Local Union No. 413 | Teamsters |
| Roadway Express, Inc. | Garage Employees Agreement between Truck Drivers, Chauffeurs and Helpers, Public Employees Construction Division, Airlines - Greater Cincinnati / Northern Kentucky Airport and Miscellaneous Jurisdiction, Local Union No. 100 | Local Union No. 100 | Teamsters |
| Roadway Express, Inc. | Kansas City Janitor Service Contract | Local Union No. 41 | Teamsters |
| Roadway Express, Inc. | Office and Clerical Employees Agreement between Roadway Express, Inc. and Local Union No. 20 | Local Union No. 20 | Teamsters |
| Roadway Express, Inc. | Agreement with Teamsters Local Union No. 25 | Local Union No. 25 | Teamsters |
| Roadway Express, Inc. | Breakbulk Building Maintenance Appendix [sic] | Teamsters Local Union 707 | Teamsters |
| Roadway Express, Inc. | Kansas City Shop Service Contract | Teamsters Local Union 41 | Teamsters |
| Roadway Express, Inc. | Toledo Garage Employees Agreement | Teamsters Local Union 20 | Teamsters |
| Roadway Express, Inc. | Office Employees Addendum to the Maryland-District of Columbia Supplemental Agreement National Master Freight Agreement ("NMFA") | Teamsters Local Union 992 | Teamsters |

| Roadway Express, Inc. | Agreement Between IBT Local 677 and Roadway Express, Inc. Terminal 107 Cheshire, CT Office Employees and Rider to the New England Supplemental and Master Freight Agreement | Teamsters Local Union 677 | Teamsters |
|---|---|---|---|
| Roadway Express, Inc. | Roadway Express Clerical Contract | Teamsters Local Union 701 | Teamsters |
| Roadway Express, Inc. | Line-Haul Mechanic Maintenance Addendum to the National Master Freight Agreement (NMFA) and the Maryland/District of Columbia Supplemental Agreement | Teamsters Local Union 992 | Teamsters |
| Roadway Express, Inc. | Joint Area Cartage Agreement Covering Local Cartage Employees of Road Carriers of Local 179, 330, 673 | Teamsters Local Unions 142, 179, 301, 330, 673 | Teamsters |
| Roadway Express, Inc. | Addendum to the Terminal Maintenance Which is an Addendum to the NMFA and the Carolina Automotive Maintenance Agreement | Teamsters Local Union 391 | Teamsters |
| Roadway Express, Inc. | Agreement between Roadway Express Inc and Office and Professional employees. International Union, Local 29, AFL-CIO | Office and Professional employees International Union, Local 29, AFL-CIO | Professional Employees International Union |
| Roadway Express, Inc. | Central Pennsylvania Mechanics and Office Employees Agreement Teamsters Local Unions No. 229 - Scranton Pa. No. 401 - Wilkes-Barre, Pa. No. 429 - Reading Pa. No. 764 - Milton Pa. No. 771 - Lancaster Pa. No. 773 - Allentown Pa. No. 776 - Harristown Pa. And Transport Employers Association, Inc | Teamsters Local Unions No. 229 - Scranton Pa.; No. 401 - Wilkes-Barre, Pa.; No. 429 - Reading, Pa.; No. 764 - Milton, Pa.; No. 771 - Lancaster, Pa.; No. 773 - Allentown Pa.; No. 776 - Harristown Pa. | Teamsters |
| Roadway Express, Inc. | Roadway Express, Inc. Terminal Maintenance, Mechanic, and Janitor Addendum to the National Master Freight Agreement (NMFA) and the Maryland/DC Supplemental Agreement | Teamsters Local Union 992 | Teamsters |
| Silent | Carolina Freight Council Over-the-Road Supplemental Agreement | Local Union No. __ | Teamsters |
| Silent | Truckload Proposed Contract | Silent | Teamsters |
| Yellow Freight System, Inc. | Agreement between Teamsters Local Union No. 688 and St. Louis Office Employees Rider | Teamsters Local Union #688 | Teamsters |
| Yellow Freight System, Inc. | Office Clerical Contract between Teamsters Local Union No. 651 and Yellow Freight Systems, Inc. for Lexington, KY Office | Teamsters Local Union No. 651 | Teamsters |
| Yellow Transportation | Yellow Transportation, Inc. Leadmen, Preventative Maintenance, Preventative Maintenance Helpers, Tiremen, Lubricators and Tankers, Parts Department, Washers, Janitors, and Other Garage Miscellaneous Help Employees Supplement to the Central Region Local Cartage Supplemental Agreement to the National Master Freight Agreement | Teamsters Local Union 200 | Teamsters |

| Yellow Transportation | Supplement to the Central Region Local Cartage Supplemental Agreement to the National Master Freight Agreement Covering Milwaukee and Waukesha Areas for the Period April 1, 2008 through March 31, 2013 | Teamsters Local Union 200 | Teamsters |
|---|---|---|---|
| Yellow Transportation | Buffalo Area Office Agreement | Teamsters Local Union No. 375 | Teamsters |
| Yellow Transportation | Cleveland, OH Shop Agreement | Teamsters Local Union #964 | Teamsters |
| Yellow Transportation | Cleveland Janitor / Dock Maintenance Employee Rider to the Central States Local Cartage Supplemental Agreement | Teamsters Local #407 | Teamsters |
| Yellow Transportation | Cleveland Office Employees Rider to the Central States Area Local Cartage Supplemental Agreement | Teamsters Local #407 | Teamsters |
| Yellow Transportation | Pittsburgh, PA and Local 926's Office Employees' Rider to the Teamsters Joint Council No. 40 Freight Council Supplemental Agreement and NMFA | Teamsters Local 926 | Teamsters |
| Yellow Transportation | Richmond Office Clerical Agreement | Teamsters Local Union No. 592 | Teamsters |
| Yellow Transportation | Office Clerical Agreement between Teamsters Local Union 71 and Yellow Transportation | Teamsters Local Union No. 71 | Teamsters |
| Yellow Transportation | Office Employees Collective Bargaining Agreement between Yellow Transportation and Local Union #639 | Local Union #639 | Teamsters |
| Yellow Transportation | Office Employees Agreement Appendix to New Jersey-New York Area General Trucking Supplemental Agreement | Teamsters Local Union No. 641 | Teamsters |
| Yellow Transportation | Collective Agreement between Yellow Transportation, Inc. and Teamsters Local Unions No. 91, 879, 938 and Teamsters, Chauffeurs, Warehousemen and Helpers Local Union No. 880 | Teamsters Local Unions No. 91, 879, 938 and 880 | Teamsters |
| Yellow Transportation | Tentative Agreement Yellow Freight Transportation, Inc and International Association of Machinists and Aerospace Workers, IAM and AW | International Association of Machinists and Aerospace Workers, IAM and AW | Machinists and Aerospace Workers |
| Yellow Transportation | Multi-States Area Agreement with the International Association of Machinists and Aero-space Workers, AFL-CIO | International Association of Machinists and Aerospace Workers, ALF-CIO and participating Local Unions (Districts 9, 10, 71, Lodge 778, 77 IAMAW) | Machinists and Aerospace Workers |
| Yellow Transportation | International Association of Machinists and Aerospace Workers Yellow Transportation, Inc Western States Trucking Maintenance Agreement April 1, 2008 through March 31, 2013 | International Association of Machinists and Aerospace Workers | Machinists and Aerospace Workers |
| Yellow Transportation | Office and Clerical Employees Agreement between Teamsters Local Union No. 325 and Yellow Transportation | Teamsters Local Union No. 325 | Teamsters |
| Yellow Transportation | Local 618 White Paper Agreement with Yellow Transportation | Local 618 | Silent |

| Yellow Transportation | Cleveland Office Employees Rider to the Central States Area Local Cartage Supplemental Agreement | Teamsters Truck Drivers Union No. 407 | Teamsters |
|---|---|---|---|
| Yellow Transportation | Sioux Falls Area Office and Clerical Employees Supplement To the Central Region Local Cartage Supplemental Agreement to the NMFA | General Drivers and Helpers Union Local No. 120 | Teamsters |
| Yellow Transportation | Middletown Office Employees Rider to the New England Supplemental Freight Agreement Rider | Teamsters Local 671 | Teamsters |
| Yellow Transportation | Tentative Agreement between Hawaii Teamsters and Allied Workers, Local 996 and Yellow Transportation | Hawaii Teamsters and Allied Workers, Local Union 996 | Teamsters |
| Yellow Transportation | Agreement between General States Motor Carriers Association, Inc and IA of M & AW District Lodge 60 | IA of M & AW District Lodge 60; IAM Local 698 | Machinists and Aerospace Workers |
| Yellow Transportation | Area Cartage Agreement Covering Local Cartage Employees of Road Carriers (T.M.I./C.S.M.C.A.) | Teamsters Local Union 705 | Teamsters |
| Yellow Transportation | Highway & Local Motor Freight Drivers, Dockworkers and Helpers, Local Union 707, IBT Breakbulk Clerical Appendix | Local Union 707, IBT | Teamsters |
| Yellow Transportation | Springfield Office Employee's Rider to the New England Supplemental Freight Agreement [sic] | Teamsters Local Union 404 | Teamsters |
| Yellow Transportation | Agreement by and between: Yellow Transportation Inc, Buffalo, NY and Automobile Mechanics Local Union #447 - of District 15 International Association of Machinists and Aerospace Workers AFL-CIO | Automobile Mechanics Local Union #447 - of District 15 International Association of Machinists and Aerospace Workers AFL-CIO | Machinists and Aerospace Workers |
| Yellow Transportation | Highway and Local Motor Freight Drivers, Dockmen and Helpers Local Union 707 I.B.T. Appendix Covering the classification of Mechanics and Garage Employees of Break Bulk Terminals | Teamsters Local Union 707 | Teamsters |
| Yellow Transportation | Office Employees Collective Bargaining Agreement By and Between Yellow Transportation, Inc. and Teamsters Local Union 355 | Teamsters Local Union 355 | Teamsters |
| Yellow Transportation | CSMCA/Yellow Transportation, Inc. Teamsters Local Union 673 Office and Clerical Employees Addendum to the Joint Area Cartage Agreement | Teamsters Local Union 673 | Teamsters |
| Yellow Transportation | Supplement to the Central Region Over-the-Road Supplemental Agreement to the National Master Freight Agreement Covering Milwaukee-based Over-the-Road Drivers | Teamsters Local Union 200 | Teamsters |
| Yellow Transportation | Yellow Transportation INC, Multi States Area Agreement With the International Association of Machinists and Aerospace Workers, AFL-CIO | International Association of Machinists and Aerospace Workers, AFL-CIO | Machinists and Aerospace Workers |

| Yellow Transportation | Yellow Transportation Inc Kansas City Addendum to the Multi States Area Agreement Local Lodge 778, International Association of Machinists and Aerospace Workers | Local Lodge 778, International Association of Machinists and Aerospace Workers | Machinists and Aerospace Workers |
|---|---|---|---|
| Yellow Transportation | Local Contract and Working Agreement Covering Office and Miscellaneous Truck Terminal Employees | Teamsters Local Union 710 | Teamsters |
| Yellow Transportation | Yellow Transportation and Teamster Local Union 371 Office Clerical Employees Addendum | Teamsters Local Union 371 | Teamsters |
| Yellow Transportation | Appendix Covering the Classifications of Mechanics and Garage Employees | Teamsters Local Union 707 | Teamsters |
| Yellow Transportation | Louisville, Kentucky Clerical Agreement | Teamsters Local Union 89 | Teamsters |
| Yellow Transportation | Cincinnati Office Agreement between Local Union No. 100 and Yellow Transportation System, Inc. | Teamsters Local Union 100 | Teamsters |
| Yellow Transportation | Appendix to the Western States Trucking Maintenance Agreement for San Francisco Local Lodge 1305 | Local Lodge 1305, International Association of Machinists and Aerospace Workers | Machinists and Aerospace Workers |
| YRC Freight | National Master Freight Agreement | International Brotherhood of Teamsters | Teamsters |
| YRC Freight | Upstate Michigan Garage Addendum to NMFA and Central States Area Local Cartage Supplemental Agreement | Teamster Union 406 | Silent |
| YRC Freight | Tentative Agreement St. Louis Addendum to the Multi-States Area Agreement International Association of Machinists and Aerospace Workers, Yellow Freight Transportation, Inc. | International Association of Machinists and Aerospace Workers | Machinists and Aerospace Workers |
| YRC Freight | Office Agreement | Teamsters Local Union No. 251 | Teamsters |
| YRC Freight | Agreement between Yellow Transportation Company and General Drivers and Helpers, Local Union No. 823 | Local Union No. 823 | Teamsters |
| YRC Freight | Agreement between YRC Inc. and General Drivers and Helpers, Local Union No. 696 | Local Union No. 696 | Teamsters |
| YRC Freight | Carolina Freight Council City Cartage Supplemental Agreement | Silent | Silent |
| YRC Freight | West Virginia Freight Council of the Eastern Region of Teamsters Supplemental Agreement | Teamsters Local Union 175 | Teamsters |
| YRC Freight | Office Employees Agreement Appendix to New Jersey-New York Area General Trucking Supplemental Agreement | Teamsters Local Union 560 | Teamsters |
| YRC Freight | Virginia Freight Council Over-the-Road Supplemental Agreement | International Brotherhood of Teamsters | Teamsters |
| YRC Freight | Virginia Freight Council City Pickup and Delivery Over-the-Road Supplemental Agreement | Teamsters Local Unions 22, 29, 171, 592, 822 | Teamsters |
| YRC Freight | Teamsters State of Michigan Office Workers Supplemental Agreement to the National Master Freight Agreement | Teamsters State of Michigan | Teamsters |

| YRC Freight | Southern Region Office Clerical Employees Supplemental Agreement | International Brotherhood of Teamsters | Teamsters |
|---|---|---|---|
| YRC Freight | Addendum to the National Master Freight Agreement and the Central States Area Local Cartage Supplemental Agreement | Teamsters Local Union 554 | Teamsters |
| YRC Freight | Southern Region Local Freight Forwarding Garage Supplemental Agreement | International Brotherhood of Teamsters | Teamsters |
| YRC Freight | Mechanics Agreement Appendix to New Jersey-New York Area General Trucking Supplemental Agreement | Teamsters Local Union 641 | Teamsters |
| YRC Freight | New Jersey-New York General Trucking Supplemental Agreement and Local 701 | Teamsters Joint Council Nos. 16, 73 | Teamsters |
| YRC Freight | New Jersey-New York Over-the-Road Supplemental Agreement Covering Employers of Private, Common and Contract Carriers | Teamsters Joint Council Nos. 16, 73 | Teamsters |
| YRC Freight | New Jersey-New York General Trucking Supplemental Agreement | Teamsters Joint Council Nos. 16, 73 | Teamsters |
| YRC Freight | Maintenance Employees (Porters) Agreement Appendix to New Jersey-New York Area General Trucking Supplemental Agreement | Teamsters Local Union 560 | Teamsters |
| YRC Freight | Tentative Agreement: Yellow Freight Transportation, Inc., and International Association of Machinists and Aerospace Workers, IAM and AW | IAM District 9 | Machinists and Aerospace Workers |
| YRC Freight | Tentative Agreement: Yellow Freight Transportation, Inc., and International Association of Machinists and Aerospace Workers, IAM and AW (Kansas City Addendum) | IAM Local Lodge 778 | Machinists and Aerospace Workers |
| YRC Freight | Tentative Agreement: Yellow Freight Transportation, Inc., and International Association of Machinists and Aerospace Workers, IAM and AW (Twin Cities Addendum) | IAM District 77 | Machinists and Aerospace Workers |
| YRC Freight | Tentative Agreement: St. Louis Addendum to the Multi-States Agreement | IAM District 9 | Machinists and Aerospace Workers |
| YRC Freight | Agreement for the Restructuring of the YRC Worldwide, Inc. Operating Companies | International Brotherhood of Teamsters | Teamsters |
| YRC Freight | Agreement Between Yellow Transportation, Inc. and Transportation Communications International Union | Teamsters Local Union 998, 1908 | Teamsters |
| YRC Freight | Appendix to the Western States Trucking Maintenance Agreement for the designated Southern California Area District 947 and affiliated Lodges | District 947 and Affiliated Lodges | Machinists |
| YRC Freight | New York State Freight Division Supplemental Agreement Covering Over the Road and Cartage | Locals 118,118A,182, 264, 264A, 294, 317, 375, 449, 529, 687, 693 | Teamsters |
| YRC Freight | Western States Area Supplemental Agreements | The Western Master Freight Division and Local Union | Teamsters |

