**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **CHRISTINA LEWIS, Individually and on Behalf of All Others Similarly Situated,**<br><br>**Plaintiff,**<br><br>    **v.**<br><br>**YRC WORLDWIDE INC.,** *et al.*,<br><br>**Defendants.** | No. 1-19-cv-00001-GTS-ATB |

**DEFENDANTS' MEMORANDUM OF LAW**
**IN SUPPORT OF MOTION TO DISMISS**
**LEAD PLAINTIFFS' AMENDED COMPLAINT**

Dan French
David G. Burch, Jr.
Barclay Damon LLP
125 East Jefferson Street
Syracuse, NY  13202
Tel:  (315) 425-3700
Fax:  (315) 425-2701

Ralph C. Ferrara (*pro hac vice*)
Ann M. Ashton (*pro hac vice*)
Proskauer Rose LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C.  20004
Tel:  (202) 416-6800
Fax:  (202) 416-6899

Jonathan E. Richman (*pro hac vice*)
Proskauer Rose LLP
11 Times Square
New York, New York  10036
Tel:  (212) 969-3000
Fax:  (212) 969-2900

Counsel for Defendants

July 15, 2019

**TABLE OF CONTENTS**

*Page*

TABLE OF AUTHORITIES ............................................................................................... ii

PRELIMINARY STATEMENT ..........................................................................................1

FACTUAL BACKGROUND ...............................................................................................2

ARGUMENT .......................................................................................................................6

I.      PLAINTIFFS HAVE NOT PLED A VIOLATION OF § 10(b). ........................................6

         A.      Plaintiffs Have Not Pled a Material Misstatement or Omission............................8

               1.      No Misstatements About Reported Financial Results ...............................11

               2.      No Misstatements About Accounting Policies ..........................................13

               3.      No Misstatements About Loss Contingencies ...........................................19

               4.      No Misstatements About Conformance to GAAP.....................................23

               5.      No Other Material Misstatements or Omissions........................................25

         B.      Plaintiffs Have Not Pled a Strong Inference of Scienter. .....................................29

               1.      No Evidence of Conscious Misbehavior or Recklessness ........................30

               2.      Insufficient Allegations of Motive to Commit Fraud ...............................32

                     a.      The 2014 Financing Transaction ...................................................32

                   b.      Individual Defendants' Stock Sales ...............................................33

II.     PLAINTIFFS HAVE NOT PLED A CONTROL-PERSON CLAIM..............................37

CONCLUSION...................................................................................................................38

# TABLE OF AUTHORITIES

*Page(s)*

CASES

*Abely v. Aeterna Zentaris Inc.*,
  2013 WL 2399869 (S.D.N.Y. May 29, 2013) ...........................................................................3

*Acito v. IMCERA Grp, Inc.*,
  47 F.3d 47 (2d Cir. 1995)........................................................................................33, 34

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007)...................................................................................................37

*Axar Master Fund, Ltd. v. Bedford*,
  308 F. Supp. 3d 743 (S.D.N.Y. 2018),
  *motion for relief from judgment denied*,
  2019 WL 1367683 (S.D.N.Y. Mar. 26, 2019) ............................................................21, 22, 28

*C.D.T.S. No. 1 v. UBS AG*,
  2013 WL 6576031 (S.D.N.Y. Dec. 13, 2013),
  *aff'd*, 604 F. App'x 5 (2d Cir. 2015)........................................................................................15

*Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*,
  394 F.3d 126 (3d Cir. 2004)...................................................................................................10

*Chill v. Gen. Elec. Co.*,
  101 F.3d 263 (2d Cir. 1996)...................................................................................................24

*City of Brockton Ret. Sys. v. Shaw Grp., Inc.*,
  540 F. Supp. 2d 464 (S.D.N.Y. 2008)....................................................................................35

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
  752 F.3d 173 (2d Cir. 2014)........................................................................................8, 15, 22

*City of Taylor Gen. Emps. Ret. Sys. v. Magna Int'l Inc.*,
  967 F. Supp. 2d 771 (S.D.N.Y. 2013).....................................................................................35

*City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*,
  129 F. Supp. 3d 48 (S.D.N.Y. 2015)................................................................................24, 28

*Cortina v. Anavex Life Scis. Corp.*,
  2016 WL 7480415 (S.D.N.Y. Dec. 29, 2016) .........................................................................36

*Davidoff v. Farina*,
  2005 WL 2030501 (S.D.N.Y. Aug. 22, 2005).........................................................................16

*Deephaven Private Placement Trading, Ltd.*,
  454 F.3d 1168 (10th Cir. 2006) ................................................................................24

*Diehl v. Omega Protein Corp.*,
  339 F. Supp. 3d 153 (S.D.N.Y. 2018) ......................................................................22

*Dura Pharm., Inc. v. Broudo*,
  544 U.S. 336 (2005) ...................................................................................................6

*ECA & Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009) ..............................................................................6, 7, 29

*Emps. Ret. Sys. of City of Providence v. Embraer S.A.*,
  2018 WL 1725574 (S.D.N.Y. Mar. 30, 2018) ...........................8, 10, 12, 16, 23, 24

*Fadem v. Ford Motor Co.*,
  352 F. Supp. 2d 501 (S.D.N.Y.),
  *aff'd*, 157 F. App'x 398 (2d Cir. 2005) .....................................................................9

*Fait v. Regions Fin. Corp.*,
  655 F.3d 105 (2d Cir. 2011) ....................................................................................16

*Feasby v. Industri-Matematik Int'l Corp.*,
  2000 WL 977673 (S.D.N.Y. July 17, 2000) .............................................................35

*Friedman v. JP Morgan Chase & Co.*,
  2016 WL 2903273 (S.D.N.Y. May 18, 2016),
  *aff'd*, 689 F. App'x 39 (2d Cir. 2017) .....................................................................37

*Gamm v. Sanderson Farms, Inc.*,
  2018 WL 1319157 (S.D.N.Y. Jan. 19, 2018) .............................................................7

*Glaser v. The9, Ltd.*,
  772 F. Supp. 2d 573 (S.D.N.Y. 2011) ................................................................10, 35

*Greebel v. FTP Software, Inc.*,
  194 F.3d 185 (1st Cir. 1999) ...............................................................................35, 36

*Hess v. Am. Physicians Capital, Inc.*,
  2005 WL 459638 (W.D. Mich. Jan. 11, 2005) .........................................................16

*Hogan v. Pilgrim's Pride Corp.*,
  2018 WL 1316979 (D. Colo. Mar. 14, 2018) .............................................................7

*In re Advanced Battery Techs., Inc.*,
  781 F.3d 638 (2d Cir. 2015) ....................................................................................29

*In re Advanta Corp. Sec. Litig.*,
  180 F.3d 525 (3d Cir. 1999)......................................................................................34

*In re Avon Prods., Inc. Sec. Litig.*,
  2009 WL 848017 (S.D.N.Y. Feb. 23, 2009) (Report),
  *adopted*, 2009 WL 10698359 (S.D.N.Y. Mar. 18, 2009) ....................................35, 36

*In re AXIS Capital Holdings Ltd. Sec. Litig.*,
  456 F. Supp. 2d 576 (S.D.N.Y. 2006)........................................................................36

*In re Bank of Am. AIG Disclosure Sec. Litig.*,
  980 F. Supp. 2d 564 (S.D.N.Y. 2013),
  *aff'd*, 566 F. App'x 93 (2d Cir. 2014)...........................................20, 21, 22, 31, 32

*In re Bristol-Myers Squibb Sec. Litig.*,
  312 F. Supp. 2d 549 (S.D.N.Y. 2004)........................................................................35

*In re Burlington Coat Factory Secs. Litig.*,
  114 F.3d 1410 (3d Cir. 1997)....................................................................................24

*In re Doral Fin. Corp. Sec. Litig.*,
  563 F. Supp. 2d 461 (S.D.N.Y. 2008),
  *aff'd*, 344 F. App'x 717 (2d Cir. 2009)....................................................................10

*In re Gentiva Securities Litigation*,
  932 F. Supp. 2d 352 (S.D.N.Y. 2013)..................................................................17, 32

*In re Health Mgmt. Sys., Inc. Sec. Litig.*,
  1998 WL 283286 (S.D.N.Y. June 1, 1998) ..............................................................35

*In re Hertz Global Holdings Inc.*,
  905 F.3d 106 (3d Cir. 2018)............................................................................ 33-34, 36

*In re Iconix Brand Grp., Inc.*,
  2017 WL 4898228 (S.D.N.Y. Oct. 25, 2017) ..........................................................33

*In re K-Tel Int'l, Inc. Sec. Litig.*,
  300 F.3d 881 (4th Cir. 2002) ....................................................................................35

*In re Keyspan Corp. Sec. Litig.*,
  383 F. Supp. 2d 358 (E.D.N.Y. 2003) ................................................................34, 36

*In re Kindred Healthcare, Inc. Sec. Litig.*,
  299 F. Supp. 2d 724 (W.D. Ky. 2004)......................................................................16

*In re Lehman Bros. Sec. and ERISA Litig.*,
  799 F. Supp. 2d 258 (S.D.N.Y. 2011).......................................................................24

*In re Lions Gate Entmt. Corp. Secs. Litig.*,
165 F. Supp. 3d 1 (S.D.N.Y. 2016) ...............................................................20, 21, 23, 31

*In re Lululemon Sec. Litig.*,
14 F. Supp. 3d 553 (S.D.N.Y. 2014),
*aff'd*, 604 F. App'x 62 (2d Cir. 2015)..............................................................................26

*In re Nimble Storage, Inc. Sec. Litig.*,
252 F. Supp. 3d 848 (N.D. Cal. 2017) ..............................................................................11

*In re PetroChina Co. Ltd. Sec. Litig.*,
120 F. Supp. 3d 340 (S.D.N.Y. 2015)................................................................................18

*In re Sanofi Sec. Litig.*,
155 F. Supp. 3d 386 (S.D.N.Y. 2016)................................................................................12

*In re Supercom Inc. Sec. Litig.*,
2018 WL 4926442 (S.D.N.Y. Oct. 10, 2018) ....................................................................17

*In re Vantive Corp. Sec. Litig.*,
283 F.3d 1079 (9th Cir. 2002) ...........................................................................................34

*Janus Capital Grp., Inc. v. First Deriv. Traders*,
564 U.S. 135 (2011)..............................................................................................................6

*Kalnit v. Eichler*,
264 F.3d 131 (2d Cir. 2001).....................................................................................30, 31, 32

*Kane v. Madge Networks N.V.*,
2000 WL 33208116 (N.D. Cal. May 26, 2000),
*aff'd sub nom. Kane v. Zisapel*, 32 F. App'x 905 (9th Cir. 2002) ...........................................16

*Kessman v. Myriad Genetics, Inc.*,
2019 WL 1330363 (D. Utah Mar. 25, 2019) .........................................................................7

*Lasker v. New York State Elec. & Gas Corp.*,
85 F.3d 55 (2d Cir. 1996)....................................................................................................25

*Levy v. Maggiore*,
48 F. Supp. 3d 428 (E.D.N.Y. 2014) ....................................................................................3

*Lopez v. CTPartners Exec. Search Inc.*,
173 F. Supp. 3d 12 (S.D.N.Y. 2016)...................................................................................22

*Malin v. XL Capital Ltd.*,
499 F. Supp. 2d 117 (D. Conn. 2007),
*aff'd*, 312 F. App'x 400 (2d Cir. 2009)..........................................................................9, 10

