**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CHRISTINA LEWIS, Individually and On Behalf of All Others Similarly Situated,<br><br>    Plaintiff,<br><br>    v.<br><br>YRC WORLDWIDE INC., JAMES L. WELCH, JAMIE G. PIERSON, and STEPHANIE D. FISHER,<br><br>    Defendants. | Case No. 1:19-cv-00001-GTS-ATB<br><br>**LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT** |

Donald R. Hall
Jeffrey P. Campisi
Jason A. Uris
**KAPLAN FOX & KILSHEIMER LLP**
850 Third Avenue, 14th Floor
New York, NY 10022
Telephone: (212) 687-1980
Facsimile: (212) 687-7714
Email: dhall@kaplanfox.com
    jcampisi@kaplanfox.com
    juris@kaplanfox.com

Jeremy A. Lieberman
Michael J. Wernke
Veronica V. Montenegro
**POMERANTZ LLP**
600 Third Avenue, 20th Floor
New York, NY 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Email: jalieberman@pomlaw.com
    mjwernke@pomlaw.com
    vvmontenegro@pomlaw.com

*Co-Lead Counsel for Co-Lead Plaintiffs City of Warwick Retirement Board and Peter Szabo and the Proposed Class*

Jonathan B. Fellows
George H. Lowe
**BOND SCHOENECK & KING, PLLC**
One Lincoln Center
Syracuse, NY 13202
Telephone: (315) 218-8000
Facsimile: (315) 218-8100
Email: jfellows@bsk.com
    glowe@bsk.com

*Local Counsel for Lead Plaintiffs and the Proposed Class*

Dated: August 16, 2019

**TABLE OF CONTENTS**

I.      PRELIMINARY STATEMENT ................................................................................ 1

II.     FACTUAL ALLEGATIONS ................................................................................... 4

        A.      Overview of the Overcharge Scheme ................................................... 4

                1.      Background on YRC's Corporate History ................................... 4

                2.      Freight Carriers, Including YRC Freight, Historically Made Positive and
                        Negative Reweigh Corrections ...................................................... 4

                3.      In 2005 and 2006, Yellow and Roadway Decided to Eliminating Negative
                        Reweigh Corrections and Formally Implemented the Overcharge
                        Scheme .......................................................................................... 5

                4.      YRC's Overcharge Scheme Cheated the DOD and U.S. Taxpayers and
                        Caused YRC to Submit False Claims in Violation of the FCA ................. 7

                5.      The Overcharge Scheme Continued During the Class Period .................... 8

        B.      The Truth Begins to Emerge ................................................................. 12

III.    ARGUMENT .......................................................................................................... 12

        A.      Plaintiffs Have Pled a Violation of Section 10(b) and Rule 10b-5 ....................... 12

        B.      Defendants' False and Misleading Statements and Omissions ........................... 14

                1.      The Overcharge Scheme Occurred During the Class Period .................... 14

                2.      Defendants Had an Affirmative Duty to Disclose the Overcharge Scheme
                        and DOJ Investigation .................................................................. 17

                3.      Defendants' Statements About YRC's Pricing Strategies in SEC Filings,
                        Press Releases and Conferences ................................................... 19

                4.      Defendants Made Materially False and Misleading Statements and
                        Omissions About their Reported Financial Results ................................. 23

                5.      Defendants Failed to Disclose the DOJ Investigation as a Loss
                        Contingency in Violation of GAAP ................................................. 25

i

6.    Defendants Understated YRC's Rerate Reserves ...................................... 27

7.    Defendants' SOX Certifications ................................................................ 28

8.    Defendants Made Materially False and Misleading Statements About Conformance to GAAP and Compliance with All Laws .......................... 29

C.    The AC Alleges a Strong Inference of Scienter as to All Defendants .................. 31

1.    Defendant Welch Had Actual Knowledge of the Overcharge Scheme .... 31

2.    All Individual Defendants Knew of the DOJ Investigation ..................... 32

3.    Defendants' Failure to Disclose Information That They Had A Clear Duty to Disclose Supports an Inference of Scienter ......................................... 33

4.    Defendants' Repeated Statements Concerning YRC's Rerating Pricing Strategy Supports an Inference of Scienter of the Overcharge Scheme ... 33

5.    The "Core Operations" Theory Supports an Inference of Scienter .......... 34

6.    The Defendants' Signatures on SEC Filings, SOX Certifications and Weak Internal Controls Support an Inference of Scienter ................................. 36

7.    Defendants Had Motive and Opportunity .................................................. 37

8.    The Complaint Adequately Pleads Corporate Scienter ........................... 39

D.    The AC Pleads Control Person Liability ............................................................. 40

IV.    CONCLUSION ................................................................................................................. 40

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*,
   651 F. Supp. 2d 155 (S.D.N.Y.2009)......................................................................................27

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009).........................................................................................................13

*Axar Master Fund, Ltd. v. Beford*,
   308 F. Supp. 3d (S.D.N.Y. 2018)......................................................................................26

*Basquiat ex rel. Estate of Basquiat v. Sakura Int'l*,
   2005 U.S. Dist. LEXIS 13989 (S.D.N.Y. July 5, 2005) .........................................................22

*Batwin v. Occam Networks, Inc.*, No. CV 07-2750 CAS (SHx),
   2008 U.S. Dist. LEXIS 52365 (C.D. Cal. July 1, 2008) .........................................................35

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007).........................................................................................................13

*Berger v. Apple REIT Ten, Inc.*,
   563 F. App'x 81 (2d Cir. 2014) .........................................................................................14

*Bricklayers and Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*,
   866 F. Supp. 2d 223 (S.D.N.Y. 2012)................................................................................22

*Brody v. Transitional Hosps. Corp.*,
   280 F.3d 997 (9th Cir. 2002) .........................................................................................21

*Catalano v. BMW of N. Am., LLC*,
   167 F. Supp. 3d 540 (S.D.N.Y. 2016)................................................................................33

*Christine Asia Co. v. Yun Ma*,
   718 Fed. Appx. 20 (2d Cir. 2017)......................................................................................19

*Christine Asia v. Alibaba Grp. Holding Ltd.*,
   192 F. Supp. 3d 456 (S.D.N.Y. 2016)................................................................................19

*City of Livonia Employees Ret. Sys. v. Wyeth*,
   2010 U.S. Dist. LEXIS 107729 (S.D.N.Y. Sept. 29, 2010).....................................................34

*City of Pontiac Gen. Emples. Ret. Sys. v. Lockheed Martin Corp.*,
   875 F. Supp. 2d 359 (S.D.N.Y. 2012)................................................................................37

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
    752 F.3d 173 (2d Cir. 2014)............................................................................19

*Cosmas v. Hassett*,
    886 F.2d 8 (2d Cir. 1989) ...............................................................................35

*Davidoff v. Farina*,
    2005 WL 2030501 (S.D.N.Y. Aug. 22, 2005)................................................28

*Dutton v. D&K Healthcare Res.*,
    2006 U.S. Dist. LEXIS 42553 (E.D. Mo. June 23, 2006)..............................24

*ECA & Local 134 IBEW Jt. Pension Trust of Chi.*,
    553 F.3d 187 (2d Cir. 2009)...........................................................................31

*Emps.' Ret. Sys. of Gov't of Virgin Islands v. Blanford*,
    794 F.3d 297 (2d Cir. 2015)...........................................................................17

*Emps. Ret. Sys. v. Embraer S.A.*,
    2018 U.S. Dist. LEXIS 56895 (S.D.N.Y. Mar. 30, 2018) .............................25

*Fadem v. Ford Motor Co.*,
    352 F. Supp. 2d 501 (S.D.N.Y. 2005)............................................................17

*Fait v. Regions Fin. Corp.*,
    655 F.3d 105 (2d Cir. 2011)...........................................................................28

*FindWhat Inv'r Grp. v. FindWhat.com*,
    658 F.3d 1282 (11th Cir. 2011) .....................................................................21

*Freudenberg v. E*Trade Fin. Corp.*,
    712 F. Supp. 2d 171 (S.D.N.Y. 2010)............................................................36

*Friedberg v. Discreet Logic, Inc.*,
    959 F. Supp. 42 (D. Mass. 1997) ...................................................................39

*Gamm v. Sanderson Farm, Inc.*,
    2018 U.S. Dist. LEXIS 9944 (S.D.N.Y. Jan. 19, 2018) ................................14

*Gauquie v. Albany Molecular Research, Inc.*,
    2016 U.S. Dist. LEXIS 97295 (E.D.N.Y. July 26, 2016)...............................34

*Glaser v. The9, Ltd.*,
    772 F. Supp. 2d 573 (S.D.N.Y. 2011)............................................................15

*Glazer Capital Management L.P. v. Magistri*,
    549 F.3d 739 (9th Cir. 2008) .........................................................................30

iv

*Hinds Cty. v. Wachovia Bank N.A.*,
   700 F. Supp. 2d 378 (S.D.N.Y. 2010)..................................................................16

*Hogan v. Pilgrim's Price Corp.*,
   2018 U.S. Dist. LEXIS 41909 (D. Colo. Mar. 14, 2018) ......................................14

*In re Alstom SA Sec. Litig.*,
   406 F. Supp. 2d 433 (S.D.N.Y. 2005)..................................................................34

*In re Am. Int'l Grp., Inc. 2008 Sec. Litig.*,
   741 F. Supp. 2d 511 (S.D.N.Y. 2010)..................................................................37

*In re Ambac Fin. Grp., Inc.*
   693 F. Supp. 2d 241 (S.D.N.Y. 2010)..................................................................30

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
   324 F. Supp. 2d 474 (S.D.N.Y. 2004)..............................................................32, 34

*In re Atossa Genetics Inc. Sec. Litig.*,
   868 F.3d 784 (9th Cir. 2017) ..............................................................................20

*In re AXIS Capital Holdings Ltd. Sec. Litig.*,
   456 F. Supp. 2d 576 (S.D.N.Y. 2006)..................................................................13

*In re Bank of Am. AIG Disclosure Sec. Litig.*,
   980 F. Supp. 2d 564 (S.D.N.Y. 2013)..................................................................19

*In re BioScrip. Inc. Sec. Litig.*,
   95 F. Supp. 3d (S.D.N.Y. 2015)..........................................................................33

*In re BISYS Sec. Litig.*,
   397 F. Supp. 2d 430 (S.D.N.Y. 2005)..................................................................40

*In re BofI Holding, Inc. Sec. Litig.*,
   2017 U.S. Dist. LEXIS 79062 (S.D. Cal. May 23, 2017)......................................17

*In re Bristol Myers Squibb Co. Sec. Litig.*,
   586 F. Supp. 2d 148 (S.D.N.Y. 2008)..................................................................38

*In Re Cabletron Sys.*,
   311 F.3d 11 (1st Cir. 2002)............................................................................15, 37

*In re Campbell Soup Sec. Litig.*,
   145 F. Supp. 2d 574 (D.N.J. 2001) .....................................................................33

*In re Capstone Turbine Corp. Sec. Litig.*,
   2018 U.S. Dist. LEXIS 22995 (C.D. Cal. Feb. 9, 2018)........................................15

*In re Carter-Wallace, Inc. Sec. Litig.*,
   220 F.3d 36 (2d Cir. 2000)..................................................................................31

*In re China Valves Technology Securities Litigation*,
   979 F. Supp. 2d 395 (S.D.N.Y. 2013)..................................................................19

*In re Complete Mgmt. Sec. Litig.*,
   153 F. Supp. 2d 314 (S.D.N.Y. 2001)...................................................................34

*In re Computer Assocs. Sec. Litig.*,
   75 F. Supp. 2d 68 (E.D.N.Y. 1999) .....................................................................27

*In re Deutsche Bank AG Sec. Litig.*,
   2016 U.S. Dist. LEXIS 96741 (S.D.N.Y. July 25, 2016) .........................................18

*In re Doral Fin. Corp. Sec. Litig.*,
   563 F. Supp. 2d 461 (S.D.N.Y. 2008)...................................................................15

*In Re Enron Corp. Secs*,
   2003 U.S. Dist. LEXIS 1668 (S.D. Tex. Jan. 28, 2003) ...........................................40

*In re EVCI Colls. Holding Corp. Sec. Litig.*,
   469 F. Supp. 2d 88 (S.D.N.Y. 2006).....................................................................32

*In re Galena Biopharma, Inc. Sec. Litig.*,
   117 F. Supp. 3d 1145 (D. Or. 2015) .....................................................................30

*In re Gen. Elec. Co. Sec. Litig.*,
   857 F. Supp. 2d 367 (S.D.N.Y. 2012)........................................................21, 34, 36

*In re Grupo Televisa Sec. Litig.*,
   368 F. Supp. 3d 711 (S.D.N.Y. 2019)....................................................................25

*In re Hertz Global Holdings Inc.*,
   905 F.3d 106 (2018).........................................................................................38

*In re Hi-Crush Partners L.P. Sec. Litig.*,
   2013 U.S. Dist. LEXIS 171110 (S.D.N.Y. Dec. 2, 2013) .......................................35

*In re Inv. Tech. Grp., Inc. Sec. Litig.*,
   251 F. Supp. 3d 596 (S.D.N.Y. 2017)...................................................................22

*In re JP Morgan Chase Sec. Litig.*,
   363 F. Supp. 2d 595 (S.D.N.Y. 2005)...................................................................39

*In re LaBranche Sec. Litig.*,
   405 F. Supp. 2d 333 (S.D.N.Y. 2005)...................................................................25

