IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **CHRISTINA LEWIS, Individually and on Behalf of All Others Similarly Situated,**<br><br>　　　　　　　　　　**Plaintiff,**<br><br>　v.<br><br>**YRC WORLDWIDE INC.,** *et al.*,<br><br>　　　　　　　　　　**Defendants.** | No. 1-19-cv-00001-GTS-ATB |

## DEFENDANTS' REPLY MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS LEAD PLAINTIFFS' AMENDED COMPLAINT

Dan French
David G. Burch, Jr.
Barclay Damon LLP
125 East Jefferson Street
Syracuse, NY  13202
Tel:  (315) 425-3700
Fax:  (315) 425-2701

Ralph C. Ferrara (*pro hac vice*)
Ann M. Ashton (*pro hac vice*)
Proskauer Rose LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C.  20004
Tel:  (202) 416-6800
Fax:  (202) 416-6899

Jonathan E. Richman (*pro hac vice*)
Proskauer Rose LLP
11 Times Square
New York, New York  10036
Tel:  (212) 969-3000
Fax:  (212) 969-2900

Counsel for Defendants

August 30, 2019

**TABLE OF CONTENTS**

*Page*

TABLE OF AUTHORITIES ..................................................................................... iii

PRELIMINARY STATEMENT .................................................................................1

ARGUMENT...............................................................................................................2

I.    PLAINTIFFS HAVE NOT PLED A STRONG INFERENCE OF SCIENTER.................2

      A.    Principles for Establishing Scienter for Individuals and Corporations ...................2

      B.    No Evidence of Conscious Misbehavior or Recklessness.......................................4

      C.    No Scienter from Knowledge of the DOJ Investigation..........................................5

      D.    No Scienter from Alleged Disclosure Duties ...........................................................9

      E.    No Scienter Under the "Core Operations" Theory ...................................................9

      F.    No Scienter from SEC Filings and SOX Certifications.........................................11

      G.    No Showing of Scienter Based on Motive and Opportunity ..................................12

            1.    No Scienter from Standard Corporate Objectives .....................................12

            2.    No Scienter from Stock Sales .....................................................................13

II.   PLAINTIFFS HAVE NOT ESTABLISHED ANY MISCONDUCT *DURING* THE CLASS PERIOD..................................................................................................15

III.  PLAINTIFFS HAVE NOT PLED A MATERIAL MISREPRESENTATION OR OMISSION. ..............................................................................................................18

      A.    No Duty to Disclose the Alleged "Overcharge Scheme" or DOJ Investigation ...............................................................................................................19

      B.    No Misrepresentations About Pricing ....................................................................19

      C.    No Misrepresentations About Reported Financial Results....................................21

      D.    No GAAP Violations from Nondisclosure of DOJ Investigation ..........................22

      E.    No Misstatements About Rerate Reserves ..............................................................23

      F.    No Misstatements in YRC's SOX Certifications ...................................................24

G.    No Misstatements About Conformance to GAAP or Compliance with Laws.............................................................................................................24

CONCLUSION...........................................................................................................................26

## TABLE OF AUTHORITIES

*Page(s)*

CASES:

*Alpine Bank v. Hubbell,*
    555 F.3d 1097 (10th Cir. 2009) ....................................................................................20

*Barrett v. PJT Partners Inc.,*
    2017 WL 3995606 (S.D.N.Y. Sept. 8, 2017) ................................................................2, 3

*Brody v. Transitional Hosps. Corp.,*
    280 F.3d 997 (9th Cir. 2002) .......................................................................................20

*Chill v. Gen. Elec. Co.,*
    101 F.3d 263 (2d Cir. 1996) .........................................................................................12

*Christine Asia Co. v. Ma,*
    718 F. App'x 20 (2d Cir. 2017) ......................................................................................7

*City of Livonia Emps.' Ret. Sys. v. Wyeth,*
    2010 WL 3910265 (S.D.N.Y. Sept. 29, 2010) ..............................................................11

*Cosmas v. Hassett,*
    886 F.2d 8 (2d Cir. 1989) .............................................................................................10

*Das v. Rio Tinto PLC,*
    332 F. Supp. 3d 786 (S.D.N.Y. 2018) ..........................................................................10

*Diamond Triumph Auto Glass, Inc. v. Safelite Glass Corp.,*
    441 F. Supp. 2d 695 (M.D. Pa. 2006)...........................................................................21

*Dutton v. D&K Healthcare Res.,*
    2006 WL 1778884 (E.D. Mo. June 23, 2006) ...............................................................22

*ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.,*
    553 F.3d 187 (2d Cir. 2009) .........................................................................................13

*Emps. Ret. Sys. of City of Providence v. Embraer S.A.,*
    2018 WL 1725574 (S.D.N.Y. Mar. 30, 2018)...............................................................16

*Emps.' Ret. Sys. of Gov't of V.I. v. Blanford,*
    794 F.3d 297 (2d Cir. 2015) .........................................................................................17

*Emps.' Ret. Sys. of Haw. v. Whole Foods Mkt., Inc.,*
    905 F.3d 892 (5th Cir. 2018) ........................................................................................20

*FindWhat Inv'r Grp. v. FindWhat.com,*
  658 F.3d 1282 (11th Cir. 2011) ...................................................................................20

*Freudenberg v. E\*Trade Fin. Corp.,*
  712 F. Supp. 2d 171 (S.D.N.Y. 2010) .........................................................................12

*Friedberg v. Discreet Logic Inc.,*
  959 F. Supp. 42 (D. Mass. 1997)................................................................................14

*Gammel v. Hewlett-Packard Co.,*
  905 F. Supp. 2d 1052 (C.D. Cal. 2012) ......................................................................20

*Gomez v. Bidz.com, Inc.,*
  2010 WL 11508670 (C.D. Cal. May 25, 2010)...........................................................16

*Gregory v. ProNAi Therapeutics, Inc.,*
  297 F. Supp. 3d 372 (S.D.N.Y. 2018) .........................................................................22

*GSC Partners CDO Fund v. Washington,*
  368 F.3d 228 (3d Cir. 2004) .......................................................................................24

*Hubbard v. BankAtlantic Bancorp. Inc.,*
  625 F. Supp. 2d 1267 (S.D. Fla. 2008).......................................................................16

*In re Aceto Corp. Sec. Litig.,*
  2019 WL 3606745 (E.D.N.Y. Aug. 6, 2019) ................................................................9

*In re Advanced Battery Techs., Inc.,*
  781 F.3d 638 (2d Cir. 2015) .......................................................................................12

*In re Alstom SA Sec. Litig.,*
  406 F. Supp. 2d 433 (S.D.N.Y. 2005) .........................................................................11

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.,*
  324 F. Supp. 2d 474 (S.D.N.Y. 2004) ...........................................................................8

*In re Bank of Am. AIG Disclosure Sec. Litig.,*
  980 F. Supp. 2d 564 (S.D.N.Y. 2013),
  *aff'd*, 566 F. App'x 93 (2d Cir. 2014)...........................................................................8

*In re Bioscrip, Inc. Sec. Litig.,*
  95 F. Supp. 3d 711 (S.D.N.Y. 2015),
  *reconsideration denied*, 2015 WL 3540736 (S.D.N.Y. June 5, 2015) .......................7

*In re BISYS Sec. Litig.,*
  397 F. Supp. 2d 430 (S.D.N.Y. 2005) ...........................................................................3

*In re BofI Holding, Inc. Sec. Litig.*,
   2017 WL 2257980 (S.D. Cal. May 23, 2017) ..........................................................17

*In re Bristol Myers Squibb Co. Sec. Litig.*,
   586 F. Supp. 2d 148 (S.D.N.Y. 2008) .....................................................................13

*In re Capstone Turbine Corp. Sec. Litig.*,
   2018 WL 836274 (C.D. Cal. Feb. 9, 2018) ..............................................................17

*In re China Valves Tech. Sec. Litig.*,
   979 F. Supp 2d 395 (S.D.N.Y. 2013) .........................................................................7

*In re Deutsche Bank AG Sec. Litig.*,
   2016 U.S. Dist. LEXIS 96741 (S.D.N.Y. July 25, 2016) ..........................................6

*In re EVCI Colleges Holding Corp. Sec. Litig.*,
   469 F. Supp. 2d 88 (S.D.N.Y. 2006) ..........................................................................7

*In re FBR Inc. Sec. Litig.*,
   544 F. Supp. 2d 346 (S.D.N.Y. 2008) .................................................................21, 22

*In re Ferrellgas Partners, L.P. Sec. Litig.*,
   2018 WL 2081859 (S.D.N.Y. Mar. 30, 2018),
   *aff'd*, 764 F. App'x 127 (2d Cir. 2019)...................................................................10

*In re Hi-Crush Partners L.P. Sec. Litig.*,
   2013 WL 6233561 (S.D.N.Y. Dec. 2, 2013) ...........................................................10

*In re JP Morgan Chase Sec. Litig.*,
   363 F. Supp. 2d 595 (S.D.N.Y. 2005) ........................................................................3

*In re Kindred Healthcare, Inc. Sec. Litig.*,
   299 F. Supp. 2d 724 (W.D. Ky. 2004)......................................................................23

*In re Lions Gate Entm't Corp. Sec. Litig.*,
   165 F. Supp. 3d 1 (S.D.N.Y. 2016) .......................................................................6, 8

*In re Marsh & McLennan Cos., Inc. Sec. Litig.*,
   501 F. Supp. 2d 452 (S.D.N.Y. 2006) .................................................................21, 22

*In re MBIA, Inc., Sec. Litig.*,
   700 F. Supp. 2d 566 (S.D.N.Y. 2010) ......................................................................11

*In re Merck & Co. Sec. Litig.*,
   432 F.3d 261 (3d Cir. 2005) .....................................................................................16

*In re MF Global Holdings Ltd. Sec. Litig.*,
   982 F. Supp. 2d 277 (S.D.N.Y. 2013) ......................................................................23

*In re Moody's Corp. Sec. Litig.*,
   599 F. Supp. 2d 493 (S.D.N.Y. 2009) .......................................................................................3

*In re Oxford Health Plans, Inc.*,
   187 F.R.D. 133 (S.D.N.Y. 1999) ...........................................................................................14

*In re Packaged Ice Antitrust Litig.*,
   723 F. Supp. 2d 987 (E.D. Mich. 2010) ................................................................................18

*In re Petrobras Sec. Litig.*,
   116 F. Supp. 3d 368 (S.D.N.Y. 2015) ...................................................................................24

*In re PSS World Med., Inc. Sec. Litig.*,
   250 F. Supp. 2d 1335 (M.D. Fla. 2002) .................................................................................22

*In re Rockwell Med., Inc. Sec. Litig.*,
   2018 WL 1725553 (S.D.N.Y. Mar. 30, 2018) .......................................................................10

