**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CHRISTINA LEWIS, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> YRC WORLDWIDE INC., JAMES L. WELCH, JAMIE G. PIERSON, STEPHANIE D. FISHER, and DARREN D. HAWKINS, <br><br> Defendants. | Case No. 1:19-cv-00001-GTS-ATB |

**JOINT DECLARATION OF MICHAEL J. WERNKE AND JEFFREY P. CAMPISI**

**I.    INTRODUCTION**

We, Michael J. Wernke and Jeffrey P. Campisi declare and state, under penalty of perjury, that the following is true and correct to the best of our knowledge, information, and belief:[1]

1.    Pomerantz LLP and Kaplan Fox & Kilsheimer LLP are the court-appointed Lead Counsel (or "Class Counsel") for Lead Plaintiffs City of Warwick Retirement Fund and Peter Szabo (collectively "Lead Plaintiffs"). Michael J. Wernke is a Partner at Pomerantz LLP and is duly admitted to practice in New York and before this Court. Jeffrey P. Campisi is a Partner at Kaplan Fox & Kilsheimer LLP and is duly admitted to practice in New York and before this Court. We have personal knowledge of the matters set forth herein and, if called upon, we could and would competently testify thereto.

---

[1] Unless otherwise indicated, all capitalized terms shall have the meanings as set forth in the Stipulation and Agreement of Settlement ("Stipulation"), dated April 12, 2021. ECF No. 96.

1

2.      We submit this Declaration in support of Lead Plaintiffs' Motions for: (1) Final Approval of Proposed Class Action Settlement; and (2) Award of Attorneys' Fees, Reimbursement of Expenses, and Award to Lead Plaintiff, both filed concurrently herewith.   The Court preliminarily approved the Stipulation by its Order Preliminarily Approving Settlement and Providing for Notice, dated April 19, 2021 ("Preliminary Approval Order").  ECF No. 98.

3.      The purpose of this Declaration is to set forth the nature of the investigation, litigation, legal briefing and negotiations that led to the Settlement. In our view, the facts set forth in this Declaration demonstrate why the Settlement is fair, reasonable, and adequate and should be approved by this Court, as well as why Lead Counsel's fees and expense request and award to Lead Plaintiff Peter Szabo are reasonable and should be approved by the Court.

4.      The Stipulation provides for a cash payment by Defendants $2,100,000 in cash into an interest-bearing escrow account in exchange for the release of all claims asserted by Lead Plaintiffs against Defendants, and completely resolves this Action.  On May 14, 2021, YRC paid the Settlement Amount into the Escrow Account.

5.      The Court preliminarily approved the Stipulation by its Order Preliminarily Approving Settlement and Providing for Notice, dated April 19, 2021 ("Preliminary Approval Order").  ECF No. 98.

## II.      PROSECUTION OF THE ACTION

### A.      Background

6.      On January 2, 2019, Christina Lewis filed a securities class action complaint against YRC Worldwide Inc. and several of its present or former officers or directors alleging violations of the Exchange Act.  ECF No. 1.

7.      On April 25, 2019, the Court appointed City of Warwick Retirement Fund and Peter Szabo as Lead Plaintiffs and the law firms of Kaplan Fox & Kilsheimer LLP and Pomerantz LLP as Lead Counsel for the putative Class.  ECF No. 56.

8.      On May 15, 2019, Lead Plaintiffs filed a letter motion to partially lift the PSLRA discovery stay. ECF No. 63. Defendants opposed the motion on the same day. ECF No. 64. On May 23, 2019 the Court held a teleconference and denied the motion, without prejudice, as premature. ECF No. 66

9.      On June 19, 2019, Lead Plaintiffs filed the Corrected Amended Complaint ("Amended Complaint") in the Action against YRC and four of its present or former officers or directors (James L. Welch, Jamie G. Pierson, Stephanie D. Fisher, and Darren D. Hawkins) asserting claims under the Exchange Act.  ECF No. 75.

10.     On July 15, 2019, Defendants moved to dismiss the Complaint in its entirety.  ECF No. 81.

11.     On March 27, 2020, the Court granted Defendants' motion in its entirety and dismissed all claims in the Action.  ECF No. 89.

12.     On April 27, 2020, Lead Plaintiffs filed a notice of appeal to the Second Circuit from the dismissal of the Action.  ECF No. 91.

13.     The Settling Parties fully briefed the appeal, and the Second Circuit tentatively scheduled it for a hearing during the week of March 22, 2021.  *Lewis v. YRC Worldwide Inc. et al.,* No. 20-1427, ECF Nos. 40, 61, 73, 76.

14.     With the appeal pending, the Settling Parties participated in two full days of mediation with a mediation team led by the Honorable Daniel Weinstein (Ret.) of JAMS (the "Mediator" or "Judge Weinstein") and Jed Melnick of JAMS on February 1 and 2, 2021.

15. At the end of the February 2, 2021 mediation session, the Settling Parties accepted Judge Weinstein's mediator's proposal to settle the Action and reached an agreement in principle on the primary terms of a settlement, which was subject to various conditions.

16. On February 5, 2021, the Settling Parties informed the Second Circuit of the status of their settlement negotiations and asked the Second Circuit to remand the case to the Court for eventual consideration of the proposed settlement and to retain jurisdiction over the appeal in case the proposed settlement does not receive final approval. *Lewis v. YRC Worldwide Inc. et al.,* No. 20-1427, ECF No. 83.

17. The Second Circuit granted the motion on February 10, 2021. *Lewis v. YRC Worldwide Inc. et al.,* No. 20-1427, ECF No. 90.

