**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **CHRISTINA LEWIS, Individually and on Behalf of All Others Similarly Situated,**<br><br>**Plaintiff,**<br><br>v.<br><br>**YRC WORLDWIDE INC., *et al.*,**<br><br>**Defendants.** | No. 1:19-cv-00001-GTS-ATB |

**DECLARATION OF ERIC A. NORDSKOG IN SUPPORT OF**
**MOTION FOR CLASS DISTRIBUTION ORDER**

I, ERIC A. NORDSKOG, declare as follows:

1.      I am a Senior Project Manager of A.B. Data, Ltd.'s Class Action Administration Division ("A.B. Data"), whose corporate office is located in Milwaukee, Wisconsin.  I am over 21 years of age and am not a party to the above-captioned action (the "Action").[1]  I have personal knowledge of the facts set forth herein and, if called as a witness, could and would testify competently thereto.

2.      A.B. Data was retained by Lead Counsel to serve as the Claims Administrator in connection with the Settlement of the Action.  Pursuant to the Court's April 19, 2021, Order Preliminarily Approving Proposed Settlement (ECF No. 98, the "Preliminary Approval Order"), the Court approved the retention of A.B. Data as the Claims Administrator.

3.      As court-appointed Claims Administrator, A.B. Data has, among other things: (a) mailed the Postcard Notice to potential Class Members and brokers and other nominees; (b) created and maintained a toll-free helpline for inquiries during the course of the administration; (c)      designed,      launched,      and      maintained      a      case-specific      website

---

[1]  Unless otherwise defined herein, all capitalized terms have the meanings set forth in the Stipulation of Settlement dated April 12, 2021 ("Stipulation"). ECF No. 96.

(www.YRCSecuritiesSettlement.com, the "Settlement Website"), which includes the option to submit a Claim Form online and provides access to copies of the Stipulation and other relevant Court documents; (d) caused the Summary Notice to be published in *Investor's Business Daily* and transmitted over *PR Newswire* (a national newswire service); (e) provided, upon request, additional copies of the Postcard Notice to brokers, nominees, and potential Class Members; and (f) received and processed Claim Forms.

4.    A.B. Data has completed processing all Claim Forms received through April 1, 2022, in accordance with the terms of the Stipulation and the Court-approved Plan of Allocation set forth in the Notice of (I) Pendency of Class Action and Proposed Settlement; (II) Settlement Fairness Hearing; and (III) Motion for Attorneys' Fees and Litigation Expenses (the "Long Form Notice"), and hereby submits its administrative determinations accepting and rejecting Claims in preparation for a distribution of the Net Settlement Fund to Authorized Claimants.  A.B. Data also presents this Declaration in support of Lead Counsel's Motion for Class Distribution Order.

I.    **DISSEMINATION OF NOTICE**

5.    As more fully described in the Declaration of Eric A. Nordskog Regarding: (A) Mailing of the Postcard Notice; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion and Objections dated July 13, 2021 (ECF No. 100-3), and the Supplemental Declaration of Eric A. Nordskog Regarding: (A) Mailing of the Postcard Notice; (B) Report on Volume of Claims received to Date; and (C) Report on Requests for Exclusion and Objections dated August 11, 2021 (ECF No. 102-2), A.B. Data has fully complied with the Court-approved notice plan.  To date, A.B. Data had disseminated a total of 47,564 Postcard Notices to potential Class Members, brokers, and other nominees.

## II.     PROCEDURES FOLLOWED IN PROCESSING CLAIMS

6.     Under the terms of the Preliminary Approval Order and as set forth in the Postcard Notice, each Class Member who wished to be eligible to receive a distribution from the Net Settlement Fund was required to complete and submit to A.B. Data a properly executed Claim Form postmarked or received no later than August 17, 2021, together with adequate supporting documentation for the transactions and holdings reported therein.  Through April 1, 2022, A.B. Data has received and fully processed 8,733 Claims.