| | | | |
|---|---|---|---|
| YRC Freight | New Jersey - New York General Trucking Supplemental Agreement and Local 701 | Local 701 | Teamsters |
| YRC Freight | Addendum to the 2008 - 2013 Local 710 Dock Agreement Covering Custodial Employees | Teamsters Local 710 | Teamsters |
| YRC Freight | Cincinnati Office Agreement between Local Union No. 100 and Yellow Freight System, Inc. | Local Union No. 100 | Teamsters |
| YRC Freight | Southern Region Area Over-the-Road Motor Freight Supplemental Agreement | International Brotherhood of Teamsters | Teamsters |
| YRC Reimer | Agreement Between Reimer Express Lines, Ltd. and General Teamsters Local Union 979 | Teamsters Local Union 979 | Teamsters |
| YRC Reimer | Agreement between Reimer Express Line Employees Association and Reimer Express Lines Ltd | Reimer Express Line Employees Association | Silent |
| YRC Reimer | Collective Agreement between Reimer Express Lines Ltd and General Teamsters Local Union No. 979 | General Teamsters Local Union No.979 - Winnipeg Terminal | Teamsters |
| YRC Reimer | Collective Agreement between Reimer Express Lines Ltd and General Teamsters Local Union No. 362 | General Teamsters Local Union No.362 - Edmington Terminal | Teamsters |
| YRC Reimer | Collective Agreement between Reimer Express Lines Ltd and Teamsters Local Union No. 879 (Woodstock) and Teamsters, Chauffeurs, Warehousemen and Helps of America Local 880 and Teamsters Local Union 938 | Teamsters Union Local 938, 880 and 879 | Teamsters |
| YRC Reimer | Memorandum of Agreement between Reimer Express Lines Ltd and Teamsters Quebec Local 106 | Teamsters Quebec Local 106 | Teamsters |
| YRC Reimer | Agreement between Reimer Express Lines Ltd (Kenora, Dryden and Thunder Bay) and Teamster's Local Union 938 | Teamsters Local Union 938 | Teamsters |
| YRC Reimer | Collective Agreement between Reimer Express Lines Limited (Clerical) and Teamsters, Chauffeurs, Warehousemen and Helpers Local Union No. 879 and Teamsters Canada | Teamsters, Chauffeurs, Warehousemen and Helpers Local Union No. 879 and Teamsters Canada | Teamsters |
| YRC Reimer | Collective Agreement between Reimer Express Lines Ltd Drivers and National Automobile, Aerospace, Transportation and General Workers Union of Canada (CAW-Canada) Local 4209 | National Automobile, Aerospace, Transportation and General Workers Union of Canada (CAW - Canada) Local 4209 | National Automobile, Aerospace, Transportation and General Workers Union of Canada |
| YRC Reimer | Collective Agreement between Reimer Express Lines Ltd. Owner Operators and National Automobile, AeroSpace Transportation and General Workers Union of Canada (CAW-Canada) Local 4209 | National Automobile, AeroSpace Transportation and General Workers Union of Canada (CAW-Canada) Local 4209 | National Automobile, Aerospace, Transportation and General Workers Union of Canada |
| YRC Reimer | Agreement between Reimer Express Lines Ltd. Maintenance Facility Winnipeg and General Teamsters Local Union No. 979 | General Teamsters Local Union No. 979 | Teamsters |

| YRC Reimer | Collective Labour Agreement between Transport Drivers, Warehousemen and General Workers, Teamsters Quebec Section Locale 106 (FTQ) and Reimer Express Lines Ltd. | Transport Drivers, Warehousemen and General Workers, Teamsters Quebec Section Locale 106 (FTQ) | Teamsters |
|---|---|---|---|
| YRC Reimer | Collective Agreement between Roadway Express Inc. and Canada Council of Teamsters represented by Teamsters Local Unions 879 and 880 | Teamsters Local Unions 879 and 880 | Teamsters |
| YRC Reimer | Collective Agreement between Yellow Transportation, Inc. and the Teamsters Local Unions No's 91, 879, 938 and the Teamsters, Chauffeurs, Warehousemen and Helpers Local Union No, 880 | Teamsters Local Unions No's 91, 879, 938 and the Teamsters, Chauffeurs, Warehousemen and Helpers Local Union No. 880 | Teamsters |
| YRC Reimer | Agreement Between Reimer Express Lines Ltd Employees Association and Reimer Express Lines Ltd. | Reimer Express Lines Ltd. Employees Association | Silent |
| YRC Reimer | Collective Agreement between Reimer Express Lines Ltd. And Teamsters, Chauffeurs, Warehousemen and Helpers Local Union No. 879 | Teamsters Local Union No. 879 | Teamsters |
| YRC Reimer | Collective Agreement Between YellowTransportation of British Columbia, Inc. and Teamsters Local Union No. 31 | Teamsters Local Union 31 | Teamsters |
| YRC Inc. | Office Agreement Between YRC Inc. - Office, Dayton, OH and Teamsters Local Union 957 | Teamsters Local Union 957 | Teamsters |
| YRC Inc. | Freight Line Office Contract Supplemental Agreement to the 2008-2013 Central Region Local Cartage Supplement to the National Master Freight Agreement between Teamsters Union Local 795, Wichita, Kansas | Teamsters Union Local 795 | Teamsters |
| YRC Inc. | Agreement between Mechanic's Local 701 IAM & AW and Central States Motor Carrier's Association (CSMCA) and Trucking Management Inc: For: YRC Inc; YRC Holland, Inc | Mechanic's Local 701 IAM & AW and Central States Motor Carrier's Association | Machinists and Aerospace Workers |
| YRC Inc. | Addendum to the National Master Freight Agreement and the Carolina Automotive Maintenance Agreement | Teamsters Local Union 509 | Teamsters |
| YRC Inc. | Addendum to the National Master Freight Agreement and Carolina Supplemental Agreement for the Period April 1, 2008 through March 31, 2013 Covering Janitor Employs Domiciled at YRC Inc. Charlotte, North Carolina | Teamsters Local Union 71 | Teamsters |
| YRC Inc. | Upstate Michigan Garage Addendum to the National Master Freight Agreement Central States Area Local Cartage Supplemental Agreement | Silent | Silent |

| YRC Inc. | Philadelphia, Pennsylvania and Vicinity Supplemental Agreement covering Local Cartage and Over the Road | Highway Truck Drivers and Helpers Local No. 107, 676, Teamsters Locals No. 312, 326, 331, 470, Truck Drivers Chauffeurs Helpers Local 384, Food Drivers, Helpers and Warehouse Employees Local No. 500 | Teamsters |
|---|---|---|---|
| YRC Inc. | Roadway Express Garage Office Clerical Agreement | Teamsters Local Union No. 391 | Teamsters |
| YRC Inc. | Labor Contract and Working Agreement covering Office and Miscellaneous Truck Terminal Employees with Local Union No. 301 | Local Union No. 301 | Teamsters |
| YRC Inc. | Joint Area Cartage Agreement Covering Local Cartage Employees of Road Carriers with Local 301 | Local Union No. 301, 142, 179, 330, 673 | Teamsters |
| YRC Inc. | Central Region Local Cartage Supplemental Agreement | Central Region of Teamsters | Teamsters |
| YRC Inc. | Central Region Over-the-Road Supplemental Agreement | Central Region of Teamsters | Teamsters |
| YRC Inc. | Supplement to the Central Region Local Cartage Supplemental Agreement to the National Master Freight Agreement covering Milwaukee and Waukesha Areas | Local Union No. 200 | Teamsters |
| YRC Inc. | New England Supplemental Agreement | Local Unions No. 25, 59, 170, 191, 251, 404, 443, 493, 653, 671, 677 | Teamsters |
| YRC Inc. | Joint Council No. 7 Bay Area Local Pickup and Delivery Supplemental Agreement | Locals 70, 287, 315, 624, 890, 912, 2785 | Teamsters |
| YRC Inc. | Carolina Freight Council Automotive Maintenance Supplemental Agreement | International Brotherhood of Teamsters | Teamsters |
| YRC Inc. | Northern New England General Freight Supplemental Agreement to the National Master Freight Agreement | International Brotherhood of Teamsters | Teamsters |
| YRC Inc. | Mechanics Agreement | Teamsters Local Union 560 | Teamsters |
| YRC Inc. | Multi-Employer Kansas City City Office Contract | Teamsters Local Union 41 | Teamsters |
| YRC Inc. | Norfolk Office Agreement | Teamsters Local Union 822 | Teamsters |
| YRC Inc. | Milwaukee Area Office and Clerical Employees Supplement to the Central Region Local Cartage Supplemental Agreement to the National Master Freight Agreement | Teamsters Local Union 200 | Teamsters |
| YRC Inc. | Office Employee's Rider to te New York State Supplemental Freight Agreement | Teamsters Local Union 294 | Teamsters |
| YRC Inc. | Roadway Addendum to the 710 Custodial Addendum to Cover Maintenance Employees | Teamsters Local Union 710 | Teamsters |
| YRC Inc. | Labor Contract and Working Agreement | Teamsters Local Union 710 | Teamsters |
| YRC Inc. | Addendum to the National Master Freight Agreement Between YRC Inc. - Office Personnel and Teamsters Local Union 120 | Teamsters Local Union 120 | Teamsters |

| YRC Inc. | Indiana Uniform Office Clerical Agreement | Teamsters Local Unions 135, 215, 364 414 | |
|---|---|---|---|
| YRC Inc. | Indiana Maintenance Agreement | Teamsters Local Union 135 | Teamsters |
| YRC Inc. | Sacramento Janitor | Teamsters Local Union 150 | Teamsters |
| YRC Inc. | Mason City Office Contract | Teamsters Local Union 238 | Teamsters |
| YRC Inc. | Albuquerque Shop | Teamsters Local Union 492 | Teamsters |
| YRC Inc. | Albuquerque Janitor | Teamsters Local Union 492 | Teamsters |
| YRC Inc. | Denver Shop | Teamsters Local Union 961 | Teamsters |
| YRC Inc. | Denver Janitor | Teamsters Local Union 691 | Teamsters |
| YRC Inc. | Charlotte Clerical | Teamsters Local Union 71 | Teamsters |
| YRC Inc. | Albany Office Clerical | Teamsters Local 294 | Teamsters |
| YRC Inc. | Scranton Office Clerical | Teamsters Local 401 | Teamsters |
| YRC Inc. | Scranton Garage Mechanics | Teamsters Local 401 | Teamsters |
| YRC Inc. | Union City Mechanics | Teamsters Local 560 | Teamsters |
| YRC Inc. | Union City Janitorial | Teamsters Loal 560 | Teamsters |

**Schedule 10.1.13(a)**
**Further Assurances and Post-Closing Conditions**

• Within 60 days of the Closing Date, or such later date as the Agent may agree in its sole discretion, Mortgage Releases in favor of JPMorgan Chase Bank, N.A., as first lien agent, and US Bank, National Association, as second lien agent.

• Within 30 days of the Closing Date, or such later date as the Agent may agree in its sole discretion, evidence reasonably satisfactory to the Agent or the Administrative Agent of the termination of that certain unauthorized lien filing against USF Glen Moore, Inc.

• Within 60 days of the Closing Date, or such later date as the Agent may agree in its sole discretion, delivery of any equity interest in Newgistics, Inc., to the extent that it has not been otherwise disposed of or tendered in that ongoing tender offer by Littlejohn & Co.

• Within 60 days of the Closing Date, or such later date as the Agent may agree in its sole discretion, delivery of Mortgages with respect to owned real property to the extent required by the Collateral and Guarantee Requirement.

• Within 90 days of the Closing Date, or such later date as the Agent may agree in its sole discretion, evidence reasonably satisfactory to the Agent of the fulfillment by the custodial administrator of its obligations under the Custodial Administration Agreement.

• To the extent not inconsistent with Section 10.1.7(b), the Borrowers will use commercially reasonable efforts to deliver insurance endorsements required thereunder.

• Within 5 Business Days of the Closing Date, or such later date as the Agent may agree in its sole discretion, delivery of reasonably necessary intellectual property releases from each of JP Morgan Chase Bank, National Association, as agent, in respect of the Existing Term Facility and US Bank, National Association, as collateral trustee, in relation to the Existing Series A Notes and Existing Series B Notes.

**Schedule 10.2.1(b)**
**Liens**

• Incorporated by reference are all capital lease obligations provided in Schedule 10.2.3(b).

**New Penn Motor Express, Inc.**

| JURISDICTION | FILING TYPE/ SEARCHED THRU | FILE NUMBER/ FILE DATE | DEBTOR | SECURED PARTY | COLLATERAL DESCRIPTION |
|---|---|---|---|---|---|
| Secretary of the Commonwealth, Pennsylvania | UCC 11/19/2013 | 2008121704739 12/17/2008 | New Penn Motor Express, Inc. 625 s 5th Ave Lebanon, PA 17042 | Toyota Material Handling, U.S.A., Inc. P.O. Box 17419 Irvine, CA 92623-74419 | Inventory of all new Toyota. |
| Secretary of the Commonwealth, Pennsylvania | CONT 11/19/2013 | 2013091204428 09/12/2013 | | | Continuation. |
| Secretary of the Commonwealth, Pennsylvania | UCC 11/19/2013 | 2009030605236 03/06/2009 | New Penn Motor Express, Inc. 625 S. 5th Avenue Lebanon, PA 17042 | RBS Asset Finance, Inc. 71 S. Wacker Drive 28th Floor Chicago, IL 60606 | Lease of specific equipment. |
| Secretary of the Commonwealth, Pennsylvania | UCC 11/19/2013 | 2012032103205 03/20/2012 | NEW PENN MOTOR EXPRESS, INC. 625 S. 5TH AVENUE LEBANON, PA 17042 | Nations Fund I, Inc. 101 Merritt Seven Norwalk, CT 06851 | Lease of specific equipment. |
| Secretary of the Commonwealth, Pennsylvania | UCC 11/19/2013 | 2012050301334 05/02/2012 | NEW PENN MOTOR EXPRESS, INC. 625 S. 5TH AVENUE LEBANON, PA 17042 | Nations Fund I, Inc. 101 Merritt Seven Norwalk, CT 06851 | Lease of specific equipment. |
| Secretary of the Commonwealth, Pennsylvania | UCC 11/19/2013 | 2012091300672 09/11/2012 | NEW PENN MOTOR EXPRESS, INC. 625 S. 5TH AVENUE LEBANON, PA 17042 | Nations Fund I, Inc. 101 Merritt Seven Norwalk, CT 06851 | Lease of specific equipment. |
| Secretary of the Commonwealth, Pennsylvania | UCC 11/19/2013 | 2012092509194 09/25/2012 | | UTICA LEASECO, LLC 44225 UTICA ROAD UTICA, MI 48317 | Secured Party assignment to: UTICA LEASECO, LLC 44225 UTICA ROAD UTICA, MI 48317 |
| Secretary of the Commonwealth, Pennsylvania | UCC 02/03/2014 | 2014010301188 12/31/2013 | NEW PENN MOTOR EXPRESS, INC. 625 S. 5TH AVENUE LEBANON, PA 17042 | U.S. Bank Equipment Finance, a Division of U.S. Bank National Association 1310 Madrid Street Marshall, MN 56258 | Lease of specific equipment. |

## Roadway, LLC

| JURISDICTION | FILING TYPE/ SEARCHED THRU | FILE NUMBER/ FILE DATE | DEBTOR | SECURED PARTY | COLLATERAL DESCRIPTION |
|---|---|---|---|---|---|
| Secretary of State, Kansas | FTL 12/05/2013 | 6714554 07/16/2010 | ROADWAY CORPORATION, a Corporation 10990 ROE AVE OVERLAND PARK, KS 66211-1213 | Internal Revenue Service | $10,413.73 |

| | | | | | |
|---|---|---|---|---|---|
| Secretary of State, Kansas | Release of FTL 12/05/2013 | 677901 03/04/2011 | | | Release of Federal Tax Lien in the amount of $10,413.73. |

## USF Glen Moore Inc.

| JURISDICTION | FILING TYPE/ SEARCHED THRU | FILE NUMBER/ FILE DATE | DEBTOR | SECURED PARTY | COLLATERAL DESCRIPTION |
|---|---|---|---|---|---|
| Secretary of the Commonwealth, Pennsylvania | UCC 11/19/2013 | 33030586 09/05/2000 | USF Glen Moore Inc. P.O. Box 760 Carlisle, PA 17013 | Financial Federal Credit Inc. 201 McCullough Drive Suite 320 Charlotte, NC 28262 | Blanket lien. |
| Secretary of the Commonwealth, Pennsylvania | CONT 11/19/2013 | 2005071900586 07/18/2005 | | | Continuation. |
| Secretary of the Commonwealth, Pennsylvania | TERM 11/19/2013 | 2008050701369 05/05/2008 | | | Termination by Finance Federal Credit Inc. |
| Secretary of the Commonwealth, Pennsylvania | CONT 11/19/2013 | 2010032301617 03/22/2010 | | | Continuation. |
| Secretary of the Commonwealth, Pennsylvania | UCC 11/19/2013 | 33030589 09/05/2000 | USF Glen Moore Inc. P.O. Box 760 Carlisle, PA 17013 | Financial Federal Credit Inc. 201 McCullough Drive Suite 320 Charlotte, NC 28262 | Blanket lien. |
| Secretary of the Commonwealth, Pennsylvania | CONT 11/19/2013 | 2005071900574 07/18/2005 | | | Continuation. |
| Secretary of the Commonwealth, Pennsylvania | TERM 11/19/2013 | 2008050701371 05/05/2008 | | | Termination by Financial Federal Credit Inc. |
| Secretary of the Commonwealth, Pennsylvania | CONT 11/19/2013 | 2010032301605 03/22/2010 | | | Continuation. |