*Mathews v. Centex Telemanagement, Inc.*,
    1994 WL 269734 (N.D. Cal. June 8, 1994) ..............................................................................16

*Murphy v. Sofamor Danek Grp. (In re Sofamor Danek Grp., Inc.)*,
    123 F.3d 394 (6th Cir. 1997) ...................................................................................................12

*OFI Asset Mgmt. v. Cooper Tire & Rubber*,
    834 F.3d 481 (3d Cir. 2016).....................................................................................................17

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    135 S. Ct. 1318 (2015)..............................................................................................................14

*Orlan v. Spongetech Delivery Sys., Inc.*,
    2012 WL 1067975 (E.D.N.Y. Mar. 29, 2012) .........................................................................30

*Pehlivanian v. China Gerui Advanced Materials Grp., Ltd.*,
    153 F. Supp. 3d 628 (S.D.N.Y. 2015)......................................................................................27

*Pub. Sch. Teachers' Pension & Ret. Fund v. Ford Motor Co. (In re Ford Motor*
    *Co. Sec. Litig.)*,
    381 F.3d 563 (6th Cir. 2004) ...................................................................................................27

*Reilly v. U.S. Physical Therapy, Inc.*,
    2018 WL 3559089 (S.D.N.Y. July 23, 2018) ...................................................................33. 36

*Ressler v. Liz Claiborne, Inc.*,
    75 F. Supp. 2d 43 (E.D.N.Y. 1998),
    *aff'd sub nom. Fishbaum v. Liz Claiborne, Inc.*, 189 F.3d 460 (2d Cir. 1999)..................33, 36

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004).....................................................................................................32

*Se. Pa. Transp. Auth. v. Orrstown Fin. Servs. Inc.*,
    2015 WL 3833849 (M.D. Pa. June 22, 2015)..........................................................................25

*Singh v. Cigna Corp.*,
    918 F.3d 57 (2d Cir. 2019)........................................................................................................28

*Steinberg v. Ericsson LM Tel. Co.*,
    2008 WL 5170640 (S.D.N.Y. Dec. 10, 2008) .........................................................................11

*Stratte-McClure v. Morgan Stanley*,
    776 F.3d 94 (2d Cir. 2015)........................................................................................................21

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*,
    531 F.3d 190 (2d Cir. 2008)......................................................................................................30

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)........................................................................................................29

*Tongue v. Sanofi*,
    816 F.3d 199 (2d Cir. 2016)......................................................................................14, 15

*Turner v. MagicJack Vocaltec, Ltd.*,
    2014 WL 406917 (S.D.N.Y. Feb. 3, 2014)...................................................................36

*Union Cent. Life Ins. Co. v. Ally Fin., Inc.*,
    2013 WL 2154220 (S.D.N.Y. Mar. 29, 2013) .............................................................32

*Utesch v. Lannett Co.*,
    316 F. Supp. 3d 895 (E.D. Pa. 2018) ....................................................................29, 32

*Woodward v. Raymond James Fin., Inc.*,
    732 F. Supp. 2d 425 (S.D.N.Y. 2010).........................................................................26

*Wyche v. Advanced Drainage Sys., Inc.*,
    2017 WL 971805 (S.D.N.Y. Mar. 10, 2017),
    *aff'd*, 710 F. App'x 471 (2d Cir. 2017)......................................................................30

*Yates v. Mun. Mortg. & Equity, LLC*,
    744 F.3d 874 (4th Cir. 2014) .......................................................................................34

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) ....................................................................................9, 10

**STATUTES**

15 U.S.C. § 78j(b) .......................................................................................... *passim*

15 U.S.C. § 78t(a) ..................................................................................................1

15 U.S.C. § 78u-4(b).......................................................................................7, 29

15 U.S.C. § 78u-5(c)............................................................................................17

31 U.S.C. § 3729..................................................................................................4

31 U.S.C. § 3730(b)(3) .......................................................................................4

**OTHER AUTHORITIES**

17 C.F.R. 240.10b-5................................................................................ *passim*

Fed. R. Civ. P. 9(b) ....................................................................................1, 6, 37

Fed. R. Civ. P. 12(b)(6)........................................................................................1

SEC Regulation S-K, Item 303 ...............................................................................................21, 22

Management's Discussion and Analysis of Financial Condition and Results of
    Operations; Certain Investment Company Disclosures,
    Securities Act Release No. 6835, 1989 WL 1092885 (May 18, 1989) ...................................22

FASB ASC 450 .......................................................................................................20, 21, 22

FASB ASC 605 ..........................................................................................................................13

FASB Concept No. 5, *Recognition and Measurement in Financial Statements of*
    *Business Enterprises* (2008) ...........................................................................................13

Statements on Auditing Standards § 312.07 ................................................................................24

## PRELIMINARY STATEMENT

This putative securities class action arises from alleged violations of the federal False Claims Act (the "FCA") and other laws by YRC Worldwide Inc. ("YRC"), a trucking company. Lead Plaintiffs City of Warwick Retirement Board and Peter Szabo ("Plaintiffs") allege that YRC engaged in a years'-long scheme to overcharge its customers "for shipments based on weights that were higher than actual weights" [AC ¶ 9] – a purported practice that led to a *qui tam* action under the FCA and, *ten years later*, to a suit by the United States on behalf of the Department of Defense, a YRC customer.[1]  Plaintiffs contend that YRC's alleged conduct and its failure to disclose a pending investigation by the Department of Justice caused YRC's financial statements and other disclosures to be materially false or misleading during the Class Period (March 10, 2014 through December 14, 2018).  Plaintiffs assert a securities-fraud claim under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (the "Exchange Act"), and SEC Rule 10b-5, 17 C.F.R. 240.10b-5, as well as a control-person liability claim against the individual defendants under § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

Plaintiffs' Complaint fails to state a claim under the heightened pleading requirements of the Private Securities Litigation Reform Act of 1995 (the "PSLRA") and Fed. R. Civ. P. 9(b), and under Fed. R. Civ. P. 12(b)(6).

First, Plaintiffs have not pled a material misrepresentation or omission.  YRC had no obligation to disclose uncharged, unadjudicated alleged wrongdoing, which – according to the facts alleged in the Complaint – took place mostly, if not entirely, *before* the Class Period began.

---

[1]    Citations to AC or to paragraph numbers (¶) refer to the Amended Complaint (the "Complaint") filed on June 14, 2019 [Dkt. No. 70].  Citations to "Ex." (designated by letter) refer to the exhibits to the accompanying Declaration of Julia D. Alonzo.

Moreover, the alleged misconduct did not render YRC's Class-Period financial results false or misleading; YRC actually received the revenues and incurred the expenses that it reported. Nor did YRC make any material misstatements or omissions about contingencies and uncertainties, because Plaintiffs have not pled any facts showing that YRC actually expected the Government to sue it under the FCA.

Second, even if any of YRC's statements had been false or misleading, Plaintiffs have not pled facts creating a strong inference that YRC knew or was reckless in not knowing of those alleged misstatements. The Complaint does not plead *anything* to suggest that three of the four individual defendants knew about the alleged overcharging scheme. And as to the fourth defendant, the Complaint contains only a single factual allegation involving one conversation at a single meeting in 2013, *before* the Class Period began. Nor does the Complaint plead any facts suggesting that anyone at YRC believed that the Government's investigation had any merit. Perhaps because they realize the weakness of their factual allegations, Plaintiffs allege that the individual defendants sold YRC stock during the Class Period. But as described in detail below, those sales were not unusual or suspicious and thus cannot create any inference of scienter.

Third, Plaintiffs have failed to plead control-person liability because they have not established either a primary violation of § 10(b) or any individual's culpable participation in any such alleged violation. The Court should therefore dismiss this case with prejudice.

## FACTUAL BACKGROUND

### A.   YRC's Business

YRC is a transportation company that does business in North America through multiple subsidiaries, including YRC Freight, its shipping division. [AC ¶¶ 5-6] YRC resulted from a 2003 merger between two transportation companies, Yellow Transportation, Inc. ("Yellow") and

2

Roadway Express, Inc. ("Roadway").  [*Id.* ¶ 5]  From 2003 until 2009, Yellow and Roadway largely operated separately, although they shared some corporate functions.  [*Id.* ¶ 45]  In 2009, Roadway and Yellow merged into YRC and started operating as one corporate unit.  [*Id.*]  YRC has many customers, including multiple agencies of the U.S. government, one of which is the Department of Defense (the "DOD").  [*Id.* ¶¶ 6, 25]

YRC concentrates on less-than-truckload freight shipping, in which goods from multiple shippers are transported in a single truck.  [*Id.* ¶ 6]  Shipments are accompanied by bills of lading, which are agreements between the customer and the carrier documenting key information about the shipment, including its weight, destination, and distance of travel.  [*Id.* ¶ 52]

YRC prices its shipments through a "rating" process.  At the time of shipment, pricing is based primarily on the shipment's weight, product classification, destination, and any applicable customer discounts.  [*E.g.*, 2017 Form 10-K at 41 (Ex. E)][2]  YRC updates its pricing information during a shipment to account for factors such as weight verifications.  [*Id.*]  YRC weighs loads of cargo as they pass through its freight terminals during the shipment process to ensure that the weight on the bill of lading is correct.  [AC ¶¶ 10, 54]

YRC weighs its shipments at multiple times during the shipping process; thus, "[a]t various points throughout [its] customer invoicing process, incorrect ratings (*i.e.*, prices) could be identified based on . . . weight verifications."  [2017 Form 10-K at 41 (Ex. E)]  Updates to a shipment's pricing, or "reratings," are estimated and accounted for by a rerating reserve that is accrued primarily based on historical trends.  [*Id.*]

---

[2]    In ruling on a motion to dismiss, the Court may consider documents incorporated in the Complaint by reference, documents deemed integral to the Complaint, and public records, including SEC filings such as financial statements and forms showing insiders' securities transactions.  *See, e.g.*, *Levy v. Maggiore*, 48 F. Supp. 3d 428, 438 (E.D.N.Y. 2014); *Abely v. Aeterna Zentaris Inc.*, 2013 WL 2399869, at *22 (S.D.N.Y. May 29, 2013).