*In re Level 3 Communs. Sec. Litig.*,
667 F.3d 1131 (10th Cir. 2012) .................................................................................21, 32

*In re Lions Gate Entmt. Corp. Sec. Litig.*,
165 F. Supp. 3d 1 (S.D.N.Y. 2016)............................................................................19, 26

*In re Marsh & McLennan Cos. Sec. Litig.*,
501 F. Supp. 2d 454 (S.D.N.Y. 2006)........................................................................14, 24

*In re Massey Energy Co. Sec. Litig.*,
883 F. Supp. 2d 597 (S.D. W. Va. 2012).........................................................................23

*In re MBIA, Inc., Sec. Litig.*,
700 F. Supp. 2d 566 (S.D.N.Y. 2010)...............................................................................34

*In re McKesson HBOC, Inc. Sec. Litig.*,
126 F. Supp. 2d 1248 (N.D. Cal. 2000) ............................................................................35

*In re Medicis Pharm. Corp. Sec. Litig.*, No. CV-08-1821-PHX-GMS,
2010 U.S. Dist. LEXIS 81410 (D. Ariz. Aug. 9, 2010)....................................................35

*In re Merck & Co., Inc. Sec. Litig.*,
432 F.3d 261 (3d Cir. 2005)..............................................................................................16

*In re MF Glob. Holdings Ltd. Sec. Litig.*,
982 F. Supp. 2d. 277 (S.D.N.Y. 2013)..............................................................................27

*In re Moody's Corp. Sec. Litig.*,
599 F. Supp. 2d 493 (S.D.N.Y. 2009)................................................................................39

*In re Packaged Ice Antitrust Litig.*,
723 F. Supp. 2d 987 (E.D. Mich. 2010).............................................................................15

*In re Petrobras Sec. Litig.*,
116 F. Supp. 3d 368 (S.D.N.Y. 2015)................................................................................29

*In re Plains All Am. Pipeline, L.P.*,
245 F. Supp. 3d 870 (S.D. Tex. 2017) .........................................................................17, 30

*In re PMA Capital Corp. Sec. Litig.*,
2005 U.S. Dist. LEXIS 15696 (E.D. Pa. July 27, 2005).....................................................23

*In re ProQuest Sec. Litig.*,
527 F. Supp. 2d 728 (E.D. Mich. 2007)..............................................................................37

*In re Pss World Med.,Inc. Sec. Litig.*,
250 F. Supp. 2d 1335 (M.D. Fla. 2002)..............................................................................24

vii

*In re Refco, Inc. Sec. Litig.*,
   503 F. Supp. 2d 611 (S.D.N.Y. 2007)..................................................................30

*In re Sadia, S.A. Sec. Litig.*,
   643 F. Supp. 2d 521 (S.D.N.Y. 2009)..................................................................29

*In re Sanofi Sec. Litig.*,
   155 F. Supp. 3d 386 (S.D.N.Y. 2016)..................................................................25

*In re Scholastic Corp. Sec. Litig.*,
   252 F.3d 63 (2d Cir. 2001)...............................................................12, 16, 33, 38

*In re Sci. Atlanta, Inc. Sec. Litig.*,
   754 F. Supp. 2d 1339 (N.D. Ga. 2010)................................................................24

*In re Silicon Graphic Inc. Sec. Litig.*,
   183 F.3d 970 (9th Cir. 1999) ..............................................................................39

*In re SLM Corp., Sec. Litig.*,
   740 F. Supp. 2d 542 (S.D.N.Y. 2010)..................................................................28

*In re Urban Outfitters, Inc. Sec. Litig.*,
   103 F. Supp. 3d 635 (E.D. Pa. 2015) ..................................................................15

*In re Van Der Moolen Holding, N.V. Sec. Litig.*,
   405 F. Supp. 2d 388 (S.D.N.Y. 2005)..................................................................24

*In re Veeco Instruments, Inc. Sec. Litig.*,
   235 F.R.D. 220 (S.D.N.Y. 2006) .........................................................................36

*In re Virtus Inv. Partners Inc. Sec. Litig.*,
   195 F. Supp. 3d 528 (S.D.N.Y. 2016)..................................................................25

*In re Vivendi, S.A. Sec. Litig.*,
   838 F.3d 223 (2d Cir.2016)..................................................................................14

*In re Vivendi Universal, S.A. Sec. Litig.*,
   2004 U.S. Dist. LEXIS 7015 (S.D.N.Y. Apr. 21, 2004)......................................38

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*,
   2017 U.S. Dist. LEXIS 112977 (N.D. Cal. July 19, 2017)...................................22

*Ind. Pub. Ret. Sys. v. SAIC, Inc.*,
   818 F.3d 85 (2d Cir. 2016)........................................................................ *passim*

*KBC Asset Mgmt. NV v. 3D Sys. Corp.*,
   2016 U.S. Dist. LEXIS 96499 (D.S.C. July 25, 2016) .........................................34

viii

*Kessman v. Myriad Genetics, Inc.*,
  2019 U.S. Dist. LEXIS 49996 (D. Utah Mar. 25, 2019) .........................................................13

*Khoja v. Orexigen Therapeutics, Inc.*,
  899 F.3d 988 (9th Cir. 2018) ................................................................................................20

*Kleinman v. Elan Corp., plc*,
  706 F.3d 145 (2d Cir. 2013)..............................................................................................3, 21

*Lasker v. New York State Elec. & Gas Corp.*,
  85 F.3d 55 (2d Cir. 1996) .....................................................................................................23

*Lentell v. Merrill Lynch & Co., Inc.*,
  396 F.3d 161 (2d Cir. 2005)..................................................................................................12

*Lopez v. CTPartners Exec. Search Inc.*,
  173 F. Supp. 3d 12 (S.D.N.Y. 2016)......................................................................................19

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
  797 F.3d 160 (2d Cir. 2015)..................................................................................................40

*Malin v. XL Capital Ltd.*,
  499 F. Supp. 2d 117 (D. Conn. 2007).....................................................................................17

*Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*,
  164 F. Supp. 3d 568 (S.D.N.Y. 2016)..........................................................................13, 27, 33

*Menkes v. Stolt-Nielsen S.A.*,
  2005 U.S. Dist. LEXIS 28208 (D. Conn. Nov. 10, 2005) .........................................................14

*Meyer v. JinkoSolar Holdings Co.*,
  761 F.3d 245 (2d Cir. 2014)........................................................................................13, 14, 20

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000).......................................................................................... *passim*

*Okla. Firefighters Pension & Ret. Sys. v. Student Loan Corp.*,
  951 F. Supp. 2d 479 (S.D.N.Y. 2013)......................................................................................28

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
  135 S. Ct. 1318 (2015).........................................................................................................27

*Oxford Health*,
  187 F.R.D. 133 (S.D.N.Y. 1999) ...........................................................................................39

*Pa. Pub. Sch. Emp'ees. Ret. Sys. v. Bank of America Corp.*,
  874 F. Supp 2d. 341 (S.D.N.Y. 2012)................................................................................24, 40

*Panther Partners Inc. v. Ikanos Commc'ns, Inc.*,
    681 F.3d 114 (2d Cir. 2012)...........................................................................18

*Patel v. L-3 Commc'ns Holdings Inc.*,
    2016 U.S. Dist. LEXIS 42978 (S.D.N.Y. Apr. 21, 2016)...........................39

*Pehlivanian v. China Gerui Advanced Materials Grp., Ltd.*,
    153 F. Supp. 3d 628 (S.D.N.Y. 2015).........................................................23

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*,
    446 F. Supp. 2d 163 (S.D.N.Y. 2006).........................................................38

*Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*,
    89 F. Supp. 3d 602 (S.D.N.Y. 2015)...........................................................29

*Pub. Sch. Teachers Pension & Ret. Fund v. Ford Motor Co. (In re Ford Motor Co. Sec. Litig.)*,
    381 F.3d 563 (6th Cir. 2004) .....................................................................23

*Reese v. BP Expl. (Alaska) Inc.*,
    643 F.3d 681 (9th Cir. 2011) .....................................................................30

*Reese v. Malone*,
    747 F.3d 557 (9th Cir. Feb. 13, 2014) .......................................................34

*Richman* v. *Goldman Sachs Grp., Inc.*,
    868 F. Supp. 2d 261 (S.D.N.Y. 2012)........................................................40

*Roofer's Pension Fund v. Papa*,
    2018 U.S. Dist. LEXIS 125885 (D.N.J. July 27, 2018)..............................23

*Rothaman v. Gregor*,
    220 F.3d 81 (2d Cir. 2000).........................................................................38

*Saunders v. Morton*,
    2011 U.S. Dist. LEXIS 31059 (D. Vt. Feb. 17, 2011)...............................21

*Schutz v. Ne. Mortg. Corp.*,
    2005 U.S. Dist. LEXIS 15985 (D. Conn. Aug. 1, 2005) ...........................22

*SEC v. Durgarian*,
    477 F. Supp. 2d 342 (D. Mass. 2007) ........................................................29

*SEC v. Egan*,
    994 F. Supp. 2d 558 (S.D.N.Y. 2014).........................................................24

*SEC v. Merchant Capital, LLC*,
    483 F.3d 747 (11th Cir. 2007) ...................................................................21

x

*SEC v. RPM Int'l, Inc.*,
  282 F. Supp. 3d 1 (D.D.C. 2017)........................................................................26

*Sharette v. Credit Suisse Int'l*,
  127 F. Supp. 3d 60 (S.D.N.Y. 2015)..................................................................30

*Stevelman v. Alia Research Inc.*,
  174 F.3d 79 (2d Cir. 1999)..................................................................................38

*Stratte-Mcclure v. Stanley*,
  776 F.3d 94 (2d Cir. 2015)..................................................................................17

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.*,
  531 F.3d 190 (2d Cir. 2008)................................................................................39

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007).............................................................................................31

*Todd v. STAAR Surgical Co.*,
  2016 U.S. Dist. LEXIS 186511 (C.D. Cal. April 12, 2016) ...............................16

*Tongue v. Sanofi*,
  816 F.3d (2d Cir. 2016).......................................................................................23

*Varghese v. China Shenghuo Pharm. Holdings, Inc.*,
  672 F. Supp. 2d 596 (S.D.N.Y. 2009)................................................................36

*Wallace v. Intralinks*,
  2013 U.S. Dist. LEXIS 65958 (S.D.N.Y. May 8, 2013) ....................................36

*Woodward v. Raymond James Fin., Inc.*,
  732 F. Supp. 2d 425 (S.D.N.Y. 2010)................................................................23

*Zucco Partners, LLC v. Digimarc Corp.*,
  552 F.3d 981 (9th Cir. 2009) .............................................................................17

## Statutes

15 U.S.C. 78u-5(b)(2)(A).............................................................................................28

Exchange Act (28 U.S.C. § 1658).................................................................................8

False Claims Act .......................................................................................... *passim*

Securities Exchange Act of 1934 Section 10(b) and 20(a).............................................1

Private Securities Litigation Reform Act of 1995. ..................................................12, 28

## **Rules**

Fed. R. Civ. P. 9(b) ...........................................................................................................12

Rule 10b-5...................................................................................................................1, 12

## I.    **PRELIMINARY STATEMENT**

This is a federal securities class action on behalf of investors in YRC Worldwide Inc. ("YRC" or the "Company") from March 10, 2014 through December 14, 2018 (the "Class Period"), asserting violations of Section 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder. Defendants are YRC, James L. Welch ("Welch"), the Company's former Chief Executive Officer and other officers.[1]

During the Class Period, Defendants represented that the prices YRC charged its customers for transportation were based on the weight of the freight. They highlighted the accuracy and integrity of YRC's "reweigh" and "pricing strategy," representing that YRC had an "extensive system that allows us to accurately capture, record and control all relevant information" so that "incorrect ratings (*i.e*. prices) could be identified based on…weight verifications," which, as Defendant Welch stated, permitted YRC "to get the right freight at the right price."

In truth, YRC – at the direction of Defendant Welch and communicated Company-wide – utilized its reweigh technology to fleece its customers.  If YRC reweighs of customer freight revealed that the actual weight was higher than on the bill of lading, YRC invoiced the customer for the higher/correct weight. However, if the reweigh revealed that the actual weight was lower, YRC blocked its technology from invoicing the customer for the correct weight. As a result of this widespread scheme (the "Overcharge Scheme"), which Defendants acknowledged was against industry norms, YRC reaped approximately $24 million a year for weight/freight it never transported, improperly recognizing it as revenue despite having never provided the services necessary to "earn" the revenue under generally accepted accounting principles ("GAAP").

---

[1] Stephanie D. Fisher ("Fisher"), the Company's Chief Financial Officer; Jamie G. Pierson ("Pierson"), the Company's former Executive Vice President and CFO; and Darren D. Hawkins ("Hawkins"), the Company's CEO (the "Individual Defendants").

1

Defendants' Overcharge Scheme was also illegal. A significant customer of YRC was the U.S. government, including the Department of Defense ("DOD"). In only a two year period, YRC issued approximately 13,000 false invoices to the DOD alone, in violation of the False Claims Act ("FCA"). As a result, in 2009, the U.S. Department of Justice ("DOJ") began a massive nine-year investigation of YRC for FCA violations pursuant to which dozens of YRC employees were deposed (including Defendant Welch), hundreds of thousands of pages of documents were produced, leading to multiple settlement negotiations. Despite exposing YRC to hundreds of millions of dollars in penalties, Defendants never disclosed the DOJ Investigation.