*In re Sanofi Sec. Litig.*,
   155 F. Supp. 3d 386 (S.D.N.Y. 2016) ...................................................................................21

*In re Scholastic Corp. Sec. Litig.*,
   252 F.3d 63 (2d Cir. 2001) ....................................................................................................16

*In re Sci. Atlanta, Inc. Sec. Litig.*,
   754 F. Supp. 2d 1339 (N.D. Ga. 2010),
   *aff'd*, 489 F. App'x 339 (11th Cir. 2012) .............................................................................22

*In re Silicon Graphics Inc. Sec. Litig.*,
   183 F.3d 970 (9th Cir. 1999) .................................................................................................14

*In re SLM Corp. Sec. Litig.*,
   740 F. Supp. 2d 542 (S.D.N.Y. 2010) ...................................................................................23

*In re Vivendi Universal, S.A. Sec. Litig.*,
   2004 U.S. Dist. LEXIS 7015 (S.D.N.Y. Apr. 21, 2004) .......................................................13

*In re Wachovia Equity Sec. Litig.*,
   753 F. Supp. 2d 326 (S.D.N.Y. 2011) ..............................................................................10, 17

*In re Weight Watchers Int'l, Inc. Sec. Litig.*,
   2016 WL 2757760 (S.D.N.Y. May 11, 2016) .......................................................................25

*Ind. Pub. Ret. Sys. v. SAIC, Inc.*,
   818 F.3d 85 (2d Cir. 2016) ....................................................................................................6, 7

*Kalnit v. Eichler*,
   264 F.3d 131 (2d Cir. 2001) ..................................................................................................13

*Kleinman v. Elan Corp.*,
706 F.3d 153 (2d Cir. 2013) ...........................................................................20

*Lenartz v. Am. Superconductor Corp.*,
879 F. Supp. 2d 167 (D. Mass. 2012)...............................................................10

*Malin v. XL Capital Ltd.*,
499 F. Supp. 2d 117 (D. Conn. 2007)................................................................16

*Mandalevy v. BofI Holding, Inc.*,
2018 WL 6436723 (S.D. Cal. Dec. 7, 2018) ......................................................6

*Markman v. Whole Foods Mkt., Inc.*,
2016 WL 10567194 (W.D. Tex. Aug. 19, 2016)...................................6, 20, 21

*Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*,
164 F. Supp. 3d 568 (S.D.N.Y. 2016) ................................................................7

*MHC Mut. Conversion Fund, L.P. v. Sandler O'Neill & Partners, L.P.*,
761 F.3d 1109 (10th Cir. 2014) ........................................................................25

*Mun. Emps.' Ret. Sys. of Mich. v. Pier 1 Imports, Inc.*,
2019 WL 3886843 (5th Cir. Aug. 19, 2019) ......................................................5

*Murphy v. Sofamor Danek Grp. (In re Sofamor Danek Grp., Inc.)*,
123 F.3d 394 (6th Cir. 1977) ...........................................................................21

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
135 S. Ct. 1318 (2015)......................................................................................23

*Panther Partners Inc. v. Ikanos Commc'ns, Inc.*,
681 F.3d 114 (2d Cir. 2012) ..............................................................................6

*Patel v. L-3 Commc'ns Holdings Inc.*,
2016 WL 1629325 (S.D.N.Y. Apr. 21, 2016) ....................................................3

*Pizza Hut, Inc. v. Papa John's Int'l, Inc.*,
227 F.3d 489 (5th Cir. 2000) ...........................................................................20

*Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*,
89 F. Supp. 3d 602 (S.D.N.Y. 2015) ................................................................24

*Plumbers Local No. 200 Pension Fund v. Wash. Post Co.*,
831 F. Supp. 2d 291 (D.D.C. 2011)..................................................................10

*Sachsenberg v. IRSA Inversiones y Representaciones S.A.*,
2018 WL 4308546 (S.D.N.Y. Sept. 10, 2018) ...............................................9, 10

*SEC v. Egan,*
    994 F. Supp. 2d 558 (S.D.N.Y. 2014) ........................................................................22

*SEC v. RPM Int'l, Inc.,*
    282 F. Supp. 3d 1 (D.D.C. 2017)................................................................................7

*Silvercreek Mgmt., Inc. v. Citigroup, Inc.,*
    248 F. Supp. 3d 428 (S.D.N.Y. 2017) ........................................................................3

*Stevelman v. Alias Research Inc.,*
    174 F.3d 79 (2d Cir. 1999) ......................................................................................14

*Stevelman v. Alias Research Inc.,*
    2000 WL 888385 (D. Conn. June 22, 2000)............................................................14

*Stokely-Van Camp, Inc. v. Coca-Cola Co.,*
    646 F. Supp. 2d 510 (S.D.N.Y. 2009) ......................................................................21

*Teamsters Local 445 Freight Division Pension Fund v. Dynex Capital, Inc.,*
    531 F.3d 190 (2d Cir. 2008) .............................................................................2, 3, 4

*Thomas v. Shiloh Indus., Inc.,*
    2017 WL 2937620 (S.D.N.Y. July 7, 2017)...............................................................2

*Todd v. STAAR Surgical Co.,*
    2016 WL 6699284 (C.D. Cal. Apr. 12, 2016) .........................................................17

*Tongue v. Sanofi,*
    816 F.3d 199 (2d Cir. 2016) ....................................................................................23

*Tyler v. Liz Claiborne, Inc.,*
    814 F. Supp. 2d 323 (S.D.N.Y. 2011) ........................................................................9

*Varghese v. China Shenghuo Pharm. Holdings, Inc.,*
    672 F. Supp. 2d 596 (S.D.N.Y. 2009) ......................................................................12

*Williams Elec. Games, Inc. v. Garrity,*
    366 F.3d 569 (7th Cir. 2004) ...................................................................................21

*Zerman v. Ball,*
    735 F.2d 15 (2d Cir. 1984) ......................................................................................21

**STATUTES:**

15 U.S.C. § 78j(b)............................................................................................................*passim*

15 U.S.C. § 78u-4(b)(1)............................................................................................................5

15 U.S.C. § 78u-4(b)(2) ............................................................................................................2

**OTHER AUTHORITIES:**

Fed. R. Civ. P. 9(b) ..................................................................................................................1

SEC Rule 10b-5 ........................................................................................................................1

## PRELIMINARY STATEMENT

Plaintiffs' opposition to Defendants' motion to dismiss fails to establish that Defendants made any material misrepresentations or omissions with the scienter required by 15 U.S.C. § 78j(b) and SEC Rule 10b-5 under the heightened pleading requirements prescribed by the Private Securities Litigation Reform Act of 1995 (the "PSLRA") and Fed. R. Civ. P. 9(b).

Plaintiffs' brief boils down to a single, circular (and erroneous) argument: because YRC Worldwide Inc. ("YRC") allegedly engaged in a scheme to overcharge customers, and because top management purportedly knew about it, YRC's statements during the Class Period were false or misleading for failing to disclose the alleged scheme. Plaintiffs' case thus depends on whether the Amended Complaint (the "Complaint" or "AC") adequately pleads that the alleged scheme occurred during the Class Period and, more important, that Defendants actually knew about it.

The Complaint, however, does *not* adequately plead the existence of a wide-ranging "overcharge scheme" during Class Period; nor does it contain particularized allegations showing that YRC's management actually knew about any such alleged conduct. Without such allegations of knowledge, Plaintiffs cannot establish that YRC's challenged statements were false or misleading for not disclosing the alleged scheme and the ten-year Department of Justice (the "DOJ") investigation, which had already been proceeding without any sign of progress for five years *before* the Class Period began. Nor can Plaintiffs establish that Defendants acted with the requisite scienter even if any of YRC's statements had been false or misleading.

Because Plaintiffs' misrepresentation theory ultimately turns on Defendants' state of mind, and because Plaintiffs need to prove scienter to prevail, this brief will address scienter issues first and then show that no misrepresentations or omissions occurred in any event.

## ARGUMENT

### I.    PLAINTIFFS HAVE NOT PLED A STRONG INFERENCE OF SCIENTER.

YRC's opening brief [at 29-30] showed that Plaintiffs cannot prevail on their claims without pleading "with particularity facts giving rise to a strong inference" of scienter – knowing or reckless misconduct.  15 U.S.C. § 78u-4(b)(2).  Plaintiffs have not overcome that high hurdle. They have not adduced evidence of Defendants' conscious misbehavior or recklessness; they cannot establish scienter based on YRC's alleged knowledge of the DOJ investigation, YRC's alleged disclosure duties, the "core operations" theory, or YRC's SEC filings and SOX certifications; and they have not shown Defendants' motive and opportunity to commit fraud.

### A.    Principles for Establishing Scienter for Individuals and Corporations

Plaintiffs do not dispute that scienter cannot be established through group pleading. [YRC Br. at 30]  Thus, to hold the Individual Defendants liable, Plaintiffs must plead facts creating a strong inference of scienter for *each* of them individually.

But Plaintiffs misconstrue the test for establishing corporate scienter.  Plaintiffs [at 39] recite the controlling standard from *Teamsters Local 445 Freight Division Pension Fund v. Dynex Capital, Inc.*, 531 F.3d 190, 195 (2d Cir. 2008), quoted in YRC's opening brief [at 30], but they then misapply it, insisting [at 39-40] that even lower-level managers' or employees' knowledge can be attributed to YRC.  Plaintiffs are incorrect for at least two reasons.