**B.    The Preparation and Filing of the Amended Complaint**

18. Lead Counsel conducted a detailed investigation of YRC and the alleged fraud in connection with researching, preparing, and drafting the Complaint and Amended Complaint.

19. Lead counsel's investigation included, among other things, review and analysis of: (i) YRC's public filings with the U.S. Securities and Exchange Commission (the "SEC"); (ii) research reports disseminated by securities and financial analysts that covered YRC during the Class Period; (iii) transcripts of YRC's conference calls with analysts and investors; (iv) presentations, press releases, and reports regarding the Company; (v) news and media reports concerning the Company and other facts related to the Action; (vi) data reflecting the pricing of YRC securities; (vii) interviews with former employees of YRC and other knowledgeable persons; (viii) consultations with relevant experts, including accounting and damages experts; and (ix) litigations involving YRC, including *United States ex rel. Hannum v. YRC Freight, Inc.; Roadway*

*Express, Inc.; and Yellow Transportation, Inc.*, Civil Action No. 08-0811(A) (W.D.N.Y.) (the "Whistleblower Action").

20.    As discussed above, on June 19, 2020, Lead Plaintiffs filed their Amended Complaint asserting claims against all Defendants under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, and against the Individual Defendants under Section 20(a) of the Exchange Act.  ECF No. 75.  The Amended Complaint alleges that the Company and Individual Defendants represented that the prices YRC charged its customers for transportation were based on the weight of the freight and highlighted the accuracy and integrity of YRC's "reweigh" and "pricing strategy," while in fact, YRC—at the direction of Defendant Welch and communicated Company-wide—utilized its reweigh technology to overcharge its customers.  The Amended Complaint alleges that Defendants engaged in a widespread scheme which meant that if YRC reweighs of customer freight revealed that the actual weight was higher than on the bill of lading, YRC invoiced the customer for the higher/correct weight. However, if the reweigh revealed that the actual weight was lower, YRC blocked its technology from invoicing the customer for the correct weight. As a result of this widespread scheme (the "Overcharge Scheme"), which Defendants acknowledged was against industry norms, YRC reaped approximately $24 million a year for weight/freight it never transported, improperly recognizing it as revenue despite having never provided the services necessary to "earn" the revenue under generally accepted accounting principles ("GAAP").

21.    The Amended Complaint alleges that Defendants' Overcharge Scheme was also illegal. A significant customer of YRC was the U.S. government, including the Department of Defense ("DOD"). In only a two-year period, YRC issued approximately 13,000 false invoices to the DOD alone, in violation of the False Claims Act ("FCA"). As a result, in 2009, the U.S.

Department of Justice ("DOJ") began a massive nine-year investigation of YRC for FCA violations pursuant to which dozens of YRC employees were deposed (including Defendant Welch), hundreds of thousands of pages of documents were produced, leading to multiple settlement negotiations. Despite exposing YRC to hundreds of millions of dollars in penalties, Defendants never disclosed the DOJ Investigation.

22.    The Amended Complaint alleges that on December 14, 2018, the DOJ issued a press release stating that it had filed a Complaint against YRC for "systematically overcharg[ing] the government for freight carrier services and ma[king] false statements to the government that hid their misconduct[.]" On this news, shares of YRC fell over 28%. Shortly thereafter, the Company disclosed for the first time the loss contingency concerning the DOJ Investigation and admitted that the action "could have a material adverse effect on our business, financial conditions and results of operations."

23.    The Amended Complaint alleges that during the Class Period, March 10, 2014 through December 14, 2018, in addition to making specific false and misleading statements about the pricing strategy and reporting inflated financial results based on revenue it never "earned," Defendants (i) failed to disclose its Overcharge Scheme and DOJ Investigation pursuant to Regulation S-K Item 303 as a "known trend or uncertainty" that could have an unfavorable impact on YRC, (ii) failed to disclose the DOJ Investigation as a "loss contingency"; (iii) misrepresented YRC's internal controls as adequate; and (iv) misrepresented that YRC was in compliance with GAAP and "all laws."

24.    Finally, the Amended Complaint alleges that as a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

6

## C.      The Motion to Dismiss

25.      On July 15, 2019, Defendants moved to dismiss the Amended Complaint in its entirety.  ECF No. 81.  Defendants' motion raised numerous complex issues relating to Lead Plaintiffs' claims.  Defendants argued that the Amended Complaint should be dismissed because: (i) Lead Plaintiffs plead no actionable misrepresentations; (ii)  the Amended Complaint alleges no particularized facts to support a cogent and compelling inference that any Defendant acted with scienter; and (iii) Plaintiffs failed to plead control-person liability.

26.      On August 16, 2019, Lead Plaintiffs prepared and submitted a detailed 54-page opposition brief to Defendants' motion to dismiss.  ECF No. 83.  In their opposition, Lead Plaintiffs addressed each of the arguments that Defendants raised. In particular, Lead Plaintiffs argued that:

- the Amended Complaint amply alleges that Defendants made false and misleading statements and statements omissions because:  (a) the Overcharge Scheme occurred during the Class Period and Defendants had an affirmative duty to disclose it and the DOJ investigation; (b) Defendants made false and misleading statements and omissions concerning YRC's pricing strategies in SEC filings, press releases and conferences; (c) Defendants made false and misleading statements and omissions about YRC's reported financial results; (d) Defendants failed to disclose the DOJ investigation as a loss contingency in violation of GAAP; (e) Defendants understated YRC's rerate reserves; (f) Defendants signed numerous certifications pursuant to SOX which were materially false and misleading; and (g) Defendants made materially false and misleading statements about conformance to GAAP and compliance with all laws;

- (ii) the Amended Complaint alleges a strong inference of scienter as to all Defendants because:  (a) Defendant Welch had actual knowledge of the Overcharge Scheme; (b) all Individual Defendants knew of the DOJ Investigation; (c) Defendants' failure to disclose

7

information that they had a clear duty to disclose supports an inference of scienter; (d) Defendants' repeated statements concerning YRC's rerating pricing strategy supports an inference of scienter of the Overcharge Scheme; (e) the "Core Operations" theory supports an inference of scienter; (f) the Defendants' signatures on SEC filings, SOX certifications and weak internal controls support an inference of scienter; (g) Defendants had motive and opportunity; and (h) the Amended Complaint adequately pleads corporate scienter; and

- (iii) the Amended Complaint pleads control person liability.