7.     In preparation for receiving and processing Claims, A.B. Data: (a) created a unique database to store Claim details, images of Claims, and supporting documentation; (b) trained staff in the specifics of the Settlement so that Claims would be properly processed; (c) formulated a system to properly and timely respond to telephone and email inquiries; (d) developed various computer programs and screens for entry of Class Members' identifying information, as well as their transactional information; and (e) developed a proprietary "calculation module" that would calculate Recognized Loss Amounts pursuant to the Court-approved Plan of Allocation set forth in the Long Form Notice.

8.     Class Members seeking to share in the Net Settlement Fund were directed in the Postcard Notice to submit their Claims either online or to a post office box address specifically designated for the Settlement.  Postcard Notices that were returned by the United State Postal Service as undeliverable were reviewed for updated addresses and, where available, new addresses were entered into the database and new Postcard Notices were mailed to the updated addresses. Any correspondence received through the post office box was reviewed and, where necessary, appropriate responses were provided to the senders.

3

### III.    PROCESSING PAPER AND ONLINE PROOFS OF CLAIM

9.    Of the 8,733 Claims received by A.B. Data through April 1, 2022, 145 were "hardcopy" or "paper" Claims, 360 were "online" Claims filed through the online filing portal on the Settlement Website, and 8,228 were submitted electronically ("Electronic Claims" or "E-Claims") to A.B. Data's Electronic Claim Filing Team ("ECF Team").[2]  Once received, paper Claims were opened and prepared for scanning.  This manual, labor-intensive process included unfolding documents, removing staples, copying nonconforming-sized documents, and sorting documents.  Once prepared, the paper Claims were scanned as images into the database together with all submitted documentation.  Each Claim was then assigned a unique Claim number.

10.    Following scanning, the information from each Claim, including the Claimant's name, address, account number, and information from his, her, or its supporting documentation, and the Claimant's purchase/acquisition transactions, sale transactions, and holdings listed on the Claim Form, was entered into the database developed by A.B. Data to process Claims.  Next, the documentation provided by each Claimant in support of his, her, or its Claim was reviewed to determine whether the Claimant purchased or otherwise acquired YRC Worldwide Inc. ("YRC") common stock during the period from March 10, 2014, through December 14, 2018, inclusive (the "Class Period").

11.    In order to process the transactions detailed in each Claim, A.B. Data utilized internal codes ("flags") to identify and classify types of Claims and any deficiency or ineligibility conditions that existed within those Claims.  The appropriate flags were assigned to each Claim as it was processed.  For example, where a Claim was submitted by a Claimant who did not have any eligible transactions in YRC common stock, that Claim would receive a flag that noted ineligibility.  Similar flags were used to note other ineligible conditions, such as duplicate Claims.

---

[2] *See* ¶13, *infra*, for an explanation of Electronic Claims.

These flags would indicate to A.B. Data that the Claimant is not eligible to receive any payment from the Net Settlement Fund with respect to that Claim unless the deficiency was resolved in its entirety. Examples of conditions of ineligibility are as follows:

| | |
|---|---|
| MIDOC | Inadequate or Missing Documentation for Entire Claim |
| DUPCL | Duplicate Claim |
| NOPUR | No Eligible Purchases/Acquisitions |
| MISIG | No Signature |
| NOLOS | No Recognized Loss |

12. Because a Claim may be deficient only in part, but otherwise acceptable, A.B. Data utilized flags that were only applied to specific transactions within a Claim. For example, if a Claimant submitted a Claim with supporting documentation for all but one purchase transaction, that one transaction would receive a curable defective flag. That flag indicated that one transaction was deficient, but that the others were otherwise eligible for payment if other transactions in the Claim calculated to a recognized loss according to the Plan of Allocation. Thus, even if the curable deficiency was never cured, the Claim could still be paid. A few examples of transaction-specific flags are as follows:

| | |
|---|---|
| TRNI | Transfer In/Free Receipt |
| INDOC | Missing or Inadequate Documentation for a Specific Transaction |
| INEL | Ineligible Transaction |

## IV.    PROCESSING ELECTRONICALLY FILED CLAIMS

13. Among the 8,733 Claims received by A.B. Data through April 1, 2022, 8,228 were Electronic Claims submitted to A.B. Data's ECF Team. Electronic Claim filers are typically banks, brokers, nominees, and other third-party filers who file Claims on behalf of a large number of Claimants ("E-Claim Filers"). Indeed, the 8,228 E-Claims A.B. Data received were filed by

5

123 E-Claim Filers. Because E-Claim Filers typically submit a high volume of transactions on behalf of the beneficial owners, A.B. Data provides E-Claim Filers with the opportunity to submit a master Claim Form and mail a computer disc or submit an electronic file to A.B. Data—rather than providing reams of paper requiring manual data entry—so that A.B. Data may upload all transactions to its proprietary database developed for the Settlement.