## USF Holland Inc.

| JURISDICTION | FILING TYPE/ SEARCHED THRU | FILE NUMBER/ FILE DATE | DEBTOR | SECURED PARTY | COLLATERAL DESCRIPTION |
|---|---|---|---|---|---|
| US District Court, Kansas | LIT 12/03/2013 | 2:13-cv-02205-EFM-GLR 05/02/2013 | Defendant: USF Holland, Inc. | Plaintiff: Zachary Alden | Wrongful termination. Family Medical Leave Act. |
| US District Court, Kansas | LIT 12/03/2013 | 2:13-cv-02575-EFM-JPO 11/05/2013 | Defendant: Ronald Beckham USF Holland, Inc. YRC Worldwide, Inc. | Plaintiff: Mary Eastwood | Wrongful Death Seeking damages in excess of $75,000 |

| | | | | | |
|---|---|---|---|---|---|
| Department of State, Michigan | UCC 12/09/2013 | 2008194256-2 12/22/2008 | USF Holland, Inc. 750 E 40th St Holland, MI 49423 | Toyota Material Handling, U.S.A., Inc. P.O. Box 17419 Irvine, CA 92637419 | Inventory of all new Toyota, manufactured industrial, construction and agricultural equipment and all similar used equipment, whether now owned or hereafter acquired and wherever located, including in transit trucks that have been delivered by or on behalf of Toyota Material Handling, USA, Inc. and that have not yet been paid for in whole. |
| Department of State, Michigan | CONT 12/09/2013 | | | | Continuation. |
| Department of State, Michigan | UCC 12/09/2013 | 2012042144-1 03/20/2012 | USF HOLLAND, INC. 750 EAST 40TH STREET HOLLAND, MI 49423 | Nations Fund I, Inc. 101 Merritt Seven Norwalk, CT 06851 | Lease of specific equipment. |
| Department of State, Michigan | UCC 12/09/2013 | 2012052055-4 04/06/2012 | USF HOLLAND, INC. 750 EAST 40TH STREET HOLLAND, MI 49423 | Nations Fund I, Inc. 101 Merritt Seven Norwalk, CT 06851 | Lease of specific equipment. |
| Department of State, Michigan | UCC 12/09/2013 | 2012095428-6 07/02/2012 | USF HOLLAND, INC. 750 EAST 40TH STREET HOLLAND, MI 49423 | Nations Fund I, Inc. 101 Merritt Seven Norwalk, CT 06851 | Lease of specific equipment. |
| Department of State, Michigan | UCC 12/09/2013 | 2012129194-0 09/11/2012 | USF HOLLAND, INC. 750 EAST 40TH STREET HOLLAND, MI 49423 | Nations Fund I, Inc. 101 Merritt Seven Norwalk, CT 06851 | Lease of specific equipment. |
| Department of State, Michigan | AMEND 12/09/2013 | 2012133070-4 09/19/2012 | YRC, INC. 10990 ROE AVE OVERLAND PARK, KS 66211 | | Debtor change to: YRC, INC. 10990 ROE AVE OVERLAND PARK, KS 66211 |
| Department of State, Michigan | ASSGN 12/09/2013 | 2012140129-8 10/03/2012 | | Utica Leaseco, LLC 44225 UTICA ROAD UTICA, MI 48317 | Secured Party assignment to: Utica Leaseco, LLC 44225 UTICA ROAD UTICA, MI 48317 |
| Department of State, Michigan | UCC 12/09/2013 | 2012179056-8 12/27/2012 | USF HOLLAND INC. 750 E. 40TH STREET HOLLAND, MI 49423 | Oce Financial Services, Inc. 5450 North Cumberland Chicago, IL 60656 | All of Debtor's rights in all equipment subject to a lease between Debtor and Secured Party. |
| Department of State, Michigan | UCC 2/5/2014 | 2013177855-2 12/17/2013 | USF HOLLAND INC. 750 E. 40TH STREET HOLLAND, MI 49423 | Canon Financial Services, Inc. 158 Gaither Drive Suite 200 Mt. Laurel, NJ 08054 | All equipment subject to lease and other rights arising from lease equipment |

**USF Reddaway Inc.**

| JURISDICTION | FILING TYPE/ SEARCHED THRU | FILE NUMBER/ FILE DATE | DEBTOR | SECURED PARTY | COLLATERAL DESCRIPTION |
|---|---|---|---|---|---|
| Secretary of State, Oregon | UCC 11/22/2013 | 8154506 12/17/2008 | USF REDDAWAY, INC 16277 SE 130TH AVE CLACKAMAS, OR 97015 | TOYOTA MATERIAL HANDLING, U.S.A., INC. P.O. BOX 17419 IRVINE, CA 92623-7419 | INVENTORY OF ALL NEW TOYOTA, MANUFACTURED INDUSTRIAL, CONSTRUCTION AND AGRICULTURAL EQUIPMENT AND ALL SIMILAR USED EQUIPMENT, WHETHER NOW OWNED OR HEREAFTER ACQUIRED AND WHEREVER LOCATED, INCLUDING IN TRANSIT TRUCKS THAT HAVE BEEN DELIVERED BY OR ON BEHALF OF TOYOTA MATERIAL HANDLING, USA, INC. AND THAT HAVE NOT YET BEEN PAID FOR IN WHOLE. |
| Secretary of State, Oregon | CONT 11/22/2013 | 8154506-1 09/12/2013 | | | Continuation. |
| Secretary of State, Oregon | UCC 11/22/2013 | 8433679 01/04/2010 | USF REDDAWAY INC. PO BOX 1035 CLACKAMAS, OR 97015 USF REDDAWAY, INC. 16277 SE 130TH AVE CLACKAMAS, OR 97015 USF REDDAWAY INC. 12250 SE FORD DRIVE CLACKAMAS, OR 97015 USF REDDAWAY INC. 10990 ROE AVENUE MS A515 OVERLAND PARK, KS 66211 | FLUID CONNECTOR PRODUCTS, INC. PO BOX 10308 PORTLAND, OR 97296 | Specific equipment. |
| Secretary of State, Oregon | UCC 11/22/2013 | 89146492 03/20/2012 | USF REDDAWAY, INC. 16277 S.E. 130TH AVENUE CLACKAMAS, OR 97015 | Nations Fund I, Inc. 101 Merritt Seven Norwalk, CT 06851 | Lease of specific equipment. |
| Secretary of State, Oregon | UCC 11/22/2013 | 89162685 04/09/2012 | USF REDDAWAY, INC. 16277 S.E. 130TH AVENUE CLACKAMAS, OR 97015 | Nations Fund I, Inc. 101 Merritt Seven Norwalk, CT 06851 | Lease of specific equipment. |
| Secretary of State, Oregon | UCC 11/22/2013 | 89210013 06/01/2012 | USF REDDAWAY, INC. 16277 S.E. 130TH AVENUE CLACKAMAS, OR 97015 | Nations Fund I, Inc. 101 Merritt Seven Norwalk, CT 06851 | Lease of specific equipment. |

| Secretary of State, Oregon | UCC 11/22/2013 | 89283578 08/22/2012 | USF REDDAWAY, INC. 16277 S.E. 130TH AVENUE CLACKAMAS, OR 97015 | Nations Fund I, Inc. 101 Merritt Seven Norwalk, CT 06851 | Lease of specific equipment. |
| Secretary of State, Oregon | UCC 11/22/2013 | 89759879 06/18/2013 | USF REDDAWAY INC. D/B/A REDDAWAY 7720 S.W. MOHAWK ST, BUILDING H TULATIN, OR 97062 | STOUGHTON TRAILERS ACCEPTANCE BY LLC 416 S. ACADEMY STREET STOUGHTON, WI 53589 | Lease of specific equipment. *Debtor name is not compliant with Article 9. |
| Secretary of State, Oregon | UCC 11/22/2013 | 89890102 11/19/2013 | USF REDDAWAY INC. D/B/A REDDAWAY 7720 S.W. MOHAWK ST, BUILDING H TULATIN, OR 97062 | STOUGHTON TRAILERS ACCEPTANCE BY LLC 416 S. ACADEMY STREET STOUGHTON, WI 53589 | Lease of specific equipment. *Debtor name is not compliant with Article 9. |

### USFreightways Corporation

| JURISDICTION | FILING TYPE/ SEARCHED THRU | FILE NUMBER/ FILE DATE | DEBTOR | SECURED PARTY | COLLATERAL DESCRIPTION |
|---|---|---|---|---|---|
| Secretary of State, Delaware | UCC 12/03/2013 | 31630311 06/26/2003 | US FREIGHTWAYS CORPORATION 630 E KENMOOR, STE 200 GRAND RAPIDS, MI 49546 | DELL FINANCIAL SERVICES, L.P. 12234 N. IH-35 BLDG B AUSTIN, TX 78753 | Lease of specific equipment. |
| Secretary of State, Delaware | CONT 12/03/2013 | 20081862471 06/01/2008 | | | Continuation. |
| Secretary of State, Delaware | AMEND 12/03/2013 | 20083248935 09/24/2008 | | DELL FINANCIAL SERVICES L.L.C. 12234 N. IH-35 BLDG B AUSTIN, TX 78753. | Secured Party change to: DELL FINANCIAL SERVICES L.L.C. 12234 N. IH-35 BLDG B AUSTIN, TX 78753. |
| Secretary of State, Delaware | CONT 12/03/2013 | 20131370056 04/10/2013 | | | Continuation. |

### YRC Inc.

| JURISDICTION | FILING TYPE/ SEARCHED THRU | FILE NUMBER/ FILE DATE | DEBTOR | SECURED PARTY | COLLATERAL DESCRIPTION |
|---|---|---|---|---|---|

| | | | | | |
|---|---|---|---|---|---|
| Secretary of State, Delaware | UCC 12/03/2013 | 20102884538 08/18/2010 | YRC INC.<br><br>200 N BELTLINE RD IRVING, TX 75061 | GENERAL ELECTRIC CAPITAL CORPORATION<br><br>PO BOX 35701 BILLINGS, MT 59107-570 | Lease of specific equipment |
| Secretary of State, Delaware | UCC 12/03/2013 | 20121040460 03/19/2012 | YRC, INC.<br><br>10990 ROE AVENUE OVERLAND PARK, KS 66211 | NATIONS FUND I, INC.<br><br>1201 MERRITT SEVEN NORWALK, CT 06851 | Lease of specific equipment. |
| Secretary of State, Delaware | UCC 12/03/2013 | 20121537473 04/20/2012 | YRC, INC.<br><br>10990 ROE AVENUE OVERLAND PARK, KS 66211 | NATIONS FUND I, INC.<br><br>1201 MERRITT SEVEN NORWALK, CT 06851 | Lease of specific equipment. |
| Secretary of State, Delaware | ASSGN 12/03/2013 | 20123708577 09/26/2012 | | MILESTONE EQUIPMENT CORPORATION<br><br>1660 TIBURON BLVD, SUITE E TIBURON, CA 94920 | Secured Party assignment to: MILESTONE EQUIPMENT CORPORATION 1660 TIBURON BLVD, SUITE E TIBURON, CA 94920 |
| Secretary of State, Delaware | UCC 12/03/2013 | 20122075275 05/30/2012 | YRC, INC.<br><br>10990 ROE AVENUE OVERLAND PARK, KS 66211 | NATIONS FUND I, INC.<br><br>1201 MERRITT SEVEN NORWALK, CT 06851 | Lease of specific equipment. |
| Secretary of State, Delaware | UCC 12/03/2013 | 20122075648 05/30/2012 | YRC, INC.<br><br>10990 ROE AVENUE OVERLAND PARK, KS 66211 | NATIONS FUND I, INC.<br><br>1201 MERRITT SEVEN NORWALK, CT 06851 | Lease of specific equipment. |
| Secretary of State, Delaware | ASSGN 12/03/2013 | 20123708825 09/26/2012 | | MILESTONE EQUIPMENT CORPORATION<br><br>1660 TIBURON BLVD, SUITE E TIBURON, CA 94920 | Secured Party assignment to: MILESTONE EQUIPMENT CORPORATION 1660 TIBURON BLVD, SUITE E TIBURON, CA 94920 |
| Secretary of State, Delaware | UCC 12/03/2013 | 20122680124 07/12/2012 | YRC INC.<br><br>10990 ROE AVENUE OVERLAND PARK, KS 66211 | NATIONS FUND I, INC.<br><br>1201 MERRITT SEVEN NORWALK, CT 06851 | Lease of specific equipment. |
| Secretary of State, Delaware | UCC 12/03/2013 | 20122922427 07/30/2012 | YRC INC.<br><br>10990 ROE AVENUE OVERLAND PARK, KS 66211 | NATIONS FUND I, INC.<br><br>1201 MERRITT SEVEN NORWALK, CT 06851 | Lease of specific equipment. |

| | | | | | |
|---|---|---|---|---|---|
| Secretary of State, Delaware | UCC 12/03/2013 | 20123001106 08/03/2012 | YRC INC. 10990 ROE AVENUE OVERLAND PARK, KS 66211 | NATIONS FUND I, INC. 1201 MERRITT SEVEN NORWALK, CT 06851 | Lease of specific equipment. |
| Secretary of State, Delaware | ASSGN 12/03/2013 | 20123708890 09/26/2012 | | MILESTONE EQUIPMENT CORPORATION 1660 TIBURON BLVD, SUITE E TIBURON, CA 94920 | Secured Party assignment to: MILESTONE EQUIPMENT CORPORATION 1660 TIBURON BLVD, SUITE E TIBURON, CA 94920 |
| Secretary of State, Delaware | UCC 12/03/2013 | 20123241256 08/21/2012 | YRC INC. 10990 ROE AVENUE OVERLAND PARK, KS 66211 | NATIONS FUND I, INC. 1201 MERRITT SEVEN NORWALK, CT 06851 | Lease of specific equipment. |
| Secretary of State, Delaware | UCC 12/03/2013 | 20123592468 09/18/2012 | YRC INC. 10990 ROE AVENUE OVERLAND PARK, KS 66211 | NATIONS FUND I, INC. 1201 MERRITT SEVEN NORWALK, CT 06851 | Lease of specific equipment. |
| Secretary of State, Delaware | ASSGN 12/03/2013 | 20123819424 10/03/2012 | | UTICA LEASECO, LLC 44225 UTICA ROAD UTICA, MI 48317 | Secured Party assignment to: UTICA LEASECO, LLC 44225 UTICA ROAD UTICA, MI 48317 |
| Secretary of State, Delaware | UCC 12/03/2013 | 20123667005 09/13/2012 | YRC INC. 10990 Roe Avenue Overland Park, KS 66211 | Nations Fund I, Inc. 101 Merritt Seven Norwalk, CT 06851 | Lease of specific equipment. |
| Secretary of State, Delaware | ASSGN 12/03/2013 | 20124032142 10/03/2012 | | PMC FINANCIAL SERVICES GROUP, LLC 3816 EAST LA PALMA AVE ANAHEIM, CA 92807 | Secured Party assignment to: PMC FINANCIAL SERVICES GROUP, LLC 3816 EAST LA PALMA AVE ANAHEIM, CA 92807 |
| Secretary of State, Delaware | UCC 12/03/2013 | 20125096484 12/31/2012 | YRC, INC. 10990 ROE AVENUE OVERLAND PARK, KS 66211 | NATIONS FUND I, INC. 1201 MERRITT SEVEN NORWALK, CT 06851 | Lease of specific equipment. |
| Secretary of State, Delaware | UCC 12/03/2013 | 20131036327 03/18/2013 | YRC INC. 10990 ROE AVENUE OVERLAND PARK, KS 66211 | CIT FINANCE LLC 10201 CENTURION PARKWAY N. JACKSONVILLE, FL 32256 | Specific equipment. |
| Secretary of State, Delaware | TERM 12/03/2013 | 20131074971 03/20/2013 | | | Termination by CIT Finance LLC. |

| | | | | | |
|---|---|---|---|---|---|
| Secretary of State, Delaware | UCC 12/03/2013 | 20131074690 03/20/2013 | YRC INC.<br><br>10990 ROE AVENUE OVERLAND PARK, KS 66211 | CIT FINANCE LLC<br><br>10201 CENTURION PARKWAY N. JACKSONVILLE, FL 32256 | Specific equipment. |
| Secretary of State, Delaware | UCC 12/03/2013 | 20132927771 07/18/2013 | YRC INC.<br><br>10990 ROE AVENUE OVERLAND PARK, KS 66211 | Nations Fund I, Inc.<br><br>PO Box 203106 Dallas, TX 75320-3106 | Lease of specific equipment. |
| Secretary of State, Delaware | UCC 12/03/2013 | 20134021334 10/08/2013 | YRC INC.<br><br>10990 ROE AVENUE OVERLAND PARK, KS 66211 | Nations Fund I, Inc.<br><br>PO Box 203106 Dallas, TX 75320-3106 | Lease of specific equipment. |
| Secretary of State, Delaware | UCC 12/03/2013 | 20134369279 11/04/2013 | YRC INC.<br><br>10990 ROE AVENUE OVERLAND PARK, KS 66211 | Nations Fund I, Inc.<br><br>PO Box 203106 Dallas, TX 75320-3106 | Lease of specific equipment. |
| Secretary of State, Delaware | UCC 1/30/2014 | 20135162830 12/30/2014 | YRC, INC.<br><br>10990 ROE AVENUE OVERLAND PARK, KS 66211 | Nations Fund I, Inc.<br><br>101 Merritt Seven 5th Floor Norwalk, CT 06851 | All equipment subject to lease and other rights arising from lease equipment. |
| Secretary of State, Kansas | UCC 12/05/2013 | 6887905 03/20/2012 | YRC, INC.<br><br>10990 ROE AVENUE OVERLAND PARK, KS 66211 | Nations Fund I, Inc.<br><br>101 Merrit Seven Norwalk, CT 06851 | Lease of specific equipment. |
| Secretary of State, Kansas | UCC 12/05/2013 | 6896716 04/23/2012 | YRC, INC.<br><br>10990 ROE AVENUE OVERLAND PARK, KS 66211 | Nations Fund I, Inc.<br><br>101 Merrit Seven Norwalk, CT 06851 | Lease of specific equipment. |
| Secretary of State, Kansas | ASSGN 12/05/2013 | 71253509 09/26/2012 | | MILESTONE EQUIPMENT CORPORATION<br><br>1660 TIBURON BLVD, SUITE E TIBURON, CA 94920 | Secured Party assignment to:<br>MILESTONE EQUIPMENT CORPORATION 1660 TIBURON BLVD, SUITE E TIBURON, CA 94920 |
| Secretary of State, Kansas | UCC 12/05/2013 | 6909386 06/01/2012 | YRC, INC.<br><br>10990 ROE AVENUE OVERLAND PARK, KS 66211 | Nations Fund I, Inc.<br><br>101 Merrit Seven Norwalk, CT 06851 | Lease of specific equipment. |
| Secretary of State, Kansas | UCC 12/05/2013 | 6909402 06/01/2012 | YRC, INC.<br><br>10990 ROE AVENUE OVERLAND PARK, KS 66211 | Nations Fund I, Inc.<br><br>101 Merrit Seven Norwalk, CT 06851 | Lease of specific equipment. |
| Secretary of State, Kansas | ASSGN 12/05/2013 | 71253780 09/26/2012 | | MILESTONE EQUIPMENT CORPORATION<br><br>1660 TIBURON BLVD, SUITE E TIBURON, CA 94920 | Secured Party assignment to:<br>MILESTONE EQUIPMENT CORPORATION 1660 TIBURON BLVD, SUITE E TIBURON, CA 94920 |