YRC's operating revenue has two primary components:  volume and yield.  Volume is evaluated using several methods, including tonnage, tonnage per day, number of shipments, shipments per day, or weight per shipment; yield is measured using revenue per shipment or other related factors.  [AC ¶ 48]

**B.      The FCA Action and the Ensuing DOJ Investigation**

In November 2008, a Roadway employee filed a sealed complaint against YRC in federal court on behalf of the United States under the FCA's *qui tam* provisions, alleging violations of the FCA, 31 U.S.C. §§ 3729 *et seq.* (the "FCA Action").  [AC ¶¶ 93-94]  A *qui tam* complaint must remain sealed for 60 days, although the Government can request additional extensions of the sealing under 31 U.S.C. § 3730(b)(3) – as it did here for ten years.  [FCA Action Docket, at 4-6 (Ex. J)]  The sealed complaint alleged that YRC was overcharging the DOD (and perhaps other governmental customers) by not crediting the customer when reweighs showed that shipments weighed less than originally stated on bills of lading (known as a "negative reweigh"), but was seeking additional compensation when reweighs showed that shipments weighed more than the bills of lading stated (known as "positive reweighs").  [AC ¶¶ 95, 14]

Plaintiffs allege that the Department of Justice (the "DOJ") began investigating the sealed *qui tam* allegations "in or around 2009" (the "DOJ Investigation").  [AC ¶ 11]  As part of that investigation, the DOJ issued a civil investigative demand, interviewed or deposed many witnesses, and received voluminous documents from YRC.  [*Id*. ¶¶ 11, 109]

After approximately ten years of investigating, the United States decided to intervene in the FCA Action and announced on December 14, 2018 that it had filed a complaint in intervention (the "DOD Complaint").  [*Id.* ¶ 482]  YRC also disclosed the DOD Complaint that same day.  [*Id.* ¶ 484]  (YRC again disclosed the DOD Complaint in its next periodic SEC filing,

4

the Form 10-K for the 2018 fiscal year filed on February 19, 2019.  [*Id.* ¶ 486])  The original *qui tam* complaint was not unsealed until sometime after November 21, 2018 (perhaps not until December 13, 2018), after the United States had informed the court of its intention to intervene in the FCA Action.  [Order Unsealing FCA Action (Ex. K); FCA Action Docket at 6 (Ex. J)]

### C.      **Plaintiffs' Securities Class Action**

On January 2, 2019, some three weeks after the United States filed the DOD Complaint, a YRC shareholder commenced this putative securities class action in this Court.  The Amended Complaint asserts that YRC's stock price was artificially inflated from March 10, 2014 through December 14, 2018 (the "Class Period") because YRC had not disclosed its purported scheme to ignore negative reweighs, as alleged in the FCA Action.  Plaintiffs contend that, by disregarding negative reweighs, YRC overstated its income and other financial metrics.  [AC ¶ 199]  Plaintiffs also allege that YRC's failure to disclose the so-called scheme caused YRC's reported financial results not to conform to generally accepted accounting principles ("GAAP") and its internal controls over financial reporting to be materially deficient.  [*Id.*]  In addition, Plaintiffs charge that the nondisclosure of the DOJ Investigation inflated YRC's stock price.  [*Id.*]  The Complaint alleges that the announcement of the DOD Complaint on December 14, 2018 caused the "truth" to emerge, leading to a decline in YRC's stock price.  [*Id.* Heading VII at 114, ¶¶ 18, 483-85]

The Complaint asserts claims under §§ 10(b) and 20(a) of the Exchange Act against YRC and four individual defendants:

- James Welch, who was YRC's CEO as well as a member of its Board of Directors from July 2011 until his retirement on July 31, 2018, and had previously served as President of YRC Freight from September 2013 through February 2014 and as CEO and President of Yellow from 2000 to 2007 [AC ¶¶ 26, 29];

- Darren Hawkins, who succeeded Mr. Welch as CEO and had previously served as YRC's President and Chief Operating Officer from January 2018 to April 2018 and as YRC Freight's President from February 2014 to December 2017 [*id.* ¶ 37];

- Jamie Pierson, who was YRC's Executive Vice President and Chief Financial Officer from November 2011 until he resigned as of December 31, 2016 [*id.* ¶¶ 33, 36]; and

- Stephanie Fisher, who succeeded Mr. Pierson as CFO in May 2017 and had previously been YRC's Vice President and Controller since May 2012 [*id.* ¶ 30].

## ARGUMENT

The Court should dismiss the Complaint in its entirety because Plaintiffs have failed to plead with particularity the existence of any material misrepresentations or omissions or to create a strong inference of scienter. Nor does the Complaint establish control-person liability.

## I.   PLAINTIFFS HAVE NOT PLED A VIOLATION OF § 10(b).

To plead a claim under § 10(b) and SEC Rule 10b-5, a plaintiff must establish a material misrepresentation or omission, scienter, reliance, economic loss, and loss causation. *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342 (2005). Liability lies only against a defendant who "'made'" the allegedly material misrepresentation or omission. *Janus Capital Grp., Inc. v. First Deriv. Traders*, 564 U.S. 135, 141-42 (2011). A person who does not actually speak or sign an alleged misstatement cannot be deemed to have "made" it unless he or she had "ultimate authority over the statement, including its content and whether and how to communicate it." *Id.* at 142. "One who prepares or publishes a statement on behalf of another is not its maker." *Id.* Thus, to the extent a particular individual defendant did not "make" a specific statement under *Janus*'s standard, he or she cannot be held liable for it.

"Any complaint alleging securities fraud must [also] satisfy the heightened pleading requirements of the PSLRA and Fed. R. Civ. P. 9(b) by stating with particularity the circumstances constituting fraud." *ECA & Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009). "Under the PSLRA, the complaint must 'specify each statement alleged to have been misleading, [and] the reason or reasons why the

6

statement is misleading,' and 'state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind.'" *Id.* (quoting 15 U.S.C. §§ 78u-4(b)(1), (2)) (emphasis added). "[I]f an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).

Where, as here, the alleged securities-law violations are based on some underlying alleged misconduct (such as FCA violations), a plaintiff must plead "sufficient facts not only establishing [that the issuer's] statements were false, but also that [the underlying] practices were illegal." *Kessman v. Myriad Genetics, Inc.*, 2019 WL 1330363, at *5 (D. Utah Mar. 25, 2019) (underlying allegations about billing practices in violation of FCA were not sufficiently pled to establish § 10(b) claim); *accord, e.g.*, *Hogan v. Pilgrim's Pride Corp.*, 2018 WL 1316979, at *5-7 (D. Colo. Mar. 14, 2018) ("[W]here plaintiff's central allegation is that defendants' statements and omissions during the Class Period were misleading because . . . they failed to disclose an underlying antitrust conspiracy, plaintiff must plead *with particularity* the facts that establish the existence of the antitrust conspiracy.") (emphasis added); *Gamm v. Sanderson Farms, Inc.*, 2018 WL 1319157, at *3 (S.D.N.Y. Jan. 19, 2018) (same).

Plaintiffs have not met these standards. The allegations of unadjudicated wrongdoing that make up the bulk of the Complaint are not pled with particularity; they merely "piggyback on allegations" in the FCA Action, *Hogan*, 2018 WL 1316979, at *7 n.4, and do not adequately plead a material misstatement or omission in YRC's public statements. Nor does the Complaint create a strong inference of scienter under the PSLRA's heightened pleading standards.

7

### A.    Plaintiffs Have Not Pled a Material Misstatement or Omission.

Plaintiffs' Complaint is based on Defendants' purported failure to disclose the so-called "Overcharge Scheme," including that the "scheme" "was materially inflating YRC's reported revenue, earnings, and the value of its publicly-traded securities," that it caused YRC's reported financials "not [to be] prepared in conformity with GAAP," and that the DOJ was investigating YRC.  [AC ¶ 15]  But "disclosure is not a rite of confession, and companies do not have a duty to disclose uncharged, unadjudicated wrongdoing," *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014) (internal quotation omitted).

Plaintiffs do not allege that any court has ever held that YRC engaged in the conduct pled in the Complaint or in the DOD Complaint, and no court has ever done so.  This case involves only unadjudicated alleged wrongdoing.  YRC promptly disclosed the DOD Complaint as soon as it was filed.  [AC ¶ 484]  (The original FCA Action had remained under seal until sometime after November 21, 2018.  [Order Unsealing FCA Action (Ex. K)])  YRC thus complied with its disclosure obligations, as explained more fully below.

Furthermore, the Complaint depends primarily on allegations of underlying misconduct that purportedly occurred *before* the Class Period began on March 10, 2014.  But allegations of *pre-Class-Period* misconduct do not establish that YRC's *Class-Period* statements were false or misleading.  *Emps. Ret. Sys. of City of Providence v. Embraer S.A.*, 2018 WL 1725574, at *4 (S.D.N.Y. Mar. 30, 2018) ("Pre-class period allegations of misconduct are insufficient where there is scant else from which to infer that this was the company's practice at any pertinent time [during the class period].") (internal quotation omitted).

The alleged events involving the purported overcharging scheme mostly took place in 2005, 2006, and 2007, seven to nine years before the Class Period started.  [AC ¶¶ 62-84]  The

8

Complaint contains a few factual allegations after that period, but the most recent of those are from 2011. [*Id.* ¶¶ 90-91] Even where the Complaint parrots allegations from the FCA Action, it does not point to any conduct after 2013 [*id.* ¶¶ 92, 121], and it concedes that the DOD Complaint does not allege any misconduct after October 2013 [*id.* ¶ 122], five months before the Class Period began and five years before the DOJ filed the DOD Complaint [*id.* ¶ 482].[3]

Plaintiffs attempt to overcome this timing problem by relying on six confidential witnesses ("CWs"). [AC ¶¶ 130-68] But three of those six witnesses – CW 1 [*id.* ¶ 130], CW 5 [*id.* ¶ 154], and CW 6 [*id.* ¶ 164] – stopped working at YRC *before* the Class Period began. Their allegations are thus insufficient under the PSLRA. *See, e.g., Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 996 (9th Cir. 2009) (disregarding allegations of CWs who "were not employed by [company] during the time period in question"); *Malin v. XL Capital Ltd.*, 499 F. Supp. 2d 117, 138, 141-42 (D. Conn. 2007) (same), *aff'd*, 312 F. App'x 400 (2d Cir. 2009); *Fadem v. Ford Motor Co.*, 352 F. Supp. 2d 501, 521 (S.D.N.Y.) (same), *aff'd*, 157 F. App'x 398 (2d Cir. 2005).

Of the other three witnesses, CW 3 left YRC in April 2015, one year after the Class Period began and four years before it ended. [AC ¶ 138] The Complaint does not plead dates for any of CW 3's allegations [*id.* ¶¶ 139-40], so it fails to establish that they occurred during the

---

[3]     Contrary to the Complaint's allegation [¶ 92 n.13], YRC's motion to dismiss the DOD Complaint did not concede that any alleged reweighing misconduct "continued after 2013." As Plaintiffs' own Complaint alleges [¶ 106], YRC "disregard[s] minor weight corrections – both upward and downward – if they are less than about 30-40 pounds." Thus, the DOD's decision to continue doing business with YRC presumably shows that the DOD is not concerned about YRC's practice because the "disregard[ed]" negative and positive reweighs likely cancel each other out and are *de minimis* in any event, inasmuch as the average weight per shipment was approximately 1,200 pounds [*see, e.g.*, Feb. 4, 2016 Form 8-K, Ex. 99.1, at 3 (Ex. F); Feb. 6, 2017 Form 8-K, Ex. 99.1, at 3 (Ex. G); Feb. 1, 2018 Form 8-K, Ex. 99.1, at 3 (Ex. H); Jan. 31, 2019 Form 8-K, Ex. 99.1, at 3 (Ex. I)].