On December 14, 2018, the DOJ issued a press release stating that it had filed a Complaint against YRC for "systematically overcharg[ing] the government for freight carrier services and ma[king] false statements to the government that hid their misconduct[.]" On this news, shares of YRC fell over 28%. Shortly thereafter, the Company disclosed for the first time the loss contingency concerning the DOJ Investigation and admitted that the action "could have a material adverse effect on our business, financial conditions and results of operations."

In addition to making specific false and misleading statements about the pricing strategy and reporting inflated financial results based on revenue it never "earned," Defendants (i) failed to disclose its Overcharge Scheme and DOJ Investigation pursuant to Regulation S-K Item 303 as a "known trend or uncertainty" that could have an unfavorable impact on YRC, (ii) failed to disclose the DOJ Investigation as a "loss contingency"; (iii) misrepresented YRC's internal controls as adequate; and (iv) misrepresented that YRC was in compliance with GAAP and "all laws." Defendants incorrectly argue that their statements detailing the accuracy and integrity of YRC's reweigh and pricing strategy were not misleading because they had no duty to disclose "unadjudicated alleged wrongdoing", and the statements were technically true. *First*, Defendants

2

have a duty to disclose any conduct (whether illegal or not) if failure to disclose it renders a statement misleading. *Second*, Defendants' statements that they were charging "the right freight at the right price" were objectively false. Moreover, "[t]he veracity of a statement or omission is measured not by its literal truth, but by its ability to accurately inform rather than mislead prospective buyers." *Kleinman v. Elan Corp., plc*, 706 F.3d 145, 153 (2d Cir. 2013) (citation omitted). A reasonable investor would understand Defendants' statements to mean that they were not systematically disabling the very system they were championing to commit fraud. Defendants' arguments otherwise raise questions of fact that cannot be resolved on a motion to dismiss.

Defendants' argument that YRC's financial results were not inflated because "YRC actually received the revenues … that it reported" ignores the undisputed fact that YRC never performed the services necessary to "earn" the revenue for the tons of freight it never transported. Defendants' assertion that it had no obligation to disclose the DOJ Investigation because they did not actually expect the DOJ to assert any FCA violation is belied by the existence of the nine-year investigation, which itself was an assertion of a claim. Defendants' arguments that they complied with GAAP raise questions of fact that cannot be resolved on a motion to dismiss.

Defendants argue that Plaintiffs failed to plead a strong inference of scienter as to Defendant Welch, despite the detailed allegations of his personal implementation of the Overcharge Scheme, because the Complaint's allegations as to his knowledge focus on a period just before the Class Period. This argument fails for a simple reason – time is linear. Having overseen the scheme for a decade, Defendant Welch cannot assert that it is reasonable to infer his sudden ignorance as it continued unabated during the Class Period.

Defendants' other arguments should be rejected for the reasons discussed below.

3

II.     **FACTUAL ALLEGATIONS**

    A.     **Overview of the Overcharge Scheme**

        1.     **Background on YRC's Corporate History**

YRC provides transportation services through YRC Freight. ¶ 43.[2] YRC Freight was created through the March 2009 merger of Roadway and Yellow. ¶¶ 44-45. YRC's operating revenue is primarily based on volume (*e.g.* weight) and yield (*e.g.*, revenue per weight). ¶ 48. YRC Freight represents approximately 64% of YRC's revenue. ¶¶ 46-47.

        2.     **Freight Carriers, Including YRC Freight, Historically Made Positive and Negative Reweigh Corrections**

Each shipment picked up by YRC (and other carriers) (¶ 52) is accompanied by a bill of lading, which identifies its weight, destination, and the distance it needed to travel. *Id.* A shipment's weight and the distance travel generally determine the applicable rate and final fee for the freight service. ¶ 53. Carriers often verify that the weight on the bill of lading is correct by reweighing the shipment while at its terminal. ¶ 54.

Before September 2005, YRC Freight's reweighs caused it to correct bills of lading for both "positive" reweighs where the revised shipment weight was heavier than the original weight, and "negative" reweighs where the revised weight was lighter than the original weight. ¶ 55. Positive reweigh corrections increased the cost to the customer, and the revenue to YRC. *Id.* Negative reweigh corrections reduced cost to the customer and the revenue to YRC. *Id.* YRC Freight believed it was important for reweighs to be accurate. ¶ 56. Emails from 2004 and 2005 show that Yellow and Roadway noted that overcharging created an integrity problem and recognized that making negative reweigh corrections was vital to their credibility. ¶¶ 57-58.

---

[2] "¶" refers to paragraphs in the [Corrected] Amended Class Action Complaint ("AC"). ECF No. 75.

### 3. In 2005 and 2006, Yellow and Roadway Decided to Eliminating Negative Reweigh Corrections and Formally Implemented the Overcharge Scheme

On August 22, 2005, Roadway streamlined its reweigh procedures to automatically update its records with any new weighs and correct Roadway's charges accordingly. ¶ 59. New scales and wireless tracking devices enabled Roadway to "capture all positive and negative weight corrections regardless of the weight difference" and managers were instructed to emphasize that the "integrity of correction information is critical in providing the customer with an accurate invoice and supporting documentation." *Id.* This changed in 2005 when senior YRC executives, including Defendant Welch, realized that the Company stood to reap tens of millions of dollars in additional revenue at no additional expense to YRC if they stopped negative weighs.

On September 1, 2005 Keith Rawson ("Rawson") then the Senior Director for Revenue Management for Yellow Roadway Enterprise Services ("Yellow Roadway") (the entity overseeing the merger between Yellow and Roadway), observed that increased reweighs caused "a problem with negative corrections (i.e. weight went down and now giving back money.)" ¶ 61. As a result of this "problem," Rawson reported that Roadway had begun "analyzing limits on negative reweighs," stating that *eliminating negative reweigh corrections was an "opportunity" that could allow Roadway and Yellow to keep a combined $2 million per month. Id.*

On September 13, 2005, Roadway eliminated negative reweigh corrections. ¶ 62. On October 3, 2005, Dean Frye ("Frye"), senior manager at Roadway, sent a widely distributed email stating, "*[n]egative weight corrections will no longer be [made].*" (Emphasis in original.) ¶ 63. Roadway widely and openly communicated the new directive throughout all levels of the company, instructing all that "[n]o negative weight corrections will be [made]." ¶ 64. The elimination of automated negative reweigh corrections was estimated to increase Roadway's revenue *$1 to $1.5 million per month* by invoicing for weight that it knew it never carried. ¶ 65.

5

Emails between Rawson and Joe Whitsel ("Whitsel"), Vice President for Revenue Management at Yellow Roadway in September 2005 reveal that Yellow also wanted to eliminate negative reweigh correction, which would allow it *to obtain approximately $6 million per year for weight it never carried*.  ¶¶ 66-67. In response to these findings, Todd Hacker ("Hacker"), Yellow's Senior Vice President for Finance & Administration, replied that *it would be discussed with Yellow's then-President, Defendant Welch*. *Id.* On October 3, 2005, Whitsel told Mike Smid ("Smid"), Roadway's President and CEO, that "we are recommending that Yellow follow Roadway's lead and implement the elimination of the negative revenue adjustments." ¶ 68.

While Rawson initially analyzed placing thresholds on blocking the negative reweighs in order to maintain some credibility, he ultimately rejected the idea, concluding "*if we are going to do it, let's go all the way*," explaining that, even with a threshold in place, once a customer learned of YRC Freight's reweigh practices they would likely have to start making negative reweigh corrections for that customer in order to keep the business, whether a threshold was in place or not. ¶¶ 69-70. Rawson concluded that *YRC Freight "could see $10-20 million in annualized revenue" from eliminating the negative reweighs*. ¶ 71. Despite finding out that most companies in the industry "believed that not [making negative reweigh corrections] was a breach of faith with their consumers and undermined the integrity of the program,"[3] Yellow's executive leadership, *including its President, Defendant Welch*, decided to copy Roadway and stop making negative reweigh corrections on February 27, 2006.  ¶¶ 72-76.

As with Roadway, Yellow's new reweigh policy generated rapid results. A presentation from June 15, 2006, demonstrated that, in just a few months, Yellow had largely succeeded in

---

[3] On September 2007 he conducted another informal industry survey which revealed all 12 companies surveyed made negative reweigh corrections. ¶ 84.

eliminating "the number of [reweigh corrections] that result in a negative revenue change." ¶ 78. Emails which include Hugh Gaynor ("Gaynor"), Revenue Management executive at Yellow, show that the Company continued to drive positive reweight revenue while pushing its managers to monitor terminals for flat or decreases in reweigh revenues. ¶¶ 79-81. Thus, by 2006, YRC senior executives, including Defendant Welch, hatched a scheme, which continued throughout the Class Period, to fleece its customers by at least $2 million per month by blocking negative reweighs.

### 4. YRC's Overcharge Scheme Cheated the DOD and U.S. Taxpayers and Caused YRC to Submit False Claims in Violation of the FCA

The Whistleblower Action was filed under seal in November 2008 by James Hannum ("Hannum"). Hannum has been employed by Roadway (subsequently YRC Freight) for over 30 years. ¶ 93. *Id.* The Whistleblower Action brought allegations for violations of the FCA under its *qui tam* provisions. ¶¶ 94-95. Hannum alleged personal knowledge of the Overcharge Scheme and its effect on shipments by the U.S. government. ¶¶ 96-108. While the Whistleblower action remained concealed from investors, in 2009, the DOJ began a massive investigation of YRC that given its breadth and scope was known to senior YRC executives, including each of the Individual Defendants. ¶ 109. The investigation exposed YRC to millions of dollars in liability for FCA violations. Pursuant to the DOJ Investigation:

- The DOJ issued a Civil Investigative Demand ("CID"); *Id.;*
- The DOJ engaged in extensive pre-filing discovery, pursuant to which YRC produced "hundreds of thousands of pages" of documents; ¶¶ 109, 111;
- The DOJ examined at least 32 witnesses, including 11 current or former YRC employees from the Company's headquarters, including ***Defendant Welch***, Neiger, Rawson, Former YRC CEO Smid, Frye, Sheafer, James Faas ("Faas"), Hacker and Gaynor; ¶¶ 109, 112;
- The depositions occurred during the Class Period; the witnesses acknowledged YRC's negative reweigh policies; the Company retained outside counsel, Dentons; ¶ 110; the world's largest law firm;
- Starting in 2009, the parties engaged in several settlement negotiations; ¶ 113.

7

During the investigation, the DOJ uncovered evidence consistent with the details above. The DOJ determined that, among other things, the Company knowingly submitted thousands of false claims to the DOD that used inflated weights to overcharge the U.S. government and hid evidence of the misconduct by programming their computer system so that negative reweight corrections would not register. ¶¶ 115-20. The DOJ identified more than 13,000 false claims the Company billed to the DOD between June 2010 and October 2012.  ¶ 121. That extrapolates to approximately 70,000 false claims from 2005 to October 2013. *Id.*

The FCA provides for a recovery of three times the damages sustained by the U.S. government (treble damages), plus a civil penalty for each violation of the Act, which is to be not less than $5,500 and not more than $11,000. ¶ 128. As a result of the approximately 70,000 false claims submitted to the DOD alone, YRC is subject to a civil penalty of approximately $385-$770 million, as well as three times the damages sustained by the U.S. government. ¶ 129.

### 5.    The Overcharge Scheme Continued During the Class Period

By the beginning of the Class Period (March 10, 2014), the Overcharge Scheme had generated tens of millions of dollars in unearned revenue for YRC, and the fraud continued throughout the Class Period.[4]  As detailed in internal emails between March 2009 and October 2011, despite internal concerns about integrity and credibility, YRC Freight continued to suppress negative reweigh corrections for their customers' shipments, including the DOD.  ¶¶ 85-92.

Former employees independently confirmed that the Overcharge Scheme continued well after the DOJ Investigation began and throughout the Class Period. CW 6 was a Weight and Inspection ("W&I") Coordinator in Fontana and Compton, California from May 2008 through

---

[4] But for the five-year statute of repose for fraud claims under the Exchange Act (28 U.S.C. § 1658), the Class Period would have been considerably longer given that the Overcharge Scheme began in 2006.

August 2010.  ¶ 164. Throughout CW 6's tenure with the Company, YRC leadership pressured W&I employees to generate additional revenue by blocking negative reweigh corrections. ¶ 165. CW 6 participated in weekly telephone conferences led by Rawson, who chastised W&I Coordinators for recording negative reweigh corrections.  *Id.* CW 6 stated that YRC targeted customers that would not identify or dispute invoices manipulated through reweighs. ¶¶ 166-67. This "hit list" of customers was well-known throughout the Company and included major retailers. *Id.* CW 6 often objected to superiors about improper revenues obtained via reweighs. ¶ 168.

CW 5 worked as an Operation Manager for YRC from 2005 through 2012, managing 24 employees involved in reweighs. ¶¶ 154-55. Starting around 2007, YRC leadership began to pressure regional W&I staffers to generate additional revenue by failing to issue negative reweigh corrections. ¶ 158. CW 5 witnessed suppression of negative reweigh corrections and misclassification of freight. ¶ 159. Managers often instructed CW 5 to speak with specific forklift operators who logged negative reweights. ¶ 160. Operators were incentivized with free merchandize and $25 gift cards to accumulate as many reweighs as possible per day.  ¶ 161. YRC customers often complained that YRC had misrepresented the true weight of their freight. *Id.* CW 5 learned from other employees that the suppression of negative reweigh corrections continued for many years beyond CW 5's departure in 2012. ¶ 163.