First, only *corporate-level* management employees' knowledge can be attributed to a corporation for scienter purposes. *See, e.g., Thomas v. Shiloh Indus., Inc.*, 2017 WL 2937620, at *3 (S.D.N.Y. July 7, 2017); *accord, e.g., Barrett v. PJT Partners Inc.*, 2017 WL 3995606, at *7 (S.D.N.Y. Sept. 8, 2017).  None of the relevant persons named in the cited AC ¶¶ 62-86, 105,

117-120, and 130-168 – other than Mr. Welch – was a management-level employee at the corporate level during the Class Period, so their alleged knowledge cannot be ascribed to YRC.[1]

Second, even if lower-level employees' knowledge could ever bind a corporation, the Complaint does not assert that any of the persons named in the cited paragraphs (other than Mr. Welch) made any misstatement or omissions, or knew of or was involved in preparing those allegedly made by anyone else. "The determinative question" for scienter-attribution purposes is whether the employee "was involved in [the company's alleged misstatements], not whether he was involved in [the underlying conduct that purportedly made those statements false]." *Barrett*, 2017 WL 3995606, at *8; *accord Silvercreek Mgmt., Inc. v. Citigroup, Inc.*, 248 F. Supp. 3d 428, 440 (S.D.N.Y. 2017) ("[I]t is not enough to *separately* allege misstatements by some individuals and knowledge belonging to some others where there is no strong inference that, in fact, there was a connection between the two."). None of the employees here satisfies that requirement.[2]

---

[1]   The table attached as Appendix A lists all persons named in the cited paragraphs of the Complaint. The table attached as Appendix B lists YRC's senior executives during the Class Period. No relevant overlap between the two lists exists, except as to Mr. Welch. The only other overlapping person is Howard Moshier, but the Complaint does not allege that he knew of or participated in any alleged misconduct or made any alleged misstatements. Rather, he is mentioned solely as someone to whom a lower-ranking person (Dean Frye) "reported," but the Complaint does not plead that Mr. Frye conveyed any information to Mr. Moshier. [AC ¶ 156] Moreover, Mr. Frye is not alleged to have worked at YRC past October 2009, some 4½ years *before* the Class Period began. [*Id.* ¶ 63 & n.4]

[2]   Plaintiffs' cited cases [at 39-40] are inapposite for at least two reasons. First, in some of them, the lower-level employees' alleged knowledge was bolstered by allegations of top executives' knowledge. *See In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 515-16 (S.D.N.Y. 2009) (CEO's scienter); *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 601, 627-28 (S.D.N.Y. 2005) (corporate officer's scienter). Second, the employees in other cases had been directly involved in *making* the challenged misstatements or omissions. *See Patel v. L-3 Commc'ns Holdings Inc.*, 2016 WL 1629325, at *14-15 (S.D.N.Y. Apr. 21, 2016) (imputing scienter from individual defendant CFO of business segment who allegedly had intentionally made accounting misstatements); *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 443-44 (S.D.N.Y. 2005) (imputing scienter from regional vice president where allegations were bolstered by allegations about senior managers who had been directly involved in financial misstatements). Plaintiffs' citation to *Dynex Capital* only confirms YRC's point. The Second Circuit there

Plaintiffs therefore are left with only the four Individual Defendants, but Plaintiffs have not pled particularized facts creating a strong inference of scienter as to any of them.

## B.    No Evidence of Conscious Misbehavior or Recklessness

Plaintiffs' brief [at 32] is devoid of *any* allegation that Mr. Hawkins, Mr. Pierson, or Ms. Fisher knew anything about the purported "overcharge scheme," and Plaintiffs have not pled particularized facts creating a strong inference that Mr. Welch did, either.

Mr. Welch was YRC's CEO between July 2011 and April 2018 and had been CEO of Yellow Transportation ("Yellow") between 2000 and 2007; he was not at YRC or any related entity between 2007 and July 2011. [AC ¶ 26] As YRC's opening brief showed [at 31], the sole factual allegation about Mr. Welch concerns a single conversation at a single meeting in 2013, *before* the Class Period began. [AC ¶ 131] Even if one assumes the truth of that allegation, it still involves only one objection by one employee (CW 1), who is not alleged to have known about any activities except those at one terminal in California. [*Id.* ¶¶ 130-32]

The only other two allegations concerning Mr. Welch are entirely conclusory, without any factual details – and they too involve events many years *before* the Class Period began.

- Paragraph 67 alleges that, in 2005 – nine years before the Class Period began – a Yellow official said that an email proposing the elimination of negative reweigh corrections "would be discussed" with Mr. Welch. But the Complaint does not allege that the proposal ever was discussed with Mr. Welch – or that he approved it.

- Paragraph 74 conclusorily alleges that "Yellow's executive leadership, including its President, Defendant Welch, ultimately decided to . . . stop making negative reweigh corrections." But the Complaint does not plead any *facts* showing that Mr. Welch was actually involved in making that decision, which purportedly took place in 2006 [¶¶ 75-76], eight years before the Class Period began.

---

*declined* to impute scienter to the corporation in the absence of any connection between the executive who had made the alleged misstatement and the lower-level employees who had allegedly known about and engaged in the underlying misconduct. 531 F.3d at 197 (no scienter where no evidence that executives "responsible for the statements made to investors had reason to believe that [lower-level] employees were systematically [engaging in wrongdoing]").

4

Moreover, the Complaint [¶ 106] alleges that, since approximately November 2008 – six years before the Class Period began, and after Mr. Welch had left Yellow in 2007 – Yellow and Roadway Express started "disregard[ing] minor weight corrections – both upward and downward – if they are less than about 30-40 pounds." As YRC's opening brief showed [at 9 n.3], the average weight per shipment is roughly 1,200 pounds, so variations of 30-40 pounds are *de minimis*. Plaintiffs also admit that YRC changed its weighing procedures in 2011 [AC ¶ 145], four years after Mr. Welch left Yellow in 2007. And by 2014 (the first year of the Class Period), YRC was citing new dimensioners – which measure shipments' dimensions and estimated weight – as among its principal capital expenses. [2014 10-K at 37 (Alonzo Decl. Ex. B)] These developments further undercut any inference of Mr. Welch's scienter in 2014-2018 based on alleged events dating back to Mr. Welch's prior tenure at Yellow in 2005 and 2006.

The PSLRA requires a plaintiff to "state with particularity all *facts*" supporting allegations pled on information and belief. 15 U.S.C. § 78u-4(b)(1) (emphasis added). But Plaintiffs' Complaint does not plead *any* facts as to Mr. Welch's alleged knowledge, except in ¶ 131 – and that single paragraph is insufficient to create a strong inference of Mr. Welch's knowledge of a company-wide "overcharge scheme" *and* the concomitant alleged falsity of YRC's public statements *during* the Class Period. *See, e.g., Mun. Emps.' Ret. Sys. of Mich. v. Pier 1 Imports, Inc.*, 2019 WL 3886843, at *5 (5th Cir. Aug. 19, 2019) ("[E]vents that took place outside of the Class Period . . . cannot establish scienter.").

### C.    No Scienter from Knowledge of the DOJ Investigation

Plaintiffs argue [at 32] that the Individual Defendants' alleged knowledge of the long-running DOJ investigation creates an inference of scienter. As YRC's opening brief explained [at 31], however, alleged knowledge of an undisclosed governmental investigation cannot create

a strong inference of scienter unless a *clear* obligation to disclose that investigation existed. But

no such obligation – and certainly no *clear* obligation – existed here.

YRC's brief showed [at 20-23] why YRC did not have any obligation to disclose the DOJ

investigation under general disclosure principles, ASC 450, or Item 303 of SEC Regulation S-K.

- Government investigations, without more, do not trigger a disclosure duty. *In re Lions Gate Entm't Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 12 (S.D.N.Y. 2016); *see also Mandalevy v. BofI Holding, Inc.*, 2018 WL 6436723, at *7 (S.D. Cal. Dec. 7, 2018) (no obligation to disclose SEC investigation where "no allegations that the SEC had made it known that it was contemplating filing suit or bringing charges"); *Markman v. Whole Foods Mkt., Inc.*, 2016 WL 10567194, at *8 (W.D. Tex. Aug. 19, 2016) (no obligation to disclose state investigations in absence of allegations explaining how those investigations "rendered specific statements made by Defendants materially misleading").

- ASC 450 does not require disclosure without a "probability" that an unasserted claim will be asserted or a "reasonable possibility" that a manifested claim will be asserted. Here, the DOJ was simply investigating; it had not manifested an intention to sue, so YRC had no reason to believe that a suit was probable. But even if the DOJ's investigation itself could be construed as a manifestation of a potential claim, Plaintiffs still have not pled any facts showing that YRC actually believed that a suit was reasonably possible – especially inasmuch as the investigation had dragged on for nearly ten years *without* the assertion of any claim.

- Item 303 requires "*actual knowledge* of the relevant trend or uncertainty" that purportedly must be disclosed. *Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 95 (2d Cir. 2016) ("*SAIC*") (emphasis added). "It is not enough that [the company] *should have known* of the existing trend, event, or uncertainty." *Id.* (emphasis added). Plaintiffs have not pled any facts showing YRC's *actual knowledge* of the underlying "overcharge scheme" or the DOJ's intention to sue.[3]

The cases that Plaintiffs cite [at 17-19, 25-27, 32-34] are inapposite, because – unlike

here – all of them involved the defendants' alleged *actual knowledge* of the underlying conduct

---

[3]   Plaintiffs' cited cases [at 18-19] are not on point because those cases involved *known* risks and uncertainties that threatened the companies' overall business operations. *See Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 121 (2d Cir. 2012) (Item 303 required disclosure of known product defect that threatened *all* products sold to 72% of company's customers); *In re Deutsche Bank AG Sec. Litig.*, 2016 U.S. Dist. LEXIS 96741, at *39, *98 (S.D.N.Y. July 25, 2016) (Item 303 required disclosure of bank's massive exposure to residential mortgage-backed securities during 2007 financial crisis where plaintiffs alleged that securities' deterioration "had *already* come to fruition" at time of securities offerings) (emphasis added).

6

and the likelihood of a lawsuit, and, in some of those cases, the defendants allegedly had

misleadingly implied that *no* investigations were pending.

- The *SAIC* case held that disclosure of a criminal investigation was required because a criminal complaint had already been filed against company employees, the complaint had alluded to SAIC's "improper actions," the Mayor of New York City had announced the reevaluation of SAIC's contracts with the City, and SAIC's own, completed internal investigation had found possible fraud.  818 F.3d at 93-94.

- Disclosure of government investigations was required in *SEC v. RPM International, Inc.*, 282 F. Supp. 3d 1, 7-8, 20-22 (D.D.C. 2017), because RPM had received a sealed *qui tam* complaint, had calculated a material amount of overcharges, had made settlement offers acknowledging material liability, and had disregarded its auditor's advice to disclose the investigations.

- Disclosure was required in *Menaldi v. Och-Ziff Capital Management Group LLC*, 164 F. Supp. 3d 568, 574, 584 (S.D.N.Y. 2016), because the company had said that *no* material proceedings were pending even though it had known about the SEC and DOJ investigations, and it had then restated and changed its disclosures *before* any suit was filed, thereby conceding the inaccuracy of its prior disclosures.

- Disclosure was required in *In re Bioscrip, Inc. Securities Litigation*, 95 F. Supp. 3d 711, 721-22, 724, 726 (S.D.N.Y. 2015), *reconsideration denied*, 2015 WL 3540736 (S.D.N.Y. June 5, 2015), because the company had said "'[t]here can be no assurance that we will not receive subpoenas or be requested to produce documents in pending investigations'" even though it had already received civil investigative demands from the DOJ, FBI, and other governmental agencies and had taken a $15 million litigation reserve in light of those investigations.

- Disclosure was required in *In re China Valves Technology Securities Litigation*, 979 F. Supp. 2d 395, 402, 409 (S.D.N.Y. 2013), because the SEC had already issued a cease-and-desist order finding multiple FCPA violations.