27. Defendants filed a reply brief on August 30, 2019. ECF No. 84.

28. On December 11, 2019, Defendants filed a Notice of Supplemental Authority with the Court. ECF No. 87. Lead Plaintiffs filed a response on December 13, 2019. ECF No. 88.

29. On March 27, 2020, the Court granted Defendants' motion in its entirety and dismissed all claims in the Action. ECF No. 89.

**D.     The Appeal**

30. On April 27, 2020, Plaintiffs filed a notice of appeal to the Second Circuit from the dismissal of the Action. ECF No. 91.

31. On April 28, 2020, Lead Plaintiffs filed a notice of appeal with the Second Circuit. *Lewis v. YRC Worldwide Inc. et al.,* No. 20-1427, ECF Nos. 1-5.

32. On August 10, 2020, Lead Plaintiffs prepared and filed a detailed 63-page appellate brief. *Lewis v. YRC Worldwide Inc. et al.,* No. 20-1427, ECF No. 40. The brief was accompanied with a 28-page addendum and 204-page Joint Appendix. *Id.* at ECF No. 46.

33. The questions presented on appeal were:

- Did the District Court err when it held that the Amended Complaint for Violation of the Federal Securities Laws was legally deficient for failing to allege a single false statement,

despite the fact that it sets forth detailed allegations challenging Defendants' materially misleading statements and detailed allegations concerning how these statements were materially misleading?;

- Did the District Court err when it held that the Amended Complaint failed to allege that Defendants acted with scienter when Defendants YRC and Welch knew about and approved, or at least recklessly ignored, the illegal scheme?; and

- Did the District Court err in dismissing Plaintiff's control person liability where Plaintiffs adequately alleged primary violation claims under the Exchange Act? *Id.* at ECF No. 40.

34.    Lead Plaintiffs argued that:  (1) the District Court ignored key allegations and disregarded the standards governing motions to dismiss; (2) Lead Plaintiffs' allegations adequately demonstrate Defendant Welch's scienter and YRC's corporate scienter; (3) the District Court erred in finding Defendants' misstatements and omissions inactionable; and (4) Lead Plaintiffs' adequately state a Section 20(a) violation. *Id.*

35.    Defendants filed their appellee brief on November 9, 2020. *Id.* at ECF No. 61.

36.    The Settling Parties filed their respective oral argument statements on November 23, 2020. *Id.* at ECF Nos. 68, 70.  Lead Plaintiffs filed their reply brief on November 30, 2020. *Id.* at ECF No. 73.

37.    The Second Circuit tentatively scheduled it for a hearing during the week of March 22, 2021. *Id.* at ECF No. 76.

38.    On December 16, 2020, the Settling Parties filed a joint information notice with the Second Circuit, informing the Court that the Settling Parties have begun discussing the possibility of trying to resolve this appeal through mediation and have scheduled mediation sessions at the end of January 2021. *Id.* at ECF No. 78.

### E.       Mediation and the Negotiation of the Settlement

39.       On February 1 and 2, 2021, Lead Counsel and Defendants' Counsel participated in two full-day mediation sessions before the Judge Weinstein.

40.       The Settling Parties submitted to the mediator the appellate briefing as well as supplemental mediation statements. During the mediation sessions, both sides had detailed discussions about the merits of Lead Plaintiffs' claims and the defenses to those claims.

41.       At the end of the February 2, 2021 mediation session, the Settling Parties accepted Judge Weinstein's mediator's proposal to settle the Action and the Settling Parties reached an agreement in principle on the primary terms of a settlement, which was subject to various conditions.

42.       The agreement was memorialized in a Settlement Term Sheet which was fully executed on February 2, 2021.  The Settlement Term Sheet sets forth, among other things, the Settling Parties' agreement to fully and finally settle and release all claims that were asserted or could have been asserted in the Action in return for a cash payment by or on behalf of Defendants of $2,100,000.00 for the benefit of the Class.

43.       Thereafter, the Settling Parties negotiated the final terms of the Settlement and drafted the Stipulation and Agreement of Settlement and related settlement papers.

44.       The Stipulation of Settlement (*see* ECF No. 96) was executed on April 12, 2021 and was submitted to the Court as part of Lead Plaintiffs' April 15, 2021 unopposed motion for entry of order preliminarily approving settlement and establishing notices procedures.  *See* ECF Nos. 95-96.

### F.       Preliminary Approval of the Settlement

45.       On April 19, 2021 the Court entered the Preliminary Approval Order, which

preliminarily approved the Settlement, certified the Class for settlement purposes, appointed Lead Plaintiffs as class representatives, appointed Lead Counsel as class counsel and approved dissemination of notice to Class Members.  *See* ECF No. 98.