14. The ECF Team coordinated and supervised the receipt and handling of all Electronic Claims. In this case, the ECF Team reviewed and analyzed each electronic file to ensure that it was formatted in accordance with A.B. Data's required format, and to identify any potential data issues or inconsistencies within the electronic file. If any issues or inconsistencies arose, A.B. Data notified the E-Claim Filer. If the electronic file was deemed to be in an acceptable format, it was then loaded into A.B. Data's database.

15. Once the electronic file was loaded, flags were applied to note any deficient or ineligible conditions that existed in each of the Electronic Claims. These flags are similar to those applied to paper Claims. In lieu of manually applying flags, the ECF Team performed programmatic reviews on Electronic Claims to identify deficient and ineligible conditions (such as, but not limited to, price out of range issues, out of balance conditions, and ineligible transactions). The output of assigned flags was thoroughly reviewed and confirmed as accurate.

16. The review process also included flagging any Electronic Claims that were not accompanied by a signed Claim Form and documentation showing the E-Claim Filer had the appropriate authorization to submit Claims on behalf of each Claimant, which would serve as a "Master Proof of Claim Form" for all accounts referenced on the electronic file submitted. Each Master Proof of Claim Form was reviewed by A.B. Data's ECF Team and, where appropriate, A.B. Data contacted the E-Claim Filers whose submissions were missing information. This ensures that only fully completed Master Proof of Claim Forms, submitted by properly authorized

representatives of the Claimants, are considered eligible for payment from the Net Settlement Fund.

17.     Finally, A.B. Data performed various targeted reviews of Electronic Claims, including reviews of high-value Claims in which supplemental information or documentation was requested. These targeted reviews and requests for supplemental information helped to ensure that electronic data supplied by E-Claim Filers did not contain inaccurate information.

## V.     EXCLUDED PERSONS

18.     A.B. Data also reviewed all Claims to ensure that they were not submitted by, or on behalf of, persons who were excluded from the Class by definition, to the extent that the identities of such persons or entities were known to A.B. Data through the list of Defendants, or other excluded persons and entities set forth in the Stipulation and the Notice, and through the Claimants' certifications on the Claims. A.B. Data also reviewed all Claims against the list of persons who were excluded from the Settlement pursuant to request. As a result of this review A.B. Data did not identify any Claims submitted by, or on behalf of, an excluded party.

## VI.     THE DEFICIENCY PROCESS

19.     Approximately 87%, *i.e.*, 437 of the 505, paper and online Claims were incomplete or had one or more defects or conditions of ineligibility, such as not being signed, not being properly documented, or not indicating a transaction in YRC common stock. The "Deficiency Process," which involved mailing letters to Claimants, as well as telephone calls and emails with Claimants, was intended to assist Claimants in properly completing their otherwise deficient or ineligible submissions so they would be eligible to participate in the Settlement.

20.     If a Claim was determined to be deficient or ineligible, a letter was sent to the Claimant describing the defect(s) or condition(s) of ineligibility with his, her, or its Claim and what, if anything, was necessary to cure the defect(s) or condition(s) of ineligibility. The letter

advised the Claimant that the submission of the appropriate information and/or documentary evidence to complete the Claim had to be sent within twenty (20) days from the date of the letter or the Claim would be recommended for rejection to the extent the deficiency or condition of ineligibility was not cured. The letter also advised Claimants that if they desired to contest the administrative determination, they were required to submit a written statement to A.B. Data requesting Court review of their Claim and setting forth the basis for their request. A.B. Data sent letters to Claimants in connection with each of the 437 Claims described in paragraph 19. A sample letter is attached hereto as Exhibit A.