| | | | | | |
|---|---|---|---|---|---|
| Secretary of State, Kansas | UCC 12/05/2013 | 6920961 07/13/2012 | YRC INC.<br><br>10990 ROE AVENUE OVERLAND PARK, KS 66211 | Nations Fund I, Inc.<br><br>101 Merrit Seven Norwalk, CT 06851 | Lease of specific equipment. |
| Secretary of State, Kansas | UCC 12/05/2013 | 6924781 07/31/2012 | YRC INC.<br><br>10990 ROE AVENUE OVERLAND PARK, KS 66211 | Nations Fund I, Inc.<br><br>101 Merrit Seven Norwalk, CT 06851 | Lease of specific equipment. |
| Secretary of State, Kansas | UCC 12/05/2013 | 6926026 08/06/2012 | YRC INC.<br><br>10990 ROE AVENUE OVERLAND PARK, KS 66211 | Nations Fund I, Inc.<br><br>101 Merrit Seven Norwalk, CT 06851 | Lease of specific equipment. |
| Secretary of State, Kansas | ASSGN 12/05/2013 | 71253798 09/26/2012 | | MILESTONE EQUIPMENT CORPORATION<br><br>1660 TIBURON BLVD, SUITE E TIBURON, CA 94920 | Secured Party assignment to:<br>MILESTONE EQUIPMENT CORPORATION<br>1660 TIBURON BLVD, SUITE E<br>TIBURON, CA 94920 |
| Secretary of State, Kansas | UCC 12/05/2013 | 6930549 08/22/2012 | YRC INC.<br><br>10990 ROE AVENUE OVERLAND PARK, KS 66211 | Nations Fund I, Inc.<br><br>101 Merrit Seven Norwalk, CT 06851 | Lease of specific equipment. |
| Secretary of State, Kansas | UCC 12/05/2013 | 6933816 09/07/2012 | YRC INC.<br><br>10990 ROE AVENUE OVERLAND PARK, KS 66211 | Nations Fund I, Inc.<br><br>101 Merrit Seven Norwalk, CT 06851 | Lease of specific equipment. |
| Secretary of State, Kansas | ASSGN 12/05/2013 | 6939532 10/03/2012 | | PMC FINANCIAL SERVICES GROUP, LLC<br><br>3816 EAST LA PALMA AVE ANAHEIM, CA 92807 | Secured Party assignment to:<br>PMC FINANCIAL SERVICES GROUP, LLC<br>3816 EAST LA PALMA AVE<br>ANAHEIM, CA 92807 |
| Secretary of State, Kansas | UCC 12/05/2013 | 6936462 09/19/2012 | YRC, INC.<br><br>10990 ROE AVENUE OVERLAND PARK, KS 66211 | Nations Fund I, Inc.<br><br>101 Merrit Seven Norwalk, CT 06851 | Lease of specific equipment. |
| Secretary of State, Kansas | ASSGN 12/05/2013 | 71258987 10/03/2012 | | UTICA LEASECO, LLC<br><br>44225 UTICA ROAD UTICA, MI 48317 | Secured Party assignment to:<br>UTICA LEASECO, LLC<br>44225 UTICA ROAD<br>UTICA, MI 48317 |
| Secretary of State, Kansas | UCC 12/05/2013 | 6959944 01/02/2013 | YRC, INC.<br><br>10990 ROE AVENUE OVERLAND PARK, KS 66211 | Nations Fund I, Inc.<br><br>101 Merrit Seven Norwalk, CT 06851 | Lease of specific equipment. |

| Secretary of State, Kansas | UCC 12/05/2013 | 6999189 05/28/2013 | YRC INC. D/B/A YRC FREIGHT<br><br>10990 ROE AVENUE OVERLAND PARK, KS 66211 | STOUGHTON TRAILERS ACCEPTANCE COMPANY, LLC<br><br>416 S. ACADEMY STREET STOUGHTON, WI 53589 | Lease of specific equipment.<br><br>*Debtor name is not compliant with Article 9. |
| Secretary of State, Kansas | UCC 12/05/2013 | 7008287 07/01/2013 | YRC INC.<br><br>10990 ROE AVENUE OVERLAND PARK, KS 66211 | Nations Fund I, Inc.<br><br>PO Box 203106 Dallas, TX 75320-3106 | Lease of specific equipment. |

## YRC Enterprise Services, Inc.

| JURISDICTION | FILING TYPE/ SEARCHED THRU | FILE NUMBER/ FILE DATE | DEBTOR | SECURED PARTY | COLLATERAL DESCRIPTION |
|---|---|---|---|---|---|
| Secretary of State, Delaware | UCC 12/03/2013 | 20103749383 10/26/2010 | YRC ENTERPRISE SERVICES, INC.<br><br>10990 ROE AVENUE OVERLAND PARK, KS 66211 | COMSOURCE, INC.<br><br>8104 CAZENOVIA ROAD MANLIUS, NY 13104 | Lease of specific equipment. |
| Secretary of State, Delaware | ASSGN 12/03/2013 | 20104533489 12/21/2010 | | MB FINANCIAL BANK, N.A.<br><br>6111 N. RIVER ROAD ROSEMONT, IL 60018 | Secured Party assignment to: MB FINANCIAL BANK, N.A. 6111 N. RIVER ROAD ROSEMONT, IL 60018 |
| Secretary of State, Delaware | ASSGN 12/03/2013 | 20110265101 01/24/2011 | | MB FINANCIAL BANK, N.A.<br><br>6111 N. RIVER ROAD ROSEMONT, IL 60018 | Secured Party assignment to: MB FINANCIAL BANK, N.A. 6111 N. RIVER ROAD ROSEMONT, IL 60018 |
| Secretary of State, Delaware | UCC 12/03/2013 | 20111360844 03/30/2011 | YRC Enterprise Services, Inc.<br><br>10990 Roe Ave Overland Park, KS 66211 | Forsythe Solutions Group, Inc.<br><br>7770 Frontage Road Skokie, IL 60077 | Specific equipment. |
| Secretary of State, Delaware | UCC 12/03/2013 | 20114124858 10/26/2011 | YRC ENTERPRISES SERVICES, INC.<br><br>10990 ROE AVENUE OVERLAND PARK, KS 62207 | NORTH AMERICAN COMMUNICATIONS RESOURCE, INC.<br><br>3344 HWY 149 EAGAN, MN 55121 | Telecommunications equipment. |
| Secretary of State, Delaware | TERM 12/03/2013 | 20130167164 01/11/2013 | | | Termination by North American Communications Resource, Inc. |

## YRC Logistics Services, Inc.

| JURISDICTION | FILING TYPE/ SEARCHED THRU | FILE NUMBER/ FILE DATE | DEBTOR | SECURED PARTY | COLLATERAL DESCRIPTION |
|---|---|---|---|---|---|

| Secretary of State, Illinois | UCC 12/04/2013 | 14278044 05/08/2009 | YRC LOGISTICS SERVICES, INC. 10990 ROE AVE OVERLAND PARK, KS 66211 | NMHG FINANCIAL SERVICES, INC. 44 OLD RIDGEBURY ROAD DANBURY, CT 06810 | All equipment now or hereafter leased by Lessor to Lessee. |
|---|---|---|---|---|---|
| Secretary of State, Illinois | CONT 12/04/2013 | 09270983 11/22/2013 | | | Continuation. |
| Secretary of State, Illinois | AMEND 12/04/2013 | 09270982 11/22/2013 | | NMHG FINANCIAL SERVICES, INC. PO BOX 35701 Billings, MT 59107-5701 | Secured Party change to: NMHG FINANCIAL SERVICES, INC. PO BOX 35701 Billings, MT 59107-5701 |
| Secretary of State, Illinois | UCC 12/04/2013 | 14814787 12/02/2009 | YRC LOGISTICS SERVICES, INC. 10990 ROE AVENUE OVERLAND PARK, KS 66211 | GREATWIDE DEDICATED TRANSPORT, LLC 12404 PARK CENTRAL DR, STE 300 SOUTH DALLAS, TX 75251 | Reference is made to (i) that certain Indemnification Escrow Agreement, dated as of November 23,2009 (the "Indemnification Escrow Agreement") between Debtor, Secured Party and JPMorgan Chase Bank, N.A. and (ii) that certain Adjustment Escrow Agreement, dated as of November 23,2009 (the "Adjustment Escrow Agreement") between Debtor, Secured Party and JPMorgan Chase Bank, N.A.<br><br>This financing statement covers (1) all of the Debtor's rights under the Indemnification Escrow Agreement, (2) the Indemnification Escrow Account, the Indemnification Escrow Amount and all investments thereof, in each case, as referred to in the Indemnification Escrow Agreement, (3) all of the Debtor's rights under the Adjustment Escrow Agreement and (4) the Adjustment Escrow Account, the Adjustment Escrow Amount and all, investments thereof, in each case, as referred to in the Adjustment Escrow Agreement. |

### YRC Worldwide Inc.

| JURISDICTION | FILING TYPE/ SEARCHED THRU | FILE NUMBER/ FILE DATE | DEBTOR | SECURED PARTY | COLLATERAL DESCRIPTION |
|---|---|---|---|---|---|
| Secretary of State, Delaware | UCC 12/03/2013 | 20084198477 12/17/2008 | YRC WORLDWIDE, INC. 10990 ROE AVE. OVERLAND PARK, KS 66211 | TOYOTA MATERIAL HANDLING, U.S.A., INC. P.O. BOX 17419 IRVINE, CA 92623-741 | Inventory of all new Toyota, manufactured industrial, construction and agricultural equipment and all similar used equipment, whether now owned or hereafter acquired and wherever located, including in transit trucks that have been delivered by or on behalf of Toyota Material Handling, USA, Inc. and that have not yet been paid for in whole. |
| Secretary of State, Delaware | CONT 12/03/2013 | 20133558716 09/12/2013 | | | Continuation. |
| Secretary of State, Delaware | UCC 12/03/2013 | 20101549991 05/04/2010 | YRC WORLDWIDE INC. 10990 ROE AVE OVERLAND PARK, KS 66211 | GENERAL ELECTRIC CAPITAL CORPORATION PO BOX 35701 BILLINGS, MT 59107-570 | Lease of specific equipment. |

| Secretary of State, Delaware | UCC 12/03/2013 | 20122122051 06/04/2012 | YRC WORLDWIDE INC. 10990 ROE AVENUE OVERLAND PARK, KS 66211 | MACQUARIE EQUIPMENT FINANCE, LLC 2285 FRANKLIN ROAD SUITE 100 BLOOMFIELD HILLS, MI 48302 | Lease of specific equipment. |
|---|---|---|---|---|---|
| Register of Deeds, Johnson County, Kansas | STL 12/04/2013 | 20130411-0004822 04/11/2013 | YRC WORLDWIDE INC. (as a corporation) 10990 Roe Ave Shawnee Mission, KS 66211-1213 | State of Kansas Department of Labor Delinquent Account Unit 401 S.W. Topeka Blvd. Topeka, KS 66603-3182 | $10,008.26 |
| Register of Deeds, Johnson County, Kansas | STL 12/04/2013 | 20130729-0012027 07/29/2013 | YRC WORLDWIDE INC. (as a corporation) 10990 Roe Ave Shawnee Mission, KS 66211-1213 | State of Kansas Department of Labor Delinquent Account Unit 401 S.W. Topeka Blvd. Topeka, KS 66603-3182 | $236.48 |
| US District Court, Kansas | LIT 12/03/2013 | 2:11-cv-02072-KHV-JPO 02/07/2011 | Defendant: YRC Worldwide Inc. | Plaintiff: Stan Better YRC Investors Group | Securities Exchange Act Plaintiffs suing in class action against YRC Worldwide Inc. for misleading conduct in company valuation. |
| US District Court, Kansas | LIT 12/03/2013 | 2:13-cv-02575-EFM-JPO 11/05/2013 | Defendant: Ronald Beckham USF Holland, Inc. YRC Worldwide, Inc. | Plaintiff: Mary Eastwood | Wrongful death. |

**Schedule 10.2.2(e)**
**Investments**

- Included by reference are all Intercompany Notes listed on <u>Schedule 10.2.3(b).</u>
- YRC Regional Transportation, Inc. owns preferred shares of Newgistics, Inc., which were converted into right to receive $3.4 million on Newgistics, Inc. merger

**Wholly Owned Subsidiaries**

| Issuer | Issued and Outstanding Shares/Equity Interests | Record and Beneficial Owner |
|---|---|---|
| YRC Worldwide Inc. | 28,629,938 583,334 shares of Class A Convertible Preferred Stock 1 share of Series A Preferred Stock | Publicly traded |
| 1105481 Ontario, Inc. | 100 shares | 100% by YRC Worldwide Inc. |
| Express Lane Service, Inc. | 100 shares | 100% by YRC Worldwide Inc. |
| OPK Insurance Co. Ltd. | Unknown | 100% by YRC Worldwide Inc. |
| Roadway LLC | 100 shares | 100% by YRC Worldwide Inc. |
| YRC Association Solutions, Inc. | 10,000 shares | 100% by YRC Worldwide Inc. |

| | | |
|---|---|---|
| YRC Logistics Asia Limited | 357,501,711 shares | 100% by YRC Worldwide Inc. |
| YRC International Investments, Inc. | 1,000 shares | 100% by YRC Worldwide Inc. |
| YRC MORTGAGES, LLC | 10,000 units | 100% by YRC Worldwide Inc. |
| YRC Regional Transportation, Inc. | 1,000 shares | 100% by YRC Worldwide Inc. |
| YRC Enterprise Services, Inc. | 1,000 shares | 100% by YRC Worldwide Inc. |
| YRCW Receivables LLC | $1,000 paid in capital | 100% by YRC Worldwide Inc. |
| YRC Inc. | 200 shares | 100% by Roadway LLC |
| Roadway Next Day Corporation | 100 shares | 100% by Roadway LLC |
| Reimer Express Lines Ltd. | 100 Class B Common 7,511,100 Class A Voting Common | 100% by YRC Inc. |
| Roadway Express International, Inc. | 1,000 shares | 100% by YRC Inc. |
| Roadway Reverse Logistics, Inc. | 100 shares | 100% by YRC Inc. |
| YRC Services S. de R.L. de C.V. | N/A | 100% by YRC Transportation, S.A. de C.V. |
| New Penn Motor Express, Inc. | 7 shares | 100% by Roadway Next Day Corporation |
| YRC (Shanghai) Management Consulting CO., LTD. | No shares | 100% by YRC Logistics Asia Limited |
| PT Meridian IQ Indonesia International | $50,000 paid in capital | 100% by YRC Logistics Asia Limited |
| YRC Worldwide Pte. Ltd. | 100 shares | 100% by YRC International Investments, Inc. |
| YRC LOGISTICS SERVICES, INC. | 50 shares | 100% by YRC Regional Transportation, Inc. |
| YRC Logistics Inc. | 100 shares | 100% by YRC LOGISTICS SERVICES, INC. |
| USF Bestway Inc. | 283.4 shares | 100% by YRC Regional Transportation, Inc. |
| USF DUGAN INC. | 1,000,000 shares | 100% by YRC Regional Transportation, Inc. |
| USF Glen Moore Inc. | 100,000 | 100% by YRC Regional Transportation, Inc. |
| USF Holland Inc. | 1,131 Common Stock 2,610 Preferred Stock | 100% by YRC Regional Transportation, Inc. |
| USF Holland International Sales Corporation | 100,000 shares | 100% by USF Holland Inc. |
| USF RedStar LLC | Unknown | 100% by YRC Regional Transportation, Inc. |
| USF Reddaway Inc. | 40.5 shares | 100% by YRC Regional Transportation, Inc. |

**Less Than Wholly Owned Subsidiaries**

| Issuer | Issued and Outstanding Shares/Equity Interests | Record and Beneficial Owner |
|---|---|---|
| JHJ International Transportation | $10,000,000 paid in capital | 50% by YRC Worldwide Inc. and 50% by Shanghai Jin Jiang International Industrial Investment Co., Ltd. |
| Roadway Express, S.A. de C.V. | 9,210,800 shares | 99.99% by YRC Inc. .01% by Transcontinental Lease, S. de R.L de C.V. |

| Transcontinental Lease, S. de R.L. de C.V. | 50 shares | 99.99% by YRC Inc.<br>.01% by Roadway Express International, Inc. |
| YRC Transportation, S.A. de C.V. | 5,000 shares | 58.9% by YRC Inc.<br>41.1% by Reimer Express Lines Ltd. |

**Schedule 10.2.3(b)**
**Debt**

• 5.0% Net Share Settled Contingent Convertible Senior Notes due 2023 and the subsidiary guarantees of them, with remaining aggregate principal amount of $177,000.

• Indebtedness arising under contracts entered into in the ordinary course of business for the purchase of goods and services, whether or not delivered or accepted, which constitute take or pay obligations.

• Included by reference are all liens listed on Schedule 10.2.1(b).