Class Period.  *See, e.g.*, *In re Doral Fin. Corp. Sec. Litig.*, 563 F. Supp. 2d 461, 466 (S.D.N.Y. 2008) (CW's statement that he attended meetings during which reports were circulated and questions were raised was "so vague as to be meaningless because it contain[ed] no time frame within which the meetings occurred"), *aff'd*, 344 F. App'x 717 (2d Cir. 2009); *see also Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 589 (S.D.N.Y. 2011) (CW allegations must be described "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged") (internal quotation omitted).  Like CW 3, CW 4 also worked at YRC both before and during the Class Period (May 2008 through December 2017 [*id.* ¶ 141]), but the Complaint again does not plead that any of CW 4's allegations involved Class-Period misconduct [*id.* ¶¶ 141-53].[4]

This leaves CW 2, who worked at YRC only during the Class Period.  [*Id.* ¶ 133]  But CW 2's allegations do not describe an overarching scheme to ignore negative reweighs and cheat customers.  Rather, CW 2 alleges that, at his or her terminal in Illinois, YRC "only looked at certain customers' freight."  [*Id.* ¶ 135]  So, at most, CW 2 is alleging only what happened to "certain customers" at a single terminal in Illinois.  Such limited allegations do not establish a company-wide scheme and do not draw allegations of pre-Class Period misconduct into the Class Period.  *Embraer*, 2018 WL 1725574, at *11; *see also, e.g.*, *Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 155 (3d Cir. 2004) (improper attribution of "nationwide

---

[4]  The bare allegation that, after leaving YRC, CW 4 "continued to communicate with several" unidentified YRC employees who purportedly told CW 4 that "the negative reweigh practices continued" [AC ¶ 153] does not meet the pleading standard for confidential-witness information.  The failure to provide *any* information about CW 4's sources deprives the Court of any ability to determine whether those sources are credible.  *See, e.g.*, *Zucco Partners*, 552 F.3d at 996-97 (CWs who "base their knowledge on vague hearsay" do not "satisfy [PSLRA's] reliability standard"); *Malin*, 499 F. Supp. 2d at 139 n.17 (allegations by CWs about statements by unnamed supervisors were "impermissible hearsay and cannot be considered").

information" to "former employees who worked in local branch offices"); *In re Nimble Storage, Inc. Sec. Litig.*, 252 F. Supp. 3d 848, 851 n.3 (N.D. Cal. 2017) (no indication that two regional employees "either had responsibility over, let alone knowledge of, the status of commercial sales for the entire company"); *Steinberg v. Ericsson LM Tel. Co.*, 2008 WL 5170640, at *6 (S.D.N.Y. Dec. 10, 2008) (same).[5]

But even on their own terms, the allegedly misleading statements pled in the Complaint do not constitute material misrepresentations or omissions and therefore do not violate § 10(b). Although the Complaint cites numerous filings and other disclosures, they involve only five types of alleged misstatements or omissions:  (1) YRC's reported financial results, (2) YRC's accounting policies, (3) contingencies and uncertainties (including pending legal matters), (4) YRC's conformance with GAAP, and (5) several miscellaneous matters.  Plaintiffs have not shown how any of those categories of statements were materially false or misleading.

### 1.    No Misstatements About Reported Financial Results

The Complaint charges that YRC's reported operating revenue and operating income were false and misleading because they had been inflated by illegal conduct (and that YRC's net

---

[5]    Indeed, other allegations show that any pre-Class Period misconduct, *if* it existed, did *not* occur during the Class Period.  For example, the Complaint asserts that Yellow and Roadway "automatically disregard minor weight corrections – both upward and downward – if they are less than about 30-40 pounds."  [AC ¶ 106]  As noted above, this practice is not problematic:  the positive and negative reweighs likely cancel each other out, and the amount at issue is relatively trivial in any event.  And the Complaint does not allege that YRC did *not* tell its customers that it would ignore minor weigh variations.  Similarly, CW 4 alleges that, after 2011, "most of the larger YRC processing facilities . . . began to use forklifts equipped with digital scales and connected (wirelessly) to the YRC mainframe computer to allow all staffers the ability to track and weigh every shipment."  [*Id.* ¶ 145]  This allegation shows that, after 2011 (*i.e.*, before and during the Class Period), YRC's accuracy in weighing shipments was actually better, not worse, than it had been in prior years.

11

loss was understated by the same conduct).[6]  But "a violation of federal securities laws cannot be premised upon a company's disclosure of accurate historical data."  *Embraer*, 2018 WL 1725574, at *7 (internal quotation omitted).

Plaintiffs "do[] not dispute that [YRC's] financial statements were (literally) accurate," *id.*; rather, they argue that YRC's financial results were "overstated" because they partially consisted of "illicit revenue" [AC ¶¶ 179, 199(b)].  But that contention does not mean that YRC did not collect the reported revenues from its customers.  Accurate reporting of historical results does not require issuer to explain that the results were achieved through purportedly improper means.  *Embraer*, 2018 WL 1725574, at *11; *accord, e.g.*, *Murphy v. Sofamor Danek Grp. (In re Sofamor Danek Grp., Inc.)*, 123 F.3d 394, 401 & n.3 (6th Cir. 1997) ("It is clear that a violation of federal securities law cannot be premised upon a company's disclosure of accurate historical data."); *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 404 (S.D.N.Y. 2016) (same).

Plaintiffs' claim [AC ¶¶ 181-82] that some of YRC's booked revenue was not "earned" under GAAP because YRC was not "entitled" to it is specious.  From a securities-law point of view, this contention flies in the face of the many cases (such as those cited above) holding that accurate disclosure of historical financial performance is not false or misleading under the securities laws.  But the argument is also incorrect even as an accounting matter.

Under GAAP, revenue can be recognized when it is both (*i*) realized or realizable and (*ii*) earned.  FASB ASC 605-10-25-1.  Revenue is "realized" when services are exchanged for

---

[6]      AC ¶¶ 201-02 (2013 Form 10-K), 221-25 (2014 Q1 Form 10-Q), 232-36 (2014 Q2 Form 10-Q), 243-47 (2014 Q3 Form 10-Q), 256-60 (2014 Form 10-K), 275-79 (2015 Q1 Form 10-Q), 286-90 (2015 Q2 Form 10-Q), 297-301 (2015 Q3 Form 10-Q), 308-12 (2015 Form 10-K), 331-35 (2016 Q1 Form 10-Q), 344-48 (2016 Q2 Form 10-Q), 355-59 (2016 Q3 Form 10-Q), 366-70 (2016 Form 10-K), 387-91 (2017 Q1 Form 10-Q), 400-04 (2017 Q2 Form 10-Q), 413-17 (2017 Q3 Form 10-Q), 426-30 (2017 Form 10-K), 445-49 (2018 Q1 Form 10-Q), 456-60 (2018 Q2 Form 10-Q), 469-73 (2018 Q3 Form 10-Q).

cash or claims to cash; it is "realizable" if the consideration received is readily convertible to known amounts of cash or claims to cash.  *See* ASC 605; FASB Concepts Statement No. 5, *Recognition and Measurement in Financial Statements of Business Enterprises* (2008). Similarly, revenue is "earned" when the company has substantially accomplished what it must do – such as delivering the goods or rendering services at issue – to be entitled to the payment. ASC 605-10-25-1(b).  The Complaint does not allege that YRC did not receive cash (or claims to cash) after it invoiced its customers or that YRC did not substantially provide the trucking services it was supposed to provide.  Thus, the revenues were realized and "earned" under GAAP, and the statements of YRC's historical financial results are not actionable.  And YRC received a "clean" audit report from its independent public accountants during each year of the Class Period.[7]

### 2.    No Misstatements About Accounting Policies

The Complaint contends that YRC's statements about its accounting policies, such as revenue recognition and internal controls, were false and misleading.[8]  The allegedly misleading statements included (*i*) YRC's explanations of its revenue-recognition policies [*e.g.*, AC ¶ 203], (*ii*) its procedures for creating rerating reserves [*e.g.*, *id.* ¶ 207], and (*iii*) its Sarbanes-Oxley ("SOX") certifications, which were signed by Messrs. Welch and Pierson and Ms. Fisher [*e.g.*, *id.* ¶ 211].  Those statements allegedly were misleading because the purported overcharge

---

[7]    *See* 2013 Form 10-K at 90 [Ex. A]; 2014 Form 10-K at 84 [Ex. B]; 2015 Form 10-K at 84 [Ex. C]; 2016 Form 10-K at 81 [Ex. D]; 2017 Form 10-K at 81 [Ex. E].

[8]    AC ¶¶ 203-12 (2013 Form 10-K), 226-29 (2014 Q1 Form 10-Q), 237-40 (2014 Q2 Form 10-Q), 250-53 (2014 Q3 Form 10-Q), 261-70 (2014 Form 10-K), 280-83 (2015 Q1 Form 10-Q), 291-94 (2015 Q2 Form 10-Q), 302-05 (2015 Q3 Form 10-Q), 313-22 (2015 Form 10-K), 338-41 (2016 Q1 Form 10-Q), 349-52 (2016 Q2 Form 10-Q), 360-63 (2016 Q3 Form 10-Q), 373-82 (2016 Form 10-K), 394-97 (2017 Q1 Form 10-Q), 407-10 (2017 Q2 Form 10-Q), 418-21 (2017 Q3 Form 10-Q), 431-40 (2017 Form 10-K), 450-53 (2018 Q1 Form 10-Q), 463-66 (2018 Q2 Form 10-Q), 476-79 (2018 Q3 Form 10-Q).

scheme "caused Defendants' [*sic*] to recognize and report revenue, operating income and net income for YRC that was not earned and that YRC was not entitled to collect."  [*Id.* ¶ 199(c)] But the Complaint does not contain any factual allegations showing that YRC's disclosures about its accounting policies or internal controls were materially false or misleading.  And, as noted above, YRC's auditors also found no issues with YRC's internal controls.

**Revenue-Recognition Policies.**  Plaintiffs claim that YRC's explanations of its policy for recognizing revenue for shipments in transit were materially false or misleading because they did not disclose the alleged overcharge scheme.  [*See, e.g.*, AC ¶¶ 203-04]  YRC's policy said: "'We assign pricing to bills of lading at the time of shipment based primarily on the weight, general classification of the product, the shipping destination and individual customer discounts. This process is referred to as rating.'"  [*Id.* ¶ 203 (quoting 2013 Form 10-K)]  The Complaint does not plead facts showing that YRC did *not* price its bills of lading at the time of shipment based primarily on the shipment's weight, general classification, shipping destination, and individual customer discounts.  Nor does the Complaint show that YRC did not record as operating revenue "'total revenue earned . . . for all shipments in transit at a particular period end'" [*id.* (quoting 2013 Form 10-K)] or that operating revenue does not have "'two primary components:  volume . . . and yield or price'" [*id.* ¶ 205 (quoting 2013 Form 10-K)].

If Plaintiffs mean to suggest that YRC was promoting the *efficacy* of its revenue-recognition policies and its systems to record relevant information, any such comments would have been expressions of opinion, which were not false unless "either 'the speaker did not hold the belief she professed' or 'the supporting fact[s] she supplied were untrue.'"  *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016) (quoting *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 1327 (2015)).  Plaintiffs have not alleged that YRC did

14

*not* believe that its policies and systems were effective or that its statements about them contained any embedded facts that were not accurate.[9]

**Rerates.**  Plaintiffs also object to YRC's statements about its rerating procedures for managing revenue reserves and correcting inaccurate customer prices.  YRC said that it had "'an extensive system . . . to accurately capture, record, and control all relevant information necessary to effectively manage our revenue reserves'" and that, "'[a]t various points throughout our customer invoicing process, incorrect ratings (*i.e.* prices) could be identified based on many factors, including weight verifications or updated customer discounts. . . .  We accrue a reserve for rerating based on historical trends.'"  [*Id.* ¶¶ 210, 207 (quoting 2013 Form 10-K)]

The statement that incorrect ratings could be identified at various points "based on many factors, including weight verifications or updated customer discounts," is not inaccurate:  weight verifications and other factors could change the ratings.  And the Complaint concedes that YRC did have a system to capture and record "relevant information necessary to effectively manage our revenue reserves":  it pleads that, since 2011 (long before the Class Period began), most of YRC's larger facilities used forklifts with digital scales that connected directly to YRC's mainframe computer so staffers could track and weigh every shipment.  [*Id.* ¶ 145]

YRC's calling its information system "effective" is also a statement of opinion, which Plaintiffs have not shown that YRC disbelieved.  Moreover, that characterization is "inactionable puffery" – "too general to cause a reasonable investor to rely upon [it]."  *City of Pontiac*, 752 F.3d at 183 (internal quotation omitted); *see, e.g., C.D.T.S. No. 1 v. UBS AG*, 2013 WL 6576031,

---

[9]    A statement of opinion, even if not false, can be misleading if "the speaker omits information whose omission makes the statement misleading to a reasonable investor" because "the omitted facts would *conflict* with what a reasonable investor would take from the statement itself." *Tongue*, 816 F.3d at 210 (emphasis added; internal quotation omitted).  But the Complaint does not plead any facts omitted from the statement of the revenue-recognition policy.