Indeed, after accessing YRC's records, the DOJ Investigation uncovered at least 13,000 false claims the Company billed the DOD alone between June 2010 and October 2012 (after the DOJ Investigation began) as a result of the Overcharge Scheme. ¶ 121. Both the DOJ Investigation and the Whistleblower Action revealed that the scheme continued through 2013.

Four additional confidential witnesses have independently confirmed that the Overcharge Scheme continued through at least March 2018.

According to CW 1 – a W&I Manager in Tracy, California from March 2011 *through March 2014* – the Overcharge Scheme continued into 2014. CW 1 stated that negative reweighs were "extremely frowned upon" by YRC management. ¶ 130. CW 1 and other W&I employees "got in trouble" for adjusting weights to the benefit of the customer. *Id.* CW 1 frequently objected to the Company's negative reweigh policies and "cheating customers" verbally and via email, including to *Defendant Welch* at a November 2013 meeting in YRC's conference room at the Tracy, California terminal. ¶ 131. CW 1 learned through conversations with other YRC employees that the blocking of negative reweighs continued "well after" 2014. *Id.*

CW 3 was a W&I Coordinator in Laredo Texas from May 2012 *through April 2015* responsible for working closely with terminal managers. ¶ 138. CW 3 routinely witnessed the failure to issue negative reweigh corrections. ¶ 139. CW 3 also observed frequent occurrences whereby customers were charged for "entire containers" where "only 2 or 3 boxes" were present, resulting in "thousands of dollars" more in unwarranted charges. ¶ 140.

CW 4 was a W&I Coordinator and Operations Supervisor from May 2008 *through December 2017* working at terminals in Illinois, New Jersey and Colorado. ¶ 141. CW 4 was responsible for, among other things, auditing and validating shipment classifications. *Id.* Throughout CW 4's tenure, "it was ["standard operating procedure"] not to cut weight back…it was a money grab." ¶ 145. CW 4 personally observed the failure to issue negative reweigh corrections and verbally objected to CW 4's superior, Paul Stegall ("Stegall"), a current W&I Manager for YRC in Akron, Ohio. ¶¶ 143-45. Like CW 5, CW 4 stated that YRC maintained a "hit list" of customers that YRC knew would not identify or dispute wrongful overcharges. ¶ 146. YRC targeted these customers, and trained employees on how to routinely upcharge them. ¶ 150. Repeat customers were frequently "tested" by YRC to see whether they would complain. ¶ 147.

YRC used software programs which provided a "roadmap" on what customer product to expect and prepare to manipulate. *Id.* At YRC's Chicago Heights terminal, YRC customers "protested" about their freight invoice "at least 10 times a day". ¶ 148.  Complaints were received by CW 4 and W&I personnel and CW 4's directive was "stay your ground, [and] unless the evidence is overwhelming," do not credit to a customer. *Id.* Consistent with CW 5's account, CW 4 stated that YRC forklift operators were incentivized through $25 gift cards. ¶ 149. CW 4 witnessed numerous operators "forging reweighs" to hit the goal. Upon CW 4's raising the infractions to the terminal manager, the operator was not punished.  *Id.*

According to CW 4, directives to manipulate customer pricing by rejecting negative reweighs came from Faas and the corporate office in Overland Park, Kansas.  ¶ 152. The topic of negative reweighs was discussed on conference calls led by Gaynor (a/k/a "Bulldog"), which occurred weekly. *Id.* CW 4 learned through several YRC employees that the negative reweigh practices continued after CW 4 left the Company in December 2017. ¶ 153.

CW 2 was a W&I Coordinator in Chicago, Illinois from August 2015 ***through March 2018***, a period entirely contained within the Class Period, and was responsible for working with terminal managers and inspecting shipments and reported to Stegall. ¶ 133. Through March 2018, YRC frequently failed to issue negative reweigh corrections, misclassified freight, and manipulated freight in transit in order to overcharge customers. ¶ 134. Like the other confidential witnesses, CW 2 described a culture where employees were trained to target larger retail customers who were unlikely to identify these wrongful overcharge practices and that this occurred "multiple times a day." ¶¶ 134-35. In cases where a customer disputed a weight charge that resulted in a credit to a customer, YRC maintained "cheat codes" which provided guidance to "make-up the

11

[revenue] loss another way." ¶ 134. CW 2 left YRC in March 2018 specifically due to CW 2's objections to the Company's improper billing practices. ¶ 137.

### B.    The Truth Begins to Emerge

On December 14, 2018, the DOJ issued a press release stating that it had filed a Complaint in Intervention against YRC for "systematically overcharg[ing] the government for freight carrier services and ma[king] false statements to the government that hid their misconduct[.]" ¶ 482. YRC issued a press release titled, "YRC Freight Statement on U.S. Government Litigation", admitting that the DOJ had been investigating YRC for over nine years. ¶ 484. On this news, shares of YRC fell $1.24, or over 28%, to close at $3.17 on December 14, 2018. ¶ 483. On the Company's 2018 10-K, filed on February 19, 2019, the Company disclosed for the first time the loss contingency concerning the DOJ Investigation and admitted that the action "could have a material adverse effect on our business, financial conditions and results of operations." ¶ 486.

## III.    ARGUMENT

### A.    Plaintiffs Have Pled a Violation of Section 10(b) and Rule 10b-5

To state a claim under Rule 10b-5, Plaintiffs must allege that Defendants: (1) made a material misstatement or omission; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury. *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 172 (2d Cir. 2005). Defendants' motion only challenges the adequacy of the scienter and falsity allegations.

Under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. §78u-4, et seq., and Fed. R. Civ. P. 9(b), a plaintiff is not required to plead a "detailed evidentiary matter," *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001), but simply sufficient facts "to support a reasonable belief" that defendants' statements were materially false or misleading. *Novak v. Kasaks*, 216 F.3d 300, 314 n.1 (2d Cir. 2000). In ruling on a motion to

12

dismiss, the Court must accept as true all well-pleaded factual allegations and draw all reasonable inferences in the plaintiff's favor. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Dismissal is appropriate only where "[Plaintiffs] can prove no set of facts consistent with the complaint that would entitle them to relief." *Meyer v. JinkoSolar Holdings Co.*, 761 F.3d 245, 249 (2d Cir. 2014). Thus, the Complaint need only contain sufficient facts "to state a claim of relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Defendants incorrectly argue that no securities violation exists unless Plaintiffs also allege that Defendants' practice of blocking negative reweigh corrections was itself illegal. Defs' Mem. 7. Section 10(b) requires only that Plaintiffs allege a misleading statement. A Plaintiff need allege underlying illegal practices in connection with a Section 10(b) claim only if the alleged misleading statements are false ***solely*** because the Defendant ***committed said illegal practices***. *See In re AXIS Capital Holdings Ltd. Sec. Litig.,* 456 F. Supp. 2d 576, 585 (S.D.N.Y. 2006) (requiring adequate antitrust allegations because claims were "entirely dependent" on antitrust violation); *Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 578 (S.D.N.Y. 2016) (same). Here, Defendants' statements concerning YRC's pricing strategies, financial results and GAAP compliance are false and misleading regardless of whether the Overcharge Scheme was also a violation of the FCA. In any event, the Complaint pleads that the Overcharge Scheme *did* amount to an illegal practice under the FCA. ¶¶ 93-129[5], and alleges facts demonstrating the Overcharge Scheme independent of the facts alleged by the DOJ.

---

[5] The cases cited by Defendants are easily distinguished. In *Kessman v. Myriad Genetics, Inc.,* 2019 U.S. Dist. LEXIS 49996 (D. Utah Mar. 25, 2019), the court determined that the defendant did not incur liability for false statements regarding its billing practice because plaintiffs had not pled sufficient facts to establish that the billing practice at issue was illegal largely because it was "an acceptable practice within the industry" and because Plaintiffs had failed to point to any agency action or statement establishing its impropriety. Here, in relevant part, the AC alleges that Defendants knew that it was industry practice to make negative reweigh corrections ( ¶¶ 73, 84)

**B.      Defendants' False and Misleading Statements and Omissions**

A statement is actionable if it, "viewed as a whole, would have misled a reasonable investor." *Berger v. Apple REIT Ten, Inc.*, 563 F. App'x 81, 83 (2d Cir. 2014). While it is trivially true that the securities laws do not impose a general duty to disclose . . . "unadjudicated alleged wrongdoing" (Defs' Mem. 8), "[i]t is well-established precedent in this Circuit that once a company speaks on an issue or topic, there is a duty to tell the whole truth, even when there is no existing independent duty to disclose information" on the issue or topic.  *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 258 (2d Cir.2016); *see JinkoSolar,* 761 F.3d at 251. "Though courts have held that the securities laws do not impose a duty to disclose uncharged criminal conduct, corporations are obligated to disclose facts necessary to ensure that their statements are not misleading.  This duty applies to the disclosure of criminal conduct to the same extent it applies to the disclosure of any other material information." *In re Marsh & McLennan Cos. Sec. Litig.,* 501 F. Supp. 2d 454, 469 (S.D.N.Y. 2006); *Menkes v. Stolt-Nielsen S.A.,* 2005 U.S. Dist. LEXIS 28208 (D. Conn. Nov. 10, 2005) (same).

**1.      The Overcharge Scheme Occurred During the Class Period**

Six former employees that worked at YRC independently confirmed that the Overcharge Scheme continued during the Class Period.  ¶¶ 130-68; *supra*, at 8-12.  Information from CWs may be relied upon so long as "they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Novak,* 216 F.3d at 314. The AC describes the witnesses' roles and

---

and the DOJ's complaint in intervention alleged that the Overcharge Scheme was illegal stating, that "for more than seven years, the defendants defrauded the Department of Defense by millions of dollars…" *Id.* ¶17.  In *Hogan v. Pilgrim's Price Corp.,* 2018 U.S. Dist. LEXIS 41909 (D. Colo. Mar. 14, 2018) and *Gamm v. Sanderson Farm, Inc.,* 2018 U.S. Dist. LEXIS 9944 (S.D.N.Y. Jan. 19, 2018), the courts held that plaintiffs had not pled the alleged underlying antitrust conspiracies with particularity. Here, the Overcharge Scheme is presented in detail.

14

responsibilities, which all involved reweighs, with a large degree of specificity and details their personal observations. ¶¶ 130-68.

Defendants argue that the statements of CW 3 an CW 4, both of whom worked at YRC during the Class Period (through April 2015 and December 2017, respectively) are insufficient because the AC "does not plead dates" for the allegations. Def's. Mem 9.  The witnesses stated that the improper conduct occurred *throughout* their tenure, which included the Class Period. *see* ¶ 139 ("throughout CW3's tenure"); ¶ 134 ("throughout CW 4's tenure").[6]  *See In re Capstone Turbine Corp. Sec. Litig.,* 2018 U.S. Dist. LEXIS 22995, *4-5, 8 (C.D. Cal. Feb. 9, 2018) (crediting statements from CW who left the company before the end of the Class Period and described the conduct at issue to have occurred "throughout" his tenure); *In re Packaged Ice Antitrust Litig.,* 723 F. Supp. 2d 987, 1012-13 (E.D. Mich. 2010) (crediting the expected testimony of a CW who worked at the company for part of the Class Period).

Unable to muddy the waters on the dates of CW 2's observations since CW 2 was employed by YRC ***exclusively during the Class Period*** (from August 2015 through March 2018), Defendants argue that CW 2's statements are somehow insufficient because they do not describe "an overarching scheme."  Defs.' Mem. 10.  However, each CW is not required to identify all aspects of the fraud. Rather, the question is whether all the CWs' observations, evaluated in their totality, create a reasonable inference that the Overcharge Scheme was widespread, which is confirmed from the consistent statements[7] of CWs from throughout the country.  In any event, CW

---

[6] The cases cited by Defendants are inapposite. In *In re Doral Fin. Corp. Sec. Litig.,* 563 F. Supp. 2d 461, 466 (S.D.N.Y. 2008) no time frame <u>at all</u> was provided by the CW.  In *Glaser v. The9, Ltd.,* 772 F. Supp. 2d 573, 589 (S.D.N.Y. 2011), the CW was not sufficiently described.

[7] Courts have found pleadings relying on CWs to be sufficient when "their consistent accounts reinforced one another[.]"  *See In Re Cabletron Sys.*, 311 F.3d 11, 31 (1st Cir. 2002); *In re Urban Outfitters, Inc. Sec. Litig.,* 103 F. Supp. 3d 635, 649 (E.D. Pa. 2015); (same).

2 described conduct that directly implicates the corporate office in Overland Park, Kansas (¶ 136), which is consistent with the statements of other CWs. *E.g.*, ¶¶ 130, 131, 141, 144, 152.[8]  Thus, because the CWs have been sufficiently identified under *Novak,* this Court must take their allegations as true and "must accept[] that the Confidential Witness[es] would possess the information alleged for the purposes of this motion to dismiss." *Hinds Cty. v. Wachovia Bank N.A.,* 700 F. Supp. 2d 378, 396 n.5 (S.D.N.Y. 2010).