- *Christine Asia Co. v. Ma*, 718 F. App'x 20, at *22-23 (2d Cir. 2017), an unpublished, nonprecedential opinion, did not involve a government investigation or threatened litigation but, rather, explicit warnings from high-level regulators in the Chinese government to senior corporate executives that, unless the company changed its business practices, it would be subject to "huge repeating fines."  The court held that the company had a duty to disclose those facts "in a manner that accurately conveyed the seriousness of the problems [it] faced."

- *In re EVCI Colleges Holding Corp. Securities Litigation*, 469 F. Supp. 2d 88, 98-99 (S.D.N.Y. 2006), also involved a state regulator, not an investigation or threat of litigation.  The court held that the company should have disclosed the regulator's

draft report because the regulator had stated its intent not to allow the college to continue operations at a particular site.[4]

Here, in contrast, Plaintiffs do not allege that YRC had internally concluded that misconduct had occurred and that restitution was necessary, that YRC had publicly implied that *no* investigation was pending, that YRC had lost contracts because of the alleged misconduct, that YRC's auditor had urged disclosure of the DOJ investigation, that YRC employees had been prosecuted, that YRC had changed its public statements *before* the DOJ sued, that YRC had concluded that a reserve was needed for anticipated litigation, or that any governmental suit had been filed before YRC disclosed the DOJ's suit on the same day that the DOJ disclosed it [AC ¶ 484]. The DOJ investigation here was nothing more than that: a protracted, nearly ten-year investigation, without any accompanying particularized facts suggesting that YRC actually knew that misconduct had occurred or that a lawsuit would ensue.

In these circumstances, no duty – and certainly no *clear* duty – existed to disclose the DOJ investigation, so mere knowledge of it does not create a strong inference of scienter. *See, e.g.*, *Lions Gate*, 165 F. Supp. 3d at 24 ("Because there is no clear case law that would require the disclosure of the SEC investigation and the Wells Notices in the absence of a pre-existing duty to disclose, the plaintiffs cannot show that the defendants acted in reckless disregard of the securities laws."); *In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 587 (S.D.N.Y. 2013), *aff'd*, 566 F. App'x 93 (2d Cir. 2014).

Moreover, as YRC's opening brief showed [at 32], even those courts that have considered other lawsuits or investigations as part of the scienter analysis have held that the

---

[4]    *In re Atlas Air Worldwide Holdings, Inc. Securities Litigation*, 324 F. Supp. 2d 474, 489-91 (S.D.N.Y. 2004), which Plaintiffs also cite [at 32], did not involve an alleged failure to disclose a governmental investigation.

8

existence of a mere investigation is not sufficient on its own to create a strong inference of scienter. In this case, there is nothing else.

**D.    No Scienter from Alleged Disclosure Duties**

To the extent Plaintiffs seek [at 33] to create a strong inference of scienter based on YRC's nondisclosure of the alleged "overcharge scheme," rather than of the DOJ investigation, that argument also fails. A failure to disclose can show scienter only if Defendants *knew* about the alleged misconduct and *believed* that it subjected YRC to undisclosed risks. But as shown above, no evidence suggests that the Individual Defendants knew about the "overcharge scheme" and actually thought that it posed a material risk to YRC. *See* YRC's opening brief at 30-32.

Moreover, if Plaintiffs take the position [at 13] that they can prevail on their misrepresentation claims without showing that YRC's alleged conduct was illegal, they have not offered any reason why disclosure of that conduct should have subjected YRC to material risks.

**E.    No Scienter Under the "Core Operations" Theory**

Advancing a theory not pled in the Complaint, Plaintiffs argue [at 34-35] that Defendants must have known about the alleged "overcharge scheme" because YRC's shipments are its "*only revenue stream*" and thus constitute a "core operation." This invocation of the so-called "core operations" doctrine fails for multiple reasons.

First, the Second Circuit and District Courts within this Circuit have repeatedly expressed skepticism about that theory's continued viability under the PSLRA's heightened pleading standards. *See, e.g.*, *Sachsenberg v. IRSA Inversiones y Representaciones S.A.*, 2018 WL 4308546, at *9 (S.D.N.Y. Sept. 10, 2018); *Tyler v. Liz Claiborne, Inc.*, 814 F. Supp. 2d 323, 342-43 (S.D.N.Y. 2011). Indeed, earlier this month, a court noted that "the core operations doctrine has been cast into doubt by the Second Circuit following the enactment of the PSLRA" in 1995. *In re Aceto Corp. Sec. Litig.*, 2019 WL 3606745, at *10 (E.D.N.Y. Aug. 6, 2019).

9

Second, even if the doctrine has any remaining viability at all, courts in this Circuit have agreed that it cannot *independently* establish scienter; the most it can do is provide only *supplemental* support to bolster other allegations of scienter. *E.g.*, *Sachsenberg*, 2018 WL 4308546, at *9. Because all other allegations of scienter in the Complaint are insufficient, the core-operations argument fails to contribute to a strong inference of scienter.

Third, Plaintiffs have not pled an appropriate "core operation" in any event. Second Circuit courts applying that doctrine require that the operation constitute "nearly all of a company's business . . . ." *In re Ferrellgas Partners, L.P. Sec. Litig.*, 2018 WL 2081859, at *19 (S.D.N.Y. Mar. 30, 2018), *aff'd*, 764 F. App'x 127 (2d Cir. 2019); *accord, e.g.*, *In re Rockwell Med., Inc. Sec. Litig.*, 2018 WL 1725553, at *14 (S.D.N.Y. Mar. 30, 2018). Plaintiffs' allegations do not meet that standard.[5]

The reweighing issues allegedly occurred at YRC Freight [*e.g.*, AC ¶¶ 5-7, 44-46, 62-129], which produced only about 64% of YRC's revenues [*id.* ¶¶ 46-47] – not "nearly all" of them. *See Plumbers Local No. 200 Pension Fund v. Wash. Post Co.*, 831 F. Supp. 2d 291, 301-02 (D.D.C. 2011) (business segment producing 57.3% to 62.2% of revenues was not core operation under "nearly all" standard); *see also Lenartz v. Am. Superconductor Corp.*, 879 F. Supp. 2d 167, 183 (D. Mass. 2012) (72% to 79% of revenues not evidence of scienter).

---

[5]   Most of Plaintiffs' cited cases [at 35 & n.24] come from outside the Second Circuit. Of the two remaining cases, *Cosmas v. Hassett*, 886 F.2d 8, 12-13 (2d Cir. 1989), is a pre-PSLRA decision that has been criticized by post-PSLRA cases. *See, e.g.*, *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 353 (S.D.N.Y. 2011) (summarizing criticism); *see also Sachsenberg*, 339 F. Supp. 3d at 183. But in any event, the operation at issue in *Cosmas* constituted about 83% of revenue – close to "nearly all." 886 F.2d at 10, 12-13. *In re Hi-Crush Partners L.P. Securities Litigation*, 2013 WL 6233561, at *26 (S.D.N.Y. Dec. 2, 2013), is inconsistent with the weight of authority in this Circuit. Even cases that cite *Hi-Crush* have recited the "nearly all" standard. *See, e.g.*, *Das v. Rio Tinto PLC*, 332 F. Supp. 3d 786, 816 (S.D.N.Y. 2018).

Moreover, the "operation" at issue here concerns reweighing of shipments, not the entire shipping business in general.  Negative reweighs allegedly amounted to only about $24 million per year [Pl. Br. at 1; AC ¶ 9] – a small fraction of YRC's revenues of (for example) more than $5 billion in 2014.  [Alonzo Decl., Ex. B at 22]  Reweighing thus hardly constitutes a "core operation."  And the Complaint [¶ 106] suggests that, since 2008 (six years before the Class Period began), YRC had been disregarding positive and negative reweighs of 30-40 pounds, so reweighs do not appear to have been a focus of attention.

Fourth, Plaintiffs' effort [at 33-34] to use the Individual Defendants' alleged statements about YRC's "rerating pricing strategy" to create an inference of scienter or establish a core operation mischaracterizes the Complaint's allegations.  None of the cited paragraphs [AC ¶¶ 248, 329, 336, 371, 392, 405, 424, 461, 474] alleges that any Individual Defendant said anything about rerating or reweighing.  Rather, as shown below, the quoted statements involved only general, boilerplate comments about pricing.  Plaintiffs' case citations thus are inapposite, because they hold only that, where a defendant makes *specific* statements about a *specific* topic, he or she cannot then claim to have been unaware of important information about that topic.[6]

F.     No Scienter from SEC Filings and SOX Certifications

Plaintiffs argue [at 36-37] that GAAP violations, signatures on SEC filings, and SOX certifications provide evidence of scienter, but – as Plaintiffs' brief concedes – GAAP violations and certifications do *not* constitute evidence of scienter unless "'coupled with evidence of

---

[6]     *See, e.g., City of Livonia Emps.' Ret. Sys. v. Wyeth*, 2010 WL 3910265, at \*6 (S.D.N.Y. Sept. 29, 2010) (defendants who spoke about a specific study can be charged with knowing that it contained adverse data); *see also In re MBIA, Inc., Sec. Litig.*, 700 F. Supp. 2d 566, 591 (S.D.N.Y. 2010) (defendants who discussed specific topic of "RMBS-content of the CDOs-squared" can be charged with knowing negative aspects of RMBS content); *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 460 n.21 (S.D.N.Y. 2005) (defendants who discussed vendor financing arrangements cannot plead ignorance of terms of those arrangements).

11

fraudulent intent . . . .'" [Pl. Br. at 36 (quoting *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 199 (S.D.N.Y. 2010)); *see also Varghese v. China Shenghuo Pharm. Holdings, Inc.*, 672 F. Supp. 2d 596, 608 (S.D.N.Y. 2009) ("GAAP violations do not independently sustain an inference of scienter"). None of Plaintiffs' cited cases found scienter based on GAAP violations, SEC filings, or SOX certifications without *other* evidence showing the defendants' knowledge or reckless disregard that the filings or certifications were inaccurate.

The law is clear that GAAP violations do *not* constitute evidence of scienter. *See, e.g., Chill v. Gen. Elec. Co.*, 101 F.3d 263, 270 (2d Cir. 1996) (GAAP violations or accounting irregularities do not state securities-fraud claim unless accompanied by facts creating strong inference of scienter); *see also In re Advanced Battery Techs., Inc.*, 781 F.3d 638, 645 (2d Cir. 2015) (GAAP violations, without more, do not suggest recklessness). And as YRC's opening brief showed [at 18-19], SOX certifications are "'[b]ased on my [*i.e.*, the signer's] knowledge.'" [AC ¶ 211 (quoting certifications)] Thus, unless the signer had the requisite knowledge, the mere fact that he or she signed a SOX certification adds nothing to the scienter analysis.