46.    The Settlement Class is defined as follows:

> all persons and entities who purchased or otherwise acquired YRC Securities during the period from March 10, 2014 through December 14, 2018, inclusive, and who were damaged thereby.  Excluded from the Class are:  such persons or entities who submit valid and timely requests for exclusion from the Class; such persons or entities who, while represented by counsel, settled an actual or threatened lawsuit or other proceeding against one or more of the Releasees arising out of or related to the Released Class Claims; and YRC and (i) all officers and directors of YRC during the Class Period (including James L. Welch, Jamie G. Pierson, Stephanie D. Fisher, and Darren D. Hawkins), (ii) YRC's Affiliates, subsidiaries, successors, and predecessors, (iii) any entity in which YRC or any individual identified in subpart (i) has or had during the Class Period a Controlling Interest, and (iv) for the individuals identified in subpart(s) (i), (ii), and/or (iii), their Family Members, legal representatives, heirs, successors, and assigns.

Stipulation I. ¶ 12; Preliminary Approval Order ¶ 3.

47.    On April 20, 2021, the Court scheduled the Settlement Fairness Hearing for final approval of the Settlement, attorney's fees and expenses, including reimbursement of Lead Plaintiffs' reasonable costs and expenses, and to hear any objections by Class Members, for August 18, 2021, at 11:00 AM.

## III.    RISKS OF CONTINUED LITIGATION

### A.    Risks of Proving Liability

48.    The Settlement provides an immediate and certain benefit to the Class in the form of a cash payment of $2,100,000.00.  As explained below, there were significant risks that Plaintiffs and the Class might recover substantially less than the Settlement Amount—or nothing at all— if the case proceeded through additional years of litigation to a potentially litigated verdict.

49.    Defendants have argued and would continue to argue through appeal (even if Lead Plaintiffs were successful on appeal and the case was remanded to this Court) that Lead Plaintiffs

11

cannot prove:  (1) that the alleged misstatements and omissions were false or misleading; and that (2) Defendants acted with scienter in making each of the alleged misstatements or omissions.

50.    Although Class Counsel believes that they would prevail on all claims on appeal, Class Counsel acknowledges that continued litigation would expose the Class to a risk of no recovery, or a much lower recovery.  As demonstrated by Defendants' motions to dismiss and appeal brief, Defendants dispute, among other things, that any of the alleged misstatements were false or misleading.  In addition, it is well-known that scienter is difficult to prove in securities fraud cases.  Furthermore, the Court dismissed the Amended Complaint in its entirety, agreeing with Defendants on these two elements (falsity and scienter).

51.    Finally, even if Lead Plaintiffs prevailed on appeal and at trial, Defendants might have appealed the decision.  The appeals process can go on for months or even years, significantly prolonging the Action and jeopardizing any recovery awarded to the Class at trial should Defendants be victorious.

52.    In contrast to the foregoing, the Settlement represents an immediate and certain benefit for the Class. Class Counsel, having evaluated the substantial risk, time, and expense required to prosecute this Action through trial and appeals, strongly believes that the Settlement is an excellent result for the Class.

### B.    Other Risks

53.    In order to succeed, Lead Plaintiffs would also have had to prevail at several stages—the pending appeal and another round of motion to dismiss that could potentially end or seriously curtail the Lead Plaintiffs' case, on a motion for class certification, an expected motion for summary judgment, and at trial and, even if Lead Plaintiffs prevailed on all of those, on appeals that were likely to follow. This is a process that could possibly extend for years and might lead

ultimately to a smaller recovery, or no recovery at all.  Indeed, even prevailing at trial would not have guaranteed a recovery larger than the $2,100,000.00 Settlement.

54.    Moreover, there are very real risks that even if Lead Plaintiffs were successful at every stage of the Action, they would not achieve a significant recovery from YRC given its current financial state. In May 2020, YRC announced that there was "substantial doubt" about its ability to stay in business. The Company later received a $700 million loan from the U.S. Treasury under the federal CARES Act in exchange for a 30% interest in YRC, with certain restrictions on the use of the loaned funds. And YRC's insurers disclaimed coverage for the litigation. Accordingly, even if Lead Plaintiffs were to succeed at trial and obtain a judgment in their favor, there is a risk that they would be unable to collect on the judgment as a result of this dispute.

55.    Given these significant litigation risks, Lead Plaintiffs and Lead Counsel believe that the Settlement represents an excellent result for the Class.

**C.    The Settlement is Reasonable in Light of the Potential Recovery in the Action**

56.    The Settlement is also fair and reasonable in light of the potential recovery. Lead Plaintiffs' realistic estimate of maximum damages that they could prove at trial was a range of approximately $23.2-30 million. In contrast, Defendants would have contended that Lead Plaintiffs' damages were greatly overstated, or that there were no damages at all.  Accordingly, the proposed Settlement of $2.1 million, represents approximately 7-9% of Lead Plaintiffs' realistic estimate of maximum damages provable at trial.  This level of recovery is reasonable in light of the significant litigation risks.

**IV.    PLAINTIFFS' COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER REQUIRING ISSUANCE OF NOTICE**

57.    On April 19, 2021, the Court issued the Preliminary Approval Order.  ECF No. 98.

58.    In the Preliminary Approval Order, the Court:

a)      preliminarily approved the Stipulation and the Settlement set forth therein, subject to further consideration at the Settlement Fairness Hearing (which it subsequently set for August 18, 2021. TEXT NOTICE ONLY.)