21. Claimants' responses to the deficiency/ineligibility letters were scanned into A.B. Data's database and associated with the corresponding Claim. The responses were then carefully reviewed and evaluated by A.B. Data's team of processors. If a Claimant's response cured the defect(s) or condition(s) of ineligibility, A.B. Data updated the database manually to reflect the changes in the status of the Claim. Of the 437 deficient paper and online Claims, a total of 87 Claims were successfully cured.

## VII. ELECTRONIC CLAIM DEFICIENCY PROCESS

22. Approximately 77%, *i.e.*, 6,351 of the 8,228, Electronic Claims were incomplete or had one or more defects or conditions of ineligibility. These 6,351 deficient Electronic Claims were filed by a total of 123 E-Claim filers. These filers were each sent an email to the email address included with their Claim ("Status Email") with an attached Excel spreadsheet containing detailed information associated with the accounts and indicating which of those accounts within the filing were deficient and/or rejected ("Status Spreadsheet").

23. Each Status Email sent to the email address of record provided with the Claim contained the following information:

(a) Notification to the filer that any Claims with deficiencies not corrected within

twenty (20) days from the date of the email may be rejected;

(b)  Notification to the filer of his, her, or its right to contest the rejection of the Claim(s) and request this Court's review of A.B. Data's administrative determination within twenty (20) days from the date of the Status Email; and

(c)  Instructions for how to submit corrections.

24.  The Status Spreadsheet attached to the Status Email contained the following information:

(a)  A listing of all accounts associated with the filing with unique identification numbers;

(b)  Identification of the individual accounts that were found to be deficient or ineligible;

(c)  The current status of the account in A.B. Data's database; and

(d)  The current Recognized Claim calculation associated with the account.

25.  Samples of the Status Email and the Status Spreadsheet are attached hereto as Exhibits B and C, respectively.

26.  The E-Claim Filers' responses were reviewed by A.B. Data's ECF Team, scanned and/or loaded into A.B. Data's database, and were associated with the corresponding Electronic Claims. Most of the deficient conditions assigned to Electronic Claims relate to deficiencies which cannot be cured unless additional transactional data is submitted. This includes deficiencies such as no eligible purchase of YRC common stock during the Class Period or no Recognized Claim under the Plan of Allocation. In total there were 691 Electronic Claims which did not contain an eligible purchase of YRC common stock and an additional 5,296 Electronic Claims which did not calculate a Recognized Claim under the Plan of Allocation. If a response corrected the defect(s) or affected an Electronic Claim's status, A.B. Data manually and/or programmatically updated the

database to reflect the changes in the status of the Electronic Claim. Of the 6,351 deficient Electronic Claims, 200 Claims were successfully cured.

## VIII.    **DISPUTED CLAIMS**

27.    As noted above, Claimants were advised that they had the right to contest A.B. Data's administrative determinations of deficiencies or ineligibility within twenty (20) days from the date of notification and that they could request that the dispute be submitted to the Court for review.    More specifically, Claimants were advised that if they disputed A.B. Data's determinations, they had to provide a statement indicating the grounds for contesting the determination, along with supporting documentation, and if the dispute concerning the Claim could not otherwise be resolved, Lead Counsel would thereafter present the request for review to the Court for a final determination.

28.    A.B. Data received two requests for Court review from Claimants.    In an attempt to resolve the disputes without necessitating the Court's intervention, A.B. Data promptly contacted the Claimants requesting Court review and sought to answer any questions, fully explain A.B. Data's determination of the Claims' status, and facilitate the submission of missing information or documentation where applicable.    As a result, the two Claims for which Court review had been requested have been resolved.

## IX.    **LATE BUT OTHERWISE ELIGIBLE CLAIMS**

29.    Of the 8,733 Claims A.B. Data received, 90 Claims were postmarked after the initial August 17, 2021, claim-filing deadline established by the Court.    A.B. Data processed all late Proofs of Claim received through April 1, 2022, and 19 have been found to be otherwise eligible in whole or in part (the "Late but Otherwise Eligible Claims").    The remaining 71 claims were rejected for no eligible purchase of YRC common stock during the Class Period, no Recognized Claim under the Court approved Plan of Allocation or were identified as a duplicate

claim submission. A.B. Data has not rejected any Claim received through April 1, 2022, solely based on its late submission, and A.B. Data believes no delay has resulted from the provisional acceptance of these Late but Otherwise Eligible Claims.  To the extent the Claims are eligible but for the fact that they were late, they are recommended herein for payment.