Additional Outstanding Notes

| Maker | Payee | Original Principal Amount |
| --- | --- | --- |
| Each Loan Party | Each Loan Party | N/A |
| YRC Inc. (fka Roadway Express, Inc.) | Roadway LLC | $ 500,000,000.00 |
| YRC Inc. (fka Roadway Express, Inc.) | YRC Worldwide Inc. | $ 200,000,000.00 |
| New Penn Motor Express, Inc. | Roadway LLC | $ 150,000,000.00 |
| YRC Logistics Asia Limited | YRC Worldwide Inc. | $ 10,203,693.27 |
| YRC Logistics Asia Limited | YRC Worldwide Inc. | 1, 563,062.02 |
| Reimer Express Lines Ltd. | YRC Logistics Inc. | $ 3,674,434.39 CAD |
| YRC Worldwide Inc. | Reimer Express Lines Ltd. | $19,000,000.00 |
| YRC Inc. | Reimer Express Lines Ltd. | $ 5,870,361.00 CAD |
| Transcontinental Lease, S. de R.L. de C.V. | YRC Transportation, S.A. de C.V. | $1,047,718.92 |

Capital Lease Obligations

| Lessee | Lessor | Opco | Location/Description | 1/31/14 Balance |
| --- | --- | --- | --- | --- |
| YRC Worldwide Inc. | Bloomington Industrial Property Owner, LLC | YRC | NAT #1 Bloomington - Terminal C4 | 19,078,779.20 |
| YRC Worldwide Inc. | 1313 Grand Street Realty, LLC | YRC | NAT #1 Brooklyn - Terminal C4 | 5,898,925.60 |
| YRC Worldwide Inc. | NATMI Truck Terminals, LLC c/o NorthAmerican Terminals Management, Inc. | YRC | NAT #1 Chula Vista - Terminal C4 | 2,074,577.49 |

| | | | | |
|---|---|---|---|---|
| YRC Worldwide Inc. | NATMI Truck Terminals, LLC c/o NorthAmerican Terminals Management, Inc. | YRC | NAT #1 Denver - Terminal C4 | 4,898,324.72 |
| YRC Worldwide Inc. | KTR Property Trust I | URD | NAT #1 Fontana - Terminal C4 | 10,324,335.07 |
| YRC Worldwide Inc. | Prologis Targeted US Logistics Fund, LP | YRC | NAT #1 Gardena - Terminal C4 | 4,634,586.79 |
| YRC Worldwide Inc. | NATMI Truck Terminals, LLC c/o NorthAmerican Terminals Management, Inc. | URD | NAT #1 Henderson - Terminal C4 | 3,155,981.50 |
| YRC Worldwide Inc. | NATMI Truck Terminals, LLC c/o NorthAmerican Terminals Management, Inc. | URD | NAT #1 Las Vegas - Terminal C4 | 2,691,607.83 |
| YRC Worldwide Inc. | NATMI Truck Terminals, LLC c/o NorthAmerican Terminals Management, Inc. | YRC | NAT #1 Manassas - Terminal C4 | 1,994,214.80 |
| YRC Worldwide Inc. | Orange Batavia I LLC | URD | NAT #1 Orange - Terminal C4 | 5,469,230.22 |
| YRC Worldwide Inc. | GPT Orlando Terminal Owner LLC c/o Gramercy Capital Corp. | YRC | NAT #1 Orlando - Terminal C4 | 1,781,154.80 |
| YRC Worldwide Inc. | Bel Air T.T., LLC (c/o Pacific Industrial, LLC) | YRC | NAT #1 San Diego - Terminal C4 | 2,197,405.00 |
| YRC Worldwide Inc. | M4 Terminals, LLC c/o Mark IV Capital, Inc. | YRC | NAT #1 San Jose - Terminal C4 | 1,956,910.11 |
| YRC Worldwide Inc. | M4 Terminals, LLC c/o Mark IV Capital, Inc. | URD | NAT #1 Santa Clara - Terminal C4 | 2,537,893.92 |
| YRC Worldwide Inc. | KTR Property Trust I | YRC | NAT #1 Seattle - Terminal C4 | 6,450,485.73 |
| YRC Worldwide Inc. | NATMI Truck Terminals, LLC c/o NorthAmerican Terminals Management, Inc. | YRC | NAT #1 Sparks - Terminal C4 | 1,732,906.54 |
| YRC Worldwide Inc. | NATMI Truck Terminals, LLC c/o NorthAmerican Terminals Management, Inc. | NPM | NAT #2 Billerica - Terminal C4 | 3,991,776.29 |
| YRC Worldwide Inc. | Terreno Dell LLC | YRC | NAT #2 Carlstadt - Terminal C4 | 3,517,707.62 |
| YRC Worldwide Inc. | GPT Houston Terminal Owner LLC c/o Gramercy Capital Corp. | YRC | NAT #3 - Houston - Terminal C4 | 3,563,775.63 |
| YRC Worldwide Inc. | NATMI Truck Terminals, LLC c/o NorthAmerican Terminals Management, Inc. | YRC | NAT #3 Phoenix - Terminal C4 | 4,384,666.83 |
| YRC Worldwide Inc. | NATMI Truck Terminals, LLC c/o NorthAmerican Terminals Management, Inc. | YRC | NAT #3 Portland - Terminal C4 | 7,627,074.06 |
| YRC Worldwide Inc. | DCT Regentview Avenue LLC c/o DCT Industrial Trust Inc. | URD | NAT #4 - Downey CA v2 - Terminal C4 | 5,330,837.07 |
| YRC Worldwide Inc. | DCT Eckhoff Street LLC c/o DCT Industrial Trust Inc. | YRC | NAT #4 - Orange CA v2 - Terminal C4 | 5,580,927.72 |
| YRC Worldwide Inc. | DCT Peoria Street LLC c/o DCT Industrial Trust Inc. | YRC | NAT #4 - Sun Valley CA - Terminal C4 | 3,648,379.41 |
| YRC Worldwide Inc. | GPT Deer Park Terminal Owner LLC c/o Gramercy Property Trust | YRC | NAT #5 - Deer Park NY - Terminal C4 | 2,179,445.82 |
| YRC Worldwide Inc. | Terreno Clawiter LLC c/o Cassidy Turley | YRC | NAT #5 - Hayward/Okland CA - Terminal C4 | 3,756,728.40 |

| YRC Worldwide Inc. | Prologis Targeted US Logistics Fund, LP | YRC | NAT #5 - Tacoma WA - Terminal C4 | 2,727,643.28 |
|---|---|---|---|---|
| YRC Worldwide Inc. | Estes Express Lines | YRC | Estes - Charlotte, NC - Terminal C4 | 5,586,472.44 |
| YRC Worldwide Inc. | Estes Express Lines | UHL | Estes - Coon Rapids - Terminal C4 | 4,645,616.92 |
| YRC Worldwide Inc. | Estes Express Lines (G. I. Trucking Company) | URD | Estes - Eugene, OR - Terminal C4 | 1,293,636.81 |
| YRC Worldwide Inc. | Estes Terminals LLC | UHL | Estes - Joilet - Terminal C4 | 7,249,164.66 |
| YRC Worldwide Inc. | Estes Express Lines | YRC | Estes - Kearny, NJ - Terminal C4 | 7,446,011.87 |
| YRC Worldwide Inc. | Estes Express Lines | YRC | Estes - Lake Park, GA - Terminal C4 | 3,834,690.79 |
| YRC Worldwide Inc. | Estes Express Lines, Inc. | UHL | Estes - Milwaukee - Terminal C4 | 4,553,172.52 |
| YRC Worldwide Inc. | Estes Express Lines | YRC | Estes - Morrisville, NC - Terminal C4 | 2,166,992.91 |
| YRC Worldwide Inc. | Estes Express Lines (G. I. Trucking Company) | URD | Estes - Redmond, OR - Terminal C4 | 638,874.55 |
| YRC Worldwide Inc. | Estes Terminals LLC | UHL | Estes - Rockford - Terminal C4 | 3,717,940.43 |
| YRC Worldwide Inc. | Estes Express Lines, Inc. | UHL | Estes - South Bend - Terminal C4 | 4,660,177.30 |
| YRC Worldwide Inc. | Estes Terminals LLC | YRC | Estes - Sparks, NV - Terminal C4 | 5,104,767.77 |
| YRC Worldwide Inc. | Estes Express Lines (G. I. Trucking Company) | URD | Estes - Tacoma, WA - Terminal C4 | 5,615,755.75 |
| YRC Worldwide Inc. | Estes Express Lines | URD | Estes - Three Forks, MT - Terminal C4 | 309,384.59 |
| YRC Worldwide Inc. | Estes Express Lines | UHL | Estes - Tomah Monroe County - Terminal C4 | 1,137,914.92 |
| YRC Worldwide Inc. | Estes Express Lines | YRC | Estes - Wichita, KS - Terminal C4 | 1,190,145.94 |
| YRC Worldwide Inc. | NATMI National San Bernardino, LP | YRC | Centerpoint - San Bernardino CA - Terminal C4 | 8,648,015.83 |
| YRC Worldwide Inc. | EXOL Properties, LLC | URD | EXOL - Boise ID - Terminal C4 | 1,034,275.43 |
| YRC Worldwide Inc. | EXOL Properties, LLC | YRC | EXOL - Meridian ID - Terminal C4 | 1,462,257.79 |
| YRC Worldwide Inc. | Freight Line Properties LLC | YRC | Freight Line - Salt Lake City, UT - Terminal C4 | 2,949,166.55 |
| YRC Worldwide Inc. | Kestrel Crossdock LLC | URD | Kestrel Crossdock - Missoula, MT - Terminal C4 | 1,293,227.68 |
| YRC Worldwide Inc. | Mad Acquisitions, LLC | YRC | Other - Roanoke, VA - Terminal C4 | 633,638.46 |
| YRC Worldwide Inc. | RLR Investments, LLC (Attn: Corp Legal Dept) | UHL | RLR - Appleton WI - Terminal C4 | 3,380,468.85 |
| YRC Worldwide Inc. | RLR Investments LLC (Attn: Corp Legal Dept) | YRC | RLR - Atlanta GA - Terminal C4 | 6,924,155.14 |
| YRC Worldwide Inc. | RL Roberts LLC (Attn: Corp Legal Dept) | YRC | RLR - Chicago West IL - Terminal C4 | 3,796,028.10 |
| YRC Worldwide Inc. | RLF Booth SPE, LLC | YRC | RLR - Kansas City, MO - Terminal C4 | 4,931,781.34 |

| | | | | |
|---|---|---|---|---|
| YRC Worldwide Inc. | R. L. Roberts, LLC | NPM | RLR - Scranton PA - Terminal C4 | 1,489,923.38 |
| YRC Worldwide Inc. | ProLogis Targeted U.S. Logistics Fund, L.P. (Attn: Diane Obringer) | YRC | SSF - San Francisco CA - Terminal C4 | 6,943,267.76 |
| YRC Worldwide Inc. | RLR Investments LLC | URD | TAC - Spokane WA (URD) - Terminal C4 | 1,477,082.54 |
| YRC Worldwide Inc. | TAC Spokane, LLC | YRC | TAC - Spokane, WA - Terminal C4 | 975,798.60 |
| YRC Worldwide Inc. | Thunderbolt Management Group Inc (Attn Barry Jenkins) | YRC | Thunderbolt Colorado Springs CO - Terminal C4 | 639,191.61 |
| YRC Worldwide Inc. | Dauntless ULC c/o Crown Enterprises | YRC | Other - Mississauga/Toronto Canada - Terminal C4 | 9,229,920.84 |
| YRC Worldwide Inc. | Price Property and Investments LLC and Green-Blue 1818 LLC | YRC | Tower and 5200 Building - Terminal C4 | 20,368,745.70 |
| YRC Worldwide Inc. | GPT Elkridge Terminal Owner LLC c/o Gramercy Property Trust Inc. | NPM | SE - Elkridge/Baltimore MD - Terminal C4 | 5,210,767.90 |
| YRC Worldwide Inc. | Southeastern Freight Lines, Inc. | YRC | SE - Lubbock TX - Terminal C4 | 946,780.16 |
| YRC Worldwide Inc. | A. Duie Pyle, Inc. | NPM | SE - Maspeth - Terminal C4 | 11,049,181.97 |
| YRC Worldwide Inc. | A. Duie Pyle, Inc. | NPM | SE - Newburgh - Terminal C4 | 2,734,071.72 |
| YRC Worldwide Inc. | Southeastern Freight Lines, Inc. | YRC | SE - Odessa TX - Terminal C4 | 557,574.47 |
| YRC Worldwide Inc. | Southeastern Freight Lines, Inc. | YRC | SE - Amarillo, TX - Terminal C4 | 1,240,096.86 |
| YRC Worldwide Inc. | Southeastern Freight Lines, Inc. | YRC | SE - McAllen, TX - Terminal C4 | 1,479,453.46 |
| YRC Worldwide Inc. | Southeastern Freight Lines, Inc. | YRC | SE - Miami, FL - Terminal C4 | 10,574,256.99 |
| YRC Worldwide Inc. | Southeastern Freight Lines, Inc. | YRC | SE - Tulsa - Terminal C4 | 1,374,813.83 |
| YRC Worldwide Inc. | Southeastern Freight Lines, Inc. | YRC | SE - Van Buren - Terminal C4 | 620,383.41 |
| YRC Worldwide Inc. | A. Duie Pyle, Inc. | YRC | SE - Westbrook (Portland, ME) - Terminal C4 | 742,826.07 |
| YRC Worldwide Inc. | A. Duie Pyle, Inc. | YRC | SE - Williston - Terminal C4 | 879,862.09 |
| YRC Inc. | Clean Energy Finance, LLC | YRC | (4) 2011 Peterbuilt LNG 384 Series Tractors | 231,502.46 |
| YRC Enterprise Services, Inc. | Kronos | YRC | HRIS Workforce Software | 910,335.59 |

Letters of Credit

| Issuing Bank | LOC # | Beneficiary | Letter of Credit Total |
|---|---|---|---|
| SunTrust Bank | F844353 | Old Republic Insurance Company | $132,243,850.00 |
| SunTrust Bank | F856462 | National Union Fire Insurance Company of Pittsburgh, PA, et al | $9,900,000.00 |
| Wells Fargo Bank, N.A. | 517615P | Hartford Fire Insurance Co. | $450,000.00 |

| | | | |
|---|---|---|---|
| Wells Fargo Bank, N.A. | **IS0014715U** | QBE Insurance Corporation | $878,775.00 |
| JPMorgan Chase Bank, N.A. | **CPCS-742627** | Bank of America, National Association, Canada Branch, FIA Card Services, National Association | $2,710,000.00 |
| JPMorgan Chase Bank, N.A. | **CPCS-793046** | Liberty Mutual Insurance Company | $8,000,000.00 |
| JPMorgan Chase Bank, N.A. | **CPCS-918562** | Safety National Casualty Corporation | $3,000,000.00 |
| JPMorgan Chase Bank, N.A. | **TFTS-239248** | Westchester Fire Insurance Company | $4,060,000.00 |
| JPMorgan Chase Bank, N.A. | **TFTS-271022** | ExxonMobil Oil Corporation | $150,000.00 |
| JPMorgan Chase Bank, N.A. | **TFTS-333618** | Macquarie Equipment Finance, LLC | $3,860,000.00 |
| JPMorgan Chase Bank, N.A. | **TFTS-359598** | Canadian National Railway Company | $100,000.00 |
| JPMorgan Chase Bank, N.A. | **TFTS-777114** | Truman Arnold Companies | $480,000.00 |
| JPMorgan Chase Bank, N.A. | **TFTS-780064** | Musket Corporation | $1,500,000.00 |
| JPMorgan Chase Bank, N.A. | **TFTS-780065** | Southern Counties Oil Co., a CA limited partnership | $250,000.00 |
| JPMorgan Chase Bank, N.A. | **TFTS-796000** | Mansfield Oil Company of Gainesville, Inc. | $450,000.00 |

**Schedule 10.2.5**
**Closing Date Dispositions**

- Sale of property located at 2385 Route 715, Tannersville, PA 18372.
- Sale of property located at 9711 State Avenue, Kansas City, Wyandotte County, Kansas
- Sale of property located at 9717 State Avenue, Kansas City, Wyandotte County, Kansas
- Sale of preferred shares of Newgistics, Inc.

**Schedule 10.2.8**
**Transactions with Affiliates**

Included by reference are all transactions with affiliates provided for in the 10-Q filed on November 12, 2013 and the 10-K filed on February 21, 2013 by YRC Worldwide Inc.

**Schedule 10.2.9**
**Burdensome Agreements**

Included by reference are all contractual obligations provided for in the 10-Q filed on November 12, 2013 and the 10-K filed on February 21, 2013 by YRC Worldwide Inc.

**EXHIBIT 10.29**

<u>GENERAL RELEASE AND SEPARATION AGREEMENT</u>

This General Release and Separation Agreement ("Agreement") is made by and between YRC Worldwide Inc., YRC Inc. ("YRC Freight") and any and all of their affiliates, subsidiaries, parents, predecessors, and successors (individually and collectively, "YRC" or "Company" or "Employer"), and Jeffrey A. Rogers ("Employee").

*RECITALS*

WHEREAS, YRC employed Employee as President of YRC Freight ("Employment"); WHEREAS, YRC has decided to

terminate Employee's employment on September 20,

2013 (the "Termination Date");

WHEREAS, Employee and YRC wish to enter into this Agreement to resolve any and all existing and potential claims between the parties arising out of Employee's employment with and separation of employment with YRC.

NOW THEREFORE, in consideration of the promises and mutual covenants and undertakings in this Agreement, the receipt and sufficiency of which are hereby acknowledged, YRC and Employee agree as follows:

1.        <u>Employee's Release of Claims.</u> Employee hereby agrees, on behalf of Employee and Employee's spouse, heirs, administrators, executors and assigns, to release and forever discharge YRC and its divisions, affiliates, related companies, predecessors, successors, partners, members, directors, officers, trustees and employees, independent contractors, consultants, stockholders, owners, attorneys, agents, benefit plans, subrogees, insurers, representatives and assigns (collectively, the "Released Parties"), from any and all suits, claims, demands, and causes of action of any nature or kind whatsoever, which Employee now has or ever had, up to the date of this Agreement (the "Release of Claims"). This Release of Claims includes, without limitation, any suits, claims, demands, or causes of action under federal, state or local laws, regulations, executive orders, common law or other source concerning civil rights, employment discrimination, employee benefits, wrongful discharge, breach of express or implied contract, promissory estoppel, defamation, emotional distress, whistleblower claims, tort, attorneys' fees or any claims which may have arisen in connection with Employee's employment with YRC or the cessation thereof. Without limiting the foregoing, the Release of Claims includes any claim Employee may have up to the date of this Agreement pursuant to the federal Age Discrimination in Employment Act, 29 U.S.C. Section 621, *et seq*. and the Older Workers Benefit Protection Act.