15

at *1, *4-5 (S.D.N.Y. Dec. 13, 2013) (statement about "'effective risk management and control systems'" is puffery), *aff'd*, 604 F. App'x 5 (2d Cir. 2015).

Plaintiffs' related allegation that YRC's failure to issue bills of lading "based on actual weights caused the Company's 'rerate reserve' to be materially understated in violation of GAAP" [AC ¶ 208; *see also id*. ¶¶ 266, 318, 380, 436] is not sufficiently particularized, as it does not "explain with any specificity what effect the alleged conduct had on the company's statements regarding its financial health." *Davidoff v. Farina*, 2005 WL 2030501, at * 13 (S.D.N.Y. Aug. 22, 2005) (dismissing allegations related to improper revenue recognition).

Moreover, reserves for financial metrics that might need to be corrected in the future (such as reratings) are matters of judgment and opinion.  A reserve is simply an estimate; its creator cannot know in advance whether the reserve will or will not be sufficient, or needed at all.  *See, e.g.*, *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 112-13 (2d Cir. 2011) (loan loss reserves are matter of opinion); *Embraer*, 2018 WL 1725574, at *9 (decision whether to record a liability is matter of opinion).

Reserves also are forward-looking statements, because their adequacy cannot be assessed until sometime in the future.  *See, e.g*., *Hess v. Am. Physicians Capital, Inc.*, 2005 WL 459638, at *7 (W.D. Mich. Jan. 11, 2005) (loss reserves are forward-looking); *In re Kindred Healthcare, Inc. Sec. Litig.*, 299 F. Supp. 2d 724, 738 (W.D. Ky. 2004) (same); *Kane v. Madge Networks N.V.*, 2000 WL 33208116, at *5 (N.D. Cal. May 26, 2000) (same for accounts receivable or bad-debt reserves), *aff'd sub nom. Kane v. Zisapel*, 32 F. App'x 905 (9th Cir. 2002); *Mathews v. Centex Telemanagement, Inc.*, 1994 WL 269734, at *6 (N.D. Cal. June 8, 1994) (same).

Under the PSLRA, a forward-looking statement is not actionable unless (*i*) the speaker *actually knew* it was false *and* (*ii*) the statement was not accompanied by appropriate cautionary

16

language.  15 U.S.C. § 78u-5(c); *see, e.g.*, *OFI Asset Mgmt. v. Cooper Tire & Rubber*, 834 F.3d 481, 491, 502 (3d Cir. 2016); *In re Supercom Inc. Sec. Litig.*, 2018 WL 4926442, at *18 (S.D.N.Y. Oct. 10, 2018).  The Complaint does not allege that anyone at YRC actually knew that the estimates of rerating reserves were inaccurate or actually disbelieved them.

The absence of any factual allegation of actual knowledge of falsity suffices on its own to provide safe-harbor protection under the PSLRA, but YRC also issued cautionary language about its forward-looking estimates.  *See, e.g.*, 2013 Form 10-K at 18 (noting speculative nature of projections and the expectation "that some or all of the assumptions and estimates relating to the projections . . . will not materialize or will vary significantly from actual results"), 40 (warning that preparation of financial statements, including revenue reserves, "requires accounting policies that involve significant estimates and judgments") [Ex. A].  The reserve estimates thus are insulated from liability under the PSLRA.

**SOX Certifications.**  Plaintiffs contend that YRC's SOX certifications stating that YRC had "'internal control over financial reporting . . . to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes'" were false or misleading because YRC failed to disclose the so-called overcharge scheme.  [*E.g.*, AC ¶¶ 197, 212][10]  Courts have repeatedly rejected this type of conclusory allegation about SOX certifications and internal controls.

In *In re Gentiva Securities Litigation*, 932 F. Supp. 2d 352, 370 (S.D.N.Y. 2013), for example, the plaintiffs alleged that SOX certifications were misleading because the issuer's (a Medicare service provider) internal procedures had allowed the issuer to "report financial results

---

[10]    The 2013, 2014, and 2015 SOX certifications were signed by Messrs. Welch and Pierson [*id.* ¶¶ 211, 269, 321], and the 2016 and 2017 certifications were signed by Mr. Welch and Ms. Fisher [*id.* ¶¶ 381, 439].  Mr. Hawkins is not alleged to have signed any SOX certifications.

17

. . . that were, in material part, the product of the wrongful manipulation of the Medicare reimbursement system." The court held that the certifications "[could] not constitute a misstatement or omissions [*sic*] for purposes of 10b-5 liability" because "[t]he [p]laintiff has not alleged any facts pertaining to the Company's internal structure for financial reporting, much less that [the issuer] lacked adequate internal controls." *Id*. at 371; *see also In re PetroChina Co. Ltd. Sec. Litig.*, 120 F. Supp. 3d 340, 359 (S.D.N.Y. 2015) (dismissing § 10(b) claim based on SOX certifications because complaint did not "claim that [issuer] failed to evaluate its internal controls or disclose any weaknesses to its auditors," "assert that the certifying officers neglected to inform [issuer's] auditor of any relevant fraud," or allege "how or why [issuer's] internal controls were inadequate").

Plaintiffs' allegations regarding YRC's SOX certifications are similarly conclusory. The Complaint does not allege any facts directly addressing YRC's internal structure for financial reporting or other internal controls; instead, Plaintiffs repeat the same allegations made throughout the Complaint about the purported overcharge scheme. [*See, e.g.*, AC ¶ 212] Even if the alleged misconduct concerning overcharging had occurred, Plaintiffs have not pled any allegations regarding deficiencies in YRC's internal controls over *financial reporting* that would render the SOX certifications false or misleading. *PetroChina*, 120 F. Supp. 3d at 359 ("Even if PetroChina officials were engaging in bribery, the [complaint] does not make any allegations that would imply that the [c]ompany had flawed internal controls over *financial reporting*.").

Moreover, the SOX certifications did not purport to be warranties of accuracy; they were expressly "'[b]ased on my [*i.e.*, the signer's] knowledge.'"  [AC ¶ 211 (quoting certifications)] As discussed below in the scienter section, the Complaint does not plead any facts showing that

18

the signers knew of any alleged overcharge scheme during the Class Period (or, for Mr. Pierson

and Ms. Fisher, at any time).

### 3.    No Misstatements About Loss Contingencies

The Complaint charges that YRC's statements about its loss contingencies, uncertainties,

and other legal matters were materially false or misleading.[11]   This section of YRC's SEC filings

changed from quarter to quarter, but it always contained disclosures such as the following:

> We have been and continue to be involved in legal proceedings, claims and
> other litigation that arise in the ordinary course of business.  Litigation may be
> related to labor and employment, competitive matters, property damage and
> liability claims, safety and contract compliance, environmental liability, our
> past financial restructurings and other matters. . . .  Some or all of our
> expenditures to defend, settle or litigate these matters may not be covered by
> insurance or could impact our cost and ability to obtain insurance in the
> future.  Litigation can be expensive, lengthy and disruptive to normal business
> operations . . . .  The results of complex legal proceedings are often uncertain
> and difficult to predict.  An unfavorable outcome of any particular matter or
> any future legal proceedings could have a material adverse effect on our
> business, financial condition, liquidity or results of operations.  In the future,
> we could incur judgments or enter into settlements of claims that could harm
> our financial position, liquidity and results of operations.

[2017 10-K at 13 (Ex. E); AC ¶ 213]  YRC also said that, "'[b]ased on our current assessment of

information available as of the date of these financial statements, we believe that our financial

statements include adequate provisions for estimated costs and losses that may be incurred

within the litigation and proceedings to which we are a party.'"  [AC ¶ 213 (quoting 2013 Form

10-K)]

---

[11]      AC ¶¶ 213-14 (2013 Form 10-K), 230-31 (2014 Q1 Form 10-Q), 241-42 (2014 Q2 Form
10-Q), 254-55 (2014 Q3 Form 10-Q), 271-72 (2014 Form 10-K), 284-85 (2015 Q1 Form 10-Q),
295-96 (2015 Q2 Form 10-Q), 306-07 (2015 Q3 Form 10-Q), 323-34 (2015 Form 10-K), 342-43
(2016 Q1 Form 10-Q), 353-54 (2016 Q2 Form 10-Q), 364-65 (2016 Q3 Form 10-Q), 383-84
(2016 Form 10-K), 398-99 (2017 Q1 Form 10-Q), 411-12 (2017 Q2 Form 10-Q), 422-43 (2017
Q3 Form 10-Q), 441-42 (2017 Form 10-K), 454-55 (2018 Q1 Form 10-Q), 467-68 (2018 Q2
Form 10-Q), 480-81 (2018 Q3 Form 10-Q).  The Complaint does *not* allege that YRC should
have disclosed the sealed *qui tam* action; it focuses only on nondisclosure of the "DOJ
Investigation" [AC ¶ 215], whose definition does not include the sealed case [*id.* ¶ 11].

19

Plaintiffs claim that these representations were materially false or misleading because, while YRC disclosed other pending lawsuits and warned that it was involved in "'other litigation or proceedings that arise in ordinary business activities,'" the failure to mention the DOJ Investigation "gave investors the false impression that the Company did not face any other material contingencies or uncertainties outside the ordinary course of business and run-of-the-mill litigation and legal proceedings." [AC ¶ 215]  These allegations fail for many reasons.

First, "a government investigation, without more, does not trigger a generalized duty to disclose." *In re Lions Gate Entmt. Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 12 (S.D.N.Y. 2016) (no obligation to disclose receipt of multiple Wells Notices and subpoenas from SEC).  "[T]he securities laws do not impose an obligation on a company to predict the outcome of investigations" or "to disclose litigation that is not substantially certain to occur." *Id.* (internal quotation omitted).  The Complaint does not plead any facts showing that YRC believed that the DOJ Investigation was "substantially certain" to result in litigation, much less *material* litigation.

Contrary to Plaintiffs' assertion [*e.g.*, AC ¶ 215], an issuer does not mislead when it discloses pending suits, but not potential, unfiled ones.  *See, e.g.*, *In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 582 (S.D.N.Y. 2013) ("No reasonable investor would believe that disclosures of pending litigation meant that no other litigations were possible."), *aff'd*, 566 F. App'x 93 (2d Cir. 2014); *see also Lions Gate*, 165 F. Supp. 3d at 15-16.