Defendants erroneously contend that because CWs 1, 5 and 6 stopped working at YRC before the Class Period their information is "insufficient".  Defs.' Mem. 9.[9] Pre-class period information is relevant when "it sheds light on whether class period statements were false or materially misleading." *In re Scholastic,* 252 F.3d at 72; *In re Merck & Co., Inc. Sec. Litig.,* 432 F.3d 261, 271 (3d Cir. 2005) (same).  Such is the case here.  CWs 1, 5 and 6 provided first-hand knowledge of the Overcharge Scheme and stated that they maintained contacts with YRC employees who confirmed that the Overcharge Scheme continued "well after" 2014 and into the Class Period (*see* ¶¶ 132, 163), which is confirmed by the first-hand observations of the other CWs during the Class Period.  Moreover, CWs 1 and 6 had contacts with YRC's senior management (including Defendant Welch) confirming their knowledge of the Overcharge Scheme.  As courts have held "it simply does not follow that the Court must completely shut its eyes to such allegations [of pre-class period conduct] when examining the overall context in which such statements at issue were made." *Todd v. STAAR Surgical Co.,* 2016 U.S. Dist. LEXIS 186511, at *23 (C.D. Cal. April

---

[8] The cases cited by Defendants (Defs.' Mem. 10-11) are distinguishable. None of the CWs in those cases describe knowledge of conduct outside of their immediate region. Here, the CWs stated that the Overcharge Scheme was directed from management, which is confirmed by the pre-Class Period emails demonstrating direct knowledge by Defendant Welch and other executives.

[9] Defendants incorrectly assert that CW 1, who was employed through March 2014, did not work at YRC during the Class Period.  The Class Period begins on March 10, 2014.

12, 2016); *see Emps.' Ret. Sys. of Gov't of Virgin Islands v. Blanford*, 794 F.3d 297, 306-07 (2d Cir. 2015) (finding falsity and stating that the "Second Circuit has held that allegations concerning activity in one period can support an inference of similar circumstances in a subsequent period"); *In re BofI Holding, Inc. Sec. Litig.,* 2017 U.S. Dist. LEXIS 79062, *31 (S.D. Cal. May 23, 2017) (crediting CW's statements regarding pre-class period conduct).[10]

### 2.    Defendants Had an Affirmative Duty to Disclose the Overcharge Scheme and DOJ Investigation

Pursuant to Item 303, Defendants had an affirmative duty to disclose in filings with the SEC that: (i) YRC was engaged in the Overcharge Scheme; (ii) the Overcharge Scheme subjected the Company to numerous undisclosed risks including monetary and reputational risk; and (iii) the DOJ Investigation exposed the Company to millions of dollars in liability for FCA violations. ¶173.

Item 303 requires a registrant  to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii). Failure to disclose this information is actionable. *See Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 95-96 (2d Cir. 2016) ("*SAIC*") (Item 303 required disclosure once the company became aware of the fraud.); *see generally, Stratte-Mcclure v. Stanley,* 776 F.3d 94 (2d Cir. 2015).

---

[10] The cases cited by Defendants are easily distinguished. Unlike *all* CWs here, in *Zucco Partners, LLC v. Digimarc Corp.,* 552 F.3d 981, 996 (9th Cir. 2009), the CWs had only secondhand information regarding the practices at issue. In *Malin v. XL Capital Ltd.,* 499 F. Supp. 2d 117, 142 (D. Conn. 2007), neither CWs (nor Plaintiffs) had alleged that the situations at issue continued through the class period.  In *Fadem v. Ford Motor Co.*, 352 F. Supp. 2d 501, 521 (S.D.N.Y. 2005) while the court acknowledged that the testimony of certain former employees might be problematic, it considered it nonetheless.

The Overcharge Scheme, which had generated at least $24 million per year in illicit revenue since 2006, was a "known trend or uncertainty" that was having an artificial favorable impact on revenues, which would be eliminated when discovered. Tellingly, Defendants fail to argue any different. Additionally, because the Overcharge Scheme was the subject of a massive investigation by the DOJ, it was "reasonably likely" that YRC would have to eventually stop the scheme which would materially impact its future revenue. It was also "reasonable likely" that the Overcharge Scheme and the resulting DOJ Investigation, which had been ongoing for nine years and exposed YRC to hundreds of millions of dollars in liability, would subject the Company to numerous undisclosed risks including monetary and reputational risk. Courts have routinely held that Item 303 mandates disclosure in similar situations.[11]

The facts and holding in *SAIC* are instructive. The plaintiff alleged that the defendant government contractor knew that its employees were engaged in overbilling various New York City agencies by millions of dollars well before it disclosed a joint investigation by the DOJ and the New York City Department of Investigation. *Id*. at 93-95. Though the company may have been uncertain about the effects on its current and future revenues, the Second Circuit held that Item 303 obligated it "to disclose the manner in which that then-known trend, event, or uncertainty might reasonably be expected to materially impact [its] future revenues." *Id.* at 96. Here, as in *Ind. Pub. Ret. Sys.*, "[i]n effect, the [] government investigation signified that the company's overbilling practices would come to light, and because the company's customers were

---

[11] *See Panther Partners Inc. v. Ikanos Commc'ns, Inc.,* 681 F.3d 114, 121 (2d Cir. 2012) (holding that Item 303 required disclosure of a defect in the company's semiconductor chips because it "constituted a known trend or uncertainty that [the defendant] reasonably expected would have a material unfavorable impact on revenues or income."); *In re Deutsche Bank AG Sec. Litig*., 2016 U.S. Dist. LEXIS 96741, at *98 (S.D.N.Y. July 25, 2016) (holding that the company violated Item 303 when it failed to disclose the known trend and the manner in which it might reasonably be expected to materially impact the company's overall financial position.).

predominantly government agencies, the fallout from the investigations already underway was almost guaranteed to have a significant and adverse effect on the company's business." *Christine Asia v. Alibaba Grp. Holding Ltd.,* 192 F. Supp. 3d 456, 476-77 (S.D.N.Y. 2016); *see also Christine Asia Co. v. Yun Ma*, 718 Fed. Appx. 20, 23 (2d Cir. 2017) (failure to disclose a single administrative proceeding is an actionable omission under Item 303); *cf. In re China Valves Technology Securities Litigation,* 979 F. Supp. 2d 395 (S.D.N.Y. 2013) (defendant's failure to disclose that a company it acquired was subject to a FCPA investigation was actionable because the future earnings of the company were rendered uncertain once the investigation suggested that earlier earnings may have resulted from corruption and could result in substantial penalties).[12]

### 3.   Defendants' Statements About YRC's Pricing Strategies in SEC Filings, Press Releases and Conferences

Discussing YRC's reweigh and pricing strategy, Defendants represented throughout the Class Period that the system for invoicing its customers was "based primarily on the weight" and "general classification" of the product (*e.g.* ¶ 203), that the Company's operating revenue was

---

[12] Defendants cite to various cases for the proposition that Item 303 did not require disclosure of the DOJ Investigation, because, they contend, YRC did not know of its eventual outcome. Defs.' Mem. 21-22. This argument misses the point—Defendants did not have to know of the eventual outcome of the DOJ Investigation to be aware of the uncertainty created by it. The cases cited by Defendants are inapposite. *In re Lions Gate Entmt. Corp. Sec. Litig.,* 165 F. Supp. 3d 1, 20 (S.D.N.Y. 2016) (holding that disclosure was not mandated because the investigation (which resulted in only a $7.5 million payment) was not material and there were no allegations that defendants knew that litigation was substantially certain to occur); *In re Bank of Am. AIG Disclosure Sec. Litig.,* 980 F. Supp. 2d 564, 576 (S.D.N.Y. 2013) (the complaint contained insufficient allegations of knowledge and information about the potential litigation and potential amount of the suit was already in the public domain); *Lopez v. CTPartners Exec. Search Inc.,* 173 F. Supp. 3d 12, 34 (S.D.N.Y. 2016) (holding that defendants were not required to disclose the alleged "coarse and unsavory work environment" because it falls outside the scope of Item 303 – financial condition and operations, and the misconduct was revealed through an unforeseen news article, making it "speculative and conjectural" for defendants to have known that the misconduct would ever be revealed or impact the company's financials). *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG,* 752 F.3d 173 (2d Cir. 2014) is inapposite because it does not concern Item 303.

19

determined by "volume" ("weight per shipment") and "yield or price" ("revenue of the shipment") (*see, e.g., id.* ¶ 204), that "incorrect ratings (*i.e.* prices) could be identified based on…weight verifications" and the Company had an "extensive system that allows us to accurately capture, record and control all relevant information." ¶¶ 207, 209. Pierson stated (as Welch stood by) that YRC was "scraping as much data as possible off every single shipment that we can scan" to allow YRC "to improve the intelligence of [YRC's] pricing model." ¶ 329. Moreover, highlighting YRC's procedures for correcting prices based on weight verification, Defendant Welch (who originally implemented the Overpricing Scheme) represented the following:

- "[e]xecuting on our strategy of improving price … ***to ensure that we have*** the right freight and ***the right price*** will continue to be a priority." (¶ 248);
- "Our intent is to remain disciplined and true to" "***our strategy to get the right freight at the right price*** running through our networks." (¶ 336);
- "Our pricing strategy remains focused on profitability while delivering award winning customer service." (¶ 371; *see also* ¶ 405 (Welch stating that "meeting our customers' needs … should contribute to improved year-over-year financial performance")).

These representations contradicted what Defendants knew at the time, and are therefore actionable under Section 10(b).  As a result of the Overcharge Scheme that blocked all negative reweigh corrections, YRC's invoices and revenues were not based on the actual weight of the shipment, Defendants were completely ignoring the accurately captured weights from the system, and Defendants' pricing strategy was to ensure that customers paid the highest possible price, not the "right price" based on the true weight. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008 (9th Cir. 2018) ("Falsity is alleged when a plaintiff points to defendant's statements that directly contradict what the defendant knew at the time."); *In re Atossa Genetics Inc. Sec. Litig.*, 868 F.3d 784, 794-96 (9th Cir. 2017) (same).  Moreover, "once a company speaks on an issue or topic, there is a duty to tell the whole truth." *JinkoSolar,* 761 F.3d at 250 & n.3.  A duty to disclose all information relating to a particular subject arises by voluntarily "touting" the subject to

20

investors. *See SEC v. Merchant Capital, LLC*, 483 F.3d 747, 770-71 (11th Cir. 2007). Here, Defendants represented to investors that their pricing strategy ensured that their customers paid "the right price" when the exact opposite was true.

Defendants' argument that their statements of the existence of the system are not actionable because they were technically true has been universally rejected:

> The veracity of a statement or omission is measured not by its literal truth, but by its ability to accurately inform rather than mislead prospective buyers. … Even a statement which is literally true, if susceptible to quite another interpretation by the reasonable investor, may properly be considered a material misrepresentation.

*Kleinman v. Elan Corp., plc*, 706 F.3d 145, 153 (2d Cir. 2013) (citation omitted); *see Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) (incomplete statements are misleading if they "affirmatively create an impression of a state of affairs which differs in a material way from the one that actually exists"). Here, there can be no doubt that a reasonable investor would interpret Defendants' statements to mean that they were not systematically disabling the very system they were championing in order to defraud their customers. *FindWhat Inv'r Grp. v. FindWhat.com*, 658 F.3d 1282, 1298 (11th Cir. 2011) ("the statements were misleading because they could mislead a reasonable investor into believing that [d]efendants had system is place that would [detect the fraud] when in truth and in fact they did not.").

Nor are these above statements "puffery" as Defendants contend. Defs' Mem. 15, 25-27. "Puffery is an optimistic statement that is so vague, broad, and non-specific that a reasonable investor would not rely on it, thereby rendering it immaterial as a matter of law." *In re Gen. Elec. Co. Sec. Litig.*, 857 F. Supp. 2d 367, 384 (S.D.N.Y. 2012). It is "vague (if not meaningless) management-speak." *In re Level 3 Communs. Sec. Litig.*, 667 F.3d 1131, 1340 (10th Cir. 2012). "[S]tatements cannot be dismissed as mere corporate optimism" if they "could have, and should have had, some basis in objective and verifiable fact." *Grossman*, 120 F.3d at 1123; *see Saunders*

21

*v. Morton,* 2011 U.S. Dist. LEXIS 31059, *20 (D. Vt. Feb. 17, 2011) (finding that when alleged misstatements are "potentially capable of measurement and verification they are "thus 'not dismissible as puffery'"). Indeed, statements that would otherwise be puffery may be material if, like here, the speaker knew at the time the statements were made that they were untrue or had no reasonable basis in fact. *See Basquiat ex rel. Estate of Basquiat v. Sakura Int'l*, 2005 U.S. Dist. LEXIS 13989, at *5 (S.D.N.Y. July 5, 2005) (statements were not puffery where they included specific detail and were alleged to be knowingly false); *Schutz v. Ne. Mortg. Corp.*, 2005 U.S. Dist. LEXIS 15985, *4-5 (D. Conn. Aug. 1, 2005) ("more concrete misrepresentations that the speaker knows to be untrue at the time they are made 'may ground a claim for fraud.'") (citations omitted); *see also Novak,* 216 F.3d at 315 (statements that "the inventory situation was 'in good shape' or 'under control' while they allegedly knew that the contrary was true" were not puffery). Here, whether YRC was invoicing its customers based on the actual weight, and whether the pricing strategy was designed to ensure the customer was charged "the right price" were not only verifiable but Defendants knew it was a lie.