**G.   No Showing of Scienter Based on Motive and Opportunity**

Having failed to establish a strong inference of scienter based on evidence of conscious misbehavior or recklessness, Plaintiffs retreat to arguing [at 37-39] that Defendants had motives and opportunity to commit fraud. But this gambit fails as well.

**1.   No Scienter from Standard Corporate Objectives**

Plaintiffs contend [at 38] that Defendants were motivated to engage in the alleged "overcharge scheme" because they wanted to "boost YRC's revenue" and "cut costs," and they also had a motive to conceal the alleged scheme to prevent an "integrity problem." But as YRC's opening brief explained [at 32], "[m]otives that are generally possessed by most corporate directors and officers do not suffice [to create a strong inference of scienter]; instead,

12

plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from the fraud." *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001).

*Every* company wants to boost its revenues and cut its costs, and *every* company wants to preserve its integrity. Those alleged motives are far too generalized to create an inference of scienter. *See, e.g.*, *ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009) ("Motives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, do not constitute 'motive' for purposes of this inquiry.").

*In re Vivendi Universal, S.A. Securities Litigation*, 2004 U.S. Dist. LEXIS 7015, at *29 (S.D.N.Y. Apr. 21, 2004), which Plaintiffs cite [at 38], is inapposite because the motive at issue there was to consummate a *particular* transaction and, in the court's words, was thus "clearly distinguishable from the more general motives that have been held insufficient to support scienter." Similarly, *In re Bristol Myers Squibb Co. Securities Litigation*, 586 F. Supp. 2d 148, 168 (S.D.N.Y. 2008), involved a *particular* transaction during the class period: the company's efforts to secure exclusive rights to a critical "wonder drug." As YRC's opening brief explained [at 33], however, the only *particular* transaction pled here [AC ¶¶ 494-96] took place in February 2014, *before* the Class Period began, so it cannot show motive to commit fraud *during* the Class Period. Plaintiffs have no response to that point.

### 2. No Scienter from Stock Sales

Plaintiffs' effort [at 38-39] to establish a strong inference of scienter based on the Individual Defendants' stock sales is equally unavailing. Plaintiffs have wisely abandoned their effort to cite Mr. Hawkins' and Ms. Fisher's stock sales as evidence of scienter; they focus only on those of Messrs. Welch and Pierson. But those sales were neither unusual nor suspicious.

13

First, Plaintiffs continue to use the wrong metric for analyzing Messrs. Welch's and Pierson's sales. As YRC explained in its opening brief [at 34 n.19], no basis exists to look only at sales of shares "acquired during the Class Period," as Plaintiffs' brief does [at 38]. Rather, as do all the cases cited in Plaintiffs' own brief, courts look at total saleable holdings, regardless of when acquired. Mr. Welch sold only 33% (not 43%) of his total saleable holdings [AC ¶ 28], and Mr. Pierson sold only 40% (not 53%) of his total saleable holdings [*id.* ¶ 35].

Second, Plaintiffs' brief focuses only on the amount of the stock sales, but continues to ignore the extraordinary 57-month length of the Class Period. As YRC's opening brief showed [at 33-34], large sales over long periods are neither unusual nor suspicious. None of the cases that Plaintiffs cite involved anything remotely close to a 57-month period.[7] Plaintiffs' reliance on *In re Silicon Graphics Inc. Securities Litigation*, 183 F.3d 970 (9th Cir. 1999), is particularly perplexing: not only did that case involve only a 15-week class period, *id.* at 982, but the court held that the insiders' sales did *not* raise a strong inference of scienter, *id.* at 989, even though two of the six individual defendants had sold *higher* percentages of their saleable shares (43.6% and 75.3%) than did Messrs. Welch and Pierson (33% and 40%), *id.* at 987.

Third, Plaintiffs again compare Messrs. Welch's and Pierson's sales during the 31 months before the Class Period with their sales during the 57-month Class Period. But as YRC's opening brief noted [at 34 n.19], Plaintiffs cannot legitimately contrast sales during two periods of significantly different lengths.

---

[7]     *See, e.g.*, *Stevelman v. Alias Research Inc.*, 174 F.3d 79, 82 (2d Cir. 1999) (insider sold 40% of holdings on a single day during 11-month putative class period); *Stevelman v. Alias Research Inc.*, 2000 WL 888385, at *1 (D. Conn. June 22, 2000) (noting that original putative class period was 11 months); *see also In re Oxford Health Plans, Inc.*, 187 F.R.D. 133, 136, 139 (S.D.N.Y. 1999) (11-month class period, with $33 million sold in two months before press release that triggered stock drop); *Friedberg v. Discreet Logic, Inc.*, 959 F. Supp. 42, 51 (D. Mass. 1997) (sales were in a secondary public offering, so all at once).

Fourth, Plaintiffs do not even try to address – and have therefore conceded – all the other points in YRC's opening brief [at 34-36] negating any inference of scienter from the stock sales:

- Messrs. Welch's and Pierson's sales must be discounted because of Mr. Welch's impending retirement and Mr. Pierson's resignation;

- Each Individual Defendant more than doubled, or even tripled, his or her reported saleable holdings between the beginning and the end of the Class Period (or his departure from YRC);

- The last reported sales by any Individual Defendant occurred 13 months before the end of the Class Period;

- Mr. Welch did not sell most of his shares at or near the peak price;

- Mr. Pierson *purchased* 35,000 shares during the Class Period; and

- Messrs. Welch and Pierson *purchased* shares in the 31 months before the Class Period even though YRC had allegedly known about the DOJ inquiry since 2009.

Plaintiffs thus have not pled particularized facts creating a strong inference of scienter.

## II.    PLAINTIFFS HAVE NOT ESTABLISHED ANY MISCONDUCT *DURING* THE CLASS PERIOD.

As YRC's opening brief showed [at 8-9], the vast majority of Plaintiffs' allegations about the "overcharge scheme" occurred in 2005-2007, seven to nine years *before* the Class Period started. Apparently realizing this problem, Plaintiffs' brief [at 14-17] largely ignores those allegations. Instead, Plaintiffs now focus on their Confidential Witnesses' (the "CWs'") allegations and contend that, because the Complaint describes the CWs' job titles, tenures, and personal observations with sufficient particularity, the allegations suffice to show that the "overcharge scheme" occurred. [*Id.*] However, *none* of the six CWs provides information to establish that a company-wide reweighing scheme took place *during* the Class Period.

15

First, the CW allegations from *before* the Class Period (made by CW 1, CW 5, and CW 6[8]) do not support an inference that any misconduct occurred *during* the Class Period. Plaintiffs' reliance on *In re Scholastic Corp. Securities Litigation*, 252 F.3d 63 (2d Cir. 2001), and *In re Merck & Co. Securities Litigation*, 432 F.3d 261 (3d Cir. 2005), is misplaced. Those cases involved objective, pre-class-period *data*, not allegations from confidential witnesses who had left the company before the class period began.[9] Additionally, *Scholastic* and *Merck* considered data from the period *immediately* before the beginning of the class periods, but CW 5 and CW 6 left YRC *years* before the Class Period began. [AC ¶¶ 154 (CW 5 left in 2012), 164 (CW 6 left in 2010)][10] Thus, Plaintiffs cannot use CW 5's and CW 6's statements to show what allegedly was happening at the beginning of the Class Period. *See, e.g., Emps. Ret. Sys. of City of Providence v. Embraer S.A.*, 2018 WL 1725574, at *11 (S.D.N.Y. Mar. 30, 2018) (allegations from five years before class period not creditable); *see also Hubbard v. BankAtlantic Bancorp. Inc.*, 625 F. Supp. 2d 1267, 1289-90 (S.D. Fla. 2008) (discrediting allegations from CWs about

---

[8]    Plaintiffs' brief suggests that CW 6 had contact with Mr. Welch. [Pl. Br. at 16 ("CWs 1 and 6 had contacts with YRC's senior management (including Defendant Welch) confirming their knowledge of the Overcharge Scheme.")] But the Complaint lacks any such factual allegations. At most, CW 6 met with a YRC senior director who is not a defendant. [AC ¶ 165]

[9]    *See Scholastic*, 252 F.3d at 72 (evaluating sales data from period immediately before class period); *Merck*, 432 F.3d at 272 (considering pre-class-period data about Merck's market share); *see also Gomez v. Bidz.com, Inc.*, 2010 WL 11508670, at *10 n.11 (C.D. Cal. May 25, 2010) (disregarding allegations of CWs employed before class period; *Scholastic* stands only "for the proposition that pre-Class Period *data* is relevant") (emphasis added).

[10]    Plaintiffs argue [at 16 n.9] that CW 1 worked at YRC during the Class Period because CW 1 "was employed through March 2014," and the Class Period began on March 10, 2014. At most, CW 1's employment overlapped with the 57-month Class Period by only three weeks. And as explained above, CW 1's only time-specific allegation of purported misconduct concerns a single meeting with Mr. Welch in November 2013, four months *before* the Class Period began. [AC ¶ 131] As YRC's opening brief noted [at 10 n.4], the claim that CW 1 "learned [of post-2014 misconduct] through conversations with other YRC employees" [Pl. Br. at 10] is impermissible hearsay. *E.g., Malin v. XL Capital Ltd.*, 499 F. Supp. 2d 117, 139 n.17 (D. Conn. 2007) (allegations by CWs about statements by unnamed supervisors "impermissible hearsay").

pre-class-period financial transaction, because transaction was "at best circumstantial evidence of the Company's lax underwriting procedures at a time prior to the Class Period").[11]

Second, although Plaintiffs contend [at 15] that CW 3 and CW 4 made allegations about conduct that purportedly occurred "throughout" their tenure at YRC, those allegations do not establish misconduct *during* the Class Period.[12]

- The only conduct that allegedly happened "throughout CW 3's tenure" was that "product coming through the Laredo, Texas terminal was weighed by scales on the loading dock, transported by forklift operators." [AC ¶ 139] The allegation that product was weighed does not show any misconduct.