b)      scheduled a Settlement Fairness Hearing to determine whether the Court should grant final certification of the Action as a class action for settlement purposes and grant final appointment of Lead Plaintiffs as Class representatives and Lead Counsel as counsel for the Class; whether the Court should approve the proposed Settlement as fair, reasonable, and adequate; whether the Court should approve the proposed Plan of Allocation as fair and reasonable; whether an Approval Order and a Judgment, substantially in the forms attached to the Settlement Agreement as Exhibits B and C, respectively, should be entered dismissing the Action on the merits and with prejudice, and whether the Releases in the Settlement Agreement should be provided to the Releasees and Releasors; whether the Court should enter a permanent injunction and bar orders as requested in the Settlement Agreement in the forms set out in the Approval Order, which is attached as Exhibit B to the Settlement Agreement; whether the Court should approve Lead Counsel's application for an Attorneys' Fees and Expenses Award; whether the Court should approve Lead Plaintiff's application for PSLRA Award; and any other matters relating to the approval and implementation of the Settlement Agreement that the Court may deem appropriate.

c)      appointed A.B. Data, Ltd. ("A.B. Data" or "Claims Administrator") to supervise and administer the notice procedure as well as the processing of claims;

d)      approved the form and content of the Postcard Notice, the Long-Form Notice, Claim Form and Summary Notice;

e)      directed A.B. Data to take all reasonable efforts to cause a copy of the Postcard Notice to be mailed by first-class mail or e-mailed to all potential Class Members;

f)      directed A.B. Data to cause the Summary Notice to be published one time in *Investor's Business Daily* as well as on *PR Newswire;*

g)      directed copies of the Long-Form Notice and Claim Form to be mailed as soon as practicable to persons who request copies of the Notice Packet and who assert, in response to the Postcard Notice, Summary Notice, or otherwise, that they are potential Class Members;

h)      directed A.B. Data to establish a website so that potential Class Members can find information relating to the Action and the proposed Settlement and approved nominee procedures;

14

i)  directed Class Counsel to serve on Defendants' counsel and file with the Court proof of such mailing and publication no later than August 11, 2021;

j)  established procedures and deadlines for Class Members to object to the Settlement, Plan of Allocation, award of attorneys' fees, reimbursement of expenses, or award to Class Representatives and to appear at the Settlement Fairness Hearing; and

k)  established procedures and deadlines for Class Members to submit Claim Forms or seek exclusion.

59.    Attached hereto as Exhibit 1 is a true and correct copy of the (Declaration of Eric Nordskog Regarding: (A) Mailing of The Postcard Notice; (B) Publication of The Summary Notice; and (C) Report on Requests for Exclusion And Objections ("Nordskog Decl.")), which sets forth the efforts undertaken by A.B. Data to mail the Postcard Notice, the Long-Form Notice and Claim Form to potential Class Members, to publish the Summary Notice, and to establish the website and Internet notice.

60.    As detailed in the Decl., A.B. Data mailed or caused to be mailed a total of 47,358 Postcard Notices. Nordskog Decl. ¶8

61.    The Summary Notice was posted over *PR Newswire* and published in *Investor's Business Daily* on May 10, 2021. *Id*. at ¶9.

62.    Additionally, A.B. Data posted the Long-Form Notice and Claim Form, the Court's April 19, 2021 Preliminary Approval Order, and the Stipulation on A.B. Data's website. *Id*. At ¶11.

63.    As required by Federal Rule of Civil Procedure 23, due process, and the Private Securities Litigation Reform Act of 1995, Pub. L. No. 104-67, 109 Stat. 737, 15 U.S.C. §78u-4(f)(7) ("PSLRA"), the Long-Form Notice: (a) described the nature of the Action; (b) included the definition of the Class; (c) set forth the Class' claims; (d) described the Settlement's terms; (e)

15

disclosed that Class Counsel intends to seek attorneys' fees of up to one-third of the Settlement Fund, plus reimbursement of expenses up to $140,000 and compensatory awards for the Class Representatives up to $2,500 each; (f) advised Class Members of the right to exclude themselves from the Class and the binding effect of not doing so; (g) provided the deadline and procedure for opting out of the Settlement or opposing the Settlement, Plan of Allocation, award of attorneys' fees, reimbursement of expenses, or awards to the Class Representatives; (h) provided the date, time, and place of the Settlement Fairness Hearing; (i) summarized the reasons why the Parties are proposing the Settlement; and (j) provided the names, telephone numbers, and addresses of Class Counsel. Nordskog Decl., Ex. B.

64.     The notice procedures set forth above satisfied federal due process because they apprised the interested parties of the pendency of the Action and afforded them the opportunity to present their objections.

65.     As set forth in the Preliminary Approval Order, the deadline for Settlement Class Members to file objections to the Settlement, the Plan of Allocation, and/or the Fee and Expense Application, or to request exclusion from the Settlement Class, is July 21, 2021.  As of July 14, 2021, only one request for exclusion, and zero objections to the Settlement, the Plan of Allocation or Lead Counsel's Fee and Expense Application have been received. *See* Nordskog Decl. ¶¶12-13.

66.     Pursuant to the Preliminary Approval Order, Lead Counsel will file reply papers, if any, on August 11, 2021, that will address the requests for exclusion and any objections that may be received after the instant filing.

## V.     ALLOCATION OF THE PROCEEDS OF THE SETTLEMENT

16

67.    Pursuant to the Preliminary Approval Order, and as set forth in the Long-Form Notice, all Settlement Class Members who want to participate in the distribution of the Net Settlement Fund (*i.e.*, the Settlement Fund less (a) any Taxes, (b) any Notice and Administration Costs, (c) any Litigation Expenses awarded by the Court, and (d) any attorneys' fees awarded by the Court) must submit a valid Claim Form with all required information postmarked no later than August 17, 2021. As set forth in the Notice, the Net Settlement Fund will be distributed among Settlement Class Members according to the Plan of Allocation approved by the Court.