30.     However, there must be a final cut-off date after which no more Claims will be accepted so that there may be a proportional distribution of the Net Settlement Fund.  Acceptance of additional Claims or responses to letters received during the finalization of the administration and the preparation of this application would necessarily require a delay in the distribution. Accordingly, it is respectfully requested that the Court order that no Claim received or adjusted after April 1, 2022, be eligible for payment for any reason whatsoever.

## X.     QUALITY ASSURANCE

31.     An integral part of the claims administration process is the quality assurance review.  Here, after all of the Claims were processed, deficiency and/or ineligibility letters were mailed, and Claimants' responses to such letters were processed, supervisors and managers in A.B. Data's Quality Assurance Department performed quality assurance reviews.  The quality assurance reviews ensure the correctness and completeness of all Claims processed prior to preparing this Declaration and of all of A.B. Data's final documents in support of distribution of the Net Settlement Fund.  As part of the quality assurance review, A.B. Data:

(a)     Verified that all Claims had signatures of authorized individuals;

(b)     Verified that true duplicate Claims were identified, verified, and rejected;

(c)     Verified that excluded Class Members did not file Claims or their Claims were rejected upon review;

(d)     Performed a final quality assurance audit of Claims and all supporting documentation to ensure completeness of Claims;

11

(e)      Determined that all Claimants requiring deficiency and/or ineligibility letters were sent such letters;

(f)      Performed an audit of deficient Claims;

(g)      Performed an additional review of Claims with high Recognized Loss Amounts;

(h)      Audited Claims that were marked invalid;

(i)      Audited Claims with a Recognized Loss Amount equal to zero;

(j)      Performed other auditing based on Claims completion requirements and the approved calculation specifications based on the Court-approved Plan of Allocation; and

(k)      Tested the accuracy of the recognized loss amount calculation program.

32.      As part of its due diligence in processing Claims, A.B. Data conducted a search of all Claims filed in the Settlement using the database it maintains of known questionable claim filers. This database contains names, addresses, and aliases of individuals or entities that have been investigated by government agencies for questionable claim filing, as well as the names and contact information compiled from previous settlements that A.B. Data has administered where fraudulent Claims were received. A.B. Data updates the database on a regular basis. The database for the Settlement was searched for all individuals identified as questionable claim filers. A.B. Data performed searches based on name, aliases, address, and city/ZIP code. In addition, all of A.B. Data's claim processors are trained to identify any potentially inauthentic documentation when processing Claims, including Claims submitted by Claimants not previously captured in our database as previously identified questionable claim filers. Processors are instructed to flag Claims as "Questionable Claims" and route them to management for review. To date, zero Proofs of Claim have been identified as questionable for this Settlement.

## XI.   RECOMMENDATION FOR APPROVAL AND REJECTION

33.     As stated above, A.B. Data received a total of 8,733 Claims as of April 1, 2022.

### A.   Timely Submitted and Valid Claims

34.     A total of 8,643 Claims were received or postmarked on or before the Court-approved Claims submission deadline of August 17, 2021, of which 2,013 Claims were determined by A.B. Data to be valid. The total Recognized Loss Amount for these timely submitted and valid Claims is $23,732,774.49.

### B.   Late but Otherwise Eligible Claims

35.     A total of 90 Claims were received or postmarked after the initial Court-approved Claims submission deadline of August 17, 2021, but received on or before April 1, 2022, of which 19 Claims were determined by A.B. Data to be otherwise eligible. As set forth in paragraph 29 above, A.B. Data recommends payment of these 19 Claims. The total Recognized Loss Amount for these Late but Otherwise Eligible Claims is $301,840.15. Accordingly, A.B. Data has determined that 2,032 Claims (*i.e.*, 2,013 Timely Submitted and Valid Proofs of Claim and 19 Late but Otherwise Eligible Claims), with a total Recognized Loss Amount of $24,034,614.64, are acceptable and should receive a distribution.