Employee is not waiving any rights that cannot be waived by law. The Release of Claims does not preclude Employee from exercising Employee's rights or remedies under this Agreement. The Release of Claims does not limit Employee's right to participate in any proceedings before an administrative agency responsible for enforcing labor and/or employment laws, e.g., the Equal Employment Opportunity Commission, but it does waive Employee's right to receive any monetary awards against the Released Parties arising from such proceedings.

2.    <u>Older Workers Benefit Protection Act.</u> Employee is hereby advised to consult with an attorney before executing this Agreement and has been given at least twenty-one (21) calendar days from the receipt of this Agreement to consider this Agreement before signing it; provided that in the event Employee signs and returns this Agreement before the end of the twenty-one (21)-day period, h e acknowledges that the actual time he has taken for such contemplation/consideration purposes w as adequate fo r all appropriate consultations, contemplations, etc. In no event shall such Release of Claims (and this Agreement) be returned to YRC later than twenty-one (21) days after Employee's Receipt Date (as defined below in Section 3(a)). The parties agree that this Agreement shall not become effective until seven (7) calendar days after Employee signs it. Employee may, within seven (7) calendar days after he signs this Agreement, revoke this Agreement in its entirety by written notice to YRC, in which case he will forfeit all rights and payments under this Agreement. Any revocation notice must be received by Executive Vice President and General Counsel, YRC Worldwide Inc., 10990 Roe Avenue, Overland Park, KS 66211 within the seven (7)-calendar-day revocation period.

3.    <u>Severance Payment, Benefits and Other Matters.</u>   In connection with the execution of this Agreement, the parties agree as follows:

a.    <u>Receipt o f Agreement; Termination Date.</u>   Employee acknowledges receipt of this Agreement on September 20, 2013 (the "Receipt Date") and acknowledges his separation from service with YRC on the Termination Date *( i.e.,* September 20, 2013).

b.    Severance Payment. I n consideration for Employee's obligations under this Agreement (including the Release of Claims under Section 1) and after Employee's seven

(7) calendar day revocation period has expired without Employee exercising his right to revoke this Agreement, for twelve (12) months following Employee's Termination Date (the "Severance Period"), Employee will be paid periodic installments totaling $485,000 gross, minus payroll deductions for (i) taxes and (ii) active-employee premiums for health insurance under Section 3(c), below (the "Severance Payments"). In the event of Employee's death following the commencement of payments, the remaining balance of payments, if any, will be paid in a single lump sum payment (minus appropriate withholdings) to Employee's estate as soon as practicable following his death. During the Severance Period, the installment payments will be determined and paid to the Employee at the same time and in the same manner as YRC normally makes payroll payments to employees. Employee also is eligible for outplacement services to be provided by YRC during the Severance Period (up to a value of $10,000).

c.    <u>Group Health Insurance Benefits and COBRA Eligibility.</u>   During the Severance Period, Employee will also be entitled to receive (should he so timely and appropriately elect) the COBRA continuation coverage he would otherwise be entitled to, but available at the rate payable by active employees of YRC (rather than payable at the standard premium rate of up to 102% of cost established for COBRA continuation coverage) until the earliest of (i) the end of the Severance Period, (ii) the date Employee becomes entitled to employer-provided health plan coverage following new employment, regardless o f whether or not Employee elects

the such other employer-provided health plan coverage or (ii) the date as of which the applicable COBRA continuation of coverage period otherwise expires. Any continuation of coverage at the active employee rate under the preceding sentence will not extend, and will be counted against, the otherwise applicable duration of COBRA continuation coverage. If Employee elects to continue the COBRA continuation coverage for the period(s), if

any, that remain(s) following the expiration of the coverage made available under this Agreement at the active employee rate, the required payment for such period(s) shall be at the standard COBRA rate established for COBRA eligible participants. Employee's payment of the premium for these benefits shall be on an after-tax basis. Employee also is required to notify YRC in writing of the availability of other employer-provided coverage. Employee's failure to provide this notice will result in a discontinuation of all future severance benefits pursuant to this Agreement (including Severance Payments, outplacement and health insurance benefits outlined in this Section 3). In all cases, the official plan document shall govern over any other verbal or written statement in regards to COBRA continuation and/or or conversion privileges, if any.

d.      Other Benefits. Employee's participation as an active employee in YRC benefits, including pension, 401(k), core retirement, disability, perquisite, employee assistance, equity participation and other plans, shall cease upon the Termination Date. Except for the amount made available under Section 3(b), above, Employee acknowledges and agrees that he is not entitled to any severance pay or payment under or through any YRC plan, policy or program. YRC acknowledges and agrees that, following the Termination Date: (i) Employee's rights to retirement benefits, to the extent vested, under any YRC pension or 40l(k) plan shall be governed by the respective plan documents governing any such plan; and (ii) Employee's ability to remain covered any YRC medical/health plan shall be as required under the COBRA continuation of coverage requirements as more fully described in Section 3(c), above.

e.      Equity Awards. Any stock options or units or shares of restricted stock granted to Employee will be governed by their respective stock option agreement, share unit agreement, or restricted stock agreement.

f.      Adequate Consideration.   Employee acknowledges   and accepts the payments and other consideration under this Agreement, as full, final and complete satisfaction of any and all claims or sums, which are now and might hereafter become due and owing to Employee for services rendered by Employee to YRC and for Employee's Release of Claims. Employee understands and agrees that Employee is not entitled to Severance Payments or active employee- premium for health insurance benefits continuation, absent Employee's execution and non-revocation of this Agreement.

g.      Tax Reporting. YRC shall report all income and deduct and withhold all federal, state, local, and employment taxes required by applicable law with respect to any payments and benefits made pursuant to the terms of this Agreement or otherwise as a resigning employee (e.g., PTO); and Employee shall be responsible for the payment of all applicable taxes on any payments and benefits made pursuant to the terms of this Agreement.

h.      General Acknowledgement of Medicare Interests. Employee declares and expressly warrants that he/she is not Medicare eligible, that he/she is not a Medicare beneficiary, that he/she is not within thirty (30) months of becoming Medicare eligible; that he/she is not 65 years of age or older; that he/she is not suffering from end stage renal failure or amyotrophic lateral

sclerosis; that he/she has not received Social Security benefits for twenty-four (24) months or longer; and/or that he/she has not applied for Social Security benefits, and/or has not been denied Social Security disability benefits and is appealing the denial. Employee affirms, covenants, and warrants he/she has made no claim for illness or injury against, nor is he/she aware of any facts reporting any claim against, Released Parties under which the Released Parties could be liable for medical expenses incurred by Employee before or after the execution

of this Agreement. As Employee is not a Medicare recipient as of the date of this Agreement, Employee is aware of no medical expenses that Medicare has paid and for which the Released Parties are or could be liable now or in the future. Employee agrees and affirms that, to the best of his/her knowledge, no liens of any governmental entities, including those for Medicare conditional payments, exist.

The parties have not shifted responsibility for medical treatment to Medicare in contravention of 42 U.S.C. § 1395y(b). The parties made every effort to adequately protect Medicare's interest and incorporate such into the severance terms, and to comply with both federal and state law. The parties acknowledge and understand that any present or future action or decision by the Centers for Medicare & Medicaid Services or Medicare on this Agreement, or Employee's eligibility or entitlement to Medicare or Medicare payments, will not render this Agreement void or ineffective, or in anyway affect the finality of this Agreement. Employee represents and agrees that he/she will indemnify, defend and hold Employer harmless from any and all claims, liens, Medicare conditional payments and rights to payment, known or unknown, arising from any and all charges for medical treatment Employee has received or will receive in the future. If any governmental entity, or anyone acting on behalf of any governmental entity, seeks reimbursement or damages (including multiple damages) from Released Parties relating to Employee's alleged past or future medical expenses, injuries, or claims, Employee will defend and indemnify Released Parties, and hold Released Parties harmless from any and all such damages (including multiple damages), claims, liens, Medicare conditional payments and rights to payment, including any attorneys' fees and costs sought by such entities. Employee agrees to waive any and all private causes of action for damages pursuant to 42 U.S.C. § 1395y(b)(3)(A) *et seq.*

4.    Acknowledgments.

a.    Employee hereby warrants and acknowledges that: (i) Employee is of legal age and is legally competent to execute this Agreement; (ii) that Employee is executing this Agreement voluntarily and with full knowledge and understanding of its contents; (iii) Employee has been advised and is hereby advised by YRC that Employee should have an attorney of Employee's choice, and at Employee's expense, review this Agreement; (iv) Employee has been and is hereby advised by YRC that Employee has twenty-one (21) days from the receipt of this Agreement to determine whether to execute it; and (v) Employee has been advised by YRC that Employee may revoke this Agreement within seven (7) days following its execution and delivery to YRC by sending written notice to YRC's Executive Vice President and General Counsel as set forth in Section 2 above, whereupon it shall be null and void and Employee shall forfeit all rights and payments under this Agreement.

b.    Employee represents and certifies that all business records, papers and files of YRC that came into Employee's possession in the course of his/her employment will be left at YRC's offices or returned to YRC prior to Employee's Termination Date or as soon as is practicable thereafter, and that he/she will not retain copies of such records, papers or files. This representation

is not intended to cover YRC documents relating solely to Employee's compensation and benefits while an employee of YRC.

5.    Duty to Cooperate. Employee agrees to cooperate with YRC in connection with any litigation, investigation, audit, or other regulatory or administrative proceeding that is now

pending or may arise and that involves matters arising during Employee's employment. In the event Employee is called upon to cooperate per this contingency, Employee acknowledges YRC's expectation that Employee would truthfully testify in any legal proceedings in which Employee may be a party or in which Employee may be called as a witness.

6.    Agreement Confidentiality.    Employee shall not reveal or disclose the terms of this Agreement to any person, except to Employee's immediate family and to those necessary to effectuate the terms of this Agreement or to professionals rendering tax or legal advice, or as required by law, other than to state that the matter has been resolved to the mutual satisfaction of the parties.

7.    Restrictive Covenants.

(a)    Acknowledgments. Employee acknowledges that: (i) as a result of Employee's employment by the Employer, Employee has obtained and will obtain Confidential Information (as defined below); (ii) the Confidential Information has been developed and created by the Company and its Affiliates (as defined below) at substantial expense and the Confidential Information constitutes valuable proprietary assets; (iii) the Company and its Affiliates will suffer substantial damage and irreparable harm which will be difficult to compute if, during the Term and thereafter, Employee should enter a Competitive Business (as defined herein) in violation of the provisions of this Agreement; (iv) the nature of the Company's and its Affiliates' business is such that it could be conducted anywhere in the world and that it is not limited to a geographic scope or region; (v) the Company and its Affiliates will suffer substantial damage which will be difficult to compute if, during the Term or thereafter, Employee should solicit or interfere with the Company's and its Affiliates' employees, clients or customers or should divulge Confidential Information relating to the business of the Company and its Affiliates; (vi) the provisions of this Agreement are reasonable and necessary for the protection of the business of the Company and its Affiliates; (vii) the Employer would not have provided the benefits contemplated under this Agreement unless he agreed to be bound by the terms hereof; and (viii) the provisions of this Agreement will not preclude Employee from other gainful employment, but instead will preclude only an unfair competitive advantage. "Competitive Business" as used in this Agreement shall mean any business which competes, directly or indirectly, with any aspect of the Company's (or its Affiliates') business. "Confidential Information" as used in this Agreement shall mean any and all confidential and/or proprietary knowledge, data, or information of the Company and its Affiliates, including, without limitation, any: (A) trade secrets, drawings, inventions, methodologies, mask works, ideas, processes, formulas, source and object codes, data, programs, software source documents, works of authorship, know-how, improvements, discoveries, developments, designs and techniques, and all other work product of the Company and its Affiliates, whether or not patentable or registrable under trademark, copyright, patent or similar laws; (B) information regarding plans for research, development, new service offerings and/or products, equipment purchases, marketing, advertising and selling, distribution, business plans, business forecasts, budgets and unpublished financial statements, licenses, prices and costs, suppliers, customers or distribution arrangements; (C) information regarding the skills and compensation of employees, suppliers, agents, and/or independent contractors of the Company and its Affiliates; (D) concepts and ideas relating to the development

and distribution of content in any medium or to the current, future and proposed products or services of the Company and its Affiliates; or (E) any other information, data or the like that is

labeled confidential or orally disclosed to Employee as confidential. For purposes of this Agreement, an "Affiliate" of an individual, corporation, partnership, limited liability company, joint venture, trust, estate, board, committee, agency, body, employee benefit plan, or other person or entity ("Person") shall mean a Person that directly or indirectly controls, is controlled by, or is under common control with, the Person specified.

(b)      Confidentiality. In consideration of the benefits provided for in this Agreement, Employee agrees not to, at any time, either during the Severance Period or thereafter, divulge, use, publish or in any other manner reveal, directly or indirectly, to any person, firm, corporation or any other form of business organization or arrangement and keep in the strictest confidence any Confidential Information, except (i) with the Company's express written consent, (ii) to the extent that any such information is in or becomes in the public domain other than as a result of Employee's breach of any of the obligations hereunder, or (iii) where required to be disclosed by court order, subpoena or other government process and in such event, Employee shall cooperate with the Employer in attempting to keep such information confidential. Upon the request of the Employer, Employee agrees to promptly deliver to the Employer the originals and all copies, in whatever medium, of all such Confidential Information in Employee's possession or control.

(c)      Non-Compete. In consideration of the benefits provided for in this Agreement, Employee covenants and agrees that for a period of twelve (12) months following the conclusion of Employee's employment, or following the date of cessation of the last violation of this Agreement, or from the date of entry by a court of competent jurisdiction of a final, unappealable judgment enforcing this covenant, whichever of the foregoing is the last to occur (the "Restricted Period"), Employee will not, as principal, or in conjunction with any other person, firm, partnership, corporation or other form of business organization or arrangement (whether as a shareholder, partner, member, principal, agent, lender, director, officer, manager, trustee, representative, employee or consultant), directly or indirectly, be employed by, provide services to, in any way be connected, associated or have any interest of any kind in, or give advice or consultation to any Competitive Business.

(d)      Non-Solicitation o f Employees. I n consideration o f the benefits provided fo r in  this  Agreement, Employee covenants and agrees that during the Restricted Period, Employee shall not, without the prior written permission of the Company, directly or indirectly (i) solicit, employ or retain, or have or deliberately cause any other person or entity to solicit, employ or retain, any person who is employed or is providing services to the Company or its Affiliates at the time of Employee's termination of employment or was or is providing such services within the twelve (12) month period before or after Employee's termination of employment or (ii) request, suggest or deliberately cause any employee of the Company or its Affiliates to breach or threaten to breach terms of said employee's agreements with the Company and its Affiliates or to terminate his or her employment with the Company and its Affiliates.

(e)     Non-Solicitation of Clients and Customers. In consideration of the benefits provided for in this Agreement, Employee covenants and agrees that during the Restricted Period, Employee will not, as principal, or in conjunction with any other person, firm, partnership, corporation or other form of business organization or arrangement (whether as a shareholder, partner, member, lender, principal, agent, director, officer, manager, trustee,

representative, employee or consultant), directly or indirectly: (i) solicit or accept any business, in competition with the Company and its Affiliates, from any person or entity who was an existing or prospective customer or client of the Company and its Affiliates at the time of, or at the time during the twelve (12) months preceding, Employee's termination of employment; or (ii) request, suggest or deliberately cause any of the Company's and its Affiliates' clients or customers to cancel, reduce, change the terms of or terminate any business relationship with the Company and its Affiliates involving services or activities which were directly or indirectly the responsibility of Employee during Employee's employment.

(f)       Post-Employment Property. The parties agree that any work of authorship, invention, design, discovery, development, technique, improvement, source code, hardware, device, data, apparatus, practice, process, method or other work product whatever (whether patentable or subject to copyright, or not, and hereinafter collectively called "discovery") related to training or marketing methods and techniques that Employee, either solely or in collaboration with others, has made or may make, discover, invent, develop, perfect or reduce to practice during the term of his employment, or within three (3) months thereafter, whether or not during regular business hours, and created, conceived or prepared on the Company's and its Affiliates' premises or otherwise and related to the Company's business, shall be the sole and complete property of the Company and its Affiliates. More particularly, and without limiting the foregoing, Employee agrees that all of the foregoing and any (i) inventions (whether patentable or not, and without regard to whether any patent therefor is ever sought); (ii) marks, names or logos (whether or not registrable as trade or service marks, and without regard to whether registration therefor is ever sought); (iii) works of authorship (without regard to whether any claim of copyright therein is ever registered); and (iv) trade secrets, ideas, and concepts ((i)- (iv) collectively, "Intellectual Property Products") created, conceived or prepared on the Company's and its Affiliates' premises or otherwise, whether or not during normal business hours, and related in any way to the Employer's or the Company's business, shall perpetually and throughout the world be the exclusive property of the Company and its Affiliates, as the case may be, as shall all tangible media (including, but not limited to, papers, computer media of all types and models) in which such Intellectual Property Products shall be recorded or otherwise fixed. Employee agrees that all works of authorship created by Employee during Employee's engagement by the Employer or the Company shall be works made for hire of which the Company and its Affiliates are the author and owner of copyright. To the extent that any competent decision-making authority should ever determine that any work of authorship created by Employee during Employee engagement by the Employer or the Company is not a work made for hire, Employee hereby assigns all right, title and interest in the copyright therein, in perpetuity and throughout the world, to the Company. To the extent that this Agreement does not otherwise serve to grant or otherwise vest in the Company all rights in any Intellectual Property Product created by Employee during Employee's engagement by the Employer or the Company, or within three (3) months thereafter, Employee hereby assigns all right, title and interest therein, in perpetuity and throughout the world, to the Company. Employee agrees to execute, immediately upon the Company's reasonable request and without charge, any further assignments, applications, conveyances or other instruments, at any time after execution of this Agreement, whether or not Employee is engaged by the Employer at the time

such request is made, in order to permit the Company, their Affiliates and/or their respective assigns to protect, perfect, register, record, maintain or enhance their rights in any Intellectual Property Product; provided, that, the Company shall bear the cost of any such assignments, applications or

consequences. Upon termination of Employee's employment with the Employer, and at any earlier time the Employer so requests, Employee will immediately deliver to the custody of the person designated by the Company all originals and copies of any documents and other property of the Employer in Employee's possession or under Employee's control.