Second, ASC 450-20-50, which the Complaint cites [AC ¶ 186], did not require disclosure of the DOJ Investigation.  As Plaintiffs admit, that accounting standard requires disclosure of loss contingencies only if there is "at least a reasonable possibility that a loss may be incurred." [*Id.* ¶ 186]  But the Complaint does not plead any facts showing that YRC believed that a reasonable possibility existed that the DOJ Investigation would result in a lawsuit that

20

would materially affect its financial statements. *See, e.g.*, *Axar Master Fund, Ltd. v. Bedford*, 308 F. Supp. 3d 743, 758-59 (S.D.N.Y. 2018) ("[D]isclosure [of a contingency] is necessary only when the uncertainty is reasonably likely to have material effects on the registrant's financial conditions or results of operations.") (internal quotation omitted), *motion for relief from judgment denied*, 2019 WL 1367683 (S.D.N.Y. Mar. 26, 2019); *see also Lions Gate*, 165 F. Supp. 3d at 21-22 (ASC 450 did not require disclosure of pending SEC investigation because no plausible allegations that litigation was reasonably possible or that amount of loss could have been estimated).

That YRC and the DOJ allegedly had engaged in settlement negotiations [AC ¶ 188] does not mean that ASC 450 required disclosure. *See, e.g.*, *Axar*, 308 F. Supp. 3d at 758-59; *In re Bank of Am.*, 980 F. Supp. 2d at 587 (existence of settlement discussions does not suggest that "litigation was imminent or that the amount of [plaintiff's] eventual suit was estimable"). "[I]t would be a leap to say that no party would engage in talks to settle litigation without first believing that the underlying claims likely had merit." *Axar*, 308 F. Supp. 3d at 759.

Third, for similar reasons, Item 303 of SEC Regulation S-K did not require YRC to disclose the DOJ Investigation. [AC ¶¶ 169-73] Item 303 requires disclosure only if management has *actual knowledge* of a purported trend, event, or uncertainty. *Axar*, 308 F. Supp. 3d at 758 n.90 (citing *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015)). But the Complaint does not plead any facts showing that, at the time of the disclosures at issue, YRC *actually knew* what the outcome of the DOJ Investigation would be. *See In re Bank of Am.*, 980 F. Supp. 2d at 584 ("Item 303 claim fails because the [c]omplaint contains no

21

allegation that the eventual filing of the [lawsuit] was ever presently known to [company] management, as Item 303 requires.").[12]

The unknown future outcome of an investigation is therefore outside Item 303's reach. *See Lopez v. CTPartners Exec. Search Inc.*, 173 F. Supp. 3d 12, 36 (S.D.N.Y. 2016) (whether alleged misconduct "would one day be publicly revealed is the sort of 'future trend or event' whose disclosure, while certainly permitted, was not required under Item 303") (internal quotation omitted).  For that reason, the Second Circuit has interpreted Item 503's "similar disclosure requirement" as "not requir[ing] disclosure of uncharged, unadjudicated wrongdoing." *Diehl v. Omega Protein Corp.*, 339 F. Supp. 3d 153, 167-68 (S.D.N.Y. 2018).[13]  If Item 303 or 503 required disclosure of every threat of litigation, the cases holding that companies need not confess their uncharged, unadjudicated alleged misconduct would be meaningless.  *E.g., City of Pontiac*, 752 F.3d at 184.

As under ASC 450, the allegation that YRC had met with the DOJ and discussed settlement does not mean that Item 303 required disclosure of the investigation.  *See, e.g.*, *Axar*, 308 F. Supp. 3d at 758-59 (no disclosure required even though defendant had begun negotiations with potential claimants); *In re Bank of Am.*, 980 F. Supp. 2d at 587 (no disclosure required even though parties had entered into tolling agreement and engaged in unsuccessful mediation).

---

[12]    Indeed, the allegations here support the opposite inference:  because the DOJ allegedly had been investigating for ten years and had had multiple meetings with YRC *without* filing a lawsuit [AC ¶ 187(iv)], the Complaint does not show that YRC reason to expect that the DOJ would eventually sue.  *See, e.g.*, *Axar*, 308 F. Supp. 3d at 758-59; *In re Bank of Am.*, 980 F. Supp. 2d at 587.

[13]    The SEC has issued guidance in accordance with this view.  *See* Management's Discussion and Analysis of Financial Condition and Results of Operations; Certain Investment Company Disclosures, Securities Act Release No. 6835, 1989 WL 1092885, at *4 (May 18, 1989) ("[A]nticipating a future trend or event or anticipating a less predictable impact of a known event, trend or uncertainty" involves "only *optional* forward-looking disclosure") (emphasis added).

22

Fourth, decisions concerning disclosure of risk contingencies are matters of judgment and opinion that, under *Omnicare*, cannot violate the securities laws unless the speaker did not believe the judgments being made. *See, e.g., Lions Gate*, 165 F. Supp. 3d at 15-16 (risk disclosures reflect judgments and opinions); *see also Embraer*, 2018 WL 1725574, at *9 (decision whether to record a liability is matter of opinion). Plaintiffs have not pled any facts showing either that YRC believed before December 2018 that the DOJ Investigation was likely to ripen into litigation or that YRC's judgment calls on that issue were not based on meaningful inquiry. To the contrary, Plaintiffs allege that YRC took the position that the eventual suit was without merit and involved less than 1% of the company's revenues. [AC ¶ 484]

### 4.    No Misstatements About Conformance to GAAP

Plaintiffs next contend that YRC falsely represented that its financial statements conformed to GAAP.[14]  YRC's Forms 10-K stated:

> "Accounting policies refer to specific accounting principles and the methods of applying those principles to fairly present our financial position and results of operations in accordance with generally accepted accounting principles. The policies discussed below include those that management has determined to be the most appropriate in preparing our financial statements."

[*E.g.*, AC ¶ 216]  This statement purportedly was materially false and misleading because YRC's financial statements allegedly did not conform to GAAP in light of YRC's "materially inflated . . . illicit revenue" and "fail[ure] to disclose the DOJ Investigation." [*E.g.*, *id.* ¶ 217]

As explained above in Sections I.A.1 and I.A.3, YRC's SEC filings did not misstate YRC's historical revenues under GAAP; nor did GAAP require disclosure of the DOJ Investigation. But even apart from those points, Plaintiffs' allegations are deficient.

---

[14]    AC ¶¶ 216-17 (2013 Form 10-K), 273-74 (2014 Form 10-K), 325-26 (2015 Form 10-K), 385-86 (2016 Form 10-K), 443-44 (2017 Form 10-K).

As an initial matter, YRC said only that it had determined that GAAP was appropriate in preparing the financial statements, and it referred to such policies accordingly.  But YRC's statements were not a warranty that the financial statements actually did conform to GAAP; they were only "aspirational" statements about how YRC sought to prepare its financial statements. *Embraer*, 2018 WL 1725574, at *8; *see also In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1421 n.10 (3d Cir. 1997) (Alito, J.) ("GAAP is not a set of rigid rules ensuring identical treatment of identical transactions, but rather characterizes the range of reasonable alternatives that management can use. . . .  GAAP includes broad statements of accounting principles amounting to aspirational norms as well as more specific guidelines and illustrations.") (internal quotation omitted).

But even if YRC had warranted that its financial statements actually complied with GAAP, any such statement would have been an expression of opinion and judgment.  *See, e.g.*, *In re Lehman Bros. Sec. and ERISA Litig.*, 799 F. Supp. 2d 258, 303 (S.D.N.Y. 2011) (representation of conformity with GAAP indicates speaker's "'*belief* that the financial statements, taken as a whole, are not materially misstated.'" (quoting Statements on Auditing Standards § 312.07)); *see also Deephaven Private Placement Trading, Ltd.*, 454 F.3d 1168, 1174-75 (10th Cir. 2006) (representation that issuer's financial disclosures conformed to GAAP was statement of opinion).[15]

Thus, statements about compliance with GAAP have been evaluated under *Omnicare*'s standard for opinions.  *See, e.g.*, *City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, 129

---

[15]    Furthermore, allegations of GAAP violations or accounting irregularities are insufficient to state a securities-fraud claim unless those allegations are accompanied by factual pleadings creating a strong inference of fraudulent intent.  *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 270 (2d Cir. 1996).  As discussed below, the Complaint does not allege any such facts.

24

F. Supp. 3d 48, 65 n.107 (S.D.N.Y. 2015); *Se. Pa. Transp. Auth. v. Orrstown Fin. Servs. Inc.*,

2015 WL 3833849, at \*34 (M.D. Pa. June 22, 2015).  As discussed above, Plaintiffs have not

pled facts showing that YRC did *not* believe that its financial statements failed to conform to

GAAP or that it lacked a reasonable basis for its expressed opinion – especially in light of the

"clean" audit opinions that YRC repeatedly received from its independent public accountants.

### 5.     No Other Material Misstatements or Omissions

The Complaint includes an assortment of other miscellaneous statements that allegedly

were materially false or misleading.  However, those statements are inactionable puffery,

demonstrably true, or inactionable expressions of opinion.

**Pricing and Business-Strategy Statements.**  Plaintiffs quote various statements by

Messrs. Welch and Hawkins about YRC's pricing and business strategy.  For example,

Mr. Welch said in 2014 that "'[e]xecuting on our strategy of improving price and managing our

freight mix to ensure that we have *the right freight at the right price* will continue to be a

priority.'"  [AC ¶ 248 (quoting 10/30/14 press release) (emphasis added); *see also* AC ¶ 336].

Similarly, he said in 2015:  "'*Staying committed to our strategy* was a key driver in improving

Adjusted EBITDA by almost $90 million to $333 million.'"  [*Id.* ¶ 327 (quoting letter to

shareholders) (emphasis added)][16]

Courts have consistently rejected these types of generalized statements as inactionable

corporate optimism or puffery.  *See, e.g.*, *Lasker v. New York State Elec. & Gas Corp.*, 85 F.3d

55, 59 (2d Cir. 1996) (statements that company's "business strategies [would] lead to continued

---

[16]     Plaintiffs cite other, substantially similar statements that discussed YRC's "strategy" of obtaining "the right freight at the right price" and/or "pricing for profitability" throughout the Class Period.  [AC ¶¶ 336 (April 28, 2016 Press Release accompanying 2016 Q1 Form 10-Q), 372 (Feb. 6, 2017 Press Release accompanying 2016 Form 10-K), 392 (May 4, 2017 Press Release accompanying 2017 Q1 Form 10-Q), 461 (Aug. 2, 2018 Press Release accompanying 2018 Q2 Form 10-Q), 474 (Nov. 1, 2018 Press Release accompanying 2018 Q3 Form 10-Q)]

prosperity" inactionable as corporate puffery).  "Such statements . . . are not actionable because they are too general to cause a reasonable investor to rely upon them."  *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 573 (S.D.N.Y. 2014) (internal quotation omitted), *aff'd*, 604 F. App'x 62 (2d Cir. 2015); *Woodward v. Raymond James Fin., Inc.*, 732 F. Supp. 2d 425, 434-35 (S.D.N.Y. 2010) (statements about corporation's management style were inactionable puffery – "nothing more than a general platitude that accompanies nearly every press release or public statement issued by a financial institution").

In addition, Plaintiffs have not demonstrated how those statements were false.  Nothing in the Complaint shows that YRC was *not* working to achieve "'the right freight at the right price'" [AC ¶¶ 248] or its "'strategy'" of "'improving yield and securing the right freight'" [*e.g.*, *id.* ¶ 461 (quoting 8/2/18 press release)].  Similarly, Mr. Welch's 2017 statement that "'[w]e want to look at a lot of things:  length of haul, revenue per shipment, weight per shipment.  So we do what we think is best for our Company'" [AC ¶ 424 (quoting from 11/17/17 investment conference)] was not false:  the Complaint alleges that YRC evaluated those factors in setting its prices [*id.* ¶ 52].  Plaintiffs' failure to show falsity is yet another reason why general statements of corporate puffery cannot be actionable:  "courts (and investors) are often unable to evaluate whether such vague and general statements are in fact 'true' or 'false.'"  *Lululemon*, 14 F. Supp. 3d at 573 n.11.