Moreover, representations relating to a key aspect of a company's business – here, YRC's pricing of its only service – are not puffery if they represent facts that contradict what actually existed at the time. "The statements at issue here are sufficiently definite and, moreover, related to 'the heart' of [YRC's] business to qualify as actionable." *In re Inv. Tech. Grp., Inc. Sec. Litig.*, 251 F. Supp. 3d 596, 611 (S.D.N.Y. 2017); *see also In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*, 2017 U.S. Dist. LEXIS 112977, *687 (N.D. Cal. July 19, 2017) (holding statements that "'top priority' and 'focal point' for R&D was to" reduce emissions were not puffery); *Bricklayers and Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*, 866 F. Supp. 2d 223, 243-44 (S.D.N.Y. 2012) (statement that defendant "conducted 'extensive'

22

training and safety programs" was actionable because "[i]n an industry as dangerous as deepwater drilling," investors are "greatly concerned" about "safety and training efforts"); *see also Roofer's Pension Fund v. Papa*, 2018 U.S. Dist. LEXIS 125885, *34-35 (D.N.J. July 27, 2018) (finding that specific statements regarding pricing were not puffery and that "once Defendants' chose to speak about [pricing] they could not 'omit material facts related to that issue to as to make the disclosure misleading'").[13]

Contrary to Defendants' assertions, these are not opinions but statements of current facts. Even if they were opinions, any statement of opinion can be misleading if "the speaker omits information whose omission makes the statement misleading to a reasonable investor" because "the omitted facts would conflict with what a reasonable investor would take from the statement itself." *Tongue v. Sanofi*, 816 F.3d, 210 (2d Cir. 2016). [14]

### 4. Defendants Made Materially False and Misleading Statements and Omissions About their Reported Financial Results

Throughout the Class Period, YRC materially misrepresented its reported revenue, operating income (loss) and net income (loss) in violation of GAAP by including the $24 million

---

[13] "Where statements are not stated in a context of a future prediction, but generally recognize the company's past achievements and current goals" and "additionally, Defendants closely aligned their statements of [pricing strategy] to their productivity and success as a company, thereby leading credence to the materiality of their statements" "this category of alleged misrepresentations have been sufficiently pled[.]" *In re Massey Energy Co. Sec. Litig.,* 883 F. Supp. 2d 597, 617 (S.D. W. Va. 2012); *see also In re PMA Capital Corp. Sec. Litig.*, 2005 U.S. Dist. LEXIS 15696, *22 (E.D. Pa. July 27, 2005) ("Defendants were obligated to speak truthfully when addressing the way in which they priced…").

[14] The cases cited by Defendants are distinguishable. The statements regarding "business strategies" at issue in *Lasker v. New York State Elec. & Gas Corp.,* 85 F.3d 55, 57 (2d Cir. 1996) and about "management style" in *Woodward v. Raymond James Fin., Inc.,* 732 F. Supp. 2d 425, 434-35 (S.D.N.Y. 2010) were general and did not specify which strategies or what management style. In *Pub. Sch. Teachers Pension & Ret. Fund v. Ford Motor Co. (In re Ford Motor Co. Sec. Litig.)*, 381 F.3d 563 (6th Cir. 2004) and *Pehlivanian v. China Gerui Advanced Materials Grp., Ltd.*, 153 F. Supp. 3d 628 (S.D.N.Y. 2015) the statements regarding their customers were general and the frauds alleged were not intimately tied to profiting by cheating customers.

per year generated by the Overcharge Scheme. *See e.g.,* ¶¶ 192-93. Financial statements that are not prepared in accordance with GAAP are presumed to be misleading at the time they were made. *Pa. Pub. Sch. Emp'ees. Ret. Sys. v. Bank of America Corp.,* 874 F. Supp 2d. 341, 356 (S.D.N.Y. 2012). YRC's financial results were overstated because the revenue from the Overcharge Scheme should never have been recognized under GAAP because it was never "earned."

As Defendants concede, revenue is "earned," and thus recognizable, only when the company has "accomplished what it must do – such as delivering the goods or rendering the services at issue – to be entitled to payment." Defs.' Mem. 13 (citing ASC 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(b)). Defendants' argument that it actually received the revenue misses the point. Here, YRC received cash for literally tons of product that it never carried or delivered. When YRC blocked negative reweighs that entitled its customers to credits or refunds, that revenue was not "earned" and, thus, not recognizable. Courts routinely find that statements of revenue are false and misleading when cash was received under false pretenses. *See, e.g., SEC v. Egan*, 994 F. Supp. 2d 558, 566 (S.D.N.Y. 2014) ("No specialized accounting knowledge is required to recognize…that revenue is not earned from sham sales."); *In re Pss World Med.,Inc. Sec. Litig.*, 250 F. Supp. 2d 1335, (M.D. Fla. 2002) (revenue misrepresented where it was recognized on transactions where products were not shipped); *In re Sci. Atlanta, Inc. Sec. Litig.*, 754 F. Supp. 2d 1339, 1358-60 (N.D. Ga. 2010) (plaintiffs presented sufficient evidence that defendants improperly recognized revenue under GAAP by engaging in channel stuffing); *Dutton v. D&K Healthcare Res.*, 2006 U.S. Dist. LEXIS 42553, *64, 88-89 (E.D. Mo. June 23, 2006) (same).

Furthermore, YRC's financial results are misleading because they failed to disclose that a material source of revenue was generated through the fraud. *See, e.g., In re Van Der Moolen Holding, N.V. Sec. Litig.,* 405 F. Supp. 2d 388, 407 (S.D.N.Y. 2005); *In re Marsh*, 501 F. Supp.

24

2d at 470; *In re LaBranche Sec. Litig.*, 405 F. Supp. 2d 333, 364-65 (S.D.N.Y. 2005). Defendants' financial statements "put its sources of revenue at issue" and "[the statements] gave rise to Section 10(b) liability because the company failed to disclose the illegal conduct that generated the revenue." *In re Virtus Inv. Partners Inc. Sec. Litig.,* 195 F. Supp. 3d 528, 537 (S.D.N.Y. 2016); *see also In re Grupo Televisa Sec. Litig.,* 368 F. Supp. 3d 711, 721 (S.D.N.Y. 2019) (same).[15]

### 5. Defendants Failed to Disclose the DOJ Investigation as a Loss Contingency in Violation of GAAP

Under GAAP, Defendants were required to disclose the DOJ Investigation. ASC 450-20-50 provides that a loss contingency must be disclosed if there is at least a "reasonable possibility" that a loss may be incurred, ***even if the loss cannot be reasonably estimated***. ¶ 186. A loss contingence is reasonably possible if the likelihood that it will occur "is ***more than remote but less than likely***." *Id.* Specifically, a loss contingency in the form of a claim is considered asserted, and requires disclosure, where there is a "manifestation by a potential claimant of an awareness of a possible claim." ASC 450-50-6.

The AC alleges facts—none of which are disputed by Defendants—that demonstrate that the DOJ had manifested an "awareness of a possible claim" because since at least 2009, the DOJ was actively engaged in a massive investigation of YRC regarding FCA violations that involved dozens of depositions, hundreds of thousands of documents, quantification of the approximately 70,000 false claims, related damages and multiple settlement negotiations. ¶¶ 109, 113, 121-122, 128-29. Needless to say, the DOJ had "manifest[ed] … an awareness of a possible claim" requiring disclosure under GAAP. *SAIC,* 818 F. 3d at 93 ("The probability standard applies in lieu of the

---

[15] The cases cited by Defendants are inapposite. *Emps. Ret. Sys. v. Embraer S.A.,* 2018 U.S. Dist. LEXIS 56895 (S.D.N.Y. Mar. 30, 2018) and *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386 (S.D.N.Y. 2016) involve bribery schemes. While the conduct was illegal, there was no dispute that services for which the defendants were paid (and recognized revenue) were fully performed.

'reasonable possibility' standard only if the loss contingency arises from 'an unasserted claim or assessment when there has been *no* manifestation of a potential claimant of an awareness of a possible claims or assessment.'" *Id.* (emphasis in original)); *see SEC v. RPM Int'l, Inc.,* 282 F. Supp. 3d 1,*18-23 (D.D.C. 2017) (finding that pursuant to ASC 450 defendants had a duty to disclose a DOJ investigation and accrue a loss because they were aware of an underlying *qui tam* alleging violation of the FCA, knew that the DOJ was actively investigating to decide whether to intervene, had issued subpoenas and had engaged in communications with defendants' counsel to quantify the overcharge to the government, which, under the FCA, could be treble).[16]  Defendants have admitted that the DOJ Investigation loss contingency was material. In YRC's 2018 10-K, in which it disclosed the DOJ Investigation for the first time, Defendants admitted that "it could have a material adverse effect on our business…" [17]

Moreover, throughout the Class Period, Defendants' filings purported to warn investors about contingencies by making statements such as, "We are involved in other litigation or proceedings that arise in ordinary business activities" (*see e.g.,* AC ¶ 213), and "[b]ased on our current assessment of information…we believe that our financial statements include adequate provisions…" *Id.* Defendants' failure to disclose the DOJ Investigation rendered their representations regarding loss contingencies materially false and misleading because it gave

---

[16] Even in the absence of a manifestation by the DOJ of an awareness of a possible claim, YRC had sufficient information (as identified above) to conclude that it was probable that a claim would be asserted and that there was a reasonable possibility (i.e. more than "remote") that the outcome would be unfavorable (especially since Defendants knew that the Overcharge Scheme had occurred and it was contrary to the industry standards).

[17] The cases cited by Defendants are easily distinguishable.  As previously discussed at 19, *In re Lions Gate,* 165 F. Supp. 3d 1 (S.D.N.Y. 2016) is distinguishable. In *Axar Master Fund, Ltd. v. Beford,* 308 F. Supp. 3d at 758-759 (S.D.N.Y. 2018) the alleged settlement negotiations had been ongoing for a short period of time (barely over four months) and therefore it was less likely that defendants could know that there was a reasonable possibility that negotiations could break down and a that as a result a loss would occur.

26

investors the false impression that the Company did not face material contingencies or uncertainties outside the ordinary course of business and run-of-the-mill litigation. *See Menaldi,* 164 F. Supp. 3d at 584 ("Given Och-Ziff's explicit acknowledgment [after its restated 10-K announcing for the first time a government investigation] that the Investigation 'could have material effect' on its business…Plaintiffs have plausibly pleaded that, in its earlier SEC filings…Och-Ziff…'did not speak in an accurate and complete manner'").[18]

### 6.   Defendants Understated YRC's Rerate Reserves

YRC's rerate reserves were also materially understated as a result of the Overcharge Scheme. *See In re Computer Assocs. Sec. Litig.,* 75 F. Supp. 2d 68, 73 (E.D.N.Y. 1999) (finding that falsity alleged as to financial statements where Plaintiff had "detailed how defendants used specific accounting practices…to prematurely recognize revenue…").

Defendants' argument that YRC's reserves are opinions fails because Defendants misrepresented an objective fact as to how the reserves were calculated. Even if they were opinions, it can be "'plausibly inferred' from the facts alleged that the Defendants 'knew they were disseminating false and misleading" opinions about [the reserves].'" *In re MF Glob. Holdings Ltd. Sec. Litig.,* 982 F. Supp. 2d. 277, 315 (S.D.N.Y. 2013) (statement of opinion concerning deferred tax asset found subjectively false) (*quoting, Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.,* 651 F. Supp. 2d 155, 179 (S.D.N.Y.2009)) (opinions false because Defendants

---

[18] Defendants' argument that their loss contingency disclosures were protected matters of judgment or opinion under *Omnicare* (Defs.' Mem. 23) is unavailing. Opinions are actionable if they omit facts about the basis for the speaker's opinion that, if disclosed, would likely "conflict with what a reasonable investor would take from the statement itself." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund,* 135 S. Ct. 1318, 1329 (2015). Here, it is undisputed that Defendants knew about the DOJ Investigation.

possessed contradictory information).[19] The PSLRA safe harbor does not apply to misstatements concerning reserves in the Company's reported financials. 15 U.S.C. 78u-5(b)(2)(A) ("this section shall not apply to a forward-looking statement . . . that is . . . included in a financial statement prepared in accordance with generally accepted accounting principles"). "[S]tatements regarding loan loss reserves are generally not considered to describe expectations for a company's future, but are regarded instead as directed to its then-present financial condition."  *Okla. Firefighters Pension & Ret. Sys. v. Student Loan Corp.,* 951 F. Supp. 2d 479, 498 n.12 (S.D.N.Y. 2013) Moreover, "Plaintiff[s] here allege that Defendants knew that the statements regarding [reserves] were false when made, and thus neither the bespeaks caution doctrine nor the PSLRA safe harbor provision apply here." *In re SLM Corp., Sec. Litig.,* 740 F. Supp. 2d 542, 556 (S.D.N.Y. 2010).

### 7.    Defendants' SOX Certifications

Throughout the Class Period, the Individual Defendants signed numerous certifications pursuant to SOX which were materially false and misleading for several reasons. *First*, their representations that they disclosed "[a]ny fraud, whether or not material, that involves management" (*see, e.g., id. ¶* 211) is false for their failure to disclose their Overcharge Scheme.[20]

---

[19] Defendants cite *Davidoff v. Farina,* 2005 WL 2030501, at *13 (S.D.N.Y. Aug. 22, 2005), asserting that Plaintiffs have not sufficiently pled how the rerate reserve was materially understated. But the court in *Davidoff* stated that "had the plaintiffs alleged a 'widespread' and 'pervasive fraudulent scheme' [as here] it would "have less hesitation to assume…that materiality existed as a 'huge net effect in error as to the company's overall figures.'" *Id.* Defendants' reliance in *Fait v. Regions Fin. Corp.,* 655 F.3d 105, 112-13 (2d Cir. 2011) is misplaced. First, the court recognized that the operative distinction was between statements of fact versus statements of opinion. *Fait,* 655 F.3d at 108-09.  Second, the court made clear that had plaintiff been able to "point to an objective standard for setting loan loss reserves" its decision might very well have been different. *Id.* 655 F.3d at 113. Here, the *actual* weighs of shipments and not those recorded as a result of the Overcharge Scheme show how Defendants manipulated rerate reserves.