- The Complaint alleges that, "[t]hroughout CW 4's tenure, 'it was [standard operating procedure] not to cut weight back" [*id.* ¶ 144]. But CW 4 says that, in 2011, three years *before* the Class Period began, "digital scales . . . connected (wirelessly) to the YRC mainframe computer to allow all staffers the ability to track and weigh every shipment" were installed at "'most' of the larger YRC processing facilities" [*id.* ¶ 145]. Those new scales replaced the previous weighing systems [*id.*], which allegedly had rejected negative reweigh results [*id.* ¶ 119]. CW 4's statements about the change in scales in 2011 thus undercut his allegations that a common course of conduct took place from 2008 (when he began working for YRC) through 2017 (when he left) [*id.* ¶ 141].[13]

---

[11]    The remaining cases that Plaintiffs cite [at 16-17] to use pre-Class-Period allegations are unavailing. *Employees' Retirement System of Government of Virgin Islands v. Blanford*, 794 F.3d 297, 307 (2d Cir. 2015), involved CW allegations of conduct that took place *during* the class period. *Todd v. STAAR Surgical Co.*, 2016 WL 6699284, at *7 (C.D. Cal. Apr. 12, 2016), held that "descriptions of FDA violations preceding the Class Period do not – by themselves – give rise to securities fraud." And in *In re BofI Holding, Inc. Securities Litigation*, 2017 WL 2257980, at *11 (S.D. Cal. May 23, 2017), a confidential witness recounted a direct quotation from an individual defendant during a meeting that "likely" occurred before the class period – an allegation more probative than any of the allegations made by the CWs here.

[12]    Furthermore, the use of "throughout" is not sufficiently definite, because these CWs did not work at YRC for the entire Class Period. CW allegations "pegged to an indefinite time period . . . render[] the task of matching CW allegations to contrary public statements all but impossible, since allegations about an unspecified time period cannot supply specific contradictory facts available to Defendants *at the time* of an alleged misstatement." *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d at 352.

[13]    The cases that Plaintiffs cite are inapposite. *In re Capstone Turbine Corp. Securities Litigation*, 2018 WL 836274 (C.D. Cal. Feb. 9, 2018), involved a CW who had been hired only one month before the class period started and who left one month before it ended. *Id.* at *3. Additionally, the "scheme" at issue had been triggered by a specific event (the imposition of

Third, although CW 2 worked at YRC during the Class Period, his or her allegations are not sufficient to show company-wide misconduct during that period. As YRC's opening brief explained [at 10-11], CW 2 worked at one terminal in Illinois, and his or her allegations related only to "certain customers[]" at that terminal. [AC ¶ 135] Plaintiffs respond [at 15] that CW 2's allegations need not "identify all aspects of the fraud." But because all of the other CW allegations must be discounted for the reasons described above, Plaintiffs have nothing left except CW 2's terminal-specific allegations. Plaintiffs also try to salvage CW 2 by claiming [at 16] that he or she "directly implicates the corporate office in Overland Park, Kansas." But CW 2's only comment about the corporate office is that photographs taken of freight at YRC's Sauk Village, Illinois facility "were automatically uploaded into a computer system maintained by the corporate office in Overland Park, Kansas." [AC ¶ 136] The fact that a computer system is housed at corporate headquarters does not show a company-wide scheme affecting all YRC terminals (and does not have anything to do with the reweigh scheme underlying the Complaint).

Plaintiffs thus have not pled particularized facts establishing a company-wide "overcharge scheme" *during* the Class Period.

## III.   PLAINTIFFS HAVE NOT PLED A MATERIAL MISREPRESENTATION OR OMISSION.

Because Plaintiffs' allegations of material misrepresentations and omissions depend so heavily on Plaintiffs' unfounded contentions that YRC engaged in Class Period misconduct and that Defendants knew about that alleged misconduct and the significant risk of a DOJ lawsuit, the misrepresentation and omissions allegations fail largely for the reasons stated above.

---

sanctions on Russia following its invasion of Crimea) that occurred at a definite time. *Id.* at *2. Thus, the conduct at issue unquestionably occurred after a specific date. *In re Packaged Ice Antitrust Litigation*, 723 F. Supp. 2d 987 (E.D. Mich. 2010), did not involve misstatements or omissions; it merely referred to a related securities complaint against the corporate defendant.

**A.    No Duty to Disclose the Alleged "Overcharge Scheme" or DOJ Investigation**

Plaintiffs' argument [at 17-19] that Defendants had an affirmative duty under Item 303 to disclose the "overcharge scheme" and the DOJ investigation depends on Plaintiffs' allegations that the purported conduct was occurring during the Class Period and on Defendants' knowledge and state of mind.  As explained above and in YRC's opening brief [at 21-22], Item 303 requires *actual knowledge* of the purported trend, event, or uncertainty.  Plaintiffs have not pled particularized facts showing that the alleged conduct was occurring during the Class Period or that Defendants actually believed that the "overcharge scheme" was probable or even reasonably likely to be a material risk or result in a DOJ suit.

**B.    No Misrepresentations About Pricing**

Plaintiffs' assertion [at 19-23] that YRC's statements about its pricing strategies were false or misleading fails for multiple reasons.

First, Plaintiffs' contention [at 20, 22] expressly turns on what Defendants knew at the time they made the statements.  But as explained above, Plaintiffs have not pled that Defendants actually knew about the "overcharge scheme."

Second, as also explained above, Plaintiffs have not pled facts showing that any misconduct occurred during the Class Period.  Thus, there is no basis for Plaintiffs' assertion [at 22] that the statements "represent[ed] facts that contradict what actually existed at the time."

Third, the generalized comments about YRC's pricing strategy [Pl. Br. at 19-20] were not false or misleading in any event.  As YRC disclosed, its prices *were* based on weight (and other factors), and its operating revenue *was* determined by shipment volume and revenue.  Nor were those statements materially misleading, inasmuch as they did no more than list criteria that YRC considered when setting prices for its shipping services.  Thus, contrary to Plaintiffs' contention, "no reasonable investor could have understood [the statements] to mean anything other than"

19

what they said:  that YRC considered each of those factors in setting prices.  *Kleinman v. Elan Corp.*, 706 F.3d 145, 153 (2d Cir. 2013).[14]

Fourth, many statements that Plaintiffs challenge [at 20-21] constitute inactionable puffery – corporate-speak and marketing slogans.  "'The right freight at the right price'" [*e.g.*, AC ¶ 336] is widely used in the trucking industry and has nothing to do with weight verification.  *See* Appendix C (listing other companies' use of that phrase and of the similar "the right product at the right price").  As YRC's opening brief explained [at 25-26], such clichés do not say anything specific about the pricing of individual shipments or the verification of price amounts; they are generalized slogans that are too amorphous for a reasonable investor to rely upon.  *See, e.g.*, *Markman*, 2016 WL 10567194, at * 3,*8 (statements about "'narrow[ing] the price gap'" and "'competitive price positioning'" did not create duty "to disclose potentially inaccurate . . . prices" and had nothing "to do with whether all of [defendant's] products were *accurately* priced with respect to each product's net weight"); *Gammel v. Hewlett-Packard Co.*, 905 F. Supp. 2d 1052, 1071 (C.D. Cal. 2012) (statement that company would "draw on its deep executive bench to position the right leaders in the right roles" is puffery).[15]

---

[14]    The other cases that Plaintiffs cite [at 21] support that conclusion.  *Brody v. Transitional Hospitals Corp.*, 280 F.3d 997, 1006-07 (9th Cir. 2002), held that the statements at issue were literally true and did *not* "affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists," because they did not "give the impression" that anything beyond what had actually happened occurred.  *FindWhat Investor Group v. FindWhat.com*, 658 F.3d 1282, 1298 (11th Cir. 2011), held that statements that the company "'employ[s] an integrated system that continually monitors traffic quality'" were actionable only because they "create[d] the impression that [the company] maintains an active and sophisticated monitoring system" even though no such system existed.  Plaintiffs do not allege that YRC did *not* consider the factors mentioned in its disclosures (*e.g.*, volume and weight) when it set prices.

[15]    *See also, e.g.*, *Emps.' Ret. Sys. of Haw. v. Whole Foods Mkt., Inc.*, 905 F.3d 892, 901 (5th Cir. 2018) (statements about transparency and product quality are puffery); *Alpine Bank v. Hubbell*, 555 F.3d 1097, 1106-07 (10th Cir. 2009) ("'we'll take care of everything else'" is puffery); *Pizza Hut, Inc. v. Papa John's Int'l, Inc.*, 227 F.3d 489, 498 (5th Cir. 2000) ("'Better Ingredients, Better Pizza'" "epitomizes the exaggerated advertising, blustering and boasting by a

20

## C.    No Misrepresentations About Reported Financial Results

Plaintiffs argue [at 23-25] that, even though YRC accurately reported its financial results, the reported numbers were nevertheless false or misleading because YRC did not truly "earn" the revenue it reported.  But contrary to Plaintiffs' assertions [at 24], YRC "deliver[ed] the goods" needed "to be entitled to payment."  As YRC's opening brief showed [at 12], courts have routinely held that accurate statements of historical results are not actionable even if the actual revenues were achieved through allegedly improper means.[16]  *See Markman*, 2016 WL 10567194, at \*9 (dismissing allegations that store's revenues were improperly inflated because prices "were 'driven' by the sale of items that were inaccurately weighed – and thus . . . sold at higher prices than their actual weights warranted"); *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 404 (S.D.N.Y. 2016) (no § 10(b) violation "[a]bsent an allegation that [company] reported income that it did not actually receive or sales growth that did not actually occur"); *In re FBR*

---

manufacturer upon which no consumer would reasonably rely"); *Zerman v. Ball*, 735 F.2d 15, 20-21 (2d Cir. 1984) (advertising slogan about bonds not actionable because not "representations of fact that could be actionable under the securities laws"); *Stokely-Van Camp, Inc. v. Coca-Cola Co.*, 646 F. Supp. 2d 510, 530 (S.D.N.Y. 2009) (corporate tagline is puffery because "any claim of superiority that could be implied by it would be vague and non specific").

[16]    Plaintiffs contend [at 25 n. 15] that the bribery cases cited in YRC's brief are inapposite because, in those cases, "[w]hile the conduct was illegal, there was no dispute that services for which the defendants were paid (and recognized revenue) were fully performed."  But the same is true here: the Complaint does not allege that YRC recognized revenue for freight that was never delivered, or before delivery was complete.  Moreover, bribes represent increased costs of business for the payor, so they increase the prices charged to customers and thus the revenues received – just as Plaintiffs contend the "overcharge scheme" increased YRC's customers' costs and YRC's revenues.  *See, e.g., Diamond Triumph Auto Glass, Inc. v. Safelite Glass Corp.*, 441 F. Supp. 2d 695, 727 n.24 (M.D. Pa. 2006) (bribe payor "is presumed to increase the price charged"); *see also Williams Elec. Games, Inc. v. Garrity*, 366 F.3d 569, 576 (7th Cir. 2004) (payor "presumably jacked up its prices . . . to cover the cost of the bribes").  Plaintiffs' futile attempt to distinguish bribery cases also fails to explain *In re Marsh & McLennan Cos., Inc. Securities Litigation*, 501 F. Supp. 2d 452, 469-70 (S.D.N.Y. 2006), which arose from an alleged antitrust conspiracy.  Antitrust conspiracies also increase revenues by allegedly increasing prices charged to customers.  *Murphy v. Sofamor Danek Group (In re Sofamor Danek Group, Inc.*, 123 F.3d 394, 401 (6th Cir. 1977), which YRC's brief cited [at 12], also did not involve bribes.

*Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 356 (S.D.N.Y. 2008) ("*Accurate* statements of past earnings figures are not themselves actionable under Section 10(b)."). *In re Marsh*, 501 F. Supp. 2d at 469-70, which Plaintiffs cite [at 14, 24], makes the same point about historical financial results.[17]

Plaintiffs insist [at 24] that YRC's financial results were misleading because a "material source of revenue was generated through the fraud." But the cases they cite for that argument held only that statements about revenue are misleading when they put the *source* of or *reason* for – not the *amount* of – the revenue at issue. The challenged statements here did not do so.

**D.      No GAAP Violations from Nondisclosure of DOJ Investigation**

Plaintiffs' contention [at 25-26] that YRC violated GAAP by not disclosing the DOJ investigation depends once again on whether any misconduct occurred – and whether Defendants knew about it and believed that a probability or even a reasonable possibility of a loss existed. But as shown above, Plaintiffs have not pled any particularized evidence of such knowledge.

Plaintiffs [at 26] also attack YRC's statements about the adequacy of the company's provisions for loss contingencies, but those statements were opinions: "'we *believe* that our financial statements include adequate provisions'" for "'litigation and proceedings to which we are a party.'" [AC ¶ 213 (emphasis added)] *See, e.g., Gregory v. ProNAi Therapeutics, Inc.*, 297 F. Supp. 3d 372, 406 (S.D.N.Y. 2018) ("statements using phrases classically indicative of

---

[17]     The cases on which Plaintiffs rely [at 24] are inapposite because they involved sales that *never* took place or bookings *before* the sales took place. *See SEC v. Egan*, 994 F. Supp. 2d 558, 562-63 (S.D.N.Y. 2014) (defendant recognized revenue from sham sale of software during negotiation period, *before* software had been sold); *In re PSS World Med., Inc. Sec. Litig.*, 250 F. Supp. 2d 1335, 1339 (M.D. Fla. 2002) (defendants manipulated books to recognize revenue *before* receiving goods, or from shipments of goods that were never actually shipped); *In re Sci. Atlanta, Inc. Sec. Litig.*, 754 F. Supp. 2d 1339, 1358-60 (N.D. Ga. 2010) (defendants prematurely recognized revenue in quarter before shipment actually occurred), *aff'd*, 489 F. App'x 339 (11th Cir. 2012); *Dutton v. D&K Healthcare Res.*, 2006 WL 1778884, at *1, 10 (E.D. Mo. June 23, 2006) (defendants pretended to buy products to inflate revenue, although products were held in warehouse on consignment).

opinion such as 'I believe'" are opinions).  Because Plaintiffs have not shown that YRC did *not* have such a belief or that it had information that materially conflicted with its expressed opinions, the opinions were not false or misleading under the securities laws.

Contrary to Plaintiffs' assertion [at 27 n.18], Defendants' mere knowledge of the DOJ investigation did not make the opinion materially misleading.  "An opinion statement . . . is not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way."  *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 1329 (2015); *accord Tongue v. Sanofi*, 816 F.3d 199, 212 (2d Cir. 2016) ("*Omnicare* does not impose liability merely because an issuer failed to disclose information that ran counter to an opinion expressed").  If Defendants did not have reason to believe that the DOJ would sue – and, as explained above, Plaintiffs have not pled particularized facts showing that they did – the lack of mention of the DOJ investigation did not make their opinions materially misleading.

### E.    No Misstatements About Rerate Reserves

For the same reason, Plaintiffs' arguments [at 27-28] about YRC's rerate reserves fail.  As YRC's opening brief showed [at 16], reserves are opinions or estimates, and, as explained above, Plaintiffs have not pled any facts to show that Defendants disbelieved those opinions when expressed.  Plaintiffs' cases holding that the defendants did *not* honestly believe their stated opinions are therefore inapposite.  *See In re MF Global Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 314-15 (S.D.N.Y. 2013); *In re SLM Corp. Sec. Litig.*, 740 F. Supp. 2d 542, 556 (S.D.N.Y. 2010).  Furthermore, as YRC's opening brief explained [at 16], the rerate-reserve disclosures were forward-looking estimates about future events (*i.e.*, the extent to which reweighs might change the revenues recorded), which, like opinions, are not actionable unless the speaker actually knew that the statements were false when made.  *See, e.g., In re Kindred*

*Healthcare, Inc. Sec. Litig.*, 299 F. Supp. 2d 724, 733-34 (W.D. Ky. 2004) ("By their very nature, reserve levels are projections of future events and results."); *see also GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 242 (3d Cir. 2004) ("statement about collectability is a prediction of the likelihood of collection" and thus "a classic forward-looking statement").

### F. No Misstatements in YRC's SOX Certifications

As YRC's opening brief showed [at 18], YRC's SOX certifications were not representations of objective accuracy, but were expressly "'based on [the signers'] knowledge'" [AC ¶ 211 (quoting certification)]. Plaintiffs do not dispute that fact, but contend [at 28 n.20] that the SOX certifications were false because the signers purportedly knew about the alleged "overcharge scheme." For the reasons explained above, however, Plaintiffs have not pled particularized facts showing that the signers actually knew about the alleged "scheme" or about the probability or even reasonable possibility that the DOJ would sue.[18]

### G. No Misstatements About Conformance to GAAP or Compliance with Laws

YRC's opening brief explained [at 24-25, 27-29] that statements about YRC's conformance to GAAP and compliance with laws were opinions and were not false or misleading because Plaintiffs have not pled facts showing that Defendants did not believe those opinions when they were expressed. Plaintiffs respond by arguing [at 29] that the statements were not opinions because they "were not preceded by 'we believe,' 'in our opinion' or any similar equivocation." Although Plaintiffs' examples certainly signal statements of opinion,

---

[18]    In contrast, the cases that Plaintiffs cite [at 29] held that the plaintiffs there *had* sufficiently alleged the certifiers' actual knowledge of facts contrary to their certifications. *Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*, 89 F. Supp. 3d 602, 617 (S.D.N.Y. 2015) (defendant "possessed information contrary to her public statements in the SOX Certifications regarding the adequacy of [company's] revenue recognition practices"); *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 380-81 (S.D.N.Y. 2015) ("[M]anagement was well aware of the extensive corruption in the Company's procurement activities.").

such magic words are not required for statements that, in substance, are opinions. *See, e.g.,* *MHC Mut. Conversion Fund, L.P. v. Sandler O'Neill & Partners, L.P.*, 761 F.3d 1109, 1120 (10th Cir. 2014) (Gorsuch, J.) ("statements not preceded by the word 'opinion' can nevertheless represent opinions rather than facts"); *In re Weight Watchers Int'l, Inc. Sec. Litig.*, 2016 WL 2757760, at *4-6 (S.D.N.Y. May 11, 2016) (noting that "essence of the claim . . . ultimately lies on [defendant's] opinion, whether stated explicitly or implied"). Inasmuch as the statements here were substantively opinions, they are not actionable for the reasons stated above: Plaintiffs have not shown that Defendants knew their opinions were false at the time they were expressed.

The same analysis applies to YRC's statements (in two contracts attached to its 2013 Form 10-K) that it was in compliance with all laws. Moreover, as YRC's opening brief noted [at 28], those compliance statements excluded any potential violations that "would not reasonably be expected to have a Material Adverse Effect." [2013 Form 10-K, Ex. 10.10, art. 5.01, & Ex. 10.11, art. 9.1.7 (Alonzo Decl., Ex. A)] Even if Plaintiffs had adequately alleged the purported "overcharge scheme" and the purported risk from the DOJ investigation, they have not pled particularized facts showing that Defendants were aware of any legal noncompliance in February 2014 and believed that it would have a material adverse effect (as defined in the loan agreements). In addition, the legal-compliance opinions in the agreements were expressed to the banks in February 2014, *before* the Class Period began. The contracts were attached to the 2013 10-K (filed in March 2014) only because the annual report described the loan agreements, not the compliance statements. [*E.g.*, 2013 Form 10-K at 35-36, 68-69]

Plaintiffs therefore have failed to plead a cause of action under § 10(b). And because Plaintiffs have not pled either a primary violation of § 10(b) or culpable participation by any of the Individual Defendants, the claim for control-person liability also fails.

25

## CONCLUSION

For the foregoing reasons, and for those explained in YRC's opening brief, the Court

should dismiss this case in its entirety, and with prejudice.

Dated: August 30, 2019

_____

Dan French
David G. Burch, Jr.
Barclay Damon LLP
125 East Jefferson Street
Syracuse, NY  13202
Tel:  (315) 425-3700
Fax:  (315) 425-2701
dfrench@barclaydamon.com
dburch@barclaydamon.com

Ralph C. Ferrara (*pro hac vice*)
Ann M. Ashton (*pro hac vice*)
Proskauer Rose LLP
Suite 600 South
1001 Pennsylvania Avenue, N.W.
Washington, D.C.  20004
Tel:  (202) 416-6800
Fax:  (202) 416-6899
rferrara@proskauer.com
aashton@proskauer.com

Jonathan E. Richman (*pro hac vice*)
Proskauer Rose LLP
11 Times Square
New York, New York  10036
Tel:  (212) 969-3000
Fax:  (212) 969-2900
jerichman@proskauer.com

Counsel for Defendants

26

# APPENDIX A

## APPENDIX A

### Employees from YRC, Yellow, or Roadway
### Mentioned in Cited Paragraphs of the Amended Complaint[1]

| Name | Position | Reported To | AC ¶¶ |
|---|---|---|---|
| Michael Calvin | • Terminal Manager at YRC | | 156 |
| Jeffrey Carroll | • Terminal Manager at YRC | | 156 |
| Moe Clemmons | • Terminal Manager at YRC | | 156 |
| James Faas | • Director of Weight & Inspection ("W&I") at YRC Freight (2012 to present)<br>• Quality Manager at YRC Freight (2010 to 2012)<br>• Director of W&I (2007 to 2010)<br>• Manager of W&I (2005 to 2007)<br>• W&I Coordinator (2000 to 2005) | • Kelly Kendall (Vice President of Revenue Management at YRC Freight)<br>• Rick Sheafer (Director of Quality)<br>• John Colburn (Vice President of Quality and W&I)<br>• Doug Neiger (Director of Risk Management; Interim Director of W&I) | 86 |
| Dean Frye | • Director of Safety at YRC (January 2007 to October 2009)<br>• Director of Quality Administration and Safety at Roadway (April 2006 to January 2007) | • Howard Moshier (Senior Vice President of Operations at YRC; President at New Penn) | 63, 156, 160 |
| Hugh Gaynor | • North American Transportation Manager, W&I (from 1982) | • James Faas (Director of W&I at YRC Freight) | 72, 77, 79, 81, 84, 142 |