68.    Lead Plaintiffs' damages expert developed the proposed Plan of Allocation in consultation with Lead Counsel. Lead Counsel believes that the Plan of Allocation provides a fair and reasonable method to equitably allocate the Net Settlement Fund among Settlement Class Members who suffered losses as result of the conduct alleged in the Complaint.

69.    The Plan of Allocation is set forth at pages 9 to 12 of the Long-Form Notice. *See* Long-Form Notice, attached as Exhibit B to the Nordskog Decl. As described in the Long-Form Notice, calculations under the Plan of Allocation are not intended to be estimates of, nor indicative of, the amounts that Settlement Class Members might have been able to recover at trial or estimates of the amounts that will be paid to Authorized Claimants pursuant to the Settlement. Instead, the calculations under the plan are only a method to weigh the claims of Settlement Class Members against one another for the purposes of making an equitable allocation of the Net Settlement Fund.

70.    In developing the Plan of Allocation, Lead Plaintiffs' damages expert calculated the estimated amount of artificial inflation in the per share closing prices of YRC common stock which allegedly was proximately caused by Defendants' alleged false and misleading statements and material omissions. In calculating the estimated artificial inflation allegedly caused by Defendants' alleged misrepresentations and omissions, Lead Plaintiffs' damages expert considered

the price change in YRC common stock in reaction to the corrective disclosure at the end of the Class Period.

71.     Under the Plan of Allocation, a "Recognized Loss" will be calculated for each purchase or other acquisition of YRC common stock during the Settlement Class Period that is listed in the Claim Form and for which adequate documentation is provided. The calculation of Recognized Loss will depend upon several factors, including when the stock was purchased or acquired and sold, and at what price. In general, the Recognized Loss calculated will be the difference between the estimated artificial inflation on the date of purchase and the estimated artificial inflation on the date of sale, or the difference between the actual purchase price and sales price, whichever is less.

72.     The sum of a Claimant's Recognized Losses is the Claimant's "Recognized Claim" and the Net Settlement Fund will be allocated to Authorized Claimants on a *pro rata* basis based on the relative size of their Recognized Claims.

73.     In sum, the Plan of Allocation was designed to fairly and rationally allocate the proceeds of the Net Settlement Fund among Settlement Class Members based on the losses they suffered on transactions in YRC common stock that were attributable to the conduct alleged in the Amended Complaint. Accordingly, Lead Counsel respectfully submits that the Plan of Allocation is fair and reasonable and should be approved by the Court.

74.     As noted above, as of July 14, 2021, A.B. Data has mailed to potential Class Members, 47,358 Postcard Notices, which direct potential Class Members to the website containing the Claim Form and Long-Form Notice, which contains the Plan of Allocation, and advises Settlement Class Members of their right to object to the proposed Plan of Allocation. S*ee*

18

Nordskog Decl. ¶8. As of July 14, 2021, zero objections to the proposed Plan of Allocation have been received. *Id.* ¶13.

## VI.      THE FEE AND LITIGATION EXPENSE APPLICATION

75.      Lead Counsel is also applying to the Court for an award of attorneys' fees on behalf of Lead Plaintiffs' Counsel not to exceed 27.5% of the Settlement Fund (or $577,500) plus interest earned at the same rate as the Settlement Fund (the "Fee Application"), which is below the one-third of the Settlement Fund that Settlement Class Members were advised in the Notice could be sought.

76.      Lead Counsel also requests reimbursement of expenses that Lead Counsel incurred in connection with the prosecution of the Action from the Settlement Fund in the amount of $116,861.23.  Lead Counsel further requests reimbursement to Lead Plaintiff Peter Szabo in the amount of $2,500 for costs and expenses they incurred directly related to their representation of the Settlement Class pursuant to 15 U.S.C. § 78u-4(a)(4).  The legal authorities supporting the requested fee and expenses are set forth in Lead Counsel's Fee Memorandum. The primary factual bases for the requested fee and expenses are summarized below.

### A.      The Fee Application

77.      For its efforts on behalf of the Settlement Class, Lead Counsel is applying for a fee award to be paid from the Settlement Fund on a percentage basis.  As set forth in the accompanying Fee Memorandum, the percentage method is the appropriate method of fee recovery because it aligns the lawyers' interest in being paid a fair fee with the interest of the Settlement Class in achieving the maximum recovery in the shortest amount of time required under the circumstances and has been recognized as appropriate by the Supreme Court and Second Circuit for cases of this nature.

78.     Based on the quality of the result achieved, the extent and quality of the work performed, the significant risks of the litigation, and the fully contingent nature of the representation, Lead Counsel respectfully submit that the requested fee award is reasonable and should be approved. As discussed in the Fee Memorandum, a 27.5% fee award is fair and reasonable for attorneys' fees in common fund cases such as this and is within the range of percentages awarded in securities class actions in this Circuit with comparable settlements.

### 1.     Lead Plaintiffs Support of the Fee Application

79.     Both Lead Plaintiffs have evaluated the Fee Application and believe it to be reasonable.  Lead Plaintiffs have concluded that Lead Counsel's requested fee is fair and reasonable based on the work performed, the recovery obtained for the Settlement Class, and the risks of the Action. *See* Declaration of Peter Szabo in Support of (A) Lead Plaintiffs' Motion for Final Approval of Class Action Settlement and Plan of Allocation; (B) Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses and Awards to Lead Plaintiffs (the "Szabo Decl."), attached hereto as Exhibit 2, ¶7.  Lead Plaintiffs' endorsement of Lead Counsel's fee request further demonstrates its reasonableness and should be given weight in the Court's consideration of the fee award.