### C.   Rejected Claims

36.     A total of 6,701 Claims are being recommended for rejection by the Court for the following reasons:

(a)     756 Claims had no purchase(s) of YRC common stock during the Class Period.

(b)     5,571 Claims did not result in a Recognized Claim under the Court-approved Plan of Allocation.

(c)     368 Claims were duplicates.

(d)     6 Claims were withdrawn.

13

**D.** **List of All Claims**

37.     Attached hereto as Exhibits D through F are listings of all Claims submitted in connection with the Settlement:

(a)     Exhibit D lists valid and timely Claims and shows each Claimant's Recognized Claim amount.  A.B. Data recommends payment of these Claims.

(b)     Exhibit E lists Claims that are considered Late but Otherwise Eligible and shows each Claimant's Recognized Claim amount. A.B. Data recommends payment of these Claims.

(c)     Exhibit F lists the rejected Claims and the reasons for rejection.

## XII.     FEES AND DISBURSEMENTS

38.     A.B. Data agreed to be the Claims Administrator in exchange for payment of its fees and expenses.  Lead Counsel has received invoices for all of the work A.B. Data performed with respect to the provision of notice and administration of the Settlement.  These services include, but are not limited to, printing and mailing over 47,564 Postcard Notices, processing the Claim Forms submitted, communicating with thousands of Class Members, sending 437 deficiency and rejection letters, processing responses to the deficiency and rejection letters, performing fraud checks, and performing quality assurance reviews.  Future work will include distributing the Net Settlement Fund to the Authorized Claimants and following up with Authorized Claimants that fail to cash checks.  The cost of the administration for this project up to the Initial Distribution of the Net Settlement Fund ("Initial Distribution") is $113,022.14.  To date, A.B. Data has received payment of $108,475.53.  Accordingly, there is a total of $4,546.61 payable to A.B. Data.  The estimated cost of conducting the Initial Distribution is $11,978.00 (attached hereto as Exhibit G is a copy of A.B. Data's estimate to conduct the Initial Distribution).  Therefore, the total amount requested from the Settlement Fund is $16,524.61, consisting of

14

$4,546.61 in fees and expenses already incurred and $11,978.00 in anticipation of the work that will be performed for the Initial Distribution, to satisfy all administration fees and expenses.[3]

## XIII.    DISTRIBUTION PLAN FOR THE NET SETTLEMENT FUND

39.    If the Court concurs with A.B. Data's determinations concerning the provisionally accepted and rejected Claims, including the Late but Otherwise Eligible Claims, A.B. Data respectfully recommends the following distribution plan (the "Distribution Plan"):

(a)    A.B. Data will conduct an Initial Distribution of the Net Settlement Fund, after deducting all payments approved by the Court, after payment of any estimated taxes, the costs of preparing appropriate tax returns, and any escrow fees, as follows:

  i.  A.B. Data will calculate award amounts to all Authorized Claimants by calculating their *pro rata* share of the Net Settlement Fund in accordance with the Court-approved Plan of Allocation.

  ii.  A.B. Data will, pursuant to the terms of the Plan of Allocation, eliminate any Authorized Claimant whose distribution payment calculates to less than $20.00.  Such Claimants will not receive any distribution from the Net Settlement Fund.

  iii.  After eliminating Claimants who would have received less than $20.00, A.B. Data will recalculate the *pro rata* distribution payments for Authorized Claimants who would receive $20.00 or more.

  iv.  A.B. Data will then conduct the Initial Distribution in accordance with the Court's order.

---

[3] If the estimate of fees and expenses to conduct the Initial Distribution is greater than the actual cost to conduct the distribution, the excess will be returned to the Net Settlement Fund.

v. In order to encourage Authorized Claimants to promptly deposit their payments, all Initial Distribution checks will bear the notation "DEPOSIT PROMPTLY; VOID AND SUBJECT TO RE-DISTRIBUTION IF NOT NEGOTIATED WITHIN 120 DAYS OF DISTRIBUTION."[4]

vi. Authorized Claimants who do not negotiate their Initial Distribution checks within the time allotted or according to the conditions set forth in footnote 3 will irrevocably forfeit all recovery from the Settlement. The funds allocated to all such stale-dated checks will be available for redistribution to other Authorized Claimants in the Second Distribution described below. Similarly, Authorized Claimants who do not negotiate subsequent distributions within the time allotted or according to the conditions set forth in footnote 3 will irrevocably forfeit any further recovery from the Net Settlement Fund.