(g)      Non-Disparagement. Employee acknowledges and agrees that Employee will not defame or publicly criticize the services, business, prospects, quality, integrity, veracity or personal or professional reputation of the Company and/or its Affiliates and their respective officers, directors, partners, executives, employees or agents thereof in either a professional or personal manner at any time.

(h)      Enforcement. If Employee commits a breach of any of the provisions of this Section 7, the Employer shall have the right and remedy to seek to have the provisions specifically enforced by any court having jurisdiction (without the posting of any bond or security), it being acknowledged and agreed by Employee that the services being rendered hereunder to the Employer are of a special, unique and extraordinary character and that any such breach will cause irreparable injury to the Employer and that money damages will not provide an adequate remedy to the Employer. Such right and remedy shall be in addition to, and not in lieu of, any other rights and remedies available to the Employer at law or in equity.

(i)      Blue Pencil. If, at any time, the provisions of this Section 7 shall be determined to be invalid or unenforceable under any applicable law, by reason of being vague or unreasonable as to area, duration or scope of activity, this Agreement shall be considered divisible and shall become and be immediately amended to only such area, duration and scope of activity as shall be determined to be reasonable and enforceable by the court or other body having jurisdiction over the matter and Employee, the Employer agree that this Agreement as so amended shall be valid and binding as though any invalid or unenforceable provision had not been included herein.

(j)      EMPLOYEE ACKNOWLEDGES THAT EMPLOYEE HAS READ THIS SECTION 7 AND HAS HAD THE OPPORTUNITY TO REVIEW ITS PROVISIONS WITH ANY ADVISORS AS EMPLOYEE CONSIDERED NECESSARY AND THAT EMPLOYEE UNDERSTANDS THIS AGREEMENT'S CONTENTS AND SIGNIFIES SUCH UNDERSTANDING AND AGREEMENT BY SIGNING BELOW.

8.      Non-Admission of Liability. Employee and YRC agree that nothing contained within this Agreement shall be construed or interpreted as an admission by either party of any liability of whatsoever nature, including but not limited to, any violation of any law.

9.      Materiality of All Conditions and Obligations, Recovery of Payments. Employee understands and agrees that all of the conditions of this Agreement applicable to Employee and all of his obligations under this Agreement are material and that the non-occurrence of any such condition or the breach of any such obligation by Employee shall result in YRC being entitled to terminate its obligations under this Agreement and assert any and all rights it may have in law or in equity, including the right to seek and obtain, in any court or competent jurisdiction, an injunction to restrain such breach or alleged breach. In addition, YRC shall be entitled to recover

any payments made under this Agreement, and shall have the right to seek damages at law, attorneys' fees and costs.

10.      Modification of Agreement. Except as provided herein, this Agreement may be modified or amended only by a written instrument signed by Employee and YRC Worldwide Inc.

11.      Non-Assignment. Employee warrants and represents that, prior to and including the date he/she executes this Agreement, no claim, demand, cause of action or obligation which is the subject of this Agreement has been assigned or transferred to any other person or entity, and no other person or entity has or has had any interest in said claims, demands, causes of action or obligation, and that Employee has the sole right to execute this Agreement.

12.      Severability. In the event that any provision or term of this Agreement is found to be void or unenforceable to any extent for any reason, it is the agreed-upon intent of the parties that all remaining provisions or terms of this Agreement shall remain in full force and effect to the maximum extent permitted and that this Agreement shall be enforceable as if such void or unenforceable provision or term had never been a part hereof.

13.      Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same document.

14.      Entire Agreement.   Other than the separate Indemnification Agreement, the validity and enforceability of which is unaffected by this Agreement, this Agreement constitutes the entire agreement between the parties and, except as specifically provided in Section 7, supersedes all prior agreements pertaining to the subject matter contained herein. By signing this Agreement, Employee acknowledges that no promise or inducement has been offered to Employee to enter into this Agreement, except as expressly set forth herein. Employee further acknowledges that this Agreement is executed without reliance upon any statement or representation by YRC except as expressly set forth herein.

15.      IRC Section 409A Compliance. To the extent applicable, this Agreement shall be applied and construed so as to comply with the requirements for an exemption from the requirements of IRC Section 409A or, if so determined by YRC, to satisfy any applicable IRC Section 409A requirements.

16.      Governing Law; Venue. This Agreement shall be construed and interpreted under the laws of the State of Kansas. Any controversy, dispute, or claim arising out of or relating to this Agreement shall be resolved through binding arbitration in Kansas, in accordance with the rules then in effect of the American Arbitration Association, and judgment on the award rendered may be entered in any court having jurisdiction thereof.

IN WITNESS WHEREOF, YRC and Employee agree as set forth above:

**YRC WORLDWIDE INC.**                    **JEFFREY A. ROGERS**

By:     /s/ James L. Welch            Employee:    /s/ Jeffrey A. Rogers

Title:   CEO

Date:   9/23/13                       Date:    9/22/13

**EXHIBIT 10.12.3**

**YRC WORLDWIDE INC.**
**DIRECTOR COMPENSATION PLAN**

December 13, 2013 Restatement of the Plan Originally Effective August 30, 2011

This Director Compensation Plan (this "Plan") of YRC Worldwide Inc., a Delaware corporation (the "Company"), is adopted effective as of the date first set forth above and amends, restates and replaces any and all prior plans relating to the compensation payable to the Company's directors.

1.      DEFINITIONS, ADMINISTRATION AND CONSTRUCTION

(a)      The following capitalized terms used in this Plan shall have the following meanings given to each of them in this Section 1(a):

"Board" means the Board of Directors of the Company.

"Committee" means any committee of the Board.

"Common Stock" means Company Common Stock, $0.01 par value per share.

"Compensation Committee" means the Compensation Committee of the Board.

"Equity Award" means an award of Common Stock or Common Stock derivatives to a Participant pursuant to the terms of this Plan and any equity incentive plan maintained by the Company, including the YRC Worldwide Inc. 2011 Incentive and Equity Award Plan.

"Participant" means a director of the Company who is not an employee of the Company.

"Restricted Stock Units" or "RSUs" are a form of Equity Award and shall have the same meaning as in the YRC Worldwide Inc. 2011 Incentive and Equity Award Plan.

"Secretary" means the Secretary of the Company.

(b)      The Compensation Committee shall administer this Plan. The Compensation Committee may adopt rules for the administration of this Plan as it may deem necessary or advisable. The Compensation Committee has full and absolute discretion in the exercise of each and every aspect of the rights, power, authority and duties retained or granted it under this Plan, including the authority to determine all facts, to interpret this Plan, to apply the terms of this Plan to the facts determined, to make decisions based upon those facts and to make any and all other decisions required of it by this Plan, such as the right to benefits, the correct amount and form of benefits, the determination of any appeal, the review and correction of the actions of any prior administrative committee, and the other rights, powers, authority and duties specified in this paragraph and elsewhere in this Plan. Notwithstanding any provision of law, or any explicit or implicit provision of this document, any action taken, or finding, interpretation, ruling or decision made by the Compensation Committee in the exercise of any of its rights, powers, authority or duties under this Plan shall be final and conclusive as to all parties, including without limitation all Participants, former Participants and beneficiaries, regardless of whether the Compensation Committee or one or more of its members may have an actual or potential conflict of interest with respect to the subject matter of the action, finding, interpretation, ruling or

decision. No final action, finding, interpretation, ruling or decision of the Compensation Committee shall be subject to de novo review in any judicial proceeding. No final action, finding, interpretation, ruling or decision of the Compensation Committee may be set aside unless it is held to have been arbitrary and capricious by a final judgment of a court having jurisdiction with respect to the issue.

(c)    Except as expressly stated to the contrary, references in this plan to "including" mean "including, without limitation" and to "persons" mean natural persons and legal entities.

2.    RETAINERS.

(a)    From time to time, the Board (or at its direction, the Compensation Committee) may set retainers for Participants for their service as a member of the Board or one or more of the Board's Committees. The current retainers for Participants are listed on <u>Exhibit A</u>.

(b)    Annual retainers shall be paid in advance in quarterly installments on January 1, April 1, July 1 and October 1 (or on the first business day immediately following such payment date). A Participant who joins the Board mid-term shall receive a pro-rated retainer based on the number of days remaining in his/her initial term. The initial payment shall be made as soon as administratively practicable following the Participant's commencement as a member of the Board.

3.    MEETING FEES AND EXPENSE REIMBURSEMENTS.

No additional compensation shall be paid for attending or participating in Board or Committee meetings. Participants will be reimbursed for reasonable business expenses, including travel expenses, incurred in the performance of their duties for the Company, including, without limitation, traveling to meetings.

4.    EQUITY AWARDS.

From time to time, the Board (or at its direction, the Compensation Committee) may make grants of Equity Awards to Participants as compensation for their service on the Board with such terms and conditions as are stated in the grant. The grant shall be made pursuant to this Plan and any equity incentive plan maintained by the Company pursuant to which the Common Stock is authorized to be issued. Past equity grants are summarized on <u>Exhibit A</u>.

5.    RESTRICTED STOCK UNITS.

(a)    **Generally**. This Section 5, except as expressly specified otherwise, applies only with respect to RSUs granted on or after the restatement date of the Plan specified above.

(b)    **Grants**. On the first business day following the annual meeting of stockholders of the Company held in 2014 and each year thereafter ("Grant Date"), each Participant shall receive a grant of that number of RSUs equal to $100,000 divided by the average closing price for the 30 day period immediately preceding the Grant Date. In addition to the annual grant described in the preceding sentence, the Board (or at its discretion, the Compensation Committee) may make such additional grants from time-to-time upon whatever terms it deems appropriate.

(c)    **Vesting**. One-third (1/3) of the RSUs will vest (i.e., no longer be subject to risk of forfeiture) on the last day of the Board term in which the Grant Date occurs ("First Vesting Date"), and one-third (1/3)

2

of the RSUs will vest on the 1st and 2nd anniversaries of the First Vesting Date, or such other vesting dates as may be designated by the Compensation Committee and described in the RSU agreement.

(i)    **Forfeiture**. If a Participant resigns prior to the end of his/her full term with the Board, fails to stand for re-election to the Board at the end of his/her full term, stands for re-election to the Board but is not re-elected by the shareholders, or is involuntarily removed from the Board, the Participant's non-vested RSUs shall be forfeited on the date of the Participant's resignation, involuntary removal or the Board meeting where the Participant fails to stand for re-election or is not re-elected to the Board (unless the Board determines otherwise). Notwithstanding the foregoing, if a Participant dies or is deemed "Disabled" (as defined below), or if a "Change in Control" (as defined below) occurs, the provisions below shall control.

(ii)    **Death and Disability**. If a Participant dies or is "Disabled" (as defined herein) while serving as a director of the Company, the Participant's non-vested RSUs shall become vested on the date of the Participant's death or the date the Participant is deemed Disabled. For purposes of this Section 5, the Participant shall be considered "Disabled" if the Participant is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or can be expected to last for a continuous period of not less than 12 months. The existence of a Disability shall be evidenced by such medical certification as the Secretary of the Company shall require and as the Committee approves.

(iii)    **Change in Control of the Company**. If a "Change in Control" of the Company occurs while the Participant is serving as a director of the Company, the Participant's non-vested RSUs shall become vested on the date of the Change in Control. For the purposes of this Section 5, a "Change in Control" shall be deemed to have taken place if:

(A)    a third person, including a "group" as defined in Section 13(d)(3) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), purchases or otherwise acquires shares of the Company that, together with stock held by such person or group, constitutes more than 50 percent of the total fair market value or total voting power of the stock of the Company;

(B)    a third person, including a "group" as defined in Section 13(d)(3) of the Exchange Act purchases or otherwise acquires (or has acquired during the 12-month period ending on the date of the most recent acquisition by such person or group) shares of the Company and as a result thereof becomes the beneficial owner of shares of the Company having 35 percent or more of the total voting power of the stock of the Company; or

(C)    as the result of or in connection with any cash tender or exchange offer, merger or other business combination, or contested election, or any combination of the foregoing transactions, a majority of the Board is replaced during any 12-month period by directors whose appointment or election is not endorsed by a majority of the Board before the date of such appointment or election.

3

(d)    **Deferral Elections**. Pursuant to a written election (a "Deferral Election"), a Participant may defer delivery of all or a portion of the shares of Common Stock underlying the RSUs, in accordance with this Section 5 and the rules prescribed by the Compensation Committee. The Company (or its designee) shall maintain an account for each Participant to record any Deferral Election made with respect to RSUs. All Deferral Elections must be delivered to the Secretary.

(i)    **Initial Deferral Election**. Except as otherwise provided in this Section 5, a Deferral Election with respect to RSUs must be made not later than the close of the Participant's taxable year immediately preceding the service year for which the RSUs are granted as compensation (or such other time as permitted under Section 409A of the Internal Revenue Code of 1986, as amended, and any applicable Internal Revenue Service guidance and Treasury Regulations issued thereunder ("Section 409A")). For example, a Deferral Election for any RSUs granted in 2014 or later as compensation for services rendered in 2014, must be made no later than December 31, 2013. A Participant's Deferral Election may be changed at any time prior to the last permissible date for making the Deferral Election, and shall thereafter be irrevocable. A form of the Deferral Election is included in Exhibit B.

(ii)    **First Year of Eligibility**. In the case of the first year in which a director becomes eligible to participate in the Plan, the director may make an initial Deferral Election within 30 days after the director first becomes eligible to participate. Such election shall only apply with respect to RSUs relating to services performed after the election. Whether a Participant is treated as newly eligible for participation under this Plan shall be determined in accordance with Section 409A, including: (i) rules that treat all elective deferral account balance plans as one plan, and (ii) rules that treat a previously eligible director as newly eligible if his benefits had been previously distributed or if he has been ineligible for 24 months.

(iii)    **Special Thirteen Month Election**. If the shares of Common Stock underlying the RSUs are deliverable in a year subsequent to the Grant Date and are subject to a condition requiring the Participant to continue to provide services for a period of at least twelve (12) months from the Grant Date to avoid forfeiture of the RSUs, a Deferral Election may be made on or before the 30th day after the Grant Date, provided that such Deferral Election is made at least twelve (12) months in advance of the earliest date at which the forfeiture condition could lapse. For purposes of this paragraph, a condition will not be treated as failing to require the Participant to continue to provide services for a period of at least 12 months from the Grant Date merely because the condition immediately lapses upon the death or Disability of the Participant, or upon a Change in Control that constitutes an event described in Section 409A(a)(2)(A)(v) and the Treasury Regulations thereunder, provided that if death, Disability, or such Change in Control occurs and the condition lapses before the end of such 12-month period, a Deferral Election may be given effect only if the Deferral Election is permitted under this Section without regard to this paragraph. A form of the Special Thirteen Month Director Equity Deferral Election is included in Exhibit C.

(iv)    **Evergreen Election.** A Participant may elect that his/her Deferral Election for an upcoming year will continue in effect for subsequent years until modified by the Participant (an "Evergreen Election"). If a Participant makes an Evergreen Election, the Participant may unilaterally modify such Deferral Election (either to terminate, increase or decrease the portion of his future RSUs which are subject to deferral) by providing a written modification

4

of the Deferral Election to the Secretary. The modification shall become effective as of the first day of January following the date such written modification is received by the Secretary or sooner if permitted under the special thirteen month election.

(v)    **Subsequent Deferral Election**. A Participant shall be entitled to delay the delivery of shares of Common Stock underlying the RSUs pursuant to his initial Deferral Election (a "Subsequent Deferral Election") provided: (1) the Subsequent Deferral Election does not take effect until at least twelve (12) months after the date on which the Subsequent Deferral Election is made, (2) if the Subsequent Deferral Election relates to a payment event other than the death or Disability of the Participant, the Subsequent Deferral Election defers payment for a period of at least five (5) years from the date such payment would otherwise have been made but for such Subsequent Deferral Election, and (3) if the Subsequent Deferral Election relates to a payment at a specified time or pursuant to a fixed schedule, the Subsequent Deferral Election is made not less than 12 months before the date the payment is scheduled to be paid.

(e)    **Delivery of Shares**. The Company shall deliver one share of Common Stock for each vested RSU, as described below:

(i)    **RSUs Not Deferred**. If the Participant does not timely elect to defer delivery of the shares of Common Stock underlying the RSUs pursuant to a Deferral Election on file with the Company's Secretary, the Company shall deliver to the Participant one share of Common Stock for each vested RSU within 90 days following the applicable vesting date.

(ii)    **RSUs Deferred**. If a Participant timely elects to defer delivery of the shares of Common Stock underlying the RSUs pursuant to a Deferral Election on file with the Company's Secretary, the Company shall deliver to the Participant one share of Common Stock for each vested RSU for which a Deferral Election has been made, on the earlier of the Participant's separation from service with the Board, death, Disability, Change in Control, or date specified by the Participant in his/her Deferral Election (each a "Payment Event"). Actual delivery of the shares shall be made within 90 days of the Payment Event, if such Payment Event is a separation from service with the Board, death, Disability, or a specified date elected by the Participant. Upon a Change in Control, delivery of the shares shall occur on the date of the Change in Control.

(iii)    **Change in Control**. Notwithstanding the foregoing, if the Participant's RSUs are not exempt from Section 409A the Company shall not deliver shares of Common Stock upon a Change in Control, unless the Change in Control also constitutes an event described in Section 409A (a)(2)(A)(v) and the Treasury Regulations thereunder.

(f)    **Dividend Equivalents**. If the Company declares a cash dividend on its Common Stock, the Company shall credit to a bookkeeping account established for each Participant an amount equal to the cash value of the dividend that would have been paid to the Participant if each RSU (whether vested or unvested) was a share of Common Stock held by the Participant ("Dividend Equivalents"). No interest or other additions shall be earned on amounts credited to such Dividend Equivalent account. Dividend Equivalents shall be paid at the same time as the delivery date of the shares of Common Stock underlying the vested RSUs to which the accrued Dividend Equivalents relate. Any Dividend Equivalents relating to any forfeited RSUs shall be forfeited.