**Statement About Collecting Data.**  Plaintiffs' attack on Mr. Pierson's February 2016 statement about YRC's collection of customer data is equally baseless.  Mr. Pierson said:

> "We are capturing not only the cube of that shipment, the weight of that shipment, the class of that shipment, the distance of that shipment, how many times we touch that shipment – so we're scraping as much data as possible off every single shipment that we can scan . . . it allows us to improve the intelligence of our pricing model."  [AC ¶ 329]

26

Plaintiffs claim this statement was materially false and misleading because it did not disclose that YRC's pricing model allegedly blocked negative reweighs.  [*Id.* ¶ 330]  But nothing that Mr. Pierson said was untrue.  The Complaint does not suggest that YRC was *not* collecting data on the size and delivery of its shipments, and other allegations show that YRC *was* doing so.  [*E.g.*, AC ¶ 145 (discussing YRC's use of digital scales to record shipment weights)]

**Statement About Customers' Needs.**  Plaintiffs also attack Mr. Welch's 2017 statement that "'we expect that meeting our customers' needs, pricing for profitability and diligently managing costs should contribute to improved year-over-year financial performance.'"  [AC ¶ 405 (quoting August 3, 2017 Press Release)]  Plaintiffs contend that YRC was not meeting its customers' needs because of the alleged overcharge scheme.  [*Id.* ¶ 406]  But like the statements discussed above about pricing strategy, this statement was mere corporate puffing.  *See, e.g.*, *Pub. Sch. Teachers' Pension & Ret. Fund v. Ford Motor Co. (In re Ford Motor Co. Sec. Litig.)*, 381 F.3d 563, 570 (6th Cir. 2004) (statements about furthering "trust and confidence [that company] has earned from its customers" is puffery); *Pehlivanian v. China Gerui Advanced Materials Grp., Ltd.*, 153 F. Supp. 3d 628, 648-49 (S.D.N.Y. 2015) (statements about "provid[ing] better solutions for customers . . . are . . . general statements of corporate optimism") (internal quotation omitted).  The statement is also an expression of opinion (YRC's "expect[ation]"), and Plaintiffs have not pled any facts showing that, at the time of the press release, Mr. Welch did *not* "expect" that those strategies could improve YRC's year-over-year performance.

**Compliance with Laws.**  Plaintiffs seize on statements – buried in two contracts attached to YRC's 2013 Form 10-K – saying that YRC was "'in compliance with all Laws, orders, writs and injunctions'" [AC ¶ 219].  According to Plaintiffs, those statements failed to disclose that

27

YRC had engaged in the alleged overcharge scheme, which had "resulted in tens of thousands of false claims by the Company to the DOD in violation of the FCA."  [*Id.* ¶ 220]

First of all, those statements were not made to the investing public, but to lenders with which YRC had entered into the credit agreements at issue.  [*Id.* ¶ 218]  But in any event, Plaintiffs have misleadingly truncated their quotations from those agreements.  The contracts actually said that YRC "(d) in is compliance with all Laws, orders, writs and injunctions . . . ; *except* in each case, referred to in clause . . . (d) . . . , to the extent that failure to do so, individually or in the aggregate, *would not reasonably be expected to have a Material Adverse Effect.*"  [2013 Form 10-K, Ex. 10.10, art. 5.01, and Ex. 10.11, art. 9.17 (emphasis added) (Ex. A)]  Thus, the representations about compliance with law did *not* cover any circumstances that "would not reasonably be expected to have a Material Adverse Effect" on YRC.  Plaintiffs have not pled any facts showing that the purported noncompliance alleged in the Complaint should reasonably have been expected in February 2014 to have had a Material Adverse Effect on YRC, as defined in the credit agreements.

Moreover, this type of general statement about compliance with laws is not material under the securities laws.  *See, e.g.*, *Singh v. Cigna Corp.*, 918 F.3d 57, 63 (2d Cir. 2019) (finding generalized statements of corporate compliance nonactionable).  Statements about compliance with law are also expressions of opinion under *Omnicare*, and Plaintiffs have not pled any facts showing that YRC did *not* believe it was in material compliance with law when it made the statements in February 2014, before the Class Period began.  *See, e.g. Axar*, 308 F. Supp. 3d at 755-56 (statement that company was not in breach of contract was statement of opinion, rather than fact); *City of Westland*, 129 F. Supp. 3d at 81 (statement that company's conduct did not violate law was opinion).  Indeed, the full language of the representation ties the

28

compliance statement to YRC's reasonable expectation – its opinion and belief – about the materiality of any potential noncompliance.

For all the above reasons, Plaintiffs have not pled a material misstatement or omission.

### B.       Plaintiffs Have Not Pled a Strong Inference of Scienter.

Plaintiffs not only have failed to plead an actionable misrepresentation or omission, they also have failed to show that any such alleged misstatement or omission was made with scienter – "a mental state embracing intent to deceive, manipulate, or defraud," *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007).  While recklessness can meet that standard, "recklessness must be conduct that is highly unreasonable, representing an extreme departure from the standards of ordinary care, . . . not merely a heightened form of negligence."  *In re Advanced Battery Techs., Inc.*, 781 F.3d 638, 644 (2d Cir. 2015) (internal quotation omitted).

To satisfy the PSLRA's scienter requirement, "a plaintiff must plead 'with particularity facts giving rise to a *strong* inference that the defendant acted with the required state of mind.'" *ECA*, 553 F.3d at 198 (quoting 15 U.S.C. § 78u-4(b)(2)).  A "strong inference" must be "more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Tellabs*, 551 U.S. at 314.  Courts thus "must consider both the inferences urged by the plaintiff and any competing inferences rationally drawn from all the facts alleged, taken collectively."  *ECA*, 553 F.3d at 198.

Allegations that YRC's reweighing conduct was improper cannot themselves establish Defendants' scienter under the securities laws.  Rather, Plaintiffs must plead facts creating a strong inference that Defendants acted with fraudulent intent in making the challenged statements to the public.  *E.g., Utesch v. Lannett Co.*, 316 F. Supp. 3d 895, 902 (E.D. Pa. 2018).

29

A plaintiff can plead scienter by alleging either (*i*) a defendant's "motive and opportunity to commit fraud" or (*ii*) "facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001) (internal quotation omitted). "Where motive is not apparent, . . . the strength of the circumstantial allegations must be correspondingly greater." *Id.* at 142 (internal quotation omitted).

To establish scienter as to the individual defendants, Plaintiffs must plead facts creating a strong inference of scienter for each of them individually. "[S]cienter is not amenable to group pleading." *Wyche v. Advanced Drainage Sys., Inc.*, 2017 WL 971805, at *11 n.6 (S.D.N.Y. Mar. 10, 2017) (internal quotation omitted), *aff'd*, 710 F. App'x 471 (2d Cir. 2017); *accord, e.g.*, *Orlan v. Spongetech Delivery Sys., Inc.*, 2012 WL 1067975, at *11 (E.D.N.Y. Mar. 29, 2012) (same).

Where a plaintiff seeks to impose liability on a corporation such as YRC, "the pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008). Plaintiffs here focus on the alleged knowledge of the four individual defendants – YRC's former CEO (Mr. Welch), its current CEO (Mr. Hawkins), its former CFO (Mr. Pierson), and its current CFO (Ms. Fisher) – and certain of YRC's directors. [*E.g.*, AC ¶¶ 487-514] But the Complaint's allegations do not establish the requisite strong inference of scienter as to any of those individuals.

### 1.      No Evidence of Conscious Misbehavior or Recklessness

The Complaint does not contain a single allegation that Mr. Hawkins, Mr. Pierson, or Ms. Fisher had any knowledge whatsoever of the purported misconduct concerning reweighing (or anything else). Not one of the Confidential Witnesses mentions any of those defendants.

30

As for Mr. Welch, the Complaint [¶ 131] alleges only one fact, concerning a single conversation at a single meeting in 2013, *before* the Class Period began. The Complaint says nothing at all about Mr. Welch's alleged knowledge *during* the Class Period. And Plaintiffs admit that the DOD Complaint does not allege any misconduct past 2013. [AC ¶ 122] The allegation about Mr. Welch also involves only one objection by only one employee (CW 1), who is not alleged to have known about any YRC activities except those at a single terminal in Tracy, California [*id.* ¶ 130] – an insufficient basis to establish a strong inference of Mr. Welch's knowledge of supposedly corporate-wide misconduct.[17]

The Complaint [¶¶ 499-511] also tries to conjure an inference of scienter based on Defendants' and others' alleged knowledge of the DOJ Investigation. But as shown above, YRC had no obligation – and certainly no *clear* obligation – to disclose that investigation. Where no clear disclosure duty exists, a strong inference of scienter cannot arise from mere knowledge of the investigation. *Kalnit*, 264 F.3d at 143; *Lions Gate*, 165 F. Supp. 3d at 24 (no scienter where some case law "supported [defendant's] failure to disclose the ongoing SEC investigation").

This allegation also erroneously assumes that Defendants and others *believed* that the DOJ Investigation had merit, would result in a lawsuit, or needed to be disclosed. But the Complaint does not so allege. *Id.*; *In re Bank of Am.*, 980 F. Supp. 2d at 587 (no scienter where no facts suggesting that "defendants knew, while settlement negotiations were ongoing, that litigation was imminent or that the amount of [the] eventual suit was estimable").

---

[17]    The only other allegation of Mr. Welch's knowledge [AC ¶ 74] also concerns *pre-Class-Period* events and lacks any factual support. The Complaint does not plead any *facts* suggesting that Mr. Welch was one of the Yellow executives who decided to stop correcting negative reweighs. And that alleged decision was made in 2005, 8½ years before the Class Period began.

Moreover, even those courts that have considered other lawsuits or investigations as part of the scienter analysis have held that "the existence of an investigation alone is *not sufficient* to give rise to a requisite cogent and compelling inference of scienter . . . ." *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 380 (E.D.N.Y. 2013) (emphasis added); *see, e.g.*, *Utesch*, 316 F. Supp. 3d at 903 ("governmental inquiries into [defendant's] purported antitrust violations are unpersuasive in raising the inference that [CEO and CFO] knew about the potential price-fixing"); *Union Cent. Life Ins. Co. v. Ally Fin., Inc.*, 2013 WL 2154220, at *2 (S.D.N.Y. Mar. 29, 2013) ("Plaintiffs' citation to a number of lawsuits and government investigations involving the . . . [d]efendants also provides no evidence of scienter."). The Complaint thus does not plead a strong inference of conscious misbehavior or recklessness.

### 2. Insufficient Allegations of Motive to Commit Fraud

Nor have Plaintiffs pled a strong inference of scienter based on Defendants' alleged motives to commit fraud: a 2014 financing transaction and the individuals' stock sales.

### a. The 2014 Financing Transaction

The allegation that Defendants were motivated to engage in misconduct so that YRC could raise capital through a financing transaction [AC ¶¶ 494-96] is legally deficient because "[m]otives that are generally possessed by most corporate directors and officers do not suffice; instead, plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from the fraud." *Kalnit*, 264 F.3d at 139. Courts have routinely held that corporate capital-raising and profitability motives are insufficient to create a strong inference of scienter. *E.g.*, *Rombach v. Chang*, 355 F.3d 164, 177 (2d Cir. 2004) (no motive from corporate acquisitions and secondary public offering); *In re Bank of Am.*, 980 F. Supp. 2d at 585 n.8 ("the alleged motive to raise capital is a generic one insufficient to support scienter").