[20] Defendant Welch, who undoubtedly knew about the Overcharge Scheme, made this false representation 17 times during the Class Period. ¶¶ 211, 228, 239, 252, 269, 282, 293, 304, 321, 340, 351, 362, 381, 396, 409, 420, 439,

28

*See In re Sadia, S.A. Sec. Litig.*, 643 F. Supp. 2d 521, 532-33 (S.D.N.Y. 2009) (sustaining claims based on SOX certification because it "plainly required Sadia's certifying officers to disclose any fraud, whether or not material, that involves management"); *SEC v. Durgarian*, 477 F. Supp. 2d 342, 349 (D. Mass. 2007) (defendant's certification that he disclosed "any fraud, whether or not material that involves management" was false and misleading in light of underlying scheme to defraud). *Second*, representations that YRC's public filings "fairly present[ed] in all material respects the financial condition [and] results of operations" of YRC (*see, e.g., id.* ¶ 211) are false because, as discussed above, the Company's revenues were derived, in material part, from the Overcharge Scheme and the revenue had never been "earned." *Third,* YRC's internal controls were materially inadequate because Defendant Welch approved the implementation of the Overcharge Scheme (*id.* ¶¶ 67, 74, 131) and YRC designed a system to block negative reweighs (*id.* ¶¶ 63, 74, 101-02, 118-20). False SOX certifications concerning internal controls are actionable. *See, e.g.*, *Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*, 89 F. Supp. 3d 602, 617-19 (S.D.N.Y. 2015) (SOX certifications actionable where statements therein were false or misleading); *In re Petrobras Sec. Litig.,* 116 F. Supp. 3d 368, 380-81 (S.D.N.Y. 2015).

### 8. Defendants Made Materially False and Misleading Statements About Conformance to GAAP and Compliance with All Laws

Defendants' representations that YRC's financial statements were prepared in conformity with GAAP (*e.g.* ¶ 216) were false and misleading because the Company's financial results were inflated by at least $24 million in illicit and "unearned" revenue per year (*supra* 23-25) and because Defendants failed to disclose the DOJ investigation. *Supra* 17.

Defendants argue that statements regarding conformance with GAAP are inactionable because they represented "aspirational" statements and/or "statements or opinion. Defs.' Mem. 23-25. Defendants' statements were not preceded by "we believe", "in our opinion" or any similar

29

equivocation. Even if opinions, Defendants had no reasonable basis under *Ominicare* for those opinions. *Supra* 25-27. Furthermore, "courts have held that parties' disagreements over GAAP compliance raise issues that cannot be resolved on a motion to dismiss." *In re Ambac Fin. Grp., Inc.* 693 F. Supp. 2d 241, 273 (S.D.N.Y. 2010); *see In re Refco, Inc. Sec. Litig.,* 503 F. Supp. 2d 611, 657-57 (S.D.N.Y. 2007) ("At the motion to dismiss stage, plaintiffs' assertion that certain [GAAP] practices were not generally accepted must be taken as true.").

In a February 13, 2014 credit agreement appended to YRC's 2013 10-K filed with the SEC, Defendants represented that YRC was "in compliance with all Laws…". ¶¶ 218-19. This representation was false and misleading because YRC had widespread FCA violations – submitting tens of thousands of false claims to the DOD since 2006. Defendants assert that the statement is inactionable because it was "not made to the investing public, but to lenders." Defs.' Mem. 28. Any publicly available statement can be actionable, especially those in SEC filings, the purpose of which is to inform investors. Courts routinely hold that similar statements can serve as the basis of a securities claim. *See e.g., Reese v. BP Expl. (Alaska) Inc.*, 643 F.3d 681, 691 (9th Cir. 2011); *In re Plains All Am. Pipeline, L.P.*, 245 F. Supp. 3d 870, 912 (S.D. Tex. 2017); *Sharette v. Credit Suisse Int'l*, 127 F. Supp. 3d 60, 91 (S.D.N.Y. 2015); *In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d 1145, 1179 (D. Or. 2015). Indeed, compliance with "all laws" statements are actionable even when not in SEC filings or public statements. *See Glazer Capital Management L.P. v. Magistri,* 549 F.3d 739, 740-742 (9th Cir. 2008).[21]

---

[21] Defendants also argue (Defs' Mem. 28) that the representation was not false because the FCA violation "would not reasonably be expected to have a Material Adverse Effect" on YRC. As discussed, *supra* 17-19, 25-27, the AC adequately alleges that the Overcharge Scheme and the DOJ Investigation subjected YRC to material adverse effects on its business and operations.

### C.    The AC Alleges a Strong Inference of Scienter as to All Defendants

"[S]cienter can be established by alleging facts to show … strong circumstantial evidence of conscious misbehavior or recklessness." *ECA & Local 134 IBEW Jt. Pension Trust of Chi.*, 553 F.3d 187, 198 (2d Cir. 2009). Recklessness is "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care ...." *In re Carter-Wallace, Inc. Sec. Litig.*, 220 F.3d 36, 39 (2d Cir. 2000) (citation omitted). A strong inference of scienter exists where a complaint alleges that the defendants: (1) "engaged in deliberately illegal behavior"; (2) "knew facts or had access to information suggesting that their public statements were not accurate"; or (3) "failed to check information they had a duty to monitor." *ECA*, 553 F.3d at 199. Scienter allegations must be viewed holistically. The issue is "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007). The inference of "scienter need not be irrefutable, *i.e.*, of the 'smoking gun' genre, or even the 'most plausible of competing inferences.'" *Id.* at 324. Rather, an inference of scienter is sufficient if a reasonable person would deem it "at least as compelling as any opposing inference one could draw from the facts alleged." *Id*. If the inferences for and against scienter are in "equipoise," the complaint survives. *Id.* at 331.

### 1.    Defendant Welch Had Actual Knowledge of the Overcharge Scheme

Defendant Welch was President and CEO of Yellow when the Overcharge Scheme was created and implemented, approved its implementation, and remained CEO of YRC until July 2018 (¶¶ 26, 85, 62-67); thus it is undisputable that he knew of the scheme when he repeatedly represented to investors that YRC's reweigh pricing strategy was accurate and was used to achieve the "right price" for the customer. "[O]ne of the classic fact patterns giving rise to a strong inference of scienter is that defendants published statements when they knew facts or had access

31

to information suggesting that their public statements were materially inaccurate." *In re Level 3*, 667 F.3d at 1344 n. 13 (citation omitted). Indeed, email evidence shows that Defendant Welch was directly involved in the decision at Yellow to stop making negative reweigh corrections (¶¶ 67, 74) and was in meetings where people objected to the policy as "cheating customers". ¶ 131.

## 2. All Individual Defendants Knew of the DOJ Investigation

Scienter is sufficiently alleged, where, as here, facts show that the Individual Defendants had "access to" or "should have known" about the DOJ Investigation (and consequently the Overcharge Scheme). *See In re EVCI Colls. Holding Corp. Sec. Litig.*, 469 F. Supp. 2d 88, 99 (S.D.N.Y. 2006) (scienter alleged where CEO and CFO "knew or should have known about" material information that threatened company's planned expansion). All Individual Defendants served as senior officers during the DOJ Investigation, which was long-running and expansive (¶¶ 109-29, 187), and therefore knew of, or ignored with reckless disregard, the Overcharge Scheme. Indeed, senior YRC executives, including Defendant Welch, were interviewed by the DOJ, and the DOJ Investigation was periodically discussed at YRC's meetings of the Board of Directors, of which Defendants Welch and Hawkins were members. ¶¶ 502, 504-05. Therefore, it is more likely than not that the Individual Defendants as senior officers (CEOs or CFOs) (¶¶ 26, 30, 33, 37) were appraised of a serious and material government investigation and the evidence uncovered, especially given the multiple settlement negotiations that began in 2009. *See In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 489-91 (S.D.N.Y. 2004) (where "a plaintiff can plead that a defendant made false or misleading statements when contradictory facts of critical importance to the company either were apparent, or should have been apparent, an inference arises that high-level officers and directors had knowledge of those facts by virtue of their positions with the company").

32

### 3. Defendants' Failure to Disclose Information That They Had A Clear Duty to Disclose Supports an Inference of Scienter

Both conscious misbehavior and recklessness may be inferred when the duty to disclose is clear. *See Catalano v. BMW of N. Am., LLC*, 167 F. Supp. 3d 540, 560 n.14 (S.D.N.Y. 2016) ("[I]n [*Novak*], the Second Circuit held that the plaintiffs adequately pleaded scienter by alleging that the defendants had . . . made a conscious decision to withhold material information"). Here, Defendants had an affirmative duty to disclose the Overcharge Scheme and the DOJ investigation under S-K Item 303 and GAAP but did not during the Class Period. *Supra* 17-19, 25-27. Courts have held that silence under similar circumstances supports a strong inference of scienter. *In re Scholastic,* 252 F.3d at 76-77 ("allegations as to what defendants knew on a daily, weekly and monthly basis, which formed basis of an Item 303 S-K violation, supported an inference of scienter."); *In re Campbell Soup Sec. Litig.*, 145 F. Supp. 2d 574, 591 (D.N.J. 2001) (same); *Menaldi*, 164 F. Supp. 3d at 585 (scienter adequately pled where defendants knew about SEC-DOJ investigation but failed to disclose its potential material impact until after underlying misconduct was publicly exposed); *In re BioScrip. Inc. Sec. Litig.,* 95 F. Supp. 3d, 711, 733 (S.D.N.Y. 2015) (scienter adequately pled as to statement of legal compliance where defendant knew about government investigation and CID describing misconduct); SAIC, 818 F. 3d at 96 (allegations that defendant knew about risks of civil and criminal liability "support[ed] the inference that [the defendant] acted with at least a reckless disregard of a known or obvious duty to disclose when . . . it omitted this material information . . . in violation of FAS 5 and Item 303").

### 4. Defendants' Repeated Statements Concerning YRC's Rerating Pricing Strategy Supports an Inference of Scienter of the Overcharge Scheme

The inference of scienter is further supported by the fact that the Individual Defendants repeatedly spoke about the rerating pricing strategy, the details of how the system worked, the data

33

it collected, and precisely how it (purportedly) ensured that YRC charged its customers the "right price" for the "right freight." ¶¶ 248, 329, 336, 371, 392, 405, 424, 461, 474. It is well settled that if executives speak about a topic of "critical importance", they cannot hide their heads in the sand and ignore crucial information at their fingertips about it. *City of Livonia Employees Ret. Sys. v. Wyeth*, 2010 U.S. Dist. LEXIS 107729, at \*6, \*18-19 (S.D.N.Y. Sept. 29, 2010).[22]  Where, as here, "facts that contradict a high-level officer's public statements were available when the statements were made, it is reasonable to conclude that the speaker had intimate knowledge of those facts or should have known of them." *In re Atlas*, 324 F. Supp. 2d at 489; *see Gauquie v. Albany Molecular Research, Inc.*, 2016 U.S. Dist. LEXIS 97295, at \*5-6 (E.D.N.Y. July 26, 2016); *see also KBC Asset Mgmt. NV v. 3D Sys. Corp.*, 2016 U.S. Dist. LEXIS 96499, at \*29 (D.S.C. July 25, 2016) ("Bolstering the inference that Individual Defendants knew about these core operations are the allegations that they repeatedly spoke on these issues at conferences, on conference calls, and in press releases.").[23]

### 5. The "Core Operations" Theory Supports an Inference of Scienter

Courts routinely hold that facts pertaining to a company's core operations are so apparent that their knowledge may be attributed to the company and its key officers.  *See In re Complete Mgmt. Sec. Litig.,* 153 F. Supp. 2d 314, 325 (S.D.N.Y. 2001) (finding it "inconceivable" that

---

[22] *See In re MBIA, Inc., Sec. Litig.*, 700 F. Supp. 2d 566, 591 (S.D.N.Y. 2010) ("Defendants cannot maintain that its officers repeatedly disclosed the RMBS content of the CDOs-squared to the market, but that none of its officers were aware of the RMBS backing the CDOs-squared); *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 460 n.21 (S.D.N.Y. 2005) ("Defendants[ ] cannot simultaneously argue that the vendor financing arrangements were disclosed to the investing public, but that [defendant's] CEO and CFO were unaware of those commitments.").

[23] *See also In re Gen. Elec. Co. Sec. Litig.*, 857 F. Supp. 2d 367, 395-96 (S.D.N.Y. 2012) ("highly improbable" that defendant who publicly described company's finances did not inquire into basis for statements); *Reese v. Malone*, 747 F.3d 557, 572 (9th Cir. Feb. 13, 2014) ("[T]he inference that Johnson did not have access to the corrosion data is directly contradicted by the fact that she specifically addressed it in her statement.").

officers were unaware of problems involving the company's largest client); *Cosmas v. Hassett,* 886 F.2d 8, 12-13 (2d Cir. 1989) ("What is critical is the fact that each [defendant] held a position in [the company] that required that he have full knowledge of its business and financial status."). "Core operations" include matters "critical to the long-term viability" of the company and events affecting a "significant source of income." *Cosmas,* 886 F.2d at 13; *In re Hi-Crush Partners L.P. Sec. Litig.,* 2013 U.S. Dist. LEXIS 171110, at \*73 (S.D.N.Y. Dec. 2, 2013).