---

[1]    All information is taken from Plaintiffs' allegations in ¶¶ 26, 62-86, 105, 117-120, and 130-68 of the Amended Complaint (the "AC") in *Lewis v. YRC Worldwide, Inc.*, No. 1:19-cv-00001-GTS-ATB (N.D.N.Y.). The AC's references to the "present" presumably mean as of the filing of the AC on June 14, 2019.

| Don Geisler | • Vice President of Marketing at YRC (2009 to 2011)<br>• Vice President of Business Development & Services Marketing at YRC (2007 to 2009)<br>• Director of Service Marketing at Roadway (April 2006 to February 2007)<br>• Manager of Product and Sales Support at Roadway (2005 to 2006) | | 85 |
|---|---|---|---|
| Todd Hacker | • Vice President of Investor Relations and Treasurer (February 2007 and December 2007)<br>• Senior Vice President of Finance and Administration at Yellow (September 2005 and January 2007)<br>• Vice President, Treasurer at YRC (February 2004 to August 2005) | | 67 |
| Mark Hayes | • W&I Manager of West Coast Region at YRC | • James Faas (Director of W&I at YRC Freight) | 142 |
| Phil Lynch | • W&I Manager of East Cost Region at YRC | • James Faas (Director of W&I at YRC Freight) | 142 |
| Steve Post | • W&I Manager for West Coast Region at YRC | • James Faas (Director of W&I at YRC Freight) | 130-31, 142 |
| Keith Rawson | • Director—Procurement and Accounts Payable at YRC (April 2013 to December 2016)<br>• Senior Director for Revenue Management at Yellow Roadway Enterprise Service | | 65, 67, 69-71, 75, 165 |

2

| Mike Smid | • President and Chief Executive Officer of YRC National Transportation (n/k/a/ YRC Frieght) and Chief Operations Officer (2009 to July 2011)<br>• President and Chief Executive Officer of YRC National Transportation (2007 to 2009)<br>• President and Chief Executive Officer at Roadway (2005 to 2007)<br>• President and Chief Executive Officer of YRCW Enterprise Services (2004 to 2005)<br>• Executive Vice President Operations, Chief Accounting Office, and Chief Financial Officer at Yellow (2000 to 2004) | | 68 |
|---|---|---|---|
| Paul Stegall | • W&I Manager at YRC | | 133, 142, 144, 158 |
| James L. Welch | • Chief Executive Officer at YRC (July 22, 2011 to April 30, 2018)<br>• President at YRC Freight (September 2013 to February 27, 2014)<br>• Chief Executive Officer at Yellow (2000 to 2007) | | 26, 67, 74, 131 |
| Joe Whitsel | • Vice President of Cash Management/Finance Shared Services at YRC (January 2010 to January 2017)<br>• Vice President of Revenue Management and Vice President of Business Integration (September 1999 to January 2010) | | 66-67, 69, 71, 73, 75, 83, 85-86 |
| Shanon Wright | • Senior Supervisor at YRC | | 158 |

3

110337967v1

# APPENDIX B

## APPENDIX B

### Table of Executive Officers of YRC During Class Period[1]

| Name | Position |
| --- | --- |
| James L. Welch | • Chief Executive Officer (July 2011 to April 2016) |
| Darren D. Hawkins | • Chief Executive Officer (April 2018 to present)<br>• President and Chief Operating Officer (January 2018 to April 2018)<br>• President of YRC Freight (February 2014 to December 2017) |
| Jamie G. Pierson | • Executive Vice President & Chief Financial Officer (November 2011 to December 2016) |
| Stephanie D. Fisher | • Chief Financial Officer (May 2017 to present)<br>• Acting Chief Financial Officer and Vice President and Controller (January 2017 to May 2017) |
| Michelle A. Friel | • Executive Vice President, General Counsel & Secretary (February 2012 to January 2, 2015) |
| James A. Fry | • Vice President, General Counsel & Secretary (April 2015 to present) |
| Justin M. Hall | • Chief Customer Officer (June 2016 to present) |
| Scott D. Ware | • Chief Network Officer (October 2018 to present) |
| Thomas J. O'Connor | • President of YRC Freight (January 2018 to present) |
| Howard C. Moshier | • Senior Vice President of Operations and Equipment Services, YRC Freight (December 2016 to September 2017)<br>• President, New Penn (September 2017 to present) |

[1] Information is taken from YRC's annual Proxy Statements, which list YRC's executive officers. References to the "present" mean as of the April 2019 Proxy Statement, which was the most recent one issued after the end of the putative Class Period. The 2014, 2015, 2017, and 2019 Proxy Statements were submitted as Exhibits S-V to the previously filed Declaration of Julia D. Alonzo. The 2016 and 2018 Proxy Statements are being submitted as Exhibits A and B to the accompanying Declaration of Jonathan E. Richman.

110256797v1

# APPENDIX C

## APPENDIX C

### Use of "Right Price" in the Trucking Industry

| Company | Quote | Exhibit[1] |
|---|---|---|
| JOC.com (concerning Covenant Transportation) | "Covenant [Transportation] is one of many truckload carriers struggling to find *the right freight at the right price* in the right lane and balance higher rates with higher operating costs." | C |
| FedEx Freight | "We'll put your volume shipments in *the right lane at the right price*." "It's fast and can put your freight in *the right lane at the right price*." "Our strategy is to put *the right freight into the right network at the right price* – it's good for the customer, but also profitable for FedEx. | D, E, F |
| Fleet Equipment Magazine (concerning Kottke Trucking) | "As we grow it is incredibly important to use analytics to make sure we are choosing *the right freight at the right price*," [general manager Kyle] Kottke says. "Using TCG activity-based costing and profitability management software, our revenue per mile has increased by 10.5% in just 18 months because we can make more informed decisions on freight we should haul, freight we shouldn't accept and pricing adjustments." | G |
| Primary Logistics | Less-Than-Truckload: "We will partner your shipment with the *best possible option, for that particularly lane, at the right price*." | H |
| Roadrunner Transportation Systems | "Active On-Demand helps our clients find *the right vehicle in the right place at the right time for the right price*." | I |
| R+L Global Logistics | "Our extensive international shipping experience[] allows us to quickly satisfy charter requirements by identifying *the right carrier with the right schedule at the right price*." | J |
| Schneider National | Less-Than-Truckload: "Our vast network of prequalified carriers and our purchasing power ensure you get *the right carrier at the right price*. We make LTL easy.  It's just that simple." | K |

---

[1] "Exhibit" refers to the exhibits to the accompanying Declaration of Jonathan E. Richman.

| | | |
|---|---|---|
| Supply Chain 24/7 | "As LTL carriers look to be more productive, we're seeing carriers placing a large emphasis on optimizing their networks. With the data, analytics, and tools like dimensionalizers available to them, LTL carriers are paying more attention to accepting *the right freight in the right lanes at the right time.* More isn't absolutely better anymore." | L |
| thinkSTG | "Whether your business requires LTL, FTL, dedicated, intermodal, local cartage, specialized, air, ocean or white glove service, thinkSTG is responsive and committed to quickly providing you *the right transportation solution at the right price.*" | M |
| TechCrunch.com (concerning Trucker Path) | "Trucker Path also says it wants to beef up its enterprise sales force, and to create a fully automated marketplace so truckers won't have to worry about negotiating with shippers or freight brokers. Indeed, ultimately, says [CEO Ivan] Tsybaev, a trucker will be able to tell Trucker Path's app how long he or she will be on the road, and it will immediately provide that person with the '*right freight at the right price.*'" | N |
| UShip | "If we can make it easy for carriers and do it quickly and efficiently – *the right freight at the right price* – that's a big win for us[.]" | O |
| Logistics Management (concerning XPO Logistics) | "Along with significantly upping its carrier base from 4,000 to 26,000, [XPO Logistics CEO and Chairman Bradley S.] Jacobs said [newly acquired] Covered [Logistics & Transportation LLC] will have access to XPO's freight optimizer tool, which takes internal and external information presented in a concise way to its sales staff to guide them on what *the right price should be for a particular load for a particular lane.*" | P |
| Logistics Management | "With Expressive Competition, the aim is achieving a basic level of harmony that puts together: *The right freight, with the right carriers, for the right service, at the right price.* When done thoughtfully and holistically, the resulting network is cost-effective and sustainable—profitable for buyer and seller alike." | Q |

2

## Uses of "Right Price" as Marketing Slogan in Other Industries

| Company | Quote | Exhibit |
|---|---|---|
| Purdue University | "They are the four P's of marketing. [Product; Price; Place; Promotion.] . . . **Price.** *The right product offered at the right price.*" | R |
| Carrefour Group | "*The right product, at the right price,* in the right place." | S |
| Baker Marketing | "[W]e have the *right product, at the right price,* targeting the right person with the right messaging . . . ." | T |
| Oracle | "Identify, up-sell and cross-sell *the right product to the right customer at the right price*[.]" | U |
| Equifax | "The evolution of cross-sell gets back to the basic '4P's' of marketing:  product, price, promotion, and place.  A best practices offer management strategy will offer consumers *the right product at the right price*, and allow front-line employees, in every channel, to clearly communicate the value proposition around why this is the best offer at this time." | V |
| Alta Verde Industries | "'It takes a real professional to find *the right cattle for the right price.*'" *Waterman v. Alta Verde Indus.*, 643 F. Supp. 797, 805 (E.D.N.C. 1986) (emphasis added). | |
| State Farm Mutual Automobile Insurance Co. | State Farm will "'help you find *the right level of coverage at the right price* for your needs.'" *Gelman v. State Farm Mut. Auto. Ins. Co.*, 583 F.3d 187, 189 (3d Cir. 2009) (emphasis added). | |
| Liberty Mutual Insurance Co. | "'[B]ecause we know that every home is different, Liberty Mutual provides homeowners' *insurance covera*ge tailored to your needs so that you, your family and your home are *properly protected at the right price.*'" *Rumick v. Liberty Mut. Ins. Co.*, 2018 WL 3740645, at *2 (N.D. Ill. Aug. 6, 2018) (emphasis added) | |

3

110347132v1

## CERTIFICATION OF SERVICE

I hereby certify that on August 30, 2019, I electronically filed Defendants' Reply Memorandum of Law in Support of Motion to Dismiss with Supporting Papers, with the Clerk of the Court using the CM/ECF system, which will send notifications to all counsel who have made an appearance in this action.

_____
Dan French (4751650)

1

19035834