### 2.     The Work and Experience of Counsel

80.     Attached hereto as Exhibit 4 is a declaration from Lead Counsel Pomerantz LLP in support of an award of attorneys' fees and reimbursement of litigation expenses. Exhibit 4 contains a summary chart of the hours expended and lodestar amounts for the firm, as well as a summary of the firm's litigation expenses. Included within the supporting declaration is a schedule summarizing the hours and lodestar of the firm from the inception of the case through and including July 14, 2021, a summary of expenses by category, and a firm resume. No time expended

20

in preparing the application for fees and reimbursement of expenses has been included.

81.    Attached hereto as Exhibit 5 is a declaration from Lead Counsel Kaplan Fox & Kilsheimer LLP in support of an award of attorneys' fees and reimbursement of litigation expenses. Exhibit 5 contains a summary chart of the hours expended and lodestar amounts for the firm, as well as a summary of the firm's litigation expenses. Included within the supporting declaration is a schedule summarizing the hours and lodestar of the firm from the inception of the case through and including July 14, 2021, a summary of expenses by category, and a firm resume. No time expended in preparing the application for fees and reimbursement of expenses has been included.

82.    Attached hereto as Exhibit 6 is a declaration for Local Counsel Bon Schoeneck & King in support of an award of attorneys' fees and reimbursement of litigation expenses. Exhibit 6 contains a summary chart of the hours expended and lodestar amounts for the firm, as well as a summary of the firm's litigation expenses. Included within the supporting declaration is a schedule summarizing the hours and lodestar of the firm from the inception of the case through and including July 14, 2021, a summary of expenses by category, and a firm resume. No time expended in preparing the application for fees and reimbursement of expenses has been included.

83.    As set forth in Exhibits 4-6, Lead Counsel and Local Counsel, combined, has expended a total of 1,858.55 hours in the investigation and prosecution of the Action through and including July 14, 2020. The resulting total lodestar is $1,085,233.25. The requested fee of 27.5% of the Settlement Fund represents $577,500 (plus interest), and therefore represents a multiplier of 0.53 to Lead Counsel's lodestar. We believe that this multiplier is fair and reasonable based on the risks of the litigation, the quality of the representation, and the results obtained.  As discussed in further detail in the Memorandum of Law in Support of Lead Counsel's Motion for an Award of

Attorneys' Fees and Reimbursement of Litigation Expenses and Award to Lead Plaintiff, filed contemporaneously, the requested multiplier is well below the range of fee multipliers typically awarded in comparable securities class actions and in other class actions involving significant contingency fee risk, in this Circuit and elsewhere.

84.     As detailed above, throughout this case, Lead Counsel devoted substantial time to the prosecution of the Action.  Senior attorneys drafted, reviewed and/or edited all pleadings, court filings and other correspondence prepared on behalf of Lead Plaintiffs, communicated with Lead Plaintiffs, engaged with defense counsel on a variety of matters, and were intimately involved in Settlement negotiations. Junior attorneys and paralegals worked on matters appropriate to their skill and experience level.  Throughout the litigation, Lead Counsel maintained an appropriate level of staffing and divided up work in the Action that avoided unnecessary duplication of effort and ensured the efficient prosecution of this litigation.

85.     As demonstrated by the firms' resumes included as Exhibit A to each firm's declaration, Lead Counsel are experienced and skilled law firms in the securities litigation field, with a long and successful track record representing investors in such cases. Founded more than 80 years ago, Pomerantz LLP is acknowledged as one of the premier firms in the areas of corporate, antitrust and securities class litigation.  Kaplan Fox & Kilsheimer LLP has decades of experience in litigating securities class actions and other complex litigation.  We believe Lead Counsel's experience added valuable leverage in the settlement negotiations.

### 3.     Standing and Caliber of Defendants' Counsel

86.     The quality of the work performed by Lead Counsel in attaining the Settlement should also be evaluated in light of the quality of the opposition. Here, Defendants were represented by Proskauer Rose LLP, a capable and respected law firm that vigorously represented

the interests of its clients throughout this Action. In the face of this experienced and formidable opposition, Lead Counsel was nonetheless able to persuade Defendants to settle the case on terms favorable to the Settlement Class.

### 4. The Risks of Litigation and the Need to Ensure the Availability of Competent Counsel in High-Risk Contingent Securities Cases

87.     This prosecution was undertaken by Lead Counsel entirely on a contingent-fee basis.  From the outset, Lead Counsel understood that it was embarking on a complex, expensive, and lengthy litigation with no guarantee of ever being compensated for the substantial investment of time and money the case would require.  In undertaking that responsibility, Lead Counsel was obligated to ensure that sufficient resources were dedicated to the prosecution of the Action, and that funds were available to compensate attorneys and staff and to cover the considerable litigation costs that a case like this requires.  With an average lag time of many years for complex cases like this to conclude, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis. Indeed, Lead Counsel received no compensation during the course of the Action and has incurred over $116,861.23 in litigation expenses in prosecuting the Action.

88.     Lead Counsel also bore the risk that no recovery would be achieved. As discussed above, from the outset, this case presented multiple risks and uncertainties that could have prevented any recovery whatsoever. Despite the most vigorous and competent of efforts, success in contingent-fee litigation like this is never assured. Lead Counsel knows from experience that the commencement of a class action does not guarantee a settlement. To the contrary, it takes hard work and diligence by skilled counsel to develop the facts and theories that are needed to sustain a complaint or win at trial, or to induce sophisticated defendants to engage in serious settlement negotiations at meaningful levels.

89.     Moreover, courts have repeatedly recognized that it is in the public interest to have

experienced and able counsel enforce the securities laws and regulations pertaining to the duties of officers and directors of public companies. As recognized by Congress through the passage of the PSLRA, vigorous private enforcement of the federal securities laws can only occur if private investors, particularly institutional investors, take an active role in protecting the interests of shareholders. If this important public policy is to be carried out, the courts should award fees that adequately compensate plaintiffs' counsel, taking into account the risks undertaken in prosecuting a securities class action.