(b) After A.B. Data has made reasonable and diligent efforts to have Authorized Claimants negotiate their Initial Distribution checks, if there is any balance remaining in the Net Settlement Fund after at least seven (7) months after the

---

[4] For Authorized Claimants whose checks are returned as undeliverable, A.B. Data will endeavor to locate new addresses by running the undeliverable addresses through address lookup services. Where a new address is located, A.B. Data will update the database accordingly and re-issue a distribution check to the Authorized Claimant at the new address. In the event an Authorized Claimant loses or damages his, her, or its check, or otherwise requires a new check, A.B. Data will issue replacements. Distribution re-issues will be undertaken only upon written instructions from the Authorized Claimant, provided that the Authorized Claimant returns the previous check where appropriate. For all checks, A.B. Data will void the initial payment prior to re-issuing a payment. Authorized Claimants requesting re-issuance of checks will be informed that, if they do not cash their Initial Distribution checks within 30 days of the mailing of such reissued check, their check will lapse, their entitlement to recovery will be irrevocably forfeited, and the funds will be re-allocated to other Authorized Claimants. Reissue requests for lost or damaged checks will be granted after the void date on the checks, however, void dates on such reissues will be adjusted so as not to delay future re-distributions. Requests for reissued checks in connection with the Second Distribution and any subsequent distributions will be handled in the same manner.

Initial Distribution (whether by reason of tax refunds, uncashed checks, or otherwise), then, if Lead Counsel, in consultation with A.B. Data, determine that it is cost-effective to do so, A.B. Data will conduct a second distribution of the Net Settlement Fund (the "Second Distribution"). Any amounts remaining in the Net Settlement Fund after the Initial Distribution, after deducting A.B. Data's fees and expenses incurred in connection with administering the Settlement for which it has not yet been paid (including the estimated costs of such Second Distribution), and after deducting the payment of any estimated taxes, the costs of preparing appropriate tax returns, and any escrow fees, will be distributed to all Authorized Claimants in the Initial Distribution who cashed their distribution checks and would receive at least $20.00 from the Second Distribution.

(c)   Additional redistributions to Authorized Claimants who have cashed their prior checks and would receive at least $20.00 on such additional redistributions will continue if Lead Counsel, in consultation with A.B. Data, determine that such redistributions will be cost-effective, after deducting A.B. Data's fees and expenses incurred in connection with administering the Settlement for which it has not yet been paid (including the estimated costs of such further distribution), and after deducting the payment of any estimated taxes, the costs of preparing appropriate tax returns, and any escrow fees.

(d)   At such time as Lead Counsel, in consultation with A.B. Data, determines that further redistribution of the funds remaining in the Net Settlement Fund is not cost-effective, Lead Counsel will seek instructions from the Court.

(e)   No new Proof of Claim may be accepted after April 1, 2022, and no further

17

adjustments to submitted Proofs of Claim may be made for any reason after April 1, 2022.

(f)      Unless otherwise ordered by the Court, one year after the Second Distribution, if that occurs, or, if there is no Second Distribution, two years after the Initial Distribution, A.B. Data will destroy the paper copies of the Claims and all supporting documentation, and one year after all funds have been distributed, A.B. Data will destroy electronic copies of the same.

## XIV.   CONCLUSION

40.      A.B. Data respectfully requests that the Court enter an Order: (a) approving its administrative determinations accepting and rejecting the Proofs of Claim submitted herein and received on or before April 1, 2022; and (b) approving the Distribution Plan.  A.B. Data further respectfully requests payment of: (a) outstanding fees and expenses already incurred in connection with the administration; and (b) its estimate to complete the Initial Distribution, as set forth in Exhibit G hereto.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 22nd day of April 2022 in Milwaukee, Wisconsin.

_____

Eric A. Nordskog

18