5

(g)   **Beneficiary**. If a Participant dies, the Company shall pay any amounts deferred under this Plan to the beneficiary or beneficiaries, if any, that the Participant designates to the Secretary in writing during the Participant's lifetime. During his/her lifetime, the Participant may revoke or change any designation of beneficiary by delivering the revocation or designation in writing to the Secretary. If no beneficiary is designated or survives the Participant, then the accounts shall be issued and paid to the Participant's surviving spouse (or, if none, personal representative).

(h)   **Unfunded**. The Participant understands that all deferrals hereunder (i.e., the balance of his/her accounts) are unfunded, will be represented by appropriate bookkeeping entries and any such amounts due the Participant shall be unsecured, general obligations of the Company.

(i)   **409A**. This Section 5 and any Equity Award agreement shall be interpreted and administered in a manner so that any amount or benefit payable hereunder shall be paid or provided in a manner that is either exempt from or compliant with the requirements of Section 409A. Neither the Company nor its directors, officers, executives, or advisers shall be held liable for any taxes, interest, penalties or other monetary amounts owed by a Participant as a result of the application of Section 409A. Notwithstanding anything in this Plan or any Equity Award agreement to the contrary, all payments and benefits under this Plan that would constitute non-exempt "deferred compensation" for purposes of Section 409A and that would otherwise be payable or distributable hereunder by reason of the Participant's separation from service on the Board, will not be payable or distributable to the Participant unless the circumstances giving rise to such separation from service meet any description or definition of "separation from service" in Section 409A (without giving effect to any elective provisions that may be available under such definition). If this provision prevents the payment or distribution of any amount or benefit, such payment or distribution shall be made on the date, if any, on which an event occurs that constitutes a Section 409A-compliant "separation from service."

6.   GENERAL

(a)   Except by the laws of descent and distribution if a Participant dies, the rights and benefits of this Plan may not be assigned or otherwise transferred. A Participant shall cease to be a Participant under this Plan upon the Participant's termination of his/her directorship with the Company whether by death, disability, retirement, resignation or removal.

(b)   Any notice to the Company that this Plan requires shall be in writing, addressed to the Secretary and be effective when the Secretary receives the notice.

(c)   This Plan and any determination or action taken respecting this Plan shall be governed by and construed in accordance with the laws of the State of Delaware, without reference to its law of conflicts of law.

6

(d)

**Exhibit A**

**Annual Retainers**

Board membership = $75,000 ($125,000 for the Chairperson of the Board)
Additional retainer for Audit/Ethics Committee Chairperson = $15,000
Additional retainer for other Committee Chairpersons = $10,000

**Past Equity Awards**

Following (i) the completion of the reverse merger of the Company into a subsidiary of the Company in which the Company survives the merger (the "Merger"), (ii) the Board's adoption of a new equity incentive plan at the time of or following such Merger, and (iii) the effective date of a reverse stock split of the Company's common stock following the Merger, each Participant shall receive a grant of restricted stock units ("RSUs") equal to $100,000 divided by $0.1134 (the conversion ratio of the Company's Series A Convertible Senior Secured Notes), proportionately adjusted to reflect the reverse stock split. The actual date of grant shall be determined by the Compensation Committee. One-third (1/3) of the RSUs will be vested on the grant date and the remaining RSUs will vest pro rata on the 1st and 2nd anniversaries of the date of grant.

With respect to the period beginning September 15, 2011, and ending on the date of the annual meeting of stockholders of the Company held in 2012, each Participant shall receive a grant of RSUs (pro-rated for partial service during such period) equal to $83,333 divided by the 30 day average closing price preceding the date of grant. Such grant shall be made on the first business day following the annual meeting of stockholders of the Company held in 2012. One-third (1/3) of the RSUs will be vested on the grant date and the remaining RSUs will vest pro rata on the 1st and 2nd anniversaries of the date of grant.

On the first business day following the annual meeting of stockholders of the Company held in 2013, each Participant shall receive a grant of RSUs (pro-rated for partial service during the immediately preceding Board term) equal to $100,000 divided by the 30 day average closing price preceding the date of grant. One-third (1/3) of the RSUs will be vested on the grant date and the remaining RSUs will vest pro rata on the 1st and 2nd anniversaries of the date of grant.

7

**Exhibit B**

**ANNUAL DIRECTOR EQUITY DEFERRAL ELECTION FORM**

To the Secretary of YRC Worldwide Inc.:

I irrevocably elect to defer delivery of the following percentage of shares of Common Stock underlying the Restricted Stock Units awarded to me for the 12-month Board term beginning in _____ (*enter year*) and all subsequent Board terms (i.e., "Evergreen Election"):

       100% or

       _____%

I further elect to receive my deferred shares of Common Stock underlying the Restricted Stock Units upon the earliest of (i) my death, (ii) my Disability, (iii) my separation from service with the Board for any reason, (iv) upon a Change in Control, (v) or the following date (optional):

       January 1, _____ (enter year).

Notwithstanding the above, I understand that if I resign from the Board, fail to stand for re-election to the Board, fail to be re-elected to the Board, or if I am involuntarily removed from the Board, my non-vested Restricted Stock Units will be forfeited unless the Board determines otherwise.

Notwithstanding the foregoing, this Deferral Election is subject to the terms of the Plan and will not be effective if it is not made in accordance with the terms of the Plan and Section 409A. All terms defined in the YRC Worldwide Inc. Director Compensation Plan have the same meaning when used in this Deferral Election form.

                     Print Name: _____

                     Signature: _____

                     Date: _____

Accepted:

YRC Worldwide Inc.

_____
Secretary

_____
Date

8

**Exhibit C**

**SPECIAL THIRTEEN MONTH DIRECTOR EQUITY DEFERRAL ELECTION FORM**

To the Secretary of YRC Worldwide Inc.:

I irrevocably elect to defer delivery of the following percentage of shares of Common Stock underlying the Restricted Stock Units awarded to me on _____, 201__, which shall vest on _____, and all subsequent Board terms (i.e., "Evergreen Election"):

        100% or

        _____%

I further elect to receive my deferred shares of Common Stock underlying the Restricted Stock Units upon the earliest of (i) my death, (ii) my Disability, (iii) my separation from service with the Board for any reason, (iv) upon a Change in Control, (v) or the following date (optional):

        January 1, _____ (enter year).

Notwithstanding the above, I understand that if I resign from the Board, fail to stand for re-election to the Board, fail to be re-elected to the Board, or if I am involuntarily removed from the Board, my non-vested Restricted Stock Units will be forfeited unless the Board determines otherwise.

Notwithstanding the foregoing, this Deferral Election is subject to the terms of the Plan and will not be effective if it is not made in accordance with the terms of the Plan and Section 409A. All terms defined in the YRC Worldwide Inc. Director Compensation Plan have the same meaning when used in this Deferral Election form.

        Print Name: _____

        Signature: _____

        Date: _____

Accepted:

YRC Worldwide Inc.

_____
Secretary

_____
Date

9

**EXHIBIT**
**10.13.4**

**YRC WORLDWIDE INC.**
**RESTRICTED STOCK UNIT AGREEMENT**

**FOR NON-EMPLOYEE DIRECTOR**

PARTICIPANT:          _____

DATE OF GRANT:          _____

SERVICE YEAR:          _____

TOTAL NUMBER OF UNITS:    _____ Restricted Stock Units

VESTING SCHEDULE:          1/3rd of the Restricted Stock Units will vest on ___ ("First Vesting Date"), the first anniversary of the First Vesting Date, and the second anniversary of the First Vesting Date

**GRANT OF RESTRICTED STOCK UNITS**

In accordance with the YRC Worldwide Inc. Director Compensation Plan and the YRC Worldwide Inc. 2011 Incentive and Equity Award Plan or any successor thereto (referred to collectively as the "Plans"), the Board of Directors of **YRC WORLDWIDE INC.,** a Delaware corporation (the "Company") hereby grants to the above-named Participant rights to receive the above number of shares of the Company's common stock, $0.01 par value, in accordance with the Vesting Schedule described above on a one share per one unit basis (the "Restricted Stock Units") and subject to the other terms and conditions described in this Restricted Stock Unit Agreement (this "Agreement").

By your acceptance of the Restricted Stock Units set forth in this Agreement, you agree that the Restricted Stock Units are granted under and governed by the terms of the Plans, this Agreement, and the Terms and Conditions of Restricted Stock Unit Agreements for Non-Employee Directors attached to this Agreement; you acknowledge that you have received, reviewed and understand the Plans, including the provisions that the Compensation Committee's decision on any matter arising under the Plans is conclusive and binding; and you agree that this Agreement amends and supersedes any other agreement or statement, oral or written, in its entirety regarding the vesting or holding period of the Restricted Stock Units.

**YRC WORLDWIDE INC.          PARTICIPANT**

By_____    _____

Title _____          Print _____

You agree that your acceptance of this Agreement may be evidenced either by your signature above or by your electronic acceptance through the Company's award administrator's website (as of the date of grant, the administrator is Fidelity).

**YRC WORLDWIDE INC.**

**TERMS AND CONDITIONS**

**OF**

**RESTRICTED STOCK UNIT AGREEMENTS FOR NON-EMPLOYEE DIRECTORS**

These Terms and Conditions are applicable to Restricted Stock Units (the "Units") granted to Non-Employee Directors pursuant to the **YRC Worldwide Inc. 2011 Incentive and Equity Award Plan** or any successor thereto, the YRC Worldwide Inc. Director Compensation Plan (referred to collectively as the "Plans") and the Restricted Stock Unit Agreement.

1. **Non-transferability**. No rights under the Restricted Stock Unit Agreement shall be transferable otherwise than by will or the laws of descent and distribution, and, except to the extent otherwise provided herein, the rights and the benefits of the Restricted Stock Unit Agreement may be exercised and received, respectively, during the lifetime of the Participant only by the Participant or by the Participant's guardian or legal representative.

2. **Limitation of Liability**. Under no circumstances will the Company be liable for any indirect, incidental, consequential or special damages (including lost profits) of any form incurred by any person, whether or not foreseeable and regardless of the form of the action in which such a claim may be brought, with respect to the Plans, the Restricted Stock Unit Agreement or the Company's role as Plan sponsor.

3. **Units Subject to Plans**. Copies of the Plans are included with the Restricted Stock Unit Agreement. The provisions of the Plans as now in effect and as the Plans may be amended in the future (but only to the extent such amendments are allowed by the provisions of the Plans) are hereby incorporated in the Restricted Stock Unit Agreement by reference as though fully set forth herein. Upon request to the Secretary of the Company, the Participant may obtain a copy of the Plans and any amendments.

4. **Definitions**. Unless redefined herein, all terms defined in the Plans have the same meaning when used as capitalized terms in these Terms and Conditions.

5. **Compliance with Regulatory Requirements**. Notwithstanding anything else in the Plans, the shares of Common Stock underlying the Units that are delivered to the Participant may not be sold, pledged or hypothecated unless the Company is in compliance with all regulatory requirements regarding registration of the shares to be issued under the terms of the Plans, and in any event only to the extent permitted under federal securities laws and the Company's Securities Trading and Disclosure Policy.

**EXHIBIT 21.1**

Subsidiaries of YRC Worldwide Inc.
At December 31, 2013

| Name | Percentage Ownership | Jurisdiction of Incorporation or Formation |
|---|---|---|
| 1105481 Ontario, Inc. | 100% | Ontario |
| Express Lane Service, Inc. | 100% | Delaware |
| JHJ International Transportation Co., Ltd. | 50%[1] | China |
| OPK Insurance Co. Ltd. | 100% | Bermuda |
| Roadway LLC | 100% | Delaware |
| Roadway Next Day Corporation | 100% | Pennsylvania |
| New Penn Motor Express, Inc. | 100% | Pennsylvania |
| YRC Inc. | 100% | Delaware |
| Reimer Express Lines Ltd. | 100% | Canada |
| YRC Transportation, S.A. de C.V. | 41.1%[2] | Mexico |
| Roadway Express International, Inc. | | Delaware |
| Transcontinental Lease, S. de R.L. de C.V. | 100% | Mexico |
| Roadway Express, S.A. de C.V. | .01%[3] | Mexico |
| Roadway Reverse Logistics, Inc. | 99.99%[4] | Ohio |
| Transcontinental Lease, S. de R.L. de C.V. | 100% | Mexico |
| Roadway Express, S.A. de C.V. | 99.99%[3] | Mexico |
| YRC Transportation, S.A. de C.V. | .01%[4] | Mexico |
| YRC Services S. de R.L. de C.V. | 58.9%[2] | Mexico |
| YRC Association Solutions, Inc. | 100% | Mexico |
| YRC International Investments, Inc. | 100% | Delaware |
| YRC Worldwide Pte. Ltd. | 100% | Delaware |
| YRC Logistics Asia Limited | 100% | Singapore |
| PT Meridian IQ Indonesia International | 100% | Hong Kong |
| YRC (Shanghai) Management Consulting Co., Ltd. | 100% | Indonesia |
| YRC Mortgages, LLC | 100% | China |
| YRC Regional Transportation, Inc. | 100% | Delaware |
| USF Bestway Inc. | 100% | Delaware |
| USF Dugan Inc. | 100% | Arizona |
| USF Glen Moore Inc. | 100% | Kansas |
| USF Holland Inc. | 100% | Pennsylvania |
| USF Holland International Sales Corporation | 100% | Michigan |
| USF Reddaway Inc. | 100% | Nova Scotia |
| USF RedStar LLC | 100% | Oregon |
| YRC Logistics Services, Inc. | 100% | Delaware |
| YRC Logistics Inc. | 100% | Illinois |
| | 100% | Ontario |

| | | |
|---|---|---|
| YRC Enterprise Services, Inc. | 100% | Delaware |
| YRCW Receivables LLC | 100% | Delaware |

[1] JHJ International Transportation Co., Ltd. is owned 50% by YRC Worldwide Inc. and 50% by a third party.

[2] YRC Transportation, S.A. de C.V. is owned 58.9% by YRC Inc. and 41.1% by Reimer Express Lines Ltd.

[3] Transcontinental Lease, S. de R.L. de C.V. is owned 99.99% by YRC Inc. and .01% by Roadway Express International, Inc.

[4] Roadway Express, S.A. de C.V. is owned 99.99% by YRC Inc. and .01% by Transcontinental Lease, S. de R.L. de C.V.

**EXHIBIT 23.1**

<u>Consent of Independent Registered Public Accounting Firm</u>

We consent to the incorporation by reference in the registration statements (Nos. 333-174277 and 333-176971) on Form S-1, (Nos. 333-190079 and 333-193752) on Form S-3, and (Nos. 333-121370, 333-121470, 333-124847, 333-139691, 333-144958, 333-150941, 333-159354, 333-167931, 333-168401, and 333-178223) on Form S-8 of YRC Worldwide Inc. of our reports dated February 27, 2014, with respect to the consolidated balance sheets of YRC Worldwide Inc. and subsidiaries as of December 31, 2013 and 2012, and the related consolidated statements of operations, comprehensive loss, shareholders' deficit, and cash flows for each of the years in the three-year period ended December 31, 2013, and the effectiveness of internal control over financial reporting as of December 31, 2013, which reports appear in the December 31, 2013 annual report on Form 10-K of YRC Worldwide Inc.


<u>/s/ KPMG LLP</u>


Kansas City, Missouri
March 10, 2014

**EXHIBIT 31.1**

CERTIFICATION PURSUANT TO
EXCHANGE ACT RULES 13A-14 AND 15D-14,
AS ADOPTED PURSUANT TO
SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002

I, James L. Welch, certify that:

(1)      I have reviewed this report on Form 10-K of YRC Worldwide Inc.;

(2)      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

(3)      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

(4)      The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and we have:

    a.      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b.      Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c.      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d.      Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

(5)      The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a.      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b.      Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: March 10, 2014                                                    /s/ James L. Welch
                                                                       James L. Welch
                                                                       Chief Executive Officer

**EXHIBIT 31.2**

CERTIFICATION PURSUANT TO
EXCHANGE ACT RULES 13A-14 AND 15D-14,
AS ADOPTED PURSUANT TO
SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002

I, Jamie G. Pierson, certify that:

(1)    I have reviewed this report on Form 10-K of YRC Worldwide Inc.;

(2)    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

(3)    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

(4)    The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and we have:

    a.    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b.    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c.    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d.    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

(5)    The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a.    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b.    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: March 10, 2014

/s/ Jamie G. Pierson

Jamie G. Pierson

Executive Vice President and Chief Financial Officer

**EXHIBIT 32.1**

CERTIFICATION PURSUANT TO
18 U.S.C. SECTION 1350,
AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

In connection with the annual report of YRC Worldwide Inc. on Form 10-K for the year ended December 31, 2013, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, James L. Welch, Chief Executive Officer of YRC Worldwide Inc., certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

(1)    The Report fully complies with the requirements of Section 13 (a) or 15 (d) of the Securities Exchange Act of 1934; and

(2)    The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of YRC Worldwide Inc.

Date: March 10, 2014                                         /s/ James L. Welch

                                                            James L. Welch
                                                            Chief Executive Officer

**EXHIBIT 32.2**

CERTIFICATION PURSUANT TO
18 U.S.C. SECTION 1350,
AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

In connection with the annual report of YRC Worldwide Inc. on Form 10-K for the year ended December 31, 2013, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Jamie G. Pierson, Chief Financial Officer of YRC Worldwide Inc., certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

(1)   The Report fully complies with the requirements of Section 13 (a) or 15 (d) of the Securities Exchange Act of 1934; and

(2)   The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of YRC Worldwide Inc.

Date: March 10, 2014                                     /s/ Jamie G. Pierson
                                                        Jamie G. Pierson
                                                        Executive Vice President and Chief Financial Officer