32

Moreover, the only specific financing transaction that Plaintiffs claim was facilitated by the alleged misconduct occurred in February 2014, *before* the Class Period began.  Any desire to consummate that transaction thus does not provide an inference of scienter *during* the Class Period.

### b.    Individual Defendants' Stock Sales

Nor do allegations about the individual defendants' stock sales [AC ¶¶ 28, 32, 35, 39, 494-93] create a strong inference of scienter.  The mere fact that executives sell stock does not suggest scienter.  *Ressler v. Liz Claiborne, Inc.*, 75 F. Supp. 2d 43, 58 (E.D.N.Y. 1998), *aff'd sub nom. Fishbaum v. Liz Claiborne, Inc.*, 189 F.3d 460 (2d Cir. 1999); *In re Iconix Brand Grp., Inc.*, 2017 WL 4898228, at *15 (S.D.N.Y. Oct. 25, 2017).  To create an inference of scienter, a plaintiff must show that the sales were "unusual" or "suspicious."  *Acito v. IMCERA Grp, Inc.*, 47 F.3d 47, 54 (2d Cir. 1995); *Ressler*, 75 F. Supp. 2d at 58.  Mere recitation of seemingly large sales, without further context, does not make the sales unusual or suspicious.  *Reilly v. U.S. Physical Therapy, Inc.*, 2018 WL 3559089, at *15 (S.D.N.Y. July 23, 2018) ("raw sales numbers" alone insufficient to establish scienter).  Plaintiffs have not pled facts to create a strong inference of scienter based on unusual or suspicious stock sales – for many different reasons.[18]

First, the alleged percentages of total shares that the individuals sold during the Class Period – 33% for Mr. Welch [AC ¶ 28], 40% for Mr. Pierson [*id.* ¶ 35], 20% for Mr. Hawkins [*id.* ¶ 39], and 5.58% for Ms. Fisher [*id.* ¶ 32] – are not suspicious, particularly in the context of an unusually long Class Period of nearly five years (57 months).  An inference of scienter from even large stock sales "is lessened when . . . the class period is well over a year."  *In re Hertz*

---

[18]    As explained in Exhibits L through N to the Alonzo Declaration, the discussion of the individual defendants' stock sales focuses on their discretionary, open-market transactions.  It does not include automatic or involuntary transactions, such as shares withheld to cover tax liabilities incurred upon vesting, or grants of performance-based compensation.

*Global Holdings Inc.*, 905 F.3d 106, 120-21 (3d Cir. 2018) (sales of 25.7% and 62.3% of

holdings during 29-month period not suspicious); *Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d

874, 890-91 (4th Cir. 2014) (sales of 78%, 37%, and 28% during "inordinately long" 44-month

period not suspicious); *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1094 (9th Cir. 2002) (sales

of 26% in 15 months "not inherently alarming or unusual"); *In re Keyspan Corp. Sec. Litig.*, 383

F. Supp. 2d 358, 382-83 (E.D.N.Y. 2003) (sales of "all or substantially all" of holdings during

16-month period not suspicious; plaintiffs "obvious[ly] . . . chose[] an unusually long class

period of sixty-three weeks . . . because lengthening the class period has allowed the plaintiffs to

sweep as many stock sales into their totals as possible, thereby making the stock sales appear

more suspicious than they would be with a shorter class period") (internal quotation omitted).

And Ms. Fisher's alleged sale of only 5.58% of her holdings is clearly immaterial. *See, e.g.,*

*Acito*, 47 F.3d at 54 (sale of less than 11% of holdings not unusual).[19]

Second, Messrs. Welch's and Pierson's sales must be discounted because of Mr. Welch's

retirement and Mr. Pierson's resignation. Many cases hold that stock sales made before the

---

[19]    Plaintiffs have no basis to calculate sales as a percentage of share *acquired during the Class Period.* [AC ¶¶ 28, 32, 35, 39] Courts consider shares as a percentage of *total saleable holdings*, regardless of when acquired. But in any event, all of those Class-Period acquisitions (except Mr. Pierson's purchase on February 11, 2016) constituted compensation (restricted stock awards and performance stock units). [Ex. N] "A large number of today's corporate executives are compensated in terms of stock and stock options. It follows then that these individuals will trade those securities in the normal course of events." *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 541 (3d Cir. 1999) (internal quotation omitted).

Equally irrelevant is Plaintiffs' allegation [AC ¶ 493] that Messrs. Welch and Pierson sold fewer shares during the 31 months before the Class Period than they sold during the Class Period. Plaintiffs are improperly comparing a 31-month period with the 57-month Class Period. But if Plaintiffs want to look at the 31 months before the Class Period, they must acknowledge that Messrs. Welch and Pierson *purchased* shares during that period [Ex. N, at 1, 3] even though YRC allegedly had known about the DOJ Investigation since 2009 [AC ¶ 109].

34

seller's retirement or resignation are not suspicious or unusual.[20]   YRC announced in December 2017 that Mr. Welch would retire in July 2018 and would start winding down his duties as of January 1, 2018.  [AC ¶ 29]  Mr. Welch made more than half (52%) of his reported Class Period sales in 2017, and half of those 2017 sales were made in November, shortly before his retirement was announced in December.  [Ex. M, at 1]  Mr. Pierson resigned from YRC in November 2016 [AC ¶ 36]; a significant percentage of his reported sales occurred in August 2016 [Ex. M, at 1].

Third, despite the Class Period sales, each individual defendant more than doubled, or even tripled, his or her reported saleable holdings between the beginning and the end of the Class Period (or his departure from YRC).  Mr. Welch's holdings increased by 2.65 times, Mr. Pierson's by 2.43 times, Mr. Hawkins' by 3.7 times, and Ms. Fisher's by 2.76 times.  [Ex. L] Those increases are inconsistent with an inference of scienter.  *See, e.g.*, *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 561 (S.D.N.Y. 2004) (increase in holdings is "wholly inconsistent with fraudulent intent"); *see also, e.g.*, *Glaser*, 772 F. Supp. 2d at 592 (same); *City of Brockton Ret. Sys. v. Shaw Grp., Inc.*, 540 F. Supp. 2d 464, 475 (S.D.N.Y. 2008) (where defendants do not "rush[] to cash out" their shares toward end of class period, their sales are not suspicious) (internal quotation omitted).

Fourth, the last reported stock sales by any defendant (Mr. Welch) occurred on November 13, 2017 [Ex. M], 13 months *before* the end of the Class Period.  Mr. Hawkins' last sale was on February 28, 2017 [*id.* at 1], and Mr. Pierson's and Ms. Fisher's last sales were even

---

[20]      *See, e.g.*, *In re K-Tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881, 896 (4th Cir. 2002); *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 206 (1st Cir. 1999); *City of Taylor Gen. Emps. Ret. Sys. v. Magna Int'l Inc.*, 967 F. Supp. 2d 771, 798 (S.D.N.Y. 2013); *In re Avon Prods., Inc. Sec. Litig.*, 2009 WL 848017, at *21 (S.D.N.Y. Feb. 23, 2009) (Report), *adopted*, 2009 WL 10698359 (S.D.N.Y. Mar. 18, 2009); *Feasby v. Industri-Matematik Int'l Corp.*, 2000 WL 977673, at *1, *4 n.5 (S.D.N.Y. July 17, 2000); *In re Health Mgmt. Sys., Inc. Sec. Litig.*, 1998 WL 283286, at *6 n.3 (S.D.N.Y. June 1, 1998).

earlier (2016 for Mr. Pierson and 2014 for Ms. Fisher) [*id.* at 1, 2].  Stock sales that occur many months before the revelation of the alleged misconduct do not suggest scienter.  *Reilly*, 2018 WL 3559089, at \*14; *In re Keyspan Corp.*, 383 F. Supp. 2d at 385 (sales two months before disclosure not suspicious); *see also, e.g.*, *In re AXIS Capital Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576, 595-96 (S.D.N.Y. 2006) (sales six months before disclosure not suspicious); *Ressler*, 75 F. Supp. 2d at 60 (same).  And at a minimum, Plaintiffs have "fail[ed] to plead a basis for inferring intent for statements made after" the date of the last sale.  *In re Avon Prods.*, 2009 WL 848017, at \*21.

Fifth, Mr. Welch did not sell most of his shares at or near the peak price.  He made 68% of his reported Class Period sales in 2016 and 2017, after YRC's stock price had declined to $11.61 to $13.14 per share – far lower than the $20.0809 to $24.2638 that he had obtained for the 32% of his sales in 2014 and 2015.  [Ex. M, at 1]  The significant majority of the sales thus were not timed to take advantage of any alleged inflation in the stock price.  *See, e.g.*, *Reilly*, 2018 WL 3559089, at \*14 (stock sales not "calculated to maximize the personal benefit from undisclosed inside information" are not suspicious); *see also, e.g.*, *In re Hertz*, 905 F.3d at 120 (sales below stock price's high points not suspicious); *Greebel*, 194 F.3d at 206 (same); *Turner v. MagicJack Vocaltec, Ltd.*, 2014 WL 406917, at \*10 (S.D.N.Y. Feb. 3, 2014) (same).

Sixth, Mr. Pierson *purchased* 35,000 shares during the Class Period, in February 2016.  [Ex. M, at 1]  Purchases during a class period are inconsistent with scienter.  *See, e.g.*, *Cortina v. Anavex Life Scis. Corp.*, 2016 WL 7480415, at \*6 n.3 (S.D.N.Y. Dec. 29, 2016) (executive's purchase of shares undermines allegation of scienter); *Turner*, 2014 WL 406917, at \*11 (same).

Plaintiffs thus have failed to plead facts creating a strong inference of scienter as to any Defendant.

36

## II.       **PLAINTIFFS HAVE NOT PLED A CONTROL-PERSON CLAIM.**

To establish control-person liability under § 20(a), "a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007).  To withstand a motion to dismiss, "a plaintiff must allege some level of culpable participation at least approximating reckless in the section 10(b) context" and must satisfy "the heightened pleading standards of Rule 9(b) and the PSLRA . . . ." *Friedman v. JP Morgan Chase & Co.*, 2016 WL 2903273, at *10 (S.D.N.Y. May 18, 2016), *aff'd*, 689 F. App'x 39 (2d Cir. 2017).

As explained above, Plaintiffs have not established a primary violation by YRC or the scienter (culpable participation) of any of the individual defendants.  The Court should therefore dismiss the § 20(a) claim.

## CONCLUSION

For the foregoing reasons, the Court should dismiss this case in its entirety, with prejudice.

Dated: July 15, 2019

Dan French
David G. Burch, Jr.
Barclay Damon LLP
125 East Jefferson Street
Syracuse, NY  13202
Tel:  (315) 425-3700
Fax:  (315) 425-2701
dfrench@barclaydamon.com
dburch@barclaydamon.com

Ralph C. Ferrara (*pro hac vice*)
Ann M. Ashton (*pro hac vice*)
Proskauer Rose LLP
Suite 600 South
1001 Pennsylvania Avenue, N.W.
Washington, D.C.  20004
Tel:  (202) 416-6800
Fax:  (202) 416-6899
rferrara@proskauer.com
aashton@proskauer.com

Jonathan E. Richman (*pro hac vice*)
Proskauer Rose LLP
11 Times Square
New York, New York  10036
Tel:  (212) 969-3000
Fax:  (212) 969-2900
jerichman@proskauer.com

Counsel for Defendants

38