Shipments are YRC's *only* revenue stream, let alone a "significant source of [the company's] income," and were "critical [to the] long term viability" of the Company. *In re Hi-Crush,* 2013 U.S. Dist. LEXIS 171110, at \*72-74. It is not plausible that the Individual Defendants, each a senior officer, would be unaware of the Overcharge Scheme and its financial impact on YRC's operations.  The Overcharge Scheme was critical to YRC's financial results. Indeed, but for fraudulent revenue generated by the Overcharge Scheme, during certain periods during the Class Period, YRC would have reported a loss, instead of net income. ¶¶ 279, 417.[24]  Moreover, the existence of the Overcharge Scheme was no secret within YRC. The directive to block negative reweighs was communicated to all employees of all levels.  Thus, it would be "absurd" to assume that the Individual Defendants had no knowledge of the scheme, when, as the CWs and internal documents show, they policy of blocking negative reweighs and the revenue generated through

---

[24] The magnitude of the accounting errors – overstatement of operating net income was over 1,100 % in certain reporting periods (¶ 260) – supports an inference of scienter.  "Accounting errors that prove to have a significant impact on core business operations – i.e. cash, revenue… sometimes give rise to a compelling inference of scienter." *In re Medicis Pharm. Corp. Sec. Litig.*, No. CV-08-1821-PHX-GMS, 2010 U.S. Dist. LEXIS 81410, at \*15 (D. Ariz. Aug. 9, 2010); *see In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1273 (N.D. Cal. 2000) (inference of scienter where revenue inflation exceeded 25%); *Batwin v. Occam Networks, Inc.*, No. CV 07-2750 CAS (SHx), 2008 U.S. Dist. LEXIS 52365, at \*37-38 (C.D. Cal. July 1, 2008) (inference of scienter where overstated revenues ranged from 30% to 40%).

the Overcharge Scheme was known throughout the Company. *In re Gen. Elec. Co. Sec. Litig.*, 857 F. Supp. 2d 367, 395 (S.D.N.Y. 2012) ("[S]urely an inference of knowledge may be appropriate…where it would be 'absurd to suggest that management was without knowledge.'").

There is no dispute that Defendants were aware of the DOJ investigation and the risk it placed on YRC's operations, especially given the critical importance of the U.S. government's business to YRC's operations. ¶¶ 49-51. The Individual Defendants knowledge of the Overcharge Scheme and the DOJ Investigation's likelihood to imperil YRC's business with its government customers – not to mention a potential civil penalty of approximately $385-$770 million (¶ 129) – support a strong inference of scienter. *See Wallace v. Intralinks*, 2013 U.S. Dist. LEXIS 65958, at *24 (S.D.N.Y. May 8, 2013) (fact that "CEO and CFO . . . would likely remain informed about developments with a crucial part of [the company's] business" provided "additional evidence" of scienter).

### 6. The Defendants' Signatures on SEC Filings, SOX Certifications and Weak Internal Controls Support an Inference of Scienter

Defendants' GAAP violations and SOX certifications provide further indicia of scienter. Specifically, Defendants' failure to disclose a loss contingency in connection with YRC's potential liability as a result of the DOJ Investigation under ASC 450 bolsters the inference of scienter. *See, e.g., Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 199 (S.D.N.Y. 2010) ("GAAP violations, when coupled with evidence of fraudulent intent provide evidence of scienter[]"); *Varghese v. China Shenghuo Pharm. Holdings, Inc.*, 672 F. Supp. 2d 596, 608 (S.D.N.Y. 2009) (GAAP violation "may contribute to that inference [of scienter]").

Moreover, a "failure to maintain sufficient internal controls to avoid fraud is sufficiently indicative of scienter." *In re Veeco Instruments, Inc. Sec. Litig.,* 235 F.R.D. 220, 232 (S.D.N.Y. 2006). The Individual Defendants' SOX certifications attesting to the adequacy of YRC's internal

controls and procedures despite their knowledge that the Company's public filings misrepresented and omitted material information contributes to an inference of scienter. *See, e.g., In re Am. Int'l Grp., Inc. 2008 Sec. Litig.*, 741 F. Supp. 2d 511, 533 (S.D.N.Y. 2010).  In the SOX certifications the Individual Defendants certified that they were responsible for "establishing and maintaining disclosure controls and procedures" and "internal control over financial reporting". *See, e.g., ¶* 211. YRC's controls were woefully deficient because Defendant Welch approved the implementation of the Overcharge Scheme (¶¶ 67, 74, 131) and YRC designed a system to block negative reweighs (¶¶ 63, 74, 101-102, 118-120).  The blatant inconsistency between representing to investors that they had designed such disclosure controls and procedures to ensure that their financial statements to investors were truthful, while seeking to evade liability by ignoring the failure of the Company's internal controls is probative of scienter. *Dobina,* 909 F. Supp. 2d at 246 (S.D.N.Y. 2012) (defendant's participation in designing and evaluating the internal controls is relevant to scienter); *see also In re ProQuest Sec. Litig.*, 527 F. Supp. 2d 728, 743 (E.D. Mich. 2007) (false SOX certifications "provide evidence either that [defendant] knew about the improper accounting practices or, alternatively, knew that the controls he attested to were inadequate").

Thus, Defendants' signatures on SEC filings during the Class period, which Plaintiffs allege to contain misleading statements and omissions and Defendants' attestations as to the correctness of those filings are further indicative of scienter.  *See, e.g., In re Cabletron Sys., Inc.*, 311 F.3d 11, 41 (1st Cir. 2002) (defendants' signatures on Form 10-K "accept[ing] responsibility for its contents" was indicative of scienter) (citation omitted).

### 7.    Defendants Had Motive and Opportunity

Although Plaintiffs are not required to plead motive and opportunity to adequately meet the scienter standard (*City of Pontiac Gen. Emples. Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 371 (S.D.N.Y. 2012)), they have done so. The Overcharge Scheme was

implemented to boost YRC's revenue. ¶¶ 62-86. Moreover, financial institutions were pressuring YRC "to cut costs and produce more revenue" which CW 5 believed was *the catalyst* behind the Overcharge Scheme. ¶ 157. Furthermore, YRC was adamant in keeping its Overcharge Scheme a secret noting that it created an "integrity problem". ¶¶ 56, 70, 77. This is sufficient to plead motive. *See In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 168 (S.D.N.Y. 2008) (finding rise in competition, threat of not securing exclusive rights to a key product, and secret negotiations probative of scienter in holistic analysis); *In re Vivendi Universal, S.A. Sec. Litig.*, 2004 U.S. Dist. LEXIS 7015, at *29 (S.D.N.Y. Apr. 21, 2004) (finding scienter where company was motivated to "maintain" its "entertainment empire" through a fraudulent deal and "clearly distinguishable from the more general motives that have been held insufficient to support scienter").[25]

Additionally, the "motive and opportunity element is generally met when corporate insiders misrepresent material facts to keep the price of stock high, while selling their own shares at a profit." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d at 74. "Insider sales have been found unusual on several bases, including the amount of profit, the percentage of shares sold, the timing of the sales…the number of insiders trading[.]" (*Rothaman v. Gregor,* 220 F.3d 81, 94 (2d Cir. 2000)), and "whether the profits were substantial relative to the seller's ordinary compensation." *In re Hertz Global Holdings Inc.,* 905 F.3d 106, 119 (2018).

During the Class Period, the Individual Defendants collectively sold 606,429 YRC shares at artificially inflated prices for gross proceeds of approximately over $9.8 million. ¶¶ 28, 32, 35, 39. Welch and Pierson, respectively, sold 43% and 53% of the YRC shares they acquired during the Class Period. *See Stevelman v. Alia Research Inc.,* 174 F.3d 79, 86 (2d Cir. 1999) (strong

---

[25] "[C]ourts often assume that corporations, corporate officers, and corporate directors would have the opportunity to commit fraud if they so desired." *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 446 F. Supp. 2d 163, 181 (S.D.N.Y. 2006).

inference of scienter could be drawn from insider sale of 40% of his holdings during the class period); *Oxford Health*, 187 F.R.D. 133, 140 (S.D.N.Y. 1999) (sales ranging from 17% to 67% of holdings significant and unusual); *Friedberg v. Discreet Logic, Inc.,* 959 F. Supp. 42, 51 (D. Mass. 1997) (scienter adequately inferred from the fact that insiders sold 12%, one sold 33% and another sold 50%). Moreover, Welch and Pierson's Class Period sales were highly unusual compared to their pre-Class Period sales. In the nearly three-year period prior to the start of the Class Period, Defendant Welch sold 58,000 shares for proceeds of $1,454,380, and Defendant Pierson sold 40,000 shares for proceeds of $974,083.  ¶ 493.  In stark contrast, during the Class Period, Defendant Welch sold 383,565 shares for gross proceeds of $5,877,367.14, and Defendant Pierson sold 163,451 shares for gross proceeds of $2,987,269.12.  *Id.*  These sales give rise to an inference of scienter because they were "dramatically out of line with prior trading practices."  *In re Silicon Graphic Inc. Sec. Litig.,* 183 F.3d 970, 989 (9th Cir. 1999). The profits Defendants Welch and Pierson realized from their stock sales were higher than their ordinary compensation. ¶¶ 28, 35. Defendants' arguments to the contrary (Defs' Mem. 33-36), dispute facts and raise questions of fact that Defendants Welch and Pierson acted in good faith.

### 8.    The Complaint Adequately Pleads Corporate Scienter

Corporate scienter is adequately pled if the "facts [] create a strong inference that *someone* whose intent could be imputed to the corporation acted with the requisite scienter." *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.*, 531 F.3d 190, 195 (2d Cir. 2008) ("There is no formulaic method…but scienter by management-level employees is generally sufficient to attribute scienter to corporate defendants."); *In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 515-16 (S.D.N.Y. 2009); *see also Patel v. L-3 Commc'ns Holdings Inc.*, 2016 U.S. Dist. LEXIS 42978, at *54 (S.D.N.Y. Apr. 21, 2016) (corporate scienter adequately pled based on information from manager "below the corporate level"); *In re JP Morgan Chase Sec. Litig.*, 363

39

F. Supp. 2d 595, 627 (S.D.N.Y. 2005) (attributing knowledge of a Vice Chairman, a Vice President and a Managing Director to the corporate defendant); *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 443 (S.D.N.Y. 2005) (attributing fraudulent behavior of senior management to the corporate defendant). Significantly, "an individual whose knowledge is imputed to the corporation [need not] also 'make' the material misstatement or omission at issue." *Pa. Pub. Sch. Emps.' Ret. Sys. v. Bank of Am. Corp.*, 874 F. Supp. 2d 341, 372 (S.D.N.Y. 2012). Thus, even if Plaintiffs had not adequately pled the Individual Defendants' scienter, the knowledge of senior managers at YRC about the Overcharge Scheme (*see* ¶¶ 62-86, 105, 117-120, 130-168) and the DOJ Investigation (¶ 112) can be properly imputed to the Company. *See Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 177-78 (2d Cir. 2015).[26]

### D.     The AC Pleads Control Person Liability

Because the CAC pleads a Section 10(b) claim, the Section 20(a) control person claim should stand. *Richman* v. *Goldman Sachs Grp., Inc.*, 868 F. Supp. 2d 261, 284 (S.D.N.Y. 2012).

### IV.     <u>CONCLUSION</u>

For the foregoing reasons, the Court should deny Defendants' Motion to dismiss.

Dated:  August 16, 2019

Respectfully submitted,

/s/   *Donald R. Hall*
Donald R. Hall
Jeffrey P. Campisi
  (Bar Roll Number: 700753)
Jason A. Uris
**KAPLAN FOX & KILSHEIMER LLP**
850 Third Avenue, 14th Floor

---

[26] The fact that YRC did not keep records of the negative reweigh corrections systematically cancelled (¶ 117) and hid evidence of their misconduct by programming their systems so that negative reweigh results would not register (¶¶ 118-120) also supports scienter. "[A]llegations relating to document destruction and concealment of the alleged fraud are relevant to scienter." *In Re Enron Corp. Secs*, 2003 U.S. Dist. LEXIS 1668, *61 (S.D. Tex. Jan. 28, 2003).

New York, NY 10022
Telephone: (212) 687-1980
Facsimile: (212) 687-7714
Email: dhall@kaplanfox.com
　　　jcampisi@kaplanfox.com
　　　juris@kaplanfox.com

*Counsel for Lead Plaintiff City of Warwick
Retirement Board and Co-Lead Counsel for
the Proposed Class*


/s/　　*Jeremy A. Lieberman*
Jeremy A. Lieberman
Michael J. Wernke
Veronica V. Montenegro
**POMERANTZ LLP**
600 Third Avenue, 20th Floor
New York, NY 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Email: jalieberman@pomlaw.com
　　　mjwernke@pomlaw.com
　　　vvmontenegro@pomlaw.com

*Counsel for Peter Szabo and
Co-Lead Counsel for the Proposed Class*


Jonathan B. Fellows
George H. Lowe
**BOND SCHOENECK & KING, PLLC**
One Lincoln Center
Syracuse, NY 13202
Telephone: (315) 218-8000
Facsimile: (315) 218-8100
Email: jfellows@bsk.com
　　　glowe@bsk.com

*Local Counsel for Lead Plaintiffs and the
Proposed Class*

41