90.     Lead Counsel's extensive efforts in the face of substantial risks and uncertainties has resulted in a significant recovery for the benefit of the Settlement Class.  In circumstances such as these, and in consideration of the hard work and the result achieved, the requested fee is reasonable and should be approved.

### 5.     The Reaction of the Settlement Class to the Fee Application

91.     As noted above, as of July 14, 2021, 47,358 Postcard Notices have been mailed advising Class Members that Lead Counsel would apply for an award of attorneys' fees on behalf of Lead Counsel in an amount not to exceed one-third of the Settlement Fund plus interest. *See* Nordskog Decl. ¶8.  In addition, the Court-approved Summary Notice has been published in *Investor's Business Daily* and transmitted over the *PR Newswire*. *See id.* ¶9.  As of July 14, 2021, zero objections to the attorneys' fees set forth in the Long-Form Notice have been received. *Id.* ¶ 13.  Should any objections be received, they will be addressed in Lead Counsel's reply papers.

92.     In sum, Lead Counsel accepted this case on a contingency basis, committed significant resources to it, and prosecuted it without any compensation or guarantee of success. Based on the favorable result obtained, the quality of the work performed, the risks of the Action, and the contingent nature of the representation, Lead Counsel respectfully submits that a fee award

of 27.5%, resulting in a multiplier of 0.53, is fair and reasonable, and is supported by the fee awards courts have granted in other comparable cases.

### B.   The Litigation Expense Application

93.   Lead Counsel also seeks reimbursement from the Settlement Fund of 116,861.23 in litigation expenses that were reasonably incurred by Lead Counsel in connection with commencing, litigating and settling the claims asserted in the Action.

94.   From the beginning of the case, Lead Counsel was aware that it might not recover any of their expenses, and, even in the event of a recovery, would not recover any of its out-of-pocket expenditures until such time as the Action might be successfully resolved. Lead Counsel also understood that, even assuming that the case was ultimately successful, reimbursement for expenses would not compensate it for the lost use of the funds advanced by it to prosecute the Action. Accordingly, Lead Counsel was motivated to and did take appropriate steps to avoid incurring unnecessary expenses and to minimize costs without compromising the vigorous and efficient prosecution of the case.

95.   As set forth in Exhibits 4-6 hereto, Lead Counsel and Local Counsel, combined, has incurred a total of $116,861.23 in unreimbursed litigation expenses in connection with the prosecution of the Action. The expenses are summarized in Exhibits 4-6, which identifies each category of expense, *e.g.*, expert fees, mediation fees, on-line research, photocopying, and postage and delivery expenses, and the amount incurred for each category.

96.   Of the total amount of expenses, $35,112.5 or 30%, was expended on Lead Plaintiffs' expert and consultants. As noted above, Lead Plaintiffs retained and consulted an expert in the field of damages to assist in the preparation of the Amended Complaint and the prosecution of the Action. Lead Plaintiffs' damages expert also assisted Lead Counsel during the mediation

25

and settlement negotiations with the Defendants and with the development of the proposed Plan of Allocation.  Furthermore, Lead Plaintiffs retained and consulted with an expert in accounting and U.S. generally accepted accounting principles (GAAP) in connection with the preparation of the Amended Complaint and the prosecution of the Action.

97.     Another large component was for mediation fees. Lead Counsel paid $48,787.20 in mediation fees charged by Judge Weinstein, which is 42% of the total expenses.

98.     The other expenses for which Lead Counsel seeks reimbursement are the types of expenses that are necessarily incurred in litigation and routinely charged to clients billed by the hour.  These expenses include, among others, court fees, local travel costs, copying costs, costs for on-line legal and factual research, and postage and delivery expenses.

99.     All of the litigation expenses incurred by Lead Counsel were reasonable and necessary to the successful litigation of the Action and have been approved by the Lead Plaintiffs. *See* Exhibit 2 (Szabo Decl.) ¶7.

100.     The Long-Form Notice informed potential Class Members that Lead Counsel would be seeking reimbursement of expenses in an amount not to exceed $140,000 The total amount requested, $116,861.23, is well below the $140,000 that Settlement Class Members were advised in the Notice could be sought. As of July 14, 2021, no objection has been raised as to the maximum amount of expenses set forth in the Long-Form Notice.

101.     The expenses incurred by Lead and Local Counsel and Lead Plaintiffs were reasonable and necessary to represent the Settlement Class and achieve the Settlement. Accordingly, Lead Counsel respectfully submits that the litigation expenses should be reimbursed from the Settlement Fund.

## VII.     CONCLUSION

26

102.    For all the reasons set forth above, Lead Plaintiffs and Lead Counsel respectfully submit that the Settlement and the Plan of Allocation should be approved as fair, reasonable and adequate. Lead Counsel further submits that the requested fee on behalf of Lead Counsel in the amount of 27.5% of the Settlement Fund plus interest should be approved as fair and reasonable, the request for reimbursement of total Litigation Expenses in the amount of $116,861.23 and an award to Lead Plaintiff Peter Szabo in the amount of $2,500 should also be approved.

I declare, under penalty of perjury under the laws of the United States, that the foregoing facts are true and correct. Executed this 14th day of July, 2021.

*/s/ Michael J. Wernke*

I declare, under penalty of perjury under the laws of the United States, that the foregoing facts are true and correct. Executed this 14th day of July, 2021.

*/s/ Jeffrey P. Campisi*